UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

---

DARKPULSE, INC.,

                                        Plaintiff,

                    – against –

FIRSTFIRE GLOBAL OPPORTUNITIES FUND,
LLC, and ELI FIREMAN,
                                        Defendants.

---

**OPINION AND ORDER**
21 Civ. 11222 (ER)

Ramos, D.J.:

DarkPulse, Inc. brought this action against FirstFire Global Opportunities Fund, LLC and

its managing member Eli Fireman on December 31, 2021, alleging, *inter alia*, violations of the

Securities Exchange Act of 1934 and seeking rescission of the parties' convertible promissory

notes under § 29(b) of the Act.  Before the Court is the motion to dismiss the First Amended

Complaint in its entirety and related motion for oral argument.  For the reasons set forth below,

Defendants' motion to dismiss is GRANTED.

## I.     FACTUAL BACKGROUND[1]

### *The Parties*

FirstFire Global Opportunities Fund ("FirstFire") is a New York-based, Delaware-

registered investment fund, which specializes in loaning money to distressed businesses with

market capitalizations under $750 million.  ¶¶ 19–20, 54.  Between March 2015 and September

2021, public filings show that FirstFire purchased more than 107 promissory notes for

---

[1] The following facts are based on the First Amended Complaint, which the Court accepts as true and construes in
the light most favorable to DarkPulse.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  Unless otherwise
noted, citations to "¶ __" refer to the First Amended Complaint.

approximately 89 issuers and sold more than one billion newly-issued shares of stock obtained pursuant to those notes into the public market for its own account.  ¶ 66.  DarkPulse, Inc. is a New York-based, Delaware-registered "microcap" company, that trades stocks in emerging companies on the "over the counter" market.[2]  ¶¶ 17–18.

### The First Transaction

On September 20, 2018, FirstFire loaned DarkPulse $225,000 in exchange for a convertible promissory note (the "2018 Note") with a principal amount of $247,500 via a securities purchase agreement (the "2018 SPA") (together with the 2018 Note, the "First Transaction").  ¶¶ 26–27; *see* Doc. 29-1.  The 2018 Note provided an 8% interest rate *per annum*, a 10% original issue discount, and a nine-month maturity date.[3]  ¶ 27.  The 2018 Note further gave FirstFire the right to convert any portion of the debt for company stock in DarkPulse, at a 30% discount to the market price, beginning 180 days after execution.  ¶ 28.  It also included a New York forum-selection clause and a Nevada choice-of-law clause.[4]  Doc. 29-1 at 16 § 4.6.

---

[2] A microcap company is a publicly traded business with a market capitalization between approximately $50 million and $300 million.  An "over-the-counter" market is a decentralized market in which market participants trade stocks or other instruments directly between parties, without a central exchange or broker.

[3] A convertible promissory note is a type of debt security that gives the lender, here FirstFire, the right to take repayment of a loan either in cash or in newly-issued company stock.  Like an option or warrant, the lender is given the right to purchase company stock at a particular strike price; at conversion, the lender "converts" the note, *i.e.*, it uses the accrued debt to "purchase" the stock instead of receiving cash.  *See* Doc. 29-1 at 3.

[4] Specifically, the 2018 Note provides:  "This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Note or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts or federal courts located in the state and county of New York.  [DarkPulse] hereby irrevocably waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*."  *Id.* at 16 § 4.6.

Pursuant to the conversion option, over a period of approximately one and one-half years, between June 7, 2019 and February 18, 2021, FirstFire effected 18 distinct conversions of debt into newly-issued DarkPulse common stock.[5] ¶¶ 29–32. In all, FirstFire exchanged $247,500 worth of debt—the entirety of the principal amount of the 2018 Note—for 879,400,000 shares of stock. ¶ 33. Presently, the estimated open market value of the stock acquired by FirstFire from converting debt under the 2018 Note totals $10,738,900. ¶ 34.

In the days following each FirstFire conversion, the average daily trading volume in DarkPulse stock increased dramatically. *Id.* Thirty days prior to FirstFire's first conversion, for example, DarkPulse had a trading volume (*i.e.*, the total number of shares traded during a given period) of 4,646,131. *Id.* Ten days following the June 7, 2019 conversion, that figure nearly doubled to 8,235,159 trades. *Id.* And ten days following the June 24, 2019 conversion, the figure rose to 12,059,811 trades. *Id.*

### The Second Transaction

On April 26, 2021, FirstFire loaned DarkPulse $750,000 in exchange for a convertible promissory note (the "2021 Note") with a principal amount of $825,000 via a securities purchase agreement (the "2021 SPA"). ¶ 37; *see* Doc. 29-2. The 2021 Note provided a 10% interest rate *per annum* and nine-month maturity date and incorporates by reference a registration rights agreement (the "RRA") (altogether, the "Second Transaction," and, with the First Transaction,

---

[5] Specifically, the conversions occurred on: June 7, 2019 (converting $5,340 of debt for 7,000,000 shares of common stock); June 18, 2019 ($3,331 for 7,000,000 shares); June 24, 2019 ($2,778 for 7,900,000 shares); July 8, 2019 ($1,560 for 6,000,000 shares); July 15, 2019 ($1,560 for 6,000,000 shares); July 24, 2019 ($2,708 for 11,600,000 shares); July 30, 2019 ($3,296 for 13,700,000 shares); August 5, 2019 ($3,008 for 16,100,000 shares); August 9, 2019 ($1,492 for 17,800,000 shares); August 15, 2019 (converting $1,426 for 20,900,000 shares); September 6, 2019 ($4,900 for 35,000,000 shares); September 10, 2019 ($4,900 for 35,000,000 shares); September 20, 2019 ($2,765 for 35,900,000 shares); September 1, 2020 ($7,000 for 85,000,000 shares); January 14, 2021 ($28,000 for 100,000,000 shares); January 25, 2021 ($42,000 for 150,000,000 shares); February 5, 2021 ($28,000 for 100,000,000 shares); and February 18, 2021 ($103,436 for 220,000,000 shares). ¶ 32.

the "Transactions".  ¶ 37; *See* Docs. 29-2; 32-5.[6]  The 2021 Note required DarkPulse to issue

FirstFire 60,000,000 "Commitment Shares" upon execution of the agreement.  Doc. 29-2 at 22 §

C.  On the date of execution of the Second Transaction, DarkPulse stock was trading at a price of

$0.019 per share; the Commitment Shares therefore had a face value of approximately

$1,140,000.  ¶ 39.

The 2021 Note also included a New York choice-of-law and forum-selection clause,

providing that its terms shall be governed by and construed in accordance with the laws of New

York, and that any action brought by either party against the other concerning the Second

Transaction must be brought only in the state or federal courts located in New York.  *Id.* at 17 §

4.6.

Similar to the 2018 Note, the 2021 Note includes a conversion right, whereby FirstFire

could forego repayment of the 2021 Note in cash and instead convert "in whole or in part" any

amounts owed to shares of DarkPulse common stock on any trading day, 180 days following

execution of the transaction.  Doc. 29-2 at 3 §§ 1.1 and 1.4(a).  In contrast to the variable

conversion price of the 2018 Note, the 2021 Note specified a fixed per-share conversion price of

$0.015—the "Fixed Conversion Price"—or, alternatively, a "Default Fixed Conversion Price" of

$0.005, applicable if an event of default occurs.  ¶ 39; Doc. 29-2 at 4 § 1.2(a).

The 2021 Note and RRA together defined "Events of Default."  Relevant here, two such

Events of Default include:  (1) DarkPulse failing to use commercially reasonable efforts to file a

registration statement covering the resale of the shares of stock issued or issuable to FirstFire

---

[6] The RRA was filed by Defendants as Ex. E to Aaron H. Marks' declaration in support of the motion to dismiss.
Doc. 32-5.  In deciding a motion to dismiss, courts may consider "any written instrument attached to the complaint,
statements or documents incorporated into the complaint by reference, legally required public disclosure documents
filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the
suit." *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The RRA is expressly referenced in
the FAC.  Accordingly, the Court takes judicial notice of Doc. 32-5 as incorporated into the FAC by reference.

pursuant to the 2021 SPA (the "Registrable Shares") within ninety days after execution of the

Second Transaction (*i.e.*, by July 26, 2021), *see* ¶ 49 n.14; Doc. 32-5 at 3 § 2(b); and (2)

DarkPulse issuing common shares pursuant to an equity line of credit or otherwise in connection

with a variable rate transaction entered after the date of the 2021 Note, *see* Doc. 29-2 at 15 §

3.16.

### *Purported Events of Default*

DarkPulse's public filings since April 26, 2021 do not include any statements registering

the shares that were the subject of the 2021 Note.  Additionally, as shown by DarkPulse's Form

424B4 Prospectus (the "Prospectus"), on August 19, 2021, DarkPulse entered into a purchase

agreement with non-party, GHS Investments, LLC (the "August GHS Agreement").  *See* Doc.

32-1.[7]  The August GHS Agreement granted DarkPulse the right to sell to GHS up to

$45,000,000 worth of shares of DarkPulse common stock at variable rates from time to time at

DarkPulse's discretion.  *See* Doc. 32-1 at 21.  On November 9, 2021, DarkPulse entered into a

second purchase agreement with GHS (the "November GHS Agreement," together with the

August GHS Agreement, the "GHS Agreements") granting DarkPulse the right to sell to GHS up

to an additional $30,000,000 worth of shares of DarkPulse common stock at variable rates from

time to time at DarkPulse's discretion.  *Id.* 15.  DarkPulse issued shares of its common stock to

GHS pursuant to the August GHS Agreement on at least five occasions between August 19, 2021

and October 14, 2021.  *Id.* at 21–22.

### *The Amendment*

---

[7] DarkPulse filed its Form 424B4 Prospectus with the SEC on May 3, 2022.  *See* Doc. 32-1.  The Court takes judicial notice of this filing.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 98; *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (taking judicial notice of documents cited in securities fraud complaint).

On November 4, 2021, Defendant Eli Fireman, the managing member of FirstFire, met with DarkPulse's Chief Executive Officer, Dennis O'Leary, while on a business trip in Las Vegas. ¶ 46. Fireman presented O'Leary with a one-page "Amendment No. 1 to the Convertible Promissory Note Issued on April 26, 2021" (the "Amendment"), claiming that it would enable DarkPulse to complete future acquisitions without having to notify O'Leary. *Id.*; *see* Doc. 32-6.[8] Fireman did not mention to O'Leary that the Amendment replaced both the New York choice-of-law and forum-selection provisions of the 2021 Note with Delaware provisions. ¶ 47. The Amendment consists of the following four provisions:

1. Remove from the Securities Purchase Agreement Section 4. Subsection d . . . .

2. **Governing Law; Venue**. The Transaction Documents shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement, the Note, the Warrant, or any other agreement, certificate, instrument, or document contemplated hereby shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY . . . .

3. The Parties have mutually agreed to the provisions set forth herein and are doing so without the exchange or any additional consideration . . . .

4. This Amendment shall be deemed part of, but shall take precedence over and supersede any provisions to the contrary contained in the Note. Except as specifically modified hereby, all of the provisions of the Note, which are not in conflict with the terms of this Amendment, shall remain in full force and effect.

---

[8] The Court takes judicial notice of the Amendment as incorporated into the FAC by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 98.

Doc. 32-6 at 2–3.  O'Leary and Fireman signed the Amendment, which is dated October 14,

2021, and purported to be effective as of April 26, 2021.[9]  *Id.* at 2–4.

### *Conversion Pursuant to the Second Transaction*

On November 15, 2021, FirstFire notified DarkPulse of its intent to convert the full

amount of debt under the 2021 Note (*i.e.*, the $825,000 principal, plus $61,875 in outstanding

interest) into shares of common stock, using the $0.005 Default Fixed Conversion Price.  ¶¶ 48–

49.  Two days later, with DarkPulse stock trading at $0.1334 per share, a transfer agent delivered

to FirstFire 177,375,000 shares of stock, having an estimated market value of $23,661,825.  ¶ 49.

## II.    PROCEDURAL HISTORY

DarkPulse filed this action on December 31, 2021.  Doc. 1. On January 17, 2022,

DarkPulse moved for a preliminary injunction to restrain FirstFire from selling DarkPulse stock

that it had acquired pursuant to the 2021 Note, reasoning that the 2021 Note is unlawful under

the Securities Exchange Act of 1934 (the "Exchange Act") and would cause irreparable harm to

DarkPulse.  Doc. 17.  On January 21, 2022, the Court heard oral argument DarkPulse's motion

for a preliminary injunction, where counsel for DarkPulse raised the additional argument, based

on the New York Court of Appeals' decision in *Adar Bays,* that the 2021 Note is void *ab initio*,

under New York's criminal usury law, New York Penal Code § 190.40.[10]  *See* Doc. 24, January

21, 2022 Transcript, at 3:1–5:25.  That same day, the Court issued an Order, Doc. 23, denying

---

[9] Notably, on October 14, 2021—the same date as the date of the Amendment—the New York Court of Appeals issued a decision in *Adar Bays, Inc., v. GeneSYS ID*, 37 N.Y.3d 320 (2021), holding that pursuant to New York General Obligations Law § 5-511(1), a criminally usurious loan (i.e., a loan charging an interest rate of 25% per annum or grater, *see* New York Penal Law § 190.40) is *void ab initio*, even if the borrower is a corporation.  ¶ 46.

[10] During the hearing, counsel for FirstFire acknowledged that the timing of the October 14, 2021 Amendment and the October 14, 2021 *Adar Bays* decision "would suggest that there's a connection there[.]"  Doc. 24 at 26:17–27:2; *see also id.* at 28:15–18 (FirstFire's Counsel:  "Now, [the Court] asked [if FirstFire] g[o]t the [A]mendment because of the *Adar Bays* decision.  The timing, I agree, was very close in time, but the *Adar Bays* decision really has nothing to do with this case.").

DarkPulse's motion for the reasons stated on the record, namely that: the forum selection clause is presumptively enforceable; DarkPulse is unlikely to succeed on the merits; DarkPulse failed to establish that they would suffer irreparable harm absent an injunction; and DarkPulse demonstrated neither that the balance of hardship favors it nor that the public interest would be disserved by denying its motion, *see* Doc. 24 at 45:6–46:14.

On May 5, 2022, DarkPulse filed the First Amended Complaint (the "FAC"), which consists of six counts. Doc. 29. Counts I and II allege that FirstFire violated the Securities Exchange Act of 1934 (the "Exchange Act") by unlawfully transacting in securities as an unregistered dealer via the Transactions. 15 U.S.C. § 78o(a)(1). Count III claims that Fireman violated § 20(a) of the Exchange Act by acting as the control person who caused FirstFire to engage in the unlawful Transactions. 15 U.S.C. § 78(t). Count IV, brought against both defendants, alleges that the FrstFire conducted the affairs of a RICO enterprise in violation of 18 U.S.C. § 1962(c). Counts V and VI allege unjust enrichment and constructive trust against both defendants. *See* Doc. 29 at 18–24. DarkPulse further seeks declaratory judgment that the Transactions are void and subject to recission pursuant to § 78c(c) of the Exchange Act and requests that the Court compel FirstFire to return all Darkpulse stock obtained via the Transactions.

On May 26, 2022, Defendants moved to dismiss the FAC in its entirety, pursuant to Federal Rules of Civil Procedure ("F.R.C.P.") 12(b)(1), (3), and (6). Doc. 30. Specifically, Defendants argue: (1) that Counts I and II, as they pertain to the 2021 Note, should be dismissed because the parties have agreed that Delaware is the exclusive forum for all actions arising under its terms; (2) Counts I through III are time barred as to the 2018 Note and otherwise fail to state a claim as to both the Transactions; (3) Count IV fails to state a claim; and (4) absent a federal

question, the remaining state law claims should be dismissed for lack of subject matter jurisdiction.  For the reasons set forth below, the motion is GRANTED.

## III.  STANDARD

### a.  12(b)(1):  Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings . . . ."  *Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

### b.  12(b)(3):  Lack of Proper Venue

"The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction."  *Casville Invs., Ltd. v. Kates*, 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).  "When a defendant challenges either the jurisdiction or venue of the court, the plaintiff bears the burden of showing that both are proper." *Id.*  (citing *DiStefano v. Carozzi*

9

*N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Savoy Senior Hous. Corp. v. TRBC Ministries*, 401

B.R. 589, 596 (S.D.N.Y. 2009)).  To meet this burden, the plaintiff must plead facts sufficient for

prima facie showing of jurisdiction or venue.  *Glasbrenner*, 417 F.3d at 355 (citing *CutCo Indus.*

*v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).  Venue is proper in the chosen forum if:  (1)

at least one defendant resides in the district and all the defendants reside in the same state in

which the district is located; (2) a "substantial part" of the events giving rise to the claim

occurred in the district; or (3) the defendant is subject to personal jurisdiction in the district and

"there is no district in which an action may otherwise be brought."  28 U.S.C. § 1391(b).

### c.  12(b)(6):  Failure to State a Claim

"To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v.*

*Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556.  The plaintiff must allege sufficient facts to show "more than a

sheer possibility that a defendant has acted unlawfully."  *Id.* (citing *Twombly*, 550 U.S. at

557).  However, this "flexible 'plausibility standard'" is not a heightened pleading

standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted),

and "a complaint . . . does not need detailed factual allegations" to survive a motion to

dismiss, *Twombly*, 550 U.S. at 555.

The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims."  *Sikhs for Justice v.*

*Nath*, 893 F. Supp.2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## IV. DISCUSSION

### a. The Delaware Forum-Selection Clause in the Amendment

Defendants argue that Counts I and II—which allege that FirstFire unlawfully transacted in securities as an unregistered dealer—should be dismissed as they relate to the Second Transaction because the parties have agreed that Delaware is the exclusive forum for all actions arising under its terms. *See* Doc. 32-6 at 2.

The Second Circuit has adopted a "strong policy of enforcing forum-selection agreements." *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1280 (S.D.N.Y. 1992). In deciding whether a forum-selection clause is valid and enforceable, a court must determine:

> (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, *i.e.*, . . . whether

11

the parties are required to bring any . . . dispute to the designated forum or simply *permitted* to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause.

*NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 343 (S.D.N.Y. 2020) (quoting *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014)). "A party can overcome this presumption only by . . . 'making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching,'" *Martinez*, 740 F.3d at 217 (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383–84 (2d Cir. 2007), "or that the "clause[] contravene[s] a strong public policy of the forum state." *Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, No. 18 Civ 3601 (JMA) (AYS), 2021 WL 4463921, at \*5 (E.D.N.Y. Aug. 17, 2021), *R.&R. adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021).

Here, the Amendment provides that "[a]ny action brought by either party against the other concerning the transactions contemplated by [the Amendment and] the [2021] Note . . . shall be brought only in the state courts . . . or in the federal courts . . . of Delaware." Doc. 32-6 at 2. This clause is presumptively enforceable for the following reasons. First, the provision was reasonably communicated to DarkPulse. The FAC states that Fireman presented O'Leary with the one-page Amendment on November 4, 2021. It notes only that "Fireman failed to mention to O'Leary that the [A]mendment . . . replaced the choice-of-law provision." ¶¶ 46–47. Assuming that were true, the change is nonetheless apparent on the face of the document; it is highlighted with a bolded and underlined heading: "**Governing Law; Venue**."[11] Doc. 32-6 at 2. Courts have enforced similarly emphasized provisions against less sophisticated litigants. *See, e.g.,*

---

[11] The only other change effected by the Amendment was removing "from the [2021 SPA] Section 4. Subsection d. **Restriction on Activities**." Doc. 36-2 at 4. Section 4, subsection d. provided: "[DarkPulse] shall not . . . without [FirstFire's] prior written consent, which consent shall not be unreasonably withheld: (a) change the nature of its business in any material respect; or (b) sell, divest, acquire, [or] change the structure of any material assets other than in the ordinary course of business. Notwithstanding the forgoing, any prior public disclosure of [DarkPulse's] intent or contemplation to sell, divest, acquire, or change the structure of any material assets shall not require [FirstFire's] prior written consent. Doc. 29-2 at 34–35.

*Seffron v. Sun Line Cruises, Inc.,* 67 F.3d 7, 9 (2d Cir. 1995) (holding that a forum-selection clause on the back of a three-page, double-sided cruise ship ticket, situated beneath the bolded headline "important notice—read before accepting," provided sufficient notice of the provision for it to be enforceable against a passenger). Furthermore, Fireman was not required to explain in detail the contents of the one-page Amendment to O'Leary for it to be enforceable. *See Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) ("If [a businessman] did not read [a contract's terms] or hire counsel to do so, he is the victim of his own lack of diligence, [and] not [the defendants'] misconduct."). Accordingly, DarkPulse had sufficient notice of the forum-selection clause in the Amendment.

Second, the provision is mandatory, not permissive. It provides that actions "concerning the transactions contemplated by [the Amendment and the 2021 Note] shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware." Doc. 29-2 at 2. Third, the forum-selection clause governs the parties and the claims at issue in this action to the extent they arise out of the Second Transaction. *Id.* For these reasons, the forum-selection clause is presumptively enforceable.

DarkPulse argues that the Amendment is invalid because the 2021 Note is void and unenforceable, as it violates New York usury law.[12] *See* Doc. 34 at 15. Specifically, DarkPulse contends that the provision in the 2021 Note requiring DarkPulse to issue FirstFire 60,000,000 shares at the time of execution—which bore a fair market value of $4,800,000—renders the First Transaction void *ab initio*.

New York Penal Code § 190.40 "prohibits corporations from interposing a defense of usury to an action to collect a debt except insofar as the rate of interest exceeds the criminal

---

[12] DarkPulse offers no other argument for why enforcing the Amendment would be unjust or contravene New York public policy.

usury rate of 25% per annum." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22 Civ. 1245 (JSR), 2022 WL 2297768, at *12 (S.D.N.Y. June 27, 2022).  Where the interest rate exceeds the criminal usury rate, a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument *ab initio*.  *See id.* (citing *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021)).  "'However, New York courts have uniformly construed [§ 190.40] as limited to the affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement.'"  *Streamlined Consultants, Inc. v. EBF Holdings*, No. 21 Civ. 9528 (KMK), 2022 WL 4368114, at * 3 (S.D.N.Y. Sept. 20, 2022) (quoting *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22 Civ. 1245 (JSR), 2022 WL 2297768, at *12 (S.D.N.Y. June 27, 2022) (collecting cases)); *see also Paycation Travel, Inc. v. Glob. Merch. Cash, Inc.*, 141 N.Y.S.3d 319, 320 (App. Div. 2021) ("General Obligations Law § 5-521 bars a corporation such as the plaintiff from asserting usury in any action, except in the case of criminal usury as defined in [] § 190.40, and then *only as a defense to an action to recover repayment of a loan*, and not as a basis for a cause of action asserted by the corporation for affirmative relief.") (emphasis added).

In *Streamlined Consultants*, for example, the parties entered into a revenue-based funding agreement, whereby the defendant purchased a 15% share of the plaintiff's future receipts for a fixed, upfront purchase price.  2022 WL 4368114, at *1.  Rather than requiring the parties to calculate the precise dollar amount to be withdrawn on a daily basis, the agreement provided for an automatic daily payment based on the plaintiff's monthly average sales.  *Id.*  Six weeks after entering into the agreement, however, the plaintiff brought an action seeking to invalidate the contract, alleging that it had been loaned money at a criminally usurious rate.  *Id.*  The court

granted the defendant's motion to dismiss the action in its entirety, reasoning that "§ 190.40 is strictly an affirmative defense to an action seeking repayment of a loan and may not, as here, be attempted as a means to [nullify an agreement and] effect recovery by the corporate borrower." *Id.* at *3; *see also Haymount Urgent Care,* 2022 WL 2297768, at *12 (denying the plaintiffs declaratory judgment that a contract was criminally usurious).

Similar to the plaintiff in *Streamlined Consultants*, DarkPulse here attempts to use New York's usury statute as a sword to void the Second Transaction, circumvent the forum-selection clause in the Amendment, and maintain the instant action against Defendants. The sole case relied upon by DarkPulse for the proposition that it has the right to do so is *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 335 (2021). There, the Court of Appeals upheld a defendant-borrower's invocation of § 190.40 to protect against the enforcement of a usurious contract, reasoning that a contract containing a criminally usurious loan is void *ab initio* under New York General Obligations Law § 5-511. *Id.* Nowhere in its opinion, however, did the *Adar Bays* court suggest that a plaintiff may use § 190.40 affirmatively; rather, the opinion exclusively characterizes usury as a defense. *See generally id.* What's more, the courts in both *Streamlined Consultants* and *Haymount* expressly relied upon *Adar*. And like the plaintiffs in those cases, DarkPulse does not "present [any] countervailing case law suggesting that [it] can seek affirmative relief under the New York usury statute." *Haymount Urgent Care,* 2022 WL 2297768, at *12. Accordingly, Counts I and II, as they relate to the 2021 Note, are dismissed.

### b. Statute of Limitations

DarkPulse brings Counts I and II pursuant to § 29(b), alleging that FirstFire violated the Exchange Act by transacting in securities as an unregistered dealer in violation of § 15(a). DarkPulse also brings Count III pursuant to § 29(b), claiming that Fireman violated the

Exchange Act by acting as the control person who caused FirstFire to engage in the purportedly

unlawful Transactions in violation of § 20(a). Defendants argue that Counts I through III are

time-barred as to the September 2018 Note.

> Section 15(a) of the Exchange Act states that it is

> unlawful for any broker or dealer . . . to make use of . . . any means or instrumentality of
> interstate commerce to effect any transactions in, or to induce or attempt to induce the
> purchase or sale of, any security . . . unless such broker or dealer is registered in
> accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).[13] Section 15, however, does not have a limitations period. But § 29(b) of

the Exchange Act provides one, at least with respect to certain claims arising under § 15.[14]

Specifically, § 29(b) provides:

> No contract shall be deemed to be void by reason of this subsection in any action
> maintained in reliance upon this subsection, by any person to or for whom
> any broker or dealer sells, or from or for whom any broker or dealer purchases,
> a security *in violation of any rule or regulation prescribed pursuant to paragraph
> (1) or (2) of subsection (c) of section 78o of this title*, unless such action is
> brought within one year after the discovery that such sale or purchase involves
> such violation and within three years after such violation.

*Id.* Accordingly, while § 29(b) imposes a one/three-year limitations period for actions brought

pursuant to (1) or (2) of subsection (c) of § 15, it is *silent* as to claims arising under § 15(a). *Id.*

Courts must therefore determine which limitations period to apply.

> Generally, courts applied the § 29(b) one/three-year limitations period governing §

15(c)(1) and (2) claims to § 15(a) claims. On this point, *Kahn v. Kohlberg, Kravis, Roberts &

Co.* is particularly instructive. 970 F.2d 1030 (2d Cir. 1992), *cert. denied*, 506 U.S. 986 (1992).

---

[13] Section (20)(a) of the Exchange Act provides that anyone "who, directly or indirectly, controls a[n entity] liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as" the controlled entity, unless "the controlling person acted in good faith and did not directly or indirectly induce the acts or acts constituting a violation or cause of action." 15 U.S.C. § 78(t).

[14] Section 29(b) provides in relevant part that "any contract made in violation of any provision of this chapter or any rule of regulation thereunder . . . shall be void." 15 U.S.C. § 78cc(b).

There, the plaintiff brought a claim for rescission under § 215 of the Investment Advisers Act (IAA) based on the defendant's failure to register as an investment adviser, as required by § 80b-3 of the IAA. *Id.* at 1032. Like § 29(b) of the Exchange Act, § 215 of the IAA provides that contracts whose formation or performance would violate the act are void. *Id.* at 1032–33. Section 215 also does not specify a limitations period for bringing a recission action pursuant to § 80b-3. *Id.* 1033. To decide the appropriate limitations period, the court—pursuant to the approach set forth by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 498 U.S. 894 (1990)—determined that the period should derive from a federal statute, rather than a state statute, since § 215 claims often involve an interstate transaction and have some nexus to interstate or foreign commerce. *Kahn*, 970 F.2d at 1033–35. With respect to *which* federal statute the court should borrow, the defendants argued that the Exchange Act is most similar to the IAA, and that its one/three-year provision should govern. *Id.* at 1038–39. The plaintiff disagreed, asserting that the Exchange Act's limitations period only pertained to claims involving *fraud*, and that it would be inappropriate to apply the period to a non-fraud action, premised on the defendant's failure to register. *Id.* The court rejected the plaintiff's argument and applied the one/three-year limitations period, observing that Congress enacted the IAA and the Exchange Act for the "almost identical" purpose: for "avoiding frauds." *Id.* The court specifically noted that § 15 of the Exchange Act "is an antifraud provision." *Id.*

Post-*Kahn*, courts in this Circuit have routinely imposed the § 29(b) one/three-year limitations rule on § 15(a) claims predicated on a dealer's failure to register. In *Alpha Cap. Anstalt v. Oxysure Systems, Inc.*, for example, a court applied the limitations period to bar an affirmative defense raised under § 15(a) to a breach of contract action. 216 F. Supp. 3d 403, 408 (S.D.N.Y. Mar. 31, 2022) (finding the defendants "barred from raising any defense based on an

implied right of action under § 29(b) of the Exchange Act," because § 29(b)'s "one-year statute of limitations runs from the time when an individual could have, through the exercise of reasonable diligence, discovered the fraud at issue," and the defendant admitted to knowing that the plaintiff's agent was not a licensed broker-dealer.).  Similarly, in *Anderson v. Binance*, a court applied the one-year limitations period to a § 29(b) claim based on the defendant acting as unregistered exchange.  No. 20 Civ. 2803, 2022 WL 976824, at *3 (S.D.N.Y. Mar. 31, 2022); *see also Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (finding that a one/three-year limitations applies where §15(a) underlies the claim).

Against the weight of the foregoing authority, DarkPulse argues that the Court should apply the two/five-year limitations period specified in the Sarbanes Oxley Act.  28 U.S.C. § 1658(b).  DarkPulse, however, does not cite *any* instance where a court has applied this limitations period to a § 29(b) claim based on a § 15(a) violation.  It asserts only that the Sarbanes Oxley Act, like the Securities Act, covers private actions involving securities fraud, and that the *Kahn* court characterized § 15 as an antifraud provision.  *See* Doc. 34 at 28.  Without more, this reasoning does not persuade the Court to deviate from the approach taken by a majority of courts in this Circuit of applying the one/three-year limitations period to § 29(b) implied claims grounded in a § 15(a) violation.[15]

As to the first transaction, Counts I through III are time-barred by the three-year limitations period in § 29(b).  DarkPulse entered into the 2018 SPA on September 20, 2018 but

---

[15] Additionally, the sole case DarkPulse cites for the proposition that the one-year/three-year limit does not apply to § 15(a) cases is *Lawrence v. Richman Grp. of Conn., LLC*, 407 F. Supp. 2d 385 (D. Conn. 2005). There, the court noted in a footnote that the statute of limitations did not apply to a § 29(b) claim when it is raised as an affirmative defense and only applies to "affirmative actions for rescission." *Id.* at 389 n.7. The court did not, however, conclude that a two/five-year limitations period should apply.  As discussed, the court in *Alpha Cap. Anstalt*, however, arrived at the precise opposite conclusion, in line with the great weight of case law. 216 F. Supp. 3d at 40.

did not file the instant action until December 31, 2021, more than three years later.  ¶¶ 26–27; *see Hottinger v. Amcoal Energy Corp.*, No. 89 Civ. 6391 (LMM), 1992 WL 349851, at *6 (S.D.N.Y. Nov. 10, 1992) (holding plaintiff's claim barred after three years from the "execution of a promissory note and accompanying investment documents").

The continuing violation doctrine, moreover, does not apply.  This "doctrine applies when the defendant's conduct causes plaintiff to sustain damages after the time when the statute of limitations would have expired if it commenced at the time of defendant's first act.  Instead, the claim accrues each time the plaintiff sustains damages." *Kahn*, 970 at 1039.  "That is, the doctrine applies to cases where 'conduct by the defendant may give rise to damages in the future which are not predictable at the time of the initial act or within the limitations period.'"  *Comm Trade USA. Inc. v. INTL FCStone, Inc.*, No. 13 Civ. 3998 (KBF), 2014 WL 787912, at * 9 (S.D.N.Y. Feb. 27, 2014); *see also See Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974) ("Each payment on the promissory [n]ote represented not the creation or assumption of new obligations, but the fulfillment of those previously created.").   Here, DarkPulse argues that each of FirstFire's conversions—the last of which occurred on February 18, 2021—constituted an independent injury that reset the clock.  However, these conversions were foreseeable to DarkPulse at the time the parties entered into First Transaction in 2018; indeed, DarkPulse expressly agreed to permit FireFire to elect that option.

Accordingly, the continuing violation doctrine does not apply, and Counts I through III are time barred as to the First Transaction.

### c.  Prohibited Transaction

Additionally, Defendants argue that because *neither* of the Transactions were "prohibited," Counts I through III fail to state a claim under § 29(b).  To establish a violation of

§ 29(b), a plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect." *EMA Fin., LLC v. Vystar Corp., Inc.*, No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at \*2 (Mar. 29, 2021).  However, "[o]nly unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981).

DarkPulse contends that the Notes should be rescinded because FirstFire was acting an unregistered securities dealer in violation of § 15(a).  ¶¶ 99, 109.  Courts in this District have, however, held that in § 29(b) actions, a defendant's failure to register as a dealer does not make the transaction "prohibited," where the underlying contract does not require the defendant to act as a dealer.  Indeed, courts have routinely dismissed such actions.  *See, e.g.*, *EMA Financial, LLC v. Vystar Corp, Inc.*, 2021 WL 1177801, at \*2–3 (S.D.N.Y. Mar. 29, 2021) (rejecting the defendant's argument on summary judgment that the agreements underlying a transaction were voidable under § 29(b) because the plaintiff acted as an unregistered broker-dealer in violation of § 15(a), and noting that the agreements did not require the plaintiff to register); *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, No. 17 Civ. 4006 (LJL) (OTW), 2018 WL 6547160, at \*5–6 (S.D.N.Y. July 10, 2017)  (Although the plaintiff-lender may have acted improperly when it sold off shares that it received from the defendant as a result of conversions under a note, nothing in the note or the sales purchase agreement explicitly required it to act as a broker.  Thus, the contracts were still capable of performance even if the plaintiff failed to register as a dealer and were not voidable.); *see also Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*, No. 12 Civ. 6075 (TPG), 2013 WL 1209799, at \*9 (S.D.N.Y. Mar. 22, 2013) ("To find a contract unenforceable for illegality at the pleading stage, the question is whether the contract on its face

requires the unregistered finder to perform broker services.") (internal quotation marks omitted). Here, neither of the Notes required FirstFire to act as a broker dealer.

DarkPulse argues that because FirstFire was obligated to purchase the Notes, the SPAs cannot be performed without violating the Exchange Act. However, obligating FirstFire to purchase the Notes does not "explicitly require" FirstFire to act as a broker. *See Foundation Ventures, LLC v. F2G, LTD.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010). Indeed, the language of the non-voidable sales purchase agreement in *ExeLED* is nearly identical to the language obligating DarkPulse to purchase the Notes here. *Compare* the *ExeLED* sales purchase agreement, No. 17 Civ. 4006 (LJL) (OTW), ECF Doc. 26-1 (obligating that "the [c]ompany shall issue and sell to the [b]uyer and the [b]uyer agrees to purchase from the [c]ompany such principal amount of [n]ote as is set forth immediately below the [b]uyer's name on the signature pages hereto"), *with* the 2018 and 2021 SPAs, Docs. 29-1, 29-2 ("On the Closing Date . . . [DarkPulse] shall issue and sell to the [FirstFire] and [FirstFire] agrees to purchase from [DarkPulse] such principal amount of the Note as is set forth immediately below [FirstFire's] name on the signature pages hereto."). The Court therefore finds this argument unpersuasive.[16] For these reasons, the Court holds that DarkPulse has failed to state a claim under § 29(b).[17]

---

[16] DarkPulse's reliance on *Mills v. Elec. Auto-Lite Co*., 396 U.S. 375 (1970) and *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) is misplaced. *Mills* involved a merger where shareholders alleged the proxy statement was materially false and misleading. 396 U.S. at 378–79. The Supreme Court held that causation is sufficiently shown under §14(a) where plaintiffs show the "proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Id.* at 385. But contrary to DarkPulse's assertion, the Court made no ruling as to the appropriate remedy. *Id.* at 386 ("Our conclusion that petitioners have established their case . . . implies nothing about the form of relief to which they may be entitled."). *Pearlstein* is likewise not analogous. There, a court, held that the plaintiff's claim under § 7 of the Exchange Act was not barred by two settlement agreements, as those agreements "resulted in a continuation of credit in violation of Regulation T, and under [§] 29(b)." 429 F.2d at 1142. Those agreements, by their terms, obligated plaintiff to pay if defendant extended further credit and thus were void under § 29(b). *Id.*

[17] Having already dismissed Counts I through III as to the First Transaction as untimely, and for failure to state a claim as to both Transactions—as well as Counts I and II as to the Second Transaction as subject to the Delaware

### d. RICO Claim

RICO prohibits "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Where, as here, a plaintiff bases its RICO claim on the collection of an unlawful debt, "a plaintiff must allege that (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (2) the debt was incurred in connection with the business of lending money . . . at a [usurious] rate, and (3) the usurious rate was at least twice the enforceable rate." *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018).

Here, DarkPulse argues that both Notes constitute collections of unlawful debt because they both are governed by and violate New York usury law. ¶¶ 74–77.

With respect to the 2018 Note, DarkPulse argues that the Nevada choice-of-law and clause is unenforceable. Nevada does not have a criminal usury statute. NRS 99.050. Courts "generally enforce choice-of-law clauses," in accordance with the well-settled principle that "contracts should be interpreted so as to effectuate the parties' intent." *Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015). New York courts will only disregard clear choice-of-law provisions upon a showing that: (1) the chosen state has no reasonable connection to the parties or the contract, (2) the agreement was obtained through fraud, or (3) the chosen state's law violates a fundamental public policy of New York. *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020).[18]

---

forum-selection clause—the Court need not delve into the factual inquiry of whether FirstFire is or is not a "dealer" under the Exchange Act.

[18] DarkPulse does not argue that the Nevada choice-of-law clause was obtained by fraud.

DarkPulse fails to meet its burden of showing that Nevada has no reasonable connection to the parties. To be sure, the FAC pleads that DarkPulse and FirstFire are each organized under the laws of Delaware and have a principal place of business is in New York. ¶¶ 17–20. Furthermore, it may well be the case that DarkPulse experienced the monetary effect of the conversions made under the First Transaction in New York. *See* Doc. 34 at 32, n. 22 (providing hyperlinks to DarkPulse's January 3, 2019 and April 1, 2021 8-K forms, which reflect DarkPulse's New York address).[19] However, the question before the Court is not where the parties have the most significant relationship; rather, it is whether the chosen state has a reasonable connection to the parties. The FAC plainly states that the parties met in Nevada to negotiate the Amendment. In so doing, the parties demonstrated an openness to conducting business there. Additionally, DarkPulse's 10-K form for the annual period ending in December 31, 2018 shows that the company entered into at least three other agreements with a Nevada choice-of-law clause; this further demonstrates the firm's amenability to transacting business there. *See* Doc. 32-3.[20]

Beyond these facts, DarkPulse fails to demonstrate that enforcing the Nevada law would contravene a fundamental New York public policy. While New York has a strong policy interest in enforcing usury laws in the *consumer* context, the Second Circuit has made clear that "corporations conducting their business transactions should be treated differently from individual consumers seeking personal credit." *United States v. Moseley*, 980 F.3d 9, 21–22 (2d Cir. 2020) (citing *Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc.*, 587 F. Supp. 557,

---

[19] The Court takes judicial notice of these filings. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Kramer*, 937 F.2d at 773.

[20] The Court takes judicial notice of this filing. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Kramer*, 937 F.2d at 773.

560 (S.D.N.Y. 1982) ("[U]sury is not a favored defense [in New York], particularly in the circumstances here where a corporation rather than a helpless consumer is involved."); *RMP Capital Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 186 (E.D.N.Y. 2014)).[21]  Here, the parties are two sophisticated financial institutions that willingly entered into an agreement to abide by the laws of Nevada.  They are simply not "the type of needy and unsophisticated consumers," contemplated by the *Moseley* court entitled to relief from a choice-of-law clause.[22] *Id.* at 22; *see also Superior Funding Corp. v. Big Apple Capital Corp.,* 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990).

With respect to the Second Transaction, the Delaware forum selection clause in the Amendment is, as discussed, enforceable, and so too is the Delaware choice-of-law provision. Both of the parties are incorporated under the laws of Delaware, therefore have a reasonable connection to the state.  Moreover, for the reasons already discussed, the fact that Delaware, like Nevada, has not adopted a usury law does not render application of Delaware law violative of New York public policy.  *See* Del. Code Ann. tit. 6, §§ 2301(c), 2304(a), 2306.  DarkPulse points to no other provision in which to ground its RICO claim as to the Second Transaction. Accordingly, that claim also fails.  The Court therefore dismisses Count IV as to both Transactions.[23]

---

[21] DarkPulse's reliance on *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, 2022 WL 426199, at *8–9 (S.D.N.Y. Feb. 11, 2022) is not persuasive, as that case involved a choice-of-law analysis for a *tort* claim, which is not the same as the standard applied for a contract-based claim.

[22] What's more, the 2018 Note includes a provision that the laws of Nevada shall apply "without regard to principles of conflicts of laws." *Id.* at 16 § 4.6; *see Ministers & Missionaries*, 26 N.Y.3d at 474 ("New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract . . . .").

[23] Because the choice-of-law provisions underlying both Transactions are enforceable—and because neither Nevada nor Delaware have adopted a usury statute—Count IV must be dismissed, and the Court need not assess FirstFire's other, largely factual arguments with respect the other potential shortcomings with DarkPulse's RICO claim.

### e.   Remaining State Law Claims

Under 28 U.S.C. § 1367(c)(3), if the Court has dismissed all claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction.  Subject matter jurisdiction in the instant action is based on federal question jurisdiction rooted in claims brought under the Exchange Act and RICO.  15 U.S.C. §§ 78o(a)(1), 78(t); 18 U.S.C. § 1962(c).

Because no federal claim remains that is subject to a merits determination by this Court, it would be inappropriate to adjudicate DarkPulse's state law claims.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice."), *aff'd*, 752 F.3d 224 (2d Cir. 2014).  Therefore, DarkPulse's remaining state law claims are dismissed without prejudice to repleading in state court.

## V.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. The Clerk of Court is respectfully directed to terminate the motions, Doc. 30 and 33, and to close the case.

It is SO ORDERED.

Dated:   January 16, 2023
      New York, New York

_____

Edgardo Ramos, U.S.D.J

25