# 23-0078-cv

## United States Court of Appeals

*for the*

## Second Circuit

DARKPULSE, INC.,

*Plaintiff-Appellant,*

— v. —

FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, ELI FIREMAN,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## JOINT APPENDIX
### Volume 1 of 2 (Pages A-1 to A-299)

MARK R. BASILE
MARJORIE SANTELLI, ESQ
GUSTAVE P. PASSANANTE, ESQ
THE BASILE LAW FIRM P.C.
*Attorneys for Plaintiff-Appellant*
390 North Broadway, Suite 140
Jericho, New York 11753
(516) 455-1500

i

# TABLE OF CONTENTS

**Page**

District Court Docket Entries .................................... A-1

Opinion and Order, dated January 16, 2023 ............. A-7

Complaint, dated December 31, 2021 ...................... A-32

    Exhibit 1 to Complaint -
    Senior Convertible Promissory Note, dated
    September 20, 2018 ................................................ A-56

    Exhibit 2 to Complaint -
    Convertible Promissory Note, dated
    April 26, 2021 ...................................................... A-103

    Exhibit 3 to Complaint -
    Edgar List .............................................................. A-164

Rule 7.1 Statement, dated December 31, 2021 .......... A-173

Plaintiff Darkpulse, Inc.'s *Ex Parte* Emergency
    Application for Order to Show Cause and for
    Temporary Restraining Order, dated
    January 14, 2022 .................................................... A-174

Text of Proposed Order ............................................. A-176

Declaration of Dennis O'Leary, pursuant to 28 USC
    § 1746, in Support of Darkpulse, Inc.'s, Motion
    for a Temporary Restraining Order and
    Preliminary Injunction, dated January 14, 2022 .... A-178

Order to Show Cause for Preliminary Injunction
    and a Temporary Restraining Order, dated
    January 14, 2022 .................................................... A-181

ii

**Page**

Plaintiff Darkpulse, Inc.'s Memorandum of Law, in
   Support of Motion for Temporary Restraining
   Order and Preliminary Injunction, dated
   January 17, 2022 .................................................... A-183

Proposed Order Granting a Preliminary Injunction ... A-206

Emergency Supplemental Declaration of Dennis
   O'Leary Pursuant to 28 U.S.C. § 1746, in
   Support for Preliminary Injunction, dated
   January 17, 2022 .................................................... A-208

   Exhibit A to O'Leary Declaration -
   January 13, 2022 Historical Data.......................... A-210

   Exhibit B to O'Leary Declaration -
   Market Capital Spreadsheet ................................... A-214

Defendants' Memorandum of Law in Opposition to
   Plaintiff's Motion for a Preliminary Injunction
   dated January 19, 2022 .......................................... A-216

Declaration of Eli Fireman, in Support of
   Defendants' Opposition to Plaintiff's Motion for
   a Preliminary Injunction, dated January 19, 2022 . A-248

   Exhibit A to Fireman Declaration -
   Second Convertible Note to FirstFire,
   dated April 26, 2021 .............................................. A-255

   Exhibit C to Fireman Declaration -
   E-mail from Eli Fireman to Dennis O'Leary with
   the Amendment Attached, dated
   November 5, 2021 .................................................. A-276

   Exhibit D to Fireman Declaration -
   E-mail from Nick Fireman to Dennis O'Leary
   with the Notice of Conversion Attached, dated
   November 15, 2021 ................................................ A-282

iii

**Page**

Exhibit E to Fireman Declaration -
E-mail from Eli Fireman to Dennis O'Leary,
dated November 23, 2021 ...................................... A-286

Exhibit F to Fireman Declaration -
E-mail from Eli Fireman to Dennis O'Leary,
dated November 29, 2021 ...................................... A-293

Declaration Of Aaron H. Marks, in Support of
Defendants' Opposition to Plaintiff's Motion for
a Preliminary Injunction, dated January 19, 2022    A-296

Rule 7.1 Statement, dated January 19, 2022.............. A-301

Plaintiff Darkpulse, Inc.'s Reply, in Support of its
Motion for Preliminary Injunction, dated
January 20, 2022 .................................................... A-302

Order of the Honorable Edgardo Ramos, dated
January 21, 2022 .................................................... A-313

Transcript of Court Proceedings of the Honorable
Edgardo Ramos, dated January 21, 2022.............. A-314

Letter from Aaron Marks to the Honorable Edgardo
Ramos, dated March 14, 2022 .............................. A-361

Counter Letter from Gustave Passanante to
Honorable Edgardo Ramos, dated
March 17, 2022 ...................................................... A-365

First Amended Complaint, dated May 5, 2022.......... A-368

Notice of Defendants' Motion to Dismiss the First
Amended Complaint, dated May 26, 2022............. A-397

Defendants' Memorandum of Law in Support of
their Motion to Dismiss the First Amended
Complaint, dated May 26, 2022 ........................... A-399

iv

**Page**

Darkpulse, Inc.'s Memorandum of Law in
    Opposition to Defendants' Motion to Dismiss the
    First Amended Complaint, dated June 16, 2022 .... A-432

Defendants' Reply Memorandum of Law, in Further
    Support of their Motion to Dismiss the First
    Amended Complaint, dated June 30, 2022 ........... A-466

Declaration of Aaron H. Marks, in Support of
    Defendants' Reply Memorandum of Law in
    Further Support of their Motion to Dismiss the
    First Amended Complaint, dated June 30, 2022 .... A-481

    Exhibit Q to Marks Declaration-
    Securities Purchase Agreement between Energie
    Holdings, Inc. and LG Capital Funding, LLC,
    dated August 19, 2015 ........................................... A-483

Letter from Aaron H. Marks to the Honorable
    Edgardo Ramos, dated September 29, 2022 .......... A-498

Supplemental Authority in *EMA Financial, LLC,
    v. Apptech Corp.*, 21-cv-06049 (LJL), signed
    September 13, 2022 ................................................. A-500

Letter from Eric J. Benzenberg to the Honorable
    Edgardo Ramos, re: Notice of Supplemental
    Authority, dated October 7, 2022 ......................... A-520

    Exhibit A to Benzenberg Letter -
    Decision in *Fleetwood Servs., LLC v. Ram Cap.
    Funding, LLC*, 2022 U.S. Dist. Lexis 100837
    (S.D.N.Y. June 6, 2022) ........................................ A-522

    Exhibit B to Benzenberg Letter -
    Decision in *Haymount Urgent Care P.C. v.
    GoFund Advance, LLC*, 2022 U.S. Dist. LEXIS
    112768 (S.D.N.Y. June 27, 2022) ......................... A-545

v

**Page**

Exhibit C to Benzenberg Letter -
Decision in *Lateral Recovery LLC v. Queen
Funding, LLC*, 2022 U.S. Dist. Lexis 129032
(S.D.N.Y. July 20, 2022)......................................... A-564

Exhibit D to Benzenberg Letter -
Decision in *AKF, Inc. v. W. Foot & Ankle Ctr.*,
2022 U.S. Dist. Lexis 176467 (E.D.N.Y.
Sept. 28, 2022)....................................................... A-573

Exhibit E to Benzenberg Letter -
Decision in *GS Capital Partners, LLC v. FTE
Networks, Inc.*, 2022 N.Y. Misc. Lexis 4698
(N.Y. Sup. Ct. Aug. 18, 2022)............................... A-585

Exhibit F to Benzenberg Letter -
Decision in in *New Y-Capp v. Arch Cap. Funding,
LLC*, 2022 U.S. Dist. Lexis 180309 (S.D.N.Y.
Sept. 30, 2022)....................................................... A-590

Notice of Appeal, dated January 17, 2023 ................. A-597

A-1

APPEAL,ECF,REOPEN

## U.S. District Court
## Southern District of New York (Foley Square)
## CIVIL DOCKET FOR CASE #: 1:21−cv−11222−ER

| | |
|---|---|
| DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC et al | Date Filed: 12/31/2021 |
| Assigned to: Judge Edgardo Ramos | Jury Demand: Plaintiff |
| Cause: 28:1331sv Fed. Question: Securities Violation | Nature of Suit: 850 Securities/Commodities |
| | Jurisdiction: Federal Question |

**Plaintiff**

**DarkPulse, Inc.**                    represented by **Eric Benzenberg**
                                                      The Basile Law Firm, P.C.
                                                      390 N. Broadway
                                                      Suite 140
                                                      Jericho, NY 11753
                                                      516−455−1500
                                                      Fax: 631−498−0478
                                                      Email: eric@thebasilelawfirm.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Mark R. Basile**
                                                      The Basile Law Firm P.C.
                                                      390 N. Broadway
                                                      Ste 140
                                                      Jericho, NY 11753
                                                      516−455−1500
                                                      Email: mark@thebasilelawfirm.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Gustave Paul Passanante**
                                                      The Basile Law Firm P.C.
                                                      390 North Broadway
                                                      Suite 140
                                                      Jericho, NY 11753
                                                      516−455−1500
                                                      Email: gus@thebasilelawfirm.com
                                                      *ATTORNEY TO BE NOTICED*

V.

**Defendant**

**FirstFire Global Opportunities Fund, LLC**    represented by **Aaron Harvey Marks**
                                                      Kirkland & Ellis LLP (NYC)
                                                      601 Lexington Avenue
                                                      New York, NY 10022
                                                      212−446−4800
                                                      Fax: 212−446−4900
                                                      Email: aaron.marks@kirkland.com
                                                      *LEAD ATTORNEY*
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Byron De Angelo Mille Pacheco**
                                                      Kirkland & Ellis LLP
                                                      601 Lexington Avenue
                                                      New York, NY 10022
                                                      212−446−4800
                                                      Email: byron.pacheco@kirkland.com
                                                      *ATTORNEY TO BE NOTICED*

                                                      **Julia Devereux Harper**

**A-2**

Kirkland & Ellis LLP
601 Lexington Avenue
New York, NY 10022
212–390–4224
Email: julia.harper@kirkland.com
*ATTORNEY TO BE NOTICED*

**Defendant**

**Eli Fireman**                    represented by   **Aaron Harvey Marks**
                                   (See above for address)
                                   *LEAD ATTORNEY*
                                   *ATTORNEY TO BE NOTICED*

                                   **Byron De Angelo Mille Pacheco**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

                                   **Julia Devereux Harper**
                                   (See above for address)
                                   *ATTORNEY TO BE NOTICED*

| Date Filed | # | Docket Text |
|---|---|---|
| 12/31/2021 | 1 | COMPLAINT against Eli Fireman, FirstFire Global Opportunities Fund, LLC. (Filing Fee $ 402.00, Receipt Number ANYSDC–25526956)Document filed by DarkPulse, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2, # 3 Exhibit 3).(Passanante, Gustave) (Entered: 12/31/2021) |
| 12/31/2021 | 2 | REQUEST FOR ISSUANCE OF SUMMONS as to FirstFire Global Opportunities Fund, LLC, re: 1 Complaint,. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 12/31/2021) |
| 12/31/2021 | 3 | REQUEST FOR ISSUANCE OF SUMMONS as to Eli Fireman, re: 1 Complaint,. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 12/31/2021) |
| 12/31/2021 | 4 | CIVIL COVER SHEET filed..(Passanante, Gustave) (Entered: 12/31/2021) |
| 12/31/2021 | 5 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 12/31/2021) |
| 01/03/2022 | | CASE OPENING INITIAL ASSIGNMENT NOTICE: The above–entitled action is assigned to Judge Edgardo Ramos. Please download and review the Individual Practices of the assigned District Judge, located at https://nysd.uscourts.gov/judges/district–judges. Attorneys are responsible for providing courtesy copies to judges where their Individual Practices require such. Please download and review the ECF Rules and Instructions, located at https://nysd.uscourts.gov/rules/ecf–related–instructions..(sj) (Entered: 01/03/2022) |
| 01/03/2022 | | Magistrate Judge James L. Cott is so designated. Pursuant to 28 U.S.C. Section 636(c) and Fed. R. Civ. P. 73(b)(1) parties are notified that they may consent to proceed before a United States Magistrate Judge. Parties who wish to consent may access the necessary form at the following link: https://nysd.uscourts.gov/sites/default/files/2018–06/AO–3.pdf. (sj) (Entered: 01/03/2022) |
| 01/03/2022 | | Case Designated ECF. (sj) (Entered: 01/03/2022) |
| 01/03/2022 | 6 | ELECTRONIC SUMMONS ISSUED as to FirstFire Global Opportunities Fund, LLC..(sj) (Entered: 01/03/2022) |
| 01/03/2022 | 7 | ELECTRONIC SUMMONS ISSUED as to Eli Fireman..(sj) (Entered: 01/03/2022) |
| 01/04/2022 | 8 | NOTICE OF APPEARANCE by Eric Benzenberg on behalf of DarkPulse, Inc...(Benzenberg, Eric) (Entered: 01/04/2022) |

**A-3**

| 01/06/2022 | 9 | NOTICE OF APPEARANCE by Mark R. Basile on behalf of DarkPulse, Inc...(Basile, Mark) (Entered: 01/06/2022) |
|---|---|---|
| 01/14/2022 | 10 | WAIVER OF SERVICE RETURNED EXECUTED. Eli Fireman waiver sent on 1/13/2022, answer due 3/14/2022. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 01/14/2022) |
| 01/14/2022 | 11 | WAIVER OF SERVICE RETURNED EXECUTED. FirstFire Global Opportunities Fund, LLC waiver sent on 1/13/2022, answer due 3/14/2022. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 01/14/2022) |
| 01/14/2022 | 12 | PROPOSED ORDER TO SHOW CAUSE WITH EMERGENCY RELIEF. Document filed by DarkPulse, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 Affidavit O'Leary).(Passanante, Gustave) **Proposed Order to Show Cause to be reviewed by Clerk's Office staff.** (Entered: 01/14/2022) |
| 01/14/2022 | | **\*\*\*NOTICE TO COURT REGARDING PROPOSED ORDER TO SHOW CAUSE WITH EMERGENCY RELIEF. Document No. 12 Proposed Order to Show Cause With Emergency Relief was reviewed and approved as to form. (km)** (Entered: 01/14/2022) |
| 01/14/2022 | 13 | NOTICE OF APPEARANCE by Aaron Harvey Marks on behalf of Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 01/14/2022) |
| 01/14/2022 | 14 | ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER: Upon consideration of the Declaration of Dennis O' Leary, Dated January 14, 2022; Plaintiff's motion for Temporary restraining Order, and accompanying memorandum of law, it is hereby ORDERED, that Defendants FirstFire Global Opportunities Fund, LLC, and Eli Fireman ("Defendants") show cause before the Honorable Edgardo Ramos, U.S. District Judge of the United States District Court for the Southern District of New York, at courtroom 619, United States Courthouse, 40 Foley Square in the City, County and State of New York on January 21, 20222 at 2:00 p.m. or a soon thereafter as counsel may be heard, why an Order should not be issued. It is further ORDERED that delivery by Electronic Service via ECF and email of a copy of this Order to Show Cause and the papers upon which it is based upon Defendant or their counsel, who have agreed to accept service electronically, hall be deemed good and sufficient service thereof; it is further ORDERED that Plaintiff Darkpulse, Inc, must submit its motion for a preliminary injunction by January 17, 2022 and it is further ORDERED that answering papers, if any shall be electronically served no than Wednesday, January 19 by 6:00 pm. Reply papers by Thursday Jan. 20 by 6:00 pm. ( Show Cause Hearing set for 1/21/2022 at 02:00 PM in Courtroom 619, 40 Centre Street, New York, NY 10007 before Judge Edgardo Ramos.), ( Motions due by 1/17/2022., Responses due by 1/19/2022, Replies due by 1/20/2022.) (Signed by Judge Edgardo Ramos on 1/14/2022) (ate) (Entered: 01/14/2022) |
| 01/14/2022 | 15 | NOTICE OF APPEARANCE by Byron De Angelo Mille Pacheco on behalf of Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Pacheco, Byron) (Entered: 01/14/2022) |
| 01/14/2022 | 16 | NOTICE OF APPEARANCE by Julia Devereux Harper on behalf of Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Harper, Julia) (Entered: 01/14/2022) |
| 01/17/2022 | 17 | BRIEF re: 14 Order to Show Cause,,,,,, Set Deadlines,,,,, . Document filed by DarkPulse, Inc.. (Attachments: # 1 Text of Proposed Order, # 2 O'Leary Declaration, # 3 Exhibit Historical Data, # 4 Exhibit Market Capital Spreadsheet).(Passanante, Gustave) (Entered: 01/17/2022) |
| 01/19/2022 | 18 | MEMORANDUM OF LAW in Opposition re: 14 Order to Show Cause,,,,,, Set Deadlines,,,,, . Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 01/19/2022) |
| 01/19/2022 | 19 | DECLARATION of Eli Fireman in Opposition re: 14 Order to Show Cause,,,,,, Set Deadlines,,,,, . Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC. (Attachments: # 1 Exhibit A, # 2 Exhibit B, # 3 Exhibit C, # 4 Exhibit D, # 5 Exhibit E, # 6 Exhibit F).(Marks, Aaron) (Entered: 01/19/2022) |

**A-4**

| 01/19/2022 | 20 | DECLARATION of Aaron H. Marks in Opposition re: 14 Order to Show Cause,,,,,,, Set Deadlines,,,,,,. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC. (Attachments: # 1 Exhibit G, # 2 Exhibit H, # 3 Exhibit I, # 4 Exhibit J, # 5 Exhibit K, # 6 Exhibit L).(Marks, Aaron) (Entered: 01/19/2022) |
|---|---|---|
| 01/19/2022 | 21 | RULE 7.1 CORPORATE DISCLOSURE STATEMENT. No Corporate Parent. Document filed by FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 01/19/2022) |
| 01/20/2022 | 22 | BRIEF re: 14 Order to Show Cause,,,,,,, Set Deadlines,,,,,, *Reply Memorandum of Law in Support of Preliminary Injunction*. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 01/20/2022) |
| 01/21/2022 | 23 | ORDER: For the reasons stated on the record at the hearing, DarkPulse's motion for a preliminary injunction is DENIED. IT IS SO ORDERED. (Signed by Judge Edgardo Ramos on 1/21/2022) (ama) (Entered: 01/21/2022) |
| 02/03/2022 | 24 | TRANSCRIPT of Proceedings re: CONFERENCE held on 1/21/2022 before Judge Edgardo Ramos. Court Reporter/Transcriber: Paula Horovitz, (212) 805–0348. Transcript may be viewed at the court public terminal or purchased through the Court Reporter/Transcriber before the deadline for Release of Transcript Restriction. After that date it may be obtained through PACER. Redaction Request due 2/24/2022. Redacted Transcript Deadline set for 3/7/2022. Release of Transcript Restriction set for 5/4/2022..(Moya, Goretti) (Entered: 02/03/2022) |
| 02/03/2022 | 25 | NOTICE OF FILING OF OFFICIAL TRANSCRIPT Notice is hereby given that an official transcript of a CONFERENCE proceeding held on 1/21/22 has been filed by the court reporter/transcriber in the above–captioned matter. The parties have seven (7) calendar days to file with the court a Notice of Intent to Request Redaction of this transcript. If no such Notice is filed, the transcript may be made remotely electronically available to the public without redaction after 90 calendar days....(Moya, Goretti) (Entered: 02/03/2022) |
| 03/14/2022 | 26 | LETTER MOTION for Conference / *Requesting a Pre–Motion Conference Regarding Defendants' Anticipated Motion to Dismiss* addressed to Judge Edgardo Ramos from Aaron Marks dated March 14, 2022. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 03/14/2022) |
| 03/14/2022 | 27 | ORDER granting 26 Letter Motion for Conference re: 26 LETTER MOTION for Conference / *Requesting a Pre–Motion Conference Regarding Defendants' Anticipated Motion to Dismiss* addressed to Judge Edgardo Ramos from Aaron Marks dated March 14, 2022. The parties are directed to appear for a telephonic pre–motion conference on April 14, 2022 at 9:30 am. The parties are directed to dial (877) 411–9748 and enter the access code 3029857# at that time. Plaintiff is directed to respond to Defendants' letter by March 17, 2022.SO ORDERED. Telephone Conference set for 4/14/2022 at 09:30 AM before Judge Edgardo Ramos. (Signed by Judge Edgardo Ramos on 3/14/2022) (va) (Entered: 03/15/2022) |
| 03/14/2022 | | Set/Reset Deadlines: Responses due by 3/17/2022 (ama) (Entered: 03/15/2022) |
| 03/14/2022 | | ***DELETED DOCUMENT. Deleted document number 28 Order. The document was incorrectly filed in this case. (ama)** (Entered: 03/15/2022) |
| 03/17/2022 | 28 | COUNTER LETTER MOTION for Conference re: 26 LETTER MOTION for Conference / *Requesting a Pre–Motion Conference Regarding Defendants' Anticipated Motion to Dismiss* addressed to Judge Edgardo Ramos from Aaron Marks dated March 14, 2022. addressed to Judge Edgardo Ramos from Gustave Passanante dated March 17, 2022. Document filed by DarkPulse, Inc...(Passanante, Gustave) (Entered: 03/17/2022) |
| 04/14/2022 | | Minute Entry for proceedings held before Judge Edgardo Ramos: Pre–Motion Conference held on 4/14/2022 by telephone. Plaintiff's and Defendants' counsel present. Plaintiff's amended complaint is due May 5, 2022. Defendants' answer or, if they so wish to move, motion to dismiss is due May 26, 2022. If a motion is filed, Plaintiff's response due June 16, 2022. Defendants' reply is due 6/23/2022. (jar) (Entered: 04/14/2022) |

| 05/05/2022 | 29 | FIRST AMENDED COMPLAINT amending 1 Complaint, against Eli Fireman, FirstFire Global Opportunities Fund, LLC with JURY DEMAND.Document filed by DarkPulse, Inc.. Related document: 1 Complaint,. (Attachments: # 1 Exhibit September 2018 Transaction, # 2 Exhibit April 2021 Transaction, # 3 Exhibit EDGAR Spreadsheet).(Passanante, Gustave) (Entered: 05/05/2022) |
|---|---|---|
| 05/26/2022 | 30 | MOTION to Dismiss *the First Amended Complaint*. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 05/26/2022) |
| 05/26/2022 | 31 | MEMORANDUM OF LAW in Support re: 30 MOTION to Dismiss *the First Amended Complaint*. . Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 05/26/2022) |
| 05/26/2022 | 32 | DECLARATION of Aaron H. Marks in Support re: 30 MOTION to Dismiss *the First Amended Complaint*.. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC. (Attachments: # 1 Exhibit A– excerpts from DPLSs Form 424B4 Prospectus, # 2 Exhibit B– excerpts from DPLSs Form 10–Q for the quarterly period ended March 31, 2022, # 3 Exhibit C– excerpts from DPLSs Form 10–K for the annual period ended December 31, 2018, # 4 Exhibit D– excerpts from DPLSs Form S–1/A Registration Statement, # 5 Exhibit E– Registration Rights Agreement between DPLS and FirstFire, # 6 Exhibit F– Amendment No. 1 to the Convertible Promissory Note, # 7 Exhibit G– DPLSs Form 8–K 5/5/21, # 8 Exhibit H– DPLSs Form 8–K 2/7/22, # 9 Exhibit I– DPLSs Form 8–K 2/8/21, # 10 Exhibit J– DPLSs registration to do business in the state of Texas, # 11 Exhibit K– DPLSs name reservation in the state of Arizona, # 12 Exhibit L– NYS Business Search, # 13 Exhibit M– DPLSs Form 8–K/A 11/19/18, # 14 Exhibit N– DPLSs Form 10–K 12/31/19, # 15 Exhibit O– DPLSs Form 10–Q 9/30/20, # 16 Exhibit P– Visium Technologies, Inc.s Form 8–K 1/16/19).(Marks, Aaron) (Entered: 05/26/2022) |
| 05/26/2022 | 33 | LETTER MOTION for Oral Argument *on Defendants' Motion to Dismiss the First Amended Complaint* addressed to Judge Edgardo Ramos from Aaron H. Marks, P.C. dated 05/26/2022. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 05/26/2022) |
| 06/16/2022 | 34 | MEMORANDUM OF LAW in Opposition re: 30 MOTION to Dismiss *the First Amended Complaint*. . Document filed by DarkPulse, Inc.. (Attachments: # 1 Exhibit 1, # 2 Exhibit 2).(Passanante, Gustave) (Entered: 06/16/2022) |
| 06/20/2022 | 35 | CONSENT LETTER MOTION for Extension of Time *to file Defendants' reply in further support of their motion to dismiss* addressed to Judge Edgardo Ramos from Aaron H. Marks, P.C. dated 6/20/2022. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 06/20/2022) |
| 06/21/2022 | 36 | ORDER: granting 35 Letter Motion for Extension of Time. Defendant's request for an extension is Granted. SO ORDERED. (Signed by Judge Edgardo Ramos on 6/21/2022) (ama) (Entered: 06/21/2022) |
| 06/21/2022 | | Set/Reset Deadlines: Replies due by 6/30/2022. (ama) (Entered: 06/21/2022) |
| 06/30/2022 | 37 | REPLY MEMORANDUM OF LAW in Support re: 30 MOTION to Dismiss *the First Amended Complaint*. . Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 06/30/2022) |
| 06/30/2022 | 38 | DECLARATION of Aaron H. Marks in Support re: 30 MOTION to Dismiss *the First Amended Complaint*.. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC. (Attachments: # 1 Exhibit Q).(Marks, Aaron) (Entered: 06/30/2022) |
| 09/29/2022 | 39 | LETTER addressed to Judge Edgardo Ramos from Aaron Marks, P.C. dated 09/29/2022 re: Supplemental Authority. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC. (Attachments: # 1 Supplement – 9/13/2022 Opinion and Order).(Marks, Aaron) (Entered: 09/29/2022) |
| 10/12/2022 | 40 | NOTICE of Supplemental Authorities re: 31 Memorandum of Law in Support of Motion, 30 MOTION to Dismiss *the First Amended Complaint*., 37 Reply Memorandum of Law in Support of Motion. Document filed by DarkPulse, Inc.. (Attachments: # 1 Exhibit Ex A – Fleetwood, # 2 Exhibit Ex B – Haymount, # 3 Exhibit Ex C – Lateral Recovery, # 4 Exhibit Ex D – AKF, # 5 Exhibit Ex E – GS Capital, # 6 Exhibit Ex F – New Y–Capp).(Benzenberg, Eric) (Entered: 10/12/2022) |

**A-6**

| 01/17/2023 | 41 | OPINION AND ORDER re: 30 MOTION to Dismiss *the First Amended Complaint.* filed by FirstFire Global Opportunities Fund, LLC, Eli Fireman. For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. The Clerk of Court is respectfully directed to terminate the motions, Doc. 30 and 33, and to close the case. It is SO ORDERED. (Signed by Judge Edgardo Ramos on 1/16/23) (yv) Transmission to Orders and Judgments Clerk for processing. (Entered: 01/17/2023) |
|---|---|---|
| 01/17/2023 | 42 | CLERK'S JUDGMENT re: 41 Memorandum & Opinion in favor of FirstFire Global Opportunities Fund, LLC, Eli Fireman against DarkPulse, Inc. It is hereby ORDERED, ADJUDGED AND DECREED: That for the reasons stated in the Court's Opinion and Order dated January 17, 2023, Defendants' motion to dismiss is GRANTED in its entirety; accordingly, the case is closed. (Signed by Clerk of Court Ruby Krajick on 1/17/2023) (Attachments: # 1 Right to Appeal) (km) (Entered: 01/17/2023) |
| 01/17/2023 | 43 | NOTICE OF APPEAL from 42 Clerk's Judgment, 41 Memorandum & Opinion,. Document filed by DarkPulse, Inc.. Filing fee $ 505.00, receipt number ANYSDC−27212649. Form C and Form D are due within 14 days to the Court of Appeals, Second Circuit. (Attachments: # 1 Exhibit Clerk's Judgment, # 2 Exhibit Opinion and Order).(Passanante, Gustave) Modified on 1/18/2023 (nd). (Entered: 01/17/2023) |
| 01/18/2023 | | Transmission of Notice of Appeal and Certified Copy of Docket Sheet to US Court of Appeals re: 43 Notice of Appeal,..(nd) (Entered: 01/18/2023) |
| 01/18/2023 | | Appeal Record Sent to USCA (Electronic File). Certified Indexed record on Appeal Electronic Files for 43 Notice of Appeal, filed by DarkPulse, Inc. were transmitted to the U.S. Court of Appeals..(nd) (Entered: 01/18/2023) |
| 01/20/2023 | 44 | LETTER MOTION for Extension of Time to File *Motion for Attorney's Fees* addressed to Judge Edgardo Ramos from Aaron H. Marks, P.C. dated 01/20/2023. Document filed by Eli Fireman, FirstFire Global Opportunities Fund, LLC..(Marks, Aaron) (Entered: 01/20/2023) |
| 01/23/2023 | 45 | ORDER granting 44 Letter Motion for Extension of Time to File. Defendants' motion to reopen this case and for leave to file a motion for attorney's fees is granted. In the event this Court's January 17, 2023 Order is affirmed, Defendants may file the motion within two weeks after the Second Circuit issues its mandate. Plaintiff will have two weeks after Defendants file the motion to file an opposition. IT IS SO ORDERED. (Signed by Judge Edgardo Ramos on 1/23/2023) (vfr) (Entered: 01/23/2023) |

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

                                        Plaintiff,

            – against –

FIRSTFIRE GLOBAL OPPORTUNITIES FUND,
LLC, and ELI FIREMAN,

                                        Defendants.

**OPINION AND ORDER**
21 Civ. 11222 (ER)

Ramos, D.J.:

    DarkPulse, Inc. brought this action against FirstFire Global Opportunities Fund, LLC and

its managing member Eli Fireman on December 31, 2021, alleging, *inter alia*, violations of the

Securities Exchange Act of 1934 and seeking rescission of the parties' convertible promissory

notes under § 29(b) of the Act.  Before the Court is the motion to dismiss the First Amended

Complaint in its entirety and related motion for oral argument.  For the reasons set forth below,

Defendants' motion to dismiss is GRANTED.

## I.    FACTUAL BACKGROUND[1]

### *The Parties*

    FirstFire Global Opportunities Fund ("FirstFire") is a New York-based, Delaware-

registered investment fund, which specializes in loaning money to distressed businesses with

market capitalizations under $750 million.  ¶¶ 19–20, 54.  Between March 2015 and September

2021, public filings show that FirstFire purchased more than 107 promissory notes for

---

[1] The following facts are based on the First Amended Complaint, which the Court accepts as true and construes in
the light most favorable to DarkPulse.  *See Gibbons v. Malone*, 703 F.3d 595, 599 (2d Cir. 2013).  Unless otherwise
noted, citations to "¶ __" refer to the First Amended Complaint.

approximately 89 issuers and sold more than one billion newly-issued shares of stock obtained pursuant to those notes into the public market for its own account. ¶ 66.  DarkPulse, Inc. is a New York-based, Delaware-registered "microcap" company, that trades stocks in emerging companies on the "over the counter" market.[2] ¶¶ 17–18.

### The First Transaction

On September 20, 2018, FirstFire loaned DarkPulse $225,000 in exchange for a convertible promissory note (the "2018 Note") with a principal amount of $247,500 via a securities purchase agreement (the "2018 SPA") (together with the 2018 Note, the "First Transaction"). ¶¶ 26–27; *see* Doc. 29-1.  The 2018 Note provided an 8% interest rate *per annum*, a 10% original issue discount, and a nine-month maturity date.[3] ¶ 27.  The 2018 Note further gave FirstFire the right to convert any portion of the debt for company stock in DarkPulse, at a 30% discount to the market price, beginning 180 days after execution. ¶ 28.  It also included a New York forum-selection clause and a Nevada choice-of-law clause.[4] Doc. 29-1 at 16 § 4.6.

---

[2] A microcap company is a publicly traded business with a market capitalization between approximately $50 million and $300 million.  An "over-the-counter" market is a decentralized market in which market participants trade stocks or other instruments directly between parties, without a central exchange or broker.

[3] A convertible promissory note is a type of debt security that gives the lender, here FirstFire, the right to take repayment of a loan either in cash or in newly-issued company stock.  Like an option or warrant, the lender is given the right to purchase company stock at a particular strike price; at conversion, the lender "converts" the note, *i.e.*, it uses the accrued debt to "purchase" the stock instead of receiving cash. *See* Doc. 29-1 at 3.

[4] Specifically, the 2018 Note provides: "This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Note or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts or federal courts located in the state and county of New York.  [DarkPulse] hereby irrevocably waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*." *Id.* at 16 § 4.6.

Pursuant to the conversion option, over a period of approximately one and one-half years, between June 7, 2019 and February 18, 2021, FirstFire effected 18 distinct conversions of debt into newly-issued DarkPulse common stock.[5] ¶¶ 29–32.  In all, FirstFire exchanged $247,500 worth of debt—the entirety of the principal amount of the 2018 Note—for 879,400,000 shares of stock. ¶ 33.  Presently, the estimated open market value of the stock acquired by FirstFire from converting debt under the 2018 Note totals $10,738,900. ¶ 34.

In the days following each FirstFire conversion, the average daily trading volume in DarkPulse stock increased dramatically. *Id.*  Thirty days prior to FirstFire's first conversion, for example, DarkPulse had a trading volume (*i.e.*, the total number of shares traded during a given period) of 4,646,131. *Id.*  Ten days following the June 7, 2019 conversion, that figure nearly doubled to 8,235,159 trades. *Id.*  And ten days following the June 24, 2019 conversion, the figure rose to 12,059,811 trades. *Id.*

### *The Second Transaction*

On April 26, 2021, FirstFire loaned DarkPulse $750,000 in exchange for a convertible promissory note (the "2021 Note") with a principal amount of $825,000 via a securities purchase agreement (the "2021 SPA"). ¶ 37; *see* Doc. 29-2.  The 2021 Note provided a 10% interest rate *per annum* and nine-month maturity date and incorporates by reference a registration rights agreement (the "RRA") (altogether, the "Second Transaction," and, with the First Transaction,

---

[5] Specifically, the conversions occurred on:  June 7, 2019 (converting $5,340 of debt for 7,000,000 shares of common stock); June 18, 2019 ($3,331 for 7,000,000 shares); June 24, 2019 ($2,778 for 7,900,000 shares); July 8, 2019 ($1,560 for 6,000,000 shares); July 15, 2019 ($1,560 for 6,000,000 shares); July 24, 2019 ($2,708 for 11,600,000 shares); July 30, 2019 ($3,296 for 13,700,000 shares); August 5, 2019 ($3,008 for 16,100,000 shares); August 9, 2019 ($1,492 for 17,800,000 shares); August 15, 2019 (converting $1,426 for 20,900,000 shares); September 6, 2019 ($4,900 for 35,000,000 shares); September 10, 2019 ($4,900 for 35,000,000 shares); September 20, 2019 ($2,765 for 35,900,000 shares); September 1, 2020 ($7,000 for 85,000,000 shares); January 14, 2021 ($28,000 for 100,000,000 shares); January 25, 2021 ($42,000 for 150,000,000 shares); February 5, 2021 ($28,000 for 100,000,000 shares); and February 18, 2021 ($103,436 for 220,000,000 shares). ¶ 32.

the "Transactions"). ¶ 37; *See* Docs. 29-2; 32-5.[6]  The 2021 Note required DarkPulse to issue

FirstFire 60,000,000 "Commitment Shares" upon execution of the agreement.  Doc. 29-2 at 22 §

C.  On the date of execution of the Second Transaction, DarkPulse stock was trading at a price of

$0.019 per share; the Commitment Shares therefore had a face value of approximately

$1,140,000.  ¶ 39.

The 2021 Note also included a New York choice-of-law and forum-selection clause,

providing that its terms shall be governed by and construed in accordance with the laws of New

York, and that any action brought by either party against the other concerning the Second

Transaction must be brought only in the state or federal courts located in New York.  *Id.* at 17 §

4.6.

Similar to the 2018 Note, the 2021 Note includes a conversion right, whereby FirstFire

could forego repayment of the 2021 Note in cash and instead convert "in whole or in part" any

amounts owed to shares of DarkPulse common stock on any trading day, 180 days following

execution of the transaction.  Doc. 29-2 at 3 §§ 1.1 and 1.4(a).  In contrast to the variable

conversion price of the 2018 Note, the 2021 Note specified a fixed per-share conversion price of

$0.015—the "Fixed Conversion Price"—or, alternatively, a "Default Fixed Conversion Price" of

$0.005, applicable if an event of default occurs.  ¶ 39; Doc. 29-2 at 4 § 1.2(a).

The 2021 Note and RRA together defined "Events of Default."  Relevant here, two such

Events of Default include:  (1) DarkPulse failing to use commercially reasonable efforts to file a

registration statement covering the resale of the shares of stock issued or issuable to FirstFire

---

[6] The RRA was filed by Defendants as Ex. E to Aaron H. Marks' declaration in support of the motion to dismiss.
Doc. 32-5.  In deciding a motion to dismiss, courts may consider "any written instrument attached to the complaint,
statements or documents incorporated into the complaint by reference, legally required public disclosure documents
filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the
suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007).  The RRA is expressly referenced in
the FAC.  Accordingly, the Court takes judicial notice of Doc. 32-5 as incorporated into the FAC by reference.

pursuant to the 2021 SPA (the "Registrable Shares") within ninety days after execution of the

Second Transaction (*i.e.*, by July 26, 2021), *see* ¶ 49 n.14; Doc. 32-5 at 3 § 2(b); and (2)

DarkPulse issuing common shares pursuant to an equity line of credit or otherwise in connection

with a variable rate transaction entered after the date of the 2021 Note, *see* Doc. 29-2 at 15 §

3.16.

> *Purported Events of Default*

DarkPulse's public filings since April 26, 2021 do not include any statements registering

the shares that were the subject of the 2021 Note.  Additionally, as shown by DarkPulse's Form

424B4 Prospectus (the "Prospectus"), on August 19, 2021, DarkPulse entered into a purchase

agreement with non-party, GHS Investments, LLC (the "August GHS Agreement").  *See* Doc.

32-1.[7]  The August GHS Agreement granted DarkPulse the right to sell to GHS up to

$45,000,000 worth of shares of DarkPulse common stock at variable rates from time to time at

DarkPulse's discretion.  *See* Doc. 32-1 at 21.  On November 9, 2021, DarkPulse entered into a

second purchase agreement with GHS (the "November GHS Agreement," together with the

August GHS Agreement, the "GHS Agreements") granting DarkPulse the right to sell to GHS up

to an additional $30,000,000 worth of shares of DarkPulse common stock at variable rates from

time to time at DarkPulse's discretion.  *Id.* 15.  DarkPulse issued shares of its common stock to

GHS pursuant to the August GHS Agreement on at least five occasions between August 19, 2021

and October 14, 2021.  *Id.* at 21–22.

> *The Amendment*

---

[7] DarkPulse filed its Form 424B4 Prospectus with the SEC on May 3, 2022.  *See* Doc. 32-1.  The Court takes judicial notice of this filing.  *See ATSI Commc'ns, Inc.*, 493 F.3d at 98; *see also Kramer v. Time Warner Inc.*, 937 F.2d 767, 773 (2d Cir. 1991) (taking judicial notice of documents cited in securities fraud complaint).

On November 4, 2021, Defendant Eli Fireman, the managing member of FirstFire, met with DarkPulse's Chief Executive Officer, Dennis O'Leary, while on a business trip in Las Vegas. ¶ 46. Fireman presented O'Leary with a one-page "Amendment No. 1 to the Convertible Promissory Note Issued on April 26, 2021" (the "Amendment"), claiming that it would enable DarkPulse to complete future acquisitions without having to notify O'Leary. *Id.*; *see* Doc. 32-6.[8] Fireman did not mention to O'Leary that the Amendment replaced both the New York choice-of-law and forum-selection provisions of the 2021 Note with Delaware provisions. ¶ 47. The Amendment consists of the following four provisions:

1. Remove from the Securities Purchase Agreement Section 4. Subsection d . . . .

2. **Governing Law; Venue**. The Transaction Documents shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement, the Note, the Warrant, or any other agreement, certificate, instrument, or document contemplated hereby shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY . . . .

3. The Parties have mutually agreed to the provisions set forth herein and are doing so without the exchange or any additional consideration . . . .

4. This Amendment shall be deemed part of, but shall take precedence over and supersede any provisions to the contrary contained in the Note. Except as specifically modified hereby, all of the provisions of the Note, which are not in conflict with the terms of this Amendment, shall remain in full force and effect.

---

[8] The Court takes judicial notice of the Amendment as incorporated into the FAC by reference. *See ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d at 98.

**A-13**

Doc. 32-6 at 2–3. O'Leary and Fireman signed the Amendment, which is dated October 14, 2021, and purported to be effective as of April 26, 2021.[9]  *Id.* at 2–4.

### *Conversion Pursuant to the Second Transaction*

On November 15, 2021, FirstFire notified DarkPulse of its intent to convert the full amount of debt under the 2021 Note (*i.e.*, the $825,000 principal, plus $61,875 in outstanding interest) into shares of common stock, using the $0.005 Default Fixed Conversion Price. ¶¶ 48–49. Two days later, with DarkPulse stock trading at $0.1334 per share, a transfer agent delivered to FirstFire 177,375,000 shares of stock, having an estimated market value of $23,661,825. ¶ 49.

## II.    PROCEDURAL HISTORY

DarkPulse filed this action on December 31, 2021. Doc. 1. On January 17, 2022, DarkPulse moved for a preliminary injunction to restrain FirstFire from selling DarkPulse stock that it had acquired pursuant to the 2021 Note, reasoning that the 2021 Note is unlawful under the Securities Exchange Act of 1934 (the "Exchange Act") and would cause irreparable harm to DarkPulse. Doc. 17. On January 21, 2022, the Court heard oral argument DarkPulse's motion for a preliminary injunction, where counsel for DarkPulse raised the additional argument, based on the New York Court of Appeals' decision in *Adar Bays,* that the 2021 Note is void *ab initio*, under New York's criminal usury law, New York Penal Code § 190.40.[10]  *See* Doc. 24, January 21, 2022 Transcript, at 3:1–5:25. That same day, the Court issued an Order, Doc. 23, denying

---

[9] Notably, on October 14, 2021—the same date as the date of the Amendment—the New York Court of Appeals issued a decision in *Adar Bays, Inc., v. GeneSYS ID*, 37 N.Y.3d 320 (2021), holding that pursuant to New York General Obligations Law § 5-511(1), a criminally usurious loan (i.e., a loan charging an interest rate of 25% per annum or grater, *see* New York Penal Law § 190.40) is *void ab initio*, even if the borrower is a corporation. ¶ 46.

[10] During the hearing, counsel for FirstFire acknowledged that the timing of the October 14, 2021 Amendment and the October 14, 2021 *Adar Bays* decision "would suggest that there's a connection there[.]" Doc. 24 at 26:17–27:2; *see also id.* at 28:15–18 (FirstFire's Counsel: "Now, [the Court] asked [if FirstFire] g[o]t the [A]mendment because of the *Adar Bays* decision. The timing, I agree, was very close in time, but the *Adar Bays* decision really has nothing to do with this case.").

DarkPulse's motion for the reasons stated on the record, namely that:  the forum selection clause is presumptively enforceable; DarkPulse is unlikely to succeed on the merits; DarkPulse failed to establish that they would suffer irreparable harm absent an injunction; and DarkPulse demonstrated neither that the balance of hardship favors it nor that the public interest would be disserved by denying its motion, *see* Doc. 24 at 45:6–46:14.

On May 5, 2022, DarkPulse filed the First Amended Complaint (the "FAC"), which consists of six counts.  Doc. 29.  Counts I and II allege that FirstFire violated the Securities Exchange Act of 1934 (the "Exchange Act") by unlawfully transacting in securities as an unregistered dealer via the Transactions.  15 U.S.C. § 78o(a)(1).  Count III claims that Fireman violated § 20(a) of the Exchange Act by acting as the control person who caused FirstFire to engage in the unlawful Transactions. 15 U.S.C. § 78(t).  Count IV, brought against both defendants, alleges that the FrstFire conducted the affairs of a RICO enterprise in violation of 18 U.S.C. § 1962(c).  Counts V and VI allege unjust enrichment and constructive trust against both defendants. *See* Doc. 29 at 18–24.  DarkPulse further seeks declaratory judgment that the Transactions are void and subject to recission pursuant to § 78c(c) of the Exchange Act and requests that the Court compel FirstFire to return all Darkpulse stock obtained via the Transactions.

On May 26, 2022, Defendants moved to dismiss the FAC in its entirety, pursuant to Federal Rules of Civil Procedure ("F.R.C.P.") 12(b)(1), (3), and (6).  Doc. 30.  Specifically, Defendants argue:  (1) that Counts I and II, as they pertain to the 2021 Note, should be dismissed because the parties have agreed that Delaware is the exclusive forum for all actions arising under its terms; (2) Counts I through III are time barred as to the 2018 Note and otherwise fail to state a claim as to both the Transactions; (3) Count IV fails to state a claim; and (4) absent a federal

A-15

question, the remaining state law claims should be dismissed for lack of subject matter jurisdiction.  For the reasons set forth below, the motion is GRANTED.

## III.   STANDARD

### a.  12(b)(1):  Lack of Subject Matter Jurisdiction

Federal Rule of Civil Procedure 12(b)(1) requires that an action be dismissed for lack of subject matter jurisdiction when the district court lacks the statutory or constitutional power to adjudicate the case.  Fed. R. Civ. P. 12(b)(1).  The party asserting subject matter jurisdiction carries the burden of establishing, by a preponderance of the evidence, that jurisdiction exists. *Morrison v. Nat'l Australia Bank Ltd.*, 547 F.3d 167, 170 (2d Cir. 2008) (quoting *Makarova v. United States*, 201 F.3d 110, 113 (2d Cir. 2000)).  "On a Rule 12(b)(1) motion challenging the district court's subject matter jurisdiction, the court may resolve the disputed jurisdictional fact issues by referring to evidence outside of the pleadings . . . ." *Zappia Middle East Constr. Co. Ltd. v. Emirate of Abu Dhabi*, 215 F.3d 247, 253 (2d Cir. 2000).  When evaluating a motion to dismiss for lack of subject matter jurisdiction, the court accepts all material factual allegations in the complaint as true but does not draw inferences from the complaint favorable to the plaintiff. *J.S. ex rel. N.S. v. Attica Cent. Sch.*, 386 F.3d 107, 110 (2d Cir. 2004) (citing *Shipping Fin. Servs. Corp. v. Drakos*, 140 F.3d 129, 131 (2d Cir. 1998)).

### b.  12(b)(3):  Lack of Proper Venue

"The legal standard for a motion to dismiss for improper venue is the same as a motion to dismiss for lack of personal jurisdiction." *Casville Invs., Ltd. v. Kates*, 12 Civ. 6968 (RA), 2013 WL 3465816, at *3 (S.D.N.Y. July 8, 2013) (citing *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005)).  "When a defendant challenges either the jurisdiction or venue of the court, the plaintiff bears the burden of showing that both are proper." *Id.* (citing *DiStefano v. Carozzi*

9

*N. Am., Inc.*, 286 F.3d 81, 84 (2d Cir. 2001); *Savoy Senior Hous. Corp. v. TRBC Ministries*, 401

B.R. 589, 596 (S.D.N.Y. 2009)).  To meet this burden, the plaintiff must plead facts sufficient for

prima facie showing of jurisdiction or venue.  *Glasbrenner*, 417 F.3d at 355 (citing *CutCo Indus.

v. Naughton*, 806 F.2d 361, 364–65 (2d Cir. 1986)).  Venue is proper in the chosen forum if:  (1)

at least one defendant resides in the district and all the defendants reside in the same state in

which the district is located; (2) a "substantial part" of the events giving rise to the claim

occurred in the district; or (3) the defendant is subject to personal jurisdiction in the district and

"there is no district in which an action may otherwise be brought."  28 U.S.C. § 1391(b).

   c.   **12(b)(6):  Failure to State a Claim**

      "To survive a motion to dismiss, a complaint must contain sufficient factual matter,

accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*,

556 U.S. 662, 678, 129 S.Ct. 1937, 173 L.Ed.2d 868 (2009) (quoting *Bell Atl. Corp. v.

Twombly*, 550 U.S. 544, 570, 127 S.Ct. 1955, 167 L.Ed.2d 929 (2007)).  A claim is facially

plausible "when the plaintiff pleads factual content that allows the court to draw the

reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing

*Twombly*, 550 U.S. at 556.  The plaintiff must allege sufficient facts to show "more than a

sheer possibility that a defendant has acted unlawfully." *Id.* (citing *Twombly*, 550 U.S. at

557).  However, this "flexible 'plausibility standard'" is not a heightened pleading

standard, *In re Elevator Antitrust Litig.*, 502 F.3d 47, 50 n.3 (2d Cir. 2007) (citation omitted),

and "a complaint . . . does not need detailed factual allegations" to survive a motion to

dismiss, *Twombly*, 550 U.S. at 555.

      The question on a motion to dismiss "is not whether a plaintiff will ultimately prevail but

whether the claimant is entitled to offer evidence to support the claims." *Sikhs for Justice v.*

*Nath*, 893 F. Supp.2d 598, 615 (S.D.N.Y. 2012) (quoting *Villager Pond, Inc. v. Town of Darien*, 56 F.3d 375, 378 (2d Cir. 1995)). "[T]he purpose of Federal Rule of Civil Procedure 12(b)(6) is to test, in a streamlined fashion, the formal sufficiency of the plaintiff's statement of a claim for relief without resolving a contest regarding its substantive merits" or "weigh[ing] the evidence that might be offered to support it." *Halebian v. Berv*, 644 F.3d 122, 130 (2d Cir. 2011) (internal citations and quotation marks omitted). Accordingly, when ruling on a motion to dismiss pursuant to Rule 12(b)(6), the Court accepts all factual allegations in the complaint as true and draws all reasonable inferences in the plaintiff's favor. *Nielsen v. Rabin*, 746 F.3d 58, 62 (2d Cir. 2014). "For purposes of this rule, the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference." *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (internal quotation marks omitted).

## IV.   DISCUSSION

### a.  The Delaware Forum-Selection Clause in the Amendment

Defendants argue that Counts I and II—which allege that FirstFire unlawfully transacted in securities as an unregistered dealer—should be dismissed as they relate to the Second Transaction because the parties have agreed that Delaware is the exclusive forum for all actions arising under its terms. *See* Doc. 32-6 at 2.

The Second Circuit has adopted a "strong policy of enforcing forum-selection agreements." *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1280 (S.D.N.Y. 1992). In deciding whether a forum-selection clause is valid and enforceable, a court must determine:

> (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, *i.e.*, . . . whether

11

**A-18**

the parties are required to bring any . . . dispute to the designated forum or simply *permitted* to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause.

*NuMSP, LLC v. St. Etienne*, 462 F. Supp. 3d 330, 343 (S.D.N.Y. 2020) (quoting *Martinez v. Bloomberg LP*, 740 F.3d 211, 217 (2d Cir. 2014)).  "A party can overcome this presumption only by . . . 'making a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching,'" *Martinez*, 740 F.3d at 217 (quoting *Phillips v. Audio Active Ltd.*, 494 F.3d 378, 383–84 (2d Cir. 2007), "or that the "clause[] contravene[s] a strong public policy of the forum state." *Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, No. 18 Civ 3601 (JMA) (AYS), 2021 WL 4463921, at *5 (E.D.N.Y. Aug. 17, 2021), *R.&R. adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021).

Here, the Amendment provides that "[a]ny action brought by either party against the other concerning the transactions contemplated by [the Amendment and] the [2021] Note . . . shall be brought only in the state courts . . . or in the federal courts . . . of Delaware." Doc. 32-6 at 2.  This clause is presumptively enforceable for the following reasons.  First, the provision was reasonably communicated to DarkPulse.  The FAC states that Fireman presented O'Leary with the one-page Amendment on November 4, 2021.  It notes only that "Fireman failed to mention to O'Leary that the [A]mendment . . . replaced the choice-of-law provision." ¶¶ 46–47.  Assuming that were true, the change is nonetheless apparent on the face of the document; it is highlighted with a bolded and underlined heading: "**<u>Governing Law; Venue</u>**." [11]  Doc. 32-6 at 2.  Courts have enforced similarly emphasized provisions against less sophisticated litigants. *See, e.g.,*

---

[11] The only other change effected by the Amendment was removing "from the [2021 SPA] Section 4. Subsection d. **<u>Restriction on Activities</u>**." Doc. 36-2 at 4.  Section 4, subsection d. provided: "[DarkPulse] shall not . . . without [FirstFire's] prior written consent, which consent shall not be unreasonably withheld: (a) change the nature of its business in any material respect; or (b) sell, divest, acquire, [or] change the structure of any material assets other than in the ordinary course of business.  Notwithstanding the forgoing, any prior public disclosure of [DarkPulse's] intent or contemplation to sell, divest, acquire, or change the structure of any material assets shall not require [FirstFire's] prior written consent. Doc. 29-2 at 34–35.

*Seffron v. Sun Line Cruises, Inc.*, 67 F.3d 7, 9 (2d Cir. 1995) (holding that a forum-selection clause on the back of a three-page, double-sided cruise ship ticket, situated beneath the bolded headline "important notice—read before accepting," provided sufficient notice of the provision for it to be enforceable against a passenger).  Furthermore, Fireman was not required to explain in detail the contents of the one-page Amendment to O'Leary for it to be enforceable.  *See Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) ("If [a businessman] did not read [a contract's terms] or hire counsel to do so, he is the victim of his own lack of diligence, [and] not [the defendants'] misconduct.").  Accordingly, DarkPulse had sufficient notice of the forum-selection clause in the Amendment.

Second, the provision is mandatory, not permissive.  It provides that actions "concerning the transactions contemplated by [the Amendment and the 2021 Note] shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware."  Doc. 29-2 at 2.  Third, the forum-selection clause governs the parties and the claims at issue in this action to the extent they arise out of the Second Transaction.  *Id.*  For these reasons, the forum-selection clause is presumptively enforceable.

DarkPulse argues that the Amendment is invalid because the 2021 Note is void and unenforceable, as it violates New York usury law.[12]  *See* Doc. 34 at 15.  Specifically, DarkPulse contends that the provision in the 2021 Note requiring DarkPulse to issue FirstFire 60,000,000 shares at the time of execution—which bore a fair market value of $4,800,000—renders the First Transaction void *ab initio*.

New York Penal Code § 190.40 "prohibits corporations from interposing a defense of usury to an action to collect a debt except insofar as the rate of interest exceeds the criminal

---

[12] DarkPulse offers no other argument for why enforcing the Amendment would be unjust or contravene New York public policy.

usury rate of 25% per annum." *Haymount Urgent Care PC v. GoFund Advance, LLC*, 22 Civ.

1245 (JSR), 2022 WL 2297768, at \*12 (S.D.N.Y. June 27, 2022).  Where the interest rate

exceeds the criminal usury rate, a corporation may interpose an affirmative defense of usury and,

if successful, obtain a declaration that invalidates the debt instrument *ab initio*.  *See id.*

(citing *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 333 (2021)).  "'However, New

York courts have uniformly construed [§ 190.40] as limited to the affirmative defense, and they

have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal

usury and seeking to invalidate an agreement.'"  *Streamlined Consultants, Inc. v. EBF Holdings*,

No. 21 Civ. 9528 (KMK), 2022 WL 4368114, at \* 3 (S.D.N.Y. Sept. 20, 2022) (quoting

*Haymount Urgent Care PC v. GoFund Advance, LLC*, 22 Civ. 1245 (JSR), 2022 WL 2297768,

at \*12 (S.D.N.Y. June 27, 2022) (collecting cases)); *see also Paycation Travel, Inc. v. Glob.*

*Merch. Cash, Inc.*, 141 N.Y.S.3d 319, 320 (App. Div. 2021) ("General Obligations Law § 5-

521 bars a corporation such as the plaintiff from asserting usury in any action, except in the case

of criminal usury as defined in [] § 190.40, and then *only as a defense to an action to recover*

*repayment of a loan*, and not as a basis for a cause of action asserted by the corporation for

affirmative relief.") (emphasis added).

    In *Streamlined Consultants*, for example, the parties entered into a revenue-based funding

agreement, whereby the defendant purchased a 15% share of the plaintiff's future receipts for a

fixed, upfront purchase price.  2022 WL 4368114, at \*1.  Rather than requiring the parties to

calculate the precise dollar amount to be withdrawn on a daily basis, the agreement provided for

an automatic daily payment based on the plaintiff's monthly average sales.  *Id.*  Six weeks after

entering into the agreement, however, the plaintiff brought an action seeking to invalidate the

contract, alleging that it had been loaned money at a criminally usurious rate.  *Id.*  The court

granted the defendant's motion to dismiss the action in its entirety, reasoning that "§ 190.40 is strictly an affirmative defense to an action seeking repayment of a loan and may not, as here, be attempted as a means to [nullify an agreement and] effect recovery by the corporate borrower." *Id.* at *3; *see also Haymount Urgent Care,* 2022 WL 2297768, at *12 (denying the plaintiffs declaratory judgment that a contract was criminally usurious).

Similar to the plaintiff in *Streamlined Consultants*, DarkPulse here attempts to use New York's usury statute as a sword to void the Second Transaction, circumvent the forum-selection clause in the Amendment, and maintain the instant action against Defendants.  The sole case relied upon by DarkPulse for the proposition that it has the right to do so is *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 335 (2021).  There, the Court of Appeals upheld a defendant-borrower's invocation of § 190.40 to protect against the enforcement of a usurious contract, reasoning that a contract containing a criminally usurious loan is void *ab initio* under New York General Obligations Law § 5-511.  *Id.*  Nowhere in its opinion, however, did the *Adar Bays* court suggest that a plaintiff may use § 190.40 affirmatively; rather, the opinion exclusively characterizes usury as a defense.  *See generally id.*  What's more, the courts in both *Streamlined Consultants* and *Haymount* expressly relied upon *Adar.*  And like the plaintiffs in those cases, DarkPulse does not "present [any] countervailing case law suggesting that [it] can seek affirmative relief under the New York usury statute."  *Haymount Urgent Care,* 2022 WL 2297768, at *12.  Accordingly, Counts I and II, as they relate to the 2021 Note, are dismissed.

**b.  Statute of Limitations**

DarkPulse brings Counts I and II pursuant to § 29(b), alleging that FirstFire violated the Exchange Act by transacting in securities as an unregistered dealer in violation of § 15(a). DarkPulse also brings Count III pursuant to § 29(b), claiming that Fireman violated the

Exchange Act by acting as the control person who caused FirstFire to engage in the purportedly

unlawful Transactions in violation of § 20(a).  Defendants argue that Counts I through III are

time-barred as to the September 2018 Note.

> Section 15(a) of the Exchange Act states that it is

> unlawful for any broker or dealer . . .  to make use of . . . any means or instrumentality of
> interstate commerce to effect any transactions in, or to induce or attempt to induce the
> purchase or sale of, any security . . . unless such broker or dealer is registered in
> accordance with subsection (b) of this section.

15 U.S.C. § 78o(a)(1).[13]  Section 15, however, does not have a limitations period.  But § 29(b) of

the Exchange Act provides one, at least with respect to certain claims arising under § 15.[14]

Specifically, § 29(b) provides:

> No contract shall be deemed to be void by reason of this subsection in any action
> maintained in reliance upon this subsection, by any person to or for whom
> any broker or dealer sells, or from or for whom any broker or dealer purchases,
> a security *in violation of any rule or regulation prescribed pursuant to paragraph
> (1) or (2) of subsection (c) of section 78o of this title*, unless such action is
> brought within one year after the discovery that such sale or purchase involves
> such violation and within three years after such violation.

*Id.*  Accordingly, while § 29(b) imposes a one/three-year limitations period for actions brought

pursuant to (1) or (2) of subsection (c) of § 15, it is *silent* as to claims arising under § 15(a).  *Id.*

Courts must therefore determine which limitations period to apply.

> Generally, courts applied the § 29(b) one/three-year limitations period governing §

15(c)(1) and (2) claims to § 15(a) claims.  On this point, *Kahn v. Kohlberg, Kravis, Roberts &

Co.* is particularly instructive.  970 F.2d 1030 (2d Cir. 1992), *cert. denied*, 506 U.S. 986 (1992).

---

[13] Section (20)(a) of the Exchange Act provides that anyone "who, directly or indirectly, controls a[n entity] liable under any provision of this chapter . . . shall also be liable jointly and severally with and to the same extent as" the controlled entity, unless "the controlling person acted in good faith and did not directly or indirectly induce the acts or acts constituting a violation or cause of action."  15 U.S.C. § 78(t).

[14] Section 29(b) provides in relevant part that "any contract made in violation of any provision of this chapter or any rule of regulation thereunder . . . shall be void."  15 U.S.C. § 78cc(b).

There, the plaintiff brought a claim for rescission under § 215 of the Investment Advisers Act (IAA) based on the defendant's failure to register as an investment adviser, as required by § 80b-3 of the IAA. *Id.* at 1032. Like § 29(b) of the Exchange Act, § 215 of the IAA provides that contracts whose formation or performance would violate the act are void. *Id.* at 1032–33. Section 215 also does not specify a limitations period for bringing a recission action pursuant to § 80b-3. *Id.* 1033. To decide the appropriate limitations period, the court—pursuant to the approach set forth by the Supreme Court in *Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 498 U.S. 894 (1990)—determined that the period should derive from a federal statute, rather than a state statute, since § 215 claims often involve an interstate transaction and have some nexus to interstate or foreign commerce. *Kahn*, 970 F.2d at 1033–35. With respect to *which* federal statute the court should borrow, the defendants argued that the Exchange Act is most similar to the IAA, and that its one/three-year provision should govern. *Id.* at 1038–39. The plaintiff disagreed, asserting that the Exchange Act's limitations period only pertained to claims involving *fraud*, and that it would be inappropriate to apply the period to a non-fraud action, premised on the defendant's failure to register. *Id.* The court rejected the plaintiff's argument and applied the one/three-year limitations period, observing that Congress enacted the IAA and the Exchange Act for the "almost identical" purpose: for "avoiding frauds." *Id.* The court specifically noted that § 15 of the Exchange Act "is an antifraud provision." *Id.*

Post-*Kahn*, courts in this Circuit have routinely imposed the § 29(b) one/three-year limitations rule on § 15(a) claims predicated on a dealer's failure to register. In *Alpha Cap. Anstalt v. Oxysure Systems, Inc.*, for example, a court applied the limitations period to bar an affirmative defense raised under § 15(a) to a breach of contract action. 216 F. Supp. 3d 403, 408 (S.D.N.Y. Mar. 31, 2022) (finding the defendants "barred from raising any defense based on an

17

implied right of action under § 29(b) of the Exchange Act," because § 29(b)'s "one-year statute of limitations runs from the time when an individual could have, through the exercise of reasonable diligence, discovered the fraud at issue," and the defendant admitted to knowing that the plaintiff's agent was not a licensed broker-dealer.). Similarly, in *Anderson v. Binance*, a court applied the one-year limitations period to a § 29(b) claim based on the defendant acting as unregistered exchange. No. 20 Civ. 2803, 2022 WL 976824, at *3 (S.D.N.Y. Mar. 31, 2022); *see also Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (finding that a one/three-year limitations applies where §15(a) underlies the claim).

Against the weight of the foregoing authority, DarkPulse argues that the Court should apply the two/five-year limitations period specified in the Sarbanes Oxley Act. 28 U.S.C. § 1658(b). DarkPulse, however, does not cite *any* instance where a court has applied this limitations period to a § 29(b) claim based on a § 15(a) violation. It asserts only that the Sarbanes Oxley Act, like the Securities Act, covers private actions involving securities fraud, and that the *Kahn* court characterized § 15 as an antifraud provision. *See* Doc. 34 at 28. Without more, this reasoning does not persuade the Court to deviate from the approach taken by a majority of courts in this Circuit of applying the one/three-year limitations period to § 29(b) implied claims grounded in a § 15(a) violation.[15]

As to the first transaction, Counts I through III are time-barred by the three-year limitations period in § 29(b). DarkPulse entered into the 2018 SPA on September 20, 2018 but

---

[15] Additionally, the sole case DarkPulse cites for the proposition that the one-year/three-year limit does not apply to § 15(a) cases is *Lawrence v. Richman Grp. cf Conn., LLC*, 407 F. Supp. 2d 385 (D. Conn. 2005). There, the court noted in a footnote that the statute of limitations did not apply to a § 29(b) claim when it is raised as an affirmative defense and only applies to "affirmative actions for rescission." *Id.* at 389 n.7. The court did not, however, conclude that a two/five-year limitations period should apply. As discussed, the court in *Alpha Cap. Anstalt*, however, arrived at the precise opposite conclusion, in line with the great weight of case law. 216 F. Supp. 3d at 40.

did not file the instant action until December 31, 2021, more than three years later. ¶¶ 26–27; *see Hottinger v. Amcoal Energy Corp.*, No. 89 Civ. 6391 (LMM), 1992 WL 349851, at *6 (S.D.N.Y. Nov. 10, 1992) (holding plaintiff's claim barred after three years from the "execution of a promissory note and accompanying investment documents").

The continuing violation doctrine, moreover, does not apply. This "doctrine applies when the defendant's conduct causes plaintiff to sustain damages after the time when the statute of limitations would have expired if it commenced at the time of defendant's first act. Instead, the claim accrues each time the plaintiff sustains damages." *Kahn*, 970 at 1039. "That is, the doctrine applies to cases where 'conduct by the defendant may give rise to damages in the future which are not predictable at the time of the initial act or within the limitations period.'" *Comm Trade USA. Inc. v. INT'L FCStone, Inc.*, No. 13 Civ. 3998 (KBF), 2014 WL 787912, at * 9 (S.D.N.Y. Feb. 27, 2014); *see also See Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974) ("Each payment on the promissory [n]ote represented not the creation or assumption of new obligations, but the fulfillment of those previously created."). Here, DarkPulse argues that each of FirstFire's conversions—the last of which occurred on February 18, 2021—constituted an independent injury that reset the clock. However, these conversions were foreseeable to DarkPulse at the time the parties entered into First Transaction in 2018; indeed, DarkPulse expressly agreed to permit FireFire to elect that option.

Accordingly, the continuing violation doctrine does not apply, and Counts I through III are time barred as to the First Transaction.

**c. Prohibited Transaction**

Additionally, Defendants argue that because *neither* of the Transactions were "prohibited," Counts I through III fail to state a claim under § 29(b). To establish a violation of

19

§ 29(b), a plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect." *EMA Fin., LLC v. Vystar Corp., Inc.*, No. 19 Civ. 1545 (ALC) (GWG), 2021 WL 1177801, at *2 (Mar. 29, 2021). However, "[o]nly unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981).

DarkPulse contends that the Notes should be rescinded because FirstFire was acting an unregistered securities dealer in violation of § 15(a). ¶¶ 99, 109. Courts in this District have, however, held that in § 29(b) actions, a defendant's failure to register as a dealer does not make the transaction "prohibited," where the underlying contract does not require the defendant to act as a dealer. Indeed, courts have routinely dismissed such actions. *See, e.g.*, *EMA Financial, LLC v. Vystar Corp, Inc.*, 2021 WL 1177801, at *2–3 (S.D.N.Y. Mar. 29, 2021) (rejecting the defendant's argument on summary judgment that the agreements underlying a transaction were voidable under § 29(b) because the plaintiff acted as an unregistered broker-dealer in violation of § 15(a), and noting that the agreements did not require the plaintiff to register); *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, No. 17 Civ. 4006 (LJL) (OTW), 2018 WL 6547160, at *5–6 (S.D.N.Y. July 10, 2017) (Although the plaintiff-lender may have acted improperly when it sold off shares that it received from the defendant as a result of conversions under a note, nothing in the note or the sales purchase agreement explicitly required it to act as a broker. Thus, the contracts were still capable of performance even if the plaintiff failed to register as a dealer and were not voidable.); *see also Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*, No. 12 Civ. 6075 (TPG), 2013 WL 1209799, at *9 (S.D.N.Y. Mar. 22, 2013) ("To find a contract unenforceable for illegality at the pleading stage, the question is whether the contract on its face

20

requires the unregistered finder to perform broker services.") (internal quotation marks omitted). Here, neither of the Notes required FirstFire to act as a broker dealer.

DarkPulse argues that because FirstFire was obligated to purchase the Notes, the SPAs cannot be performed without violating the Exchange Act. However, obligating FirstFire to purchase the Notes does not "explicitly require" FirstFire to act as a broker. *See Foundation Ventures, LLC v. F2G, LTD.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010). Indeed, the language of the non-voidable sales purchase agreement in *ExeLED* is nearly identical to the language obligating DarkPulse to purchase the Notes here. *Compare* the *ExeLED* sales purchase agreement, No. 17 Civ. 4006 (LJL) (OTW), ECF Doc. 26-1 (obligating that "the [c]ompany shall issue and sell to the [b]uyer and the [b]uyer agrees to purchase from the [c]ompany such principal amount of [n]ote as is set forth immediately below the [b]uyer's name on the signature pages hereto"), *with* the 2018 and 2021 SPAs, Docs. 29-1, 29-2 ("On the Closing Date . . . [DarkPulse] shall issue and sell to the [FirstFire] and [FirstFire] agrees to purchase from [DarkPulse] such principal amount of the Note as is set forth immediately below [FirstFire's] name on the signature pages hereto."). The Court therefore finds this argument unpersuasive.[16] For these reasons, the Court holds that DarkPulse has failed to state a claim under § 29(b).[17]

---

[16] DarkPulse's reliance on *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) and *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) is misplaced. *Mills* involved a merger where shareholders alleged the proxy statement was materially false and misleading. 396 U.S. at 378–79. The Supreme Court held that causation is sufficiently shown under §14(a) where plaintiffs show the "proxy solicitation itself, rather than the particular defect in the solicitation materials, was an essential link in the accomplishment of the transaction." *Id.* at 385. But contrary to DarkPulse's assertion, the Court made no ruling as to the appropriate remedy. *Id.* at 386 ("Our conclusion that petitioners have established their case . . . implies nothing about the form of relief to which they may be entitled."). *Pearlstein* is likewise not analogous. There, a court, held that the plaintiff's claim under § 7 of the Exchange Act was not barred by two settlement agreements, as those agreements "resulted in a continuation of credit in violation of Regulation T, and under [§] 29(b)." 429 F.2d at 1142. Those agreements, by their terms, obligated plaintiff to pay if defendant extended further credit and thus were void under § 29(b). *Id.*

[17] Having already dismissed Counts I through III as to the First Transaction as untimely, and for failure to state a claim as to both Transactions—as well as Counts I and II as to the Second Transaction as subject to the Delaware

21

### d. RICO Claim

RICO prohibits "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Where, as here, a plaintiff bases its RICO claim on the collection of an unlawful debt, "a plaintiff must allege that (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (2) the debt was incurred in connection with the business of lending money . . . at a [usurious] rate, and (3) the usurious rate was at least twice the enforceable rate." *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018).

Here, DarkPulse argues that both Notes constitute collections of unlawful debt because they both are governed by and violate New York usury law. ¶¶ 74–77.

With respect to the 2018 Note, DarkPulse argues that the Nevada choice-of-law and clause is unenforceable. Nevada does not have a criminal usury statute. NRS 99.050. Courts "generally enforce choice-of-law clauses," in accordance with the well-settled principle that "contracts should be interpreted so as to effectuate the parties' intent." *Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015). New York courts will only disregard clear choice-of-law provisions upon a showing that: (1) the chosen state has no reasonable connection to the parties or the contract, (2) the agreement was obtained through fraud, or (3) the chosen state's law violates a fundamental public policy of New York. *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020).[18]

---

forum-selection clause—the Court need not delve into the factual inquiry of whether FirstFire is or is not a "dealer" under the Exchange Act.

[18] DarkPulse does not argue that the Nevada choice-of-law clause was obtained by fraud.

DarkPulse fails to meet its burden of showing that Nevada has no reasonable connection

to the parties.  To be sure, the FAC pleads that DarkPulse and FirstFire are each organized under

the laws of Delaware and have a principal place of business is in New York.  ¶¶ 17–20.

Furthermore, it may well be the case that DarkPulse experienced the monetary effect of the

conversions made under the First Transaction in New York.  *See* Doc. 34 at 32, n. 22 (providing

hyperlinks to DarkPulse's January 3, 2019 and April 1, 2021 8-K forms, which reflect

DarkPulse's New York address).[19]  However, the question before the Court is not where the

parties have the most significant relationship; rather, it is whether the chosen state has a

reasonable connection to the parties.  The FAC plainly states that the parties met in Nevada to

negotiate the Amendment.  In so doing, the parties demonstrated an openness to conducting

business there.  Additionally, DarkPulse's 10-K form for the annual period ending in December

31, 2018 shows that the company entered into at least three other agreements with a Nevada

choice-of-law clause; this further demonstrates the firm's amenability to transacting business

there.  *See* Doc. 32-3.[20]

Beyond these facts, DarkPulse fails to demonstrate that enforcing the Nevada law would

contravene a fundamental New York public policy.  While New York has a strong policy interest

in enforcing usury laws in the *consumer* context, the Second Circuit has made clear that

"corporations conducting their business transactions should be treated differently from individual

consumers seeking personal credit."  *United States v. Moseley*, 980 F.3d 9, 21–22 (2d Cir. 2020)

(citing *Walter E. Heller & Co. v. Chopp-Wincroft Printing Specialties, Inc.*, 587 F. Supp. 557,

---

[19] The Court takes judicial notice of these filings. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Kramer*, 937 F.2d at 773.

[20] The Court takes judicial notice of this filing. *See ATSI Commc'ns, Inc.*, 493 F.3d at 98; *Kramer*, 937 F.2d at 773.

560 (S.D.N.Y. 1982) ("[U]sury is not a favored defense [in New York], particularly in the circumstances here where a corporation rather than a helpless consumer is involved."); *RMP Capital Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 186 (E.D.N.Y. 2014)).[21] Here, the parties are two sophisticated financial institutions that willingly entered into an agreement to abide by the laws of Nevada. They are simply not "the type of needy and unsophisticated consumers," contemplated by the *Moseley* court entitled to relief from a choice-of-law clause.[22] *Id.* at 22; *see also Superior Funding Corp. v. Big Apple Capital Corp.*, 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990).

With respect to the Second Transaction, the Delaware forum selection clause in the Amendment is, as discussed, enforceable, and so too is the Delaware choice-of-law provision. Both of the parties are incorporated under the laws of Delaware, therefore have a reasonable connection to the state. Moreover, for the reasons already discussed, the fact that Delaware, like Nevada, has not adopted a usury law does not render application of Delaware law violative of New York public policy. *See* Del. Code Ann. tit. 6, §§ 2301(c), 2304(a), 2306. DarkPulse points to no other provision in which to ground its RICO claim as to the Second Transaction. Accordingly, that claim also fails. The Court therefore dismisses Count IV as to both Transactions.[23]

---

[21] DarkPulse's reliance on *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, 2022 WL 426199, at *8–9 (S.D.N.Y. Feb. 11, 2022) is not persuasive, as that case involved a choice-of-law analysis for a *tort* claim, which is not the same as the standard applied for a contract-based claim.

[22] What's more, the 2018 Note includes a provision that the laws of Nevada shall apply "without regard to principles of conflicts of laws." *Id.* at 16 § 4.6; *see Ministers & Missionaries*, 26 N.Y.3d at 474 ("New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract . . . .").

[23] Because the choice-of-law provisions underlying both Transactions are enforceable—and because neither Nevada nor Delaware have adopted a usury statute—Count IV must be dismissed, and the Court need not assess FirstFire's other, largely factual arguments with respect the other potential shortcomings with DarkPulse's RICO claim.

#### e.  Remaining State Law Claims

Under 28 U.S.C. § 1367(c)(3), if the Court has dismissed all claims over which it has original jurisdiction, it may decline to exercise jurisdiction over any non-federal claims over which it could have exercised supplemental jurisdiction.  Subject matter jurisdiction in the instant action is based on federal question jurisdiction rooted in claims brought under the Exchange Act and RICO.  15 U.S.C. §§ 78o(a)(1), 78(t); 18 U.S.C. § 1962(c).

Because no federal claim remains that is subject to a merits determination by this Court, it would be inappropriate to adjudicate DarkPulse's state law claims.  *See United Mine Workers of Am. v. Gibbs*, 383 U.S. 715, 726 (1966) ("Certainly, if the federal claims are dismissed before trial, . . . the state claims should be dismissed as well."); *McGugan v. Aldana-Bernier*, No. 11 Civ. 342 (TLM), 2012 WL 1514777, at *8 (E.D.N.Y. Apr. 30, 2012) ("[W]hen all federal claims are eliminated in the early stages of litigation, the balance of factors generally favors declining to exercise pendent jurisdiction over remaining state law claims and dismissing them without prejudice."), *aff'd*, 752 F.3d 224 (2d Cir. 2014).  Therefore, DarkPulse's remaining state law claims are dismissed without prejudice to repleading in state court.

### V.   CONCLUSION

For the foregoing reasons, Defendants' motion to dismiss is GRANTED in its entirety. The Clerk of Court is respectfully directed to terminate the motions, Doc. 30 and 33, and to close the case.

It is SO ORDERED.

Dated:   January 16, 2023
         New York, New York

_____
                                   Edgardo Ramos, U.S.D.J

A-32

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARKPULSE, INC., | |
| Plaintiff, | **CIVIL ACTION NO. _____** |
| v. | **COMPLAINT** |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC | |
| Serve: Eli Fireman 1040 1st Avenue, Suite 190 New York, NY 10022, | |
| and | |
| ELI FIREMAN, | |
| Defendants. | |

Plaintiff DarkPulse, Inc. ("DarkPulse"), through counsel, states for its Complaint against

Defendant FirstFire Global Opportunities Fund, LLC ("Defendant" or "FirstFire") and Eli Fireman

("Fireman") (collectively, "Defendants") as follows:

## I.   NATURE OF THE ACTION

1.   FirstFire is a "death spiral" or "toxic" lender:[1] an unregistered securities dealer that

makes unlawful, predatory loans to small, publicly traded companies.[2] Toxic lenders like FirstFire

---

[1]   *See* SEC discussion (and warnings) about toxic lending and convertible securities, https://www.investor.gov
/introduction-investing/investing-basics/glossary/convertible-securities (last accessed on December 22, 2021.)

[2]   Based on a review of the filings in the EDGAR database from March 17, 2015 to date, FirstFire has engaged in
financing similar to this case on *at least 203* separate occasions with *at least 89* other microcap companies, resulting
in approximately *203 securities transactions* with *at least 1,001,396,742 shares* being issued, with an estimated open

purport to be investors who 'save' struggling microcap companies, but the reality is very much the opposite: FirstFire is not an investor, but rather a *creditor* that, in keeping with typical toxic lending arrangements, gives itself the right to take payment of the debt in company stock, but with a substantial discount to the market price. Unlike a typical private-placement investor, FirstFire can immediately dump the stock into the public market to reap the difference between the discount and the market price.[3] Moreover, because it can convert the debt in tranches, FirstFire is able to dump large quantities of the newly-issued stock into the market and remain unaffected by the price depression that its selling tends to cause.

2.     The Agreements[4] in this case are a masterful example of toxic lending. In two separate Notes, FirstFire loaned to DarkPulse a combined total of $975,000. As repayment of those two Notes, FirstFire extracted more than $38 million dollars in company stock from DarkPulse, which it immediately sold into the public market.

3.     According to the Securities and Exchange Commission ("SEC"), FirstFire's business model is not simply predatory, it is patently unlawful. In several recent civil actions, the SEC has prosecuted toxic lenders for unlawfully operating as unregistered securities dealers, in

---

market value of tens of millions of dollars. *See* **Exhibit 3** (EDGAR Spreadsheet, listing securities transactions by FirstFire identified in issuer EDGAR filings).

[3]     Toxic lenders take advantage of the so-called "tacking" provisions currently provided in Rule 144, *see* 17 CFR 230.144(d)(3)(ii). Recognizing the harms to microcaps and their investors caused by toxic lending, the SEC has proposed rulemaking to revise the holding period for securities acquired upon the conversion or exchange of certain market-adjustable securities like those used by FirstFire: "Currently, Rule 144 deems securities acquired solely in exchange for other securities of the same issuer to have been acquired at the same time as the securities surrendered for conversion or exchange. Under the amendments, the holding period for the underlying securities acquired upon conversion or exchange of 'market-adjustable securities' would not begin until conversion or exchange, meaning that a purchaser would need to hold the underlying securities for the applicable Rule 144 holding period before reselling them under Rule 144." *See* Notice of Proposed Rule, https://www.sec.gov/rules/proposed/2020/33-10911.pdf (last accessed on Dec. 28, 2021) ("Prop. Rule").

[4]     The "Agreements" refer to the agreements executed by Plaintiff in favor of FirstFire, *viz.*: (1) a Convertible Promissory Note for $247,500.00 executed on April 20, 2018, (constituted by a "Senior Convertible Promissory Note" and Share Purchase Agreement ("SPA")) (**"September 2018 Note"**); and (2) a Convertible Promissory Note executed for $825,000.00 executed on April 26, 2021 (also constituted by a "Convertible Promissory Note" and SPA) (**"April 2021 Note"**). A true and correct copy of each of the Notes and SPAs are attached as follows: (1) September 2018 Note and SPA as **Exhibit 1**; and (2) April 2021 Note and SPA as **Exhibit 2**. The securities transactions effected by the Agreements are hereinafter referred to as the "DarkPulse Transactions."

2

violation of § 15(a) of the Securities Exchange Act of 1934 ("Act") (15 U.S.C. § 78o).  *Every court to address the matter has agreed with the SEC.*[5]

4.      The toxic lenders under scrutiny in the SEC cases use FirstFire's *precise* business model (indeed, the contracts seem to have been drafted by the same firm), and—like FirstFire—refrain from registering with the SEC in order to evade regulatory oversight and continue making predatory loans that generate outrageous profits.

5.      The remedy sought by the SEC in those cases (and awarded in cases that have progressed to judgment) is disgorgement of profits and cancellation of any remaining shares.  *See SEC v. Almagarby*, 2021 U.S. Dist. LEXIS 186477 (S.D. Fla. Sep. 29, 2021) (Order).

6.      Similarly, in addition to other remedies, the remedy sought by Plaintiff here is rescission of the DarkPulse Transactions pursuant to § 29(b) of the Act, on the ground that each of the contracts was both *made* and *performed* in violation of § 15(a) of the Act.  *See* 15 U.S.C. § 78o.

## II.    JURISDICTION AND VENUE

7.      This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

8.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

9.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants' principal place of business is located in this District and because a substantial part of

---

[5]    *See, e.g., SEC v. Big Apple Consulting USA, Inc.,*783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby,* 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener,* 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro,* 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC,* 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021). For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy,* LLC, 6 F.4th 50 (1st Cir. 2021); *Auctus Fund, LLC, v. Players Network, Inc.,* 20-cv-10766 (D. Mass. Dec. 10, 2021).

3

the events giving rise to this action occurred in this District.

10. Notwithstanding that the DarkPulse Transactions should be voided and rescinded in their entirety by the Court for the reasons stated herein, Defendants should be estopped from denying that jurisdiction or venue is proper in this Court because the Agreements provide expressly that any action brought by either party concerning the transactions contemplated by the Agreements must be brought in state or federal courts located in the State of New York.[6]

### III.   PARTIES

11. DarkPulse's principal place of business is located at 1345 Avenue of the Americas, 2nd Floor, New York, New York 10105. DarkPulse is a corporation organized under the laws of the state of Delaware.[7]

12. DarkPulse's stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major stock exchanges—are traded.

13. FirstFire's principal place of business is located at 1040 First Avenue, Suite 190, New York, New York 10022. FirstFire is registered as a Delaware limited liability company.

14. FirstFire's website[8] shows that FirstFire held itself out to the public as a "New York based investment manager" that "will source, structure, and execute direct investments in publicly traded companies with market capitalizations under $750 million."

---

[6]  *See* Notes at § 4.6; SPAs at § 8a.
[7]  In April 2018, DarkPulse was located in Virginia.
[8]  A screenshot of FirstFire's website (http://www.firstfirecap.com/) as it existed on January 26, 2020, was recovered by DarkPulse with the Wayback Machine, a digital archive of the world wide web, *available at:* https://archive.org/web/ (last accessed on December 29, 2021). The website appears to have been deleted from the Internet in 2020.



15.     FirstFire is not now, and has never been, registered as a securities dealer with the SEC.

16.     Upon information and belief, Fireman is a permanent resident in the State of New York.

17.     Upon information and belief, Fireman is the managing member of FirstFire Capital Management, LLC, an entity which is the managing member of FirstFire.

18.     Fireman is not now, and has never been, registered as a securities dealer with the SEC.

19.     FirstFire Capital Management, LLC, is not now, and has never been, registered as a securities dealer with the SEC.

## IV.   FACTUAL ALLEGATIONS

### A.  The September 2018 Note

20.     FirstFire executed the first securities transaction with DarkPulse on September 20, 2018 when it purchased from DarkPulse a convertible promissory note, a type of debt security constituted by a promissory note and a share purchase agreement.

21.     FirstFire paid DarkPulse $225,000 for the September 2018 Note, for which DarkPulse was obligated to repay FirstFire $247,500 plus 8% interest, due in nine months.

22.     The September 2018 Note also gave FirstFire the right, commencing 180 days after purchase, to exchange all or any portion of the debt for company stock, at a 30% discount to the market price.[9]

23.     By exercising the conversion option, Defendants exchanged the debt under the note (securities) for newly-issued company stock (securities).

24.     On June 7, 2019, FirstFire began conversion of the September 2018 Note.  In all, FirstFire effectuated 18 separate conversions under the September 2018 Note.

25.     Each of those 18 conversions, as well as the subsequent sales of the stock obtained thereby, are transactions in securities; with each conversion or sale, FirstFire used the mail and or other means or instrumentalities of interstate commerce to effect a transaction in securities.

26.     FirstFire's conversions of debt into DarkPulse stock under the September 2018 Note are as follows:

    a.     6/7/2019:  converted $5,340.00 of debt for 7,000,000 shares of common stock;

    b.     6/18/2019: converted $3,331.00 of debt for 7,000,000 shares of common stock;

    c.     6/24/2019: converted $2,778.00 of debt for 7,900,000 shares of common stock;

    d.     7/8/2019:  converted $1,560.00 of debt for 6,000,000 shares of common stock;

    e.     7/15/2019: converted $1,560.00 of debt for 6,000,000 shares of common stock;

---

[9]     With the value of the 30% conversion discount added to 10% original issue discount and the stated 8% interest rate, it is clear that the September 2018 Note violates the 25% interest rate cap set forth in New York's criminal usury laws.  *See Adar Bays v. GeneSYS ID, Inc.,* 2021 NY Slip Op. 05616, 2021 WL 4777289 (Oct. 14, 2021).

     f.    7/24/2019: converted $2,708.00 of debt for 11,600,000 shares of common stock;

     g.    7/30/2019: converted $3,296.00 of debt for 13,700,000 shares of common stock;

     h.    8/5/2019:  converted $3,008.00 of debt for 16,100,000 shares of common stock;

     i.    8/9/2019:  converted $1,492.00 of debt for 17,800,000 shares of common stock;

     j.    8/15/2019: converted $1,426.00 of debt for 20,900,000 shares of common stock;

     k.    9/6/2019: converted $4,900.00 of debt for 35,000,000 shares of common stock;

     l.    9/10/2019: converted $4,900.00 of debt for 35,000,000 shares of common stock;

     m.    9/20/2019: converted $2,765.00 of debt for 35,900,000 shares of common stock;

     n.    9/1/2020:   converted $7,000 of debt for 85,000,000 shares of common stock;

     o.    1/14/2021: converted $28,000 of debt for 100,000,000 shares of common stock;

     p.    1/25/2021:  converted $42,000 of debt for 150,000,000 shares of common stock;

     q.    2/5/2021: converted $28,000.00 of debt for 100,000,000 shares of common stock; and

     r.    2/18/2021:  converted $103,436 of debt for 220,000,000 shares of common stock.

27.    In all, FirstFire exchanged $247,500 worth of debt for 879,400,000 shares of newly-issued stock.

28.    The estimated open market value of the stock FirstFire acquired from conversion of the September 2018 Note totaled *$10,738,900.00*.

29.     Upon information and belief, as soon as FirstFire received the newly-issued DarkPulse shares, it immediately sold them into the marketplace to reap a substantial profit.

30.     As shown in the following list, the ***average daily trading volume*** in DarkPulse stock increased dramatically in the days following each FirstFire conversion, demonstrating FirstFire's well-known practice of dumping issuer stock into the market as soon as possible.[10]

- 30 days prior to first conversion:                          4,646,131
- 10 days following 06/07/2019 conversion:            8,235,159
- 10 days following 06/24/2019 conversion:          12,059,811
- 10 days following 07/08/2019 conversion:          11,579,818
- 10 days following 07/15/2019 conversion:          13,563,234

### B. The April 26, 2021 Note

31.     On April 26, 2021, the parties executed a second securities transaction in which FirstFire purchased from DarkPulse a second convertible promissory note.  In that transaction, FirstFire paid DarkPulse $750,000 for the April 2021 Note, which obligated DarkPulse to repay in the amount of $825,000.00, plus 10% APR in interest, with a nine-month maturity date.

32.     The April 2021 Note is a security under the Act, constituted by a promissory note and a share purchase agreement, which gave FirstFire the right to convert the debt into stock.

33.     Unlike the fixed discount under the September 2018 Note, the April 2021 Note provided a *fixed* price of $0.015 per share; however, that price would reduce to $0.005 per share upon the occurrence of any incident of default.

34.     The April 2021 Note specified that it was governed by New York law.  *See* EXH.2, Note at 4.6; SPA at ¶ 8.

---

[10]    *See* Prop. Rule, *supra* at note 3 ("If the securities are converted or exchanged after the Rule 144 holding period is satisfied, the underlying securities may be sold quickly into the public market at prices above the price at which they were acquired. Accordingly, initial purchasers or subsequent holders have an incentive to purchase the market-adjustable securities with a view to distribution of the underlying securities following conversion to capture the difference between the built-in discount and the market value of the underlying securities.... [W]hen a holder purchases with a view to distribution, it is acting as an underwriter and is unable to rely on the Section 4(a)(1) exemption from registration.").

8

35.     Unlike the September 2018 Note, the April 2021 Note contained the extra requirement that DarkPulse pay to FirstFire 75,000,000 "commitment shares" upon execution of the Note.  *See* EXH. 2, SPA at 1, section C.

36.     On the date of execution of the April 2021 Note, DarkPulse stock was trading at a price of $0.019 per share, giving the 75,000,000 commitment shares a face value of $1,425,000.[11]

37.     FirstFire's requirement that DarkPulse remit these shares (which, even with a six-month restriction, constitutes property with a fair market value in excess of $1,000,000) as up-front consideration for the $825,000 loan renders the April 2021 Note criminally usurious on its face under New York law.  *See* General Obligations Law Sections 5-501, *et seq.*

38.      On October 14, 2021, the New York Court of Appeals issued its decision in *Adar Bays, Inc., v. GeneSYS ID*, 2021 NY Slip Op. 05616., wherein that Court was called to answer two certified questions on the correct interpretation of New York criminal usury law.  In a unanimous decision, the Court of Appeals held that under N.Y. G.O.L. § 5-511(1), a criminally usurious loan[12] is *void ab initio*, even where the borrower is a corporation.  *See* Slip Op. at 6-7.

39.     The six-month restriction on the conversion stock (and the commitment shares) expired on October 26, 2021.

40.     On November 4, 2021, DarkPulse CEO Dennis O'Leary met with Fireman while on a business trip in Las Vegas, at Fireman's request.  Fireman presented O'Leary with a one-page amendment to the April 2021 Note, claiming that it would enable DarkPulse to complete future acquisitions without having to notify him.

---

[11]     *See* April 26, 2021 prices at https://seekingalpha.com/symbol/DPLS/chart (last accessed on Dec. 22, 2021).
[12]     Under New York Penal Law § 190.40, any loan charging an interest rate of 25% per annum or greater is criminally usurious.

41.     Fireman failed to mention to O'Leary that the amendment also replaced the choice

of law provision, replacing governance by New York law with governance under Delaware law

(which has no laws against usury), nor did he explain why the amendment was dated October 14,

2021, the date of the *Adar Bays* decision.  O'Leary signed the amendment.

42.     On November 15, 2021, FirstFire submitted a notice of conversion seeking to

convert the full amount of the debt under the April 2021 note (principal + interest = $886,875.00)

into DarkPulse common stock.

43.     FirstFire's November 15 notice of conversion (which is submitted to the transfer

agent, not DarkPulse) claimed to be due shares using the default price of $.005 per share.[13]

Accordingly, on November 17, 2021, with DarkPulse stock trading at $0.1334 per share, the

transfer agent delivered to FirstFire 177,375,000 shares of freely-trading stock, with an estimated

fair market value of ***$23,661,825.00***.[1415]

### C.  Defendants' General Business Model:  Violating Federal Securities
### Laws by Operating as an Unregistered Dealer

44.     Every time FirstFire purchases a convertible note, converts debt into stock, or sells

conversion stock, it effects a transaction in securities.

45.     As a part of its regular business, FirstFire acquires large volumes of shares directly

from issuers at a substantial discount to market, sells large volumes of shares back into the open

market for a substantial profit due to the conversion discount, and does so for its own account and

---

[13]   The April 2021 Note incorporated a registration rights agreement that required DarkPulse to make "best efforts" to file, within 90 days after execution (July 26, 2021) a registration statement to register the commitment shares and shares issued to FirstFire.  Although the registration statement appears to have been filed, FirstFire maintains that DarkPulse defaulted on this obligation.

[14]   DarkPulse vigorously disputes that it was in default, and alleges that Fireman made repeated assurances to the contrary.  Upon learning that the transfer agent had used the default conversion price, DarkPulse contacted FirstFire to raise its objections.  In response, FirstFire filed suit in Delaware Chancery Court seeking a declaratory judgment that not only was the default price correct, but that, under the default provisions of the Note, FirstFire is entitled to even further penalties.  *See* Complaint, *FirstFire Global Cŗp'ty Fund, LLC v. Darkpulse, Inc.*, Case No. 2021-1082.

[15]   The market value of all of the shares obtained by FirstFire, including the "commitment shares" issued pursuant to the April 2021 Note and the shares acquired under the September 2018 Note, equals no less than ***$38,825,725.00***.

absent investment intent. Accordingly, FirstFire buys securities, converts securities, and sells securities as part of its regular business for its own account.

46.     The SEC's EDGAR database shows that since 2015, FirstFire has purchased similar convertible securities on over 200 occasions, from at least 89 microcap companies in addition to DarkPulse.

47.     Upon information and belief, FirstFire made use of the mails, email, and other instrumentalities of interstate commerce to effect the DarkPulse Transactions and subsequent securities transactions. For example, FirstFire used its internet website, transferred cash through wire transfers, and used email and telephone communications to negotiate and effect purchases and sales.

48.     Via its website at www.firstfirecap.com, Defendant held itself out to the public as a "New York based investment manager" that "will source, structure, and execute direct investments in publicly traded companies with market capitalizations under $750 million."

49.     FirstFire's business of buying and selling securities is not exclusively intrastate.

50.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC, or, in the case of a natural person, associate with a registered dealer. *See* 15 U.S.C. § 78o(a)(1).

51.     By failing to comply with the dealer registration requirements mandated by federal law, FirstFire purposefully "operated under the radar" to avoid important legal and regulatory oversight by the SEC and the Financial Industry Regulatory Authority ("FINRA").

52.     The dealer registration requirements provide important safeguards for the investing public, shareholders and companies. The excessive compensation and patently unfair terms used

in the DarkPulse Transactions (and FirstFire's transactions with other issuers) would have violated FINRA Rules 5110 (b)(4)(B) and 5110(c)(2)(A), and hence could not have been effected by a registered securities dealer.

53.     FirstFire's enormous profits from the DarkPulse Transactions resulted from the market prices they received when they sold the stock into the public market, and the deeply discounted price at which it acquired the stock from DarkPulse.  This mechanism, where FirstFire reaps the profits on the spread or markup of the stock they sold, is a common attribute of a securities dealer or underwriter.

54.     Registration as a securities dealer and accompanying SEC oversight would further prevent FirstFire from utilizing the Rule 144 tacking provision (17 C.F.R. 230.144(d)(3)(ii)) because FirstFire's business operations constitute underwriting activity, or sales with a view to distribution.

55.     As shown in EDGAR data, FirstFire had a regular clientele of issuers from which it would purchase securities, convert, and sell newly-issued stock into the market to reap profits on the markup.

56.     Issuers of stock like DarkPulse are clients of underwriters. Operating as an underwriter is not acting as a trader, but as a securities dealer, which requires registration with the SEC.

57.     As a part of its regular business, Defendant obtained newly-issued stock directly from the microcap issuers through note conversions, as opposed to purchases in the open or secondary markets.

58.     The convertible securities that Defendant purchased enabled it to acquire billions of shares of newly-issued stock at a substantial discount—typically between 30 and 50 percent of the trading price.[16]

59.     As a regular part of its business, Defendant sold large blocks of newly-issued shares into the public market, which is a common hallmark of a securities dealer.

60.     Between March 2015 and September 2021, Defendants purchased *more than 107 convertible promissory notes* from approximately *89 different penny stock issuers* and *sold more than 1 billion newly-issued shares of stock* obtained from those notes into the public market for Defendants' own account.

61.     FirstFire has used the same business model– promising easy cash to microcap companies in need of working capital and then fleecing them for millions of shares of stock– since its formation in 2015.  For example:

- DigitalTown, Inc.: FirstFire purchased a convertible security for $183,750.00; upon conversion of that security, FirstFire acquired *more than 793,406,848* shares of DigitalTown stock (fair market value of $1,384,791.64) which, upon information and belief, were sold into the market shortly thereafter;

- Ionix Technology, Inc.: FirstFire purchased one or more convertible securities for $665,000.00, upon conversion of that security, FirstFire acquired more than 9,467,000 shares of Ionix stock (fair market value $1,041,370.00) which, upon information and belief, it sold into the market shortly thereafter; and

- Visium Technologies, Inc.: FirstFire purchased one or more convertible securities for $150,000.00, upon conversion of that security, FirstFire acquired *more than 49,000,000 shares of* Visium stock, (fair market value $196,000.00) which, upon information and belief, it sold into the market shortly thereafter.

---

[16]   Because the Notes required that the discount be applied to a '20-day low' trading price instead of the average price on the date of conversion, the price FirstFire paid at conversion was almost always far lower than a 30% discount.

62.     Defendants continue to purchase new convertible securities, convert the debt into stock and dump the stock into the market to reap profits. In 2021 alone, Defendant has purchased *no less than 23 convertible promissory notes*—from *no less than 14 issuers*. Upon information and belief, Defendants repeated the same behavior outlined above, utilizing the Rule 144 holding period to sell the conversion shares immediately upon conversion.

63.     The equitable remedy of voiding and rescission provided under § 29(b) of the Act should be effectuated by mandating FirstFire to return to DarkPulse every share of stock it acquired under the Notes, less the cash value of the net sum provided to the Plaintiff for the purchase of the Notes.

### D.  *Fireman Controlled Firstfire and Its Related Entities In A Securities Business*

64.     At all relevant times, Fireman, due to his position in FirstFire Capital Management LLC, possessed and exercised the ultimate decision-making and control over FirstFire, including the power to decide whether to enter into each of the securities transactions (including the DarkPulse Transactions), to negotiate and approve the final deal terms, and to direct its sales of stock.

65.     Fireman personally negotiated the terms of the convertible notes that FirstFire purchased from microcap companies (including the DarkPulse Transactions), as well as amendments to the original terms. Fireman also signed the contracts by which FirstFire acquired the convertible notes, including both Notes with Plaintiff.

66.     Ultimately, Fireman was and remains the sole person with the power to direct, authorize, and compel FirstFire to enter into, convert, and subsequently sell securities through convertible notes with issuers, including the Notes with DarkPulse. Fireman is, and was, a

14

"controlling person" within the meaning of Section 20(a) of the Act and had the power to cause FirstFire to engage in the unlawful conduct described herein.

## V.   CAUSES OF ACTION

### A.   COUNT I (Against FirstFire): Rescission Pursuant to § 29(b) of the Act for Violating § 15(a) by Effecting the DarkPulse Transactions As an Unregistered Dealer

67.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-66 as though set forth herein.

68.     Section 29(b) of the Act provides in relevant part that: "[e]very contract *made* in violation of any provision of this chapter or of any rule or regulation thereunder … shall be void …." 15 U.S.C. § 78cc(b) (emphasis added).

69.     The DarkPulse Transactions were made in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using the means of interstate commerce to effect any transaction in securities.

70.     FirstFire is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

71.     FirstFire is not registered as a securities dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

72.     FirstFire effected transactions in securities when it executed the DarkPulse Transactions and when it converted and sold or caused to be sold the Darkpulse stock obtained thereby.

73.     FirstFire used the means of interstate commerce to effect the DarkPulse Transactions, such as its use of an internet website, wiring of cash through wire transfers, and use of email and telephone communications to negotiate or effectuate the transaction.

74.    As a party to the DarkPulse Transactions, DarkPulse is in contractual privity with FirstFire.

75.    The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

76.    Because FirstFire, as an unregistered securities dealer, utilized the means and instrumentalities of interstate commerce when it effected the transactions in securities known herein as the DarkPulse Transactions, the DarkPulse Transactions were unlawful when made.

> **B.  COUNT II (Against FirstFire): Rescission Pursuant to
> § 29(b) of the Act for Violating § 15(a) of the Act by
> Unlawfully Transacting in Securities in Performance of
> the DarkPulse Transactions as an Unregistered Dealer**

77.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-66 as though set forth herein.

78.    Section 29(b) of the Act provides in relevant part that: "[e]very contract … *the performance of which* involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void…." (15 U.S.C. § 78cc(b)) (emphasis added).

79.    The DarkPulse Transactions were performed in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using the means of interstate commerce to effect any transaction in securities.

80.    FirstFire is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

81.    FirstFire is not registered as a securities dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

82.     FirstFire effected transactions in securities in performance of the DarkPulse Transactions when it converted debt into stock and sold (or caused to be sold) the DarkPulse stock acquired thereby (hereinafter "Performance Transactions").

83.     FirstFire used the means of interstate commerce to effect the Performance Transactions, such as wiring cash through wire transfer, or using email and telephone communications to negotiate and effectuate sales transactions through their broker.

84.     As a party to the DarkPulse Transactions, Darkpulse is in contractual privity with FirstFire.

85.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

86.     Because FirstFire is an unregistered dealer and used the means and instrumentalities of interstate commerce to effect transactions in securities when it performed under the DarkPulse Transactions, the DarkPulse Transactions were **unlawful as performed** (via the conversions and sales of the conversion stock into the public market).

### C.  COUNT III (Against Fireman): Violation of § 20(a) of the Act by Fireman as a Control Person Based on FirstFire's Transactions in Securities as an Unregistered Dealer

87.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-66 as though set forth herein.

88.     Fireman had the power and authority to cause FirstFire to engage in the wrongful conduct described in Counts I and II herein.

89.     Fireman did in fact cause FirstFire to engage in the wrongful conduct described in Counts I and II herein.

90.     Fireman did not act in good faith.

91.     Fireman directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

92.     Therefore, Fireman acted as a control person of FirstFire within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

### D.  COUNT IV (Against All Defendants):
### Unjust Enrichment

93.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of Paragraphs 1-66 as though set forth herein.

94.     The Defendants have received valuable benefits from DarkPulse, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of DarkPulse common stock.

95.     These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

96.     The Defendants have unjustly retained these benefits at DarkPulse and its stockholders' expense.

97.     As a result, the Defendants have been unjustly enriched.

### E.  COUNT V (Against All Defendants):
### Constructive Trust

98.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

99.     As alleged in Count IV, Defendants have been unjustly enriched by DarkPulse.

100.    The circumstances are such that it would be inequitable for Defendants to retain the property conferred on them by DarkPulse.

A-50

101.    DarkPulse has a specific, identifiable interest in the property unjustly retained by Defendants as a result of the wrongful conduct alleged in Counts I-III herein.

102.    Defendants have wrongfully acquired and detained DarkPulse's property obtained via the wrongful conduct alleged in Counts I-III herein.

103.    Allowing Defendants to retain the property conferred on them by DarkPulse would inequitably allow Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes, including, without limitation, paying their attorney's fees and costs in connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

104.    As a result, a constructive trust should be imposed on DarkPulse's property retained by Defendants.

## VI.    **PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiff DarkPulse seeks a Verdict and Judgment against the Defendants herein as follows:

A.    **On Count I (Against FirstFire):**

1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

        a.    The DarkPulse Transactions and the Performance Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

        b.    FirstFire is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

        c.    The DarkPulse Transactions are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

        d.    FirstFire is entitled to retain only the principal amount of the loans made pursuant to DarkPulse Transactions.

2.    DarkPulase requests that the Court enter an Order:

        a.    Rescinding the DarkPulse Transactions pursuant to the Act (15 U.S.C. § 78cc);

        b.    Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the DarkPulse Transactions;

        c.    Requiring FirstFire to return to DarkPulse all DarkPulse stock obtained via the DarkPulse Transactions, less the number of shares

20

constituting the principal amount originally loaned to DarkPulse under the DarkPulse Transactions; and

d.     Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the DarkPulse Transactions.

**B.     On Count II (Against FirstFire):**

1.     Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

a.     The DarkPulse Transactions and Performance Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

b.     FirstFire is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

c.     The Darkpulse Transactions are void and subject to rescission under the Act (15 U.S.C. § 78o); and

d.     FirstFire is entitled to retain the principal amount of the loans made pursuant to the DarkPulse Transactions, already repaid by DarkPulse.

2.     DarkPulse requests that the Court enter an Order:

a.     Rescinding the DarkPulse Transactions pursuant to the Act (15 U.S.C. § 78o);

b.     Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of

the DarkPulse Transactions;

c.      Requiring FirstFire to return to DarkPulse all DarkPulse stock obtained via the DarkPulse Transactions; and

d.      Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the DarkPulse Transactions.

**C.      On Count III (Against Fireman):**

1.      Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

a.      Fireman had the power and authority to cause FirstFire to engage in the wrongful conduct described in Counts I and II herein;

b.      Fireman did in fact cause FirstFire to engage in the wrongful conduct described in Counts I and II herein; and

c.      Fireman acted as a control person of FirstFire within the meaning of § 20(a) of the Act (15 U.S.C. § 78t(a)).

2.      DarkPulse requests that the court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Fireman jointly and severally liable with and to the same extent as FirstFire is liable to DarkPulse under Counts I, II, IV, and V herein.

**D.      On Count IV (Against All Defendants):**

1.      Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

      a.      Defendants have voluntarily accepted and retained the property conferred by FirstFire on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

      b.      The circumstances are such that it would be inequitable for the Defendants to retain the property conferred on them by DarkPulse without first paying the value thereof to DarkPulse, to prevent the Defendants from being unjustly enriched.

      c.      DarkPulse requests that the Court enter an Order requiring the Defendants to return to DarkPulse the value of the property they have unjustly retained in the amount of $26,560,750 less the value conferred upon the Plaintiff.

**E.**      **On Count V (Against All Defendants):**

      1.      Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that the Defendants have been unjustly enriched as alleged in Count VI; and

      2.      DarkPulse requests that the Court enter an Order imposing a constructive trust on DarkPulse's property in the possession of the Defendants as a result of the benefits conferred on them by Darkpulse.

**F.**      **As to each of Counts I-V,** to the extent permitted by applicable law, and not otherwise requested, DarkPulse requests that the Court enter an Order:

      1.      Awarding DarkPulse compensatory, direct, and consequential damages;

2.      Awarding DarkPulse punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

3.      Awarding DarkPulse its attorneys' fees and costs associated with this litigation;

4.      Entering an award of monetary damages jointly and severally against the Defendants; and

5.      Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## VII.    **JURY DEMAND**

Plaintiff demands a trial by jury on all issues properly so tried.

DATED: December 31, 2021                Respectfully submitted,

*/s/ Gustave Passanante*
Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
**THE BASILE LAW FIRM, P.C.**
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:    (631) 498-0748
Email: gus@thebasilelawfirm.com
            eric@thebasilelawfirm.com

*Attorneys for Plaint¡f Darkpulse, Inc.*

# EXHIBIT 1

THIS INSTRUMENT CONTAINS AN AFFIDAVIT OF CONFESSION OF JUDGMENT PROVISION WHICH CONSTITUTES A WAIVER OF IMPORTANT RIGHTS BORROWER MAY HAVE AND ALLOWS THE HOLDER TO OBTAIN A JUDGMENT AGAINST BORROWER WITHOUT ANY FURTHER NOTICE.

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH MAY BE THE LEGAL COUNSEL OPINION (AS DEFINED IN THE PURCHASE AGREEMENT)), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144, RULE 144A OR REGULATION S UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $247,500.00**　　　　　　　　　　　　　　**Issue Date: September 20, 2018**
**Actual Amount of Purchase Price: $225,000.00**

### SENIOR CONVERTIBLE PROMISSORY NOTE

　　　　FOR VALUE RECEIVED, **DARKPULSE, INC.**, a Delaware corporation (hereinafter called the "Borrower" or the "Company"), hereby promises to pay to the order of **FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**, a Delaware limited liability company, or registered assigns (the "Holder"), in the form of lawful money of the United States of America, the principal sum of $247,500.00, which amount is the $225,000.00 actual amount of the purchase price (the "Consideration") hereof plus an original issue discount in the amount of $22,500.00 (the "OID") (subject to adjustment herein) (the "Principal Amount") and to pay interest on the unpaid Principal Amount hereof at the rate of eight percent (8%) (the "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, as further provided herein. The maturity date shall be nine (9) months from the Issue Date (each a "Maturity Date"), and is the date upon which the principal sum, the OID, as well as any accrued and unpaid interest and other fees, shall be due and payable.

　　　　It is further acknowledged and agreed that the Principal Amount owed by Borrower under this Note shall be increased by the amount of all expenses incurred by the Holder relating to the conversion of this Note into shares of Common Stock. All such expenses shall be deemed added to the Principal Amount hereunder to the extent such expenses are paid by the Holder.

　　　　This Note may not be prepaid or repaid in whole or in part except as otherwise explicitly set forth herein.

　　　　This Note shall be a senior obligation of the Company, with priority over all future Indebtedness (as defined below) of the Company as provided for herein.

　　　　Interest shall commence accruing on the date that the Note is fully funded and shall be computed on the basis of a 365-day year and the actual number of days elapsed. Any Principal Amount or interest on this Note which is not paid when due shall bear interest at the rate of the lesser of (i) fifteen percent (15%) per annum and (ii) the maximum amount permitted by law from the due date thereof until the same is paid ("Default Interest").

　　　　All payments due hereunder (to the extent not converted into shares of common stock, $0.01 par value per share, of the Borrower (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date.

Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement, dated as of the Issue Date, pursuant to which this Note was originally issued (the "Purchase Agreement"). As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed. As used herein, the term "Trading Day" means any day that shares of Common Stock are listed for trading or quotation on the OTCBB (as defined in the Purchase Agreement), any tier of the NASDAQ Stock Market, the New York Stock Exchange or the NYSE American.

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1 Conversion Right. The Holder shall have the right, at any time on or after the 180th calendar day after the Issue Date, to convert all or any portion of the then outstanding and unpaid Principal Amount and interest (including any Default Interest) into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price (as defined below) determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of this Note or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of Conversion Shares issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the then outstanding shares of Common Stock. For purposes of the proviso set forth in the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso, provided, however, that the limitations on conversion may be waived (up to 9.99%) by the Holder upon, at the election of the Holder, not less than 61 days' prior notice to the Borrower, and the provisions of the conversion limitation shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver). The number of Conversion Shares to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 4:00 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the Principal Amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such Principal Amount at the Interest Rate to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2).

1.2 Conversion Price.

(a) Calculation of Conversion Price. The per share conversion price into which Principal Amount and interest (including any Default Interest) under this Note shall be convertible into shares of Common Stock hereunder (the "Conversion Price") shall be equal to the lesser of (i) $0.25 (the "Fixed Conversion Price") or (ii) 70% multiplied by the lowest traded price of the Common Stock during the twenty (20) consecutive Trading

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

Day period immediately preceding the Trading Day that the Company receives a Notice of Conversion (the "Alternate Conversion Price"); *and provided, further, however*, and notwithstanding the above calculation of the Alternate Conversion Price or any other calculation of Conversion Price pursuant to this Section 1.2, if the lowest traded price of the Common Stock is less than the Conversion Price on the date following the Conversion Date (the "Free Trading Share Receipt Date") on which the Holder actually receives from the Company or its transfer agent Conversion Shares issuable pursuant to this Section 1 which are immediately upon receipt unrestricted and freely tradable by the Holder either by way of (A) registration under the 1933 Act or (B) pursuant to Rule 144 under the 1933 Act (or a successor rule) ("Rule 144"), Rule 144A under the 1933 Act (or a successor rule) ("Rule 144A") or Regulation S under the 1933 Act (or a successor rule) ("Regulation S"), then the Conversion Price shall be deemed to have been retroactively adjusted, as of the Conversion Date, to a price equal to 70% multiplied by the lowest traded price of the Common Stock on the Free Trading Shares Receipt Date (the "Free Trading Shares Receipt Date Conversion Price"), and the Company shall, on the Trading Day following the Free Trading Share Receipt Date, issue to the Holder additional shares of unrestricted, freely tradable Common Stock equal to the difference between (Y) the number of Conversion Shares receivable upon conversion of the applicable Conversion Amount at the Conversion Price and (Z) the number of Conversion Shares receivable upon conversion of the applicable Conversion Amount at the Free Trading Shares Receipt Date Conversion Price (subject to the beneficial ownership limitations contained in Section 1.1, such that the additional shares shall be issued in tranches if required to comply with such beneficial ownership limitations); *and provided, further, however*, and notwithstanding the above calculation of the Conversion Price, if, prior to the repayment or conversion of this Note, in the event the Borrower consummates a registered or unregistered primary offering of its securities for capital raising purposes (a "Primary Offering"), the Holder shall have the right, in its discretion, to (x) demand repayment in full of an amount equal to any outstanding Principal Amount and interest (including Default Interest) under this Note as of the closing date of the Primary Offering or (y) convert any outstanding Principal Amount and interest (including any Default Interest) under this Note into Common Stock at the closing of such Primary Offering at a Conversion Price equal to the lower of (i) the Conversion Price and (ii) a 20% discount to the offering price to investors in the Primary Offering. The Borrower shall provide the Holder no less than ten (10) business days' notice of the anticipated closing of a Primary Offering and an opportunity to exercise its conversion rights in connection therewith.

(b) <u>Conversion Price During Major Announcements.</u> Notwithstanding anything contained in Section 1.2(a) to the contrary, in the event the Borrower (i) makes a public announcement that it intends to be acquired by, consolidate or merge with any other corporation or entity (other than a merger in which the Borrower is the surviving or continuing corporation and its capital stock is unchanged) or sell or transfer all or substantially all of the assets of the Borrower or (ii) any person, group or entity (including the Borrower) publicly announces a tender offer to purchase 50% or more of the Common Stock (or any other takeover scheme) (any such transaction referred to in clause (i) or (ii) being referred to herein as a "Change in Control" and the date of the announcement referred to in clause (i) or (ii) is being referred to herein as the "Announcement Date"), then the Conversion Price shall, effective upon the Announcement Date and continuing through the Adjusted Conversion Price Termination Date (as defined below), be equal to the lower of (x) the Conversion Price and (y) a 25% discount to the Acquisition Price (as defined below). From and after the Adjusted Conversion Price Termination Date, the Conversion Price shall be determined as set forth in Section 1.2(a). For purposes hereof, "Adjusted Conversion Price Termination Date" shall mean, with respect to any proposed Change in Control for which a public announcement as contemplated by this Section 1.2(b) has been made, the date upon which the Borrower (in the case of clause (i) above) or the person, group or entity (in the case of clause (ii) above) consummates or publicly announces the termination or abandonment of the proposed Change in Control which caused this Section 1.2(b) to become operative. For purposes hereof, "Acquisition Price" shall mean a price per share of Common Stock derived by dividing (x) the total consideration (in cash, equity, earn-out or similar payments or otherwise) paid or to be paid to the Borrower or its shareholders in the Change in Control transaction by (y) the number of authorized shares of Common Stock outstanding as of the business day prior to the Announcement Date.

1.3 <u>Authorized and Reserved Shares.</u> The Borrower covenants that at all times until the Note is satisfied in full, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of a number of Conversion Shares equal to the greater of: (a) 50,000,000 shares of Common Stock or (b) the sum of (i) the number of Conversion Shares issuable upon the full conversion of this Note (assuming no payment of Principal Amount or interest) as of any issue date (taking into consideration any adjustments to the Conversion Price pursuant to Section 2 hereof or otherwise) <u>multiplied by</u> (ii) four and a half (4.5) (the "Reserved Amount"). In the event that the Borrower shall be unable to

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

reserve the entirety of the Reserved Amount (the "Reserve Amount Failure"), the Borrower shall promptly take all actions necessary to increase its authorized share capital to accommodate the Reserved Amount (the "Authorized Share Increase"), including without limitation, all board of directors actions and approvals and promptly (but no less than 60 days following the calling and holding a special meeting of its shareholders no more than 60 days following the Reserve Amount Failure to seek approval of the Authorized Share Increase via the solicitation of proxies. Notwithstanding the foregoing, in no event shall the Reserved Amount be lower than the initial Reserved Amount, regardless of any prior conversions. The Borrower represents that upon issuance, the Conversion Shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of Conversion Shares into which this Note shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of this Note. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Conversion Shares or instructions to have the Conversion Shares issued as contemplated by Section 1.4(f) hereof, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates or cause the Company to electronically issue shares of Common Stock to execute and issue the necessary certificates for the Conversion Shares or cause the Conversion Shares to be issued as contemplated by Section 1.4(f) hereof in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under this Note.

1.4 Method of Conversion.

(a) Mechanics of Conversion. This Note may be converted by the Holder in whole or in part, on any Trading Day, at any time on or after the 180th calendar day after the Issue Date, by submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 4:00 p.m., New York, New York time). Any Notice of Conversion submitted after 4:00 p.m., New York, New York time, shall be deemed to have been delivered and received on the next Trading Day.

(b) Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid Principal Amount is so converted. The Holder and the Borrower shall maintain records showing the Principal Amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid Principal Amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted Principal Amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c) Payment of Taxes. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d) Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of

{00481369.DOCX.3}                                              4

Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Conversion Shares (or cause the electronic delivery of the Conversion Shares as contemplated by Section 1.4(f) hereof) within one (1) Trading Day after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid Principal Amount and interest (including any Default Interest) under this Note, surrender of this Note). If the Company shall fail for any reason or for no reason to issue to the Holder on or prior to the Deadline a certificate for the number of Conversion Shares or to which the Holder is entitled hereunder and register such Conversion Shares on the Company's share register or to credit the Holder's balance account with DTC (as defined below) for such number of Conversion Shares to which the Holder is entitled upon the Holder's conversion of this Note (a "Conversion Failure"), then, in addition to all other remedies available to the Holder, (i) the Company shall pay in cash to the Holder on each day after the Deadline and during such Conversion Failure an amount equal to 2.0% of the product of (A) the sum of the number of Conversion Shares not issued to the Holder on or prior to the Deadline and to which the Holder is entitled and (B) the closing sale price of the Common Stock on the Trading Day immediately preceding the last possible date which the Company could have issued such Conversion Shares to the Holder without violating this Section 1.4(d); and (ii) the Holder, upon written notice to the Company, may void its Notice of Conversion with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Notice of Conversion; provided that the voiding of a Notice of Conversion shall not affect the Company's obligations to make any payments which have accrued prior to the date of such notice. In addition to the foregoing, if on or prior to the Deadline the Company shall fail to issue and deliver a certificate to the Holder and register such Conversion Shares on the Company's share register or credit the Holder's balance account with DTC for the number of Conversion Shares to which the Holder is entitled upon the Holder's exercise hereunder or pursuant to the Company's obligation pursuant to clause (ii) below, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of shares of Common Stock issuable upon such exercise that the Holder anticipated receiving from the Company, then the Company shall, within two (2) Trading Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other reasonable and customary out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "Buy-In Price"), at which point the Company's obligation to deliver such certificate (and to issue such Conversion Shares) or credit such Holder's balance account with DTC for such Conversion Shares shall terminate, or (ii) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such Conversion Shares or credit such Holder's balance account with DTC and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the closing sales price of the Common Stock on the date of exercise. Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Company's failure to timely deliver certificates representing the Conversion Shares (or to electronically deliver such Conversion Shares) upon the conversion of this Note as required pursuant to the terms hereof.

(e) Obligation of Borrower to Deliver Common Stock. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Conversion Shares issuable upon such conversion, the outstanding Principal Amount and the amount of accrued and unpaid interest (including any Default Interest) under this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for the Conversion Shares (or cause the electronic delivery of the Conversion Shares as contemplated by Section 1.4(f) hereof) shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is received by the Borrower before 6:00 p.m., New York, New York time, on such date.

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

(f) <u>Delivery of Conversion Shares by Electronic Transfer</u>. In lieu of delivering physical certificates representing the Conversion Shares issuable upon conversion hereof, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Conversion Shares issuable upon conversion hereof to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission system.

1.5 <u>Concerning the Shares</u>. The Conversion Shares issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the 1933 Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be the Legal Counsel Opinion (as defined in the Purchase Agreement)) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144, Rule 144A or Regulation S or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement). Except as otherwise provided in the Purchase Agreement (and subject to the removal provisions set forth below), until such time as the Conversion Shares have been registered under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for the Conversion Shares that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

> **"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH MAY BE THE LEGAL COUNSEL OPINION (AS DEFINED IN THE PURCHASE AGREEMENT)), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144, RULE 144A OR REGULATION S UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Company shall issue to the Holder a certificate for the applicable Conversion Shares without such legend upon which it is stamped or (as requested by the Holder) issue the applicable Conversion Shares by electronic delivery by crediting the account of such holder's broker with DTC, if, unless otherwise required by applicable state securities laws: (a) such Conversion Shares are registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) the Company or the Holder provides the Legal Counsel Opinion (as contemplated by and in accordance with Section 4(m) of the Purchase Agreement) to the effect that a public sale or transfer of such Conversion Shares may be made without registration under the 1933 Act, which opinion shall be accepted by the Company so that the sale or transfer is effected. The Company shall be responsible for the fees of its transfer agent and all DTC fees associated with any such issuance. The Holder agrees to sell all Conversion Shares, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Holder with respect to the transfer of Conversion Shares pursuant to an exemption from registration, such as Rule 144, Rule 144A or Regulation S, at the Deadline, notwithstanding that the conditions of Rule 144, Rule 144A or Regulation S, as applicable, have been met, it will be considered an Event of Default under this Note.

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

1.6 Effect of Certain Events.

(a) Effect of Merger, Consolidation, Etc. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall either: (i) be deemed to be an Event of Default pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (defined in Section 3.23) or (ii) be treated pursuant to Section 1.6(b) hereof. "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

(b) Adjustment Due to Merger, Consolidation, Etc. If, at any time when this Note is issued and outstanding and prior to conversion of all of this Note, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not effectuate any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, at least thirty (30) days prior written notice (but in any event at least fifteen (15) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Section 1.6(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c) Adjustment Due to Distribution. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

(d) Purchase Rights. If, at any time when all or any portion of this Note is issued and outstanding, the Borrower issues any convertible securities or rights to purchase stock, warrants, securities or other property (the "Purchase Rights") pro rata to the record holders of any class of Common Stock, then the Holder of this Note will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such Holder could have acquired if such Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without regard to any limitations on conversion contained herein) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(e) Dilutive Issuance. If the Borrower, at any time while this Note or any amounts due hereunder are outstanding, issues, sells or grants (or has issued, sold or granted as of the Issue Date, as the case may

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

be) any option to purchase, or sells or grants any right to reprice, or otherwise disposes of, or issues (or has sold or issued, as the case may be, or announces any sale, grant or any option to purchase or other disposition), any Common Stock or other securities convertible into, exercisable for, or otherwise entitle any person or entity the right to acquire, shares of Common Stock (including, without limitation, upon conversion of this Note, and any convertible notes or warrants outstanding as of or following the Issue Date), in each or any case at an effective price per share that is lower than the then Conversion Price (such lower price, the "Base Conversion Price" and such issuances, collectively, a "Dilutive Issuance") (it being agreed that if the holder of the Common Stock or other securities so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which are issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share that is lower than the Conversion Price, such issuance shall be deemed to have occurred for less than the Conversion Price on such date of the Dilutive Issuance), then the Conversion Price shall be reduced, at the option of the Holder, to a price equal the Base Conversion Price.  If the Company enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Company shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible price per share at which such securities could be issued in connection with such Variable Rate Transaction. Such adjustment shall be made whenever such Common Stock or other securities are issued.  Notwithstanding the foregoing, no adjustment will be made under this Section 1.6(e) in respect of an Exempt Issuance.  In the event of an issuance of securities involving multiple tranches or closings, any adjustment pursuant to this Section 1.6(e) shall be calculated as if all such securities were issued at the initial closing.

An "Exempt Issuance" shall mean the issuance of (a) shares of Common Stock or other securities to officers or directors of the Company pursuant to any stock or option or similar equity incentive plan duly adopted for such purpose, by a majority of the non-employee members of the Company's Board of Directors or a majority of the members of a committee of non-employee directors established for such purpose in a manner which is consistent with the Company's prior business practices; (b) securities issued pursuant to a merger, consolidation, acquisition or similar business combination approved by a majority of the disinterested directors of the Company, provided that any such issuance shall only be to a Person (or to the equity holders of a Person) which is, itself or through its subsidiaries, an operating company or an owner of an asset in a business synergistic with the business of the Company and shall provide to the Company additional benefits in addition to the investment of funds, but shall not include a transaction in which the Company is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities; (c) securities issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement or debt financing from a bank or similar financial institution approved by a majority of the disinterested directors of the Company; or (d) securities issued with respect to which the Holder waives its rights in writing under this Section 1.6(e).

(f)  Notice of Adjustments. Upon the occurrence of each adjustment or readjustment of the Conversion Price as a result of the events described in this Section 1.6, the Borrower, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Borrower shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon conversion of the Note.

1.7 [Intentionally Omitted].

1.8 Status as Shareholder. Upon submission of a Notice of Conversion by a Holder, (i) the Conversion Shares covered thereby (other than the Conversion Shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies for the Borrower's failure to convert this Note.

1.9 Prepayment. Notwithstanding anything to the contrary contained in this Note, at any time prior to or as of (but not following) the earlier of the (i) the first Conversion Date hereunder and (ii) the 180th calendar day after the Issue Date, the Borrower shall have the right, exercisable on not less than three (3) Trading Days prior written notice to the Holder of the Note, to prepay the outstanding Principal Amount and interest (including any Default Interest) then due under this Note, in whole or in part, in accordance with this Section 1.9. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice.  On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the amounts designated below to or upon the order of the Holder as specified by the Holder in writing to the Borrower at least one (1) business day prior to the Optional Prepayment Date. If the Borrower exercises its right to prepay the Note at any time within the initial 180 calendar days following the Issue Date, the Borrower shall make payment to the Holder of an amount in cash equal to the sum of: (w) 130% multiplied by the Principal Amount then outstanding plus (x) accrued and unpaid interest on the Principal Amount to the Optional Prepayment Date plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and (x).



**ARTICLE II. RANKING AND CERTAIN COVENANTS**

2.1 Ranking and Security.  The obligations of the Borrower under this Note shall rank senior with respect to any and all Indebtedness incurred as of or following the Issue Date.

2.2 Other Indebtedness.  So long as the Borrower shall have any obligation under this Note, the Borrower shall not (directly or indirectly through any Subsidiary or affiliate) incur or suffer to exist or guarantee any Indebtedness that is senior to or pari passu with (in priority of payment and performance) the Borrower's obligations hereunder.  As used in this Section 2.2, the term "Borrower" means the Borrower and any Subsidiary of the Borrower.  As used herein, the term "Indebtedness" means (a) all indebtedness of the Borrower for borrowed money or for the deferred purchase price of property or services, including any type of letters of credit, but not including deferred purchase price obligations in place as of the Issue Date and as disclosed in the SEC Documents or obligations to trade creditors incurred in the ordinary course of business, (b) all obligations of the Borrower evidenced by notes, bonds, debentures or other similar instruments, (c) purchase money indebtedness hereafter incurred by the Borrower to finance the purchase of fixed or capital assets, including all capital lease obligations of the Borrower which do not exceed the purchase price of the assets funded, (d) all guarantee obligations of the Borrower in respect of obligations of the kind referred to in clauses (a) through (c) above that the Borrower would not be permitted to incur or enter into, and (e) all obligations of the kind referred to in clauses (a) through (d) above that the Borrower is not permitted to incur or enter into that are secured and/or unsecured by (or for which the Holder of such obligation has an existing right, contingent or otherwise, to be secured and/or unsecured by) any lien or encumbrance on property (including accounts and contract rights) owned by the Borrower, whether or not the Borrower has assumed or become liable for the payment of such obligation.

2.3 <u>Distributions on Capital Stock.</u> So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors.

2.4 <u>Restriction on Stock Repurchases and Debt Repayments.</u> So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any such shares, or repay any pari passu or subordinated indebtedness of Borrower.

2.5 <u>Sale of Assets.</u> So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business. Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

2.6 <u>Advances and Loans; Affiliate Transactions.</u> So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Borrower, except loans, credits or advances (a) in existence or committed on the Issue Date and which the Borrower has informed Holder in writing prior to the Issue Date, (b) in regard to transactions with unaffiliated third parties, made in the ordinary course of business or (c) in regard to transactions with unaffiliated third parties, not in excess of $50,000. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, repay any affiliate (as defined in Rule 144) of the Borrower in connection with any indebtedness or accrued amounts owed to any such party.

2.7 <u>Section 3(a)(9) or 3(a)(10) Transaction.</u> So long as this Note is outstanding, the Borrower shall not enter into any transaction or arrangement structured in accordance with, based upon, or related or pursuant to, in whole or in part, either Section 3(a)(9) of the Securities Act (a "3(a)(9) Transaction") or Section 3(a)(l0) of the Securities Act (a "3(a)(l0) Transaction"). In the event that the Borrower does enter into, or makes any issuance of Common Stock related to a 3(a)(9) Transaction or a 3(a)(l0) Transaction while this note is outstanding, a liquidated damages charge of 25% of the outstanding principal balance of this Note, but not less than Twenty Five Thousand Dollars ($25,000), will be assessed and will become immediately due and payable to the Holder at its election in the form of a cash payment or added to the balance of this Note (under Holder's and Borrower's expectation that this amount will tack back to the Issue Date).

2.8 <u>Preservation of Business and Existence, etc.</u> So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, change the nature of its business or sell, divest, or change the structure of any material assets other than in the ordinary course of business. In addition, so long as the Borrower shall have any obligation under this Note, the Borrower shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries (other than dormant Subsidiaries that have no or minimum assets) to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary. Furthermore, so long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, solicit any offers for, respond to any unsolicited offers for, or conduct any negotiations with, any other person or entity with respect to any Variable Rate Transaction or investment.

2.9 <u>Noncircumvention.</u> The Company hereby covenants and agrees that the Company will not, by amendment of its Certificate or Articles of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

good faith carry out all the provisions of this Note and take all action as may be required to protect the rights of the Holder.

2.10 Lost, Stolen or Mutilated Note. Upon receipt by the Company of evidence reasonably satisfactory to the Company of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Company in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Company shall execute and deliver to the Holder a new Note.

### ARTICLE III. EVENTS OF DEFAULT

It shall be considered an event of default if any of the following events listed in this Article III (each, an "Event of Default") shall occur:

3.1 Failure to Pay Principal or Interest. The Borrower fails to pay the Principal Amount hereof or interest thereon when due on this Note, whether at maturity, upon acceleration or otherwise, or fails to fully comply with Section 1.10 of this Note.

3.2 Conversion and the Shares. The Borrower (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, (iii) reserve the Reserved Amount at all times, or (iii) the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for two (2) Trading Days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an Event of Default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty eight (48) hours of a demand from the Holder.

3.3 Breach of Agreements and Covenants. The Borrower breaches any material agreement, covenant or other material term or condition contained in the Purchase Agreement, this Note, the Warrant described in the Purchase Agreement, the Irrevocable Transfer Agent Instructions or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith.

3.4 Breach of Representations and Warranties. Any representation or warranty of the Borrower made in the Purchase Agreement, this Note, the Warrant described in the Purchase Agreement, the Irrevocable Transfer Agent Instructions or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.5 Receiver or Trustee. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

Electronically Signed using eSignOnline™ [ Session ID : 64c098ee-78bd-489e-aeb0-ea66cd7f67a7 ]

3.6 Judgments. Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $50,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

3.7 Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.8 Delisting of Common Stock. The Borrower shall fail to maintain the listing of the Common Stock on at least one of the Over the Counter Bulletin Board, the OTCQB Market, any level of the OTC Markets, or any level of the Nasdaq Stock Market or the New York Stock Exchange (including the NYSE American).

3.9 Failure to Comply with the 1934 Act. At any time after the Issue Date, the Borrower shall fail to comply with the reporting requirements of the 1934 Act and/or the Borrower shall cease to be subject to the reporting requirements of the 1934 Act.  It shall be an Event of Default under this Section 3.9 if the Borrower shall file any Notification of Late Filing on Form 12b-25 with the SEC.

3.10 Liquidation. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.11 Cessation of Operations. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.12 Maintenance of Assets. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.13 Financial Statement Restatement. The restatement of any financial statements filed by the Borrower with the SEC for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.14 Reverse Splits. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

3.15 Replacement of Transfer Agent.  In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.16 DTC "Chill". The DTC places a "chill" (i.e. a restriction placed by DTC on one or more of DTC's services, such as limiting a DTC participant's ability to make a deposit or withdrawal of the security at DTC) on any of the Borrower's securities.

3.17 Illegality. Any court of competent jurisdiction issues an order declaring this Note, the Purchase Agreement or any provision hereunder or thereunder to be illegal.

3.18. DWAC Eligibility.  In addition to the Event of Default in Section 3.16, the Common Stock is otherwise not eligible for trading through the DTC's Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs.

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

3.19 Cross-Default. The declaration of an event of default by any lender or other extender of credit to the Company under any notes, loans, agreements or other instruments of the Company evidencing any Indebtedness of the Company (including those filed as exhibits to or described in the Company's filings with the SEC), after the passage of all applicable notice and cure or grace periods.

3.20 Variable Rate Transactions; Dilutive Issuances. The Borrower (i) issues shares of Common Stock (or convertible securities or Purchase Rights) pursuant to an equity line of credit of the Company or otherwise in connection with a Variable Rate Transaction (whether now existing or entered into in the future), (ii) adjusts downward the "floor price" at which shares of Common Stock (or convertible securities or Purchase Rights) may be issued under an equity line of credit or otherwise in connection with a Variable Rate Transaction (whether now existing or entered into in the future), or (iii) a Dilutive Issuance is triggered as provided in this Note.

3.21 Bid Price. The Borrower shall lose the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2) and/or a market (including the OTC Pink, OTCQB or an equivalent replacement marketplace or exchange).

3.22 Unavailability of Rule 144. If, at any time on or after the date which is six (6) months after the Issue Date, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent in order to facilitate the Holder's conversion of any portion of the Note into free trading shares of the Borrower's Common Stock pursuant to Rule 144, and/or (ii) thereupon deposit such shares into the Holder's brokerage account.

3.23 Rights and Remedies Upon an Event of Default. Upon the occurrence and during the continuation of any Event of Default specified in this Article III, this Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount (the "Default Amount") equal to the Principal Amount then outstanding plus accrued interest (including any Default Interest) through the date of full repayment multiplied by 150%. Holder may, in its sole discretion, determine to accept payment part in Common Stock and part in cash. For purposes of payments in Common Stock, the conversion formula set forth in Section 1.2 shall apply. Upon an uncured Event of Default, all amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived by the Borrower, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity, including, without limitation, those set forth in Section 3.24 below.

3.24 Holder's Right to Confession of Judgment. Upon the occurrence and during the continuation of any Event of Default, and in addition to any other right or remedy of the Holder hereunder, under the Purchase Agreement or otherwise at law or in equity, the Borrower hereby irrevocably authorizes and empowers Holder or its legal counsel, each as the Borrower's attorney-in-fact, to appear ex parte and without notice to the Borrower to confess judgment against the Borrower for the unpaid amount of this Note as evidenced by the Affidavit of Confession of Judgment signed by the Borrower as of the Issue Date and to be completed by the Holder or its counsel pursuant to the foregoing power of attorney (which power is coupled with an interest), a copy of which is attached as Exhibit B hereto (the "Affidavit"). The Affidavit shall set forth the amount then due hereunder, plus attorney's fees and cost of suit, and to release all errors, and waive all rights of appeal. The Borrower waives the right to contest Holder's rights under this Section 3.24, including without limitation the right to any stay of execution and the benefit of all exemption laws now or hereafter in effect. No single exercise of the foregoing right and power to confess judgment will be deemed to exhaust such power, whether or not any such exercise shall be held by any court to be invalid, voidable, or void, and such power shall continue undiminished and may be exercised from time to time as the Holder may elect until all amounts owing on this Note have been paid in full.

## ARTICLE IV. MISCELLANEOUS

4.1 Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or

privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

       4.2 <u>Notices.</u> All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, e-mail or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by e-mail or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

       If to the Borrower, to:

           **DARKPULSE, INC.**
           8760 Virginia Meadows Dr.
           Manassas, VA 20109
           Attention: Dennis O'Leary
           e-mail: doleary@darkpulse.com

       If to the Holder:

           **FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
           1040 First Avenue, Suite 190
           New York, NY 10022
           Attention: Eli Fireman
           e-mail: eli@firstfirecapital.com

       With a copy by e-mail only to (which copy shall not constitute notice):

           **LEGAL & COMPLIANCE, LLC**
           330 Clematis Street, Suite 217
           West Palm Beach, FL 33401
           Attn: Chad Friend, Esq., LL.M.
           e-mail: CFriend@LegalandCompliance.com

       4.3 <u>Amendments.</u> This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

       4.4 <u>Assignability.</u> This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Neither the Borrower nor the Holder shall assign this Note or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Holder may assign its rights hereunder to any "accredited investor" (as defined in Rule 501(a) of the 1933 Act) in a private transaction from the Holder or to any of its "affiliates", as that term is defined under the 1934 Act, without the consent of the Borrower. Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof..

{00481369.DOCX.3}           14

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

4.5 <u>Cost of Collection.</u> If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6 <u>Governing Law; Venue; Attorney's Fees.</u> This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts or federal courts located in the state and county of New York. The Borrower hereby irrevocably waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **THE BORROWER HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorney's fees and costs.

4.7 <u>Certain Amounts.</u> Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding Principal Amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

4.8 <u>Purchase Agreement.</u> The Company and the Holder shall be bound by the applicable terms of the Purchase Agreement and the documents entered into in connection herewith and therewith.

4.9 <u>Notice of Corporate Events.</u> Except as otherwise provided below, the Holder of this Note shall have no rights as a Holder of Common Stock unless and only to the extent that it converts this Note into Common Stock. The Borrower shall provide the Holder with prior notification of any meeting of the Borrower's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Borrower of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any Change in Control or any proposed liquidation, dissolution or winding up of the Borrower, the Borrower shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Borrower shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.9.

4.10 <u>Remedies.</u> The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

4.11 Construction; Headings. This Note shall be deemed to be jointly drafted by the Company and all the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

4.12 Usury. To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note. Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Company under this Note for payments which under the applicable law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under the applicable law in the nature of interest that the Company may be obligated to pay under this Note exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by applicable law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the Issue Date, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Holder's election.

4.13 Severability. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

4.14 Terms of Future Financings. So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any security, or amendment to a security that was originally issued before the Issue Date, with any term that the Holder reasonably believes is more favorable to the holder of such security or with a term in favor of the holder of such security that the Holder reasonably believes was not similarly provided to the Holder in this Note, then (i) the Borrower shall notify the Holder of such additional or more favorable term within one (1) business day of the issuance and/or amendment (as applicable) of the respective security, and (ii) such term, at Holder's option, shall become a part of the transaction documents with the Holder (regardless of whether the Borrower complied with the notification provision of this Section 4.14). The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, and original issue discounts. If Holder elects to have the term become a part of the transaction documents with the Holder, then the Borrower shall immediately deliver acknowledgment of such adjustment in form and substance reasonably satisfactory to the Holder (the "Acknowledgment") within three (3) business days of Borrower's receipt of request from Holder (the "Adjustment Deadline"), provided that Borrower's failure to timely provide the Acknowledgment shall not affect the automatic amendments contemplated hereby. If the Acknowledgement is not delivered by the Adjustment Deadline, then $1,000.00 per day shall be added to the balance of the Note for each day beyond the Adjustment Deadline that the Borrower fails to deliver such Acknowledgement. In addition, the Holder shall have the right, at any time until the Note is satisfied in its entirety, and upon written notice to the Borrower, to purchase an additional convertible promissory note from the Borrower, with the exact same terms and conditions as provided in this Note (with the understanding that the Borrower shall execute the form of this Note and all related transaction documents with updated dates within three (3) business days after the Holder exercises such right).

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

A-73

[signature page follows]

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

A-74

**IN WITNESS WHEREOF**, Borrower has caused this Note to be signed in its name by its duly authorized officer on September 20, 2018.

**DARKPULSE, INC.**

By: *Dennis M. O'Leary*
    Name: Dennis O'Leary
    Title:   Chief Executive Officer

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

A-75

### EXHIBIT A -- NOTICE OF CONVERSION

      The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of **DARKPULSE, INC.,** a Delaware corporation (the "Borrower"), according to the conditions of the Senior Convertible Promissory Note of the Borrower dated as of September 20, 2018 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

    ☐    The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

             Name of DTC Prime Broker:
             Account Number:

    ☐    The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

             **FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
             1040 First Avenue, Suite 190
             New York, NY 10022
             Attn: Eli Fireman
             e-mail: eli@firstfirecapital.com

Date of Conversion:                     _____
Applicable Conversion Price:         $    _____
Costs Incurred by the Undersigned to Convert
the Note into Shares of Common Stock:    $    _____
Number of Shares of Common Stock to be
  Issued Pursuant to Conversion of the Note:    _____
Amount of Principal Balance Due remaining
  Under the Note after this conversion:    _____

By: _____
Name:
Title:
Date:

{00481369.DOCX.3}

**EXHIBIT B**

**Affidavit of Confession of Judgment**

SUPREME COURT OF THE STATE OF NEW YORK
COUNTY OF NEW YORK
--------------------------------------------------------------------- X
FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC,

                        Plaintiff,

- against -

DARKPULSE, INC., and DENNIS O'LEARY,
                                 Defendants.
--------------------------------------------------------------------- X

Index No.

**AFFIDAVIT OF
CONFESSION OF
JUDGMENT**

STATE OF NEW YORK      )
                         )   ss.:
COUNTY OF NEW YORK   )

       Dennis O'Leary ("Affiliate"), being duly sworn, hereby deposes and says:

       1.      I am the Chief Executive Officer of defendant DARKPULSE, INC. (the "Company") (together with Affiliate, an individual, the "Borrower"). As such, I am fully familiar with all the facts and circumstances recited herein on personal knowledge. Borrower has its principal place of business at 8760 Virginia Meadows Dr., Manassas, VA 20109. On behalf of the Borrower, and as an individual, I hereby confess judgment in favor of FirstFire Global Opportunities Fund, LLC ("FirstFire"), residing at 1040 First Avenue, Suite 190, New York, New York, 10022, in the amount of the Default Amount (as defined in the senior convertible promissory note between of the parties, dated September 20, 2018, in the original principal amount of $247,500.00 (the "Note")), less any payments made on or after the date of this affidavit of confession of judgment, plus interest a default interest rate of fifteen percent (15%) percent per annum on said amount. In no event shall interest payable hereunder exceed the maximum permissible under applicable law.

{00481369.DOCX.3}

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

2.      I hereby authorize the Supreme Court of the State of New York to enter judgment against Borrower in the amount of in the amount of the Default Amount plus a default interest rate of fifteen percent (15%) per annum on said amount from the date of any default, plus the costs and attorneys' fees that are set forth below, less any payments made on or after the date of this affidavit of confession of judgment, upon Borrower's failure for any reason to timely make any payment to FirstFire called for by the Note, due to Borrower's breach of Section 3.1 of the Note (failure to pay Principal or Interest) or due to Borrower's breach of its obligations that it owes to FirstFire pursuant to Sections 3.2-3.22 of the Note.

3.      In order to secure these obligations, Borrower agreed to simultaneously deliver with the execution of the Note this Affidavit of Confession of Judgment.

4.      The sums confessed pursuant to this affidavit of confession of judgment are justly due and owing to FirstFire under the following circumstances: Borrower entered into the Note pursuant to which Borrower promised to pay to the order of FirstFire the Default Amount plus interest as provided for therein.  The amounts confessed by this affidavit represent a convertible note investment by FirstFire in Borrower and arise out of Borrower's breach of its obligations under the Note.

5.      Borrower agrees to pay any and all costs and expenses incurred by FirstFire in enforcing the terms of this affidavit of confession of judgment, including reasonable attorneys' fees and expenses at the rate of $475.00 per hour that FirstFire incurs or is billed for in connection with enforcing the terms of the affidavit of confession of judgment, entering any Judgment, collecting upon said Judgment, and defending or prosecuting any appeals.

{00481369.DOCX.3}

A-78

By: _____
Name: <u>Dennis O'Leary, an individual</u>


DARKPULSE, INC.


By: _Dennis M. O'Leary_____
Name: <u>Dennis O'Leary</u>
Title: <u>Chief Executive Officer</u>

{00481369.DOCX.3}

**A-79**

STATE OF _____ )
                                                          ss.:
COUNTY OF _____ )

**ACKNOWLEDGMENT**

On _____, 2018, before me personally came _____, to me known, who, by me duly sworn, did depose and say that deponent is an officer of DARKPULSE, INC., the corporation described in, and which executed the foregoing affidavit of confession of judgment, that deponent knows the seal of the corporation, that the seal affixed to the affidavit of confession of judgment is the corporation's seal, that it was affixed by order of the board of directors of the corporation and that deponent signed deponent's name by like order.

_____
        Notary Public

SEAL:

**[Signature Page to Affidavit of Confession of Judgment]**

{00481369.DOCX.3}

# SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of September 20, 2018, by and between **DARKPULSE, INC.**, a Delaware corporation, with headquarters located at 8760 Virginia Meadows Dr., Manassas, VA 20109 (the "Company"), and **FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC**, a Delaware limited liability company, with its address at 1040 First Avenue, Suite 190, New York, NY 10022 (the "Buyer").

## WHEREAS:

A.  The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "1933 Act") and Rule 506(b) promulgated by the United States Securities and Exchange Commission (the "SEC") under the 1933 Act;

B.  Buyer desires to purchase from the Company, and the Company desires to issue and sell to the Buyer, upon the terms and conditions set forth in this Agreement, a Senior Convertible Promissory Note of the Company, in the aggregate principal amount of $247,500.00 (as the principal amount thereof may be increased pursuant to the terms thereof, and together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, in the form attached hereto as Exhibit A, the "Note"), convertible into shares of common stock, $0.01 par value per share, of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note; and

C.  The Buyer wishes to purchase, upon the terms and conditions stated in this Agreement, such principal amount of the Note as is set forth immediately below its name on the signature pages hereto.

**NOW THEREFORE**, in consideration of the foregoing and of the agreements and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Buyer hereby agree as follows:

1.  Purchase and Sale of Note.

    a.  Purchase of Note. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer, and the Buyer agrees to purchase from the Company, the Note, as further provided herein.

    b.  Form of Payment. On the Closing Date: (i) the Buyer shall pay the purchase price of $225,000.00 (the "Purchase Price") for the Note, to be issued and sold to it at the Closing (as defined below), by wire transfer of immediately available funds to the Company, in accordance with the Company's written wiring instructions, against delivery of the Note, and (ii) the Company shall deliver such duly executed Note on behalf of the Company, to the Buyer, against delivery of such Purchase Price.

    c.  Closing Date. Subject to the satisfaction (or written waiver) of the conditions thereto set forth in Section 6 and Section 7 below, the date and time of the issuance and sale of the Note pursuant to this Agreement (the "Closing Date") shall be 4:00 PM, Eastern Time on the date first written above, or such other mutually agreed upon time.

    d.  Closing.  The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the Closing Date at such location as may be agreed to by the parties (including via exchange of electronic signatures).

2.  Buyer's Representations and Warranties. The Buyer represents and warrants to the Company as of the Closing Date that:

    a.  Investment Purpose. As of the Closing Date, the Buyer is purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note and such additional shares

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

of Common Stock, if any, as are issuable on account of interest on the Note pursuant to this Agreement, such shares of Common Stock being collectively referred to herein as the "Conversion Shares" and, collectively with the Note (the "Securities") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act; provided, however, that by making the representations herein, the Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

b. Accredited Investor Status. The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D (an "Accredited Investor").

c. Reliance on Exemptions. The Buyer understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

d. Information. The Buyer and its advisors, if any, have been, and for so long as the Note remains outstanding will continue to be, furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by the Buyer or its advisors. The Buyer and its advisors, if any, have been, and for so long as the Note remains outstanding will continue to be, afforded the opportunity to ask questions of the Company regarding its business and affairs. Notwithstanding the foregoing, the Company has not disclosed to the Buyer any material nonpublic information regarding the Company or otherwise and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer. Neither such inquiries nor any other due diligence investigation conducted by Buyer or any of its advisors or representatives shall modify, amend or affect Buyer's right to rely on the Company's representations and warranties contained in Section 3 below.

e. Governmental Review. The Buyer understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities.

f. Transfer or Re-sale. The Buyer understands that (i) the sale or resale of the Securities has not been and is not being registered under the 1933 Act or any applicable state securities laws, and the Securities may not be transferred unless (a) the Securities are sold pursuant to an effective registration statement under the 1933 Act, (b) the Buyer shall have delivered to the Company, at the cost of the Company, an opinion of counsel (which may be the Legal Counsel Opinion (as defined below)) that shall be in form, substance and scope customary for opinions of counsel in comparable transactions to the effect that the Securities to be sold or transferred may be sold or transferred pursuant to an exemption from such registration, which opinion shall be accepted by the Company, (c) the Securities are sold or transferred to an "affiliate" (as defined in Rule 144 promulgated under the 1933 Act (or a successor rule) ("Rule 144")) of the Buyer who agrees to sell or otherwise transfer the Securities only in accordance with this Section 2(f) and who is an Accredited Investor, (d) the Securities are sold pursuant to Rule 144, or (e) the Securities are sold pursuant to Regulation S under the 1933 Act (or a successor rule) ("Regulation S"), and the Buyer shall have delivered to the Company, at the cost of the Company, an opinion of counsel that shall be in form, substance and scope customary for opinions of counsel in corporate transactions, which opinion shall be accepted by the Company; (ii) any sale of such Securities made in reliance on Rule 144 may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any re-sale of such Securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register such Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder (in each case). Notwithstanding the foregoing or anything else contained herein to the contrary, the Securities may be pledged in connection with a bona fide margin account or other lending arrangement secured by the Securities, and such pledge of Securities shall not be deemed to be a transfer, sale or assignment of the Securities hereunder, and the Buyer in effecting such pledge of Securities shall be not required to provide the

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

Company with any notice thereof or otherwise make any delivery to the Company pursuant to this Agreement or otherwise.

g. <u>Legends</u>. The Buyer understands that until such time as the Note, and, upon conversion of the Note in accordance with its respective terms, the Conversion Shares, have been registered under the 1933 Act or may be sold pursuant to Rule 144, Rule 144A under the 1933 Act or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, the Securities may bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of the certificates for such Securities):

> **"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE [CONVERTIBLE/EXERCISABLE] HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144, RULE 144A OR REGULATION S UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Company shall issue a certificate for the applicable shares of Common Stock without such legend to the holder of any Security upon which it is stamped or (as requested by such holder) issue the applicable shares of Common Stock to such holder by electronic delivery by crediting the account of such holder's broker with The Depository Trust Company ("**DTC**"), if, unless otherwise required by applicable state securities laws, (a) such Security is registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) the Company or the Buyer provides the Legal Counsel Opinion (as contemplated by and in accordance with Section 4(m) hereof) to the effect that a public sale or transfer of such Security may be made without registration under the 1933 Act, which opinion shall be accepted by the Company so that the sale or transfer is effected. The Company shall be responsible for the fees of its transfer agent and all DTC fees associated with any such issuance. The Buyer agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144, Rule 144A or Regulation S, at the Deadline (as defined in the Note), it will be considered an Event of Default pursuant to Section 3.2 of the Note.

h. <u>Authorization; Enforcement</u>. This Agreement has been duly and validly authorized by the Buyer and has been duly executed and delivered on behalf of the Buyer, and this Agreement constitutes a valid and binding agreement of the Buyer enforceable in accordance with its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization, moratorium or other similar laws affecting creditors' rights generally and except as may be limited by the exercise of judicial discretion in applying principles of equity.

i. <u>Residency</u>. The Buyer is a resident of the jurisdiction set forth immediately below the Buyer's name on the signature pages hereto.

3. <u>Representations and Warranties of the Company</u>. The Company represents and warrants to the Buyer as of the Closing Date that:

a. <u>Organization and Qualification</u>. The Company and each of its Subsidiaries (as defined below), if any, is a corporation duly organized, validly existing and in good standing under the laws of the

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted. Schedule 3(a), if attached hereto, sets forth a list of all of the Subsidiaries of the Company and the jurisdiction in which each is incorporated. The Company and each of its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its ownership or use of property or the nature of the business conducted by it makes such qualification necessary except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. "Material Adverse Effect" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith. "Subsidiaries" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest.

b. Authorization; Enforcement. (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement, the Note, and to consummate the transactions contemplated hereby and thereby and to issue the Securities, in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement, the Note, and the Conversion Shares by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note, as well as the issuance and reservation for issuance of the Conversion Shares issuable upon conversion of the Note) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, its shareholders, or its debt holders is required, (iii) this Agreement and the Note (together with any other instruments executed in connection herewith or therewith) have been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement, the Note and the other instruments documents executed in connection herewith or therewith and bind the Company accordingly, and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their terms.

c. Capitalization; Governing Documents. As of September 20, 2018, the authorized capital stock of the Company consists of: 250,000,000 authorized shares of Common Stock, of which 89,680,567 shares were issued and outstanding, and 950,000 authorized shares of preferred stock, of which 509,374 were issued and outstanding. All of such outstanding shares of capital stock of the Company and the Conversion Shares, are, or upon issuance will be, duly authorized, validly issued, fully paid and non-assessable. No shares of capital stock of the Company are subject to preemptive rights or any other similar rights of the shareholders of the Company or any liens or encumbrances imposed through the actions or failure to act of the Company.  As of the effective date of this Agreement, other than as publicly announced prior to such date and reflected in the SEC filings of the Company (i) there are no outstanding options, warrants, scrip, rights to subscribe for, puts, calls, rights of first refusal, agreements, understandings, claims or other commitments or rights of any character whatsoever relating to, or securities or rights convertible into or exchangeable for any shares of capital stock of the Company or any of its Subsidiaries, or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries, (ii) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of its or their securities under the 1933 Act and (iii) there are no anti-dilution or price adjustment provisions contained in any security issued by the Company (or in any agreement providing rights to security holders) that will be triggered by the issuance of any of the Securities. The Company has furnished to the Buyer true and correct copies of the Company's Certificate of Incorporation as in effect on the date hereof ("Certificate of Incorporation"), the Company's By-laws, as in effect on the date hereof (the "By-laws"), and the terms of all securities convertible into or exercisable for Common Stock of the Company and the material rights of the holders thereof in respect thereto.

d. Issuance of Conversion Shares. The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its terms, will be validly issued, fully paid and non-assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

e. [Intentionally Omitted].

f. <u>Acknowledgment of Dilution.</u> The Company understands and acknowledges the potentially dilutive effect of the Conversion Shares to the Common Stock upon the conversion of the Note. The Company further acknowledges that its obligation to issue, upon conversion of the Note, the Conversion Shares, in accordance with this Agreement, and the Note are absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other shareholders of the Company.

g. <u>Ranking; No Conflicts.</u> The Note shall be a senior debt obligation of the Company, with priority in payment and performance over all existing and future indebtedness of the Company. The execution, delivery and performance of this Agreement and the Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, note, evidence of indebtedness, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities is subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a Material Adverse Effect), or (iv) trigger any anti-dilution and/or ratchet provision contained in any other contract in which the Company is a party thereto or any security issued by the Company. Neither the Company nor any of its Subsidiaries is in violation of its Certificate of Incorporation, By-laws or other organizational documents and neither the Company nor any of its Subsidiaries is in default (and no event has occurred which with notice or lapse of time or both could put the Company or any of its Subsidiaries in default) under, and neither the Company nor any of its Subsidiaries has taken any action or failed to take any action that would give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party or by which any property or assets of the Company or any of its Subsidiaries is bound or affected, except for possible defaults as would not, individually or in the aggregate, have a Material Adverse Effect. The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the 1933 Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency, regulatory agency, self-regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of its obligations under this Agreement and the Note in accordance with the terms hereof or thereof or to issue and sell the Note in accordance with the terms hereof and, upon conversion of the Note, issue Conversion Shares. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof. If the Company is listed on the Over-the-Counter Bulletin Board, the OTCQB Market, any principal market operated by OTC Markets Group, Inc. or any successor to such markets (collectively, the "OTCBB"), the Company is not in violation of the listing requirements of the OTCBB and does not reasonably anticipate that the Common Stock will be delisted by the OTCBB in the foreseeable future. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

h. <u>SEC Documents; Financial Statements.</u> The Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents (other than exhibits to such documents) incorporated by reference therein, being hereinafter referred to herein as the "SEC Documents"). As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of

Electronically Signed using eSignOnline™ [ Session ID : 64cc98bc-78bd-489e-aeb0-ea66cd7f67a7 ]

the statements made in any such SEC Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings prior the date hereof). As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth in the financial statements of the Company included in the SEC Documents, the Company has no liabilities, contingent or otherwise, other than (i) liabilities incurred in the ordinary course of business subsequent to June 30, 2018, and (ii) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in such financial statements, which, individually or in the aggregate, are not material to the financial condition or operating results of the Company. The Company is subject to the reporting requirements of the 1934 Act.  The Company has never been a "shell company" as described in Rule 144(i)(1)(i).

i. <u>Absence of Certain Changes.</u>  Since June 30, 2018, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or 1934 Act reporting status of the Company or any of its Subsidiaries.

j. <u>Absence of Litigation.</u> There is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect.  The SEC Documents contain a complete list and summary description of any pending or, to the knowledge of the Company, threatened proceeding against or affecting the Company or any of its Subsidiaries, without regard to whether it would have a Material Adverse Effect. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

k. <u>Intellectual Property.</u> The Company and each of its Subsidiaries owns or possesses the requisite licenses or rights to use all patents, patent applications, patent rights, inventions, know-how, trade secrets, trademarks, trademark applications, service marks, service names, trade names and copyrights ("Intellectual Property") necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future); there is no claim or action by any person pertaining to, or proceeding pending, or to the Company's knowledge threatened, which challenges the right of the Company or of a Subsidiary with respect to any Intellectual Property necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future); to the best of the Company's knowledge, the Company's or its Subsidiaries' current and intended products, services and processes do not infringe on any Intellectual Property or other rights held by any person; and the Company is unaware of any facts or circumstances which might give rise to any of the foregoing. The Company and each of its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of their Intellectual Property.

l. <u>No Materially Adverse Contracts, Etc.</u> Neither the Company nor any of its Subsidiaries is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's officers has or is expected in the future to have a Material Adverse Effect. Neither the Company nor any of its Subsidiaries is a party to any contract or agreement which in the judgment of the Company's officers has or is expected to have a Material Adverse Effect.

m. <u>Tax Status.</u> The Company and each of its Subsidiaries has made or filed all federal, state and foreign income and all other tax returns, reports and declarations required by any jurisdiction to which it is subject (unless and only to the extent that the Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) and has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim. The Company has not executed a waiver with respect to the statute of limitations relating to the assessment or collection of any foreign, federal, state or local tax. None of the Company's tax returns is presently being audited by any taxing authority.

                n. <u>Transactions with Affiliates.</u> Except for arm's length transactions pursuant to which the Company or any of its Subsidiaries makes payments in the ordinary course of business upon terms no less favorable than the Company or any of its Subsidiaries could obtain from third parties and other than the grant of stock options described in the SEC Documents, none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

                o. <u>Disclosure.</u> All information relating to or concerning the Company or any of its Subsidiaries set forth in this Agreement and provided to the Buyer pursuant to Section 2(d) hereof and otherwise in connection with the transactions contemplated hereby is true and correct in all material respects and the Company has not omitted to state any material fact necessary in order to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading. No event or circumstance has occurred or exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed (assuming for this purpose that the Company's reports filed under the 1934 Act are being incorporated into an effective registration statement filed by the Company under the 1933 Act).

                p. <u>Acknowledgment Regarding Buyer's Purchase of Securities.</u> The Company acknowledges and agrees that the Buyer is acting solely in the capacity of arm's length purchaser with respect to this Agreement and the transactions contemplated hereby. The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any statement made by the Buyer or any of its respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation and is merely incidental to the Buyer's purchase of the Securities. The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the Company and its representatives.

                q. <u>No Integrated Offering.</u> Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the 1933 Act of the issuance of the Securities to the Buyer. The issuance of the Securities to the Buyer will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

                r. <u>No Brokers.</u> The Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

                s. <u>Permits; Compliance.</u> The Company and each of its Subsidiaries is in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exemptions, consents, certificates, approvals and orders necessary to own, lease and operate its properties and to carry on its business as it is now being conducted (collectively, the "Company Permits"), and there is no action pending or, to the knowledge of the Company, threatened regarding suspension or cancellation of any of the Company Permits. Neither the Company nor any of its Subsidiaries is in conflict with, or in default or violation of, any of the Company Permits, except for any such conflicts, defaults or violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Since June 30, 2018, neither the Company nor any of its Subsidiaries has

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

received any notification with respect to possible conflicts, defaults or violations of applicable laws, except for notices relating to possible conflicts, defaults or violations, which conflicts, defaults or violations would not have a Material Adverse Effect.

t. <u>Environmental Matters.</u>

(i) There are, to the Company's knowledge, with respect to the Company or any of its Subsidiaries or any predecessor of the Company, no past or present violations of Environmental Laws (as defined below), releases of any material into the environment, actions, activities, circumstances, conditions, events, incidents, or contractual obligations which may give rise to any common law environmental liability or any liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or similar federal, state, local or foreign laws and neither the Company nor any of its Subsidiaries has received any notice with respect to any of the foregoing, nor is any action pending or, to the Company's knowledge, threatened in connection with any of the foregoing. The term "Environmental Laws" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants contaminants, or toxic or hazardous substances or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(ii) Other than those that are or were stored, used or disposed of in compliance with applicable law, no Hazardous Materials are contained on or about any real property currently owned, leased or used by the Company or any of its Subsidiaries, and no Hazardous Materials were released on or about any real property previously owned, leased or used by the Company or any of its Subsidiaries during the period the property was owned, leased or used by the Company or any of its Subsidiaries, except in the normal course of the Company's or any of its Subsidiaries' business.

(iii) There are no underground storage tanks on or under any real property owned, leased or used by the Company or any of its Subsidiaries that are not in compliance with applicable law.

u. <u>Title to Property.</u> The Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(u), if attached hereto, or such as would not have a Material Adverse Effect. Any real property and facilities held under lease by the Company and its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as would not have a Material Adverse Effect.

v. <u>Insurance.</u> The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect. Upon written request the Company will provide to the Buyer true and correct copies of all policies relating to directors' and officers' liability coverage, errors and omissions coverage, and commercial general liability coverage.

w. <u>Internal Accounting Controls.</u> The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company's board of directors, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations, (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability, (iii) access to assets is permitted only in accordance with management's general or specific authorization and (iv) the recorded accountability for

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

x. <u>Foreign Corrupt Practices.</u> Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

y. <u>Solvency.</u> The Company (after giving effect to the transactions contemplated by this Agreement) is solvent (i.e., its assets have a fair market value in excess of the amount required to pay its probable liabilities on its existing debts as they become absolute and matured) and currently the Company has no information that would lead it to reasonably conclude that the Company would not, after giving effect to the transaction contemplated by this Agreement, have the ability to, nor does it intend to take any action that would impair its ability to, pay its debts from time to time incurred in connection therewith as such debts mature. The Company's financial statements for its most recent fiscal year end and interim financial statements have been prepared assuming the Company will continue as a going concern, which contemplates the realization of assets and the satisfaction of liabilities in the normal course of business.

z. <u>No Investment Company.</u> The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "Investment Company"). The Company is not controlled by an Investment Company.

aa. <u>No Off Balance Sheet Arrangements.</u> There is no transaction, arrangement, or other relationship between the Company or any of its Subsidiaries and an unconsolidated or other off balance sheet entity that is required to be disclosed by the Company in its 1934 Act filings and is not so disclosed or that otherwise could be reasonably likely to have a Material Adverse Effect.

bb. <u>No Disqualification Events.</u>   None of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the offering hereunder, any beneficial owner of 20% or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the 1933 Act) connected with the Company in any capacity at the time of sale (each, an "Issuer Covered Person") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the 1933 Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Company has exercised reasonable care to determine whether any Issuer Covered Person is subject to a Disqualification Event.

cc. <u>Manipulation of Price.</u> The Company has not, and to its knowledge no one acting on its behalf has: (i) taken, directly or indirectly, any action designed to cause or to result, or that could reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company.

dd. <u>Breach of Representations and Warranties by the Company.</u>  The Company agrees that if the Company breaches any of the representations or warranties set forth in this Section 3 and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of Default under Section 3.4 of the Note.

4. <u>ADDITIONAL COVENANTS, AGREEMENTS AND ACKNOWLEDGEMENTS.</u>

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

a. <u>Best Efforts.</u> The parties shall use their best efforts to satisfy timely each of the conditions described in Section 6 and 7 of this Agreement.

b. <u>Form D; Blue Sky Laws</u>. The Company agrees to file a Form D with respect to the Securities as required under Regulation D and to provide a copy thereof to the Buyer promptly after such filing. The Company shall, on or before the Closing Date, take such action as the Company shall reasonably determine is necessary to qualify the Securities for sale to the Buyer at the applicable closing pursuant to this Agreement under applicable securities or "blue sky" laws of the states of the United States (or to obtain an exemption from such qualification), and shall provide evidence of any such action so taken to the Buyer on or prior to the Closing Date.

c. <u>Use of Proceeds.</u> The Company shall use the proceeds for business development, and not for the repayment of any indebtedness owed to officers, directors or employees of the Company or their affiliates or in violation or contravention of any applicable law, rule or regulation.

d. <u>Right of Participation in Subsequent Offerings.</u>

i.        From the date first written above until eighteen (18) months after the date first written above, the Company will not, (i) directly or indirectly, offer, sell, grant any option to purchase, or otherwise dispose of (or announce any offer, sale, grant or any option to purchase or other disposition of) any of its or its Subsidiaries' debt, equity or equity equivalent securities, including without limitation any debt, preferred shares or other instrument or security that is, at any time during its life and under any circumstances, convertible into or exchangeable or exercisable for Common Stock (any such offer, sale, grant, disposition or announcement being referred to as a "Subsequent Placement") or (ii) enter into any definitive agreement with regard to the foregoing, in each case unless the Company shall have first complied with this Section 4(d).

ii.        The Company shall deliver to the Buyer an irrevocable written notice (the "Offer Notice") of any proposed or intended issuance or sale or exchange (the "Offer") of the securities being offered (the "Offered Securities") in a Subsequent Placement, which Offer Notice shall (w) identify and describe the Offered Securities, (x) describe the price and other terms upon which they are to be issued, sold or exchanged, and the number or amount of the Offered Securities to be issued, sold or exchanged, (y) identify the persons or entities (if known) to which or with which the Offered Securities are to be offered, issued, sold or exchanged and (z) offer to issue and sell to or exchange with the Buyer at least $247,500.00 of the Offered Securities (the "Subscription Amount").

iii.        To accept an Offer, in whole or in part, the Buyer must deliver a written notice to the Company prior to the end of the tenth (10th) business day after the Buyer's receipt of the Offer Notice (the "Offer Period"), setting forth the portion of the Subscription Amount that the Buyer elects to purchase (the "Notice of Acceptance").  The Company shall have ten (10) business days from the expiration of the Offer Period to complete the Subsequent Placement and in connection therewith to issue and sell the Subscription Amount to the Buyer but only upon terms and conditions (including, without limitation, unit prices and interest rates) that are not more favorable to the Buyer or less favorable to the Company than those set forth in the Offer Notice. Following such ten (10) business day period, the Company shall publicly announce either (A) the consummation of the Subsequent Placement or (B) the termination of the Subsequent Placement.

iv.        Notwithstanding anything to the contrary contained herein, if the Company desires to modify or amend the terms and conditions of the Offer prior to the expiration of the Offer Period, the Company shall deliver to the Buyer a new Offer Notice and the Offer Period shall expire on the tenth (10th) business day after the Buyer's receipt of such new Offer Notice.

v.        If by the fifteenth (15th) business day following delivery of the Offer Notice no public disclosure regarding a transaction with respect to the Offered Securities has been made, and no notice regarding the abandonment of such transaction has been received by the Buyer, such

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

transaction shall be deemed to have been abandoned and the Buyer shall not be deemed to be in possession of any material, non-public information with respect to the Company.

As used in this Agreement, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed.

e. Usury. To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Buyer in order to enforce any right or remedy under this Agreement, the Note and any document, agreement or instrument contemplated thereby. Notwithstanding any provision to the contrary contained in this Agreement, the Note and any document, agreement or instrument contemplated thereby, it is expressly agreed and provided that the total liability of the Company under this Agreement, the Note or any document, agreement or instrument contemplated thereby for payments which under applicable law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under applicable law in the nature of interest that the Company may be obligated to pay under this Agreement, the Note and any document, agreement or instrument contemplated thereby exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by law applicable to this Agreement, the Note and any document, agreement or instrument contemplated thereby is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Agreement, the Note and any document, agreement or instrument contemplated thereby from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Buyer with respect to indebtedness evidenced by this Agreement, the Note and any document, agreement or instrument contemplated thereby, such excess shall be applied by the Buyer to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Buyer's election.

f. Restriction on Activities. Commencing as of the date first above written, and until the earlier of payment of the Note in full or full conversion of the Note, the Company shall not, directly or indirectly, without the Buyer's prior written consent, which consent shall not be unreasonably withheld: (a) change the nature of its business; (b) sell, divest, acquire, change the structure of any material assets other than in the ordinary course of business; or (c) solicit any offers for, respond to any unsolicited offers for, or conduct any negotiations with any other person or entity in respect of any Variable Rate Transaction (as defined herein), whether a transaction similar to the one contemplated hereby or any other investment.

g. Listing. The Company will, so long as the Buyer owns any of the Securities, maintain the listing and trading of its Common Stock on the OTCBB or any equivalent replacement exchange or electronic quotation system (including but not limited to the Pink Sheets electronic quotation system) and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Financial Industry Regulatory Authority ("FINRA") and such exchanges, as applicable. The Company shall promptly provide to the Buyer copies of any notices it receives from the OTCBB and any other exchanges or electronic quotation systems on which the Common Stock is then traded regarding the continued eligibility of the Common Stock for listing on such exchanges and quotation systems.

h. Corporate Existence. The Company will, so long as the Buyer beneficially owns any of the Securities, maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith and (ii) is a publicly traded corporation whose Common Stock is listed for trading or quotation on the OTCBB, any tier of the NASDAQ Stock Market, the New York Stock Exchange or the NYSE MKT.

{00481385.DOCX.3}                                      11

i. No Integration. The Company shall not make any offers or sales of any security (other than the Securities) under circumstances that would require registration of the Securities being offered or sold hereunder under the 1933 Act or cause the offering of the Securities to be integrated with any other offering of securities by the Company for the purpose of any stockholder approval provision applicable to the Company or its securities.

j. Breach of Covenants. The Company acknowledges and agrees that if the Company breaches any of the covenants set forth in this Section 4, in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of Default under Section 3.4 of the Note.

k. Compliance with 1934 Act; Public Information Failures. For so long as the Buyer beneficially owns the Note, or any Conversion Shares, the Company shall comply with the reporting requirements of the 1934 Act; and the Company shall continue to be subject to the reporting requirements of the 1934 Act. During the period that the Buyer beneficially owns the Note, if the Company shall (i) fail for any reason to satisfy the requirements of Rule 144(c)(1), including, without limitation, the failure to satisfy the current public information requirements under Rule 144(c) or (ii) if the Company has ever been an issuer described in Rule 144(i)(1)(i) or becomes such an issuer in the future, and the Company shall fail to satisfy any condition set forth in Rule 144(i)(2) (each, a "Public Information Failure") then, as partial relief for the damages to the Buyer by reason of any such delay in or reduction of its ability to sell the Securities (which remedy shall not be exclusive of any other remedies available pursuant to this Agreement, the Note, or at law or in equity), the Company shall pay to the Buyer an amount in cash equal to three percent (3%) of the Purchase Price on each of the day of a Public Information Failure and on every thirtieth day (pro rated for periods totaling less than thirty days) thereafter until the date such Public Information Failure is cured. The payments to which a holder shall be entitled pursuant to this Section 4(k) are referred to herein as "Public Information Failure Payments." Public Information Failure Payments shall be paid on the earlier of (i) the last day of the calendar month during which such Public Information Failure Payments are incurred and (iii) the third business day after the event or failure giving rise to the Public Information Failure Payments is cured. In the event the Company fails to make Public Information Failure Payments in a timely manner, such Public Information Failure Payments shall bear interest at the rate of 5% per month (prorated for partial months) until paid in full.

l. Acknowledgement Regarding Buyer's Trading Activity. The Company acknowledges and agrees that (i) the Buyer has not been asked to agree, nor has the Buyer agreed, to desist from purchasing or selling, long and/or short, securities of the Company, or "derivative" securities based on securities issued by the Company or to hold the Securities for any specified term; (ii) the Buyer, and counter-parties in "derivative" transactions to which any the Buyer is a party, directly or indirectly, presently may have a "short" position in the Common Stock, and (iii) the Buyer shall not be deemed to have any affiliation with or control over any arm's length counter-party in any "derivative" transaction. The Company further understands and acknowledges that the Buyer may engage in hedging and/or trading activities at various times during the period that the Securities are outstanding, including, without limitation, during the periods that the value of the Conversion Shares are being determined and (b) such hedging and/or trading activities, if any, can reduce the value of the existing stockholders' equity interest in the Company both at and after the time the hedging and/or trading activities are being conducted. The Company acknowledges that such aforementioned hedging and/or trading activities do not constitute a breach of this Agreement or any of the documents executed in connection herewith.

m. Disclosure of Transactions and Other Material Information. By 9:00 a.m., New York time, following the date this Agreement has been fully executed, the Company shall file a Current Report on Form 8-K describing the terms of the transactions contemplated by this Agreement in the form required by the 1934 Act and attaching this Agreement, the form of Note (the "8-K Filing"). From and after the filing of the 8-K Filing with the SEC, the Buyer shall not be in possession of any material, nonpublic information received from the Company, any of its Subsidiaries or any of their respective officers, directors, employees or agents that is not disclosed in the 8-K Filing. In addition, effective upon the filing of the 8-K Filing, the Company acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between the Company, any of its Subsidiaries or any of their respective officers, directors, affiliates, employees or agents, on the one hand, and the Buyer or any of its affiliates, on the other hand, shall terminate.

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

n. Legal Counsel Opinions. Upon the request of the Buyer from to time to time, the Company shall be responsible (at its cost) for promptly supplying to the Company's transfer agent and the Buyer a customary legal opinion letter of its counsel (the "Legal Counsel Opinion") to the effect that the resale of the Conversion Shares by the Buyer or its affiliates, successors and assigns is exempt from the registration requirements of the 1933 Act pursuant to Rule 144 (provided the requirements of Rule 144 are satisfied and provided the Conversion Shares are not then registered under the 1933 Act for resale pursuant to an effective registration statement). Should the Company's legal counsel fail for any reason to issue the Legal Counsel Opinion, the Buyer may (at the Company's cost) secure another legal counsel to issue the Legal Counsel Opinion, and the Company will instruct its transfer agent to accept such opinion. The Company hereby agrees that it may never take the position that it is a "shell company" in connection with its obligations under this Agreement or otherwise.

o. Piggyback Registration Rights. The Company hereby grants to the Buyer the registration rights set forth on Exhibit B hereto.

p. Most Favored Nation. While the Note or any principal amount, interest or fees or expenses due thereunder remain outstanding and unpaid, the Company shall not enter into any public or private offering of its securities (including securities convertible into shares of Common Stock) with any individual or entity (an "Other Investor") that has the effect of establishing rights or otherwise benefiting such Other Investor in a manner more favorable in any material respect to such Other Investor than the rights and benefits established in favor of the Buyer by this Agreement or the Note unless, in any such case, the Buyer has been provided with such rights and benefits pursuant to a definitive written agreement or agreements between the Company and the Buyer.

q. Subsequent Variable Rate Transactions. From the date hereof until such time as the Buyer no longer holds the Note or any of the Conversion Shares, the Company shall be prohibited from effecting or entering into an agreement involving a Variable Rate Transaction. "Variable Rate Transaction" means a transaction in which the Company (i) issues or sells any debt or equity securities that are convertible into, exchangeable or exercisable for, or include the right to receive, additional shares of Common Stock either (A) at a conversion price, exercise price or exchange rate or other price that is based upon, and/or varies with, the trading prices of or quotations for the shares of Common Stock at any time after the initial issuance of such debt or equity securities or (B) with a conversion, exercise or exchange price that is subject to being reset at some future date after the initial issuance of such debt or equity security or upon the occurrence of specified or contingent events directly or indirectly related to the business of the Company or the market for the Common Stock or (ii) enters into any agreement, including, but not limited to, an equity line of credit, whereby the Company may issue securities at a future determined price. Any Purchaser shall be entitled to obtain injunctive relief against the Company to preclude any such issuance, which remedy shall be in addition to any right to collect damages.

r. Brokerage Account Restrictions. If the Common Stock issued upon conversion of the Note cannot be delivered to a brokerage account of the Buyer as a result of restrictions imposed by such brokerage firm, then the Company agrees to take any such action required, including but not limited to a reverse stock split, to remove any such restrictions on depositing the Common Stock into such brokerage account or to satisfy any requirement for deposit of the Common Stock into such brokerage account.

5. Transfer Agent Instructions. The Company shall issue irrevocable instructions to the Company's transfer agent to issue certificates, registered in the name of the Buyer or its nominee, upon conversion of the Note, the Conversion Shares, in such amounts as specified from time to time by the Buyer to the Company in accordance with the terms thereof (the "Irrevocable Transfer Agent Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement (including but not limited to the provision to irrevocably reserved shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent to the Company and the Company. Prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to Rule 144 without any restriction as to the number of Securities as of a particular date that can then be immediately sold, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement. The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5 will be given by the Company to its transfer agent and that the Securities shall otherwise be freely

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

transferable on the books and records of the Company as and to the extent provided in this Agreement and the Note; (ii) it will not direct its transfer agent not to transfer or delay, impair, and/or hinder its transfer agent in transferring (or issuing)(electronically or in certificated form) any certificate for Securities to be issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; (iii) it will not fail to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Securities issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement and (iv) it will provide any required corporate resolutions and issuance approvals to its transfer agent within 6 hours of each conversion of the Note. Nothing in this Section shall affect in any way the Buyer's obligations and agreement set forth in Section 2(g) hereof to comply with all applicable prospectus delivery requirements, if any, upon re-sale of the Securities. If the Buyer provides the Company, at the cost of the Company, with (i) an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act and such sale or transfer is effected or (ii) the Buyer provides reasonable assurances that the Securities can be sold pursuant to Rule 144, the Company shall permit the transfer, and, in the case of the Securities, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

6. Conditions to the Company's Obligation to Sell. The obligation of the Company hereunder to issue and sell the Note to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

a. The Buyer shall have executed this Agreement and delivered the same to the Company.

b. The Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

c. The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date, as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

d. No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

7. Conditions to The Buyer's Obligation to Purchase. The obligation of the Buyer hereunder to purchase the Note, on the Closing Date, is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

a. The Company shall have executed this Agreement and delivered the same to the Buyer.

b. The Company shall have delivered to the Buyer the duly executed Note in such denominations as the Buyer shall request and in accordance with Section 1(b) above.

c.[Intentionally Omitted].

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

d. The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to the Buyer, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent.

e. The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of Closing Date, as though made at such time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

f. No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

g. No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company including but not limited to a change in the 1934 Act reporting status of the Company or the failure of the Company to be timely in its 1934 Act reporting obligations.

h. Trading in the Common Stock on the OTCBB shall not have been suspended by the SEC, FINRA or the OTCBB.

i. The Company shall have delivered to the Buyer (i) a certificate evidencing the formation and good standing of the Company and each of its Subsidiaries in such entity's jurisdiction of formation issued by the Secretary of State (or comparable office) of such jurisdiction, as of a date within ten (10) days of the Closing Date and (ii) resolutions adopted by the Company's Board of Directors at a duly called meeting or by unanimous written consent authorizing this Agreement and all other documents, instruments and transactions contemplated hereby.

8. Governing Law; Miscellaneous.

a. Governing Law; Venue. This Agreement shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement, the Note, or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts or in the federal courts located in the state and county of New York. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note, or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b. Counterparts. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. A facsimile or .pdf signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile or .pdf signature. Delivery of a counterpart signature hereto by facsimile or email/.pdf transmission shall be deemed validly delivery thereof.

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

c. <u>Construction; Headings.</u> This Agreement shall be deemed to be jointly drafted by the Company and the Buyer and shall not be construed against any person as the drafter hereof. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

d. <u>Severability.</u> In the event that any provision of this Agreement, the Note, or any other agreement or instrument delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Agreement, the Note, or any other agreement, certificate, instrument or document contemplated hereby or thereby.

e. <u>Entire Agreement; Amendments.</u> This Agreement, the Note, and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement or any agreement or instrument contemplated hereby may be waived or amended other than by an instrument in writing signed by the Buyer.

f. <u>Notices.</u> All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, e-mail or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by e-mail or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Company, to:

**DARKPULSE, INC.**
8760 Virginia Meadows Dr.
Manassas, VA 20109
Attention: Dennis O'Leary
e-mail: doleary@darkpulse.com

If to the Buyer:

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC**
1040 First Avenue, Suite 190
New York, NY 10022
Attn: Eli Fireman
e-mail: eli@firstfirecapital.com

With a copy by e-mail only to (which copy shall not constitute notice):

**LEGAL & COMPLIANCE, LLC**
330 Clematis Street, Suite 217
West Palm Beach, FL 33401
Attn: Chad Friend, Esq., LL.M.
e-mail: CFriend@LegalandCompliance.com

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

g. <u>Successors and Assigns.</u> This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, subject to Section 2(f), the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

h. <u>Third Party Beneficiaries.</u> This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

i. <u>Survival.</u> The representations and warranties of the Company and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyer. The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

j. <u>Publicity.</u> The Company, and the Buyer shall have the right to review a reasonable period of time before issuance of any press releases, SEC, OTCBB or FINRA filings, or any other public statements with respect to the transactions contemplated hereby; <u>provided, however,</u> that the Company shall be entitled, without the prior approval of the Buyer, to make any press release or SEC, OTCBB (or other applicable trading market) or FINRA filings with respect to such transactions as is required by applicable law and regulations (although the Buyer shall be consulted by the Company in connection with any such press release prior to its release and shall be provided with a copy thereof and be given an opportunity to comment thereon).

k. <u>Expense Reimbursement; Further Assurances.</u>  At the Closing to occur as of the Closing Date, the Company shall pay on behalf of the Buyer or reimburse the Buyer for its legal fees and expenses incurred in connection with this Agreement, pursuant to the disbursement authorization signed by the Company of even date.  Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

l. <u>No Strict Construction.</u> The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

m. <u>Indemnification.</u>  In consideration of the Buyer's execution and delivery of this Agreement and acquiring the Securities hereunder, and in addition to all of the Company's other obligations under this Agreement or the Note, the Company shall defend, protect, indemnify and hold harmless the Buyer and its stockholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing persons' agents or other representatives (including, without limitation, those retained in connection with the transactions contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in this Agreement, the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in this Agreement, the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of this Agreement, the Note or any other

agreement, certificate, instrument or document contemplated hereby or thereby, (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities, or (iii) the status of the Buyer or holder of the Securities as an investor in the Company pursuant to the transactions contemplated by this Agreement.    To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities that is permissible under applicable law.

        n. <u>Remedies.</u> The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement or the Note will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement or the Note, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement or the Note and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

        o. <u>Payment Set Aside</u>.  To the extent that the Company makes a payment or payments to the Buyer hereunder or pursuant to the Note, or the Buyer enforces or exercises its rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other person or entity under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

        p. <u>Failure or Indulgence Not Waiver.</u> No failure or delay on the part of the Buyer in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges.  All rights and remedies of the Buyer existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

[Signature Page Follows]

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

**DARKPULSE, INC.**

By: *Dennis M. O'Leary*
      Name: DENNIS O'LEARY
      Title: CHIEF EXECUTIVE OFFICER

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC**

By: FirstFire Capital Management LLC, its manager

By: _____
      ELI FIREMAN

SUBSCRIPTION AMOUNT:

**Principal Amount of Note: $247,500.00**
**Actual Amount of Purchase Price of Note: $225,000.00***

*The purchase price of $225,000.00 shall be paid within a reasonable amount of time after the full execution of the Note and all related transaction documents.

{00481385.DOCX.3}                                        19

**A-99**

**EXHIBIT A**

**FORM OF NOTE**

**[attached hereto]**

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

**EXHIBIT B**

**REGISTRATION RIGHTS**

All of the Conversion Shares will be deemed "Registrable Securities" subject to the provisions of this Exhibit B. All capitalized terms used but not defined in this Exhibit B shall have the meanings ascribed to such terms in the Securities Purchase Agreement to which this Exhibit is attached.

1.    <u>Piggy-Back Registration</u>.

1.1    <u>Piggy-Back Rights</u>.  If at any time on or after the date of the Closing the Company proposes to file any Registration Statement under the 1933 Act (a "Registration Statement") with respect to any offering of equity securities, or securities or other obligations exercisable or exchangeable for, or convertible into, equity securities, by the Company for its own account or for shareholders of the Company for their account (or by the Company and by shareholders of the Company), other than a Registration Statement (i) filed in connection with any employee stock option or other benefit plan on Form S-8, (ii) for a dividend reinvestment plan or (iii) in connection with a merger or acquisition, then the Company shall (x) give written notice of such proposed filing to the holders of Registrable Securities appearing on the books and records of the Company as such a holder as soon as practicable but in no event less than ten (10) days before the anticipated filing date of the Registration Statement, which notice shall describe the amount and type of securities to be included in such Registration Statement, the intended method(s) of distribution, and the name of the proposed managing underwriter or underwriters, if any, of the offering, and (y) offer to the holders of Registrable Securities in such notice the opportunity to register the sale of such number of Registrable Securities as such holders may request in writing within three (3) days following receipt of such notice (a "Piggy-Back Registration").  The Company shall cause such Registrable Securities to be included in such registration and shall cause the managing underwriter or underwriters of a proposed underwritten offering to permit the Registrable Securities requested to be included in a Piggy-Back Registration on the same terms and conditions as any similar securities of the Company and to permit the sale or other disposition of such Registrable Securities in accordance with the intended method(s) of distribution thereof.  All holders of Registrable Securities proposing to distribute their securities through a Piggy-Back Registration that involves an underwriter or underwriters shall enter into an underwriting agreement in customary form with the underwriter or underwriters selected for such Piggy-Back Registration.

1.2    <u>Withdrawal</u>. Any holder of Registrable Securities may elect to withdraw such holder's request for inclusion of Registrable Securities in any Piggy-Back Registration by giving written notice to the Company of such request to withdraw prior to the effectiveness of the Registration Statement.  The Company (whether on its own determination or as the result of a withdrawal by persons making a demand pursuant to written contractual obligations) may withdraw a Registration Statement at any time prior to the effectiveness of such Registration Statement.  Notwithstanding any such withdrawal, the Company shall pay all expenses incurred by the holders of Registrable Securities in connection with such Piggy-Back Registration as provided in Section 1.5 below.

1.3    The Company shall notify the holders of Registrable Securities at any time when a prospectus relating to such holder's Registrable Securities is required to be delivered under the 1933 Act, upon discovery that, or upon the happening of any event as a result of which, the prospectus included in such Registration Statement, as then in effect, includes an untrue statement of a material fact or omits to state any material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.  At the request of such holder, the Company shall also prepare, file and furnish to such holder a reasonable number of copies of a supplement to or an amendment of such prospectus as may be necessary so that, as thereafter delivered to the purchasers of the Registrable Securities, such prospectus shall not include an untrue statement of a material fact or omit to state a material fact required to be stated therein or necessary to make the statements therein not misleading in light of the circumstances then existing.  The holders of Registrable Securities shall not to offer or sell any Registrable Securities covered by the Registration Statement after receipt of such notification until the receipt of such supplement or amendment.

1.4    The Company may request a holder of Registrable Securities to furnish the Company such information with respect to such holder and such holder's proposed distribution of the Registrable Securities pursuant to the Registration Statement as the Company may from time to time reasonably request in writing or as

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

shall be required by law or by the SEC in connection therewith, and such holders shall furnish the Company with such information.

1.5     All fees and expenses incident to the performance of or compliance with this Exhibit B by the Company shall be borne by the Company whether or not any Registrable Securities are sold pursuant to a Registration Statement. The fees and expenses referred to in the foregoing sentence shall include, without limitation, (i) all registration and filing fees (including, without limitation, fees and expenses of the Company's counsel and independent registered public accountants) (A) with respect to filings made with the SEC, (B) with respect to filings required to be made with any trading market on which the Common Stock is then listed for trading, (C) in compliance with applicable state securities or Blue Sky laws reasonably agreed to by the Company in writing (including, without limitation, fees and disbursements of counsel for the Company in connection with Blue Sky qualifications or exemptions of the Registrable Securities) and (D) with respect to any filing that may be required to be made by any broker through which a holder of Registrable Securities intends to make sales of Registrable Securities with the FINRA, (ii) printing expenses, (iii) messenger, telephone and delivery expenses, (iv) fees and disbursements of counsel for the Company, (v) 1933 Act liability insurance, if the Company so desires such insurance, (vi) fees and expenses of all other persons or entities retained by the Company in connection with the consummation of the transactions contemplated by this Exhibit B and (vii) reasonable fees and disbursements of a single special counsel for the holders of Registrable Securities (selected by holders of the majority of the Registrable Securities requesting such registration). In addition, the Company shall be responsible for all of its internal expenses incurred in connection with the consummation of the transactions contemplated by this Agreement (including, without limitation, all salaries and expenses of its officers and employees performing legal or accounting duties), the expense of any annual audit and the fees and expenses incurred in connection with the listing of the Registrable Securities on any securities exchange as required hereunder. In no event shall the Company be responsible for any broker or similar commissions of any holder of Registrable Securities.

1.6     The Company and its successors and assigns shall indemnify and hold harmless the Buyer, each holder of Registrable Securities, the officers, directors, members, partners, agents and employees (and any other individuals or entities with a functionally equivalent role of a person holding such titles, notwithstanding a lack of such title or any other title) of each of them, each individual or entity who controls the Buyer or any such holder of Registrable Securities (within the meaning of Section 15 of the 1933 Act or Section 20 of the 1934 Act) and the officers, directors, members, stockholders, partners, agents and employees (and any other individuals or entities with a functionally equivalent role of a person holding such titles, notwithstanding a lack of such title or any other title) of each such controlling individual or entity (each, an "Indemnified Party"), to the fullest extent permitted by applicable law, from and against any and all losses, claims, damages, liabilities, costs (including, without limitation, reasonable attorneys' fees) and expenses (collectively, "Losses"), as incurred, arising out of or relating to (1) any untrue or alleged untrue statement of a material fact contained in a Registration Statement, any related prospectus or any form of prospectus or in any amendment or supplement thereto or in any preliminary prospectus, or arising out of or relating to any omission or alleged omission of a material fact required to be stated therein or necessary to make the statements therein (in the case of any such prospectus or supplement thereto, in light of the circumstances under which they were made) not misleading or (2) any violation or alleged violation by the Company of the 1933 Act, the 1934 Act or any state securities law, or any rule or regulation thereunder, in connection with the performance of its obligations under this Exhibit B, except to the extent, but only to the extent, that (i) such untrue statements or omissions are based upon information regarding the Buyer or such holder of Registrable Securities furnished to the Company by such party for use therein. The Company shall notify the Buyer and each holder of Registrable Securities promptly of the institution, threat or assertion of any proceeding arising from or in connection with the transactions contemplated by this Exhibit B of which the Company is aware.

1.7     If the indemnification under Section 1.6 is unavailable to an Indemnified Party or insufficient to hold an Indemnified Party harmless for any Losses, then the Company shall contribute to the amount paid or payable by such Indemnified Party, in such proportion as is appropriate to reflect the relative fault of the Company and Indemnified Party in connection with the actions, statements or omissions that resulted in such Losses as well as any other relevant equitable considerations. The relative fault of the Company and Indemnified Party shall be determined by reference to, among other things, whether any action in question, including any untrue or alleged untrue statement of a material fact or omission or alleged omission of a material fact, has been taken or made by, or relates to information supplied by, the Company or the Indemnified Party, and the parties' relative intent, knowledge, access to information and opportunity to correct or prevent such action, statement or omission. The

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

amount paid or payable by a party as a result of any Losses shall be deemed to include any reasonable attorneys' or other fees or expenses incurred by such party in connection with any proceeding to the extent such party would have been indemnified for such fees or expenses if the indemnification provided for in Section 1.6 was available to such party in accordance with its terms.  It is agreed that it would not be just and equitable if contribution pursuant to this Section 1.7 were determined by pro rata allocation or by any other method of allocation that does not take into account the equitable considerations referred to in the immediately preceding sentence. Notwithstanding the provisions of this Section 1.7, neither the Buyer nor any holder of Registrable Securities shall be required to contribute, in the aggregate, any amount in excess of the amount by which the net proceeds actually received by such party from the sale of all of their Registrable Securities pursuant to such Registration Statement or related prospectus exceeds the amount of any damages that such party has otherwise been required to pay by reason of such untrue or alleged untrue statement or omission or alleged omission.

**[End of Exhibit B]**

Electronically Signed using eSignOnline™ [ Session ID : 64c088ee-78bd-489e-aeb0-ea66cd7f67a7 ]

A-103

# EXHIBIT
# 2

A-104

NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT OR OTHER APPLICABLE EXEMPTION. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.

**Principal Amount: $825,000.00**                                    **Issue Date: April 26, 2021**
**Actual Amount of Purchase Price: $750,000.00**

## CONVERTIBLE PROMISSORY NOTE

**FOR VALUE RECEIVED**, **DARKPULSE, INC.**, a Delaware corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**, a Delaware limited liability company, or registered assigns (the "Holder"), in the form of lawful money of the United States of America, the principal sum of up to $825,000.00 (the "Principal Amount") (subject to adjustment herein), with a purchase price of $750,000.00 (the "Consideration") hereof plus an original issue discount in the amount of $75,000.00 (the "OID"), and to pay interest on the Principal Amount under this Note at the rate of ten percent (10%) (the "Interest Rate") per annum guaranteed from the date that the amount of Consideration is fully funded in accordance with the terms of this Note until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, as further provided herein with the understanding that the first nine (9) months of interest (equal to $61,875.00) shall be guaranteed and earned in full as of the Issue Date.. The maturity date for this Note shall be nine (9) months from the issue date ("Maturity Date"), and is the date upon which the principal sum as well as any accrued and unpaid interest and other fees shall be due and payable. Notwithstanding any other provision of this Note or any related transaction documents, Borrower may prepay this Note only pursuant to Section 1.9 hereof.

It is further acknowledged and agreed that the Principal Amount owed by Borrower under this Note shall be increased by the amount of all expenses up to a maximum of $500 incurred by the Holder relating to any conversion of this Note into shares of Common Stock. All such expenses shall be deemed added to the Principal Amount hereunder to the extent such expenses are paid by the Holder.

Interest shall commence accruing on the date that the Note is issued and shall be computed on the basis of a 365-day year and the actual number of days elapsed. Any Principal Amount or interest on this Note which is not paid when due shall bear interest at the rate the lesser of (a) twenty percent (20%) per annum from the due date thereof until the same is paid ("Default Interest"); or (b) the maximum rate allowed by law.

All payments due hereunder (to the extent not converted into shares of common stock of the Borrower (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date.

1

DocuSign Envelope ID: 320227A5-E6B6-4621-BAB2-76BA9SE643BE

Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement, dated as of the Issue Date, pursuant to which this Note was originally issued (the "Purchase Agreement"). As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed. As used herein, the term "Trading Day" means any day that shares of Common Stock are listed for trading or quotation on the Principal Market (as defined in the Purchase Agreement), any tier of the NASDAQ Stock Market, the New York Stock Exchange or the NYSE MKT or any of the OTCQX® Best Market, OTCQB® Venture Market or the OTC Pink Market.

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

### ARTICLE I. CONVERSION RIGHTS

1.1     Conversion Right. The Holder shall have the right, at any time while there are amounts outstanding under the Note and after one hundred eighty (180) days from the issuance hereof, to convert all or any portion of the then outstanding and unpaid Principal Amount and interest (including any Default Interest) into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price (as defined below) determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of this Note or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of Conversion Shares issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the then outstanding shares of Common Stock. For purposes of the proviso set forth in the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso, provided, however, that the limitations on conversion may be waived (up to 9.99%) by the Holder upon, at the election of the Holder, not less than 61 days' prior notice to the Borrower, and the provisions of the conversion limitation shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver). The number of Conversion Shares to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower or Borrower's transfer agent by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the Principal Amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such Principal Amount at the Interest Rate to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2), plus (4) up to $500.00 of expenses incurred by the Holder with respect to a Conversion.

DocuSign Envelope ID: 320227A6-E6B6-4623-BAB2-76BA9SE643BE

1.2     Conversion Price.

(a) Calculation of Conversion Price. The per share conversion price into which Principal Amount and interest (including any Default Interest) under this Note shall be convertible into shares of Common Stock hereunder (the "Conversion Price") shall be equal to $0.015 per share (the "Fixed Conversion Price") subject to pro-rata and other appropriate adjustments in the event of a stock split, reverse-stock split, stock dividend and similar recapitalizations; *provided however*, if an Event of Default has occurred or is existing while any amounts due under this Note are outstanding, the Conversion Price shall be $0.005 per share (the "Default Fixed Conversion Price"), also Default Fixed Conversion Price shall be subject to pro-rata and other appropriate adjustments as would be applicable to the Conversion Price. In the event the Borrower has a DTC "Chill" on its shares, an additional discount of ten percent (10%) shall apply to the Conversion Price while that "Chill" is in effect.

(b) Conversion Price During Major Announcements. Notwithstanding anything contained in Section 1.2(a) to the contrary, in the event the Borrower (i) makes a public announcement that it intends to be acquired by, consolidate or merge with any other corporation or entity (other than a merger in which the Borrower is the surviving or continuing corporation and its capital stock is unchanged) or sell or transfer all or substantially all of the assets of the Borrower or (ii) any person, group or entity (including the Borrower) publicly announces a tender offer to purchase fifty percent (50%) or more of the Common Stock (or any other takeover scheme) (any such transaction referred to in clause (i) or (ii) being referred to herein as a "Change in Control" and the date of the announcement referred to in clause (i) or (ii) is being referred to herein as the "Announcement Date"), then the Conversion Price shall, effective upon the Announcement Date and continuing through the Adjusted Conversion Price Termination Date (as defined below), be equal to the lower of (x) the Conversion Price and (y) a twenty-five percent (25%) discount to the Acquisition Price (as defined below), but shall in no event be no lower than $0.01 per share. From and after the Adjusted Conversion Price Termination Date, the Conversion Price shall be determined as set forth in Section 1.2(a). For purposes hereof, "Adjusted Conversion Price Termination Date" shall mean, with respect to any proposed Change in Control for which a public announcement as contemplated by this Section 1.2(b) has been made, the date upon which the Borrower (in the case of clause (i) above) or the person, group or entity (in the case of clause (ii) above) consummates or publicly announces the termination or abandonment of the proposed Change in Control which caused this Section 1.2(b) to become operative. For purposes hereof, "Acquisition Price" shall mean a price per share of Common Stock derived by dividing (x) the total consideration (in cash, equity, earn-out or similar payments or otherwise) paid or to be paid to the Borrower or its shareholders in the Change in Control transaction by (y) the number of authorized shares of Common Stock outstanding as of the business day prior to the Announcement Date.

1.3     Authorized and Reserved Shares. The Borrower covenants that at all times until the Note is satisfied in full, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of a number of Conversion Shares equal to (i) the number of Conversion Shares issuable upon the full conversion of this Note (assuming no payment of Principal Amount or interest) as of any issue date (taking into consideration any adjustments to the Conversion Price pursuant to Section 2 hereof or otherwise) multiplied by (ii) three (3) (the "Reserved Amount"). The initial Reserved Amount shall be 550,000,000 shares. In the event that the Borrower shall be unable to reserve the entirety of the Reserved Amount (the "Reserve Amount Failure"), the Borrower shall promptly take all actions necessary to increase its authorized share capital to accommodate the Reserved Amount (the "Authorized Share Increase"), including without limitation, all board of directors actions and approvals and promptly (but no less than sixty (60) days following the calling and holding a special meeting of its shareholders no more than sixty (60) days following the Reserve Amount Failure to seek approval of the Authorized Share Increase via the solicitation of proxies. Notwithstanding the foregoing, in no event shall the Reserved Amount be lower than the initial Reserved Amount, regardless of any prior conversions. The Borrower represents that upon issuance, the Conversion Shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of Conversion Shares into which

3

A-107

DocuSign Envelope ID: 32022745-E6B6-4621-BAB2-76BA95E643BE

this Note shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of this Note. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Conversion Shares or instructions to have the Conversion Shares issued as contemplated by Section 1.4(f) hereof, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates or cause the Borrower to electronically issue shares of Common Stock to execute and issue the necessary certificates for the Conversion Shares or cause the Conversion Shares to be issued as contemplated by Section 1.4(f) hereof in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under this Note.

1.4     Method of Conversion.

(a) Mechanics of Conversion. This Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 11:59 p.m., New York, New York time). Any Notice of Conversion submitted after 11:59 p.m., New York, New York time, shall be deemed to have been delivered and received on the next Trading Day.

(b) Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid Principal Amount is so converted. The Holder and the Borrower shall maintain records showing the Principal Amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid Principal Amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted Principal Amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c) Payment of Taxes. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d) Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for

4

DocuSign Envelope ID: 320227A5-E6B6-4621-BAE2-76EA95E643BE

the Conversion Shares (or cause the electronic delivery of the Conversion Shares as contemplated by Section 1.4(f) hereof) within three (3) Trading Days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid Principal Amount and interest (including any Default Interest) under this Note, surrender of this Note). If the Borrower shall fail for any reason or for no reason to issue to the Holder on or prior to the Deadline a certificate for the number of Conversion Shares or to which the Holder is entitled hereunder and register such Conversion Shares on the Borrower's share register or to credit the Holder's balance account with DTC (as defined below) for such number of Conversion Shares to which the Holder is entitled upon the Holder's conversion of this Note (a "Conversion Failure"), then, in addition to all other remedies available to the Holder, (i) the Borrower shall pay in cash to the Holder on each day after the Deadline and during such Conversion Failure an amount equal to two percent (2.0%) of the product of (A) the sum of the number of Conversion Shares not issued to the Holder on or prior to the Deadline and to which the Holder is entitled and (B) the closing sale price of the Common Stock on the Trading Day immediately preceding the last possible date which the Borrower could have issued such Conversion Shares to the Holder without violating this Section 1.4(d); and (ii) the Holder, upon written notice to the Borrower, may void its Notice of Conversion with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Notice of Conversion; provided that the voiding of an Notice of Conversion shall not affect the Borrower's obligations to make any payments which have accrued prior to the date of such notice. In addition to the foregoing, if on or prior to the Deadline the Borrower shall fail to issue and deliver a certificate to the Holder and register such Conversion Shares on the Borrower's share register or credit the Holder's balance account with DTC for the number of Conversion Shares to which the Holder is entitled upon the Holder's exercise hereunder or pursuant to the Borrower's obligation pursuant to clause (ii) below, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of shares of Common Stock issuable upon such exercise that the Holder anticipated receiving from the Borrower, then the Borrower shall, within two (2) Trading Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other reasonable and customary out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "Buy-In Price"), at which point the Borrower's obligation to deliver such certificate (and to issue such Conversion Shares) or credit such Holder's balance account with DTC for such Conversion Shares shall terminate, or (ii) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such Conversion Shares or credit such Holder's balance account with DTC and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the closing sales price of the Common Stock on the date of exercise. Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Borrower's failure to timely deliver certificates representing the Conversion Shares (or to electronically deliver such Conversion Shares) upon the conversion of this Note as required pursuant to the terms hereof.

(e) Obligation of Borrower to Deliver Common Stock. At the time that the Holder submits the Notice of Conversion to the Borrower or Borrower's transfer agent, the Holder shall be deemed to be the holder of record of the Conversion Shares issuable upon such conversion, the outstanding Principal Amount and the amount of accrued and unpaid interest (including any Default Interest) under this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for the Conversion Shares (or cause the electronic delivery of the Conversion Shares as contemplated by Section 1.4(f) hereof) shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged

5

A-109

DocuSign Envelope ID: 320227A5-E6B6-4631-BAB2-76BA95E643BE

breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is sent to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time, on such date.

(f) Delivery of Conversion Shares by Electronic Transfer. In lieu of delivering physical certificates representing the Conversion Shares issuable upon conversion hereof, provided the Borrower is participating in the Depository Trust Borrower ("DTC") Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its reasonable best efforts to cause its transfer agent to electronically transmit the Conversion Shares issuable upon conversion hereof to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission system.

1.5 Concerning the Shares. The Conversion Shares issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement or otherwise qualified for sale pursuant to Regulation A pursuant to inclusion in a qualified Form 1-A filing under the 1933 Act; or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be the Legal Counsel Opinion (as defined in the Purchase Agreement)) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration; or (iii) such shares are sold or transferred pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption; or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement). Except as otherwise provided in the Purchase Agreement (and subject to the removal provisions set forth below), until such time as the Conversion Shares have been registered under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for the Conversion Shares that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

**"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH MAY BE THE LEGAL COUNSEL OPINION (AS DEFINED IN THE PURCHASE AGREEMENT)), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144, RULE 144A, REGULATION S, OR OTHER APPLICABLE EXEMPTION UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Borrower shall issue to the Holder a certificate for the applicable Conversion Shares without such legend upon which it is stamped or (as requested by the Holder) issue the applicable Conversion Shares by electronic delivery by crediting the account of such

6

DocuSign Envelope ID: 320227A6-E6B6-4623-BAE2-76BA9SE642BE

holder's broker with DTC, if, unless otherwise required by applicable state securities laws: (a) such Conversion Shares are registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) the Borrower or the Holder provides the Legal Counsel Opinion (as contemplated by and in accordance with Section 4(f) of the Purchase Agreement) to the effect that a public sale or transfer of such Conversion Shares may be made without registration under the 1933 Act, which opinion shall be accepted by the Borrower so that the sale or transfer is effected. The Borrower shall be responsible for the fees of its transfer agent and all DTC fees associated with any such issuance. The Holder agrees to sell all Conversion Shares, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Borrower does not accept the opinion of counsel provided by the Holder with respect to the transfer of Conversion Shares pursuant to an exemption from registration, such as Rule 144, Rule 144A or Regulation S, at the Deadline, notwithstanding that the conditions of Rule 144, Rule 144A, Regulation S, or other applicable exemption, as applicable, have been met, it will be considered an Event of Default under this Note.

    1.6    Effect of Certain Events.

    (a) Effect of Merger, Consolidation, Etc. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall either: (i) be deemed to be an acceleration event pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of an amount equal to Principal Amount plus accrued but unpaid interest; or (ii) be treated pursuant to Section 1.6(b) hereof. "Person" shall mean any individual, corporation, limited liability Borrower, partnership, association, trust, or other entity or organization.

    (b) Adjustment Due to Merger, Consolidation, Etc. If, at any time when this Note is issued and outstanding and prior to conversion of all of this Note, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not effectuate any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, at least thirty (30) days prior written notice (but in any event at least seven (7) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Section 1.6(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

    (c) Adjustment Due to Distribution. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock

7

repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

(d) [RESERVED].

(e) Dilutive Issuance. If the Borrower, at any time while this Note or any amounts due hereunder are outstanding, issues, sells or grants (or has issued, sold or granted as of the Issue Date, as the case may be) any option to purchase, or sells or grants any right to reprice, or otherwise disposes of, or issues (or has sold or issued, as the case may be or announces any sale, grant or any option to purchase or other disposition), securities convertible into, exercisable for, or otherwise entitle any person or entity the right to acquire, shares of Common Stock (including, without limitation, upon conversion of this Note, and any convertible notes or warrants outstanding as of or following the Issue Date), in each or any case at an effective price per share that is lower than the then Conversion Price (such lower price, the "Base Conversion Price" and such issuances, collectively, a "Dilutive Issuance") (it being agreed that if the holder of the Common Stock or other securities so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which are issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share that is lower than the Conversion Price, such issuance shall be deemed to have occurred for less than the Conversion Price on such date of the Dilutive Issuance), then the Conversion Price shall be reduced, at the option of the Holder, to a price equal the Base Conversion Price. If the Borrower enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Borrower shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible price per share at which such securities could be issued in connection with such Variable Rate Transaction. Such adjustment shall be made whenever such Common Stock or other securities are issued. Notwithstanding the foregoing, no adjustment will be made under this Section 1.6(e) in respect of an Exempt Issuance. In the event of an issuance of securities involving multiple tranches or closings, any adjustment pursuant to this Section 1.6(e) shall be calculated as if all such securities were issued at the initial closing. This Section shall also be subject to the mechanics of Section 1.6(g) "Pending Legislation" clause herein. Notwithstanding the foregoing, this Section 1.6(e) shall apply only to issuances originating after the Effective Date hereof (i.e. post-Effective Date conversions of convertible notes or warrants issued prior to the Effective Date shall not trigger an adjustment even if the conversion or exercise price is less than the Conversion Price).

An "Exempt Issuance" shall mean the issuance of (i) shares of Common Stock or other securities to officers or directors of the Borrower pursuant to any stock or option or similar equity incentive plan duly adopted for such purpose, by a majority of the non-employee members of the Borrower's Board of Directors or a majority of the members of a committee of non-employee directors ("Plan") established for such purpose in a manner which is consistent with the Borrower's prior business practices or in settlement of accrued but unpaid compensation and/or benefits regardless of whether such securities were issued from a Plan or in settlement of vendor payables; (ii) securities issued pursuant to a merger, consolidation, acquisition or similar business combination approved by a majority of the disinterested directors of the Borrower, provided that any such issuance shall only be to a Person (or to the equity holders of a Person) which is, itself or through its subsidiaries, an operating Borrower or an owner of an asset in a business synergistic with the business of the Borrower and shall provide to the Borrower additional benefits in addition to the investment of funds, but shall not include a transaction in which the Borrower is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities; (iii) securities issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement or debt financing from a bank or similar financial institution

DocuSign Envelope ID: 32022745-E6B6-4623-BAB2-76BA9CE642BE

approved by a majority of the disinterested directors of the Borrower; (iv) existing convertible debt and equity lines of credit in existence on the date hereof;; or (v) securities issued with respect to which the Holder waives its rights in writing under this Section 1.6(e).

(f) Notice of Adjustments. Upon the occurrence of each adjustment or readjustment of the Conversion Price as a result of the events described in this Section 1.6, the Borrower, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Borrower shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment; (ii) the Conversion Price at the time in effect; and (iii) the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon conversion of the Note.

(g) Pending Legislation. As of the Issue Date hereof, proposed legislation exists, namely proposed amendments to Rule 144(d)(3)(ii) proposed on December 22, 2020 in SEC Release 2020-336, that would fundamentally change the economic terms of this Note. In the event the rule becomes law and becomes effective while any amounts are outstanding under this Note, Section 1.2 hereof shall be automatically amended to contain only the Fixed Conversion Price of $0.015 per share. In the event that the Borrower is in default of any of the provisions of the Note or other Transaction Documents, and the Borrower has not cured said default within five (5) calendar days, the Fixed Conversion Price shall be reduced to the Default Fixed Conversion Price in addition to any other principal adjustments, default interest, or other remedies available to it under law. In the event the final rule, or any other combination of final rules, make this provision inoperable, invalid, or otherwise have an effect that changes the economics of the transactions contemplated hereby, the pertinent clause or mechanic of operation shall be stricken and only the Fixed Price provision shall remain.

1.7    Adjustments to Conversion Price. At any time after the Issue Date, (i) if in the case that the Borrower's Common Stock is not deliverable by DWAC (including if the Borrower's transfer agent has a policy prohibiting or limiting delivery of shares of the Borrower's Common Stock specified in a Notice of Conversion); (ii) if the Borrower ceases to be a reporting Borrower pursuant or subject to the Exchange Act; (iii) if after the Borrower gets listed on a trading market, the Borrower subsequently loses a market (including the OTC Pink Market, OTCQB® Venture Market or an equivalent replacement exchange) for its Common Stock; (iv) if the Borrower fails to maintain its status as "DTC Eligible" for any reason; (v) if the Note cannot be converted into free trading shares on or after six (6) months from the Issue Date; (vi) if at any time the Borrower does not maintain or replenish the Reserved Amount (as defined herein) within three (3) business days of the request of the Holder; (vii) if the Borrower fails to comply with the reporting requirements of the Exchange Act; the reporting requirements necessary to satisfy the availability of Rule 144 to the Holder or its assigns, including but not limited to the timely fulfillment of its filing requirements as a fully- reporting issuer registered with the SEC; (ix) if the Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder; (x) if, once listed, subsequently OTC Markets changes the Borrower's designation to 'No Information' (Stop Sign) or 'Caveat Emptor' (Skull and Crossbones); (xi) the restatement of any financial statements filed by the Borrower with the SEC for any date or period from two (2) years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement; (xii) once it begins trading on any of the trading markets or exchanges listed hereafter, any cessation of trading of the Common Stock on at least one of the OTC Markets including but not limited to the OTC Pink Market, or an equivalent replacement exchange, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, the New York Stock Exchange, or the NYSE MKT, and such cessation of trading shall continue for a period of five consecutive (5) Trading Days; and/or (xiii) the Borrower loses the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2); or (xiv) if the Holder is notified in writing by the Borrower or the Borrower's transfer agent that the Borrower does not have the necessary

amount of authorized and issuable shares of Common Stock available to satisfy the issuance of Shares pursuant to a Conversion Notice, then in addition to all other remedies under this Note, the Holder shall be entitled to increase, by fifteen percent (15%) for each occurrence, cumulative or otherwise, the discount to the Conversion Price shall apply for all future conversions under the Note.

1.8     Status as Shareholder. Upon submission of a Notice of Conversion by a Holder, (i) the Conversion Shares covered thereby (other than the Conversion Shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock, and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies for the Borrower's failure to convert this Note.

1.9     Prepayment. Notwithstanding anything to the contrary contained in this Note, subject to the terms of this Section, at any time during the period beginning on the Issue Date and ending at Maturity ("Prepayment Termination Date"), Borrower shall have the right, exercisable on not less than five (5) Trading Days prior written notice to the Holder of this Note, to prepay up to the outstanding balance on this Note (principal and accrued interest), in full, in accordance with this Section. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than fifteen (15) Trading Days from the date of the Optional Prepayment Notice; and (3) the amount (in dollars) that the Borrower is paying. Notwithstanding Holder's receipt of the Optional Prepayment Notice the Holder may convert, or continue to convert the Note in whole or in part until the Optional Prepayment Amount (as defined herein) is paid to the Holder. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to or upon the order of the Holder as specified by the Holder in writing to the Borrower at least one (1) business day prior to the Optional Prepayment Date. If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of one hundred percent (100%) of the total amount outstanding under the Note including, but not limited to all principal, interest, fees, and defaults (the "Optional Prepayment Amount").

**ARTICLE II. RANKING AND CERTAIN COVENANTS**

2.1     Ranking and Security. The obligations of the Borrower under this Note shall be subordinate with respect to any and all Indebtedness incurred as of or following the Issue Date.

2.2     Other Indebtedness. So long as the Borrower shall have any obligation under this Note, the Borrower shall not (directly or indirectly through any Subsidiary or affiliate) incur or suffer to exist or guarantee any Indebtedness that is senior to or pari passu with (in priority of payment and performance) the Borrower's obligations hereunder unless the proceeds of such Indebtedness are used to pay off the interest and principal under this Note. As used in this Section 2.2, the term "Borrower" means the Borrower and any Subsidiary of the Borrower. As used herein, the term "Indebtedness" means (a) all indebtedness of the Borrower for borrowed money, but not including deferred purchase price obligations in place as of the Issue Date and as disclosed in the SEC Documents or obligations to trade creditors incurred in the ordinary course of business, (b) all obligations of the Borrower evidenced by notes, bonds, debentures

A-114

DocuSign Envelope ID: 32022745-E6B6-4623-BAB2-76BA9CE642BE

or other similar instruments, (c) purchase money indebtedness hereafter incurred by the Borrower to finance the purchase of fixed or capital assets, including all capital lease obligations of the Borrower which do not exceed the purchase price of the assets funded, (d) all guarantee obligations of the Borrower in respect of obligations of the kind referred to in clauses (a) through (c) above that the Borrower would not be permitted to incur or enter into, and (e) all obligations of the kind referred to in clauses (a) through (d) above that the Borrower is not permitted to incur or enter into that are secured and/or unsecured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured and/or unsecured by) any lien or encumbrance on property (including accounts and contract rights) owned by the Borrower, whether or not the Borrower has assumed or become liable for the payment of such obligation.

2.3     Distributions on Capital Stock. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors or as may be permitted pursuant to Section 1.6(e).

2.4     Restriction on Stock Repurchases. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any such shares.

2.5     Sale of Assets. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets other than in an arm's length transaction. Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition, but otherwise such consent shall not be unreasonably withheld, conditioned, or delayed.

2.6     Advances and Loans; Affiliate Transactions. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Borrower, except loans, credits or advances (a) in existence or committed on the Issue Date and which the Borrower has informed Holder in writing prior to the Issue Date, (b) in regard to transactions with unaffiliated third parties, made in the ordinary course of business or (c) in regard to transactions with unaffiliated third parties, not in excess of $250,000. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, repay any affiliate (as defined in Rule 144) of the Borrower in connection with any indebtedness or accrued amounts owed to any such party outside the ordinary course of business.

2.7     Section 3(a)(9) or 3(a)(10) Transaction. So long as this Note is outstanding, the Borrower shall not enter into any transaction or arrangement structured in accordance with, based upon, or related or pursuant to, in whole or in part, either Section 3(a)(9) of the Securities Act (a "3(a)(9) Transaction") or Section 3(a)(l0) of the Securities Act (a "3(a)(l0) Transaction"). In the event that the Borrower does enter into, or makes any issuance of Common Stock related to a 3(a)(9) Transaction or a 3(a)(l0) Transaction while this note is outstanding, a liquidated damages charge of twenty-five percent (25%) of the outstanding principal balance of this Note, but not less than Twenty-Five Thousand Dollars ($25,000), will be assessed and will become immediately due and payable to the Holder at its election in the form of a cash payment or added to the balance of this Note (under Holder's and Borrower's expectation that this amount will tack back to the Issue Date). Notwithstanding the forgoing, transactions contemplated

11

in the second paragraph (a) of Section 1.6(e) that may be considered Section 3(a)(9) or 3(a)(10) transactions are permissible and will not cause a liquidated damages charge.

       2.8     <u>Preservation of Business and Existence, etc</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, (a) change the nature of its business in a material respect; or (b) sell, divest, change the structure of any material assets other than in the ordinary course of business. In addition, so long as the Borrower shall have any obligation under this Note, the Borrower shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries (other than dormant Subsidiaries that have no or minimum assets) to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary. Furthermore, so long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, solicit any offers for, respond to any unsolicited offers for, or conduct any negotiations with, any other person or entity with respect to any Variable Rate Transaction or investment.

       2.9     <u>Non-circumvention</u>. The Borrower hereby covenants and agrees that the Borrower will not, by amendment of its Certificate or Articles of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all the provisions of this Note and take all action as may be required to protect the rights of the Holder.

       2.10     <u>Lost, Stolen or Mutilated Note</u>. Upon receipt by the Borrower of evidence reasonably satisfactory to the Borrower of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Borrower in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Borrower shall execute and deliver to the Holder a new Note.

**ARTICLE III. EVENTS OF DEFAULT**

       It shall be considered an event of default if any of the following events listed in this Article III (each, an "Event of Default") shall occur:

       3.1     <u>Conversion and the Shares</u>. The Borrower (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note; (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note; (iii) fails to reserve the Reserved Amount at all times; or (iv) the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) Trading Days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an Event of Default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the

DocuSign Envelope ID: 32022745-E6B6-4623-BAB3-705A9CE642BE

Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder.

    3.2    <u>Breach of Agreements and Covenants.</u> The Borrower materially breaches any agreement, covenant or other term or condition contained in the Purchase Agreement, this Note, the Irrevocable Transfer Agent Instructions or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith.

    3.3    <u>Breach of Representations and Warranties.</u> Any material breach of any representation or warranty of the Borrower made in the Purchase Agreement, this Note, the Irrevocable Transfer Agent Instructions or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

    3.4    <u>Receiver or Trustee.</u> The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

    3.5    <u>Judgments.</u> Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $300,000.00, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

    3.6    <u>Bankruptcy.</u> Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

    3.7    <u>Delisting of Common Stock.</u> The Borrower should fail to maintain the listing of the Common Stock on at least one of the OTC Markets, including, but not limited to the OTC Pink Market, any level of the NASDAQ Markets or the New York Stock Exchange (including the NYSE MKT).

    3.8    <u>Failure to Comply with the 1934 Act.</u> At any time after the Issue Date, the Borrower shall fail to comply in all material respects with the reporting requirements of the 1934 Act and/or the Borrower shall cease to be subject to the reporting requirements of the 1934 Act. It shall be an Event of Default under this section if the Borrower shall file any Notification of Late Filing on Form 12b-25 with the SEC.

    3.9    <u>Liquidation.</u> Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

    3.10    <u>Cessation of Operations.</u> Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

    3.11    <u>Financial Statement Restatement.</u> The restatement of any financial statements filed by the Borrower with the SEC for any date or period from two (2) years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

13

DocuSign Envelope ID: 32022745-E6B6-4623-BAB2-76BA8CE642BE

     3.12    <u>Reverse Splits.</u> The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

     3.13    <u>Replacement of Transfer Agent.</u> In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

     3.14    <u>DTC "Chill".</u> The DTC places a "chill" (i.e. a restriction placed by DTC on one or more of DTC's services, such as limiting a DTC participant's ability to make a deposit or withdrawal of the security at DTC) on any of the Borrower's securities.

     3.15    <u>DWAC Eligibility.</u> In addition to the Event of Default in Section 3.16, the Common Stock is otherwise not eligible for trading through the DTC's Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs.

     3.16    <u>Variable Rate Transactions; Dilutive Issuances.</u> The Borrower (i) issues shares of Common Stock (or convertible securities or Purchase Rights) pursuant to an equity line of credit of the Borrower or otherwise in connection with a Variable Rate Transaction (entered into in the future) except for existing lines of credit or Variable Rate Transactions existing as of the date hereof; (ii) adjusts downward the "floor price" at which shares of Common Stock (or convertible securities or Purchase Rights) may be issued under an equity line of credit or otherwise in connection with a Variable Rate Transaction (or entered into in the future) except for existing lines of credit or Variable Rate Transactions existing as of the date hereof; or (iii) a Dilutive Issuance is triggered as provided in this Note.

     3.17    <u>Bid Price.</u> Once the Borrower obtains a listing, the Borrower shall subsequently lose the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2) or a market (including the OTC Pink, OTCQB or an equivalent replacement marketplace or exchange).

     3.18    <u>Inside Information.</u> Any attempt by the Borrower or its officers, directors, and/or affiliates to intentionally transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date

     3.19    <u>Unavailability of Rule 144.</u> If, at any time on or after the date which is six (6) months after the Issue Date, except due to the Holder's actions or inactions, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent in order to facilitate the Holder's conversion of any portion of the Note into free trading shares of the Borrower's Common Stock pursuant to Rule 144; or (ii) thereupon deposit such shares into the Holder's brokerage account.

     3.20    <u>Suspension of Trading of Common Stock.</u> If, at any time on or after the Borrower obtains a listing, the Borrower's Common Stock (i) is suspended from trading; or (ii) halted from trading.

     3.21    <u>Failure to Register.</u> If the Borrower fails to meet its obligations under the Registration Rights Agreement entered into by the parties in connection herewith.

     3.22    <u>Rights and Remedies Upon an Event of Default.</u> Upon the occurrence and during the continuation of any Event of Default specified in this Article III, this Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder,

14

A-118

DocuSign Envelope ID: 32022745-E6B6-4623-BAB3-76BA9CE642BF

an amount (the "Default Amount") equal to the Principal Amount then outstanding plus accrued interest (including any Default Interest) through the date of full repayment multiplied by one hundred twenty-five percent (125%). Holder may, in its sole discretion, determine to accept payment in Common Stock or part in Common Stock and part in cash. For purposes of payments in Common Stock, the conversion formula set forth in Section 1.2 shall apply. Upon an uncured Event of Default, all amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived by the Borrower, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity, including, without limitation.

## ARTICLE IV. MISCELLANEOUS

4.1     Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2     Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served; (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid; (iii) delivered by reputable air courier service with charges prepaid; or (iv) transmitted by hand delivery, telegram, e-mail or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by e-mail or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Borrower, to:

**DARKPULSE, INC.**
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Attention: Dennis O'Leary
e-mail: doleary@darkpulse.com

If to the Holder:

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
1040 First Avenue, Suite
190 New York, NY 10022
Attention: Eli Fireman
e-mail: eli@firstfirecapital.com

With a copy by e-mail only to (which copy shall not constitute notice):

**FABIAN VANCOTT**
Attn: Anthony Michael Panek

DocuSign Envelope ID: 32022745-E6B6-4623-BAB2-76BA9CE642BE

e-mail: apanek@fabianvancott.com

4.3     Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4     Assignability. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Neither the Borrower nor the Holder shall assign this Note or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Holder may assign its rights hereunder to any "accredited investor" (as defined in Rule 501(a) of the 1933 Act) in a private transaction from the Holder or to any of its "affiliates", as that term is defined under the 1934 Act, without the consent of the Borrower. Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

4.5     Cost of Collection. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6     Governing Law; Venue; Attorney's Fees. This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts located in the state of New York or federal courts located in the state of New York. The Borrower hereby irrevocably waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **THE BORROWER HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorney's fees and costs.

4.7     Certain Amounts. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding Principal Amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

A-120

DocuSign Envelope ID: 32022745-E6B6-4623-BAB3-70BA9CE642BE

      4.8    <u>Purchase Agreement.</u> The Borrower and the Holder shall be bound by the applicable terms of the Purchase Agreement and the documents entered into in connection herewith and therewith.

      4.9    <u>Notice of Corporate Events.</u> Except as otherwise provided below, the Holder of this Note shall have no rights as a Holder of Common Stock unless and only to the extent that it converts this Note into Common Stock. The Borrower shall provide the Holder with prior notification of any meeting of the Borrower's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Borrower of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any Change in Control or any proposed liquidation, dissolution or winding up of the Borrower, the Borrower shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Borrower shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.9.

      4.10    <u>Remedies.</u> The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

      4.11    <u>Construction; Headings.</u> This Note shall be deemed to be jointly drafted by the Borrower and all the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

      4.12    <u>Usury.</u> To the extent it may lawfully do so, the Borrower hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note. Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Borrower under this Note for payments which under the applicable law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under the applicable law in the nature of interest that the Borrower may be obligated to pay under this Note exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by applicable law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the Issue Date, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by

A-121

the Borrower to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Borrower, the manner of handling such excess to be at the Holder's election.

4.13    Severability.    In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

4.14    Terms of Future Financings.    So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any convertible debt or convertible preferred stock, with any term that the Holder reasonably believes is more favorable to the holder of such security or with a term in favor of the holder of such security that the Holder reasonably believes was not similarly provided to the Holder in this Note, then (i) the Borrower shall notify the Holder of such additional or more favorable term within one (1) business day of the issuance and/or amendment (as applicable) of the respective security, and (ii) such term, at Holder's option, shall become a part of the transaction documents with the Holder (regardless of whether the Borrower complied with the notification provision of this Section 4.14). The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, and original issue discounts. If Holder elects to have the term become a part of the transaction documents with the Holder, then the Borrower shall immediately deliver acknowledgment of such adjustment in form and substance reasonably satisfactory to the Holder (the "Acknowledgment") within one (1) business day of Borrower's receipt of request from Holder (the "Adjustment Deadline"), provided that Borrower's failure to timely provide the Acknowledgement shall not affect the automatic amendments contemplated hereby. Nor shall this section apply to any adjustments made to any of the Borrower's securities issued prior to the date hereof.

4.15    Dispute Resolution. In the case of a dispute as to the determination of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, Issue, Closing or Maturity Date, the closing bid price, or fair market value (as the case may be) or the arithmetic calculation of the Conversion Price or the applicable prepayment amount(s) (as the case may be), the Borrower or the Holder shall submit the disputed determinations or arithmetic calculations via facsimile (i) within one (1) Trading Day after receipt of the applicable notice giving rise to such dispute to the Borrower or the Holder or (ii) if no notice gave rise to such dispute, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Borrower are unable to agree upon such determination or calculation within five (5) Trading Days of such disputed determination or arithmetic calculation (as the case may be) being submitted to the Borrower or the Holder, then the Borrower shall, within three (3) Trading Days, submit (a) the disputed determination of the Conversion Price, the closing bid price, or fair market value (as the case may be) to an independent, reputable investment bank selected by the Borrower and approved by the Holder or (b) the disputed arithmetic calculation of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, to an independent, outside accountant selected by the Holder that is reasonably acceptable to the Borrower. The Borrower shall cause at its expense the investment bank or the accountant to perform the determinations or calculations and notify the Borrower and the Holder of the results no later than one (1) Trading Day from the time it receives such disputed determinations or calculations. Such investment bank's or accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

A-122

**IN WITNESS WHEREOF**, Borrower has caused this Note to be signed in its name by its duly authorized officer on April 26, 2021.

**DARKPULSE, INC.**

By:

Name: Dennis O'Leary
Title: Chief Executive Officer

## EXHIBIT A -- NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of **DARKPULSE, INC.**, a Delaware corporation (the "Borrower"), according to the conditions of the Convertible Promissory Note of the Borrower dated as of April 26, 2021 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

☐   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

☐   The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
1040 First Avenue, Suite
190 New York, NY 10022
Attn: Eli Fireman
e-mail: eli@firstfirecapital.com

| | |
|---|---|
| Date of Conversion: | |
| Applicable Conversion Price: | $ _____ |
| Costs Incurred by the Undersigned to Convert | $ _____ |
| the Note into Shares of Common Stock: | |
| Number of Shares of Common Stock to be | _____ |
| Issued Pursuant to Conversion of the Note: | |
| Amount of Principal Balance Due remaining | _____ |
| Under the Note after this conversion: | |

By: __
Name:
Title:
Date:

ACTIVE.126128909.01

**A-124**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

## SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of April 26, 2021, by and between **DARKPULSE, INC.**, a Delaware corporation, with headquarters located at 1345 Avenue of the Americas, 2nd Floor, New York, New York 10105 (the "Company"), and **FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC**, a Delaware limited liability company, with its address at 1040 First Avenue, Suite 190, New York, NY 10022 (the "Buyer").

### WHEREAS:

A. The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "1933 Act") and Rule 506(b) promulgated by the United States Securities and Exchange Commission (the "SEC") under the 1933 Act;

B. Buyer desires to purchase from the Company, and the Company desires to issue and sell to the Buyer, upon the terms and conditions set forth in this Agreement, a Convertible Promissory Note of the Company, in the aggregate principal amount of $825,000.00 (as the principal amount thereof may be increased pursuant to the terms thereof, and together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, in the form attached hereto as Exhibit A (the "Note"), convertible into shares of common stock of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note; and

C. Company desires to issue to the Buyer, upon the terms and conditions set forth in this Agreement, sixty million (60,000,000) shares of common stock ("Commitment Shares") upon the terms and subject to the limitations and conditions set forth herein;

**NOW THEREFORE**, in consideration of the foregoing and of the agreements and covenants herein contained, and for other good and valuable consideration, the receipt and sufficiency of which is hereby acknowledged, the Company and the Buyer hereby agree as follows:

1. Purchase and Sale of Note and Commitment Shares.

    a.   Purchase of Note and Commitment Shares. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company the Note and the Commitment Shares, subject to the express terms of the Note, and this Agreement as the case may be. As it pertains to the Commitment Shares, and only the Commitment Shares, Buyer shall be limited to trading not more than five percent (5%) of the daily volume of the Company's Common Stock on any given Trading Day.

    b.   Form of Payment. On the Closing Date, the Buyer shall pay the purchase price of $750,000.00 (the "Purchase Price") for the Note, by wire transfer of immediately available funds, in accordance with the Company's written wiring instructions, against delivery of the Note and the Commitment Shares, and the Company shall deliver such duly executed Note and Commitment Shares on behalf of the Company, to the Buyer.

    c.   Closing Date. Subject to the satisfaction (or written waiver) of the

1

**A-125**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

conditions thereto set forth in Section 6 and Section 7 below, the date and time of the issuance and sale of the Note and Commitment Shares pursuant to this Agreement (the "Closing Date") shall be 4:00 PM, Eastern Time on the date first written above, or such other mutually agreed upon time.

      d.   <u>Closing</u>. The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the Closing Date at such location as may be agreed to by the parties (including via exchange of electronic signatures).

      2.   <u>Buyer's Representations and Warranties</u>. The Buyer represents and warrants to the Company as of the Closing Date that:

      a.   <u>Investment Purpose</u>. As of the Closing Date, the Buyer is purchasing the Note and Commitment Shares and the shares of Common Stock issuable upon conversion the Note and such additional shares of Common Stock, if any, as are issuable on account of interest on the Note pursuant to this Agreement, such shares of Common Stock being collectively referred to herein as the "Conversion Shares" and, collectively with the Note and Commitment Shares, the "Securities") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act; <u>provided</u>, <u>however</u>, that by making the representations herein, the Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

      b.   <u>Accredited Investor Status</u>. The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D (an "Accredited Investor").

      c.   <u>Reliance on Exemptions</u>. The Buyer understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments, and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

      d.   <u>Information</u>. The Buyer and its advisors, if any, have been, and for so long as any of the Securities remain outstanding will continue to be, furnished with all materials relating to the business, finances, and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by the Buyer or its advisors. The Buyer and its advisors, if any, have been, and for so long as the Note or Commitment Shares remains outstanding will continue to be, afforded the opportunity to ask questions of the Company regarding its business and affairs. Notwithstanding the foregoing, the Company has not disclosed to the Buyer any material non-public information regarding the Company or otherwise, and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer. Neither such inquiries nor any other due diligence investigation conducted by Buyer or any of its advisors or representatives shall modify, amend or affect Buyer's right to rely on the Company's representations and warranties contained in Section 3 below.

      e.   <u>Governmental Review</u>. The Buyer understands that no United States

A-126

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities.

    f. <u>Transfer or Resale.</u> The Buyer understands that (i) the sale or resale of the Securities have not been, and as of the Issue Date, are currently not being registered under the 1933 Act or any applicable state securities laws, and the Securities may not be transferred unless (a) the Securities are sold pursuant to an effective registration statement under the 1933 Act; (b) the Buyer shall have delivered to the Company, at the cost of the Company, an opinion of counsel (which may be the Legal Counsel Opinion (as defined below)) that shall be in form, substance, and scope customary for opinions of counsel in comparable transactions to the effect that the Securities to be sold or transferred may be sold or transferred pursuant to an exemption from such registration, which opinion shall be accepted by the Company; (c) the Securities are sold or transferred to an "affiliate" (as defined in Rule 144 promulgated under the 1933 Act (or a successor rule) ("Rule 144")) of the Buyer who agrees to sell or otherwise transfer the Securities only in accordance with this Section 2(f) and who is an Accredited Investor; (d) the Securities are sold pursuant to Rule 144 or other applicable exemption; or (e) the Securities are sold pursuant to Regulation S under the 1933 Act (or a successor rule) ("Regulation S"), and the Buyer shall have delivered to the Company, at the cost of the Company, an opinion of counsel that shall be in form, substance and scope customary for opinions of counsel in corporate transactions, which opinion shall be accepted by the Company; (ii) any sale of such Securities made in reliance on Rule 144 may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any resale of such Securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register such Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder (in each case). Any registration rights shall be further set out in the Registration Rights Agreement entered into herewith.

    g. <u>Legends.</u> The Buyer understands that until such time as the Commitment Shares, the Note, and, upon conversion of the Note in accordance with its respective terms, the Conversion Shares, have been registered under the 1933 Act or may be sold pursuant to Rule 144 under the 1933 Act or other applicable exemption without any restriction as to the number of securities as of a particular date that can then be immediately sold, the Securities may bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of the certificates for such Securities):

    **"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES MAY BE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO
RULE 144 OR OTHER APPLICABLE EXEMPTION UNDER SAID ACT.
NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE
PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT
OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY
THE SECURITIES."

The legend set forth above shall be removed and the Company shall issue a certificate for
the applicable shares of Common Stock without such legend to the holder of any Security upon
which it is stamped or (as requested by such holder) issue the applicable shares of Common Stock
to such holder by electronic delivery by crediting the account of such holder's broker with The
Depository Trust Company ("DTC"), if, unless otherwise required by applicable state securities
laws, (a) such Security is registered for sale under an effective registration statement filed under
the 1933 Act or otherwise may be sold pursuant to Rule 144 or other applicable exemption without
any restriction as to the number of securities as of a particular date that can then be immediately
sold; or (b) the Company or the Buyer provides the Legal Counsel Opinion (as contemplated by
and in accordance with Section 4(k) hereof) to the effect that a public sale or transfer of such
Security may be made without registration under the 1933 Act, which opinion shall be accepted
by the Company so that the sale or transfer is effected. The Company shall be responsible for the
fees of its transfer agent and all DTC fees associated with any such issuance. The Buyer agrees to
sell all Securities, including those represented by a certificate(s) from which the legend has been
removed, in compliance with applicable prospectus delivery requirements, if any.

h.   Authorization; Enforcement. This Agreement has been duly and validly
authorized by the Buyer and has been duly executed and delivered on behalf of the Buyer, and this
Agreement constitutes a valid and binding agreement of the Buyer enforceable in accordance with
its terms, except as enforcement may be limited by bankruptcy, insolvency, reorganization,
moratorium or other similar laws affecting creditors' rights generally and except as may be limited
by the exercise of judicial discretion in applying principles of equity.

i.   Manipulation of Price. The Buyer has not, and to its knowledge no one
acting on its behalf has: (i) taken, directly or indirectly, any action designed to cause or to result,
or that could reasonably be expected to cause or result, in the stabilization or manipulation of the
price of any security of the Company; (ii) bid for, purchased, or paid any compensation for
soliciting purchases of, any Stock in the open market; or (iii) paid or agreed to pay to any person
any compensation for soliciting another to purchase any other securities of the Company.

j.   No Shorting. Buyer and its affiliates shall be prohibited from engaging
directly or indirectly in any short selling or hedging transactions with respect to any securities of
the Company while this Note is outstanding.

3.   Representations and Warranties of the Company. The Company represents and
warrants to the Buyer as of the Closing Date that:

a.   Organization and Qualification. The Company and each of its
Subsidiaries, not including any subsidiaries with respect to which lack of good standing or valid
existence would not have a Material Adverse Effect on the Company and its Subsidiaries (as
defined below), if any, is a corporation duly organized, validly existing and in good standing under

4

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted. Schedule 3(a), if attached hereto, sets forth a list of all of the Subsidiaries of the Company and the jurisdiction in which each is incorporated. The Company and each of its Subsidiaries is duly qualified as a foreign corporation to do business and is in good standing in every jurisdiction in which its ownership or use of property or the nature of the business conducted by it makes such qualification necessary except where the failure to be so qualified or in good standing would not have a Material Adverse Effect. "Material Adverse Effect" means any material adverse effect on the business, operations, assets, financial condition or prospects of the Company or its Subsidiaries, if any, taken as a whole, or on the transactions contemplated hereby or by the agreements or instruments to be entered into in connection herewith. "Subsidiaries" means any corporation or other organization, whether incorporated or unincorporated, in which the Company owns, directly or indirectly, any equity or other ownership interest greater than fifty percent (50%).

b. <u>Authorization; Enforcement.</u> (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement, the Note, and to consummate the transactions contemplated hereby and thereby and to issue the Securities, in accordance with the terms hereof and thereof; (ii) the execution and delivery of this Agreement, the Note and the Commitment Shares by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note and Commitment Shares, as well as the issuance and reservation for issuance of the Conversion Shares issuable upon conversion of the Note) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, its shareholders, or its debt holders is required; (iii) this Agreement, the Note, and the Commitment Shares (together with any other instruments executed in connection herewith or therewith) have been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement, the Note, and issue the Commitment Shares and the other instruments documents executed in connection herewith or therewith and bind the Company accordingly; and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note and the Commitment Shares, each of such instruments will constitute, a legal, valid and binding obligation of the Company, enforceable against the Company in accordance with their terms.

c. <u>Capitalization; Governing Documents.</u> As of February 16, 2021, the authorized capital stock of the Company consists of: 20,000,000,000 authorized shares of Common Stock, of which 4,469,762,151 shares were issued and outstanding. All of such outstanding shares of capital stock of the Company and the Conversion Shares, are, or upon issuance will be, duly authorized, validly issued, fully paid, and non-assessable. No shares of capital stock of the Company are subject to preemptive rights or any other similar rights of the shareholders of the Company or any liens or encumbrances imposed through the actions or failure to act of the Company other than those shares that are reserved for issuance upon conversion this Note, upon its issuance, or other similar convertible notes, or warrants or options as may be appropriate or with respect to equity or option plans and those that may relate to rights of participation or rights to adjust terms to more favorable terms. As of the effective date of this Agreement, other than as publicly announced prior to such date and reflected in the SEC Documents (as defined in this Agreement) of the Company (i) there are no outstanding options, warrants, scrip, rights to subscribe for, puts, calls, rights of first refusal, agreements, understandings, claims or other commitments or rights of any character whatsoever relating to, or securities or rights convertible

5

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

into or exchangeable for any shares of capital stock of the Company or any of its Subsidiaries, or arrangements by which the Company or any of its Subsidiaries is or may become bound to issue additional shares of capital stock of the Company or any of its Subsidiaries; (ii) there are no agreements or arrangements under which the Company or any of its Subsidiaries is obligated to register the sale of any of its or their securities under the 1933 Act; and (iii) there are no anti-dilution or price adjustment provisions contained in any security issued by the Company (or in any agreement providing rights to security holders) that will be triggered by the issuance of any of the Securities. The Company has furnished to the Buyer true and correct copies of the Company's Certificate of Incorporation as in effect on the date hereof ("Certificate of Incorporation"), the Company's Bylaws, as in effect on the date hereof (the "Bylaws"), and the terms of all securities convertible into or exercisable for Common Stock of the Company and the material rights of the holders thereof in respect thereto.

       d.   Issuance of Conversion Shares. The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its terms, will be validly issued, fully paid and non- assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

       e.   No Broker-Dealer Acknowledgement. Absent a final adjudication from a court of competent jurisdiction stating otherwise, so long as any amount on the Note remains outstanding, the Company shall not to any person, institution, governmental or other entity, state, claim, allege, or in any way assert, that Holder is currently, or ever has been a broker-dealer under the Securities Exchange Act of 1934.

       f.   Acknowledgment of Dilution. The Company understands and acknowledges the potentially dilutive effect of the Conversion Shares to the Common Stock upon the conversion of the Note. The Company further acknowledges that its obligation to issue, upon conversion of the Note, the Conversion Shares, in accordance with this Agreement, the Note, and issue the Commitment Shares are absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other shareholders of the Company.

       g.   Ranking; No Conflicts. The execution, delivery and performance of this Agreement, the Note, and the issuance of the Commitment Shares by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or Bylaws; or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, note, evidence of indebtedness, indenture, patent, patent license or instrument to which the Company or any of its Subsidiaries is a party; or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws and regulations and regulations of any self-regulatory organizations to which the Company or its securities is subject) applicable to the Company or any of its Subsidiaries or by which any property or asset of the Company or any of its Subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the

6

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

aggregate, have a Material Adverse Effect); or (iv) trigger any anti-dilution or ratchet provision contained in any other contract in which the Company is a party thereto or any security issued by the Company. Neither the Company nor any of its Subsidiaries is in violation of its Certificate of Incorporation, Bylaws or other organizational documents and neither the Company nor any of its Subsidiaries is in default (and no event has occurred which with notice or lapse of time or both could put the Company or any of its Subsidiaries in default) under, and neither the Company nor any of its Subsidiaries has taken any action or failed to take any action that would give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture or instrument to which the Company or any of its Subsidiaries is a party or by which any property or assets of the Company or any of its Subsidiaries is bound or affected, except for possible defaults as would not, individually or in the aggregate, have a Material Adverse Effect. The businesses of the Company and its Subsidiaries, if any, are not being conducted, and shall not be conducted so long as the Buyer owns any of the Securities, in violation of any law, ordinance or regulation of any governmental entity. Except as specifically contemplated by this Agreement and as required under the 1933 Act and any applicable state securities laws, the Company is not required to obtain any consent, authorization or order of, or make any filing or registration with, any court, governmental agency, regulatory agency, self-regulatory organization or stock market or any third party in order for it to execute, deliver or perform any of its obligations under this Agreement and the Note in accordance with the terms hereof or thereof or to issue and sell the Note in accordance with the terms hereof and, upon conversion of the Note, issue Conversion Shares. All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

        h.   SEC Documents; Financial Statements. The Company has timely filed all reports, schedules, forms, statements and other documents required to be filed by it with the SEC pursuant to the reporting requirements of the Securities Exchange Act of 1934, as amended (the "1934 Act") (all of the foregoing filed prior to the date hereof and all exhibits included therein and financial statements and schedules thereto and documents (other than exhibits to such documents) incorporated by reference therein, being hereinafter referred to herein as the "SEC Documents"). As of their respective dates, the SEC Documents complied in all material respects with the requirements of the 1934 Act and the rules and regulations of the SEC promulgated thereunder applicable to the SEC Documents, and none of the SEC Documents, at the time they were filed with the SEC, contained any untrue statement of a material fact or omitted to state a material fact required to be stated therein or necessary in order to make the statements therein, in light of the circumstances under which they were made, not misleading. None of the statements made in any such SEC Documents is, or has been, required to be amended or updated under applicable law (except for such statements as have been amended or updated in subsequent filings on or prior the date hereof). As of their respective dates, the financial statements of the Company included in the SEC Documents complied as to form in all material respects with applicable accounting requirements and the published rules and regulations of the SEC with respect thereto. Such financial statements have been prepared in accordance with United States generally accepted accounting principles, consistently applied, during the periods involved and fairly present in all material respects the consolidated financial position of the Company and its consolidated Subsidiaries as of the dates thereof and the consolidated results of their operations and cash flows for the periods then ended (subject, in the case of unaudited statements, to normal year-end audit adjustments). Except as set forth in SEC Documents or the financial statements of the Company included in the SEC Documents, the Company has no liabilities, contingent or otherwise, other

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

than (i) liabilities incurred in the ordinary course of business subsequent to September 30, 2020, and (ii) obligations under contracts and commitments incurred in the ordinary course of business and not required under generally accepted accounting principles to be reflected in such financial statements, which, individually or in the aggregate, are not material to the financial condition or operating results of the Company. The Company is subject to the reporting requirements of the 1934 Act. The Company has never been a "shell company" as described in Rule 144(i)(1)(i).

i.    Absence of Certain Changes. Since September 30, 2020, there has been no material adverse change and no material adverse development in the assets, liabilities, business, properties, operations, financial condition, results of operations, prospects or 1934 Act reporting status of the Company or any of its Subsidiaries.

j.    Absence of Litigation. Other than as disclosed in the SEC Documents, there is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its Subsidiaries, threatened against or affecting the Company or any of its Subsidiaries, or their officers or directors in their capacity as such, that could have a Material Adverse Effect. The SEC Documents contain a complete list and summary description of any material pending or, to the knowledge of the Company, threatened proceeding against or affecting the Company or any of its Subsidiaries. The Company and its Subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing. Notwithstanding the foregoing, the Buyer acknowledges the existence of all litigations disclosed and outstanding the SEC Documents.

k.    Intellectual Property. The Company and each of its Subsidiaries owns or possesses the requisite licenses or rights to use all patents, patent applications, patent rights, inventions, know-how, trade secrets, trademarks, trademark applications, service marks, service names, trade names and copyrights ("Intellectual Property") necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future); there is no claim or action by any person pertaining to, or proceeding pending, or to the Company's knowledge threatened, which challenges the right of the Company or of a Subsidiary with respect to any Intellectual Property necessary to enable it to conduct its business as now operated (and, as presently contemplated to be operated in the future); to the best of the Company's knowledge, the Company's or its Subsidiaries' current and intended products, services and processes do not infringe on any Intellectual Property or other rights held by any person; and the Company is unaware of any facts or circumstances which might give rise to any of the foregoing. The Company and each of its Subsidiaries have taken reasonable security measures to protect the secrecy, confidentiality and value of their Intellectual Property.

l.    No Materially Adverse Contracts, Etc. Neither the Company, nor any of its Subsidiaries, is subject to any charter, corporate or other legal restriction, or any judgment, decree, order, rule or regulation which in the judgment of the Company's officers has or is expected in the future to have a Material Adverse Effect. Neither the Company, nor any of its Subsidiaries, is a party to any contract or agreement which in the judgment of the Company's officers has or is expected to have a Material Adverse Effect.

m.    Tax Status. The Company and each of its Subsidiaries has made or filed all federal, state and foreign income and all other tax returns, reports and declarations required by

8

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

any jurisdiction to which it is subject (unless and only to the extent that the Company and each of its Subsidiaries has set aside on its books provisions reasonably adequate for the payment of all unpaid and unreported taxes) and has paid all taxes and other governmental assessments and charges that are material in amount, shown or determined to be due on such returns, reports and declarations, except those being contested in good faith and has set aside on its books provisions reasonably adequate for the payment of all taxes for periods subsequent to the periods to which such returns, reports or declarations apply. There are no unpaid taxes in any material amount claimed to be due by the taxing authority of any jurisdiction, and the officers of the Company know of no basis for any such claim. The Company has not executed a waiver with respect to the statute of limitations relating to the assessment or collection of any foreign, federal, state or local tax. None of the Company's tax returns is presently being audited by any taxing authority.

n. Transactions with Affiliates. Except as disclosed in SEC filings and except for arm's length transactions pursuant to which the Company or any of its Subsidiaries makes payments in the ordinary course of business upon terms no less favorable than the Company or any of its Subsidiaries could obtain from third parties and other than the grant of stock options described in the SEC Documents, none of the officers, directors, or employees of the Company is presently a party to any transaction with the Company or any of its Subsidiaries (other than for services as employees, officers and directors), including any contract, agreement or other arrangement providing for the furnishing of services to or by, providing for rental of real or personal property to or from, or otherwise requiring payments to or from any officer, director or such employee or, to the knowledge of the Company, any corporation, partnership, trust or other entity in which any officer, director, or any such employee has a substantial interest or is an officer, director, trustee or partner.

o. Disclosure. All information relating to or concerning the Company or any of its Subsidiaries set forth in this Agreement and provided to the Buyer pursuant to Section 2(d) hereof and otherwise in connection with the transactions contemplated hereby is true and correct in all material respects and the Company has not omitted to state any material fact necessary in order to make the statements made herein or therein, in light of the circumstances under which they were made, not misleading. No event or circumstance has occurred or exists with respect to the Company or any of its Subsidiaries or its or their business, properties, prospects, operations or financial conditions, which, under applicable law, rule or regulation, requires public disclosure or announcement by the Company but which has not been so publicly announced or disclosed (assuming for this purpose that the Company's reports filed under the 1934 Act are being included in, or to the extent appropriate and permitted, incorporated into an effective registration statement filed by the Company under the 1933 Act).

p. Acknowledgment Regarding Buyer's Purchase of Securities. The Company acknowledges and agrees that the Buyer is acting solely in the capacity of arm's length purchaser with respect to this Agreement and the transactions contemplated hereby. The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any statement made by the Buyer or any of its respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation and is merely incidental to the Buyer's purchase of the Securities. The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the Company and its representatives.

9

**A-133**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

q.   [RESERVED]

r.   No Brokers. Other than the use of JH Darbie and Co., the Company has taken no action which would give rise to any claim by any person for brokerage commissions, transaction fees or similar payments relating to this Agreement or the transactions contemplated hereby.

s.   Permits; Compliance. The Company and each of its Subsidiaries is in possession of all franchises, grants, authorizations, licenses, permits, easements, variances, exemptions, consents, certificates, approvals and orders necessary to own, lease and operate its properties and to carry on its business as it is now being conducted (collectively, the "Company Permits"), and there is no action pending or, to the knowledge of the Company, threatened regarding suspension or cancellation of any of the Company Permits. Neither the Company nor any of its Subsidiaries is in conflict with, or in default or violation of, any of the Company Permits, except for any such conflicts, defaults or violations which, individually or in the aggregate, would not reasonably be expected to have a Material Adverse Effect. Since September 30, 2020, neither the Company nor any of its Subsidiaries has received any notification with respect to possible conflicts, defaults or violations of applicable laws, except for notices relating to possible conflicts, defaults or violations, which conflicts, defaults or violations would not have a Material Adverse Effect.

t.   Environmental Matters.

(i) There are, to the Company's knowledge, with respect to the Company or any of its Subsidiaries or any predecessor of the Company, no past or present violations of Environmental Laws (as defined below), releases of any material into the environment, actions, activities, circumstances, conditions, events, incidents, or contractual obligations which may give rise to any common law environmental liability or any liability under the Comprehensive Environmental Response, Compensation and Liability Act of 1980 or similar federal, state, local or foreign laws and neither the Company nor any of its Subsidiaries has received any notice with respect to any of the foregoing, nor is any action pending or, to the Company's knowledge, threatened in connection with any of the foregoing. The term "Environmental Laws" means all federal, state, local or foreign laws relating to pollution or protection of human health or the environment (including, without limitation, ambient air, surface water, groundwater, land surface or subsurface strata), including, without limitation, laws relating to emissions, discharges, releases or threatened releases of chemicals, pollutants contaminants, or toxic or hazardous substances  or wastes (collectively, "Hazardous Materials") into the environment, or otherwise relating to the manufacture, processing, distribution, use, treatment, storage, disposal, transport or handling of Hazardous Materials, as well as  all authorizations, codes, decrees, demands or demand letters, injunctions, judgments, licenses, notices or notice letters, orders, permits, plans or regulations issued, entered, promulgated or approved thereunder.

(ii) Other than those that are or were stored, used or disposed of in compliance with applicable law, no Hazardous Materials are contained on or about any real property currently owned, leased or used by the Company or any of its Subsidiaries, and no Hazardous Materials were released on or about any real property previously owned, leased or used by the Company or any of its Subsidiaries during the period the property was owned, leased or used by the Company or any of its Subsidiaries, except in the normal course of the Company's or

10

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

any of its Subsidiaries' business.

(iii) There are no underground storage tanks on or under any real property owned, leased or used by the Company or any of its Subsidiaries that are not in compliance with applicable law.

u.    Title to Property. The Company and its Subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal property owned by them which is material to the business of the Company and its Subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(u), if attached hereto, or such as would not have a Material Adverse Effect. Any real property and facilities held under lease by the Company and its Subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as would not have a Material Adverse Effect.

v.    Insurance. The Company and each of its Subsidiaries are insured by insurers of recognized financial responsibility against such losses and risks and in such amounts as management of the Company believes to be prudent and customary in the businesses in which the Company and its Subsidiaries are engaged. Neither the Company nor any such Subsidiary has any reason to believe that it will not be able to renew its existing insurance coverage as and when such coverage expires or to obtain similar coverage from similar insurers as may be necessary to continue its business at a cost that would not have a Material Adverse Effect. Upon written request the Company will provide to the Buyer true and correct copies of all policies relating to directors' and officers' liability coverage, errors and omissions coverage, and commercial general liability coverage.

w.    Internal Accounting Controls. The Company and each of its Subsidiaries maintain a system of internal accounting controls sufficient, in the judgment of the Company's board of directors, to provide reasonable assurance that (i) transactions are executed in accordance with management's general or specific authorizations; (ii) transactions are recorded as necessary to permit preparation of financial statements in conformity with generally accepted accounting principles and to maintain asset accountability; (iii) access to assets is permitted only in accordance with management's general or specific authorization; and (iv) the recorded accountability for assets is compared with the existing assets at reasonable intervals and appropriate action is taken with respect to any differences.

x.    Foreign Corrupt Practices. Neither the Company, nor any of its Subsidiaries, nor any director, officer, agent, employee or other person acting on behalf of the Company or any Subsidiary has, in the course of his actions for, or on behalf of, the Company, used any corporate funds for any unlawful contribution, gift, entertainment or other unlawful expenses relating to political activity; made any direct or indirect unlawful payment to any foreign or domestic government official or employee from corporate funds; violated or is in violation of any provision of the U.S. Foreign Corrupt Practices Act of 1977, as amended, or made any bribe, rebate, payoff, influence payment, kickback or other unlawful payment to any foreign or domestic government official or employee.

y.    [RESERVED]

11

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

        z.   <u>No Investment Company</u>. The Company is not, and upon the issuance and sale of the Securities as contemplated by this Agreement will not be an "investment company" required to be registered under the Investment Company Act of 1940 (an "Investment Company"). The Company is not controlled by an Investment Company.

        aa.   <u>No Off-Balance Sheet Arrangements</u>. There is no transaction, arrangement, or other relationship between the Company or any of its Subsidiaries and an unconsolidated or other off-balance sheet entity that is required to be disclosed by the Company in its 1934 Act filings and is not so disclosed or that otherwise could be reasonably likely to have a Material Adverse Effect.

        bb.   <u>No Disqualification Events</u>. None of the Company, any of its predecessors, any affiliated issuer, any director, executive officer, other officer of the Company participating in the offering hereunder, any beneficial owner of twenty percent (20%) or more of the Company's outstanding voting equity securities, calculated on the basis of voting power, nor any promoter (as that term is defined in Rule 405 under the 1933 Act) connected with the Company in any capacity at the time of sale (each, an "Issuer Covered Person") is subject to any of the "Bad Actor" disqualifications described in Rule 506(d)(1)(i) to (viii) under the 1933 Act (a "Disqualification Event"), except for a Disqualification Event covered by Rule 506(d)(2) or (d)(3). The Company has exercised reasonable care to determine whether any Issuer Covered Person is subject to a Disqualification Event.

        cc.   <u>Manipulation of Price</u>. The Company has not, and to its knowledge no one acting on its behalf has: (i) taken, directly or indirectly, any action designed to cause or to result, or that could reasonably be expected to cause or result, in the stabilization or manipulation of the price of any security of the Company to facilitate the sale or resale of any of the Securities, (ii) sold, bid for, purchased, or paid any compensation for soliciting purchases of, any of the Securities, or (iii) paid or agreed to pay to any person any compensation for soliciting another to purchase any other securities of the Company. Notwithstanding the foregoing, the Company has engaged, in ordinary course of business, in investor relations activities and has engaged one or more companies to assist in such activities.

        dd.   <u>Bank Holding Company Act</u>. Neither the Company nor any of its Subsidiaries is subject to the Bank Holding Company Act of 1956, as amended (the "BHCA") and to regulation by the Board of Governors of the Federal Reserve System (the "Federal Reserve"). Neither the Company nor any of its Subsidiaries or affiliates owns or controls, directly or indirectly, five percent (5%) or more of the outstanding shares of any class of voting securities or twenty-five percent (25%) or more of the total equity of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve. Neither the Company nor any of its Subsidiaries or affiliates exercises a controlling influence over the management or policies of a bank or any entity that is subject to the BHCA and to regulation by the Federal Reserve.

        ee.   <u>Illegal or Unauthorized Payments; Political Contributions</u>. Neither the Company nor any of its Subsidiaries nor, to the Company's knowledge, any of the officers, directors, employees, agents or other representatives of the Company or any of its Subsidiaries or any other business entity or enterprise with which the Company or any Subsidiary is or has been affiliated or associated, has, directly or indirectly, made or authorized any payment, contribution or gift of money, property, or services, whether or not in contravention of applicable law, (i) as a kickback or bribe to any person; or (ii) to any political organization, or the holder of or any aspirant

**A-136**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

to any elective or appointive public office except for personal political contributions not involving the direct or indirect use of funds of the Company or any of its Subsidiaries.

        ff.  <u>Breach of Representations by the Company.</u> The Company agrees that if the Company breaches any of the representations set forth in this Section 3 or the Note, that would have a Material Adverse Effect, in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of Default under Section 3 of the Note.

    4. <u>ADDITIONAL COVENANTS, AGREEMENTS AND ACKNOWLEDGEMENTS.</u>

        a.  <u>Best Efforts.</u> The parties shall use their reasonable best efforts to satisfy timely each of the conditions described in Section 6 and 7 of this Agreement.

        b.  <u>Use of Proceeds.</u> The Company shall use the proceeds for the repayment of any indebtedness, not including, however, any indebtedness owed to officers, directors or employees of the Company or their affiliates or in violation or contravention of any applicable law, rule or regulation. Any excess proceeds shall be used for general working capital.

        c.  <u>Usury.</u> To the extent it may lawfully do so, the Company hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Buyer in order to enforce any right or remedy under this Agreement, the Note and any document, agreement or instrument contemplated thereby. Notwithstanding any provision to the contrary contained in this Agreement, the Note and any document, agreement or instrument contemplated thereby, it is expressly agreed and provided that the total liability of the Company under this Agreement, the Note or any document, agreement or instrument contemplated thereby for payments which under applicable law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under applicable law in the nature of interest that the Company may be obligated to pay under this Agreement, the Note and any document, agreement or instrument contemplated thereby exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by law applicable to this Agreement, the Note and any document, agreement or instrument contemplated thereby is increased or decreased by statute or any official governmental action subsequent to the date hereof, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Agreement, the Note and any document, agreement or instrument contemplated thereby from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by the Company to the Buyer with respect to indebtedness evidenced by this Agreement, the Note and any document, agreement or instrument contemplated thereby, such excess shall be applied by the Buyer to the unpaid principal balance of any such indebtedness or be refunded to the Company, the manner of handling such excess to be at the Buyer's election.

        d.  <u>Restriction on Activities.</u> Commencing as of the date first above written, and until the earlier of payment of the Note in full or full conversion of the Note, the

13

**A-137**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

Company shall not, directly or indirectly, without the Buyer's prior written consent, which consent shall not be unreasonably withheld: (a) change the nature of its business in any material respect; or (b) sell, divest, acquire, change the structure of any material assets other than in the ordinary course of business. Notwithstanding the forgoing, any prior public disclosure of the Company's intent or contemplation to sell, divest, acquire, or change the structure of any material assets shall not require Buyer's prior written consent.

e.   Listing. The Company, for so long as the Buyer owns any of the Securities, will maintain the listing and trading of its Common Stock on the Principal Market or any replacement exchange or electronic quotation system (including but not limited to the Pink Sheets electronic quotation system) and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Financial Industry Regulatory Authority ("FINRA") and such exchanges, as applicable. The Company shall promptly provide to the Buyer copies of any notices it receives from the Principal Market and any other exchanges or electronic quotation systems on which the Common Stock is then traded regarding the continued eligibility of the Common Stock for listing on such exchanges and quotation systems.

f.   Corporate Existence. The Company will, so long as there is any remaining principal amount or accrued interest outstanding with respect to the Note, maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith and (ii) is a publicly traded corporation whose Common Stock is listed for trading or quotation on the Principal Market, any tier of the NASDAQ Stock Market, the New York Stock Exchange or the NYSE MKT.

g.   No Integration. The Company shall not make any offers or sales of any security (other than the Securities) under circumstances that would require registration of the Securities being offered or sold hereunder under the 1933 Act or cause the offering of the Securities to be integrated with any other offering of securities by the Company for the purpose of any stockholder approval provision applicable to the Company or its securities.

h.   Breach of Covenants. The Company acknowledges and agrees that if the Company breaches any of the covenants set forth in this Section 4 that would have a Material Adverse Effect, in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of Default under Section 3.2 of the Note.

i.   Compliance with 1934 Act; Public Information Failures. For so long as any portion of the principal amount or any accrued interest remains outstanding, the Company shall comply in all material respects with the reporting requirements of the 1934 Act; and the Company shall continue to be subject to the reporting requirements of the 1934 Act. During the period that the Buyer beneficially owns the Note, if the Company shall (i) fail for any reason to satisfy the requirements of Rule 144(c)(1), including, without limitation, the failure to satisfy the current public information requirements under Rule 144(c) or (ii) if the Company has ever been an issuer described in Rule 144(i)(1)(i) or becomes such an issuer in the future, and the Company shall fail to satisfy any condition set forth in Rule 144(i)(2) (each, a "Public Information Failure") then, as partial relief for the damages to the Buyer by reason of any such delay in or reduction of

14

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

its ability to sell the Securities (which remedy shall not be exclusive of any other remedies available pursuant to this Agreement, the Note, or at law or in equity), the Company shall pay to the Buyer on every thirtieth day (pro-rated for periods totaling less than thirty days), an amount in cash equal to three percent (3%) of the Purchase Price for each day of a Public Information Failure until the date such Public Information Failure is cured. The payments to which a holder shall be entitled pursuant to this Section 4(i) are referred to herein as "Public Information Failure Payments." Public Information Failure Payments shall be paid on the earlier of (i) the last day of the calendar month during which such Public Information Failure Payments are incurred and (iii) the third business day after the event or failure giving rise to the Public Information Failure Payments is cured. In the event the Company fails to make Public Information Failure Payments in a timely manner, such Public Information Failure Payments shall bear interest at the rate of two percent (2%) per month (prorated for partial months) until paid in full. As used in this Agreement, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed.

j.    Disclosure of Transactions and Other Material Information. By 9:00 a.m., New York time, four (4) Business Days following the date this Agreement has been fully executed and funded, the Company shall file a Current Report on Form 8-K describing the terms of the transactions contemplated by this Agreement in the form required by the 1934 Act and attaching this Agreement, the form of Note and any other related documents that are required to be filed (the "8-K Filing"). From and after the filing of the 8-K Filing with the SEC, the Buyer shall not be in possession of any material, non-public information received from the Company, any of its Subsidiaries or any of their respective officers, directors, employees or agents that is not disclosed in the 8-K Filing. In addition, effective upon the filing of the 8-K Filing, the Company acknowledges and agrees that any and all confidentiality or similar obligations under any agreement, whether written or oral, between the Company, any of its Subsidiaries or any of their respective officers, directors, affiliates, employees or agents, on the one hand, and the Buyer or any of its affiliates, on the other hand, shall terminate.

k.    Legal Counsel Opinions. Upon the request of the Buyer from to time to time, the Company shall be responsible, at its cost, for promptly supplying to the Company's transfer agent and the Buyer, at the Company's discretion, either a customary legal opinion letter or reliance letter (which reliance letter shall indicate that the transfer agent may rely on the opinion of Buyer's counsel) of its counsel (the "Legal Counsel Opinion or Reliance Letter") to the effect that the resale of the Conversion Shares by the Buyer or its affiliates, successors and assigns is exempt from the registration requirements of the 1933 Act pursuant to Rule 144, provided the requirements of Rule 144 are satisfied and provided the Conversion Shares are not then registered under the 1933 Act for resale pursuant to an effective registration statement, or other applicable exemption, provided the requirements of such other applicable exemption are satisfied. Buyer will take no action or inaction that would invalidate the proposed opinion. Buyer will provide the customary representations to counsel in order to provide such an opinion. Should the Company's legal counsel fail for any reason other than that the requirements of said exemption are unavailable in the reasonable opinion of counsel to issue the Legal Counsel Opinion or Reliance Letter, the Buyer may, at the Company's cost, secure another legal counsel, acceptable to the Company, to issue the Legal Counsel Opinion or Reliance Letter, and the Company will instruct its transfer agent to accept such opinion. The Company represents that it is not now, nor ever has been, a "shell company."

15

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

l.    Most-Favored Nation. While the Note or any principal amount, interest or fees or expenses due thereunder remain outstanding and unpaid, the Company shall not enter into any subsequent public or private offering of its securities (including securities convertible into shares of Common Stock), or issue any securities from existing convertible or exercisable securities, with any individual or entity (an "Other Investor") that has the effect of establishing rights or otherwise benefiting such Other Investor in a manner more favorable in any material respect to such Other Investor than the rights and benefits established in favor of the Buyer by this Agreement. In the event the Company enters into such an agreement with said more favorable terms, this Agreement shall automatically, without further action of the parties, be amended to include those more favorable terms into this Agreement. Notwithstanding the foregoing, any conversion prices that are variable in nature shall be included herein as a Fixed Conversion Price and the variable characteristics shall not be incorporated herein.

m.    Non-Public Information. The Company covenants and agrees that, neither it, nor any other person acting on its behalf will provide the Buyer or its agents or counsel with any information that constitutes, or the Company reasonably believes constitutes, material non-public information, unless prior thereto the Buyer shall have consented to the receipt of such information and agreed with the Company to keep such information confidential. The Company understands and confirms that the Buyer shall be relying on the foregoing covenant in effecting transactions in securities of the Company. To the extent that the Company delivers any material, non-public information to the Buyer without such Buyer's consent, the Company hereby covenants and agrees that such Buyer shall not have any duty of confidentiality to the Company, any of its Subsidiaries, or any of their respective officers, directors, agents, employees or affiliates, not to trade on the basis of, such material, non-public information, provided that the Buyer shall remain subject to applicable law. To the extent that any notice provided, information provided, or any other communications made by the Company, to the Buyer, constitutes or contains material non-public information regarding the Company or any Subsidiaries, the Company shall, as promptly as reasonably possible, file such notice or other material information with the SEC pursuant to a Current Report on Form 8-K or other means of public release. In addition to any other remedies provided by this Agreement or the related transaction documents, if the Company provides any material non-public information to the Buyer without their prior written consent, and it fails to disclose this material non-public information in accordance with this provision, it shall pay the Buyer as partial liquidated damages and not as a penalty a sum equal to $3,000 per day beginning with the day the information is disclosed to the Buyer and ending and including the day the Form 8-K disclosing this information is filed.

n.    [RESERVED].

As used in this Agreement, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed.

5.    Transfer Agent Instructions. The Company shall issue irrevocable instructions to the Company's transfer agent to issue certificates or other evidence of ownership of such equity instruments in book-entry, registered in the name of the Buyer or its nominee or in street name, upon conversion of the Note, the Conversion Shares, in such amounts as specified from time to time by the Buyer to the Company in accordance with the terms thereof (the "Irrevocable Transfer Agent

16

**A-140**

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

Instructions"). In the event that the Company proposes to replace its transfer agent, the Company shall provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to this Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount (as defined in the Note)) signed by the successor transfer agent to the Company and the Company. Prior to registration of the Conversion Shares under the 1933 Act or the date on which the Conversion Shares may be sold pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption without any restriction as to the number of Securities as of a particular date that can then be immediately sold, all such certificates shall bear the restrictive legend specified in Section 2(g) of this Agreement. The Company warrants that: (i) no instruction other than the Irrevocable Transfer Agent Instructions referred to in this Section 5 will be given by the Company to its transfer agent; (ii) it will not direct its transfer agent not to transfer or delay, impair, and/or hinder its transfer agent in transferring (or issuing electronically or in certificated form) any certificate for Securities to be issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; (iii) it will not fail to remove (or directs its transfer agent not to remove or impairs, delays, or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Securities issued to the Buyer upon conversion of or otherwise pursuant to the Note as and when required by the Note and this Agreement; and (iv) it will provide any required issuance approvals to its transfer agent within six (6) hours of each conversion of the Note. Nothing in this Section shall affect in any way the Buyer's obligations and agreement set forth in this Agreement hereof to comply with all applicable prospectus delivery requirements, if any, upon resale of the Securities. If the Buyer provides the Company, at the cost of the Company, with (i) an opinion of counsel in form, substance and scope customary for opinions in comparable transactions, to the effect that a public sale or transfer of such Securities may be made without registration under the 1933 Act and such sale or transfer is effected, or (ii) the Buyer provides reasonable assurances that the Securities can be sold pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption, the Company shall permit the transfer, and, in the case of the Securities, promptly instruct its transfer agent to issue one or more certificates, free from restrictive legend, in such name and in such denominations as specified by the Buyer. The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer, by vitiating the intent and purpose of the transactions contemplated hereby. Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Section 5 may be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Section, that the Buyer shall be entitled, in addition to all other available remedies, to an injunction restraining any breach and requiring immediate transfer, without the necessity of showing economic loss and without any bond or other security being required.

6.   Conditions to the Company's Obligation to Sell. The obligation of the Company hereunder to issue and sell the Note and the Commitment Shares to the Buyer at the Closing is subject to the satisfaction, at or before the Closing Date, of each of the following conditions thereto, provided that these conditions are for the Company's sole benefit and may be waived by the Company at any time in its sole discretion:

a.  The Buyer shall have executed this Agreement and delivered the same to the Company.

b.  The Buyer shall have delivered the Purchase Price in accordance with Section 1(b) above.

17

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

c.    The representations and warranties of the Buyer shall be true and correct in all material respects as of the date when made and as of the Closing Date, as though made at that time (except for representations and warranties that speak as of a specific date), and the Buyer shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Buyer at or prior to the Closing Date.

d.    No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

7.    Conditions to The Buyer's Obligation to Purchase. The obligation of the Buyer hereunder to purchase the Note, on the Closing Date, is subject to the satisfaction, at or before the Closing Date, of each of the following conditions, provided that these conditions are for the Buyer's sole benefit and may be waived by the Buyer at any time in its sole discretion:

a.    The Company shall have executed this Agreement and delivered the same to the Buyer.

b.    The Company shall have delivered to the Buyer the duly executed Note in such denominations as the Buyer shall request and in accordance with Section 1(b) above.

c.    The Irrevocable Transfer Agent Instructions, in form and substance satisfactory to the Buyer, shall have been delivered to and acknowledged in writing by the Company's Transfer Agent.

d.    The representations and warranties of the Company shall be true and correct in all material respects as of the date when made and as of Closing Date, as though made at such time (except for representations and warranties that speak as of a specific date) and the Company shall have performed, satisfied and complied in all material respects with the covenants, agreements and conditions required by this Agreement to be performed, satisfied or complied with by the Company at or prior to the Closing Date.

e.    No litigation, statute, rule, regulation, executive order, decree, ruling or injunction shall have been enacted, entered, promulgated or endorsed by or in any court or governmental authority of competent jurisdiction or any self-regulatory organization having authority over the matters contemplated hereby which prohibits the consummation of any of the transactions contemplated by this Agreement.

f.    No event shall have occurred which could reasonably be expected to have a Material Adverse Effect on the Company including but not limited to a change in the 1934 Act reporting status of the Company or the failure of the Company to be timely in its 1934 Act reporting obligations.

g.    The Company shall have delivered to the Buyer (i) a certificate evidencing the formation and good standing of the Company and each of its Subsidiaries in such

18

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

entity's jurisdiction of formation issued by the Secretary of State (or comparable office) of such jurisdiction, as of a date within ten (10) days of the Closing Date, and (ii) resolutions adopted by the Company's Board of Directors at a duly called meeting or by unanimous written consent authorizing this Agreement and all other documents, instruments and transactions contemplated hereby.

8. <u>Governing Law; Miscellaneous.</u>

a.   <u>Governing Law; Venue</u>. This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement, the Note, or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts of New York or in the federal courts located in the state of New York. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note, the Commitment Shares, or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

b.   <u>Counterparts.</u> This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. A facsimile or .pdf signature shall be considered due execution and shall be binding upon the signatory thereto with the same force and effect as if the signature were an original, not a facsimile or .pdf signature. Delivery of a counterpart signature hereto by facsimile or email/.pdf transmission shall be deemed validly delivery thereof.

c.   <u>Construction; Headings.</u> This Agreement shall be deemed to be jointly drafted by the Company and the Buyer and shall not be construed against any person as the drafter hereof. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

d.   <u>Severability.</u> In the event that any provision of this Agreement, the Note, or any other agreement or instrument delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

Agreement, the Note, the Commitment Shares, or any other agreement, certificate, instrument or document contemplated hereby or thereby.

e.    Entire Agreement; Amendments. This Agreement, the Note, the Commitment Shares, and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement or any agreement or instrument contemplated hereby may be waived or amended other than by an instrument in writing signed by the Buyer.

f.    Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served; (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid; (iii) delivered by reputable air courier service with charges prepaid; or (iv) transmitted by hand delivery, telegram, e-mail or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by e-mail or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received), or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Company, to:

DARKPULSE, INC.
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Attention: Dennis O'Leary
e-mail: doleary@darkpulse.com

If to the Buyer:

FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC
1040 First Avenue, Suite
190 New York, NY 10022
Attention: Eli Fireman
e-mail: eli@firstfirecapital.com

With a copy by e-mail only to (which copy shall not constitute notice):

FABIAN VANCOTT
Attn: Anthony Michael Panek
e-mail: apanek@fabianvancott.com

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

g.    Successors and Assigns. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, subject to Section 2(f), the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

h.    Third Party Beneficiaries. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

i.    Survival. The representations and warranties of the Company and the Buyer and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyer or by or on behalf of the Company. The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred. The Buyer agrees to indemnify and hold harmless the Company and all its officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Buyer of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

j.    Publicity. The Company shall be entitled, without the prior approval of the Buyer, to make any press release or SEC, Principal Market (or other applicable trading market) or FINRA filings with respect to such transactions as is required by applicable law and regulations (although the Buyer shall be consulted by the Company in connection with any such press release prior to its release and shall be provided with a copy thereof and be given an opportunity to comment thereon).

k.    Expense Reimbursement; Further Assurances. At the Closing to occur as of the Closing Date, the Company shall pay on behalf of the Buyer or reimburse the Buyer for its legal fees and expenses incurred in connection with this Agreement, pursuant to the disbursement authorization signed by the Company of even date. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

l.    [RESERVED]

m.    Indemnification. In consideration of the Buyer's execution and delivery of this Agreement and acquiring the Securities hereunder, and in addition to all of the Company's other obligations under this Agreement or the Note, the Company shall defend, protect, indemnify and hold harmless the Buyer and its stockholders, partners, members, officers, directors, employees and direct or indirect investors and any of the foregoing persons' agents or other representatives (including, without limitation, those retained in connection with the transactions

21

DocuSign Envelope ID: 82ABF682-C2A0-484C-ADB2-D9E970D44BF8

contemplated by this Agreement) (collectively, the "Indemnitees") from and against any and all third party actions, causes of action, suits, claims, losses, costs, penalties, fees, liabilities and damages, and expenses in connection therewith (irrespective of whether any such Indemnitee is a party to the action for which indemnification hereunder is sought), and including reasonable attorneys' fees and disbursements (the "Indemnified Liabilities"), incurred by any Indemnitee as a result of, or arising out of, or relating to (a) any misrepresentation or breach of any representation or warranty made by the Company in this Agreement, the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby, (b) any breach of any covenant, agreement or obligation of the Company contained in this Agreement, the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby or (c) any cause of action, suit or claim brought or made against such Indemnitee by a third party (including for these purposes a derivative action brought on behalf of the Company) and arising out of or resulting from (i) the execution, delivery, performance or enforcement of this Agreement, the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby; (ii) any transaction financed or to be financed in whole or in part, directly or indirectly, with the proceeds of the issuance of the Securities; or (iii) the status of the Buyer or holder of the Securities as an investor in the Company pursuant to the transactions contemplated by this Agreement. To the extent that the foregoing undertaking by the Company may be unenforceable for any reason, the Company shall make the maximum contribution to the payment and satisfaction of each of the Indemnified Liabilities that is permissible under applicable law.

n.  Remedies.  The Company and the Buyer each acknowledge that a breach by one, of its obligations hereunder will cause irreparable harm to the other by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Company and the Buyer each acknowledge that the remedy at law for a breach of its obligations under this Agreement or the Note will be inadequate and agrees, in the event of a breach or threatened breach by the Company or the Buyer of the provisions of this Agreement, the Note, or the Commitment Shares, that the Company or the Buyer, as appropriate, shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement or the Note and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

o.  Payment Set Aside.  To the extent that the Company makes a payment or payments to the Buyer hereunder or pursuant to the Note, or the Buyer enforces or exercises its rights hereunder or thereunder, and such payment or payments or the proceeds of such enforcement or exercise or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, recovered from, disgorged by or are required to be refunded, repaid or otherwise restored to the Company, a trustee, receiver or any other person or entity under any law (including, without limitation, any bankruptcy law, foreign, state or federal law, common law or equitable cause of action), then to the extent of any such restoration the obligation or part thereof originally intended to be satisfied shall be revived and continued in full force and effect as if such payment had not been made or such enforcement or setoff had not occurred.

p.  Failure or Indulgence Not Waiver.  No failure or delay on the part of the Buyer on the one hand or the Company on the other hand, in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

or privileges. All rights and remedies of the Buyer or the Company existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

**DARKPULSE, INC.**

By:

Name: Dennis O'Leary

Title: Chief Executive Officer

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC**

By: FirstFire Capital Management, LLC

By:

Name: Eli Fireman

Title: Manager

SUBSCRIPTION AMOUNT:

**Principal Amount of Note: $825,000.00**
**Actual Amount of Purchase Price of Note: $750,000.00\***

\*The purchase price of $750,000.00 shall be paid promptly after the full execution of the Note and related transaction documents.

24

DocuSign Envelope ID: 82A8F682-C2A0-484C-ADB2-D9E970D44BF8

**EXHIBIT A**

**FORM OF NOTE**

**[attached hereto]**

## REGISTRATION RIGHTS AGREEMENT

**THIS REGISTRATION RIGHTS AGREEMENT** (this "Agreement"), dated as of April 26, 2021, is made by and between DarkPulse, Inc., a Delaware corporation (the "Company"), and FirstFire Global Opportunities Fund, LLC (the "Holder"). The Company and the Holder are hereinafter sometimes collectively referred to as the "Parties" and each a "Party" to this Agreement.

## RECITALS

**WHEREAS**, the Company's Board of Directors (the "Board") has unanimously approved, upon the terms and subject to the conditions of, that certain Securities Purchase Agreement, of even date herewith, by and between the Holder and the Company (the "Purchase Agreement"), the Company has agreed to issue and sell to Holder a convertible promissory note in the principal amount of $825,000.00 (the "Note") and 75,000,000 shares of Common Stock (the "Commitment Shares") to the Holder; and

**WHEREAS**, to induce the Holder to execute and deliver the Purchase Agreement and this Agreement, the Company has agreed to provide certain registration rights under the Securities Act of 1933, as amended (the "Securities Act") and the rules and regulations promulgated thereunder, and applicable state securities laws, with respect to the Shares (as defined below) issuable pursuant to the Purchase Agreement.

**NOW, THEREFORE**, for and in consideration of the foregoing premises, the agreements and covenants herein contained, and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the Company and the Holder, intending to be legally bound, hereby agree as follows:

This Agreement predominately references a Registration Statement and inclusion of the Holder's securities thereunder. However, the Company may also satisfy any of its obligations hereunder by including the Holder's securities in a Regulation A Offering filed with the SEC and New York state. As a result, references to Registration Statement, Effectiveness, among others, and the deadlines related thereto, also can be satisfied by having a Regulation A Offering qualified covering the Holder's securities.

      1.      **Definitions**. As used in this Agreement, the following terms shall have the following meanings:

          a.      "Closing Date" shall mean the Purchase Date, as such term is defined in the Purchase Agreement.

          b.      "Filing Date" shall mean the date the Registration Statement has been filed with the SEC (as determined by EDGAR) and no stop order of acceptance has been issued by the SEC.

          c.      "Registration Statement" means a Registration Statement of the Company filed with the SEC under the Securities Act.

          d.      "Person" means a corporation, a limited liability company, an association, a partnership, an organization, a business, an individual, a governmental or political subdivision thereof or a governmental agency.

          e.      "Principal Market" means either the NYSE MKT (formerly the American Stock Exchange), the New York Stock Exchange, Inc., any tier of the NASDAQ Stock Market, OTCQX®

Best Market, the OTCQB® Venture Market or the OTC Pink Market, whichever is the principal market on which the Securities is listed.

f.      "Purchase Amount" means the Purchase Price, as such term is defined in the Purchase Agreement.

g.      "Effectiveness Date" shall mean the date the SEC declares the Registration Statement effective and the Company has filed all necessary amendments covering the resale of Shares.

h.      "Register," "Effective" and "Effectiveness" refer to the process of register shares under a Registration Statement by preparing and filing with the SEC one or more Registration Statements in compliance with the Securities Act and any successor rule providing for among other securities, the Shares (defined below), and the process of keeping such Registration Statement(s) effective.

i.      "Shares" means the shares of Common Stock issued or issuable (i) pursuant to the Purchase Agreement (including the Commitment Shares) and (ii) any shares of capital stock issued or issuable with respect to such Note and any conversion thereof, or other securities issued as a result of any stock split, stock dividend, recapitalization, exchange or similar event or otherwise, which have not been (x) included in a Registration Statement that has been declared effective by the SEC, (y) sold under circumstances meeting all of the applicable conditions of Rule 144, promulgated under the Securities Act or (z) saleable without limitation as to time, manner and volume pursuant to Rule 144(k) (or any similar provision then in force) under the Securities Act.

j.      "SEC" means the United States Securities and Exchange Commission.

All capitalized terms used but not defined in this Agreement shall have the meaning ascribed to them in the Purchase Agreement; provided however, that any references to Fixed Conversion Price or Default Fixed Conversion Price shall have the meaning ascribed to them in the Note.

For the purposes of determining dates for penalties or filing deadlines, as outlined in this Agreement, both Parties agree that the date given by the SEC shall constitute the official date.

**2.      Registration.**

a.      Registration. If at any time while any amounts are due outstanding under the Note, the Company files a Registration Statement under the Securities Act, the Company shall use its commercially reasonable efforts, to the extent permissible under U.S. securities laws and the rules and regulations thereunder, to include the Shares in such Registration Statement with the intention of covering the resale of all of the Shares. If the Company cannot register enough shares to cover resale of all of the Shares of the Holder, the Company shall register an amount equal to the maximum amount allowed under the applicable rule or rules as interpreted by the SEC. In the event the Company cannot Register sufficient shares to cover the Securities, due to the remaining number of authorized shares being insufficient, the Company will use its best efforts to effective the maximum number of shares it can, based upon the remaining balance of authorized shares and will use its best efforts to increase the number of its authorized shares as soon as reasonably practicable.

b.      The Company shall use its commercially reasonable efforts, to the extent permissible under U.S. securities laws, to have the Registration Statement filed with the SEC within ninety (90) days following the payment of the consideration due under the Note (the "Filing Deadline").

Notwithstanding the foregoing, failure to file by the Filing Deadline shall not constitute an Event of Default under the Note to the extent any delay in the filing of the Registration Statement occurs because of an act of, or a failure to act or to act timely by the Holder or is otherwise attributable to the Holder.

The Company acknowledges that its failure to have the Registration Statement filed by the Filing Deadline will cause the Holder to suffer irreparable harm, and, that damages will be difficult to ascertain. Accordingly, the Parties agree that it is appropriate that the failure to file by the Filing Deadline shall constitute an acceleration event with respect to the Maturity Date of the Note. The availability of any remedies hereunder and thereunder shall not relieve the Company from its obligations to register the  Shares and deliver the Shares pursuant to the terms of this Agreement and the Purchase Agreement.

c.      The Company shall use its best efforts and take all available steps to have the Registration Statement declared effective by the SEC within one hundred eighty (180) calendar days after the Filing Date (the "Effectiveness Deadline").  If the Registration Statement covering the Shares to be filed by the Company pursuant to Section 2(a) hereof has not become effective by the Effectiveness Deadline, then it shall constitute an Event of Default under the Note.

If the Registration Statement covering the Shares to be filed by the Company pursuant to Section 2(a) hereof has become effective, and, thereafter, the Holder's right to sell is suspended, for any reason, then the Company shall pay the Holder the sum of one percent (1%) of the Purchase Amount plus interest and penalties due to the Holder for the Shares pursuant to the Purchase Agreement for each thirty (30) calendar day period, pro-rata, compounded annually, following the suspension, until such suspension ceases (the "Suspension Damages").  The Suspension Damages shall continue until the obligation is fulfilled and shall be paid within five (5) business days after each thirty (30) day period, or portion thereof, until such suspension is released.  The Suspension Damages shall be paid, at the Holder's option, in cash or shares of the Company's common stock, par value $0.001, priced at the Default Fixed Conversion Price, or portion thereof.  Failure of the Company to make payment within said five (5) business days after each thirty (30) day period shall be considered a breach of this Agreement.

Notwithstanding the foregoing, the amounts payable by the Company pursuant to this Section 2(c) shall not be payable to the extent any delay in the effectiveness of the Registration Statement or any suspension of the Registration Statement occurs because of an act of, or a failure to act or to act timely by the Holder or is otherwise attributable to the Holder.

The Company acknowledges that its failure to have the Registration Statement become effective by the Effectiveness Deadline or to permit the suspension of the Registration Statement, will cause the Holder to suffer irreparable harm and, that damages will be difficult to ascertain. Accordingly, the Parties agree that it is appropriate to include in this Agreement a provision for liquidated damages. The Parties acknowledge and agree that the liquidated damages provision set forth in this Section 2(c) represents the Parties' good faith effort to quantify such damages and, as such, agree that the form and amount of such liquidated damages are reasonable and will not constitute a penalty.  The payment of liquidated damages shall not relieve the Company from its obligations to effective the Shares and deliver the Shares pursuant to the terms of this Agreement and the Purchase Agreement.

3.      **Related Obligations.**

At such time as the Company is obligated to prepare and file a Registration Statement with the SEC pursuant to Section 2(a) hereof, the Company will use its best efforts to Register the Shares in accordance with the intended method of disposition thereof and, with respect thereto, the Company shall have the following obligations:

a.      The Company shall use its best efforts to cause such Registration Statement relating to the Shares to become effective within ninety (90) calendar days after the Filing Date and shall keep such Registration Statement Effective until the date on which the Holder shall have sold all the Shares, or the Shares included therein otherwise cease to be Shares (the "Effectiveness Period"), which Registration Statement (including any amendments or supplements thereto and prospectuses contained therein) shall, as of the date thereof, not contain any untrue statement of a material fact or omit to state a material fact required to be stated therein, or necessary to make the statements therein, in light of the circumstances in which they were made, not misleading.

b.      The Company shall prepare and file with the SEC such amendments (including post-effectiveness amendments) and supplements to the Registration Statement and any exhibits and attachments thereto, as may be necessary to keep such Registration Statement Effective during the Effectiveness Period, and, during such period, comply with the provisions of the Securities Act with respect to the disposition of all the Shares of the Company covered by such Registration Statement until such time as all of such Shares shall have been disposed of in accordance with the intended methods of disposition by the Holder as set forth in such Registration Statement. In the event the number of shares available under a Registration Statement filed pursuant to this Agreement is at any time insufficient to cover all of the Shares, the Company shall amend such Registration Statement, or file a new Registration Statement, or both, so as to cover all of the Shares, in each case, as soon as practicable, but in any event within thirty (30) calendar days after the necessity therefor arises, assuming the Company has sufficient authorized shares at that time, and if it does not, within thirty (30) calendar days after such shares are authorized.  The Company shall use it best efforts to cause such amendment or new Registration Statement to become effective as soon as practicable following the filing thereof. If any of the provisions of the Securities Act in any way limit the ability of the Company to file any amendment or new Registration Statement within thirty (30) calendar days, then the Company shall file the appropriate amendment or Registration Statement as soon as permitted under the relevant Securities Act provisions.

c.      If necessary to allow the Holder to sell all of the Shares without pricing restrictions, the Company shall "uplist" to the requisite tier of the Company's Principal Market in connection with the registration of the Shares. This requirement may be waived by the Holder with its consent.

d.      Upon the happening of any event as a result of which the Registration Statement, as then in effect, would then contain an untrue statement of a material fact, or omission to state a material fact, which would otherwise be required to be stated therein or necessary to make the statements therein, in light of the circumstances under which they were made, not misleading, and, as a result of which the Registration Statement is required to be amended ("Effectiveness Default"), the Company shall use all diligent efforts to promptly prepare any necessary supplement or amendment to such Registration Statement and take any other necessary steps to cure the Effectiveness Default, and deliver one (1) copy of such supplement or amendment to Holder (or such other number of copies as Holder may reasonably request; delivery via EDGAR shall constitute delivery). Failure to cure the Effectiveness Default within five (5) business days shall result in the Company paying liquidated damages of one percent (1%) of the Purchase Amount for each thirty (30) calendar day period or portion thereof, beginning on the date of suspension. The Company shall also promptly notify Holder in writing (i) when any post-effective amendment has been filed, and when a Registration Statement or any post-effectiveness amendment has become Effective (notification of such Effectiveness shall be delivered to Holder by facsimile on the same day of such Effectiveness and by overnight mail); (ii) in the event the Registration Statement is no longer effective; or (iii) the Registration Statement is stale for a period of more than five (5) trading days as a result of the Company's failure to timely file any reports required by the SEC or state jurisdiction.

The Company acknowledges that its failure to cure the Effectiveness Default within five (5) business days will cause the Holder irreparable harm, and that damages will be difficult to ascertain. Accordingly, the Parties agree that it is appropriate to include in this Agreement a provision for liquidated damages. The Parties acknowledge and agree that the liquidated damages provision set forth in this Section 3(e) represents the Parties' good faith effort to quantify such damages and, as such, agree that the form and amount of such liquidated damages are reasonable and will not constitute a penalty.

It is the intention of the Parties that interest payable under any of the terms of this Agreement shall not exceed the maximum amount permitted under any applicable law. If a law, which applies to this Agreement which sets the maximum interest amount, is finally interpreted so that the interest in connection with this Agreement exceeds the permitted limits, then: (1) any such interest shall be reduced by the amount necessary to reduce the interest to the permitted limit; and (2) any sums already collected (if any) from the Company which exceed the permitted limits will be refunded to the Company. The Holder may choose to make this refund by reducing the amount that the Company owes under this Agreement or by making a direct payment to the Company. If a refund reduces the amount that the Company owes the Holder, the reduction will be treated as a partial payment. In the event that any provision of this Agreement is held by a court of competent jurisdiction to be excessive in scope or otherwise invalid or unenforceable, such provision shall be adjusted rather than voided, if possible, so that it is enforceable to the maximum extent possible, and the validity and enforceability of the remaining provisions of this Agreement will not in any way be affected or impaired thereby.

e.     The Company shall use its best efforts to prevent the issuance of any stop order or other suspension of the Effectiveness of a Registration Statement, or the suspension of the registration of any of the Shares for sale in any jurisdiction and, if such an order or suspension is issued, to obtain the withdrawal of such order or suspension at the earliest possible moment and to notify the Holder of the issuance of such order and the resolution thereof. The Company will immediately notify the Holder of a proceeding, or threat of proceeding, the result of which could affect the Effectiveness of the Registration Statement.

f.     The Company shall hold in confidence and not make any disclosure of information concerning the Holder unless (i) disclosure of such information is necessary to comply with federal or state securities laws, (ii) the disclosure of such information is necessary to avoid or correct a misstatement or omission in any Registration Statement, (iii) the release of such information is ordered pursuant to a subpoena or other final, non-appealable order from a court or governmental body of competent jurisdiction, or (iv) such information has been made generally available to the public other than by disclosure in violation of this Agreement or any other agreement. The Company agrees that it shall, upon learning that disclosure of such information concerning a Holder is sought in or by a court or governmental body of competent jurisdiction or through other means, give prompt written notice to the Holder and allow the Holder, at the Holder's expense, to undertake appropriate action to prevent disclosure of, or to obtain a protective order for, such information.

g.     The Company shall use its best efforts to secure or maintain designation and quotation of all the Shares covered by any Registration Statement on the Principal Market, to the extent such is necessary for the Shares to trade on such market. If, despite the Company's best efforts, the Company is unsuccessful in satisfying this obligation, it shall use its best efforts to cause all the Shares covered by any Registration Statement to be listed on each other national securities exchange and automated quotation system, if any, on which securities of the same class or series issued by the Company are then listed, if any, if the listing of such Shares is then permitted under the rules of such exchange or system. The Company shall pay all fees and expenses in connection with satisfying its obligation under this Section 3(g).

h.      The Company shall cooperate with the Holder to facilitate the timely preparation and delivery of book-entry or street name shares (not bearing any restrictive legend) representing the Shares to be offered pursuant to a Registration Statement and enable such certificates to be in such denominations or amounts, as the case may be, as the Holder may reasonably request and effective in such names of the Persons who shall acquire such Shares from the Holder, as the Holder may request.

i.      The Company shall provide a transfer agent for all the Shares not later than the Effectiveness Date of the first Registration Statement filed pursuant hereto.

j.      If requested by the Holder, the Company shall (i) as soon as reasonably practical, incorporate in post-effectiveness amendment such information as Holder reasonably determines should be included therein relating to the sale and distribution of Shares, including, without limitation, information with respect to the Note and the Shares; (ii) make all required filings of such post-effectiveness amendment as soon as notified of the matters to be incorporated in such prospectus supplement or post-effectiveness amendment; and (iii) or make amendments to any Registration Statement if reasonably requested by Holder.

k.      The Company shall use its best efforts to cause the Shares covered by the applicable Registration Statement to be effective with or approved by such other governmental agencies or authorities as may be necessary to consummate the disposition of such Shares.

l.      The Company shall otherwise use its best efforts to comply with all applicable rules and regulations of the SEC in connection with any Registration hereunder.

m.      Within five (5) business days after the Registration Statement which includes the Shares is declared effective by the SEC, the Company shall deliver to the Holder confirmation that such Registration Statement has been declared effective by the SEC.

n.      The Company shall take all other reasonable actions necessary to expedite and facilitate disposition by the Holder of the Shares pursuant to a Registration Statement.

4.      **Obligations of The Holder.**

a.      At least five (5) calendar days prior to the first anticipated filing date of a Registration Statement, the Company shall notify the Holder in writing of the information the Company requires from the Holder. The Holder covenants and agrees that, in connection with any resale of Shares by it pursuant to a Registration Statement, it shall comply with the "Plan of Distribution" section relating to such Registration Statement.

b.      The Holder, by the Holder's acceptance of the inclusion of any of the Shares in a Registration Statement, agrees to cooperate with the Company as reasonably requested by the Company in connection with the preparation and filing of any Registration Statement hereunder and in responding to SEC comments in connection therewith.

c.      The Holder agrees that, upon receipt of any notice from the Company of the happening of any event of the kind described in Section 3(d) and Section 3(e) hereof, the Holder will immediately discontinue disposition of Shares pursuant to any Registration Statement(s) covering such Shares until Holder's receipt of the copies of the supplemented or amended prospectus contemplated by Section 3(d) and Section 3(e) hereof.

     **5.**      **Expenses of Registration**.

     All expenses, other than underwriting discounts and commissions, incurred in connection with the filing of a Registration Statement, any other filings connected thereto pursuant to <u>Section 2</u> and <u>Section 3</u> hereof, including, without limitation, all registration, listing fees, printing and accounting fees, and reasonable fees and disbursements of counsel for the Company shall be paid by, and are the sole obligation of, the Company.

     **6.**      **Indemnification**.

     In the event any Shares are included in a Registration Statement under this Agreement:

          a.     To the fullest extent permitted by law, the Company will, and hereby agrees to, indemnify, hold harmless and defend the Holder who holds such Shares, the directors, officers, partners, employees, agents, representatives of, and each Person, if any, who controls Holder within the meaning of the Securities Act or the Exchange Act) (each, an "<u>Indemnified Person</u>"), against any losses, claims, damages, liabilities, judgments, fines, penalties, charges, costs, reasonable attorneys' fees, amounts paid in settlement or reasonable expenses, joint or several (collectively, "<u>Claims</u>"), incurred in investigating, preparing or defending any action, claim, suit, inquiry, proceeding, investigation or appeal taken from the foregoing by or before any court or governmental, administrative or other regulatory agency, body or the SEC, whether pending or threatened, whether or not an indemnified party is or may be a party thereto (<u>Indemnified Damages</u>"), to which any of them may become subject insofar as such Claims (or actions or proceedings, whether commenced or threatened, in respect thereof) arise out of or are based upon: (i) any untrue statement or alleged untrue statement of a material fact in a Registration Statement or any post-effective amendment thereto or in any filing made in connection with the effectiveness of the Note under the securities or any "blue sky" laws of any jurisdiction in which Shares are offered ("<u>Blue Sky Filing</u>") if applicable, or the omission or alleged omission to state a material fact required to be stated therein or necessary to make the statements therein, in light of the circumstances under which the statements therein were made, not misleading, (ii) any untrue statement or alleged untrue statement of a material fact contained in the final prospectus (as amended or supplemented, if the Company files any amendment thereof or supplement thereto with the SEC) or the omission or alleged omission to state therein any material fact necessary to make the statements made therein, in light of the circumstances under which the statements therein were made, not misleading, or (iii) any violation or alleged violation by the Company of the Securities Act, the Exchange Act, any other law, including, without limitation, any state securities law, or any rule or regulation thereunder relating to the offer or sale of the Shares pursuant to a Registration Statement (the matters in the foregoing clauses (i) through (iii) being, collectively, "<u>Violations</u>"). Subject to the restrictions set forth in <u>Section 6(c)</u> hereof with respect to the number of legal counsel, the Company shall reimburse the Holder and each such controlling person, promptly as such expenses are incurred and are due and payable, for any reasonable legal fees or other reasonable expenses incurred by them in connection with investigating or defending any such Claim. Notwithstanding anything to the contrary contained herein, the indemnification agreement contained in this <u>Section 6(a)</u>: (i) shall not apply to a Claim arising out of or based upon a Violation committed by any Indemnified Person or which occurs in reliance upon and in conformity with information furnished in writing to the Company by any Indemnified Person expressly for use in connection with the preparation of the Registration Statement or any such amendment thereof or supplement thereto, if such prospectus were timely made available by the Company pursuant to <u>Section 3(c)</u> hereof; (ii) shall not be available to the extent such Claim is based on (a) a failure of the Holder to deliver or to cause to be delivered the prospectus made available by the Company or (b) the Indemnified Person's use of an incorrect prospectus despite being promptly advised in advance by the Company in writing not to use such incorrect prospectus; and (iii) shall not apply to amounts paid in settlement of any Claim if such settlement is effected without the prior written consent of the Company, which consent shall not be unreasonably withheld. Such indemnity shall remain in full force and effect regardless of any

investigation made by or on behalf of the Indemnified Person and shall survive the resale of the Shares by the Holder pursuant to the Registration Statement.

b.      Promptly after receipt by an Indemnified Person or Indemnified Party under this Section 6 of notice of the commencement of any action or proceeding (including any governmental action or proceeding) involving a Claim, such Indemnified Person or Indemnified Party shall, if a Claim in respect thereof is to be made against any indemnifying party under this Section 6, deliver to the indemnifying party a written notice of the commencement thereof, and the indemnifying party shall have the right to participate in, and, to the extent the indemnifying party so desires, jointly with any other indemnifying party similarly noticed, to assume control of the defense thereof with counsel mutually satisfactory to the indemnifying party and the Indemnified Person or the Indemnified Party, as the case may be; provided, however, that an Indemnified Person or Indemnified Party shall have the right to retain its own counsel with the fees and expenses to be paid by the indemnifying party, if, in the reasonable opinion of counsel retained by the indemnifying party, the representation by such counsel of the Indemnified Person or Indemnified Party and the indemnifying party would be inappropriate due to actual or potential differing interests between such Indemnified Person or Indemnified Party and any other party represented by such counsel in such proceeding. The indemnifying party shall pay for only one separate legal counsel for the Indemnified Persons or the Indemnified Parties, as applicable. Such counsel shall be selected by the Company if the Company is the indemnifying party. The Indemnified Party or Indemnified Person shall cooperate fully with the indemnifying party in connection with any negotiation or defense of any such action or claim by the indemnifying party and shall furnish to the indemnifying party all information reasonably available to the Indemnified Party or Indemnified Person which relates to such action or claim. The indemnifying party shall keep the Indemnified Party or Indemnified Person fully apprised at all times as to the status of the defense or any settlement negotiations with respect thereto. No indemnifying party shall be liable for any settlement of any action, claim or proceeding effected without its written consent, provided, however, that the indemnifying party shall not unreasonably withhold, delay or condition its consent. No indemnifying party shall, without the consent of the Indemnified Party or Indemnified Person, consent to entry of any judgment or enter into any settlement or other compromise which does not include as an unconditional term thereof the giving by the claimant or plaintiff to such Indemnified Party or Indemnified Person of a release from all liability in respect to such Claim. Following indemnification as provided for hereunder, the indemnifying party shall be subrogated to all rights of the Indemnified Party or Indemnified Person with respect to all third parties, firms or corporations relating to the matter for which indemnification has been made. The failure to deliver written notice to the indemnifying party within a reasonable time of the commencement of any such action shall not relieve such indemnifying party of any liability to the Indemnified Person or Indemnified Party under this Section 6, except to the extent that the indemnifying party is actually prejudiced in its ability to defend such action.

c.      The indemnification required by this Section 6 shall be made by periodic payments of the amount thereof during the course of the investigation or defense, as and when bills are received or Indemnified Damages are incurred.

d.      The indemnity agreements contained herein shall be in addition to (i) any cause of action or similar right of the Indemnified Party or Indemnified Person against the indemnifying party or others; and (ii) any liabilities the indemnifying party may be subject to pursuant to the law.

7.      **Contribution.**

To the extent any indemnification by an indemnifying party is prohibited or limited by law, the indemnifying party agrees to make the maximum contribution with respect to any amounts for which it would otherwise be liable under Section 6 hereof to the fullest extent permitted by law; provided, however, that: (i) no contribution shall be made under circumstances where the maker would not have been liable for

indemnification under the fault standards set forth in Section 6 hereof; (ii) no seller of Shares guilty of fraudulent misrepresentation (within the meaning of Section 11(f) of the Securities Act) shall be entitled to contribution from any seller of Shares who was not guilty of fraudulent misrepresentation; and (iii) contribution by any seller of   Shares shall be limited in amount to the net amount of proceeds received by such seller from the sale of such   Shares.

**8.    Reports Under the Exchange Act.**

With a view to making available to the Holders the benefits of Rule 144 under the Securities Act or any similar rule or regulation of the SEC that may at any time permit the Holder to sell securities of the Company to the public without Effectiveness ("Rule 144") the Company agrees to take commercially reasonable efforts to:

a.    make and keep public information available, as those terms are understood and defined in Rule 144;

b.    file with the SEC in a timely manner all reports and other documents required of the Company under the Securities Act and the Exchange Act so long as the Company remains subject to such requirements and the filing of such reports and other documents as are required by the applicable provisions of Rule 144; and

c.    furnish to the Holder so long as the Holder owns Shares, promptly upon request, (i) a written statement by the Company that it has complied with the reporting requirements of Rule 144, the Securities Act and the Exchange Act; (ii) a copy of the most recent annual or quarterly report of the Company and such other reports and documents so filed by the Company; and (iii) such other information as may be reasonably requested to permit Holder to sell such securities pursuant to Rule 144 without Effectiveness.

**9.    No Assignment of Effectiveness Rights.**

The Effectiveness rights and obligations under this Agreement shall not be assignable.

**10.    Amendment of Effectiveness Rights.**

Provisions of this Agreement may be amended and the observance thereof may be waived (either generally or in a particular instance and either retroactively or prospectively), only with the written consent of both the Company and the Holder of the Shares. Any amendment or waiver effected in accordance with this Section 10 shall be binding upon the Holder and the Company.  No such amendment shall be effective to the extent that it applies to less than all of the Holders of the Shares. No consideration shall be offered or paid to any Person to amend or consent to a waiver or modification of any provision of any of this Agreement unless the same consideration also is offered to all of the Parties to this Agreement.

**11.    Miscellaneous.**

a.    Any notices, consents, waivers or other communications required or permitted to be given under the terms of this Agreement must be in writing and will be deemed to have been delivered (i) upon receipt, when delivered personally; (ii) upon receipt, when sent by facsimile (provided a confirmation of transmission is mechanically or electronically generated and kept on file by the sending Party); or (iii) one (1) day after deposit with a nationally recognized overnight delivery service, in each case properly addressed to the Party to receive the same. The addresses for such communications are

as set forth on the signature page to this Agreement.  Each Party shall provide five (5) business days prior notice to the other Party of any change in address, phone number or facsimile number.

        b.     Failure of any Party to exercise any right or remedy under this Agreement or otherwise, or delay by a Party in exercising such right or remedy, shall not operate as a waiver thereof.

        c.     This Agreement and all acts and transactions pursuant hereto and the rights and obligations of the Parties hereto shall be governed, construed and interpreted in accordance with the laws of the State of Delaware, without giving effect to principles of conflicts of law. The Parties submit to the jurisdiction of the state of New York and federal courts in the borough of Manhattan, New York, and agree that any legal action or proceeding relating to this Agreement may be brought in those courts.

        d.     This Agreement, the Purchase Agreement, the Note and any other documents in connection therewith, constitute the entire set of agreements among the Parties hereto with respect to the subject matter hereof and thereof.  There are no restrictions, promises, or undertakings, other than those set forth or referred to herein or in the Purchase Agreement.

        e.     This Agreement and the Purchase Agreement supersede all prior agreements and understandings among the Parties hereto with respect to the subject matter hereof and thereof.

        f.     The headings in this Agreement are for convenience of reference only and shall not limit or otherwise affect the meaning hereof.

        g.     This Agreement may be executed in two or more counterparts, all of which taken together shall constitute one instrument.  Execution and delivery of this Agreement by exchange of facsimile copies bearing the facsimile signature of a Party shall constitute a valid and binding execution and delivery of this Agreement by such Party.  Such facsimile copies shall constitute enforceable original documents.

        h.     Each Party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other Party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

        i.     All consents and other determinations to be made by the Holder pursuant to this Agreement shall be made, unless otherwise specified in this Agreement, by the Holder holding a majority of the Shares.

        j.     The language used in this Agreement will be deemed to be the language chosen by the Parties to express their mutual intent and no rules of strict construction will be applied against any Party.

        k.     The Company hereby represents to the Holder that: (i) it has voluntarily entered into this Agreement of its own freewill; (ii) it is not entering into this Agreement under economic duress; (iii) the terms of this Agreement are reasonable and fair to the Company; and (iv) the Company has had, or has had the opportunity and declined to have, independent legal counsel of its own choosing review this Agreement, advise the Company with respect to this Agreement, and represent the Company in connection with its entering into this Agreement.

l.          Notwithstanding anything in this Agreement to the contrary, the Parties hereto hereby acknowledge and agree to the following: (i) the Holder makes no representations or covenants that it will not engage in trading in the securities of the Company; (ii) the Company has not and shall not provide material non-public information to the Holder unless prior thereto the Holder shall have executed a written agreement regarding the confidentiality and use of such information; and (iii) the Company understands and confirms that the Holder will be relying on the acknowledgements set forth in clauses (i) through (iii) above if the Holder effects any transactions in the securities of the Company.

**12.      Waiver.**

The Holder's delay or failure at any time or times hereafter to require strict performance by Company of any undertakings, agreements or covenants shall not waive, affect, or diminish any right of the Holder under this Agreement to demand strict compliance and performance herewith. Any waiver by the Holder of any breach under this Agreement (an "Event of Default") shall not waive or affect any other Event of Default, whether such Event of Default is prior or subsequent thereto and whether of the same or a different type. None of the undertakings, agreements and covenants of the Company contained in this Agreement, and no Event of Default, shall be deemed to have been waived by the Holder, nor may this Agreement be amended, changed or modified, unless such waiver, amendment, change or modification is evidenced by an instrument in writing specifying such waiver, amendment, change or modification and signed by the Holder.

**13.      Payment of Liquidated Damages.**

With respect to any liquidated damages or other fees incurred herein by the Company for failure to act in a timely manner, the Holder reserves the rights to take payment of such amounts in cash or in shares priced at the Fixed Default Conversion Price.

*[Signature Page Follows]*

A-160

   **IN WITNESS WHEREOF**, the Parties hereto have caused this Effectiveness Rights Agreement to be duly executed on the day and year first above written.

THE COMPANY:

DARKPULSE, INC.

| | |
|---|---|
| By: | _____ |
| Name: | Dennis O'Leary |
| Title: | CEO |
| Address: | 1345 Avenue of the Americas, 2nd Floor |
| | New York, New York 10105 |

HOLDER:

FirstFire Global Opportunities Fund, LLC
*(entity name, if applicable)*

| | |
|---|---|
| By: | _____ |
| Name: | Eli Fireman, Manager of FirstFire Capital |
| | Management, LLC, its Manager |
| Address: | 1040 1st Avenue, Suite 190 |
| | New York, New York 10022 |

A-161

## AMENDMENT NO. 1 TO THE CONVERTIBLE PROMISSORY NOTE ISSUED ON APRIL 26, 2021

THIS AMENDMENT NO. 1 TO THE CONVERTIBLE PROMISSORY NOTE ISSUED ON April 26 2021 (the "Amendment") is entered into on October 14 2021, by and between DarkPulse, Inc. a Delaware corporation (the "Company"), and FirstFire Global Opportunities Fund LLC, a Delaware limited liability company (the "Holder") (Company and Holder collectively the "Parties").

### BACKGROUND

A.      The Company and Holder are the parties to that certain Securities Purchase Agreement (the "SPA") whereunder Holder acquired (i) a Convertible Promissory Notes in the original principal amount of $825,000 (the "Note"); (the SPA, Note, Commitment Shares, and all other related documents hereinafter the "Transaction Documents").

B.      The Parties desire to amend the Transaction Documents as set forth expressly below.

NOW THEREFORE, the Parties agree as follows:

1.      Remove from the Securities Purchase Agreement Section 4. Subsection d. **Restriction on Activities.**

2.      **Governing Law; Venue.** The Transaction Documents shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement, the Note, the Warrant, or any other agreement, certificate, instrument, or document contemplated hereby shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note, or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

3.      The Parties have mutually agreed to the provisions set forth herein and are doing so without the exchange of any additional consideration.

Scanned with CamScanner

A-162

4.   This Amendment shall be deemed part of, but shall take precedence over and supersede any provisions to the contrary contained in the Note. Except as specifically modified hereby, all of the provisions of the Note, which are not in conflict with the terms of this Amendment, shall remain in full force and effect.

A-163

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment on October 25, 2021, effective as of April 26, 2021.

**DARKPULSE, INC.**

By :

Dennis O'Leary- CEO

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC**

By : FirstFire Capital Management LLC

Eli Fireman, Managing Member

A-164

# EXHIBIT
# 3

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/ Warrant Shares | Notes |
|---|---|---|---|---|---|---|---|---|
| 1 | AB International Group Corp. (ABQQ) | 9/1/20 | Note | $75,000.00 | 10% | | | |
| 2 | Accelerated Pharma, Inc. | 1/30/17 | Note | $345,000.00 | 2% | | | |
| 3 | Adial Pharmaceuticals, LLC (ADIL) | 5/1/17 | Note | $287,500.00 | 2% | | | |
| 4 | Amazing Energy Oil & Gas, Co. (AMAZ) | 9/18/19 | Note | $250,000.00 | 12% | | | |
| | | 9/18/19 | Share Issuance | | | | 1,875,000 | |
| | | 1/31/02 | Conversion | | | $210,299.00 | 5,000,000 | |
| 5 | American Housing Income Trust, Inc. (CXBS) | 4/17/17 | Note | $525,000.00 | 2% | | | |
| | | 4/17/17 | Warrant | | | | 787,500 | Exercise Price: $.50/share |
| 6 | American International Holdings Corp. (AMIH) | 4/30/20 | Note | $105,000.00 | 8% | | | |
| 7 | Apotheca Biosciences, Inc. | 10/3/18 | Note | $300,000.00 | 5% | | | |
| | | 10/3/18 | Warrant | | | | 480,000 | Exercise Price: $.3125/share |
| | | 1/18/19 | Note | $150,000.00 | 5% | | | |
| 8 | Applied BioSciences Corp. (APPB) | 9/4/19 | Note | $500,000.00 | 12% | | | Convertible Price: 0.02 |
| 9 | Applied Minerals, Inc. (AMNL) | 2/13/20 | Note | $250,000.00 | 5% | | | |
| 10 | Arista Financial Corp (ARST) | 11/1/20 | Conversion | | 8% | $40,504.00 | 8,300,000 | |
| | | 9/7/18 | Note | $137,500.00 | 8% | | | Exercise Price: $1.25/share |
| | | 9/7/18 | Warrant | | | | 50,000 | |
| 11 | BioLargo, Inc. (BLGO) | 1/16/18 | Note | $150,000.00 | 5% | | | |
| 12 | Bioxytran, Inc. (BIXT) | 11/20/19 | Note | $125,000.00 | 4% | | | Convertible Price: 0.80/share |
| | | 11/20/19 | Warrant | | | | 50,000 | Exercise Price: $2.00/share |
| 13 | Black Bird Biotech, Inc. (BBBT) | Sept. 2021 | Note | $250,000.00 | | | | |
| 14 | Blox, Inc. (BLXX) | 8/9/19 | Note | $75,000.00 | 5% | | | |
| | | 8/9/19 | Warrant | | | | 555,555 | Exercise Price: $.0135/share |
| 15 | BOQI International Medical, Inc. (BIMI) | 2/13/20 | Note | $200,000.00 | 6% | | | |
| 16 | Breathe Ecig Corp. | 7/2/15 | Warrant | | | | 4,000,000 | Exercise Price: $.20/share |
| 17 | BrewBilt Brewing Co (BRBL) | 3/8/21 | Note | $300,000.00 | 12% | | | |
| 18 | Cachet Financial Solutions, Inc. | 12/22/16 | Note | $550,000.00 | 5% | | | |
| | | 12/22/16 | Warrant | | | | 89,110 | Exercise Price: 5.55/share |
| 19 | Canna Corporation (MPGR) | 9/11/18 | Note | $210,000.00 | 5% | | | |
| 20 | Canbiola Inc, / Can B Corp. (CANB) | 1/3/20 | Note | $550,000.00 | 12% | | | |
| 21 | Cannaglstics, Inc. (CNGT) | 8/5/21 | Note | $500,000.00 | 0% | | | |
| 22 | Cipherloc Corp. (CLOK) | 9/26/17 | Note | $330,000.00 | 5% | | | |
| | | 9/26/17 | Warrant | | | | 165,000 | Exercise Price: $4.50/share |

A-166

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/ Warrant Shares | Notes |
|---|--------|------|------------------|------------------|---------------|------------------|----------------------------------|-------|
| 23 | Clean Energy Technologies, Inc. (CETY) | 10/14/20 | Note | $168,000.00 | 8% | | | Convertible Price: 0.02 |
| | | 10/14/20 | Warrant | | | | 1,500,000 | Exercise price: 0.001/share |
| | | 10/14/20 | Warrant | | | | 1,250,000 | Exercise price: 0.001/share |
| | | 5/28/21 | Share Issuance | | | | 546,468 | |
| 24 | CLS Holdings USA, Inc. (CLSH) | 11/15/17 | Note | $363,000.00 | 5% | | | Exercise price: 0.40 |
| | | 11/15/17 | Warrant | | | | 350,000 | Exercise price: 0.75/share |
| | | 11/15/17 | Warrant | | | | 250,000 | |
| | | 5/9/18 | Warrant | | | | 25,000 | |
| 25 | DarkPulse, Inc. (DPLS) | 9/24/18 | Note | $247,500.00 | 8% | | | |
| | | 4/26/21 | Note | $825,000.00 | 10% | | | |
| | | 7/26/21 | Note | $825,000.00 | 10% | | | |
| 26 | Defense Technologies International Corp. (DTII) | 7/18/16 | Note | $189,000.00 | | | | |
| | | 8/9/17 | Share Issuance | | | | 8,667 | |
| 27 | Digerati Technologies, Inc. (DTGI) | 5/30/18 | Note | $305,555.56 | 6% | | | |
| | | 5/30/18 | Share Issuance | | | | 125,000 | |
| | | 11/2/18 | Share Issuance | | | | 85,000 | |
| | | 1/3/19 | Conversion | | | $15,000.00 | 218,181 | |
| | | 1/11/19 | Conversion | | | $30,000.00 | 427,972 | |
| 28 | Digility Money Group, Inc. | 12/1/16 | Note | $550,000.00 | 5% | | | |
| 29 | Digital Brands Group, Inc. (DBGI) | 10/1/21 | Note | $1,575,000.00 | 6% | | | |
| | | 11/16/21 | Note | $2,625,000.00 | 6% | | | |
| 30 | DigitalTown, Inc. (DGTW) | 7/10/18 | Note | $183,750.00 | 10% | | | |
| | | 7/10/18 | Share Issuance | | | $8,010.00 | 90,000 | |
| | | 1/11/19 | Conversion | | | $10,000.00 | 1,086,065 | |
| | | 2/7/19 | Conversion | | | $10,000.00 | 1,930,783 | |
| | | 2/21/19 | Conversion | | | $10,565.00 | 3,500,000 | |
| | | 3/6/19 | Conversion | | | $10,431.00 | 4,700,000 | |
| | | 3/18/19 | Conversion | | | $10,230.00 | 5,000,000 | |
| | | 3/25/19 | Conversion | | | $11,328.00 | 6,000,000 | |
| | | 3/29/19 | Conversion | | | $11,938.00 | 8,000,000 | |
| | | 4/8/19 | Conversion | | | $6,600.00 | 6,000,000 | |
| | | 5/9/19 | Conversion | | | $6,204.00 | 9,500,000 | |
| | | 5/14/19 | Conversion | | | $7,313.00 | 10,900,000 | |
| | | 5/16/19 | Conversion | | | $6,812.00 | 12,400,000 | |
| | | 5/20/19 | Conversion | | | $4,920.00 | 14,100,000 | |
| | | 5/21/19 | Conversion | | | $9,276.00 | 24,300,000 | |

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/ Warrant Shares | Notes |
|---|---|---|---|---|---|---|---|---|
| | | 5/23/19 | Conversion | | | $12,478.00 | 31,200,000 | |
| | | 5/24/19 | Conversion | | | $11,353.00 | 34,300,000 | |
| | | 5/28/19 | Conversion | | | $7,584.00 | 36,000,000 | |
| | | 6/13/19 | Conversion | | | $9,780.00 | 45,000,000 | |
| | | 6/17/19 | Conversion | | | $10,756.00 | 49,000,000 | |
| | | 6/18/19 | Conversion | | | $7,767.00 | 49,000,000 | |
| | | 6/26/19 | Conversion | | | $4,656.00 | 48,000,000 | |
| | | Q1-2 2020 | Conversion | | | $149,426.00 | 393,400,000 | |
| 31 | Edison Nation, Inc. (EDNT) | 3/6/19 | Note | $560,000.00 | 2% | | | |
| 32 | Elite Performance Holding Corp. | 6/17/19 | Share Issuance | | | | 15,000 | |
| | | 12/10/18 | Note | $157,500.00 | 5% | | | |
| 33 | Emerald Medical Applications Corp. (VBIX) | 7/7/16 | Note | $100,000.00 | 8% | | | Convertible Price: 0.40 |
| | | 7/7/16 | Warrant | | | | 250,000 | Exercise Price: 0.735 |
| | | 7/7/16 | Warrant | | | | 250,000 | Exercise Price: 0.735 |
| 34 | Evio, Inc. (EVIO) | 8/20/18 | Note | $750,000.00 | 5% | | | |
| | | 9/6/19 | Share Issuance | | | | 1,000,000 | |
| 35 | Ethema Health Corp. (GRST) | 3/5/19 | Note | $200,000.00 | 5% | | | |
| | | 10/29/20 | Note | $137,500.00 | 6.5% | | | |
| 36 | eWellness Healthcare Corp (EWLL) | 12/7/15 | Note | $275,000.00 | 8% | | | |
| 37 | Foothills Exploration, Inc. (FTXP) | 11/17/17 | Note | $267,500.00 | 8% | | | |
| | | 3/4/19 | Note | $705,882.00 | 10% | | | |
| | | 3/4/19 | Warrant | | | | 1,125,000 | Exercise Price: 0.5/share |
| | | 9/29/17 | Warrant | | | | 375,000 | Exercise Price: 0.665/share |
| | | 9/29/17 | Warrant | | | | 375,000 | Exercise Price: 1.25/share |
| | | 9/29/17 | Warrant | | | | 185,000 | Exercise Price: 2.00 |
| 38 | Friendable, Inc. (FDBL) | 3/9/21 | Note | $110,000.00 | 10% | | | Conversion Price: 0.01/share |
| | | 3/9/21 | Warrant | $66,500.00 | | | 3,500,000 | Exercise Price: 0.025/share |
| 39 | Generation Alpha, Inc. (GNAL) | 10/24/17 | Warrant | | | | 283,140 | Exercise Price: 1.25/share |
| | | 11/1/17 | Warrant | | | | 166,860 | Exercise price: 1.00/share |
| 40 | Generex Biotechnology Corp (GNBT) | 1/28/19 | Note | $750,000.00 | 10% | | | |
| | | 2/15/19 | Note | $750,000.00 | 10% | | | |
| | | 6/25/20 | Note | $150,000.00 | 12% | | | |
| 41 | Global Fiber Technologies | 6/15/18 | Note | $12,238.00 | 5% | | | |

Case 23-78, Document 35, 05/01/2023, 3508266, Page174 of 305

Case 1:21-cv-11222  Document 1-3  Filed 12/31/21  Page 5 of 9

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/ Warrant Shares | Notes |
|---|--------|------|------------------|------------------|---------------|------------------|----------------------------------|-------|
| 42 | Global Wholehealth Parthers Corp (GWHP) | 6/15/18 | Warrant | | | | 112,238 | Exercise Price: 0.35/share |
| | | 6/18/21 | Note | $275,000.00 | 12% | | | |
| | | 6/18/21 | Warrant | | | | 165,000 | Exercise Price: $.50/share |
| | | 8/27/21 | Note | $385,000.00 | 12% | | | |
| 43 | Greater Cannabis Company, Inc. (GCAN) | 8/27/21 | Warrant | | | | 330,000 | Exercise Price: $.50/share |
| | | 3/11/21 | Note | $545,000.00 | 6% | | | |
| | | 3/11/21 | Warrant | | | | 25,000,000 | Exercise Price: $.025/share |
| | | 3/11/21 | Warrant | | | | 15,000,000 | Exercise Price: $.05/share |
| | | 3/11/21 | Warrant | | | | 10,000,000 | Exercise Price: $.075/share |
| 44 | Greenpro Capital Corp. (GRNQ) | 3/15/21 | Note | $545,999.00 | 6% | | | |
| 45 | Greenwood Hall, Inc. (ELRN) | 10/13/20 | Note | $560,000.00 | 10% | | | |
| | | Dec. 2015 | Note | $275,000.00 | | | | |
| 46 | Grom Social Enterprises, Inc. (GRMM) | Dec. 2015 | Warrant | | | | 250,000 | Exercise Price: $.01/share |
| | | 3/11/21 | Note | $300,000.00 | 12% | $336,000.00 | | |
| | | 3/11/21 | Warrant | | | | 3,750,000 | Exercise Price: $.06/share |
| 47 | Growlife, Inc. (PHOT) | 6/17/21 | Conversion | | | | 175,000 | |
| | | 10/12/20 | Note | $156,601.50 | 12% | | | |
| | | 12/3/20 | Note | $156,602.00 | 12% | | | |
| 48 | HiCell Energy Corp (HCCC) | 10/17/19 | Note | $110,000.00 | 8% | | | |
| | | 1/15/20 | Note | $85,250.00 | 8% | | | |
| | | 5/18/18 | Conversion | | | $15,450.00 | 100,000 | |
| 49 | Hip Cuisine Inc. (HLTY) | 3/8/18 | Note | $160,500.00 | 2% | | | |
| 50 | Home Bistro, Inc. (GRTD, HBIS) | 12/28/20 | Note | $172,000.00 | 12% | | | |
| | | 11/3/15 | Share Issuance | $220,000.00 | | | | |
| 51 | Inception Mining Inc. (IMII) | 11/7/18 | Note | $136,250.00 | 8% | | | |
| 52 | Incumaker, Inc. | 3/22/16 | Note | $225,500.00 | 3% | | | |
| 53 | Indoor Harvest Corp. (INQD) | 9/26/16 | Note | $137,500.00 | 8% | | | |
| | | 9/26/16 | Warrant | | | | 250,000 | Exercise Price: $.30/share |
| 54 | Ionix Technology, Inc. (IINX) | 10/19/16 | Note | $137,500.00 | 8% | | | |
| | | 12/14/16 | Note | $165,000.00 | 10% | | | |
| | | 9/11/19 | Note | | 5% | | | |
| | | 9/1/20 | Conversion | | | $10,200.00 | 75,000 | |
| | | 9/14/20 | Conversion | | | $13,550.00 | 350,000 | |
| | | 10/9/20 | Conversion | | | $31,000.00 | 2,500,000 | |

A-169

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/Warrant Shares | Notes |
|---|--------|------|------------------|------------------|---------------|------------------|---------------------------------|-------|
| | | 10/16/20 | Conversion | | | $14,100.00 | 1,200,000 | |
| | | 10/29/20 | Conversion | | | $31,000.00 | 2,500,000 | |
| | | 12/21/20 | Share Issuance | | | | 1,500,000 | |
| 55 | Kinerjaypay Corp. (KPAY) | 7/5/21 | Note | $500,000.00 | 5% | | | 1041370 |
| | | 7/8/21 | Share Issuance | | | | 1,342,000 | |
| 56 | Kiwa Bio-tech Products Group Corp. (KWBT) | 1/30/19 | Note | $131,250.00 | 10% | | 100,000 | |
| | | 1/4/18 | Warrant Exercised | $100,000.00 | 12% | $100,000.00 | 83,333 | |
| | | 9/19/19 | Note | | | | | |
| | | 9/19/19 | Share Issuance | | | | | |
| 57 | Major League Football, Inc. (MLFB) | 8/3/21 | Note | $750,000.00 | 12% | | | |
| 58 | Marijuana Company of America, Inc. (MCOA) | 7/10/21 | Note | $268,750.00 | 12% | | | |
| 59 | Multimedia Platforms, Inc. | 7/10/21 | Warrant | $176,000.00 | | | 38,174,715 | Exercise Price: 0.00704/share |
| | | 12/16/15 | Note | | | | 176,000 | Exercise Price: $.40/share |
| | | 12/15/15 | Warrant | | | | 400,000 | Exercise Price: 0.3/Share |
| 60 | NanoFlex Power Corp (OPVS) | 6/16/16 | Amendment to Warrant | $135,000.00 | | | 100,000 | Exercise Price: $.50/share |
| | | 12/15/17 | Note | $128,000.00 | 12% | | | |
| 61 | NuLife Sciences, INc. (GWSN) | 6/5/08 | Warrant | | | | | Exercise Price: $.50/share |
| | | 9/12/17 | Note | $82,500.00 | 12% | | | |
| 62 | Petrone Worldwide, Inc. (PFWIQ) | 12/28/15 | Note | $230,000.00 | 5% | | | Convertible Price: 0.5/share |
| 63 | PHI GROUP INC (PHIL) | 9/27/21 | Note | $275,000.00 | 7% | | | |
| 64 | PreCheck Health Services, Inc. (HLTY) | 10/17/18 | Note | $120,000.00 | 12% | | | |
| 65 | RDE, Inc. (UBID) | 11/7/2018 | Note | $220,000.00 | 0% | | 5,250,000 | Exercise Price: 0.05/share |
| 66 | REGI U.S., Inc. (RGUS) | 4/12/18 | Note | $162,000.00 | 2% | | | Convertible Price: 0.10/share |
| 67 | Resonate Blends, Inc. (KOAN) | 7/20/20 | Note | $225,000.00 | 8% | | | |
| 68 | RespireRx Pharmaceuticals Inc. (RSPI) | 8/19/19 | Note | $55,000.00 | 10% | | | |
| | | 8/19/19 | Warrant | | | | 150,000 | Exercise Price: $0.50/share |
| | | 2/17/21 | Note | $112,000.00 | 10% | | | |
| | | 7/2/20 | Note | $137,500.00 | 10% | | | |
| 69 | Rokk3r Inc. / Eight Dragons Co. (ROKK) | 7/2/20 | Warrant | | | | 6,875,000 | Exercise Price: $.007/share |
| | | 6/30/21 | Warrant | | | | 600,000 | Exercise Price: $.02/share |
| | | 4/27/17 | Note | $330,000.00 | 1% | | | |
| 70 | Simaltus Corp (SIML) | 6/15/18 | Share Issuance | | | | 1,000,000 | |
| | | 3/8/21 | Note | $300,000.00 | 12% | | | |

**A-170**

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/ Warrant Shares | Notes |
|---|---|---|---|---|---|---|---|---|
| 71 | Simplicity ESports & Gaming Co. (WINR) | 8/7/20 | Note | $333,333.33 | 12% | | | |
| | | 3/10/21 | Note | $560,000.00 | 12% | | | |
| | | 6/11/21 | Note | $1,266,666.67 | 12% | | | |
| | | 9/17/21 | Warrant | | | | 40,000 | Exercise Price: $10.73/share |
| | | 10/1/21 | Warrant | | | | 40,000 | Exercise price: 1.25/share |
| 72 | Solis Tek, Inc./nV (GNAL) | 10/24/17 | Warrant | $351,000.00 | | | 283,140 | Exercise Price: $1.00/share |
| | | 11/1/17 | Warrant | $199,000.00 | | | 166,880 | Exercise Price: $.375/share |
| 73 | Spyr, Inc. (SPYR) | 4/20/18 | Warrant | | | | 200,000 | |
| 74 | STWC Holdings, Inc. (STWC) | 6/18/19 | Note | $150,000.00 | 10% | | | |
| 75 | Success Entertainment Group International, Inc. (SEGN) | 9/5/19 | Note | $75,000.00 | 5% | | | |
| | | 7/7/20 | Note | $112,000.00 | 6% | | | |
| 76 | Tauriga Sciences, Inc. (TAUG) | 5/18/20 | Note | $88,333.00 | 8% | | | |
| 77 | Tego Cyber, Inc. (TGCB) | 12/28/20 | Note | $120,000.00 | 8% | | | |
| 78 | That Marketing Solution, Inc. | 3/20/15 | Note | $137,500.00 | | | | |
| 79 | Touchpoint Group Holdings, Inc. (CHGI, TGHI) | 6/2/20 | Note | $45,000.00 | 10% | | | |
| | | 6/15/20 | Note | $45,000.00 | 10% | | | |
| | | 2/5/21 | Note | $100,000.00 | 10% | | | |
| 80 | TPT Global Tech, Inc. (TPTW) | 10/6/21 | Note | $1,087,000.00 | 10% | | | |
| 81 | Two Hands Corp. (TWOH) | 3/1/19 | Note | $200,000.00 | 7% | | | |
| | | 3/1/19 | Warrant | | | | 1,000,000 | Exercise Price: $.20/share |
| | | As of Mar. 2020 | Conversion | | | $219,816.00 | 3,032,600 | Aggregate |
| | | 4/14/20 | Share Issuance | | | | 2,000,000 | |
| 82 | Ubiquity, Inc. | 3/17/15 | Note | $40,250.00 | 1% | | | |
| 83 | Virtual Crypto Technologies, Inc. (VBIX) | 7/7/16 | Note | $100,000.00 | 8% | | | |
| 84 | Virtus Oil & Gas Corp. | 12/30/15 | Note | $58,0/0.00 | 8% | | | Convertible Price: 10.00/share |
| 85 | Vision Hydrogen Corporation (HCCC) | 10/18/19 | Note | $110,000.00 | 8% | | | |
| 86 | Visium Technologies, Inc. (VISM) | 12/28/18 | Note | $150,000.00 | 8% | | | |
| | | 12/28/18 | Warrant | | | | 250,000 | Exercise Price: $.15/share |
| 87 | Vystar Corp | 3/31/21 | Conversion | | | $14,725.00 | 49,000,000 | Conversion Price: 0.0003 |
| | | 2/13/18 | Note | $76,500.00 | 5% | | | |
| 88 | Westmountain Co. | 11/8/18 | Note | $222,222.00 | 8% | | | |
| | | 11/8/18 | Warrant | | | | 555,555 | Exercise Price: $.40/share |
| 89 | Xtreme Fighting Championships, Inc. (DKMR) | 11/2/20 | Note | $550,000.00 | 10% | | | Convertible Price: 0.20 |

| # | Issuer | Date | Transaction Type | Principal Amount | Interest Rate | Amount Converted | Shares Converted/ Warrant Shares | Notes |
|---|--------|------|------------------|------------------|---------------|------------------|----------------------------------|-------|
| | Totals | | | $34,777,433.06 | | $1,419,071.00 | 1,001,396,742 | |



EDGAR Link

A-173

# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC.                          Plaintiff, | |
| **-v-**<br>FIRSTFIRE GLOBAL OPPORTUNITIES<br>FUND, LLC and ELI FIREMAN<br><br>Defendant. | Case No. 1:21-cv-11222<br><br>**Rule 7.1 Statement** |

Pursuant to Federal Rule of Civil Procedure 7.1 [formerly Local General Rule 1.9] and to enable District Judges and Magistrate Judges of the Court to evaluate possible disqualification or recusal, the undersigned counsel for

DARKPULSE, INC. _____ (a private non-governmental party)

certifies that the following are corporate parents, affiliates and/or subsidiaries of said party, which are publicly held.

There are no corporate parents, affiliates, or subsidiaries of said party that are publicly held.

**Date:** 12/31/2021 _____

_____
**Signature of Attorney**

**Attorney Bar Code:** _____

A-174

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| DARKPULSE, INC., | |
| *Plaintiff,* | |
| v. | Civil Action No. 21-cv- 22111 |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, and ELI FIREMAN, | |
| *Defendants.* | |

**PLAINTIFF DARKPULSE, INC.'S *EX PARTE* EMERGENCY APPLICATION FOR ORDER TO SHOW CAUSE AND TEMPORARY RESTRAINING ORDER**

Pursuant to Federal Rule 65, Plaintiff DarkPulse, Inc, respectfully moves for a temporary restraining order ("TRO") against Defendants FirstFire Global Opportunities Fund, LLC, and Eli Fireman ("Defendants") to prevent them from selling or attempting to sell, transfer, or otherwise dispose of 177,275,000 shares of wrongfully obtained DarkPulse common stock prior to a decision on Plaintiff's motion for a preliminary injunction, which will be submitted by the end of today.

Specifically, Plaintiff now seeks a TRO to enjoin Defendants from selling, transferring or otherwise disposing of DarkPulse common stock, which Defendants wrongfully acquired pursuant to securities transactions that are unlawful pursuant to Section 15(a) of the Securities Exchange Act of 1934, and in violation of New York laws against criminal usury, NY GOL 5-501 et seq, NY Penal Law §190.40.

A-175

This motion is supported by the declaration of Dennis O'Leary attached hereto, and a memorandum of law to be filed by the end of the day. A TRO is required because with this suit having been commenced, Defendants may attempt to sell this stock in order to hamstring Plaintiff's attempt to recover the stock, and the remedies available to DarkPulse may not allow for the consequential damages that such action may cause.

A TRO is necessary to prevent additional irreparable harm because Darkpulse is a small company and Defendants' sale of millions of shares into the public market would eviscerate DarkPulse current trading price, hampering its ability to pursue this action and without the Court having an opportunity to make a decision on DarkPulse's forthcoming motion for a preliminary injunction.

Undersigned counsel has not attempted to reach counsel for Defendants to confer on this motion because it could trigger rampant selling by the defendants, causing immeasurable loss and damage. Accordingly, Plaintiff respectfully requests that the Court grant its motion for a TRO. A proposed order is submitted herewith.

Dated:  January 14, 2022                                  Respectfully submitted,


                                          _____ /s/ Gustave P. Passanante
                                          Gustave P. Passanante, Esq.
                                          Eric J. Benzenberg, Esq.
                                          **THE BASILE LAW FIRM P.C.**
                                          390 North Broadway, Suite 140
                                          Jericho, NY 11753
                                          Tel.:   (516) 455-1500
                                          Fax:    (631) 498-0748
                                          Email: gus@thebasilelawfirm.com
                                                 eric@thebasilelawfirm.com

2

**A-176**

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

|  |  |
|---|---|
| DARKPULSE, INC., | |
| *Plaintiff,* | CIVIL ACTION NO. 22-cv-22111 |
| v. | |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, and ELI FIREMAN, | **ORDER TO SHOW CAUSE FOR PRELIMINARY INJUNCTION AND TEMPORARY RESTRAINING ORDER** |
| *Defendants.* | |

Upon consideration of the Declaration of Dennis O'Leary, Dated January ___, 2022; Plaintiff's motion for Temporary restraining Order, and accompanying memorandum of law, it is hereby

ORDERED, that Defendants FirstFire Global Opportunities Fund, LLC, and Eli Fireman ("Defendants") show cause before the Honorable _____U.S. District Judge, of the United States District Court for the Southern District of New York, at courtroom ____, United States Courthouse, 500 Pearl Street, in the City, County and State of New York, or as soon thereafter as counsel may be heard, why an Order should not issue:

(a) Granting Plaintiff DarkPulse, Inc., a preliminary injunction pursuant to Fed. R. Civ.P.65, enjoining, during the pendency of this action, Defendants and their agents, servants, employees, attorneys, and affiliates, from selling, transferring, assigning, encumbering, or otherwise disposing of any DarkPulse shares of common stock currently in their possession or control; and

(b) Awarding to DarkPulse such other relief as the Court shall deem just and proper.

It is further

ORDERED that, sufficient reason having been shown therefore, pending the hearing on Plaintiff's motion for a preliminary injunction, and pursuant to Fed. R. Civ. P. Rule 65, the Defendants are hereby temporarily restrained and enjoined from taking any steps or other process that result in any attempt to sell, transfer, assign, encumber, or otherwise dispose of any DarkPulse shares of common stock whatsoever; and it is further

ORDERED that, security in the amount of _____ be posted by Plaintiff prior to _____, at _____ o'clock in the noon of that day; it is further

ORDERED that delivery by Electronic Service via ECF of a copy of this Order to Show Cause and the papers upon which it is based upon Defendants or their counsel, who have agreed to accept service electronically, shall be deemed good and sufficient service thereof; it is further

ORDERED that Plaintiff Darkpulse, Inc, must submit and serve its motion for a preliminary injunction by _____, and it is further

ORDERED that answering papers, if any, shall be electronically served no later than

_____.

Dated: January _____, 2022
New York, New York.

SO ORDERED.

_____
United States District Judge

A-178

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., | |
| *Plaintiff,* | Civil Action No. 1:21-cv-11222-ER |
| v. | |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, and ELI FIREMAN, | **DECLARATION OF DENNIS O'LEARY PURSUANT TO 28 USC § 1746 IN SUPPORT OF DARKPULSE, INC.'S MOTION FOR TEMPORARY RESTRAINING ORDER AND PRELIMINARY INJUNCTION** |
| *Defendants.* | |

1.      I, Dennis O'Leary, am Chief Executive Officer and Chairman of the Board of DarkPulse, Inc., ("DarkPulse"), plaintiff in the above-captioned matter.

2.      I make this Declaration upon personal knowledge, information, and belief, including information contained in DarkPulse's business records and information reported to me by other DarkPulse employees.

3.      DarkPulse is a company incorporated under the laws of Delaware with a principal place of business in New York, New York.  I am duly authorized to make this Declaration on behalf of DarkPulse.

4.      I would testify as stated herein if called upon to do so.

5.      I make this Declaration in support of the motion filed by DarkPulse seeking a temporary restraining order to restrain FirstFire, and those acting at its direction, from selling shares of DarkPulse common stock pending the outcome of this case.

6.      In April 2021 FirstFire purchased a convertible promissory note from DarkPulse, which gave FirstFire the right to convert the debt into shares of DarkPulse stock.  At that time,

1

A-179

DarkPulse was unaware that FirstFire could not lawfully enter into the transaction under federal law.

7.    Further, my understanding after talking to DarkPulse's counsel is that the total interest charged by FirstFire exceeds the maximum rate allowed by New York law, and therefore the transaction is unlawful on those grounds as well. DarkPulse was unaware of this fact when it entered into the transaction.

8.    FirstFire converted the entire debt on November 15, 2021. FirstFire effectuated the conversion by sending a notice of conversion to DarkPulse's transfer agent. Because FirstFire sent the notice of the conversion to my personal account instead of my DarkPulse account, DarkPulse did not become aware of the transaction until several days after the transfer agent had conveyed 177,375,000 shares of stock to FirstFire.

9.    For the reasons stated in the Complaint, FirstFire was not entitled to those shares, or to any shares of DarkPulse stock.

10.    FirsFire's tactics show that it is not an investor, as it purports to be. Because of the great number of shares currently in FirstFire's possession, FirstFire now has the power to severely depress the stock price if it dumps the entire block into the market. This is what FirstFire did in a prior transaction with DarkPulse involving another convertible note. When FirstFire started conversions into stock in the prior transaction, daily trading volume on DarkPulse stock went from 4.6 million to 8 million then to over 13 million – indicating that FirstFire dumped the stock immediately. Investors do not dump huge blocks of stock into the market and depress the price.

11.    I have learned that FirstFire routinely dumps stock in this manner as part of its business model; I have every expectation it will do it again if given the chance.

A-180

12.     If FirstFire is permitted to dump DarkPulse's stock, it would severely injure the company and its shareholders, making it nearly impossible for the company to find new investors and greatly impeding the company's ability to prosecute this lawsuit.

13.     The reputational harm to a small microcap company like DarkPulse caused by a plunge in its stock price is generally severe and often irreparable. Small companies like DarkPulse are struggling to grow; the possibility of future money damages cannot compensate for reputational harm of this type because it translates into lost potential contracts, lost potential investors, and greater difficulty raising money.

14.     Further, DarkPulse is already fielding numerous serious complaints from public shareholders about the sharp decrease in the share price. We are concerned that if we do not stop FirstFire, DarkPulse will begin to see claims against the company, management and the Board.

*        *        *

I declare under penalty of perjury that the foregoing is true and correct.


Executed on January 14, 2022                */s/ Dennis O'Leary*
                                            DENNIS O'LEARY

A-181

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DARKPULSE, INC.,

      *Plaintiff,*

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

      *Defendants.*

CIVIL ACTION NO. 21-cv-11222

**ORDER TO SHOW CAUSE FOR**
**PRELIMINARY INJUNCTION**
**AND TEMPORARY**
**RESTRAINING ORDER**

Upon consideration of the Declaration of Dennis O'Leary, Dated January _14_, 2022;

Plaintiff's motion for Temporary restraining Order, and accompanying memorandum of law, it is

hereby

ORDERED, that Defendants FirstFire Global Opportunities Fund, LLC, and Eli Fireman

("Defendants") show cause before the Honorable _Edgardo Ramos_ U.S. District Judge, of the

United States District Court for the Southern District of New York, at courtroom _619_, United States

Courthouse, ~~500 Pearl Street,~~ _40 Foley Square_ in the City, County and State of New York, or as soon thereafter as _on January 21, 2022 at 2:00 p.m._

counsel may be heard, why an Order should not issue:

(a) Granting Plaintiff DarkPulse, Inc., a preliminary injunction pursuant to Fed. R. Civ.P.65,

      enjoining, during the pendency of this action, Defendants and their agents, servants,

      employees, attorneys, and affiliates, from selling, transferring, assigning, encumbering, or

      otherwise disposing of any DarkPulse shares of common stock currently in their possession

      or control; and

(b) Awarding to DarkPulse such other relief as the Court shall deem just and proper.

It is further

ORDERED that, sufficient reason having been shown therefore, pending the hearing on

Plaintiff's motion for a preliminary injunction, and pursuant to Fed. R. Civ. P. Rule 65, the Defendants

are hereby temporarily restrained and enjoined from taking any steps or other process that result in

any attempt to sell, transfer, assign, encumber, or otherwise dispose of any DarkPulse shares of

common stock whatsoever; and it is further

ORDERED that, security in the amount of _____ be posted by

Plaintiff prior to _____, at _____ o'clock in the noon of that day; it is further

ORDERED that delivery by Electronic Service via ECF of a copy of this Order to Show Cause

and the papers upon which it is based upon Defendants or their counsel, who have agreed to accept

service electronically, shall be deemed good and sufficient service thereof; it is further

ORDERED that Plaintiff Darkpulse, Inc, must submit and serve its motion for a preliminary

injunction by _January 17, 2022_ and it is further

ORDERED that answering papers, if any, shall be electronically served no later than

_Wednesday, Jan 19 by 6:00pm._

Dated: January _14_, 2022          Reply papers by Thursday Jan. 20
New York, New York.                                    by 6:00pm

SO ORDERED.

_____  1/14/2022
United States District Judge

_and email_

A-183

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., | |
| *Plaintiff,* | Civil Action No. 1:21-cv-11222-ER |
| v. | |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, and ELI FIREMAN, | |
| *Defendants.* | |

## PLAINTIFF DARKPULSE, INC.'S MEMORANDUM
## OF LAW IN SUPPORT OF MOTION FOR TEMPORARY
## RESTRAINING ORDER AND  PRELIMINARY INJUNCTION

**THE BASILE LAW FIRM, P.C.**
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:    (631) 498-0748
Email: gus@thebasilelawfirm.com
          eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc*

A-184

## TABLE OF CONTENTS

SUMMARY OF THE ARGUMENT ........................................................................... 1

PRELIMINARY STATEMENT ................................................................................. 2

BACKGROUND ....................................................................................................... 4

ARGUMENT ............................................................................................................. 6

   I.   THE PRELIMINARY INJUNCTION STANDARD .................................... 6

      A.   DARKPULSE IS LIKELY TO SUCCEED ON THE MERITS BECAUSE FIRSTFIRE HAS A STATUTORY RIGHT TO RESCIND THE UNLAWFUL AGREEMENTS ........... 6

           1. The Convertible Notes Were Made in Violation of § 15(a) of the Act Because FirstFire is an Unregistered Dealer, Who May Not Lawfully Effect Any Transaction in Securities…………………………………………………………..…….7

           2. Because FirstFire is an Unregistered Dealer, It Could Not Lawfully Make or Perform the Agreements, Which Are Voidable by DarkPulse……………..….12

           3.   FirstFire Is an Unregistered Dealer that Could Not Lawfully Effect the Securities Transactions in this Case and its Performance Under those Transactions Was Unlawful……………………………………………………….13

      B.   DARKPULSE WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION BECAUSE THE REMEDY UNDER § 29(b) DOES NOT INCLUDE DAMAGES ........... 14

           1.   DarkPulse Will Be Irreparably Harmed if FirsFire is Permitted to Sell Such a Large Block of Stock Into the Market………………………………..………….15

           2.   Because Damages Are Not Available Under § 29(b), the Damages Incurred are By Definition Irreparable………………………..……….16

      D.    AN INJUNCTION WOULD SERVE THE PUBLIC INTERESTS THAT THE ACT IS INTENDED TO PROTECT ........................................................................... 17

CONCLUSION ....................................................................................................... 18

## TABLE OF AUTHORITIES

**Cases**

*Abbott Labs. v. H&H Wholesale Servs., Inc.,*
   670 Fed. Appx. 6 (2d Cir. 2016) ........................................................ 6

*Auctus Fund, LLC, v. Players Network, Inc.,*
   20-cv-10766 (D. Mass. Dec. 10, 2021) ............................................. 8

*Berckeley Inv. Grp., Ltd. v. Colkitt,*
   455 F.3d 195 (3d Cir. 2006) ............................................................. 14

*Candelaria v. Baker,*
   2006 WL 618576 (W.D.N.Y. 2006) ................................................ 16

*Eastside Church of Christ v. National Plan, Inc.,*
   391 F.2d 357 (5th Cir. 1968) .................................................. 7, 8, 15

*Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC,*
   6 F.4th 50 (1st Cir. 2021) ........................................................... 7, 15

*EMA Fin., LLC v. Vystar Corp.,*
   2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) ................................ 15

*Franklin Fed'l. Savings Bank v. United States,*
   60 Fed Cl. 55, 72 (2004) ................................................................ 17

*Lawrence v. The Richman Group Capital Corp.,*
   358 F. Supp. 2d 29 (D. Conn. 2005) ................................................ 3

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.,*
   2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018) ................................ 15

*Mass. Fin. Servs., Inc. v. Securities Investor Prot. Corp.,*
   411 F. Supp. 411 (D. Mass. 1976) .................................................. 12

*Mills v. Elec. Auto-Lite Co.,*
   396 U.S. 375 (1970) .......................................................................... 7

*Moody v. Bache & Co.,*
   570 F.2d 523 (5th Cir. 1978) .......................................................... 18

*Nechis v. Oxford Health Plans, Inc.*,
  421 F.3d 96 (2d Cir. 2005) ............................................................................... 16

*Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*,
  678 F.2d 552 (5th Cir. 1982) ............................................................................. 7

*Roth v. Securities & Exchange Comm'n*,
  22 F.3d 1108 (D.C. Cir. 1994) ........................................................................... 3

*Royal Air Properties, Inc. v. Smith*,
  312 F.2d 210 (9th Cir. 1962) ............................................................................. 7

*SEC v. Almagarby*,
  479 F. Supp. 3d 1266 (S.D. Fla. 2020) ................................................. 10, 12, 13

*SEC v. Big Apple Consulting USA, Inc.*,
  783 F.3d 786 (11th Cir. 2015) ...................................................... 10, 11, 12, 13

*SEC v. Fierro*,
  2020 WL 7481773 (D.N.J. Dec. 18, 2020) .................................................. 10, 12

*SEC v. Fife*,
  2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) ............................................... 11, 12

*SEC v. Gibraltar Glob. Sec., Inc.*,
  2016 WL 153090 (S.D.N.Y. Jan. 12, 2016) ........................................................ 9

*SEC v. GPL Ventures, LLC*,
  No. 21-cv-06814 ............................................................................................... 10

*SEC v. Keener*,
  2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) ......................................... 10, 12, 13

*SEC v. Kenton Capital, Ltd.*,
  69 F. Supp. 2d 1, 12-13 (D.D.C. 1998) ............................................................ 12

*SEC v. Management Dynamics, Inc.*,
  515 F.2d 801 (2d Cir. 1975) ............................................................................ 19

*SEC v. River N. Equity LLC*,
  415 F. Supp. 3d 853 (N.D. Ill. 2019) ......................................................... 10, 13

*Sharma v. Skaruup Ship Mngt. Corp.*,
  916 F.2d 820 (2d. Cir. 1990) ........................................................................... 19

*Strougo ex rel. Brazil Fund v. Scudder, Stevens & Clark, Inc.*,
    964 F. Supp. 783 (S.D.N.Y. 1997) ................................................................. 17

*Transamerica Mortgage Advisors v. Lewis*,
    444 U.S. 11 (1979) ....................................................................................... 18

*Warner Vision Entm't. Inc. v. Empire of Carolina, Inc.*,
    101 F.3d 259 (2d Cir. 1996) ......................................................................... 17

*Wisdom Imp. Sales Co. v. Labatt Brewing Co.*,
    339 F.3d 101 (2d Cir. 2003) ......................................................................... 16


**Statutes**

15 U.S.C. § 78c(18) ............................................................................................. 3

15 U.S.C. § 78c(5)(A) ......................................................................................... 9

15 U.S.C. § 78c(a)(10) ........................................................................................ 8

15 U.S.C. § 78cc(b) ....................................................................................... 6, 13

15 U.S.C. § 78o(1) ..................................................................................... 2, 8, 11


**Other Authorities**

Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy
    Awakened*, 48 Geo.Wash.L.Rev. 1 (1979) ................................................ 7, 16

Testimony of Arthur Levitt, Before the Subcommittee on Commerce, Justice, State and Judiciary
    of the Senate Committee on Appropriations, 1998 WL 169924 (March 19, 1998)................... 3

**Rules**

FINRA Rules 5110(b)(4)(B), 5110(c)(2)(A). ...................................................... 3

**Regulations**

*Registration Requirements for Foreign Broker-Dealers*, SEC Release No. 34-27017, 54 Fed.
    Reg. 30013, 30015 (July 18, 1989) ............................................................. 10

A-188

Pursuant to Rule 65 of the Federal Rules of Civil Procedure, Plaintiff DarkPulse, Inc. ("DarkPulse" or "Plaintiff"), submits this Memorandum of Law in Support of its Motion for Temporary Restraining Order and Preliminary Injunction.

## SUMMARY OF THE ARGUMENT

On November 15, 2020, Defendant FirstFire Global Opportunities Fund, LLC, ("FirstFire" or "Defendant") used an unlawful securities contract to obtain 177,275,000 shares of DarkPulse stock directly from DarkPulse's transfer agent. That block of stock has an estimated fair market value of $23,660,000. As set forth in its Complaint, Plaintiff ultimately seeks rescission of the unlawful contracts[1] based on the statutory right provided under § 29(b) of the Securities Exchange Act of 1934 ("Act") (codified at 15 U.S.C. § 78cc).

In order to maintain the status quo, however, Plaintiff DarkPulse now seeks an order enjoining FirstFire and its controlling person Eli Fireman ("Fireman") (collectively "Defendants") from selling the wrongfully-obtained stock. Because DarkPulse is a small company, the sale of such an enormous number of shares into the market would cause Plaintiff massive and irreparable harm. Although preliminary injunctive relief is an extraordinary remedy, the necessary factors for granting relief are present in this case.

*First*, DarkPulse is likely to succeed on the merits. FirstFire is not just a predatory lender, it is a predatory lender that operates as an *unregistered securities dealer* to effect its loans, whose conduct in the securities market is nearly identical to entities currently under prosecution by the Securities and Exchange Commission ("SEC"). As an unregistered dealer, FirsFire was prohibited by federal law from effecting *any transaction in securities*, including the contracts in this case,

---

[1]    As noted in the Complaint, Plaintiff seeks rescission of two unlawful securities contracts. However, because FirstFire already sold the stock obtained from the first contract, the need for injunction does not pertain to that contract.

1

which are all securities contracts.  FirstFire violated the law when it obtained the stock, and it should not be allowed to commit further legal violations by selling it.

*Second*, DarkPulse faces massive, irreparable harm in the absence of an order prohibiting the sale of the stock.  If FirstFire is permitted to sell *177,275,000* newly-issued shares of DarkPulse stock into the open market, the shareholders will be diluted, the stock price will plummet, and the company's market capitalization will be severely damaged.  This harm is irreparable because the remedy available to Darkpulse *does not allow for damages*:  *rescission* of the securities contracts under § 29(b).  Such rescission is an equitable remedy designed to put the parties into their *pre*-contractual position, not to compensate for the damage that will surely result from dumping over 177 million shares into the open market.

*Third,* the balance of hardships favors DarkPulse.  The potential harm to FirstFire from a restraint on sales of a single stock is purely economic (and readily ascertainable), but the harm to DarkPulse in the absence of injunctive relief potentially destabilizes the entire company.

*Fourth*, the public interest favors granting the relief for the simple reason that a party that violates federal securities laws should not be permitted to gain from its unlawful conduct while—at the same time—further injuring its victim.  The public policies underpinning these laws would be rendered meaningless if FirstFire were allowed to go unrestrained.

## PRELIMINARY STATEMENT

Persons who, as a regular business, buy and sell securities for their own account are considered  securities dealers who must comply with the registration requirement of the Act.  *See* 15 U.S.C. § 78o(1).  It is unlawful for an unregistered securities dealer to effect transactions in securities.

2

A-190

The broker-dealer registration requirement is regarded as the "keystone of the entire system of broker dealer regulation." *Roth v. Securities & Exchange Comm'n*, 22 F.3d 1108, 1109 (D.C. Cir. 1994). *See also Lawrence v. The Richman Group Capital Corp.*, 358 F. Supp. 2d 29 (D. Conn. 2005) ("registration is more than a formality[;]" it "not only requires the registration to adhere to certain record keeping requirements and [subjects the dealer] to SEC discipline and inspections," it "also requires the registrant to exercise control over associated persons in effecting securities transactions (*see* 15 U.S.C. § 78c(18)).").

Registration facilitates regulatory oversight of dealers by the SEC and obligates dealers to comply with ethics rules, reporting requirements, and even profit limitations.[2] These legal requirements also protect small stock issuers like DarkPulse from unscrupulous and unqualified agents that act as securities dealers.[3] The registration requirement is of heightened importance where, as in this case, "the securities are those of relatively obscure and unseasoned companies," *i.e.*, microcap securities traded on the OTC Markets.[4]

At no time relevant hereto has FirstFire or Fireman been registered as dealers with the SEC. *See* Complaint (filed 12/31/2021, ECF 1) at ¶¶ 15, 18. Defendants remain unregistered even now despite substantial evidence that they are dealers, *see id., i.e.* that they are in the regular business of buying and selling securities for their own account, including evidence of Defendants' own

---

[2]    *See, e.g.,* FINRA Rules 5110(b)(4)(B), 5110(c)(2)(A).

[3]    *See* Testimony of Arthur Levitt, Before the Subcommittee on Commerce, Justice, State and Judiciary of the Senate Committee on Appropriations, 1998 WL 169924 (March 19, 1998) (SEC Chairman Arthur Levitt explaining that the microcap "market shows signs of an increase in abuses in the market for low-priced stocks or 'microcap' stocks… *This part of the market provides legitimate opportunities for small and new businesses to raise capital, but also provides opportunity for criminals to prey on innocent investors…*") (emphasis added).

[4]    *See* Securities and Exchange Commission Release Note, *Distribution by Broker-Dealers of Unregistered Securities*, Release No. 4445, 1962 WL 69442, at *1 (Feb. 2, 1962).

3

statements[5] and evidence that they have engaged in over 200 similar securities transactions with nearly 90 different issuers.[6]

While continuing to evade SEC oversight, Defendants have already converted approximately $1.5 million in DarkPulse debt—purchased via two convertible promissory notes (which are securities)—into more than one billion newly-issued shares of DarkPulse common stock (with each conversion also being a separate transaction in securities). Defendants have engaged in such conduct at the expense of DarkPulse and its legitimate investors, who have been severely diluted by Defendants' practices.

The relief requested should be granted.

## BACKGROUND

DarkPulse is a "microcap" company—a small, publicly-held corporation that trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies that are too small for the major exchanges are traded. *See* ECF 1 at ¶ 12. FirstFire is a predatory lender whose business model is to utilize convertible notes (a type of security) to obtain microcap issuer[7] common stock at a steep discount, which it then promptly dumps back into the market *en masse*, to reap profits—without any concern for the downward plunge of the stock price this inevitably causes or the damage it does to the company. *See* ECF 1 at ¶ 1.

**Securities Transaction: FirstFire Purchases the April 2021 Convertible Note.**

The events in this case are just another day in FirstFire's unlawful lending business. On April 26, 2021, FirstFire purchased from DarkPulse a convertible promissory note, a type of debt

---

[5] *See* ECF No. 1-1, at 25-26 (Investment Purpose) ("Buyer is purchasing the Note and the shares of Common Stock … for its own account….") (emphasis added); ECF No. 1-2, at 23 (same).
[6] *See* ECF No. 1-3 (EDGAR Transaction List) (showing that, since 2015, FirstFire has effected over 200 securities transactions via convertible notes with at least 89 microcap issuers in addition to DarkPulse) ("EDGAR List").
[7] "Issuer" means a publicly-traded company that issues stock.

security that gives FirstFire the option to exchange the debt for company stock at a deep discount. ("April 2021 Note"). *See* ECF 1 at P 1-2. FirstFire paid DarkPulse $750,000 for April 2021 Note, for which DarkPulse was obligated to repay $825,000, plus 10% interest, in nine months. *See* ECF 1 at ¶ 31. The April 2021 Note also: (1) imposed a fixed conversion price ($0.015 per share), but provided that such "fixed" price could be reduced to $0.005 per share upon the occurrence of any incident of default; and (2) obligated DarkPulse to issue FirstFire 75,000,000 "commitment shares" upon execution. *See* ECF 1 at ¶ 32. The commitment shares had an estimated open market value of $1,425,000. *See* ECF 1 at ¶ 36. As stated in the Complaint, the April 2021 Note is unlawful because, inter alia, it was unlawful "as made" pursuant to § 29(b) of the Act because FirstFire, as an unregistered securities dealer, was not legally permitted to effectuate purchase of the Note to begin with.[8]

On November 15, 2021, FirstFire effected a conversion of the full amount under the April 2021 Note, acquiring thereby 177,275,000 shares of newly-issued stock, which carried an estimated open market value greater than $23,660,000 on the date of conversion. *See* ECF 1 at ¶ 43. Unfortunately, DarkPulse was unaware of the conversion request and the transfer agent conveyed the 177,275,000 shares of stock to FirstFire before DarkPulse could halt the transaction. DarkPulse now seeks to prevent FirstFire from dumping the wrongfully-obtained shares into the market, which has been FirstFire's demonstrated practice.

---

[8]   FirstFire previously purchased a convertible promissory note from DarkPulse. on September 20, 2018. *See* ECF 1-1. Under this prior note, FirstFire paid DarkPulse $225,000, and DarkPulse was obligated to repay $247,500, plus 8% interest, in merely nine months; the note also gave FirstFire the right to convert the all or any portion of the debt into DarkPulse stock at a 30% discount to prevailing market prices. On June 7, 2019, FirstFire submitted its first conversion request, demanding the issuance of 7,000,000 shares of DarkPulse stock in exchange for $5,340 in debt. After submitting 17 additional conversions, under which FirstFire demanded and received over 850,000,000 shares of DarkPulse common stock (which had an aggregate open market value in excess of $10,000,000), the September 20, 2018 Note was fully satisfied.

5

## ARGUMENT

### I.    THE PRELIMINARY INJUNCTION STANDARD

Preliminary injunctive relief requires the movant to demonstrate: (i) the likelihood that the movant will succeed on the merits; (ii) the likelihood that, without an injunction, the movant will suffer irreparable harm; (iii) the balance of hardships tips in the movant's favor; and (iv) whether the injunction is in the public's interest. *See Abbott Labs. v. H&H Wholesale Servs., Inc.*, 670 Fed. Appx. 6, 8 (2d Cir. 2016). These four factors are met in this case.

### II.    PRELIMINARY INJUNCTIVE RELIEF SHOULD BE GRANTED

#### A.    DARKPULSE IS LIKELY TO SUCCEED ON THE MERITS BECAUSE FIRSTFIRE HAS A STATUTORY RIGHT TO RESCIND THE UNLAWFUL AGREEMENTS

DarkPulse is likely to succeed on the merits because its claim for rescission is based on a statutory right. Under § 29(b) of the Act, *any contract made in violation of the Act is void. See Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375, 386-88 (1970).

§ 29(b) provides, in relevant part:

> *Every* contract *made in violation of any provision of this chapter* or of any rule or regulation thereunder, and every contract … heretofore or hereafter made the *performance of which involves the violation* of, or the continuance or any relationship or practice in violation of, any provision of this title or any rule or regulation thereunder, *shall be void* (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract…

*Id.* (codified at 15 U.S.C. § 78cc(b)) (emphasis added). The Supreme Court has held that private litigants are entitled to assert claims for relief under § 29(b), *see Mills*, 396 U.S. at 386-89, and numerous courts have recognized violations of § 15(a) for acting as an unregistered dealer to serve as the predicate violation and right to rescission thereunder. *See, e.g., Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy,* LLC, 6 F.4th 50 (1st Cir. 2021); *Reg'l Props., Inc. v. Fin. & Real*

6

*Estate Consulting Co.*, 678 F.2d 552, 557-58 (5th Cir. 1982) ("courts have uniformly either held or assumed that such suits can be brought," as § 29(b) provides a private cause of action); *Eastside Church of Christ v. National Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968), *cert. denied*, 393 U.S. 913 (1968); *Royal Air Properties, Inc. v. Smith*, 312 F.2d 210 (9th Cir. 1962); *Couldock & Bohan, Inc. v. Société Generale Sec. Corp.*, 93 F. Supp. 2d 220 (D. Conn. 2000); *Lawrence*, Case No. 3:03-cv-850 (JBA) (D. Conn. Aug. 03, 2007); *Auctus Fund, LLC, v. Players Network, Inc.*, 20-cv-10766 (D. Mass. Dec. 10, 2021); *see also* Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened*, 48 Geo.Wash.L.Rev. 1 (1979) ("Viable Remedy"). To void a contract under § 29(b), the proponent must show that "(1) the contract involved a prohibited transaction; (2) he is in contractual privity with [the party relying on the contract]; and (3) [he] is in the class of persons that the securities acts were designed to protect." *Eastside Church*, 391 F.2d at 362.

As explained below, the contracts in this case were prohibited transactions because FirstFire violated the Act when it entered into the transactions as an unregistered dealer. (The second and third elements above (privity and class of protected persons) cannot reasonably be disputed.)[9]  *See* ECF 1 at ¶¶ 67-86.

> **1.    The Convertible Notes Were Made in Violation of § 15(a) of the Act Because FirstFire is an Unregistered Dealer, Who May Not Lawfully Effect Any Transaction in Securities**

The prohibited transaction in this case involves a violation of § 15(a), which provides:

It shall be unlawful for any broker or dealer … (other than such a broker or dealer whose business is exclusively intrastate and who does not make use of any facility of a national securities exchange) to make use of the mails or any means or instrumentality of interstate commerce to effect any transactions in, or to induce or

---

[9]   Because DarkPulse is a party to the contract, privity is not an issue. Further, it is well established that the issuer of the securities sought to be purchased by the unregistered dealer—in this case, DarkPulse—is "obviously a member" of the class of persons that the statute was designed to protect. *See Regional Properties, Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982).

attempt to induce the purchase or sale of, any security … unless such broker or
dealer is registered in accordance with subsection (b) of this section.

*Id.* (codified at 15 U.S.C. § 78o(1)) (emphasis added).   Hence, under § 15(a), it is unlawful for
(1) an unregistered (2) broker or dealer (3) to make use of the mails or any means or
instrumentality of interstate commerce (4) to effect any transactions in, or to induce or attempt to
induce the purchase or sale of, any security.  *See SEC v. Gibraltar Glob. Sec., Inc.*, 2016 WL
153090, at *2 (S.D.N.Y. Jan. 12, 2016) (citing 15 U.S.C. § 78o(a)(1)).

It cannot be disputed that FirstFire's purchase of the April 2021 Note[10] was a transaction
in securities.  *See* ECF 1 at ¶ 32.  Securities are broadly defined in the Act,[11] which definition
clearly includes the transactions here.  Further, it cannot be disputed that neither FirstFire nor
Fireman are now, or were during any time relevant hereto, registered as a securities dealer under
the Act.[12]  *See* ECF 1 at ¶¶ 15, 18.

Because § 15(a) provides that it would be unlawful for an unregistered securities dealer to
effect a transaction in securities, no unregistered securities dealer could have lawfully effected the
purchase of the April 2021 Note.

FirstFire made use of the mails, email, and other instrumentalities of interstate commerce
to effectuate the securities transactions in this case.  *See* ECF 1 at ¶ 25.  FirstFire conducted inter-
state conference calls, used email to negotiate the transactions, and used interstate wire transfers
to transfer funds to and from its bank account.  *See* ECF 1 at ¶ 47.  Additionally, FirstFire sent the
conversion notices from its headquarters in New York to DarkPulse's transfer agent, Standard
Registrar and Transfer Company Inc., which is located in Utah.  *See* ECF 1 at ¶ 43.  Thus, the only

---

[10]   And the other Note that Plaintiff seeks to rescind in this case (*see* Complaint, ECF No. 1 at ¶¶ 20-30).
[11]   15 U.S.C. § 78c(a)(10) (defining "securities" as "any note, stock, treasury stock, security future, security-based swap, bond, debenture…").
[12]   *See* Company Information About Active Broker-Dealers (March 2007 - December 2021), SEC.gov, *available at* https://www.sec.gov/help/foiadocsbdfoiahtm.html (last accessed January 14, 2022).

8

question that remains is whether FirstFire qualifies as a securities dealer under the Act, *i.e.*, whether it was engaged in the business of buying and selling securities for its own account. *See* 15 U.S.C. § 78c(5)(A) (defining a "dealer"). The answer to this question is—undoubtedly—*yes*.

**a.** **According to the SEC, FirstFire Operates as an Unregistered Securities Dealer**

FirstFire uses a business model (and securities contract documents) nearly identical to that used by entities currently under prosecution by the SEC. *See* ECF 1 at ¶¶ 3-4. The SEC has commenced several civil enforcement actions to close down similar toxic lenders for unlawfully operating as unregistered dealers, which, thus far, the courts have universally upheld. (In this district, Judge Caproni (sitting in motion Part One) recently granted a TRO for an SEC case raising the same question, *see SEC v. GPL Ventures, LLC*, No. 21-cv-06814 (August 13, 2021 Order, ECF 11). *See* ECF 1 at ¶ 5. In these cases, the courts agreed that the lender-defendants were operating as unregistered dealers when using operations (and documents) nearly identical to that used by FirstFire. *See, e.g., SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby,* 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener,* 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)*; SEC v. Fierro,* 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).

9

b.   **The Sheer Volume of FirstFire's Transactions Shows That It Buys and Sells Securities _As A Regular Business_**

Under the Act, a "dealer" is "any person engaged in the business of buying and selling securities … for such person's own account through a broker or otherwise." § 78c(5)(A)[13]. This definition was "drawn broadly by Congress to encompass a wide range of activities involving investors and securities markets," _Registration Requirements for Foreign Broker-Dealers_, SEC Release No. 34-27017, 54 Fed. Reg. 30013, 30015 (July 18, 1989).

In _SEC v. Big Apple Consulting_, the 11th Circuit highlighted that the operative question in the "dealer" analysis was whether the person was "in the business" of buying and selling securities. In that case, the court found "business" was demonstrated in part by the sheer volume of transactions that the defendant engaged in, stating:

> To qualify as a "dealer," a person must be in the "business of" buying and selling securities. We think the centerpiece to this definition is the word "business," which is defined as "[a] commercial enterprise carried on for profit, a particular occupation or employment habitually engaged in for _livelihood or gain_." Central to this definition is _profit or gain_. While evidence of merely some profits from buying and selling securities may alone be inconclusive proof, the defendants' _entire_ business model was predicated on the purchase and sale of securities. Big Apple and its subsidiaries depended on acquiring client stock and selling that stock to support operations and earn a profit.

_Big Apple_, 783 F.3d at 809-10. _See also Mass. Fin. Servs., Inc. v. Securities Investor Prot. Corp._, 411 F. Supp. 411, 415 (D. Mass. 1976) (holding that "to be 'engaged in the business' "connote[s] a certain regularity of participation in securities transactions at key points in the chain of distribution."); _SEC v. Kenton Capital, Ltd._, 69 F. Supp. 2d 1, 12-13 (D.D.C. 1998) (finding that regular participation in securities transactions is the "primary indicia of being 'engaged in the business,'" and can be demonstrated by, _inter alia_, evidence that the subject person is selling, or

---

[13]   FirstFire states in its own documents that it _"is purchasing the Note a_nd the shares of Common Stock … _for its own account…_." ECF No. 1-1, at ¶¶ 25-26 (emphasis added); ECF No. 1-2, at ¶ 23 (same).

previously sold, the securities of other issuers, the number of securities transactions effectuated,

the number of shares acquired and/or sold, or the dollar amount of such securities.).

In this case, an examination of the SEC's EDGAR database[14] and FirstFire's dealings with

DarkPulse reveals a volume and regularity of participation in securities transactions rivalling that

of the holders in *Almagarby*,[15] *Keener*,[16] *Fierro*,[17] and *F.fe;*

- FirstFire has effectuated *no fewer than 203 securities transactions* with other microcap issuers;

- FirstFire has effectuated *more than 20 separate securities transactions* with DarkPulse;

- FirstFire has acquired (and, upon information and belief, sold) *at least 1,001,396,742 newly-issued securities* from microcap issuers other than DarkPulse;

- FirstFire has acquired (and, upon information and belief, sold) more than 875,000,000 newly-issued shares of DarkPulse common stock; and

- FirstFire has acquired more than $30 million worth of open-market securities from DarkPulse, which it promptly sold for substantial profit.[18]

---

[14]   *See generally* EDGAR List.

[15]   *See SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020) (finding as a matter of law that defendants are unregistered dealers, who acted in violation of § 78o(1), when, during a 5-year period, defendants purchased no less than *57 aged debt securities (convertible notes)* for no less than $1,115,000 from other debtholders of at least *38 different issuers*, acquired through conversions approximately 8.5 billion securities, sold no less than 7.6 billion securities and obtained no less than $2.8 million in proceeds from selling the newly-issued, converted securities).

[16]   *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 13, 2020) (denying defendant's motion to dismiss SEC's complaint alleging defendant acted as an unregistered dealer in violation of § 78o(1) after rejecting defendant's claim that he was a "trader" and, therefore, exempt from registration, and finding that defendant's level of participation in buying and selling securities—which included buying and converting over 100 convertible notes from more than 100 microcap issuers during a 3-year period, selling approximately 17.5 billion shares of newly-issued stock obtained from the aforesaid notes and making a $21.5 million profit from the same—involved more than a few isolated transactions, akin to a dealer).

[17]   *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020) (defendants' motion to dismiss denied; finding it "more than plausible that [defendants] meet[] the statutory 'dealer' definition," when defendants, during a 2-year period, purchased and converted more than 50 convertible notes from more than *20 microcap issuers* and sold more almost 6.5 billion newly-issued shares of common stock into the market, generating approximately $2.3 million in profits).

[18]   Indeed, when comparing prevailing market prices of DarkPulse common stocks to the conversion price on the date of each conversion, FirstFire stood to make *as much as $10,462,514* by promptly selling the newly-converted shares into the public markets (realized from the difference between the conversion price and prevailing market price).

c.      **The Profit Mechanism Used by FirstFire Is Used By Dealers, Not Traders**

Like the entities found to be dealers in *River North*, *Big Apple*, *Almagarby*, and *Keener*, FirstFire is not a trader or an investor. *See* ECF 1 at ¶ 1. FirstFire reaped its enormous profits by acquiring large amounts of newly-issued stock at a substantial discount (like a dealer or underwriter), rather than purchasing stocks already in the marketplace, like a trader. *See* ECF 1 at ¶ 29. Using this mechanism, FirstFire turned a profit *not* from selling only after market prices increased (like a trader), but rather from quickly reselling the stock to reap the 'spread' between the discount and the market price. *Id.* Such activity is a hallmark of a dealer, not a trader. *See River North*, 415 F. Supp. 3d at 859; *Big Apple Consulting*, 783 F.3d at 810; *Almagarby,* 2020 U.S. Dist. LEXIS 150289 at 14; *Keener* 2020 U.S. Dist. LEXIS 146256 at *12. FirstFire cannot dispute that its multitude of securities contracts it has effected over the last several years all enabled it to obtain newly issued stock, directly from issuer-companies (including DarkPulse) at a substantial discount to the market price,[19] which it promptly sold into the market. *See* ECF 1 at ¶¶ 55, 57, and 59.

---

[19]    For similar contracts with other issuers, *see* EDGAR List; DigitalTown, Inc., Form 10-Q, filed August 22, 2019, available at https://www.sec.gov/Archives/edgar/data/1065598/000164033419001724/dgtw_10q.htm (showing FirstFire converted debt purchased through a convertible note (a security) into, at least, 793,406,848 newly-issued shares of common stock at a conversion price equal to the lower of $0.20 per share or 75% of the lowest closing market price from the 10 trading days preceding a conversion) (last accessed January 14, 2022); Applied Minerals, Inc., Form 8-K, filed February 28, 2020, *available at* https://www.sec.gov/Archives/edgar/data/8328/000157587220000045/app016_8k.htm (showing FirstFire converted debt purchased through a convertible note (a security) into, at least, 8,300,000 newly-issued shares of common stock at a conversion price equal to the lower of $0.02 per share or 75% of the lowest closing market price from the 20 trading days preceding a conversion) (last accessed January 14, 2022); Visium Technologies, Inc., Form 8-K, filed January 10, 2019, at Exhibit 10.2, *available at* https://www.sec.gov/Archives/edgar/data/1082733/00014931521__9000437/ex10-2.htm (showing FirstFire converted debt purchased through a convertible note (a security) into, at least, 49,000,000 newly-issued shares of common stock at a conversion price equal to the lower of $0.15 per share or 65% of the lowest closing market price from the 10 trading days preceding a conversion) (last accessed January 14, 2022). *See also generally* EDGAR List.

### 2. Because FirstFire is an Unregistered Dealer, It Could Not Lawfully Make or Perform the Agreements, Which Are Voidable by DarkPulse

The overwhelming volume of FirstFire's buying and selling of securities, the stated fact that the purchases were for its own account, its profits based upon (1) purchase of convertible securities from small issuers (2) acquisition of newly-issued stock directly from issuers, at a substantial discount to the market price; (3) the prompt sale of that stock into the market, as well as the large volume sales all lead to the inevitable conclusion that FirstFire operated as a securities dealer that was required to registered with the SEC.  *See* ECF 1 at ¶ 59.

### 3. FirstFire Is an Unregistered Dealer that Could Not Lawfully Effect the Securities Transactions in this Case and its Performance Under those Transactions Was Unlawful.

The plain language of § 29(b) provides that a contract may be voided if either the *making* of the contract, or *performance* of the contract involved a violation of the Act.  *See Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006) (involving allegations of both performance and "as made" violations).  In respect to alleged § 15(a) violations, most caselaw involves a brokerage contract for the services of an unlicensed broker-dealer; since a brokerage contract is not itself a security, the analysis focuses only on performance. *See e.g. Reg'l Props.*, 752 F.2d 178.

However, the threshold question in any securities litigation must be whether the instrument at issue is a security.  Here, the analysis under § 15(a)  necessarily changes if the contract *itself* is a transaction in securities made by an unlicensed dealer.[20]  *See* 15 U.S.C. § 78cc(b). Because the

---

[20]   The decisions in *EMA Fin., LLC v. Vystar Corp.*, 2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021) and *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018) reached an incorrect result because the analysis was based on broker cases.  In each of these cases, the defendants claimed a right to  rescission under § 29(b), based on the lender's status as an unregistered dealer (in violation of §15(a)) of the Act.  However, the *Vystar* and *ExeLED* defendants (inexplicably) argued only that the securities contracts were unlawful because they could not lawfully be *performed* by an unlicensed securities dealer. The courts rejected this argument on the ground that the unlicensed dealer *was not required* to effect a transaction in securities to obtain repayment under the contract— the lender could theoretically forgo the extra profits and take repayment in cash, which would not violate § 15(a). What both courts failed to recognize—and the parties apparently failed to argue—is that *the contracts were themselves securities*, and it was unlawful for the unregistered dealer to be a party to that contract to begin with.  Regardless of

13

Notes in this case are, in and of themselves, securities, an unregistered securities dealer could not lawfully effect the transaction to purchase them in the first place. *Compare* Notes, *with* §§ 78c(a)(10), 78cc(b).

Notwithstanding that FirstFire could not have lawfully effected the purchase of the Notes, the recent holding of *Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir. 2021) distinguishes "as performed" cases where the contract *has, in fact, been performed unlawfully.* In *Edgepoint Capital*, the First Circuit held that a contract met the "as performed" prong of § 29(b) if it was *in fact* performed in violation of the Act, even if the contract, in theory, permitted lawful performance. Under *Edgepoint Capital*, the Notes in this case would be unlawful "as performed" in addition to "as made," because FirstFire did, in fact effect multiple securities transactions pursuant to the Notes when it converted debt into stock and sold the stock. *See* Complaint at ¶¶ 24-28, 42-43. *See* ECF 1 at ¶¶ 67-86.

## B.   DARKPULSE WILL BE IRREPARABLY HARMED ABSENT AN INJUNCTION BECAUSE THE REMEDY UNDER § 29(b) DOES NOT INCLUDE DAMAGES

"The purpose of issuing a preliminary injunction is to preserve the *status quo* and prevent irreparable harm until the court has an opportunity to rule on the … merits." *Candelaria v. Baker*, 2006 WL 618576, at *3 (W.D.N.Y. 2006). "[I]njunctive relief is generally appropriate only when there is an inadequate remedy at law and irreparable harm will result if the relief is not granted." *Nechis v. Oxford Health Plans, Inc.*, 421 F.3d 96, 103 (2d Cir. 2005). As for irreparable harm, the Second Circuit has held that "harm shown to be non-compensable in terms of money damages

---

whether the contract further obligated unlawful performance, an unregistered dealer's transaction in securities is unlawful when made. *See Eastside Church of Christ v. National Plan Inc.*, 391 F.2d 357, 362 (5th Cir. 1968) (finding security transaction unlawful "as made" when effected by an unregistered dealer and voiding the transaction).

provides the basis for awarding injunctive relief." *Wisdom Imp. Sales Co. v. Labatt Brewing Co.*, 339 F.3d 101, 113-14 (2d Cir. 2003).

### 1. DarkPulse Will Be Irreparably Harmed if FirsFire is Permitted to Sell Such a Large Block of Stock Into the Market

The collateral damage caused by conversion is well recognized: any issuance of shares causes irreversible shareholder dilution. When newly-issued stock is sold into the market — as FirstFire consistently does under its well-established, *unlawful* business model— the existing stockholders are "diluted," usually severely so. *See* ECF 1 at ¶ 45. That is, the value held by each individual stockholder is diminished, a diminution that goes on in perpetuity and *cannot be undone*. Stockholder dilution is a compensable form of damages. *See Franklin Fed'l. Savings Bank v. United States*, 60 Fed Cl. 55, 72 (2004).

But the harm does not stop there. The drastic dilution that would result from dumping such a large number of shares into the market predictably creates a "firesale" effect that pushes the stock price even lower and creates reputational damage. Indeed, while a court could, theoretically, award an issuer with damages to repurchase the securities that were wrongfully issued and sold back into the marketplace, the true damages spread far beyond that—loss of investor confidence, loss in market capitalization, severe depreciation in trading price, etc.—and cannot be fully ascertained or remedied by monetary damages.[21]

FirstFire's dumping of 177,375,000 shares into the market will depress DarkPulse's trading price and make it more difficult to raise money. The drop in stock price that would accompany FirstFire's liquidation of 177,375,000 shares into the market is essentially guaranteed. Causing a drop in stock price is referred to as "market damages." *Strougo ex rel. Brazil Fund v. Scudder,*

---

[21] The foregoing is further supported by the purpose of a preliminary injunction: to preserve "the court's power to render a meaningful decision after a trial on the merits," not to provide the movant with ultimate relief. *Warner Vision Entm't. Inc. v. Empire of Carolina, Inc.*, 101 F.3d 259, 261-62 (2d Cir. 1996).

*Stevens & Clark, Inc.*, 964 F. Supp. 783, 802-03 (S.D.N.Y. 1997).  Accordingly, DarkPulse would be irreparably harmed if FirstFire is not restrained as requested herein.

>    **2.    Because Damages Are Not Available Under § 29(b), the Damages Incurred are By Definition Irreparable.**

Section 29(b) provides for the equitable remedy of rescission, not money damages. Although there are few cases on this question, those cases (as well as one significant commentator) have concluded that *compensatory money damages*, such as damages from dilution or market damages, *are not available* under § 29(b).  *See Moody v. Bache & Co.*, 570 F.2d 523 at n.6 (5th Cir. 1978).

This conclusion stems from the Supreme Court's opinion in *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11 (1979), where the court analyzed § 215 of Investment Advisors Act, a provision nearly identical to § 29(b).  In that case, the Court concluded that  the limited right to rescission under the § 215 *does not include* compensation for any damages alleged to have resulted from the unlawful conduct.  The Court reasoned that "[s]uch relief could provide by indirection the equivalent of a private damages remedy" that Congress did not confer in the statute. *Transamerica*, 444 U.S. at 24, n.14.  Subsequent to *Transamerica*, courts that had previously awarded damages under § 29(b) concluded that only recission, not money damages was the remedy provided in that section.    As one noted commentator opined,

>    The Court's analysis of Section 215 of the Advisers Act strongly suggests that the right to relief created by that section is limited to equitable relief. Consequently, based on a strict reading of *Lewis* and despite language in *Mills* to the contrary, the right created by Section 29(b) arguably should be similarly limited.

Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened*, 48 Geo.Wash.L.Rev. 1, 44 (1979).

For the foregoing reasons, the inevitable sale of DarkPulse's stock by FirstFire will cause massive damage to DarkPulse—harm that cannot be compensated in the future—if FirstFire is not preliminarily enjoined.

### C.   THE BALANCE OF HARDSHIPS FAVORS DARKPULSE

FirstFire will not suffer irreparable harm if it is enjoined from selling the recently issued conversion shares of DarkPulse common stock during the pendency of this case.  FirstFire's interests in the case are purely monetary, by definition remediable through damages.  If the Court decided in FirstFire's favor, FirstFire's damages would be solely monetary in nature and easily calculable.  *See, e.g., Sharma v. Skaruup Ship Mngt. Corp.*, 916 F.2d 820, 826 (2d. Cir. 1990).

### D.   AN INJUNCTION WOULD SERVE THE PUBLIC INTERESTS THAT THE ACT IS INTENDED TO PROTECT

As noted above, the registration requirement set forth in § 15(a) of the Act is designed to protect stock issuers, the market, and the general public from the damage caused by unscrupulous or unqualified agents acting as dealers.  The SEC is charged with safeguarding the public interest by enforcing the statutory requirements set forth in the Act.  Moreover, the public interest is in mind when registration with the SEC requires a dealer to provide important information to the SEC about its business—some of which is made public—including but not limited to the names of the direct and indirect owners and executive officers of the business, certain arrangements with other persons or entities, the identities of those who control the business, the states in which the dealer does business, past criminal or regulatory actions of the dealer or any affiliate that controls the business. *See generally SEC v. Management Dynamics, Inc.*, 515 F.2d 801, 808 (2d Cir. 1975).

A-205

**CONCLUSION**

For all the foregoing reasons, Plaintiff respectfully requests that the Court enjoin, pending

a merits decision on this case, FirstFire, Fireman and their respective brokers, agents, servants,

employees, attorneys, and affiliates, from selling, transferring, assigning, encumbering, or

otherwise disposing of any DarkPulse common stock or any proceeds that were derived from that

sale of any Darkpulse common stock.

DATED: January 17, 2022                    Respectfully submitted,

                                           /s /   Gustave P. Passanante
                                           Gustave P. Passanante, Esq.
                                           Eric J. Benzenberg, Esq.
                                           **THE BASILE LAW FIRM, P.C.**
                                           390 N. Broadway, Ste. 140
                                           Jericho, NY 11753
                                           Tel.:   (516) 455-1500
                                           Fax:    (631) 498-0748
                                           Email: gus@thebasilelawfirm.com
                                                   eric@thebasilelawfirm.com

                                           *Attorneys for Plaintiff Darkpulse, Inc.*

A-206

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., | |
| *Plaintiff,* | CIVIL ACTION NO. 22-cv-22111 |
| v. | |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, and ELI FIREMAN, | **[PROPOSED] ORDER GRANTING A PRELIMINARY INJUNCTION** |
| *Defendants.* | |

Upon consideration of the Declaration of Dennis O'Leary, Dated January 14, 2022; the Emergency Supplemental Declaration of Dennis O'Leary dated January 17, 2022 and Exhibits attached thereto; Plaintiff's motion for Preliminary Injunction, and accompanying memorandum of law, it is hereby

ORDERED, that Plaintiff DarkPulse, Inc. is granted a preliminary injunction pursuant to Fed. R. Civ. P. Rule 65, enjoining, during the pendency of this action, Defendants and their agents, servants, employees, attorneys, and affiliates, from selling, transferring, assigning, encumbering, or otherwise disposing of any DarkPulse shares of common stock, or proceeds derived from a sale of Darkpulse's common stock, currently in their possession or control; and it is further

ORDERED, that a constructive trust is imposed on the stock obtained by the Defendants through their conversion of debt on November 15, 2021, as referenced in the January 14, 2022, Declaration by Dennis O'Leary or, if any of Darkpulse's stock has been sold, a constructive trust is also imposed on the proceeds acquired from the sale of Darkpulse's stock; and it is further

ORDERED, that Plaintiff post a bond in the amount of $100,000 by _____.

A-207

Dated: _____, 2022
New York, New York.

                        SO ORDERED.


                        _____
                        United States District Judge

A-208

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DARKPULSE, INC.,

*Plaintiff,*

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

*Defendants.*

Civil Action No. 1:21-cv-11222-ER

**EMERGENCY SUPPLEMENTAL
DECLARATION OF DENNIS O'LEARY
28 U.S.C. § 1746 IN SUPPORT FOR
PRELIMINARY INJUNCTION**

---

1.      I, Dennis O'Leary, am the Chief Executive Officer and a Chairman of the Board of

Darkpulse, Inc. ("Darkpulse"), plaintiff in the above-captioned matter.

2.      I make this Declaration upon personal knowledge, information, and belief,

including information contained in Darkpulse's business records and information reported to me

by other Darkpulse employees.  I would testify as stated herein if called to do so.

3.      I write this Emergency Supplemental Declaration to supplement my Declaration in

support of Darkpulse's motion for preliminary injunction and temporary restraining order filed on

January 14, 2021. *See* ECF No. 12-2.

4.      Darkpulse's Common Shares are listed and traded on the OTC market under the

symbol "DPLS."

5.      On December 31, 2021, Darkpulse filed its complaint in the United States District

Court for the Southern District of New York. *See* ECF No. 1.

6.      On January 13, 2022, counsel for FirstFire Global Opportunities Fund, LLC

("FirstFire") and Eli Fireman ("Fireman" and together with FirstFire, the "Defendants") executed

A-209

a Waiver of the Service of Summons for both Defendants. *See* ECF Nos. 10 & 11.

       7.      On January 13, 2022, Darkpulse's trading volume was 33,846,106. *See* Historical Data annexed hereto as **Exhibit A**.

       8.      On January 14, 2022, just one day after the Defendants were notified of this action, Darkpulse's trading volume increased to 89,943,435 from 33,846,106, a 56,097,329 increase from the previous day. *See* Historical Data annexed hereto as **Exhibit A**.

       9.      As referenced in my prior declaration dated January 14, 2022, FirstFire effectuated a conversion for the entire debt due under the convertible promissory on note on November 15, 2021, by which it wrongfully acquired over 177 million shares of freely trading DarkPulse stock. Upon information and belief, FirstFire immediately dumped over 50 million shares to purposefully injure Darkpulse.

      10.     The 56,097,329 share volume difference resulted in a market capital of 4,928,900.24, with an ultimate market loss of $3,175,671.95 to Darkpulse. *See* Market Capital Spreadsheet annexed hereto as **Exhibit B**.

*    *    *

      I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 17, 2022              */s/ Dennis O'Leary*
                                     DENNIS O'LEARY

A-210

**Exhibit A**

Historical Data

DarkPulse, Inc. (DPLS) Stock Historical Prices & Data – Yahoo Finance          1/17/22, 11:40 AM



**DarkPulse, Inc. (DPLS)**
Other OTC · Other OTC Delayed Price. Currency in USD

Quote Lookup

**0.0460** -0.0058 (-11.20%)
At close: January 14 03:59PM EST

Summary   Company Outlook 🆙   Chart   Conversations   Statistics   **Historical Data**   Profile   Financials   Analysis   Options   Holders   Sustainability

**Finance Home**   **Watchlists**   **My Portfolio**   **Cryptocurrencies**   **Yahoo Finance Plus** 🆙   **Screeners**   **Markets**   ...   y!finance⁺   Try it free

Time Period: Jan 09, 2022 - Jan 16, 2022 ⌄     Show: Historical Prices ⌄     Frequency: Daily ⌄

Apply

Currency in USD
⬇ Download

| Date | Open | High | Low | Close* | Adj Close** | Volume |
|------|------|------|-----|--------|-------------|--------|
| Jan 14, 2022 | 0.0509 | 0.0519 | 0.0420 | 0.0460 | 0.0460 | 89,943,435 |
| Jan 13, 2022 | 0.0531 | 0.0548 | 0.0503 | 0.0518 | 0.0518 | 33,846,106 |
| Jan 12, 2022 | 0.0594 | 0.0599 | 0.0511 | 0.0548 | 0.0548 | 46,470,422 |
| Jan 11, 2022 | 0.0595 | 0.0610 | 0.0578 | 0.0590 | 0.0590 | 16,241,285 |
| Jan 10, 2022 | 0.0630 | 0.0640 | 0.0585 | 0.0596 | 0.0596 | 9,651,458 |

*Close price adjusted for splits.     **Adjusted close price adjusted for splits and dividend and/or capital gain distributions.

**MD: If You Have Dark Spots, Do This Immediately (It's Genius!)**

**Stock up on stock picks** — Invest smarter with in-depth company data.   yahoo/⁺ finance   Try it free

**People Also Watch**

| Symbol | Last Price | Change | % Change |
|--------|-----------|--------|----------|
| **GTLL** Global Technologies, Ltd. | 0.0017 | 0.0000 | 0.00% |
| **WDLF** Social Life Network, Inc. | 0.0023 | +0.0001 | +4.55% |
| **CYBL** Cyberlux Corporation | 0.0210 | -0.0016 | -7.08% |



| AITX | 0.0211 | -0.0009 | -4.09% |
| --- | --- | --- | --- |
| Artificial Intelligence Technology Solutions... | | | |
| OZSC | 0.0332 | -0.0002 | -0.48% |
| Ozop Energy Solutions, Inc. | | | |

**Financials ›**

Annual  Quarterly            Revenue  Earnings



**Recommendation Trends ›**

Strong Buy
Buy
Hold
Underperform
Sell

0    0    0    0
Oct  Nov  Dec  Jan

**Company Profile ›**

1345 Avenue of the
Americas
2nd Floor
New York, NY 10105
United States
800 436 1436
https://www.darkpulse.com
Sector(s): **Technology**
Industry: **Software—Application**
Full Time Employees:

DarkPulse, Inc., a technology-security company,
develops, markets, and distributes a suite of
engineering, installation, and security
management solutions to industries and
governments. The company develops patented
BOTDA dark-pulse sensor technology that allows a
data stream of critical metrics for assessing the
health and security of their infrastructure. It offers
two security platforms, Fiber and Ultra-High
Sensitivity Sensors. The company intends to
deliver security and monitoring systems in
applications for border security, pipelines, the oil
and gas industry, and mine safety. It has an
agreement with the university of Arizona to

DarkPulse, Inc. (DPLS) Stock Historical Prices & Data - Yahoo Finance                                    1/17/22, 11:40 AM

develop intelligent rock bolt for charging mining
conditions. The company was incorporated in
1989 and is based in New York, New York.

More about DarkPulse, Inc.

Advertise with us

Data Disclaimer  Help  Suggestions
Privacy Dashboard

Privacy (Updated)  About Our Ads  Terms
(Updated)  Sitemap

© 2022 Yahoo. All rights reserved.

A-214

**Exhibit B**

Market Capital Spreadsheet

A-215

**Darkpulse, Inc.**

| Date | Open | Close | Volume | Volume Difference | Close Difference | Market Capital | Market Capital Gain/Loss |
|------|------|-------|--------|-------------------|------------------|----------------|--------------------------|
| 1/12/22 | 0.0594 | 0.0460 | 46,470,422 | | | 2,137,639.41 | |
| 1/13/22 | 0.0531 | 0.0518 | 33,846,106 | (12,624,316) | 0.0058 | 1,753,228.29 | 384,411.12 |
| 1/14/22 | 0.0509 | 0.0548 | 89,943,435 | 56,097,329 | -0.0022 | 4,928,900.24 | (3,175,671.95) |

A-216

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

        Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

        Defendants.

Index No. 1:21-cv-11222 (ER)

## DEFENDANTS' MEMORANDUM OF LAW IN OPPOSITION TO
## PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

**Page**

PRELIMINARY STATEMENT ........................................................................................ 1

FACTUAL BACKGROUND ........................................................................................... 4

    A.    DPLS Common Shares Are a Heavily Traded Penny Stock .................................. 4

    B.    DPLS Has Extensive Experience With Issuance of Convertible Promissory Notes and Their Conversion To DPLS Common Shares of Stock ......................... 5

    C.    The FirstFire Note ............................................................................................ 6

    D.    The Amendment to the Note ............................................................................. 8

    E.    The Events of Default ....................................................................................... 8

    F.    The Conversion and the Dispute ....................................................................... 9

    G.    FirstFire Sold Half of the DPLS Shares Over The Past Two Months (42 Trading Days) .................................................................................................. 10

ARGUMENT ............................................................................................................... 11

I.    THIS APPLICATION SHOULD BE DENIED, AS DELAWARE IS THE PARTIES' EXCLUSIVE FORUM ............................................................................. 11

    A.    The Amendment to the Exclusive Forum Provision in the Note Is Valid, Was Communicated to Plaintiff, Has Mandatory Force, and Covers the Parties and Claims in this Application ............................................................... 11

    B.    DPLS Fails to Show that Enforcement of the Exclusive Forum Provision Would Be Unreasonable or Unjust ................................................................... 13

II.    THE REQUEST FOR A PRELIMINARY INJUNCTION SHOULD BE DENIED ....... 14

    A.    DPLS Cannot Show Irreparable Harm .............................................................. 15

    B.    DPLS Is Unlikely to Succeed on the Merits of Counts I and II ........................... 19

    C.    The Balance of Hardships Weighs in FirstFire's Favor ....................................... 24

III.    IF ANY INTERIM RELIEF IS GRANTED, DPLS SHOULD BE REQUIRED TO POST A BOND IN CASH EQUAL TO THE PRESENT TRADING VALUE OF FIRSTFIRE'S SHARES ................................................................................. 25

CONCLUSION ............................................................................................................ 25

i

A-218

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*5464 Route 212, LLC v. New York State Dep't of Transportation*,
    2020 WL 1888976 (N.D.N.Y. Apr. 16, 2020)........................................................24

*Aiena v. Olsen*,
    37 F. Supp. 2d 303 (S.D.N.Y. 1999)..............................................................15, 16

*Alpha Capital Anstalt v. Shifipixy, Inc.*,
    432 F. Supp. 3d 326 (S.D.N.Y. 2020).................................................................15

*Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*,
    571 U.S. 49 (2013)...........................................................................................11

*Boguslavsky v. Kaplan*,
    159 F.3d 715 (2d Cir. 1998)..............................................................................16

*Borey v. National Union Fire Ins. Co. of Pittsburgh, PA*,
    934 F.2d 30 (2d Cir. 1991)................................................................................15

*Buffalo Forge Co. v. Ogden Corp.*,
    555 F. Supp. 892 (W.D.N.Y.), *aff'd* 717 F.2d 757 (2d Cir. 1983) ........................24

*Buffalo Forge Co. v. Ogden Corp.*,
    717 F.2d 757 (2d Cir. 1983), *cert. denied* 464 U.S. 1018 (1983)...........................23

*Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*,
    230 F. Supp. 2d 439 (S.D.N.Y. 2002)................................................................24

*Cottonwood Holdings, Inc. v. C3, Inc.*,
    1995 WL 276196 (S.D.N.Y. May 11, 1995) ................................................12, 14

*Dexter 345 Inc. v. Cuomo*,
    663 F.3d 59 (2d Cir. 2011)................................................................................17

*Elite Parfums Ltd. v. Rivera*,
    872 F. Supp. 1269 (S.D.N.Y. 1995)...................................................................14

*EMA Fin., LLC v. NFusz, Inc.*,
    509 F. Supp. 3d 18 (S.D.N.Y. 2020)..................................................................20

*EMA Fin., LLC v. Vystar Corp., Inc.*,
    2021 WL 1177801 (Mar. 29, 2021), *reconsideration denied* 2021 WL
    5998411 (S.D.N.Y. Dec. 20, 2021).........................................................19, 20, 22

ii

*EMA Financial, LLC v. AIM Exploration, Inc.*,
    18-Civ. 145 (ER), 2019 WL 689237 ...........................................................................5, 15

*Foulke by Foulke v. Foulke*,
    896 F. Supp. 158 (S.D.N.Y. 1995)...........................................................................24

*Foundation Ventures, LLC v. F2G, Ltd.*,
    2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010)......................................................22

*Franklin Fed. Savings Bank v. United States*,
    60 Fed. Cl. 55 (2004) ...............................................................................................18

*Frati v. Saltzstein*,
    2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) .....................................................20

*Freedom Holdings, Inc. v. Spitzer*,
    408 F.3d 112 (2d Cir. 2005).....................................................................................17

*Hodnett v. Medalist Partners Opportunity Master Fund ll-a, L.P.*,
    2021 WL 535485 (S.D.N.Y. Feb. 12, 2021)........................................................19

*Interlink Int'l Fin. Servs., Inc. v. Block*,
    145 F. Supp. 2d 312 (S.D.N.Y. 2001)....................................................................25

*Jones v. Weibrecht*,
    901 F.2d 17 (2d Cir. 1990)........................................................................................13

*Leasing Serv. Corp. v. Graham*,
    646 F. Supp. 1410 (S.D.N.Y. 1986)........................................................................14

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
    2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018)......................................................20

*Mills v. Electric-Auto-Lite Co.*,
    396 U.S. 375 (1970)....................................................................................................16

*Monowise Limited Corp. v. Ozy Media, Inc.*,
    2018 WL 2089342 (S.D.N.Y. May 3, 2018) ...................................................15, 19

*Moody v. Bach & Co.*,
    570 F.2d 523 (5th Cir. 1978) ...................................................................................16

*Nat'l Sch. Reporting Servs., Inc. v. Nat'l Sch. of Cal., Ltd.*,
    924 F. Supp. 21 (S.D.N.Y. 1996).............................................................................13

*NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*,
    2014 WL 2619588 (S.D.N.Y. June 11, 2014) .......................................................18

*Nokia Corp. v. Interdigital, Inc.*,
    645 F.3d 553 (2d Cir. 2011)...................................................................25

*Omega Overseas Partners, Ltd. v. Griffith*,
    2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014).........................................20

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co., Inc.*,
    794 F. Supp. 1265 (S.D.N.Y. 1992).......................................................23

*Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*,
    2021 WL 4463921 (E.D.N.Y. Aug. 17, 2021), *report and recommendation
    adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021)...................12, 13

*S.E.C. v. Big Apple Consulting USA, Inc.*,
    783 F.3d 786 (11th Cir. 2015) ..............................................................22

*SEC v. Almagarby*,
    479 F. Supp. 3d 1266 (S.D. Fla. 2020) ............................................22, 23

*SEC v. Fierro*,
    2020 WL 7481773 (D.N.J. Dec. 18, 2020)............................................22

*SEC v. Fife*,
    2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).........................................22

*SEC v. GPL Ventures, LLC*,
    Case No. 21-cv-06814 (Jan. 18, 2022) ..................................................23

*SEC v. Keener*,
    2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)........................................22

*SEC v. River N. Equity LLC*,
    415 F. Supp. 3d 853 (N.D. Ill. 2019) ...............................................22, 23

*Strougo v. Scudder, Stevens & Clark, Inc.*,
    964 F. Supp. 783 (S.D.N.Y. 1997), *vacated and remanded*, 282 F.3d 162 (2d
    Cir. 2002) ...............................................................................................18

*Sussman v. Crawford*,
    488 F.3d 136 (2d Cir. 2007)...................................................................14

*Transcience Corp. v. Big Time Toys, LLC*,
    50 F. Supp. 3d 441 (S.D.N.Y. 2014) (Ramos, J.) .................................18

*Union Capital LLC v. Vape Holdings, Inc.*,
    2016 WL 8813991 (S.D.N.Y. Mar. 9, 2016) .........................................16

*Usherson v. Bandshell Artist Management*,
  2020 WL 4228754 (S.D.N.Y. July 22, 2020) ........................................................17

*Weaver v. Schiavo*,
  750 Fed. App'x 59 (2d Cir. 2019)..................................................................14, 15

*Weiss v. Columbia Pictures Television, Inc.*,
  801 F. Supp. 1276 (S.D.N.Y. 1992).............................................................11, 13

*Winter v. Natural Resources Defense Council, Inc.*,
  555 U.S. 7 (2008).......................................................................................15

*Zerman v. Jacobs*,
  510 F. Supp. 132 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981)................20

**Statutes**

Securities Exchange Act of 1934 § 3, 15 U.S.C. § 78c ...............................................21

Securities Exchange Act of 1934 § 29, 15 U.S.C. § 78cc....................................*passim*

Securities Exchange Act of 1934 § 15, 15 U.S.C. § 78o ....................................*passim*

**Rules**

Fed. R. Civ. P. 65(c) ..........................................................................................25

Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman respectfully submit this memorandum of law in opposition to Plaintiff DarkPulse, Inc.'s ("DPLS") motion for a preliminary injunction.[1]

## PRELIMINARY STATEMENT

The Court should deny DPLS's motion for a preliminary injunction for several reasons. As a threshold matter, DPLS knowingly has brought this motion (and the related claims in this Action) in violation of the Parties' exclusive forum selection clause. The parties agreed in an amendment to the convertible promissory note at issue (the "Note") that any action concerning the Note "shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware." (Fireman Decl. ¶ 23.) There is an action pending in Delaware Chancery Court, filed weeks before this Action, concerning this very same dispute regarding the Note (the "Delaware Action"). On December 13, 2021, weeks after DPLS first demanded that FirstFire return the shares converted pursuant to the Note,[2] FirstFire brought the Delaware Action, seeking a declaration that the conversion was proper and that FirstFire was entitled to the 177,375,000 shares of DPLS common stock it received in connection with the conversion. In response, DPLS improperly asserts claims in this Action concerning the Note—what should be DPLS's defenses

---

[1] Submitted concurrently herewith are the Declaration of Aaron H. Marks, sworn to on January 19, 2022 ("Marks Decl.") and the Declaration of Eli Fireman, sworn to on January 19, 2022 ("Fireman Decl."). "Mot." refers to Plaintiff DarkPulse, Inc's Memorandum of Law in Support of Motion for Temporary Restraining Order and Preliminary Injunction (ECF 17). "O'Leary Decl." refers to the Declaration of Dennis O'Leary Pursuant to 28 U.S.C. § 1746 in Support of DarkPulse, Inc.'s Motion for Temporary Restraining Order and Preliminary Injunction (ECF 12-2). Unless otherwise indicated, all emphasis is added and internal citations and quotations are omitted.

[2] Initially, in November, DPLS's CEO Dennis O'Leary requested that FirstFire return to DPLS two-thirds of the DPLS common shares that FirstFire had converted, acknowledging that the Note was valid and the conversion was proper, but claiming that FirstFire had improperly used the default conversion rate under the Note (which provides for a default conversion rate that is one-third of the ordinary conversion rate under the Note). (Fireman Decl. ¶ 28.) Only upon filing its Complaint here on December 31, did DPLS first claim that the entire Note should be voided and that FirstFire's conversion of shares should be rescinded in its entirety.

1

or counterclaims in the Delaware Action—in sharp violation of the Note's exclusive forum provision.[3]

Even if this were the proper forum (which it is not), DPLS cannot meet any of the prerequisites for being granted extraordinary injunctive relief. DPLS cannot show that it would be irreparably harmed in the absence of injunctive relief being granted. FirstFire selling shares of DPLS common stock represents a quintessential reparable harm—if proven, it can be addressed with monetary relief. Nothing precludes DPLS from purchasing 177 million DPLS common shares (it is a penny stock that is heavily traded), thus making interim injunctive relief unnecessary and improper, as there is an adequate remedy of law. There is further no non-speculative concern about dilution from FirstFire selling its DPLS common shares, which make up less than 2% of the DPLS shares in the market. And, the Note and its attendant DPLS common shares, like the previous 19 convertible notes (and their attendant shares) that DPLS entered, are disclosed in DPLS's public filings beginning the date the notes are entered; accordingly, the market already has full knowledge about this purported dilution.

Moreover, DPLS cannot at all demonstrate what it baldly alleges—that FirstFire's sales of DPLS shares will somehow cause the price to fall, and further, that a decline in DPLS's share price somehow harms DPLS. DPLS is remarkably late in bringing this motion; FirstFire converted the Note to 177,375,000 DPLS shares on November 17, 2021—in strict compliance with the Note's terms and with notice in advance to DPLS on November 15, 2021.[4] Over the 42 trading days

---

[3] The Complaint in this Action was deemed served upon the Defendants on January 13, 2022, when Defendants executed a waiver of service. In connection with executing the waiver of service, Defendants' time to respond to the Complaint does not run until March 14, 2022, at which time, Defendants will be filing a motion to dismiss, including a request to dismiss all claims relating to the Note due to this Court being an improper forum.

[4] Section 1.4(a) of the Note provides that "[t]his Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion." As reflected herein, FirstFire provided a Notice of Conversion to Borrower on November 15, 2021 by sending an email to DPLS CEO Dennis O'Leary at his darkpulse.com email address, as provided in Section 4.2 of the Note, and by submitting the Notice of Conversion to Borrower's transfer agent on

between November 18, 2021 (the first trading day after conversion) and January 14, 2022 (the trading day that preceded DPLS filing this application), FirstFire already sold into the market 85,509,808 of the converted DPLS common shares, deliberately selling no more shares than a small percentage of the trading volume on any given day, notwithstanding that well over 1 billion DPLS common shares traded during this period. (Fireman Decl. ¶ 30.) As but one example, DPLS wildly and baselessly alleges in its January 17, 2022 filing that on January 14, 2022 FirstFire must have sold at least 56 million shares as the total trading volume for the day was 56 million shares higher than the day before (90 million shares sold in the market versus 34 million the day before). The fact is, however, that on January 14, FirstFire sold 3,134,808 DPLS shares, making up less than five percent of the total trading volume of over 90 million for the day. At all times over the past two months, FirstFire has sought to receive only the highest price possible for the DPLS common shares it has been selling, and DPLS has of course no evidence that FirstFire's selling has caused any decline in DPLS's share price.[5]

DPLS also cannot come close to demonstrating that it has a likelihood of success on the merits of its claims relating to the Note. By its complaint in this Action, DPLS seeks rescission with respect to the Note because FirstFire is allegedly an unregistered securities dealer and thus violated the Securities and Exchange Act (Counts I–III). DPLS does not, however, have a reasonably likelihood of success in establishing any of the several mandatory elements of these claims—that the Note was a prohibited transaction under the Act; that FirstFire should be

---

November 17, 2021. (Fireman Decl. ¶ 25.) O'Leary's statement in his submitted affidavit that "FirstFire sent the notice of the conversion to my personal account instead of my DarkPulse account" (O'Leary Decl. ¶ 8) is patently false.

[5] DPLS, in its complaint, disparagingly and baselessly references "FirstFire's well-known practice of dumping issuer stock into the market as soon as possible." (Compl. ¶ 30.) Putting aside the insulting and false nature of this "dumping" remark, if DPLS knew FirstFire to be inclined to sell shares quickly after a conversion, why is DPLS only now moving for injunctive relief a full two months after it learned of FirstFire's conversion and receipt of 177 million shares? Why would DPLS expect FirstFire two months later to still hold any of its common shares, if FirstFire is a "dumper"?

3

considered an unregistered "dealer" under the Act; or that DPLS here is an "unwilling and innocent" party. Because, among other things, DPLS has a long history of issuing convertible promissory notes to investment funds that were not registered "dealers," and explicitly covenanted with respect to this Note to never assert that FirstFire is a "dealer" under the Act, it will come as no surprise that DPLS does not have a likelihood of success on the merits of these claims.

Finally, the balance of equities tips decidedly in FirstFire's favor, as preventing FirstFire from selling shares would result in significant financial hardship, especially as the price of DPLS common shares is historically highly volatile. In contrast, DPLS cannot demonstrate—beyond mere conclusory statements—how a decline in DPLS's current trading price would harm DPLS.

## FACTUAL BACKGROUND

### A. DPLS Common Shares Are a Heavily Traded Penny Stock

DPLS is a small-cap company and DPLS's stock is a penny stock not listed on a major exchange, but that rather trades through OTC Pink, one of OTC Market Group's platforms. (Marks Decl. ¶ 2.) According to DPLS's public filings, as of September 30, 2021, there were nearly five billion (4,922,968,442) shares of DPLS common stock issued and outstanding, and DPLS has authorized a total of twenty billion shares of common stock for issuance. (*Id.* ¶ 3.) According to Yahoo! Finance and DPLS's own website (https://ir.darkpulse.com/stock/), as of January 14, 2022 (DPLS's application was filed that evening), DPLS common shares closed trading at a price of approximately $0.05 and have a 52-week price range of $0.0014 to $0.202—the high of the range being about 144 times the low. (*Id.* ¶ 4.) And DPLS common shares are heavily traded. According to the figures contained on DPLS's own website, in the 42 trading days between November 18, 2021 and January 14, 2022, the period between FirstFire's conversion and DPLS filing this motion, over 1.178 billion DPLS common shares were traded—for an average daily trading volume of 28.04 million shares per day. (*Id.* ¶ 5.) As an aside, over the ten trading days preceding FirstFire's

4

November 17 conversion, there was an average daily trading volume of 36.08 million DPLS common shares per day.  (*Id.* ¶ 6.)

B.   **DPLS Has Extensive Experience with Issuance of Convertible Promissory Notes and Their Conversion to DPLS Common Shares of Stock**

DPLS has since July 2018 financed its business, in part, through the issuance of convertible promissory notes—notes containing an option for the holder to convert the outstanding balance to shares of DPLS common stock rather than receive repayment in cash.  DPLS's public filings reflect that between July 2018 and July 2021, DPLS entered into 20 different convertible notes with multiple investment funds, including the Note with FirstFire that is the subject of this dispute.  (*Id.* ¶ 8.)  And in 2020 and in 2021, on 36 separate occasions, DPLS issued significant volumes of shares of DPLS common stock upon the conversion or partial conversion of notes by their holders.  (*Id.* ¶ 9.)  In total, in 2020 and 2021, DPLS, through its transfer agent, issued over 3,545,380,000 common shares in connection with these 36 conversions, including the 177,375,000 common shares issued to FirstFire.  (*Id.* ¶ 10.)  Each of the convertible notes entered by DPLS (and their attendant DPLS common shares) are disclosed in DPLS's public filings beginning the date the notes are entered.  (*Id.* ¶ 11.)

DPLS has also been, and is, party to several lawsuits against investment funds with which the company has entered into convertible promissory notes.[6]  For example, according to DPLS's own public filings, on May 13, 2021, two weeks after entering into the Note with FirstFire, DPLS filed a motion in its action against Carebourn Capital, L.P., "arguing that Carebourn is conducting itself as an unregistered dealer, in violation of Section 15(a) of the Securities and Exchange Act of

---

[6] As this Court is well familiar, there have been several lawsuits brought in this Court and in others around the country, involving convertible promissory notes and assertions by issuers of usury and claims based on purported violations of the securities laws.  *See EMA Fin., LLC v. AIM Exploration, Inc.*, 18-Civ. 145 (ER), 2019 WL 689237, at *1, n.1 (S.D.N.Y. Feb. 19, 2019).

1934 (the 'Act'), and, pursuant to Section 29(b) of the Act, the Company is entitled to have all contracts arising under the unlawful securities transaction declared void ab initio and seek rescissionary damages for any unlawful transactions effected by Carebourn"—the same arguments to rescind the Note that DPLS now makes here (with DPLS suggesting that its arguments and knowledge are somehow new).  (*Id.* ¶ 13.)  DPLS is litigating a similar case against More Capital, LLC, and on January 4, 2022, DPLS initiated an action against EMA Financial, LLC and a related entity and an individual that is almost identical to this Action.  (*Id.* ¶ 14.)  It now appears to be DPLS's pattern and practice to enter into convertible notes with investment funds, receive the cash funding thereunder, and then seek to void or rescind the notes in frivolous litigation in which DPLS even suggests that it had no prior knowledge of the allegations of unlawfulness that it is making. (*Id.* ¶ 15.)

### C.    The FirstFire Note

FirstFire is an investment fund focusing on small- to medium-sized public and private companies.  FirstFire's expertise is in distressed, special situations and event-driven investing, both as equity and as a debt participant.  FirstFire's relationships and industry expertise enable it to serve not only as financial investors but also as substantial value-added partners.  In this capacity, FirstFire occasionally takes on a role as an investor providing a lifeline for highly distressed companies. (Fireman Decl. ¶ 2.)

As noted in Complaint, DPLS first issued a convertible note to FirstFire in September 2018 (the "September 2018 Note").  The September 2018 Note was converted by FirstFire to DPLS

common shares (totaling 879,400,000) in multiple partial conversions in 2019, 2020 and 2021. (*Id.* ¶ 4.)  The September 2018 Note is not the subject of this Motion.[7]

On April 26, 2021, DPLS entered into a Securities Purchase Agreement (the "SPA"), a Registration Rights Agreement and the Note with FirstFire.  Under the SPA, FirstFire agreed to provide DPLS with an infusion of $750,000 in cash (provided on April 30) in exchange for the Note.  The Note provides for a principal sum of $825,000 and incorporates an interest rate of 10% per annum.  (*Id.* ¶ 5.)

Alternatively, Section 1.1 of the Note provides for a conversion right, whereby FirstFire could forego repayment of the Note in cash and, instead, have the right to convert outstanding amounts owed under the Note (principal and interest) to shares of DPLS common stock, at a specified Conversion Price.  (*Id.* ¶ 7.)  Section 1.2(a) of the Note provides for a per-share conversion price of $0.015 per share—the Fixed Conversion Price or, alternatively, a Default Fixed Conversion Price of $0.005 per share, applicable if an Event of Default occurs.[8]  (*Id.* ¶ 8.) This fixed-price conversion feature differs from nearly all of the other convertible notes entered by DPLS (including the September 2018 Note with FirstFire), as those notes all provided, rather than a fixed per-share conversion rate, a conversion rate that was variable—providing for a discount (30% or 35%) from the market price at the time of conversion.  (*Id.* ¶¶ 9, 10.)[9]

---

[7] In its Complaint, DPLS also asserts claims relating to the September 2018 Note.  Although the September 2018 Note includes a New York exclusive forum provision (and Nevada choice of law), FirstFire intends to file a dispositive motion in March that will include arguments to dismiss DPLS's claims concerning the September 2018 Note.

[8] If an Event of Default occurs (as has occurred here), Section 3.22 of the Note provides for a Default penalty—that upon the occurrence and during the continuation of an Event of Default, the Note shall be payable in an amount equal to the Principal Amount then outstanding plus accrued interest (including any Default Interest) multiplied by 125%. To date, FirstFire has not converted that part of the Note that includes the Default penalty.  (Fireman Decl. ¶ 29.)

[9] By agreeing to a fixed-price conversion, FirstFire took on significant market risk (particularly given the high volatility in DPLS common stock, the six-month holding and non-conversion period, and that the conversion price in the Note was set near the then-current market price).  A variable rate conversion price, on the other hand, effectively provides for a specified discount to the market price in effect at the time the note is converted into common shares.

A-229

In Section 3.e of the SPA, DPLS represents and warrants to FirstFire that "so long as any amount on the Note remains outstanding, the Company shall not to any person, institution, governmental or other entity, state, claim, allege, or in any way assert, that [FirstFire] is currently, or ever has been a broker-dealer under the Securities Exchange Act of 1934." (*Id.* ¶ 6.)

**D.      The Amendment to the Note**

On or about November 4, 2021, FirstFire and DPLS executed "Amendment No. 1 to the Convertible Promissory Note Issued on April 26, 2021" (the "Amendment"). (*Id.* ¶ 22.) The Amendment is a one-page document, and nearly the entirety of the Amendment concerns the parties' agreement to change the choice of law and exclusive forum provisions from New York to Delaware. (*Id.* ¶ 23.) The Amendment was executed by CEO Dennis O'Leary for DPLS while O'Leary and Eli Fireman were together in Arizona (not Nevada, as stated in the Complaint), after DPLS's counsel Brian Higley had reviewed the Amendment with Mr. O'Leary, and Mr. Fireman emailed a countersigned version of the Amendment to Mr. O'Leary thereafter for DPLS's records. (*Id.* ¶ 22; Compl. ¶ 40.) Contrary to the allegations in the Complaint (¶¶ 40, 41), at no time did Mr. Fireman seek to conceal from Mr. O'Leary (nor realistically could he) that the Amendment modified the Note's choice of law and exclusive forum provisions. (Fireman Decl. ¶ 24.)

**E.      The Events of Default**

Article III specifies Events of Default under the Note. Section 3.21 provides that it shall be an Event of Default "[i]f the Borrower fails to meet its obligations under the Registration Rights Agreement entered into by the parties in connection herewith." (*Id.* ¶ 11.) Among other things, the Registration Rights Agreement (Section 2(b)) requires DPLS to use commercially reasonable efforts to file a registration statement covering the resale of the shares of DPLS common stock issued or issuable to FirstFire pursuant to the SPA and with respect to the Note and any conversion thereof (the "Registrable Shares"), within ninety (90) days following the funding of the Note.

8

Section 3.16 of the Note provides that it shall be an Event of Default if DPLS issues common shares pursuant to an equity line of credit or otherwise in connection with a Variable Rate Transaction entered into after the date of the Note. (*Id.* ¶ 17.) As reflected in the Fireman Declaration (¶¶ 12–21) and in the Delaware complaint, DPLS has committed Events of Default under both of these provisions.

### F.     The Conversion and the Dispute

On November 15, 2021, in compliance with the procedures specified in the Note,[10] Nick Fireman, an officer of FirstFire, emailed DPLS CEO Dennis O'Leary, at his darkpulse.com email account, a copy of a notice of conversion (the "Notice of Conversion") whereby FirstFire elected to convert the $825,000 principal and $61,875 of interest outstanding on the Note into 177,375,000 shares of DPLS common stock, using the Default Fixed Conversion Price of $0.005 per share, based on the aforementioned Defaults by DPLS. (*Id.* ¶ 25.) On November 17, 2021, again in accordance with the Note, FirstFire submitted the same Notice of Conversion, along with a legal opinion and related materials, to the Transfer Agent, and the Transfer Agent confirmed the issuance of the shares of DPLS common stock later the same day. (*Id.* ¶ 26.)

In any event, by no later than November 23, 2021, DPLS was aware that 177,375,000 DPLS common shares had been issued to FirstFire pursuant to a conversion. (*Id.* ¶ 27, Ex. E). And on November 29, 2021, FirstFire received an email from Mr. O'Leary requesting that FirstFire return the shares of DPLS common stock it received "over and above the original note amount" and stating that "no additional shares were/are owed per the note agreement." (*Id.* ¶ 28.) In other words, DPLS did not contest the validity of the Note or FirstFire's right to convert, but instead

---

[10] Section 1.4(a) of the Note provides that "[t]his Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion." (Fireman Decl. ¶ 7.)

argued that the conversion should have been effected using the non-default Fixed Conversion Price of $0.015 per share, which would have resulted in the issuance of 59,125,000 shares, and that FirstFire should return to DPLS 118,250,000 shares.  It was not until DPLS initiated this lawsuit that it took the position that the Note should be rescinded.

On December 13, 2021, FirstFire commenced the Delaware Action against DPLS, seeking a declaration that FirstFire is entitled to all 177,375,000 DPLS common shares it converted as well as further shares.[11]  (Marks Decl. ¶ 16.)

### G.    FirstFire Sold Half of the DPLS Shares over the Past Two Months (42 Trading Days)

Over the 42 trading days following the conversion from November 18, 2021 to January 14, 2022, FirstFire sold a total of 85,509,808 DPLS common shares.  (Fireman Decl. ¶ 30.)  This represents on average around 6.91% of the trading volume during this period (which, as noted above, was 28.04 million per day).  (Marks Decl. ¶ 5.)  So, for example, on January 14, 2022, the day that DPLS filed this injunction application, there was total trading volume of over 90 million DPLS common shares, and FirstFire accounted for sales of approximately 3,134,808 million DPLS common shares (as opposed to the 56 million alleged by DPLS in its January 17 filing).  (Fireman Decl. ¶ 31.)  All of FirstFire's trading has been in an effort to achieve the highest available price. (*Id.* ¶ 32.)  It is, of course, in FirstFire's best interest that DPLS's share price remain as high as possible while FirstFire sells its shares.  There is no basis to suggest that FirstFire's trading has had any negative impact on DPLS's share price.  (*Id.*)

---

[11] FirstFire is entitled under the Note to more consideration than it originally sought and received in connection with the November 17, 2021 conversion.  Under the Note, because DPLS committed Events of Default, FirstFire is to receive principal and interest at an additional 25% default penalty, which default amount is also subject to conversion to shares of DPLS common stock.  Accordingly, FirstFire is entitled to an additional 44,343,750 DPLS common shares (or a total of 221,718,750 common shares).  (Fireman Decl. ¶ 29.)

A-232

**ARGUMENT**

Plaintiff's request for a preliminary injunction should be denied. Plaintiff has brought this motion (and the related claims in the Action) in plain violation of the Note's exclusive forum-selection clause, notwithstanding the preexisting case concerning the same Note already pending in Delaware Chancery Court. *And*, even if this were the proper venue (which it is not), the injunction should not in any event issue, as Plaintiff has failed to show that it will be irreparably harmed in its absence, that DPLS is likely to succeed on the merits of the Complaint, and that the balance of equities weighs in Plaintiff's favor.

**I.      This Application Should Be Denied, as Delaware is the Parties' Exclusive Forum**

**A.      The Amendment to the Exclusive Forum Provision in the Note Is Valid, Was Communicated to Plaintiff, Has Mandatory Force, and Covers the Parties and Claims in this Application**

The Second Circuit has a "strong policy of enforcing forum selection agreements." *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1278 (S.D.N.Y. 1992). A valid forum-selection clause "represents the parties' agreement as to the most proper forum." *Atl. Marine Constr. Co., Inc. v. U.S. Dist. Court for W. Dist. of Texas*, 571 U.S. 49, 63 (2013). Thus, the "enforcement of valid forum-selection clauses, bargained for by the parties, protects their legitimate expectations and furthers vital interests of the justice system." *Id.*

By executing the Amendment to the Note, DPLS agreed that "[a]ny action brought by either party against the other concerning the transactions contemplated by this [amendment], the Note, the Warrant, or any other agreement . . . shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware." (Fireman Decl. Ex. C, Amendment ¶ 2.) Pursuant to the parties' agreed-upon exclusive choice of forum, FirstFire filed the Delaware Action against DPLS, seeking a declaration from the Delaware Chancery Court that the conversion of shares pursuant to the Note was proper and that FirstFire is entitled to the 177,375,000 shares of

11

DPLS common stock received in connection with the conversion. (Marks Decl. Ex. I, Del. Compl. ¶ 1.) In response, DPLS has improperly brought claims in this Action concerning the Note— without regard to and in clear violation of the Note's exclusive forum provision. (*See* Compl. ¶¶ 9–10.) Defendants request that the Court enforce the parties' choice of forum and deny this motion. *See Cottonwood Holdings, Inc. v. C3, Inc.*, 1995 WL 276196, at *4 (S.D.N.Y. May 11, 1995) (holding that the parties' "forum selection clause is found to govern, and all claims against the C3 Defendants are dismissed without prejudice").

"Courts analyzing a contractual forum selection clause must first ask: (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, *i.e.*, whether the parties are required to bring any dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause." *Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, 2021 WL 4463921, at *5 (E.D.N.Y. Aug. 17, 2021), *report and recommendation adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021). Where the forum-selection clause was communicated to the other party and covers "the claims and parties involved in the dispute," it is presumptively enforceable unless the moving party makes "a sufficiently strong showing that enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching." *Id.*

First, the existence of the forum-selection clause was communicated to DPLS. DPLS admits that Mr. "Fireman presented [DPLS CEO Mr.] O'Leary with a one-page amendment to the April 2021 Note." (Compl. ¶ 40.) The changes to the forum-selection clause appear plainly on the face of the document, which DPLS acknowledges is just over one page long, and the clause constitutes almost the entirety of the substance of the document. (Fireman Decl. Ex. C,

Amendment ¶ 2); *see Nat'l Sch. Reporting Servs., Inc. v. Nat'l Sch. of Cal., Ltd.*, 924 F. Supp. 21, 24 (S.D.N.Y. 1996) (finding defendants aware of the exclusive forum clause as "the clause appear[ed] in . . . the Promissory Note, a two-page-long document").  Second, the Amendment has mandatory force as it requires that actions arising under the Note "shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware."  (Fireman Decl. Ex. C, Amendment ¶ 2); *Power Up*, 2021 WL 4463921, at *6.  Third, the forum-selection clause governs the parties and the claims at issue in this application, which arises out of the Note.  Because the Amendment was communicated to DPLS, has mandatory force, and applies to the parties and the claims at issue in this application, it is presumptively enforceable.  *Power Up*, 2021 WL 4463921, at *6.

### B.    DPLS Fails to Show that Enforcement of the Exclusive Forum Provision Would Be Unreasonable or Unjust

To avoid enforcement of the Amendment, DPLS bears the burden to make a "sufficiently strong showing that enforcement would be unreasonable or unjust," *id.*, or that the Amendment "was obtained through fraud or overreaching," *Jones v. Weibrecht*, 901 F.2d 17, 18 (2d Cir. 1990). It is not enough to assert "vague and conclusory statements . . . to argue that the clause is unfair." *Nat'l Sch. Reporting Servs., Inc.*, 924 F. Supp. at 24.  Further, "mere absence of negotiation over the terms of a contract does not render a forum selection clause unenforceable."  *Weiss*, 801 F. Supp. at 1279.

Here, DPLS is a sophisticated party, and Mr. O'Leary a sophisticated businessman, with previous experience negotiating contracts containing forum-selection clauses.  (Compl. ¶ 34.) DPLS alleges that Mr. "Fireman failed to mention to [Mr.] O'Leary that the amendment . . . replaced the choice of law provision."  (Compl. ¶ 40.)  Even if true (which it is not), Mr. Fireman was not required to explain in detail the contents of the Amendment to Mr.

O'Leary in order for the Amendment to be enforceable. *Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) ("If [a businessman] did not read [a contract's terms] or hire counsel to do so, he is the victim of his own lack of diligence, not [Defendants'] misconduct.").

DPLS does not point to any facts to indicate that Mr. Fireman pressured, coerced or deceived Mr. O'Leary into signing the Amendment. Mr. O'Leary's purported oversight or lack of diligence does not amount to fraud or overreaching by Defendants. *See Elite Parfums Ltd. v. Rivera*, 872 F. Supp. 1269, 1273 (S.D.N.Y. 1995). Because DPLS has not met its burden to show that the Amendment was unfair or obtained fraudulently, the forum-selection clause is valid and enforceable as to all of DPLS's claims relating to the Note. *See Cottonwood Holdings, Inc.*, 1995 WL 276196, at \*3–4 (dismissing securities and state-law fraud claims against defendants who signed forum-selection clause requiring action to be brought in Maryland).

## II.     The Request for a Preliminary Injunction Should Be Denied

Even if DPLS's request for a preliminary injunction was properly before this Court (it is not), it nevertheless fails on the merits. A district court may only grant a preliminary injunction "when the party seeking the injunction demonstrates (1) that he or she will suffer irreparable harm absent injunctive relief, and (2) either (a) that he or she is likely to succeed on the merits, or (b) that there are sufficiently serious questions going to the merits to make them a fair ground for litigation, and that the balance of hardships tips decidedly in favor of the moving party." *Weaver v. Schiavo*, 750 Fed. App'x 59, 60 (2d Cir. 2019). A preliminary injunction is "an extraordinary and drastic remedy, one that should not be granted unless the movant, by a *clear showing*, carries the burden of persuasion." *Sussman v. Crawford*, 488 F.3d 136, 139 (2d Cir. 2007). DPLS fails to show that in the absence of an injunction, DPLS would be irreparably harmed, its claims are likely to succeed on the merits, and that the balance of equities weighs in DPLS's favor.

### A.      DPLS Cannot Show Irreparable Harm

DPLS's failure to show it will be irreparably harmed in the absence of an injunction, on its own, requires denial of its motion. "Irreparable harm is the single most important prerequisite for relief." *Weaver*, 750 Fed. App'x at 60. For this Court to issue an injunction, DPLS must make a "clear showing that the plaintiff is entitled to such relief." *Winter v. Natural Res. Defense Council, Inc.*, 555 U.S. 7, 22 (2008). A "mere possibility of irreparable harm is insufficient." *Borey v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 934 F.2d 30, 34 (2d Cir. 1991); *Monowise Ltd. Corp. v. Ozy Media, Inc.*, 2018 WL 2089342, at *1 (S.D.N.Y. May 3, 2018) ("[I]f a party fails to show irreparable harm, a court need not even address the remaining elements of the test.").

#### (i)      *There Is an Adequate Remedy at Law*

Where a party is requesting the issuance or return of stock pursuant to a note, "[t]he majority of courts . . . have rejected the notion that monetary damages are not an adequate remedy at law for common stock available on the open market." *Alpha Capital Anstalt v. Shifipixy, Inc.*, 432 F. Supp. 3d 326, 339 (S.D.N.Y. 2020); *see also EMA Fin., LLC v. AIM Exploration, Inc.*, 2019 WL 689237, at *13 (S.D.N.Y. Feb. 19, 2019) (Ramos, J.).

Plaintiff alleges that FirstFire was "unjustly enriched" by its conversion under the Note and thus "this is a case about money, not the right to possession of specific shares of [DPLS] stock." *Aiena v. Olsen*, 37 F. Supp. 2d 303, 306 (S.D.N.Y. 1999). The Complaint concedes this point as it requests primarily "rescissionary damages," "statutory prejudgment interest on any monetary award and on the value of any stock obtained," "compensatory, direct, and consequential damages," "punitive and/or treble damages," and the "return to DarkPulse [of] the *value* of the property they have unjustly retained in the amount of $26,560,750." (Compl. Prayer for Relief.) The Complaint rather only states a "conclusory reference to unspecified equitable relief in addition to demanding the payment of damages." *Aiena*, 37 F. Supp. 2d at 306. DPLS refers only to

15

financial harm to justify its request for injunctive relief by stating conclusorily that FirstFire's sale would "mak[e] it nearly impossible for the company to find new investors." (O'Leary Decl. ¶ 12.) Any conceivable damage here is ascertainable, and so "[t]he possibility that adequate compensatory or other corrective relief will be available at a later date, in the ordinary course of litigation, weighs heavily against a claim of irreparable harm." *Union Capital LLC v. Vape Holdings, Inc.*, 2016 WL 8813991, at *3 (S.D.N.Y. Mar. 9, 2016) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974)). As DPLS's stock is fungible and the value of its stock is clearly ascertainable, DPLS can be made whole at a later date should this Action prove meritorious.[12]

DPLS's argument that monetary damages are unavailable under Section 29(b), which thus somehow shows that there exists no adequate remedy at law, is legally unsound. As an initial matter, Plaintiff's cited case law does not support this proposition. *Moody v. Bache & Co.*, 570 F.2d 523, 527 n.6 (5th Cir. 1978) (noting that to allow monetary damages under Section 29(b), plaintiff must show a "causal relationship between the violation and the harm to the complainant"). Despite DPLS's "noted commentator," the Supreme Court specifically stated in *Mills v. Electric-Auto-Lite Co.*, 396 U.S. 375 (1970), that monetary damages are a "possibility" under Section 29(b) "to the extent that they can be shown."[13]  *Id.* at 388–89.  Finally, DPLS's argument here is surprising given the Complaint explicitly requests monetary damages for Counts I and II brought under Section 29(b), which it now claims are unavailable. (Compl. Prayer for Relief (requesting "rescissionary damages" and "statutory prejudgment interest on any monetary award").)

As there is a clear remedy at law, the Court should decline to issue an injunction.

---

[12] In fact, upon filing this lawsuit, DPLS issued a press release, promising shareholders "[it] is management[']s intention to take an award by the courts and issue a special dividend to all shareholders of record in DPLS *(in the event cash is recovered)*." (Marks Decl. Ex. L.)

[13] The exact remedy under Section 29(b) for Section 15(a) violations specifically is unclear, as the Second Circuit expressly refused to address whether Section 15(a) could form the basis for a Section 29(b) claim. *Boguslavsky v. Kaplan*, 159 F.3d 715, 722 n.6 (2d Cir. 1998).

(ii)     *DPLS Has Not Shown Any Concrete, Actual Harm*

DPLS has failed to allege any actual harm in the absence of an injunction.  To show irreparable harm, Plaintiff must allege "an injury that is neither remote nor speculative, but actual and imminent." *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 114 (2d Cir. 2005).

DPLS first argues that it will be irreparably harmed by dilution, as the DPLS share price will go down. (Mot. at 15.)  Yet the 90 million shares that DPLS has not yet sold make up less than 2% of DPLS common shares currently in the market, and their issuance has been publicly disclosed already for a long time.  (Compl. ¶ 43.)  Thus, the dilution harm Plaintiff argues is completely speculative and, at best, constitutes purported harm that has already occurred. *Dexter 345 Inc. v. Cuomo*, 663 F.3d 59, 63 (2d Cir. 2011) (affirming denial of injunction where the harm alleged had already occurred); *see also Usherson v. Bandshell Artist Mgmt.*, 2020 WL 4228754, at *2 (S.D.N.Y. July 22, 2020) ("As the old saying goes, the cat is out of the bag.").

Additionally, as DPLS concedes, DPLS common shares of stock are fungible and there is nothing unique about the shares that FirstFire received upon conversion compared to those on the open market.  (Mot. at 15.)  DPLS states that "[i]f FirstFire is permitted to dump DarkPulse's stock, it would severely injure the company and its shareholders, making it nearly impossible for the company to find new investors and greatly impeding the company's ability to prosecute this lawsuit." (O'Leary Decl. ¶ 12.)  However, on December 13, 2021, DPLS filed a prospectus registering 300 million shares of its common stock for sale by GHS Investments LLC, noting that common stock outstanding prior to the offering totaled 5,154,044,407.  (Marks Decl. Ex. K, DarkPulse, Inc., Prospectus 4 (Form 424B4) (Dec. 13, 2021).)  DPLS also filed a registration statement on December 8, 2021, noting the issuance of over 3.5 billion shares pursuant to the conversion of a series of convertible notes of which FirstFire's shares constitute only 5%. (Marks

Decl. Ex. J, DarkPulse, Inc., Registration Statement II-1–II-5 (Form S-1/A) (Dec. 8, 2021).)  Given the small portion of the market of DPLS shares converted by FirstFire under the Note and the number of outstanding shares, it is speculative at best what effect FirstFire's sale of its shares would have on the market.  *NewLead Holdings Ltd. v. Ironridge Global IV Ltd.*, 2014 WL 2619588, at *7–8 (S.D.N.Y. June 11, 2014) (noting that within six days Plaintiff had nearly doubled the number of outstanding shares, by issuing shares to other parties, which undermined any argument of irreparable harm as plaintiff "will continue to hemorrhage common shares and dilute their value regardless of whether [defendant] is enjoined").[14]

DPLS has failed to show any actual, concrete harm, let alone harm that is irreparable.

(ii)   *DPLS's Delay Militates Against Granting Any Relief*

DPLS's unexplained two-month delay in bringing this request for a preliminary injunction, and the fact that FirstFire has sold over half of the shares at issue in small volume sales in the interim, further warrants denial of its request.  Typically, delay in seeking injunctive relief is "'compelling evidence' that there is no irreparable harm." *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 457 (S.D.N.Y. 2014) (Ramos, J.).  "Preliminary injunctions are generally granted under the theory that there is an urgent need for speedy action to protect the plaintiffs' rights. Delay in seeking enforcement of those rights, however, tends to indicate at least a reduced need for such drastic, speedy action." *Monowise Ltd. Corp.*, 2018 WL 2089342, at *2.

While there is no set time after which delay is inexcusable, "courts in this Circuit typically decline to grant preliminary injunctions in the face of unexplained delays of more than two

---

[14] Plaintiff's cited case law either supports a finding of no irreparable harm or are completely irrelevant. *Franklin Fed. Savings Bank v. United States*, 60 Fed. Cl. 55, 72 (2004) (rejecting expert's methodology for calculating monetary damages for the dilution of shareholders' interests); *Strougo v. Scudder, Stevens & Clark, Inc.*, 964 F. Supp. 783, 802 (S.D.N.Y. 1997) (recognizing monetary damages available to compensate shareholders for dilution in claim for breach of fiduciary duty under Maryland law), *vacated and remanded*, 282 F.3d 162 (2d Cir. 2002).

months." *Hodnett v. Medalist Partners Opportunity Master Fund II-a, L.P.*, 2021 WL 535485, at *6 (S.D.N.Y. Feb. 12, 2021).  Here, DPLS waited two months after FirstFire's notice of conversion before bringing this motion for a preliminary injunction, and the circumstances have changed given that FirstFire has already sold out of more than half of its position.  (Compl. ¶ 42.)  Given Plaintiff was clearly aware of the likelihood of FirstFire selling its DPLS common shares upon conversion (*see* Compl. ¶ 30), which FirstFire was fully within its rights to do, Plaintiff has provided no explanation for its two-month delay in bringing a motion for a preliminary injunction.

**B.     DPLS Is Unlikely to Succeed on the Merits of Counts I and II**[15]

DPLS's Section 29(b) claims (Counts I and II) will fail for several reasons.  To establish a violation of Section 29(b), Plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect."  *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 1177801, at *2 (Mar. 29, 2021), *reconsideration denied* 2021 WL 5998411 (S.D.N.Y. Dec. 20, 2021).  As the Note did not require FirstFire to act as a "dealer," did not involve a "prohibited transaction," and because FirstFire does not meet the requirements of the definition of a dealer and because DPLS is not an unwilling or innocent party, DPLS's 29(b) claims will fail.

(i)     *The Note Did Not Involve a Prohibited Transaction*

"[O]nly unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts."  *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *a'f'd*, 672 F.2d 901 (2d Cir. 1981).  The *Vystar* case, also involving a convertible note, is instructive.  *Vystar Corp., Inc.*, 2021 1177801, at *1.  EMA Financial sued to recover for breaches of the note and Vystar

---

[15] DPLS does not argue that Counts III–V are likely to succeed on the merits so Defendants have not addressed them here.  Defendants do not believe DPLS is likely to succeed on the merits of these Counts and not addressing them here should not be construed as a waiver of those arguments.

argued in response that EMA acted as an unregistered broker-dealer in violation of Section 15(a)(1) and sought rescission pursuant to Section 29(b). *Id.* The court held that Vystar's argument failed "as a matter of law because the Agreements do not require EMA to act as a broker-dealer and are therefore not voidable under Section 29(b)." *Id.* at *2. Courts in this Circuit have consistently held that absent any provision requiring a party to act as a broker-dealer, contracts are not voidable under Section 29(b). *See LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018) (finding that "even if [plaintiff] should have registered, nothing in the note or the SPA indicates that those contracts 'could not have been legally performed' because [plaintiff] failed to do so"); *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, n.22 (S.D.N.Y. 2020) (noting that for a contract to be void under Section 29(b), a provision requiring the lender "to register as a broker . . . is essential"); *Omega Overseas Partners, Ltd. v. Gr.,fith*, 2014 WL 3907082, at *4–5 (S.D.N.Y. Aug. 7, 2014) (noting that Section 29(b) "voids only contracts that are made illegally or require illegal performance"); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (holding "[t]here is . . . no reason to believe that the contracts themselves could not be legally performed," which was "fatal to Plaintiffs' claim").[16] Similarly here, the Note and the SPA did not require FirstFire to act as a broker-dealer, as they do not require DPLS to buy or sell securities. Moreover, contrary to DPLS's incorrect statements in its memorandum law (Mot. at 12), the Note does not even involve a variable rate conversion price—the Note's conversion rate is fixed.

---

[16] DPLS attempts to distinguish *Vystar* and *LG Capital*, arguing that "the analysis was based on broker cases" and that the defendants only argued that the contracts were unlawful because they could not be lawfully performed. (Mot. at 13 n.20.) DPLS fails to explain how "broker cases" render these cases "incorrect" and the *Vystar* Court explicitly held that the contracts at issue "were neither *made* nor performed in violation of federal securities laws." *Vystar Corp., Inc.*, 2021 1177801, at *3. As the *LG Capital* Court recognized, the correct inquiry is whether the contracts were illegal *when executed*, not when performed. *LG Capital Funding, LLC*, 2018 WL 6547160, at *5 (holding plaintiff could not "vitiate contracts that were lawful at the time they were executed").

(ii)   *FirstFire Is Not a "Dealer"*

FirstFire also does not remotely meet the definition of a "dealer" within the Exchange Act.

Pursuant to Section 3(a)(5)(A), "[t]he term 'dealer' means any person engaged in the business of

buying and selling securities . . . for such person's own account through a broker or otherwise."

15 U.S.C. § 78c(a)(5)(A).  A "trader" by contrast, for which there is an exception from the

definition of dealer, is a party who "buys and sells securities for his or her own account, either

individually or in a fiduciary capacity, but not as part of a regular business."  S.E.C., Guide to

Broker-Dealer Registration (Apr. 2008).  An entity may meet the definition of a dealer by:

> (1) underwriting; (2) acting as a market maker or specialist on an organized
> exchange or trading system; (3) acting as a *de facto* market maker whereby market
> professionals or the public look to the firm for liquidity; or (4) buying and selling
> directly to securities customers together with conducting any of an assortment of
> professional market activities such as providing investment advice, extending credit
> and lending securities in connection with transactions in securities, and carrying a
> securities account.

*Id.*  FirstFire engages in none of these activities and the Complaint is devoid of any allegations to

the contrary.  FirstFire explicitly has only ever sold securities on its own behalf and has never

acted as an underwriter for an offering of securities.  (Fireman Decl. ¶ 3.)  While the Complaint

claims that Defendants "sold more than 1 billion newly-issued shares of stock obtained from those

notes into the public market," the Complaint does not describe even a single stock sale.  (Compl.

¶ 60.)  Rather, the Complaint shows that out of $34 million in principal loaned to various issuers,

FirstFire converted only $1.4 million or 4% of the total amount loaned.  (Compl. Ex. 3 at 8.)  This

is a far cry from "buying and selling securities" as part of its regular business, but rather clearly

shows that FirstFire acts as a trader.  *Foundation Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294,

at *7 (S.D.N.Y. Aug. 11, 2010) ("[T]he record here does not indicate that [defendant] regularly

engages in securities transactions.").

21

The cases DPLS relies on are distinguishable. First, all of these cases were brought by the S.E.C. directly under Section 15(a), rather than any involving a private plaintiff bringing a Section 29(b) claim. *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809 (11th Cir. 2015); *SEC v. Keener,* 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)*; SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021). This distinction is important, as these cases do not involve the Court's examination of a single transaction, but rather an entity's entire business, and do not involve consideration of whether the contracts at issue were illegal *when made*.[17] *Vystar Corp., Inc.*, 2021 1177801, at *3.

These cases additionally all involve very different facts than those at issue here. For example, in *S.E.C. v. Big Apple Consulting USA, Inc.*, 783 F.3d 786 (11th Cir. 2015), the Eleventh Circuit interpreted the Securities Act to find that defendants were dealers, where defendants did not contest their "*entire* business model was predicated on the purchase and sale of securities." *Id.* at 809 (emphasis in original). As explained above, Plaintiff has failed to show that the buying and selling securities is even a substantial portion of FirstFire's business, let alone its entire business. The defendants in *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020), and *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019), bought securities from third parties and "immediately" sold them back into the market. *Almagarby*, 479 F. Supp. 3d at 1272; *River N. Equity LLC*, 415 F. Supp. 3d at 857. The defendant in *Almagarby* also "went so far as employing and paying 'finders' who were in the business of soliciting referral companies." *Almagarby*, 479 F. Supp. 3d at 127. Here, by contrast, DPLS hired a registered broker-dealer who found FirstFire

---

[17] DPLS's novel argument that the contracts themselves are securities is unsupported by any case law and would render nearly all of DPLS's financing within the last two years illegal. (Marks Decl. Ex. J, DarkPulse, Inc., Registration Statement II-1–II-5 (Form S-1/A) (Dec. 8, 2021).)

to enter into the Note (Marks Decl. Ex. H, DarkPulse, Inc., Current Report 2 (Form 8-K) (May 5, 2021)) and FirstFire's conversion was at a fixed price under the Note, rather than at any discount, so FirstFire could only wait for an increase in market price to sell its shares to make a profit (Fireman Decl. Ex. A, Note § 1.2).[18]

While DPLS brings a separate count arguing that the contracts as performed violate federal securities laws, as stated above under Section 29(b), "only unlawful *contracts* may be rescinded, not unlawful transactions made pursuant to *lawful* contracts." *Pompano-Windy City Partners, Ltd. v. Bear Sterns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992). Thus as the contract is not in violation of federal securities law, the transactions as performed are not either.[19]

(iii)   *DPLS Is Not an Innocent, Unwilling Party*

Finally, DPLS is not an unwilling or innocent party that falls within the class of persons Section 29(b) was designed to protect. To rescind a contract under Section 29(b), Plaintiff must be "an unwilling innocent party to the contract." *Buffalo Forge Co. v. Ogden Corp.*, 717 F.2d 757, 759 (2d Cir. 1983), *cert. denied*, 464 U.S. 1018 (1983). The Note specifically stated that a broker would be used to the extent necessary to effectuate the transfer of the converted shares (Fireman Decl. Ex. A, Note §§ 1.5, 3.19) and the SPA specifically acknowledges that FirstFire is not (nor has ever been) "a broker-dealer under the Securities Exchange Act of 1934" (Fireman Decl. Ex. B, SPA § 3e). DPLS is also a sophisticated entity that has entered into dozens of similar convertible notes over the past few years, including with parties that are not registered as broker-dealers. (Marks Decl. Ex. K, DarkPulse, Inc., Prospectus 39–40 (Form 424B4) (Dec. 13, 2021).)

---

[18] *SEC v. GPL Ventures, LLC*, Case No. 21-cv-06814 (Jan. 18, 2022) (ECF No. 62), involved an unregistered "market maker" for securities, who would convert notes and then have a third-party promotor find investors in the security. *Id.* at 13–14. There is no similar allegation here.

[19] That DPLS affirmatively represented in the SPA that it would not assert that FirstFire is a broker-dealer also speaks volumes to the invalidity of DPLS's claim.

Where, as here, a party "willingly entered into the questioned contract and knew all of the facts which [it] now claims constitute 'manipulation' . . . it may not invoke the provisions of section 29(b) to challenge the contract." *Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 892, 906 (W.D.N.Y.), *aff'd* 717 F.2d 757 (2d Cir. 1983); *see also Cary Oil Co., Inc. v. MG Refining & Marketing, Inc.*, 230 F. Supp. 2d 439, 486 (S.D.N.Y. 2002) ("[T]here is no claim that the contract was entered into because of any misrepresentations. Hence it would be too glib to talk about an 'innocent party,' at whose option the contract is voidable."). DPLS is thus unlikely to succeed on the merits of this and all prongs of its Section 29(b) claims.

### C. The Balance of Hardships Weighs in FirstFire's Favor

"In balancing the equities, the issue is whether plaintiff would suffer decidedly greater harm from an erroneous denial of an injunction than the defendants would suffer from an erroneous grant." *Foulke by Foulke v. Foulke*, 896 F. Supp. 158, 162 (S.D.N.Y. 1995). Even if the Court finds that DPLS is likely to succeed on the merits, it "must consider the balance of hardships between the plaintiff and defendant and issue the injunction *only if* the balance of hardships tips in the plaintiff's favor." *5464 Route 212, LLC v. N.Y. State Dep't of Transp.*, 2020 WL 1888976, at *8 (N.D.N.Y. Apr. 16, 2020).

Here, DPLS seeks to enjoin FirstFire from selling DPLS common shares. The risks to FirstFire are serious—granting DPLS's motion for a preliminary injunction would prevent FirstFire from selling the shares of DPLS stock that FirstFire rightfully converted pursuant to the Note, for any reason, lasting for the entire duration of this Action. The price of DPLS common stock is historically volatile, and enjoining FirstFire from trading its shares for the duration of this Action, without any regard to the movements of the market, would result in undue financial hardships for FirstFire. *See id.* (considering financial hardship in balancing the equities in favor of defendants and denying injunction). In contrast, DPLS has not demonstrated, beyond mere

24

conclusory statements, how a purported drop in the price of its shares (conclusorily stated as caused by FirstFire) would harm DPLS.  Denial of DPLS's motion would merely subject DPLS to the ebbs and flows of the market, as the price of its stock may be affected by any number of factors. Additionally, because FirstFire has already sold out of more than half of its position, the harm DPLS purports to prevent by its motion is already necessarily lessened.

**III.    If Any Interim Relief Is Granted, DPLS Should Be Required to Post a Bond in Cash Equal to the Present Trading Value of FirstFire's Shares**

"The court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." *See* Fed. R. Civ. P. 65(c).  This rule serves to "assure[] the enjoined party that it may readily collect damages from the funds posted in the event that it was wrongfully enjoined, and that it may do so without further litigation and without regard to the possible insolvency of the plaintiff." *Nokia Corp. v. Interdigital, Inc.*, 645 F.3d 553, 557 (2d Cir. 2011).

Here, if the Court were inclined to issue an injunction (which it should not do), a bond equal to the present trading value of FirstFire's shares is necessary to protect FirstFire against the volatility of the price of DPLS's shares.

### CONCLUSION

For the foregoing reasons, Defendants respectfully request this Court deny Plaintiff's motion for a preliminary injunction.

Dated:  January 19, 2022                */s/ Aaron H. Marks*

                                    Aaron H. Marks, P.C.
                                      Byron Pacheco
                                      Julia D. Harper
                                      KIRKLAND & ELLIS LLP
                                      601 Lexington Avenue
                                      New York, New York 10022
                                      (212) 446-4800

                                      *Attorneys for Defendants*

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

DARKPULSE, INC.,

               Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

               Defendants.

Index No. 1:21-cv-11222 (ER)

---

**DECLARATION OF ELI FIREMAN IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Eli Fireman, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

    1.    I am the Managing Member of FirstFire Global Opportunities Fund, LLC ("FirstFire"), a defendant in the above-captioned action, and am authorized to make this declaration on behalf of FirstFire. I am also personally named as a defendant in this action. I submit this Declaration in support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction. I make this Declaration based upon my own personal knowledge.

    2.    FirstFire is an investment fund focusing on small to medium-sized public and private companies, with expertise in distressed, special situations, and event-driven investing. Occasionally, FirstFire provides equity for highly distressed companies.

    3.    FirstFire has only ever sold securities on its own behalf and has never acted as an underwriter for an offering of securities.

**A.**     **DPLS Convertible Promissory Notes**

4.     On September 20, 2018, DarkPulse, Inc. ("DPLS") issued a convertible note to FirstFire (the "September 2018 Note"). The September 2018 Note was converted by FirstFire on multiple occasions in 2019, 2020, and 2021, for a total of 879,400,000 DPLS common shares converted.

5.     On April 26, 2021, DPLS issued a second convertible note to FirstFire (the "Note") in exchange for FirstFire agreeing to provide DPLS with $750,000 in cash. In connection with entering the Note, a true and correct copy of which is attached hereto as **Exhibit A**, DPLS and FirstFire also entered into a Securities Purchase Agreement (the "SPA"), a true and correct copy of which is attached hereto as **Exhibit B**, and a Registration Rights Agreement. The Note obligates DPLS to repay the principal sum of $825,000 and interest at the rate of 10% per annum.  (**Exhibit A**, Note at 1.)

6.     Under Section 3.e of the SPA, DPLS represents and warrants to FirstFire that "so long as any amount on the Note remains outstanding, the Company shall not to any person, institution, governmental or other entity, state, claim, allege, or in any way assert, that [FirstFire] is currently, or ever has been a broker-dealer under the Securities Exchange Act of 1934."

7.     Section 1.1 of the Note provides for a conversion right. Should FirstFire choose to forgo a cash repayment of the Note, FirstFire may instead convert any outstanding amounts owed under the Note (including principal and interest) to shares of DPLS common stock at a specified Conversion Price. Section 1.4(a) of the Note provides that "[t]his Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion."

2

8.      Section 1.2(a) of the Note provides for a per share conversion price into which the outstanding principal amount and interest under the Note may be converted into shares of DPLS common stock.  The Fixed Conversion Price is $0.015 per share.  If an Event of Default occurs, the Default Fixed Conversion Price at a rate of $0.005 per share is applicable.

9.      If an Event of Default occurs, Section 3.22 of the Note provides for a Default penalty for the duration of the Event of Default, whereby the Note shall be payable in an amount equal to the Principal Amount then outstanding plus accrued interest (including any Default Interest) multiplied by 125%. If an Event of Default occurs, FirstFire is also entitled to "all costs, including, without limitation, legal fees and expenses, of collection."  To date, FirstFire has not converted that part of the Note that includes the Default penalty (the additional 25% of the Principal Amount to which FirstFire is entitled, including any Default Interest).

10.     The Note has a fixed conversion price, not a variable conversion rate with a discount from the market price at the time of conversion.  The Note therefore indisputably is subject to market risk (of the price of the stock declining).  The Fixed Conversion Price set by the Note is different from almost all of the other convertible notes entered into by DPLS, including the September 2018 Note with FirstFire, as those notes all provided a variable conversion rate— typically set as a calculation providing for a discount (30% or 35%) from the market price at the time of conversion.

11.     Article III of the Note specifies Events of Default.  For example, Section 3.21 provides that an Event of Default will occur "[i]f the Borrower fails to meet its obligations under the Registration Rights Agreement entered into by the parties in connection herewith."

3

**B.      DPLS's Defaults Under the Note**

12.      One of DPLS's obligations under the Registration Rights Agreement (under Section 2(b)) is to use commercially reasonable efforts to file a registration statement covering the resale of the shares of DPLS common stock issued or issuable to FirstFire pursuant to the SPA and with respect to the Note and any conversion thereof (the "Registrable Shares"), within ninety (90) days following the funding of the Note.

13.      Since the Note was funded on April 30, 2021, the deadline for DPLS to file a registration statement for the Registrable Shares related to the Note was July 29, 2021.

14.      However, DPLS failed to file a registration statement with respect to the Registrable Shares by this deadline, and still has not to this day.

15.      DPLS's allegation in the Complaint that "the registration statement appears to have been filed" is plainly false.

16.      Accordingly, DPLS's failure to meet its obligations under the Registration Rights Agreement triggered an Event of Default under Section 3.21 of the Note.

17.      Section 3.16 of the Note provides that an Event of Default will occur if DPLS issues common shares pursuant to an equity line of credit or otherwise in connection with a Variable Rate Transaction entered into after the date of the Note.

18.      On August 19, 2021, DPLS entered into a purchase agreement (the "August GHS Agreement") with GHS Investments, LLC ("GHS"), granting DPLS the right to sell to GHS up to $45,000,000 of shares of DPLS common stock at variable rates from time to time at DPLS's discretion.

19.      On November 9, 2021, DPLS entered into a second purchase agreement (the "November GHS Agreement" and, together with the August GHS Agreement, the "GHS

Agreements") with GHS, granting DPLS the right to sell to GHS up to an additional $30,000,000 of shares of DPLS common stock at variable rates from time to time at DPLS's discretion.

20.     According to DPLS's publicly available SEC filings, DPLS issued shares of DPLS common stock to GHS pursuant to the August GHS Agreement on at least five closings between August 19, 2021 and October 14, 2021.  The GHS Agreements are equity lines of credit and Variable Rate Transactions under the Note.

21.     Accordingly, the issuance of shares of DPLS common stock pursuant to the GHS Agreements triggered an Event of Default under Section 3.16 of the Note.

### C.     The Amendment to the Note

22.     On or about November 4, 2021, I met with DPLS's CEO Dennis O'Leary in Arizona to discuss an amendment to the Note, a copy of which I had previously sent to Mr. O'Leary, that would, among other things, change the choice of law provision in the Note from New York law to Delaware law and change the exclusive forum provision from New York courts (state or federal) to Delaware courts (state or federal) (the "Amendment").  During our meeting, Mr. O'Leary informed me that his attorney Brian Higley had reviewed the Amendment with him. Mr. O'Leary executed the Amendment on behalf of DPLS, and I emailed him a countersigned version of the Amendment on behalf of FirstFire later for his records.  Attached hereto as **Exhibit C** is a true and correct copy of my November 5, 2021 email to Dennis O'Leary and the Amendment.

23.     The Amendment is roughly a one-page document, with almost the entirety of the Amendment concerning the parties' agreement that the Transaction Documents "shall be governed and construed in accordance with the laws of the State of Delaware" and that "[a]ny action brought by either party . . . concerning [the Transaction Documents] shall be brought only in the state courts

5

of Delaware or in the federal courts located in the state of Delaware." (**Exhibit C**, Amendment ¶ 2.)

24.     Contrary to the allegations in the Complaint, at no time did I try to conceal from Mr. O'Leary that the Amendment modified the Note's choice of law and exclusive forum provisions.

     **D.**     **November 2021 Conversion of the Note**

25.     On November 15, 2021, in compliance with the Note, Nick Fireman, an officer of FirstFire, emailed Mr. O'Leary, at his darkpulse.com email account, the account listed for notices in the Note, which indicated that FirstFire elected to convert the $825,000 principal and $61,875 of interest outstanding on the Note into 177,375,000 shares of DPLS common stock, using the Default Fixed Conversion Price of $0.005 per share, based on the Events of Default that DPLS had triggered.  Attached hereto as **Exhibit D** is a true and correct copy of the November 15, 2021 email from Nick Fireman to Dennis O'Leary and the Notice of Conversion.

26.     On November 17, 2021, FirstFire submitted the same Notice of Conversion, along with a legal opinion from JDT Legal, PLLC and related materials, to the Transfer Agent, and the Transfer Agent confirmed the issuance of the shares of DPLS common stock later that same day.

27.     At least by November 23, 2021, DPLS was aware that 177,375,000 DPLS common shares had been issued to FirstFire pursuant to this November 17 conversion.  Attached hereto as **Exhibit E** is a true and correct copy of a November 23, 2021 email from Dennis O'Leary to me.

28.     On November 29, 2021, FirstFire received an email from Mr. O'Leary requesting that FirstFire return the shares of DPLS common stock it received "over and above the original note amount" and stating that "no additional shares were/are owed per the note agreement."  A

A-254

true and correct copy of the November 29, 2021 email from Dennis O'Leary to me is attached hereto as Exhibit F.

29.    Because DPLS had committed Events of Default under the Note, FirstFire is entitled to receive principal and interest at the additional 25% default penalty, and because the default amount is also subject to conversion, FirstFire is entitled to at least an additional 44,343,750 DarkPulse common shares (for a total of 221,718,750 common shares).

30.    Over the 40 trading days from November 18, 2021 to January 14, 2022, FirstFire sold a total of 85,509,808 DPLS common shares, representing a small percentage of the total volume of trading in DPLS common shares during this period.

31.    On January 14, 2022, the day that DPLS filed its injunction application, there was total trading volume of 95 million DPLS common shares, and FirstFire accounted for sales of approximately 3,134,808 million of those shares, contrary to Mr. O'Leary's incorrect statement in his affidavit that FirstFire traded over 56 million shares that day.

32.    All of FirstFire's trading has been in an effort to achieve the highest available price, since it is in FirstFire's best interest that DPLS's share price remains as high as possible.  There is no basis for suggesting that FirstFire's trading has had any negative impact on DPLS's share price.

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022 in _San Fernando_ , _CA_ .

_____
Eli Fireman

7

# EXHIBIT A

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT OR OTHER APPLICABLE EXEMPTION. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

**Principal Amount: $825,000.00**                    **Issue Date: April 26, 2021**
**Actual Amount of Purchase Price: $750,000.00**

### CONVERTIBLE PROMISSORY NOTE

**FOR VALUE RECEIVED, DARKPULSE, INC.,** a Delaware corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC,** a Delaware limited liability company, or registered assigns (the "Holder"), in the form of lawful money of the United States of America, the principal sum of up to $825,000.00 (the "Principal Amount") (subject to adjustment herein), with a purchase price of $750,000.00 (the "Consideration") hereof plus an original issue discount in the amount of $75,000.00 (the "OID"), and to pay interest on the Principal Amount under this Note at the rate of ten percent (10%) (the "Interest Rate") per annum guaranteed from the date that the amount of Consideration is fully funded in accordance with the terms of this Note until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise, as further provided herein with the understanding that the first nine (9) months of interest (equal to $61,875.00) shall be guaranteed and earned in full as of the Issue Date.. The maturity date for this Note shall be nine (9) months from the issue date ("Maturity Date"), and is the date upon which the principal sum as well as any accrued and unpaid interest and other fees shall be due and payable. Notwithstanding any other provision of this Note or any related transaction documents, Borrower may prepay this Note only pursuant to Section 1.9 hereof.

It is further acknowledged and agreed that the Principal Amount owed by Borrower under this Note shall be increased by the amount of all expenses up to a maximum of $500 incurred by the Holder relating to any conversion of this Note into shares of Common Stock. All such expenses shall be deemed added to the Principal Amount hereunder to the extent such expenses are paid by the Holder.

Interest shall commence accruing on the date that the Note is issued and shall be computed on the basis of a 365-day year and the actual number of days elapsed. Any Principal Amount or interest on this Note which is not paid when due shall bear interest at the rate the lesser of (a) twenty percent (20%) per annum from the due date thereof until the same is paid ("Default Interest"); or (b) the maximum rate allowed by law.

All payments due hereunder (to the extent not converted into shares of common stock of the Borrower (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date.

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement, dated as of the Issue Date, pursuant to which this Note was originally issued (the "Purchase Agreement"). As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed. As used herein, the term "Trading Day" means any day that shares of Common Stock are listed for trading or quotation on the Principal Market (as defined in the Purchase Agreement), any tier of the NASDAQ Stock Market, the New York Stock Exchange or the NYSE MKT or any of the OTCQX® Best Market, OTCQB® Venture Market or the OTC Pink Market.

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1     Conversion Right. The Holder shall have the right, at any time while there are amounts outstanding under the Note and after one hundred eighty (180) days from the issuance hereof, to convert all or any portion of the then outstanding and unpaid Principal Amount and interest (including any Default Interest) into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified, at the Conversion Price (as defined below) determined as provided herein (a "Conversion"); *provided, however*, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of this Note or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of Conversion Shares issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the then outstanding shares of Common Stock. For purposes of the proviso set forth in the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "1934 Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso, *provided, however*, that the limitations on conversion may be waived (up to 9.99%) by the Holder upon, at the election of the Holder, not less than 61 days' prior notice to the Borrower, and the provisions of the conversion limitation shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver). The number of Conversion Shares to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower or Borrower's transfer agent by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the Principal Amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such Principal Amount at the Interest Rate to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2), plus (4) up to $500.00 of expenses incurred by the Holder with respect to a Conversion.

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

1.2    Conversion Price.

(a) Calculation of Conversion Price. The per share conversion price into which Principal Amount and interest (including any Default Interest) under this Note shall be convertible into shares of Common Stock hereunder (the "Conversion Price") shall be equal to $0.015 per share (the "Fixed Conversion Price") subject to pro-rata and other appropriate adjustments in the event of a stock split, reverse-stock split, stock dividend and similar recapitalizations; *provided however*, if an Event of Default has occurred or is existing while any amounts due under this Note are outstanding, the Conversion Price shall be $0.005 per share (the "Default Fixed Conversion Price"), also Default Fixed Conversion Price shall be subject to pro-rata and other appropriate adjustments as would be applicable to the Conversion Price. In the event the Borrower has a DTC "Chill" on its shares, an additional discount of ten percent (10%) shall apply to the Conversion Price while that "Chill" is in effect.

(b) Conversion Price During Major Announcements. Notwithstanding anything contained in Section 1.2(a) to the contrary, in the event the Borrower (i) makes a public announcement that it intends to be acquired by, consolidate or merge with any other corporation or entity (other than a merger in which the Borrower is the surviving or continuing corporation and its capital stock is unchanged) or sell or transfer all or substantially all of the assets of the Borrower or (ii) any person, group or entity (including the Borrower) publicly announces a tender offer to purchase fifty percent (50%) or more of the Common Stock (or any other takeover scheme) (any such transaction referred to in clause (i) or (ii) being referred to herein as a "Change in Control" and the date of the announcement referred to in clause (i) or (ii) is being referred to herein as the "Announcement Date"), then the Conversion Price shall, effective upon the Announcement Date and continuing through the Adjusted Conversion Price Termination Date (as defined below), be equal to the lower of (x) the Conversion Price and (y) a twenty-five percent (25%) discount to the Acquisition Price (as defined below), but shall in no event be no lower than $0.01 per share. From and after the Adjusted Conversion Price Termination Date, the Conversion Price shall be determined as set forth in Section 1.2(a). For purposes hereof, "Adjusted Conversion Price Termination Date" shall mean, with respect to any proposed Change in Control for which a public announcement as contemplated by this Section 1.2(b) has been made, the date upon which the Borrower (in the case of clause (i) above) or the person, group or entity (in the case of clause (ii) above) consummates or publicly announces the termination or abandonment of the proposed Change in Control which caused this Section 1.2(b) to become operative. For purposes hereof, "Acquisition Price" shall mean a price per share of Common Stock derived by dividing (x) the total consideration (in cash, equity, earn- out or similar payments or otherwise) paid or to be paid to the Borrower or its shareholders in the Change in Control transaction by (y) the number of authorized shares of Common Stock outstanding as of the business day prior to the Announcement Date.

1.3    Authorized and Reserved Shares. The Borrower covenants that at all times until the Note is satisfied in full, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of a number of Conversion Shares equal to (i) the number of Conversion Shares issuable upon the full conversion of this Note (assuming no payment of Principal Amount or interest) as of any issue date (taking into consideration any adjustments to the Conversion Price pursuant to Section 2 hereof or otherwise) multiplied by (ii) three (3) (the "Reserved Amount"). The initial Reserved Amount shall be 550,000,000 shares. In the event that the Borrower shall be unable to reserve the entirety of the Reserved Amount (the "Reserve Amount Failure"), the Borrower shall promptly take all actions necessary to increase its authorized share capital to accommodate the Reserved Amount (the "Authorized Share Increase"), including without limitation, all board of directors actions and approvals and promptly (but no less than sixty (60) days following the calling and holding a special meeting of its shareholders no more than sixty (60) days following the Reserve Amount Failure to seek approval of the Authorized Share Increase via the solicitation of proxies. Notwithstanding the foregoing, in no event shall the Reserved Amount be lower than the initial Reserved Amount, regardless of any prior conversions. The Borrower represents that upon issuance, the Conversion Shares will be duly and validly issued, fully paid and non- assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of Conversion Shares into which

3

A-259

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

this Note shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of this Note. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Conversion Shares or instructions to have the Conversion Shares issued as contemplated by Section 1.4(f) hereof, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates or cause the Borrower to electronically issue shares of Common Stock to execute and issue the necessary certificates for the Conversion Shares or cause the Conversion Shares to be issued as contemplated by Section 1.4(f) hereof in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under this Note.

1.4     Method of Conversion.

(a) Mechanics of Conversion. This Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 11:59 p.m., New York, New York time). Any Notice of Conversion submitted after 11:59 p.m., New York, New York time, shall be deemed to have been delivered and received on the next Trading Day.

(b) Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid Principal Amount is so converted. The Holder and the Borrower shall maintain records showing the Principal Amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid Principal Amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted Principal Amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c) Payment of Taxes. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d) Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

the Conversion Shares (or cause the electronic delivery of the Conversion Shares as contemplated by Section 1.4(f) hereof) within three (3) Trading Days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid Principal Amount and interest (including any Default Interest) under this Note, surrender of this Note). If the Borrower shall fail for any reason or for no reason to issue to the Holder on or prior to the Deadline a certificate for the number of Conversion Shares or to which the Holder is entitled hereunder and register such Conversion Shares on the Borrower's share register or to credit the Holder's balance account with DTC (as defined below) for such number of Conversion Shares to which the Holder is entitled upon the Holder's conversion of this Note (a "Conversion Failure"), then, in addition to all other remedies available to the Holder, (i) the Borrower shall pay in cash to the Holder on each day after the Deadline and during such Conversion Failure an amount equal to two percent (2.0%) of the product of (A) the sum of the number of Conversion Shares not issued to the Holder on or prior to the Deadline and to which the Holder is entitled and (B) the closing sale price of the Common Stock on the Trading Day immediately preceding the last possible date which the Borrower could have issued such Conversion Shares to the Holder without violating this Section 1.4(d); and (ii) the Holder, upon written notice to the Borrower, may void its Notice of Conversion with respect to, and retain or have returned, as the case may be, any portion of this Note that has not been converted pursuant to such Notice of Conversion; provided that the voiding of an Notice of Conversion shall not affect the Borrower's obligations to make any payments which have accrued prior to the date of such notice. In addition to the foregoing, if on or prior to the Deadline the Borrower shall fail to issue and deliver a certificate to the Holder and register such Conversion Shares on the Borrower's share register or credit the Holder's balance account with DTC for the number of Conversion Shares to which the Holder is entitled upon the Holder's exercise hereunder or pursuant to the Borrower's obligation pursuant to clause (ii) below, and if on or after such Trading Day the Holder purchases (in an open market transaction or otherwise) shares of Common Stock to deliver in satisfaction of a sale by the Holder of shares of Common Stock issuable upon such exercise that the Holder anticipated receiving from the Borrower, then the Borrower shall, within two (2) Trading Days after the Holder's request and in the Holder's discretion, either (i) pay cash to the Holder in an amount equal to the Holder's total purchase price (including brokerage commissions and other reasonable and customary out-of-pocket expenses, if any) for the shares of Common Stock so purchased (the "Buy-In Price"), at which point the Borrower's obligation to deliver such certificate (and to issue such Conversion Shares) or credit such Holder's balance account with DTC for such Conversion Shares shall terminate, or (ii) promptly honor its obligation to deliver to the Holder a certificate or certificates representing such Conversion Shares or credit such Holder's balance account with DTC and pay cash to the Holder in an amount equal to the excess (if any) of the Buy-In Price over the product of (A) such number of shares of Common Stock, times (B) the closing sales price of the Common Stock on the date of exercise. Nothing shall limit the Holder's right to pursue any other remedies available to it hereunder, at law or in equity, including, without limitation, a decree of specific performance and/or injunctive relief with respect to the Borrower's failure to timely deliver certificates representing the Conversion Shares (or to electronically deliver such Conversion Shares) upon the conversion of this Note as required pursuant to the terms hereof.

(e) Obligation of Borrower to Deliver Common Stock. At the time that the Holder submits the Notice of Conversion to the Borrower or Borrower's transfer agent, the Holder shall be deemed to be the holder of record of the Conversion Shares issuable upon such conversion, the outstanding Principal Amount and the amount of accrued and unpaid interest (including any Default Interest) under this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for the Conversion Shares (or cause the electronic delivery of the Conversion Shares as contemplated by Section 1.4(f) hereof) shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged

DocuSign Envelope ID: 32022715-E8B6-4623-BAB2-76BA9CE642BE

breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is sent to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time, on such date.

(f) Delivery of Conversion Shares by Electronic Transfer. In lieu of delivering physical certificates representing the Conversion Shares issuable upon conversion hereof, provided the Borrower is participating in the Depository Trust Borrower ("DTC") Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its reasonable best efforts to cause its transfer agent to electronically transmit the Conversion Shares issuable upon conversion hereof to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission system.

1.5    Concerning the Shares. The Conversion Shares issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement or otherwise qualified for sale pursuant to Regulation A pursuant to inclusion in a qualified Form 1-A filing under the 1933 Act; or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be the Legal Counsel Opinion (as defined in the Purchase Agreement)) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration; or (iii) such shares are sold or transferred pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption; or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement). Except as otherwise provided in the Purchase Agreement (and subject to the removal provisions set forth below), until such time as the Conversion Shares have been registered under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for the Conversion Shares that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

**"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH MAY BE THE LEGAL COUNSEL OPINION (AS DEFINED IN THE PURCHASE AGREEMENT)), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144, RULE 144A, REGULATION S, OR OTHER APPLICABLE EXEMPTION UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Borrower shall issue to the Holder a certificate for the applicable Conversion Shares without such legend upon which it is stamped or (as requested by the Holder) issue the applicable Conversion Shares by electronic delivery by crediting the account of such

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

holder's broker with DTC, if, unless otherwise required by applicable state securities laws: (a) such Conversion Shares are registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144, Rule 144A, Regulation S, or other applicable exemption without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) the Borrower or the Holder provides the Legal Counsel Opinion (as contemplated by and in accordance with Section 4(f) of the Purchase Agreement) to the effect that a public sale or transfer of such Conversion Shares may be made without registration under the 1933 Act, which opinion shall be accepted by the Borrower so that the sale or transfer is effected. The Borrower shall be responsible for the fees of its transfer agent and all DTC fees associated with any such issuance. The Holder agrees to sell all Conversion Shares, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Borrower does not accept the opinion of counsel provided by the Holder with respect to the transfer of Conversion Shares pursuant to an exemption from registration, such as Rule 144, Rule 144A or Regulation S, at the Deadline, notwithstanding that the conditions of Rule 144, Rule 144A, Regulation S, or other applicable exemption, as applicable, have been met, it will be considered an Event of Default under this Note.

1.6     Effect of Certain Events.

(a) Effect of Merger, Consolidation, Etc. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall either: (i) be deemed to be an acceleration event pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of an amount equal to Principal Amount plus accrued but unpaid interest; or (ii) be treated pursuant to Section 1.6(b) hereof. "Person" shall mean any individual, corporation, limited liability Borrower, partnership, association, trust, or other entity or organization.

(b) Adjustment Due to Merger, Consolidation, Etc. If, at any time when this Note is issued and outstanding and prior to conversion of all of this Note, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of another Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not effectuate any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, at least thirty (30) days prior written notice (but in any event at least seven (7) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Section 1.6(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c) Adjustment Due to Distribution. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

(d) [RESERVED].

(e) Dilutive Issuance. If the Borrower, at any time while this Note or any amounts due hereunder are outstanding, issues, sells or grants (or has issued, sold or granted as of the Issue Date, as the case may be) any option to purchase, or sells or grants any right to reprice, or otherwise disposes of, or issues (or has sold or issued, as the case may be, or announces any sale, grant or any option to purchase or other disposition), securities convertible into, exercisable for, or otherwise entitle any person or entity the right to acquire, shares of Common Stock (including, without limitation, upon conversion of this Note, and any convertible notes or warrants outstanding as of or following the Issue Date), in each or any case at an effective price per share that is lower than the then Conversion Price (such lower price, the "Base Conversion Price" and such issuances, collectively, a "Dilutive Issuance") (it being agreed that if the holder of the Common Stock or other securities so issued shall at any time, whether by operation of purchase price adjustments, reset provisions, floating conversion, exercise or exchange prices or otherwise, or due to warrants, options or rights per share which are issued in connection with such issuance, be entitled to receive shares of Common Stock at an effective price per share that is lower than the Conversion Price, such issuance shall be deemed to have occurred for less than the Conversion Price on such date of the Dilutive Issuance), then the Conversion Price shall be reduced, at the option of the Holder, to a price equal the Base Conversion Price. If the Borrower enters into a Variable Rate Transaction, despite the prohibition set forth in the Purchase Agreement, the Borrower shall be deemed to have issued Common Stock or Common Stock Equivalents at the lowest possible price per share at which such securities could be issued in connection with such Variable Rate Transaction. Such adjustment shall be made whenever such Common Stock or other securities are issued. Notwithstanding the foregoing, no adjustment will be made under this Section 1.6(e) in respect of an Exempt Issuance. In the event of an issuance of securities involving multiple tranches or closings, any adjustment pursuant to this Section 1.6(e) shall be calculated as if all such securities were issued at the initial closing. This Section shall also be subject to the mechanics of Section 1.6(g) "Pending Legislation" clause herein. Notwithstanding the foregoing, this Section 1.6(e) shall apply only to issuances originating after the Effective Date hereof (i.e. post-Effective Date conversions of convertible notes or warrants issued prior to the Effective Date shall not trigger an adjustment even if the conversion or exercise price is less than the Conversion Price).

An "Exempt Issuance" shall mean the issuance of (i) shares of Common Stock or other securities to officers or directors of the Borrower pursuant to any stock or option or similar equity incentive plan duly adopted for such purpose, by a majority of the non-employee members of the Borrower's Board of Directors or a majority of the members of a committee of non-employee directors ("Plan") established for such purpose in a manner which is consistent with the Borrower's prior business practices or in settlement of accrued but unpaid compensation and/or benefits regardless of whether such securities were issued from a Plan or in settlement of vendor payables; (ii) securities issued pursuant to a merger, consolidation, acquisition or similar business combination approved by a majority of the disinterested directors of the Borrower, provided that any such issuance shall only be to a Person (or to the equity holders of a Person) which is, itself or through its subsidiaries, an operating Borrower or an owner of an asset in a business synergistic with the business of the Borrower and shall provide to the Borrower additional benefits in addition to the investment of funds, but shall not include a transaction in which the Borrower is issuing securities primarily for the purpose of raising capital or to an entity whose primary business is investing in securities; (iii) securities issued pursuant to any equipment loan or leasing arrangement, real property leasing arrangement or debt financing from a bank or similar financial institution

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

approved by a majority of the disinterested directors of the Borrower; (iv) existing convertible debt and equity lines of credit in existence on the date hereof;; or (v) securities issued with respect to which the Holder waives its rights in writing under this Section 1.6(e).

(f) <u>Notice of Adjustments.</u> Upon the occurrence of each adjustment or readjustment of the Conversion Price as a result of the events described in this Section 1.6, the Borrower, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Borrower shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment; (ii) the Conversion Price at the time in effect; and (iii) the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon conversion of the Note.

(g) <u>Pending Legislation.</u> As of the Issue Date hereof, proposed legislation exists, namely proposed amendments to Rule 144(d)(3)(ii) proposed on December 22, 2020 in SEC Release 2020-336, that would fundamentally change the economic terms of this Note. In the event the rule becomes law and becomes effective while any amounts are outstanding under this Note, Section 1.2 hereof shall be automatically amended to contain only the Fixed Conversion Price of $0.015 per share. In the event that the Borrower is in default of any of the provisions of the Note or other Transaction Documents, and the Borrower has not cured said default within five (5) calendar days, the Fixed Conversion Price shall be reduced to the Default Fixed Conversion Price in addition to any other principal adjustments, default interest, or other remedies available to it under law. In the event the final rule, or any other combination of final rules, make this provision inoperable, invalid, or otherwise have an effect that changes the economics of the transactions contemplated hereby, the pertinent clause or mechanic of operation shall be stricken and only the Fixed Price provision shall remain.

1.7    <u>Adjustments to Conversion Price.</u> At any time after the Issue Date, (i) if in the case that the Borrower's Common Stock is not deliverable by DWAC (including if the Borrower's transfer agent has a policy prohibiting or limiting delivery of shares of the Borrower's Common Stock specified in a Notice of Conversion); (ii) if the Borrower ceases to be a reporting Borrower pursuant or subject to the Exchange Act; (iii) if after the Borrower gets listed on a trading market, the Borrower subsequently loses a market (including the OTC Pink Market, OTCQB® Venture Market or an equivalent replacement exchange) for its Common Stock; (iv) if the Borrower fails to maintain its status as "DTC Eligible" for any reason; (v) if the Note cannot be converted into free trading shares on or after six (6) months from the Issue Date; (vi) if at any time the Borrower does not maintain or replenish the Reserved Amount (as defined herein) within three (3) business days of the request of the Holder; (vii) if the Borrower fails to comply with the reporting requirements of the Exchange Act; the reporting requirements necessary to satisfy the availability of Rule 144 to the Holder or its assigns, including but not limited to the timely fulfillment of its filing requirements as a fully- reporting issuer registered with the SEC; (ix) if the Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder; (x) if, once listed, subsequently OTC Markets changes the Borrower's designation to 'No Information' (Stop Sign) or 'Caveat Emptor' (Skull and Crossbones); (xi) the restatement of any financial statements filed by the Borrower with the SEC for any date or period from two (2) years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement; (xii) once it begins trading on any of the trading markets or exchanges listed hereafter, any cessation of trading of the Common Stock on at least one of the OTC Markets including but not limited to the OTC Pink Market, or an equivalent replacement exchange, the NASDAQ Global Select Market, the NASDAQ Global Market, the NASDAQ Capital Market, the New York Stock Exchange, or the NYSE MKT, and such cessation of trading shall continue for a period of five consecutive (5) Trading Days; and/or (xiii) the Borrower loses the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2); or (xiv) if the Holder is notified in writing by the Borrower or the Borrower's transfer agent that the Borrower does not have the necessary

9

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

amount of authorized and issuable shares of Common Stock available to satisfy the issuance of Shares pursuant to a Conversion Notice, then in addition to all other remedies under this Note, the Holder shall be entitled to increase, by fifteen percent (15%) for each occurrence, cumulative or otherwise, the discount to the Conversion Price shall apply for all future conversions under the Note.

1.8     Status as Shareholder. Upon submission of a Notice of Conversion by a Holder, (i) the Conversion Shares covered thereby (other than the Conversion Shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock, and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies for the Borrower's failure to convert this Note.

1.9     Prepayment. Notwithstanding anything to the contrary contained in this Note, subject to the terms of this Section, at any time during the period beginning on the Issue Date and ending at Maturity ("Prepayment Termination Date"), Borrower shall have the right, exercisable on not less than five (5) Trading Days prior written notice to the Holder of this Note, to prepay up to the outstanding balance on this Note (principal and accrued interest), in full, in accordance with this Section. Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than fifteen (15) Trading Days from the date of the Optional Prepayment Notice; and (3) the amount (in dollars) that the Borrower is paying. Notwithstanding Holder's receipt of the Optional Prepayment Notice the Holder may convert, or continue to convert the Note in whole or in part until the Optional Prepayment Amount (as defined herein) is paid to the Holder. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the Optional Prepayment Amount (as defined below) to or upon the order of the Holder as specified by the Holder in writing to the Borrower at least one (1) business day prior to the Optional Prepayment Date. If the Borrower exercises its right to prepay the Note, the Borrower shall make payment to the Holder of one hundred percent (100%) of the total amount outstanding under the Note including, but not limited to all principal, interest, fees, and defaults (the "Optional Prepayment Amount").

**ARTICLE II. RANKING AND CERTAIN COVENANTS**

2.1     Ranking and Security. The obligations of the Borrower under this Note shall be subordinate with respect to any and all Indebtedness incurred as of or following the Issue Date.

2.2     Other Indebtedness. So long as the Borrower shall have any obligation under this Note, the Borrower shall not (directly or indirectly through any Subsidiary or affiliate) incur or suffer to exist or guarantee any Indebtedness that is senior to or pari passu with (in priority of payment and performance) the Borrower's obligations hereunder unless the proceeds of such Indebtedness are used to pay off the interest and principal under this Note. As used in this Section 2.2, the term "Borrower" means the Borrower and any Subsidiary of the Borrower. As used herein, the term "Indebtedness" means (a) all indebtedness of the Borrower for borrowed money, but not including deferred purchase price obligations in place as of the Issue Date and as disclosed in the SEC Documents or obligations to trade creditors incurred in the ordinary course of business, (b) all obligations of the Borrower evidenced by notes, bonds, debentures

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

or other similar instruments, (c) purchase money indebtedness hereafter incurred by the Borrower to finance the purchase of fixed or capital assets, including all capital lease obligations of the Borrower which do not exceed the purchase price of the assets funded, (d) all guarantee obligations of the Borrower in respect of obligations of the kind referred to in clauses (a) through (c) above that the Borrower would not be permitted to incur or enter into, and (e) all obligations of the kind referred to in clauses (a) through (d) above that the Borrower is not permitted to incur or enter into that are secured and/or unsecured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured and/or unsecured by) any lien or encumbrance on property (including accounts and contract rights) owned by the Borrower, whether or not the Borrower has assumed or become liable for the payment of such obligation.

2.3      Distributions on Capital Stock. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors or as may be permitted pursuant to Section 1.6(e).

2.4      Restriction on Stock Repurchases. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any such shares.

2.5      Sale of Assets. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets other than in an arm's length transaction. Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition, but otherwise such consent shall not be unreasonably withheld, conditioned, or delayed.

2.6      Advances and Loans; Affiliate Transactions. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, lend money, give credit, make advances to or enter into any transaction with any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Borrower, except loans, credits or advances (a) in existence or committed on the Issue Date and which the Borrower has informed Holder in writing prior to the Issue Date, (b) in regard to transactions with unaffiliated third parties, made in the ordinary course of business or (c) in regard to transactions with unaffiliated third parties, not in excess of $250,000. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, repay any affiliate (as defined in Rule 144) of the Borrower in connection with any indebtedness or accrued amounts owed to any such party outside the ordinary course of business.

2.7      Section 3(a)(9) or 3(a)(10) Transaction. So long as this Note is outstanding, the Borrower shall not enter into any transaction or arrangement structured in accordance with, based upon, or related or pursuant to, in whole or in part, either Section 3(a)(9) of the Securities Act (a "3(a)(9) Transaction") or Section 3(a)(10) of the Securities Act (a "3(a)(10) Transaction"). In the event that the Borrower does enter into, or makes any issuance of Common Stock related to a 3(a)(9) Transaction or a 3(a)(10) Transaction while this note is outstanding, a liquidated damages charge of twenty-five percent (25%) of the outstanding principal balance of this Note, but not less than Twenty-Five Thousand Dollars ($25,000), will be assessed and will become immediately due and payable to the Holder at its election in the form of a cash payment or added to the balance of this Note (under Holder's and Borrower's expectation that this amount will tack back to the Issue Date). Notwithstanding the forgoing, transactions contemplated

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

in the second paragraph (a) of Section 1.6(e) that may be considered Section 3(a)(9) or 3(a)(10) transactions are permissible and will not cause a liquidated damages charge.

        2.8    Preservation of Business and Existence, etc. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, (a) change the nature of its business in a material respect; or (b) sell, divest, change the structure of any material assets other than in the ordinary course of business. In addition, so long as the Borrower shall have any obligation under this Note, the Borrower shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries (other than dormant Subsidiaries that have no or minimum assets) to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary. Furthermore, so long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, solicit any offers for, respond to any unsolicited offers for, or conduct any negotiations with, any other person or entity with respect to any Variable Rate Transaction or investment.

        2.9    Non-circumvention. The Borrower hereby covenants and agrees that the Borrower will not, by amendment of its Certificate or Articles of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all the provisions of this Note and take all action as may be required to protect the rights of the Holder.

        2.10    Lost, Stolen or Mutilated Note. Upon receipt by the Borrower of evidence reasonably satisfactory to the Borrower of the loss, theft, destruction or mutilation of this Note, and, in the case of loss, theft or destruction, of any indemnification undertaking by the Holder to the Borrower in customary form and, in the case of mutilation, upon surrender and cancellation of this Note, the Borrower shall execute and deliver to the Holder a new Note.

## ARTICLE III. EVENTS OF DEFAULT

        It shall be considered an event of default if any of the following events listed in this Article III (each, an "Event of Default") shall occur:

        3.1    Conversion and the Shares. The Borrower (i) fails to issue Conversion Shares to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note; (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note; (iii) fails to reserve the Reserved Amount at all times; or (iv) the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for the Conversion Shares issuable to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any Conversion Shares issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for five (5) Trading Days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an Event of Default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder.

3.2    Breach of Agreements and Covenants. The Borrower materially breaches any agreement, covenant or other term or condition contained in the Purchase Agreement, this Note, the Irrevocable Transfer Agent Instructions or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith.

3.3    Breach of Representations and Warranties. Any material breach of any representation or warranty of the Borrower made in the Purchase Agreement, this Note, the Irrevocable Transfer Agent Instructions or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith or therewith shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.4    Receiver or Trustee. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.5    Judgments. Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $300,000.00, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

3.6    Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.7    Delisting of Common Stock. The Borrower should fail to maintain the listing of the Common Stock on at least one of the OTC Markets, including, but not limited to the OTC Pink Market, any level of the NASDAQ Markets or the New York Stock Exchange (including the NYSE MKT).

3.8    Failure to Comply with the 1934 Act. At any time after the Issue Date, the Borrower shall fail to comply in all material respects with the reporting requirements of the 1934 Act and/or the Borrower shall cease to be subject to the reporting requirements of the 1934 Act. It shall be an Event of Default under this section if the Borrower shall file any Notification of Late Filing on Form 12b-25 with the SEC.

3.9    Liquidation. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.10    Cessation of Operations. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.11    Financial Statement Restatement. The restatement of any financial statements filed by the Borrower with the SEC for any date or period from two (2) years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the un-restated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

3.12    Reverse Splits. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

3.13    Replacement of Transfer Agent. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.14    DTC "Chill". The DTC places a "chill" (i.e. a restriction placed by DTC on one or more of DTC's services, such as limiting a DTC participant's ability to make a deposit or withdrawal of the security at DTC) on any of the Borrower's securities.

3.15    DWAC Eligibility. In addition to the Event of Default in Section 3.16, the Common Stock is otherwise not eligible for trading through the DTC's Fast Automated Securities Transfer or Deposit/Withdrawal at Custodian programs.

3.16    Variable Rate Transactions; Dilutive Issuances. The Borrower (i) issues shares of Common Stock (or convertible securities or Purchase Rights) pursuant to an equity line of credit of the Borrower or otherwise in connection with a Variable Rate Transaction (entered into in the future) except for existing lines of credit or Variable Rate Transactions existing as of the date hereof; (ii) adjusts downward the "floor price" at which shares of Common Stock (or convertible securities or Purchase Rights) may be issued under an equity line of credit or otherwise in connection with a Variable Rate Transaction (or entered into in the future) except for existing lines of credit or Variable Rate Transactions existing as of the date hereof; or (iii) a Dilutive Issuance is triggered as provided in this Note.

3.17    Bid Price. Once the Borrower obtains a listing, the Borrower shall subsequently lose the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2) or a market (including the OTC Pink, OTCQB or an equivalent replacement marketplace or exchange).

3.18    Inside Information. Any attempt by the Borrower or its officers, directors, and/or affiliates to intentionally transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date

3.19    Unavailability of Rule 144. If, at any time on or after the date which is six (6) months after the Issue Date, except due to the Holder's actions or inactions, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent in order to facilitate the Holder's conversion of any portion of the Note into free trading shares of the Borrower's Common Stock pursuant to Rule 144; or (ii) thereupon deposit such shares into the Holder's brokerage account.

3.20    Suspension of Trading of Common Stock. If, at any time on or after the Borrower obtains a listing, the Borrower's Common Stock (i) is suspended from trading; or (ii) halted from trading.

3.21    Failure to Register. If the Borrower fails to meet its obligations under the Registration Rights Agreement entered into by the parties in connection herewith.

3.22    Rights and Remedies Upon an Event of Default. Upon the occurrence and during the continuation of any Event of Default specified in this Article III, this Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder,

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

an amount (the "Default Amount") equal to the Principal Amount then outstanding plus accrued interest (including any Default Interest) through the date of full repayment multiplied by one hundred twenty-five percent (125%). Holder may, in its sole discretion, determine to accept payment in Common Stock or part in Common Stock and part in cash. For purposes of payments in Common Stock, the conversion formula set forth in Section 1.2 shall apply. Upon an uncured Event of Default, all amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived by the Borrower, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity, including, without limitation.

## ARTICLE IV. MISCELLANEOUS

4.1    Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies of the Holder existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2    Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served; (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid; (iii) delivered by reputable air courier service with charges prepaid; or (iv) transmitted by hand delivery, telegram, e-mail or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by e-mail or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Borrower, to:

**DARKPULSE, INC.**
1345 Avenue of the Americas, 2nd Floor
New York, New York 10105
Attention: Dennis O'Leary
e-mail: doleary@darkpulse.com

If to the Holder:

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
1040 First Avenue, Suite
190 New York, NY 10022
Attention: Eli Fireman
e-mail: eli@firstfirecapital.com

With a copy by e-mail only to (which copy shall not constitute notice):

**FABIAN VANCOTT**
Attn: Anthony Michael Panek

15

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

e-mail: apanek@fabianvancott.com

4.3    Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4    Assignability. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Neither the Borrower nor the Holder shall assign this Note or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Holder may assign its rights hereunder to any "accredited investor" (as defined in Rule 501(a) of the 1933 Act) in a private transaction from the Holder or to any of its "affiliates", as that term is defined under the 1934 Act, without the consent of the Borrower. Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

4.5    Cost of Collection. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6    Governing Law; Venue; Attorney's Fees. This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts located in the state of New York or federal courts located in the state of New York. The Borrower hereby irrevocably waives any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **THE BORROWER HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTIONS CONTEMPLATED HEREBY.** Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Note or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Note and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law. The prevailing party in any action or dispute brought in connection with this the Note or any other agreement, certificate, instrument or document contemplated hereby or thereby shall be entitled to recover from the other party its reasonable attorney's fees and costs.

4.7    Certain Amounts. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding Principal Amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

A-272

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

4.8 <u>Purchase Agreement.</u> The Borrower and the Holder shall be bound by the applicable terms of the Purchase Agreement and the documents entered into in connection herewith and therewith.

4.9 <u>Notice of Corporate Events.</u> Except as otherwise provided below, the Holder of this Note shall have no rights as a Holder of Common Stock unless and only to the extent that it converts this Note into Common Stock. The Borrower shall provide the Holder with prior notification of any meeting of the Borrower's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Borrower of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any Change in Control or any proposed liquidation, dissolution or winding up of the Borrower, the Borrower shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Borrower shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.9.

4.10 <u>Remedies.</u> The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

4.11 <u>Construction; Headings.</u> This Note shall be deemed to be jointly drafted by the Borrower and all the Holder and shall not be construed against any person as the drafter hereof. The headings of this Note are for convenience of reference and shall not form part of, or affect the interpretation of, this Note.

4.12 <u>Usury.</u> To the extent it may lawfully do so, the Borrower hereby agrees not to insist upon or plead or in any manner whatsoever claim, and will resist any and all efforts to be compelled to take the benefit or advantage of, usury laws wherever enacted, now or at any time hereafter in force, in connection with any action or proceeding that may be brought by the Holder in order to enforce any right or remedy under this Note. Notwithstanding any provision to the contrary contained in this Note, it is expressly agreed and provided that the total liability of the Borrower under this Note for payments which under the applicable law are in the nature of interest shall not exceed the maximum lawful rate authorized under applicable law (the "Maximum Rate"), and, without limiting the foregoing, in no event shall any rate of interest or default interest, or both of them, when aggregated with any other sums which under the applicable law in the nature of interest that the Borrower may be obligated to pay under this Note exceed such Maximum Rate. It is agreed that if the maximum contract rate of interest allowed by applicable law and applicable to this Note is increased or decreased by statute or any official governmental action subsequent to the Issue Date, the new maximum contract rate of interest allowed by law will be the Maximum Rate applicable to this Note from the effective date thereof forward, unless such application is precluded by applicable law. If under any circumstances whatsoever, interest in excess of the Maximum Rate is paid by

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

the Borrower to the Holder with respect to indebtedness evidenced by this the Note, such excess shall be applied by the Holder to the unpaid principal balance of any such indebtedness or be refunded to the Borrower, the manner of handling such excess to be at the Holder's election.

4.13     Severability.  In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law (including any judicial ruling), then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of this Note.

4.14     Terms of Future Financings.  So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any convertible debt or convertible preferred stock, with any term that the Holder reasonably believes is more favorable to the holder of such security or with a term in favor of the holder of such security that the Holder reasonably believes was not similarly provided to the Holder in this Note, then (i) the Borrower shall notify the Holder of such additional or more favorable term within one (1) business day of the issuance and/or amendment (as applicable) of the respective security, and (ii) such term, at Holder's option, shall become a part of the transaction documents with the Holder (regardless of whether the Borrower complied with the notification provision of this Section 4.14). The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, and original issue discounts. If Holder elects to have the term become a part of the transaction documents with the Holder, then the Borrower shall immediately deliver acknowledgment of such adjustment in form and substance reasonably satisfactory to the Holder (the "Acknowledgment") within one (1) business day of Borrower's receipt of request from Holder (the "Adjustment Deadline"), provided that Borrower's failure to timely provide the Acknowledgement shall not affect the automatic amendments contemplated hereby. Nor shall this section apply to any adjustments made to any of the Borrower's securities issued prior to the date hereof.

4.15     Dispute Resolution.  In the case of a dispute as to the determination of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, Issue, Closing or Maturity Date, the closing bid price, or fair market value (as the case may be) or the arithmetic calculation of the Conversion Price or the applicable prepayment amount(s) (as the case may be), the Borrower or the Holder shall submit the disputed determinations or arithmetic calculations via facsimile (i) within one (1) Trading Day after receipt of the applicable notice giving rise to such dispute to the Borrower or the Holder or (ii) if no notice gave rise to such dispute, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Borrower are unable to agree upon such determination or calculation within five (5) Trading Days of such disputed determination or arithmetic calculation (as the case may be) being submitted to the Borrower or the Holder, then the Borrower shall, within three (3) Trading Days, submit (a) the disputed determination of the Conversion Price, the closing bid price, the or fair market value (as the case may be) to an independent, reputable investment bank selected by the Borrower and approved by the Holder or (b) the disputed arithmetic calculation of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, to an independent, outside accountant selected by the Holder that is reasonably acceptable to the Borrower. The Borrower shall cause at its expense the investment bank or the accountant to perform the determinations or calculations and notify the Borrower and the Holder of the results no later than one (1) Trading Day from the time it receives such disputed determinations or calculations. Such investment bank's or accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

**IN WITNESS WHEREOF,** Borrower has caused this Note to be signed in its name by its duly authorized officer on April 26, 2021.

**DARKPULSE, INC.**

By: _dennis oleary_

Name: Dennis O'Leary
Title: Chief Executive Officer

**A-275**

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

## EXHIBIT A – NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of **DARKPULSE, INC.,** a Delaware corporation (the "Borrower"), according to the conditions of the Convertible Promissory Note of the Borrower dated as of April 26, 2021 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

☐ The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

☐ The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

**FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
1040 First Avenue, Suite
190 New York, NY 10022
Attn: Eli Fireman
e-mail: eli@firstfirecapital.com

Date of Conversion:
Applicable Conversion Price:                    $ _____
Costs Incurred by the Undersigned to
Convert                                         $ _____
the Note into Shares of Common Stock:
    Number of Shares of Common Stock to
                        be                        _____
    Issued Pursuant to Conversion of the
                      Note:
Amount of Principal Balance Due
remaining                                         _____
    Under the Note after this conversion:

By: __
Name:
Title:
Date:

20

# EXHIBIT C

| | |
|---|---|
| **From:** | Eli Fireman <eli@firstfirecap.com> |
| **Sent:** | Monday, November 29, 2021 12:45 PM |
| **To:** | Perechocky, David L. |
| **Subject:** | Fwd: Follow Up |
| **Attachments:** | DPLS Amendment.pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

> This message is from an EXTERNAL SENDER - be cautious, particularly with links and attachments.

---------- Forwarded message ---------
From: **Eli Fireman** <eli@firstfirecap.com>
Date: Fri, Nov 5, 2021 at 9:59 AM
Subject: Follow Up
To: Dennis O'Leary <doleary@darkpulse.com>


Good morning Dennis,
Was really great seeing you again yesterday. Please see the attached countersigned amendment for your records.
All the best,


--




Eli Fireman
Managing Member
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

1

A-278

--

Eli Fireman
**Managing Member**
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

A-279

## AMENDMENT NO. 1 TO THE CONVERTIBLE PROMISSORY NOTE
## ISSUED ON APRIL 26, 2021

THIS AMENDMENT NO. 1 TO THE CONVERTIBLE PROMISSORY NOTE ISSUED ON April 26 2021 (the "Amendment") is entered into on October 14 2021, by and between DarkPulse, Inc. a Delaware corporation (the "Company"), and FirstFire Global Opportunities Fund LLC, a Delaware limited liability company (the "Holder") (Company and Holder collectively the "Parties").

### BACKGROUND

A.      The Company and Holder are the parties to that certain Securities Purchase Agreement (the "SPA") whereunder Holder acquired (i) a Convertible Promissory Notes in the original principal amount of $825,000 (the "Note"); (the SPA, Note, Commitment Shares, and all other related documents hereinafter the "Transaction Documents").

B.      The Parties desire to amend the Transaction Documents as set forth expressly below.

NOW THEREFORE, the Parties agree as follows:

1.      Remove from the Securities Purchase Agreement Section 4. Subsection d. **Restriction on Activities.**

2.      **Governing Law; Venue.** The Transaction Documents shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Agreement, the Note, the Warrant, or any other agreement, certificate, instrument, or document contemplated hereby shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware. The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. EACH PARTY HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS AGREEMENT OR ANY TRANSACTIONS CONTEMPLATED HEREBY. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement, the Note, or any other agreement, certificate, instrument or document contemplated hereby or thereby by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

3.      The Parties have mutually agreed to the provisions set forth herein and are doing so without the exchange of any additional consideration.

A-280

4.   This Amendment shall be deemed part of, but shall take precedence over and supersede any provisions to the contrary contained in the Note. Except as specifically modified hereby, all of the provisions of the Note, which are not in conflict with the terms of this Amendment, shall remain in full force and effect.

A-281

IN WITNESS WHEREOF, the Parties hereto have executed this Amendment on October 25, 2021, effective as of April 26, 2021.

DARKPULSE, INC.

By : _____
        Dennis O'Leary- CEO


FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC


By : FirstFire Capital Management LLC

_____
        Eli Fireman, Managing Member

Scanned with CamScanner

# EXHIBIT D

A-283

| | |
|---|---|
| **From:** | Nick Fireman <nick@firstfirecap.com> |
| **Sent:** | Monday, November 29, 2021 12:55 PM |
| **To:** | Perechocky, David L. |
| **Subject:** | Fwd: DPLS Conversion |
| **Attachments:** | DPLS NOC (1).pdf |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

> This message is from an **EXTERNAL SENDER** - be cautious, particularly with links and attachments.

Please see below the email we sent to Dennis a few days prior to sending to the TA.
Thanks

Nick Fireman
FirstFire Capital
Direct: 973-223-2505
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

---------- Forwarded message ---------
From: **Nick Fireman** <nick@firstfirecap.com>
Date: Mon, Nov 15, 2021 at 12:25 PM
Subject: DPLS Conversion
To: Dennis O'Leary <doleary@darkpulse.com>

Hi Dennis
I hope all is well and you had a great weekend.
Please see the attached conversion for your files.
We are looking forward to seeing you at the shareholder event this week.
Thanks

A-284

Nick Fireman
FirstFire Capital
Direct: 973-223-2505
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

**A-285**

DocuSign Envelope ID: 32022715-E6B6-4623-BAB2-76BA9CE642BE

### EXHIBIT A -- NOTICE OF CONVERSION

The undersigned hereby elects to convert $ 625,000+61,875 Interest principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of **DARKPULSE, INC.**, a Delaware corporation (the "Borrower"), according to the conditions of the Convertible Promissory Note of the Borrower dated as of April 26, 2021 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

☐　The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

　　Name of DTC Prime Broker:
　　Account Number:

☐　The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

　　　　**FIRSTFIRE GLOBAL OPPORTUNITIES FUND LLC**
　　　　1040 First Avenue, Suite
　　　　190 New York, NY 10022
　　　　Attn: Eli Fireman
　　　　e-mail: eli@firstfirecapital.com

| | |
|---|---|
| Date of Conversion: | 11/15/2021 |
| Applicable Conversion Price: | $   .005 |
| Costs Incurred by the Undersigned to Convert | $ |
| the Note into Shares of Common Stock: | |
| Number of Shares of Common Stock to be | 177,375,000 |
| Issued Pursuant to Conversion of the Note: | |
| Amount of Principal Balance Due remaining | |
| Under the Note after this conversion: | |

By: _____

Name: Eli Fireman
Title: Managing Member
Date: 11/15/2021

ACTIVE.126128909.01

A-286

# EXHIBIT E

A-287

| | |
|---|---|
| **From:** | Eli Fireman <eli@firstfirecap.com> |
| **Sent:** | Monday, November 29, 2021 12:46 PM |
| **To:** | Perechocky, David L. |
| **Subject:** | Fwd: DI Share Issuance |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

> This message is from an EXTERNAL SENDER - be cautious, particularly with links and attachments.

---------- Forwarded message ---------
From: **Eli Fireman** <eli@firstfirecap.com>
Date: Tue, Nov 23, 2021 at 2:44 PM
Subject: Re: DI Share Issuance
To: Dennis O'Leary <doleary@darkpulse.com>

That's perfect for me. I am open all day.
Have a great evening,

On Tue, Nov 23, 2021 at 2:41 PM Dennis O'Leary <doleary@darkpulse.com> wrote:
 Ok again AM works if that's good for you

 On Tue, Nov 23, 2021 at 5:36 PM Eli Fireman <eli@firstfirecap.com> wrote:
  Seems like there may be some confusion here.
  Call me to discuss whenever you have time,


  On Tue, Nov 23, 2021 at 2:27 PM Dennis O'Leary <doleary@darkpulse.com> wrote:
   I have the conversion copy. We agreed together to hold the S1 since the company had just filed s3 as to
   avoid confusion. You converted at.005 after we agreed on holding the S1. If this is an error please notify
   Amy.
   I'm open early AM tomorrow
   Thanks
   D

   On Tue, Nov 23, 2021 at 5:10 PM Eli Fireman <eli@firstfirecap.com> wrote:
    Sure, I am available anytime.
    Much appreciated,


    On Tue, Nov 23, 2021 at 2:07 PM Dennis O'Leary <doleary@darkpulse.com> wrote:

     I can set time aside tomorrow morning if that works. Thanks
     On Tue, Nov 23, 2021 at 5:04 PM Eli Fireman <eli@firstfirecap.com> wrote:
      Are you available now to discuss?

1

A-288

Best,

On Tue, Nov 23, 2021 at 2:00 PM Dennis O'Leary <doleary@darkpulse.com> wrote:
Hey Eli,
We never agreed to the SP adjustment after agreeing not having to file the S1
I'm confused
D

On Tue, Nov 23, 2021 at 4:51 PM Eli Fireman <eli@firstfirecap.com> wrote:
Hey Dennis,
Hope you had a safe trip home after the amazing event.
I believe it was sent to you around the 15th. I have attached it again for your convenience.
If we don't talk, have a relaxing Thanksgiving Holiday!

On Tue, Nov 23, 2021 at 1:35 PM Dennis O'Leary <doleary@darkpulse.com> wrote:
Hi Eli,
Please send us a copy of the conversation
Thanks - dennis

---------- Forwarded message ---------
From: **Brian Higley, Esq.** <brian@businesslegaladvisor.com>
Date: Tue, Nov 23, 2021 at 4:32 PM
Subject: DI Share Issuance
To: Dennis O'Leary <doleary@darkpulse.com>


Dennis,

The control log says that, on November 17, 2021, the Company issued 177,375,000 to FirstFire. Was this a note conversion? If so, can you please forward to me the conversion documents? I need it for the S-1. Thanks!


Kind regards,

**Brian Higley, Esq.**



*President*
(801) 634-1984
www.businesslegaladvisor.com

This message and any attachments have been sent by a lawyer and may contain confidential and privileged information. This email and any associated files transmitted with it are confidential and intended solely for the above named addressees. If you are not the named addressee do not disseminate, distribute, copy, or alter this email. Please notify BUSINESS LEGAL ADVISORS, LLC by telephone at (801) 634-1984 or please reply to advise sender of the error and then immediately delete this message. You will be reimbursed for any reasonable costs. IRS CIRCULAR 230 NOTICE: To ensure compliance with requirements imposed by the Internal Revenue Service, we inform you that any U.S. tax advice contained in this communication (or in any attachment) is not intended or written to be used, and cannot be used, for the purpose of (i) avoiding penalties under the Internal Revenue Code or (ii) promoting,

A-289

marketing, or recommending to another party any transaction or matter addressed in this communication (or in any attachment).

--
Dennis M O'Leary
Chairman, CEO, CFO
DarkPulse Inc
T: 800.436.1436
D: 212.256.1086

--

Eli Fireman
**Managing Member**
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

--
Dennis M O'Leary
Chairman, CEO, CFO
DarkPulse Inc
T: 800.436.1436
D: 212.256.1086

--

Eli Fireman
**Managing Member**
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

3

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

--
Dennis M O'Leary
Chairman, CEO, CFO
DarkPulse Inc
T: 800.436.1436
D: 212.256.1086

--

Eli Fireman
Managing Member
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

--
Dennis M O'Leary
Chairman, CEO, CFO
DarkPulse Inc
T: 800.436.1436
D: 212.256.1086

--

4

Eli Fireman
Managing Member
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

--
Dennis M O'Leary
Chairman, CEO, CFO
DarkPulse Inc
T: 800.436.1436
D: 212.256.1086

--

Eli Fireman
Managing Member
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

A-292

--

Eli Fireman
**Managing Member**
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

A-293

# EXHIBIT F

A-294

| | |
|---|---|
| **From:** | Eli Fireman <eli@firstfirecap.com> |
| **Sent:** | Monday, November 29, 2021 12:46 PM |
| **To:** | Perechocky, David L. |
| **Subject:** | Fwd: Per our phone conversation |
| | |
| **Follow Up Flag:** | Follow up |
| **Flag Status:** | Flagged |

> **This message is from an EXTERNAL SENDER** - be cautious, particularly with links and attachments.

---------- Forwarded message ---------
From: **Dennis O'Leary** <doleary@darkpulse.com>
Date: Mon, Nov 29, 2021 at 4:41 AM
Subject: Per our phone conversation
To: Eli Fireman <eli@firstfirecap.com>, The Basile Law Firm, P.C. <mark@thebasilelawfirm.com>

Hi Eli,
Per our discussion. Both myself and the company maintain that no additional shares were/are owed per the note agreement. We are requesting you return the shares you received over and above the original note amount.
Thank you again
Dennis
--
Dennis M O'Leary
Chairman, CEO, CFO
DarkPulse Inc
T: 800.436.1436
D: 212.256.1086

--

Eli Fireman
Managing Member
FirstFire Capital
Direct: 212-317-5992
Office: 212-317-5970

CONFIDENTIALITY STATEMENT:

1

A-295

This message is intended only for the use of the individual or entity to which it is addressed and may contain information that is privileged, confidential and exempt from disclosure under applicable law. If the reader of this message is not the intended recipient or the employee or agent responsible for delivering the message to the intended recipient, YOU ARE HEREBY NOTIFIED that any dissemination, distribution or copying of this communication is strictly prohibited. If you are not the intended recipient of this message, please destroy any printed version and delete this email. In addition, this firm does not accept service of papers by email or facsimile transmission.

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

        Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

        Defendants.

Index No. 1:21-cv-11222 (ER)

**DECLARATION OF AARON H. MARKS IN SUPPORT OF DEFENDANTS'
OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION**

I, Aaron H. Marks, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as
follows:

    1.     I am a partner of the law firm of Kirkland & Ellis LLP, counsel of record for
Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman in the above-
captioned action.  I submit this Declaration in support of Defendants' Opposition to Plaintiff's
Motion for a Preliminary Injunction.  I make this Declaration based on my own personal
knowledge.

    **A.**     **DPLS Common Shares**

    2.     According to DPLS's own website, https://ir.darkpulse.com/stock/, DPLS's stock
is a penny stock not listed on a major exchange, but that rather trades through OTC Pink, one of
OTC Market Group's platforms.

    3.     DPLS's public filings indicate that as of September 30, 2021 there were nearly five
billion (4,922,968,442) shares of DPLS common stock issued and outstanding, and DPLS has

authorized a total of twenty billion (20,000,000,000) shares of common stock for issuance. Attached hereto as **Exhibit G** is a true and correct copy of DPLS's Form 10-Q for the quarterly period ended September 30, 2021, filed with the SEC on EDGAR on November 15, 2021.

4.      According      to      yahoo!      finance      and      DPLS's      own      website, https://ir.darkpulse.com/stock/, as of January 14, 2022, DPLS shares closed trading at a price of approximately $0.05, and have a 52-week price range of $0.0014 to $0.202—the high of the range being about 144 times the low.

5.      According to the figures contained on DPLS's own website, in the 42 trading days between November 18, 2021 and January 14, 2022, the period between FirstFire's conversion and DPLS filing this motion, over 1.178 billion DPLS common shares were traded—for an average daily trading volume of 28.04 million shares per day during this period.

6.      Over the ten trading days preceding FirstFire's conversion pursuant to the Note, there was an average daily trading volume of 36.08 million DPLS common shares per day.

**B.      DPLS's History of Issuing Convertible Notes**

7.      According to DPLS's public filings, DPLS hired a registered broker-dealer and paid a finder's fee of $15,000 to the broker-dealer, who found FirstFire to enter into the Note.  Attached hereto as **Exhibit H** is DPLS's Form 8-K filed with the SEC on EDGAR on May 5, 2021.

8.      DPLS's public filings reflect that between July 2018 and July 2021, DPLS entered into 20 different convertible notes with multiple investment funds—including the note issued to FirstFire on April 26, 2021 (the "Note") that is the subject of this dispute.  Attached hereto as **Exhibit I** is a true and correct copy of DPLS's Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on EDGAR on April 14, 2019.  Attached hereto as **Exhibit J** is a true and correct copy of DPLS's Form S-1/A Registration Statement, filed with the SEC on EDGAR on December 8, 2021.

2

9.      On 36 separate occasions in 2020 and in 2021, DPLS issued significant volumes of shares of common stock upon the conversion or partial conversion of convertible promissory notes by their holders.  (**Exhibit J**, DPLS Form S-1/A at II–3–II-5.)

10.     In total, in 2020 and 2021, DPLS, through its transfer agent, issued over 3,545,380,000 common shares in connection with these 36 note conversions, including the 177,375,000 common shares issued to FirstFire on November 17, 2021.  (*Id.*)

11.     Each of the convertible notes entered by DPLS (and the convertible notes' attendant DPLS common shares) are disclosed in DPLS's public filings beginning the date the notes are entered.  (*See id.*)

12.     Additionally, on December 13, 2021, DPLS filed a prospectus registering 300 million shares of its common stock for sale by GHS Investments LLC, noting that common stock outstanding prior to the offering totaled 5,154,044,407.  Attached hereto as **Exhibit K** is DPLS's Form 424B4 filed with the SEC on EDGAR.

### C.      Lawsuits Filed By DPLS

13.     According to DPLS's public filings, on May 13, 2021, two weeks after entering into the Note with FirstFire, DPLS filed a motion in its action against another investment fund with which DPLS entered into a convertible note, Carebourn Capital, L.P., "arguing that Carebourn is conducting itself as an unregistered dealer, in violation of Section 15(a) of the Securities and Exchange Act of 1934 (the "Act"), and, pursuant to Section 29(b) of the Act, the Company is entitled to have all contracts arising under the unlawful securities transaction declared void ab initio and seek rescissionary damages for any unlawful transactions effected by Carebourn"—the same arguments to rescind the Note that DPLS now makes here.  (**Exhibit G**, DPLS 10-Q at 25.)

**A-299**

14.     DPLS is litigating a similar case against More Capital, LLC (*id.* at 26), and on January 4, 2022, DPLS initiated an action against EMA Financial, LLC and a related entity and individual that is almost identical to this Action. *DarkPulse, Inc. v. EMA Fin., LLC, et al.*, Case No. 1:22-cv-00045 (S.D.N.Y. Jan. 3, 2022).

15.     It appears to be DPLS's pattern and practice to enter into convertible notes with investment funds, to receive the cash funding thereunder, and then seek to void or rescind the notes in frivolous litigation—in which DPLS even suggests that it had no prior knowledge of the allegations of unlawfulness that it is making.

**D.     The Delaware Action and this Action**

16.     On December 13, 2021, weeks after DPLS first demanded that FirstFire return the shares converted pursuant to the Note, FirstFire filed a complaint in the Delaware Chancery Court concerning this same dispute regarding the Note and seeking a declaration that the November 17 conversion was proper and that FirstFire was entitled to the 177,375,000 share of DPLS common stock it received in connection with the conversion ("the Delaware Action").

17.     On December 31, 2021, instead of responding to the Delaware Action, DPLS initiated this Action.

18.     Upon filing this Action, DPLS issued a press release, a true and correct copy of which is attached hereto as **Exhibit L**.

19.     DPLS has entered its appearance in the Delaware Action, and on January 14, 2022, the Delaware Chancery Court entered a scheduling order in the Delaware Action, providing for a February 4, 2022 deadline for DPLS to respond to the complaint and setting an April 13, 2022 hearing date for any motion that DPLS may file. *FirstFire Glob. Cpp. Fund LLC v. DarkPulse, Inc.*, C.A. No. 2021-1082-LWW (Del. Ch. Dec. 13, 2021).

4