# 23-0078-cv

## United States Court of Appeals

*for the*

## Second Circuit

DARKPULSE, INC.,

*Plaintiff-Appellant,*

— v. —

FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, ELI FIREMAN,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**JOINT APPENDIX**
**Volume 2 of 2 (Pages A-300 to A-597)**

MARK R. BASILE
MARJORIE SANTELLI, ESQ
GUSTAVE P. PASSANANTE, ESQ
THE BASILE LAW FIRM P.C.
*Attorneys for Plaintiff-Appellant*
390 North Broadway, Suite 140
Jericho, New York 11753
(516) 455-1500

i

## TABLE OF CONTENTS

**Page**

District Court Docket Entries ................................... A-1

Opinion and Order, dated January 16, 2023 ............. A-7

Complaint, dated December 31, 2021 ...................... A-32

    Exhibit 1 to Complaint -
    Senior Convertible Promissory Note, dated
    September 20, 2018 ............................................... A-56

    Exhibit 2 to Complaint -
    Convertible Promissory Note, dated
    April 26, 2021 ...................................................... A-103

    Exhibit 3 to Complaint -
    Edgar List .............................................................. A-164

Rule 7.1 Statement, dated December 31, 2021 .......... A-173

Plaintiff Darkpulse, Inc.'s *Ex Parte* Emergency
    Application for Order to Show Cause and for
    Temporary Restraining Order, dated
    January 14, 2022 .................................................. A-174

Text of Proposed Order ............................................ A-176

Declaration of Dennis O'Leary, pursuant to 28 USC
    § 1746, in Support of Darkpulse, Inc.'s, Motion
    for a Temporary Restraining Order and
    Preliminary Injunction, dated January 14, 2022 .... A-178

Order to Show Cause for Preliminary Injunction
    and a Temporary Restraining Order, dated
    January 14, 2022 .................................................. A-181

ii

**Page**

Plaintiff Darkpulse, Inc.'s Memorandum of Law, in
Support of Motion for Temporary Restraining
Order and Preliminary Injunction, dated
January 17, 2022 .................................................... A-183

Proposed Order Granting a Preliminary Injunction ... A-206

Emergency Supplemental Declaration of Dennis
O'Leary Pursuant to 28 U.S.C. § 1746, in
Support for Preliminary Injunction, dated
January 17, 2022 .................................................... A-208

Exhibit A to O'Leary Declaration -
January 13, 2022 Historical Data ........................... A-210

Exhibit B to O'Leary Declaration -
Market Capital Spreadsheet ................................... A-214

Defendants' Memorandum of Law in Opposition to
Plaintiff's Motion for a Preliminary Injunction
dated January 19, 2022 .......................................... A-216

Declaration of Eli Fireman, in Support of
Defendants' Opposition to Plaintiff's Motion for
a Preliminary Injunction, dated January 19, 2022 . A-248

Exhibit A to Fireman Declaration -
Second Convertible Note to FirstFire,
dated April 26, 2021 .............................................. A-255

Exhibit C to Fireman Declaration -
E-mail from Eli Fireman to Dennis O'Leary with
the Amendment Attached, dated
November 5, 2021 .................................................. A-276

Exhibit D to Fireman Declaration -
E-mail from Nick Fireman to Dennis O'Leary
with the Notice of Conversion Attached, dated
November 15, 2021 ................................................ A-282

iii

**Page**

Exhibit E to Fireman Declaration -
E-mail from Eli Fireman to Dennis O'Leary,
dated November 23, 2021 ...................................... A-286

Exhibit F to Fireman Declaration -
E-mail from Eli Fireman to Dennis O'Leary,
dated November 29, 2021 ...................................... A-293

Declaration Of Aaron H. Marks, in Support of
Defendants' Opposition to Plaintiff's Motion for
a Preliminary Injunction, dated January 19, 2022 .... A-296

Rule 7.1 Statement, dated January 19, 2022 .............. A-301

Plaintiff Darkpulse, Inc.'s Reply, in Support of its
Motion for Preliminary Injunction, dated
January 20, 2022 .................................................. A-302

Order of the Honorable Edgardo Ramos, dated
January 21, 2022 .................................................. A-313

Transcript of Court Proceedings of the Honorable
Edgardo Ramos, dated January 21, 2022 ............... A-314

Letter from Aaron Marks to the Honorable Edgardo
Ramos, dated March 14, 2022 .............................. A-361

Counter Letter from Gustave Passanante to
Honorable Edgardo Ramos, dated
March 17, 2022 ................................................... A-365

First Amended Complaint, dated May 5, 2022 .......... A-368

Notice of Defendants' Motion to Dismiss the First
Amended Complaint, dated May 26, 2022 ............. A-397

Defendants' Memorandum of Law in Support of
their Motion to Dismiss the First Amended
Complaint, dated May 26, 2022 ........................... A-399

iv

**Page**

Darkpulse, Inc.'s Memorandum of Law in
    Opposition to Defendants' Motion to Dismiss the
    First Amended Complaint, dated June 16, 2022 ....   A-432

Defendants' Reply Memorandum of Law, in Further
    Support of their Motion to Dismiss the First
    Amended Complaint, dated June 30, 2022 ...........   A-466

Declaration of Aaron H. Marks, in Support of
    Defendants' Reply Memorandum of Law in
    Further Support of their Motion to Dismiss the
    First Amended Complaint, dated June 30, 2022 ....   A-481

Exhibit Q to Marks Declaration-
    Securities Purchase Agreement between Energie
    Holdings, Inc. and LG Capital Funding, LLC,
    dated August 19, 2015 ...........................................   A-483

Letter from Aaron H. Marks to the Honorable
    Edgardo Ramos, dated September 29, 2022 ..........   A-498

Supplemental Authority in *EMA Financial, LLC,
    v. Apptech Corp.*, 21-cv-06049 (LJL), signed
    September 13, 2022 ................................................   A-500

Letter from Eric J. Benzenberg to the Honorable
    Edgardo Ramos, re: Notice of Supplemental
    Authority, dated October 7, 2022 .........................   A-520

Exhibit A to Benzenberg Letter -
    Decision in *Fleetwood Servs., LLC v. Ram Cap.
    Funding, LLC*, 2022 U.S. Dist. Lexis 100837
    (S.D.N.Y. June 6, 2022) ........................................   A-522

Exhibit B to Benzenberg Letter -
    Decision in *Haymount Urgent Care P.C. v.
    GoFund Advance, LLC*, 2022 U.S. Dist. LEXIS
    112768 (S.D.N.Y. June 27, 2022) .........................   A-545

v

**Page**

Exhibit C to Benzenberg Letter -
Decision in *Lateral Recovery LLC v. Queen
Funding, LLC*, 2022 U.S. Dist. Lexis 129032
(S.D.N.Y. July 20, 2022)........................................ A-564

Exhibit D to Benzenberg Letter -
Decision in *AKF, Inc. v. W. Foot & Ankle Ctr.*,
2022 U.S. Dist. Lexis 176467 (E.D.N.Y.
Sept. 28, 2022)........................................................ A-573

Exhibit E to Benzenberg Letter -
Decision in *GS Capital Partners, LLC v. FTE
Networks, Inc.*, 2022 N.Y. Misc. Lexis 4698
(N.Y. Sup. Ct. Aug. 18, 2022).............................. A-585

Exhibit F to Benzenberg Letter -
Decision in in *New Y-Capp v. Arch Cap. Funding,
LLC*, 2022 U.S. Dist. Lexis 180309 (S.D.N.Y.
Sept. 30, 2022)........................................................ A-590

Notice of Appeal, dated January 17, 2023 ................. A-597

A-300

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022 in Westchester County, New York.

_____

Aaron H. Marks

5

A-301

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

        Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

        Defendants.

Index No. 1:21-cv-11222 (ER)

## RULE 7.1 STATEMENT

Pursuant to Federal Rule of Civil Procedure 7.1, Defendant FirstFire Global Opportunities

Fund, LLC hereby discloses that it does not have any parents, affiliates, and/or subsidiaries which

are publicly held, and no publicly held corporation owns ten percent or more of its stock.

Dated:  January 19, 2022

        */s/ Aaron H. Marks*

        Aaron H. Marks, P.C.
        Byron Pacheco
        Julia D. Harper
        KIRKLAND & ELLIS LLP
        601 Lexington Avenue
        New York, New York 10022
        (212) 446-4800

        *Attorneys for Defendants*

# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.,

                       *Plaintiff,*

      v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

                      *Defendants.*

Civil Action No. 1:21-cv-11222-ER

## PLAINTIFF DARKPULSE, INC.'S REPLY IN SUPPORT
## OF ITS MOTION FOR PRELIMINARY INJUNCTION

**THE BASILE LAW FIRM, P.C.**
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:    (516) 455-1500
Fax:    (631) 498-0748
Email: gus@thebasilelawfirm.com
            eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc*

## PRELIMINARY STATEMENT

This dispute is being heard in the correct forum. Although this case does not currently involve a claim for usury, the mere fact that the April 26, 2021 convertible promissory note ("Note") is criminally usurious under the laws of New York (the forum originally selected by the parties), renders the Note **void _ab initio_**.[1] _Adar Bays, LLC v. GeneSYS_ ID, Inc. 2021 N.Y. LEXIS 2206, 2021 NY Slip Op 05616 (Oct. 14, 2021). Further, when a contract is void _ab initio,_ the invalidity extends even to procedural matters in the contract like a forum selection clause. _DeSola Grp., Inc. v. Coors Brewing Co.,_ 199 A.D.2d 141 , 141-42 , 605 N.Y.S.2d 83 (1st Dep't 1993). _See also Signature Fin. LLC v. Neighbors Global Holdings, LLC,_ 281 F. Supp. 3d 438, 446 (S.D.N.Y. 2017). Accordingly, the bid by Defendant FirstFire Global Opportunities Fund, LLC ("FirstFire" or "Defendant") to save the transaction—by securing an amendment **_dated the day Adar Bays was issued_** and purporting to change the forum to Delaware—was a **_nullity_**.

DarkPulse is entitled to a preliminary injunction. Plaintiff is likely to succeed on the merits as there is significant evidence FirstFire is engaged in business as an unregistered securities dealer. There is **_no remedy at law_** for the violations of § 29(b) of the Act, no less an _inadequate_ one. There is clear evidence of irreparable harm in that DarkPulse's common stock has experienced price erosion and the company has suffered reduced market capitalization due to FirstFire's _en masse_ selling. And the remaining factors for a preliminary injunction are met.

Accordingly, for all the reasons stated herein, and those set forth in DarkPulse's opening papers, the requested preliminary injunction should be granted.

---

[1] Since the loan is void _ab initio_ the fact that Plaintiff did not assert that the Note should be voided until filing its Complaint in this case is of no moment. _See_ Defendant's Memorandum of Law in Opposition ("Opp.") at 1 n.2.

A-304

## ARGUMENT

### I.    THIS DISPUTE IS PROPERLY BEFORE THIS COURT[2]

One cannot amend that which, legally, does not exist. Here, the Note is criminally usurious on its face, and, therefore, void and unenforceable—*incapable of being amended for any purpose.* New York's usury laws provide that a corporation may interpose the defense of usury as described in § 190.40 in the penal code. *See* N.Y. G.O.L. § 5-521(3). The law provides that "[a] person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate *exceeding twenty-five per centum per annum* or the equivalent rate for a longer or shorter period." N.Y. Penal Law § 190.40 (emphasis added). What must be considered "interest" for purposes of a usury analysis is further defined by New York statute. Pursuant to § 5-501, "interest shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance." N.Y. G.O.L. § 5-501(2). Totalling all items considered "interest" under New York law, there is no question the Note violates the criminal usury statute and is void *ab initio.*

*First,* New York courts hold that an original issue discount ("OID") must be considered interest on the loan when the OID payment does not reimburse the lender for expenses. *See Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336, 339 (S.D.N.Y. 2013) (holding that "when fee payments do not actually reimburse lenders for expenses associated with the loan, and instead are a disguised loan payment, then such fee expenses can be considered in determining the interest rate."); *Hammelburger v. Foursome Inn Corp.,* 76 A.D.2d 646, 648 (App. Div. 2d

---

[2] Plaintiff anticipates making a similar argument, among others to be determined on a full, dispositive motion briefing cycle in the Delaware action brought by FirstFire.

3

Dept.) (1980) (holding that a discount retained by the lender must be added to the interest rate). *See also Band Realty Co. v. N. Brewster, Inc.*, 335 N.E.2d 316, 319 (1975). Here, the Note required DarkPulse to pay  an OID of $75,000.00, or 10% of the total amount loaned. As in *Hillair Capital*, the OID does not compensate for expenses because of other provisions in the Agreement. Section 8k of the share purchase agreement ("SPA") shows that DarkPulse was already obligated to compensate FirstFire for "legal fees and expenses incurred in connection with this Agreement," and hence the OID must be deemed interest. *Id.*

*Second*, New York courts hold that the value of securities given to a lender in consideration for a loan must be added to the interest-rate calculation. *See Sabella v. Scantek Med. Inc.*, 2009 LEXIS 88170 (S.D.N.Y. Sept. 25, 2009) (lender's entitlement to common stock for making a loan renders the loan usurious if the value of the shares "cause the return on the loan to exceed 25%."). This is true even if the exact value of the stocks is not apparent on the face of the agreement (*e.g.* restricted securities). *See id.* The restricted securities given as up-front consideration in *Hillair Capital* were deemed to have value and included in the interest rate. *Hillair*, 963 F. Supp.2d at 340 (noting various IRS methods for valuation of restricted stock). *See also Am. E Grp. LLC v. LiveWire Ergo. Inc* 2020 U.S. Dist. LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) (voiding convertible note as criminally usurious when stock value included); *Funding Group, Inc. v. Water Chef, Inc.*, 852 N.Y.S. 2d 736 (Sup. Ct. N.Y. County, 2008).

It is evident on its face that the Note charges interest in excess of 25%. With stated interest (10%) and OID (annualized, approximately 14%) alone, the interest rate on the Note comes to at least 24%. When the value of the commitment shares is added (trading at $1.4 million at issuance), the most conservative estimate puts the interest rate at approximately **225%**.[3] Accordingly, the

---

[3] Courts applying New York law have held that *usury-savings clauses (such as found in section 4.12 of the Note)* do not save an otherwise usurious note. *See, e.g., Hammelburger v. Foursome Inn Corp.*, 54 N.Y.2d 580, 595-598 (1981)

Note was and remains void *ab initio* and, therefore, the October 14, 2021 Amendment—purporting to change the selected forum from New York to Delaware—was ineffective. This dispute, therefore, is properly before this Court.

## II.   DARKPULSE MEETS THE FACTORS FOR A PRELIMINARY INJUNCTION

### A   DARKPULSE IS LIKELY TO SUCCEED ON THE MERITS

**1.   FirstFire is engaged in business as an unregistered dealer in securities.**[4] *First, Defendant acts as an underwriter.* Regardless of what Fireman states in his declaration ("Fireman Decl."), underwriting activity is not measured solely by what you proclaim yourself to be. *See* 15 U.S.C. § 78c (20). Underwriting activity appears to be a deciding factor for the courts in recent cases, tipping the scales in favor of finding dealer activity.[5] As noted in Plaintiff's opening papers, FirstFire is in the business of purchasing convertible notes from penny-stock issuers, and its profits are achieved in essentially the same manner as in *River North* and *Big Apple*. FirstFire drafts the agreements that ensures acquisition of newly-issued stock at a substantial discount to the market. Upon conversion, FirstFire immediately sells the stock into the market to reap the spread between the discount and the market price.[6]

*Second,* the vast amount of buying and selling securities leads to the conclusion that FirstFire is acting as a securities dealer. FirstFire makes blind assertions that it is merely a "trader"

---

(Cooke, J., concurring); N.Y. G.O.L. § 5-511 (2)); *Bakhash v Winston*, 134 AD3d 468, 469, 19 N.Y.S.3d 887 (2015); *Fred Schutzman Co. v Park Slope Adv. Med. PLLC*, 128 AD3d 1007, 1008, 9 N.Y.S.3d 682 (2015).

[4] Defendants argue that DarkPulse has *waived* the position that FirstFire is a dealer under the Exchange Act. *See* Opp. at n.19; Fireman Decl. at ¶ 6.  While its efforts to escape New York law speaks volumes about FirstFire's knowledge that the transaction was unlawful, the argument is simply wrong.  Section 29(a) of the Act states that any contractual provision purporting to waive compliance with the Act or any regulation thereunder "***shall be void.***"

[5] In *SEC v. River North Equity LLC*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019), the court focused on the defendant's ability to acquire the issuer stock at a deep discount, generating a markup when it sold shares obtained from conversions. The court noted that the defendant "turned a profit not from selling only after market prices increased (like a trader), but rather from quickly reselling at a marked-up price." *Id.* The use of this "underwriting spread" mechanism to gain profits was also significant in the recent cases of *SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 810 (11th Cir. 2015) and *SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1272 (S.D. Fla. 2020).

[6] *See* Barron's Dictionary Fin. & Invest. Terms at 828 (definition of "dealer spread" or "underwriting spread," the difference between the amount paid to an issuer of securities and the amount paid by the public on the open market).

5

under the Act because it has "only ever sold securities on its own behalf and has never acted as an underwriter for an offering of securities." Opp. at 21. FirstFire neglects to mention that, **as a part of its regular business,** it acquires discounted stock directly from issuers and turns a profit by quickly reselling it at a marked-up price (a practice in which "traders" do not engage). *See SEC v. River North Equity LLC*, 415 F. Supp. 3d 853, 859 (N.D. Ill. 2019); *see also SEC v. GPL Ventures LLC*, (S.D.N.Y. Jan. 18, 2022) (rejecting defendant's "trader" argument and denying dismissal when complaint sufficiently alleged defendants engaged in "business of buying and selling securities").[7]

   **2. *LG Capital* and *Vystar* are incorrectly decided.** The holdings in these cases are wrong because the courts examine only the performance of the transactions and ignore that *the agreements were transactions in securities. LG Capital* appears to be the first case addressing a 29(b) claim against purveyors of convertible promissory notes for a violation of § 15(a). The court rejected the claim, concluding that "nothing in the Note or the SPA indicates that those contracts 'could not have been legally performed" by an unregistered dealer." *Id.* at *15-16. The court overlooked that the agreements (constituted by a convertible note and share purchase agreement) were **themselves securities,** and that an unregistered dealer would have violated the statute **by merely entering into the transactions**. In *EMA Fin., LLC v. Vystar Corp.*, 2021 WL 1177801 (S.D.N.Y. Mar. 29, 2021), the court repeated *LG Capital's* error, holding "assuming *arguendo* that the selling of converted shares made Ema a broker-dealer, the selling of those shares was not

---

[7] Defendants fail to rebut the allegations about their business model with a supporting declaration the way they seek to rebut the alleged stock sales under the April 2021 Note, simply avering that the Complaint does not set forth the necessary allegations (which it surely does!). ***Evidence of such sales are currently unknown to everyone other than the Defendants, hence, without discovery, it is not possible for any party to allege specific sales of stock,*** as FirstFire demands.  Defendants also fail to adequately distinguish SEC enforcement actions from private party securities actions; not only is their contention incorrect, it would result in an absurd rule of law: that the securities laws may be violated so long as the SEC is not involved. *See Auctus Fund, LLC, v. Players Network, Inc.*, Case No. 20-cv-10766 (D. Mass. Dec. 10, 2021) (private plaintiff successfully stated claim for rescission under § 29(b)).

required by the contract." Thus, "[a]t the time the parties entered into the Agreement, the
Agreement could be performed without violating provisions of the securities laws." *Vystar*, 336
F.R.D. 75, 81. Like *LG Capital*, *Vystar* overlooks the indisputable fact that the agreement in that
case was a convertible promissory note (a security) and share purchase agreement (a security)
containing an option to convert (a security) debt into stock (security). As with *LG Capital*, the
agreements in *Vystar* are themselves securities and unlawful "when made" if they were effectuated
***by an unregistered securities dealer***.[8]  Moreover, DarkPulse's claim in this case is nearly identical
to the violation in *Eastside Church*, where the plaintiff brought a 29(b) action for rescission
effected by an entity determined to be an unregistered dealer under the Act. Accordingly, the court
held that "under § 15(a)(1), National was prohibited from effecting the transactions here involved
and thus *violated the Act by entering into those transactions.*" *Eastside Church of Christ v.
National Plan, Inc.*, 391 F.3d 357, 362 (5th Cir. 1968) (emphasis added).[9]  For these reasons,
reliance on *Vystar* and *LG Capital* is misplaced.[10]

    **3. DarkPulse is in the "class of persons" that the Act was designed to protect**. *See
Eastside Church*, 391 F.2d at 362 (finding that "[t]he requirement that brokers and dealers register

---

[8] DarkPulse's interpretation is not nearly as "novel" as FirstFire contends, but comports with the numerous cases
voiding a contract because securities laws were violated in its *making. See, e.g., Mills*, 396 U.S. 375 (29(b) rescission
based on fraudulent proxy statements); *Berkeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195 (3d Cir. 2006).

[9] *Berkeley* involves rescission based both on the grounds that the contract was *made* in violation of § 10(b) *and* that
*performance* violated the short-selling prohibitions in § 5 of the Securities Act of 1933. Though it rejected the "as
performed" violation because short-selling was not part of the contract, it agreed with the "as made" claim.

[10] The cases cited by FirstFire are distinguishable because the initial agreements were not securities transactions, and
hence the "as made" question never arose. Although *Frati v. Saltzstein*, 2011 U.S. Dist. LEXIS 25567, at *18
(S.D.N.Y. Mar. 14, 2011) involved a claim for rescission under 29(b) based on § 15(a), the contract at issue effected
the purchase of shares in a hedge fund, which is excluded from the definition of "security" under the Act. *See* 15
U.S.C. § 78c(12)(A)(v). The court rejected the claim because the plaintiffs failed to allege any act requiring the
defendant to be a registered broker-dealer. In *Foundation Ventures, LLC v. F2G, Ltd.*, 2010 U.S. Dist. LEXIS 81293
(S.D.N.Y. Aug. 11, 2010), the parties entered into an agreement on appointing FV to act as F2G's "exclusive finder"
to raise $25 million in capital for F2G. Because the contract under scrutiny is a services contract (not a transaction in
securities) any violation could only have been through performance.

is of the utmost importance in effecting the purposes of the Act" and that absent rescission under 29(b), "there would be no civil remedy for the failure to register.").

**4. FirstFire's allegation that DarkPulse is not an "unwilling and innocent party" because it has entered into "dozens of similar convertible notes" is meritless.** Opp. at 23. Such facts, even if true, are not relevant to the "unwilling innocent party" question. This language comes directly from § 29(b) and from *Mills*, 396 U.S. at 386-88, where the Supreme Court clarified that the *violator of the Act* had no right to void the contract, only the non-violating (or "innocent and unwilling") party. Here, FirstFire violated the Act when it effected a transaction in securities as an unregistered dealer, not DarkPulse. A party fails the "unwilling and innocent" test only if it actively participated or encouraged the violator's unlawful conduct—essentially applying the equitable defense of *in pari delicto*. In order to assert the defense, it must be shown that the fault of the parties is "clearly mutual, simultaneous, and relatively equal" and that the plaintiff was an active, essential, and knowing participant in the unlawful activity. *Palmer v. Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 289 (D. Conn. 1979). *See also Reg'l Props.*, 678 F.2d at 562.[11]

**B.    PLAINTIFF FACES IRREPARABLE HARM WITHOUT AN INJUNCTION**

DarkPulse will suffer massive irreparable harm in the absence of a preliminary injunction. *First*, despite their argument that "there is a clear remedy at law...," Opp. at 15-16, Defendants acknowledge that "[t]he exact remedy under Section 29(b) for Section 15(a) violations specifically

---

[11] *Buffalo Forge Co. v. Ogden Corp.*, 555 F. Supp. 89 (W.D.N.Y. 1983) does not support Defendants' position. That case involved a company that had literally been on both sides of a transaction (sides that changed after the company was taken over). *Id.* at 906. Other cases rejecting 29(b) claims involve sophisticated traders engaging in extended courses of unethical behavior (*Drasner v. Thompson Secur. Inc.*, 433 F. Supp. 485 (S.D.N.Y. 1977)) or even criminal behavior (*Naftalin & Co. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 469 F.2d 1166 (8th Cir. 1972)). Here, DarkPulse had nothing to do with FirstFire's decision to operate an unlawful enterprise. FirstFire's violation of Section 15(a) stems from a business model that it has been using for several years, with hundreds of small companies. It is this fact—that FirstFire has been "in the business of buying and selling securities for its own account"—that causes the violation here, not simply that it effected the securities transactions in this case.

is unclear…," *id.* at 16 n.13. Indeed, not only is there not an adequate remedy at law, **there is no remedy at law whatsoever,** hence no legal damages. This conclusion stems from the United States Supreme Court's opinion in *Transamerica Mortgage Advisors v. Lewis*, 444 U.S. 11 (1979). In that case, the Court analyzed § 215 of the Investment Advisers Act, a provision nearly identical to § 29(b). In concluding that Section 215 did imply a private right of action, the Court also warned that the limited right to rescission under Section 215 does not include compensation for any diminution in the value of the complainant's investment alleged to have resulted from the unlawful conduct. The Court reasoned that "[s]uch relief could provide by indirection the equivalent of a private damage remedy" that Congress did not confer in the statute. *Transamerica*, 444 U.S. 24 at n.14. Subsequent to Transamerica, courts that had previously awarded damages under § 29(b) concluded that only rescission, not money damages, was the remedy provided in that section. *See, e.g., Reg'l Properties*, 678 F.2d 552.

Second, harm, including "immediate and long-term *irreparable* harm," *Momenta Pharm., Inc. v. Amphastar Pharm., Inc.*, Case No. 11-11681-NMG (ECF No. 92) (Memorandum & Order), at *24-25 (D. Mass. 2011), occurs when a publicly-traded corporation faces price erosion of its securities and loss of market capitalization. *Id.* These harms can be caused by the unlawful selling of stock that detracts from an issuer's survival (as demonstrated by prevailing market prices). *See Barbara v. MarineMax, Inc.*, 2012 WL 6025604 (E.D.N.Y. Dec. 04, 2012) (publicly-traded company harmed when it "lost its economic viability" due to unlawful selling activity); *LaSala v. Bordier et Cie*, 519 F.3d 121, 131 (3d Cir. 2008) (a corporation's loss in value or economic viability is, in the first instance, a harm to the corporation).

A-311

## C.     THE BALANCE OF HARDSHIPS FAVORS DARKPULSE

Contrary to FirstFire's allegations, DarkPulse did not delay in bringing this motion. DarkPulse understood that the highest risk of dumping (and intent to injure it) would come as soon as it commenced this case against FirstFire. Moreover, the action itself was not untimely, and Defendants' own authorities support this conclusion. *See* Opp. at 18 (citing *Transcience Corp. v. Big Time Toys, LLC*, 50 F. Supp. 3d 441, 458 (S.D.N.Y. 2014), where the plaintiffs waited *nine months* to commence litigation). Indeed, Plaintiff commenced the instant action in *less than half the shortest period of time* that court's have found "unreasonable delay" warranting denial of an injunction. *See, e.g., Trends Analysts v. Freedonia Grp.*, 650 F.Supp. 1452, 1459 (S.D. N.Y. 1987) (finding unreasonable delay when 6 months passed between discovery of the actionable misconduct and filing of complaint). FirstFire attempts to demonstrate unreasonable delay by stating—***with no evidentiary support***—that DarkPulse was "clearly aware" Defendants were engaging in selling activity. In fact, ***Plaintiff has no means to verify whether Defendants sold one or tens of millions of newly-converted shares into the public markets,*** since it was unaware Defendants had already sold *more than 85 million shares during a 39-trading day period. See* Fireman Decl., at ¶ 30; *cf.* Opp. at 2-3 (incorrectly counting the 42 days). The imminent nature of Plaintiff's sought-after relief is further evidenced by the fact that ***on the same day this motion was filed,*** Defendants sold more than 3 million shares in a single trading day, contributing to the substantial erosion in DarkPulse's common stock experienced on that very day.

## <u>CONCLUSION</u>

For all the foregoing reasons, and all those set forth in Plaintiff's opening papers, Plaintiff respectfully requests that the Court grant its motion.

DATED: January 20, 2022                    Respectfully submitted,

                                           */s /  Gustave P. Passanante*
                                           Gustave P. Passanante, Esq.
                                           Eric J. Benzenberg, Esq.
                                           **THE BASILE LAW FIRM, P.C.**
                                           390 N. Broadway, Ste. 140
                                           Jericho, NY 11753
                                           Tel.:   (516) 455-1500
                                           Fax:    (631) 498-0748
                                           Email:  gus@thebasilelawfirm.com
                                                   eric@thebasilelawfirm.com

                                           *Attorneys for Plaintiff DarkPulse, Inc.*

A-313

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

DARKPULSE, INC.

               Plaintiff,

       v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

               Defendants.

**ORDER**

21 Civ. 11222 (ER)

RAMOS, D.J.

      On December 31, 2021, DarkPulse, Inc. ("DarkPulse") brought this action against

FirstFire Global Opportunities Fund, LLC ("FirstFire") and managing member Eli Fireman

alleging, *inter alia*, violations of the Securities Exchange Act of 1934 and seeking rescission of

the parties' convertible promissory note under § 29(b) of the Act.  Doc. 1.  On January 17, 2022,

DarkPulse moved for a preliminary injunction to restrain FirstFire from selling DarkPulse stock

that it had acquired pursuant to the note.  Doc. 17.  On January 21, 2022, the Court held a

conference and heard oral argument on DarkPulse's motion for a preliminary injunction.

      For the reasons stated on the record at the hearing, DarkPulse's motion for a preliminary

injunction is DENIED.

      It is SO ORDERED.

Dated: January 21, 2022
      New York, New York

                                 _____

                                   Edgardo Ramos, U.S.D.J.

MIL6DARC

```
1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x

3    DARKPULSE, INC.,

4              Plaintiff,

5         v.                          21 CV 11222

6    FIRSTFIRE GLOBAL OPPORTUNITIES        Injunction
     FUND, LLC, et al,
7
               Defendant.
8
     ------------------------------x
9                                    New York, N.Y.
                                     January 21, 2022
10                                   2:00 p.m.

11   Before:

12                   HON. EDGARDO RAMOS,

13                                   District Judge

14                       APPEARANCES

15   THE BASILE LAW FIRM P.C.
          Attorneys for Plaintiff
16   BY:  GUSTAVE P. PASSANANTE
          ERIC BENZENBERG
17
     KIRKLAND & ELLIS LLP
18        Attorneys for Defendants
     BY:  AARON H. MARKS
19        TRACY LIN
          JULIA DEVEREUX HARPER
20

21

22

23

24

25
```

**A-315**

MIL6DARC

```
 1              (Case called)
 2              DEPUTY CLERK:  Counsel, please state your name for the
 3    record.
 4              MR. PASSANANTE:  Gustave Passanante for the plaintiff.
 5              MR. BENZENBERG:  Eric Benzenberg, your Honor, the
 6    Basile Law Firm.
 7              MR. MARKS:  Good afternoon, your Honor.  Aaron Marks,
 8    Tracy Lin, and Julia Harper from Kirkland Ellis, for the
 9    defendants.
10              THE COURT:  Good afternoon to you all.
11              This matters is on for a preliminary injunction
12    hearing.  I have received the parties' papers, and I'm ready to
13    hear you.  If you speak from the table, you don't have to
14    stand.  If you want to use the podium, if that makes you more
15    comfortable, you can use the podium.  Just please bring the
16    microphone as close to you as possible.
17              And Mr. Passanante or Mr. Benzenberg?
18              MR. PASSANANTE:  It will be Mr. Passanante, your
19    Honor.
20              THE COURT:  Okay.
21              MR. PASSANANTE:  So, your Honor, this case is about an
22    unregistered dealer engaging in the business's security
23    transactions.
24              The first point I want to make is the objections that
25    the defendants made to the amendment of the note and the
```

A-316

MIL6DARC

1   venue -- forum selection clause.  The plaintiff's asserting

2   that since the -- on the face of the note, it's criminally

3   usurious based on the stated interest rate, the original issued

4   discount, as well as the commitment shares issue.  It brings in

5   over the usury limitation of 25 percent in the State of

6   New York, deeming the note criminally usurious.

7           THE COURT:  I'm sorry.  Can you slow down, please?

8           MR. PASSANANTE:  Yes.

9           THE COURT:  And I apologize.  We all have to wear

10  masks, but if you speak up a little bit, slow down, speak up a

11  little bit, bring the microphone closer.

12          MR. PASSANANTE:  So because of the stated interest in

13  the note as well as the origination discount and the commitment

14  shares that were issued -- the value of which, by the way, were

15  approximately $1.4 million -- that easily exceeds the

16  25 percent interest cap that the State of New York provides for

17  in the penal law, deemed the note criminally usurious and void

18  *ab initio*.  Since that note is void *ab initio*, that would mean

19  that all ancillary documents, as far as the amendment goes, as

20  well as the forum selection clause, would also be void.

21          THE COURT:  When did you determine that this was

22  usurious?

23          MR. PASSANANTE:  You can tell by the terms of the

24  note, your Honor, because of the stated interest rate and the

25  original issue discount, which is about -- around 10 percent of

MIL6DARC

1   the principal.  However, when you analyze, it actually

2   increases to 15 percent because the nine-month maturity on the

3   note as well as the commitment shares were issued.

4           THE COURT:  So it was usurious at the time it was

5   entered into?

6           MR. PASSANANTE:  Correct, your Honor.

7           THE COURT:  And why didn't your client know that?

8           MR. PASSANANTE:  Well, your Honor, my client is not an

9   attorney, and it's an emerging growth corporation.  They are

10   traded on OTC markets.  They are typically desperate for

11   capital infusions, especially at the stage that they're in.

12           THE COURT:  Did your client have a lawyer?

13           MR. PASSANANTE:  Excuse me?

14           THE COURT:  Did your client have a lawyer?

15           MR. PASSANANTE:  Not sure, your Honor.  I'm only

16   litigation counsel.

17           THE COURT:  What?

18           MR. PASSANANTE:  You're saying at the time they

19   entered the transaction?

20           THE COURT:  Yes.

21           MR. PASSANANTE:  Did they have an attorney?  They had

22   general counsel.  As far as determining the usurious nature,

23   though, I don't think that was a concern -- a concern for them

24   at the time, because they were desperate for capital.  And

25   since they -- since the defendant was willing to provide

MIL6DARC

1   capital, they were more interested in doing that.  And then

2   when the client determined that how --

3            THE COURT:  I'm sorry.  You really have to slow down.

4            MR. PASSANANTE:  I'm sorry.

5            Once my client was able to determine how offensive

6   some of the provisions in the note, were was when they sought

7   counsel to determine the lawfulness of the note, which then

8   when we reviewed it, determined that it was usurious as well as

9   the other potential violations that defendants engaged in.

10           THE COURT:  I'm sorry.  So when, exactly, did your

11   client determine that it was usurious?

12           MR. PASSANANTE:  Your Honor, I don't think my client

13   determined that it was usurious.  I think counsel determined it

14   was usurious, litigation counsel.

15           THE COURT:  When?

16           MR. PASSANANTE:  When?  When we were able to review

17   the note.  The reason it wasn't inserted in our opening brief,

18   your Honor, because -- the point that you posed to me -- is

19   that corporations can't assert usury as an affirmative claim,

20   so we can only raise it as a defense.  The corporation can only

21   raise it as a defense.  So it's really just in response to

22   defendant's argument as to the forum selection clause.

23           THE COURT:  Okay.

24           MR. PASSANANTE:  So that's why it wasn't raised until

25   now, your Honor.

**A-319**

MIL6DARC

1        THE COURT:  Now, how long has your client been around?

2        MR. PASSANANTE:  How long have they been around?

3        THE COURT:  DarkPulse.

4        MR. PASSANANTE:  As a publicly traded company?

5        THE COURT:  Yes, sir.

6        MR. PASSANANTE:  Three years, but there were private

7   before that for about seven.

8        THE COURT:  I know they engaged in a similar

9   transaction with FirstFire in 2018, correct?

10        MR. PASSANANTE:  Correct.

11        THE COURT:  Were they desperate for cash then?

12        MR. PASSANANTE:  Yes, they were, your Honor.

13        THE COURT:  Have they been desperate for cash since or

14   throughout?

15        MR. PASSANANTE:  Yes, your Honor.  So they're a tech

16   company.

17        THE COURT:  What do they do?

18        MR. PASSANANTE:  They -- they create software or

19   hardware, rather, called BODTA, brillouin optical -- optilian,

20   something, something, technology.  Essentially, what it does is

21   it produces a dark pulse sensor, which can be inserted in

22   mines, and what it will do is it will send out a dark pulse to

23   read for any weaknesses in structures, any cracks in pipes, or

24   anything like that.  So they try and sell their software -- or

25   hardware, rather, to mines, gold mines, oil mines, and things

MIL6DARC

1    like that.  That's where their technology is used.

2          THE COURT:  And there's at least two with FirstFire,

3    correct?

4          MR. PASSANANTE:  Correct.

5          THE COURT:  And they have engaged in similar

6    transactions with other entities, correct?

7          MR. PASSANANTE:  They have, your Honor.

8          THE COURT:  How many more?

9          MR. PASSANANTE:  I think it's approximately 12.

10          THE COURT:  Approximately 12?

11          MR. PASSANANTE:  Yeah.

12          THE COURT:  And I think you've brought at least one

13    other lawsuit here, correct?

14          MR. PASSANANTE:  We're in litigation -- DarkPulse is

15    in litigation in Southern District.  I think they're a

16    defendant in the Southern District, but they're a plaintiff in

17    the Eastern District.

18          THE COURT:  Don't you have a case before

19    Judge Schofield?

20          MR. PASSANANTE:  Yes, your Honor.  In front of

21    Judge Schofield as well.  You're right.

22          THE COURT:  And then you're engaged in other

23    litigations?

24          MR. PASSANANTE:  Yeah.

25          THE COURT:  When did these litigations begin?

MIL6DARC

1          MR. PASSANANTE:  Roughly around the same time, your

2     Honor, within the last couple of months.

3          MR. BENZENBERG:  The Carebourn litigation, your Honor,

4     is the earliest.  It started approximately one year ago now.

5          THE COURT:  One year ago?

6          MR. BENZENBERG:  Yes.

7          THE COURT:  And did you bring the same causes of

8     action in that litigation as this one?

9          MR. BENZENBERG:  No.  Carebourn brought that action in

10    the State Court of Minnesota, and we've been there since --

11    we've been asserting defenses in that case, and we're currently

12    in discovery as of the moment.

13         THE COURT:  Okay.  So you needed cash, and so you

14    entered into a number of these transactions with entities like

15    FirstFire, et cetera.  Now, these are all multimillion dollar

16    transactions, correct?

17         MR. PASSANANTE:  Not always, your Honor.  For example,

18    I think the first note with FirstFire was roughly $250,000.

19         THE COURT:  With FirstFire?

20         MR. PASSANANTE:  Yes.  The September 2018 note.  It

21    was for roughly around that much.  I am not sure if, actually,

22    any of them are over a million.  I think they're generally a

23    couple hundred thousand dollars in principal.

24         THE COURT:  Okay.  Go ahead.

25         MR. PASSANANTE:  Okay.  And so to move on to the

MIL6DARC

1    elements to meet for a preliminary injunction, your Honor, the

2    plaintiff believes that they're likely to succeed on the merits

3    based on only the transactions available on EDGAR, which are

4    public documents -- public record.

5          And I note that plaintiff understands that those are

6    only disclosures regarding the purchase of notes; however,

7    they -- plaintiff did make the allegations as to the selling

8    activity of the defendants, as also evidenced in their

9    affidavits that they provided in support of their opposition,

10   so --

11         THE COURT:  What am I to make of the fact they have

12   been converting your stock?

13         MR. PASSANANTE:  Excuse me?

14         THE COURT:  What am I to make of the pattern, if any,

15   in terms of their conversion of your stock?

16         MR. PASSANANTE:  Well, your Honor, if a person is in

17   the business -- engages in the business of buying and selling

18   securities, they are deemed a dealer under the Exchange Act,

19   under section 3(a)(5).  Generally, when you're in the business

20   of buying and selling securities, it means that you're engaged

21   in more than just a few isolated transactions.

22         What we do know is that the defendants in this action

23   had engaged in dozens and dozens of these transactions, that we

24   can tell, as of disclosures on EDGAR made by other issuers.

25   And just in our cases, we do know that they engaged in the

**A-323**

MIL6DARC

1   conversion of that debt into stock, and then do sell that

2   common stock into the market.

3       So all of those securities transactions are certainly

4   more than a few isolated transactions, and we believe in

5   discovery, we would be able to obtain the selling records from

6   the brokers of the defendants.

7       THE COURT:  Isn't that published information.

8       MR. PASSANANTE:  No, your Honor.  Not selling records.

9       THE COURT:  Okay.

10      MR. PASSANANTE:  But the disclosures, of course, are

11  public record, which, while it does evidence a lot of

12  transactions, it could also be missing transactions because,

13  remember, those disclosures are on behalf of the issuers, so

14  some issuers don't make proper disclosures.  So in discovery,

15  there's likely to -- we're likely to find even more

16  transactions that are evidenced on EDGAR.

17      THE COURT:  What do you mean some issuers don't make

18  proper disclosures?

19      MR. PASSANANTE:  So some public companies, they might

20  not disclose necessarily the entity name.  They might be not

21  reporting under the Exchange Act, which would -- obviously,

22  they'd suffer consequences from the SEC and from the markets

23  themselves, and could suffer a delisting.  But it's not

24  uncommon for -- especially if a company trades on the OTC

25  markets, to file either incomplete disclosures or just not file

MIL6DARC

 1   disclosures at all and not make proper -- not meet the proper

 2   reporting requirements.

 3          THE COURT:  So you're asking me to speculate that

 4   FirstFire may have improperly failed to disclose certain of its

 5   transactions?

 6          MR. PASSANANTE:  Well, no, your Honor.  So FirstFire

 7   wouldn't be the company disclosing it.  It would be the issuer.

 8   So, for example, let's say there's ABC Corp., and FirstFire has

 9   a note with ABC Corp. and ABC Corp. is a publicly traded

10   company.

11          THE COURT:  Slow down.

12          MR. PASSANANTE:  Sorry.

13          ABC Corp. would then be required to file in the

14   disclosure -- whether it being 8-K or a 10-Q or a 10-K, stating

15   the transaction that it entered into was FirstFire.  So we

16   wouldn't find the disclosures by FirstFire.  We'd -- it would

17   be evidenced by disclosure of other companies traded on the OTC

18   markets, which are subject to those reporting requirements by

19   the SEC.  And so I'm not asking you to speculate, as I think

20   that there's plenty of evidence on EDGAR as of today.  We

21   attached the transaction list from all the evidence that we

22   found regarding transactions with FirstFire as an exhibit to

23   the complaint.

24          THE COURT:  Sorry.  Ms. Rivera, can you close the

25   curtains so we don't blind Mr. Benzenberg, please?

**A-325**

MIL6DARC

1        MR. BENZENBERG:  Thank you, your Honor.

2        THE COURT:  That's fine.

3        MR. PASSANANTE:  So, your Honor, back to my point.

4    I'm not asking the Court to speculate that FirstFire is engaged

5    in these transactions.

6        THE COURT:  But you're suggesting that there may be

7    some wrongdoing somewhere along the line?

8        MR. PASSANANTE:  Not necessarily wrongdoing.  What I'm

9    trying to purport is that there could potentially be even more

10    transactions out there that are not public record.

11        THE COURT:  Well, what's wrong with the transactions

12    that they've engaged in that we know about?

13        MR. PASSANANTE:  So the transactions that they've

14    engaged in are securities transactions themselves.  So the

15    purchase of the note -- the note's defined as a security under

16    the Exchange Act.  So the securities purchase agreement sets

17    forth the terms for the parties -- for FirstFire in this

18    case -- to purchase the note from DarkPulse.  So that agreement

19    itself is a securities transaction, so that's why the plaintiff

20    takes the position that the agreement itself -- in this case,

21    the note, which is sold through the securities purchase

22    agreement -- is itself, indeed, a securities transaction.

23        THE COURT:  Okay.

24        MR. PASSANANTE:  Right?  On top of that, the --

25    there's significant evidence in our case already that FirstFire

M1L6DARC

1    acts as an underwriter, because they acquire the securities

2    with an intent to redistribute.  They make profits off of the

3    markups because they acquire the securities at a substantial

4    discount to market and then quickly sell after the conversion;

5    that conversion either being a market-adjustable discount to

6    conversion or being a fixed discount, which would still leave

7    them in the money, so to say, similar to an option contract.

8    So they're still acquiring stock at a discount to market, and

9    then they will quickly resell that stock into the market to

10   reap the benefit of the markup.

11           THE COURT:  Can I just ask you a question?  Putting

12   aside whether or not this initial agreement is legal or not, is

13   what you just described allowed for under the agreement?

14           MR. PASSANANTE:  Is it allowed for under the

15   agreement?  Yes, your Honor.

16           THE COURT:  Go ahead.

17           MR. PASSANANTE:  Okay.  And just to bring to the

18   Court's attention there are two cases that were decided in the

19   Southern District that were mentioned in our papers; the *LG* and

20   the *Vystar* cases.

21           THE COURT:  The *LG* and the *Vystar*?

22           MR. PASSANANTE:  *Vystar*, yeah.  Those were two

23   Southern District cases that focused on the performance under

24   the agreements.

25           While sometimes that may be a proper analysis for a

MIL6DARC

```
 1    court to engage in for a section 15(a) violation; in this case,

 2    it isn't, only because, as we stated before, the acquisition of

 3    the note itself from the defendant is, indeed, a securities

 4    transaction, as opposed to, for example, the cases that

 5    defendants cite in their brief, the Frati and the Foundation

 6    Venture cases.  Those were service agreements that contemplated

 7    further securities transactions.

 8              THE COURT:  But in the LG and Vystar, was the same

 9    argument made?

10              MR. PASSANANTE:  No, your Honor.  So the argument made

11    in those cases were that the agreements were unlawful because

12    of the performance due under the agreements, which would

13    further -- be further security transactions by an unregistered

14    dealer.  For some reason the court --

15              THE COURT:  Is that what you're saying?

16              MR. PASSANANTE:  No, your Honor.  So under section

17    29(b), it voids all agreements as made in violation under the

18    Exchange Act.  And so like I was saying earlier, these

19    convertible notes are purchased through a securities purchase

20    agreement.  That securities purchase agreement itself is a

21    transaction in securities.  So the position the plaintiff is

22    taking is that the initial transaction -- the acquisition of

23    that note by the defendant -- is in fact, a securities

24    transaction, which is why the entire note would be void.

25              THE COURT:  Okay.
```

MIL6DARC

1          MR. PASSANANTE:  Okay.  And as a public securities

2     issuer, DarkPulse is within the class of persons that the act

3     was designed to protect.  And to touch on the --

4          THE COURT:  What is the class of persons the act is

5     designed to protect?  How is it defined in that section?

6          MR. PASSANANTE:  Since DarkPulse is an issuer of

7     securities, the act is designed to protect issuers of

8     securities, especially with the dealer registration requirement

9     because of the restrictions and disclosure requirements it

10    imposes on broker dealers.

11         To touch on the unwilling or innocent party argument

12    that defendants brought up in their brief, I just wanted to

13    clarify that that applies only to violaters of the act.  And

14    for a person to be an unwilling or innocent party, they would

15    have to assist in the violation of the act.

16         DarkPulse didn't assist in -- assist in the defendants

17    engaging in securities transactions and buying and selling

18    securities as a part of their business.  So since DarkPulse

19    didn't assist in that violation --

20         THE COURT:  I guess I don't understand that argument.

21    This is a bilateral agreement, and to the extent that DarkPulse

22    was desperate for cash, why can't that be seen as assisting in

23    this transaction?

24         MR. PASSANANTE:  Well, I wouldn't take that position,

25    your Honor.  I wouldn't take that position because they, for

**A-329**

MIL6DARC

1   example, in the *Buffalo Forge* case, there was --

2          THE COURT:  The Buffalo?

3          MR. PASSANANTE:  *Buffalo Forge* case.  That party was

4   essentially on both sides of the transaction, assisting in

5   deals and finding other agreements, which would be -- and then

6   they attempted to terminate the note -- or I'm sorry, void the

7   transaction.  Since they were assisting in it, then they would

8   be considered unwilling or innocent party -- I'm sorry, not

9   considered, because of the activity that they were engaging in,

10  because they were assisting in the violations of the act.

11         Moving on to the irreparable harm argument.  It's been

12  demonstrated that excessive selling activity and the erosion of

13  the stock price is irreparable because it would affect the

14  economic viability of a company.  It's something that's not

15  remedial by money damages.  You can't restore market

16  confidence, you can't restore certain --

17         THE COURT:  Why would market confidence be damaged by

18  FirstFire converting its debt?  As I understand it, from

19  defendant's papers, while their stake in DarkPulse may not be

20  insignificant, it is small.  And as they tell it, even when

21  they're trading on a daily basis, the stock that they traded is

22  a small percentage of the overall stock that's traded on any

23  given day.

24         MR. PASSANANTE:  Well, your Honor, yeah, that was in

25  the affidavit that the defendants brought in support of its

MIL6DARC

1    papers.  However, they do still write currently -- as long as

2    the affidavit was accurate, over 90 million shares of the

3    DarkPulse stock.  So if they were to dump, let's say, all of

4    that stock in one day, that would probably amount to a volume

5    significantly more than their average trading volume.

6              THE COURT:  If they were to do that.

7              MR. PASSANANTE:  If they were to do that.

8              THE COURT:  Why would they do that?

9              MR. PASSANANTE:  Well, your Honor, since they

10   converted at such a substantial discount to market, they would

11   still technically profit from any sales regardless of how much

12   the stock price does decline.

13             THE COURT:  Isn't it in their interest for your stock

14   to be as valuable as possible?

15             MR. PASSANANTE:  It is, your Honor.  But there's no --

16   since they did acquire it at such a steep discount, it's not

17   like they would make no money -- of course, they would make

18   less money, as you're suggesting, but they do have the

19   opportunity to do that, and the opportunity to do that alone

20   would -- if they were to put those many sell orders on a stock

21   trade at this volume, then it would --

22             THE COURT:  Well, let me ask you this, because we're

23   not exactly working on a blank slate here, right?  There's a

24   prior agreement.  And we didn't see FirstFire engage in that

25   type of reckless trading that you're suggesting might happen

MIL6DARC

```
 1   here, right?  They converted that stock over a period of months

 2   or maybe even a couple years.  So why are you asking me now to

 3   assume that they're going to dump all this stock precipitously,

 4   and damages — and even assuming that creates larger than a

 5   ripple, given the amount of stock that your company trades on

 6   any given day?

 7             MR. PASSANANTE:  Well, certainly, your Honor.  The

 8   reason why this got brought to our attention is because on

 9   January 14th -- I think it was last Friday when plaintiff

10   originally filed its order to show cause for temporary

11   restraining order -- we got notified from our client that there

12   was a massive sell order for DarkPulse stock, and the defendant

13   was one of the only parties that had the ability to put in an

14   order that large, which was why the plaintiff took the position

15   that they might do this again, that the defendants might put in

16   a significant sell order again that could potentially damage

17   the shares.

18             THE COURT:  Was that part of the papers you put in

19   last week?

20             MR. PASSANANTE:  It was part of the first affidavit by

21   Dennis O'Leary.

22             THE COURT:  Did FirstFire put in a massive sell order

23   on that day?

24             MR. PASSANANTE:  Well, FirstFire rebutted that with an

25   affidavit from Eli Firearm, which stated how many shares that
```

MIL6DARC

1    that they sold.  But the reason that the plaintiff originally

2    believed it was the defendants was because of the sell order

3    that the O'Leary affidavit speaks about.  I believe it was

4    January 14th.

5           THE COURT:  Have you confirmed it was them?

6           MR. PASSANANTE:  Well, your Honor, we were discussing

7    before, we can't see the parties.  It's not public information,

8    who is selling and buying.

9           THE COURT:  Okay.

10          MR. PASSANANTE:  You can just see the volume.

11          THE COURT:  By the way, can I ask another question?

12   Generally speaking, when a party comes to court to request a

13   TRO or preliminary injunction, the party is required to state

14   that no similar application has been made before, and you

15   didn't.  I assume there's not.  But I learned, I guess from the

16   defense, that they had actually started an action in Delaware a

17   couple weeks before you brought your action.  That was not

18   mentioned in your papers.  Should it have been?

19          MR. PASSANANTE:  Well, your Honor, so since the

20   plaintiff takes the position that the agreements are void

21   *ab initio*, the Delaware action, according to the plaintiff's

22   position, was improper.  That's why the plaintiffs didn't feel

23   the need to mention the Delaware action, because it takes the

24   position that it was improper.

25          THE COURT:  So it doesn't exist?

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

MIL6DARC

1          MR. PASSANANTE:  Well, no, not that it doesn't exist,

2     your Honor.  It was just that we felt -- the plaintiff felt

3     that jurisdiction was improper here because of the usurious

4     nature of the contract, and that amendment would be void.  And

5     the same argument is most likely going to be made in the

6     Delaware action.  And the Delaware action also was only seeking

7     a declaratory judgment; it wasn't to enforce the terms of the

8     note.

9          THE COURT:  No.  Well, I mean, tomayto, tomahto.

10    Again, as I said, it's not that you were required under the

11    rule to tell me about that action.  My only question is should

12    you have.  Would that have then contributed to the quantum of

13    information that would have assisted me in analyzing your

14    papers?  But go ahead.

15         MR. PASSANANTE:  I apologize, your Honor.  Maybe we

16    should have.

17          As to the balance of hardships between the parties,

18    the relief that the defendants could potentially be entitled to

19    is certainly calculable, which, during the pendency of this

20    action, they wouldn't suffer any harm if they were to be

21    prevented from selling any DarkPulse stock on the market

22    because if, let's say, the market conditions increased, that

23    would be calculated into damages and they missed an opportunity

24    to sell that stock at a certain time, then it would be easily

25    quantifiable, and they could obtain a money judgment against

MIL6DARC

1   the plaintiff if they were to be successful on the merits of

2   this action.

3           Lastly, your Honor, of course the plaintiff is willing

4   to post a bond in the amount of whatever the Court would

5   request, pending the disposition of this action.

6           And that's all I have to say, your Honor.

7           THE COURT:  Very well.  Thank you.

8           Mr. Marks, will you be arguing on behalf of FirstFire?

9           MR. MARKS:  I will.  I just want to make sure you can

10  hear me.

11          THE COURT:  I can hear you.

12          MR. MARKS:  Okay.  Thank you.

13          Your Honor, as set out in our papers, we believe there

14  are several reasons why DarkPulse's motion for preliminary

15  injunction should be denied.  As your Honor pointed out in the

16  first instance, we believe that this motion and DarkPulse's

17  claims related to the April 2021 note do not belong before this

18  Court.

19          We agreed in an amendment to the note that the

20  exclusive forum provision would be for the state and federal

21  courts in Delaware.  This dispute first arose in November when

22  FirstFire converted the note to shares, the parties went back

23  and forth after DarkPulse requested two-thirds of the share's

24  back.  And on December 13th, we filed a declaratory action in

25  the chancellery court of Delaware, seeking a judgment that the

MIL6DARC

1    conversion was proper and that FirstFire is entitled to keep

2    all of the shares it converted.

3          DarkPulse, through Delaware counsel, has entered an

4    appearance there, and we have a scheduling order in place now

5    for briefing on initial dispositive motions.

6          THE COURT:  They haven't answered?

7          MR. MARKS:  What's that?

8          THE COURT:  They didn't answer?

9          MR. MARKS:  Not yet.  Their answer is not due yet.

10         THE COURT:  Right.

11         MR. MARKS:  DarkPulse provides no viable reason for

12   nullifying the forum selection clause agreed upon in the

13   amendment and why the claims concerning the April 2021 note

14   should be heard by this Court.

15         First, in their complaint, DarkPulse suggested that

16   the amendment's contents were not explained to their CEO by my

17   client before DarkPulse, the CEO, executed the amendment.

18   That, of course, is not an excuse for a sophisticated party to

19   void a contract or a contractual provision.

20         THE COURT:  But wasn't there some suggestion in I

21   think your paper that, in fact, Mr. O'Leary, if that's his

22   name, did consult with counsel?

23         MR. MARKS:  He did.  He did.  So, yes, it's our

24   contention that the amendment should obviously be enforced;

25   that Mr. O'Leary consulted with counsel; that Mr. O'Leary, as

MIL6DARC

1    the CEO of DarkPulse, was more than capable of understanding

2    the one-page amendment that only really spoke to the governing

3    law provision and the choice of forum provision.  So we

4    think --

5         THE COURT:  So the amendment spoke not only to forum

6    but also to the choice of law?

7         MR. MARKS:  Correct.

8         THE COURT:  Okay.

9         MR. MARKS:  In their papers, for the first time last

10   night, DarkPulse now claims that the note was criminally

11   usurious, and that somehow that is a basis for voiding the

12   forum selection clause.  There are several layers of reasons

13   why this argument is completely unsound.

14        First of all what they don't address, again, is that

15   Delaware law applies here and not New York law, not New York

16   usury statutes.  In fact, Judge Buchwald, in a similar case,

17   *EMA Financial v. NFusz*, 444 F.Supp.3d 530, spoke to whether the

18   parties agreed-upon choice of law -- in that case it was

19   Nevada -- should be ignored because of the New York usury

20   statute, and Judge Buchwald found that the public policy behind

21   the New York usury statute was not fundamental to warrant

22   overriding the parties' choice of law in order to ensure the

23   usury statute's enforcement.  Judge Buchwald could not conclude

24   that enforcing the parties' choice of law provision would be

25   truly obnoxious to New York public policy.

MIL6DARC

1          So they state no reason why we should even look to the

2   New York's usury statute in assessing the choice of forum

3   provision.  However, even if they could state a reason from

4   looking at the New York usury statute, it really does not

5   matter because, here, it is obvious that even if the New York

6   statute applied, it is plain that the note at issue here is not

7   criminally usurious.  On its face, this note has a 10 percent

8   interest rate, it has a 10 percent OID, original issue

9   discount, even annualized -- DarkPulse acknowledges in their

10   papers last night that, on its face, the interest rate and the

11   OID adds up to less than 25 percent, which is the limit.

12          THE COURT:  As I understand it, it's a fixed rate in

13   connection with this agreement?

14          MR. MARKS:  Correct, your Honor.  Correct.  So I think

15   what you're referring to is the conversion mechanism, and that

16   is a fixed rate, and there is good reason why one does not then

17   account for the conversion rate in figuring out whether the

18   instrument is usurious or not.

19          And, in fact, DarkPulse did not even suggest that the

20   conversion mechanism here goes into the calculation of usury.

21   What they did suggest, just before when Mr. Passanante was

22   arguing -- what they did suggest was that on top of the

23   interest rate and the original issue discount, that this Court

24   should also add value that of the shares that were reserved for

25   conversion at the time of entering the note to determine usury.

**A-338**

MIL6DARC

1    Okay?

2          When the note was entered in April 2021, the company

3    reserved, whatever it was, 177 million or more shares in the

4    event that six months or more later there would be a

5    conversion.  They're suggesting that in determining usury, that

6    these shares, which may never be touched, should be taken into

7    the calculation of whether something is usurious.  That is

8    flatly wrong, and your Honor actually rejected that very same

9    argument in a 2019 decision that your Honor wrote in the case

10   *EMA Financial v. AIM Exploration.*

11         Your Honor cited several Southern District decisions

12   that held, "The reservation of shares is not an independent

13   payment to the lender, but merely a mechanism by which to

14   effectuate the share conversion as envisioned by the note and

15   the SPA.  Since the share conversion feature does not render

16   the agreement usurious, neither does the reservation of shares

17   provision."  And you can conclude in that decision, did hear

18   the note, did not require the share reserve to be paid to the

19   plaintiff.  It was simply security that the defendants were

20   required to set aside so that there would be shares available

21   if the conversion option was exercised.

22         THE COURT:  So is it the case, Mr. Marks, that if the

23   reserve shares are counted, it may be usurious, but if they're

24   not counted, they are not usurious?

25         MR. MARKS:  That's correct.  Meaning that what they

MIL6DARC

1    did in their papers from last night, as you'll see, they value

2    their reserve shares at the time that we contracted, right, you

3    know, however 177 million shares were worth $1.4 million on

4    April 21 -- or April 26 when we entered this contract, and

5    they're saying you add that to your calculation, and that puts

6    you over the usury line.  Okay?  But there's no decision, yours

7    or the several decisions cited in the Southern District, that

8    you cite that would require that.  In fact, they all reject it.

9          So this argument that this note was usurious, and then

10   for that to be a reason to void the forum selection clause is

11   completely speechless.  There's no basis for it whatsoever.

12         So, your Honor, the motion should be denied outright

13   for being brought in the wrong forum.

14         THE COURT:  Can I ask you a question about that note,

15   Mr. Marks?

16         MR. MARKS:  Sure.

17         THE COURT:  My understanding is that there is a

18   New York Court of Appeals decision from last fall.

19         MR. MARKS:  Yes.

20         THE COURT:  Which essentially, I think, tells us that

21   we all, here in the Southern District, got it wrong.

22         MR. MARKS:  Yes.

23         THE COURT:  Was that the reason for the amendment; if

24   you can tell me?

25         MR. MARKS:  Your Honor, the timing -- look, I was not

**A-340**

MIL6DARC

1    involved with the amendment.  Timing would suggest that there's

2    a connection there; however, something that's important to

3    understand is that that decision, the *Ader Bays* decision by the

4    Court of Appeals, really has no application to this note, and

5    that's because of the following:

6            What the *Ader Bays* decision determined was that if a

7    note had a variable or floating conversion rate, meaning that

8    at the time of conversion, six months, eight months after the

9    note is entered, let's say the stock has gone up or the stock

10   has gone down -- the way that a variable or floating rate

11   conversion note works is that, let's say there's $100,000 in

12   outstanding balance, the way the conversion would work under a

13   variable rate note, which is typical, is you'd be able to

14   convert at the then-market rate at the time of conversion,

15   minus like a 30 or 35 percent discount.  That's typical for one

16   of these notes.

17           And what the *Ader Bays* court, what the Court of

18   Appeals said, is that if the noteholder is guaranteed a

19   discount off-of-the-market rate, they are not subject really to

20   market risk of the stock, meaning if the stock goes down here

21   from April to November when we converted, under a variable rate

22   note, our conversion price would drop with the market and go

23   30 percent lower so that it would never be in trouble.  Okay?

24           Our note is different because we don't have a variable

25   rate.  We don't have a variable rate conversion rate.  We have

MIL6DARC

1    a fixed conversion rate here, meaning we agreed that on

2    April 26th, our conversion rate, under normal circumstances,

3    would be 15 cents or .15 cents, whatever it is, per share.  And

4    it was going to stay that regardless.  It was fixed.  So if the

5    stock went down significantly and the company tanked, our

6    conversion rate stayed the same.  We weren't entitled to

7    convert to a lower number with the market and a discount from

8    there.

9              What *Ader Bays* said is this variable rate or floating

10   rate note, notwithstanding the fact it might be tough to

11   calculate what that's worth, but that should be added to a

12   calculation for usury.  They distinguished that from this note,

13   right, which is a fixed rate note.  So the *Ader Bays* decision

14   is really inapplicable to this case.

15             Now, you asked did we get the amendment because of the

16   *Ader Bays* decision.  The timing, I agree, was very close in

17   time, but the *Ader Bays* decision really has nothing to do with

18   this case.  Okay?

19             So for the reasons I just stated, we believe strongly

20   that the motion should be denied because it was brought in the

21   wrong forum.  Delaware is the proper place.

22             As to if your Honor reaches the preliminary injunction

23   motion itself, we think that on the merits of it, it also would

24   have to be denied as it fails every single prong.

25             First, they don't come close to satisfying the

MIL6DARC

1    requirement of irreparable harm here.  DarkPulse asserts that

2    it will be irreparably harmed if we sell into the market.  What

3    was 177 million shares is now half of that.  First of all, you

4    know, obviously, they were late in bringing this motion.

5    Seven weeks and 42 trading days past.  Whatever urgency they

6    had, whatever they saw in the market that they thought we were

7    doing something, we weren't.  And whatever urgency they suggest

8    there was from 177 million shares, obviously, is at least half

9    of that now.

10            First, and obviously, we're talking about shares of

11   stock here.  DarkPulse common shares are heavily traded in the

12   open market.  Monday, Tuesday, Wednesday of this week alone,

13   260 million shares of DarkPulse traded.  85 million shares a

14   day this week.  And my client has little, if any, of that.

15           THE COURT:  But there's something, isn't there,

16   Mr. Marks, to the point that if you were to dump the balance of

17   the DarkPulse shares that you have on Monday, notwithstanding

18   the fact that there are however many billion shares outstanding

19   in circulation, that might have a negative impact on it,

20   wouldn't it?

21           MR. MARKS:  Your Honor, at this point it's less than

22   2 percent of the DarkPulse shares out there.  It's less than

23   what was traded on each of the three days this week.  It's

24   totally speculative as to what impact our selling would have.

25           THE COURT:  I take it that the 85 million shares that

MIL6DARC

1  were sold on average over the last three days were multiples of

2  different traders, correct, or different holders?

3         MR. MARKS:  I mean, that's not public information.

4         THE COURT:  All right.

5         MR. MARKS:  And let me add this:  It may or may not be

6  because last month in December, DarkPulse struck another deal

7  with a different financing source, right, where they gave --

8  this is a firm GHS.  We mentioned this in our papers.  They

9  offered to GHS 300 million new shares.  Okay?  So GHS is

10  unlikely holding onto these shares.  GHS is likely a party that

11  is out there selling their shares.  There are no restrictions

12  on them whatsoever.

13         THE COURT:  What are the terms of that agreement; if

14  you know?

15         MR. MARKS:  It's a finance agreement.  It's not a

16  convertible note.  It's a different type of instrument.

17         THE COURT:  Okay.

18         MR. MARKS:  But the point is that they're looking to

19  limit us from selling 85 million shares.  They just gave

20  another investor completely uninhibited 300 million shares, and

21  they're not asking that entity to slow down their trade.

22         Your Honor, again, that where an injunction is sought

23  regarding common shares of stock, and such shares are available

24  on the open market, there is no reason why monetary damages

25  would not adequately compensate the plaintiff if it proved up

A-344

MIL6DARC

1    its case.

2         This notion, as we just talked about, about

3    dilution -- again, I understand it's a hypothetical that if

4    somebody trades a lot of shares in one day, but DarkPulse has

5    done nothing to quantify that, to suggest that a sale of 80 or

6    90 million shares, which my client has not done -- you know, to

7    date, we've only sold in small pieces -- that that would make

8    up less than 2 percent of the market, where this company has

9    issued 300 million to somebody else last month, where they've

10   issued 3.5 billion shares to convertible noteholders over the

11   past three years, 3.5 billion shares -- that this 80 or

12   90 million shares is somehow going to make some sort of

13   difference here.  It just doesn't make sense.

14        THE COURT:  How many different holders did they issue

15   up to?

16        MR. MARKS:  I think it's in our papers that they have

17   done 20 different notes, they've done 36 conversions.  I think

18   it's seven or eight different investment funds that they've

19   converted with.  And it's been massive amounts of shares.

20        THE COURT:  So 3.5 billion over 20 different notes?

21        MR. MARKS:  Yes.

22        THE COURT:  Okay.

23        MR. MARKS:  Right.  So I mean, again, there's now 5, 5

24   and a half billion shares out there.  Three and a half billion

25   of them are issued to the investment funds that they've done

**A-345**

MIL6DARC

1    these deals with.

2            So, your Honor, there's no irreparable harm here.  I

3    can quickly address likelihood of success on merits if you'd

4    like me to.

5            THE COURT:  Is your client an unregistered securities

6    dealer?

7            MR. MARKS:  They are not a dealer, they are not

8    registered, but they are not in the business of buying and

9    selling securities as defined under the Securities and Exchange

10   Act.  You know, first, there are several prongs of 29(b) that

11   are in no way satisfied here.  First, the note issue is not an

12   unlawful transaction under the securities law.

13           THE COURT:  Is it a security?

14           MR. MARKS:  It's not a security at all.  It's funny

15   that when they're claiming that it's usurious, DarkPulse

16   characterizes the note as a loan; when not discussing usury,

17   it's now somehow a security.  It's not a security.

18           And Judge Carter's decision in *Vystar* is really

19   squarely on point.  Judge Carter then granted summary judgment

20   in favor of EMA Financial on plaintiff's 29(b) claims because

21   nothing in the note or the SPA explicitly required

22   EMA Financial, the noteholder, to act as a broker-dealer.  The

23   note was capable of being performed, even if EMA or, here,

24   FirstFire, did not register as a dealer.

25           FirstFire is not required under the note to sell or

M1L6DARC

1    buy securities.  Notes were neither made nor performed in

2    violation of any federal securities laws required for decision

3    under section 29(b).

4            Judge Carter dismissed the Vystar's 29(b) filing on

5    this basis.  He also, by the way, found that rule 15(a)(1)

6    provides no private right of action.  Those are two reasons

7    right there in Judge Carter's opinion why there's no likelihood

8    of success on the merits.

9            But there are more reasons.  Your Honor just asked

10   about the business of buying and selling securities.  DarkPulse

11   would have to prove under 29(b) that FirstFire is irregularly

12   engaged in the business of buying and selling securities as a

13   dealer.  There is no basis for suggesting that the trader

14   exception that is built into this determination of whether an

15   entity would be a dealer, the exception for being a trader

16   trading on its own account; this exemption should apply to

17   FirstFire.

18           As far as whether they're in the regular business of

19   buying and selling securities, one example proving otherwise,

20   comes from DarkPulse's own complaint.  DarkPulse has alleged

21   that out of $34 million in principal, right, loaned by

22   FirstFire for all of its convertible notes that DarkPulse found

23   on EDGAR, FirstFire converted only on $1.4 million of that

24   known amount, or 4 percent of the total amount loaned.

25           So with respect to the other $32.6 million of loans

MIL6DARC

1    made, those were all paid back by the companies they loaned to

2    in cash, right?  They were straight up loan-type transactions.

3    The six months passed or however many months passed.  Rather

4    than converting for shares, the companies paid back, there was

5    $700,000 in cash, plus the interest.  There was no securities

6    involved whatsoever.

7         DarkPulse also said in their papers that FirstFire

8    effectuated no fewer than 203 securities transactions with

9    other small companies like DarkPulse; yet the EDGAR list shows

10   only about 30 conversions and 13 share issuances.

11        DarkPulse does not have a reasonable likelihood based

12   on this data of demonstrating that FirstFire is in the business

13   of buying and selling securities, which is a plain requirement

14   obviously for 29(b).

15        Last element here:  DarkPulse will not be able to show

16   that it is in the class of entities intend to be protected by

17   the Exchange Act.  As set out in our brief, precedent requires

18   a party to be an unwilling and innocent party to a transaction

19   that purportedly violated 29(b).

20        Here, based on DarkPulse's track record of entering

21   dozens of these convertible notes, based on the fact that this

22   note, in particular, acknowledged that FirstFire was not a

23   registered dealer; the fact there's a covenant in the SPA that

24   DarkPulse would never assert before any person or governmental

25   authority that it was entitled to relief based on the fact that

Case 23-78, Document 36, 05/01/2023, 3508267, Page55 of 304

MIL6DARC

1    FirstFire was an unregistered dealer; the fact that DarkPulse

2    is and was plaintiff in lawsuits seeking to void contracts with

3    investment funds like this that were not registered before it

4    entered into this note --

5         THE COURT:  Sorry.  What are the dates of those

6    actions that you're referring to?

7         MR. MARKS:  So Mr. Benzenberg referred to the

8    *Carebourne* action.  For example, that action was brought by

9    Carebourne in advance of -- you know, over a year ago.

10   Carebourne is the plaintiff there pursuing the shares.  It

11   didn't receive the shares.  They didn't convert.  DarkPulse

12   prevented them from converting.  And DarkPulse is defending

13   that action saying that Carebourn was an unregistered dealer,

14   and that predates this note.

15        THE COURT:  Okay.

16        MR. MARKS:  Okay?  All these things point to

17   overwhelmingly that DarkPulse was no babe in the woods when it

18   came to this dealer issue.  They were well aware.

19        THE COURT:  Let me ask you this:  The counsel for

20   DarkPulse says that this was a company that was continually

21   desperate for money, desperate for cash.  Assuming that your

22   client knew that, would that change the analysis as to whether

23   they were, in fact, a willing participant in this transaction?

24        MR. MARKS:  No.  Because, your Honor, there's no

25   question that DarkPulse knew what it was signing up for.  They

MIL6DARC

1     had counsel for each of these notes.  They were aware of this

2     unregistered dealer issue.  There's nothing unlawful about the

3     transaction that's been entered into.  And, again, this is just

4     one of the several prongs of 29(b), the notion that DarkPulse

5     needs to be an unwilling and innocent party.  It would be

6     different if they were coming at this for the first time, but

7     there is nobody more sophisticated than DarkPulse about these

8     convertible notes.  They've done 20 of them.  They've been

9     converted to the tune of 3.5 billion shares.  They've brought

10    all sorts of lawsuits about them.  They've hired here, and

11    they've hired them several times, the law firm that represents

12    all these small-cap companies in these cases.

13         So we believe that that element, that they would not

14    have a reasonable likelihood of success on these several

15    elements under 29(b), including this element.

16         Just to conclude, we don't think your Honor needs to

17    even reach the likelihood of success on the merits of this

18    injunction.  We think, in the first instance, that this belongs

19    in Delaware, where the preexisting case in chancellery court

20    regarding this note is going forward.

21         But if we were to reach the merits, we think that it

22    fails under irreparable harm as well as the likelihood of

23    success on the merits.

24         THE COURT:  Thank you.  Mr. Passanante, I'll give you

25    an opportunity to respond briefly.

MIL6DARC

1          MR. PASSANANTE:  Sure, your Honor.  Thank you.

2          Just one thing I wanted to clarify that Mr. Marks

3    said.  When he was referring to the usurious nature of the

4    contract and arguing that the reserve shares were not included

5    in the calculations, he was absolutely correct.

6          What he's incorrect about were the shares that we're

7    alleging that did count in the calculation, which were the

8    75 million commitment shares that were issued upon execution of

9    the note.  That was what was valued at $1.4 million.  The

10   reserve shares are what the transfer agent holds in reserve.

11   So the commitment shares is what Mr. Marks was supposed to be

12   referring to, because those were issued upon execution of the

13   note.  The reserve shares that he was discussing have to do

14   with an obligation under the notes that require the company to

15   put shares in reserve.  Those shares in reserve are held by the

16   transfer agent, the trust account, which will then be

17   transferred to the lender upon a request for a conversion.

18         Those shares are held in reserve to ensure that the

19   lender can actually obtain shares upon conversion.  So he's

20   correct; they're not conveyed, and they should not be

21   calculated at value; however, the 75 million shares that were

22   conveyed upon execution should be considered value --

23         THE COURT:  So did you include the reserve shares in

24   your calculation in determining the usurious nature of the

25   contract?

MIL6DARC

1          MR. PASSANANTE:  Yes, your Honor.  With the stated

2     interest rate on top of the OID, that amounts to roughly

3     25 percent.  The value of the stock that they acquired upon

4     execution was roughly $1.4 million.

5          THE COURT:  Again, I'm just trying to get this one

6     little point clear in my mind.  Mr. Marks said that you

7     included the reserve shares in your calculation, and my

8     question to you is, did you?

9          MR. PASSANANTE:  No, your Honor.  So what we included

10    was the commitment shares.

11         THE COURT:  Okay.

12         MR. PASSANANTE:  The shares that were actually

13    conveyed upon execution.  Reserve shares were not conveyed upon

14    execution.  They were held, like I said, by the transfer agent.

15         THE COURT:  You didn't include them in your

16    calculation?

17         MR. PASSANANTE:  No, your Honor.  Because they

18    didn't --

19         THE COURT:  Go ahead.

20         MR. PASSANANTE:  And that property under *Sabella*,

21    which was decided in the Southern District, a case we mentioned

22    in our papers, the value of those shares given as consideration

23    are absolutely considered as interest.  And regardless of how

24    those shares are valued, because understandably, they were

25    likely restricted, which would have probably at least a slight

MIL6DARC

1    reduction in value at the time of conveyance as to the market

2    price, regardless even a fraction of a percent would take it

3    under -- over the lawful interest rate, making the entire loan

4    void *ab initio*.

5            THE COURT:  Okay.

6            MR. PASSANANTE:  And with respect to Ader Bays,

7    another clarification, what the Court said was --

8            THE COURT:  With respect to what?

9            MR. PASSANANTE:  Ader Bays, the Court of Appeals

10   decision decided last fall.

11           THE COURT:  Okay.

12           MR. PASSANANTE:  That wasn't mentioned in our papers

13   regarding at least the conversion discount to the applied

14   interest, but if it were, there's certainly a way to value that

15   conversion option.

16           As the Court in that case stated, as the Court of

17   Appeals stated, there is a factually intensive analysis to

18   determine the value of the conversion option at the time of

19   execution.  And it's specifically laid out two methods that it

20   would suggest courts to engage in; either Black-Scholes

21   analysis, the way that options and warrants are valued, or

22   binomial lattice evaluation.

23           THE COURT:  A binomial?

24           MR. PASSANANTE:  Binomial lattice.  Please don't ask

25   me to explain it.

MIL6DARC

1           THE COURT:  All right.

2           MR. PASSANANTE:  But it's a valuation procedure that

3     would occur at the -- by a financial expert that would consider

4     obviously volatility, among other things, to determine how much

5     that conversion option is valued.  But I want to just state

6     that that is not necessary here.  Because of commitment shares,

7     the stated interest and the original issue discount would

8     easily take us past that 25 percent threshold.

9           And, your Honor, as to the note being a security -- a

10    note is defined as a security under the Exchange Act.  So

11    there's really no argument to that effect, saying that it is

12    not a security.  And it is, indeed, also a loan, obviously,

13    because it's money in exchange for a repayment of that debt

14    whether it be by cash or -- sorry.

15          THE COURT:  So if it is a security, is it subject to

16    usury analysis?

17          MR. PASSANANTE:  Well, it's a loan as well, your

18    Honor.  So a loan is subject to a usury analysis, but a note is

19    a security under the Exchange Act.

20          MR. BENZENBERG:  Your Honor, if I may.  The

21    Exchange Act definition section when it defines security, it

22    states stock, note, warrant, option, and lists several other

23    types of financial instruments.  Additionally, New York usury

24    laws applies to any loan or forbearance of money.  The note

25    would constitute a forbearance of money, and in that regard,

MIL6DARC

1    must comply with New York usury laws.

2         MR. PASSANANTE:  And just to speak to the effect of

3    the defendant's reliance on the trader exemption, your Honor.

4    It's important to point out that the defendants do not acquire

5    shares on the open market like a trader would.  They do not

6    make money based on the appreciation of the stock that they

7    acquire, because they make it based off of the markup from the

8    conversions that they -- that they are entitled to under the

9    notes that they enter into.  Traders do not do that.  Traders

10   engage in a few isolated transactions, and aren't acquiring

11   securities with the view towards distributing those same

12   securities.

13        THE COURT:  I'm sorry.  I didn't understand that last

14   part.  Can you go through that again?

15        MR. PASSANANTE:  Yes.  So the defendants argue that

16   they fall into the trader exemption.  The trader exemption is

17   essentially for people like me or you who would engage in

18   purchasing stocks with an e-trade account or some other kind of

19   brokerage account.  If me or you were to acquire those shares,

20   we would acquire them and hope for them to increase in value,

21   and then hope to make money on the gain of that profit.  As

22   opposed to an underwriter or a dealer, who acquires those

23   securities with a view towards distribution.  The reason they

24   can act in that manner is because they acquire them at a

25   discount to the market price.

MIL6DARC

 1        THE COURT:  So it's as if they have no interest in the

 2   value of the security going up?

 3        MR. PASSANANTE:  Well, I wouldn't say that they don't

 4   have any interest in the value of securities going up, but I

 5   would say that they do not need the value of the securities to

 6   go up because they'll always make money because they'll always

 7   be in the money based on the conversion discount.  So they'll

 8   always acquire under market, whether it be a --

 9        THE COURT:  Well, it's under market today, right?

10   Isn't it always going to be to under market?

11        MR. PASSANANTE:  Generally, yeah.  They will draft the

12   agreements to always be under market, whether it be with a

13   fixed discount or with an adjustable discount.  Even though it

14   has a fixed discount, they'll usually have a default provision

15   so they can convert a fraction of the stated fixed interest --

16   fixed conversion rate.

17        THE COURT:  But that doesn't mean that they would

18   never have an interest in having them value the stock over

19   market?

20        MR. PASSANANTE:  Correct, yeah.  And as to the

21   unwilling or innocent party discussion, the fact that DarkPulse

22   was simply a party to these transactions does not mean that

23   they assisted in violations.

24        Like you brought up, they were an emerging growth

25   company, they were desperate for capital, and simply by

MIL6DARC

1   engaging in these tractions does not by any means mean they

2   were assisting in the violations that the unregistered

3   securities dealers were.

4           And that would be all from me, your Honor.

5           THE COURT:  Okay.  Mr. Marks, anything?

6           MR. MARKS:  Just to correct one thing about the trader

7   exception.

8           What Mr. Passanante was referring to when saying that

9   we received these shares at a discount, okay, he's referring to

10  a variable rate note that I described before, where there's a

11  built in 30 percent discount off of the market.  Here, there

12  was a fixed rate at 15 cents, you know, 15 cents or .015 per

13  share.  Okay?  There was market risk.  Okay?  That is not

14  Ader Bays.  That is not a riskless transaction where we're

15  always going to be below the market when we convert.  So that

16  is not the sign of a dealer.  That fits squarely within the

17  trader exception.

18          Otherwise, I rest on my prior arguments and papers.

19          THE COURT:  Very well.  So let's take a 5-, 10-minutes

20  break.  Don't go far.

21          (Recess)

22          THE COURT:  Okay.  The injunction will not issue.

23          First, I find that defendants are correct that the

24  forum selection clause is presumptively enforceable, and thus

25  this action is not properly before this Court.  The forum

MIL6DARC

1   selection clause is presumptively enforceable if:  One, it was

2   reasonably communicated to the party resisting enforcement;

3   two, the clause is mandatory and not merely permissive; and

4   three, covers the claims and parties involved in this suit.

5   Citing *Phillips v. Audio Active Ltd.*, 494 F.3d 378 (2d Cir.

6   2007).  Here, the defendants have put forth evidence that the

7   November 2021 amendment was communicated to DarkPulse's CEO,

8   Mr. O'Leary, who signed it.  DarkPulse cannot reasonably

9   contest that the forum selection clause was communicated to it,

10  because it was contained in the agreement signed by

11  Mr. O'Leary, who, as CEO of the company, was sufficiently

12  sophisticated to understand it.

13          Moreover, there's evidence in the record that he also

14  had the advice of counsel at the time that he signed it.

15          Here, citing *H.A.L. NY Holdings v. Guinan*, reported at

16  2018 WL 5869648, a Southern District case from 2018.  By its

17  terms, the forum selection clause is mandatory and covers this

18  action, and there's no evidence on the record before me that

19  the enforcement would be unreasonable or unjust, nor that the

20  clause is invalid.

21          While that may be sufficient for the denial of the

22  motion, I find that even if the forum selection clause did not

23  apply, I would deny the motion for preliminary injunction.  In

24  deciding whether to enter a preliminary injunction, I must

25  consider four factors:  One, where the plaintiff is likely to

MIL6DARC

1   succeeds on the merits; two, whether they are likely to suffer

2   irreparable harm in the absence of preliminary relief; three,

3   the balance of hardships, or equities; and four, whether an

4   injunction is in the public interest, citing *Benihana, Inc. v.*

5   *Benihana of Tokyo*, 784 F.3d 887 of 2015, Second Circuit case.

6          Plaintiffs has not shown that they are likely to

7   succeed on the merits of their claims.  In fact, plaintiff's

8   theory that the April 2021 note is invalid under section 29(b)

9   of the Securities Exchange Act because FirstFire was acting as

10  an unregistered broker dealer has already been rejected by two

11  courts in this district.  *See LG Cap Funding, LLC v. ExeLED*

12  *Holdings,* reported at 2018 WL 6547160, a Southern District case

13  from 2018, and *EMA Financial, LLC v. Vystar Corp.*, reported at

14  2021 WL 1177801, a 2021 Southern District case, reconsideration

15  denied.  And that was reported at 2021 WL 5998411.  The no

16  broker-dealer representation clause in the April 2021 agreement

17  also undercuts plaintiff's claims.

18         Furthermore, plaintiff has not established that they

19  will suffer irreparable harm in the absence of an injunction.

20  All plaintiff argues at section 29(b) must not provide for

21  damages, the only remedy is recision.  Courts in this district

22  have found that monetary damages are an adequate remedy for

23  stock on the market.  See, for example, *Alpha Cap Anstalt v.*

24  *Shiftpixy*, reported at 432 F.Supp. 326 of 2020, Southern

25  District case, and *Union Capital, LLC v. Vape Holdings,*

A-359

MIL6DARC

1    reported at 2017 WL 1406278 of 2017, Southern District case.

2            I find that the time period between FirstFire's

3    conversion of the note and the initiation of this action

4    further undercuts a finding of irreparable harm.  In addition

5    plaintiff placed a great deal of emphasis on the fact that

6    defendant was apparently reporting to dump, if you will, its

7    remaining stock on the market.  Nothing in the record in the

8    history of the transactions between the relationships between

9    these two parties suggests that will be the case.

10           As to the third and fourth factors, I do not find that

11   plaintiff has demonstrated that the balance of hardship

12   strongly favors it or that the public interest would be

13   disserved by denial of the instant motion.

14           The record shows that FirstFire owns a very small

15   percentage of DarkPulse stock, approximately 5 percent, and so

16   it is unlikely that selling this stock could cause the

17   reputational damage that DarkPulse fears.  In fact, FirstFire

18   has put forth the argument that it could be harmed if I

19   enjoined it from selling the stock it converted pursuant to the

20   note.

21           Finally, while the registration requirement under

22   section 15(a) does serve public interest, I do not find that

23   this necessarily applies to the parties' transactions, given

24   the provisions of their contract, executed between two

25   sophisticated entities who had previously entered into a

A-360

MIL6DARC

1    similar contract.

2              That constitutes the opinion of the Court.

3              How do the parties wish to proceed, Mr. Marks?

4              MR. MARKS:  Well, your Honor, we have until

5    March 13th -- I'm sorry, your Honor.

6              THE COURT:  You don't to have to apologize.

7              MR. MARKS:  As far as proceeding goes, our response to

8    the complaint is due, you know, like March 13th.  We were just

9    served January 13th.  I imagine we'll probably be filing a

10   three-page letter before your Honor pursuant to your rules

11   seeking leave to file a dispositive motion.

12             THE COURT:  Very well.  Anything further that I should

13   do today, Mr. Passanante?

14             MR. PASSANANTE:  No, your Honor.

15             THE COURT:  Mr. Marks?

16             MR. MARKS:  No, thank you, your Honor.

17             THE COURT:  Then we're adjourned.  I want to thank the

18   parties for your arguments today.  They were quite helpful.

19             (Adjourned)

20

21

22

23

24

25

**A-361**

# KIRKLAND & ELLIS LLP

AND AFFILIATED PARTNERSHIPS

Aaron Marks, P.C.
To Call Writer Directly:
+1 212 446 4856
aaron.marks@kirkland.com

601 Lexington Avenue
New York, NY 10022
United States

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

March 14, 2022

The Honorable Edgardo Ramos
U.S. District Court for the
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:     *DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC et al.,*
        Case No. 1:21-cv-11222-ER

Dear Judge Ramos:

In accordance with Your Honor's Individual Practices Rule 2(A)(ii), Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman (collectively, "Defendants") request a pre-motion conference regarding Defendants' anticipated motion to dismiss Plaintiff DarkPulse, Inc.'s ("DPLS" or "Plaintiff") Complaint (Dkt. No. 1) pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6).

DPLS and FirstFire entered into two convertible note transactions that are the subject of this action: i) an April 26, 2021 Senior Convertible Promissory Note (the "2021 Note"), attendant to which the parties also executed a Securities Purchase Agreement ("2021 SPA") and Registration Rights Agreement (Compl. ¶ 31); and ii) a September 20, 2018 Senior Convertible Promissory Note ("2018 Note"), also attendant to which was a Securities Purchase Agreement ("2018 SPA") and Registration Rights Agreement (*id.* ¶ 20). After DPLS failed to repay the 2018 Note in 2019, FirstFire converted the 2018 Note to DPLS common shares over a two-year period. (*Id.* ¶ 26.) After DPLS defaulted on its obligations under the Registration Rights Agreement entered into in connection with the 2021 Note, FirstFire converted the 2021 Note to DPLS common shares on November 15, 2021. (*Id.* ¶¶ 42; 43 & n.13.)

DPLS thereafter objected to FirstFire's conversion of the 2021 Note, and as a result, on December 13, 2021, FirstFire commenced an action (in compliance with the 2021 Note's exclusive forum provision) in the Delaware Court of Chancery, seeking a declaration that it properly converted the 2021 Note (the "Delaware Action"). DPLS subsequently filed this action on

A-362

## KIRKLAND & ELLIS LLP

Hon. Edgardo Ramos
March 14, 2022
Page 2

December 31, 2021, asserting claims to rescind the 2021 Note and 2018 Note pursuant to Section 29(b) of the Securities Exchange Act (Counts I and II), a claim against Mr. Fireman as a purported control person (Count III), and common law claims for unjust enrichment and a constructive trust (Counts IV and V). Shortly after initiating this action, DPLS sought a temporary restraining order, which the Court denied, and a preliminary injunction stopping FirstFire from selling the DPLS shares it acquired from converting the 2021 Note. (Dkt. Nos. 12, 14, 17, 18, 22.) At a hearing on January 21, 2022, the Court denied DPLS's motion for a preliminary injunction (Dkt. No. 23), finding the 2021 Note's Delaware exclusive forum-selection clause was enforceable and thus "this action is not properly before this Court," but "even if the forum selection clause did not apply, [the Court] would deny the motion for preliminary injunction," as DPLS (i) was unlikely to succeed on the merits of its Section 29(b) claim, (ii) failed to show irreparable harm, (iii) failed to show that the balance of hardships favored its interests, and (iv) failed to show that the public interest would be served by an injunction. (Dkt. No. 24 ("Transcript" or "Tr.") at 43:22–46:13.)

FirstFire now seeks leave to move to dismiss all Counts of the Complaint.

### I.   DPLS's Claims Regarding the 2021 Note Should Be Dismissed Pursuant to Federal Rule of Civil Procedure 12(b)(3) Based on the Exclusive Forum Selection Clause.

In addressing DPLS's preliminary injunction motion, the Court held that the "[Delaware] forum selection clause is presumptive enforceable, and thus this action is not properly before this Court." (Tr. at 43:22–25.) The clause was clearly communicated to and agreed upon by DPLS, by its terms is mandatory, and encompasses the claims in this lawsuit relating to the 2021 Note. (*Id.* at 43:23–44:20 (citation omitted).) Counts I, II, IV and V should therefore be dismissed as to the 2021 Note.[1]

### II.   DPLS's Section 29(b) Claims Regarding the 2018 Note Are Time-Barred.

A Section 29(b) action must be brought within "one year after the discovery that [a] sale or purchase involves [a violation of Section 15(a)] and within three years after such violation." 15 U.S.C. § 78cc(b). The three-year statute of limitations begins to run at the *time of the violation*, *i.e.*, at the time the September 2018 Note was executed. *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041 (2d Cir. 1992) (applying Section 29(b)'s statute of limitations to a claim for violations under the "almost identical" Investment Advisers Act and holding the statute began to run on the date the agreement was signed, rather than when subsequent sales were made pursuant to the agreement). As the 2018 Note was executed on September 20, 2018 (Compl. ¶ 20), and this

---

[1]   Simultaneous with submitting this letter, FirstFire has voluntarily dismissed the Delaware Action. Having prevailed on DPLS's motion for a preliminary injunction and having sold the DPLS common shares it desired to sell from its partial conversion of the 2021 Note, FirstFire does not wish to pursue its claims in the Delaware Action at this time. This voluntary dismissal, of course, does not alter the fact that DPLS must bring any of its own claims relating to the 2021 Note in a Delaware forum, not in this Court.

A-363

## KIRKLAND & ELLIS LLP

Hon. Edgardo Ramos
March 14, 2022
Page 3

action was filed on December 31, 2021, claims relating to the 2018 Note are time-barred.  In addition, such claims are time-barred because DPLS could have reasonably discovered the facts underlying its claims within a year of execution of the 2018 Note.

## III.    Each Count of the Complaint Fails to State a Claim.

*DPLS's Section 29(b) Claims Fail.*  In denying Plaintiff's motion for a preliminary injunction, the Court held that DPLS was unlikely to succeed on the merits of these claims, as its "theory that the April 2021 note is invalid under section 29(b) of the Securities Exchange Act because FirstFire was acting as an unregistered broker dealer has already been rejected by two courts in this district." (Tr. at 45:6–15 (citing *LG Cap. Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018), and *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 1177801, at *2 (Mar. 29, 2021), *reconsideration denied* 2021 WL 5998411 (S.D.N.Y. Dec. 20, 2021))); *see also EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020); *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019); *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4–5 (S.D.N.Y. Aug. 7, 2014); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011). The reasoning of these decisions  applies with equal force to the 2018 Note, which by its terms, did not require FirstFire to act as an unregistered broker-dealer, as it did not require FirstFire to buy or sell securities. (Compl. Ex. 1.) Additionally, FirstFire is not a dealer within the meaning of the Securities Exchange Act.  FirstFire has only ever sold securities on its own behalf and has never acted as an underwriter for an offering of securities. (Dkt. No. 18 at 21.) Accordingly, as the contracts at issue are not in violation of federal securities law, the transactions as performed are not either.[2]  Counts I and II should be dismissed.[3]

*DPLS's Section 20(a) Claim Fails.*  As the Complaint fails to allege an underlying securities violation, DPLS's Section 20(a) claim against Mr. Fireman (Count III) fails.[4]

*DPLS's State Law Claims Fail.*  DPLS also fails to state a claim under *any* state law potentially applicable to Counts IV and V. Further, if Counts I–III are dismissed, this Court would lack subject matter jurisdiction over these state law claims as the parties are not diverse.

Defendants thus respectfully request a pre-motion conference to file a motion to dismiss.

---

[2]    It is unclear whether an alleged section 15(a) violation can be a predicate for a section 29(b) claim for rescission.

[3]    While DPLS has argued that the contracts as performed violate federal securities laws, under Section 29(b), "only unlawful *contracts* may be rescinded, not unlawful transactions made pursuant to *lawful* contracts." *Pompano-Windy City Partners, Ltd. v. Bear Sterns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992).

[4]    The Complaint is also devoid of any allegation that Mr. Fireman acted with scienter, a required element of a Section 20(a) violation. *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 248 (S.D.N.Y. 2006).

A-364

## KIRKLAND & ELLIS LLP

Hon. Edgardo Ramos
March 14, 2022
Page 4

Sincerely,

*/s/ Aaron Marks*
Aaron Marks, P.C.
*Counsel for Defendants FirstFire Global*
*Opportunities Fund, LLC & Eli Fireman*

**A-365**



| | 390 North Broadway – Ste. 140 \| Jericho, New York 11753 |
|---|---|
| | Main Telephone: (516) 455-1500 \| Facsimile: (631) 498-0478 |
| The BASILE LAW FIRM p.c. | DALLAS \| NEW YORK \| NAPLES |

March 17, 2022

The Honorable Edgardo Ramos
U.S. District Court for the Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

Re:     *DarkPulse, Inc. v. FirstFire Global Opps. Fund, LLC, et al.*, Case No.1:21-cv-11222-ER

Dear Judge Ramos:

In accordance with the Court's Individual Practices, Rule 2(A)(ii), Plaintiff DarkPulse, Inc. ("DarkPulse") provides herein its position on the March 14, 2022 letter filed by Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman ("Fireman"), requesting a pre-motion conference regarding their anticipated motion to dismiss DarkPulse's Complaint (ECF 1) pursuant to Federal Rules of Civil Procedure 12(b)(3) and 12(b)(6) ("Request"). This litigation concerns the validity of two Senior Convertible Promissory Notes, dated April 26, 2021 and September 20, 2018 ("2021 Note" and "2018 Note," respectively, and the "Notes," collectively). Defendants' proposed motion would be futile under both state and federal law.

**I.      FirstFire's Attempt to Escape the Application of New York Law Using a Backdated Amendment Cannot Succeed Because the Loans are Void *Ab Initio***

On October 14, 2021, the New York Court of Appeals in *Adar Bays v. GenesysID, Inc.*, 37 N.Y.3d 320 (2021) held on a question certified from the U.S. Court of Appeals for the Second Circuit that a criminally usurious loan is void *ab initio* under N.Y. Gen. Oblig. Law § 5-511, *id.* at 323, stating: "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: *complete invalidity of the loan instrument,*" *id.* at 333 (emphasis added).

Here, the 2021 Note is criminally usurious without the need for a valuation of the conversion option.[1]  *See Adar Bays*, 37 N.Y.3d at 336. Despite the stated 10% interest rate, the 2021 Note is patently usurious when the value of the 60,000,000 commitment shares is added to the interest rate and are considered *retained interest*; accordingly, the value of the up-front payments are to be subtracted from the amount the borrower received at closing. *See* April SPA 2021 § (C)(1)(a). The face value of restricted stock is generally discounted in some way. *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 27 (1971). A precise valuation is not necessary to find usury where the only question is whether the added stock value

---

[1] Even if such a calculation were needed to find the 2021 Note to be usurious, such an analysis is not appropriate on a motion to dismiss. *See Sec. Investor Prot. Corp. v. BDO Seidman, LLP*, 222 F.3d 63 (2d Cir. 2000). A 12(b)(6) motion to dismiss is "inappropriate unless it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle [them] to relief." *Id.* at 681. Similarly, to survive a motion to dismiss under Fed. R. Civ. P. 12(b)(3) a plaintiff need only plead facts sufficient for a prima facie showing of venue. *Gulf Ins. Co. v. Glasbrenner*, 417 F.3d 353, 355 (2d Cir. 2005).

The Honorable Edgardo Ramos
March 17, 2022
Page 2 of 3

causes the interest rate to exceed the legal maximum. Here, *even when the shares are discounted by 90%*, the value of the commitment shares is so substantial that the loan is still charging **31% APR**.[2]

An amendment to the original agreement can be of no effect for the simple reason that the original agreement is void *ab initio*; one cannot amend what no longer exists. *DeSola Grp., Inc. v. Coors Brewing Co.*, 199 A.D.2d 141, 141-42 (1st Dep't 1993); *see also Signature Fin. LLC v. Neighbors Global Holdings, LLC*, 281 F. Supp. 3d 438, 446 (S.D.N.Y. 2017). Accordingly, FirstFire's Amendment to the 2021 Note, purporting to change the governance of the transaction to Delaware law by backdating the "entered into" date to October 14, 2021 — the very day that *Adar Bays* was decided — is a legal nullity.

## II.   DarkPulse's Dealer Registration Claims are Not Time-Barred

The statute of limitations does not bar the claims based on FirstFire's transactions in securities as an unregistered dealer. FirstFire "*effected*" multiple transactions in securities, first, by entering into the Notes, and, thereafter, by effecting *each conversion* and *every sale of stock*. Each of these actions is a fresh violation of § 15(a) of the Securities Exchange Act of 1934 (the "Act"). Such behavior is a textbook basis for the application of the continuing violation doctrine.[3] The last conversion under the 2018 Note was submitted on February 18, 2021, less than a year before this action was commenced. FirstFire's reliance on *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030 (2d Cir. 1992) is misplaced because FirstFire's violation was not *reasonably discoverable* as of the date of the Notes. While it may have been easy to discover FirstFire's registration status, it was *impossible* to determine the extent of FirstFire's business — buying and selling securities for its own account — because much of that information is *not* publicly available. *See Auctus Fund, LLC, v. Players Network Inc. et al.*, No. 20-cv-10766-LTS at *18.

## III.   The Notes are Subject to Rescission Because FirstFire is an Unregistered Dealer

Notwithstanding the opinions of various other SDNY courts, which are not binding on this Court, § 29(b) of the Act provides that "[e]very contract **made** in violation of" the Act and every contract "the **performance of which**" violates the Act or any rule or regulation thereunder **shall be void**. § 29(b) (15 U.S.C. § 78cc(b)) (emphasis added). *See Mills v. Electric Auto-Lite Co.*, 396 U.S. 375 (1970) (recognizing private right of action for rescission). DarkPulse's theory that FirsFire is engaged in the business of buying and selling securities for its own account (as it stated in its very own Request, at 3) as an unregistered securities dealer — requiring the agreements in this case to be voided and rescinded — is well-founded and has been adopted by numerous courts. *See, e.g., SEC v. Fife*, No. 20-cv-5227, 2021 U.S. Dist. LEXIS 242126, at *11-21 (N.D. Ill. Dec. 20, 2021); *Auctus Fund, LLC, v. Players Network Inc., et al.*, No. 20-

---

[2] Average trading price on the date of transfer: $0.019 x 60,000,000 shares = $1,140,000 x .1 = $114,000. Principal amount borrowed: $825,000 - $114,000 = $711,000. Amount charged under 2021 Note pursuant to a November 17, 2021 conversion notice: $886,875 (principal + interest).

$$\frac{\$886,000 - \$711,000}{711,000} = \frac{175,000}{711,000} \times 100 = 24.6\% \times \frac{12}{9} = \textbf{31\% APR}$$

This calculation is *not* inclusive of original issue discounts and other fees charged to DarkPulse as part of the transaction, which are also considered retained interest.

[3] The Court need not (and should not) make a final ruling on the application of the doctrine at this time, however. *See SEC v. Fiore*, 416 F. Supp. 3d 306, 331 (S.D.N.Y. 2019) (declining to grant 12(b)(6) motion on the basis of the doctrine, stating "[i]n light of the fact that all of the SEC's claims survive based on timely-pled allegations alone, the Court declines to determine at this stage [the effects of] the potential inapplicability of the . . . doctrine . . .").

A-367

The Honorable Edgardo Ramos
March 17, 2022
Page 3 of 3

cv-10766-LTS (Mem. Opin. and Order, D. Mass. Dec. 10, 2021); *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Big Apple Consulting USA, Inc.*,783 F.3d 786 (11th Cir. 2015); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019).  The contrary SDNY decisions should be rejected as they wrongly allow violators of the Act to commit more violations so long as they do so at their own leisure, without a contractual obligation.[4]

### IV.    The Remaining Causes of Action are Properly Pled

Defendants cite to *Lapin v. Goldman Sachs Group, Inc.*, 506 F. Supp. 2d 221, 248 (S.D.N.Y. 2006) for the proposition that *scienter* is a required element of a § 20(a) violation.  On the very same page cited to by Defendants, however, the court stated that requiring a § 20(a) plaintiff to plead scienter is "inconsistent with the language of the statute."  Further, *Lapin* is distinguishable because it analyzes a 20(a) violation in the context of § 10(b), a claim which in itself *requires scienter to be pled*.  Because DarkPulse states actionable claims in Counts I-III, the remaining state law claims should not be dismissed.

If the Court elects to permit Defendants to file their motion to dismiss, DarkPulse respectfully asks that it be allowed to file an amended complaint in lieu of an opposition brief.

Respectfully submitted,

**THE BASILE LAW FIRM P.C.**

By:*/s/ Gustave Passanante*
GUSTAVE PASSANANTE, ESQ.
390 North Broadway, Suite 140
Jericho, NY 11753
Tel.: (516) 455-1500
Fax: (631) 498-0748
Email:  gus@thebasilelawfirm.com
*Attorneys for Plaint.of DarkPulse, Inc.*

---

[4] DarkPulse is hopeful that the Second Circuit will correct the error in these decisions, which is presented on the pending appeal in *EMA Financial, LLC v. Joey Chancis, et al.*, USCA Second Circuit 22-274 (L).

A-368

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., | CIVIL ACTION NO. 1:21-cv-11222 (ER) |
| Plaintiff, | |
| v. | **PLAINTIFF'S FIRST AMENDED COMPLAINT** |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC | **JURY TRIAL DEMANDED** |
| <u>Serve:</u><br>Eli Fireman<br>1040 1st Avenue,<br>Suite 190<br>New York, NY 10022, | |
| and | |
| ELI FIREMAN, | |
| Defendants. | |

Plaintiff DarkPulse, Inc. ("DarkPulse"), through counsel, states for its Complaint against

Defendant FirstFire Global Opportunities Fund, LLC ("Defendant", "FirstFire", or "FirstFire

Lending Enterprise") and Eli Fireman ("Fireman") (collectively, "Defendants") as follows:

## I.   NATURE OF THE ACTION

1.    FirstFire is a "death spiral" or "toxic" lender:[1] an unregistered securities dealer that

makes unlawful, predatory loans to small, publicly traded companies.[2]  Toxic lenders like FirstFire

---

[1]   *See* SEC discussion (and warnings) about toxic lending and convertible securities. https://www.investor.gov /introduction-investing/investing-basics/glossary/convertible-securities (last accessed on December 22, 2021.)

[2]   Based on a review of the filings in the EDGAR database from March 17, 2015 to date, FirstFire has engaged in financing similar to this case on *at least 203* separate occasions with *at least 89* other microcap companies, resulting in approximately *203 securities transactions* with *at least 1,001,396,742 shares* being issued, with an estimated open

purport to be investors who 'save' struggling microcap companies, but the reality is very much the opposite: FirstFire is not an investor, but rather a *creditor* that, in keeping with typical toxic lending arrangements, gives itself the right to take payment of the debt in company stock, but with a substantial discount to the market price. Unlike a typical private-placement investor, FirstFire can immediately dump the stock into the public market to reap the difference between the discount and the market price.[3] Moreover, because it can convert the debt in tranches, FirstFire is able to dump large quantities of the newly-issued stock into the market and remain unaffected by the price depression that its selling tends to cause.

2. The Agreements[4] in this case are a masterful example of toxic lending. In two separate convertible promissory notes, FirstFire loaned to DarkPulse a combined total of $975,000. As repayment of those two Notes, FirstFire extracted more than $38 million dollars in company stock from DarkPulse, which it immediately sold into the public market.

3. According to the Securities and Exchange Commission ("SEC"), FirstFire's business model is not simply predatory, it is patently unlawful. In several recent civil actions, the

---

market value of tens of millions of dollars. *See* **Exhibit 3** (EDGAR Spreadsheet, listing securities transactions by FirstFire identified in issuer EDGAR filings).

[3] Toxic lenders take advantage of the so-called "tacking" provisions currently provided in Rule 144, *see* 17 CFR 230.144(d)(3)(ii). Recognizing the harms to microcaps and their investors caused by toxic lending, the SEC has proposed rulemaking to revise the holding period for securities acquired upon the conversion or exchange of certain market-adjustable securities like those used by FirstFire: "Currently, Rule 144 deems securities acquired solely in exchange for other securities of the same issuer to have been acquired at the same time as the securities surrendered for conversion or exchange. Under the amendments, the holding period for the underlying securities acquired upon conversion or exchange of 'market-adjustable securities' would not begin until conversion or exchange, meaning that a purchaser would need to hold the underlying securities for the applicable Rule 144 holding period before reselling them under Rule 144." *See* Notice of Proposed Rule, https://www.sec. gov/rules/proposed/2020/33-10911.pdf (last accessed on May 4, 2021) ("Prop. Rule").

[4] The "Agreements" refer to the agreements executed by Plaintiff in favor of FirstFire, *viz.:* (1) a Convertible Promissory Note for $247,500.00 executed on April 20, 2018, (constituted by a "Senior Convertible Promissory Note" and Share Purchase Agreement ("SPA")) ("September 2018 Note"); and (2) a Convertible Promissory Note executed for $825,000.00 executed on April 26, 2021 (also constituted by a "Convertible Promissory Note" and SPA) ("April 2021 Note" and together with the September 2018 Note, the "Notes"). A true and correct copy of each of the Notes and SPAs are attached as follows: (1) September 2018 Note and SPA as **Exhibit 1**; and (2) April 2021 Note and SPA as **Exhibit 2**. The securities transactions effected by the Agreements are hereinafter referred to as the "DarkPulse Transactions."

**A-370**

SEC has prosecuted toxic lenders for unlawfully operating as unregistered securities dealers, in violation of § 15(a) of the Securities Exchange Act of 1934 ("Act") (15 U.S.C. § 78o). ***Every court to address the matter has agreed with the SEC.***[5]

4.      The toxic lenders under scrutiny in the SEC cases use FirstFire's *precise* business model (indeed, the contracts seem to have been drafted by the same firm), and—like FirstFire—refrain from registering with the SEC in order to evade regulatory oversight and continue making predatory loans that generate outrageous profits.

5.      The remedy sought by the SEC in those cases (and awarded in cases that have progressed to judgment) is disgorgement of profits and cancellation of any remaining shares. *See SEC v. Almagarby*, 2021 U.S. Dist. LEXIS 186477 (S.D. Fla. Sep. 29, 2021) (Order).

6.      Similarly, in addition to other remedies, the remedy sought by Plaintiff here is rescission of the DarkPulse Transactions pursuant to § 29(b) of the Act, on the ground that each of the contracts was both *made* and *performed* in violation of § 15(a) of the Act. *See* 15 U.S.C. § 78o.

7.      Further, the Agreements in this case charge DarkPulse a rate of interest that is criminally usurious under New York law.  As shown in greater detail below, the Agreements charge an annualized interest rate of **more than double** the maximum rate of interest that may be charged by New York which is 25% APR. *See* N.Y. G.O.L. § 5-501; N.Y. Penal Law § 190.40.[6]

8.      Consistent with FirstFire's established business model, the Agreements provided FirstFire with a conversion option, that is, the right to take repayment by exchanging the accrued

---

[5]      *See, e.g., SEC v. Big Apple Consulting USA, Inc.*,783 F.3d 786 (11th Cir. 2015); *SEC v. Almagarby,* 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020)*; SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife*, 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021). For private civil actions seeking rescission based on failure to register, *see Edgepoint Capital Holdings, LLC v. Apothecare Pharmacy*, LLC, 6 F.4th 50 (1st Cir. 2021); *Auctus Fund, LLC, v. Players Network, Inc.*, 20-cv-10766 (D. Mass. Dec. 10, 2021).

[6]      *See Adar Bays, LLC v. GeneSYS, ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021).

debt (or any portion thereof) for shares of company stock. Consistent with its general practices, FirstFire does not exchange debt on a dollor-for-dollar basis, but at a significant discount to market at the time of conversion.

9.      FirstFire is an "enterprise" as defined in the Racketeer Influenced and Corrupt Organization Act ("RICO"). *See* U.S.C. 18 § 1961, *et seq.*

10.      FirstFire has engaged in the collection of unlawful debt at the direction and control of Defendant Eli Fireman, culpable "person" as defined in RICO.  *See* 18 U.S.C. § 1961.

11.      FirstFire collected an unlawful debt from DarkPulse when it obtained stock pursuant to the conversion feature of the usurious Agreements.

12.      Accordingly, among other relief, DarkPulse seeks an award of treble damages under RICO, because the amount of interest charged by FirstFire in the Agreements is more than double the maximum enforceable rate of interest allowed by New York law, and FirstFire conducts a business of making usurious loans.

## II.      JURISDICTION AND VENUE

13.      This Court has subject matter jurisdiction over this case pursuant to 15 U.S.C. § 78aa and 28 U.S.C. § 1331 because Plaintiff is asserting a claim under the Act.

14.      This Court has supplemental jurisdiction over Plaintiff's state law claims pursuant to 28 U.S.C. § 1367.

15.      Venue is proper in this Court under 28 U.S.C. § 1391(b)(1) and (2) because Defendants' principal place of business is located in this District and because a substantial part of the events giving rise to this action occurred in this District.

16.      Notwithstanding that the DarkPulse Transactions should be voided and rescinded in their entirety by the Court for the reasons stated herein, Defendants should be estopped from

A-372

denying that jurisdiction or venue is proper in this Court because the Agreements provide expressly that any action brought by either party concerning the transactions contemplated by the Agreements must be brought in state or federal courts located in the State of New York.[7]

### III.    PARTIES

17.    DarkPulse's principal place of business is located at 1345 Avenue of the Americas, 2nd Floor, New York, New York 10105. DarkPulse is a corporation organized under the laws of the state of Delaware.[8]

18.    DarkPulse's stock trades on the over-the-counter ("OTC") market, where the stocks of early-stage, developing companies—too small for the major stock exchanges—are traded.

19.    FirstFire's principal place of business is located at 1040 First Avenue, Suite 190, New York, New York 10022. FirstFire is registered as a Delaware limited liability company.

20.    FirstFire's website[9] showed that FirstFire held itself out to the public as a "New York based investment manager" that "will source, structure, and execute direct investments in publicly traded companies with market capitalizations under $750 million."

---

[7]    *See* Notes at § 4.6; SPAs at § 8a.
[8]    In April 2018, DarkPulse was located in Virginia.
[9]    A screenshot of FirstFire's website (http://www.firstfirecap.com/) as it existed on January 26, 2020, was recovered by DarkPulse with the Wayback Machine, a digital archive of the world wide web, *available at:* https://archive.org/web/ (last accessed on December 29, 2021). The website appears to have been deleted from the Internet in 2020.



21.     FirstFire is not now, and has never been, registered as a securities dealer with the SEC.

22.     Upon information and belief, Fireman is a permanent resident in the State of New York.

23.     Upon information and belief, Fireman is the managing member of FirstFire Capital Management, LLC, an entity which is the managing member of FirstFire.

24.     Fireman is not now, and has never been, registered as a securities dealer with the SEC.

25.     FirstFire Capital Management, LLC, is not now, and has never been, registered as a securities dealer with the SEC.

## IV.   **FACTUAL ALLEGATIONS**

### A.  *The September 2018 Note*

26.     FirstFire executed the first securities transaction with DarkPulse on September 20, 2018 when it purchased from DarkPulse a convertible promissory note, a type of debt security constituted by a promissory note and a share purchase agreement.

6

27.     FirstFire paid DarkPulse $225,000 for the September 2018 Note, for which DarkPulse was obligated to repay FirstFire $247,500 plus 8% interest, due in nine months.

28.     The September 2018 Note also gave FirstFire the right, commencing 180 days after purchase, to exchange all or any portion of the debt for company stock, at a 30% discount to the market price.[10]

29.     By exercising the conversion option, Defendants exchanged the debt under the note (securities) for newly-issued company stock (securities).

30.     On June 7, 2019, FirstFire began conversion of the September 2018 Note.  In all, FirstFire effectuated 18 separate conversions under the September 2018 Note.

31.     Each of those 18 conversions, as well as the subsequent sales of the stock obtained thereby, are transactions in securities; with each conversion or sale, FirstFire used the mail and or other means or instrumentalities of interstate commerce to effect a transaction in securities.

32.     FirstFire's conversions of debt into DarkPulse stock under the September 2018 Note are as follows:

  a. 6/7/2019:  converted $5,340.00 of debt for 7,000,000 shares of common stock;

  b. 6/18/2019: converted $3,331.00 of debt for 7,000,000 shares of common stock;

  c. 6/24/2019: converted $2,778.00 of debt for 7,900,000 shares of common stock;

  d. 7/8/2019:  converted $1,560.00 of debt for 6,000,000 shares of common stock;

  e. 7/15/2019: converted $1,560.00 of debt for 6,000,000 shares of common stock;

---

[10]   With the value of the 30% conversion discount added to 10% original issue discount and the stated 8% interest rate, it is clear that the September 2018 Note violates the 25% interest rate cap set forth in New York's criminal usury laws. *See Adar Bays v. GeneSYS ID, Inc.,* 2021 NY Slip Op. 05616, 2021 WL 4777289 (Oct. 14, 2021).

7

    f.    7/24/2019: converted $2,708.00 of debt for 11,600,000 shares of common stock;

    g.    7/30/2019: converted $3,296.00 of debt for 13,700,000 shares of common stock;

    h.    8/5/2019:  converted $3,008.00 of debt for 16,100,000 shares of common stock;

    i.    8/9/2019:  converted $1,492.00 of debt for 17,800,000 shares of common stock;

    j.    8/15/2019: converted $1,426.00 of debt for 20,900,000 shares of common stock;

    k.    9/6/2019: converted $4,900.00 of debt for 35,000,000 shares of common stock;

    l.    9/10/2019: converted $4,900.00 of debt for 35,000,000 shares of common stock;

    m.    9/20/2019: converted $2,765.00 of debt for 35,900,000 shares of common stock;

    n.    9/1/2020:   converted $7,000 of debt for 85,000,000 shares of common stock;

    o.    1/14/2021: converted $28,000 of debt for 100,000,000 shares of common stock;

    p.    1/25/2021:  converted $42,000 of debt for 150,000,000 shares of common stock;

    q.    2/5/2021: converted $28,000.00 of debt for 100,000,000 shares of common stock; and

    r.    2/18/2021:  converted $103,436 of debt for 220,000,000 shares of common stock.

33.    In all, FirstFire exchanged $247,500 worth of debt for 879,400,000 shares of newly-issued stock.

34.    The estimated open market value of the stock FirstFire acquired from converting the debt under the September 2018 Note totaled ***$10,738,900.00***.

35.     Upon information and belief, as soon as FirstFire received the newly-issued DarkPulse shares, it immediately sold them into the marketplace to reap a substantial profit.

36.     As shown in the following list, the ***average daily trading volume*** in DarkPulse stock increased dramatically in the days following each FirstFire conversion, demonstrating FirstFire's well-known practice of dumping issuer stock into the market as soon as possible.[11]

- 30 days prior to first conversion:                          4,646,131
- 10 days following 06/07/2019 conversion:            8,235,159
- 10 days following 06/24/2019 conversion:          12,059,811
- 10 days following 07/08/2019 conversion:          11,579,818
- 10 days following 07/15/2019 conversion:          13,563,234

### B. The April 2021 Note

37.     On April 26, 2021, the parties executed a second securities transaction in which FirstFire purchased from DarkPulse a second convertible promissory note.  In that transaction, FirstFire paid DarkPulse $750,000 for the April 2021 Note, which obligated DarkPulse to repay in the amount of $825,000.00, plus 10% APR in interest, with a nine-month maturity date.

38.     The April 2021 Note is a security under the Act, constituted by a promissory note and a share purchase agreement, which gave FirstFire the right to convert the debt into stock.

39.     Unlike the fixed discount under the September 2018 Note the April 2021 Note provided a *fixed* price of $0.015 per share; however, that price would reduce to $0.005 per share upon the occurrence of any incident of default which is, .

40.     The April 2021 Note specified that it was governed by New York law. *See* EXH.2, Note at 4.6; SPA at ¶ 8.

---

[11]   *See* Prop. Rule, *supra* at note 3 ("If the securities are converted or exchanged after the Rule 144 holding period is satisfied, the underlying securities may be sold quickly into the public market at prices above the price at which they were acquired. Accordingly, initial purchasers or subsequent holders have an incentive to purchase the market-adjustable securities with a view to distribution of the underlying securities following conversion to capture the difference between the built-in discount and the market value of the underlying securities.... [W]hen a holder purchases with a view to distribution, it is acting as an underwriter and is unable to rely on the Section 4(a)(1) exemption from registration.").

41.     Unlike the September 2018 Note, the April 2021 Note contained the extra requirement that DarkPulse pay to FirstFire 60,000,000 "commitment shares" upon execution of the April 2021 Note. *See* EXH. 2, SPA at 1, section C.

42.     On the date of execution of the April 2021 Note, DarkPulse stock was trading at a price of $0.019 per share, giving the 60,000,000 commitment shares a face value of $1,140,000.[12]

43.     FirstFire's requirement that DarkPulse remit these shares (which, even with a six-month restriction, constitutes property with a fair market value in excess of $1,000,000) as up-front consideration for the $825,000 loan renders the April 2021 Note criminally usurious on its face under New York law. *See* General Obligations Law Sections 5-501, *et seq.*

44.      On October 14, 2021, the New York Court of Appeals issued its decision in *Adar Bays, Inc., v. GeneSYS ID*, 37 N.Y.3d 320 (2021), wherein that Court was called to answer two certified questions on the correct interpretation of New York criminal usury law.  In a unanimous decision, the Court of Appeals held that under N.Y. G.O.L. § 5-511(1), a criminally usurious loan[13] is *void ab initio*, even where the borrower is a corporation. *See* Slip Op. at 6-7.

45.     The six-month restriction on the conversion stock (and the commitment shares) expired on October 26, 2021.

46.     On November 4, 2021, DarkPulse CEO Dennis O'Leary met with Fireman while on a business trip in Las Vegas, at Fireman's request.  Fireman presented O'Leary with a one-page amendment to the April 2021 Note, claiming that it would enable DarkPulse to complete future acquisitions without having to notify him.

---

[12]  *See* April 26, 2021 prices at https://seekingalpha.com/symbol/DPLS/chart (last accessed on May 3, 2021).
[13]  Under New York Penal Law § 190.40, any loan charging an interest rate of 25% per annum or greater is criminally usurious.

47.     Fireman failed to mention to O'Leary that the amendment also replaced the choice

of law provision, replacing governance by New York law with governance under Delaware law

(which has no laws against usury), nor did he explain why the amendment was dated October 14,

2021, the date of the *Adar Bays* decision.  O'Leary signed the amendment.

48.     On November 15, 2021, FirstFire submitted a notice of conversion seeking to

convert the full amount of the debt under the April 2021 note (principal + interest = $886,875.00)

into DarkPulse common stock.

49.     FirstFire's November 15 notice of conversion (which is submitted to the transfer

agent, not DarkPulse) claimed to be due shares using the default price of $.005 per share.[14]

Accordingly, on November 17, 2021, with DarkPulse stock trading at $0.1334 per share, the

transfer agent delivered to FirstFire 177,375,000 shares of freely-trading stock, with an estimated

fair market value of ***$23,661,825.00***.[15][16]

### C. Defendants' General Business Model:  Violating Federal Securities Laws by Operating as an Unregistered Dealer

50.     Every time FirstFire purchases a convertible note, converts debt into stock, or sells

conversion stock, it effects a transaction in securities.

51.     As a part of its regular business, FirstFire acquires large volumes of shares directly

from issuers at a substantial discount to market, sells large volumes of shares back into the open

market for a substantial profit due to the conversion discount, and does so for its own account and

---

[14]   The April 2021 Note incorporated a registration rights agreement that required DarkPulse to use its "best efforts" to file, within 90 days after execution (July 26, 2021) a registration statement to register the commitment shares and shares issued to FirstFire.  Although the registration statement appears to have been filed, FirstFire maintains that DarkPulse defaulted on this obligation.

[15]   DarkPulse vigorously disputes that it was in default, and alleges that Fireman made repeated assurances to the contrary.  Upon learning that the transfer agent had used the default conversion price, DarkPulse contacted FirstFire to raise its objections.  In response, FirstFire filed suit in Delaware Chancery Court seeking a declaratory judgment that not only was the default price correct, but that, under the default provisions of the Note, FirstFire is entitled to even further penalties.  *See* Complaint, *FirstFire Global Opp'ty Fund, LLC v. Darkpulse, Inc.*, Case No. 2021-1082.

[16]   The market value of all of the shares obtained by FirstFire, including the "commitment shares" issued pursuant to the April 2021 Note and the shares acquired under the September 2018 Note, equals no less than ***$38,540,725.00***.

11

**A-379**

absent investment intent.  Accordingly, FirstFire buys securities, converts securities, and sells securities as part of its regular business for its own account.

52.     The SEC's EDGAR database shows that since 2015, FirstFire has purchased similar convertible securities on over 200 occasions, from at least 89 microcap companies in addition to DarkPulse.

53.     Upon information and belief, FirstFire made use of the mails, email, and other instrumentalities of interstate commerce to effect the DarkPulse Transactions and subsequent securities transactions.  For example, FirstFire used its internet website, transferred cash through wire transfers, and used email and telephone communications to negotiate and effect purchases and sales.

54.     Via its website at www.firstfirecap.com, Defendant held itself out to the public as a "New York based investment manager" that "will source, structure, and execute direct investments in publicly traded companies with market capitalizations under $750 million."

55.     FirstFire's business of buying and selling securities is not exclusively intrastate.

56.     Any person engaged in the business of buying and selling securities for such person's own account (through a broker or otherwise) as part of a regular business must register as a dealer with the SEC, or, in the case of a natural person, associate with a registered dealer. *See* 15 U.S.C. § 78o(a)(1).

57.     By failing to comply with the dealer registration requirements mandated by federal law, FirstFire purposefully "operated under the radar" to avoid important legal and regulatory oversight by the SEC and the Financial Industry Regulatory Authority ("FINRA").

58.     The dealer registration requirements provide important safeguards for the investing public, shareholders and companies.  The excessive compensation and patently unfair terms used

in the DarkPulse Transactions (and FirstFire's transactions with other issuers) would have violated FINRA Rules 5110 (b)(4)(B) and 5110(c)(2)(A), and hence could not have been effected by a registered securities dealer.

59.     FirstFire's enormous profits from the DarkPulse Transactions resulted from the market prices they received when they sold the stock into the public market, and the deeply discounted price at which it acquired the stock from DarkPulse.  This mechanism, where FirstFire reaps the profits on the spread or markup of the stock they sold, is a common attribute of a securities dealer or underwriter.

60.     Registration as a securities dealer and accompanying SEC oversight would further prevent FirstFire from utilizing the Rule 144 tacking provision (17 C.F.R. 230.144(d)(3)(ii)) because FirstFire's business operations constitute underwriting activity, or sales with a view to distribution.

61.     As shown in EDGAR data, FirstFire had a regular clientele of issuers from which it would purchase securities, convert, and sell newly-issued stock into the market to reap profits on the markup.

62.     Issuers of stock like DarkPulse are clients of underwriters. Operating as an underwriter is not acting as a trader, but as a securities dealer, which requires registration with the SEC.

63.     As a part of its regular business, Defendant obtained newly-issued stock directly from the microcap issuers through note conversions, as opposed to purchases in the open or secondary markets.

64.     The convertible securities that Defendant purchased enabled it to acquire billions of shares of newly-issued stock at a substantial discount—typically between 30 and 50 percent of the trading price.[17]

65.     As a regular part of its business, Defendant sold large blocks of newly-issued shares into the public market, which is a common hallmark of a securities dealer.

66.     Between March 2015 and September 2021, Defendants purchased *more than 107 convertible promissory notes* from approximately *89 different penny stock issuers* and *sold more than 1 billion newly-issued shares of stock* obtained from those notes into the public market for Defendants' own account.

67.     FirstFire has used the same business model– promising easy cash to microcap companies in need of working capital and then fleecing them for millions of shares of stock– since its formation in 2015.  For example:

- DigitalTown, Inc.: FirstFire purchased a convertible security for $183,750.00; upon conversion of that security, FirstFire acquired *more than 793,406,848* shares of DigitalTown stock (fair market value of $1,384,791.64) which, upon information and belief, were sold into the market shortly thereafter;

- Ionix Technology, Inc.: FirstFire purchased one or more convertible securities for $665,000.00, upon conversion of that security, FirstFire acquired more than 9,467,000 shares of Ionix stock (fair market value $1,041,370.00) which, upon information and belief, it sold into the market shortly thereafter; and

- Visium Technologies, Inc.: FirstFire purchased one or more convertible securities for $150,000.00, upon conversion of that security, FirstFire acquired *more than 49,000,000 shares of* Visium stock, (fair market value $196,000.00) which, upon information and belief, it sold into the market shortly thereafter.

---

[17]   Because the Notes required that the discount be applied to a '20-day low' trading price instead of the average price on the date of conversion, the price FirstFire paid at conversion was almost always far lower than a 30% discount.

14

68.     Defendants continue to purchase new convertible securities, convert the debt into stock and dump the stock into the market to reap profits. In 2021 alone, Defendant has purchased *no less than 23 convertible promissory notes*—from *no less than 14 issuers*. Upon information and belief, Defendants repeated the same behavior outlined above, utilizing the Rule 144 holding period to sell the conversion shares immediately upon conversion.

69.     The equitable remedy of voiding and rescission provided under § 29(b) of the Act should be effectuated by mandating FirstFire to return to DarkPulse every share of stock it acquired under the Agreements, less the cash value of the net sum provided to the Plaintiff for the purchase of the Notes.

### D.   The FirstFire Lending Enterprise

70.     The FirstFire Lending Enterprise exists to lend money for profit using the business model described herein.

71.     Upon information and belief, the FirstFire Lending Enterprise has made loans to other issuers that also violate New York's usury laws—in the same manner as the Agreements in this case which is by charging and/or collecting more than twice the lawful maximum interest rate.

### E.   The Agreements Evidence the Creation of Unlawful Debt, Subsequently Collected in Violation of RICO, 18 U.S.C. § 1962

72.     The Agreements evidence an unlawful debt under RICO because each one Charges more than twice the enforceable rate under New York law, and FirstFire is in the business of making usurious loans. *See* 18 U.S.C. § 1961(6); NY Penal Law § 190.40.

73.     The New York criminal usury statute provides:

A person is guilty of criminal usury in the second degree when, not being authorized or permitted by law to do so, he knowingly charges, takes or receives any money or other property as interest on the loan or forbearance of any money or other property, at a rate exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period.

15

NY Penal Law § 190.40.

74.     The Agreements are loans that must comply with New York usury laws.

75.     Pursuant to the express terms of the Agreements, FirstFire had the right to convert the debt into DarkPulse stock as repayment for the loan, but at a substantial discount of either, 30% to market or at $0. 005 (less than market value), at the time of conversion.

76.     The value of a fixed conversion discount is interest that must be included in the interest calculation for purposes of a usury analysis in New York. *See Adar Bays*, 37 N.Y.3d at 338.

77.     Both of the Agreements are governed by the laws of the state of New York, irrespective of the choice of law provisions within the Agreements.[18]  Pursuant to New York's usury laws, the maximum enforceable legal rate for a loan to a corporation is 25% A.P.R.[19]  *See* NY Penal Law § 190.40; Gen. Oblig. Law § 5-501, *et. seq.*

78.     In accord with the landmark decision in *Adar Bays, LLC v. GeneSYS, ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021), the Agreements are void *ab initio*, thus, any subsequent amendments that change the controlling law in the Agreements are a nullity.

79.     Although the Agreements impose a stated interest rate of either 8% or 10% per annum, the added value conferred by the commitment shares, conversion discounts, and original issue discounts produces an estimated 291.52%[20] APR for the April 2021 Note and 61%[21] for the

---

[18]     *Power Up Lending Grp., Ltd. v. Cardinal Energy Group, Inc.*, No. 2:16-cv-1545 (DRH) (GRB), 2019 BL 118785, at *5 (E.D.N.Y. Apr. 3, 2019).
[19]     In addition to the Agreements, many, if not all, of the other convertible promissory notes entered into by FirstFire with other securities issuers imposed substantially similar terms.
[20]   The annualized interest is 291.52% A.P.R., which is calculated by adding the 10% stated interest rate on the note, the 10% OID on the note, the 133% conversion discount rate pursuant to the conversion provision on the note, and the 138.18% interest coming from the value received in the commitment shares outlined in the accompanying SPA.
[21]   The annualized interest is 61% A.P.R., which is calculated by adding the 8% stated interest rate on the note, the 10% OID on the note, and the 43% conversion discount rate pursuant to the conversion provision on the note

September 2018 Note – both of which are more than twice the enforceable rate permitted by New York's criminal usury law (25%).

### F.  DarkPulse was Harmed by the Unlawful Debt Collection

80.     As a result of the unlawful debt collection, DarkPulse has been injured in its business and property.

81.     As a result of the unlawful debt collection, FirstFire obtained tens of millions of shares of free-trading DarkPulse common stock to which it was not entitled or capable of lawfully acquiring.

82.     The excessive conversions and resulting issuances forced DarkPulse to increase its outstanding shares, thereby massively diluting DarkPulse's stockholders.

83.     Once FirstFire began converting under the Agreements, its immediate and massive selling of large blocks of newly-issued shares of DarkPulse's common stock into the public market caused enormous depression in DarkPulse's market capitalization and stock price.

84.     As a result of these actions, DarkPulse became unable to privately raise money from other entities, with other toxic lenders becoming the only reasonably available option for short-term financing, leading to more losses.

85.     All of the foregoing harm was foreseeable by FirstFire and was proximately caused by FirstFire's collection of an unlawful debt as alleged herein.

86.     Assessment of the total damage caused by these actions to DarkPulse is difficult to quantify and will be determined at trial.

### G.  Fireman Controlled Firstfire in its Convertible Debt Securities Business

87.     At all relevant times, Fireman, due to his position in FirstFire Capital Management LLC, possessed and exercised the ultimate decision-making and control over FirstFire, including the power to decide whether to enter into each of the securities transactions (including the

DarkPulse Transactions), to negotiate and approve the final deal terms, and to direct its sales of stock.

88.     Fireman personally negotiated the terms of the convertible notes that FirstFire purchased from microcap companies (including the DarkPulse Transactions), as well as amendments to the original terms. Fireman also signed the contracts by which FirstFire acquired the convertible notes, including both Notes with Plaintiff.

89.     Ultimately, Fireman was and remains the sole person with the power to direct, authorize, and compel FirstFire to enter into, convert, and subsequently sell securities through usurious convertible notes with issuers, including the Agreements with DarkPulse. Fireman is, and was, a "controlling person" within the meaning of Section 20(a) of the Act and had the power to cause FirstFire to engage in the unlawful conduct described herein.

## V.   CAUSES OF ACTION

### A.  COUNT I (Against FirstFire): Rescission Pursuant to § 29(b) of the Act for Violating § 15(a) by Effecting (Making) the DarkPulse Transactions As an Unregistered Dealer

90.     Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

91.     Section 29(b) of the Act provides in relevant part that: "[e]very contract *made* in violation of any provision of this chapter or of any rule or regulation thereunder ... shall be void ...." 15 U.S.C. § 78cc(b) (emphasis added).

92.     The DarkPulse Transactions were made in violation of Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using the means of interstate commerce to effect any transaction in securities.

18

93.     FirstFire is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. § 78c(a)(5).

94.     FirstFire is not registered as a securities dealer with the SEC or with any other regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

95.     FirstFire effected transactions in securities when it executed the DarkPulse Transactions and when it converted and sold or caused to be sold the Darkpulse stock obtained thereby.

96.     FirstFire used the means of interstate commerce to effect the DarkPulse Transactions, such as its use of an internet website, wiring of cash through wire transfers, and use of email and telephone communications to negotiate or effectuate transactions.

97.     As a party to the DarkPulse Transactions, DarkPulse is in contractual privity with FirstFire.

98.     The registration requirement is designed to protect stock issuers (and others) from unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is within the class of persons that the Act was designed to protect.

99.     Because FirstFire, as an unregistered securities dealer, utilized the means and instrumentalities of interstate commerce when it effected the transactions in securities known herein as the DarkPulse Transactions, the DarkPulse Transactions were unlawful when made.

### B.  COUNT II (Against FirstFire): Rescission Pursuant to § 29(b) of the Act for Violating § 15(a) of the Act by Unlawfully Transacting in Securities Via Performance of the Agreements as an Unregistered Dealer

100.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

101.   Section 29(b) of the Act provides in relevant part that: "[e]very contract … ***the***

***performance of which*** involves the violation of, or the continuance of any relationship or practice

in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void…."

(15 U.S.C. § 78cc(b)) (emphasis added).

102.   The DarkPulse Transactions were performed in violation of Section 15(a) of the

Act (15 U.S.C. § 78o(a)(1)), which prohibits unregistered dealers from using the means of

interstate commerce to effect any transaction in securities.

103.   FirstFire is a securities dealer within the meaning of the Act.  *See* 15 U.S.C. §

78c(a)(5).

104.   FirstFire is not registered as a securities dealer with the SEC or with any other

regulatory body, as required by Section 15(a) of the Act (15 U.S.C. § 78o(a)(1)).

105.   FirstFire effected transactions in securities in performance of the DarkPulse

Transactions when it converted debt into stock and sold (or caused to be sold) the DarkPulse stock

acquired thereby (hereinafter "Performance Transactions").

106.   FirstFire used the means of interstate commerce to effect the Performance

Transactions, such as wiring cash through wire transfer, or using email and telephone

communications to negotiate and effectuate sales transactions through their broker.

107.   As a party to the DarkPulse Transactions, Darkpulse is in contractual privity with

FirstFire.

108.   The registration requirement is designed to protect stock issuers (and others) from

unscrupulous or unqualified agents acting as dealers.  Accordingly, DarkPulse, as an issuer, is

within the class of persons that the Act was designed to protect.

20

109.   Because FirstFire is an unregistered dealer and used the means and instrumentalities of interstate commerce to effect transactions in securities when it performed under the DarkPulse Transactions, the DarkPulse Transactions were **unlawful as performed** (via the conversions and sales of the conversion stock into the public market).

### C.  COUNT III (Against Fireman): Violation of § 20(a) of the Act by Fireman as a Control Person Based on FirstFire's Transactions in Securities as an Unregistered Dealer

110.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

111.   Fireman had the power and authority to cause FirstFire to engage in the wrongful conduct described in Counts I and II herein.

112.   Fireman did in fact cause FirstFire to engage in the wrongful conduct described in Counts I and II herein.

113.   Fireman did not act in good faith.

114.   Fireman directly and/or indirectly induced the acts and conduct that constitute the violations in this case.

115.   Therefore, Fireman acted as a control person of FirstFire within the meaning of § 20(a) of the Act (15 U.S.C. § 78t).

### D.  COUNT IV (Against All Defendants): Conducting the Affairs of the RICO Enterprise (RICO § 1962(c))

116.   Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

117.   Fireman is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3): an individual or entity capable of holding a legal or beneficial interest in property.

118.    The FirstFire Lending Enterprise is an "enterprise" within the meaning of RICO, 18 U.S.C. §1962(c).

119.    Fireman agreed to, and did, conduct and participate in the conduct of the FirstFire Lending Enterprise's affairs through the collection of unlawful debt from DarkPulse by collecting and attempting to collect debt unenforceable under New York usury laws, having been incurred by a loan by the enterprise that charges, takes or receives, interest at more than double the maximum legal rate.

120.    Upon information and belief, pursuant to and in furtherance of their scheme, the FirstFire Lending Enterprise is in the business of making loans at usurious interest rates, and thereby committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country.

121.    Fireman directly and indirectly conducted and participated in the conduct of the enterprise's affairs through the collection of unlawful debt described above, in violation of 18 U.S.C. § 1962(c).

122.    The unlawful conduct violating § 1962(c), including the collection of unlawful debt, was accomplished in this case through the use of the telephone and the internet, and/or other instrumentalities of interstate commerce, as alleged herein.

123.    As a direct and proximate result of the Defendants' unlawful debt collection and violations of 18 U.S.C. § 1962(c), DarkPulse has been injured in its business and property because, among other things:  its market capitalization has been significantly decreased, its stock has been unlawfully acquired by the Defendants, the value of which is no less than approximately $38 million which shall be trebled to no less than $114 million, and it has suffered further damage and injury to be determined at trial.

22

**A-390**

### E.  COUNT V (Against All Defendants): Unjust Enrichment

124.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

125.    The Defendants have received valuable benefits from DarkPulse, including, *inter alia*, the stock and profits realized from the sale of the unlawfully issued shares of DarkPulse common stock.

126.    These benefits are the result of the wrongful conduct alleged herein in Counts I-III.

127.    The Defendants have unjustly retained these benefits at DarkPulse and its stockholders' expense.

128.    As a result, the Defendants have been unjustly enriched.

### F.  COUNT VI (Against All Defendants):<br>Constructive Trust

129.    Plaintiff repeats, reiterates, and re-alleges each and every allegation of the prior Paragraphs as though set forth herein.

130.    As alleged in Count V, Defendants have been unjustly enriched by DarkPulse.

131.    The circumstances are such that it would be inequitable for Defendants to retain the property conferred on them by DarkPulse.

132.    DarkPulse has a specific, identifiable interest in the property unjustly retained by Defendants as a result of the wrongful conduct alleged in Counts I-IV herein.

133.    Defendants have wrongfully acquired and detained DarkPulse's property obtained via the wrongful conduct alleged in Counts I-IV herein.

134.    Allowing Defendants to retain the property conferred on them by DarkPulse would inequitably allow Defendants to profit from their own wrongdoing, and to dispose of said property for their own purposes, including, without limitation, paying their attorney's fees and costs in

23

connection with this action, and engaging in additional unlawful transactions of the type giving rise to this action.

135.    As a result, a constructive trust should be imposed on DarkPulse's property retained by Defendants.

## VI.    PRAYER FOR RELIEF

**WHEREFORE**, Plaintiff DarkPulse seeks a Verdict and Judgment against the Defendants herein as follows:

**A.    On Count I (Against FirstFire):**

1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

   a.    The DarkPulse Transactions and the Performance Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

   b.    FirstFire is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

   c.    The DarkPulse Transactions are void and subject to rescission under the Act (15 U.S.C. § 78cc); and

   d.    FirstFire is entitled to retain only the principal amount of the loans made pursuant to DarkPulse Transactions.

2.    DarkPulase requests that the Court enter an Order:

   a.    Rescinding the DarkPulse Transactions pursuant to the Act (15 U.S.C. § 78cc);

   b.    Awarding rescissionary damages and such other relief as the Court

deems just and equitable to effectuate the voiding and rescission of the DarkPulse Transactions;

c.    Requiring FirstFire to return to DarkPulse all DarkPulse stock obtained via the DarkPulse Transactions, less the number of shares constituting the principal amount originally loaned to DarkPulse under the DarkPulse Transactions; and

d.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the DarkPulse Transactions.

**B.    On Count II (Against FirstFire):**

1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

a.    The DarkPulse Transactions and Performance Transactions are transactions in securities within the meaning set forth in the Act (15 U.S.C. § 78c(a));

b.    FirstFire is operating as an unregistered dealer in securities, in violation of the Act (15 U.S.C. § 78o);

c.    The Darkpulse Transactions are void and subject to rescission under the Act (15 U.S.C. § 78o); and

d.    FirstFire is entitled to retain the principal amount of the loans made pursuant to the DarkPulse Transactions, already repaid by DarkPulse.

2.    DarkPulse requests that the Court enter an Order:

    a.    Rescinding the DarkPulse Transactions pursuant to the Act (15 U.S.C. § 78o);

    b.    Awarding rescissionary damages and such other relief as the Court deems just and equitable to effectuate the voiding and rescission of the DarkPulse Transactions;

    c.    Requiring FirstFire to return to DarkPulse all DarkPulse stock obtained via the DarkPulse Transactions; and

    d.    Awarding statutory prejudgment interest on any monetary award and on the value of any stock obtained via the DarkPulse Transactions.

**C.    On Count III (Against Fireman):**

    1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

    a.    Fireman had the power and authority to cause FirstFire to engage in the wrongful conduct described in Counts I and II herein;

    b.    Fireman did in fact cause FirstFire to engage in the wrongful conduct described in Counts I and II herein; and

    c.    Fireman acted as a control person of FirstFire within the meaning of § 20(a) of the Act (15 U.S.C. § 78t(a)).

    2.    DarkPulse requests that the court enter an Order, pursuant to Section 20(a) of the Act (15 U.S.C. § 78t(a)), holding Fireman jointly and severally liable with and to the same extent as FirstFire is liable to DarkPulse under Counts I, II,

IV, and V herein.

**D.      On Count IV (Against All Defendants):**

       1.      DarkPulse requests that this Court enter a Judgment against all the Defendants as follows:

          a.      awarding DarkPulse compensatory, direct, and consequential damages;

          b.      awarding DarkPulse treble damages as a remedy for the economic injury sustained by Defendants' collection of unlawful debt pursuant to 18 U.S.C. § 1964 (c);

          c.      awarding DarkPulse its attorneys' fees and costs associated with this litigation pursuant to 18 U.S.C. § 1964 (c);

          d.      entering an award of monetary damages jointly and severally against the Defendants; and

          e.      awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

**E.      On Count V (Against All Defendants):**

       1.      Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that:

          a.      Defendants have voluntarily accepted and retained the property conferred by FirstFire on the Defendants through and as a result of violations of the Act (15 U.S.C. § 78o); and

          b.      The circumstances are such that it would be inequitable for

A-395

the Defendants to retain the property conferred on them by DarkPulse without first paying the value thereof to DarkPulse, to prevent the Defendants from being unjustly enriched.

c.    DarkPulse requests that the Court enter an Order requiring the Defendants to return to DarkPulse the value of the property they have unjustly retained in the amount of $26,560,750 less the value conferred upon the Plaintiff.

**F.    On Count VI (Against All Defendants):**

1.    Pursuant to the Uniform Declaratory Judgment Act, 28 U.S.C. § 2201, DarkPulse requests the Court to declare that the Defendants have been unjustly enriched as alleged in Count VI; and

2.    DarkPulse requests that the Court enter an Order imposing a constructive trust on DarkPulse's property in the possession of the Defendants as a result of the benefits conferred on them by Darkpulse.

**F.    As to each of Counts I-VI,** to the extent permitted by applicable law, and not otherwise requested, DarkPulse requests that the Court enter an Order:

1.    Awarding DarkPulse compensatory, direct, and consequential damages;

2.    Awarding DarkPulse punitive and/or treble damages, to deter the Defendants from continuing to engage in the same wrongful and unlawful transactions;

3.    Awarding DarkPulse its attorneys' fees and costs associated with

this litigation;

4.      Entering an award of monetary damages jointly and severally against the Defendants; and

5.      Awarding such further and additional legal and equitable relief that the Court deems just, proper, and in the interest of justice.

## VII.    JURY DEMAND

Plaintiff demands a trial by jury on all issues properly so tried.

DATED: May 5, 2022                       Respectfully submitted,

                                         */s/ Gustave Passanante*
                                         Gustave P. Passanante, Esq.
                                         Eric J. Benzenberg, Esq.
                                         **THE BASILE LAW FIRM, P.C.**
                                         390 N. Broadway, Ste. 140
                                         Jericho, NY 11753
                                         Tel.:   (516) 455-1500
                                         Fax:    (631) 498-0748
                                         Email: gus@thebasilelawfirm.com
                                                eric@thebasilelawfirm.com

                                         *Attorneys for Plaintiff Darkpulse, Inc.*

A-397

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., <br><br>         Plaintiff, <br><br> v. <br><br> FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC and ELI FIREMAN <br><br>         Defendants. | Index No. 1:21-cv-11222 (ER) |

## NOTICE OF DEFENDANTS' MOTION TO DISMISS
## THE FIRST AMENDED COMPLAINT

**PLEASE TAKE NOTICE** that upon (i) the accompanying Memorandum of Law in Support of Defendants' Motion to Dismiss the First Amended Complaint, and (ii) the Declaration of Aaron Marks in Support of Defendants' Motion to Dismiss the First Amended Complaint, dated May 26, 2022, and exhibits attached thereto, the undersigned will move this Court before the Honorable Edgardo Ramos, United States District Judge, in Courtroom 619, Thurgood Marshall United States Courthouse, 40 Foley Square, New York, New York 10007 at a date and time to be determined by the Court, for an order pursuant to Rules 12(b)(1), 12(b)(3), and 12(b)(6) of the Federal Rules of Civil Procedure dismissing the First Amended Complaint (Dkt. No. 29) in the above-captioned action in its entirety and with prejudice and for other and further relief the Court may deem just and proper.

*[Remainder of the page intentionally left blank]*

1

Date:  New York, New York                    Respectfully submitted,
       May 26, 2022

**KIRKLAND & ELLIS LLP**

/s/ *Aaron H. Marks*
Aaron H. Marks, P.C.
Byron Pacheco
Julia D. Harper
601 Lexington Avenue
New York, New York 10022
Telephone:  (212) 446-4800
Facsimile:  (212) 446-4900
aaron.marks@kirkland.com
byron.pacheco@kirkland.com
julia.harper@kirkland.com

*Attorneys for Defendants*

A-399

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., <br><br>         Plaintiff, <br><br> v. <br><br> FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC and ELI FIREMAN <br><br>         Defendants. | Index No. 1:21-cv-11222 (ER) |

**DEFENDANTS' MEMORANDUM OF LAW
IN SUPPORT OF THEIR MOTION TO DISMISS
THE FIRST AMENDED COMPLAINT**

A-400

**TABLE OF CONTENTS**

**Page**

**FACTUAL BACKGROUND** ........................................................................................... 2

    A.    DPLS's History of Issuing Convertible Promissory Notes ................................... 2

    B.    The FirstFire Notes. .............................................................................................. 3

    C.    The Amendment to the 2021 Note. ....................................................................... 4

    D.    The Events of Default. ........................................................................................... 4

    E.    The Conversion and the Dispute. .......................................................................... 5

    F.    Procedural History ................................................................................................ 6

**ARGUMENT** ................................................................................................................. 6

**I.**    **PLAINTIFF CANNOT AVOID ITS AGREEMENT TO DESIGNATE DELAWARE AS THE FORUM FOR ALL DISPUTES AS TO THE 2021 NOTE.** ................................................................................................................. 7

    **A.**    **The Exclusive Forum Provision in the 2021 Note Is Enforceable.** ................... 7

    **B.**    **Enforcement of the Forum Provision Would Not Be Unreasonable or Unjust.** ................................................................................................................. 8

**II.**    **PLAINTIFF'S EXCHANGE ACT CLAIMS (COUNTS I–III) ARE MERITLESS.** ................................................................................................................. 11

    A.    Plaintiff's Claims Are Time-Barred as to the September 2018 Note. ................. 11

    B.    The Notes Did Not Involve a Prohibited Transaction. ......................................... 12

    C.    FirstFire Is Not a Dealer Within the Meaning of the Exchange Act. ................... 13

    D.    The Complaint Fails to Allege Control Person Liability. ..................................... 15

**III.**    **PLAINTIFF'S RICO CLAIM (COUNT IV) FAILS ON EVERY REQUIRED ELEMENT.** .............................................................................................. 16

    A.    Plaintiffs Have Not Alleged a "Person" Distinct from an Enterprise. ................. 17

    B.    DPLS Has Not Shown Any "Unlawful Debt." .................................................... 18

A-401

|     | (i)   | New York Law Does Not Apply to Either Note................................... 18 |
|-----|-------|---|
|     | (ii)  | Even if New York Law Applies, DPLS's Claim Fails. .......................... 21 |
|     | (iii) | Plaintiff Fails to Allege FirstFire Is in the Business of Lending at Usurious Rates. ................................................................................ 23 |

**IV.   PLAINTIFF'S STATE LAW CLAIMS (COUNTS V-VI) MUST BE DISMISSED.............................................................................................. 24**

**CONCLUSION .......................................................................................................... 25**

A-402

## <u>TABLE OF AUTHORITIES</u>

**Page(s)**

**Cases**

*1077 Madison Street, LLC v. Daniels,*
   954 F.3d 460 (2d Cir. 2020)..................................................................22

*Acklin v. Eichner,*
   2021 WL 4442819 (S.D.N.Y. Sept. 27, 2021).....................................24

*Adar Bays, LLC v. GeneSYS ID, Inc.,*
   37 N.Y.3d 320 (2021) ....................................................................10, 22

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.,*
   216 F. Supp. 3d 403 (S.D.N.Y. 2016) ................................................11

*ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,*
   493 F.3d 87 (2d Cir. 2007)....................................................................2

*Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.,*
   268 F.3d 103 (2d Cir. 2001).................................................................16

*BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.,*
   2009 WL 264088 (Del. Ch. Feb. 3, 2009) ...........................................25

*Bakerman v. Sidney Frank Importing Co., Inc.,*
   2006 WL 3927242 (Del. Ch. Oct. 10, 2006) .......................................25

*Beaufort Cap. Partners LLC v. Oxysure Sys., Inc.,*
   2017 WL 913791 (S.D.N.Y. Mar. 7, 2017) ....................................22, 23

*Bentley v. Providian Fin. Corp.,*
   2003 WL 22234700 (S.D.N.Y. Apr. 21, 2003).....................................11

*In re Bibox Grp. Holdings Ltd. Sec. Litig.,*
   534 F. Supp. 3d 326 (S.D.N.Y. 2021)............................................11, 12

*Cellucci v. O'Leary,*
   2020 WL 977986 (S.D.N.Y. Feb. 28, 2020) ........................................23

*Chassman v. Shipley,*
   695 F. App'x 630 (2d Cir. 2017) .........................................................22

*Clark-Fitzpatrick, Inc. v. Long Island R. Co.,*
   70 N.Y.2d 382 (1987) ..........................................................................25

*Contract Transport Servs., Inc. v. New Era Lending LLC,*
   2018 WL 11226077 (S.D.N.Y. Oct. 26, 2018).....................................24

iv

*Cottonwood Holdings, Inc. v. C3, Inc.,*
    1995 WL 276196 (S.D.N.Y. May 11, 1995) ........................................................................9

*Dae Hyuk Kwon v. Santander Consumer USA,*
    742 F. App'x 537 (2d Cir. 2018) ................................................................................17, 22

*DeFalco v. Bernas,*
    244 F.3d 286 (2d Cir. 2001) ......................................................................................17

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank,*
    755 F.2d 239 (2d Cir. 1985) ..................................................................................19, 24

*EMA Fin., LLC v. NFusz, Inc.,*
    444 F. Supp. 3d 530 (S.D.N.Y. 2020) ........................................................10, 19, 21

*EMA Fin., LLC v. NFusz, Inc.,*
    509 F. Supp. 3d 18 (S.D.N.Y. 2020) ........................................................................13

*EMA Fin., LLC v. Vystar Corp., Inc.,*
    2021 WL 1177801 (Mar. 29, 2021) ..........................................................................13

*Ernst & Ernst v. Hochfelder,*
    425 U.S. 185 (1976) ..................................................................................................16

*FCX Solar, LLC v. FTC Solar, Inc.,*
    2022 WL 355606 (S.D.N.Y. Feb. 7, 2022) ................................................................25

*Fezzani v. Bear, Stearns & Co., Inc.,*
    384 F. Supp. 2d 618 (S.D.N.Y. 2004) ......................................................................16

*Found. Ventures, LLC v. F2G, Ltd.,*
    2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010) ......................................................14, 15

*Frati v. Saltzstein,*
    2011 WL 1002417 (S.D.N.Y. Mar. 14, 2011) ........................................................13, 24

*GlobalNet Financial.Com, Inc. v. Frank Crystal & Co. Inc.,*
    449 F.3d 377 (2d Cir. 2006) ..................................................................................24, 25

*Gross v. Waywell,*
    628 F. Supp. 2d 475 (S.D.N.Y. 2009) ......................................................................16

*Hertz Corp. v. Friend,*
    559 U.S. 77 (2010) ....................................................................................................20

*Hottinger v. Amcoal Energy Corp.,*
    1992 WL 349851 (S.D.N.Y. Nov. 10, 1992) ............................................................12

*Intima-Eighteen, Inc. v. A.H. Schreiber Co., Inc.,*
    568 N.Y.S.2d 802 (1st Dep't 1991) ..........................................................................10

*JD Anderson v. Binance,*
   2022 WL 976824 (S.D.N.Y. Mar. 31, 2022) ........................................................................12

*Kahn v. Kohlberg, Kravis, Roberts & Co.,*
   970 F.2d 1030 (2d Cir. 1992) ....................................................................................11, 12

*Krock v. Lipsay,*
   97 F.3d 640 (2d Cir. 1996) ...........................................................................................24

*Lapin v. Goldman Sachs Grp., Inc.,*
   506 F. Supp. 2d 221 (S.D.N.Y. 2006) ............................................................................15

*Leasing Serv. Corp. v. Graham,*
   646 F. Supp. 1410 (S.D.N.Y. 1986) ................................................................................9

*LG Cap. Funding, LLC v. ExeLED Holdings, Inc.,*
   2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018) ................................................................13

*LG Funding, LLC v. United Senior Props. of Olathe, LLC,*
   122 N.Y.S.3d 309 (2d Dep't 2020) ................................................................................10

*Lynn v. McCormick,*
   2017 WL 6507112 (S.D.N.Y. Dec. 18, 2017) ................................................................18

*Lynn v. McCormick,*
   760 F. App'x 51 (2d Cir. 2019) ....................................................................................18

*Metro Ambulance, Inc. v. Eastern Medical Billing, Inc.,*
   1995 WL 409015 (Del. Ch. July 5, 1995) .....................................................................25

*Ministers & Missionaries Ben. Bd. v. Snow,*
   26 N.Y.3d 466 (2015) ..................................................................................................19

*Moses v. Apple Hospitality Reit Inc.,*
   2015 WL 1014327 (E.D.N.Y. Mar. 9, 2015) .................................................................25

*Moss v. BMO Harris Bank, N.A.,*
   258 F. Supp. 3d 289 (E.D.N.Y. 2017) ...........................................................................16

*O'Neill v. Standard Homeopathic Co.,*
   346 F. Supp. 3d 511 (S.D.N.Y. 2018) .............................................................................2

*Omega Overseas Partners, Ltd. v. Griffith,*
   2014 WL 3907082 (S.D.N.Y. Aug. 7, 2014) .................................................................13

*Petroff Amshen LLP v. Alfa Rehab PT PC,*
   2022 WL 480475 (2d Cir. 2022) ..............................................................................17, 24

*Pompano-Windy City Partners, Ltd. v. Bear Sterns & Co., Inc.,*
   794 F. Supp. 1265 (S.D.N.Y. 1992) ..............................................................................15

*Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*,
   2021 WL 4463921 (E.D.N.Y. Aug. 17, 2021)................................................8

*Power Up Lending Grp., Ltd. v. Cardinal Energy Group, Inc.*,
   2019 WL 1473090 (E.D.N.Y. Apr. 3, 2019) ..............................................19

*Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*,
   30 F.3d 339 (2d Cir. 1994)........................................................................17

*RMP Cap. Corp. v. Bam Brokerage, Inc.*,
   21 F. Supp. 3d 173 (E.D.N.Y. 2014) .........................................................11

*Rosenson v. Mordowitz*,
   2012 WL 3631308 (S.D.N.Y. Aug. 23, 2012) ............................................16

*Sabre Int'l Sec., Ltd. v. Vulcan Cap. Mgmt., Inc.*,
   95 A.D.3d 434 (N.Y. App. Div. 2012) ......................................................25

*Sadallah v. City of Utica*,
   2004 WL 1949416 (2d Cir. Sept. 3, 2004) ................................................24

*Superior Funding Corp. v. Big Apple Cap. Corp.*,
   738 F. Supp. 1468 (S.D.N.Y. 1990)...........................................................11

*Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*,
   2019 WL 1368570 (S.D.N.Y. Mar. 26, 2019) ...........................................13

*Thea v. Kleinhandler*,
   807 F.3d 492 (2d Cir. 2015)......................................................................11

*U1it4less, Inc. v. Fedex Corp.*,
   871 F.3d 199 (2d Cir. 2017).......................................................................17

*Union Cap. LLC v. Vape Holdings Inc.*,
   2017 WL 1406278 (S.D.N.Y. Mar. 31 2017) .............................................23

*United States v. Moseley*,
   980 F.3d 9 (2d Cir. 2020) ....................................................................10, 11

*Virgo Penn Bus. Ctrs. LLC v. Williamsport Holdings LLC*,
   2020 WL 5576690 (N.Y. Sup. Ct. Sept. 16, 2020)....................................21

*Wade Park Land Holdings, LLC v. Kalikow*,
   2022 WL 657664 (S.D.N.Y. Mar. 4, 2022)...........................................17, 18

*Weiss v. Columbia Pictures Television, Inc.*,
   801 F. Supp. 1276 (S.D.N.Y. 1992)..............................................................7

*Zerman v. Jacobs*,
   510 F. Supp. 132 (S.D.N.Y. 1981)..............................................................13

A-406

*Zeta Glob. Corp. v. Marcpost Mktg. Cloud, Inc.*,
    2021 WL 1668134 (S.D.N.Y. Apr. 28, 2021)..............................................................8

*Zurch Ins. Co. v. Shearson Lehman Hutton, Inc.*,
    84 N.Y.2d 309 (1994) .......................................................................................20

**Statutes**

A.R.S. § 44-1201(A) ..............................................................................................21

15 U.S.C. § 78 ..........................................................................................11, 12, 14

18 U.S.C. § 1961 ....................................................................................................17

18 U.S.C. § 1962 ....................................................................................................16

28 U.S.C. 1332 ......................................................................................................24

Del. Code Ann. tit. 6, §§ 2301(c), 2304(a), 2306 ....................................................19

N.Y. Penal Law § 190.40 ........................................................................................10

NRS 99.050 ...........................................................................................................19

Va. Code Ann. § 6.2-308 (2010).............................................................................20

**Rules**

Fed. R. Civ. P. 12(b) ...............................................................................................7

Plaintiff seeks to undo two transactions as somehow voidable that are perfectly legitimate and virtually identical to dozens of transactions entered into by Plaintiff over the past several years that have provided, and continue to provide, Plaintiff with large infusions of cash to help its business. Plaintiff DarkPulse, Inc's ("DPLS") twice sought and accepted investments from Defendant FirstFire Global Opportunities Fund, LLC ("FirstFire") through convertible notes that gave FirstFire the right to convert the debt into shares in DPLS should DPLS fail to pay the notes back in cash. The first note, entered by DPLS and FirstFire in 2018 (the "2018 Note"), was converted by FirstFire into DPLS shares without incident or objection. However, soon after FirstFire converted the second note (the "2021 Note," and together with the 2018 Note, the "Notes") in November 2021, DPLS objected, triggering litigation in Delaware and in this Court.

DPLS's latest iteration of a complaint fails for several principal reasons. *First*, Plaintiff's claims as to the 2021 Note were brought in the wrong forum due to the Note's Delaware exclusive forum clause. *Second*, DPLS's unregistered dealer claims are time-barred as to the 2018 Note and meritless as to both Notes—this claim was already criticized on the merits by this Court on DPLS's motion for a preliminary injunction, based on a steady line of decisions in this District rejecting the cause of action. *Third*, DPLS now seeks through its amended complaint to turn this garden-variety contract dispute into a civil RICO claim, alleging (without any supporting facts) that the Defendants are engaged in some unspecified criminal enterprise—however, every element of a civil RICO claim is absent here. *Fourth*, without a federal question this Court lacks subject matter jurisdiction over DPLS's state law claims, but regardless of jurisdiction, DPLS has failed to plead the necessary elements of the state law claims.

Despite DPLS's accusations and invective, the reality here is simple: DPLS willingly agreed to the Notes, including the very terms it now disputes. Indeed, DPLS is a sophisticated

party that has entered into *many* convertible notes and other similar instruments over the years, including in recent months.  In short, DPLS has provided no basis for the Court to rescind or otherwise refuse to enforce the plain terms of the Notes, and as a result, its claims must be dismissed.

**FACTUAL BACKGROUND**

**A.      DPLS's History of Issuing Convertible Promissory Notes.**

DPLS is a small-cap company that was formed in 2018 as the result of a merger.  (Decl.[1] Ex. A, DarkPulse, Inc., Form 424B4 (Prospectus) (May 3, 2022) at 24, 27.)[2] DPLS has financed its business through the issuance of convertible promissory notes—notes that give the holder the option to convert the outstanding balance to shares of DPLS common stock rather than receive repayment in cash.  (*Id.* at 20–21; Decl. Ex. B, DarkPulse, Inc., Quarterly Report (Form 10-Q) (May 16, 2022) at 28 ("We have been able to raise working capital to fund operations through the issuances of convertible notes or obtained through the issuance of our restricted common stock.").) Between July 2018 and November 2021, DPLS entered into approximately 20 different convertible notes with multiple investment funds, including the Notes with FirstFire that are the subject of this dispute.  (Decl. Ex. A., Prospectus at 20–21; Decl. Ex. C, DarkPulse, Inc., Annual Report (Form 10-K) (Apr. 14, 2019) at 15–16.)  And in 2020 and in 2021, on 36 separate occasions those notes were converted, with DPLS issuing over 3,545,370,000 common shares in connection with these

---

[1] "Decl." refers to the Declaration of Aaron Marks submitted herewith.  "FAC" or "First Amended Complaint" refers to DPLS's First Amended Complaint filed on May 5, 2022 (Dkt No. 29).  "Tr." refers to the Transcript of the hearing on DPLS's motion for a preliminary injunction held on January 21, 2022 (Dkt. No. 24).  Unless otherwise specified, all emphasis has been added and internal quotations and citations omitted.

[2] The documents that the Court may consider in deciding this motion include "any written instrument attached to the complaint, statements or documents incorporated into the complaint by reference, legally required public disclosure documents filed with the SEC, and documents possessed by or known to the plaintiff and upon which it relied in bringing the suit."  *ATSI Commc'ns, Inc. v. Shaar Fund, Ltd.,* 493 F.3d 87, 98 (2d Cir. 2007).  The Court may additionally take notice of news articles and websites where they are publicly available and their authenticity is not reasonably in dispute.  *O'Neill v. Standard Homeopathic Co.,* 346 F. Supp. 3d 511, 519 nn.1–2 (S.D.N.Y. 2018).

36 conversions, including the 177,375,000 common shares issued to FirstFire. (Decl. ¶ 6.) In the first quarter of 2022 alone, DPLS issued around 200,121,061 shares of common stock for approximately $7.2 million. (Decl. Ex. B, DarkPulse, Inc., Quarterly Report (Form 10-Q) (May 16, 2022) at 6, 21–22.)

### B.    The FirstFire Notes.

FirstFire is an investment fund focusing on small- to medium-sized public and private companies. FirstFire's expertise is in distressed, special situations, and event-driven investing, both as equity and as a debt participant. (FAC ¶ 20.) In this capacity, FirstFire's investments can provide a lifeline for distressed companies. (*Id.*)

DPLS first sought an investment from FirstFire in 2018. In September 2018, DPLS issued the 2018 Note and a Securities Purchase Agreement. (*Id.* ¶ 26.) FirstFire converted the 2018 Note to DPLS common shares (totaling 879,400,000) in multiple partial conversions in 2019, 2020 and 2021. (*Id.* ¶ 32.)

On April 26, 2021, DPLS sought an additional infusion of cash from FirstFire, when it entered into a second Securities Purchase Agreement (the "2021 SPA"), a Registration Rights Agreement (the "RRA"), and the 2021 Note with FirstFire. (*Id.* ¶¶ 37, 49 n.14.) Under the 2021 SPA, FirstFire agreed to provide DPLS with $750,000 in cash (provided on April 30) in exchange for the 2021 Note. (*Id.* ¶ 37.) The 2021 Note provides for a principal sum of $825,000 and includes an interest rate of 10% per annum. (*Id.*)

As with the 2018 Note, the 2021 Note provides FirstFire with a conversion right, whereby FirstFire could forego repayment of the 2021 Note in cash and, instead, convert outstanding amounts owed under the 2021 Note (principal and interest) to shares of DPLS common stock. (*Id.* Ex. 2 at 3.) However, whereas the 2018 Note's conversion price was variable (based on market price at the time of conversion, discounted by 30% or 35%), the 2021 Note's conversion price was

3

"fixed." (*Id.* ¶ 39.)  In particular, Section 1.2(a) of the 2021 Note provides for a per-share conversion price of $0.015 per share—the "Fixed Conversion Price" or, alternatively, a "Default Fixed Conversion Price" of $0.005 per share, applicable if an "Event of Default" occurs. (*Id.*)

### C.     The Amendment to the 2021 Note.

On or about November 4, 2021, FirstFire and DPLS executed "Amendment No. 1 to the Convertible Promissory Note Issued on April 26, 2021" (the "Amendment"). (*Id.* ¶ 46.)  The Amendment changes the choice-of-law and exclusive-forum provisions from New York to Delaware. (*Id.*)  DPLS's CEO, Dennis O'Leary, executed the Amendment while O'Leary and Mr. Fireman were together. (*Id.* ¶¶ 46–47.)

### D.     The Events of Default.

The 2021 Note and RRA together define a series of "Events of Default."  Among other things, the RRA (Section 2(b)) requires DPLS to use commercially reasonable efforts to file a registration statement covering the resale of the shares of DPLS common stock issued or issuable to FirstFire pursuant to the 2021 SPA and with respect to the 2021 Note and any conversion thereof (the "Registrable Shares"), within ninety (90) days following the funding of the 2021 Note.  (FAC ¶ 49 n.14; Decl. Ex. E, RRA § 2(b).)  Section 3.16 of the 2021 Note provides that it shall be an Event of Default if DPLS issues common shares pursuant to an equity line of credit or otherwise in connection with a Variable Rate Transaction entered into after the date of the 2021 Note.  (FAC Ex. 2 at 15.)  During the relevant time period, DPLS engaged in at least two Events of Default.

First, the deadline for DPLS to file a registration statement with respect to the Registrable Shares related to the Note was July 26, 2021.  (FAC ¶ 49 n.14.)  DPLS failed to do so, and in fact has still not filed a registration statement with respect to such shares nor has any such registration statement been declared effective.  FAC ¶ 49 n.14; Decl. ¶ 8.)

A-411

Second, DPLS entered into a series of transactions with GHS Investments, LLC ("GHS") that constituted Events of Default. On August 19, 2021, DPLS entered into a purchase agreement (the "August GHS Agreement") granting DPLS the right to sell to GHS up to $45,000,000 of shares of DPLS common stock at variable rates from time to time at DPLS's discretion. (Decl. Ex. A, Prospectus at 21.) Then again, on November 9, 2021, DPLS entered into a second purchase agreement (the "November GHS Agreement" and, together with the August GHS Agreement, the "GHS Agreements") with GHS granting DPLS the right to sell to GHS up to an additional $30,000,000 of shares of DPLS common stock at variable rates from time to time at DPLS's discretion. (*Id.* at 15.) DPLS issued shares of DPLS common stock to GHS pursuant to the August GHS Agreement on at least five closings between August 19, 2021 and October 14, 2021. (*Id.* at 21–22.) The GHS Agreements are equity lines of credit and Variable Rate Transactions under the 2021 Note. Accordingly, the issuance of shares of DPLS common stock pursuant to the GHS Agreements triggered an Event of Default under the 2021 Note. (FAC Ex. 2 at 15.)

### E. The Conversion and the Dispute.

On November 15, 2021, consistent with the procedure specified in the 2021 Note,[3] Nick Fireman, an officer of FirstFire, emailed DPLS CEO Dennis O'Leary, at his darkpulse.com email address, a copy of a notice of conversion (the "Notice of Conversion") whereby FirstFire elected to convert the $825,000 principal and $61,875 of interest outstanding on the 2021 Note into 177,375,000 shares of DPLS common stock. Because of DPLS's defaults, FirstFire's calculations relied on the Default Fixed Conversion Price of $0.005 per share. (FAC ¶¶ 48–49.) On November 17, 2021, again in accordance with the 2021 Note, FirstFire submitted the same Notice of

---

[3] Section 1.4(a) of the 2021 Note provides that "[t]his Note may be converted by the Holder in whole or in part, on any Trading Day, while any amounts are outstanding hereunder, by submitting to the Borrower or Borrower's transfer agent a Notice of Conversion." (FAC Ex. 2 at 5.)

Conversion, along with a legal opinion and related materials, to the Transfer Agent, and the Transfer Agent confirmed the issuance of the shares of DPLS common stock later the same day. (*Id.* ¶ 49.) DPLS initially objected only to the total *amount* of the converted shares on the 2021 Note, arguing that it had not defaulted. (*Id.* ¶ 49 & n.15.) Later, when it filed this action, DPLS argued for the first time that both the 2018 and 2021 Notes should be rescinded entirely. (Dkt. No. 1.)

### F.     Procedural History.

After DPLS disputed FirstFire's conversion of the 2021 Note, FirstFire filed an action in the Delaware Chancery Court seeking, *inter alia*, declaratory judgment that FirstFire's conversion was appropriate. (FAC ¶ 49 n.15.)[4] In response, DPLS filed this action on December 31, 2021, and sought both a temporary restraining order and a preliminary injunction, both of which the Court denied. (Dkt. No. 14.)

On March 14, 2022, Defendants filed a pre-motion to dismiss letter. (Dkt. No. 26.) DPLS countered on March 17, 2022 requesting leave to file an amended complaint. (Dkt. No. 28.) At the pre-motion conference on April 14, 2022, Defendants agreed to DPLS's request to file an amended complaint, which DPLS filed on May 5, 2022. (Dkt. No. 29.) The FAC asserts six causes of action, including counts (i), (ii), and (iii) that allege FirstFire operated as an unregistered securities dealer controlled by Mr. Fireman; (iv) civil RICO; (v) unjust enrichment; and (vi) constructive trust. Defendants now move to dismiss all Counts of the First Amended Complaint pursuant to Federal Rules of Civil Procedure 12(b)(1), 12(b)(3), and 12(b)(6).

### ARGUMENT

---

[4] On March 14, 2022, FirstFire voluntarily dismissed the Delaware action without prejudice, *FirstFire Global Opportunities Fund LLC v. DarkPulse, Inc.*, C.A. No. 2021-1082-LWW (Del. Ch.), Dkt. No. 33, after having defeated DPLS's motion for a preliminary injunction and having sold the relevant DPLS common shares it desired to sell from its partial conversion of the 2021 Note.

A-413

## I.   PLAINTIFF CANNOT AVOID ITS AGREEMENT TO DESIGNATE DELAWARE AS THE FORUM FOR ALL DISPUTES AS TO THE 2021 NOTE.

### A.   The Exclusive Forum Provision in the 2021 Note Is Enforceable.

As a threshold matter, Counts I and II (to the extent related to the 2021 Note) must be dismissed because the parties have agreed that Delaware is the exclusive forum for all actions arising under its terms.  Through the Amendment, DPLS agreed that "[a]ny action brought by either party against the other concerning the transactions contemplated by this [amendment], the [2021] Note, the Warrant, or any other agreement . . . shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware."  (Decl. Ex. F at 1, Amendment ¶ 2.)  Indeed, in denying the preliminary injunction, the Court held that the "forum selection clause is presumptively enforceable, and thus this action is not properly before this Court."  (Tr. at 43:22–25.)

The Second Circuit has a "strong policy of enforcing forum selection agreements."  *Weiss v. Columbia Pictures Television, Inc.*, 801 F. Supp. 1276, 1280 (S.D.N.Y. 1992).  "Courts analyzing a contractual forum selection clause must first ask:  (1) whether the clause was reasonably communicated to the party resisting enforcement; (2) whether the clause is mandatory or permissive, *i.e.*, whether the parties are required to bring any dispute to the designated forum or simply permitted to do so; and (3) whether the claims and parties involved in the suit are subject to the forum selection clause."  *Power Up Lending Grp., Ltd. v. All. Bioenergy Plus, Inc.*, 2021 WL 4463921, at *5 (E.D.N.Y. Aug. 17, 2021), *R. & R. adopted*, 2021 WL 4463494 (E.D.N.Y. Sept. 29, 2021).  Where the forum-selection clause was communicated to the non-moving party and covers "the claims and parties involved in the dispute," it is presumptively enforceable" unless the moving party makes "a sufficiently strong showing that enforcement would be unreasonable

**A-414**

or unjust, . . . that the clause was invalid for such reasons as fraud or overreaching," or that the "clause[] contravene[s] a strong public policy of the forum state." *Id.* at *5, 8.[5]

First, the existence of the forum-selection clause was communicated to DPLS. DPLS admits that Mr. "Fireman presented [DPLS CEO Mr.] O'Leary with a one-page amendment to the April 2021 Note." (FAC ¶ 46). Although DPLS alleges its CEO lacked information about the forum-selection change (*id.* ¶ 47), that change is apparent on the face of the document, highlighted with a bolded and underlined heading, "**Governing Law; Venue**." Moreover, the Court previously held that DPLS "cannot reasonably contest that the forum selection clause was communicated to it" (Tr. at 44:8–12). Second, the relevant language is mandatory: actions "concerning the transactions contemplated by" the 2021 Note and SPA "shall be brought only in the state courts of Delaware or in the federal courts located in the state of Delaware." (Decl. Ex. F at 1, Amendment ¶ 2); *Power Up*, 2021 WL 4463921, at *6. Third, the forum-selection clause governs the parties and the claims at issue in this action to the extent it arises out of the 2021 Note and SPA. (Tr. at 44:16–20 (holding the forum-selection clause "covers this action").) Thus, the forum-selection clause is presumptively enforceable.

**B.      Enforcement of the Forum Provision Would Not Be Unreasonable or Unjust.**

There is also no realistic argument that enforcing the forum-selection clause would be unreasonable, unjust, or violate a fundamental policy. DPLS is a sophisticated party, and Mr. O'Leary a sophisticated businessman, with previous experience negotiating contracts containing forum-selection clauses. (*See* FAC ¶ 40.) This Court agreed, noting that "Mr. O'Leary, . . . as CEO of the company, was sufficiently sophisticated to understand" the Amendment. (Tr. at 44:8–

---

[5] Where, as here, this action arises under federal law, the "enforceability of the forum selection clause is governed by federal common law" and matters of interpretation are "governed by the parties' chosen body of law." *Zeta Glob. Corp. v. Maropost Mktg. Cloud, Inc.*, 2021 WL 1668134, at *2 (S.D.N.Y. Apr. 28, 2021).

12.)   DPLS alleges that Mr. "Fireman failed to mention to [Mr.] O'Leary that the amendment . . . replaced the choice of law provision." (FAC ¶ 47.)  Even if true (which it is not), Mr. Fireman was not required to explain in detail the contents of the Amendment to Mr. O'Leary in order for the Amendment to be enforceable. *Leasing Serv. Corp. v. Graham*, 646 F. Supp. 1410, 1415 (S.D.N.Y. 1986) ("If [a businessman] did not read [a contract's terms] or hire counsel to do so, he is the victim of his own lack of diligence, not [Defendants'] misconduct.").  "Moreover, [there is] evidence in the record that [Mr. O'Leary] also had the advice of counsel at the time that he signed it." (Tr. at 44:13–14.)  In short, because DPLS cannot meet its burden to show that the Amendment was unfair or obtained fraudulently, the forum-selection clause is valid and enforceable as to all of DPLS's claims relating to the 2021 Note. *See Cottonwood Holdings, Inc. v. C3, Inc.*, 1995 WL 276196, at *3–4 (S.D.N.Y. May 11, 1995).

Instead, DPLS argues that the Amendment is invalid as the 2021 Note is "void *ab initio*" and "any subsequent amendments . . . are a nullity."[6] (FAC ¶ 78.)  DPLS also raised this argument when it sought a preliminary injunction, to no avail.  (Dkt. No. 22 at 3–5; Tr. at 43:23–44:20.)  New York law explicitly prohibits corporations from raising usury as a defense.  N.Y. GOL § 5-521(1).  There is a single exception that permits a corporation to bring criminal usury as a defense when the rate of interest exceeds 25% per year.  N.Y. GOL § 5-521(3); N.Y. Penal Law § 190.40.  However, this statutory exception "is strictly an affirmative defense to an action seeking repayment of a loan and may not . . . be employed as a means to effect recovery by the corporate borrower." *Intima-Eighteen, Inc. v. A.H. Schreiber Co., Inc.*, 568 N.Y.S.2d 802, 804 (1st Dep't 1991); *see also LG Funding, LLC v. United Senior Props. of Olathe, LLC*, 122 N.Y.S.3d 309, 313 (2d Dep't 2020) ("[T]he defendants may assert criminal usury as an affirmative defense, they may not assert

---

[6] DPLS additionally ignores that the effective date of the Amendment was retroactive to the date of the Note. (Decl. Ex. F at 2.)

9

criminal usury as the basis for a counterclaim."); *cf. Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 335 (2021) ("[U]sury is an affirmative defense . . . ."). This is not an action to collect on the Notes and DPLS may not use usury law to avoid a valid forum-selection clause.

To the extent DPLS argues that enforcement would violate a strong public policy of the forum state, this is equally unavailing. New York courts have found such rights as anti-discrimination laws and human rights to be fundamental, whereas preventing usurious transactions between sophisticated corporate entities who both routinely enter into convertible notes, are not. *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 542 (S.D.N.Y. 2020). Here, where the parties are both corporations well-versed in promissory notes and securities purchase agreements, New York's usury law does not represent a fundamental public policy. In analyzing a choice-of-law provision, the Second Circuit recently identified a "longstanding public policy in New York in favor of enforcing its usury laws to protect those of its residents who enter into consumer debt contracts," but distinguished cases involving corporate borrowers—"the antithesis of the type of needy and unsophisticated consumers both at issue here and of concern to the New York Court of Appeals." *United States v. Moseley*, 980 F.3d 9, 22 (2d Cir. 2020). In *Moseley*, the Second Circuit instructed that "when courts determine whether New York would enforce choice-of-law provisions set out in a contract, corporations conducting their business transactions should be treated differently from individual consumers seeking personal credit" and affirmed the line of cases in this Circuit that rejected applying the public policy exception to choice-of-law provisions between two corporations. *Id.*; *RMP Cap. Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 186 (E.D.N.Y. 2014); *Bentley v. Providian Fin. Corp.*, 2003 WL 22234700, at *3 (S.D.N.Y. Apr. 21, 2003); *Superior Funding Corp. v. Big Apple Cap. Corp.*, 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990). As usury cannot be used affirmatively as DPLS suggests and the enforcement of the forum-selection

clause does not violate a public policy of New York, DPLS has identified no reason to avoid enforcement, the claims related to the 2021 Note must be dismissed.

## II.     PLAINTIFF'S EXCHANGE ACT CLAIMS (COUNTS I–III) ARE MERITLESS.

### C.     Plaintiff's Claims Are Time-Barred as to the September 2018 Note.

To the extent they are based on the 2018 Note, Counts I–III of the Complaint are time barred. A statute of limitations defense may be decided on a Rule 12(b)(6) motion "if the defense appears on the face of the complaint." *Thea v. Kleinhandler*, 807 F.3d 492, 501 (2d Cir. 2015). A Section 29(b) action must be brought within "one year after the discovery that [a] sale or purchase involves [a violation of Section 15(a)] and within three years after such violation." 15 U.S.C. § 78cc(b). While the three-year statute of limitations begins to run at the time of violation, *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1041–2 (2d Cir. 1992), *cert. denied*, 506 U.S. 986 (1992), the one-year statute of limitation runs from the "time when an individual could have, through the exercise of reasonable diligence, discovered the fraud at issue," *Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216 F. Supp. 3d 403, 408 (S.D.N.Y. 2016). Because the same "statute[] of limitations that appl[ies] to primary claims under the 1933 and 1934 Acts also apply to control person claims," the Section 20(a) claim against Mr. Fireman as it relates to the 2018 Note must be dismissed as well. *In re Bibox Grp. Holdings Ltd. Sec. Litig.*, 534 F. Supp. 3d 326, 338 n.4 (S.D.N.Y. 2021).

Plaintiff's claim is barred by the three-year statute of limitations, which began to run from the date of the alleged wrong, rather than the date of the discovery of the wrong. *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d at 1039 (applying Section 29(b)'s statute of limitations to a claim for violations under the "almost identical" Investment Advisers Act and holding the statute began to run on the date the agreement was signed). Here, the statute began to run on September 20, 2018 and Plaintiff did not file this claim until December 31, 2021. (FAC ¶ 2 n.4; *id.* Ex. 1 at 2,

11

25; Dkt. No. 1.) Having failed to file within three years of the date of execution, Plaintiff's claims are time-barred. *See Hottinger v. Amcoal Energy Corp.*, 1992 WL 349851, at *6 (S.D.N.Y. Nov. 10, 1992) (holding plaintiff's claim barred after three years from the "execution of a promissory note and accompanying investment documents"); *Kahn*, 970 F.2d at 1040.

Even if Plaintiff could get around this unequivocal bar, DPLS's claims are also barred by the one-year statute of limitations. To determine when this statute began to run, courts look at when "plaintiff learns of the critical facts that he has been hurt and who has inflicted the injury." *JD Anderson v. Binance*, 2022 WL 976824, at *3 (S.D.N.Y. Mar. 31, 2022). Plaintiff admits that it could have easily discovered the facts underlying Counts I–III—*i.e.*, FirstFire's registrations status—at the time of the execution of the 2018 Note. (Dkt. No. 28 at 2 ("[I]t may have been easy to discover FirstFire's registration status . . . .").) DPLS claims that the execution of the 2018 Note constituted an unlawful purchase of a security (FAC ¶ 95), meaning that its execution would be the first alleged "sale or purchase involve[ing] [a] violation," 15 U.S.C. § 78cc. However, even if the first conversion is the relevant transaction, this case is time-barred as of June 7, 2020, more than a year before DPLS filed this action. (FAC ¶ 32.) DPLS through the exercise of "reasonable diligence" could have discovered the alleged violation in September of 2018 and failed to file its claim within one year.

**D.     The Notes Did Not Involve a Prohibited Transaction.**

DPLS contends that the Notes should be rescinded because it claims that FirstFire was acting an unregistered securities dealer. (*E.g.*, FAC ¶¶ 99, 109.) This argument is unavailing. To establish a violation of Section 29(b), Plaintiff must show that "(1) the contract involved a prohibited transaction, (2) he is in contractual privity with the defendant, and (3) he is in the class of persons the Act was designed to protect." *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 1177801, at *2 (Mar. 29, 2021). "[O]nly unlawful contracts may be rescinded, not unlawful

12

transactions made pursuant to lawful contracts."  *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y. 1981), *aff'd*, 672 F.2d 901 (2d Cir. 1981).  As neither Note required FirstFire to act as a "dealer," DPLS's Section 29(b) claims fail.

Accordingly, in denying Plaintiff's motion for a preliminary injunction the Court held that DPLS was unlikely to succeed on the merits of these claims as its "theory that the April 2021 note is invalid under section 29(b) of the Securities Exchange Act because FirstFire was acting as an unregistered broker dealer has already been rejected by two courts in this district."  (Tr. at 45:6–15 (citing *LG Cap. Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018), and *EMA Fin., LLC v. Vystar Corp., Inc.*, 2021 WL 1177801, at *2 (Mar. 29, 2021), *reconsideration denied*, 2021 WL 5998411 (S.D.N.Y. Dec. 20, 2021))); *see also EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020); *Tanzanian Royalty Exploration Corp. v. Crede CG III, Ltd.*, 2019 WL 1368570, at *13 (S.D.N.Y. Mar. 26, 2019); *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4–5 (S.D.N.Y. Aug. 7, 2014); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011).  While the motion for a preliminary injunction only involved the 2021 Note, the Court's reasoning and this Circuit's precedent apply with equal force to the 2018 Note, which also did not require FirstFire to act as an unregistered broker-dealer. (FAC Ex. 1.)  Counts I–II should be dismissed as Plaintiff has repeatedly failed to cite any case law in this circuit that support its Section 29(b) claims.[7]

**E.     FirstFire Is Not a Dealer Within the Meaning of the Exchange Act.**

Even if DPLS's claims could survive this first hurdle, FirstFire does not remotely meet the definition of a "dealer" within the Exchange Act.  Pursuant to Section 3(a)(5)(A), "[t]he term

---

[7] Plaintiff instead persistently argues this Court should reject these precedents as "wrong" or "incorrectly decided," effectively admitting the case law supports Defendants' position.  (Dkt. No. 22 at 6; Dkt. No. 28 at 3.)  However, DPLS fails to provide any compelling reason to deviate from the overwhelming case law consistently holding the same thing—a Section 29(b) claim cannot lie where the contract is not illegal on its face.

'dealer' means any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A). A "trader" by contrast, for which there is an exception from the definition of dealer, is a party who "buys and sells securities for his or her own account, either individually or in a fiduciary capacity, but not as part of a regular business." S.E.C., Guide to Broker-Dealer Registration (Apr. 2008). An entity may meet the definition of a dealer by, among other things, underwriting or acting as a "market maker" for securities. *Id.*

FirstFire engages in none of these activities and the FAC is devoid of any allegations to the contrary. While DPLS claims that Defendants "sold more than 1 billion newly-issued shares of stock obtained from those notes into the public market," the FAC does not describe even a single stock sale. (FAC ¶ 66.) Rather, the FAC shows that out of $34 million in principal loaned to various issuers, FirstFire converted only $1.4 million or 4% of the total amount loaned. (FAC Ex. 3 at 8.) This is a far cry from "buying and selling securities" as part of its regular business, but rather clearly shows that FirstFire acts as a trader. *Found. Ventures, LLC v. F2G, Ltd.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010) ("[T]he record here does not indicate that [defendant] regularly engages in securities transactions."). Rather than FirstFire buying and selling DPLS stock to "make a market," DPLS *hired and paid a registered broker-dealer* to engage FirstFire to enter into the 2021 Note. (Decl. Ex. G, DarkPulse, Inc., Current Report (Form 8-K) (May 5, 2021) at 2.) Moreover, in Section 3.e of the 2021 SPA, DPLS represents and warrants to FirstFire that "so long as any amount on the [2021] Note remains outstanding, the Company shall not to any person, institution, governmental or other entity, state, claim, allege, or in any way assert, that [FirstFire] is currently, or ever has been a broker-dealer under the Securities Exchange Act of

1934." (FAC Ex. 2 at 27.)  FirstFire was not acting as an unregistered dealer in violation of Section 15(a).[8]

**F.      The Complaint Fails to Allege Control Person Liability.**

Plaintiff has failed to plead a violation of Section 20(a) against Mr. Fireman.  To state a claim under Section 20(a), a plaintiff must plead "(1) a primary violation by a controlled person; (2) control of the primary violator by the defendant; and (3) that the controlling person was in some meaningful sense a culpable participant in the primary violation."  *Lapin v. Goldman Sachs Grp., Inc.*, 506 F. Supp. 2d 221, 244 (S.D.N.Y. 2006).  As an initial matter, DPLS does not specify whether it alleges the primary violation is a Section 29(b) violation or a Section 15(a) violation. (*See* FAC ¶¶ 111–14.)  Either way, Count III must be dismissed as Plaintiff has failed to allege an underlying Exchange Act violation.  *Lapin*, 506 F. Supp. 2d at 245–6; §§ II.A–C, *supra*.

DPLS has furthermore failed to allege that Mr. Fireman controlled the "primary violator." *Lapin*, 506 F. Supp. 2d at 244–5.  DPLS alleges that Mr. Fireman is a managing member of FirstFire Capital Management, LLC, which is a managing member of FirstFire.  (FAC ¶ 23.) DPLS then states conclusorily that Mr. Fireman "possessed and exercised the ultimate decision-making and control over FirstFire" due to his position at FirstFire Capital Management, LLC.  (*Id.* ¶¶ 23, 87.)  Section 20(a) does not extend to "tertiary liability," meaning control over one entity that then allegedly has control over another.  *Fezzani v. Bear, Stearns & Co., Inc.*, 384 F. Supp. 2d 618, 646 n.10 (S.D.N.Y. 2004).  Count III must be dismissed.[9]

---

[8] While DPLS brings a separate count (Count II) arguing that the contracts as performed violate federal securities laws, as stated above under Section 29(b), "only unlawful *contracts* may be rescinded, not unlawful *transactions* made pursuant to *lawful* contracts."  *Pompano-Windy City Partners, Ltd. v. Bear Sterns & Co., Inc.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992).  As the contract is not in violation of federal securities law, the transactions as performed are not either.

[9] DPLS has also failed to plead Mr. Fireman was a "culpable participant" in the primary securities violation.  DPLS has previously argued it does not have to plead scienter for this Section 20(a) violation.  (Dkt. No. 28 at 3.)  However, every provision of the Exchange Act, with one exception not relevant here, "contains a state-of-mind condition

## III. PLAINTIFF'S RICO CLAIM (COUNT IV) FAILS ON EVERY REQUIRED ELEMENT.

Despite the splashy rhetoric in the FAC, DPLS fails to allege *any* element of a RICO claim. In enacting RICO, the legislative purpose was to eliminate "the infiltration of organized crime and racketeering into legitimate organizations." *Att'y Gen. of Can. v. R.J. Reynolds Tobacco Holdings, Inc.*, 268 F.3d 103, 107 (2d Cir. 2001). Yet in recent years, plaintiffs have attempted to turn "garden variety . . . claims" into civil RICO actions because of "the allure of treble damages, attorney's fees, and federal jurisdiction." *Rosenson v. Mordowitz*, 2012 WL 3631308, at *4 (S.D.N.Y. Aug. 23, 2012); *see also Gross v. Waywell*, 628 F. Supp. 2d 475, 479 (S.D.N.Y. 2009) (surveying civil RICO cases and finding a success rate of 2%). As a result, "plaintiffs wielding RICO almost always miss the mark," *Moss v. BMO Harris Bank, N.A.*, 258 F. Supp. 3d 289, 297 (E.D.N.Y. 2017). The same is true here.

RICO prohibits "any person employed by or associated with any enterprise . . . to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." 18 U.S.C. § 1962(c). Where, as here, a plaintiff bases its RICO claim on the collection of an unlawful debt, "a plaintiff must allege that (1) the debt was unenforceable in whole or in part because of state or federal laws relating to usury, (2) the debt was incurred in connection with the business of lending money . . . at a [usurious] rate, and (3) the usurious rate was at least twice the enforceable rate." *Dae Hyuk Kwon v. Santander Consumer USA*, 742 F. App'x 537, 539 (2d Cir. 2018). The statute further requires that "the 'unlawful debt' be incurred in connection with an illegal 'business.'" *Wade Park Land Holdings, LLC v. Kalikow*, 2022 WL 657664, at *23 (S.D.N.Y. Mar. 4, 2022). A plaintiff must also show

---

requiring something more than negligence." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 209 n.28 (1976). Having failed to allege *any* scienter, Count III additionally fails.

16

that the alleged unlawful debt was the "proximate cause" of its injury, which requires "some direct relation between the injury asserted and the injurious conduct alleged." *Petroff Amshen LLP v. Afta Rehab PT PC*, 2022 WL 480475, at *2 (2d Cir. 2022). Each required element must be alleged "as to each individual defendant," rather than relying on the "collective activities of the members of the enterprise." *DeFalco v. Bernas*, 244 F.3d 286, 306 (2d Cir. 2001).

**G.     Plaintiffs Have Not Alleged a "Person" Distinct from an Enterprise.**

While DPLS brings this Count against all Defendants (FAC ¶ 123), an entity cannot be both the alleged "enterprise"[10] and the liable "person."[11] It is well-settled that "the plain language and purpose of the statute contemplate that a <u>person</u> violates the statute by conducting an <u>enterprise</u> through a pattern of criminality, so a corporate person cannot violate the statute by corrupting itself." *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017) (emphasis in original); *Riverwoods Chappaqua Corp. v. Marine Midland Bank, N.A.*, 30 F.3d 339, 344 (2d Cir. 1994).

Here, Plaintiff alleges that FirstFire is the "enterprise" within the meaning of RICO (FAC ¶ 9), and as a result, FirstFire cannot also be the "person" liable under Section 1962(c). Furthermore, as "[c]orporations can only act through their agents . . . a plaintiff may not circumvent the distinctness requirement by alleging a RICO enterprise that consists merely of a corporate defendant associated with its own employees or agents carrying on the regular affairs of the defendant." *Lynn v. McCormick*, 760 F. App'x 51, 53 (2d Cir. 2019). While DPLS provides the Court with the legal conclusion that FirstFire is "an 'enterprise' within the meaning of RICO" (FAC ¶ 118), the FAC alleges the elements of RICO only as to FirstFire, not Mr. Fireman. (*Id.* ¶¶ 70–86); *Lynn v. McCormick*, 2017 WL 6507112, at *5–6 (S.D.N.Y. Dec. 18, 2017) (holding

---

[10] An "enterprise" is defined as "includ[ing] any individual, partnership, corporation, association, or other legal entity, and any union or group of individuals associated in fact although not a legal entity." 18 U.S.C. § 1961(4).

[11] A "person" is defined as "includ[ing] any individual or entity capable of holding a legal or beneficial interest in property." 18 U.S.C. § 1961(3).

A-424

each element of RICO must be alleged as to each defendant), *aff'd*, 760 F. App'x 51 (2d Cir. 2019).

Allowing a civil RICO claim to proceed against Mr. Fireman, the only "person" alleged that is a distinct entity from the "enterprise," would permit Plaintiff a backdoor around this distinctness requirement.  Count IV against must be dismissed on this basis alone.

**H.    DPLS Has Not Shown Any "Unlawful Debt."**

While a RICO offense "may be predicated on a single instance of collection of an unlawful debt . . . the statute does not reach the collection of a loan that is made occasionally and not as part of the business of lending money at a usurious rate." *Wade Park Land Holdings, LLC*, 2022 WL 657664, at *23.  This provision of RICO is aimed at "the evils of loan sharking" and thus excludes "occasional usurious transactions by one not in the business of loan sharking." *Id.*  Other than conclusory, non-descript allegations regarding FirstFire's business (FAC ¶¶ 71, 120), DPLS alleges that the Notes constituted collections of unlawful debt under RICO (*id.* ¶ 72).  Without any regard to the Notes' choice-of-law provisions, DPLS argues that the Notes constitute the collection of an unlawful debt as they violate New York usury law.  (*Id.* ¶¶ 71–74, 77.)  This claim fails as New York law does not apply to either Note.  DPLS additionally fails to allege that Defendants are engaged in the business of lending money at a usurious rate—at best, DPLS has alleged a legitimate business that engages in "occasional usurious transactions by one not in the business of loan sharking." *Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).

(i)    *New York Law Does Not Apply to Either Note.*

DPLS argues that the Notes constitute collections of unlawful debt because they both are governed by and violate New York usury laws.  (FAC ¶¶ 74–77.)[12]  Neither Note is governed by

---

[12] DPLS cites one case, not from this Court, in support of this proposition.  (FAC ¶ 77 & n.18 (citing *Power Up Lending Grp., Ltd. v. Cardinal Energy Group, Inc.*, 2019 WL 1473090, at *5 (E.D.N.Y. Apr. 3, 2019)).)  As this Court

18

New York law.  The 2018 Note is governed by Nevada law (*id.* Ex. 1 at 16) and the 2021 Note is governed by Delaware law (Decl. Ex. F at 1; Part I, *supra*).  Neither of these jurisdictions have usury laws.  *See* Del. Code Ann. tit. 6, §§ 2301(c), 2304(a), 2306; NRS 99.050.  Courts "generally enforce choice-of-law clauses" in line with the well-settled principle that "contracts should be interpreted so as to effectuate the parties' intent." *Ministers & Missionaries Ben. Bd. v. Snow*, 26 N.Y.3d 466, 470 (2015).  The Notes each additionally include provisions that the laws of these states shall apply "without regard to principles of conflicts of laws." (FAC Ex. 1 at 16; Decl. Ex. F at 1); *see Ministers & Missionaries*, 26 N.Y.3d at 474 ("New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract . . . .").

New York courts will only disregard these clear choice-of-law provisions upon a showing that:  (1) the chosen state has no reasonable connection to the parties or the contract, (2) the agreement was obtained through fraud, or (3) the chosen state's law violates a fundamental public policy of New York. *NFusz, Inc.*, 444 F. Supp. 3d at 540.  As explained in Section I.B, *supra*, the 2021 Note's choice-of-law provision was not procured by fraud, the parties have a reasonable relationship to Delaware, and Delaware's law does not violate a fundamental public policy of New York.  While the FAC's allegations regarding the 2018 Note are sparse, DPLS has made no allegation that the 2018 Note was in any way procured by fraud, the parties have in the past met and negotiated in Nevada (FAC ¶ 46),[13] and Nevada law is not violative of a fundamental policy of New York for the same reasons explained in Section I.B, *supra*.  Therefore, nothing supports the Court's application of New York law to the Notes.

---

stated recently, that case did not involve a borrower "avoiding the laws of its own state of incorporation." *NFusz, Inc.*, 444 F. Supp. 3d at 541.  Here, DPLS tries to do exactly that.

[13] Multiple promissory notes that DPLS entered into around this time had a Nevada choice-of-law clause.  (Decl. Ex. C, DarkPulse, Inc., Form 10-K Ex. 99.5 at 10; *id.* Ex. 10.2 at 16; *id.* Ex. 4.1 at 9.)

In addition, DPLS has alleged *no* connection to the State of New York and yet attempts to invoke the protection of its usury laws.  In evaluating whether a state has a reasonable relationship to the parties or a transaction, courts look at "the places of negotiation and performance; the location of the subject matter; and the domicile or place of business of the contracting parties." *Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.S.2d 309, 317 (1994).  The FAC is bare of allegations of the "places of negotiation and performance," outside of alleging that the Amendment was negotiated in Nevada.  (FAC ¶ 46.)  As to the domicile of the parties, this too works against DPLS.  At the time of the execution of the 2018 Note, DPLS was incorporated in Delaware and headquartered in Virginia.  (FAC ¶ 17 n.8; *id.* Ex. 1 at 15, 25.)[14]  While DPLS now alleges that its principal place of business is in New York (*id.* ¶ 17), it announced that, as of March 1, 2022, its "national headquarters" is located in Houston, Texas.  (Decl. Ex. H, DarkPulse, Inc., Current Report (Form 8-K) (Feb. 7, 2022) at 2); *cf. Hertz Corp. v. Friend*, 559 U.S. 77, 81, 92 (2010) (holding a corporation's principal place of business is the corporation's "nerve center," which will "typically be found at a corporation's headquarters").  In between Virginia and Texas, despite the New York addresses listed on its filings with the SEC[15] (which appear to be either temporary or solely mailing addresses),[16] DPLS listed no major lease or headquarters in the United

---

[14] Should the Court determine that Nevada does not have a reasonable relationship to the 2018 Note, Delaware law should apply as both parties are incorporated there.  Even if Virginia law applied, where DPLS was headquartered at the time, Virginia does not have usury laws for corporations.  Va. Code Ann. § 6.2-308 (2010).

[15] The Supreme Court in *Hertz Corp.* explicitly rejected "that the mere filing of a form like the Securities and Exchange Commission's Form 10-K listing a corporation's 'principal executive offices' would, without more, be sufficient proof to establish a corporation's 'nerve center'" as "[s]uch possibilities would readily permit jurisdictional manipulation." 559 U.S. at 97.

[16] DPLS first reported a New York address in its SEC filings on November 19, 2018, as "350 5th Avenue, 59th Floor." (Decl. Ex. M, DarkPulse, Inc., Amended Current Report (Form 8-K/A) (Nov. 19, 2018) at 1.)  In its Form 10-K filed on June 8, 2020, DPLS listed its address as "225 West 34th Street, 9th Floor."  (Decl. Ex. N, DarkPulse, Inc., Form 10-K (June 8, 2020) at 1.)  A few months later, DPLS's address was reported as "1345 Avenue of the Americas, 2nd Floor," an address which it still claims today.  (Decl. Ex. O, DarkPulse, Inc., Form 10-Q (Nov. 13, 2020) at 1.)  Each of these addresses belongs to Virgo Business Centers, which, according to its website, provides "shared office space, coworking space and meeting rooms."  Virgo Business Centers, https://www.virgobc.com/midtown/ (last visited May 26, 2022) (listing address at "1345 Avenue of the Americas 2nd and 33rd Floors"); *see also* Summons ¶¶ 10–11, *Virgo Penn Business Centers LLC v. Williamsport Holdings LLC*, 2020 WL 5576690 (N.Y. Sup. Ct. Sept. 16, 2020) (listing

States other than a manufacturing and engineering facility in Tempe, Arizona beginning in April 2021.[17] (Decl. Ex. I, DarkPulse, Inc., Current Report (Form 8-K) (Feb. 8, 2021).) While DPLS is authorized to do business in Texas (Decl. Ex. J at 1) and filed a name reservation for "DarkPulse" in February 2021, listing an address in Scottsdale, Arizona (Decl. Ex. K at 1), there is no record of DPLS having ever applied or been registered to do business in New York (Decl. Ex. L). DPLS, without any tie to New York, attempts to "avoid[] the laws of its own state of incorporation," and instead achieve a windfall due to the laws of a state in which it is not headquartered and is not registered to conduct business. *NFusz, Inc.*, 444 F. Supp. 3d at 541.[18]

  (ii) *Even if New York Law Applies, DPLS's Claim Fails.*

  Even assuming New York law applies, the Notes are not usurious. As DPLS acknowledges, both Notes state interest rates on their face well below New York's criminal usury rate. (FAC ¶ 79.) To calculate the interest rate, DPLS added the stated interest rates, the original issue discounts, and the "conversion discount rates." (*Id.* ¶ 79 nn.20–21.) As to the 2018 Note, even assuming *arguendo* that DPLS's method of calculating interest is correct, the interest rate is less than twice the maximum rate of 25% and is not an "unlawful debt" under RICO.[19] (FAC ¶ 77); *Dae Hyuk Kwon*, 742 F. App'x at 539.

  As to the 2021 Note, DPLS incorrectly includes the fixed default discount and the so-called "commitment shares" in its calculation of the interest rate and fails to allege usurious intent. The

---

the address for Virgo Business Centers' "temporary . . . mail delivery . . . [and] co-working space" as "the 9th Floor of 225 West 34th Street").

[17] Arizona law additionally permits parties to contract for any rate of interest without violating usury laws. A.R.S. § 44-1201(A).

[18] Furthermore, DPLS's argument leads to absurd results: if New York usury law applies to every contract alleged to charge a usurious rate, regardless of a contract's choice-of-law provision, then New York's usury law through RICO is now federal usury law. This would permit DPLS to recover treble damages on the 20 promissory notes it has executed over the last few years, an unwarranted windfall to an entity well-versed in the terms of such agreements.

[19] Despite acknowledging the 2018 Note contained a "discount of . . . 30% to market," (FAC ¶ 75), DPLS inexplicably applies a "43% conversion discount rate" to calculate an "annualized interest rate" of 61% (*id.* ¶ 79 n.21). Perhaps because when 30% is added to the 8% stated discount rate and the 10% original issue discount, the rate is below twice the New York usury rate.

defense of usury does not apply where the terms of a note impose a rate of interest "in excess of the statutory maximum *only after default*." *Beaufort Cap. Partners LLC v. Oxysure Sys., Inc.*, 2017 WL 913791, at \*3 (S.D.N.Y. Mar. 7, 2017) (collecting cases); *see also 1077 Madison Street, LLC v. Daniels*, 954 F.3d 460, 465 (2d Cir. 2020). Thus the "conversion discount" DPLS used in its interest calculation for the 2021 Note is flawed—the conversion price without DPLS's default would have been $0.015 per share. (FAC Ex. 2 at 4.) This was the average trading price for the week prior to the 2021 Note's execution, meaning that FirstFire bore significant market risk and could expect at most, a very small profit if not a loss from the conversion of the Note. In the case DPLS repeatedly relies on, *Adar Bays*, the Court of Appeals distinguished between fixed-discount conversion and fixed-price conversions, holding that fixed-price conversion options do "not render the loan usurious on its face" and the analysis instead depends on "usurious intent," which DPLS fails to allege. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 338 (2021). Finally, the "commitment shares" were not interest on the loan, but rather an added inducement to convince FirstFire to advance the principal amount. *Chassman v. Shipley*, 695 F. App'x 630, 633 (2d Cir. 2017) (holding where warrants were given to induce the lender they were not "a deposit on the yet unaccrued interest on the loan"). Thus, the Notes do not charge interest at twice the legal rate in New York, and DPLS's RICO claim fails.

Additionally, both Notes have already been converted, thus a usury defense no longer applies. *Union Cap. LLC v. Vape Holdings Inc.*, 2017 WL 1406278, at \*5 (S.D.N.Y. Mar. 31 2017) ("[N]otes with stock conversion provisions likely have the character of an equity investment, and thus are no longer vulnerable to a usury defense once converted."); *Beaufort Cap. Partners LLC v. Oxysure Sys., Inc.*, 2017 WL 913791, at \*3 (S.D.N.Y. Mar. 7, 2017) (same). Thus, the Notes are no longer loans or subject to New York's usury laws.

  (iii) *Plaintiff Fails to Allege FirstFire Is in the Business of Lending at Usurious Rates.*

  While DPLS fails to allege any collection of an "unlawful debt," its RICO claim also fails because the FAC fails to properly plead that FirstFire is in the business of lending at a usurious rate. DPLS makes the conclusory assertion that FirstFire "has made loans to other issuers that also violate New York's usury laws" based on "information and belief." (FAC ¶ 71); *see also Cellucci v. O'Leary*, 2020 WL 977986, at *1 (S.D.N.Y. Feb. 28, 2020) ("Allegations based on 'information and belief' are accepted only if they are non-conclusory and pertain to facts [that] are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the inference of culpability plausible.").[20] While DPLS appears aware of the publicly available information regarding other transactions FirstFire has entered into (FAC Ex. 3), DPLS's bare, unsupported assertion does not properly plead that FirstFire and Mr. Fireman are engaged in the business of lending money at double the legal rate under the applicable law. *Durante Bros. & Sons, Inc.*, 755 F.2d at 250; *Contract Transport Servs., Inc. v. New Era Lending LLC*, 2018 WL 11226077, at *6 (S.D.N.Y. Oct. 26, 2018) (dismissing RICO claim with prejudice for "fail[ing] to specify any other individuals or companies to whom Defendants have lent money or the usurious interest rates attached to any other loans made by Defendants"). That is because it cannot. (*See, e.g.*, Decl. Ex. P, Visium Technologies, Inc., Current Report (Form 8-K) (Jan. 16, 2019), Ex. 10.2 at 21 (governing law is Nevada).)[21]

---

[20] The FAC contains the unsupported allegation that Mr. Fireman "personally negotiated the terms of the convertible notes that FirstFire purchased from microcap companies" and "was and remains the sole person with the power to direct, authorize, and compel FirstFire to enter into, convert, and subsequently sell securities through usurious convertible notes with issuers." (FAC ¶¶ 88–89.)

[21] DPLS has additionally failed to allege any injury that is a proximate cause of FirstFire's or Mr. Fireman's actions. "FirstFire owns a very small percentage of [DPLS] stock, approximately 5 percent" (Tr. at 46:14–17) and so the assertion that its conversions or sales of stock, especially when DPLS has a massive amount of shares outstanding, made DPLS "unable to privately raise money from other entities" (FAC ¶ 84) is unsupported. *Petrof Amshen LLP*, 2022 WL 480475, at *2. DPLS additionally warns its stockholders of dilution due to the GHS Agreements in its filings, not the Notes. (Decl. Ex. A at 14.)

A-430

**IV.    PLAINTIFF'S STATE LAW CLAIMS (COUNTS V-VI) MUST BE DISMISSED.**

Because DPLS fails to state a single federal claim, "the only remaining basis for this Court's subject matter jurisdiction is diversity jurisdiction under 28 U.S.C. § 1332(a)." *Frati v. Salztein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011).  However, the parties are not diverse as both are incorporated in Delaware.  (FAC ¶¶ 17, 19.)  Thus, the Court lacks subject matter jurisdiction over DPLS's remaining state law claims.[22]

DPLS's state law claims also fail on the merits.  Equitable and tort claims are "extra-contractual" and so the Court must conduct a choice-of-law analysis to determine what law applies. *Krock v. Lipsay*, 97 F.3d 640, 645 (2d Cir. 1996).  As to DPLS's claim for unjust enrichment, there is no "actual conflict" between the laws of New York and Delaware.  *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co. Inc.*, 449 F.3d 377, 382, 384 (2d Cir. 2006) (holding the "first step" in a choice-of-law analysis is "to determine whether there is an actual conflict between the laws of the jurisdictions involved" and this analysis of "jurisdictions involved" relies "almost exclusively" on "the parties' domiciles and the locus of the tort"); *FCX Solar, LLC v. FTC Solar, Inc.*, 2022 WL 355606, at *7–8 (S.D.N.Y. Feb. 7, 2022) (holding, as between New York and Delaware law, "[t]here is no material difference between common law unjust enrichment claims").

Count V must be dismissed as, under both New York and Delaware law, where a contract governs the parties' relationship, a party may not bring a claim for unjust enrichment.  *BAE Sys. Info. & Elec. Sys. Integration, Inc. v. Lockheed Martin Corp.*, 2009 WL 264088, at *7 (Del. Ch. Feb. 3, 2009) ("If a contract comprehensively governs the parties' relationship, then it alone must

---

[22] The Court should decline to exercise supplemental jurisdiction over DPLS's state law claims.  *Sadallah v. City of Utica*, 2004 WL 1949416, at *39 (2d Cir. Sept. 3, 2004) ("[B]ecause plaintiffs no longer have any viable federal claim, any remaining state law claims belong in state, rather than federal, court."); *Acklin v. Eichner*, 2021 WL 4442819, at *8 (S.D.N.Y. Sept. 27, 2021) ("[I]f the federal claims are dismissed before trial, . . . the state claims should be dismissed as well.").

24

A-431

provide the measure of the plaintiff's rights and any claim of unjust enrichment will be denied.");

*Sabre Int'l Sec., Ltd. v. Vulcan Cap. Mgmt., Inc.*, 95 A.D.3d 434, 438 (N.Y. App. Div. 2012)

(same); *Clark-Fitzpatrick, Inc. v. Long Island R. Co.*, 70 N.Y.2d 382, 388 (1987) (same);

*Bakerman v. Sidney Frank Importing Co., Inc.*, 2006 WL 3927242, at *18 (Del. Ch. Oct. 10, 2006)

(same).  DPLS's claim is based on FirstFire's alleged unjust enrichment through the conversions

pursuant to the Notes (FAC ¶ 125)—thus, Count V is barred under New York and Delaware law.

As to Count VI, the law of the state of incorporation applies where plaintiff requests a

constructive trust be imposed on shares of a corporation, which here is Delaware. *Moses v. Apple

Hospitality Reit Inc.*, 2015 WL 1014327, at *4 (E.D.N.Y. Mar. 9, 2015).  For the same reasons

Count V fails to state a claim, Count VI fails as a constructive trust is an equitable remedy imposed

"when a defendant's fraudulent, unfair or unconscionable conduct causes them to be unjustly

enriched at the expense of another to whom he owed some duty." *Metro Ambulance, Inc. v.

Eastern Medical Billing, Inc.*, 1995 WL 409015, at *4 (Del. Ch. July 5, 1995).

## CONCLUSION

For the foregoing reasons, Defendants respectfully move this Court to dismiss the First

Amended Complaint with prejudice.


Dated:  May 26, 2022                              */s/ Aaron H. Marks*

                                                 Aaron H. Marks, P.C.
                                                 Byron Pacheco
                                                 Julia D. Harper
                                                 KIRKLAND & ELLIS LLP
                                                 601 Lexington Avenue
                                                 New York, New York 10022
                                                 (212) 446-4800

                                                 *Attorneys for Defendants*

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

DARKPULSE, INC.,

                *Plaintiff,*

    v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

                *Defendants.*

Civil Action No. 1:21-cv-11222-ER

**DARKPULSE, INC.'S MEMORANDUM OF LAW IN OPPOSITION TO**
**DEFENDANTS' MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

**THE BASILE LAW FIRM P.C.**

Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:   (516) 455-1500
Fax:   (631) 498-0748
Email: gus@thebasilelawfirm.com
        eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc.*

A-433

TABLE OF CONTENTS

INTRODUCTION ................................................................................................ 1

STATEMENT OF FACTS .................................................................................. 1

LEGAL STANDARD .......................................................................................... 5

ARGUMENT ....................................................................................................... 6

I.  BECAUSE THE APRIL 2021 TRANSACTION WAS EXPRESSLY GOVERNED BY NEW YORK LAW, AND WAS USURIOUS ON ITS FACE, IT WAS VOID *AB INITIO*, AND DEFENDANTS' ATTEMPT TO AMEND THE APRIL 2021 NOTE WITH DELAWARE LAW AND A DELAWARE FORUM HAD NO EFFECT ....... 6

A.  THE NOTE IMPOSES A CRIMINALLY USURIOUS RATE OF INTEREST ... 6

1.  *Usurious Intent* is Implied Where a Usurious Rate Is Evident From the Face of the Loan. ................................................................................................ 6

2. "Interest" is Broadly Defined in the Usury Statute. ........................................... 7

a.  Interest Includes the Value of Securities Given as Consideration for a Loan. ................................................................................................... 8

b.  *Beaufort* and *Union Capital* are Abrogated by *Adar Bays*. ........................ 8

B.  THE APRIL 2021 NOTE EVIDENCES A LOAN CHARGING IN EXCESS OF THE LEGAL RATE, PROPERLY INCLUDING THE VALUE OF THE "COMMITMENT SHARES" AS INTEREST ....................................................... 8

Criminally Usurious Loans are Void in New York Under *Adar Bays* ............ 10

C.  THE CHOICE OF LAW CLAUSE IN THE SEPTEMBER 2018 NOTE IS UNENFORCEABLE ............................................................................................ 10

The September 2018 Note is Void *Ab Initio* Under New York Law. ............. 13

II.  THE AGREEMENTS INVOLVE A PROHIBITED TRANSACTION BECAUSE THEY REQUIRE AN UNREGISTERED SECURITIES DEALER TO PURCHASE A CONVERTIBLE SECURITY, IN VIOLATION OF § 15(a) ................................. 14

A.  THE PLAIN LANGUAGE OF § 29(b) STATES THAT CONTRACTS ARE VOIDABLE IF EITHER "MADE IN VIOLATION" OF THE EXCHANGE ACT OR IF "PERFORMANCE ... INVOLVES A VIOLATION" OF THE EXCHANGE ACT ......................................................................................... 14

i

1.  Unlike *Vystar*, the Agreements Here Involve Performance that Violates § 15(a) of the Exchange Act, Because the SPAs Obligates FirstFire—an Unlicensed Securities Dealer—to Purchase a Convertible Security ................................. 15

2.  Supreme Court Precedent Affirms Section 29(b) Rescission of Contracts "Made in Violation" of the Exchange Act .................................................................. 17

3.  The Second Circuit Court of Appeals Affirms Section 29(b) Rescission of a Contract "Made in Violation" of the Exchange Act ........................................ 17

4.  The Formation of the Agreements Violated the Exchange Act Because—Under § 15(a)(1)—FirstFire Was Prohibited From Effecting the September 2018 and April 2021 Transactions ............................................................................... 17

III. PLAINTIFF'S § 29(b) CLAIMS ARE NOT TIME-BARRED ................................ 18

FirstFire's Registration Status Would Not Have Alerted DarkPulse to the Violation ........................................................................................................... 20

The Rescission Claim is Timely As to the 2018 Agreement Under the Continuing Violation Doctrine .................................................................... 20

*Kahn v. Kohlberg*'s Continuing Violation Analysis is Not Applicable to this Case .................................................................................................................. 20

IV. DARKPULSE HAS PLED A PLAUSIBLE RICO CLAIM (COUNT IV) ............... 21

A. DarkPulse Has Alleged A RICO "Person" Distinct From the Enterprise ......... 21

B. DarkPulse Has Alleged that FirstFire Collected Upon an Unlawful Debt and is Engaged in the Business of Collecting Unlawful Debts .................................. 22

V. PLAINTIFF'S STATE LAW CLAIMS (COUNTS V-VI) ARE PROPERLY PLED. 24

CONCLUSION ............................................................................................................. 25

A-435

TABLE OF AUTHORITIES

**Cases**

*Adar Bays, LLC v. Genesys ID, Inc.*,
  37 N.Y.3d 320 (N.Y. 2021) ...................................................... 2, 3, 4, 6, 7, 8, 10, 13, 14

*Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*,
  2004 U.S. Dist. LEXIS 6970 (S.D.N.Y. Apr. 23, 2004) ............................................. 11

*Am. E. Grp., LLC v. Livewire Ergogenics, Inc.*,
  2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) ...................................................... 8, 10

*Am. Express Travel Related Servs. Co. v. Assih*,
  893 N.Y.S.2d 438 (Richmond Cnty. 2009) .............................................................. 11

*Angelo v. Brenner*,
  90 A.D.2d 131 (3d Dept. 1982) .................................................................................. 6

*Arista Records, LLC v. Doe 3*,
  604 F3d 110 (2d Cir. 2010) ....................................................................................... 23

*Auctus Fund, LLC, v. Players Network, Inc.*,
  Case No. 20-cv-10766, ECF No. 84 (Order) (D. Mass. Dec.10, 2021) ..................... 20

*Bakhash v. Winston*,
  19 N.Y.S.3d 887 (1st Dept. 2015) ............................................................................. 10

*Band Realty Co. v. N. Brewster, Inc.*,
  335 N.E.2d 316 (N.Y. 1975) ....................................................................................... 8

*Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*,
  692 F.3d 42 (2d Cir. 2012) .......................................................................................... 5

*Beatie and Osborn LLP v. Patriot Scient.fic Corp.*,
  431 F. Supp. 2d 367 (S.D.N.Y. 2006) ....................................................................... 11

*Beaufort Cap.Partners LLC v. Oxysure Sys., Inc.*,
  2017 WL 913791 (S.D.N.Y. Mar. 7, 2017) ................................................................ 8

*Blue Wolf Capital Fund II, LP v. Am. Stevedoring Inc.*,
  105 A.D.3d 178 (1st Dept. 2013) ........................................................................... 4, 7

*Busher v. Barry*,
  2019 U.S. Dist. LEXIS 172754 (S.D.N.Y. 2019) ...................................................... 20

*Cargill, Inc. v. Charles Kowsky Resources, Inc.*,
   949 F.2d 51 (2d Cir. 1991) ...................................................................................... 11

*Case Cash Funding, LLC v. Gilberg*,
   57 N.Y.S.3d 674 (2d Dept. 2017) .............................................................................. 10

*Cent. Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*,
   49 A.D.2d 899 (2d Dept. 1975) ................................................................................ 25

*Chambers v. Time Warner, Inc.*,
   282 F.3d 147 (2d Cir. 2002) ...................................................................................... 5

*Chassman v. Shipley*,
   695 F. App'x 630 (2d Cir. 2017) ................................................................................ 7

*Chechele v. Dundon*,
   850 Fed. Appx. 75 (2d Cir. 2021) ............................................................................. 23

*Clever Ideas, Inc. v. 999 Rest. Corp.*,
   2007 N.Y. Misc. LEXIS 9248 (N.Y. Cnty. Oct. 12, 2007) ......................................... 23

*DeStaso v. Bottiglieri*,
   901 N.Y.S.2d 905 (N.Y. 2009) .................................................................................. 10

*Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*,
   755 F.2d 239 (2d Cir. 1985) ...................................................................................... 24

*Eastside Church of Christ v. National Plan, Inc.*,
   391 F.3d 357 (5th Cir. 1968) .................................................................................... 18

*EMA Fin., LLC v. Vystar Corp.*,
   336 F.R.D. 75 (S.D.N.Y. 2020) ................................................................................ 15, 16

*Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*,
   9 N.Y.S.3d 682 (2d Dept. 2015) ............................................................................... 10

*Freitas v. Geddes Sav. & Loan Ass'n*,
   471 N.E.2d 437 (N.Y. 1984) ...................................................................................... 7

*Funding Group, Inc. v. Water Chef Inc.*,
   852 N.Y.S.2d 736 (N.Y. 2008) .................................................................................. 6, 8

*Hammelburger v. Foursome Inn Corp.*,
   76 A.D.2d 646 (2d Dept. 1980) ................................................................................ 10

*Harford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*,
　230 F.3d 549 (2d Cir. 2000) ....................................................................11

*Hartley v. Eagle Ins. Co.*,
　118 N.E. 622 (N.Y. 1918) .........................................................................7

*Hillair Capital Invs., L.P. v. Integrated Freight Corp.*,
　963 F. Supp. 2d 336 (S.D.N.Y. 2013) ...............................................8, 10

*Hufnagel v. George*,
　135 F. Supp. 2d 406 (S.D.N.Y. 2001) ......................................................6

*Hogg v. Walker*,
　622 A.2d 648 (Del. 1993) .......................................................................25

*Hoover v. Ronwin*,
　466 U.S. 558, 587 (1984) ..........................................................................5

*Ingenito v. Bermec Corporation*,
　376 F. Supp. 1154 (S.D.N.Y. 1974) ......................................................21

*Int'l Adiotext Network, Inc. v. Am. Tel. & Tel. Co.*,
　62 F.3d 69 (2d Cir. 1995) ..........................................................................5

*In re Grand Union Co.*,
　219 F. 353 (2d Cir. 1914) ..........................................................................7

*In re McCorhill Publ'g, Inc.*,
　86 B.R. 783 (Bankr. S.D.N.Y. 1988) .....................................................11

*In re: Venture Mortgage Fund LP*,
　282 F. 3d 185 (2d Cir. 2002) ..................................................................10

*Jaghory v. N.Y. State Dep't of Educ.*,
　131 F.3d 326 (2d Cir. 1997) ......................................................................5

*Kahn v. Kohlberg, Kravis, Roberts & Co.*,
　970 F.2d 1030 (2d Cir. 1992) ...........................................................19, 20

*Kramer v. Time Warner, Inc.*,
　937 F.2d 767 (2d Cir. 1991) ....................................................................12

*Lampf, Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*,
　498 U.S. 894 (1990) .................................................................................19

*Lawrence v. Richman Grp. of Conn., LLC,*
    407 F. Supp. 2d 385 (D. Conn. 2005)................................................................19

*Lazard Freres & Co. v. Protective Life Ins. Co.,*
    108 F.3d 1531 (2d Cir. 1997)....................................................................11

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.,*
    2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018)........................................16

*Madden v. Midland Funding, LLC,*
    237 F. Supp. 3d 130 (S.D.N.Y. 2017)....................................................11

*Marcus v. AT & T Corp.,*
    938 F. Supp. 1158 (S.D.N.Y. 1996)........................................................12

*McCall v. Frampton,*
    81 A.D.2d 607, (2d Dept. 1981)..............................................................24

*McPhee v. Gen. Elec. Int'l, Inc.,*
    736 F. Supp. 2d 676 (S.D.N.Y. 2010)....................................................11

*Mills v. Elec. Auto-Lite Co.,*
    396 U.S. 375 (1970)................................................................................17

*N. Am. Bank, Ltd. v. Schulman,*
    123 Misc. 2d 516 (Westchester Cnty. 1984)..........................................13

*Omega Overseas, Ltd. v. Griffith,*
    2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014)......................15

*Pearlstein v. Scudder & German,*
    429 F.2d 1136 (2d Cir. 1970)..................................................................17

*Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.,*
    2022 U.S. Dist. LEXIS 25145 (E.D.N.Y. Feb. 11, 2022)......................12

*Roswell Capital Partners LLC v. Alt. Const. Techs.,*
    2009 WL 222348 (S.D.N.Y. Jan. 30, 2009)..........................................10

*Rothman v. Gregor,*
    220 F.3d 81 (2d Cir. 2000)......................................................................23

*Schermerhorn v. Talman,*
    14 N.Y. 93 (N.Y. 1856)............................................................................7

*SEC v. Almagarby*,
    479 F. Supp. 3d 1266 (S.D. Fla. 2020) ....................................................................20

*Seidel v. 18 East 17th Street Owners, Inc.*,
    79 N.Y.2d 735 (N.Y. 1992) ..............................................................................7, 8

*Simon v. Electrospace Corp.*,
    269 N.E.2d 21 (N.Y. 1971) .....................................................................................8

*Simsbury Fund, Inc. v. New St. Louis Associates*,
    611 N.Y.S.2d 557 (1st Dept. 1994) .......................................................................10

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*,
    263 F.3d 26 (2d Cir. 2001) ...................................................................................10

*Sweet Baby Lightning Enter., LLC v. Keystone Cap. Corp. et al.*,
    Case No. 21-cv-06528-RA, ECF 31 (Order) (S.D.N.Y. June 15, 2022) .......................7

*UFCW Local 1500 Pension Fund v. Mayer*,
    2016 U.S. Dist. LEXIS 145091 (N.D. Cal. 2016) ....................................................21

*Union Cap. LLC v. Vape Holdings Inc.*,
    2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017) ...........................................................8

*United States v. Biasucci*,
    786 F.2d 504 (2d Cir. 1986), *cert. denied*, 479 U.S. 827 (1986) .................................7

*United States v. Moseley*,
    980 F.3d 9 (2d Cir. 2020) ....................................................................................13

*Uni-World Capital, L.P. v. PreferredFragrance, Inc.*,
    2014 U.S. Dist. LEXIS 109919 (S.D.N.Y. 2014)......................................................14

*US Airways, Inc. v. Sabre Holdings Corp.*,
    938 F.3d 43 (2d Cir. 2019) ...................................................................................21

*Waxman v. Envipco Pickup & Processing Servs.*,
    2006 U.S. Dist. LEXIS 44006 (S.D.N.Y. June 28, 2006) ............................................8

**Statutes and Regulations**

15 U.S.C. § 77a..................................................................................................................1

15 U.S.C. § 78a..................................................................................................................1

15 U.S.C. § 78cc ............................................................................................................ 14

15 U.S.C. § 78cc(b) ................................................................................................. 14, 18

15 U.S.C. § 78o(a)(1) .................................................................................................... 15

15 U.S.C. § 80b-1 ........................................................................................................... 1

18 U.S.C. § 1961 ..................................................................................................... 1, 22

28 U.S.C. § 1658(b) ...................................................................................................... 19

17 C.F.R. § 230.144 ......................................................................................................... 3

NY Gen. Oblig. § 5-501(2) ............................................................................................. 7

N.Y. Gen. Oblig. Law § 5-511 ............................................................................. 4, 6, 10

N.Y. Penal Law § 190.40 ..................................................................................... 4, 6, 10

**Rules**

Fed. R. Civ. P. 12(b)(6) .................................................................................................... 1

Fed. R. Evid. 201 .......................................................................................................... 12

**Secondary Sources**

Samuel Williston & Richard A. Lord,
    *A Treatise on the Law of Contracts* § 1:20 (4th ed. 1990) ........................................ 10

viii

## INTRODUCTION[1]

The arguments that Defendants advance in support of their Motion do not approach the high bar for dismissal under Fed. R. Civ. P. 12(b)(6). They fail to show that DarkPulse should be denied the opportunity to prove its claims that the Defendants violated the Exchange Act and RICO, by engaging in the business of buying and selling securities without being registered as a securities dealer, and by collecting an unlawful debt, respectively. The Motion should be denied.

## STATEMENT OF FACTS

FirstFire is a self-proclaimed "New York based" lender, registered as a Delaware LLC, that loans money to small publicly-traded companies in need of cash. DarkPulse is a New York based microcap company registered in Delaware. DarkPulse stock trades on the "over the counter" market.

In September 2018, FirstFire loaned DarkPulse $225,000.00 via the purchase of a convertible promissory note[2] with a principal amount of $247,500.00. FAC, Ex. 1 (ECF 29-1). The September 2018 Note charges interest at 8% APR, a 10% original issue discount, and uses a nine-month maturity date. *Id.* at 1. The documents making up the September 2018 Transaction

---

[1] The following terms are used herein:  Plaintiff DarkPulse, Inc. ("Plaintiff" or "DarkPulse"); Defendant FirstFire Global opportunities Fund, LLC ("Defendant" or "FirstFire"); Defendant Eli Fireman ("Defendant Fireman" or "Fireman" and together with FirstFire, the "Defendants"); Convertible Promissory Note executed April 26, 2021 ("April 2021 Note"); Securities Purchase Agreement executed April 26, 2021 ("April 2021 SPA"); Registration Rights Agreement executed April 26, 2021 ("RRA") (the RRA, together with the April 2021 Note and April 2021 SPA, the "April 2021 Transaction"); Amendment No. 1 to the Convertible Promissory Note executed April 26, 2021 ("*Adar Bays* Amendment"); Senior Convertible Promissory Note executed September 20, 2018 ("September 2018 Note" amd together with the April 2021 Note, the "Notes"); Securities Purchase Agreement executed September 20, 2018 ("September 2018 SPA" and together with the September 2018 Note, the "September 2018 Transaction") (the September 2018 SPA and April 2021 SPA together, the "SPAs"); Plaintiff's First Amended Complaint (ECF 29) ("Complaint" or "FAC"); FAC Exhibit 3 (ECF 29-3) ("FirstFire Transaction List"); Defendants' Memorandum of Law in Support of their Motion to Dismiss the First Amended Complaint ("Motion" or "MTD"); Securities Act of 1933, 15 U.S.C. § 77a *et seq.* ("Securities Act"); Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq.* (the "Exchange Act"); Racketeer Influenced and Corrupt Organizations Act, 18 U.S.C. § 1961 *et seq.* ("RICO"); Investment Advisors Act, 15 U.S.C. § 80b-1, *et seq.* ("IAA").

[2] A convertible promissory note is a type of debt security that gives the lender (FirstFire) the right to take repayment of the loan either in cash or in newly-issued company stock. Like an option or warrant, the lender is given the right to purchase company stock at a particular strike price; at conversion, the lender 'converts' the note, *i.e.*, it uses the accrued debt to 'purchase' the stock instead of cash. *See* September 2018 Note at § 1.1.

consist of the convertible promissory note and a securities purchase agreement, which sets forth the terms for the purchase of the September 2018 Note.

Unlike a typical *fixed-price* option, the conversion option in the September 2018 Note carried no fixed strike price; instead, conversion carried a substantial, 30% *fixed discount*, often referred to as a "floating price" discount. This type of conversion option guaranteed FirstFire a strike price pegged at 30% below the market price at the time of exercise. In practical terms, this guaranteed that for every $100 of debt converted, FirstFire would "purchase" a minimum of $142 worth of DarkPulse stock. The value of floating price conversion options is substantial and must be included in the interest calculation for the loan. *See Adar Bays, LLC v. Genesys ID, Inc.*, 37 N.Y.3d 320, 334 (2021).

On April 26, 2021, FirstFire loaned DarkPulse $750,000.00 via the purchase of a convertible promissory note in the principal amount of $825,000.00. FAC, Ex. 2 (ECF 29-2). The April 2021 Note charges interest at 10% APR ($61,875) and a nine-month maturity date. *Id.* at 1. In addition to the April 2021 Note and SPA, the April 2021 Transaction incorporated the RRA, which obligated DarkPulse to register the shares.

The April 2021 Note provided a "Fixed Conversion Price" of $0.015 per share. *See* April 2021 Note at § 1.2(a). Hence, commencing 180 days after purchase of the April 2021 Note, FirstFire could exercise the option to use the debt (at that point, $825,000 + $61,875) to exercise its right to convert the debt into DarkPulse stock at $0.015 per share. *Id.* at § 1.1.

The April 2021 Note also provided that if the borrower defaulted on any provision under the April 2021 Transaction, much lower "Default Fixed Conversion Price" of $0.005 per share would become operative. *See* April 2021 Note at § 1.2(a) and Art.III (naming 21 separate events of default under the Note).

2

As a condition for FirstFire's purchase of the April 2021 Note, DarkPulse was required to pay FirstFire 60,000,000 "commitment shares" as up-front consideration. *See* April 2021 SPA at § C, 1(a), Ex. 2. Since the average trading price of Darkpulse stock on April 26, 2021, was $.019/per share, the 60 million commitment shares had an estimated fair market value of $1,140,000. Although the shares were not registered under the Securities Act and were hence restricted from sale for six months from the date of purchase, 17 C.F.R. § 230.144, DarkPulse was also obligated to register[3] the shares pursuant to the RRA.

Additionally, the April 2021 SPA charged an original issue discount of $75,000 which reduced the net amount of the loan to $750,000.00. DarkPulse was also obligated to pay all other expenses incurred by FirstFire in executing the April 2021 Transaction, *see* April 2021 SPA at § 8(k), as well as any conversion processing fees, *see* April 2021 Note at 1, and for the costs of legal opinion letters, *see* April 2021 SPA at § 4(k).

Importantly, § 4.6 of the April 2021 Note and § 8(a) of the April 2021 SPA provided that *New York law governs the April 2021 Note and SPA.*

Between July 2019 and February 2021, FirstFire effected 18 separate conversions of debt under the September 2018 Note. By the time the September 2021 Note was fully converted, FirstFire had acquired no less than 879,400,000 shares of DarkPulse common stock—with an estimated open market value in excess of $10 million—in exchange for $247,500 worth of debt under the September 2018 debt.

On October 14, 2021, the New York Court of Appeals issued its opinion in *Adar Bays*, resolving two certified questions concerning the interpretation of New York's usury statutes. *Adar*

---

[3] Registration refers to registration of the stock pursuant to the Securities Act. Registered stock is freely-trading and not subject to the six-month restriction period under Rule 144; however, registration is a costly and time-consuming process.

3

A-444

*Bays, LLC v. GeneSYS ID, Inc.* The second question in *Adar Bays* is relevant to the April 2021 Transaction, *viz.*: "[i]f the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void *ab initio* pursuant to N.Y. Gen. Oblig. Law § 5-511." *Adar Bays*, 37 N.Y.3d 320, at 323-24. The Court of Appeals answered this question in the affirmative, holding that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: *complete invalidity of the loan instrument.*"[4] *Id.* at 333 (emphasis added).

On October 26, 2021, FirstFire had DarkPulse sign an Amendment to the September 2021 Note, which, *inter alia*, purported to change the governing law from New York to Delaware, and required suit in a Delaware forum. FAC, Ex. 2. Though the signatures are dated October 26, 2021, the Amendment states that it was "entered into on October 14, 2021," *i.e., the date of the Adar Bays decision. Id.* at 1. Delaware has no laws against usury.

October 26, 2021 also marked the end of the six-month restriction period under Rule 144, and commenced FirstFire's right of conversion under the Note. *See* April 2021 Note at § 1.1 (specifying conversion right commences 180 days after issuance). Accordingly, the 60,000,000 commitment shares, as well as any shares obtained via conversion, would be deemed freely trading on that date (regardless of registration status). On October 27, 2021, DarkPulse stock traded for an average price of $0.08 per share, which would give the freely-trading commitment shares an estimated fair market value of ***$4,800,000*** (60,000,000 x $.08 = $4,800,000).

On November 17, 2021 FirstFire effected a conversion for $886,875 (the entire debt (principal plus stated interest) under the April 2021 Note). At conversion, FirstFire represented that DarkPulse was in default under the April 2021 Note and claimed entitlement to the Default

---

[4] Under New York law, when a transaction is void *ab initio* for usury, there are no equitable remedies available to the lender. *See Blue Wolf Capital Fund II, LP v. Am. Stevedoring Inc.*, 105 A.D.3d 178, 185 (1st Dept. 2013).

**A-445**

Fixed Conversion Price of $0.005 per share. The transfer agent honored FirstFire's notice of conversion and delivered to FirstFire (using the default price) 177,375,000 shares of freely trading DarkPulse stock. (886,875/$.005 = 177,375,000). On November 17, 2021, DarkPulse's average trading price was $0.12465 per share, giving the conversion shares an estimated fair market value of ***$22,109,793.75***.

FirstFire claimed to be owed even more shares due to various alleged defaults, and filed suit in Delaware to obtain a declaratory judgment on its rights under the September 2021 Transaction. FirstFire withdrew its lawsuit in response to DarkPulse's Motion to Dismiss.

## LEGAL STANDARD

In deciding a motion to dismiss, a court must accept all factual allegations in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *See Bayerische Landesbank v. Aladdin Capital Mgmt. LLC*, 692 F.3d 42, 51-52 (2d Cir. 2012). The Court may not grant a motion to dismiss unless "it appears beyond doubt, even when the complaint is liberally construed, that the plaintiff can prove no set of facts which would entitle him to relief." *Jaghory v. N.Y. State Dep't of Educ.*, 131 F.3d 326, 329 (2d Cir. 1997) (quoting *Hoover v. Ronwin*, 466 U.S. 558, 587 (1984)). "For purposes of this general rule, 'the complaint is deemed to include any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'" *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002) (quoting *Int'l Adiotext Network, Inc. v. Am. Tel. & Tel. Co.*, 62 F.3d 69, 72 (2d Cir. 1995) (*per curiam*)).

## ARGUMENT

**I.   BECAUSE THE APRIL 2021 TRANSACTION WAS EXPRESSLY GOVERNED BY NEW YORK LAW, AND WAS USURIOUS ON ITS FACE, IT WAS VOID *AB INITIO,* AND DEFENDANTS' ATTEMPT TO AMEND THE APRIL 2021 NOTE WITH DELAWARE LAW AND A DELAWARE FORUM HAD <u>NO</u> <u>EFFECT</u>**

It is evident from the face of the April 2021 Transaction that the agreement between the parties was a loan to DarkPulse, and that the April 2021 Note contemplates charging DarkPulse far in excess of the legal interest rate set forth in N.Y. Penal Law § 190.40.  Pursuant to New York G.O.L. § 5-511 and *Adar Bays*, *a criminally usurious loan is void ab initio, and—by definition—it cannot be later amended, nor can it ever be enforced.*  Defendants' attempt to backdate the Amendment to October 14 to avoid the original choice of law provision (which stated governance by New York law) was without effect because under New York law, the contract was deemed void at its inception.  *See* Complaint *passim.*

### A.   THE NOTES IMPOSE CRIMINALLY USURIOUS RATES OF INTEREST

New York's criminal usury statute prohibits a person from knowingly charging interest on a loan at a rate exceeding 25% per annum. N.Y. Penal Law § 190.40.  Criminal usury requires proof that the lender (1) knowingly charged, took or received (2) annual interest exceeding 25% (3) on a loan or forbearance.  *Hufnagel v. George*, 135 F. Supp. 2d 406, 407 (S.D.N.Y. 2001); *Funding Group, Inc. v. Water Chef Inc.*, 852 N.Y.S.2d 736, 740 (N.Y. 2008).

**1.**   *Usurious Intent* **is Implied Where A Usurious Rate Is Evident From the Face of the Loan.**  Criminal usury is a crime of general, not specific intent.  Accordingly, this element requires proof only of the general intent to charge a rate in excess of the legal rate[5] rather than the specific intent to violate the usury statute.  *See Angelo v. Brenner*, 90 A.D.2d 131 (3d Dept. 1982);

---

[5] FirstFire's attempt to amend the April 2021 Note to change the governing law from New York to Delaware, dated October 14, 2021—the date that *Adar Bays* was issued—strongly indicates that FirstFire was fully aware that the April 2021 Transaction charged a usurious rate.

*U.S. v. Biasucci*, 786 F.2d 504, 512 (2d Cir. 1986), *cert. denied,* 479 U.S. 827 (1986). If a usurious interest rate "can be gleaned from the face of an instrument, intent will be implied and usury will be found as a matter of law." *Blue Wolf*, 105 A.D.3d at 183. Hence, the borrower satisfies his *prima facie* burden of proving usury by showing that the note purchased by the lender evidences a loan and charges an illegal rate of interest. *See Freitas v. Geddes Sav. & Loan Ass'n*, 471 N.E.2d 437, 443 (N.Y. 1984). *Cf. Hartley v. Eagle Ins. Co.*, 118 N.E. 622, 625 (N.Y. 1918) (where interest payable is "so large," intent may be imputed even if not clear from the face of the loan). *See also Sweet Baby Lightning Enter., LLC v. Keystone Cap. Corp. et al.*, Case 1:21-cv-06528-RA, ECF 31 (Order) (S.D.N.Y. June 15, 2022) (filed herewith as **Exhibit 1**).

    **2.** **"Interest" is Broadly Defined in the Usury Statute.** Under NY Gen. Oblig. § 5-501(2), "interest" is construed broadly, and includes "money, goods or things in action" and "shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance." *Id. See also Adar Bays*, 37 N.Y.3d at 336 ("our cases involving criminal usury show strict attention to additional fees exacted sometimes creatively through loan instruments. Exchanges of other forms of property, substituted for money, are equally germane to the calculation.").[6]

---

[6] FirstFire cites to *Chassman v. Shipley*, 695 F. App'x 630 (2d Cir. 2017) as support for its contention "the commitment shares were not interest on the loan but rather an added inducement to convince FirstFire" to make the loan. *See* MOL at 22. *Shipley* is an unpublished opinion without precedential value–but more importantly, the holding in *Shipley* is contrary to *Adar Bays*, and contrary to well-established New York usury law. Under the *Shipley* analysis, a lender could charge usurious interest at will, so long as it labeled the offending charges as something other than interest. This position fails the fundamental duty imposed on courts to look beyond the form of the document and take into account "all other property exchanged in consideration for the loan," which must be "included in determining the loan's interest rate for purposes of [New York's] usury statutes," *Adar Bays*, 37 N.Y.3d at 334. *See also Adar Bays*, 37 N.Y.3d at 336 (noting that since New York's founding, the legislature construed 'interest' broadly and included "the value of all goods and promises exchanged in consideration for a loan in the usury analysis"); *In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914); *Seidel v. 18 East 17th Street Owners, Inc.*, 79 N.Y.2d 735 (N.Y. 1992); *Schermerhorn v. Talman,* 14 N.Y. 93 (N.Y. 1856).

    **a.**    **Interest Includes the Value of Securities Given as Consideration for a Loan.** It is settled law in New York that the value of securities given as consideration for a loan must be included in the interest calculation. *Adar Bays*, 37 N.Y.3d at 334. *See also Funding Group*, 852 N.Y.S.2d at 488 (finding usury based upon payment in stock at 120%); *Am. E. Grp., LLC v. Livewire Ergogenics, Inc.*, 2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) (finding usury based on added value of up-front stock payment). Restricted stock is also included in the interest calculation, *see Hillair Capital Invs., L.P. v. Integrated Freight Corp.*, 963 F. Supp. 2d 336 (S.D.N.Y. 2013), although the face value of restricted stock is typically discounted in some way. *Simon v. Electrospace Corp.*, 269 N.E.2d 21, 27 (N.Y. 1971).[7]

    **b.**    ***Beaufort* and *Union Capital* are Abrogated by *Adar Bays*.** FirstFire next contends that because "both Notes have already been converted," the usury defense no longer applies." MOL at 22 (citing *Union Cap. LLC v. Vape Holdings Inc.*, 2017 WL 1406278 (S.D.N.Y. Mar. 31, 2017) and *Beaufort Cap. Partners LLC v. Oxysure Sys., Inc.*, 2017 WL 913791 (S.D.N.Y. Mar. 7, 2017). This argument was rejected in *Adar Bays*: "loans with the option of repayment in property (including stock) rather than cash remain loans—not equity investments." 179 N.E.3d at 622; *see also Seidel* (holding that the "mere presence of a unilateral option in favor [the lender] … did not transform the lender into a joint venturer." *Id.* at 744.

---

[7] The vast majority of judicial restricted-stock valuations are done in the context of a damages calculation. *See, e.g., Waxman v. Envipco Pickup & Processing Servs.*, 2006 U.S. Dist. LEXIS 44006, at *12-14 (S.D.N.Y. June 28, 2006) (concluding that the average discount for a two-year restriction on stock (which was the length of the restriction in that case) was 30-35%). Unlike a damages calculation, the only question in a usury valuation is whether the added stock value causes the interest rate to exceed the legal maximum. As observed by the New York Court of Appeals, the "issue is not a question of determining most precisely the rate of return realized by a lender as an abstract matter … [r]ather the issue is *whether a lender has received a return proscribed as usurious* by the Legislature." *Band Realty Co. v. N. Brewster, Inc.*, 335 N.E.2d 316, 319 (N.Y. 1975) (emphasis added).

B.     **THE APRIL 2021 NOTE EVIDENCES A LOAN CHARGING IN EXCESS OF THE LEGAL RATE, PROPERLY INCLUDING THE VALUE OF THE "COMMITMENT SHARES" AS INTEREST**

Despite the stated 10% interest rate, the April 2021 Note is patently usurious when the value of the commitment shares is included as interest.  While the precise valuation of the (restricted) commitment shares is a finding of fact, no reasonable estimate of the share value would be low enough to put the April 2021 Note into non-usurious (*or non-RICO*) territory.  Given that DarkPulse was obligated to register the commitment shares, it is debatable whether they should be discounted at all for the six-month restriction.  In fact, the value of these shares is so substantial that the loan is usurious *even when the shares are discounted by 80%.*

Importantly, FirstFire does not challenge the value of the commitment shares.  However, it is worth noting that (1) DarkPulse was obligated to register the commitment shares; (2) the value of the shares quadrupled by the time the six-month restriction was removed (leaving the 60,000,000 commitment shares with an estimated fair market value of *$4,800,000*);[8] and (3) the parties themselves designated the discounted share price of $0.0138 per share.

Under New York law, up-front payments to the lender are *retained interest*; the value of up-front payments are subtracted from the amount the borrower received from the lender at closing.  *See Band Realty*, 335 N.E.2d at 318.  Here, the April 2021 Note reflects DarkPulse receiving a principal amount of $825,000 at closing.  Using the lowest valuation for the 60,000,000 commitment shares on the date of transfer ($741,500.00) the net loan to DarkPulse is calculated as $84,000.00.  Hence, *at the time it was executed*, the April 2021 Note was governed by New

---

[8] And the prices continued upward until the end of November 2021.  Accordingly, the "leak out" provision in the April 2021 SPA, which prevented FirstFire from dumping all the stock in 1-2 would (if followed) increased profits.

9

York law, and obligated DarkPulse to repay FirstFire $886,875 (defined interest + principal) on a nine-month loan of $84,000.00, evidencing an interest rate of **1,242% APR.**[9]

Criminally Usurious Loans are Void in New York Under *Adar Bays*.[10]  Prior to *Adar Bays*, certain federal courts interpreting New York usury law found that the voiding mechanism in N.Y. G.O.L. § 5-511 did not authorize the voiding of criminally usurious loans to corporations.  Those rulings were directly attributed to *dicta* in *In re: Venture Mortgage Fund LP*, 282 F. 3d 185 (2d Cir. 2002).  Accordingly, when the U.S. Court of Appeals for the Second Circuit certified the usury voiding question to the New York Court of Appeals, it was to resolve this confusion.  As explained, the unanimous decision of the New York Court of Appeals on this question was that "[a] loan determined to be criminally usurious under NY Penal Law § 190.40 is void *ab initio*[[11]] pursuant to N.Y. Gen. Oblig. Law § 5-511." *Adar Bays*, 37 N.Y.3d at 333 (emphasis added).

### C.    THE CHOICE OF LAW CLAUSE IN THE SEPTEMBER 2018 NOTE IS UNENFORCEABLE

The September 2018 Note contains a choice-of-law provision declaring it be interpreted

---

[9] 886,875-84,000)/84,000 x 100 = 956%  x  12/9 = 1,242.8%.

[10] New York caselaw makes clear that criminal usury cannot be waived in a contractual provision such as those found in the April 2021 Note.  *See Hammelburger v. Foursome Inn Corp.*, 76 A.D.2d 646, 649-50 (2d Dept. 1980).  Moreover, it is also well-established that usury-savings clauses like the ones set forth in § 4.12 of the Note and § 4(c) of the April 2021 Note and § 8(d) of the April 2021 SPA do not save an otherwise usurious note.  *See Bakhash v. Winston*, 19 N.Y.S.3d 887, 887 (1st Dep't 2015); *Fred Schutzman Co. v. Park Slope Advanced Med., PLLC*, 9 N.Y.S.3d 682, 682 (2d Dept. 2015) ("[A] clause in the subject promissory note purporting to reduce the rate of interest to a non-usurious rate if the rate originally imposed was found to be usurious could not save the note from being usurious."); *Hillair Capital*, 963 F. Supp. 2d at 338 n.1; *Simsbury Fund, Inc. v. New St. Louis Assoc.*, 611 N.Y.S.2d 557, 557 (1st Dept. 1994); *DeStaso v. Bottiglieri*, 901 N.Y.S.2d 905 (N.Y. 2009); *Roswell Capital Partners LLC v. Alt. Const. Techs.*, 2009 WL 222348, at *15 n.13 (S.D.N.Y. Jan. 30, 2009).  The same logic compels the conclusion that the severability clauses found in § 4.13 of the April 2021 Note and § 8(d) of the April 2021 SPA, do not render the April 2021 Note non-usurious.  *See Case Cash Funding, LLC v. Gilberg*, 57 N.Y.S.3d 674, 674 (2d Dept. 2017) ("The severability clause of the Agreement is likewise ineffective to save the Agreement). *See Am. E. Grp., LLC v. Livewire Ergogenics, Inc.*, 2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020).  The September 2018 Transaction contains similar provisions.

[11] "**Void *ab initio***" means a bargain is null from the beginning, as from the first moment when the purported contract was entered into.  A bargain that is void *ab initio* is a nullity because it is based on a promise for breach of which law neither gives a remedy nor otherwise recognizes any duty of performance by the promisor.  *See* Samuel Williston & Richard A. Lord, *A Treatise on the Law of Contracts* § 1:20, at 49 (4th ed. 1990).  Indeed, the appellation "void contract" is, as noted by Williston, a misnomer, for "if an agreement is void, it cannot be a contract." *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001). ***And if the April 2021 Note was never a contract, it was—and remains—incapable of being amended.***

under the laws of Nevada. *See* September 2018 Note at § 4.6, September 2018 SPA at § 8.a. However, since the Court sits in New York, it must apply New York's choice of law approach to determine the governing law. *McPhee v. Gen. Elec. Int'l, Inc.*, 736 F. Supp. 2d 676, 679 (S.D.N.Y. 2010). *See also Beatie and Osborn LLP v. Patriot Scientific Corp.*, 431 F. Supp. 2d 367, 378 (S.D.N.Y. 2006) ("New York courts may refuse to enforce a choice-of-law clause only where (1) the parties' choice has no reasonable basis or (2) application of the chosen law would violate fundamental public policy of another jurisdiction with materially greater interests in the dispute."). In cases involving a contract with an express choice-of-law provision, New York law holds that "absent fraud or violation of public policy, a court is to apply the law selected in the contract [as long as the state selected has sufficient contacts with the transaction]." *Hartford Fire Ins. Co. v. Orient Overseas Containers Lines (UK) Ltd.*, 230 F.3d 549, 556 (2d Cir. 2000). *See also Cargill, Inc. v. Charles Kowsky Resources, Inc.*, 949 F.2d 51, 55 (2d Cir. 1991) ("New York law allows a court to disregard the parties' choice [to designate the laws of another state] when the 'most significant contracts' are in another state.").

Overwhelming authority[12] demonstrates that the Court should disregard the September 2018 Note's choice-of-law provision and apply the laws of the state with the most significant relationship: New York.[13] For example, in *Madden v. Midland Funding, LLC*, this Court declined

---

[12] *See, e.g., Am. Equities Grp., Inc. v. Ahava Dairy Prods. Corp.*, 2004 U.S. Dist. LEXIS 6970, at *8 (S.D.N.Y. Apr. 23, 2004) (disregarding the choice-of-law provision designating New Jersey law after noting New York's strong public policy, which the court found "must be enforced," and that New York had the most substantial relationship, as demonstrated by the parties negotiating and performing the agreement in New York, and despite the borrower's headquarters being located in New Jersey); *In re McCorhill Publ'g, Inc.*, 86 B.R. 783, 793 (Bankr. S.D.N.Y. 1988) (holding that enforcing New Jersey law would violate New York's "strong public policy against interest rates which exceed 25%, which policy must be enforced"); *Am. Express Travel Related Servs. Co. v. Assih*, 893 N.Y.S.2d 438, 446 (Richmond Cnty. 2009) ("New York has a strong public policy against interest rates which are excessive and this is a policy the courts must enforce."); *Clever Ideas, Inc. v. 999 Rest. Corp.*, 2007 N.Y. Misc. LEXIS 9248, at *2-4 (N.Y. Cnty. Oct. 12, 2007) (choice of Illinois law not given effect in part because New York's usury prohibition is a fundamental public policy).

[13] *See McPhee*, 736 F. Supp. 2d at 680 (applying the following factors to assist with identifying the state with the most significant contacts: "(1) the place of contracting; (2) the place of contract negotiation; (3) the place of performance; (4) the location of the subject matter of the contract; and (5) the domicile of the contracting parties"). *See also Lazard*

to apply a Delaware choice-of-law provision because applying Delaware usury law would violate New York's fundamental public policy against usury. *See* 237 F. Supp. 3d 130, 150-51 (S.D.N.Y. 2017). The Eastern District reached this conclusion in *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, disregarding a Virginia choice-of-law clause when Virginia had no connection with the parties. 2022 U.S. Dist. LEXIS 25145, *8-9 (E.D.N.Y. Feb. 11, 2022). The court applied New York's law after finding New York had the greatest interest, when the harmed party was headquartered in the state and, thus, suffered loss in the same. *Id.*

Here, FirstFire's principal place of business was, at all times relevant hereto, located in New York, and, thus, FirstFire also negotiated, entered into, and performed the September 2018 Note from New York. *See* FAC ¶¶ 19-20. DPLS also suffered all harm under the September 2018 Note while its principal place of business was located in New York. *See* DarkPulse, Inc., Form 8-K (filed January 3, 2019) (showing that as of January 3, 2019—months before the first conversion under the September 2018 Note (*see* FAC ¶ at 32)—DarkPulse's headquarters was located in New York, New York);[14] DarkPulse, Inc., Form 8-K (filed Apr. 1, 2021) (showing that as of April 1, 2021—months after the last conversion under the September 2018 Note (*see* FAC at ¶ 32)—DarkPulse's headquarters was located in New York, New York, and, thus, suffered all harm from FirstFire's collections under the September 2018 Note while located in New York); *McPhee*, 736 F. Supp. 2d at 680; *Am. Equities*, 2004 U.S. Dist. LEXIS 6970, at *8 (finding New York's fundamental public policy requires it be applied and that New York had a substantial connection— *vis-à-vis* the *situs* of negotiation, performance, and principal place of business and at the time of

---

*Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1539 n.5 (2d Cir. 1997) ("In New York, 'the relevant analytical approach to choice of law in tort actions' is the 'interest analysis.' That is, 'the law of the jurisdiction having the greatest interest in the litigation will be applied.'").

[14] *See* Fed. R. Evid. 201; *Kramer v. Time Warner, Inc.*, 937 F.2d 767 , 774 (2d Cir. 1991) ("[A] district court may take judicial notice of the contents of relevant public documents required to be filed with the SEC"); *Marcus v. AT & T Corp.*, 938 F. Supp. 1158, 1164-65 (S.D.N.Y. 1996) (noting that on a motion to dismiss, the court may take judicial notice of public documents even if not included in or attached to complaint).

the alleged harm—requiring application of its laws despite, like here, the other party entering the disputed contract from its headquarters in New Jersey).

Nevada—the choice-of-law designated in the September 2018 Note—has *no connection whatsoever* to the parties or to the September 2018 Note.  None of the parties were formed under the laws of Nevada, nor did they maintain their respective places of business in Nevada.  And they did not negotiate or perform the September 2018 in Nevada.  Consequently, the enforcement of Nevada law would require this Court to enforce a choice-of-law provision that has no basis—let alone a reasonable one—and would violate a fundamental public policy of New York, a state with significantly greater interests.  *See, e.g., United States v. Moseley*, 980 F.3d 9, 21 (2d Cir. 2020) ("New York judicial opinions have consistently recognized the state's prohibition of excessive interest rates as embodying a *fundamental public policy*.") (emphasis added).  Accordingly, this Court should disregard the Nevada choice-of-law provision and, instead, apply New York law to the September 2018 Note.  *Accord N. Am. Bank, Ltd. v. Schulman*, 123 Misc. 2d 516, 520-21 (Westchester Cnty. 1984) (finding that, when usury is at issue, allowing a contract to be "governed by the laws of a jurisdiction which has apparently chosen not to outlaw usury at all … would, in this court's view, fly in the face of time-honored public policy").

**DarkPulse has pled facts sufficient to support its claim that the September 2018 Note is void *ab initio* under New York law.**  *First*, DarkPulse pled that the Defendants intended or knowingly charged a usurious rate of interest.  *See* FAC ¶¶ 30-36, 51, 119-120.  Here, the September 2018 Note contained a conversion discount, *id.* ¶¶ 51, 59, 64, 75-79, which is construed as interest, *see Adar Bays*, 37 N.Y.3d at 338.  Usurious intent is a question of fact where usury is not evident from the face of the loan.  *Id.* at 336.  Accordingly, DarkPulse has alleged the Defendants had usurious intent since it is a question of fact for the September 2018 Note. *See Uni-*

*World Capital, L.P. v. PreferredFragrance, Inc.,* 2014 U.S. Dist. LEXIS 109919 (S.D.N.Y. 2014).

*Second,* DarkPulse alleged that Defendants charged interest in excess of 25% a.p.r. because the value of the conversion discount—like the value of the commitment shares—caused the September 2018 Note to be usurious. *See* FAC ¶¶ 77-79. As *Adar Bays* noted: "our cases involving criminal usury show strict attention to additional fees exacted sometimes creatively through loan instruments . . . other forms of property, substituted for money, are equally germane to the calculation." 37 N.Y.3d at 336. Here, DarkPulse pled that the value of the conversion discount caused the interest rate charged under the September 2018 Note to be approximately 61%. *See* FAC ¶ 79.[15] *Third,* DarkPulse pled that the September 2018 Transaction was a loan. FAC ¶¶ 2, 7, 26-28, 70-79. DarkPulse thus properly alleged all three elements of usury that would, if true, render the September 2018 Transaction void *ab initio.*

## II.   THE AGREEMENTS INVOLVE A PROHIBITED TRANSACTION BECAUSE THEY REQUIRE AN UNREGISTERED SECURITIES DEALER TO PURCHASE A CONVERTIBLE SECURITY, IN VIOLATION OF § 15(A)

Section 29(b) of the Exchange Act (15 U.S.C. § 78cc) provides aggrieved parties the right to rescind contracts where the formation *or* performance violates the act or any rule or regulation thereunder, stating:

> **Every contract made in violation of any provision** of this chapter or of any rule or regulation thereunder, and **every contract … the performance of which involves the violation** of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract…

Exchange Act at § 29(b) (codified as 15 U.S.C. § 78cc(b)) (emphasis added).

### A.   THE PLAIN LANGUAGE OF § 29(b) STATES THAT CONTRACTS ARE VOIDABLE IF EITHER "MADE IN VIOLATION" OF THE EXCHANGE

---

[15] The value of the conversion discount is a question of fact requiring expert testimony. *See Adar Bays,* 37 N.Y.3d at 340. The interest calculation here includes the original issue discount, the stated 8% APR, and the value of the conversion discount.

### ACT OR IF "PERFORMANCE … INVOLVES A VIOLATION" OF THE EXCHANGE ACT

Congress could not have been clearer in drafting § 29(b), which requires the court to scrutinize *both* whether the "making" of the contract was unlawful, or whether the "performance" of the contract "involved a violation" of the Exchange Act. "Thus, the express terms of a contract could be perfectly lawful, yet the 'making' of the contract might involve a violation of the Exchange Act or its rules or regulations."[16]  As noted by this District, a contract is void under § 29(b) "where the contract was made illegally or required illegal performance." *Omega Overseas, Ltd. v. Griffith*, 2014 U.S. Dist. LEXIS 109781 (S.D.N.Y. Aug. 7, 2014).

The violations at issue can be characterized in either sense:  the Agreements were "made in violation" of Section 15(a) of the Exchange Act *and* require "performance" that would violate Section 15(a) of the Exchange Act.  Under Section 15(a):

> It shall be unlawful for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce **to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security** (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

Exchange Act at § 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)) (emphasis added).  Because the Notes at issue here are *themselves securities,* an unregistered securities dealer violates § 15(a) of the Exchange Act merely by entering into a contract to purchase the Notes (violation in formation), or where the contract requires the unregistered dealer to purchase a security.

**1.    Unlike *Vystar*[17], the Agreements Here Involve Performance that Violates § 15(a) of the Exchange Act, Because the SPA Obligates FirstFire—an Unlicensed Securities Dealer— to Purchase a Convertible Security**

---

[16] Gruenbaum & Steinberg, *Section 29(b) of the Securities Exchange Act of 1934: A Viable Remedy Awakened*, 48 Geo.Wash.L.Rev. 1, 21 (1979).
[17] *EMA Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020)

Page one of the SPA (under both Agreements) unequivocally demonstrates that, for both the 2018 and 2021 Agreements, FirstFire's only real obligation was to *purchase a security*:

> 1. Purchase and Sale of Note.
>
>> a. Purchase of Note. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

SPAs at § 1.a., Ex. 1, 2. Unlike the defendant in *Vystar* who was unable to "identify a provision in the contracts that obligates [plaintiff] to act as a broker dealer"[18] the contracts in this case clearly show that FirstFire's primary obligation under the SPAs is to purchase the Notes. Because section 15(a) prohibits an unregistered securities dealer from "effecting a transaction in securities," Firstfire (an unregistered securities dealer) cannot perform the obligation in the SPAs without violating the Exchange Act.

Contrary to the apparent holdings of *Vystar* and *ExeLED*, a contract may be voided not just for requiring *performance* in violation of the Exchange Act, but also where the Exchange Act was violated *in the formation* of the contract. FirstFire contends that "a Section 29(b) claim cannot lie where the contract is not illegal on its face," and that DarkPulse "fails to provide any compelling reason to deviate from the overwhelming case law consistently holding the same thing." MOL at n.7. FirstFire is wrong on both counts. First, the "overwhelming case law" largely stems from two cases (*Vystar* and *ExeLED*[19]) where the court analyzed the contracts as if they were brokerage services contracts instead of *securities contracts*. Next, rescission of contracts that are not "illegal on their face"—but violated the Exchange Act during their formation—is mandated not only by

---

[18] *Vystar* characterizes a 15(a) violation as "acting as a broker dealer," but the statute provides that it is unlawful for an unregistered dealer "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security."

[19] *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160 (S.D.N.Y. Sept. 28, 2018).

the plain language of section 29(b), but also by precedent of the U.S. Supreme Court, and the U.S.

Court of Appeals for the Second Circuit.

### 2.   Supreme Court Precedent Affirms Section 29(b) Rescission of Contracts "Made in Violation" of the Exchange Act

A best-known example of a contract rescinded under § 29(b) of the Exchange Act was

based on violations occurring during *the formation* of the contract.  In *Mills v. Elec. Auto-Lite Co.*,

396 U.S. 375 (1970), a group of shareholders used § 29(b) to rescind a merger contract with

another corporation.  The shareholders showed that the proxy-soliciting materials used to gain

shareholder approval of the merger contained material misstatements, in violation of section 14(a)

of the Exchange Act.  The Court affirmed rescission of the merger contract, holding that because

the violating proxy solicitation was an "essential link in the accomplishment of the transaction,"

the linkage was sufficient to invoke the voidability provision of section 29(b).  *Mills*, 396 U.S. at

385.  The contract at issue in *Mills* was not illegal on its face and did not require performance that

would violate the Exchange Act.

### 3.   The Second Circuit Court of Appeals Affirms Section 29(b) Rescission of a Contract "Made in Violation" of the Exchange Act

In *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) the court upheld a

§ 29(b) rescission of a bond purchase.  The bond contract was not illegal on its face, and required

no performance that would violate the Exchange Act.  However, the broker violated Regulation T

of the Exchange Act during the formation of the contract because the broker had permitted the

customer to take out a bank loan to finance the purchase, which is prohibited under the Exchange

Act. *Pearlstein*, 429 F. 2d at 1140-41.  The court considered the violation to be "essential link" in

the formation of the contract, and deemed it void.

### 4.   The Formation of the Agreements Violated the Exchange Act Because—Under § 15(a)(1)—FirstFire Was Prohibited From Effecting the September 2018 and April 2021 Transactions

17

A securities purchase agreement executed by an unregistered securities dealer would be unlawful as made, because an unregistered securities dealer cannot lawfully purchase a security. The primary example of this scenario is found in *Eastside Church of Christ v. National Plan, Inc.*, 391 F.3d 357 (5th Cir. 1968). *Eastside Church* is relevant to this case because, just as in this case, the contract was a securities contract.

In *Eastside Church*, Fifth Circuit granted rescission under § 29(b), where the plaintiff sought to rescind certain bonds (securities) that it had issued to defendant National Plan. The church alleged that because National Plan was an unregistered broker dealer, National's purchase of the bond was unlawful under § 15(a)(1). Upon review, the Fifth Circuit agreed that National was indeed "a broker and a dealer within the meaning of the Act," and hence, because it was not registered, it could not lawfully effect the bond transactions in that case. The court held:

> Under § 15(a)(1), National was prohibited from effecting the transactions here involved and thus violated the Act by entering into those transactions. Under the voiding provision of § 29(b), it is sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class.

*Eastside Church*, 391 F.3d at 362 (citations omitted). Nothing on the face of the bond compelled the unregistered dealer to further transact in securities, or was otherwise illegal. The bond was unlawful as made, because "National ... violated the Act by entering into those transactions." *Id.*

## III.   PLAINTIFF'S § 29(b) CLAIMS ARE NOT TIME-BARRED[20]

FirstFire begins its statute of limitations argument by intentionally misquoting section 29(b). FirstFire argues that:  "Section 29(b) action must be brought within 'one year after the discovery that [a] sale or purchase involves [a violation of Section 15(a)] and within three years after such violation.' 15 U.S.C. § 78cc(b)." MOL at 11. In fact, § 29(b) unambiguously provides that the limitations period *only* applies "to paragraph (1) or (2) of subsection (c) of section 15 of

---

[20] FirstFire does not challenge the timeliness of claims against the April 2021 Note.

this title" (*i.e.*, § 15(c)), which pertains to broker-dealer fraud.  Nothing in section 29(b) indicates

a statute of limitations for § 15(a).  *See Lawrence v. Richman Grp. of Conn.*, 407 F. Supp.

2d 385, 389 n.7 (D. Conn. 2005).

Defendants' untimeliness claim is based on *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970

F.2d 1030 (2d Cir. 1992), where the Second Circuit considered the limitations period for rescission

claims under § 215 of the IAA, a section widely recognized as very similar to § 29(b).  As with

§ 29(b), § 215 contains no limitations period; hence, the court looked to the analysis in *Lampf,*

*Pleva, Lipkind, Prupis & Petigrow v. Gilbertson*, 498 U.S. 894 (1990), to determine whether the

one/three year limitations period should apply to § 215 rescission (based on, *inter alia,* the

defendant's failure to register as an investment advisor).  The *Kahn* plaintiffs argued that the

one/three-year limitations period only applied to claims involving fraud, making it inappropriate

for application to a non-fraud case such as failure to register as an investment advisor.  As support

for this argument, the *Kahn* plaintiffs noted that section 29(b) of the Exchange Act only applied

the one/three-year limitations period to claims under section 15(c), which pertains to broker fraud.

*Kahn* rejected this argument and applied the one/three-year limitations period, observing that both

the IAA and the Exchange Act were "enacted for the purpose of avoiding frauds," and noted

specifically that section 15 of the Exchange Act "is an antifraud provision."  *Khan,* 970 F.2d at

1038-39.

Further, the Sarbanes Oxley Act of 2002 changed the statute of limitation period for any

private right of action that "involves a claim of fraud, deceit, manipulation, or contrivance in

contravention of a regulatory requirement concerning the securities law…"  28 U.S.C. § 1658(b).

Given the Second Circuit's present designation of § 15 as "an antifraud provision," it stands to

reason that a claim under § 15(a) would be governed by the two-year/five year limitations period.

**FirstFire's Registration Status Would Not Have Alerted DarkPulse to the Violation.**
Defendants aver that the one-year clock started to run on the date the September 2018 Note was executed, because "through the exercise of reasonable diligence," DarkPulse "could have discovered the alleged violation in September 2018." MOL at 12. That makes no sense because *Defendants have consistently maintained—as they do even now—that they are not dealers and therefore are not required to register. See Auctus Fund, LLC, v. Players Network, Inc.*, 20-cv-10766, ECF No. 84 (Order) at *18 (D. Mass. Dec. 10, 2021) (stating that the results of a BrokerCheck search "would not have put the [issuer] on notice of any violation because the [noteholder's] misrepresentations made the [issuer] believe that [the noteholder] was *not* a dealer and thus not required to register as such.") (filed herewith as **Exhibit 2**). *See also Busher v. Barry*, 2019 U.S. Dist. LEXIS 172754, at *18-19 (S.D.N.Y. 2019).

**The Rescission Claim is Timely As to the 2018 Agreement Under the Continuing Violation Doctrine.** Even if the Court were to apply the 1-year/3-year rule here, DarkPulse's claims would be timely under the continuing violation doctrine, which is "aimed at ensuring that illegal conduct is punished by preventing a defendant from invoking the earliest manifestation of its wrongdoing as a means of running out the limitations clock on a course of misconduct that persisted over time." *SEC v. Almagarby,* 479 F. Supp. 3d 1266, 1271 (S.D. Fla. 2020).

***Kahn v. Kohlberg*'s Continuing Violation Analysis is Not Applicable to this Case.**
Although *Kahn* declined to apply the continuing violation doctrine, the contract at issue in *Kahn* (investment advisor services) is substantially different from the Agreements in this case. As an unregistered dealer, Defendants first violated § 15(a) in September 2018, when it used the channels of interstate commerce to effect securities transactions beginning with the September 2018 Transaction. Unlike the contract in *Kahn*, Firstfire committed a fresh, independent violation of

§ 15(a) each time it *effected a transaction in DarkPulse securities, or induced or attempted to induce the purchase or sale of a DarkPulse security.  See UFCW Local 1500 Pension Fund v. Mayer*, 2016 U.S. Dist. LEXIS 145091, at \*36 (N.D. Cal. 2016).  Although Firstfire could have refrained from further violations of the Exchange Act and simply taken cash as repayment of the Note, they did not do so.  *See Ingenito v. Bermec Corporation*, 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974).  Each conversion and sale constituted an independent act and inflicted a new and accumulating injury to DarkPulse and its shareholders.  *See US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 68-69 (2d Cir. 2019).

On February 18, 2021, Defendants acquired 220,000,000 shares of DarkPulse stock via a Notice of Conversion under the September 2018 Note.  Thus, the operative date is February 18, 2021, the last violation in a chain of unlawful acts that reaches back to, and was enabled by, the 2018 Agreements.  This action was commenced on December 31, 2021 and it is therefore timely.

Firstfire's claim that it does not qualify as a dealer because Darkpulse has not yet offered adequate proof of stock sales is meritless. FirstFire: is not registered as a dealer with the SEC, FAC ¶ 21; engages in a large number of transactions, FAC ¶¶ 51,52; purchases directly from issuers like a dealer, not a trader, *id.*; profits *primarily* by reaping the difference between the low price it pays for the stock and the market price, *id.*; engages in underwriting activity, *id.*, ¶ 62; has a regular clientele of issuers from which it would purchase securities, *id.*, and never holds the stock but quickly resells the stock to obtain the underwriting spread, *id.* ¶¶ 35, 36.  Accordingly, DarkPulse's claim that FirstFire is an unregistered securities dealer is plausible.

## IV.    DARKPULSE HAS PLED A PLAUSIBLE RICO CLAIM (COUNT IV)

### A.    DarkPulse Has Alleged A RICO "Person" Distinct From the Enterprise

Defendants inexplicably argue that DarkPulse has failed to allege a RICO "person" distinct from the enterprise, when that most basic requirement has clearly been met.  *See MOL* at 17-18.

In paragraph 117 of the Complaint, DarkPulse alleges: "Fireman is a RICO culpable "person" within the meaning of 18 U.S.C. § 1961(3):  an individual or entity capable of holding a legal or beneficial interest in property."  *See also* allegations incorporated in Count IV, including ¶ 23, Section IV.G. "*Fireman Controlled FirstFire in its Convertible Debt Securities Business*" (¶¶ 87-89), and ¶ 111.  Further, there is no conflation of the Defendants, as FirstFire is separately alleged to be the RICO "enterprise" (which Defendants acknowledge, *see* MOL at 17).  FAC ¶¶ 9-10, 70-71, 87-89, 119-121.  Accordingly, Defendants' 'distinctiveness' argument lacks merit.

**B.    DarkPulse Has Alleged that FirstFire Collected Upon an Unlawful Debt and is Engaged in the Business of Collecting Unlawful Debts[21]**

Defendants have selectively read the Complaint.  They ignore that DarkPulse did, in fact, allege that Defendants:  (1) collected the unlawful debt imposed by the Notes (*see* FAC ¶¶ 32 (alleging that between June 2019 and February 2021, Defendants collected the unlawful debt imposed by the September 2018 Note through 18 separate conversions), 48-49 (alleging FirstFire collected the unlawful debt imposed by the April 2021 via a conversion), and (2) are engaged in the business of making usurious loans.  *See* FAC ¶¶ 1, 12, 52, 54, 66-68 (alleging Defendants more than 200 substantially similar loans transactions with at least 89 different microcap companies). *See also* MOL at 23 (conceding that "[DarkPulse] appears aware of the publicly available information regarding other transactions [in which FirstFire has engaged]").  Indeed, DarkPulse has made *specific non-conclusory* allegations that FirstFire has made loans to other issuers that violate New York's usury laws based on publicly available factual information regarding other transactions FirstFire has entered into (*see* FirstFire Transaction List) that makes the inference of culpability plausible.  *See* FAC ¶ 71.  The Complaint also alleges that "FirstFire has used the same

---

[21] As discussed above, DarkPulse has properly alleged that New York law applies to both Notes, and, under such law, both Notes are void *ab initio*.

business model—promising easy cash to microcap companies in need of working capital and then fleecing them for millions of shares of stock—since its formation in 2015." *Id.* ¶ 67 (citing examples of loans each imposing interest in excess of 69% (DigitalTown, Inc., Ionix Technology, Inc., and Visium Technologies, Inc.)). Finally, the Complaint alleges that "FirstFire is in the business of making usurious loans," *id.* ¶ 72, and that it has "committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country[,]" *id.* ¶ 120.

The allegations meet the "facial plausibility" standard, as sufficient facts have been pled to allow the Court to draw a reasonable inference that Defendants are liable for the misconduct alleged. *See Arista Records, LLC v. Doe 3*, 604 F3d 110, 120 (2d Cir. 2010) (citing *Ashcroft v. Iqbal,* 129 S.Ct. 1937, 1949 (2009)); *Chechele v. Dundon*, 850 Fed. Appx. 75, 76 (2d Cir. 2021) ("For purposes of a motion to dismiss, the complaint includes 'any written instrument attached to it as an exhibit or any statements or documents incorporated in it by reference.'") (citing *Rothman v. Gregor*, 220 F.3d 81, 88 (2d Cir. 2000)).[22] Thus, DarkPulse has pled that Defendants are

---

[22] Indeed, the FirstFire Transaction list contains factual material demonstrating that ***Defendants have engaged in unlawful debt collection no fewer than 204 times***. *See Twombly*, 550 U.S. at 556 ("Asking for plausible grounds to infer an agreement does not impose a probability requirement at the pleading stage; it simply calls for enough fact to raise a reasonable expectation that discovery will reveal evidence of illegal[ity].") The FirstFire Transaction List, which makes reference to information published on the SEC's publicly-accessible EDGAR database, shows Defendants have entered into numerous convertible note transactions that are governed by New York law (and, thus, subject to New York's usury laws) that contain substantial fixed conversion discounts that render the loan transaction criminally usurious, for example: (1) Accelerated Pharma, Inc., Form S-1/A EX-10.28 (filed June 20, 2017), *available at* https://bit.ly/3xuZeRr (convertible promissory note with 2% stated interest rate, a 50% fixed conversion discount, and a three-month repayment period, resulting in an estimated true interest rate greater than 69.97% APR); (2) Petrone Worldwide, Inc., Form 10-K EX-10 (filed Sept. 9, 2016), *available at* https://bit.ly/3xBBURQ (convertible promissory note for 7% stated interest rate, a 50% fixed conversion discount, and a eight-month repayment period, resulting in an estimated true interest rate greater than 77.66% APR); (3) Indoor Harvest Corp., Form 8-K EX-10.2 (filed Dec. 16, 2016) and Form 8-K EX 10.2 (filed Oct. 21, 2016), *available at* https://bit.ly/3HsRRP7 and https://bit.ly/3MZYnht (two separate convertible promissory notes, each with a 8% stated interest rate, 45% fixed conversion discount, and six-month repayment period, resulting in an estimated true interest rate *for each loan* in excess of 75.24% APR); (4) Ubiquity, Inc., Form 8-K EX-4.1 (filed March 27, 2015), *available at* https://bit.ly/3b6uX3D (convertible promissory note for 1% stated interest rate, a 45% fixed conversion discount, and a six-month repayment period, resulting in an estimated true interest rate greater than 64.48% APR); (5) NuLife Sciences, Inc., Form 8-K EX-4.3 (filed Sept. 28, 2017), *available at* https://bit.ly/3zPS2BY (convertible promissory note for 5% stated interest rate, a 35% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater

engaged "in the business" of making usurious loans, and of collecting unlawful debts. *See Durante Bros. & Sons, Inc. v. Flushing Nat'l Bank*, 755 F.2d 239, 250 (2d Cir. 1985).

## V.    PLAINTIFF'S STATE LAW CLAIMS (COUNTS V-VI) ARE PROPERLY PLED

Defendants' arguments concerning Plaintiff's state claims are flawed.  As to Plaintiff's unjust enrichment claim, the Complaint contains ample allegations—which must be accepted as true—that Defendants are unregistered dealers who acted (and continue to act) in violation of Section 15(a) of the Exchange Act.  Although Plaintiff cannot seek relief from a Section 15(a) violation, equity heavily supports the proposition that Defendants should be barred from benefiting from their unlawful acts (*i.e.*, unlawful securities transactions and debt collection) at Plaintiff's expense.  *See, e.g., McCall v. Frampton*, 81 A.D.2d 607, 608-09 (2d Dept. 1981) ("[W]here the agreement consists in part of an unlawful objective and in part of lawful objectives, under certain circumstances the illegality may be severed and the legal components enforced," with the final resolution look towards "prevents of unjust enrichment").  Indeed, the authorities relied on by Defendants, *see* MOL at 24-25, and the legal theories supporting their conclusion, are entirely based on the existence of *a valid and enforceable* contract—*which does not exist in this case.*

Likewise, Defendants cite authority that actually supports Plaintiff's constructive trust claim.  Defendants cannot overcome Plaintiff's allegations—which must be accepted as true—that

---

than 70.63% APR); (6) Touchpoint Group Holdings, Inc., Form 10-Q EX-10.2 (filed June 30, 2020), *available at* https://bit.ly/3O1fwsk (convertible promissory note for 10% stated interest rate, a 35% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater than 61.54% APR); (7) Bioxytran, Inc., Form 8-K EX-10.40 (filed Nov. 25, 2019), *available at* https://bit.ly/3MVm5v3 (convertible promissory note for 4% stated interest rate, a 30% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater than 60% APR); (8) Major League Football, Inc., Form 8-K EX-10.4 (filed Aug. 9, 2021), *available at* https://bit.ly/3tFgjqJ (convertible promissory note for 12% stated interest rate, a 30% fixed conversion discount, and a one-year repayment period, resulting in an estimated true interest rate greater than 70% APR); (9) Clean Energy Technologies, Inc., Form 8-K EX-10.120  (filed Oct. 19, 2020), *available at* https://bit.ly/3OkRXdH (convertible promissory note for 8% stated interest rate, a 30% fixed conversion discount, and a ten-month repayment period, resulting in an estimated true interest rate greater than 70.92% APR); (10) Global Wholehealth Partners Corp., Form 10-K EX-4 (filed Sept. 27, 2021), *available at* https://bit.ly/3xVwYsG (convertible promissory note for 12% stated interest rate, a 30% fixed conversion discount, and a ten-month repayment period, resulting in an estimated true interest rate greater than 81.40% APR).

**A-465**

support that FirstFirst is an unregistered dealer, engaged in the collection of unlawful debts.  Thus, Defendants have engaged in unconscionable conduct—acting in violation of federal law—and Plaintiff is entitled to an equitable remedy that puts in escrow all wrongfully, and unlawfully obtained monies to which Defendants are not entitled.  *See Cent. Sch. Dist. No. 3 of Cortlandt v. Town of Cortlandt*, 49 A.D.2d 899, 901 (2d Dept. 1975) (finding "equity *requires* us to declare a constructive trust" over *unlawfully obtained monies*, even when certain claimants could not recover the illegally levied taxes); *Hogg v. Walker*, 622 A.2d 648, 652 (Del. 1993) ("When one party, by virtue of fraudulent, unfair or unconscionable conduct, is enriched at the expense of another to whom he or she owes some duty, a constructive trust will be imposed.").

## CONCLUSION

For all the foregoing reasons, Defendants' Motion to Dismiss the First Amended Complaint should be denied in its entirety.

DATED: June 16, 2022

Respectfully submitted,

**THE BASILE LAW FIRM, P.C.**

By: */s / Gustave P. Passanante*
Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:   (516) 455-1500
Fax:   (631) 498-0748
Email: gus@thebasilelawfirm.com
       eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc.*

25

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

DARKPULSE, INC.,

        Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

        Defendants.

Index No. 1:21-cv-11222 (ER)

---

**DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER**
**SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT**

A-467

**TABLE OF CONTENTS**

**Page**

**ARGUMENT** ................................................................................................. 1

**I.      DPLS'S USURY ARGUMENTS ARE IRRELEVANT AS TO THE 2021 NOTE'S FORUM-SELECTION CLAUSE** ................................................ 1

**II.     DPLS'S EXCHANGE ACT CLAIMS (COUNTS I–III) MUST BE DISMISSED** ........................................................................................... 2

      A.      The One-/Three-Year Statute of Limitations Applies to DPLS's Section 29(b) Claims ........................................................................ 2

      B.      DPLS's Section 29(b) Claim Is Time-Barred as to the 2018 Note ........................ 3

      C.      The Notes Did Not Involve a Prohibited Transaction ............................................ 5

      D.      FirstFire Is Not a Dealer ...................................................................................... 7

**III.    PLAINTIFF'S RICO ALLEGATIONS FAIL TO STATE A CLAIM.** ..................... 8

      A.      Count IV Must Be Dismissed Against Both Defendants ....................................... 8

      B.      DPLS Fails to Allege Any Unlawful Debt as New York Law Does Not Apply .................................................................................................................. 8

      C.      DPLS Fails to Allege FirstFire Is Engaged in Unlawful Debt Collection ............ 10

**IV.     PLAINTIFF'S STATE LAW CLAIMS (COUNTS V–VI) MUST BE DISMISSED** ....................................................................................... 10

**CONCLUSION** ............................................................................................. 10

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Alpha Cap. Anstalt v. Oxysure Sys., Inc.,*
   216 F. Supp. 3d 403 (S.D.N.Y. 2016)......................................................................2

*Ashcroft v. Iqbal,*
   556 U.S. 662 (2009).............................................................................................7

*Bennett v. U.S. Tr. Co. of New York,*
   770 F.2d 308 (2d Cir. 1985)..................................................................................6

*Busher v. Barry,*
   2019 U.S. Dist. LEXIS 172754 (S.D.N.Y. 2019)....................................................4

*Celsion Corp. v. Stearns Mgmt. Corp.,*
   157 F. Supp. 2d 942 (N.D. Ill. 2001)......................................................................3

*EMA Fin., LLC v. NFusz, Inc.,*
   444 F. Supp. 3d 530 (S.D.N.Y. 2020).....................................................................9

*EMA Fin., LLC v. NFusz, Inc.,*
   509 F. Supp. 3d 18 (S.D.N.Y. 2020).......................................................................7

*Found. Ventures, LLC v. F2G, LTD.,*
   2010 WL 3187294 (S.D.N.Y. Aug. 11, 2010).........................................................5

*Ingenito v. Bermec Corp.,*
   376 F. Supp. 1154 (S.D.N.Y. 1974).......................................................................5

*JD Anderson v. Binance,*
   2022 WL 976824 (Mar. 31, 2022).......................................................................2, 3

*Kahn v. Kohlberg, Kravis, Roberts & Co.,*
   970 F.2d 1030 (2d Cir. 1992)................................................................................4

*Kao v. Brit. Airways, PLC,*
   2018 WL 501609 (S.D.N.Y. Jan. 19, 2018) ...........................................................7

*Lawrence v. Richman Grp. of Conn., LLC,*
   407 F. Supp. 2d 385 (D. Conn. 2005)......................................................................2

*LG Cap. Funding, LLC v. ExeLED Holdings Inc.,*
   Case No. 1:17-cv-04006-LJL-OTW (S.D.N.Y. July 10, 2017)................................5

*Madden v. Midland Funding, LLC,*
   237 F. Supp. 3d 130 (S.D.N.Y. 2017)....................................................................9

*Mills v. Elec. Auto-Lite Co.*,
　396 U.S. 375 (1970) ...................................................................................................6

*Mills v. Elec. Auto-Lite Co.*,
　552 F.2d 1239 (7th Cir. 1977) ...................................................................................6

*Pearlstein v. Scudder & German*,
　429 F.2d 1136 (2d Cir. 1970) ....................................................................................6

*Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*,
　2022 WL 426199 (S.D.N.Y. Feb. 11, 2022) .............................................................9

*RMP Cap. Corp. v. Bam Brokerage, Inc.*,
　21 F. Supp. 3d 173 (E.D.N.Y. 2014) .........................................................................9

*SEC v. Almagarby*,
　479 F. Supp. 3d 1266 (S.D. Fla. 2020) .....................................................................4

*Sup. Funding Corp. v. Big Apple Cap. Corp.*,
　738 F. Supp. 1468 (S.D.N.Y. 1990) ..........................................................................9

*U1it4less, Inc. v. Fedex Corp.*,
　871 F.3d 199 (2d Cir. 2017) .......................................................................................8

*UFCW Local 1500 Pension Fund v. Mayer*,
　2016 U.S. Dist. LEXIS 145091 (N.D. Cal. 2016) ....................................................5

*United States v. Moseley*,
　980 F.3d 9 (2d Cir. 2020) .......................................................................................8, 9

*US Airways, Inc. v. Sabre Holdings Corp.*,
　938 F.3d 43 (2d Cir. 2019) .........................................................................................5

*Walter E. Heller & Co. v. Chopp-Wincraft Printing Specialties, Inc.*,
　587 F. Supp. 557 (S.D.N.Y. 1982) ............................................................................9

*Weiss v. Altholtz*,
　2011 WL 4538459 (N.D. Ill. Sept. 29, 2011) ...........................................................3

*Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*,
　84 N.Y.2d 309 (1994) ................................................................................................9

**Rules**

Rule 12(b)(6) ...............................................................................................................1

**A-470**

DPLS's Opposition to FirstFire's motion to dismiss confirms, many times over, that DPLS's claims are meritless and that its First Amended Complaint should be dismissed in its entirety.[1]  Indeed, all of the problems the Court identified when it denied DPLS's request for an injunction in January 2022 persist today and are fatal to DPLS's ability to state any claim under Rule 12(b)(6), and DPLS's effort to add RICO claims in its amendment plainly fails.

*First*, this case was brought in the wrong forum, and DPLS has no viable argument to the contrary, as usury cannot be applied affirmatively to undermine an exclusive forum provision. *Second*, DPLS's unregistered dealer claims are not only meritless, but also time-barred as to the 2018 Note, and any "discovery rule" or "continuing violation" exceptions plainly do not apply. *Third*, DPLS's civil RICO claim is conclusory, self-contradictory, and lacking as to every element. *Fourth*, DPLS fails to plead the necessary elements for its state law claims, and its only excuse for this failure—that supposedly there is no valid underlying contract—is belied by its own allegations and authorities.  The Court should dismiss DPLS's First Amended Complaint in its entirety.

## ARGUMENT

### I.   DPLS'S USURY ARGUMENTS ARE IRRELEVANT AS TO THE 2021 NOTE'S FORUM-SELECTION CLAUSE.

With no supporting authority, DPLS insists its usury arguments render the Amendment and its choice-of-law and -forum provisions unenforceable. (Opp. at 6.) Yet DPLS ignores that: (i) the Amendment was dated effective April 26, 2021, the date of the 2021 Note, meaning the parties agreed *as of* April 26, 2021, the 2021 SPA and Note were governed by Delaware law and included a Delaware choice-of-forum clause (Decl. Ex. F at 2); and (ii) usury under New York law is only a *defense* in an action to recover on a debt, which this action, brought *affirmatively* by DPLS, is

---

[1]    All terms not defined herein take their meaning from Defendants' Memorandum of Law in Support of Their Motion to Dismiss ("MTD"). "Decl." refers to the Declaration of Aaron Marks submitted herewith. Unless otherwise specified, all emphasis has been added and internal quotations and citations omitted.

**A-471**

not (MTD at 9–10).  DPLS's sole response is that the 2021 Note and SPA are "void *ab initio*" and

are "based on a promise for breach of which law neither gives a remedy nor otherwise recognizes

any duty of performance by the promisor."  (Opp. at 10 n.11.)  Even assuming DPLS is correct in

its assertions regarding usury law (which it is not), this is *not* an action where FirstFire is seeking

a remedy on the 2021 Note, nor one where DPLS is being asked to perform.  As made clear in

Defendants' opening brief, DPLS's usury arguments bear no relevance to the enforceability of the

2021 Note's forum-selection clause under the relevant framework.  (MTD at 7–10.)

## II.    DPLS'S EXCHANGE ACT CLAIMS (COUNTS I–III) MUST BE DISMISSED.

### A.    The One-/Three-Year Statute of Limitations Applies to DPLS's Section 29(b) Claims.

Rather than the one-/three-year statute of limitations, DPLS contends that a "two-year/five-

year" limitations period for securities fraud claims should apply to its Section 29(b) claim.  (Opp.

at 19.)  That is not the law.  Although Section 29(b) does not set out a specific statutory limitations

period, the Supreme Court instructs that the applicable limitations period should be determined

from the most analogous federal statute.  Accordingly, courts in this Circuit and elsewhere have

routinely held that the one-/three-year statutory periods apply to Section 29(b) claims arising from

Section 15(a) violations.[2] *See, e.g., JD Anderson v. Binance*, 2022 WL 976824, at *3 (Mar. 31,

2022) (holding one-year limitations period with discovery rule applied to Section 29(b) claim

based on defendant acting as unregistered exchange); *Alpha Cap. Anstalt v. Oxysure Sys., Inc.*, 216

F. Supp. 3d 403, 408 (S.D.N.Y. 2016) (holding Section 29(b) affirmative defense based on alleged

Section 15(a) claim was time-barred one year after "individual could have, through the exercise of

---

[2]      The sole case DPLS cites for the proposition that the one-year/three-year limit does not apply to Section 15(a) cases is *Lawrence v. Richman Grp. of Conn., LLC*, 407 F. Supp. 2d 385 (D. Conn. 2005).  However, in that case, the court held that the statute of limitations did not apply to a Section 29(b) claim when it is raised as an affirmative defense and only applies to "affirmative actions for rescission."  *Id.* at 389 n.7.

reasonable diligence, discovered the fraud at issue"); *see also Weiss v. Altholtz*, 2011 WL 4538459, at *2 (N.D. Ill. Sept. 29, 2011) ("The Exchange Act provides a number of express causes of action, and with one exception, all provide the same statute of limitations period: 1 year after discovery and 3 years after the violation."); *Celsion Corp. v. Stearns Mgmt. Corp.*, 157 F. Supp. 2d 942, 947 (N.D. Ill. 2001) (holding one-/three-year limitations applies to Section 29(b) where Section 15(a) underlies the claim). DPLS's attempt to apply any other limitations period is baseless.

**B.    DPLS's Section 29(b) Claim Is Time-Barred as to the 2018 Note.**

DPLS contends that the one-year statute of limitations has not run because "Defendants have consistently maintained—as they do even now—that they are not dealers and therefore are not required to register." (Opp. at 20.) This argument is circular and illogical: because FirstFire refuses to admit to engaging in unlawful securities transactions (which it certainly has not), DPLS claims that it could not have discovered FirstFire's unlawful securities transactions such that the statute of limitations would begin to run. Of course, DPLS resorts to this tautology in order to distract from the relevant legal inquiry—which focuses on when plaintiff DPLS could have discovered, through reasonable diligence, "the critical facts that he has been hurt and who has inflicted the injury." *JD Anderson*, 2022 WL 976824, at *3.

Here, DPLS had all of the "critical facts" regarding its Section 29(b) claim in 2018 that it has today—*i.e.*, that the parties' 2018 Note provided FirstFire with a right of conversion, and FirstFire does not hold itself out as a registered securities dealer. (FAC ¶¶ 26–36.)[3]  Indeed, contrary to DPLS's assertions, the First Amended Complaint *does not* allege that FirstFire

---

[3]    FirstFire also relies on "EDGAR data," which shows fifty-eight "transactions in securities" DPLS participated in prior to DPLS's execution of the 2018 Note. (FAC ¶ 61; *id.* Ex. 3.) The three transactions that the First Amended Complaint highlights all involved notes that were executed either before or shortly after the 2018 Note. (FAC ¶ 67; *id.* Ex. 3 (showing the DigitalTown, Inc., Ionix Technology, Inc., and Visium Technologies, Inc. notes were executed on July 10, 2018, September 11, 2019, and December 28, 2018, respectively).)

misrepresented itself to make "[DPLS] believe that [FirstFire] was *not* a dealer and thus not required to register as such" (Opp. at 20);[4] ever represented itself as a registered broker or dealer; or claimed that it was not a broker-dealer and not required to register prior to this suit.

Having failed to show that it was unaware of its claim in 2018, DPLS next resorts to the "continuing violation" doctrine, claiming that the statute of limitations does not apply because the underlying conduct was ongoing. (*Id.* at 20–21.) This argument also fails as a matter of law. The continuing violation doctrine does not apply where, as here, the "continuing violation" alleged is the performance of a contract entered into prior to the statute of limitations. *Kahn v. Kohlberg, Kravis, Roberts & Co.*, 970 F.2d 1030, 1040 (2d Cir. 1992) ("[O]nce plaintiff has committed itself to the transaction, the claim accrued and thus the statute begins to run.").

DPLS's attempt to distinguish the contract in *Kahn* as "substantially different" is unavailing. (Opp. at 20.) The standard in *Kahn* applies to any "contract calling for subsequent payments," under which there is no "continuing violation" that extends the limitations period if the plaintiff has committed to pay that amount previously. *Kahn*, 970 F.2d at 1040. DPLS seeks to sidestep *Kahn* by claiming that "[e]ach conversion and sale constituted an independent act and inflicted a new and accumulating injury to DarkPulse and its shareholders" (Opp. at 21), but the issue is whether DPLS committed to those subsequent transactions as of September 2018 and had no right to terminate the agreement to avoid them, *Kahn*, 970 F.2d at 1040; (*see also* FAC Ex. 1). There is no question DPLS committed itself to these subsequent transactions under the 2018 Note; thus, there is no "continuing violation" that extends the three-year limitations period.[5]

---

[4]      DPLS's reliance on *Busher v. Barry*, 2019 U.S. Dist. LEXIS 172754 (S.D.N.Y. 2019), is misplaced. In *Busher*, a shareholder derivative action alleging breach of fiduciary duty, the court held under New York law that plaintiff had not waived any objection to the company's conduct because plaintiff was a successor-in-interest to a person who had died by the time the company took the action at issue. *Id.* at *18–19.

[5]      DPLS's other cases are either inapposite or support Defendants' argument. (Opp. at 20.) First, DPLS relies on a case from the Southern District of Florida, where the court held, in the context of a Section 15(a) claim brought by the S.E.C., that it could consider violations that occurred before the statute of limitations ran. *SEC v. Almagarby*,

### C.   The Notes Did Not Involve a Prohibited Transaction.

In Defendants' opening brief, Defendants cited numerous courts in this Circuit that have rejected on the merits Section 29(b) claims virtually identical to DPLS's claim here.  (MTD at 13 (collecting cases).)  In response, DPLS argues two of the cases, *Vystar* and *ExeLED*, are distinguishable because the Notes did require FirstFire to violate the Exchange Act and the Court in those cases mistakenly "analyzed the contracts as if they were brokerage services contracts instead of *securities contracts*." (Opp. at 16.)  Neither theory holds water.  First, DPLS argues that because the SPAs obligated FirstFire to purchase the Notes, the SPAs cannot be performed without violating the Exchange Act.  (*Id.*)  However, obligating FirstFire to purchase the Notes does not "explicitly require" FirstFire to act as a broker.  *Found. Ventures, LLC v. F2G, LTD.*, 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010).  Further, the SPA in *ExeLED* contained language, near-identical to the language in the SPAs DPLS highlights here, which obligated the plaintiff to purchase the Note.  (*Compare* Decl. Ex. Q § C.1.a, *LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, Case No. 1:17-cv-04006-LJL-OTW (S.D.N.Y. July 10, 2017), Dkt. No. 26-1 (obligating that "the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto"), *with* Opp. at 16 (same).)

DPLS next turns to an interpretation of Section 29(b) already rejected by this Court,

---

479 F. Supp. 3d 1266, 1271 (S.D. Fla. 2020) ("[A] decision as to whether Defendants acted as dealers will require an evaluation of the totality of Defendants' conduct.  Because some of that conduct occurred within the limitations period, the statute of limitations does not bar the SEC's disgorgement claim.").  Next, DPLS cites a Northern District of California case where the court held that where the defendant entered into contracts *every year* that allegedly violated the Investment Company Act, the case was distinguishable from cases involving "continuing ill effects of an earlier violation."  *UFCW Local 1500 Pension Fund v. Mayer*, 2016 U.S. Dist. LEXIS 145091, at *35 (N.D. Cal. 2016).  DPLS's remaining two cases rejected DPLS's argument that where, as here, the alleged "continuing violation" is the performance of a contract, the statute of limitations begins to run from the date of the contract, not its performance.  *See Ingenito v. Bermec Corp.*, 376 F. Supp. 1154, 1184 (S.D.N.Y. 1974) ("Each payment [on the promissory note] represented not the creation or assumption of new obligations, but the fulfillment of those previously created."); *US Airways, Inc. v. Sabre Holdings Corp.*, 938 F.3d 43, 69 (2d Cir. 2019) ("We thus conclude that . . . the prior overt act of entering into the 2006 contract . . . began the running of the statute of limitations . . . .").

5

claiming it is supported U.S. Supreme Court and Second Circuit precedent.  (Opp. at 16–17.)
However, DPLS's descriptions of *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970) and
*Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970) are plainly incorrect.  *Mills*
involved a merger where shareholders alleged the proxy was materially false and misleading.
396 U.S. at 378–79.  The issue for the Supreme Court was whether plaintiffs had shown that
this disclosure violation caused their injury.  *Id.*  The Supreme Court held that causation is
sufficiently shown under Section 14(a) where plaintiffs show the "proxy solicitation itself, rather
than the particular defect in the solicitation materials, was an essential link in the
accomplishment of the transaction."  *Id.* at 385.  But contrary to DPLS's assertion (Opp. at 17),
the Court made *no* ruling as to the appropriate remedy.  *Id.* at 386 ("Our conclusion that
petitioners have established their case . . . implies nothing about the form of relief to which they
may be entitled.").  In fact, the Court observed that because shareholders were not parties to the
merger agreement, they "do not enjoy a statutory right under s 29(b) to set it aside." *Id.* at 388.
As the district court eventually awarded monetary damages, *Mills v. Elec. Auto-Lite Co.*,
552 F.2d 1239, 1241 (7th Cir. 1977), the Supreme Court never "affirmed rescission of the
merger contract" under Section 29(b), as DPLS claims (Opp. at 17).   And DPLS similarly
misconstrues *Pearlstein v. Scudder & German*, 429 F.2d 1136 (2d Cir. 1970), which held that
plaintiff's claim under Section 7 of the Exchange Act was not barred by two settlement
agreements, as those agreements "resulted in a continuation of credit in violation of Regulation
T, and under Section 29(b)."[6] *Id.* at 1142.  Those agreements, by their terms, obligated "plaintiff
[to] pay if defendant extended further credit" and thus were "void" under Section 29(b).  *Id.*[7]

---

[6]      *Pearlstein* also held that plaintiffs have a private right of action under Section 7, which was later overturned
by the Second Circuit in *Bennett v. U.S. Tr. Co. of New York*, 770 F.2d 308, 313 (2d Cir. 1985).  It is an open question
whether the remainder of *Pearlstein* is still good law.

[7]      DPLS's reliance on Fifth Circuit precedent does not save its claims, as this Court already declined to follow

A-476

**D.**     **FirstFire Is Not a Dealer.**

Devoid of factual allegations, the FAC instead makes legal conclusions that FirstFire is a dealer under the Exchange Act.  But "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions.  Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  Here, DPLS alleges "FirstFire buys securities, converts securities, and sells securities as part of its regular business for its own account" (FAC ¶ 51); "FirstFire acquires large volumes of shares directly from issuers at a substantial discount to market, sells large volumes of shares back into the open market for a substantial profit due to the conversion discount, and does so for its own account and absent investment intent"[8] (*id.*); and "[o]perating as an underwriter is not acting as a trader, but as a securities dealer, which requires registration with the SEC" (*id.* ¶ 62).  These legal conclusions cannot support DPLS's claims.  DPLS also points to FirstFire's conversion of the 2018 Note, over three years, as evidence that FirstFire "quickly resells the stock" from conversions to obtain the underwriting spread.   (*Id.* ¶¶ 35, 36; Opp. at 21.)  This only shows the slow conversion of the 2018 Note over *years*, not the "quick" conversion and stock sale DPLS claims.  FirstFire was not acting as a dealer, no specific allegations are to the contrary, and Counts I–III must be dismissed.[9]

---

it in assessing Section 29(b) claims.  *EMA Fin., LLC v. NFusz, Inc.*, 509 F. Supp. 3d 18, 37 n.22 (S.D.N.Y. 2020) ("NFusz's reliance on Fifth Circuit precedents, which are not binding on this Court, is of no assistance to NFusz.").

[8]     Both SPAs contain a warranty from FirstFire stating FirstFire "is purchasing the Note and the shares of Common Stock issuable upon conversion . . . for its own account and not with a present view towards the public sale or distribution thereof."  (FAC Ex. 1 at 25–26; *id.* Ex. 2 at 23.)

[9]     DPLS makes no mention in its opposition of Defendants' arguments to dismiss Count III.  Having failed to oppose Defendants' argument, DPLS has waived that issue.  *See Kao v. Brit. Airways, PLC*, 2018 WL 501609, at *5 (S.D.N.Y. Jan. 19, 2018).  Count III must be dismissed.

## III.   PLAINTIFF'S RICO ALLEGATIONS FAIL TO STATE A CLAIM.

### A.   Count IV Must Be Dismissed Against Both Defendants.

DPLS's effort to state a RICO claim is wholly futile.  As a threshold matter, DPLS concedes that Count IV must be dismissed against FirstFire when it acknowledged that Mr. Fireman is alleged to be the RICO "person" and FirstFire the RICO "enterprise." (Opp. at 22.)  It is well established that "the same entity cannot be <u>both</u> the RICO person and the enterprise" and only the "RICO person" may be held liable.  *U1it4less, Inc. v. Fedex Corp.*, 871 F.3d 199, 205 (2d Cir. 2017).  Accordingly, based on DPLS's own allegations, there can be no claim against FirstFire.

DPLS also fails to state a claim as to Mr. Fireman, as the FAC contains no allegations that Fireman engaged in ***any*** supposedly unlawful conduct.  The only such allegations are against FirstFire (against whom DPLS cannot state a claim).  For example, DPLS alleges FirstFire, not Mr. Fireman, engaged "in the business of making usurious loans" and "collected an unlawful debt from" DPLS.  (FAC ¶¶ 12, 72.)  DPLS fails to plead a cognizable RICO claim against Mr. Fireman.

### B.   DPLS Fails to Allege Any Unlawful Debt as New York Law Does Not Apply.

New York law does not apply to either Note.  As to the 2021 Note, DPLS relies on its allegations that a void contract "cannot be amended" regardless of the parties' agreement as to the Amendment's effective date or that the choice-of-law provision is presumptively enforceable and does not violate any fundamental policy of New York.  (Section I.B, *supra*; MTD at 18–21.)

As to the 2018 Note, DPLS argues the Court should disregard the choice-of-law provision in favor of New York's usury law, because Nevada's law violates a fundamental policy of New York and the parties have "the most significant relationship" with New York.  (Opp. at 11–12.) *First*, applying Nevada law does not violate a fundamental policy of New York in this case.  DPLS misleadingly quotes from *United States v. Moseley*, 980 F.3d 9 (2d Cir. 2020), yet asks this Court to ignore that case's instruction.  (Opp. at 13.)  There, the Second Circuit noted that "when courts

8

determine whether New York would enforce choice-of-law provisions set out in a contract, corporations conducting their business transactions should be treated differently from individual consumers seeking personal credit" and affirmed the line of cases in this Circuit that rejected applying the public policy exception to choice-of-law provisions between two corporations. *Id.* at 22 (citing approvingly *Walter E. Heller & Co. v. Chopp-Wincroft Printing Specialties, Inc.*, 587 F. Supp. 557, 560 (S.D.N.Y. 1982); *RMP Cap. Corp. v. Bam Brokerage, Inc.*, 21 F. Supp. 3d 173, 186 (E.D.N.Y. 2014); *Sup. Funding Corp. v. Big Apple Cap. Corp.*, 738 F. Supp. 1468, 1471 (S.D.N.Y. 1990)). The court in *Moseley* distinguished *Madden v. Midland Funding, LLC*, 237 F. Supp. 3d 130, 149–50 (S.D.N.Y. 2017), on which DPLS relies (Opp. at 11–12),[10] as that case involved "individual consumers seeking personal credit." *Moseley*, 980 F.3d at 22. Thus, applying the corporate parties' chosen law to the Notes does not violate a fundamental policy of New York.

*Second*, DPLS fails to show Nevada has no reasonable relationship to the 2018 Note. DPLS misstates the test, which is whether the state has "*no reasonable relationship*"—*not* "the most significant relationship"—with the parties or transaction. *EMA Fin., LLC v. NFusz, Inc.*, 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020). The 2018 Note's only connection to New York is that FirstFire is headquartered there. (FAC ¶ 19.) DPLS infers, unsupported by the FAC, that "FirstFire also negotiated, entered into, and performed the September 2018 Note from New York." (Opp. at 12.) DPLS also claims it "suffered all harm under the" 2018 Note while headquartered in New York, but this is irrelevant. *See Zurich Ins. Co. v. Shearson Lehman Hutton, Inc.*, 84 N.Y.2d 309, 317 (1994). DPLS notes the parties' incorporation in Delaware (FAC ¶¶ 17, 19) and that the Amendment was negotiated in Nevada (*id.* ¶ 46) yet fails to show either state—which

---

[10]     DPLS also cites *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc.*, 2022 WL 426199, at *8–9 (S.D.N.Y. Feb. 11, 2022), which involved a choice-of-law analysis for a tort claim, an entirely different test that is irrelevant to the contract-based claims here.

have no usury laws—has no reasonable relationship to the Notes.  (MTD at 19–20.)

      **C.**      **DPLS Fails to Allege FirstFire Is Engaged in Unlawful Debt Collection.**

      DPLS's allegation regarding FirstFire's supposed collection of unlawful debts centers on its "Transaction List," yet nowhere does DPLS explain whether these transactions included New York choice-of-law provisions, or why New York usury law applies.  (Opp. at 22.)  DPLS simply asserts that FirstFire engaged in unlawful debt collection "204 times" (*id.* at 23 n.22), showing DPLS's theory of RICO liability relies on New York usury law applying to all promissory notes, regardless of choice-of-law provisions.  (*See* MTD at 21 n.18.)  DPLS's allegations are bolstered only by legal conclusions that "FirstFire is in the business of making usurious loans" (FAC ¶ 72), and that FirstFire "committed multiple related acts of unlawful debt collection from a plethora of other desperate public companies throughout the country" (*id.* ¶ 120).  DPLS fails to allege with specificity that FirstFire is "engaged in the business" of making *usurious* loans.  (MTD at 23.)

**IV.**     **PLAINTIFF'S STATE LAW CLAIMS (COUNTS V–VI) MUST BE DISMISSED.**

      Attempting to salvage its state law claims, DPLS argues that no valid contract exists.  (Opp. at 24.)  This misses the mark.  For the same reasons DPLS's Section 29(b) claim fails to show that the Notes required FirstFire to violate Section 15(a), DPLS's theory that its unjust enrichment claim survives because the agreements had "unlawful objective[s]" also fails.  (Section II.C, *supra*.)  Nothing in the Notes or SPAs renders them illegal and thus there is no unjust enrichment.

**CONCLUSION**

      For the foregoing reasons, Defendants respectfully move this Court to dismiss the First Amended Complaint with prejudice.

A-480

Dated:  June 30, 2022

/s/ Aaron H. Marks

Aaron H. Marks, P.C.
Byron Pacheco
Julia D. Harper
KIRKLAND & ELLIS LLP
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

*Attorneys for Defendants*

A-481

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

---

DARKPULSE, INC.,

          Plaintiff,

v.

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC and ELI FIREMAN

          Defendants.

Index No. 1:21-cv-11222 (ER)

---

## DECLARATION OF AARON H. MARKS IN SUPPORT OF DEFENDANTS' REPLY MEMORANDUM OF LAW IN FURTHER SUPPORT OF THEIR MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

I, Aaron H. Marks, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

    1.     I am a partner of the law firm of Kirkland & Ellis LLP, counsel of record for Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman in the above-captioned action. I have personal knowledge of the facts set forth in this Declaration, unless otherwise indicated. I submit this Declaration in support of Defendants' Reply Memorandum of Law in Further Support of Their Motion to Dismiss the First Amended Complaint.

    2.     Attached hereto as **Exhibit Q** is a true and correct copy of the Securities Purchase Agreement dated August 19, 2015, by and between Energie Holdings, Inc. and LG Capital Funding, LLC, attached as an exhibit to the First Amended Complaint filed in *LG Capital Funding, LLC v. ExeLED Holdings Inc.*, Case No. 1:17-cv-04006-LJL-OTW (S.D.N.Y. July 10, 2017), Dkt. No. 26-1.

A-482

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on June 30, 2022 in Westchester County, New York.

/s/ Aaron H. Marks
Aaron H. Marks

A-483

# Exhibit Q

## SECURITIES PURCHASE AGREEMENT

This **SECURITIES PURCHASE AGREEMENT** (the "Agreement"), dated as of August 19, 2015, by and between **Energie Holdings, Inc.**, a Delaware corporation, with headquarters located at 4885 Ward Road, Suite 300, Wheat Ridge, CO 80033 (the "Company"), and **LG CAPITAL FUNDING, LLC**, a New York limited liability company, with its address at 1218 Union Street, Suite #2, Brooklyn, NY 11225 (the "Buyer").

**WHEREAS**:

A.     The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by the rules and regulations as promulgated by the United States Securities and Exchange Commission (the "SEC") under the Securities Act of 1933, as amended (the "1933 Act");

B.     Buyer desires to purchase and the Company desires to issue and sell, upon the terms and conditions set forth in this Agreement an 8% convertible note of the Company, in the forms attached hereto as Exhibit A in the aggregate principal amount of $58,937.26 (together with any note(s) issued in replacement thereof or as a dividend thereon or otherwise with respect thereto in accordance with the terms thereof, the "Note"), convertible into shares of common stock, of the Company (the "Common Stock"), upon the terms and subject to the limitations and conditions set forth in such Note. The Note shall contain an original issue discount such that the purchase price of the Note shall be $54,396.14.

C.     The Buyer wishes to purchase, upon the terms and conditions stated in this Agreement, such principal amount of Note as is set forth immediately below its name on the signature pages hereto; and

**NOW THEREFORE**, the Company and the Buyer severally (and not jointly) hereby agree as follows:

1.     Purchase and Sale of Note.

a.     Purchase of Note. On each Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company such principal amount of Note as is set forth immediately below the Buyer's name on the signature pages hereto.

HRH
Company Initials

b.    <u>Form of Payment</u>. On the Closing Date (as defined below), (i) the Buyer shall pay the purchase price for the Note to be issued and sold to it at the Closing (as defined below) (the "Purchase Price") by wire transfer of immediately available funds to the Company, in accordance with the Company's written wiring instructions, against delivery of the Note in the principal amount equal to the Purchase Price as is set forth immediately below the Buyer's name on the signature pages hereto, and (ii) the Company shall deliver such duly executed Note on behalf of the Company, to the Buyer, against delivery of such Purchase Price.

c.    <u>Closing Date</u>. The date and time of the first issuance and sale of the Note pursuant to this Agreement (the "Closing Date") shall be on or about August 19, 2015, or such other mutually agreed upon time. The closing of the transactions contemplated by this Agreement (the "Closing") shall occur on the Closing Date at such location as may be agreed to by the parties.

2.    <u>Buyer's Representations and Warranties.</u> The Buyer represents and warrants to the Company that:

a.    <u>Investment Purpose</u>. As of the date hereof, the Buyer is purchasing the Note and the shares of Common Stock issuable upon conversion of or otherwise pursuant to the Note, such shares of Common Stock being collectively referred to herein as the "Conversion Shares" and, collectively with the Note, the "Securities") for its own account and not with a present view towards the public sale or distribution thereof, except pursuant to sales registered or exempted from registration under the 1933 Act; <u>provided</u>, <u>however</u>, that by making the representations herein, the Buyer does not agree to hold any of the Securities for any minimum or other specific term and reserves the right to dispose of the Securities at any time in accordance with or pursuant to a registration statement or an exemption under the 1933 Act.

b.    <u>Accredited Investor Status</u>. The Buyer is an "accredited investor" as that term is defined in Rule 501(a) of Regulation D (an "Accredited Investor").

c.    <u>Reliance on Exemptions</u>. The Buyer understands that the Securities are being offered and sold to it in reliance upon specific exemptions from the registration requirements of United States federal and state securities laws and that the Company is relying upon the truth and accuracy of, and the Buyer's compliance with, the representations, warranties, agreements, acknowledgments and understandings of the Buyer set forth herein in order to determine the availability of such exemptions and the eligibility of the Buyer to acquire the Securities.

d.    <u>Information</u>. The Buyer and its advisors, if any, have been, and for so long as the Note remain outstanding will continue to be, furnished with all materials relating to the business, finances and operations of the Company and materials relating to the offer and sale of the Securities which have been requested by the Buyer or its advisors. The Buyer and its advisors, if any, have been, and for so long as the Note remain outstanding will continue to be, afforded the opportunity to ask questions of the Company. Notwithstanding the foregoing, the

2

Company has not disclosed to the Buyer any material nonpublic information and will not disclose such information unless such information is disclosed to the public prior to or promptly following such disclosure to the Buyer. Neither such inquiries nor any other due diligence investigation conducted by Buyer or any of its advisors or representatives shall modify, amend or affect Buyer's right to rely on the Company's representations and warranties contained in Section 3 below. The Buyer understands that its investment in the Securities involves a significant degree of risk. The Buyer is not aware of any facts that may constitute a breach of any of the Company's representations and warranties made herein.

       e.    <u>Governmental Review</u>. The Buyer understands that no United States federal or state agency or any other government or governmental agency has passed upon or made any recommendation or endorsement of the Securities.

       f.    <u>Transfer or Re-sale</u>. The Buyer understands that (i) the sale or re-sale of the Securities has not been and is not being registered under the 1933 Act or any applicable state securities laws, and the Securities may not be transferred unless (a) the Securities are sold pursuant to an effective registration statement under the 1933 Act, (b) the Buyer shall have delivered to the Company, at the cost of the Buyer, an opinion of counsel that shall be in form, substance and scope customary for opinions of counsel in comparable transactions to the effect that the Securities to be sold or transferred may be sold or transferred pursuant to an exemption from such registration, which opinion shall be accepted by the Company, (c) the Securities are sold or transferred to an "affiliate" (as defined in Rule 144 promulgated under the 1933 Act (or a successor rule) ("Rule 144")) of the Buyer who agrees to sell or otherwise transfer the Securities only in accordance with this Section 2(f) and who is an Accredited Investor, (d) the Securities are sold pursuant to Rule 144, or (e) the Securities are sold pursuant to Regulation S under the 1933 Act (or a successor rule) ("Regulation S"), and the Buyer shall have delivered to the Company, at the cost of the Buyer, an opinion of counsel that shall be in form, substance and scope customary for opinions of counsel in corporate transactions, which opinion shall be accepted by the Company; (ii) any sale of such Securities made in reliance on Rule 144 may be made only in accordance with the terms of said Rule and further, if said Rule is not applicable, any re-sale of such Securities under circumstances in which the seller (or the person through whom the sale is made) may be deemed to be an underwriter (as that term is defined in the 1933 Act) may require compliance with some other exemption under the 1933 Act or the rules and regulations of the SEC thereunder; and (iii) neither the Company nor any other person is under any obligation to register such Securities under the 1933 Act or any state securities laws or to comply with the terms and conditions of any exemption thereunder (in each case). Notwithstanding the foregoing or anything else contained herein to the contrary, the Securities may be pledged as collateral in connection with a <u>bona fide</u> margin account or other lending arrangement.

       g.    <u>Legends</u>. The Buyer understands that the Note and, until such time as the Conversion Shares have been registered under the 1933 Act may be sold pursuant to Rule 144 or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, the Conversion Shares may bear a restrictive legend in substantially the following form (and a stop-transfer order may be placed against transfer of the certificates for such Securities):

"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Company shall issue a certificate without such legend to the holder of any Security upon which it is stamped, if, unless otherwise required by applicable state securities laws, (a) such Security is registered for sale under an effective registration statement filed under the 1933 Act or otherwise may be sold pursuant to Rule 144 or Regulation S without any restriction as to the number of securities as of a particular date that can then be immediately sold, or (b) such holder provides the Company with an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Security may be made without registration under the 1933 Act, which opinion shall be accepted by the Company so that the sale or transfer is effected. The Buyer agrees to sell all Securities, including those represented by a certificate(s) from which the legend has been removed, in compliance with applicable prospectus delivery requirements, if any. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, within 2 business days, it will be considered an Event of Default under the Note.

h.    Authorization; Enforcement. This Agreement has been duly and validly authorized. This Agreement has been duly executed and delivered on behalf of the Buyer, and this Agreement constitutes a valid and binding agreement of the Buyer enforceable in accordance with its terms.

i.    Residency. The Buyer is a resident of the jurisdiction set forth immediately below the Buyer's name on the signature pages hereto.

3.    Representations and Warranties of the Company. The Company represents and warrants to the Buyer that:

4

       a.    <u>Organization and Qualification</u>.  The Company and each of its subsidiaries, if any, is a corporation duly organized, validly existing and in good standing under the laws of the jurisdiction in which it is incorporated, with full power and authority (corporate and other) to own, lease, use and operate its properties and to carry on its business as and where now owned, leased, used, operated and conducted.

       b.    <u>Authorization; Enforcement</u>.  (i) The Company has all requisite corporate power and authority to enter into and perform this Agreement, the Note and to consummate the transactions contemplated hereby and thereby and to issue the Securities, in accordance with the terms hereof and thereof, (ii) the execution and delivery of this Agreement, the Note by the Company and the consummation by it of the transactions contemplated hereby and thereby (including without limitation, the issuance of the Note and the issuance and reservation for issuance of the Conversion Shares issuable upon conversion or exercise thereof) have been duly authorized by the Company's Board of Directors and no further consent or authorization of the Company, its Board of Directors, or its shareholders is required, (iii) this Agreement has been duly executed and delivered by the Company by its authorized representative, and such authorized representative is the true and official representative with authority to sign this Agreement and the other documents executed in connection herewith and bind the Company accordingly, and (iv) this Agreement constitutes, and upon execution and delivery by the Company of the Note, each of such instruments will constitute, a legal, valid and binding obligation of the Company enforceable against the Company in accordance with its terms.

       c.    <u>Issuance of Shares</u>.  The Conversion Shares are duly authorized and reserved for issuance and, upon conversion of the Note in accordance with its respective terms, will be validly issued, fully paid and non-assessable, and free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Company and will not impose personal liability upon the holder thereof.

       d.    <u>Acknowledgment of Dilution</u>.  The Company understands and acknowledges the potentially dilutive effect to the Common Stock upon the issuance of the Conversion Shares upon conversion of the Note.  The Company further acknowledges that its obligation to issue Conversion Shares upon conversion of the Note in accordance with this Agreement, the Note is absolute and unconditional regardless of the dilutive effect that such issuance may have on the ownership interests of other shareholders of the Company.

       e.    <u>No Conflicts</u>.  The execution, delivery and performance of this Agreement, the Note by the Company and the consummation by the Company of the transactions contemplated hereby and thereby (including, without limitation, the issuance and reservation for issuance of the Conversion Shares) will not (i) conflict with or result in a violation of any provision of the Certificate of Incorporation or By-laws, or (ii) violate or conflict with, or result in a breach of any provision of, or constitute a default (or an event which with notice or lapse of time or both could become a default) under, or give to others any rights of termination, amendment, acceleration or cancellation of, any agreement, indenture, patent, patent license or instrument to which the Company or any of its subsidiaries is a party, or (iii) result in a violation of any law, rule, regulation, order, judgment or decree (including federal and state securities laws

5

and regulations and regulations of any self-regulatory organizations to which the Company or its securities are subject) applicable to the Company or any of its subsidiaries or by which any property or asset of the Company or any of its subsidiaries is bound or affected (except for such conflicts, defaults, terminations, amendments, accelerations, cancellations and violations as would not, individually or in the aggregate, have a material adverse effect). All consents, authorizations, orders, filings and registrations which the Company is required to obtain pursuant to the preceding sentence have been obtained or effected on or prior to the date hereof. The Company is not in violation of the listing requirements of the OTCQB marketplace (the "OTCQB") and does not reasonably anticipate that the Common Stock will be delisted by the OTCQB in the foreseeable future, nor are the Company's securities "chilled" by DTC. The Company and its subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

f.      Absence of Litigation. Except as disclosed in the Company's public filings, there is no action, suit, claim, proceeding, inquiry or investigation before or by any court, public board, government agency, self-regulatory organization or body pending or, to the knowledge of the Company or any of its subsidiaries, threatened against or affecting the Company or any of its subsidiaries, or their officers or directors in their capacity as such, that could have a material adverse effect. Schedule 3(f) contains a complete list and summary description of any pending or, to the knowledge of the Company, threatened proceeding against or affecting the Company or any of its subsidiaries, without regard to whether it would have a material adverse effect. The Company and its subsidiaries are unaware of any facts or circumstances which might give rise to any of the foregoing.

g.      Acknowledgment Regarding Buyer' Purchase of Securities. The Company acknowledges and agrees that the Buyer is acting solely in the capacity of arm's length purchasers with respect to this Agreement and the transactions contemplated hereby. The Company further acknowledges that the Buyer is not acting as a financial advisor or fiduciary of the Company (or in any similar capacity) with respect to this Agreement and the transactions contemplated hereby and any statement made by the Buyer or any of its respective representatives or agents in connection with this Agreement and the transactions contemplated hereby is not advice or a recommendation and is merely incidental to the Buyer' purchase of the Securities. The Company further represents to the Buyer that the Company's decision to enter into this Agreement has been based solely on the independent evaluation of the Company and its representatives.

h.      No Integrated Offering. Neither the Company, nor any of its affiliates, nor any person acting on its or their behalf, has directly or indirectly made any offers or sales in any security or solicited any offers to buy any security under circumstances that would require registration under the 1933 Act of the issuance of the Securities to the Buyer. The issuance of the Securities to the Buyer will not be integrated with any other issuance of the Company's securities (past, current or future) for purposes of any shareholder approval provisions applicable to the Company or its securities.

i.      Title to Property. The Company and its subsidiaries have good and marketable title in fee simple to all real property and good and marketable title to all personal

6

property owned by them which is material to the business of the Company and its subsidiaries, in each case free and clear of all liens, encumbrances and defects except such as are described in Schedule 3(i) or such as would not have a material adverse effect. Any real property and facilities held under lease by the Company and its subsidiaries are held by them under valid, subsisting and enforceable leases with such exceptions as would not have a material adverse effect.

        j.     Bad Actor. No officer or director of the Company would be disqualified under Rule 506(d) of the Securities Act as amended on the basis of being a "bad actor" as that term is established in the September 19, 2013 Small Entity Compliance Guide published by the Securities and Exchange Commission.

        k.     Breach of Representations and Warranties by the Company. If the Company breaches any of the representations or warranties set forth in this Section 3, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an Event of default under the Note.

        4.     COVENANTS.

        a.     Expenses. At the Closing, the Company shall reimburse Buyer for expenses incurred by them in connection with the negotiation, preparation, execution, delivery and performance of this Agreement and the other agreements to be executed in connection herewith ("Documents"), including, without limitation, reasonable attorneys' and consultants' fees and expenses, transfer agent fees, fees for stock quotation services, fees relating to any amendments or modifications of the Documents or any consents or waivers of provisions in the Documents, fees for the preparation of opinions of counsel, escrow fees, and costs of restructuring the transactions contemplated by the Documents. When possible, the Company must pay these fees directly, otherwise the Company must make immediate payment for reimbursement to the Buyer for all fees and expenses immediately upon written notice by the Buyer or the submission of an invoice by the Buyer. The Company's obligation with respect to this transaction is to reimburse Buyer's expenses shall be $8,984.93 in legal fees which shall be deduced from the Note when funded.

        b.     Listing. The Company shall promptly secure the listing of the Conversion Shares upon each national securities exchange or automated quotation system, if any, upon which shares of Common Stock are then listed (subject to official notice of issuance) and, so long as the Buyer owns any of the Securities, shall maintain, so long as any other shares of Common Stock shall be so listed, such listing of all Conversion Shares from time to time issuable upon conversion of the Note. The Company will obtain and, so long as the Buyer owns any of the Securities, maintain the listing and trading of its Common Stock on the OTCQB or any equivalent replacement market, the Nasdaq stock market ("Nasdaq"), the New York Stock Exchange ("NYSE"), or the American Stock Exchange ("AMEX") and will comply in all respects with the Company's reporting, filing and other obligations under the bylaws or rules of the Financial Industry Regulatory Authority ("FINRA") and such exchanges, as applicable. The

Company shall promptly provide to the Buyer copies of any notices it receives from the OTCQB and any other markets on which the Common Stock is then listed regarding the continued eligibility of the Common Stock for listing on such markets.

c.    <u>Corporate Existence</u>.  So long as the Buyer beneficially owns any Note, the Company shall maintain its corporate existence and shall not sell all or substantially all of the Company's assets, except in the event of a merger or consolidation or sale of all or substantially all of the Company's assets, where the surviving or successor entity in such transaction (i) assumes the Company's obligations hereunder and under the agreements and instruments entered into in connection herewith and (ii) is a publicly traded corporation whose Common Stock is listed for trading on the OTCQB, Nasdaq, NYSE or AMEX.

d.    <u>No Integration</u>.  The Company shall not make any offers or sales of any security (other than the Securities) under circumstances that would require registration of the Securities being offered or sold hereunder under the 1933 Act or cause the offering of the Securities to be integrated with any other offering of securities by the Company for the purpose of any stockholder approval provision applicable to the Company or its securities.

e.    <u>Right of First Refusal.</u>  While the Notes are outstanding, the Company shall grant the Buyer the right of first refusal for the issuance of any convertible debt transactions (or other convertible security) or other registered public offering.

f.    <u>Breach of Covenants</u>.  If the Company breaches any of the covenants set forth in this Section 4, and in addition to any other remedies available to the Buyer pursuant to this Agreement, it will be considered an event of default under the Note.

5.    <u>Governing Law; Miscellaneous</u>.

a.    <u>Governing Law</u>.  This Agreement shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws.  Any action brought by either party against the other concerning the transactions contemplated by this Agreement shall be brought only in the state courts of New York or in the federal courts located in the state and county of New York.  The parties to this Agreement hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*.  The Company and Buyer waive trial by jury.  The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs.  In the event that any provision of this Agreement or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law.  Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement.  Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with

this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

        b.     Counterparts; Signatures by Facsimile. This Agreement may be executed in one or more counterparts, each of which shall be deemed an original but all of which shall constitute one and the same agreement and shall become effective when counterparts have been signed by each party and delivered to the other party. This Agreement, once executed by a party, may be delivered to the other party hereto by facsimile transmission of a copy of this Agreement bearing the signature of the party so delivering this Agreement.

        c.     Headings. The headings of this Agreement are for convenience of reference only and shall not form part of, or affect the interpretation of, this Agreement.

        d.     Severability. In the event that any provision of this Agreement is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

        e.     Entire Agreement; Amendments. This Agreement and the instruments referenced herein contain the entire understanding of the parties with respect to the matters covered herein and therein and, except as specifically set forth herein or therein, neither the Company nor the Buyer makes any representation, warranty, covenant or undertaking with respect to such matters. No provision of this Agreement may be waived or amended other than by an instrument in writing signed by the majority in interest of the Buyer.

        f.     Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, (iv) via electronic mail or (v) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received) or delivery via electronic mail, or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

        If to the Company, to:

Energie Holdings, Inc.
4885 Ward Road, Suite 300
Wheat Ridge, CO 80033
Attn: Harold Hansen, CEO

If to the Buyer:
LG CAPITAL FUNDING, LLC
1218 Union Street, Suite #2
Brooklyn, NY 11225
Attn: Joseph Lerman, Manager


Each party shall provide notice to the other party of any change in address.

      g.    <u>Successors and Assigns</u>. This Agreement shall be binding upon and inure to the benefit of the parties and their successors and assigns. Neither the Company nor the Buyer shall assign this Agreement or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Buyer may assign its rights hereunder to any person that purchases Securities in a private transaction from the Buyer or to any of its "affiliates," as that term is defined under the 1934 Act, without the consent of the Company.

      h.    <u>Third Party Beneficiaries</u>. This Agreement is intended for the benefit of the parties hereto and their respective permitted successors and assigns, and is not for the benefit of, nor may any provision hereof be enforced by, any other person.

      i.    <u>Survival</u>. The representations and warranties of the Company and the agreements and covenants set forth in this Agreement shall survive the closing hereunder notwithstanding any due diligence investigation conducted by or on behalf of the Buyer. The Company agrees to indemnify and hold harmless the Buyer and all their officers, directors, employees and agents for loss or damage arising as a result of or related to any breach or alleged breach by the Company of any of its representations, warranties and covenants set forth in this Agreement or any of its covenants and obligations under this Agreement, including advancement of expenses as they are incurred.

      j.    <u>Further Assurances</u>. Each party shall do and perform, or cause to be done and performed, all such further acts and things, and shall execute and deliver all such other agreements, certificates, instruments and documents, as the other party may reasonably request in order to carry out the intent and accomplish the purposes of this Agreement and the consummation of the transactions contemplated hereby.

      k.    <u>No Strict Construction</u>. The language used in this Agreement will be deemed to be the language chosen by the parties to express their mutual intent, and no rules of strict construction will be applied against any party.

l.   <u>Remedies</u>.  The Company acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Buyer by vitiating the intent and purpose of the transaction contemplated hereby.  Accordingly, the Company acknowledges that the remedy at law for a breach of its obligations under this Agreement will be inadequate and agrees, in the event of a breach or threatened breach by the Company of the provisions of this Agreement, that the Buyer shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Agreement and to enforce specifically the terms and provisions hereof, without the necessity of showing economic loss and without any bond or other security being required.

IN WITNESS WHEREOF, the undersigned Buyer and the Company have caused this Agreement to be duly executed as of the date first above written.

**Energie Holdings, Inc.**

By: _____
        Harold Hansen
        Chief Executive Officer

**LG CAPITAL FUNDING, LLC.**

By: _____
Name: Joseph Lerman
Title:   Manager

AGGREGATE SUBSCRIPTION AMOUNT:

Aggregate Principal Amount of Note:                              $58,937.26

Aggregate Purchase Price:

Note 1: $58,937.26 less $4,541.12 in OID, less $8,984.93 in legal fees

A-496

**EXHIBIT A**
**144 NOTE - $58,937.26**

A-498

# KIRKLAND & ELLIS LLP
### AND AFFILIATED PARTNERSHIPS

Aaron Marks, P.C.
To Call Writer Directly:
+1 212 446 4856
aaron.marks@kirkland.com

601 Lexington Avenue
New York, NY 10022
United States

+1 212 446 4800

www.kirkland.com

Facsimile:
+1 212 446 4900

September 29, 2022

The Honorable Edgardo Ramos
U.S. District Court for the
Southern District of New York
Thurgood Marshall U.S. Courthouse
40 Foley Square
New York, NY 10007

        Re:    *DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC et al.*,
               Case No. 1:21-cv-11222-ER

Dear Judge Ramos:

        We represent Defendants FirstFire Global Opportunities Fund, LLC and Eli Fireman
("Defendants") in connection with the above-referenced action. We write to respectfully submit
the below supplemental authority regarding Section 29(b), 15 U.S.C. § 78cc(b), for your
consideration in connection with Defendants' Motion to Dismiss the First Amended Complaint
(Dkt. Nos. 30–33, 37–38).

- *EMA Financial, LLC v. AppTech Corp.*, 2022 WL 4237144, at *6–7 (S.D.N.Y.
  Sept. 13, 2022) ("A party cannot enjoy the benefits of a contract and then relieve
  itself of any obligations under that contract on the sole basis that its counterparty
  engages in business as a broker-dealer and should have registered with the SEC.")

A-499

## KIRKLAND & ELLIS LLP

Hon. Edgardo Ramos
September 29, 2022
Page 2

Respectfully submitted,

Aaron Marks, P.C.

*Counsel for Defendants FirstFire Global
Opportunities Fund, LLC & Eli Fireman*

A-500

2022 WL 4237144
Only the Westlaw citation is currently available.
United States District Court, S.D. New York.

EMA FINANCIAL, LLC, a Delaware
Limited Liability Company, Plaintiff,

v.

APPTECH CORP., a Wyoming Corporation, Defendant.

21-cv-06049 (LJL)
|
Signed September 13, 2022

**Attorneys and Law Firms**

Jeffrey Fleischmann, New York, NY, for Plaintiff.

Gabriel Oliver Koppell, Law Offices of G. Oliver Koppell & Assoc., New York, NY, for Defendant.

OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

**\*1** Plaintiff EMA Financial, LLC ("Plaintiff" or "EMA") brings this action alleging that Apptech Corp. ("Defendant" or "AppTech")[1] breached a securities purchase agreement ("Securities Purchase Agreement" or "SPA"), a related convertible note agreement ("Note"), and a common stock purchase warrant agreement ("Warrant," and together with the Note and the SPA, the "Agreements"). EMA moves for summary judgment and argues that it shsould be granted attorneys' fees and a total of $1,901,999.16 in damages, reflecting $1,473,999.77 for breach of the Note and $427,999.39 for breach of the Warrant. Dkt. No. 14. AppTech moves to dismiss the Complaint in its entirety on the basis that the Agreements are void and illegal. Dkt. No. 20. For the following reasons, the motion for summary judgment is granted in part and denied in part, and the motion to dismiss is denied.

**BACKGROUND**

The following facts are undisputed, as indicated by EMA's statement submitted pursuant to Rule 56 of the Federal Rules of Civil Procedure and Rule 56.1 of the Local Rules of the United States District Court for the Southern District of New York (the "Rule 56.1 Statement") and the evidence submitted in connection with the summary judgment motion.[2] Dkt. No. 28.

**\*2** On or about November 18, 2020, AppTech, a small public corporation, entered into the Securities Purchase Agreement and two related securities contracts with EMA, an investment firm. Those contracts were: the Note, issued to EMA for $300,000 in convertible debt, id. ¶ 1, and the Common Stock Purchase Warrant, which provided EMA the option to purchase up to 200,000 shares of AppTech stock, id. ¶ 2.

The Note provides that EMA may convert amounts due under the Note, at any time after issuance of the Note, into shares of AppTech common stock. Id. ¶¶ 3, 9. Under the terms of the Note, EMA may do so by submitting a "Notice of Conversion" to AppTech or AppTech's transfer agent.[3] Id. ¶ 4. The Note also sets a conversion price that determines the number of shares to be issued. More specifically, Section 1.2(a) of the Note states that:

> The conversion price hereunder (the "Conversion Price") per share shall equal one dollar ($1) for the one hundred eighty (180) days immediately following the Issue Date, and thereafter shall equal the lower of: (i) the lowest closing price of the Common Stock during the preceding twenty-five (25) Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note or (ii) 75% of the lowest trading price for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days including and immediately preceding the Conversion Date.

Id. ¶ 5; Dkt. No. 12-2 § 1.2(a). After EMA submits a Notice of Conversion, AppTech is obligated under the Note to issue and deliver certificates for common stock within one business day after receipt of the Notice of Conversion. Dkt. No. 28 ¶ 6.

The Note also requires that AppTech, "at all times while this Note is outstanding[,] reserve from its authorized and

unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion or adjustment of this Note."*Id.* ¶ 6; Dkt. No. 12-2 § 1.3. Further, AppTech is obligated under the SPA to direct its transfer agent to ensure that such shares are freely available for conveyance without delay, unburdened by any restrictive legends. Dkt. No. 28 ¶¶ 8, 22.

Like the Note, the Warrant also allows for exercise of its purchase rights at any time in whole or in part after issuance of the Warrant and before its expiration. *Id.* ¶ 9. EMA can exercise the Warrant by sending a "Notice of Exercise" to AppTech. *Id.* ¶¶ 9–11. AppTech is obligated under the Warrant to deliver these shares within three trading days of delivery of the Notice of Exercise. *Id.* ¶¶ 10–11. AppTech was also required to maintain a reserve of 500% of the total shares of Common Stock issuable upon full exercise of the Warrant. *Id.* ¶ 11.

On July 13, 2021, EMA, in accordance with the terms of the Agreements, submitted two Notices of Conversion seeking to convert the debt that it was owed into 990,791 common shares ("First Notice of Conversion") and 491,262 common shares ("Second Notice of Conversion"). That same day, EMA also submitted a Notice of Exercise to AppTech exercising EMA's right to purchase 480,000 warrant shares of stock, which translated into 287,693 common shares. *Id.* ¶¶ 14–16, Dkt. No. 12-6 (Notice of Exercise). AppTech did not honor the Notices of Conversion and the Notice of Exercise. Dkt. No. 28 ¶ 17. Instead, AppTech sent a letter to its transfer agent indicating AppTech's view that the transaction was "void" and "illegal" and that AppTech would not perform under those Agreements. *Id.* ¶¶ 18–19. EMA subsequently sent notice to AppTech that one or more events of default had occurred under the Agreements. *Id.* ¶ 20.

**\*3** For both the Note and the Warrant, AppTech failed to maintain an adequate reserve of shares. *Id.* ¶ 13. Section 3.20 of the Note provides that the failure to do so constitutes an "Event of Default" under that agreement. *Id.* ¶ 21. Section 5(d) of the Warrant also obligates AppTech to execute the terms of the Warrant in good faith. *Id.* ¶ 24. The Note provides that a violation of the SPA or the Warrant also constitutes an "Event of Default" under the Note. *Id.* ¶¶ 23–25, 27.

The Note also contains provisions that specify damages and provide for fee-shifting in the case of an "Event of Default." Article III of the Note specifies that, upon default, AppTech

becomes liable to EMA in an amount equal to 200% of the sum of the outstanding principal, accrued interest, and default interest, which accrues on unpaid principal and interest at a rate of 24% per year. *Id.* ¶¶ 26, 29. The 200% amount under the Note becomes payable "without demand, present or notice, together with all costs, including ... legal fees and expenses." *Id.* ¶ 31. Section 4.5 of the Note also provides that in the case of default, AppTech will pay EMA the "costs of collection, including reasonable attorneys' fees." *Id.* ¶ 34. Finally, Section 8 of the Note permits EMA to enforce any and all of EMA's rights under the Note and SPA or otherwise permitted by law. *Id.* ¶ 28.

## PROCEDURAL HISTORY

EMA filed its Complaint against AppTech on July 14, 2021. Dkt. No. 1. EMA brought four claims against AppTech: (1) specific performance of the Agreements including, *inter alia*, an increase in the share reserve and immediate delivery of the shares pursuant to the Notices of Conversion and the Notice of Exercise; (2) breach of contract entitling EMA to damages in excess of principal in the sum of $2,750,000, inclusive of default interest, liquidated damages, and damage as provided by the Agreements;[4] (3) a permanent injunction enjoining AppTech from interfering with the performance of the Agreements and requiring AppTech to deliver the shares as called for; and (4) an award of costs and expenses including reasonable attorneys' fees.

EMA filed its motion for summary judgment on September 3, 2021. Dkt. No. 11. Apptech filed its motion to dismiss on September 9, 2021. Dkt. No. 17. Both parties submitted memoranda of law opposing the others' motions on October 15, 2021, Dkt. Nos. 22–25, and then submitted replies in support of their motions on October 25, 2021, Dkt. Nos. 26–27. AppTech submitted a counterstatement to EMA's Rule 56.1 Statement on October 29, 2021. Dkt. No. 28. The Court heard oral argument on September 6, 2022. Dkt. No. 37. Following oral argument, both parties submitted letters to the Court providing answers to questions raised during oral argument. Dkt. Nos. 38, 39.

## LEGAL STANDARD

Under Federal Rule of Civil Procedure 56, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the moving party

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "An issue of fact is 'material' for these purposes if it 'might affect the outcome of the suit under the governing law,' " while "[a]n issue of fact is 'genuine' if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.' " *Konikof v. Prudential Ins. Co. of Am.*, 234 F.3d 92, 97 (2d Cir. 2000) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)). In determining whether there are any genuine issues of material fact, the Court must view all facts "in the light most favorable to the non-moving party," *Holtz v. Rockefeller & Co.*, Inc., 258 F.3d 62, 69 (2d Cir. 2001), and the movant bears the burden of demonstrating that "no genuine issue of material fact exists," *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 286 (2d Cir. 2002) (citations omitted). If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co.*, 536 F.3d 140, 145 (2d Cir. 2008). To survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record." Fed. R. Civ. P. 56(c)(1)(A); see also *Wright v. Goord*, 554 F.3d 255, 266 (2d Cir. 2009).

**\*4** The Southern District's Local Civil Rule 56.1 sets forth specific requirements about how the facts relied upon by the moving party and disputed by the opposing party are to be presented. Any party moving for summary judgment must "annex [ ] to the notice of motion a separate, short and concise statement, in numbered paragraphs, of the material facts as to which the moving party contends there is no genuine issue to be tried." L.R. 56.1(a). Local Rule 56.1(b), in turn, requires the party opposing the motion to "include a correspondingly numbered paragraph responding to each numbered paragraph in the statement of the moving party, and if necessary, additional paragraphs containing a separate, short and concise statement of additional material facts as to which it is contended that there exists a genuine issue to be tried." L.R. 56.1(b). All statements in a Local Rule 56.1 submission "must be followed by citation to evidence which would be admissible." L.R. 56.1(d). "Each numbered paragraph in the statement of material facts set forth in the statement required to be served by the moving party will be deemed to be admitted for purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party." L.R. 56.1(c).

To survive a motion to dismiss for failure to state a claim, a complaint must include "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.' " *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A complaint must offer more than "labels and conclusions," "a formulaic recitation of the elements of a cause of action," or "naked assertion[s]" devoid of "further factual enhancement" in order to survive dismissal. *Twombly*, 550 U.S. at 555, 557. The ultimate question is whether "[a] claim has facial plausibility, [i.e.,] the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678.

## DISCUSSION

### I. Breach of Contract and Broker-Dealer Status

EMA moves for summary judgment on liability for its claim of breach of contract. Dkt. No. 14. AppTech opposes the motion and argues that the Complaint should be dismissed because the Agreements are void. Dkt. Nos. 20, 25.

The elements of a claim for breach of contract under Delaware law [5] are "first, the existence of the contract, whether express or implied; second, the breach of an obligation imposed by that contract; and third, the resultant damage to the plaintiff." *VLIW Tech., LLC v. Hewlett-Packard Co.*, 840 A.2d 606, 612 (Del. 2003). There is no genuine dispute of material fact that agreements existed between EMA and AppTech, Dkt. No. 28 ¶¶ 1–6, that EMA adequately performed under the Agreements by submitting its Notices of Conversion and Exercise and, in doing so, imposed an obligation on AppTech under the Agreements, *id.* ¶¶ 14–16, that AppTech failed to honor those obligations and thereby breached the Agreements, *id.* ¶¶ 21–27, or that EMA suffered damages, *id.* ¶¶ 28–34. EMA has asserted in its Rule 56.1 statement, and AppTech does not properly dispute, that AppTech breached by "(1) failing to raise the reserve of shares at EMA's request, (2) affirmatively stating that it would not honor EMA's notice of conversion, and (3) actually failing to honor EMA's notice of conversion, dated July 1[3], 202[1]." [6] Dkt. No. 14 at 8–9. [7]

**\*5** Instead, in its motion to dismiss and in its opposition to the motion for summary judgment, AppTech asserts as a defense to the breach of contract claim and as grounds for

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

holding the Agreements to be void that the Agreements are "contract[s] for the performance of an illegal act," Dkt. No. 20 at 1, because EMA is "acting as [an] unregistered dealer[ ]" in violation of Section 15(a) of the Securities and Exchange Act of 1934 (the "Exchange Act"), *id.* at 8 (citing 15 USC. § 78*o*(a)(1)). AppTech invokes Section 29(b) of the Exchange Act, *id.* (citing 15 U.S.C. § 78cc(b)), and argues that it was not possible for EMA to abide by the terms of the Agreements without violating the federal securities laws because EMA is in the business of selling the securities it buys pursuant to the agreements it enters with issuers. Dkt No. 20 at 3, 11. AppTech, in its opposition to summary judgment and during oral argument, further argues that EMA engages in "predatory lending practices to extort companies," Dkt. No. 25 at 16, and warns that EMA "essentially attempts to use the judicial system of the United States to facilitate [its] acting as a predatory lender," *id.* AppTech argues that EMA's business model is to purchase convertible debt securities and warrants from businesses otherwise struggling to raise capital with the goal of acquiring heavily discounted stock that EMA then "dumps" on the market for a significant profit. See Dkt. No. 25 at 16 (citing cases). According to AppTech, EMA does not engage in *bona fide* investments but instead takes advantage of financially strapped issuers.

EMA, in response, argues that is not a "dealer," but a "trader," and that there is nothing in the Agreements that would require EMA to register as a dealer. *See* Dkt. No. 23 at 3 (opposition to motion to dismiss); Dkt. No. 26 at 3–8 (reply in support of summary judgment). It also argues that, regardless of whether EMA was required to register as a broker-dealer, AppTech is required to perform its obligations under the Agreements. *See* Dkt. No. 26 at 6–8. It argues that there is nothing in the Agreements that would require EMA, even if it were required to register as a broker-dealer, to violate the terms of the Exchange Act. *See* Dkt. No. 23 at 7–8; Dkt. No. 26 at 7.

For the following reasons, the Court concludes that it need not decide whether EMA is required, as a general matter, to register as a broker-dealer. Even assuming that EMA was required to register as a broker-dealer, there is nothing in the Agreements that would require EMA to engage in conduct that violates the securities laws. Accordingly, the Court denies AppTech's motion to dismiss and grants EMA's motion for summary judgment on liability.

Under Section 15(a) of the Exchange Act, "[i]t shall be unlawful for any broker or dealer ... to effect any transactions in, or to induce or attempt to induce the purchase or sale of,

any security ... unless such broker or dealer is registered." 15 U.S.C. § 78*o*(a)(1). A "dealer" is defined by statute as "any person engaged in the business of buying *and selling* securities (not including security-based swaps, other than security-based swaps with or for persons that are not eligible contract participants) for such person's own account through a broker or otherwise." 15 U.S.C. § 78c(a)(5)(A) (emphasis added). It does "not include a person that buys or sells securities ... for such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business." *Id.* § 78c(a)(5)(B). "Whether an individual falls within this definition ... requires analysis of a variety of factors, including whether the individual: 'advertises or otherwise lets others know that it is in the business of buying and selling securities'; 'makes a market in, or quotes prices for both purchases and sales of, one or more securities'; and/ or 'provides services to investors, such as handling money and securities, extending credit, or giving investment advice.' " *Dervan v. Gordian Grp., LLC*, 2017 WL 819494, at *10 (S.D.N.Y. Feb. 28, 2017) (Nathan, J.) (alterations adopted).

With respect to the "illegality" of contracts, the Exchange Act provides that:

> Every contract made in violation of any provision of this chapter or of any rule or regulation thereunder, and every contract (including any contract for listing a security on an exchange) heretofore or hereafter made, the performance of which involves the violation of, or the continuance of any relationship or practice in violation of, any provision of this chapter or any rule or regulation thereunder, shall be void (1) as regards the rights of any person who, in violation of any such provision, rule, or regulation, shall have made or engaged in the performance of any such contract ....

**\*6** 15 U.S.C. § 78cc(b). Such contracts in violation of the Exchange Act are "voidable at the option of the innocent party," *Mills v. Electric Auto-Lite Co.*, 396 U.S. 375, 387 (1970), and such party has a "right to rescind" the contract, *Transamerica Mortg. Advisors, Inc. (TAMA) v. Lewis*, 444 U.S. 11, 19 (1979). "To state a claim for rescission under

15 U.S.C. § 78cc(b), a party must show 'that (1) the contract involved a prohibited transaction, (2) he is in contractual privity with the opposing party, and (3) he is in the class of persons the Act was designed to protect.' " *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81 (S.D.N.Y. 2020) (quoting *RWP Consol., L.P. v. Salvatore*, 534 F. Supp. 2d 364, 368 (D. Conn. 2008)) (internal alterations omitted).

The parties cross swords on whether there is a triable issue that EMA is a broker-dealer. AppTech argues that EMA is required to register as a broker-dealer because publicly available information demonstrates that it has purchased at least 170 promissory notes and/or warrants from at least 128 issuers, which it then converted into shares of stock and sold into the public market on an ongoing and regular basis. Dkt. No. 20 at 11. From those facts, it would have the Court conclude as a matter of law (or at least find to be a triable issue) that EMA is " 'engaged in the business' of buying and selling securities." *Id.* (quoting 15 U.S.C. § 78c(a)(5)(A)). EMA denies that it should be defined as a broker-dealer but instead states that it should be categorized as trader. Dkt. No. 23 at 3. It points to guidance by the Securities and Exchange Commission ("SEC") that defines a "trader" as a "party that buys and sells securities for its own accounts but does not fall within the definition of a dealer and is not required to registered with the SEC." *Id.* at 4 (citing Nat'l Council of Sav. Institutions, SEC No-Action Letter, 1986 WL 67129, at *3–4 (July 27, 1986)). Among the factors the SEC looks to in determining whether a party is a dealer is if it: buys and sells securities as part of its regular business, contemporaneously and continuously buys and sells securities on the market, handles other people's money or securities and invests on their behalf, makes a market in securities, buys and sells securities on behalf of a regular clientele, renders investment advice, and whether individuals employ the party to earn a return on their behalf. Nat'l Council of Sav. Institutions, 1986 WL 67129, at *1. EMA denies that it satisfies any of these criteria: its regular business is financing companies in exchange for convertible debt, not buying and selling securities, and it does not contemporaneously buy and sell securities for investment purposes, handle other people's money or securities, make a market, buy or sell securities for others, or render investment advice. Dkt. No. 23 at 5.

The Court need not determine whether AppTech has identified sufficient facts to create a triable issue that EMA is required to register as a broker-dealer. Even an unregistered broker-dealer is permitted to enter contracts and have those contracts honored. Under Section 29(b), "only unlawful

contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Zerman v. Jacobs*, 510 F. Supp. 132, 135 (S.D.N.Y.) (Weinfeld, J.), *aff'd*, 672 F.2d 901 (2d Cir. 1981); *see also Vystar Corp.*, 336 F.R.D. at 81 ("Section 29(b) can only 'render void those contracts which by their terms violate the Act or the rules and regulations thereunder, for it is only such contracts which are made "in violation of," or the performance of which involves the violation of the statute and the rules and regulations thereunder.' " (quoting *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984))); *Slomiak*, 597 F. Supp. at 682 ("[The] focus on contracts which 'by their terms' are illegal may fairly be interpreted ... [to] foreclose the remedy of rescission where, as here, the violation complained of is *collateral or tangential* to the contract between the parties." (emphasis added)). A party cannot enjoy the benefits of a contract and then relieve itself of any obligations under that contract on the sole basis that its counterparty engages in business as a broker-dealer and should have registered with the SEC.

*7 AppTech argues that the Agreements require EMA to engage in illegal acts because EMA sells the securities it purchases under the Agreements. Dkt. No. 20 at 2, 3, 11. In that form, AppTech argues, EMA is in the business of "buying and selling" securities. But there is nothing in the Agreements that requires EMA either to convert the debt that it obtains pursuant to the Agreements or—if it converts the debt into securities—to sell those securities on the market. The Agreements give EMA the *option* to exercise its conversion right. Depending on the price of the stock at such time that EMA is able to exercise, and whether EMA will realize value from the stock (either in the short term or over the long term), it may or may not make sense for EMA to exercise that option. And importantly, there is nothing in the Agreements that requires EMA to sell the securities it obtains pursuant to the exercise of its conversion right. EMA has the option either to sell or to hold. Indeed, at oral argument, AppTech was unable to point to a single provision in the Agreements that would require EMA to sell. Thus, the Agreements are valid. AppTech cannot avoid its obligations under the Agreements on the basis that EMA should have registered.

For identical reasons, numerous other courts in this District have reached the same conclusion with respect to similar contracts and at least in one instance, with respect to a contract involving EMA. Indeed, AppTech's argument has been uniformly rejected in this District for nearly half a century. *See Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75,

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

81 (S.D.N.Y. 2020) ("[A]ssuming *arguendo* that the selling of converted shares made [EMA] a broker-dealer, the selling of those shares was not required by the contract."); *LG Cap. Funding, LLC v. ExeLED Holdings, Inc.*, 2018 WL 6547160, at *5 (S.D.N.Y. Sept. 28, 2018) (Sullivan, J.) ("[N]either the Note nor the SPA require LG to take any action that would violate this statute."); *Omega Overseas Partners, Ltd. v. Griffith*, 2014 WL 3907082, at *4 (S.D.N.Y. Aug. 7, 2014) (Sullivan, J.) (same and citing cases); *Frati v. Saltzstein*, 2011 WL 1002417, at *6 (S.D.N.Y. Mar. 14, 2011) (same); *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) (same); *Slomiak v. Bear Stearns & Co.*, 597 F. Supp. 676, 682 (S.D.N.Y. 1984) (same); *Zerman*, 510 F. Supp. at 135; *cf.Gordian Grp. LLC*, 2017 WL 819494, at *10 (denying motion to dismiss and finding the need for a fact-specific inquiry when there was a contractual provision that could include such illegal behavior).

These cases have soundly assessed the text and Congressional intent undergirding Section 29(b). As Judge Friendly explained, "[d]espite the Draconian language, § 29(b) does not provide a pat legislative formula for solving every case in which a contract and a violation concur. Rather it was a legislative direction to apply common-law principles of illegal bargain, enacted at a time when it seemed much more likely than it might now that courts would fail to do this without explicit legislative instruction."*Pearlstein v. Scudder & German*, 429 F.2d 1136, 1149 (2d Cir.1970) (Friendly, J., dissenting). This common law principle of illegal contract merely requires that "the contract would be invalid ... where the contract was made illegally or requires illegal performance." *Griffith*, 2014 WL 3907082, at *3. The text of Section 29(b) also supports this interpretation. See*Drasner v. Thomson McKinnon Sec., Inc.*, 433 F. Supp. 485, 501–02 (S.D.N.Y. 1977) (interpreting the terms "made in violation of" and "the performance of which involves the violation of" in Section 29(b) to only render void those contracts "which by their terms violate the Act").

AppTech urges the Court to not follow the results reached in each of those cases because it says that it now has presented evidence that it is the "business model" of EMA to regularly execute promissory notes and warrants that it then converts into stock. [8] Dkt. No. 20 at 11. AppTech cites a letter submitted by special counsel to AppTech (not counsel of record in this matter) that listed such transactions. Dkt. No. 18-4 at 2–7. The letter, however, only lists the issuer and "Date(s) of EMA Note" and does not indicate whether EMA

converted the debt into shares or whether EMA sold those shares. *Id.* AppTech also submits "filed records in relation to 60 of [those] transactions." Dkt. No. 19 ¶ 4. Some, but not all, of those filings describe instances in which EMA sought to exercise or convert its shares, often in the context of ensuing litigation. Many only describe that the issuers signed convertible debt and warrant agreements with EMA. The evidence thus does not establish that EMA invariably converts and immediately sells the shares it obtains. But even if the evidence was sufficient to show that EMA engaged in activity as a broker-dealer or that it consistently sold upon exercising, it does not follow from the fact that EMA previously has chosen to exercise and sell in connection with other contracts that the Agreements should be considered to be void. Such agreements that are not void at their inception because they do not require EMA to engage in conduct that would violate the securities laws do not become void because EMA subsequently decides, in its discretion, to sell rather than to hold. See*Vystar Corp.*, 336 F.R.D. at 82 ("Vystar can rescind the contracts only if they were illegal at the time they were made, not because [EMA] later engaged in an illegal transaction."); see also*Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195, 207 (3d Cir. 2006) (finding that subsequent "sales are too attenuated to establish a claim under Section 29(b)"). It follows necessarily that EMA's agreement with AppTech is not void simply because in certain or all of those other situations EMA chose to sell rather than to hold. In each instance, as in the case of the Agreements, the decision whether to hold or to sell is that of EMA alone. There is nothing in the Agreements that would require it to sell and thus nothing in the Agreements that would make them "illegal contracts," *Zerman*, 510 F. Supp. at 135.

**\*8** Indeed, AppTech's argument admits of no limiting principle. What if, in the first three agreements EMA signs, it subsequently chooses to exercise and then immediately sell? Does that give the fourth counterparty a free pass to enjoy the funds EMA loans it without having to satisfy its end of the bargain? What if it is ten? Does that mean that the first nine note issuers have to satisfy their obligations to EMA but not the tenth? And what if EMA chooses to sell in 90% of the cases but not in the remaining 10%, or in 75% but not the remaining 25%? What is the tipping line that makes the contract an illegal contract rather than a lawful contract pursuant to which EMA engaged in an unlawful transaction? The lesson of the cases is that whether a contract is unlawful and thus may be voided is addressed by the courts as Section 29(b) addresses it—case-by-case on the terms of the contract sought to be voided and not on the basis of some other

contracts that the non-breaching party has made with other third parties.

The two out-of-circuit cases upon which AppTech relies are not to the contrary. In *Regional Properties Inc. v. Financial & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982), "[t]wo real estate developers ... entered into a number of agreements with a securities broker whereby the broker agreed to structure limited partnerships and market the limited partnership interests." *Id.* at 554. The Fifth Circuit held that the "developers were entitled to rescind their agreements with the broker under the contract-voiding provision contained in the [Exchange] Act." *Id.* In support of that proposition, the Fifth Circuit stated that "Section 29(b) does not render void only those contracts that 'by their terms' violated the Act," reasoning that if that were true, then "[the] statute ... would be so narrow as to be a waste of the congressional time spent in its enactment." *Id.* at 560. The Fifth Circuit also reasoned that doing so would read the word "necessarily" into the statute and "generate[ ] difficult problems of proof." *Id.* Notwithstanding some of its broad language, however, "[t]he illegality involved in *Regional* ... was inseparable from the performance of the contract plaintiff was seeking to rescind.... While the contract [in *Regional*] did not 'by its own terms,' or *in vacuo*, violate the Act, there could be no performance under the contract without violating the Act." *Slomiak*, 597 F. Supp. at 682. The contrary is true here. EMA could perform the Agreements without violating the securities laws.

The second case, *EdgePoint Capital Holdings, LLC v. Apothecare Pharmacy, LLC*, 6 F.4th 50 (1st Cir. 2021) ("*Apothecare*"), involved an agreement in which an investment banking firm agreed to "assist [a medical company] *in the sale of all or part of the Company.*" *Id.* at 54 (emphasis in original) (quoting the agreement at issue). Implementation of that contract also included sending a confidential information memorandum ("CIM") to prospective purchasers considering acquiring the medical company. *Id.* at 54. The firm had two arms: EPCH, which was not registered as a broker-dealer and handled assets sales, and EPCA, which was a registered broker-dealer and handled stock sales. *Id.* at 52. To avoid taxes that the Financial Industry Regulatory Authority ("FINRA") imposes on transactions with broker-dealers, the investment firm structured the agreement so that the medical company formally engaged the non-broker-dealer (EPCH), but the sell-side agreement it entered into with the medical company bound EPCH "and all related affiliates" and engaged them to assist the seller "in the sale of all or part of the Company *or* its assets" and not just to

engage in an asset sale. *Id.* at 53–54 (emphasis added). EPCH, moreover, admitted that it assigned contracts to EPCA well after EPCH had started its efforts on behalf of a client if EPCH came to believe that the transaction would involve the sale of securities. *Id.* at 53. After EPCH drafted the CIM, it contacted seven companies in an attempt to induce the purchase or sale of the medical company's equity. *Id.* at 59. The CIM issued by EPCH in connection with its marketing efforts stated that the medical company was looking for a prospective buyer of the company, that buyers could specify whether they were interested in a stock transaction, and "falsely listed EPCA as [the medical company's] representative, which would wrongly reassure potential buyers that a registered broker was at that time handling the purchase and sale." *Id.* at 59–60. In those circumstances, the First Circuit concluded that the investment firm, by choosing to use its unregistered arm "to induce a type of transaction expressly contemplated to include a possible securities transaction," had signed an illegal agreement which—as a result—was voidable. *Id.* at 63. The agreement did not just give the investment firm the option whether to sell securities or to engage in an asset transaction. On its face, it required the investment firm (and its unregistered arm) to effect a sale of securities if such was in the interest of the medical company seller. *See id.* at 61 ("EPCH's attempts to induce the sale of securities were inseparatable from the contract's central purpose of selling Apothecare."). In this case, by contrast, EMA enjoyed the unfettered discretion whether to convert and then whether to sell or to hold. AppTech could not compel EMA to do either. In other words, the scope of performance under the Agreements does not implicate—let alone require—any of the prohibited actions that were at issue in *Apothecare* or *Regional Properties*.

## II. Damages

**\*9** EMA also moves for summary judgment as to damages, seeking $1,952,511.41 in total,[9] reflecting $1,473,999.77 from AppTech's breach of the Note, $427,999.39 from breach of the Warrant, $45,552.65 in default interest, and $4,960.10 in statutory interest.[10] AppTech responds that Section 3.20 of the Note, which describes payments in the case of an Event of Default, is a liquidated damages clause that is "punitive and unenforceable" because it is "plainly disproportionate." Dkt. No 25 at 14–15. Although the Court concludes that Section 3.20 is valid, it denies EMA's specific request for damages of $1,952,511.41.

## A. EMA's Assessment of Damages

### 1. Damages from Breach of the Note

EMA reaches its damages figure of $1,473,999.77 for breach of the Note through the following calculations. EMA first determines the principal and cumulative interest remaining on the Note at the time of breach. Importantly, EMA also submitted three prior Notices of Conversion on May 28, June 8, and June 14, 2021. [11] AppTech honored the May 28 and June 8 Notices of Conversion at a conversion price of $0.625 per share, converting approximately $20,500 in Note principal (after fees for legal services and transfer agents) to 36,000 shares. Dkt. No. 39-5 at 2 (EMA spreadsheet documenting these transactions); Dkt. No. 24 ¶¶ 5–6 (Moriarty Affidavit confirming these transactions). AppTech, however, refused to honor the June 14 Notice of Conversion. EMA, for the purposes of its damages calculations, refers to June 14, 2021 as the default date. Dkt. No. 29 at 2 n.2 (EMA explaining in a letter that "although Defendant defaulted as early as April 13, 2021 by failing to maintain the required reserves, EMA did not calculate either default interest or liquidated damages ... until the later failure to honor the June 14, 2021 conversion"). Thus, on June 14, 2021, the Note's total remaining principal was $279,500, reflecting the reduction attributable to the honored conversions. The accrued interest at that point—which accumulated at a rate of 12% per year—was $20,435.34. Dkt. No. 39-5. The total remaining principal and accrued interest was $299,935.34 on June 14, 2021.

EMA then applies the second paragraph of Section 3.20 of the Note, which is triggered "[u]pon the occurrence of any Event of Default specified in Article III of the Note," Dkt. No. 12-2 § 3.3. Events of Default in Article III include the failure to honor a Notice of Conversion, *id.* § 3.2, and the failure to maintain reserves, *id.* Section 3.20 provides that AppTech, upon default, shall pay an amount that includes double the principal, accrued interest, and "Default Interest." [12] The relevant portion of Section 3.20 reads as follows:

> Upon the occurrence of any Event of Default specified in Article III of the Note, the Note shall become immediately and automatically due and payable without demand, presentment or notice and

the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to ... (i) 200% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Repayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/ or (x) plus (z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum").

**\*10** Dkt. No. 12-2 § 3.20. In accordance with subsection (i), EMA doubles the "then outstanding principal amount of the note" and accrued interest of $299,935.34 to yield a payment of $599,870.68.

EMA then adds in Default Interest. The Default Interest provision in the Note states that "[a]ny amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of twenty-four (24%) per annum from the due date thereof until the same is paid." *Id.* at 1. EMA clarifies in its post-argument letter that it calculated the accumulated Default Interest to be $11,438.16 between June 14, 2021 and July 13, 2021. [13] The $11,438.16 figure reflects a 24% per annum rate applied to the *doubled* sum of principal and interest over a time period of 29 days. With the doubled principal and accrued interest of $599,870.68, the resulting payment figure is $611,308.84. After applicable fees for transfer agents and legal services, *see* Dkt. No. 12 §§ 1.2(a), 1.4(d), the final payment sum is $612,308.84.

Finally, EMA claims that the third paragraph of Section 3.20 allows it to convert its debt at this doubled sum. The third paragraph of Section 3.20 states that:

> The Holder shall have the right at any time after the occurrence of an Event of Default, to require the Borrower,

EMA Financial, LLC v. Apptech Corp., Slip Copy (2022)

> to immediately issue, *in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock of the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect,* subject to issuance in tranches due to the beneficial ownership limitations provided in this Note.

Dkt. No. 12-2 § 3.20. In other words, EMA interprets this paragraph to allow it convert the final payment sum of $612,308.84 into shares.

EMA then calculates the conversion rate of the debt. EMA, in its motion for summary judgment, asserts that it would be entitled to convert its rate at a 40% discount price. The specific terms of the conversion rate are found in Section 1.2(a):

> The conversion price here under (the "Conversion Price") per share shall equal one dollar ($1) for the one hundred eighty (180) days immediately following the Issue Date, and thereafter shall equal the lower of: (i) the lowest closing price of the Common Stock during the preceding twenty-five (25) Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note or *(ii) 75% of the lowest trading price for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days including and immediately preceding the Conversion Date.* In order to determine the lowest trading price for the Common Stock on the Principal Market during the twenty-five (25) consecutive Trading Days, a minimum daily trading volume of 1,000 must be traded on the day which determines the Conversion Price. The Holder, or any of the Holder's affiliates may not trade on the day which determines the Conversion Price. If

> an Event of Default under Section 3.9 of the Note has occurred, Holder, in its sole discretion, may elect to use a Conversion Price equal to the lower of: (i) the lowest traded price of the Common Stock on the Principal Market on the Trading Day immediately preceding the Issue Date or (ii) 75% of either the lowest traded price or the closing bid price, whichever is lower for the Common Stock on the Principal Market during any Trading Day in which the Event of Default has not been cured.

**\*11** Dkt. No. 12-2 § 1.2(a) (emphasis added). EMA here relies on the methodology within subsection (ii), which focuses on the 75% of the lowest price for the stock during the twenty-five days preceding the conversion date. By default, EMA is entitled to a 25% discount on the price.

Section 1.2(a) of the Note also provides for two ways to gain two additional 15% discounts on top of the 25%, leading to a potential total discount of 55%. The first trigger for a discount, which EMA does not invoke, states:

> If the Borrower's Common stock is chilled for deposit at [Depository Trust Company], becomes chilled at any point while this Note remains outstanding or deposit or other additional fees are payable due to a Yield Sign, Stop Sign or other trading restrictions, or if the closing price at any time falls below $0.10 (as appropriately and equitably adjusted for stock splits, stock dividends, stock contributions and similar events), then an additional 15% discount will be attributed to the Conversion Price for any and all Conversions submitted thereafter.

*Id.* § 1.2(a). The second trigger for a discount, which EMA invokes in its letter to the Court, [14] provides:

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

> [I]f the Company ceases to be a
> reporting company pursuant to
> the 1934 Act at any time after the Issue
> Date or *if the Note cannot be converted
> into free trading shares after 181 days
> from the issuance date, an additional
> 15% discount will be attributed to
> the Conversion Price* for any and all
> Conversions submitted thereafter.

*Id.* (emphasis added). This provision and the default 25%
discount combined allow EMA to purchase shares at a 40%
discount.

EMA then calculates the number of shares that the final
payment sum of $612,308.84 would be entitled to purchase
at a conversion rate reflecting a 40% discount. According to
EMA, the lowest trading price during the previous twenty-
five trading days, in accordance with the conversion formula
in Section 1.2(a), was $1.03. [15] Applying a 40% discount to
$1.03 yields a conversion rate of $0.618. Application of this
price to the final payment sum of $612,308.84 yields 990,791
shares of common stock. Dkt. No. 14 at 10.

EMA then determines the value of the shares according to the
average price in the stock market on the day after the breach.
EMA relies on a value weighted average price ("VWAP") on
the business day after shares were due, which was $1.4877 on
July 15, 2021. Dkt. No. 12-7. Multiplying $1.4877 by 990,791
shares of stock yields a pre-interest total damages figure of
$1,473,999.77 for breach of the Note.

**\*12** EMA then argues that is entitled to an 24% "Default
Interest" rate on top of this amount for the period between
June 14 default and the July 13 Notices of Conversion. Dkt.
No. 14 at 10. It applies the 24% Default Interest rate to the
pre-interest total damages figure beginning on July 15, 2021.
From that date to August 31, 2021, the Default Interest rate
added another $45,552.65 in interest to the total payment for
the breach of the Note. In total, EMA asks for 1,519,552.42
for breach of the Note.

### 2. Damages from Breach of the Warrant

EMA's calculations for damages for the Breach of the Warrant
are more straightforward. The total value of the Warrant is
$300,000 because the Warrant guaranteed 200,000 shares
at a $1.50 exercise price. Dkt. No. 12-3 at 1, § 2(c). As
previously noted, EMA exercised Notices of Conversion on
May 28 and June 8 at a conversion price of $0.625 per share.
Dkt. No. 39-5 at 2; Dkt. No. 24 ¶¶ 5–6. AppTech issued
shares of common stock to satisfy these notices. Accordingly,
AppTech's honoring of the Notices of Conversion and its
issuance of stock to satisfy them triggered Section 3(b) of the
Warrant, an "anti-dilution clause," Dkt. No. 39 at 1, which
provides the following:

> If the Company or any Subsidiary
> thereof, as applicable, at any time
> while this Warrant is outstanding,
> shall sell or grant any option to
> purchase, or sell or grant any right
> to reprice, or otherwise dispose of or
> issue (or announce any offer, sale,
> grant or any option to purchase or
> other disposition) any Common Stock
> or securities entitling any Person,
> except employees or contractors for
> services, to acquire shares of Common
> Stock (*upon conversion, exercise or
> otherwise) at an effective price per
> share less than the then Exercise Price
> (such lower price, the "Base Share
> Price"* and such issuances collectively,
> a "Dilutive Issuance") ... then the
> Exercise Price shall be reduced and
> only reduced to equal the Base Share
> Price, *and the number of Warrant
> Shares issuable hereunder shall be
> increased such that the aggregate
> Exercise Price payable hereunder,*
> after taking into account the decrease
> in the Exercise Price, shall be equal to
> the aggregate Exercise Price prior to
> such adjustment.

Dkt. No. 12-3 § 3(b) (emphasis added). Although the previous
Exercise Price was $1.50 per share, *id.* § 2(c), the effect of
the issuance of the stock necessary to satisfy the Notes of
Conversion at $0.625 per share in effect "reset[ ] the warrant
amount to 480,000 shares," Dkt. No. 39 at 1, because only that

warrant amount would maintain the total value of the Warrant at $300,000.

Because EMA opted for a cashless exercise of its Warrant, Section 2(d) determined the total number of warrant shares issuable to EMA. The equation for the final shares is described as follows:

[T]he Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (B), where:

(A) = the Market Price (as defined below);

(B) = the Exercise Price of this Warrant (as adjusted); and

(X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.

"Market Price" shall mean the closing sale price per share of Common Stock on the principal market where the Common Stock is traded on the Trading Day immediately preceding delivery of the Notice of Exercise or the Closing Date, whichever is greater.

Dkt. No. 12-3 § 2(d). After accounting for stock splits, the Market Price ("A") on July 12, 2021 was $1.56. The exercise price of the Warrant ("B") was $0.625. The difference is $0.935. The number of Warrant Shares issuable by cash exercise was 480,000. Multiplying 480,000 by $0.935 yields a sum of $448,800. According to EMA, these inputs lead to a total of 287,692 shares. Using the same VWAP as in the case of the Note, EMA then multiplies 287,692 shares by $1.4877 to yield a pre-interest damages figure of $427,999.39. Dkt. No. 39 at 2.

**\*13** EMA then argues that is entitled to an 9% "statutory interest" rate for damages from the date of default on July 15, 2021. [16] Dkt. No. 14 at 11. From that date to August 31, 2021, the statutory damages rate added another $4,960.10 in interest to the total payment for the breach of the Warrant. In total, EMA asks for $432,959.49 for breach of the Warrant.

## B. The Court's Assessment of Damages

### 1. Damages from Breach of the Note

With respect to Section 3.20, EMA argues for summary judgment that the Note entitles EMA enforce the "doubling"

effect of Section 3.20. AppTech argues that Section 3.20 "is punitive in nature and thus is unenforceable as a liquidated damages clause." Dkt. No. 25 at 14. In particular, AppTech notes that the "damages total in the amount of $1,901,999.16," *id.*, and that "a liquidated damages clause that provides for damages in an amount that is more than six times the principal [of $300,000] is plainly disproportionate," *id.* at 15. EMA argues in response that AppTech cites nothing in the record to support its contention, did not "challenge the case law cited or dispute the breaches," and characterizes AppTech's argument as essentially stating that "because [AppTech's] actions caused such a large number of damages, the Court should not award Plaintiff the contractual expectation damages Plaintiff is entitled to." Dkt. No. 26 at 9. [17] For the following reasons, the Court concludes that neither party is entirely correct. EMA is correct that Section 3.20 is enforceable, but it does not provide the damages EMA seeks, while AppTech's argument that the clause is an impermissible penalty rests on a misconstruction of the provision. Thus, although the Court rejects the argument that Section 3.20 is unenforceable, it denies EMA's motion for summary judgment on damages.

**\*14** "[L]iquidated damages, by definition, are damages paid in the event of a breach of a contract." *Brazen v. Bell Atl. Corp.*, 695 A.2d 43, 47 (Del. 1997); *see also Unbound Partners Ltd. P'ship v. Invoy Holdings Inc.*, 251 A.3d 1016, 1033 (Del. Super. Ct. 2021) ("A liquidated damages provision may be best described as any 'contract provision that requires payment in the event of a termination.' "); *cf. U.S. Fid. & Guar. Co. v. Braspetro Oil Servs. Co.*, 369 F.3d 34, 71 (2d Cir. 2004) ("[A] liquidated damages provision is an estimate made by the parties at the time they enter their agreement, of the extent of the injury that would be sustained as a result of breach of the agreement."). The salutary effect of the clause is to relieve the parties—on both sides—of the often arduous and sometimes unpredictable exercise of litigating the precise sum of actual damages after-the-fact in a court proceeding where certain and definite damages are not susceptible of calculation with a fair amount of precision. *See Delaware Bay Surgical Servs., P.C. v. Swier*, 900 A.2d 646, 650 (Del. 2006) (quoting *S.H. Deliveries, Inc. v. TriState Courier & Carriage, Inc.*, 1997 WL 817883, at \*2 (Del. Super. Ct. May 21, 1997))

In addition, under Delaware law, "[t]he Court ... will presume a liquidated damages provision is valid." *Unbound Partners Ltd. P'ship*, 251 A.3d at 1034 (citing *Kold, LLC v. Croman*, 2014 WL 7008431, at \*4 (Del. Super. Ct. Nov. 25, 2014) ("In Delaware, liquidated damages are presumptively valid

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

and enforceable, unless the liquidated damages constitute a penalty.")) "The distinction between a penalty and a liquidated damages clause is significant—if a provision is considered a penalty, it is void as against public policy and recovery is limited to actual damages." *Delaware Bay Surgical Servs*, 900 A.2d at 650; *see also* *S.H. Deliveries, Inc.*, 1997 WL 817883, at \*2 ("[A] 'penalty' is a sum inserted into a contract that serves as a punishment for default, rather than a measure of compensation for its breach. In other words, it is an agreement to pay a stipulated sum upon breach, irrespective of the damage sustained."); *Rattigan v. Commodore Int'l Ltd.*, 739 F. Supp. 167, 169 (S.D.N.Y. 1990) ("If such a clause is intended to operate as a means to compel performance, it will be deemed a penalty and will not be enforced."). "Use of the word 'penalty' or 'liquidated damages' in a contract is not conclusive as to the character of the disputed provision." *Olsen v. T.A. Tyre Gen. Contractor, Inc.*, 2006 WL 2661140, at \*2 n.1 (Del. 2006). The notion is that, while parties are permitted to calculate in advance a sum that would reasonably compensate the non-breaching party for the damages caused by the breach, the law of contracts prohibits penalizing a party from what otherwise is not considered a wrongful or tortious act—the efficient breach of a contract. *See* *Unbound Partners Ltd. P'ship*, 251 A.3d at 1032 (defining a penalty clause as imposing punishment for default).

"Where [1] the damages are uncertain and [2] the amount agreed upon is reasonable, such an agreement will not be disturbed." *Delaware Bay Surgical Servs., P.C.*, 900 A.2d at 651 (quoting *Brazen*, 695 A.2d at 48); *see also* *United Air Lines, Inc. v. Austin Travel Corp.*, 867 F.2d 737, 740 (2d Cir. 1989) (Under New York law, "[l]iquidated damages are not penalties if they bear a reasonable proportion to the probable loss and the amount of actual loss is incapable or difficult of precise estimation." (internal quotation marks omitted)); *LG Cap. Funding, LLC v. 5Barz Int'l, Inc.*, 307 F.Supp.3d 84, 101 (E.D.N.Y. 2018) (stating, under New York law, that "[i]f the provision does not satisfy *one or both* of these factors, the liquidated damages provision will be deemed an unenforceable penalty." (emphasis added)). To fail the second prong under Delaware law, the damages must be "*uncertain or incapable of accurate calculation*," and to fail the second prong, the damages must be "*unconscionable or not rationally related*" to any measure of damages a party might conceivably sustain," *Delaware Bay Surgical Servs., P.C.*, 900 A.2d at 651 (quoting *Brazen*, 695 A.2d at 48) (emphasis in original). There are "two factors ... relevant to a determination of whether the amount fixed as liquidated

damages is reasonable." *Brazen*, 695 A.2d at 48. "The first factor is the anticipated loss by either party should the merger not occur. The second factor is the difficulty of calculating that loss: the greater the difficulty, the easier it is to show that the amount fixed was reasonable." *Id.* at 48. As opposed to the "business judgment rule," in which "[c]ourts do not apply an objective reasonableness test ... to examine the wisdom of the decision itself," "courts [under the liquidated damages rubric] will not substitute their business judgment for that of the directors, but will examine the decision to assure that it is, on balance, within a range of reasonableness." *Id.* at 49.

**\*15** "Where, as provided for in a convertible note, a defendant fails to convert debt into shares and deliver them to the plaintiff, the calculation of expectation damages must include the principal and any accrued interest being converted. Courts can do this in one of two ways: (1) 'multiplying the number of shares owed by the mean market value of that stock on the day of the breach,' or (2) multiplying the number of shares owed by the difference between the market price and the conversion price ... and then adding back the converted principal and any accrued interest." *LG Cap. Funding, LLC v. ExeLED Holdings Inc.*, 2021 WL 4949173, at \*6 (S.D.N.Y. Oct. 25, 2021) (quoting *LG Cap. Funding, LLC v. CardioGenics Holdings, Inc.*, 787 F. App'x 2, 3 (2d Cir. 2019) (summary order)); *see also* *Boyce v. Soundview Tech. Grp., Inc.*, 464 F.3d 376, 385 (2d Cir. 2006) (valuation of a "publicly traded stock" for the purposes of damages utilizes " 'the mean between the highest and lowest quoted selling prices,' " (quoting *United States v. Cartwright*, 411 U.S. 546, 551 (1973))).

The Court agrees with EMA that Section 3.20 is an enforceable liquidated damages clause but disagrees with EMA on its interpretation. EMA's first error is in concluding that the provision entitles it to damages based on the application of a figure of double the sum of the principal, accrued interest, and Default Interest to the conversion rate. A close reading of the relevant language demonstrates that it provides EMA no such entitlement. The language of Section 3.20 is carefully phrased. The third Paragraph provides that

> [t]he Holder shall have the right at any time after the occurrence of an Event of Default, to require the Borrower, to immediately issue, *in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock*

*cf the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect, subject to issuance in tranches due to the beneficial ownership limitations provided in this Note.*

Dkt. No. 12-2 § 3.20. It thus refers specifically to the "Default Amount" and/or the "Default Sum." And Section 3.20 defines the Default Sum as "the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z)." For reference, the relevant portion of Section 3.20 states that the payment shall be:

> an amount equal to ... (i) 200% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Repayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Section and 1.4(g) hereof (*the then outstanding principal amount cf this Note to the date cf payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum"*).

*Id.* (emphasis added). The Note thus defines "Default Sum" as "the then outstanding principal amount of this Note to the date of payment" plus (x), (y), and (z). *Id.* It does not define the term Default Sum as including double the sum of those amounts. The amounts referenced in clauses (x) and (y) (as clause (z) has been abandoned here, see *supra* note 12) also clearly refer to pre-doubling amounts of interest and Default Interest. Subpart (i), which contains the language referencing double the principal amount refers to a sum *in cash* that the Note holder is entitled to upon an Event of Default. It does not refer to a sum that the Note holder can then apply at the contractual conversion rate to yield a number of shares. Thus, if EMA elects to receive damages based upon a calculation of shares it would be entitled to on conversion, it is entitled only to the number of shares that would be yielded by application

of the pre-doubled principal, accrued interest, and Default Interest under Section 3.20 of the Note.

**\*16** Section 1.1, the provision that establishes EMA's conversion right, further confirms this analysis. Although that section appears to provide EMA with a relatively unfettered right to convert amounts owed under the Note to shares, it is limited by the remainder of the paragraph. The beginning of Section 1.1. provides that EMA:

> shall have the right, in its sole and absolute discretion, at any time from time to time, to convert all or any part of the outstanding amount due under this Note (such outstanding amount includes but is not limited to the principal, interest and/or Default Interest accrued, *plus any and all other amounts owed pursuant to the terms cf this Note*) into fully paid and non-assessable shares of Common Stock.

Dkt. No. 12-2 § 1.1 (emphasis added). Section 1.1, however, later provides the mechanism for executing this right. In doing so, it states that the "Conversion Amount," along with the conversion price, defines the number of shares.

> The number of shares of Common Stock to be issued upon *each Conversion cf this Note ("Conversion Shares") shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price* then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New

York time on such conversion date (the "Conversion Date"). *The term "Conversion Amount" means, with respect to any Conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such Conversion, plus (2) accrued and unpaid interest, if any, to be converted in such Conversion at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2), plus (4) any Additional Principal for such Conversion, plus (5) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.2(c) and 1.4(g) hereof.*

*Id.* (emphasis added). Absent from this "Conversion Amount" is any mention of amounts owed under Section 3.20, even though specific mention is made of the liquidated damages clauses in Sections 1.2(c) and 1.4(g). Reading Section 3.20 to entitle the Note holder to convert shares based on a figure of double the principal would place it in needless conflict with Section 1.1. Moreover, to interpret the beginning of Section 1.1 so broadly—namely, that EMA may convert "any and all other amounts owed"—would essentially render both the specific categorization of amounts owed in the "Conversion Amount" provision in Section 1.1 and the specific application of third paragraph of Section 3.20 to conversion of the Default Sum to be superfluous. There would be no purpose in specifying the categories of amounts owed subject to conversion in either provision if the beginning of Section 1.1 operates as an all-inclusive catch-all. Delaware law indicates that the Court ought not read contracts in this manner. *See* *Honeywell Int'l, Inc. v. Air Prods. & Chems., Inc.*, 872 A.2d 944, 956 (Del. 2005) ("[A]bsent evidence calling for a different result, all parts of a contract must be read in harmony to determine the contract's meaning, with one portion of a contract not being read to negate a different portion."); *NAMA Holdings, LLC v. World Mkt. Ctr. Venture, LLC*, 948 A.2d 411, 419 (Del. Ch. 2007), *aff'd*, 945 A.2d 594 (Del. 2008) ("Contractual interpretation operates under the assumption that the parties never include superfluous verbiage in their agreement."); *Osborn ex rel. Osborn v. Kemp*, 991 A.2d 1153, 1160 (Del. 2010) ("An unreasonable interpretation

produces an absurd result or one that no reasonable person would have accepted when entering the contract."). The better interpretation of the third paragraph of Section 3.20, and the only one that makes sense of the Note as a whole, is that it addresses the holder's right to convert and the Conversion Price at which the holder is permitted to convert and not that it gives the Note holder upon default a right to convert based on a principal amount that is doubled the amount the Note holder is owed.

**\*17** Under Section 3.20, EMA has the option of choosing to double the "Default Sum"—the leftover principal, accrued interest, and Default Interest. It also has the option of choosing instead to convert the Default Sum into shares. But EMA does *not* have the option of doubling the Default Sum and then converting it into shares under the terms of the Note.

Having construed the Note correctly, the Court finds that Section 3.20 is an enforceable liquidated damages clause. Courts in the Second Circuit have differed in their assessments as to whether multiplier provisions similar to the one in this case—including in cases involving EMA—constitute an unenforceable penalty. *See, e.g., Parallax Health Scis., Inc. v. EMA Fin., LLC*, 2022 WL 2442338, at *10 (S.D.N.Y. June 13, 2022), *report and recommendation adopted*, 2022 WL 2354546 (S.D.N.Y. June 30, 2022) (finding 200% multiplier unenforceable as it applied to the 24% Default Interest rate and otherwise would only serve as a "penalty"); *EMA Fin., LLC v. Joey New York Inc.*, 2022 WL 292920, at *15 (S.D.N.Y. Feb. 1, 2022) (finding 150% multiplier provision to be unenforceable because "actual damages are not hard to calculate" and the provision is "grossly disproportionate"); *LG Cap. Funding, LLC v. One World Holding, Inc.*, 2018 WL 3135848, at *13 (E.D.N.Y. June 27, 2018) (finding 200% damages provision to be enforceable because the conversion rate of the stock was 50% and thus enforcement of the provision was "essential in order to make Plaintiff whole").

As an initial matter, EMA challenges only the reasonableness of Section 3.20. It does not argue that damages could be calculated with relative certainty. In fact, EMA appears to argue the opposite, stating that "because the trading volume of AppTech shares is low, assuming EMA could convert such shares and quickly sell them at a premium operates outside of the established facts" and then arguing for further discovery on the issue. Dkt. No. 25 at 15–16. While it is possible for EMA to successfully challenge Section 3.20 as an unenforceable penalty under Delaware law by

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

only challenging the reasonableness prong, see *Delaware Bay Surgical Servs., P.C.*, 900 A.2d at 651, the "difficulty of calculating th[e] loss" correlates with the reasonableness of the damages, see *Brazen*, 695 A.2d at 48. AppTech's arguments that the trading volume is low, that price changes during sale would be volatile, and that more discovery is needed, all suggest that calculating loss would be difficult and thus undercut EMA's reasonableness challenge.

The Court thus grants summary judgment on the basis that Section 3.20[18] is not unreasonable because it is "rationally related" to the actual measure of damages and not unconscionable.[19] With respect to whether the multiplier is "rationally related" to the actual measure of damages, the Note provided that its conversion discount would be

> the lower of: (i) the lowest closing price of the Common Stock during the preceding twenty-five (25) Trading Day period ending on the latest complete Trading Day prior to the Issue Date of this Note or (ii) 75% of the *lowest trading price* for the Common Stock on the Principal Market during the twenty five (25) consecutive Trading Days including and immediately preceding the Conversion Date.

Dkt. No. 12-2 1.2(a) (emphasis added). Therefore, had AppTech not defaulted on the Note, EMA would have been able to convert the principal and interest owed to it for a discount of 75% of the "lowest trading price"—not the average market price, or the highest market price. Importantly, AppTech is akin to a "thinly traded penny stock," Dkt. No. 26 at 11; *see also* Dkt. No. 25 at 15 (AppTech stating that its stock is "thinly traded"), which generally have the tendency to "trad[e] intermittently and at widely fluctuating prices," *Almond for Almond Fam. 2001 Tr. v. Glenhill Advisors LLC*, 2018 WL 3954733, at *8 (Del. Ch. Aug. 17, 2018). For example, AppTech's VWAP after its June breach ranged from $1.3254 to $1.6348 during the following month—a nearly 23% swing. Dkt. No. 12-8. Seeking liquidated damages of double the principal and accumulated interest is thus "rationally related to [the] measure of damages a party might conceivably sustain," *Unbound Partners Ltd.*

*P'ship*, 251 A.3d at 1033, because 75% of the lowest trading price during the prior twenty-five days may end up being an even lower percentage of the "mean market value of that stock on the day of the breach," *ExeLED Holdings Inc.*, 2021 WL 4949173, at *6, or the price at which EMA could have theoretically immediately sold its shares. In addition, Section 1.2(a) contemplates the alternative possibility of using "the lowest closing price of the Common Stock during the preceding twenty-five ... Trading Day period ... prior to the Issue Date of this Note." Dkt. No. 12-2 § 1.2(a). That also may have been at 50% of the average market price at the time of the breach, justifying the 200% multiplier. *See S.E.C. v. Bronson*, 14 F. Supp. 3d 402, 404 (S.D.N.Y. 2014) ("[P]enny stocks are considered to be particularly high risk and not suitable to all investors."). Thus, even if such liquidated damages ended up substantially more than the actual market price of shares, they still constituted a "reasonable estimate of the damages which *could* be caused." *DecisivEdge, LLC v. VNU Grp., LLC*, 2018 WL 1448755, at *6 (Del. Super. Ct. Mar. 19, 2018) (emphasis added).

\*18   The specific terms of the Note and the context of penny stock trading make this case more comparable to *One World Holding, Inc*, in which a court in the Eastern District of New York concluded that use of a doubling multiplier was proper. *One World Holding, Inc.* involved a provision in which there was a doubling multiplier applied to "outstanding principal and accrued interest, plus 'Default Interest.' " *One World Holding, Inc.*, 2018 WL 3135848, at *1. Like the Note here when properly construed, the promissory note at issue there did not subsequently convert that doubled sum to shares. *See LG Cap. Funding, LLC v. One World Holdings, Inc.*, No. 15-cv-0698 (E.D.N.Y. Aug. 6, 2015), Report and Recommendation, ECF No. 28 at 9. The conversion ratio of the debt was at "50% of the Market Price," with the "Market Price" being the "average of the lowest three (3) Trading Prices for the Common Stock during the ten (10) Trading Day period ending one Trading Day prior to the date the Conversion Notice is sent." *LG Capital Funding, LLC v. One World Holdings, Inc.*, No. 15-cv-0698, ECF. No. 5-1 at 2. Although 75% is higher than 50%, the 75% conversion price here is taken from a singular lowest price, with no moderation through averaging, over a significantly longer time period that provides greater opportunity for volatile fluctuation. A doubling multiplier is thus also "rationally related" to "make [EMA] whole," *One World Holding, Inc.*, 2018 WL 3135848, at *14, given the potential uncertainty and volatility of prices here.

Nor is the 200% multiplier, when applied to the principal and accrued interest, unconscionable under Delaware law. That the 75% of the lowest price during the preceding twenty-five days of the Conversion Date might not be equivalent to 50% of the market price at the time of breach does not render the doubling multiplier "unconscionable." Delaware courts have held that liquidated damages of even greater proportion to actual damages are not unconscionable. *See, e.g., Symbiont.io, Inc. v. Ipreo Holdings, LLC,* 2021 WL 3575709, at *58 (Del. Ch. Aug. 13, 2021) (finding that liquidated damages of $70 million was not unconscionable relative to actual damages of $26 to $45 million). The fact that the 200% multiplier bears a rational relationship to the nature of the sought-after asset—penny stocks, which are inherently high risk—further indicates that the multiplier is not unconscionable. *Cf.Leasing Serv. Corp. v. Just.,* 673 F.2d 70, 74 (2d Cir. 1982) (finding under New York law that the value that was "incapable of precise estimation" and "may in fact fluctuate radically over time" supported finding that a lease provision was not unconscionable).

EMA's second error flows from its first error. EMA mistakenly applies the Default Interest to the doubled sum from Section 3.20. Because the doubled sum never constituted or replaced the principal or interest, EMA incorrectly applied its Default Rate. [20] And because EMA is only allowed to convert the Default Sum *or* receive a doubled sum under Section 3.20, EMA also erred in assuming that it could apply the Default Interest once again on the final erroneously converted double payment. That Default Interest should only apply to the principal and accrued interest. It does not apply to any resulting figure *after* either conversion or doubling under Section 3.20.

### 2. Damages from Breach of the Warrant

**\*19** With respect to the cashless exercise provision under Section 2(d) of the Warrant Agreement, EMA argues for summary judgment that it is entitled to a pre-interest damages figure of $427,999.39, reflecting the conversion of 287,692 shares at a price of $1.4877 per share. Although the failure of EMA to establish an entitlement to the requested damages with respect to the Note alone deprives EMA of any right to summary judgment with respect to damages in this case, the Court notes a discrepancy with respect to the calculation of the warrants that the parties should address in the further proceedings that will be required in this case.

Again, Section 2(d) addresses the number of shares EMA is entitled to under the Warrant and provides that:

> [T]he Holder shall be entitled to receive a certificate for the number of Warrant Shares equal to the quotient obtained by dividing [(A-B) (X)] by (B), where:
>
> (A) = the Market Price (as defined below);
>
> (B) = the Exercise Price of this Warrant (as adjusted); and
>
> (X) = the number of Warrant Shares issuable upon exercise of this Warrant in accordance with the terms of this Warrant by means of a cash exercise rather than a cashless exercise.

Dkt. No. 12-2 § 2(d).

EMA submitted its 2(d) calculation in a letter to the Court on September 8, 2022. That letter stated the following:

> The cashless exercise formula provided in 2(d) of the Warrant is the number of Warrant Shares issuable upon exercise of this Warrant in accordance with terms of this Warrant by means of a cash exercise rather a cashless exercise (480,000) multiplied by (the Market Price ($1.56) less the anti-dilution/base price (0.625) = 0.935) *divided by the Market Price 1.56.* Accordingly, (480,000 × .935 = 448,800 / 1.56 = 287,692) common shares to be issued under cashless exercise.

Dkt. No. 39 at 2 (emphasis added). Thus, it appears that EMA derived the warrant figure by dividing the numerator by the Market Price or (A). But the contract on its face (and curiously [21] ) requires the numerator to be divided by the Exercise Price or (B). Had EMA divided the numerator by the Exercise Price of the Warrant rather than by the Market Price, the resulting figure would have yielded 718,080 common shares. EMA does not appear to be alone in reflecting that the intended approach, contra the contract, is to use the Market Price (A). AppTech appears to agree. Whether the numerator should be divided by Market Price (A) rather than Market Price (B), whether the stated formula is a product of

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

mutual mistake, or whether the Court has misinterpreted the provision is a subject that will have to await further briefing.

### 3. Attorneys' Fees

Finally, EMA moves for summary judgment for an award of costs and reasonable attorneys' fees under Section 4.5 of the Note, noting that it has incurred total fees and costs of $6,995.00 as of its filing of its motion for summary judgment. Dkt. No. 14 at 12. AppTech argues that an award of attorneys' fees is not warranted because the underlying Agreements are illegal. Dkt. No. 25 at 1, 3, 13–14. As previously noted, the Court has rejected that argument. *See supra* Section I. While "[u]nder the American Rule and Delaware law, litigants are normally responsible for paying their own litigation costs, [i]n contract litigation, where the contract contains a fee-shifting provision, [Delaware courts] will enforce that provision." *SIGA Techs., Inc. v. PharmAthene, Inc.*, 67 A.3d 330, 352 (Del. 2013) (internal quotation marks omitted). Section 4.5 of the Note provides that "[i]f default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees." Dkt. No. 12-2 § 4.5. It also states in Section 4.6 that

"[t]he prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs." Dkt. No. 12-2 § 4.6. The Court grants summary judgment in favor of EMA on this issue and concludes EMA is entitled to attorneys' fees and costs but reserves decision on the specific figure and the reasonableness of that figure pending final resolution of the damages award.

### CONCLUSION

**\*20** The motion for summary judgment is GRANTED IN PART and DENIED IN PART. The motion to dismiss is DENIED.

The Clerk of Court is respectfully directed to close Dkt. Nos. 11 and 17.

SO ORDERED.

### All Citations

Slip Copy, 2022 WL 4237144

### Footnotes

1   AppTech Corp. is also referred to as "APCX" in the parties' submissions. For the purposes of convenience, the Court will refer to the Defendant as "AppTech."

2   AppTech submitted a Rule 56.1 Counterstatement after EMA had already submitted a reply in support of its motion for summary judgment. Dkt. No. 28. The Court declines to exercise its discretion to consider AppTech's untimely Rule 56.1 Counterstatement. See *Holtz v. Rockefeller & Co.*, 258 F.3d 62, 73 (2d Cir. 2001). Although AppTech argues in a letter submitted to the court and at oral argument that its untimeliness should be excused because EMA failed to communicate with AppTech about its Rule 56.1 Statement or provide a word copy of that Statement, nothing about that behavior would prevent EMA from filing its own Counterstatement or, at minimum, requesting an extension of time. See S.D.N.Y. Loc. Civ. R. 56.1(b) (providing that "[t]he papers opposing a motion for summary judgment shall include [the opposing Rule 56.1 Statement]"); see also *Gadsden v. Jones Lang Lasalle Ams., Inc.*, 210 F. Supp. 2d 430, 438 (S.D.N.Y. 2002) (declining to consider late 56.1 statement in opposition and deeming admitted the defendant's timely filed Rule 56.1 statement). In any event, even in the instances where AppTech disputes key factual statements in EMA's Rule 56.1 Statement, AppTech generally fails to cite evidence in the record showing any dispute of material fact, instead relying on "improper legal argument and unsupported assertions." *Emanuel v. Griffin*, 2015 WL 1379007, at \*2 (S.D.N.Y. Mar. 25, 2015) (internal quotation marks omitted). "In responding to a Rule 56.1 statement, the party opposing the motion for summary judgment is 'required by [the district's] Local Rules to specifically respond to the assertion of each purported undisputed fact by the movant and, if controverting any such fact, to support its position by citing to admissible evidence in the record.' ... 'If the opposing party

then fails to controvert a fact set forth in the movant's Rule 56.1 statement, that fact will be deemed admitted pursuant to the local rule.' " *Baity v. Kralik*, 51 F. Supp. 3d 414, 417–18 (S.D.N.Y. 2014) (first quoting *Risco v. McHugh*, 868 F.Supp.2d 75, 86 n. 2 (S.D.N.Y.2012); and then quoting *Johnson v. IAC/Interactive Corp.*, 2 F. Supp. 3d 504, 507 (S.D.N.Y. 2014)). Such facts will thus be deemed admitted.

3   Transfer agents "work for the security issuer to record changes of ownership, maintain the issuer's security holder records, cancel and issue certificates, and distribute dividends." U.S. Secs. & Exch. Comm'n, Investor.gov, "Transfer Agents," https://www.investor.gov/introductioninvesting/investingbasics/glossary/transferagents#:~:text=Transfer% 20agents% 20work% 20for% 20the,as% 20its% 20own% 20transfer% 20agent.

4   EMA clarified during oral argument on the motions that it was no longer seeking $2,750,000 in damages but was seeking $1,952,511.41, as provided in its motion for summary judgment.

5   The Agreements are governed by Delaware law. The Securities Purchase Agreement states that "[t]his Agreement shall be governed by and construed in accordance with the laws of the State of Delaware without regard to principles of conflicts of laws thereof or any other State." Dkt. No. 12-1 § 10(a). The Warrant provides that "[a]ll questions concerning the construction, validity, enforcement and interpretation of this Warrant shall be determined in accordance with the provisions of the Purchase Agreement." Dkt. No. 12-3 § 5(e). The Note also provides that Delaware law shall govern its interpretation. Dkt. No. 12-2 § 4.6.

6   EMA listed the date of the "notice of conversion" on "July 17, 2020." Dkt. No. 14 at 9. This cannot be correct, as that date is earlier than the execution of the Agreements on November 18, 2020. *Id.* at 2. The Court corrects the date on the basis of the record, which indicates that the notice of conversion was filed on July 13, 2021, not July 17, 2020. Dkt. No. 12-4, 12-5.

7   AppTech, not having filed a timely Rule 56.1 Counterstatement, failed to dispute these facts. Even if the Court were to consider AppTech's untimely Rule 56.1 Counterstatement, AppTech has not cited anything in the record that would show a genuine dispute of material fact as to any of these elements. *See supra* note 2.

8   AppTech argues in its reply brief on the motion to dismiss, in response to EMA's denial that it is a dealer, that EMA received transaction-based compensation in exchange for signing the agreements. But such commissions do not categorically establish broker-dealer status and would not suffice for granting the motion to dismiss. *See* *Dervan v. Gordian Grp. LLC*, 2017 WL 819494, at *11.

9   The true sum of the listed amounts is $1,952,511.91. The $0.50 difference is not material to the outcome of this opinion.

10   EMA, in its motion for summary judgment, relies only on the First Notice of Conversion on July 13, 2021 and the Notice of Exercise, also on July 13, 2021, in confirming that "plaintiff's damages total $1,901,999.16." Dkt. No. 14 at 14. In a letter sent to the Court on September 8, 2022, EMA explained that the Second Notice of Conversion on July 13, 2021 was included as an "alternative should the Court not agree to award the liquidated damages .... provided for in Section 3.2[0]." Dkt. No. 39 at 2 n.2.

11   These are distinct from the "First Notice of Conversion" and the "Second Notice of Conversion," as termed by EMA, which both occurred on July 13, 2021.

12   Section 3.20 also provides that AppTech was obligated to pay EMA a doubled amount of amounts owed "pursuant to Section ... 1.4(g)," Dkt. No. 12-2 § 3.20, which obligates AppTech to pay "$250.00 per day in cash, for each day beyond the Deadline that [AppTech] fails to deliver such Common Stock." EMA did not

raise this daily payment provision in its motion and confirmed at oral argument that it was not seeking to enforce this provision.

13    EMA argued in its motion that $11,438.16 was a result of "interest under the Note *at a rate of 12%* totaling $11,438.16," Dkt. No. 14 at 10 (emphasis added), but EMA appears to correct itself in its letter submitted on September 8, 2022, with the spreadsheet noting that the $11,438.16 is instead a result of the "Default Interest" rate, Dkt. No. 39-5 at 2, which was 24%, Dkt. No. 12-2 at 1.

14    Although EMA asserts that it should be allowed to use a 40% discount price in its motion for summary judgment, Dkt. No. 14 at 10, it also represented at oral argument that it did not seek to apply any additional 15% discounts. EMA clarified its position in its September 8, 2022 letter on which of the 15% discounts it claimed was applicable here. Dkt. No. 39 at 1.

15    EMA references "Exhibit G" attached to its accompanying Declaration of Felicia Preston, but Exhibit G does not include any evidence that the lowest trading price was $1.03 in the 25 days prior to June 14. Exhibit G instead is a copy of the June 14 Notice of Conversion and provides a conversion price of $0.625, as opposed to $0.618. Because the Court ultimately concludes that further briefing is required on damages and denies summary judgment on EMA's specific damages figures, EMA's lack of evidence for the $0.618 price is immaterial to the Court's decision.

16    EMA does not cite a provision in its motion as to the specific statutory provision that would provide a 9% interest rate on damages. Presumably, EMA is referring to N.Y. C.P.L.R. § 5004(a), which provides that "[i]nterest shall be at the rate of nine per centum per annum, except where otherwise provided by statute." *See also id.* § 5001 (providing when such interest accrues); Dkt. No. 14 at 11 (EMA's memorandum citing N.Y. C.P.L.R. § 5001(b) in support of its Default Interest rate calculation). To the extent that EMA relies on New York law, it is mistaken. Delaware law governs this matter. *See supra* note 5. In addition, prejudgment interest for damages are substantive issues under both Delaware and New York law. *See, e.g., Certain Underwriters at Lloyd's London v. Nat'l Installment Ins. Servs., Inc.*, 2007 WL 4554453, at *21 (Del. Ch. Dec. 21, 2007) ("[T]he application of prejudgment interest is generally an issue of substantive law."); *MCI Worldcom Network Servs., Inc. v. Pelcrete Constr., Inc.*, 2006 WL 1388490, at *3 (S.D.N.Y. May 8, 2006) ("The award of prejudgment interest is a substantive issue governed by [N.Y. C.P.L.R.] 5001."); Restatement (Second) § 207 cmt. e ("The local law of the state selected by application of the rule of this Section determines whether plaintiff can recover interest, and, if so, the rate, upon damages awarded him for the period between the breach of contract and the rendition of judgment."). Delaware law provides for prejudgment interest at 5% over the Federal Reserve discount rate, with exceptions inapplicable here. Del. Code Ann. tit. 6, § 2301.

17    The parties agreed that Delaware law would govern their disputes over the Agreements. *See supra* note 5.

18    Neither party contends that Section 3.20 is not a liquidated damages clause. *See, e.g.*, Dkt. No. 39 at 2 n.2 (EMA referring to Section 3.20 as providing "liquidated damages").

19    Although Section 3.20 allows for application of the doubling multiplier to Default Interest, EMA did not seek to double the Default Interest (before erroneously converting the doubled sum to shares). Because EMA has not sought summary judgment on the application of the doubling multiplier to Default Interest, the Court need not determine whether such an application would be an unenforceable penalty. *Cf. Parallax Health Scis., Inc.*, 2022 WL 2442338, at *11 (S.D.N.Y. June 13, 2022) (concluding that doubling EMA's 24% Default Interest had "no justification").

20    AppTech also argues in an untimely Rule 56.1 Counterstatement that the Default Interest rate is inapplicable due to New York's usury laws. Dkt. No. 28 ¶¶ 34, 43. For reasons previously stated, the Court declines to consider AppTech's untimely Rule 56.1 Counterstatement. *See supra* note 2. And such legal argument

EMA Financial, LLC v. AppTech Corp., Slip Copy (2022)

is improperly raised in a Rule 56.1 Counterstatement. *See Risco v. McHugh*, 868 F. Supp. 2d 75, 88 n.2. (S.D.N.Y. 2012) (citing cases). But even if New York law—and not Delaware law—governed this dispute, the default interest is not usurious because it does not exceed 25%, the relevant usury rate for AppTech's usury defense. *See Blue Citi, LLC v. 5Barz Int'l Inc.*, 338 F. Supp. 3d 326, 334 (S.D.N.Y. 2018), *aff'd*, 802 F. App'x 28 (2d Cir. 2020) (summary order) ("Under New York law, a contract is criminally usurious if the parties to the agreement knowingly provide for an interest rate of 25 percent per annum or more. See N.Y. Penal Law § 190.40."); *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320, 326, 179 N.E.3d 612, 616 (2021) ("[T]he defense of usury is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action."); Dkt. No. 12-2 at 1 (defining the "Default Interest" as 24%). Alternatively, under Delaware law, *see supra* note 5 (concluding that Delaware law governs this dispute), the Default Rate is not usurious. *See* 6 Del. Code § 2301(c) ("[T]here shall be no limitation on the rate of interest which may be legally charged for the loan or use of money, where the amount of money loaned or used exceeds $100,000, and where repayment thereof is not secured by a mortgage against the principal residence of any borrower."). In addition, the imposition of default interest itself may serve a useful purpose in blocking obstructive action delaying recovery. *See* Gregory Klass, *Contracting for Cooperation in Recovery*, 117 Yale L.J. 2, 21 (2007) ("Compensation for the other secondary harms of obstructive breach—delay in recovery and inability to mitigate—is in all cases more effectively accomplished using prejudgment interest clauses ...."). The Court thus holds that Default Interest may be applied under a correctly construed Section 3.20 of the Note, in which Default Interest only applies to the principal and accrued interest, and not the doubled payment or converted Default Sum.

21    The formula is curious since a cashless exercise typically yields less shares than a cash exercise.

---

**End of Document**    © 2022 Thomson Reuters. No claim to original U.S. Government Works.



| | 390 North Broadway – Ste. 140 | Jericho, New York 11753 |
|---|---|
| | Main Telephone: (516) 455-1500 | Facsimile: (631) 498-0478 |
| | DALLAS | NEW YORK | NAPLES |

**October 7, 2022**

<u>Via ECF</u>
The Honorable Edgardo Ramos
United States District Court
Thurgood Marshall
United States Courthouse
40 Foley Square
New York, NY 10007

Re:     *DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC, et al,*
         *Case No.: 1:21-cv-11222; Notice of Supplemental Authorities*

Dear Judge Ramos:

We represent Plaintiff Darkpulse, Inc. in the above-captioned matter.  We write to provide the Court with supplemental authorities relevant to DarkPulse's claims for relief asserted under the Racketeer Influenced and Corrupt Organizations Act ("RICO") (18 U.S.C. § 1961, *et seq.*), which is premised on New York's criminal usury statute, in this matter.

On June 6, 2022, the U.S. District Court for the Southern District of New York granted a borrower's motion for summary judgment on its RICO unlawful debt collection claim—premised on New York usury laws—in *Fleetwood Servs., LLC v. Ram Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 100837 (S.D.N.Y. June 6, 2022).  A copy of the *Fleetwood* decision is filed herewith as **Exhibit A**.

On June 27, 2022, the U.S. District Court for the Southern District of New York denied the lender's motion to dismiss to the borrower's RICO claims for unlawful debt collection, also premised on New York's usury claims, in *Haymount Urgent Care P.C. v. GoFund Advance, LLC*, 2022 U.S. Dist. LEXIS 112768 (S.D.N.Y. June 27, 2022).  A copy of the *Haymount* decision is filed herewith as **Exhibit B**.

On July 20, 2022, the U.S. District Court for the Southern District of New York denied the lender's motion to dismiss to the borrower's RICO claims for unlawful debt collection, also premised on New York's usury claims, in *Lateral Recovery LLC v. Queen Funding, LLC*, 2022 U.S. Dist. LEXIS 129032 (S.D.N.Y. July 20, 2022).  A copy of the *Lateral Recovery* decision is filed herewith as **Exhibit C**.

On September 28, 2022, the U.S. District Court for the Eastern District of New York denied the lender's motion for summary judgment on its breach of contract claim when the borrower interposed the affirmative defense of criminal usury under New York law in *AKF, Inc. v. W. Foot*

**A-521**

*DarkPulse, Inc. v. FirstFire Global Opportunities Fund, LLC, et al,*
Case No.: 1:21-cv-11222
Notice of Supplemental Authorities
Oct. 12, 2022

*& Ankle Ctr.*, 2022 U.S. Dist. LEXIS 176467 (E.D.N.Y. Sept. 28, 2022). A copy of the *AKF* decision is filed herewith as **Exhibit D**.

On August 18, 2022, the New York County Supreme Court denied a convertible note lender's CPLR 3213 motion for summary judgment in lieu of a complaint, finding defendants "have raised factual disputes" concerning the convertible note, and that the conversion discount could cause the transaction to impose a criminally usurious rate of interest. *GS Capital Partners, LLC v. F1E Networks, Inc.*, 2022 N.Y. Misc. LEXIS 4698 (N.Y. Sup. Ct. Aug. 18, 2022). A copy of the *GS Capital* decision is filed herewith as **Exhibit E**.

On September 30, 2022, the U.S. District Court for the Southern District of New York denied the lender's motion to dismiss to the borrower's RICO claims for unlawful debt collection, also premised on New York's usury claims, in *New Y-Capp v. Arch Cap. Funding, LLC*, 2022 U.S. Dist. LEXIS 180309 (S.D.N.Y. Sept. 30, 2022). A copy of the *New Y-Capp* decision is filed herewith as **Exhibit F**.

All of the foregoing decisions rested their findings on the Court of Appeals' recent usury decision in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 37 N.Y.3d 320 (N.Y. 2021).

We thank the Court for its attention to this matter.

Respectfully submitted,

**THE BASILE LAW FIRM P.C.**

By:  */s/ Eric J. Benzenberg*
Eric J. Benzenberg, Esq.
390 N. Broadway, Suite 140
Jericho, New York 11753
Tel.:   (516) 455-1500
Fax.:   (631) 498-0478
Email: eric@thebasilelawfirm.com

cc:     Via ECF
        All Counsel of Record

A-522

# Exhibit A

 Neutral
As of: September 8, 2022 8:47 PM Z

## *Fleetwood Servs., LLC v. Ram Capital Funding, LLC*

United States District Court for the Southern District of New York

June 6, 2022, Decided; June 6, 2022, Filed

20-cv-5120 (LJL)

**Reporter**
2022 U.S. Dist. LEXIS 100837 *; 2022 WL 1997207

FLEETWOOD SERVICES, LLC, Plaintiff, -v- RAM CAPITAL FUNDING, LLC, TSVI REICH a/k/a STEVE REICH, RICHMOND CAPITAL GROUP LLC n/k/a RCG ADVANCES LLC, and ROBERT GIARDINA, Defendants.

**Prior History:** *Fleetwood Servs., LLC v. Ram Capital Funding, LLC, 2021 U.S. Dist. LEXIS 85108, 2021 WL 9099984 (S.D.N.Y., May 4, 2021)*

## Core Terms

Merchant, choice-of-law, funds, parties, rights, reconciliation, receivables, collection, summary judgment, debited, damages, interest rate, Designated, customers, event of default, contractual, repayment, default, obligations, guarantors, courts, lender, center of gravity, depositing, bears, summary judgment motion, reasonable relation, purchase price, unenforceable, borrower

**Counsel:** [*1] For Fleetwood Services, LLC, Plaintiff: Shane R. Heskin, LEAD ATTORNEY, White & Williams, LLP(Philadelphia), Philadelphia, PA.

For Ram Capital Funding, LLC, TSVI Reich, also known as, Steve Reich, Defendants: Abraham S Beinhorn, Jacobowitz Newman Tversky LLP, NY, Cedarhurst, NY.

For Richmond Capital Group LLC, now known as, RCG Advances LLC, Robert Giardina, Defendants: Jeremy M Iandolo, LEAD ATTORNEY, J. Iandolo Law, PC, Brooklyn, NY.

**Judges:** LEWIS J. LIMAN, United States District Judge.

**Opinion by:** LEWIS J. LIMAN

## Opinion

### OPINION AND ORDER

LEWIS J. LIMAN, United States District Judge:

Plaintiff Fleetwood Services, LLC ("Plaintiff" or "Fleetwood") moves, pursuant to *Federal Rule of Civil Procedure 56*, for an order granting it summary judgment with respect to the five causes of action it brought in the Amended Complaint. Dkt. No. 74.

For the following reasons, the motion for summary judgment is granted in part and denied in part.

### BACKGROUND

The following facts are undisputed for the purposes of summary judgment except where otherwise indicated.

#### I. The Parties

Fleetwood is a small Texas business, providing golf course construction, development, renovation, and remolding for courses and country clubs in and around the Dallas area. Dkt. No. 79 ¶ 11. Its owners [*2] are Pamela Fleetwood and Robert Fleetwood. *Id.* ¶ 15. Richmond Capital Group n/k/a RCG Advances LLC ("Richmond") is a New York limited liability company that also operates under the name Ram Capital Funding ("Ram Capital"). *Id.* ¶ 2. Robert Giardina ("Giardina" and together with Ram Capital, "Defendants") is the founder and sole managing member of Richmond. *Id.* ¶ 3. Ram Capital Funding LLC ("Ram LLC") and Tsvi Reich a/k/a Steve Reich were initially named as defendants in this action, but Fleetwood voluntarily dismissed its claims against them after entering into a settlement agreement with those entities in September 2020. *See* Dkt. No. 13; Dkt. No. 28 at 1 n.1; Dkt. No. 38-14. Richmond d/b/a Ram Capital and Ram LLC were both involved in the cash advance business. Dkt. No. 78-10 at 19-20.

Beginning at least as early as July 2015 and continuing

through the end of 2018, Richmond was in the business of advancing funds to small businesses in Texas and throughout the United States. Dkt. No. 79 ¶ 4. Richmond advanced these funds pursuant to agreements called "Merchant Agreements." Each of the Merchant Agreements used by Richmond contained identical assignment and payment language, representations [*3] and warranties, events of default, default rights and remedies, a security agreement, a personal guaranty, a reconciliation provision, and Automated Clearing House ("ACH") authorization terms. Id. ¶ 5. In connection with the transactions governed by each of the Merchant Agreements, merchants were required to complete a form that provided Richmond with the merchant's log-in information to its bank account; it stated: "[t]he way your advance is set up RCG needs viewing access to your bank accounts each business day in order to calculate the amount of your daily payment." Id. ¶ 7. In addition, each merchant was required to execute a confession of judgment that, upon an event of default, permitted Richmond to obtain a judgment against the merchant and any guarantor in New York without notice or the need to commence a plenary action. Id.

## II. The Fleetwood Agreement

In November 2016, as it was experiencing cash-flow issues, Fleetwood was contacted by a broker offering financing through Ram LLC. Id. ¶ 12. On or about November 28, 2016, Fleetwood entered into a Merchant Agreement written on the paper of Ram LLC (the "Fleetwood Agreement" or the "Agreement"), listing "Ram Capital Funding LLC [*4] ("RCF")" as the counterparty. Id. ¶ 13; Dkt. No. 77-4 at 1. Though the Agreement was on the paper of Ram LLC, Richmond advanced the $100,000 purchase price (the "Purchase Price"), less applicable fees, to Fleetwood, and Richmond collected the daily payments due pursuant to the Agreement. Dkt. No. 79 ¶ 35.

The Fleetwood Agreement was identical in form and substance to the Merchant Agreements. Id. at ¶ 13. As part of the transaction (the "Fleetwood Transaction"), Pamela and Robert Fleetwood also executed (i) a security agreement and personal guaranty; (ii) a confession of judgment; and (iii) an authorization agreement for direct deposit and direct payments. Id. ¶ 15. The provisions of the Fleetwood Agreement are analyzed elsewhere in this Opinion; here, it is sufficient to describe certain of the material terms. Pursuant to the terms of the Fleetwood Agreement, Ram LLC agreed to advance Fleetwood $100,000 in exchange for the purported purchase of what was defined as all of Fleetwood's "future receivables" until Fleetwood had repaid the sum of $149,900 (the "Purchased Amount"). Id. ¶¶ 16, 44. The Purchased Amount was to be repaid through daily ACH withdrawals from a designated account [*5] (the "Designated Account") located at a Texas branch of JPMorgan Chase Bank, N.A., each in the equal amount of $1,399.00, which was stated to equal 10% of Fleetwood's daily receipts. Id. ¶¶ 17-18, 45.

The first paragraph of the Fleetwood Agreement contains the provision regarding the purported "Purchase and Sale of Future Receivables" and reads in part as follows:

## PURCHASE AND SALE OF FUTURE RECEIVABLES

Merchant ("Merchant" or "Seller") hereby sells, assigns and transfers to RCF ("RCF" or "Buyer") (making RCF the absolute owner) in consideration of the funds provided ("Purchase Price") [$100,000] specified, below, all of Merchant's future accounts, contract rights and other entitlements arising from or relating to the payment of monies from Merchant's customers' and/or other third party payors (the "Receipts" defined as all payments made by cash, check, electronic transfer or other form of monetary payment in the ordinary course of the Merchant's business), for the payments due to Merchant as a result of Merchant's sale of goods or services (the "Transactions") until the amount specified below (the "Purchased Amount") has been delivered by or on behalf of Merchant to RCF.

The Purchased [*6] Amount [$149,900] shall be paid to RCF by Merchant's irrevocably directing and authorizing that there be only one depositing bank account, which account must be acceptable to, and preapproved by, RCF (the "Account") into which Merchant and Merchant's customers shall remit the percentage specified below (the "Specified Percentage") [10%] of the Merchant's settlement amounts due from each Transaction, until such time as RCF receives payment in full of the Purchased Amount. Merchant hereby authorizes RCF to ACH Debit the specified remittances from the merchant's Account on a daily basis and will provide RCF with all required access codes, and monthly bank statements. Merchant understands that it is responsible for ensuring that the specified

Case 23-78, Document 36, 05/01/2023, 3508267, Page232 of 304

A-525

Case 1:21-cv-11222-ER   Document 40-1   Filed 10/12/22   Page 4 of 23   Page 3 of 22
2022 U.S. Dist. LEXIS 100837, *6

percentage to be debited by RCF remains in the Account and will be held responsible for any fees incurred by RCF resulting from a rejected ACH attempt or an event of default. RCF is not responsible for any overdrafts or rejected transactions that may result from RCF's ACH debiting the specified amounts under the terms of this agreement. RCF will debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements [*7] on or about the eighteenth day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited each month equals the specified percentage. RCF may, upon Merchant's request, adjust the amount of any payment due under this Agreement at RCF's sole discretion and as it deems appropriate. Notwithstanding anything to the contrary in this Agreement or in any other agreement between RCF and Merchant, upon the violation of any provision contained in Section 1.11 of the MERCHANT AGREEMENT TERMS AND CONDITIONS or the occurrence of an Event of Default under Section 3 of the MERCHANT AGREEMENT TERMS AND CONDITIONS, the Specified Percentage shall equal 100%. A list of all fees applicable under this Agreement is contained in Appendix A.

Dkt. No. 77-1 at 1; *see also* Dkt. No. 79 ¶¶ 48-49, 52. Although stated to be for "future receivables," the defined term "Transaction" is broader. It includes "the payment of monies from Merchant's customers' and/or other third party payors . . . for the payments due to Merchant as a result of Merchant's sale of goods or services." Dkt. No. 77-1 at 1.

Section 3.1 of Fleetwood [*8] Agreement with respect to "Events of Default" reads as follows:

**3.1 Events of Default**. The occurrence of any of the following events shall constitute an "Event of Default" hereunder: (a) Merchant or Guarantor shall violate any term or covenant in this Agreement; (b) Any representation or warranty by Merchant in this Agreement shall prove to have been incorrect, false or misleading in any material respect when made; (c) Merchant shall admit in writing its inability to pay its debts, or shall make a general assignment for the benefit of creditors, or any proceeding shall be instituted by or against Merchant seeking to adjudicate it a bankrupt or insolvent, or seeking

reorganization, arrangement, adjustment, or composition of it or its debts; (d) the sending of notice of termination by Merchant; (e) Merchant shall transport, move, interrupt, suspend, dissolve or terminate its business; (f) Merchant shall transfer or sell all or substantially all of its assets; (g) Merchant shall make or send notice of any intended bulk sale or transfer by Merchant; (f) Merchant shall use multiple depository accounts without the prior written consent of RCF; (i) Merchant shall change its depositing account [*9] without the prior written consent of RCF; (j) Merchant shall perform any act that reduces the value of any Collateral granted under this Agreement; or (k) Merchant shall default under any of the terms, covenants and conditions of any other agreement with RCF.

Dkt No. 77-1 § 3.1. Appendix A to the Agreement provides that there is a fee for insufficient funds in the Designated Account but provides that it shall be "[u]p to FOUR TIMES ONLY before a default is declared." *See* Dkt. No. 77-1 at ECF p. 7; Dkt. No. 79 ¶ 58. An authorization agreement signed by Robert Fleetwood authorized Ram LLC to debit the Designated Account $1,399.00 each day, Monday through Friday. Dkt. No. 77-1 at ECF p. 6.

Upon an Event of Default, the full amount of the outstanding Purchased Amount plus any additional fees, including legal fees, became immediately due and owing. Dkt. No. 79 ¶ 60. In that case, the counterparty to the Agreement had the ability to exercise all rights or remedies available at law or in equity or as a secured creditor under the Uniform Commercial Code. *Id.* In addition, upon an Event of Default, it had the right to (i) obtain insurance, (ii) collect monies due and owing from Fleetwood's account [*10] debtors; (iii) receive, endorse and collect any checks, notes, drafts of other chattel paper; (v) sign Fleetwood's name to any invoice and direct that Fleetwood's customers pay the counterparty and (vi) file any claims or pursue any actions to collect upon a Fleetwood receivable.[1] *Id.* ¶ 61.

In connection with the Fleetwood Agreement, Fleetwood

---

[1] In its Rule 56.1 Statement, Plaintiff refers to the counterparty of the Fleetwood Agreement as "Richmond," even though it is written on the paper of Ram LLC and Ram LLC is identified as the counterparty in the text of the Agreement. For ease of reference, and because the Court concludes that Richmond performed the obligations under the Fleetwood Agreement, the Court will refer to Fleetwood's counterparty to the Agreement as Richmond in this Opinion.

2022 U.S. Dist. LEXIS 100837, *10

granted Richmond a security interest in and lien upon: (a) "all accounts, chattel paper, documents, equipment, general intangibles, instruments, and inventory"; (b) all proceeds thereof; and (c) "all funds at time in the Merchant's Account, regardless of the source of the funds." *Id.* ¶ 63. To further secure Fleetwood's performance under the Fleetwood Agreement, Pamela and Robert Fleetwood personally guaranteed Fleetwood's "good faith, truthfulness, and performance of all representations, warranties and covenants" in the Agreement (the "Personal Guaranties"). *Id.* ¶ 64. And, pursuant to Sections 1.11 and 2.9 of the Fleetwood Agreement, if Fleetwood filed for bankruptcy Pamela and Robert Fleetwood's obligations under the Personal Guaranties would be triggered. *Id.* ¶ 65.

The Fleetwood Agreement contains a choice of law clause. It reads, in relevant [*11] part, as follows:

> 4.5 **Binding Effect: Governing Law, Venue and Jurisdiction.** . . . This Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principles of conflicts of law.

Dkt. No. 72-4 § 4.5.

The Agreement was signed by Robert Fleetwood and Pamela Fleetwood on behalf of Fleetwood with a physical address in Rockwall, Texas. *Id.* at 1. It was not countersigned by Ram LLC. *Id.*; *see also* Dkt. No. 79 ¶ 19. The address for Ram Capital Funding, LLC listed on the agreement is in Lakewood, New Jersey. Dkt. No. 77-1 at 1. Richmond is a New York limited liability company. Dkt. No. 79 ¶ 2.

In connection with the Fleetwood Agreement, Pamela Fleetwood received and executed a form that requested her to provide information to access the Designated Account so that Richmond could calculate the daily payment amount. *Id.* ¶ 57. The form stated:

> Please note that the way your advance is set up RCF needs viewing access to your bank account each business day in order to calculate the amount of daily payment

*Id.*

## III. Richmond's Funding Pursuant to the MCA

On November 29, 2016, the sum of $44,500 was wired into the Designated Account from [*12] an account at Empire State Bank in the name of Richmond (the "Empire Account"). *Id.* ¶¶ 21-22; 39.[2] The "Wire Transfer of Funds Notice" issued by Empire State Bank for this transaction reflects that the originator was "Richmond Capital Group LLC" with the contact email "rgiardina@richmondcapitalgroup.com" and that the wire was charged to an identification number that corresponds to Richmond's identification number. Dkt. No. 78-17.

The wire transfer was reflected in the Designated Account statement by a notice that read in part: "Fedwire Credit Via: Empire State Bank . . . Richmond Capital Group LLC, New York NY." Dkt. No. 79 ¶ 40. The Empire Account had been opened by Richmond in or around June 2016 in the name "Richmond Capital Group d/b/a RAM Capital Funding." Dkt. No. 78-16; Dkt. No. 79 ¶¶ 36-37. The sum wired on November 29th equaled half the Purchase Price less applicable fees. Dkt. No. 79 ¶ 23. By email on or about December 8, 2016, Fleetwood contacted its broker to request payment of the remaining $50,000. *Id.* ¶ 24. In response, Fleetwood was offered a second $50,000 receivables purchase agreement, but Fleetwood rejected the offer and demanded payment of the full Purchase Price. [*13] *Id.* ¶¶ 24-25. Fleetwood was then told that the additional funds "won't release til [sic] the New Year." *Id.* ¶ 25. Neither Ram LLC nor Richmond ever advanced the additional $50,000 owed pursuant to the Fleetwood Agreement, *id.* ¶ 26, and Ram LLC never advanced any funds to Fleetwood, *id.* ¶¶ 22, 26, 35. Nor did Ram LLC sign the Fleetwood Agreement. *Id.* ¶ 19.

On or around July 17, 2016, shortly after Richmond opened the Empire Account, Richmond entered into an agreement with Actum Processing ("Actum"), pursuant to which Actum agreed to provide ACH services to Richmond d/b/a Ram Capital. *Id.* ¶ 38. On November 30, 2016, Actum, on behalf of Richmond d/b/a Ram Capital, effected a withdrawal of $1,399 from the Fleetwood Account. *Id.* ¶¶ 41-42. Thereafter, from November 30, 2016 through and including April 10, 2017, Actum continued to deduct daily payments— almost always in the amount of $1,399[3] —from the

---

[2] In one paragraph, Plaintiff's Rule 56.1 Statement refers to the payment being made on November 29, 2021. *See* Dkt. No. 79 ¶ 21. That is obviously a typographical error. The Court uses the date in the underlying evidence.

[3] The accompanying bank records reflect that $1,399 was occasionally deducted twice in one day around holidays, and that for five days in March 2017, only $700 per day was deducted. *See* Dkt. No. 77-7.

Fleetwood Account on behalf of Richmond d/b/a Ram Capital. *Id.* ¶ 43; Dkt No. 77-7.[4] By email dated March 17, 2017 to Richmond at its d/b/a Ram Capital email address, Fleetwood requested a brief pause in its daily payments because it had not yet received expected payments on certain invoices and [*14] was running low on funds. *Id.* ¶ 27. A collection agent, Michelle Gregg, immediately responded: "UNFORTUNATELY ... WE DO NOT OFFER 'BREAKS'. DOING THAT WOULD PUT YOU IN AUTOMATIC DEFAULT," and Richmond continued to debit amounts from the Fleetwood Account. *Id.* ¶¶ 28-29. By April 2017, a total of $119,617 had been debited from the Fleetwood Account—$44,667 more than Richmond was entitled to under the Fleetwood Agreement. *Id.* ¶ 31; *see also* Dkt. No. 77 ¶ 17 ("Since Richmond had only provided half the Purchase Price, it was only entitled to collect half the Purchased Amount or $74,950."). By letter dated April 28, 2017, Fleetwood, by and through its attorneys, demanded that the sum of $44,667 (the "Excess Funds") be returned to Fleetwood. Dkt. ¶¶ 31-32. By letter dated September 27, 2019, Fleetwood's counsel again demanded the return of the Excess Funds plus additional amounts deemed to be usurious interest under Texas law. *Id.* ¶ 33. To date, Richmond has not returned any funds to Fleetwood. *Id.* ¶ 34. And notwithstanding the provision regarding reconciliations in the Fleetwood Agreement, Richmond never performed a reconciliation on Fleetwood's account. *Id.* ¶ 53; *see also id.* § 54 ("Richmond [*15] never reviewed a merchant's account to determine the proper amount of a daily payment and it never reconciled any merchant's account.").

On the assumption, discussed below, that the Agreement constituted a loan, the relationship between the Purchase Price and the Purchased Amount calculated over the 107 days from when the Purchase Price was to be paid and the Purchased Amount was to be returned would translate to an annual interest rate of 99.8%. When the excess withdrawals are taken into consideration, the nominal interest rate would be 278.5% per annum. Dkt. No. 78-19 at ECF p. 9.

**IV. Other Similar MCAs**

Richmond and Giardina have engaged in similar

conduct with other merchants. On or about June 10, 2020, the New York Attorney General (the "NYAG") filed a petition against Richmond, Giardina, and others in *James v. Richmond Capital Group LLC*, Index No. 451328/2020 (the "NYAG Action"), alleging, among other things, that Richmond, Giardina, and others have preyed upon thousands of small businesses throughout the United States by offering funding under "merchant cash advances" that "are in fact fraudulent, usurious loans with interest rates in the triple and even quadruple digits, [*16] far above the maximum rate permissible for a loan under New York law." Dkt. No. 79 ¶¶ 66-67. Shortly after the commencement of the NYAG Action, the Federal Trade Commission commenced a separate action against Richmond, Giardina, and others entitled *Federal Trade Commission v. RCG Advances, LLC*, No. 20-cv-4432 (S.D.N.Y.), alleging that defendants engaged in deceptive conduct including, among other things, promising consumers specific amounts of financing but providing a much smaller amount, making unauthorized debits from merchant accounts and threatening physical violence when the merchants advise that they cannot make the payments required by the Agreements. *Id.* ¶¶ 68-69.

The NYAG has obtained affidavits from merchants testifying that Richmond never performed any reconciliations and failed and refused to reduce their daily payments when the merchant's receivable collections slowed down; instead of reducing the daily payments, Richmond threatened to destroy the merchant's business and, in some instances, implied that they would harm the merchant's owner if the merchant failed to make the daily payments required by the Agreements. *Id.* ¶¶ 71-72. Those affidavits are undisputed on this [*17] record. *See* Dkt. No. 78-32.

For example, Richmond refused to grant a reduction to the owner of another Texas entity, Texas Tactical Gear & Firearms, who had explained that it anticipated a slowdown in receivables and would be unable to make daily payments; Richmond continued to withdraw the daily payments until the company could not make any further payments and defaulted. *Id.* ¶ 73. When a small chocolatier in Las Vegas, Nevada was unable to make the required daily payments due to a seasonal business slowdown in the Spring of 2017 and requested a reduction in the amount of its payments, Richmond responded: "We will take everything from you. . . . We are from New York. . . . Don't mess with us." *Id.* ¶ 74. Richmond has offered no evidence to dispute this, despite offering a 30(b)(6) witness to answer questions about Richmond's other customers. *See generally* Dkt.

---

[4] Plaintiff's Rule 56.1 Statement recites dates in the year 2021, *see id.* ¶¶ 41-43 but the actual underlying evidence refers to 2016 to 2017. The Court uses the underlying evidence.

No. 78-32 at 110-15.

Richmond responded similarly to a request for a payment reduction by J.B. Plumbing & Heating of Virginia, Inc., a small family-owned company located in Virginia. When the merchant's owner called Richmond in December 2015 and requested a one-week adjustment of its payments because the company was awaiting payments [*18] of receivables from its clients, Richmond refused the request and responded: "I don't care about your problems," and "I'll default you before you can get out of the bathroom." *Id.* ¶ 75.

In another instance, Richmond advanced funds to a Brooklyn synagogue operating under the name Congregation Shule, Inc. When the synagogue's donations slowed down in October 2017 and were insufficient to make the daily payments, Richmond did not reconcile the synagogue's account and responded to the synagogue's request for a reduction in payments with a series of vivid physical threats. *Id.* ¶¶ 76-77. After Richmond obtained a confessed judgment against the rabbi and synagogue, its harassment grew more intense with threats of a sexual and physical nature to the point where the Rabbi was forced to apply for an order of protection, which the Rabbi received. *Id.* ¶ 78.

### V. Invocation of the *Fifth Amendment* and the 30(b)(6) Testimony

In depositions conducted in this case, Giardina and two other individuals who worked as contractors to Richmond, Michelle Gregg and Jose DaSilva, invoked their *Fifth Amendment* rights against self-incrimination to virtually every question asked of them in deposition. *Id.* ¶¶ 82-83. Those questions included whether [*19] Giardina had been "involved in any transactions involving Fleetwood Services" or involved in or aware of any transactions "between Fleetwood Services and Richmond," Dkt. No. 78-28 at 68:25-69:11, whether the Fleetwood Transaction was funded by Richmond, *id.* at 71:7-71:12; Dkt. No. 78-30 at 39:7-39:13, whether Giardina was involved in negotiating the terms of the Fleetwood Transaction, Dkt. No. 78-28 at 75:2-75:5, whether the daily payments under Richmond agreements had a connection to a merchant's anticipated sales amounts, *id.* at 84:21-85:23, and whether Richmond monitored merchant accounts to ensure that it was collecting only a specified percentage of the merchant's daily receipts, *id.* at 86:17-87:23; Dkt. No. 78-30 at 55:10-56:24.

Fleetwood took the 30(b)(6) deposition of a corporate representative of Richmond. *Id.* ¶¶ 84-85. The representative testified on behalf of Richmond that she was not aware of any grounds to dispute the following allegations in the Amended Complaint, among others: (i) the Fleetwood Agreement failed to transfer the benefits and risks of ownership from Fleetwood to Richmond; (ii) Fleetwood remained absolutely liable for repayment of the Purchased Amount and [*20] Richmond retained full recourse rights against Fleetwood; (iii) the daily payments were fixed and resulted in a usurious interest rate; and (iv) Giardina exercised control over Richmond and the alleged RICO enterprise. *Id.* ¶ 86; *see generally* Dkt. No. 78-31

### PROCEDURAL HISTORY

Plaintiff filed this action on or about March 18, 2020 in New York State Supreme Court asserting a number of claims, including a violation of the Racketeer Influenced Corrupt Organizations Act ("RICO"). Dkt No. 1. On July 3, 2020, Defendants removed the action to this Court on the basis of federal question jurisdiction, pursuant to *28 U.S.C. §§ 1331, 1332, 1441,* and *1446*. Dkt No. 1.

On December 7, 2020, Plaintiff filed its First Amended Complaint. Dkt. No. 28. Plaintiff's first cause of action asserts a claim for breach of contract and breach of the duty of good faith and fair dealing as a result of Richmond's provision of only $50,000 towards the purchase price (rather than the full $100,000), entitling Richmond to debit no more than half the Purchased Amount of $74,950 from the Fleetwood Account; Plaintiff alleges it is entitled to an award of damages in the amount of $44,667, the excess of the amount that was taken from the Fleetwood Account [*21] over the amount to which Richmond would have been entitled based on half of the Purchase Price. *Id.* ¶¶ 114-124. Plaintiff's second cause of action pleads, in the alternative, a claim for money had and received for Richmond's retention of the Excess Funds in the amount of $44,667. *Id.* ¶¶ 125-129. The third count pleads a claim for violation of the Texas usury statute, *Tex. Fin. Code § 305.001(a-1)* and *§ 305.003* on the theory that the sums extended pursuant to the Merchant Agreement were a loan and that the rate of interest on that loan was 400%, more than twice the maximum of 28% permitted by Texas law and above the rate of interest permitted by New York law. *Id.* ¶¶ 130-149. The fourth count contains a claim for reasonable attorneys' fees under the Texas usury statute, *Tex. Fin. Code § 305.001* and *305.003. Id.* ¶¶ 150-153. Finally, count five asserts a claim for violation of RICO, *18 U.S.C. §*

2022 U.S. Dist. LEXIS 100837, *21

*1962(c)* against Giardina. *Id.* ¶¶ 154-179.

On May 18, 2020, the Court issued an Opinion and Order which, among other things, denied Defendants' motion to dismiss the complaint. Dkt. No. 56.

On September 28, 2021, Plaintiff filed this motion for summary judgment. Dkt. Nos. 74-79. Defendants filed an affirmation in opposition to the motion for summary judgment on October 18, 2021. Dkt. [*22] No. 80. On November 2, 2021, Plaintiff filed a reply memorandum of law in further support of the motion for summary judgment along with a response to defendant's statement of facts and a reply affirmation. Dkt. Nos. 81-83.

**LEGAL STANDARD**

Under *Federal Rule of Civil Procedure 56(a)*, a court "shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "A genuine issue of material fact exists if 'the evidence is such that a reasonable jury could return a verdict for the nonmoving party.'" *Nick's Garage, Inc. v. Progressive Cas. Ins. Co., 875 F.3d 107, 113-14 (2d Cir. 2017)* (quoting *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986)*). "The movant bears the burden of 'demonstrat[ing] the absence of a genuine issue of material fact.'" *Id. at 114* (quoting *Celotex, 477 U.S. at 323*). In deciding a motion for summary judgment, the Court must "construe the evidence in the light most favorable to the non-moving party, and draw all reasonable inferences in its favor." *Gilman v. Marsh & McLennan Cos., Inc., 826 F.3d 69, 73 (2d Cir. 2016)*.

If the movant meets its burden, "the nonmoving party must come forward with admissible evidence sufficient to raise a genuine issue of fact for trial in order to avoid summary judgment." *Jaramillo v. Weyerhaeuser Co., 536 F.3d 140, 145 (2d Cir. 2008)*. It may not rely on "mere speculation or conjecture as to the true nature of the facts," *Hicks v. Baines, 593 F.3d 159, 166 (2d Cir. 2010)* (citation omitted), or "on the allegations [*23] in [its] pleading, or on conclusory statements, or on mere assertions that affidavits supporting the motion are not credible," *Gottlieb v. Cnty. of Orange, 84 F.3d 511, 518 (2d Cir. 1996)* (internal citation omitted). Rather, to survive a summary judgment motion, the opposing party must establish a genuine issue of fact by "citing to particular parts of materials in the record," *Fed. R. Civ. P. 56(c)(1)(A)*, and demonstrating more than "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)*; *see also Wright v. Goord, 554 F.3d 255, 266 (2d Cir. 2009)*. If "the party opposing summary judgment propounds a reasonable conflicting interpretation of a material disputed fact," summary judgment must be denied. *Schering Corp. v. Home Ins. Co., 712 F.2d 4, 9-10 (2d Cir. 1983)*.

Defendant Giardina and others associated with Richmond refused to answer questions in reliance on their *Fifth Amendment* privilege against self-incrimination. "A defendant in a civil proceeding who invokes the *Fifth Amendment* as a result of an overlapping criminal investigation or proceeding risk[s] the adverse inference arising from [his or her] assertion of the privilege." *Louis Vuitton Malletier S.A. v. LY USA, Inc., 676 F.3d 83, 97-98 (2d Cir. 2012)* (internal citations omitted). However, even at trial, "'[i]f defendants choose to remain silent, the adverse inference that may be drawn will be only one of a number of factors the factfinder will consider and will be given no more evidentiary value than the facts of the case warrant.'" [*24] *Id. at 103* (quoting *United States v. Dist. Council of New York City, 782 F. Supp. 920, 925-26 (S.D.N.Y.1992)*). The *Fifth Amendment* permits, but does not require, the jury to draw "adverse inferences against parties to civil actions when they refuse to testify in response to probative evidence offered against them," *Baxter v. Palmigiano, 425 U.S. 308, 318, 96 S. Ct. 1551, 47 L. Ed. 2d 810 (1976)*; it is up to the jury to decide whether it should draw an adverse inference and how much weight to put on that inference. It follows that "adverse inferences cannot be drawn against a non-moving party at summary judgment based on an invocation of the *Fifth Amendment* privilege." *Amusement Indus., Inc. v. Stern, 721 F. App'x 9, 11 (2d Cir. 2018)* (summary order) (citing *650 Fifth Ave. v. Alavi Found., 830 F.3d 66, 93 n.25 (2d Cir. 2016)*); *see also S.E.C. v. Suman, 684 F. Supp. 2d 378, 386-87 (S.D.N.Y. 2010)* ("[A] motion for summary judgment cannot be granted on an adverse inference alone."). Where the party moving for summary judgment bears the burden of proof on a particular element, "invocation of the *Fifth Amendment* is not a substitute for relevant evidence" and does not free a litigant "from adducing proof in support of a burden which would otherwise have been his." *United States v. Certain Real Prop. & Premises Known as 4003-4005 5th Ave., Brooklyn,*

2022 U.S. Dist. LEXIS 100837, *24

*N.Y.*, 55 F.3d 78, 83 (2d Cir. 1995) (internal quotation marks omitted). Thus, on summary judgment, a defendant's invocation of the *Fifth Amendment* may functionally prevent the defendant from offering evidence in opposition to the motion, such that "'the lack of testimony from . . . witnesses [who took the *Fifth Amendment*] meant that there was no record evidence to dispute the overwhelming evidence' proffered [*25] by the moving party," *Amusement Indus., Inc., 721 F. App'x at 11* (quoting *650 Fifth Ave. v. Alavi Found., 830 F.3d at 93 n.25*), but it will not itself satisfy the plaintiff's burden—as the moving party—to demonstrate that facts exist supporting its right to judgment on each element as to which it bears the burden of proof.

Richmond's corporate representative, testifying pursuant to *Federal Rule of Civil Procedure 30(b)(6)*, was confronted with many of the allegations in the Amended Complaint and testified that she had no information that would refute those allegations. *See* Dkt. No. 78-32 at 75-77, 82, 84-86. The representative thus indicated on behalf of Richmond that there were no sources that Plaintiffs needed to discover in order to refute any potential answers by Richmond to those allegations. That testimony "is 'binding' in the sense that whatever [an organization's] deponent says can be used against the organization," although it does not "preclude[] the deponent from correcting, explaining, or supplementing its statements." *Keepers, Inc. v. City of Milford, 807 F.3d 24, 34 (2d Cir. 2015)*. "[B]ecause a *Rule 30(b)(6)* designee testifies on behalf of the entity, the entity is not allowed to defeat a motion for summary judgment based on an affidavit that conflicts with its *Rule 30(b)(6)* deposition or contains information that the *Rule 30(b)(6)* deponent professed not to know." *Snapp v. United Transp. Union, 889 F.3d 1088, 1103 (9th Cir. 2018)* (quoting *Moore's Federal Practice § 30.25[3]*).[5]

---

[5] Local Civil Rule 56.1 states that "[e]ach numbered paragraph in the [moving party's] statement of material facts . . . will be deemed to be admitted for the purposes of the motion unless specifically controverted by a correspondingly numbered paragraph in the statement required to be served by the opposing party," Local Civ. R. 56.1(c), and that "each statement controverting any statement of material fact[] must be followed by citation to evidence which would be admissible," *id.* at (d). Assertions that Defendants lack information to deny facts contained in the statement is insufficient, without more, to render those facts genuinely disputed. The Court will consider such statements to be undisputed. *See Russell v. Aid to Developmentally Disabled, Inc., 753 F. App'x 9, 12-13 (2d Cir. 2018)* (summary order) (holding that the district court did not abuse its discretion in

## DISCUSSION

Plaintiff [*26] moves for summary judgment on all five of its claims. As noted, it asserts claims for usury and RICO, as well as for breach of contract and the duty of good faith and fair dealing and for money had and received. It argues that the undisputed facts entitle it to summary judgment on the usury and RICO claims. In the event that the Court decides that the Fleetwood Agreement does not constitute a loan giving rise to a claim for usury, it argues that it is entitled to summary judgment on the contract and money had and received claims. The preliminary question is the proper characterization of the Fleetwood Agreement—that is, whether the agreement constitutes a loan or a true purchase of future receivables. The Court starts there and then continues to address Plaintiff's entitlement to summary judgment.

## I. Whether the Fleetwood Agreement Constitutes a Loan

The parties agree that New York law applies to the interpretation of the Fleetwood Agreement. *See* Dkt. No. 76 at 16-18 (Plaintiff arguing that New York law applies to the interpretation of the Agreement because there is no conflict between the relevant New York and Texas laws); Dkt. No. 80 at ECF p. 7-8 (Defendants arguing that New York [*27] law generally applies because of the Agreement's choice-of-law clause); *cf. Flatiron Acquisition Vehicle, LLC v. CSE Mortg. LLC, 2019 U.S. Dist. LEXIS 43682, 2019 WL 1244294, at *6 (S.D.N.Y. Mar. 18, 2019)* ("Where '[t]he parties' briefs assume' that a certain body of law controls, 'such implied consent is sufficient to establish choice of law.'" (quoting *Krumme v. WestPoint Stevens Inc., 238 F.3d 133, 138 (2d Cir. 2000)*).

New York and Texas apply similar principles in determining whether a transaction constitutes a true sale or a secured loan. The hallmark of a loan is that the lender "'is absolutely entitled to repayment under all circumstances,'" or put otherwise, the "principal sum is repayable absolutely." *LG Funding, LLC v. United*

"crediting as undisputed those facts that [plaintiff] did not properly controvert in her opposition" where "defendants properly cited to the record to support their facts," the district court conducted some scrutiny into the record, and the plaintiff responded to defendants' Rule 56.1 statement "by stating, for example, she 'lacks sufficient knowledge or information to admit or deny'").

2022 U.S. Dist. LEXIS 100837, *27

*Senior Props. of Olathe, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309, 312 (2d Dep't 2020)* (quoting *K9 Bytes, Inc. v. Arch Cap. Funding, LLC, 56 Misc. 3d 807, 57 N.Y.S.3d 625, 632 (Sup. Ct. Westchester Cnty. 2017)*). "[T]he name, color, or form which the parties have seen fit to give [an agreement]" are not dispositive, *id.*; rather, the court considers the agreement "'in its totality and judge[s] it by its real character,'" to determine whether it constitutes a loan. *Id.* (quoting *Abir v. Malky, Inc., 59 A.D.3d 646, 873 N.Y.S.2d 350, 354 (2d Dep't 2009)*); *see also Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 621-22 (N.Y. 2021)* ("When determining whether a transaction is a loan, substance—not form—controls."); *Gonzalez Cnty. Sav. & Loan Ass'n v. Freeman, 534 S.W.2d 903, 906 (Tex. 1976)* ("It has often been said that courts will look beyond the form of the transaction to its substance in determining the existence or nonexistence of usury. . . . Labels put on particular charges are not controlling."). The analysis usually is guided by examining three factors to "determin[e] whether **[\*28]** repayment is absolute or contingent: (1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, 122 N.Y.S.3d at 312.* A reconciliation provision is relevant because it can shift the risk of nonpayment away from the merchant by "allow[ing] the merchant to seek an adjustment of the amounts being taken out of its account based on its cash flow (or lack thereof). If a merchant is doing poorly, the merchant will pay less and will receive a refund of anything taken by the company exceeding the specified percentage. . . . If there is no reconciliation provision, the agreement may be considered a loan." *K9 Bytes, Inc., LLC, 57 N.Y.S.3d at 632-33.* Moreover, if the amount of monthly payments can change pursuant to reconciliations, then the term of the agreement is necessarily not finite. *See Principis Cap., LLC v. I Do, Inc., 201 A.D.3d 752, 160 N.Y.S.3d 325, 327 (2d Dep't 2022).* And "[i]f the term is indefinite, then it 'is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.'" *K9 Bytes, Inc., LLC, 57 N.Y.S.3d* (quoting *IBIS Capital Group, LLC v. Four Paws Orlando LLC, 2017 N.Y. Misc. LEXIS 884, 2017 WL 1065071, at \*5 (Sup Ct. Nassau Cnty. Mar. 10, 2017)*). In determining whether the merchant retains the risk of nonpayment, it is significant that "the agreement provides that [defendant's] written admission of its inability **[\*29]** to pay its debt or its bankruptcy constitute events of default under the agreement, which entitle the plaintiff to the immediate full repayment of any of the unpaid purchased amount." *LG Funding, 122 N.Y.S.3d at 313.*

The *LG Funding* court explained that certain features of an agreement suggested that the merchant's "obligation to repay was absolute and not contingent on its actual accounts receivable," including that:

> [t]he agreement provides that in the event [the merchant] files for bankruptcy or is placed under an involuntary filing, the plaintiff would be entitled to enforce the provisions of the personal guaranty executed by [the individual defendants], [the merchant defendant] would be required to deliver to the plaintiff a confession of judgment in the amount of the purchased amount, and the plaintiff would be allowed to enter the confession of judgment as a judgment.

*Id.*

The three factors provide only a guide to analysis. They do not dictate the conclusion, and a court need not find the presence of all three factors in concluding that a transaction is a loan. *See, e.g., LG Funding, 122 N.Y.S.3d at 312-13* (affirming denial of motion to dismiss affirmative defenses alleging that the transaction was a criminally usurious loan without considering whether **[\*30]** the agreement had a finite term); *Davis v. Richmond Cap. Grp., LLC, 194 A.D.3d 516, 150 N.Y.S.3d 2, at 4 (1st Dep't 2021)* (concluding that plaintiffs sufficiently alleged that agreements were loans subject to usury laws and reciting characteristics of agreement relating to reconciliation and recourse but not finite term of agreement); *Advance Servs. Grp. v. Acadian Props. Austin LLC, 70 Misc. 3d 1225(A), 141 N.Y.S.3d 834, at \*5 (Sup. Ct. Kings Cnty. 2021)* (concluding that repayment was absolute and therefore agreement was a loan notwithstanding the lack of a finite term in the agreement); *Pirs Capital, LLC v. D & M Truck, Tire & Trailer Repair Inc., 69 Misc. 3d 457, 129 N.Y.S.3d 734, 74 (Sup. Ct. N.Y. Cnty. 2020)* (concluding that, notwithstanding a recourse provision in an agreement, "the other aspects of the transaction render the [a]greement . . . 'sufficiently risky such that they cannot be considered loans, as a matter of law'" where those other aspects included a reconciliation provision and a non-finite repayment term (quoting *K9 Bytes, Inc., 57 N.Y.S.3d at 633 (Sup. Ct. Westchester Cnty. 2017)*)). Rather, the essential question under New York law is whether the contracting party "is absolutely entitled to repayment under all circumstances." *LG Funding, 122 N.Y.S.3d at 312* (quoting *K9 Bytes, Inc., 57 N.Y.S.3d at 632*). Thus, an agreement can be a loan notwithstanding the presence of a reconciliation provision and a non-finite term. *See Legend Advance*

2022 U.S. Dist. LEXIS 100837, *30

*Funding II, LLC v. Almeida's Auto Repair, Inc., 2022 N.Y. Misc. LEXIS 1550, 2022 WL 885718, at \*2-3 (Sup. Ct. N.Y. Cnty. Mar. 24, 2022)* (denying summary judgment to putative lender where an agreement included a reconciliation provision and was for a non-finite term but where the "plaintiff has multiple means of recourse if merchant declares **[\*31]** bankruptcy").

The Second and Fifth Circuits engage in a similar analysis to distinguish a true sale from a transfer of collateral in connection with a secured financing. In both Circuits, the characterization turns upon "the substance of the transaction," and not on the label attached to it by the parties. *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1068-69 (2d Cir. 1995)*; *see also Reaves Brokerage Co. v. Sunbelt Fruit & Vegetable Co., 336 F.3d 410, 414 (5th Cir. 2003)* ("Characterization of the agreement at issue turns on 'the substance of the relationship . . . not simply the label attached to the transaction . . . .'" (quoting *Endico Potatoes, 67 F.3d at 1068*)); *In re R&J Pizza Corp., 2014 Bankr. LEXIS 5461, 2014 WL 12973408 at \*3 (Bankr. E.D.N.Y. Oct. 14, 2014)* ("[T]he case law focuses on the economics of the transaction and which party bears the risk of non-collection from the account debtor in determining whether a sale of accounts is a true sale or a secured transaction. While the terminology and characterization of the transaction in the agreement itself is a factor to be considered, it is not conclusive." (citation omitted)). The courts applying *Endico Potatoes* consider a number of factors including:

> the right of the creditor to recover from the debtor any deficiency if the assets assigned are not sufficient to satisfy the debt, the effect on the creditor's right to the assets assigned if the debtor were to pay the debt from independent funds, whether the debtor has a right **[\*32]** to any funds recovered from the sale of assets above that necessary to satisfy the debt, and whether the assignment itself reduces the debt.

*Endico Potatoes, 67 F.3d at 1068*; *see also Sotheby's Inc. v. Minor, 2010 U.S. Dist. LEXIS 160557, 2010 WL 11601336, at \*9 (S.D.N.Y. Mar. 30, 2010)* (reciting *Endico Potatoes* factors in analyzing breach of contract claim and explaining that "the root of all of these factors is the transfer of risk"). The ultimate question, like that in *LG Funding*, relates to whether the transaction involves a transfer of risk. Where the putative "lender and not the [putative] borrower bears the risk of non-performance by the account debtor" and "the borrower's debt is extinguished" by the transaction, then "the lender's risk

with regard to the performance of the accounts is direct," and the transaction is properly characterized as the purchase of accounts receivable. *Endico Potatoes, 67 F.3d at 1069*. By contrast, the transaction is properly characterized as a loan where "the lender holds only a security interest [and] the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to satisfy the loan." *Id.*; *see also Adar Bays, LLC, 179 N.E.3d at 622* ("[P]arties who are not directly exposed to **[\*33]** market risk in the value of the underlying assets are likely to be lenders, not investors.").

Whether the Court looks to the *LG Funding* or *Endico Potatoes* factors, the result here is the same. Reading the agreement in its totality and by its real character, it constitutes a loan and not a sale of assets. The lender "is absolutely entitled to repayment [by Fleetwod] under all circumstances," *LG Funding, 122 N.Y.S.3d at 312* (quoting *K9 Bytes, Inc., 57 N.Y.S.3d at 632*), and it is the borrower—and not the lender—who bears the risk of the account debtor's nonpayment. On the most elementary level, the Agreement places the obligation on Fleetwood and not on any account debtor to repay Richmond and sets that sum not as a percentage of the receipts from account debtors but as an absolute figure of "the specific daily amount" of $1,399 "each business day," regardless of whether any accounts receivable are collectible or not. *Id.* Thus, Fleetwood, not the account debtors, assumes responsibility "for ensuring that the specified percentage to be debited . . . remains in the Account." *Id.* The Designated Account is to be the "only one depositing bank account." *Id.* And if Fleetwood fails in its obligation to ensure that the "specified percentage to be debited remains in the account," then **[\*34]** Richmond is entitled to remedies against *Fleetwood* and not against the account debtors. Among other things, if the Designated Account does not have sufficient funds to cover the withdrawals of the daily amount more than four times, a default is declared, *id.* at ECF p. 7, the full uncollected Purchased Amount becoming immediately due and payable, and Richmond has the right to pursue all remedies provided for in the Agreement against Fleetwood and the guarantors, *id.* § 1.11.

Although on its face the Agreement purports to provide for the sale of accounts receivables, that is just window dressing. The Agreement has none of the characteristics of the sale of receivables in terms of the transfer of risk and rewards. The Fleetwood Agreement

provides that Fleetwood "sells, assigns and transfers" not just its accounts receivable but "all of [its] *future accounts, contract rights and other entitlements arising from or relating to* the payment of monies from Merchants' customers and/or third party payors . . . for the payments due to Merchant as a result of Merchant's sale of goods or services" until the total "Purchased Amount" is repaid. Dkt. No. 77-1 at 1. That language is so broad as to be [*35] essentially vacuous. It captures not just future accounts from Fleetwood's customers but gives Richmond the right to *all* Fleetwood revenues up to the full uncollected Purchased Amount. It covers all contract rights and other entitlements as long as those entitlements relate to the payment of monies from any third-party payors related to the sale of goods *or* services. Tellingly, Defendants do not identify any revenue that Fleetwood, or any operating business, could receive that would not somehow be captured by this broad language, and it is difficult to imagine what revenue would not fall within it.

Furthermore, the rights and risks that Richmond obtains do not bear any resemblance to the purchase of assets. Richmond itself has no obligation, or (ordinarily no) right, to collect on the "receivables." That obligation rests entirely on Fleetwood, and Fleetwood is required to remit the specified percentage into the Designated Account, regardless whether the "Merchant's customers" are able to do so. Richmond has no responsibility to contact Fleetwood's customers; indeed, it is given the right to collect directly from them only in the event of a default. Dkt. No. 77-1 § 1.10. The risk of [*36] non-payment thus falls entirely on Fleetwood. The failure of an account debtor has no consequence on the amount due. If a Fleetwood account debtor failed to pay its debt or became insolvent, there would be no reduction in the Purchased Amount or on Fleetwood's obligations to pay the daily amount; Richmond would be repaid from the proceeds of any other Transaction. Cf. *Funding Metrics, LLC v. NRO Boston, LLC, 2019 N.Y. Misc. LEXIS 4878, 2019 WL 4376780, at *4 (Sup. Ct. N.Y. Cnty. Aug. 28, 2019)* ("Denominating loan documents by another name, such as 'Merchant Agreements' as in this case, and including in such documents language of [the putative lender's purported purchase of account receivables that is unsupported by actual [borrower] receivables dedicated to repayment, does not shield it from the judicial determination that it contemplates a criminally usurious transaction, which is void *ab initio* as a matter of law.").

Richmond also does not receive the reward of performance by the account debtors. Under the Agreement, it is entitled to only the Purchased Amount, and not more. Fleetwood has use of the Designated Account, and Richmond's right to draw from it is extinguished at "such time as [Richmond] receives payment in full of the Purchased Amount." Dkt No. 77-1 at 1. Thus, even if the account debtors perform [*37] better than expected, Richmond's recovery is capped, and it will receive no benefit from that performance. Indeed, so long as Fleetwood has enough money to cover the daily payment amount in the Designated Account, Fleetwood can use the proceeds from Transactions however it likes—the receipts need not be deposited in an escrow account or otherwise held in trust for Richmond's benefit. Fleetwood enjoys the use of the proceeds. Richmond has none of the rights of ownership—it does not have the right to possess, use, or convey any of the accounts it supposedly has purchased. *See* Black's Law Dictionary (11th ed. 2019) (defining ownership as "[t]he bundle of rights allowing one to use, manage, and enjoy property, including the right to covey it to others. . . . Ownership rights are general, permanent, and heritable."); *Handelman v. Commissioner, 509 F.2d 1067, 1071 (2d Cir. 1975)* (referring to "the greater bundle of rights and attributes of ownership" as "including title, possession and management, and the burdens and benefits accompanying same" (internal quotation marks omitted)).

Under the Agreement, Fleetwood and Pamela and Robert Fleetwood, as guarantors, have the obligation to conduct due diligence and credit checks on the customers whose accounts [*38] Richmond supposedly has purchased; Richmond does not. The Agreement gives Richmond itself neither the obligation nor the right, absent a default, to collect on the accounts. Fleetwood and the guarantors:

> agree[d], warrant[ed] and represent[ed] ... that they w[ould] constantly perform all appropriate Due Diligence and credit checks of all of the customers' finance, cash flow, solvency, good faith, payment histories, and business reputations (the 'Due Diligence Requirements') as may suffice to ensure any and all products and/or services provided sold or delivered by [Fleetwood] to said customers will be paid for by customers in full and on time, and will not result in the creation of an unpaid account.

Dkt. No. 77-1 § 2.14.

Fleetwood is obligated to "expend its Best Efforts to maintain and to grow its business, to ensure that [Richmond] obtains the full Purchased Amount," and a breach of that obligation constitutes a default giving rise

to the full remedies against both Fleetwood and the guarantors. Dkt. No. 77-4 § 2.14. And significantly, Fleetwood, as the "Merchant," agreed that, if it interrupts the operation of the business, or transfers, moves, sells, disposes, or otherwise conveys [*39] its business or assets without Richmond's express written consent, the "full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately." *Id.* § 1.11.

Richmond is entitled to repayment in full from Fleetwood in virtually every imaginable circumstance. The Agreement contains provisions that provide recourse for Richmond against Fleetwood and its guarantors in the case of Fleetwood declaring bankruptcy. In the Fleetwood Agreement, Fleetwood's written admission of its inability to pay debts or its bankruptcy or insolvency each constitutes an "Event of Default," pursuant to which Richmond

> may proceed to protect and enforce its rights or remedies by suit in equity or by action at law or both . . . or to enforce the discharge of Merchant's obligations hereunder (including the Guaranty) or any other legal or equitable right or remedy. All rights, powers and remedies of [Richmond] in connection with this Agreement may be exercised at any time by [Richmond] after the occurrence of an Event of Default . . . and shall be in addition to any other rights, powers or remedies provided by law or equity.

Dkt. No. 77-1 [*40] § 3.3. The Agreement also provides that "[i]n the event that the Merchant files for bankruptcy protection or is placed under an involuntary filing Protections 2 and 3 are immediately invoked." *Id.* § 2.9. Protection 2 allows Richmond to "enforce the provisions of the Personal Guaranty of Performance against the Guarantor," while under Protection 3, Fleetwood authorized Richmond to execute in the name of Fleetwood a confession of judgment in favor of Richmond "in the amount of the Purchase Amount stated in the Agreement." *Id.* § 1.11.[6] As in *LG Funding,* if Fleetwood files for bankruptcy, Richmond would be

entitled to repayment of the full Purchase Amount—not just the amount that it paid upfront—through a court-filed confession of judgment, suggesting that the agreement is a loan. *See Advance Servs. Grp., 141 N.Y.S.3d at *5* ("Finally, paragraphs 2.9 and 1.11 of the Merchant Agreement provide that if Acadian files for bankruptcy or is placed under an involuntary filing, Advance is immediately entitled to enforce the personal guaranties and enter a confession of judgment against Acadian. These provisions reflect that bankruptcy is a default under the Merchant Agreement, entitling Advance to an immediate judgment against Acadian. Thus, Advance [*41] did *not* assume the risk that Acadian would have no future receivables and repayment was absolute, not contingent, and weighs in favor of treating this transaction as a loan rather than a purchase of receivables.").

The guaranty signed by Pamela and Robert Fleetwood guarantees Fleetwood's performance of "all representations, warranties, covenants made by Merchant in the [Fleetwood] Agreement in Sections thereof 2.3, 2.5, 2.6, 2.9 [relating to bankruptcy], 2.10, 2.11, 2.12, 2.13, 2.14" and provides that "Guarantor's obligations are due at the time of any breach by Merchant of any representation, warranty, or covenant made by Merchant in the Agreement." *Id.* at ECF p. 4. Those representations, warranties, and covenants include the obligation to remit the specified percentage into the Designated Account. If Fleetwood fails to satisfy that covenant, Richmond is entitled to seek recovery from the guarantors for all "losses and damages by enforcement of [Richmond's] rights under th[e] Agreement," including the right to the full Purchased Amount. *Id.* at ECF p. 4. Upon the occurrence of an "Event of Default" listed in Section 3.1—including if Fleetwood is unable to pay its debts or its files [*42] for bankruptcy—Richmond may "enforce the discharge of Merchant's obligations hereunder (including the Guaranty)." Dkt. No. 77-1 § 3.3. Courts have observed that personal guarantees are "consideration[s] pointing toward treating the agreement being treated as a loan rather than a receivables purchase" but have also observed that personal guarantees that are limited by the contingent nature of the merchant's obligations under an agreement may not render the agreement a loan. *Pirs Cap., LLC, 129 N.Y.S.3d at 740; see also OriginClear Inc. v. GTR Source, LLC, 2021 U.S. Dist. LEXIS 239013, 2021 WL 5907878, at *6 (W.D.N.Y. Dec. 14, 2021).* Here, the Guaranty is tied to the merchant's obligations under the Agreement, but those obligations are not contingent upon the receipt of future receivables—if Fleetwood declared bankruptcy, it would

---

[6] Protection 3 states that "[u]pon breach of any provision in this paragraph 1.11, [Richmond] may enter that Confession of Judgment as a Judgment with the Clerk of any Court and execute thereon," *id.,* but in order for Section 2.9's reference to Protection 3 to have any meaning, it must be interpreted to mean that Richmond can enter with a court the confession of judgment that was previously authorized upon filing for bankruptcy protection.

2022 U.S. Dist. LEXIS 100837, *42

be subject to a confession of judgment for the full Purchase Amount of $149,900.00. *See* Dkt. No. 77-4 § 1.11.

Thus, under the Agreement, there are virtually no circumstances where, if the accounts receivable would not be sufficient to pay the Purchased Amounts, Richmond would not be absolutely entitled to repayment of that amount by Fleetwood. "Beyond the superficial hazard associated with a [merchant's] relatively meager chance of success, [Richmond] backed up the risk with [a] personal guarantee and a **[\*43]** security interest in [Fleetwood's] property. Moreover, any default of the Agreements (including [Fleetwood's] closing or bankruptcy) would trigger payment." *Clever Ideas, Inc. v. 999 Rest. Corp., 2007 N.Y. Misc. LEXIS 9248, 2007 WL 3234747 (Sup. Ct. N.Y. Cnty. Oct. 12, 2007).*

The Fleetwood Agreement nominally has a reconciliation provision, Dkt. No. 77-1 at 1 ("RCF *will* debit the specific daily amount each business day and upon receipt of the Merchant's monthly bank statements on or about the eighteenth day of each month *reconcile the Merchant's Account* by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage" (emphasis added)). But that provision functions in such a way that renders it largely illusory. It does not relieve Fleetwood of the obligation, if the merchants do not pay the specific daily amount, for Fleetwood to pay the specific daily amount, nor does it qualify the right of Richmond, if the specific daily amount is not paid for four days, to declare the full Purchased Amount immediately due and payable and to exercise its rights to collect as against Fleetwood.

The reconciliation provision provides that it will "upon receipt of the Merchant's monthly bank statements on or about the eighteenth **[\*44]** day of each month reconcile the Merchant's Account by either crediting or debiting the difference from or back to the Merchant's Account so that the amount debited per month equals the specified percentage." *Id.* Notably, the provision does not provide that the daily amount would change upon reconciliation—indeed, the only way the specific daily amount would actually change would be if Richmond "upon Merchant's request, adjust[ed] the amount of any payment due under this Agreement at [its] *sole discretion and as it deems appropriate*." *Id.; see also Am. Water Restoration, Inc. v. AKF Inc., 74 Misc. 3d 1203(A), 157 N.Y.S.3d 919, at \*4 (Sup. Ct. Ontario Cnty. 2002)* (concluding usurious loan contention was negated where reconciliation provision required

adjustment of daily amount debited after reconciliation "to more closely reflect the Merchant's actual Receipts times the Specified Percentage"). Thus, as Richmond itself made clear in its communications to Fleetwood and to its other debtors, *see supra* at p. 10, it had the right to decline a request by a debtor to reduce the amount that needed to be deposited into the designated account even if the debtor did not have sufficient funds to deposit into the account, *see, e.g.,* Dkt. No. 77-6; Dkt. No. 79 ¶¶ 70-72 (citing to affidavits of Richmond's customers **[\*45]** that Richmond refused to reduce the daily payments of merchants when the merchant's receivable collections slowed down"). Even if the business was not performing and a reconciliation would show that the daily amount Richmond was deducting from Fleetwood's account was far above the specified percentage of Transactions to which it was entitled, Fleetwood would continue to be charged that daily amount each day regardless of the result of that reconciliation absent Richmond's unilateral decision to reduce the amount. If the merchant is unable to pay that daily amount for more than four days, the merchant would be in default pursuant to the language in Appendix A.[7] Since a "default under any of the terms, covenants, and conditions of any other agreement with RCF" is an "Event of Default" under the Fleetwood Agreement, Richmond would be entitled to 100% of the amounts due from each Transaction, *see* Dkt. No. 77-1 at 1, in addition to "[a]ll rights, powers, and remedies of RCF in connection with th[e] Agreement, *id.* § 3.3. Among the "rights, powers, and remedies" granted to RCF in connection with the Fleetwood Agreement are: (1) the "full uncollected Purchase Amount plus all fees

---

[7] A simple example illustrates the point. Suppose, for example, that Fleetwood's receipts from defined Transactions equaled $1,300 per day, Richmond still would have the right to withdraw $1,399 per day. The deficit between what Fleetwood received from defined Transactions and the Specified Percentage would not affect Richmond's right on a daily basis to withdraw $1,399. Richmond would have the obligation, on the 18th of the month, to credit Fleetwood back the difference between $1,399 and 10% of the $1,300 (or $130). But Fleetwood's right to the credit would be illusory. If the $1,300 it received on a daily basis was insufficient for Richmond to withdraw $1,399 on a daily basis for a four-day period, Richmond could declare an Event of Default and Richmond would owe the full Purchase Amount. Fleetwood would never reach the 18th day of the month. That is exactly the point that Richmond made in its correspondence with its merchant customers. It could declare them in default and obtain the full Purchase Amount regardless of the performance of the accounts.

2022 U.S. Dist. LEXIS 100837, *45

(including [*46] legal fees) due under the[s] Agreement and the attached Security Agreement becom[ing] due and payable in full immediate," *id.* § 1.11 (Protection 1); (2) "enforc[ing] the provisions of the Personal Guaranty of Performance against the Guarantor(s)," *id.* (Protection 2); (3) entering a confession in favor of RCF in the amount of the full Purchase Amount with the clerk of any court, *id.* (Protection 3); (4) the "entire Purchase Amount and all fees (including legal fees) . . . becom[ing] immediately refundable and payable to RCF from Merchant," *id.* (Protection 5); and (5) "proceed[ing] to protect and enforce its rights or remedies by suit in equity or by action at law, or both . . . to enforce the discharge of Merchant's obligations hereunder (including the Guaranty)," *id.* § 3.3.

Viewing the Agreement as a whole, the Court concludes that it is a loan and not a contract for the purchase of future receivables. It thus may be subject to usury laws. *LG Funding, 122 N.Y.S.3d at 312* ("The rudimentary element of usury is the existence of a loan or forbearance of money, and where there is no loan, there can be no usury, however unconscionable the contract may be.").

## II. Usury Claim

Plaintiff seeks summary judgment for its third cause [*47] of action, which is for usury in violation of the Texas Finance Code, and its fourth cause of action, for associated attorneys' fees. The essential elements of a usury claim under Texas law are: "(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the extraction of a greater compensation than allowed by law for the use of the money by the borrower." *First Bank v. Tony's Tortilla Factory, Inc., 877 S.W.2d 285, 287 (Tex. 1994)*. Under Texas law, the maximum interest rate "[f]or a contract made, extended, or renewed under which credit is extended for a business, commercial, investment, or similar purpose" is 28% per year. *Tex. Fin. Code § 303.009(c)*. Under *Section 305.003 of the Texas Finance Code*, "[a] creditor who charges or receives legal interest that is greater than the amount authorized" is liable to the borrower for "an amount that is equal to . . . three times the difference between the maximum allowable legal interest and the total amount of interest charged." *Id. § 305.003*. If the interest charged and collected is more than twice the legal maximum, then, in addition to any amounts due under *Section 305.003*, the creditor is entitled to "(1) the principal amount on which the interest is charged and received; and (2) the interest and all

other amounts charged and received" by the creditor. *See Tex. Fin. Code § 305.004(a)*.

Plaintiff argues that, [*48] on its face, the Agreement charged a nominal interest rate of 99.8% per year, but, considering the excess withdrawals, the nominal interest rate was actually 278.5% per year. Dkt. No. 76 at 35. In support of these figures, Plaintiff submits an expert report of a Charles S. Lunden, a "Certified Public Accountant with more than forty years of experience assessing damages," *id.*, who calculated these figures, Dkt. No. 78-19 at ECF p. 9.

## A. Choice-of-Law

The preliminary gating question is whether Texas law applies. The Fleetwood Agreement has a choice-of-law provision stating that the "Agreement shall be governed by and construed in accordance with the laws of the state of New York, without regards to any applicable principles of conflicts of law." Dkt No. 77-1 § 4.5. Plaintiff argues that the choice-of-law provision governs only the construction of the Fleetwood Agreement and not extra-contractual causes of action such as usury. Dkt. No. 76 at 18. Defendants assert that New York law applies, arguing that the law chosen by the parties is relevant and explaining that "New York has a superior interest in resolving the matters at issue herein, as the Defendants reside in the NY metropolitan area, [*49] did business in the NY metropolitan area, bank in the NY metropolitan area, and most importantly . . . ., have been successfully defending multiple governmental agencies [sic] within the NY metropolitan area." Dkt. No. 80 at ECF p. 8.

"In a federal question action where a federal court is exercising supplemental jurisdiction over state claims, the federal court applies the choice-of-law rules of the forum state." *Manning Int'l Inc. v. Home Shopping Network, Inc., 152 F. Supp. 2d 432, 436 n.3 (S.D.N.Y. 2001)* (citing *Rogers v. Grimaldi, 875 F.2d 994, 1002 (2d Cir. 1989)*). Moreover, the validity of a contractual choice-of-law provision is "decided not under the law specified in the clause, but under the relevant forum's choice-of-law rules governing the effectiveness of such clauses." *Fin. One Pub. Co. v. Lehman Bros. Special Fin., Inc., 414 F.3d 325, 332, 335 (2d Cir. 2005)*. "Under New York law, great deference is to be given a contract's designation of the law that is to govern disputes arising from the contract, and that designation is determinative if the state selected has sufficient contacts with the transaction." *Zerman v. Ball, 735 F.2d 15, 20 (2d Cir. 1984)*; *see also IBM v. Mueller, 2017*

Case 23-78, Document 36, 05/01/2023, 3508267, Page244 of 304

A-537

*U.S. Dist. LEXIS 159618, 2017 WL 4326114, at *4 (S.D.N.Y. 2017)* (same).

If a claim falls within a contract's choice-of-law provision and the provision calls for New York law, New York law will generally be applied "so long as the chosen law bears a reasonable relationship to the parties or the transaction," but it will not be applied "where the chosen law [*50] 'violates some fundamental principles of justice, some prevalent conception of good morals, some deep-rooted tradition of the common weal.'" *Welsbach Elec. Corp. v. MasTec N. Am., Inc., 7 N.Y.3d 624, 859 N.E.2d 498, 500-01, 825 N.Y.S.2d 692 (N.Y. 2006)*; *see also United States v. Moseley, 980 F.3d 9, 20 (2d Cir. 2020)* ("'New York law is unambiguous in the area of express choice of law provisions in a contract. Absent fraud or violation of public policy, contractual selection of governing law is generally determinative so long as the State selected has sufficient contacts with the transaction.'" (quoting *Int'l Minerals & Res., S.A. v. Pappas, 96 F.3d 586, 592 (2d Cir. 1996)*); *Medtronic, Inc. v. Walland, 2021 U.S. Dist. LEXIS 172235, 2021 WL 4131657, at *4-6 (S.D.N.Y. Sept. 10, 2022)* (explaining that, even after the New York Court of Appeal's decision in *Ministers & Missionaries Benefit Bd. v. Snow, 26 N.Y.3d 466, 25 N.Y.S.3d 21, 45 N.E.3d 917 (N.Y. 2015)*—which stated that "New York courts should not engage in any conflicts analysis where the parties include a choice-of-law provision in their contract"—a court should consider whether a choice-of-law provision bears a reasonable relationship to the parties or transaction or violates a fundamental policy of a state with a materially greater interest than the chosen state). The rule protects the justified expectations of the parties to an agreement and honors the principle that "persons are free within broad limits to determine the nature of their contractual obligations" and "the demands of certainty, predictability and convenience," while at the same time preventing parties [*51] from opting into the law of a particular state that has no reasonable relationship to the parties or the transaction simply because the law is convenient. *See Restatement (Second) Conflict of Laws § 187 comment e.*

The application of a choice-of-law provision to a usury claim can make a material difference to the success or failure of that claim. Assuming that the usury claim falls within the scope of the choice-of-law provision, the parties' choice of law is respected and will be enforced unless the chosen law bears no reasonable relationship to the transaction or the parties or if enforcement of it would be intolerable for the court. By contrast, in the absence of a choice-oflaw provision, New York applies

a "center of gravity" approach to contract cases, *Moseley, 980 F.3d at 23*, and an interest analysis to tort cases, *Toretto v. Donnelley Fin. Solutions, Inc., --- F. Supp. 3d ---, 2022 U.S. Dist. LEXIS 20558, 2022 WL 348412, at *5 (Feb. 4, 2022)*. The center of gravity approach focuses on the place with "the most significant contacts with the matter in dispute," looking to "five generally significant contacts: the places of contracting, negotiation and performance; the location of the subject matter of the contract; and the domicile of the contracting parties." *Moseley, 980 F.3d at 23* (internal quotation marks and citations omitted) (alterations adopted) (analyzing which state's usury laws would apply under [*52] "center of gravity" approach); *see also A. Conner Gen. Contracting Inc. v. Rols Cap. Co., 145 A.D.2d 452, 535 N.Y.S.2d 420, 421 (2d Dep't 1988)*. In this approach, "public policy considerations . . . may also bear on the analysis in cases 'where the policies underlying conflicting laws in a contract dispute . . . reflect strong governmental interests." *Id.* (quoting *In re Allstate Ins. Co. (Stolarz), 81 N.Y.2d 219, 613 N.E.2d 936, 597 N.Y.S.2d 904 (N.Y. 1993)*). In tort cases, the "'law of the jurisdiction having the greatest interest in the litigation [will] be applied.'" *Krock v. Lipsay, 97 F.3d 640, 645-46 (2d Cir. 1996)* (alterations adopted) (quoting *Kalb, Voorhis & Co. v. Am. Fin. Corp., 8 F.3d 130, 132 (2d Cir. 1993)*). For the purposes of the interest analysis, "the facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Miller v. Miller, 22 N.Y.2d 12, 237 N.E.2d 877, 879, 290 N.Y.S.2d 734 (N.Y. 1968)*. Factors to be considered in applying the interest analysis include "[t]he contacts of the parties and occurrences with each jurisdiction . . .[,] the policies underlying each jurisdiction's rules, the strength of the governmental interests embodied in these policies, and the extent to which these interests are implicated by the contacts." *Fin. One Pub. Co., 414 F.3d at 337*. Moreover, the interest analysis approach looks to whether the law under consideration is "conduct-regulating" rather than "loss-allocating," where "[c]onduct-regulating rules have the prophylactic effect of governing conduct to prevent injuries from [*53] occurring," while "[l]oss allocating rules . . . prohibit, assign, or limit liability after the tort occurs." *Padula v. Lilarn Props. Corp., 84 N.Y.2d 519, 644 N.E.2d 1001, 1003, 620 N.Y.S.2d 310 (N.Y. 1994)*; *see also In re Thelen LLP, 736 F.3d 213, 220 (2d Cir.)*, *certified question accepted sub nom. Thelen LLP. v. Seyfarth Shaw LLP, 22 N.Y.3d 1017, 981 N.Y.S.2d 349, 4 N.E.3d 359 (N.Y. 2013)*, and *certified question answered, 24 N.Y.3d 16, 995 N.Y.S.2d 534, 20 N.E.3d 264 (N.Y. 2014)* (internal quotation marks and citations omitted).

2022 U.S. Dist. LEXIS 100837, *53

The threshold question is thus whether or not Plaintiff's usury claim may fall within the choice-of-law provision in the Agreement. "'[T]he effect of a choice-of-law clause depends on its scope,' and New York courts are 'reluctant to read choice-of-law clauses broadly.'" *Arnone v. Aetna Life Ins. Co., 860 F.3d 97, 108 (2d Cir. 2017)* (alterations adopted) (quoting *Fin. One Pub. Co., 414 F.3d at 332, 335*). Specifically, there is "a reluctance on the part of New York courts to construe contractual choice-of-law clauses broadly to encompass extra-contractual causes of action." *Fin. One Public Co., 414 F.3d at 334*. Thus, "New York courts typically apply the law selected in contractual choice-of-law clauses only to causes of action sounding in contract unless 'the express language of the choice-of-law provision is sufficiently broad as to encompass the entire relationship between the contracting parties.'" *EMA Fin., LLC v. NRusz, Inc., 444 F. Supp. 3d 530, 540 (S.D.N.Y. 2020)* (quoting *H.S.W. Enters. v. Woo Lae Oak, Inc., 171 F. Supp. 2d 135, 141 (S.D.N.Y. 2001)*).

The law is not completely settled in the Second Circuit whether a usury claim falls within a "narrow" choice of law provision. The Second Circuit has observed that a [*54] choice-of-law provision that states "[t]his Agreement will be governed by and construed in accordance with the laws of the State of New York (without reference to choice of law doctrine)" is "not broad enough to reach tort claims incident to the contractual relationship," *Fin. One Pub. Co., 414 F.3d at 335* (citing *Knieriemen v. Bache Halsey Stuart Shields Inc., 74 A.D.2d 290, 427 N.Y.S.2d 10, 12-13 (1st Dep't 1980)*), or to reach other non-contractual causes of action, *see Mayagüez S.A. v. Citigroup, Inc., 2018 U.S. Dist. LEXIS 51931, 2018 WL 1587597, at *7 (S.D.N.Y. Mar. 28, 2018)*. Such language "merely specif[ies] the law that applies to claims *arising from* the contract but not to non-contractual claims (*e.g.*, consumer protection statutes sounding in fraud)." *Heskiaoff v. Sling Media, Inc., 719 F. App'x 28, 31 (2d Cir. 2017)* (summary order). Thus, "language in a choice-of-law provision indicating that the *contract* will be governed by a certain body of law is insufficient to determine which law will govern *tort claims arising out of* that contract." *Bausch & Lomb Inc. v. Mimetogen Pharms., Inc., 2016 U.S. Dist. LEXIS 59941, 2016 WL 2622013, at *8 (W.D.N.Y. May 5, 2016)*. Extra-contractual claims will not fall within the scope of a narrow choice-of-law provision "even where the rights at issue are closely related to contractual rights and obligations." *Mayagüez S.A., 2018 U.S. Dist. LEXIS 51931, 2018 WL 1587597, at *7*.

A narrow choice-of-law provision has been held

insufficient to cover tort claims such as fraudulent conveyance claims, *Ramiro Aviles v. S&P Glob., Inc., 380 F. Supp. 3d 221, 271 (S.D.N.Y. 2019)*, fraudulent misrepresentation claims, *Krock, 97 F.3d at 645*, fraudulent inducement claims, fraudulent concealment claims, negligent misrepresentation claims, *Mayagüez S.A., 2018 U.S. Dist. LEXIS 51931, 2018 WL 1587597, at *7*, and [*55] tortious interference claims even if they arise in connection with a contract, *Manbro Energy Corp. v. Chatterjee Advisors, LLC, 2021 U.S. Dist. LEXIS 97031, 2021 WL 2037552, at *3 (S.D.N.Y. May 21, 2021)*. It also does not cover claims that are non-contractual in nature like promissory estoppel and unjust enrichment claims. *Mayagüez S.A., 2018 U.S. Dist. LEXIS 51931, 2018 WL 1587597, at *7*. "[I]n order for a choice-of-law provision to apply to claims for tort arising incident to the contract, the express language of the provision must be 'sufficiently broad' as to encompass the entire relationship between the contracting parties." *Krock, 97 F.3d at 645* (quoting *Turtur v. Rothschild Registry Int'l, Inc., 26 F.3d 304, 309-10 (2d Cir. 1994)*).

Claims that a contract is unconscionable, on the other hand, have been found to sound in contract and thus to fall within a narrow choice-of-law provision. *See, e.g., Mayagüez S.A., 2018 U.S. Dist. LEXIS 51931, 2018 WL 1587597, at *10* ("Because Mayagüez's unconscionability claim is a contract-based claim, it is subject to the choice of law provision in the [agreement]."); *WeWork Cos. v. Zoumer, 2016 U.S. Dist. LEXIS 46033, 2016 WL 1337280, at *5 (S.D.N.Y. April 5, 2016)* (applying New York law to unconscionability claim where choice-of-law provision was narrow).[8]

---

[8] Courts outside the Second Circuit appear to be split on whether usury claims are contractual. *Compare Hengle v. Asner, 433 F. Supp.3d 825, 864 (E.D. Va. 2020)* (applying Virginia's choice-of-law rules to usury claim and, in so doing, noting that "courts considering *contract-related* claims will give a choice-of-law provision in a contract the fullest effect intended by the parties absent unusual circumstances" (emphasis added)); *with BREA 3-2 LLC v. Hagshama Florida 8 Sarasota, LLC, 327 So.3d 926, 935 n.6 (Ct. App. Fl. 3d Dist. 2021)* (analyzing usury claim as tort claim in determining whether it fell within the scope of an arbitration provision); *Sake TN, LLC v. Cain, 2022 U.S. Dist. LEXIS 30599, 2022 WL 525993, at *8-9 (M.D. Tenn. Feb. 22, 2022)* (observing that usury is a cause of action that lies in both tort and contract and finding allegations of violations of state usury statute sufficient to adequately allege an underlying tort to support conspiracy claim). A few decisions have treated usury claims as non-contractual and falling outside a narrow choice-of-law

2022 U.S. Dist. LEXIS 100837, *55

The foregoing cases beg the question, rather than answering it, whether a usury claim should be considered to be contractual for purposes of choice-of-law. Although the answer is not free from doubt, it appears that the approach that is most consistent with Second Circuit law [*56] is to treat usury claims as contractual for purposes of choice-of-law analysis and to give effect to the parties' choice of the law that they desire to apply to the enforceability of the interest provision of a contract as long as that law has a reasonable relationship to the transaction and/or the parties and is not against public policy. In particular, in _United States v. Moseley_, the Second Circuit considered a relatively broad choice-of-law provision that stated that

---

provision. _See, e.g._, _Clark v. Advanceme, Inc., 2009 U.S. Dist. LEXIS 140364, 2009 WL 10672598, at *3 (C.D. Cal. 2009)_ (holding New York law was not applicable to plaintiffs' usury claims where contractual choice-of-law provision read that the agreement "shall be governed by, and construed in accordance with, the internal laws of the State of New York" because of persuasive authority "that a usury claim is non-contractual"); _Essex Partners Ltd. v. Merchant Cash & Cap., 2011 U.S. Dist. LEXIS 172116, 2011 WL 13123326, at *3-4 (C.D. Cal. Aug. 1, 2011)_ (citing cases that hold that usury claims are non-contractual, including _Clark_, and thus fall outside of contract's New York choice-of-law clause and concluding the same).

Courts have opined that "the right to recover usurious interest is not predicated upon the written contract . . . under which the usury was paid, but rather on a duty imposed by law to repay an unjust and unmerited enrichment. The liability based upon an obligation of this kind arises purely upon an implication of law, independent of the agreement or intention of the parties." _Miller v. York, 92 Nev. 226, 548 P.2d 941, 945 (Nev. 1976)_; _see also Clark, 2009 U.S. Dist. LEXIS 140364, 2009 WL 10672598, at *3 n.5_ (citing _Miller_ and stating that, while it is not "directly on point," "its reasoning is instructive and consistent with [p]laintiffs' contention that a usury claim is non-contractual"). In that view, the violation would pertain to a duty "imposed by law in recognition of public policy and is generally owed to others besides the contracting party" and does not "emanate from a[] duty created by the parties' unique contractual relationship." _BREA 3-2 LLC, 327 So.3d at 935_ (internal quotation marks omitted); _see also Dunn v. Global Trust Mgmt., LLC, 506 F.Supp.3d 1214, 1222 (M.D. Fl. 2020)_. Under this theory, because it arises from a duty other than one that is imposed by contract, Plaintiffs' usury claim would not fall within the narrow choice-of-law provision agreed by the parties pursuant to the contract. _See Travelers Ins. Co. v. Sequa Corp., 2014 U.S. Dist. LEXIS 205829, 2014 WL 12812403, at *2 (S.D.N.Y. Mar. 10, 2014)_ ("Where the claim requires 'the interpretation and enforcement of the rights and duties of the parties' under the contract . . . it falls within the law agreed upon by the parties pursuant to the contract.").

the law of a jurisdiction "shall control the rights, duties, and obligations of the parties hetero without regard to [the jurisdiction's] choice of law provisions." _980 F.3d at 19_ (internal quotation marks omitted). While not considering the breadth of the choice-of-law provision, the Circuit apparently agreed that a usury claim would fall within it and proceeded to analyze whether the choice-of-law provision would otherwise be effective in light of New York's public policy in favor of enforcing its usury laws to protect its residents. _Id. at 20-22_. After concluding that the choice-of-law provision would not be effective because "provisions specifying foreign jurisdictions without usury laws are unenforceable in New York as against its public policy," _id. at 22_, the Circuit [*57] applied the "center of gravity" approach that is applicable to "adjudicating the choice of law for a contract dispute," _id. at 23_.

The Circuit's use of the "center of gravity" approach to choice-of-law issues, rather than the "interest analysis" advocated for by Fleetwood and applicable to tort claims, suggests at least an implicit conclusion that usury claims sound in contract and not in tort. _Cf. Fieger v. Pitney Bowes Credit Corp., 251 F.3d 386, 394 (2d Cir. 2001)_ (applying "center of gravity" analysis to determine "which state has the most significant relationship to the transaction and the parties" to claim that "sounds more in contract than in tort"); _Fin. One Pub. Co., 414 F.3d at 336_ (analyzing whether a claim fit within a narrow choice-of-law provision separately from whether the "center of gravity" choice-of-law approach applicable to contract claims or the "interest analysis" approach applied but ultimately concluding that the claim both fell outside the choice-of-law provision and was better suited to using an "interest analysis" approach).

New York courts, as well as courts within the Second Circuit, have similarly applied the "center of gravity" approach to cases involving usury, suggesting that usury is a contract-based claim. In _A. Conner General Contracting Inc._, the Appellate [*58] Division appeared to conflate the "center of gravity" approach and the interest analysis, explaining that:

New York's present choice-of-law rule, dubbed the center of gravity approach is that the law of the state having the most significant contacts with the matter in dispute will be applied, even where the matter in dispute is usury. . . . [T]he Court of Appeals has not articulated a special rule for usury cases. Rather, it appears to remain that "the law of the jurisdiction having the greatest interest in the litigation will be applied and that the facts or

2022 U.S. Dist. LEXIS 100837, *58

contracts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict."

*535 N.Y.S.2d at 422* (quoting *Miller, 237 N.E.2d at 879*). But courts following *A. Conner*—both state and federal—have cited that case as holding that the "center of gravity" approach should apply. *See Indus. Dev. Bank of Isr. Ltd. v. Bier, 149 Misc. 2d 797, 565 N.Y.S.2d 980, 984 (Sup. Ct. N.Y. Cnty. 1991)* (citing *A. Conner* in considering whether a loan agreement that allegedly contained a usurious interest rate should be enforced and holding that, because "agreements and guarantees were entered into Israel, the parties all resided in Israel at the time, and performance was to take place there . . . [Israel] has the most substantial relationship to these transactions, **[*59]** and it is the law of that country which should be applied"); *Am. Equities Grp. v. Ahava Dairy Prods. Corp., 2004 U.S. Dist. LEXIS 6970, 2004 WL 870206, at *9 (S.D.N.Y. Apr. 23 2004)* (applying New York law "[b]ecause New York is the state with the most significant contacts to the parties in the context of the Agreement"); *Am. Exp. Travel Related Servs. Co. v. Assih, 26 Misc. 3d 1016, 893 N.Y.S.2d 438, 447 (Civ. Ct. Richmond Cnty. 2009)* (concluding "that New York has the most significant contacts to the parties and New York law will apply to the Agreement in reference to whether or not the interest being charged is usurious"); *cf. Leasing Serv. Corp. v. Graham, 646 F. Supp. 1410, 1417 (S.D.N.Y. 1986)* (applying "most significant contacts" test to determine whether conflicting Texas or New York usury law should be applied to agreements). And courts in this Circuit have treated the affirmative defense of usury as a claim as falling within a narrow contractual choice-of-law provision, even though they have done so without expressly analyzing whether the scope of the contractual provision includes such claims, instead appearing to assume that it does. *See, e.g., Madden v. Midland Funding, LLC, 237 F. Supp. 3d 130, 147-48 (S.D.N.Y. 2017)* (declining to apply Delaware choice-of-law provision because applying Delaware usury law would violate a fundamental public policy of New York); *Power Up Lending Grp. v. Alliance Bioenergy Plus, Inc., 2019 U.S. Dist. LEXIS 33274, 2019 WL 1322621, at *3-4* (declining to ignore choice-of-law provision to allow for defense based on New York usury law on public policy grounds); *EMA Fin., 444 F. Supp. 3d at 540* (applying usury law of state provided for in choice-of-law provision). **[*60]** It thus follows that, at least for choice-of-law purposes, a usury claim is considered to be contractual and to be encompassed by a narrow choice-of-law provision.[9]

This approach is similar to that which the Restatement (Second) of Conflict of Laws takes to usury claims. The Restatement permits parties to agree by contract to the law that will govern whether the interest rate in a contract is usurious out of respect for the principles of freedom of contract and on the general view that, oftentimes and as with New York and Texas law, "the permissible rate of interest will vary only slightly from state to state." *Restatement (Second) of Conflict of Laws § 203 comment b*. At the same time, it recognizes that the purposes of usury laws "to protect a person against the oppressive use of superior bargaining power" would otherwise "be deprived of efficacy if the parties could effectively choose to be governed as to usury by the local law of a state which has no substantial relationship to the contract." *Id.* at *comment e*. Thus, under New York law, while courts have suggested that a parties' principal place of business being in the selected forum may create the requisite reasonable relationship, a broad statement that a company's "headquarters" are **[*61]** located in a state is not sufficient to meet the reasonable relationship requirement. *See Cap Gemini Ernst & Young, U.S., L.L.C. v. Nackel, 346 F.3d 360, 366 (2d Cir. 2003)*

---

[9] That usury as a contract defense is treated as contractual for the purposes of choice-of-law analysis, *see, e.g., Power Up Lending Grp., 2019 U.S. Dist. LEXIS 33274, 2019 WL 1322621, at *3-5; EMA Fin., LLC, 444 F. Supp. 3d at 539-43*, further suggests that affirmative usury claims should also be treated as such. In response to a breach of contract claim, the defendant who has agreed to the laws of a state that has a reasonable relationship to the transaction and that permits a high interest rate to be charged (albeit one that is not against public policy) cannot argue that it should be relieved of its contractual duties because another state has a more significant relationship with the transaction and the agreed-upon interest rate is usurious under the law of that second state. That is, having agreed to the application of the law of State 1, a party cannot later avoid its obligations and argue in response to a suit that the law of State 2 should be applied and that the agreed rate is unlawful and unenforceable. It would follow as a necessary corollary that when a party is seeking to not to defend against a failure to pay but to affirmatively have an obligation declared to be unenforceable, the choice of law provision also should apply. A different rule would induce a race to the courthouse and make the law applicable to a contract turn not upon the expressed understandings of the parties or even the interests of the potential states involved but on the fortuity of which party—the person seeking to enforce the interest rate provision or the person seeking to avoid it—filed its claim first.

(vacating and remanding for further findings on choice-of-law question where record "merely reveal[ed]" that the company's "'headquarters' are in New York[] [w]ithout any further explanation of the extent of [the company's] presence in New York"); *see also Power Up Lending Grp., 2019 U.S. Dist. LEXIS 33274, 2019 WL 1322621, *4* (citing *Finucane v. Interior Const. Corp., 264 A.D.2d 618, 695 N.Y.S.2d 322, 325 (1st Dep't 1999)*) (explaining that the "reasonable relationship" test may be satisfied so long as "one of the parties' principal place of business is in the selected forum"); *see also TransAtlantic Lines LLC v. Amergent Techs, LLC, 2017 U.S. Dist. LEXIS 2217, 2017 WL 78511, at *4 n.6 (S.D.N.Y. Jan. 6, 2017)* (same); *Zerman, 735 F.2d at 20* ("The present transaction had a reasonable relationship to New York, where Hutton had its headquarters and where the margin loan was payable."); *cf. Clever Ideas, 2007 N.Y. Misc. LEXIS 9248, 2007 WL 3234747* (concluding that choice-of-law provision selecting Illinois law would not be given effect where, although the lender was an Illinois corporation, agreements were signed in New York, borrower was a New York corporation, the guarantor was a New York resident, and the action was initiated in New York). And a court may consider whether a party is seeking to evade usury laws by "nominally operating" in another jurisdiction. *See Power Up Lending Grp., 2019 U.S. Dist. LEXIS 33274, 2019 WL 1322621, at *4* (citing *Culbert v. Rols Cap. Co., 184 A.D.2d 612, 585 N.Y.S.2d 67, 67 (2d Dep't 1992)*).

The foregoing analysis is dispositive of Fleetwood's motion for summary judgment **[*62]** on its Texas usury claim and the associated claim for attorneys' fees. The undisputed facts do not establish, as a matter of law, that Texas law applies. That is, Fleetwood has not pointed to undisputed evidence that there is no reasonable relationship between New York or the parties, nor has it argued that applying New York usury law would be offensive to the public policy of New York. *Cf.* Dkt. No. 77 ¶ 2 (noting that Richmond is a New York limited liability company; *id.* ¶ 74 (quoting a Richmond representative as stating "[w]e are from New York"); *id.* ¶ 22 (explaining that the relevant funds were wired from Richmond's Empire State Bank account).

In light of the Second Circuit's treatment of usury claims as contractual and the weight of in-Circuit and New York cases applying contractual choice-of-law principles to usury claims, the Court cannot say as a matter of law that the choice-of-law provision in the Fleetwood Agreement is inapplicable to Fleetwood's usury claim and that Texas law should apply. Fleetwood is therefore not entitled to summary judgment on its Texas usury claims.

## III. RICO Claim

Fleetwood moves for summary judgment on its RICO claim, which it brings against Giardina. **[*63]** *Section 1962(c) of RICO* makes it unlawful for a person "employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce to conduct or participate, directly or indirectly, in the conduct of such enterprises affairs through a pattern of racketeering activity *or* collection of unlawful debt." *18 U.S.C. § 1962(c)* (emphasis added). RICO defines "unlawful debt" to mean:

> a debt (A) incurred or contracted in gambling activity which was in violation of the law . . . or which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate.

*18 U.S.C. § 1961(6)*.

Moreover, "[u]nlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the [plaintiff] need only demonstrate a single collection." *United States v. Giovanelli, 945 F.2d 479, 490 (2d Cir. 1991)*; *see also United States v. Grote, 961 F.3d 105, 119 (2d Cir. 2020)* ("RICO offenses may be predicated on a single instance of collection of unlawful debt, as well as on a pattern of racketeering activity."). **[*64]** At the same time, however, the statute does not reach the collection of a loan that is made occasionally and not as part of the "business of lending money" at a usurious rate. *See Eqerigue v. Chowaiki, 2020 U.S. Dist. LEXIS 73060, 2020 WL 1974228, at *19 (S.D.N.Y. Apr. 24, 2020)*, *vacated in part for other reasons sub nom. Weiss v. David Benrimon Fine Art LLC, 2021 U.S. App. LEXIS 38395, 2021 WL 6128437 (2d Cir. Dec. 28, 2021)*. That is, "[t]he first part of *§ 1961(6)* requires that 'unlawful debt' either (1) be incurred or contracted in some form of illegal gambling activity or (2) be unenforceable by virtue of state or federal usury laws. The second part— *subsection (B)*—further narrows the definition, requiring, *inter alia*, that the 'unlawful debt' be incurred in connection with an illegal 'business.'" *United States v. Persico, 2011 U.S. Dist. LEXIS 63034, 2011 WL 2433728, at *2 (E.D.N.Y. June 14, 2011)*; *see also*

2022 U.S. Dist. LEXIS 100837, *64

*Wade Park Land Holdings, LLC v. Kalikow, 2022 U.S. Dist. LEXIS 38828, 2022 WL 657664, at *23 (S.D.N.Y. Mar. 4, 2022).*

"The inclusion of 'collection of unlawful debt' as a major predicate for RICO liability [was] an explicit recognition of the evils of loan sharking . . . ." *Durante Bros. & Sons v. Flushing Nat'l Bank, 755 F.2d 239, 250 (2d Cir. 1985).* To that end, the statute requires "that the loan have been incurred in connection with 'the business of making usurious loans'" and excludes from the definition of unlawful debt the "occasional usurious transactions by one not in the business of loan sharking." *Id. at 250.*

A civil RICO claim under *Section 1962(c)* requires a showing that, among other things, there was a RICO enterprise whose activities affected interstate commerce; that an individual participated in [*65] the conduct of the affairs of the enterprise through the collection of an unlawful debt; and that as a result of the enterprise collecting an unlawful debt, a party—here Fleetwood—was injured in its business or property. *Durante Bros., 755 F.2d at 248.* "[T]o prove that what was collected was an unlawful debt within the meaning of RICO, [a plaintiff] would have to show that [1] the debt was unenforceable in whole or in part because of state or federal laws relating to usury, [2] that debt was incurred in connection with 'the business of lending money . . . at a [usurious] rate,' and [3] the usurious rate was at least twice the enforceable rate. *Id.; see also Dae Hyuk Kwon v. Santander Consumer USA, 742 F. App'x 537, 539 (2d Cir. 2018)* (summary order).

Defendants argue that Plaintiff is not entitled to summary judgment on it its RICO claim for two reasons: First, there is no evidence that Richmond or Giardina are liable for wrongdoing because the Agreement is not a loan, Dkt. No. 80 at ECF pp. 8-10—an argument that the Court has already rejected; and second, Plaintiff has not demonstrated "actual damages" because Plaintiff settled with Ram LLC for an undisclosed amount and because Pamela Fleetwood "could not quantify her damages when asked under oath," *id.* at ECF p. 13.

The undisputed evidence [*66] entitles Plaintiff to summary judgment against Giardina on Plaintiff's RICO claim. The undisputed evidence establishes that Richmond constitutes an enterprise, defined by RICO to include "any individual, partnership, corporation, association, or other legal entity," *18 U.S.C. § 1961(4),* and that the enterprise affected interstate commerce. As set forth in Plaintiff's Rule 56.1 Statement, Richmond is a limited liability company that, for over three years,

"advanced funds to small businesses in Texas and throughout the United States." Dkt. No. 79 ¶¶ 2, 4. It is also undisputed that Giardina—the founder and sole managing member of Richmond, *id.* ¶ 3—was an individual who participated in the conduct of Richmond, as he "oversaw the operations of Richmond and had final veto power over every decision made by Richmond" during the relevant times, *id.* ¶ 8.

There also is no material dispute of fact that Giardina—a natural person legally distinct from Richmond, *see Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 161-63, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)*—participated in this enterprise through the collection of an unlawful debt; not only has Plaintiff offered evidence that the agreements entered into by Richmond and merchants across the country were identical, in sum and substance, to the Agreement that the Court [*67] has concluded is a loan, including with respect to the effective interest rates, *see, e.g.,* Dkt. No. 78-7, and Defendants do not proffer evidence to dispute this, but the undisputed evidence shows that Giardina and Richmond collected an unlawful debt, within the meaning of RICO, from Plaintiff itself.

Plaintiff contends that the Fleetwood Agreement is unenforceable under the usury laws of either Texas or New York law. "Under Texas law, a 'usury' claim has three elements: '(1) a loan of money; (2) an absolute obligation to repay the principal; and (3) the exaction of a greater compensation than allowed by loan for use of the money by the borrower.'" *Vanderbilt Mortg. & Fin., Inc. v. Flores, 735 F. Supp. 2d 679, 696 (S.D. Tex. 2010)* (quoting *Tony's Tortilla Factory, Inc., 877 S.W.2d at 287*). The maximum permissible interest rate under Texas law for commercial loans is 28% per year. *Tex. Fin. Code § 303.009(c).* If more than twice that amount is charged and received, the creditor is liable to the obligor for the principal, interest, and all other amounts charged and received. *Id. § 305.004; cf. Miller v. First State Bank, 551 S.W.2d 89, 95-96 (Tex. Civ. Ct. App. 1977)* ("A usurious contract is unenforceable as to the interest contracted for, charged or received."); *Danziger v. San Jacinto Sav. Ass'n, 732 S.W.2d 300, 304 (Tex. 1987).* Under New York law, a loan is criminally usurious if it has an annual interest rate exceeding 25%, *N.Y. Pen. L. § 190.40,* and such a usurious loan is void and unenforceable, *see Adar Bays, LLC, 179 N.E.3d at 616.* [*68] Plaintiff has submitted an expert report that calculates the annual interest rate of 99.8%, *see* Dkt. No. 79 ¶ 47, and Defendants do not challenge this figure. Nor do Defendants contest that, if the Agreement is considered a loan, the interest rate would be usurious

under New York or Texas law and the debt would be unenforceable at least in part, instead stating that "Plaintiff has not determined [sic] that the debt owed . . . was in fact illegal" and supporting this contention with arguments that the Agreement is a factoring agreement and not a usurious loan. *See* Dkt. No. 80 at ECF p. 12 n.10. Plaintiff has thus demonstrated that the first and third prongs of the "unlawful debt" test are met: the debt incurred pursuant to the Agreement is unenforceable at least in part under either Texas or New York laws relating to usury, and the interest rate on the debt was at least twice the enforceable rate under either state's statutes (28% for Texas and 25% for New York).

The second prong of the "unlawful debt" test asks if the debt was incurred in connection with the business of lending money at a usurious rate. Richmond was engaged in the business of lending money at usurious rates over the [*69] course of years by advancing funds to small businesses across the country and entering into agreements with these businesses that contained identical language to the Agreement the Court has concluded was a usurious loan. That was Richmond's principal business. Richmond has admitted that it has no evidence to refute the allegations of the Amended Complaint—and that are reflected in the agreements and affidavits submitted in connection with summary judgment—that it entered into usurious agreements with numerous merchants and enforced those agreements forcefully over time. *See* Dkt. No. 78-32 at 77, 82, 86-87; Dkt. No. 28 ¶¶ 8, 10-11, 33, 92-97 (setting forth allegations regarding those agreements); Dkt. No. 79 ¶¶ 2-7; Dkt. Nos. 78-5 (agreement between Galaxy United Services, LLC and Richmond); 78-6 (agreement between Eagle Painting Company and Richmond); 78-7 (agreement between Richmond and Triad Well Service, LLC); 78-23 (affidavit of president of JMA Chocolates, a customer of Richmond, describing merchant agreement); 78-24 (affidavit of former owner of J.B. Plumbing & Heating of Virginia, a customer of Richmond, describing merchant agreement). Nor has Giardina offered any evidence in [*70] response to Plaintiff's evidence that would create a genuine issue of material fact.

The undisputed evidence also shows that Fleetwood's debt was incurred in connection with this business. While Defendants make much of the fact that the Fleetwood Agreement was written on the paper of Ram LLC and identified Ram LLC as the contractual counterparty, *see* Dkt. No. 80-4 ¶¶ 2, 17, 18, it is undisputed that the funds paid pursuant to the Fleetwood Agreement were wired from the account of

Richmond "d/b/a Ram Capital Funding," Dkt. No. 79 ¶¶ 35-37, 39, 40. It is also undisputed that the daily withdrawals were processed by "Actum on behalf of Richmond d/b/a Ram Capital." Dkt. No. 79 ¶¶ 41-43. When Plaintiff sought a pause in its payments so that it would not default on its obligations under the Agreement, it wrote to Richmond at its d/b/a/ Ram Capital email address and corresponded with Michelle Gregg, who was a collection agent of Richmond. *Id.* ¶¶ 27-28. Thus, even though the Agreement was nominally with Ram LLC, the Fleetwood's debt was incurred in connection with the business of Richmond, who advanced the funds, withdrew the funds, and handled repayment requests. *Cf. Recticel Foam Corp. v. Bay Indus., 128 F. App'x 798, 799 (2d Cir. 2005)* (summary order) ("New [*71] York law provides that if a party objectively manifests an intent to be bound by a contract, that intent controls, even if the party does not sign the written agreement.").

Defendants argue that Plaintiff still has not made out a claim for RICO because it has not shown that it was damaged by a RICO violation associated with the Fleetwood Agreement. "Victims of racketeering who have been deprived of their monetary resources as a direct result of racketeers' predicate acts should, under the most natural interpretation of the phrase 'business or property,' recover their pecuniary losses." *Nat'l Asbestos Workers Med. Fund v. Philip Morris, Inc., 74 F. Supp. 2d 221, 229 (E.D.N.Y. 1999)*. And RICO damages should be "sufficient to place the plaintiff in the same financial position [it] would have occupied absent the illegal conduct." *Bankers Trust Co v. Rhoades, 859 F.2d 1096, 1106 (2d Cir. 1988)*. As Plaintiff points out, "[t]here is no dispute that $119,617 was collected from Fleetwood's account by Richmond." Dkt. No. 81 at 21-22. Richmond points to evidence that Plaintiff entered into a settlement agreement in connection with this case for an undisclosed sum, Dkt. No. 80-4 ¶ 12, and that, in response to the question "what is your economic damage relating to this [agreement]," Pamela Fleetwood responded "I can't answer that", *id.* ¶ 29, but Defendant [*72] does not proffer any evidence that would suggest that Plaintiff recovered the full amount of damages pursuant to this agreement or that Pamela Fleetwood's personal inability to quantify her damages means Fleetwood did not suffer any or would preclude Fleetwood from offering evidence of those damages. Nor have Defendants suggested that the settlement agreement placed Fleetwood in the same position they would have been in without the illegal conduct. Defendants instead argue that "upon information and belief," the settlement amount was somewhere around

2022 U.S. Dist. LEXIS 100837, *72

$40,000; even if that were so, it would fall well below the actual damages suffered by Plaintiff not to mention those damages when trebled. Dkt. No. 80-4; *cf. Comm. Union Assur. Co. v. Milken, 17 F.3d 608, 612 (2d Cir. 1994)* (noting that "[i]f a portion or all of their investment in the partnership was unrecoverable, a treble damage award might be appropriate, assuming the other RICO requirements were satisfied" but concluding no viable RICO cause of action may be maintained where defendants placed plaintiffs in the same position in the same position they would have been absent illegal conduct by returning their initial investment and a double-digit return on their capital). Indeed, where treble damages **[*73]** are available—as in RICO cases—courts "routinely treble damages before setoff in cases where a plaintiff sues multiple defendants . . ., settles with one or more of them, and then prevails against the remaining defendants." *Creel v. Dr. Says, LLC, 2022 U.S. Dist. LEXIS 60155, 2022 WL 987815, at *4 (E.D. Tex. Mar. 31, 2022)* (trebling RICO damages before crediting settlement amount) (citing *Hydrolevel Corp. v. Am. Soc'y of Mech. Eng'rs, Inc., 635 F.2d 118, 130 (2d Cir. 1980)*, aff'd, *456 U.S. 556, 102 S. Ct. 1935, 72 L. Ed. 2d 330 (1982)* and *New York v. Hendrickson Brothers, Inc., 840 F.2d 1065, 1086-87 (2d Cir. 1988)*, cert. denied, *488 U.S. 848, 109 S. Ct. 128, 102 L. Ed. 2d 101 (1988)*); see also *New York City Dist. Council of Carpenters Pension Fund v. Forde, 2018 U.S. Dist. LEXIS 92145, 2018 WL 2455437, at *20-21 (S.D.N.Y. June 1, 2018)* (following *Hydrolevel Corp.* because "the *Clayton Act* is the model for RICO's private right of action" and deducting compensation for RICO injuries "only after the trebling of damages").

Absent Defendant proffering any evidence to dispute that Plaintiff suffered damages, and because Plaintiff was deprived of its monetary resources as a result of Richmond's usurious lending practices, Plaintiff has shown that it was damaged. Because Plaintiff has demonstrated that all elements of its RICO claim have been met, it is entitled to summary judgment on liability on this count.

## IV. Fleetwood's Alternative Claims

Fleetwood argues that, "[i]n the event that this Court does not conclude that the Fleetwood Agreement is a usurious and unenforceable loan agreement, Fleetwood is entitled to summary judgment on its breach of contract/duty of good faith claim." Dkt. No. 76 at 42. The Court has concluded **[*74]** that Fleetwood is not entitled to summary judgment on its usury claim under Texas

law and that further factual presentations or trial are required before the Court can determine whether New York law or Texas law applies to that claim. Accordingly, since that claim is still open, Fleetwood's argument in the alternative for summary judgment on its breach of contract and duty of good faith claims is premature and is denied.

## CONCLUSION

The motion for summary judgment GRANTED IN PART and DENIED IN PART. Plaintiff's motion for summary judgment is GRANTED against Giardina on count five. The motion is otherwise DENIED.

The Clerk of Court is respectfully directed to close Dkt. No. 74.

SO ORDERED.

Dated: June 6, 2022

New York, New York

/s/ Lewis J. Liman

LEWIS J. LIMAN

United States District Judge

---

**End of Document**

A-545

# Exhibit B

 Neutral

As of: September 8, 2022 8:52 PM Z

## *Haymount Urgent Care PC v. GoFund Advance, LLC*

United States District Court for the Southern District of New York

June 27, 2022, Decided; June 27, 2022, Filed

22-cv-1245 (JSR)

**Reporter**

2022 U.S. Dist. LEXIS 112768 *; __ F.Supp.3d __; 2022 WL 2297768

HAYMOUNT URGENT CARE PC; ROBERT A. CLINTON, JR.; INDIGO INSTALLATIONS, INC.; and CHRISTOPHER A. TURRENTINE; et al., Plaintiffs, -v- GOFUND ADVANCE, LLC; FUNDING 123, LLC; MERCHANT CAPITAL LLC; ALPHA RECOVERY PARTNERS, LLC; YITZCHOK ("ISAAC") WOLF; JOSEF BREZEL; JOSEPH KROEN; AND YISROEL C. GETTER, Defendants.

**Prior History:** *Haymount Urgent Care Pc v. Gofund Advance, 2022 U.S. Dist. LEXIS 50229, 2022 WL 836743 (S.D.N.Y., Mar. 21, 2022)*

## Core Terms

merchant, receivables, settlement, lender, reconciliation, collection, loans, defendants', remittance, alleges, wire fraud, notice, declaratory judgment, factors, prejudgment remedy, bank account, racketeering, transactions, predicate, default, void, fraud claim, withdrawals, attachment, conspiracy, provisions, purport, declaration, borrower, parties

## Case Summary

### Overview

HOLDINGS: [1]-In a putative class action alleging that defendants make allegedly fraudulent and usurious loans, defendants' motion to dismiss was denied, in part, because the Complaint adequately pled that the merchant cash advance (MCA) agreements functioned as loans and, as such, since defendants did not dispute that the implied interest rates on the transactions far exceed 50% per annum, which was twice the New York State criminal usury rate, the Complaint adequately pled that the debts were unenforceable, unlawful debts under the RICO statute; [2]-The court held that defendants' motion to dismiss was denied with respect to the substantive and conspiratorial RICO claims, although plaintiffs could not proceed with the aspect of the wire fraud prong of the substantive RICO claim predicated on allegedly excessive fees that were disclosed in the MCA agreements.

### Outcome

Defendants' motion to dismiss the First Amended Complaint granted in part and denied in part.

## LexisNexis® Headnotes

Banking Law > ... > National Banks > Interest & Usury > Rate & Recovery of Interest

Contracts Law > Defenses > Usury

Banking Law > ... > Banking & Finance > National Banks > Usury Litigation

**HN1[ ]** Interest & Usury, Rate & Recovery of Interest

The RICO statute, *18 U.S.C.S. § 1962(c)*, declares that it is unlawful for any person employed by or associated with any enterprise engaged in interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through collection of unlawful debt. The statute defines an unlawful debt as a debt (A) which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. *18 U.S.C.S. § 1961(6)*.

2022 U.S. Dist. LEXIS 112768, *112768

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

**HN2[↧]** **Standards of Performance, Creditors & Debtors**

As the Second Circuit explains in Moseley for the purposes of RICO liability, New York law governs the issues of whether the contracts amount to loans, and, if they are loans, whether they are unlawful debt under RICO.

Banking Law > ... > Banking & Finance > Consumer Protection > Predatory Lending

Contracts Law > Defenses > Usury

Real Property Law > Financing > Mortgages & Other Security Instruments > Usury

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

Banking Law > ... > Banking & Finance > National Banks > Usury Litigation

**HN3[↧]** **Consumer Protection, Predatory Lending**

Liability for an unlawful debt RICO violation requires proof of five elements: 1) that a debt existed, 2) that it was unenforceable under New York's usury laws, 3) that it was incurred in connection with the business of lending money at more than twice the legal rate, 4) that the defendant aided collection of the debt in some manner, and 5) that the defendant acted knowingly, willfully and unlawfully. However, even when a transaction is unmistakably a loan, the lender is entitled to a presumption that the loan is lawful, so the borrower must establish by clear evidence that a transaction is a usurious loan.

Banking Law > ... > National Banks > Interest & Usury > Rate & Recovery of Interest

Contracts Law > Defenses > Usury

Real Property Law > Financing > Mortgages & Other Security Instruments > Usury

Banking Law > ... > Banking & Finance > National Banks > Usury Litigation

**HN4[↧]** **Interest & Usury, Rate & Recovery of Interest**

Under New York law, usury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be. New York courts uniformly hold that when determining whether a transaction is a loan, substance -- not form -- controls.

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

**HN5[↧]** **Standards of Performance, Creditors & Debtors**

In assessing the substance of financial transactions, the Court of Appeals has focused on how the contract at issue allocates risk between the parties. As the Second Circuit has explained, when determining whether a transaction was a true sale of receivables, the root of the analysis is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor. However, where economic analysis reveals that the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to pay, then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan. Parties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders.

Banking Law > ... > Banking & Finance > National Banks > Usury Litigation

Contracts Law > Defenses > Usury

Civil Procedure > Appeals > Standards of Review > Questions of Fact & Law

2022 U.S. Dist. LEXIS 112768, *112768

Business & Corporate Compliance > ... > Discharge & Payment > Payments > Interest

purposes.

Civil Procedure > Remedies > Prejudgment Remedies > Application for Remedies

*HN6*[⬇] **Interest & Usury, Usury Litigation**

Usurious intent is an essential element of usury and where usury does not appear on the face of the note, usury is a question of fact.

Civil Procedure > Remedies > Provisional Remedies > Attachment

Business & Corporate Compliance > ... > Contracts Law > Standards of Performance > Creditors & Debtors

*HN10*[⬇] **Prejudgment Remedies, Application for Remedies**

*HN7*[⬇] **Standards of Performance, Creditors & Debtors**

A default then entitles the lender to immediate repayment of the full amount of the transaction outstanding.

Antitrust & Trade Law > ... > Private Actions > Racketeer Influenced & Corrupt Organizations > Scope

*HN8*[⬇] **Private Actions, Racketeer Influenced & Corrupt Organizations**

Pleading a RICO claim based on a pattern of racketeering activity requires alleging (1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity.

Civil Procedure > ... > Justiciability > Mootness > Voluntary Cessation Exception

*HN9*[⬇] **Mootness, Voluntary Cessation Exception**

A party may establish open-ended continuity by alleging predicate acts occurring over a short period of time so long as there is a threat that such conduct will recur in the future. The threat that such illegal conduct will recur in the future exists when: (1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting an ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal

In any event, the United States Supreme Court has repeatedly explained that *42 U.S.C.S. § 1983* liability may lie for either abusive use of a prejudgment attachment statute or knowing or reckless use of an unconstitutional prejudgment remedy where the alleged deprivation was caused by the exercise of a power created by the state and the party charged with the deprivation is a person who he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State. Attorneys employing a confession of judgment statute to attach private property without notice or hearing may be treated as state actors, because they enlist the compulsive powers of the state to seize property by executing on a judgment without pre-deprivation notice or hearing and so they act under color of law.

Civil Procedure > ... > Writs > Ancillary Writs > Writs of Attachment

*HN11*[⬇] **Ancillary Writs, Writs of Attachment**

It is a constitutionally delicate matter for a state to permit a private party's attorney to issue writs of attachment purportedly in aid of pending litigation but without any judicial supervision and without proper notice or hearing.

Civil Procedure > Remedies > Provisional Remedies > Attachment

*HN12*[⬇] **Provisional Remedies, Attachment**

The mere fact that the plaintiffs waived their rights to a pre-deprivation hearing does not inoculate defendants from *42 U.S.C.S. § 1983* liability where they employ the prejudgment attachment statute maliciously, that is, where they pursue a purportedly lawful end by

intentionally unlawful means.

Civil Procedure > Remedies > Prejudgment Remedies > Application for Remedies

Civil Procedure > Remedies > Prejudgment Remedies > Hearings on Remedies

**HN13[ ]  Prejudgment Remedies, Application for Remedies**

It is well established that litigants challenging an allegedly unconstitutional prejudgment remedy may seek relief in a federal court under *42 U.S.C.S. § 1983*, even if there is a pending state court action associated with the prejudgment remedy.

Banking Law > ... > National Banks > Interest & Usury > Rate & Recovery of Interest

Contracts Law > Defenses > Usury

Real Property Law > Financing > Mortgages & Other Security Instruments > Usury

Business & Corporate Compliance > ... > Discharge & Payment > Payments > Interest

Banking Law > ... > Banking & Finance > National Banks > Usury Litigation

**HN14[ ]  Interest & Usury, Rate & Recovery of Interest**

The New York usury statute prohibits corporations from interposing a defense of usury to an action to collect a debt except insofar as the rate of interest exceeds the criminal usury rate of 25% per annum, set out in Penal Code § 190.40. *N.Y. Gen. Oblig. L. § 5-521*. Where the interest rate exceeds the criminal usury rate, a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument ab initio. However, New York courts have uniformly construed this statute as limited to the affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement.

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Releases

Real Property Law > ... > Contracts of Sale > Enforceability > Undue Influence

Civil Procedure > Settlements > Releases From Liability > General Releases

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Settlement Agreements

**HN15[ ]  Types of Contracts, Releases**

It is well established under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties. A release of claims in a settlement agreement is therefore binding on the parties absent a showing of fraud, duress, undue influence, or some other valid legal defense.

Business & Corporate Compliance > ... > Contracts Law > Types of Contracts > Releases

Contracts Law > ... > Affirmative Defenses > Coercion & Duress > Economic Duress

Civil Procedure > Settlements > Releases From Liability > Interpretation of Releases

**HN16[ ]  Types of Contracts, Releases**

Under New York law, a release agreement may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of his free will. Parties seeking to establish duress from one-sided economic advantage must carry a heavy burden.

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

**HN17[ ]  Actual Fraud, Elements**

In New York, the elements of a cause of action for fraud

2022 U.S. Dist. LEXIS 112768, *112768

are a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages.

Torts > ... > Fraud & Misrepresentation > Actual Fraud > Elements

*HN18*[⤓] **Actual Fraud, Elements**

Under New York law, to maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages.

**Counsel:** **[*1]** For Haymount Urgent Care PC, Robert A. Clinton, Jr., individually and on behalf of all those similarly situated, Plaintiffs: Agatha Christina Mingos, White and Williams LLP, New York, NY; Shane R. Heskin, White & Williams, LLP(Philadelphia), Philadelphia, PA.

For Indigo Installations, Inc., Christopher A. Turrentine, individually and on behalf of all those similarly situated, Plaintiffs: Shane R. Heskin, White & Williams, LLP(Philadelphia), Philadelphia, PA.

For GoFund Advance, LLC, Funding 123 LLC, Merchant Capital LLC, Yisroel C. Getter, Joseph Kroen, Yitzchok Wolf, Isaac, Josef Brezel, Defendants: John Albert Mueller, Harter,Secrest & Emery, LLP (Bflo), Buffalo, NY.

**Judges:** JED S. RAKOFF, UNITED STATES DISTRICT JUDGE.

**Opinion by:** JED S. RAKOFF

# Opinion

OPINION AND ORDER

JED S. RAKOFF, U.S.D.J.:

This is a putative class action alleging that defendants make allegedly fraudulent and usurious loans and then engage in abusive collection tactics. The defendants are companies and individuals engaged in the "merchant cash advance" ("MCA") industry. MCA agreements are financial products, often marketed to small businesses through high-pressure sales operations resembling "boiler rooms," that purport to purchase at a discount **[*2]** a portion of a business's future receivables. The plaintiffs here are two small businesses (a North Carolina urgent care facility and a Texas construction contractor) and their principals that entered into MCA agreements with defendants that they have since come to regret. Plaintiffs' amended complaint, ECF 22 ("Complaint" or "FAC"), brings claims sounding in RICO, racketeering conspiracy, breach of contract, *§ 1983*, and fraud.

Now before the Court is defendants' motion to dismiss all claims other than the breach of contract claims. ECF 68 ("Mot."). The Court has carefully considered the parties' briefing and the presentations of counsel at oral argument. As explained further below, defendants' motion to dismiss is granted in part and denied in part.

Specifically, the motion is granted in part with respect to the declaratory judgment claim, which is dismissed against all defendants except GoFund Advance, against whom only the aspect of the claim concerning the validity of the Indigo settlement may proceed. The motion is also granted in part with respect to the fraud claim, which is dismissed against all defendants other than GoFund Advance, against whom only the aspect of the claim concerning **[*3]** allegedly fraudulent electronic bank transfers may proceed. The motion is otherwise denied. With this motion resolved, the Court also lifts the stay of these proceedings previously imposed, and the parties are directed to follow the procedures set forth in the conclusion of this Opinion to develop a new case management plan that will move this litigation expeditiously toward trial.

## I. Background

A. Factual Background[1]

1. MCA Agreement Terms

The MCA transactions here at issue relate to purported purchases of a portion of the plaintiff merchants' receivables in exchange for up-front payments. The MCA agreements specify a purchase price to be paid by

---

[1] The factual allegations here are taken from the Complaint and the documents referenced therein and integral thereto.

2022 U.S. Dist. LEXIS 112768, *3

the MCA company to the merchant, an amount of receivables purchased, the percentage of the merchant's total receivables that the purchase purportedly represents, and a daily "remittance" amount. See, e.g., ECF 69-2 at 3.[2] The merchant is obligated to pay that daily remittance amount through an ACH bank transfer unless the amount is adjusted. Id. The owner of the merchant company is also required to sign the agreement in his personal capacity as a "guarantor." Id.

The first page of the agreement includes the following statements under the heading [*4] "Purchase and sale of future receivables:"

> Merchant is selling a portion of a future revenue stream to GFA at a discount, not borrowing money from GFA, therefore there is no interest rate or payment schedule and no time period during which the Purchased Amount must be collected by GFA. The Remittance is a good faith estimate of Purchased Percentage multiplied by revenues of Merchant. Merchant going bankrupt or going out of business, or experiencing a slowdown in business, or a delay in collecting its receivables, in and of itself, does not constitute a breach of this Agreement. GFA is entering this Agreement knowing the risks that Merchant's business may slow down or fail, and GFA assumes these risks based on Merchant's representations, warranties and covenants.... Merchant and Guarantor are only guaranteeing their performance of the terms of this Revenue Purchase Agreement, and are not guaranteeing the payment of the Purchased Amount. The initial Remittance shall be as described above. The Remittance is subject to adjustment as set forth [herein].

ECF 69-2 at 3. The MCA agreement also includes a "reconciliation" provision that purports to result in adjustment of the daily remittance [*5] amount. This provision states, in relevant part:

> As long as an Event of Default, or breach of this Agreement, has not occurred, once per calendar month Merchant may request a retroactive reconciliation of the total Remittance Amount (for the purposes of this Agreement "total Remittance Amount" shall be defined as all payments made by Merchant to GFA after GFA remitted the Purchase Price to Merchant). All requests hereunder must be in writing to eric@gofundadvance.com within five (5) business days of the close of the calendar month. Said request must include copies of all Merchant's bank account statements, credit card processing statements, and accounts receivable report if applicable, for the requested month. GFA retains the right to request additional documentation such as bank login ... to view Merchant's accounts, refusal to provide access shall be a breach of this Agreement and GFA shall have no obligation to reconcile. Such reconciliation, if applicable, shall be performed by GFA within five (5) Business Days following its receipt of Merchant's request for reconciliation by either crediting or debiting the difference back to, or from, Merchants Bank Account so that the total [*6] amount debited by GFA shall equal the Specific Percentage of the Future Receipts that Merchant Collected from the date of this Agreement up to and including the date of the Reconciliation request.

ECF 69-2 at 4 (§ 1.4).

The MCA agreement also provides GFA with various "Protections Against Default," should various listed events occur, including collection of the "full uncollected Purchased Amount plus all fees ... immediately," enforcement of the "Limited Personal Guaranty of Performance against the Garantor(s)," and "execut[ion] [by GFA] in the name of the Merchant [of] a Confession of Judgment in favor of GFA in the amount of Purchased Amount stated in the Agreement." ECF 69-2 at 5 (§ 1.13). For okaintiffs Haymount and Indigo, the personal guaranty was executed by their principals, also plaintiffs here. See, e.g., ECF 69-2 at 9. The MCA agreements state that "[s]aid Guarantors will be jointly and severally liable to GFA for all of GFA's losses and damages, in additional to all costs and expenses and legal fees associated with such enforcement." ECF 69-2 at 6 (§ 3.2). As for the "confession of judgment" protection, the MCA agreement states in part:

> Each and every merchant, endorser guarantor [*7] and surety of this agreement, and each other

---

[2] In analyzing the MCA transactions at issue here, this Opinion references the terms from a GoFund Advance agreement, ECF 69-2, since that is the most common agreement form in the case. This agreement is cognizable on a motion to dismiss because it is incorporated by reference and in integral to the Complaint. Neither party has identified material differences in the agreement terms among the companies, so for the purpose of this motion, the Court treats these terms as applying to all transactions presently at issue. For convenience, the Court will use "GFA" to refer collectively to defendants GoFund Advance, Merchant Capital, and Funding 123, the three purported "purchasers" of the merchants' receivables.

2022 U.S. Dist. LEXIS 112768, *7

person or entity who may become liable for all or any part of this obligation, hereby acknowledge that the transaction of which this agreement is a part is a commercial transaction, and to the extent allowed under *Connecticut General Statutes sections 52-278a to 52-278m*, inclusive, or by other applicable law each and every merchant, endorser and guarantor of this agreement hereby waive (a) all rights to notice and prior court hearing or court order in connection with any and all prejudgment remedies to which FCG hereof may become entitled by virtue of any default or provision of this agreement or security agreement securing this agreement and (b) all rights to request that FCG hereof post a bond....

ECF 69-2 at 7 (§ 4.13). Finally, the MCA agreement also includes a security agreement, permitting UCC lien notices to be sent to the merchant's banks and counterparties, freezing its accounts. ECF 69-2 at 8.

The MCA agreements also contain a fee allocation document. It lists various large fees, including "Underwriting Fee: Minimum of $500.00 or up to 12% of the purchase price for underwriting and related expenses," and "ACH Origination Fee: Minimum of $500.00 or up to 10% of the purchase price to cover [*8] cost of Origination and ACH Setup." Id at 10.

## 2. Haymount Urgent Care

Haymount is an urgent care and primary care facility located in Fayetteville N.C. at which more than 100 employees provide medical care to approximately 300 people per day. FAC ¶¶ 87-88. Plaintiff Dr. Robert Clinton Jr. is Haymount's owner. See ECF 69-2 at 9. Haymount's financial position allegedly came under strain as a result of the COVID-19 pandemic, both because of additional costs (e.g., setting up a PCR lab, hiring additional staff, and purchasing supplies and personal protective equipment) and because of slow payments for care provided to uninsured and Medicare-insured patients. FAC ¶¶ 91-100.

Haymount was therefore seeking additional financing to help it sustain operations with limited cash flows. FAC ¶ 101. Haymount entered into the six MCA agreements with defendants GoFund Advance, Merchant Capital, and Funding123 summarized below:

Go to table1

See FCA ¶¶ 103-186.

Haymount alleges that these figures represent the terms

of short-term commercial loans, rather than purchases of receivables for reasons that are discussed below at length. Haymount points out that these agreements reflect widely varying estimates of the company's daily revenue. For instance, the MCA agreement dated December 16, 2021 estimated that 45% of the company's daily revenues was $35,000, whereas the MCA agreement dated December 27, 2021 estimated that 45% of daily revenues was $80,000. See FAC ¶¶ 139-140, 155. There is no basis, Haymount argues, for the defendants to have concluded that its revenues more than doubled in 11 days, thus supporting the inference that these figures are not good faith reflections of revenues purportedly purchased.[4]

Moreover, Haymount alleges that it would repeatedly not receive its full advance, with defendants disbursing only part of the amount and then waiting until that had been more than paid back before dispensing the rest. This is the basis of the breach of contract claim, [*10] which is not at issue in the instant motion. See FAC ¶¶ 308-314.

Alpha Recovery Partners allegedly serves as the collection arm of the RICO enterprise, setting up and operating the ACH withdrawals and, upon default, issuing UCC liens and attachment orders pursuant to a Connecticut pre-judgment relief statute. In Haymount's case, Alpha froze bank accounts and medical insurance reimbursement accounts, effectively debilitating Haymount's business.

## 3. Indigo

Indigo, through its principal, plaintiff Christopher Turrentine, entered an MCA agreement in which it would be advanced $40,000 for a $63,960 payback at a rate of $2,200 per day, purporting to be for 45% of revenues. FAC ¶¶ 195, 203. Like Haymount, Indigo alleges that the advance was not paid in full, and that the balance -- minus the allegedly fraudulent fees -- was only paid after Indigo's total repayment was more than the value of the first advance. FAC ¶¶ 205-207.

Alpha Recovery Partners used the Connecticut pre-judgment relief procedure to freeze Indigo's Texas bank account by serving a writ of attachment on a Connecticut branch of PNC Bank on or about February

---

[4] Haymount also points to text messages that suggest negotiations over fixed loan terms rather than purchases of receivables. See Opp. 6. However, plaintiffs have identified no adequate rationale for the Court considering these documents, which are neither referenced in nor integral to the Complaint.

2022 U.S. Dist. LEXIS 112768, *10

24, 2022. FAC ¶ 328. Defendants allegedly provided Indigo and Turrentine [*11] no notice of this attachment, either before or after the writ was issued. Moreover, the defendants allegedly failed to serve on Indigo or PNC a copy of any underlying Connecticut civil action, a sworn affidavit as required by statute, or a statutorily required notice. FAC ¶ 329. Indigo agreed to a settlement with defendants where it paid $4,000 to settle outstanding claims and, as part of that settlement, to release claims against defendants. See ECF 69-9 ¶ 11.

### B. Procedural Background

The putative class action Complaint pleads six counts: (i) RICO, based on collection of an unlawful debt or, in the alternative, based on a pattern of wire fraud; (ii) racketeering conspiracy, based on an alleged conspiracy to commit the substantive RICO scheme alleged in Count I; (iii) declaratory judgment, seeking a declaration that the MCA agreements are void ab initio as usurious loans, and that the settlement with Indigo is void; (iv) common law fraud, related to the imposition of excessive fees; (v) breach of contract, related to the timing of payments from GFA to the merchants; and (vi) section 1983, related to allegedly abusive use of the Connecticut pre-judgment relief statute.

On March 21, 2022, the Court [*12] granted Haymount's motion for a preliminary injunction against GoFund Advance, prohibiting defendants from freezing Haymount's bank and medical insurance reimbursement accounts. ECF 66. Defendants now move for dismissal of all claims other than the claim for breach of contract.

### II. Discussion

Defendants seek dismissal of the RICO, section 1983, declaratory judgment, and fraud claims. Most of these claims are also multifaceted, in that they contain two unrelated theories of liability under a single claim. The Court addresses the arguments against each claim in turn.

### A. RICO

The Complaint's core claim is that defendants are liable under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., for illegally operating an enterprise that loans money to

small businesses at criminally usurious interest rates and then uses various improper tactics to collect on those loans. The catch, however, is that RICO's application to an enterprise engaged in the collection of an unlawful debt requires that the transactions at issue be loans, since the outstanding balance on a financing transaction that is not a loan cannot, by definition, constitute an unlawful debt. The plaintiffs therefore plead, apparently in the alternative, that RICO liability also lies on the [*13] basis of a pattern of wire fraud, and they argue that both the MCA agreements' excessive fees and defendants' deceptive ACH transfer practices might constitute wire fraud. Finally, the Complaint pleads a racketeering conspiracy claim.

For the reasons explained further below, the Court finds that the Complaint states claims for substantive and conspiratorial RICO violations, both predicated on the collection of unlawful debts and on a pattern of wire fraud involving allegedly manipulative use of ACH withdrawals.

#### 1. Collection of an Unlawful Debt

The Complaint's principal theory of RICO liability is that the defendants are operating an enterprise dedicated to making and collecting on usurious loans. The potentially dispositive issue raised by the instant motion is whether the MCA agreements amount to loans under applicable state law, because it is undisputed that the implied interest rates of these agreements far exceed the cap in applicable New York usury law.

HN1 The RICO statute declares that it is "unlawful for any person employed by or associated with any enterprise engaged in ... interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's [*14] affairs through ... collection of unlawful debt." 18 U.S.C. § 1962(c). As relevant here, the statute defines an "unlawful debt" as a "debt (A) ... which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury, and (B) which was incurred in connection with ... the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate." 18 U.S.C. § 1961(6).

Since RICO's "definition of 'unlawful debt' invokes state as well as federal laws related to usury to provide substance to the concept of 'unlawful[ness],'" the first question is what state's law applies to the transactions at issue. United States v. Moseley, 980 F.3d 9, 18 (2d Cir. 2020). The MCA agreements at issue expressly

choose that New York law will govern their terms. See, e.g., ECF 69-2 at 6 (§ 4.5). And there is no apparent reason why those choice of law provisions would be held unenforceable under either the laws of New York, of North Carolina (Haymount's domicile), or of Texas (Indigo's domicile), particularly since New York's usury laws are the strictest among these three states. See generally ECF 82, 83. *HN2*[↑] Therefore, as the Second Circuit explained in *Moseley*, for **[*15]** the purposes of RICO liability, New York law governs the issues of whether the contracts amount to loans, and, if they are loans, whether they are unlawful debt under RICO. *980 F.3d at 20*.

*HN3*[↑] Here, therefore, liability for an "unlawful debt" RICO violation requires proof of five elements: "[1] that a debt existed, [2] that it was unenforceable under New York's usury laws, [3] that it was incurred in connection with the business of lending money at more than twice the legal rate, [4] that the defendant aided collection of the debt in some manner, and [5] that the defendant acted knowingly, willfully and unlawfully." *United States v. Biasucci, 786 F.2d 504, 513 (2d Cir. 1986)*. The instant motion challenges only the second element. The motion's core argument is that the debts arising from the MCA agreements are not unenforceable under New York's usury laws because the MCA agreements are genuine purchases of receivables, not loans. Defendants effectively concede, at least for now, that if the transactions amount to loans, then the implied interest rates are well above 50%, which is the twice the rate of criminal usury under New York law (25%), *N.Y. Penal L. § 190.40*. However, even when a transaction is unmistakably a loan, the lender is entitled to a presumption that the loan is lawful, **[*16]** so the borrower must establish by "clear evidence" that a transaction is a usurious loan. *Giventer v. Arnow, 37 N.Y.2d 305, 309, 333 N.E.2d 366, 372 N.Y.S.2d 63 (1975)*.

*HN4*[↑] Under New York law, "[u]sury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Seidel v. 18 E. 17th St. Owners, Inc., 79 N.Y.2d 735, 744, 598 N.E.2d 7, 586 N.Y.S.2d 240 (1992)*. New York courts uniformly hold that "[w]hen determining whether a transaction is a loan, substance -- not form -- controls." *Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 334, 157 N.Y.S.3d 800, 179 N.E.3d 612 (2021)*.

*HN5*[↑] In assessing the substance of financial transactions, the Court of Appeals has focused on how

the contract at issue allocates risk between the parties. As the Second Circuit has explained, when determining whether a transaction was a true sale of receivables, "[t]he root of [the analysis] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)*. However, where economic analysis reveals that "the lender's risk is derivative or secondary, that is, the borrower remains liable for the debt and bears the risk of non-payment by the account debtor, while **[*17]** the lender only bears the risk that the account debtor's non-payment will leave the borrower unable to [pay]," then there has not been a bona fide purchase of receivables and the transaction is, in substance, a loan. Id. See also *Adar Bays, 37 N.Y.3d at 334* ("[P]arties who are not directly exposed to market risk in the value of the underlying assets are likely to be lenders."). In addition to an economic analysis of the transaction, the New York Court of Appeals has also considered objective indicia of the parties' intent to "distinguish between intent to borrow and intent to engage in a joint transaction or exchange money for some other reason." *Adar Bays, 37 N.Y.3d at 334*. *HN6*[↑] "Usurious intent is an essential element of usury and where usury does not appear on the face of the note, usury is a question of fact" *Id. at 336*.

The New York Court of Appeals has not yet addressed how to apply these general principals to MCA agreements, so this Court's task is necessarily to predict how the Court of Appeals would treat an MCA agreement. While there have been several Appellate Division decisions and numerous trial court cases on the issue, the outcomes are strongly fact-bound and vary considerably. The Court's review of the caselaw suggests that, contrary **[*18]** to defendants' suggestion, the Appellate Divisions have yet to settle on any specific framework for classifying MCA agreements.

Defendants suggest that the Court should treat as dispositive a set of three factors that the Second Department and various trial courts have repeatedly applied: "(1) whether there is a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC v. United Senior Properties of Olathe, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309 (2d Dep't 2020)*. To that end, defendants argue that the MCA agreements at issue

Case 23-78, Document 36, 05/01/2023, 3508267, Page262 of 304

A-555

Case 1:21-cv-11222-ER    Document 40-2    Filed 10/12/22    Page 11 of 19
Page 10 of 18
2022 U.S. Dist. LEXIS 112768, *18

here cannot be loans because they contain a reconciliation provision that can be read as mandatory, lack a stated term, and do not treat the merchant's bankruptcy filing as an event of default. See Mot. 14.

But the Court concludes that, while these three factors may be relevant to the analysis, they are far from dispositive. To start, other Departments have analyzed MCA contracts without applying these factors. See, e.g., _Davis v. Richmond Capital Group LLC, 194 A.D.3d 516, 517, 150 N.Y.S.3d 2 (1st Dep't 2021)._ But even the Second Department has not reduced the question of whether a particular MCA contract is a loan to a mechanical application of these three factors, as the defendants urge the Court to do. For instance, in _LG Funding_, the Second [*19] Department considered the three factors as part of an overall analysis of the transaction, but its holding that the MCA contract at issue _was_ a loan subject the usury laws depended on the conclusion that "[t]he agreement also contains provisions suggesting that [the merchant's] obligation to repay was absolute and not contingent on its actual accounts receivable." _181 A.D.3d at 666._ Indeed, the _LG Funding_ decision's holding is ultimately about whether the transaction represented a real transfer of risk, concluding that the contract's "provisions suggest that the [MCA lender] did not assume the risk that [the merchant] would have less-than-expected or no revenues," so the economic substance of the transaction was a loan, not a purchase of receivables. _Id._ Other judges in this District have similarly considered the three Second Department factors but ultimately determined that the essential question was whether the purported MCA purchaser actually bears the risk of a revenue shortfall or if the agreement is structured to ensure an "absolute payment obligation." _Womack v. Cap. Stack, LLC, 2019 U.S. Dist. LEXIS 148644, 2019 WL 4142740, at *5-*7 (S.D.N.Y. Aug. 30, 2019)_ (collecting cases); see also, e.g., _Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9 (S.D.N.Y. June 6, 2022)_ ("The three factors provide only a guide to analysis. They do not dictate the conclusion.").

Starting with the Second [*20] Department's three factors, defendants contend that applying these factors to the face of the MCA agreements at issue weigh against finding them to be loans: none of the agreements have definite terms,[5] none names the

merchant's bankruptcy as a default event, and all purport to have mandatory reconciliation provisions. See ECF 69-2 at 6. However, the actual operation of the contracts muddies this picture. Although the reconciliation provision is styled as a mechanism requiring defendants to adjust the remittance amount upon the merchant's application, the actual structure of the provision makes it often impossible to use and leaves the lender with substantial discretion to prevent adjustment. To begin with, the merchant may only seek reconciliation once per calendar month, and then only during the last five business days of a month. See ECF 69-2 at 4 (§ 1.4). Therefore, the contract only permits the merchant to seek reconciliation about 20% of the time. This limitation is particularly significant because some of the MCA agreements here at issue had implied repayment periods of less than one month, see Opp. 5, reflecting the high daily remittance amounts, and thus a corresponding likelihood [*21] that the merchant's need for reconciliation might be urgent. If a mid-month decline in revenues would lead a merchant to have insufficient cash to fund its high daily remittance, its inability to even apply for reconciliation could lead its account to return an insufficient funds message to the lender, which would trigger a default under the contract and entitle the lender to immediately seek the whole uncollected amount due from the merchant's principal, via the personal guaranty. See ECF 69-2 at 5-6 (§§ 1.13, 3.1). Moreover, while the reconciliation provision purports to be "mandatory," its structure nonetheless vests substantial discretion in GFA to deny reconciliation: the reconciliation provision expressly permits the lender "to request additional documentation such as bank login," and notes that "refusal to provide access shall be a breach" such that the lender "shall have no obligation to reconcile." ECF 69-2 at 4 (§ 1.4). It is readily apparent how the lender could use this contractual right to obtain from the merchant further documentation as a procedural pretext for denying reconciliation.

In any event, drawing back from the aforementioned three factors, which are neither [*22] exclusive nor dispositive, the MCA agreements at issue here have many features that weigh in favor of finding the transactions to be loans, rather than _bona fide_

---

While none of the MCA agreements have definite terms spelled out in the texts of those contracts, the expected

duration of the repayment period is readily calculable, since the merchant's total repayment amount due is known, as is the daily remittance amount. While that remittance is subject to reconciliation, and thus to extension of the loan term, "the contingent nature of [potential future payments] [do not] remove the loan from the scrutiny of the usury law." _Adar Bays, 37 N.Y.3d at 338._

purchases of receivables, because they operate to prevent GFA from taking on the risk of shortfalls in the merchants' receivables. See *Endico Potatoes, Inc., 67 F.3d at 1069*. And New York courts have found that many of these features weigh in favor of finding MCA transactions to constitute loans subject to the usury laws. For instance, the daily remittance amounts described in the MCA agreements and alleged to have been negotiated are fixed dollar amounts, and the Complaint adequately alleges that these amounts appear not to be good faith estimates of the merchant's receivables. See *Davis, 194 A.D.3d at 517*. Nor does any MCA agreement identify particular revenues or accounts that were supposedly purchased, so there is no transfer of "risk of nonpayment by any specific customer." *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC, 37 N.Y.3d 591, 609 n. 2, 163 N.Y.S.3d 467, 183 N.E.3d 1185 (2021)* (Wilson, J. dissenting). Moreover, the MCA agreements leave merchants with the responsibility to collect revenues from all their accounts, and merchants may possess and use those revenues so long as the daily remittances are made. All these features of the MCA agreements are more consistent with an "intent to [*23] borrow" a fixed sum through a loan rather than an intent to purchase specified receivables of an independent business. *Adar Bays, 37 N.Y.3d at 334*.

The repayment and remedy terms of the MCA agreements also operate in a manner more akin to a standard, high interest-rate loan than to a genuine transfer of the risks associated with specified receivables. For instance, they provide that a merchant defaults on the MCA agreement if its bank rejects the automated debit for one of those remittances without the merchant having provided prior notice. *HN7*[⬆] This default then entitles the lender to immediate repayment of the full amount of the transaction outstanding. See *Davis, 194 A.D.3d at 517*. And should a merchant default and the lender be unable to recover the outstanding balance from the merchant's bank accounts, the MCA agreements entitle the lender to obtain full repayment from the merchant's principal, via the personal guaranty. See id. Finally, GFA's risks of nonpayment are further mitigated by the MCA agreements' provisions permitting GFA to use the Connecticut confession of judgment process, including the incorporation of a waiver permitting the lender to issue a writ of attachment on the merchant's accounts and assets without a judicial [*24] hearing. See *LG Funding, 181 A.D. 3d at 666*. Together, "[t]hese provisions suggest that the plaintiff did not assume the risk that [merchants] would have less-than-expected or

no revenues." Id.

Considering all of these factors, as well as the factual questions raised concerning the defendants' alleged usurious intent, the Court concludes that the Complaint has adequately pled that the MCA agreements at issue here function as loans. Because the transactions should be treated as loans, at least at this juncture, and because defendants do not dispute that the implied interest rates on these transactions far exceed 50% per annum (twice the New York State criminal usury rate), the Court holds that the Complaint has adequately pled that the debts created by the MCA agreements that the defendants issue are unenforceable, "unlawful debts" under the RICO statute. Since this was the only element of the RICO claim that defendants challenged on this motion, the Court's conclusion that the transactions amount to loans is sufficient to deny the prong of the motion concerning the RICO claim for collection of unlawful debts.

2. Pattern of Wire Fraud

In the alternative, the Complaint pleads a RICO claim predicated on a patter of racketeering [*25] activity, to wit, wire fraud. Plaintiffs allege that two types of activities described in the Complaint amount to wire fraud: (i) the use of email to transmit agreements that misrepresent the nature of the fees they were charging, and (ii) the use of ACH withdrawals, including through use of misleading names, to extract unrecorded payments or payments after merchants blocked access to their accounts. See Opp. 18. For the reasons explained below, the Court concludes that only the second allegation adequately pleads a pattern of wire fraud sufficient to support a RICO claim.

*HN8*[⬆] Pleading a RICO claim based on a pattern of racketeering activity requires alleging "(1) at least two predicate acts of racketeering occurring within a ten-year period; (2) that these predicate acts are related to each other; and (3) that these predicate acts amount to or pose a threat of continuing criminal activity." *Related Companies, L.P. v. Ruthling, 2017 U.S. Dist. LEXIS 207857, 2017 WL 6507759, at *18 (S.D.N.Y. Dec. 18, 2017)*. Defendants contend the wire fraud allegations are not pled with particularity and that there is no adequate continuity of the alleged fraud.

Plaintiffs' first theory of wire fraud is that defendants charge exorbitant fees for "underwriting" and "ACH setup" that far exceed any actually incurred expenses. [*26] However, the MCA agreements disclose the amounts of these fees. See ECF 69-2 at 9.

2022 U.S. Dist. LEXIS 112768, *26

While they are plainly exorbitant and do not reflect real costs, they are disclosed. Plaintiffs provide no authority that charging excessive but disclosed fees pursuant to a contract amounts to wire fraud. To the extent that plaintiffs allege that no services were actually performed in exchange for these fees, or that the work performed materially differed from the descriptions in the fee schedule, plaintiffs' complaints sound in breach of contract, not fraud.[6] Accordingly, this theory is not a viable basis for a RICO claim.

However, the Complaint also alleges that GoFund Advance made ACH withdrawals from Haymount's account (after Haymount attempted to block further withdrawals) by using misleading names to evade the blocks. See FAC ¶¶ 180-186. As discussed further in Section II.D *infra*, this allegation just barely clears the *Rule 9(b)* barrier for pleading fraud claims with particularity.

That still leaves the issue of continuity. The several "attacks" on Haymount's bank account are isolated and close in time, so there is no closed-end continuity. See *DeFalco v. Bernas, 244 F.3d 306, 321 (2d Cir. 2001)* (the Second Circuit has not recently upheld closed end continuity [*27] where acts occurred over a period of less than two years). Moreover, the tactic of using deceptive party names to evade blocks on ACH withdrawals is only alleged in relation to Haymount, not Indigo. See FAC ¶¶ 306-307.

However, the Complaint has, just barely, alleged that open-ended continuity applies to the second variant of the wire fraud theory. HN9[⬆] "A party may establish open-ended continuity by alleging predicate acts occurring over a short period of time so long as there is a threat that such conduct will recur in the future. The threat that such illegal conduct will recur in the future exists when: (1) a specific threat of repetition exists, (2) the predicates are a regular way of conducting an ongoing legitimate business, or (3) the predicates can be attributed to a defendant operating as part of a long-term association that exists for criminal purposes." Rakoff & Goldstein, RICO: Civil and Criminal Law and Strategy § 1.04[2] (2021). Here, ACH withdrawals are a regular means of collecting on the MCA agreements. Taking the Complaint's allegations as a whole,

specifically including the repeated attempts to debit Haymount's Bank of America account on at least five days spread over [*28] several weeks, see FAC ¶¶ 183-184, and considering these allegations in the light most favorable to the plaintiffs, it is plausible to infer that the alleged RICO enterprise regularly conducted business using these tactics. Accordingly, the Court concludes that the Complaint alleges facts that can support a finding of open-ended continuity, and thus, pleads a claim for a RICO violation predicated on a pattern of wire fraud activity.

### 3. Racketeering Conspiracy

Defendants' only argument against the claim that they engaged in a racketeering conspiracy in violation of *18 U.S.C. § 1962(d)* is derivative of their objections to the substantive RICO claim. Specifically, defendants cite *First Cap. Asset Mgmt., Inc. v. Satinwood, Inc.* for the proposition that a RICO conspiracy claim is properly dismissed where a complaint fails to state a substantive RICO claim. *385 F.3d 159, 182 (2d Cir. 2004)*. However, since the Court has concluded that the substantive RICO claim is adequately pled, there is no reason at this juncture to dismiss the racketeering conspiracy claim.

For these reasons, the Court concludes that the motion to dismiss is denied with respect to the RICO and racketeering conspiracy claims.[7]

### B. *Section 1983*

Plaintiffs allege that defendants have violated [*29] their constitutional right to due process while acting under color of Connecticut state law, all in violation of *42 U.S.C. § 1983*. The complaint alleges that defendants had their attorneys issue writs of attachment on the plaintiffs' bank and medical insurance reimbursement accounts, but that defendants failed to adhere to the statutory requirements for use of this as a form of prejudgment remedy without any court order or procedure. This, plaintiffs claim, violates procedural due process, even considering the creditor-friendly provisions of the Connecticut prejudgment attachment statute.

---

[6] The same is true regarding the allegations that certain remittances were not properly credited to Haymount's accounts. This may be a breach of contract, but the Complaint does not sufficiently allege that this constitutes a fraud, let alone a pattern of fraud.

[7] However, as explained above, the plaintiffs are precluded from proceeding on the aspect of the wire fraud prong of the substantive RICO claim concerning the allegedly excessive fees that were, nevertheless, disclosed, and this limitation applies to the conspiracy claim as well.

2022 U.S. Dist. LEXIS 112768, *29

Defendants move to dismiss this claim, contending that the MCA agreements contained valid waivers permitting their attorneys to issue writs, without any court process, and thereby freeze the merchants' accounts. Defendants argue, therefore, that plaintiffs have waived any due process objections they now make to their use of this procedure. Defendants further contend that if there were procedural deficiencies or other issues with their use of the pre-judgment remedy, then plaintiffs should have raised those issues in Connecticut court, not made them the basis of a federal constitutional claim. However, taking the plaintiffs' [*30] allegations as true, the Court concludes that the complaint states a claim under *section 1983*.[8]

Connecticut's prejudgment attachment statute provides, in relevant part:

> In an action upon a commercial transaction, ... wherein the defendant has waived his right to a notice and hearing..., the attorney for the plaintiff shall issue the writ for a prejudgment remedy without securing a court order provided that (1) the complaint shall set forth a copy of the waiver; (2) the plaintiff shall file an affidavit sworn to by the

plaintiff or any competent affiant setting forth a statement of facts sufficient to show that there is probable cause that a [net] judgment in the amount of [or greater than] the prejudgment remedy sought, ... will be rendered in the matter in favor of the plaintiff; and (3) the plaintiff shall include in the process served on the defendant a notice satisfying the requirements of [another provision].

*Conn. Gen. Stat. Ann. § 52-278f*. According to the Complaint, the Connecticut judiciary also publishes a practice guide explaining in more details the three procedural requirements for issuing a writ pursuant to a waiver. See FAC § 323. As the defendants contend, the MCA agreements contain boilerplate language [*31] designed to operate as a waiver of judicial process, see, e.g., ECF 69-3 at 7, § 4.13, and so defendants appear eligible to use this prejudgment remedy provision without notice and hearing. Plaintiffs respond that, to the extent the relevant provisions of the MCA agreements would operate as a waiver of due process requirements, their purported waiver was neither knowing nor intentional, since the provisions were buried in a dense, adhesive contract. See FAC ¶¶ 9, 319, 330-331. But the Court need not address, at this juncture, whether the waiver was valid, because the Complaint adequately alleges that the defendants failed to follow any of the procedural requirements set forth in *section 52-278f*.

Specifically, the Complaint alleges that defendants did not draft -- or at least did not serve on plaintiffs or their bank -- a complaint, a supporting factual affidavit, or the statutorily required notice. FAC ¶ 325. Instead, defendants allegedly have a practice of serving writs directly on a financial institution, and even those papers served on the banks do not include either a complaint or an sworn affidavit. ¶¶ 328-329. Rather than an orderly processed linked to a meritorious lawsuit, as the statute envisions, [*32] plaintiffs allege that defendants "first freeze the merchant's bank accounts by serving writs of attachment on the bank only, and then immediately demand a settlement under duress and the threat of financial ruin." FAC ¶ 326. The inference that defendants have abused Connecticut's prejudgment remedy is also supported by the allegation that, at least in the case of a writ served on plaintiff Indigo's bank, defendants have never "provided a copy of the complaint or the supporting affidavit ... despite numerous requests by Indigo's counsel." FAC ¶ 329.

Treating the Complaint's allegations as true, as required on a motion to dismiss, the Court concludes that neither defendants' substantive nor their procedural argument is

---

[8] Although they are private parties, defendants do not challenge that the Complaint adequately alleges that they acted "under color of state law" and with a sufficient nexus to state action in their allegedly unlawful use of the prejudgment attachment statute. *HN10*[↑] In any event, the Supreme Court has repeatedly explained that *section 1983* liability may lie for either abusive use of a prejudgment attachment statute or knowing or reckless use of an unconstitutional prejudgment remedy where the alleged deprivation was caused by the exercise of a power created by the state and the party charged with the deprivation is a person who "he is a state official, because he has acted together with or has obtained significant aid from state officials, or because his conduct is otherwise chargeable to the State." *Lugar v. Edmondson Oil Co., 457 U.S. 922, 937, 102 S. Ct. 2744, 73 L. Ed. 2d 482 (1982)*. See also, e.g., *Connecticut v. Doehr, 501 U.S. 1, 111 S. Ct. 2105, 115 L. Ed. 2d 1 (1991)*; *North Georgia Finishing, Inc. v. Di-Chem, Inc., 419 U.S. 601, 95 S. Ct. 719, 42 L. Ed. 2d 751 (1975)*. Attorneys employing a confession of judgment statute to attach private property without notice or hearing may be treated as state actors, because they "enlist[] the compulsive powers of the state to seize property by executing on a judgment without pre-deprivation notice or hearing [and so they] act[] under color of law." *Jordan v. Fox, Rothschild, O'Brien & Frankel, 20 F.3d 1250, 1267 (3d Cir. 1994)*. Here, the writs of attachment purported to be issued in aid of a pending lawsuit, and so the banks froze the plaintiffs' accounts because the writs purported to "use the state's power of legal compulsion to deprive another of property." Id.

availing. Substantively, the allegations that defendants routinely fail to follow _§ 52-278f_'s procedural requirements undercut defendants' position that their conduct comports with due process. **HN11**[↑] It is a constitutionally delicate matter for a state to permit a private party's attorney to issue writs of attachment purportedly in aid of pending litigation but without any judicial supervision and without proper notice or hearing. See, e.g., _Doehr, 501 U.S. at 9-10_. _Section 52-278f_'s procedural safeguards, which defendants [*33] are alleged to have flagrantly ignored, are therefore crucial to a private entity's lawful use of the statute, assuming _arguendo_ that the statute is constitutional if properly employed. **HN12**[↑] The mere fact that the plaintiffs waived their rights to a pre-deprivation hearing does not inoculate defendants from _section 1983_ liability where they employ the prejudgment attachment statute maliciously, that is, where they pursue a purportedly "lawful end by ... intentionally unlawful means." _Pinsky v. Duncan, 79 F.3d 306, 313 (2d Cir. 1996)_. The Complaint has therefore adequately alleged that defendants employ attorneys who act under the color of state law to deprive the plaintiffs of property without due process of law.

Defendants' procedural objection -- that the plaintiffs should have raised these complaints in Connecticut state court "where the underlying litigation was filed" -- is also unavailing. Although Connecticut law provides a procedure by which a properly obtained prejudgment remedy may be modified or vacated, _see Conn. Gen. Stat. Ann. § 52-278k_, the Complaint alleges that defendants issue their writs without ever commencing actions in state court. FAC ¶ 9. Indeed, defendants have not identified that they ever "filed" any "underlying litigation[s]" in Connecticut in which [*34] the plaintiffs could have raised the issues of which they complain. **HN13**[↑] But, in any event, it is well established that litigants challenging an allegedly unconstitutional prejudgment remedy may seek relief in a federal court under _section 1983_, even if there is a pending state court action associated with the prejudgment remedy. See, e.g., _Pinsky, 79 F.3d at 308_.

The Court therefore concludes that none of defendants' arguments justifies dismissing the _section 1983_ claim.

**C. Declaratory Judgment**

The Complaint pleads a single declaratory judgment count that nonetheless seeks two distinct declarations. First, plaintiffs ask the Court to declare that the MCA

agreements were void _ab initio_, because they function as criminally usurious loans. However, as explained below, New York law prohibits corporations from seeking affirmative relief in this manner, so this aspect of the claim is precluded. Second, Indigo and Turrentine seek a declaration invalidating the settlement agreement they consummated with GoFund Advance is void because it was obtained under economic duress and by circumventing plaintiff's counsel. None of defendants' arguments justify dismissal of this aspect of the claim.

In sum, the declaratory judgment claim is dismissed against [*35] all defendants except GoFund Advance, which is the only one of the defendants that is party to the Indigo settlement.

1. _MCA Agreements_

**HN14**[↑] The New York usury statute prohibits corporations from interposing a defense of usury to an action to collect a debt except insofar as the rate of interest exceeds the criminal usury rate of 25% per annum, set out in _Penal Code § 190.40_. _N.Y. Gen. Oblig. L. § 5-521_. Where the interest rate exceeds the criminal usury rate, a corporation may interpose an affirmative defense of usury and, if successful, obtain a declaration that invalidates the debt instrument _ab initio_. See _Adar Bays, 37 N.Y.3d at 333_. However, New York courts have uniformly construed this statute as limited to the affirmative defense, and they have prohibited corporations from bringing affirmative claims or counterclaims alleging criminal usury and seeking to invalidate an agreement. See, e.g., _Paycation Travel, Inc. v. Glob. Merch. Cash, Inc., 192 A.D.3d 1040, 1041, 141 N.Y.S.3d 319 (2d Dep't 2021)_; _LG Funding, 181 A.D.3d at 666-67_; _Intima-Eighteen, Inc. v. A.H. Schreiber Co., 172 A.D.2d 456, 457, 568 N.Y.S.2d 802 (1st Dep't 1991)_. Plaintiffs present no countervailing case law suggesting that they can seek affirmative relief under the New York usury statute.

Therefore, the Court dismisses the declaratory judgment count insofar as it seeks a declaration that the MCA agreements are void _ab initio_.

2. _Indigo Settlement_

As explained above, Indigo alleges that its accounts and assets were the subject [*36] of UCC lien notices sent by defendants seeking to collect on the outstanding MCA agreements. FCA ¶¶ 278-288. During negotiations over those liens, defendants allegedly induced and, while this case was pending, allegedly got Indigo to sign

2022 U.S. Dist. LEXIS 112768, *36

a settlement agreement in which it paid $4,000 to settle claims of $33,000 and thereby had the liens withdrawn. ¶¶ 278-288; ECF 69-9. Plaintiffs seek a declaratory judgment that the settlement is void because it was obtained under economic duress and by circumventing Indigo's counsel. Defendants move for dismissal of this claim, arguing that the Indigo principal stated that he consulted with a different lawyer and that there was no wrongful threat.

Parties seeking to void a settlement agreement releasing claims face a steep climb. *HN15*[↑] "It is well established under New York law that a valid release which is clear and unambiguous on its face and which is knowingly and voluntarily entered into will be enforced as a private agreement between parties." *Berman v. Parco*, 986 F.Supp. 195, 208 (S.D.N.Y. 1997).[9] A release of claims in a settlement agreement is therefore "binding on the parties absent a showing of fraud, duress, undue influence, or some other valid legal defense." *Davis & Assocs., Inc. v. Health Mgmt. Servs., Inc., 168 F. Supp. 2d 109, 113 (S.D.N.Y. 2001)* (Lynch, J.).

With regard to the issue of whether defendants circumvented Indigo's counsel in obtaining its agreement to the settlement, defendants argue that a representative was told that Turrentine consulted with an attorney other than his counsel in this litigation.[10]

---

[9] The Indigo settlement agreement does not specify which state's law governs its terms, and neither party addressed this issue. See generally ECF 69-9. But the Court need not decide the choice of law issue at this juncture. The potentially relevant grounds for voiding the settlement -- undue influence and duress -- are similar under both New York law (which might apply because the settled claims arose from an MCA agreement that specified New York law, see ECF 69-8 at 6 (¶ 4.5)) and Connecticut law (which might be relevant because the settlement could be read to settle litigation supposedly pending in Stamford, Connecticut), see ECF 69-9 at 2. See [*37] also *Doherty v. Sullivan, 29 Conn. App. 736, 618 A.2d 56, 59 (Conn. App. 1992)* ("Our law has long been clear that a 'compromise agreement ... if free from fraud, mistake or undue influence ... is conclusive between the parties.'") (quoting *Azzolina v. Sons of Italy, 119 Conn. 681, 179 A. 201, 204 (1935)*)). The Court therefore assumes without deciding that the Indigo settlement agreement is governed by New York law.

[10] In response, defendants submitted an affidavit attaching a text message exchange between a GoFund Advance representative and Turrentine. See ECF 77-1. But defendants have offered no authority for why these communications,

Even if this assertion were cognizable on a motion to dismiss, it still might not justify dismissal, because the complaint and its supporting materials clearly allege that the defendants' counsel sought to negotiate and consummate the settlement directly with Indigo, knowing that Indigo was represented and despite efforts by Indigo's counsel to intervene.[11] The principal evidence on the issue of circumvention is an email chain attached to the Complaint that indicates that defendants' counsel (not the attorney of record in this litigation) was advising defendants with respect to the settlement agreement and caused a representative of his clients to contact Indigo with a proposed settlement and release document. See ECF 22-11. Plaintiffs allege that this conduct violated Rule 4.2(b) of the New York Rules of Professional Conduct, which states in part:

> [A] lawyer may cause a client to communicate with a represented person unless the represented person is not legally competent, and may counsel [*38] the client with respect to those communications, provided the lawyer gives reasonable advance notice to the represented person's counsel that such communications will be taking place.

*22 NYCRR 1200.0* (Rule 4.2(b)). In this posture, there is no evidence that any advance notice to counsel was ever provided. And plaintiffs assert, without any dispute from defendants, that the New York Rules apply to this conduct. Accordingly, the Complaint adequately alleges that the settlement was obtained in circumvention of the N.Y. rules of professional conduct. Defendants never suggest that the settlement would be valid if obtained by an attorney's conduct that violated applicable rules of professional conduct; presumably this conduct might amount to undue influence, though plaintiffs never explain why. But since defendants never raise these legal issues, the Court need not reach the questions of whether the New York Rules apply or whether a settlement obtained in violation of Rule 4.2(b) may be voidable.

Indeed, even if defendants had raised these legal issues regarding circumvention of counsel, the Court would not

---

which are neither integral to the complaint nor incorporated by reference, are cognizable on a motion to dismiss.

[11] Indeed, the text messages submitted by defendants, see n. 10 supra, read in the light most favorable to the plaintiffs, support the inference that the defendants knew that Indigo's counsel in this litigation sought to advise his client on the proposed settlement, which was plainly devised to torpedo the instant lawsuit.

Case 23-78, Document 36, 05/01/2023, 3508267, Page268 of 304

A-561

Case 1:21-cv-11222-ER   Document 40-2   Filed 10/12/22   Page 17 of 19
Page 16 of 18
2022 U.S. Dist. LEXIS 112768, *38

need to decide now whether they could independently justify voiding the settlement, because the second allegation [*39] -- that the settlement was obtained under economic duress -- is effectively unchallenged at this stage. HN16[↑] Under New York law, "[a] release agreement may be voided on the ground of economic duress where the complaining party was compelled to agree to its terms by means of a wrongful threat which precluded the exercise of his free will." *Davis & Assocs., Inc., 168 F. Supp. 2d at 114.* Parties seeking to establish duress from one-sided economic advantage must carry a "heavy burden." *Id.* However, the alleged threats at issue here -- unlawful use of a prejudgment remedy to induce financial paralysis as a means of collecting on a criminally usurious debt -- would almost certainly be wrongful if proven.[12] Defendants have little to say on this issue. Their only response is to conclusively assert that Indigo was not deprived of its free will because, according to the non-cognizable text messages, Turrentine appeared to have had time to consult with an unspecified company attorney before signing the settlement. Mot. 20. But even if there were a procedural basis to consider this fact-dependent contention, it would be irrelevant: the possibility that Turrentine had time to consult a lawyer before signing says nothing about whether the defendants [*40] induced consent to the release through wrongful economic duress by allegedly holding Indigo's bank account ransom with unlawfully issued UCC lien notices.

Since there is no merit to any of defendants' attacks on the aspect of the declaratory judgment claim concerning the Indigo settlement, that prong of the motion is denied. Since GoFund Advance is Indigo and Turrentine's only counterpart in the settlement, this aspect of the claim is irrelevant to the other defendants.[13] Therefore, since New York law does not permit the affirmative relief sought by the aspect of the declaratory judgment claim concerning the validity of the MCA agreements

themselves, the declaratory judgment claim is dismissed against all defendants other than GoFund Advance.

**D. Fraud**

The Complaint also pleads a fraud claim under state law. HN17[↑] In New York, "[t]he elements of a cause of action for fraud [are] a material misrepresentation of a fact, knowledge of its falsity, an intent to induce reliance, justifiable reliance by the plaintiff and damages." *Eurycleia Partners, LP v. Seward & Kissel, LLP, 12 N.Y.3d 553, 559, 910 N.E.2d 976, 883 N.Y.S.2d 147 (2009).* The Complaint's fraud count suggests several theories for how defendants committed fraud, two of which require analysis.[14]

The first theory is based on the allegation [*41] that defendants charged excessive fees purportedly for origination and servicing of the MCA agreements. Specifically, plaintiffs allege that defendants falsely represented that the fees were charged to offset actual fees and costs incurred by the MCA companies, when in fact the companies undertook no meaningful activities for which the fees were charged (e.g., an "underwriting" fee amounting to 12% of the MCA loan amount) or the actual costs involved were much lower than the fees charged (e.g., for ACH setup, which is very fast and cheap but led to a fee of 10% of the MCA loan amount). FAC ¶¶ 292-302.

This theory fails to state a claim for fraud. The allegedly excessive fees arise under a contract, which plainly discloses the existence and amounts of the fees. See FAC ¶ 291. Plaintiffs make no meaningful showing that liability for fraud lies where a business charged excessive fees that are prominently disclosed in the contract. The only authority they cite involves submission and payment of false invoices, a case that is not analogous and does not establish the existence of an actionable misrepresentation here. See *Needham & Co., LLC v. Access Staffing, LLC, 2016 U.S. Dist. LEXIS 111925, 2016 WL 4399288, at *2 (S.D.N.Y. Aug. 12, 2016).*

While plaintiffs sufficiently allege that the fees far exceed the costs [*42] for which they purport to relate, there is no allegation that the actions for which the fees were charged did not occur. For instance, while ACH

---

[12] Indeed, the settlement's reference to a lawsuit supposedly pending in Connecticut state court might justify voiding the settlement for fraud, should it turn out that no such lawsuit ever existed. See ECF 69-9 at 2.

[13] The Court notes, however, that the settlement purports to extend its release to apply to claims against any individuals or "affiliated businesses" associated with GoFund Advance. See ECF 69-9 at 3. Obviously, if the Court declares against GoFund that the settlement is void, none of the other defendants will be heard to argue that they have standing to revive the release as third-party beneficiaries.

---

[14] To the extent that any other theories of fraud lurk in count four of the Complaint, the Court finds that they fail to state a claim.

2022 U.S. Dist. LEXIS 112768, *42

setup does not cost tens of thousands of dollars, the rate was disclosed in the contract, and plaintiffs do not allege that defendants failed to set up ACH payments. And even if that allegation had been made, it would sound in breach of contract, not fraud. HN18[↑] Under New York law, "[t]o maintain a claim of fraud in such a situation, a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as contract damages." *Bridgestone/Firestone, Inc. v. Recovery Credit Servs., Inc., 98 F.3d 13, 20 (2d Cir. 1996)*. Plaintiffs make none of these showings.[15]

The second theory is that defendants committed fraud by extracting unauthorized debits from their bank accounts using misleading names calculated to evade stop payment orders entered by plaintiffs' banks to prevent further ACH withdrawals. FAC ¶¶ 306-307, 180-186. Specifically, the Complaint alleges that "On February 16, 2022, February 18, 2022 and February 23, 2022, GoFund [*43] attempted to bypass its block from debiting from Plaintiff's account by fraudulently debiting $60,000 from the Plaintiff's bank account under the name 'GoFund b' as opposed to 'GoFund.'" FAC ¶ 186. The Court concludes that this suffices to state a claim for fraud against defendant GoFund Advance. However, since any fraud claim must be pled with specificity, *see Fed. R. Civ. P. 9(b)*, and the Complaint's allegations on this point relate to no defendant other than GoFund Advance, the fraud count fails to state a claim as to any of the other defendants.

Since there is no other viable fraud claim pled, the Court will dismiss the fraud count against all defendants other than GoFund Advance.

### III. Conclusion

For the reasons explained above, defendants' motion to dismiss the First Amended Complaint is granted in part and denied in part. The motion is denied with respect to the substantive and conspiratorial RICO claims, although the plaintiffs may not proceed with the aspect of the wire fraud prong of the substantive RICO claim

predicated on allegedly excessive fees that were disclosed in the MCA agreements. The motion is denied with respect to the *section 1983* claim, which survives in its entirety. The declaratory judgment [*44] claim has two parts, one of which -- seeking a declaration that the MCA agreements are void *ab initio* -- is dismissed. The aspect of the declaratory judgment claim concerning the validity of the Indigo settlement survives, but only as against GoFund Advance. Finally, the fraud claim is dismissed against all defendants other than GoFund Advance, and then only the aspect of the claim concerning allegedly fraudulent ACH withdrawals may proceed.

Following argument on the instant motion, the Court stayed discovery and all further proceedings in this case, which was then less than three months from being ready for trial. That stay is now dissolved. The parties are directed to complete a new case management plan, using the template available on the Court's website and inserting a ready-for-trial date three months from the date of this order. The parties shall email this proposed case management plan to Chambers and then initiate a joint phone conference with the Court's law clerk within one week of the entry of this order.

SO ORDERED.

New York, NY

June 27, 2022

/s/ Jed S. Rakoff

JED          S.          RAKOFF,          U.S.D.J.

---

[15] The same conclusion applies to the complaint's suggestion that defendants "failed to properly account for [Haymount's] payments," and various other alleged failures to properly service the MCA agreement. FAC ¶ 305.

A-563

2022 U.S. Dist. LEXIS 112768, *44

**Table1 (**_Return to related document text_**)**

| Contract Date | MCA Entity | Purchase Price | Amount of Purchased Receivables | Stated Percentage of Revenue | Stated Daily Remittance | Implied Interest Rate[3] |
|---|---|---|---|---|---|---|
| 8/25/21 | Merchant Capital | $200,000 | $275,000 | 45% | $7,299 | 263% |
| 8/26/21 | GoFund Advance | $250,000 | $349,750 | 25% | $8,000 | 242% |
| 9/27/21 | GoFund Advance | $150,000 | $224,850 | 25% | $7,500 | 650% |
| 12/16/21 [ *9] | GoFund Advance | $1,000,000 | $1,350,000 | 45% | $35,000 | 319% |
| 12/27/21 | Funding123 | $2,000,000 | $2,998,000 | 45% | $80,000 | 405% |
| 1/20/22 | GoFund Advance | $1,000,000 | $1,499,990 | 45% | $60,000 | 612% |

**Table1 (**_Return to related document text_**)**

---

End of Document

---

[3] As explained, the MCA agreements expressly state that there is no interest rate associated with the contemplated financial transactions. However, the Complaint alleges that there are implied interest rates, based on the total amount borrowed, the total amount to be repaid, and the number of days over which repayment is expected.

A-564

Exhibit C

 Caution
As of: October 12, 2022 7:26 PM Z

## *Lateral Recovery LLC v. Queen Funding, LLC*

United States District Court for the Southern District of New York

July 20, 2022, Decided; July 20, 2022, Filed

21 Civ. 9607 (LGS)

**Reporter**
2022 U.S. Dist. LEXIS 129032 *; 2022 WL 2829913

LATERAL RECOVERY LLC, et al., Plaintiffs, -against-
QUEEN FUNDING, LLC, et al., Defendants.

**Subsequent History:** Appeal filed, 09/01/2022

Later proceeding at *Lateral Recovery, LLC v. Queen Funding, LLC, 2022 U.S. Dist. LEXIS 169206 (S.D.N.Y., Sept. 15, 2022)*

## Core Terms

Merchant, Funding, receivables, alleges, wire fraud, reconciliation, collection, predicate act, lender, loans, conspiracy, fraudulent, event of default, particularity, enterprise, quotation, default, debit, marks, pattern of racketeering activity, motion to dismiss, mail, wire, statute of limitations, indefinite term, interest rate, transactions, borrower's, continuity, provisions

**Counsel:** [*1] For Lateral Recovery, LLC, as assignee of Benchmark Builders, Inc., FTE Networks, Inc, Jus-Com LLC, Focus Wireless, LLC, Plaintiffs: Shane R. Heskin, White & Williams, LLP(Philadelphia), Philadelphia, PA.

For Queen Funding, LLC, Yehuda Klein, Defendants: Jacob Zev Weinstein, LEAD ATTORNEY, Weinstein & Weinstein LLP, Flushing, NY.

**Judges:** LORNA G. SCHOFIELD, UNITED STATES DISTRICT JUDGE.

**Opinion by:** LORNA G. SCHOFIELD

## Opinion

### OPINION AND ORDER

LORNA G. SCHOFIELD, District Judge:

Plaintiffs bring this civil action against Defendants Queen Funding, LLC ("Queen Funding"), Yehuda Klein and John and Jane Doe Investors in Queen Funding who funded its operations. Plaintiffs allege that Queen Funding, which is a merchant cash advance ("MCA") company, Klein and other affiliated investors violated the *Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq.*, by engaging in wire fraud and collecting unlawful debt. Defendants move to dismiss both the RICO substantive claim and the RICO conspiracy claim pursuant to *Federal Rule of Civil Procedure 12(b)(6)*. For the reasons below, Defendants' motion is denied.

### I. BACKGROUND

The following facts are taken from the Complaint and documents attached to, or incorporated by reference in, the Complaint and are construed in the light most favorable to Plaintiffs. See *R.M. Bacon, LLC v. Saint-Gobain Performance Plastics Corp., 959 F.3d 509, 512 (2d Cir. 2020)*.

Plaintiffs include [*2] FTE Networks, Inc., and its three subsidiaries Benchmark Builders, Inc., Jus-Com LLC and Focus Wireless, LLC (collectively, "FTE"). Plaintiff Lateral Recovery LLC is an assignee of FTE's claims pursuant to a foreclosure.

Defendant Queen Funding is an MCA company controlled by Klein that provides funds to small businesses through MCA agreements. Between November 2017 and November 2018, the parties here entered into seven MCA Agreements (the "Merchant Agreements"). Under each Merchant Agreement, Queen Funding purported to purchase a portion of Plaintiffs' receivables in exchange for up-front payments to FTE. The Merchant Agreements specify a purchase price to be paid by Queen Funding, a dollar amount of receivables purchased, the percentage of the

2022 U.S. Dist. LEXIS 129032, *2

merchant's total receivables that the purchase purportedly represents and a daily payment amount to be paid by FTE. FTE's daily payment was debited directly from an FTE bank account. The daily payment amount purported to be a "good-faith estimate of the percentage of receivables purchased" for that month, which in each Merchant Agreement was 13%, regardless of the amount actually purchased. Under the Merchant Agreements, Queen Funding advanced [*3] FTE approximately $6,500,000 in cash but collected about $10,500,000 in daily payments during a two-year period. Each Merchant Agreement had an effective annual interest rate between 100% and 300%.

For example, under the parties' first Merchant Agreement, Queen Funding purchased $149,900 of FTE's receivables for a purchase price of $100,000. Queen Funding actually advanced $95,000 to FTE, which was the purchase price less a fee of $5,000. The amount of receivables purchased purportedly represented 13% of FTE's total receivables, resulting in a daily payment by FTE of $4,999 to be paid over six weeks. FTE's payments in this first Merchant Agreement had an equivalent effective annual interest rate of 300% per annum.

The Merchant Agreements include provisions that grant Defendants the irrevocable right to withdraw money directly from FTE's bank accounts -- including collecting checks and signing invoices in FTE's name -- and that prohibit FTE from transferring, moving or selling the business or any assets without permission from Defendants. The Merchant Agreements also contain numerous default and remedy provisions. One of these states that an "Event of Default" occurs when "the attempted [*4] ACH debit of the [daily payment amount] is rejected two times during the term of [the] Agreement and Merchant does not contact [Queen Funding] in advance of the ACH debit being rejected." The "Protections against Default" provision states that, upon any of the several events of default listed, "the full uncollected Purchase Amount plus all fees due under this Agreement and the attached Security Agreement become due and payable in full immediately." The Merchant Agreements also allow Defendants to collect on the personal guaranty by the borrower's individual owners if Plaintiffs are unable to pay or are bankrupt.

## II. LEGAL STANDARD FOR MOTION TO DISMISS

On a motion to dismiss, a court accepts as true all well-pleaded factual allegations and draws all reasonable inferences in favor of the non-moving party but does not consider "conclusory allegations or legal conclusions couched as factual allegations." *Dixon v. von Blanckensee, 994 F.3d 95, 101 (2d Cir. 2021)* (internal quotation marks omitted). To withstand a motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, 'to state a claim to relief that is plausible on its face.'" *Kaplan v. Lebanese Canadian Bank, SAL, 999 F.3d 842, 854 (2d Cir. 2021)* (quoting *Ashcroft v. Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d 868 (2009)*). "Threadbare recitals of the elements of a cause of action, supported by [*5] mere conclusory statements, do not suffice." *Iqbal, 556 U.S. at 678*; *accord Dane v. UnitedHealthcare Ins. Co., 974 F.3d 183, 189 (2d Cir. 2020)*. It is not enough for a plaintiff to allege facts that are consistent with liability; the complaint must "nudge[] [plaintiff's] claims across the line from conceivable to plausible." *Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*; *accord Bensch v. Est. of Umar, 2 F.4th 70, 80 (2d Cir. 2021)*. To survive dismissal, "plaintiffs must provide the grounds upon which [their] claim rests through factual allegations sufficient to raise a right to relief above the speculative level." *Rich v. Fox News Network, LLC, 939 F.3d 112, 121 (2d Cir. 2019)* (alteration in original) (internal quotation marks omitted).

## III. DISCUSSION

### A. RICO Legal Standard

To state a civil RICO claim under *18 U.S.C. § 1964*, a complaint must plead (1) "that the individual defendants committed a substantive RICO violation" and (2) "that the violation proximately caused an injury to [the plaintiffs'] business or property." *NRP Holdings LLC v. City of Buffalo, 916 F.3d 177, 196 (2d Cir. 2019)*; *see also 18 U.S.C. § 1964(c)* (providing a private right of action for persons injured "by reason of" a substantive RICO violation). To plead a substantive RICO violation, a complaint must allege that the defendant engaged in "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" or "through . . . collection of unlawful debt." *18 U.S.C. § 1962(c)*; *Cruz v. FXDirectDealer, LLC, 720 F.3d 115, 120 n.1 (2d Cir. 2013)* (quoting *DeFalco v. Bernas, 244 F.3d 286, 306 (2d Cir. 2001)*); *Sonterra Cap. Master Fund, Ltd. v. Barclays Bank PLC, 366 F. Supp. 3d 516, 554 (S.D.N.Y. 2018)*. "Racketeering activity," for purposes of RICO, includes "any 'act' indictable [*6] under various specified federal statutes, including the mail and wire

2022 U.S. Dist. LEXIS 129032, *6

fraud statutes . . . ." *Kim v. Kimm, 884 F.3d 98, 103 (2d Cir. 2018)* (citing *18 U.S.C. § 1961(1)*). A RICO claim must allege every essential element of each predicate act. *See, e.g., Lundy v. Cath. Health Sys. of Long Island Inc., 711 F.3d 106, 119 (2d Cir. 2013)* (dismissing a RICO claim where the complaint failed to plead predicate acts of mail fraud with particularity).

Conspiracy to violate *§ 1962(c)* is also actionable under *§ 1964. See 18 U.S.C. §§ 1962(d), 1964*. To state a RICO conspiracy, a plaintiff must allege "the existence of an agreement to violate RICO's substantive provisions." *Williams v. Affinion Grp., LLC, 889 F.3d 116, 124 (2d Cir. 2018)* (internal quotation marks omitted). If a complaint fails to state a substantive RICO claim, it also does not state a claim for RICO conspiracy. *See Discon, Inc. v. NYNEX Corp., 93 F.3d 1055, 1064 (2d Cir. 1996), vacated on other grounds, 525 U.S. 128, 119 S. Ct. 493, 142 L. Ed. 2d 510 (1998); Nygård v. Bacon, No. 19 Civ. 1559, 2021 U.S. Dist. LEXIS 157972, 2021 WL 3721347 at *3 (S.D.N.Y. Aug. 20, 2021)*. The Complaint alleges a violation of RICO and a RICO conspiracy under two independent theories of (1) a pattern of racketeering activity based on wire fraud and (2) the collection of unlawful debt.

**B. Pattern of Racketeering Activity -- Wire Fraud**

**1. Wire Fraud**

Defendants argue that the Complaint fails to plead with particularity a RICO predicate act of wire fraud. This argument is incorrect; the Complaint pleads wire fraud with particularity.

Under RICO, wire fraud is one of the predicate offenses that constitute "racketeering activity." [*7] *18 U.S.C. 1961(1)*. "The essential elements of [mail and wire fraud] are (1) a scheme to defraud, (2) money or property as the object of the scheme, and (3) use of [interstate] mails or wires to further the scheme." *United States v. Weaver, 860 F.3d 90, 94 (2d Cir. 2017)* (internal quotation marks omitted) (second alteration added); *see 18 U.S.C. § 1343*. Where an alleged predicate act sounds in fraud, such as wire fraud, the plaintiff "must state with particularity the circumstances constituting fraud or mistake." *Lundy, 711 F.3d at 119* (regarding pleading standard for predicate act of mail fraud for RICO claim) (quoting *Fed. R. Civ. P. 9(b)*); *accord Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., 531 F. Supp. 3d 673, 726 (S.D.N.Y.*

*Mar. 31, 2021)*. "The complaint must detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams, 889 F.3d at 124*. "Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally." *Fed. R. Civ. P. 9(b)*; *see Setzer v. Omega Healthcare Invs., Inc., 968 F.3d 204, 212 (2d Cir. 2020)*.

The Complaint alleges facts with sufficient particularity for the underlying wire fraud claim. The Complaint alleges that the seven Merchant Agreements contain the following false statements: "(1) the transaction is not a loan, (2) the daily payment is a good-faith estimate of the merchant's receivables, (3) the fixed daily payment is for the merchant's convenience, [*8] (4) that the automated ACH program is labor intensive and is not an automated process, requiring the MCA company to charge an exorbitant ACH Program Fee or Origination Fee." The Complaint alleges how each misstatement was false: (1) that the transactions were loans because, notwithstanding the reconciliation provision, the Merchant Agreements required fixed daily payments, a security interest in all of FTE's receivables, and the personal guarantee of the individual owners and because the agreements relied on the creditworthiness of FTE rather than its customers who owed the receivables, among other reasons; (2) that FTE's required daily payments represented a specified percentage of a good-faith estimate of its monthly receivables purchased is belied by the Merchant Agreements themselves, all of which specify a percentage of 13% even though the amount of receivables purchased varied dramatically from $149,900 to $2,848,100 and the daily payments ranged from $4,999 to $49,900; (3) that FTE's required daily payments were not for the convenience of FTE but instead were to ensure that Defendants were paid and would not have to bear the risk of the creditworthiness of the purchased receivables [*9] and (4) "[w]hile the Origination Fee and ACH Program Fee purportedly related to the costs of due diligence and withdrawing the Daily Payments, Queen Funding performed little or no due diligence, and the actual costs of the ACH withdrawals were a fraction of the fee."

The false statements are alleged with particularity. A complaint alleging acts of mail and wire fraud are generally required to "detail the specific statements that are false or fraudulent, identify the speaker, state when and where the statements were made, and explain why the statements were fraudulent." *Williams, 889 F.3d at 124*. Here, the allegedly false statements are contained

Page 4 of 8

2022 U.S. Dist. LEXIS 129032, *9

in the seven Merchant Agreements, which are incorporated in the Complaint. The Complaint also alleges with particularity what role each Defendant played in the RICO scheme.

The Complaint also sufficiently alleges use of interstate wires. "Use of wire" includes email communication and wire transfer of money. *See United States v. Percoco, 13 F.4th 158, 174 (2d Cir. 2021)* (email); *United States v. Vilar, 729 F.3d 62, 95 (2d Cir. 2013)* (wire transfer of money); *18 U.S.C. § 1343.* The Complaint alleges that Defendants used emails to "originate, underwrite, service and collect upon the Agreements," which contained the false statements. Defendants also allegedly collected amounts due under the Agreements [*10] via interstate electronic ACH debits. Use of wires is sufficiently pleaded as are the remaining elements of the predicate act of wire fraud.

### 2. Pattern of Racketeering Activity

The Complaint alleges sufficient facts to show a pattern of racketeering activity based on continuity of the alleged enterprise. "The plaintiff must plead at least two predicate acts . . . and must show that the predicate acts are related and that they amount to, or pose a threat of, continuing criminal activity." *GICC Cap. Corp. v. Tech. Fin. Grp., Inc., 67 F.3d 463, 465 (2d Cir. 1995)* (citing *§ 1961(5)* and *H.J. Inc. v. Nw. Bell Tel. Co., 492 U.S. 229, 239, 109 S. Ct. 2893, 106 L. Ed. 2d 195 (1989)*); *accord Haymount Urgent Care PC v. GoFund Advance, LLC, No. 22 Civ. 1245, 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *9 (SDNY June 27, 2022).* RICO targets conduct that "amount[s] to or pose[s] a threat of continued criminal activity," which may be closed- or open-ended. *Reich v. Lopez, 858 F.3d 55, 60 (2d Cir. 2017)* (quoting *H.J. Inc., 492 U.S. at 239*) (alteration in original). "Criminal activity that occurred over a long period of time in the past has closed-ended continuity . . . ." *Lopez, 858 F.3d at 60* (quoting *H.J. Inc., 492 U.S. at 242*). The Second Circuit generally requires the predicate acts to have extended over at least two years. *Lopez, 858 F.3d at 60* (citing *Spool v. World Child Int'l Adoption Agency, 520 F.3d 178, 184 (2d Cir. 2008)*). The continuity requirement applies only to the pattern of racketeering activity for wire fraud and not unlawful debt. *See United States v. Grote, 961 F.3d 105, 119 (2d Cir. 2020)* ("RICO offenses may be predicated on a single instance of collection of an unlawful debt . . . .").

The Complaint sufficiently alleges closed-ended

continuity of [*11] the enterprise. The Complaint alleges not only that Defendants defrauded Plaintiffs through a series of fraudulent Merchant Agreements, but also that such practices were part of a regular way of operating their business. Defendants entered into seven different Merchant Agreements with Plaintiffs over the course of two years, which sufficiently alleges closed-ended continuity and a pattern of racketeering activity. The ACH withdrawals, which also serve as the basis for the predicate of wire fraud, were a "regular means of collecting on the [Merchant Agreements]." *Haymount Urgent Care PC, 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *9.* The Complaint sufficiently alleges a violation of RICO predicated on a pattern of wire fraud activity.

### C. Unlawful Debt

Defendants argue that the RICO claim cannot be based on the collection of an unlawful debt because that there was no unlawful debt. This argument is unpersuasive because the Complaint sufficiently alleges an unlawful debt.

RICO defines "unlawful debt" as a debt (A) "which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury," and (B) "which was incurred in connection with . . . the business of lending money or a thing of value at a [*12] rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate . . . ." *18 U.S.C. § 1961(6).*

"Usury laws apply only to loans or forbearances, not investments. If the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Seidel v. 18 E. 17th St. Owners, 79 N.Y.2d 735, 598 N.E.2d 7, 11-12, 586 N.Y.S.2d 240 (N.Y. 1992)* (citation omitted) (internal quotation marks omitted). Under New York law, "[w]hen determining whether a transaction is a loan, substance - - not form -- controls." *Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 621-22 (N.Y. 2021).* Courts must examine whether the plaintiff "is absolutely entitled to repayment under all circumstances" and the "principal sum advanced is repayable absolutely." *See LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309, 312 (2d Dep't 2020).*

Put differently, when determining whether a transaction was a true sale of receivables or a loan, "[t]he root of

2022 U.S. Dist. LEXIS 129032, *12

[the analysis] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)*; *accord Haymount Urgent Care PC, 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *6*. Courts have considered, among others, the following three factors to analyze who bears the ultimate risk that the borrower's customers will not pay: **[*13]** (1) whether there is a reconciliation provision; (2) whether the agreement has an indefinite term and (3) whether the lender has any recourse should the merchant declare bankruptcy. *See LG Funding, 122 N.Y.S.3d at 312*; *see, e.g., Davis v. Richmond Cap. Grp., LLC, 194 A.D.3d 516, 150 N.Y.S.3d 2, 5 (1st Dep't 2021)* (holding the RICO claim based on unlawful debt was sufficiently alleged based on allegations that "defendants refused to permit reconciliation, the selection of daily payment rates that did not appear to represent a good faith estimate of receivables, provisions making rejection of an automated debit on two or three occasions without prior notice an event of default entitling defendants to immediate repayment of the full uncollected purchased amount, and provisions authorizing defendants to collect on the personal guaranty in the event of plaintiff business's inability to pay or bankruptcy"); *Haymount Urgent Care PC, 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *7* (same on a motion to dismiss). The issue is "ultimately about whether the transaction represented a real transfer of risk . . . so the economic substance of the transaction was a loan, not a purchase of receivables." *Id.; see Fleetwood Servs., LLC v. Ram Cap. Funding, LLC, No. 20 Civ. 5120, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *10 (S.D.N.Y. June 6, 2022)* (holding in a summary judgment motion that the three *LG Funding* factors and other considerations suggested that the purchase of receivables in reality constituted a loan).[1]

---

[1] On June 8, 2022, Plaintiffs filed a notice of supplemental authority and attached the opinion in *Fleetwood Services, LLC v. Ram Capital Funding, LLC, No. 20 Civ. 5120, 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207 (S.D.N.Y. June 6, 2022)*. Defendants moved to strike based on **Federal Rule of Appellate Procedure 28(j)**, arguing that the notice is irrelevant. The motion to strike is denied as the decision is relevant to the legal issues in this case.

## 1. Reconciliation [*14] Provision

The Complaint's alleged facts are sufficient to plead that the transactions between FTE and Queen Funding were loans. The first *LG Funding* factor is whether there is a reconciliation provision. By its terms, the reconciliation provision in the Merchant Agreements is to ensure that the sum of FTE's daily payments to Queen Funding in any given month actually is 13% of its monthly receipts. In theory, the presence of such a provision would suggest that the transaction is not a loan, but rather a purchase where Queen Funding bears the risk of loss if receivables are not paid.

Here, the Complaint sufficiently and plausibly alleges that the reconciliation provision was a "sham." First, Defendants "do[] not have a reconciliation department, do[] not perform reconciliations, and [have] never refunded a merchant money as required under their sham reconciliation provision."

Second, the Merchant Agreements by their terms do not to require a reconciliation. The Merchant Agreement contains a provision that permits the merchant to request Queen Funding to reconcile the daily payment amount going forward to more closely reflect the agreed upon 13%.[2] The "Addendum to Secured Merchant Agreement" further [*15] provides that the merchant may request a reconciliation to ensure that the amount FTE actually paid for a prior month is 13% of its actual receipts.[3] In each case, any obligation that Queen

---

[2] Paragraph 1.4 of the Merchant Agreement states: "The Specific Amount is intended to represent the Specified Percentage of Merchant's Receipts each calendar month. At any time, [Queen Funding] may adjust the Specific Amount so that the amount received by [Queen Funding] in the future more closely represents the Specified Percentage. Also, once each calendar month Merchant may request that [Queen Funding] reconcile Merchant's actual receipts and adjust the Specific Amount so that the amount received by [Queen Funding] in the future more closely represents the Specified Percentage. Upon receipt of a written reconciliation request from Merchant, [Queen Funding] may request any and all information from Merchant that [Queen Funding], in its sole judgment, believes is necessary to accurately reconcile the amount [Queen Funding] has received from Merchant with the actual Specified Percentage. [Queen Funding] shall not be required to adjust the Specific Amount until such time as it has received all such requested information."

[3] Paragraph c. states: "At the Merchant's option, within five (5) business [sic] following the end of a calendar month, the Merchant may request a reconciliation to take place, whereby Queen Funding may ensure that the cumulative amount

2022 U.S. Dist. LEXIS 129032, *15

Funding may have is contingent on the merchant's providing documentation requested by Queen Funding "in its sole judgment" and in its "sole and absolute discretion," respectively. Queen Funding consequently has the absolute ability to nullify any obligation to reconcile.

Moreover, the Addendum expressly states that Queen Funding has no obligation to reconcile any past payments in excess of the 13% and describes the potential reconciliation as "a courtesy, and that Queen Funding is under no obligation to provide same." The Addendum goes on to emphasize that "if the Merchant fails to furnish the requested documentation within five (5) business days following the end of a calendar month, then Queen Funding shall not effectuate the reconciliation discussed above."

## 2. Indefinite Term

The *LG Funding* second factor is whether the Merchant Agreements have an indefinite term. A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed [*16] the risk associated with the receivables not being collectable. *See Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9* ("If the term is indefinite, then it is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.") (internal quotation marks omitted). The Master Agreement provides for a seemingly indefinite term, in stating that the merchant must continue to pay the daily amount until it has fully paid the amount of receivables that Queen Funding purportedly purchased -- i.e., the amount FTE owes for the cash advance. However, a de facto fixed term plausibly exists. The period of payment can be easily calculated by dividing the amount FTE owes by the amount of daily payments. A failure to pay will not indefinitely extend the term because the Merchant agreement provides that a default will occur if two daily payments are not made during the term of the agreement and the merchant does not contact Queen

Funding in advance. Upon an event of Default, Queen Funding has the right to exercise all remedies in connection with the Agreement, including accelerating the debt and collect the entire amount owed, enforcing its security interest in the collateral (i.e., all of FTE's receivables) [*17] and enforcing the guarantee.

## 3. Lender Recourse in an Event of Bankruptcy

The third *LG Funding* factor is whether the lender has recourse should the merchant declare bankruptcy. If the merchant's bankruptcy triggers a default, this factor would weigh in favor of finding the agreement to be a loan because it would suggest that the lender has not assumed the risk of loss of not collecting on the receivables but instead is relying on the creditworthiness of the borrower to be repaid. *See Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9* ("In determining whether the merchant retains the risk of nonpayment, it is significant that 'the agreement provides that [defendant's] written admission of its inability to pay its debt or its bankruptcy constitute events of default under the agreement, which entitle the plaintiff to the immediate full repayment of any of the unpaid purchased amount.'") (quoting *LG Funding, 122 N.Y.S.3d at 313*).

This factor weighs in favor of finding the transactions to be loans. The Merchant Agreements' exacting event of default provision, the "Protections against Default" provision making payment due immediately and permitting seizure of the collateral in case of a default and the personal guaranty provision effectively shield the lender from the risk of loss [*18] when the creditor is nearly or actually bankrupt. The lender bears nearly no risk of the receivables' non-performance and would recover the Purchased Amount even if the receivables turned out to be uncollectable.

## 4. Other Factors Affecting Ultimate Transfer of Risk

In addition to the three *LG Factors*, the Complaint alleges additional facts to show that the transactions were loans. The repayment and remedy terms of the Merchant Agreements shield Defendants from the risk that the purchased receivables may be uncollectable. For example, an "Event of Default" occurs if "attempted ACH debit of the Specific Daily Amount is rejected two times during the term of [the Merchant Agreement] and the Merchant does not contact [Queen Funding] in advance of the ACH debit being rejected." In such

---

remitted for the subject month via the Daily Payment is equal to the amount of the Specified Percentage. However, in order to effectuate this reconciliation, upon submitting the request for reconciliation to Queen Funding -- but in no event later than five (5) business days following the end of the calendar month -- the Merchant must produce any and all evidence and documentation requested by Queen Funding in its sole and absolute discretion, necessary to identify the appropriate amount of the Specified Percentage."

Case 23-78, Document 36, 05/01/2023, 3508267, Page278 of 304

A-571

Firefox
about:blank

Case 1:21-cv-11222-ER   Document 40-3   Filed 10/12/22   Page 8 of 9

Page 7 of 8

2022 U.S. Dist. LEXIS 129032, *18

cases, payment becomes immediately due and Defendants are allowed to foreclose on the collateral, including any collateral held by the guarantor. For this reason as well, Defendants bore no "real transfer of risk," and therefore, "the economic substance of the transaction was a loan, not a purchase of receivables." *Haymount Urgent Care PC, 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *7*. On balance, the Complaint pleads sufficient facts to show that the transactions reflected in [*19] the Merchant Agreements are loans subject to usury laws. *See Davis. v. Richmond Capital Group, 194 A.D.3d 516, 150 N.Y.S.3d 2, 4 (1st Dep't 2021)*.

**5. Usury**

The usury element of unlawful debt under RICO is also adequately pleaded. RICO prohibits an enterprise's collection of unlawful debt. *18 U.S.C. § 1962 (c)*. "Unlawful debt" under RICO is a debt "which is unenforceable under State or Federal law . . . because of the laws relating to usury," and "where the usurious rate is at least twice the enforceable rate." *18 U.S.C. § 1961(6)*. Under New York law, a loan is usurious if the interest rate exceeds "six per centum per annum," *N.Y. Gen. Oblig. L. § 5-501* and criminally usurious if it has an interest rate "exceeding twenty-five per centum per annum or the equivalent rate for a longer or shorter period," *N.Y. Penal Law § 190.40*. The effective interest rates of the Merchant Agreements range from 100% to 300% per annum, which far exceed the New York criminal usury law's limit of 25%. Usurious intent, which is usually a question of fact for the jury, is also adequately alleged. *See Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 623 (N.Y. 2021)*. The Complaint sufficiently and plausibly alleges collection of unlawful debt in violation of RICO.

**D. Standing**

Defendants' argument that Plaintiffs lack standing because the Complaint does not allege "definite damages" or injury is unpersuasive. To satisfy RICO's standing requirements, **[*20]** a plaintiff must demonstrate "(1) a violation of *[18 U.S.C. §] 1962*; (2) injury to business or property; and (3) causation of the injury by the violation." *Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003)* (per curiam) (quoting *Hecht v. Com. Clearing House, Inc., 897 F.2d 21, 23 (2d Cir.1990)*) (internal quotation marks omitted); *accord*

*Black v. Ganieva, No. 21 Civ. 8824, 2022 U.S. Dist. LEXIS 116239, 2022 WL 2374514, *26 (S.D.N.Y. June 30, 2022)*. "RICO standing is a more rigorous matter than standing under Article III." *Denney v. Deutsche Bank AG, 443 F.3d 253, 266 (2d Cir. 2006)*; *accord Petroff Amshen LLP v. Alfa Rehab PT PC, No. 21-847, 2022 U.S. App. LEXIS 4312, 2022 WL 480475, at *2 (2d Cir. Feb. 17, 2022)* (summary order). "[A]s a general rule, a cause of action does not accrue under RICO until the amount of damages becomes clear and definite." *First Nationwide Bank v. Gelt Funding Corp., 27 F.3d 763, 767 (2d Cir. 1994)*; *accord Black, 2022 U.S. Dist. LEXIS 116239, 2022 WL 2374514, *26*.

Plaintiffs plead allegedly fraudulent agreements or usurious debt. All of Plaintiffs' payments pursuant to the Merchant Agreements apparently have been made. What amounted to allegedly fraudulent or usurious interest payments represent concrete injury and damage sufficient to establish standing. *See Motorola Credit Corp. v. Uzan, 322 F.3d 130, 135 (2d Cir. 2003)* ("To satisfy RICO's standing requirements, a plaintiff must demonstrate . . . a violation of [RICO] [and] injury to business or property . . . .").

The case cited by Defendants is inapposite. In *First Nationwide Bank v. Gelt Funding Corp.*, plaintiffs brought a RICO claim against loan brokers whose loans defaulted at a higher rate. *27 F.3d 763, 767 (2d Cir. 1994)*. Defendants argued that a portion of plaintiffs' claim for damages was based on loans that "had not been sold, foreclosed, or restructured" and from which plaintiffs suffered **[*21]** no damages. *See id*. The Second Circuit held that "with respect to those loans not foreclosed, [plaintiff] has not alleged an injury ripe for suit under RICO." *Id. at 772*. In our case, Plaintiffs sufficiently allege that they suffered damages based on the fraudulent or otherwise unenforceable interest payments.

**E. Statute of Limitations**

Defendants are incorrect that the claims are barred by the statute of limitation. RICO claims are subject to a four-year statute of limitations. *Rotella v. Wood, 528 U.S. 549, 552, 120 S. Ct. 1075, 145 L. Ed. 2d 1047 (2000)*; *accord Simmons v. Reich, No. 20-4114, 2021 U.S. App. LEXIS 32372, 2021 WL 5023354, at *2 (2d Cir. Oct. 29, 2021)*. The statute of limitations for RICO is unaffected by the predicate act's statute of limitations, even when the predicate act arises out of a state law claim. *United States v. Paone, 782 F.2d 386, 393 (2d*

Page 8 of 8

2022 U.S. Dist. LEXIS 129032, *21

*Cir. 1986)*; *accord Monterey Bay Mil. Hous., LLC v. Ambac Assurance Corp., 531 F. Supp. 3d 673, 711 (S.D.N.Y. 2021)*. The Complaint was filed on November 19, 2021, which is one day less than four years from the date the first Merchant Agreement was signed. The claims are timely.

/s/ Lorna G. Schofield

**LORNA G. SCHOFIELD**

**UNITED STATES DISTRICT JUDGE**

End of Document

**F. Other Elements of RICO Violation**

Contrary to Defendants' arguments, the Complaint sufficiently pleads the other elements of a RICO violation sufficient to state a claim. The Complaint sufficiently alleges an "enterprise," which is distinct from the "person" who has violated RICO. Any legal entity may qualify as a RICO enterprise, *18 U.S.C. § 1961(4)*, and "[t]he corporate owner/employee, a natural person, [*22] is distinct from the corporation itself, a legally different entity with different rights and responsibilities due to its difference legal status." *Cedric Kushner Promotions, Ltd. v. King, 533 U.S. 158, 163, 121 S. Ct. 2087, 150 L. Ed. 2d 198 (2001)*; *accord In re Arab Bank, PLC Alien Tort Statute Litig., 822 F.3d 34, 40 (2d Cir. 2016)* (Cabranes, J., concurring). Queen Funding is a legal entity that falls within the definition of a RICO enterprise and is distinct from Klein, a natural person. *See, e.g., Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *19* (finding an MCA company to be an enterprise under RICO); *Haymount Urgent Care PC, 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *9* (same).

**G. RICO Conspiracy**

The Complaint's RICO conspiracy claim also survives. Defendants' only argument is that the conspiracy claim fails because the underlying substantive RICO claim fails. For reasons above, this argument is without merit.

**IV. CONCLUSION**

For the foregoing reasons, Defendants' motion to dismiss is DENIED. The stay of discovery is lifted. By July 27, 2022, the parties shall file a proposed case management plan as outlined in the Court's Individual Rules. The Clerk of Court is respectfully directed to close the motions at Dkt. No. 19 and 34.

Dated: July 20, 2022

New York, New York

A-573

# Exhibit D

 Cited
As of: October 12, 2022 7:42 PM Z

### *AKF, Inc. v. W. Foot & Ankle Ctr.*

United States District Court for the Eastern District of New York

September 28, 2022, Decided; September 28, 2022, Filed

19-CV-7118 (PKC) (ST)

**Reporter**
2022 U.S. Dist. LEXIS 176467 *; 2022 WL 4538869

AKF, INC. d/b/a FUNDKITE, Plaintiff, - against - WESTERN FOOT & ANKLE CENTER, A PODIATRY CORPORATION, and WESTERN PODIATRY RESIDENCY DEVELOPMENT AND MANAGEMENT, INC., and EDWARD SONG WOO RHEE, Defendants.

## Core Terms

interest rate, guaranty, breach of contract, reconciliation, summary judgment, parties, bank account, imputed, matter of law, borrower, discount, debiting, question of law, annualized, effective, Default, summary judgment motion, Defendants', contractual, disclaimer, nonmoving, cleaned, undisputed evidence, terms of the loan, undisputed, charges, formula, weighs, lease

**Counsel:** [*1] For AKF, Inc., doing business as, Fundkite, Plaintiff: Nancy Lam, Wing K. Chiu, Oleg A. Mestechkin, Mestechkin Law Group P.C., Brooklyn, NY.

For Western Foot & Ankle Center, A Podiatry Corporation, Western Podiatry Residency Development and Management, Inc., Edward Song Woo Rhee, Defendants: Geoffrey David Mueller, LEAD ATTORNEY, Law Offices of Geoffrey D. Mueller, LLC, Englewood Cliffs, NJ.

**Judges:** Pamela K. Chen, United States District Judge.

**Opinion by:** Pamela K. Chen

## Opinion

### MEMORANDUM & ORDER

PAMELA K. CHEN, United States District Judge:

Pending before the Court is the motion of Plaintiff AKF, Inc. d/b/a Fundkite ("AKF") for partial summary judgment on the issues of breach of contract and

guaranty under New York law. Defendants—Western Foot & Ankle Center, a Podiatry Corporation ("Western-1"), Western Podiatry Residency Development and Management, Inc. ("Western-2"), and Doctor Edward Song Woo Rhee ("Dr. Rhee")—oppose the motion on narrow grounds, including that a material factual dispute exists, certain discovery was withheld, and the contract was usurious. For the reasons stated herein, the Court finds that, even though the undisputed evidence establishes breach of contract by one or more of Defendants, because [*2] the contract was usurious, Plaintiff's motion is denied.

### BACKGROUND[1]

---

[1] The Background section is based on the parties' statements and exhibits filed pursuant to Local Rule 56.1. Assertions of fact which are "[s]upported in the record," and Defendants failed to properly controvert, are "deemed admitted." *Giannullo v. City of N.Y., 322 F.3d 139, 140 (2d Cir. 2003)* (citations omitted). Because "[l]egal arguments are impermissible in any Rule 56.1 Statement and are to be disregarded," *Taveras v. HRV Mgmt., Inc., No. 17-CV-5211 (SJB), 2020 U.S. Dist. LEXIS 56565, 2020 WL 1501777, at *2 (E.D.N.Y. Mar. 24, 2020)*, the Court ignores the parties' dueling assertions as to the character and meaning of their contract (including its status as a loan). (*See, e.g.*, Dkt. 45-2, ¶¶ 2, 8, 10, 19.); *see also Rodriguez v. Schneider, No. 95-CV-4083 (RPP), 1999 U.S. Dist. LEXIS 9741, 1999 WL 459813, at *1 n.3 (S.D.N.Y. June 29, 1999)* ("Rule 56.1 statements are not argument. They should contain factual assertions, with citation to the record. They should not contain conclusions[.]" (emphasis omitted)). The Court likewise disregards assertions and denials that are wholly untethered to the record or unsupported by relevant evidence. *Holtz v. Rockefeller & Co., 258 F.3d 62, 73 (2d Cir. 2001)* ("[W]here there are no citations or where the cited materials do not support the factual assertions in the [s]tatements, the Court is free to disregard the assertion." (cleaned up)); *Gonzalez v. Allied Concrete Indus., Inc., 575 F. Supp. 3d 336, 339 (E.D.N.Y. 2021)* ("A party may not rest on a mere denial without citing supporting admissible evidence.").

Page 2 of 11

2022 U.S. Dist. LEXIS 176467, *2

Dr. Rhee, a California based medical doctor, is the sole owner of California entities Western-1 and Western-2. (Ex. A, Dkt. 46-5, at 16, 21; Pl.'s 56.1, Dkt. 46-2 ¶ 10; Ex. H, Dkt 46-12, Resp. Interrog. 8.)[2] On October 17, 2019, AKF and Western-1 entered into an agreement entitled "Revenue Purchase Agreement" (the "RPA"), which the parties agreed would be governed by New York law. (Pl.'s 56.1, Dkt. 46-2 ¶ 1; Ex. A, Dkt. 46-5, ¶ 4.5.) Pursuant to the RPA, on October 18, 2019, AKF paid Western-1 a lump sum of $93,614. (Pl.'s 56.1, Dkt. 46-2, ¶¶ 3, 12; Ex. E, Dkt. 46-9, at 2.) In exchange, the RPA required Western-1 to "sell[], assign[,] and transfer[]" to AKF fourteen percent (14%) of its:

> [F]uture sales, accounts, contract rights and other obligations and entitlements arising from or relating to the payment of monies from [Western-1's] customers to and/or third party payers (the "**Receipts**") including, but not limited to all payments made by cash, check electronic transfer or other form of monetary payment in the ordinary course of [Western- 1's] business . . . [until AKF was paid $130,545].

(Ex. A, Dkt. [*3] 46-5, at 5; *see also* Pl.'s 56.1, Dkt. 46-2, ¶ 2.) The RPA did not specify a time period by which the $130,545 had to be paid in full.

In lieu of calculating and timely transferring 14% of its Receipts on a daily basis, Western- 1 chose to deposit a daily, pre-set sum of $888.06 to a Union Bank account that AKF agreed to debit (in its entirety) on "each business day Monday to Friday." (Ex. A, Dkt. 46-5, at 4-6.) This "Alternative Daily Amount" agreed to by the parties under the RPA was "intended to represent [14%] of the Receipts." (Pl.'s 56.1, Dkt. 46-2, ¶¶ 5-6.)

On October 17, 2019, Dr. Rhee and Western-2 executed a guaranty for Western-1's performance under the RPA. (Pl.'s 56.1, Dkt. 46-2, ¶¶ 10-11.) Dr. Rhee's and Western-2's obligations as guarantors became due "at the time of any breach by [Western-1]." (*Id.* ¶ 11.) Such breach on Western-1's side would constitute an

"Event of Default" under the RPA. (Ex. A, Dkt. 46-5, ¶ 3.1(a).) An Event of Default entitled AKF to immediate possession of all of Western-1's Receipts (*id.* at 5); to the full sum of $130,545 (*i.e.*, the full amount Western-1 should have paid AKF under the RPA), and punitive fees that became due immediately [*4] (*id.* ¶ 3.2). And, because the RPA constituted an "assignment of [the] lease of [Western-1's] business premises," an Event of Default also entitled AKF to "exercise rights" on the lease "without prior notice." (*Id.*) Absent an Event of Default, once a month, Western-1 could request to "reconcile" with AKF and adjust the Alternative Daily Amount to reflect the true value of 14% of Western-1's Receipts. (*Id.* at 5.) Requests to reconcile had to be submitted through certified mail. (*Id.* at ¶ 4.3.) Prior to any reconciliation, Western-1 had to "provide [AKF] with" its "monthly bank statements and any other information requested by [AKF]." (*Id.* at 7-8.) But after "receipt and reasonable verification" of all such information, AKF was required to reconcile with Western-1 by:

> either crediting or debiting the difference from or back to [Western-1's] bank account so that the amount debited in the immediately preceding calendar month equal[ed] [14%] of [Western-1's] actual Receipts for that calendar month. [AKF] also [had to] adjust the Alternative Daily Amount on a going-forward basis to more closely reflect [Western-1's] actual Receipts times [14%]. [AKF] [would] give [Western-1] notice five business [*5] days prior to any such adjustment. After each adjustment made pursuant to [Paragraph 4.3 of the RPA], the new dollar amount [would] be deemed the Alternative Daily Amount until any subsequent adjustment.

(*Id.* at 5.)

Finally, the RPA contained a disclaimer provision titled "**Non-Recourse Sale of Future Receipts (THIS IS NOT A LOAN)**":

> [Western-1] is selling a portion of a future revenue stream to [AKF] at a discount, not borrowing money from [AKF]. There is no interest rate or payment schedule and no time period during which the [$130,545] must be collected by [AKF]. If Receipts are remitted more slowly than [AKF] may have anticipated or projected because [Western-1's] business has slowed down, or if the full [$130,545] is never remitted because [Western-1's] business went bankrupt or otherwise ceased operations in

---

[2] Together with its 56.1 Statements, each party attached an identical copy of the RPA and described it as the parties' operative agreement (*compare* Dkt. 45-1, *with* Dkt. 46-2). Thus, the existence and contents of the RPA, as to all its parts, are undisputed facts for the purposes of this motion. Unless otherwise stated, all citations to Ex. A, Dkt. 46-5, are confined solely to the Revenue Purchase Agreement ("RPA"), spanning pages one to twelve, and do not refer to the guaranty and other documents which appear within it.

2022 U.S. Dist. LEXIS 176467, *5

the ordinary course of business, and [Western-1] has not breached this Agreement, [Western-1] would not owe anything to [AKF] and would not be in breach of or default under this Agreement. [AKF] is buying the [$130,545] of Receipts knowing the risks that [Western-1's] business may slow down or fail, and [AKF] assumes these risks based on [Western-1's] representations, warranties **[*6]** and covenants in this Agreement that are designed to give [AKF] a reasonable and fair opportunity to receive the benefit of its bargain. By this Agreement, [Western-1] transfers to [AKF] full and complete ownership of the [$130,545] of Receipts and [Western-1] retains no legal or equitable interest therein. [Western-1] will treat the . . . [$130,545] in a manner consistent with a sale in its accounting records and tax returns.

(*Id.* ¶ 1.2.)

On October 21, 2019, AKF began charging Western-1 the Alternative Daily Amount. (Pl.'s 56.1, Dkt. 46-2, ¶¶ 13-14.; Ex. E, Dkt. 46-9, at 5.) Within less than two months, AKF debited Western-1's Union Bank account for $35,522.40. (*See generally* Ex. E, Dkt. 46-9.)[3] On November 13, 2019, despite the RPA's prohibition on "enter[ing] into . . . [an] agreement . . . that relates to . . . Receipts" with "any party" (Ex. A, Dkt. 46-5, ¶ 2.10), Western-1 signed a "Sale of Purchased Future Receipts" agreement with an entity named West Coast Business Capital, LLC ("WCB") (*see* Pl.'s 56.1, Dkt. 46-2, ¶ 18; Ex. I, Dkt. 46-13, ¶ 3). Five days later, WCB paid Western-1 $70,462, and proceeded to charge the Union Bank account $18,772. (Ex. J, Dkt. 46-14, at 2-16.) On or **[*7]** about December 17, 2019, despite the

RPA's prohibition on "block[ing]" AKF from debiting the Union Bank account (Pl.'s 56.1, Dkt. 46-2, ¶ 8; Ex. A, Dkt. 46-5, ¶ 3.1(j)), Dr. Rhee contacted Union Bank and terminated AKF's ability to debit Western-1 (Pl.'s 56.1, Dkt. 46-2, ¶ 14). The Union Bank account remains inaccessible to AKF. (Pl.'s 56.1, Dkt. 46-2, ¶ 16.) After some time, Western-2 was "suspended from operating in the state of California," and Western-1 signed another Sale of Receipts agreement and accumulated $921,900 in additional debt. (Ex. H, Dkt 46-12, Resps. Interrogs. 2, 13.)

On December 19, 2019, AKF initiated this lawsuit alleging breach of contract and breach of guaranty, for which AKF seeks $136,850.28 in damages (Complaint ("Compl."), Dkt. 1, ¶¶ 26-41, Prayer (i)-(ii)), and unjust enrichment and "money had and received," for which AKF seeks $97,686.76 in damages (*Id.* ¶¶ 42-57, Prayer (iii)-(iv)). Discovery ended on August 15, 2020. statement unsupported by the record and disregards it. *See, e.g.*, *I.M. v. United States, 362 F. Supp. 3d 161, 179 (S.D.N.Y. 2019)* (disregarding a 56.1 Statement when the "portion of [the] deposition transcript [cited] to d[id] not support [the] proposition."); *McGrier v. City of New York, No. 16-CV-5667 (VEC), 2019 U.S. Dist. LEXIS 38688, 2019 WL 1115053, at *2 n.2 (S.D.N.Y. Mar. 11, 2019)* (rejecting a 56.1 **[*8]** (03/05/2020 Order.) In March 2021, AKF filed the present motion for summary judgment as to its breach of contract and guaranty claims, which Defendants oppose. (Dkts. 45, 46, 47.)

**STANDARD OF REVIEW**

Summary judgment is proper only when "the movant shows that there is no genuine dispute as to any material fact and movant is entitled to judgment as a matter of law." *Fed. R. Civ. P. 56(a)*; *accord Gonzalez v. City of Schenectady, 728 F.3d 149, 154 (2d Cir. 2013)*; *New York v. Mountain Tobacco Co., 942 F.3d 536, 541 (2d Cir. 2019)* (same). Once this burden is met, the burden shifts to the nonmoving party to proffer some evidence establishing the existence of a question of material fact that must be resolved at trial. *See Spinelli v. City of New York, 579 F.3d 160, 166-67 (2d Cir. 2009)*; *see also Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 106 S. Ct. 2548, 91 L. Ed. 2d 265 (1986)*. "A fact is material if it 'might affect the outcome of the suit under the governing law.'" *Loreley Fin. (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC, 13 F.4th 247, 259 (2d Cir. 2021)*. "To present a 'genuine' issue of material fact sufficient to defeat a motion for summary judgment, the

---

[3] Although Dr. Rhee contends that "records" prove that he actually paid AKF $40,117.05, instead of $35,522.40, during this period and that he never received from AKF a statement regarding third-party payments on Western-1's behalf (Dkt. 45-2, ¶ 17), Dr. Rhee's statement is based on portions of his deposition that discuss neither records nor third-party payees (*see* Dr. Rhee Deposition Transcript ("Dr. Rhee Dep."), Dkt. 46-6, 162:1-5). The Court deems the Statement where "[t]he cited page of [the] deposition d[id] not support [it]."), *aff'd, 849 F. App'x 268 (2d Cir. 2021)* (summary order); *Anilao v. Spota, 340 F. Supp. 3d 224, 237 n.10 (E.D.N.Y. 2018)* (disregarding a 56.1 Statement when "review of the deposition pages cited by [defendants] and the surrounding testimony reveal[ed] that the cited materials do not support [it]."), *aff'd, 27 F.4th 855 (2d Cir. 2022)*. The Court instead relies on the identical, uncontested Union Bank account statements to determine payments made from the Union Bank account to AKF. (*Compare* Ex. E, Dkt. 46-9, *with* Ex. F., Dkt. 45-1, at 62-98.)

Case 23-78, Document 36, 05/01/2023, 3508267, Page284 of 304

A-577

Firefox
about:blank

Case 1:21-cv-11222-ER   Document 40-4   Filed 10/12/22   Page 5 of 12

Page 4 of 11

2022 U.S. Dist. LEXIS 176467, *8

record must contain contradictory evidence 'such that a reasonable jury could return a verdict for the nonmoving party.'" *Horror Inc. v. Miller, 15 F.4th 232, 241 (2d Cir. 2021).* A mere "scintilla of evidence" in support of the nonmoving party is insufficient; "there must be evidence on which the jury could reasonably find for the [non-movant]." *Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 252, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986); Marvel Characters, Inc. v. Kirby, 726 F.3d 119, 143 (2d Cir. 2013); see also Matsushita Elec. Indus. Co, v. Zenith Radio Corp., 475 U.S. 574, 587, 106 S. Ct. 1348, 89 L. Ed. 2d 538 (1986)* ("[T]he nonmoving party must come forward with specific facts showing that there is a genuine issue for trial." (cleaned [*9] up)). "In deciding a motion for summary judgment, a court must construe the facts in the light most favorable to the non-moving party and must resolve all ambiguities and draw all reasonable inferences against the movant." *Brod v. Omya, Inc., 653 F.3d 156, 164 (2d Cir. 2011)* (internal quotation marks omitted).

## DISCUSSION

### I. Plaintiff Has Established a Breach of Contract

Based on the undisputed evidence, Plaintiff has established a contractual breach under New York law.[4]

---

[4] As a threshold matter, as Defendants' opposition raises only the defense of criminal usury under New York law and omits all other defenses mentioned in the Answer, the Court deems all unraised defenses abandoned for the purposes of this motion. *See Kovaco v. Rockbestos- Surprenant Cable Corp., 834 F.3d 128, 143 (2d Cir. 2016); Taylor v. City of New York, 269 F. Supp. 2d 68, 75 (E.D.N.Y. 2003);* (*compare* Answer ("Ans."), Dkt. 7, *with* Dkt. 45.) Similarly, the Court denies Defendants' request to forestall the decision on this motion. (Dkt. 45, at 9-10.) First, the Court finds fanciful the argument that judicial economy is offended by the common device of partial summary judgment (*id.*), and illogical the argument that the existence of a factual dispute as to claims not subject to this motion precludes granting this motion (*id.*). Second, the Court rejects Defendants' argument that discovery violations preclude a decision on this motion. "[A] party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit showing (1) what facts are sought [to resist the motion] and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts." *Gurary v. Winehouse, 190 F.3d 37, 43 (2d Cir. 1999)* (cleaned up) (brackets in original).

Under New York law, breach of contract is established where the following facts are proved: "the existence of a contract, the plaintiff's performance pursuant to the contract, the defendant's breach of its contractual obligations, and damages resulting from the breach[.]" *PFM Packaging Mach. Corp. v. ZMY Food Packing, Inc., 131 A.D.3d 1029, 16 N.Y.S. 3d 298, 299-300 (App. Div. 2015)* (citations omitted); *143 Bergen St., LLC v. Ruderman, 144 A.D.3d 1002, 42 N.Y.S. 3d 252, 254 (App. Div. 2016)* (same); *see also Awards.com, LLC v. Kinko's, Inc., 42 A.D.3d 178, 834 N.Y.S. 2d 147, 155 (App. Div. 2007)* ("[A party's] subjective intention or willingness to perform its obligations is irrelevant; the issue is whether [the party acted pursuant to the contract], not whether [the party] was willing or able to do so[.]"), *aff'd, 14 N.Y.3d 791, 899 N.Y.S.2d 123, 925 N.E.2d 926 (N.Y. 2010).*

Dr. Rhee's attempt to create a factual dispute on the basis that, in his view, the parties' contract was a loan is meritless. "A contract['s] . . . meaning and intent present questions of law only," *Dwight v. Germania Life Ins. Co., 103 N.Y. 341, 8 N.E. 654, 658, 3 N.Y. St. 115 (N.Y. 1886),* and, thus, Dr. Rhee's [*10] view or belief that the contract is a loan raises a legal, not a factual, dispute, *see LG Funding, LLC v. United Senior Props. of Olathe, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309, 312 (App. Div. 2020)* (finding that to determine whether an instrument is a loan, "a *court* must examine whether the plaintiff is absolutely entitled to repayment under all circumstances" (emphasis added) (cleaned up)). Similarly, whether any alleged loan was usurious is a question of law. *See Hartley v. Eagle Ins. Co. of London, Eng., 222 N.Y. 178, 185, 118 N.E. 622 (1918)* (noting that the court below found as a "conclusion of law, that the transaction was a loan under which the plaintiff was to repay the defendant more than [the allowed interest rate.]"); *see also Provident Life & Tr. Co. v. Fletcher, 237 F. 104, 108 (S.D.N.Y. 1916)* ("[Q]uestions of fact [having be[en] disposed of, the first question of law which arises is whether the transaction .

Defendants' utter failure to submit the required affidavit, or take any action to obtain discovery they now claim was improperly denied—*e.g.*, pursue a timely *Federal Rule of Civil Procedure 37* motion or raise the issue during discovery—render their argument meritless. *Id. at 43-44* ("[T]he failure to file [] an affidavit is fatal to a claim . . . even if the party resisting the [summary judgment] motion . . . alluded to a claimed need for discovery in a memorandum of law."); *Williams v. R.H. Donnelley Corp., 368 F.3d 123, 126 n.1 (2d Cir. 2004)* ("[failure to file an affidavit is] itself sufficient grounds to reject a claim that the opportunity for discovery was inadequate" (quotation marks and citations omitted)).

2022 U.S. Dist. LEXIS 176467, *10

. . was usurious [under New York law].", aff'd, *258 F. 583 (2d Cir. 1919)*; *Power Up Lending Grp., Ltd. v. Cardinal Energy Grp., Inc., No. 16-CV-1545 (DRH) (GRB), 2019 U.S. Dist. LEXIS 57527, 2019 WL 1473090, at *6 (E.D.N.Y. Apr. 3, 2019)* (finding that whether an agreement was a loan at a usurious interest rate was a "question[] of law, not fact[.]"); *In re GMI Grp., Inc., 606 B.R. 467, 486 (Bankr. N.D. Ga. 2019)* (analyzing the existence of usury under New York law as a question of law).

It is well-established law that the Court may decide all questions of law on summary judgment.[5] See *New York State Guernsey Breeders' Co-op. v. Wickard, 141 F.2d 805, 810 (2d Cir. 1944)* ("Since on this record only questions of law were involved, summary judgment was proper."); *Flair Broad. Corp. v. Powers, 733 F. Supp. 179, 184 (S.D.N.Y. 1990)* ("[D]isputed legal questions present nothing for trial and are appropriately resolved on [*11] a motion for summary judgment." (cleaned up)); *Benjamin v. Traffic Exec. Ass'n E.R.R., 869 F.2d 107, 115 n.11 (2d Cir. 1989)* (same). Thus, to the extent the material facts are undisputed, it is appropriate for the Court to decide whether the RPA was a usurious loan, as Defendants assert as a defense to Plaintiff's breach of contract and guaranty claims.

The undisputed facts demonstrate that Dr. Rhee's decision to block the Union Bank account and Western-1's decision to contract with WCB each constituted a contractual breach. First, as Defendants do not contest in their opposition papers that a contractual breach occurred— despite doing so in their Answer (*see* Ans., Dkt. 7, ¶ 7)—any such defense is abandoned, and summary judgment is appropriate. *Maher v. All. Mortg. Banking Corp., 650 F. Supp. 2d 249, 267 (E.D.N.Y. 2009)* ("Federal courts may deem a claim abandoned

when a party moves for summary judgment on one ground and the party opposing summary judgment fails to address the argument in any way." (collecting cases)); *Jackson v. Fed. Express, 766 F.3d 189, 198 (2d Cir. 2014)* ("[I]n the case of a counseled party, a court may, when appropriate, infer from a party's partial opposition that relevant claims or defenses that are not defended have been abandoned."). Second, and regardless, a contractual breach conclusively appears on the face of this record. The undisputed facts establish [*12] the existence of the RPA, which required AKF to transfer a lump-sum of $93,614.00 to Western-1. The RPA prohibited Western-1 from "enter[ing] into . . . [an] agreement . . . that relates to. . . [the] Receipts" with "any party" and from "block[ing]" AKF from debiting the Union Bank account (*see* Dkt. 46-5, ¶¶ 2.10, 3.1(j)). Despite these explicit prohibitions, Western-1 entered into a Sale of Receipts agreement with WCB, and Dr. Rhee blocked AKF from accessing and debiting the Union Bank account. To date, AKF has charged the Union Bank account only $35,522.40 out of the $130,545 that Western-1 promised to pay AKF under the RPA.

The Court therefore finds, as a matter of law, that Plaintiff has established a breach of contract by Defendants.

**II. Plaintiff Has Established a Breach of Guaranty**

Based on the undisputed evidence, Plaintiff has also proved a breach of guaranty by Defendants under New York law. "[T]o recover on a guarantee under New York law, [a claimant must show] (1) that it is owed a debt from a third party; (2) that the defendant made a guarantee of payment of the debt; and (3) that the debt has not been paid by either the third party or the defendant." *Chem. Bank v. Haseotes, 13 F.3d 569, 573 (2d Cir. 1994)* (citations omitted); [*13] *accord City of N. Y. v. Clarose Cinema Corp., 256 A.D.2d 69, 681 N.Y.S.2d 251, 253 (App. Div. 1998)* ("[What the] creditor need[s to] prove is an absolute and unconditional guaranty, the underlying debt, and the guarantor's failure to perform under the guaranty[.]" (citations omitted)). Defendants again do not contest or respond to the allegation that they breached the guaranty in their opposition papers. (*See generally* Dkt. 45.) Any defense is therefore waived. Defendants' breach of guaranty is also apparent on the face of the undisputed record. Pursuant to the RPA, Western-1 owed a debt to AKF (Dkt. 46-2, ¶ 17); Western-2 and Dr. Rhee signed a guaranty, whose terms are not disputed, guaranteeing

---

[5] Even had Dr. Rhee's view as to the contract's meaning created a factual dispute, that dispute would be immaterial. Under New York law, contractual "ambigu[ity]" is a legal question, and when a court deems the contractual language clear, "[e]vidence outside [its] four corners" is generally "inadmissible[.]" *W.W.W. Assocs., Inc. v. Giancontieri, 77 N.Y.2d 157, 566 N.E.2d 639, 642, 565 N.Y.S.2d 440 (N.Y. 1990)*. The Court finds the RPA unambiguous, and consequently Dr. Rhee's statements are not "facts that might affect the outcome of the suit under the governing law[.]" *Zann Kwan v. Andalex Grp. LLC, 737 F.3d 834, 843 (2d Cir. 2013)*; *see also First Int'l Bank of Israel, Ltd. v. L. Blankstein & Son, Inc., 88 A.D.2d 501, 449 N.Y.S.2d 737, 738-39 (App. Div. 1982)* ("[T]he [contract] speaks for itself . . . [p]arol evidence is inadmissible to vary the terms of the written instrument.").

2022 U.S. Dist. LEXIS 176467, *13

payment of that debt (id. ¶¶ 10-11); and the debt is outstanding (id. ¶ 17).

The Court therefore finds, as a matter of law, that Plaintiff has established a breach of guaranty by Defendants.

### III. Defendants Have Established the Defense of Usury

Based on the undisputed evidence, Defendants have established a defense of criminal usury to the breach of contract and guaranty claims, which vitiates Defendants' liability[6] and defeats summary judgment on those claims.[7] To prove the defense of criminal usury under New York law, "a debtor must allege and prove by clear and convincing evidence [*14] that [(1)] a loan or forbearance of money, [(2)] requiring interest in violation of [the criminal] usury statute, [(3)] was charged by the holder or payee with the intent to take interest in excess of the legal rate [of 25% per annum]." *Blue Wolf Cap. Fund II, L.P. v. Am. Stevedoring Inc., 105 A.D.3d 178, 961 N.Y.S.2d 86, 89 (App. Div. 2013)* (citations omitted); *N.Y. Penal Law § 190.40* (McKinney 2022) (making it unlawful to charge interest on a loan "at a rate exceeding twenty-five per centum per annum[.]").

---

[6] The dispositive impact of Defendants establishing their usury defense is discussed *infra* at 22-23.

[7] The Court elects to construe Defendants' ambiguous opposition broadly. Defendants advance the erroneous contention that the existence of a usurious loan is a factual dispute, along with other arguments, including that the Court must determine the "transaction's purpose by its true character under all circumstances," and that the RPA is a loan made at "a criminal 35% interest rate." (Dkt. 45, at 4-6.) Because Defendants asserted the defense of usury in their Answer, and have "consistently averred that the [a]greement was a usurious [loan] in violation of New York Penal law" (*id.* at 6), the Court construes the pleadings broadly as stating that the defense of usury is at issue with respect to this partial summary judgment motion. *See Lujan v. Nat'l Wildlife Fed'n, 497 U.S. 871, 909 n.10, 110 S. Ct. 3177, 111 L. Ed. 2d 695 (1990)* (noting that motions are to be construed according to their substance, not by reference to any nomenclature); *Gins v. Mauser Plumbing Supply Co., 148 F.2d 974, 976 (2d Cir. 1945)* ("[P]articular legal theories of counsel yield to the court's duty to grant the relief to which the prevailing party is entitled, whether demanded or not"); *Newman v. Silver, 713 F.2d 14, 15 n.1 (2d Cir. 1983)* (upholding district court's decision to try a case based on a legal theory not in the complaint when its factual basis was pleaded).

"Under [New York law], the defense of [civil] usury [(i.e., interest over 16%)] is not available to corporations, but this bar does not preclude a corporate borrower from raising the defense of "criminal usury" (i.e., interest over 25%) in a civil action[.]" *See Adar Bays, LLC v. GeneSYS ID, Inc., 37 N.Y.3d 320, 157 N.Y.S.3d 800, 179 N.E.3d 612, 616 (N.Y. 2021)*. On summary judgment, a debtor may meet its "burden of proof simply by submitting the [contract] evidencing the usurious transaction." *Funding Grp., Inc. v. Water Chef, Inc., 19 Misc. 3d 483, 852 N.Y.S.2d 736, 740 (Sup. Ct. 2008)*.

### A. The RPA is a Loan

Under New York law, "[i]f the transaction is not a loan, there can be no usury, however unconscionable the contract may be." *Seidel v. 18 E. 17th St. Owners, 79 N.Y.2d 735, 598 N.E.2d 7, 11-12, 586 N.Y.S.2d 240 (N.Y. 1992)* (internal quotation marks omitted). "When determining whether a transaction is a loan, substance—not form—controls." *Adar Bays, 179 N.E.3d at 622* (citation omitted); *LG Funding, 122 N.Y.S.3d at 312* ("[The transaction] must be considered in its totality and judged by its real character, rather than by the name, color, [*15] or form which the parties have seen fit to give it" (cleaned up)). New York courts distinguish between loans and sales based on the contract's distribution of risk amongst the parties. *See Haymount Urgent Care PC v. GoFund Advance, LLC, ___ F. Supp. 3d ___, No. 22-CV-1245 (JSR), 2022 U.S. Dist. LEXIS 112768, 2022 WL 2297768, at *6 (S.D.N.Y. June 27, 2022)* ("In assessing the substance of financial transactions, the [New York] Court of Appeals has focused on how the contract at issue allocates risk between the parties."); *accord Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)* ("[T]he root of [the analysis] is the transfer of risk [between the lender and the borrower]."). A loan entails an absolute contractual entitlement for repayment and allocates risk to the borrower; conversely, a sale affords only a conditional right for performance and allocates risk to the buyer. *See LG Funding, LLC, 122 N.Y.S.3d at 312* ("[The] court must examine whether the [transferor of funds] is absolutely entitled to repayment under all circumstances[, and if not], the transaction is not a loan."); *accord Major's Furniture Mart, Inc. v. Castle Credit Corp., 602 F.2d 538, 546 (3d Cir. 1979)* ("It is apparent that at . . . none of the risks present in a true sale [were] present here . . .[.] Accordingly[,] . . . the true nature of the transaction between [the parties] was a secured loan, not a sale."). "Usually, courts weigh three factors when determining whether [the right to]

2022 U.S. Dist. LEXIS 176467, *15

repayment is absolute or contingent: (1) whether there is [*16] a reconciliation provision in the agreement; (2) whether the agreement has a finite term; and (3) whether there is any recourse should the merchant declare bankruptcy." *LG Funding, LLC, 181 A.D.3d 664, 122 N.Y.S.3d 309 at 312.*

### 1. The RPA's Reconciliation Provision Placed the Risk of Default on Defendants

AKF controlled the possibility of reconciliation under the RPA. The RPA permitted Defendants to seek adjustments of the Alternative Daily Amount, but only (1) once a month through certified mail, (2) if no Event of Default occurred, and (3) after providing Defendants' monthly statements and any other information that AKF in its discretion requested. (Ex. A, Dkt. 46-5, at 5.) These conditions effectively made reconciliation under the RPA remote and highly improbable.

First, any reconciliation hinged on Western-1's ability to produce "any [] information"— with no limitation on its scope or amount—that AKF required. The capacious phrase "any information" allowed AKF to demand materials wholly ancillary to the reconciliation, impossible to obtain, or utterly fanciful. Nothing in the RPA prohibited AKF from demanding, for example, that Defendants produce a deposition of each of their customers in the past decade, or the birth certificates and marriage [*17] licenses of their suppliers. In effect, the RPA armed AKF with the power to veto any adjustment to the Alternative Daily Amount, and placed the risk associated with any such adjustment on Defendants. Second, and relatedly, the RPA rendered the possibility of filing a timely reconciliation request remote. Defendants, based in California, had a narrow opportunity to apply for reconciliation—only once a month—and must have timely transmitted all of their requests to do so to AKF's offices in New York through "certified mail." Finally, the RPA defined any failure to pay the daily sum of **$888.06** as an irremediable infraction that permanently foreclosed any possibility of future reconciliation. In sum, as the RPA's provisions made the possibility of reconciliation very unlikely and difficult to obtain, the Court finds that this factor weighs in Defendants' favor, as to finding that the RPA was a loan.

### 2. The RPA Has a Definite Term

Second, while the RPA states no explicit or definite

term, the Court discerns it from the RPA's payment structure. Barring any reconciliation, the RPA mandated that Defendants deposit $888.06, Monday through Friday, until they paid AKF $130,545.00. (Ex. A, Dkt. [*18] 46-5, at 4-5.) The term of the RPA was, therefore, roughly 205 days.[8] *See In re GMI Grp., Inc., 606 B.R. at 488- 89* (determining the payment term based on the "payment schedule" consisting of the number of days until the required amount was paid in full); *Lateral Recovery LLC v. Queen Funding, LLC, No. 21-CV-9607 (LGS), 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022)* ("[Although the contract] provides for a seemingly indefinite term, . . . a de facto fixed term plausibly exists. The period of payment can be easily calculated by dividing the amount [defendant] owes by the amount of daily payments.").

This factor, therefore, weighs in favor of finding that the RPA was a loan.

### 3. AKF Had Recourse Under the RPA in the Event of Bankruptcy

The Court finds that the RPA protected AKF in the event Defendants declared bankruptcy. First, the RPA constituted an assignment of Western-1's business lease, collateral which turned AKF into a secured creditor who would retain the lease even if Defendants became bankrupt. (Dkt. 46-5, ¶ 3.2.) Second, although the RPA states that if "[Western-1] became bankrupt, *and [Western-1] has not breached the agreement*" (*id.* ¶ 1.2 (emphasis added)), the sum of $130,545 would not be due, it seems virtually certain that AKF would be able to file a claim in the bankruptcy proceeding, as a

---

[8] This period is arrived at by dividing the full amount to be paid—$130,545—by the Alternative Daily Amount of $888.06, which equals roughly 147 daily payments. Because these payments were only made five days a week, *i.e.*, Monday to Friday, Defendants would have needed about 29 weeks, or 205 days to pay the sum of $130,545 in full. In section 1.14, the RPA states that deposits must be made only on days when banks would be open, thus seemingly exempting deposits on federal holidays. (Ex. A, Dkt. 46-5, ?? 1.14.) However, the RPA also states that on the next business day after any such holiday, Western-1 would have to deposit the Alternative Daily Amount for that business day, and for the preceding day where the bank was closed (*i.e.*, the federal holiday). (*Id.*) Thus, in reality, the RPA neither prolonged or shortened the term of the loan because of federal holidays nor exempted Defendants from paying Plaintiff for these days.

2022 U.S. Dist. LEXIS 176467, *18

secured creditor, for **[*19]** the remainder of the $130,545 owed. That is because a filing of bankruptcy, which invariably involves an actual or projected negative cash stream, automatically stays "any act to obtain possession of property of the [debtor's] estate . . . or to exercise control over property of the estate." *11 U.S.C. § 362(a)(3)*. This "provides a debtor with breathing room from the claims of its creditors," and "allows the bankruptcy court to centralize all disputes concerning property of the debtor's estate in the bankruptcy court." *In re Ionosphere Clubs, Inc., 922 F.2d 984, 989 (2d Cir. 1990)*. The Bankruptcy Code "sets forth a basic system of priority, which ordinarily determines the order in which the bankruptcy court will distribute assets of the estate. Secured creditors are highest on the priority list, for they must receive the proceeds of the collateral that secures their debts." *Czyzewski v. Jevic Holding Corp., 580 U.S. 451, 137 S. Ct. 973, 197 L. Ed. 2d 398 (2017)* (citing *11 U.S.C. § 725*). Thus, rather than having no recourse, as a secured creditor, AKF would be "highest on [Defendants'] priority list" in the event of a bankruptcy. *Id.*

Thus, notwithstanding the purported "disclaimer" in the RPA, AKF had recourse in the event Western-1 became bankrupt, which weighs heavily in favor of finding that the RPA was a loan.

* * *

In sum, the Court finds, based on the undisputed **[*20]** evidence and the above weighing of the relevant factors, that the RPA is a loan.

**B. The RPA Charges a Usurious Interest Rate**

"In determining whether the interest charged exceeded the usury limit, courts must apply the traditional method for calculating the effective interest rate as set forth in *Band Realty Co. v. North Brewster, Inc., [37 N.Y.2d 460, 335 N.E.2d 316, 373 N.Y.S.2d 97 (N.Y. 1975)*.]" *Canal v. Munassar, 144 A.D.3d 1663, 41 N.Y.S.3d 828, 829 (App. Div. 2016)*; *Miller Plan. Corp. with Delta Funding Corp. v. Wells, 253 A.D.2d 859, 678 N.Y.S.2d 340, 340 (App. Div. 1998)* (same); *Advance Servs. Grp. LLC v. Acadian Properties Austin LLC, 70 Misc. 3d 1225(A), 141 N.Y.S.3d 834 (Sup. Ct. 2021)* (finding a 49% interest rate to be usurious on a summary judgment motion); *see also* 72 N.Y. Jur. 2d Interest and Usury § 165 ("Whether a usurious rate of interest was exacted [is a question of law when] there is no material conflict in the evidence, and only one conclusion can reasonably be drawn from the facts proved.").

Because all portions of the RPA are undisputed, and correct application of the *Band* formula yields only one reasonable conclusion, the Court proceeds to decide the interest rate.

Although Defendants argue the RPA's interest is 35% (Dkt. 45, at 5), and AKF implies, based on the RPA's "No-Loan" disclaimer, that no interest rate can be deduced (Dkt. 47, at 4 n.2; Dkt. 46, at 8-9), the Court determines the annualized interest rate for the loan to be 125%. Pursuant to the *Band* formula, the "true" annual interest rate is determined by taking the "discount"—*i.e.*, the difference **[*21]** between the amount advanced to the borrower and the amount owed to the lender—dividing that amount by the number of years in the term of the loan, adding that amount to the interest rate stated on the note, and dividing this sum by the difference between the principal and the discount (*i.e.*, the net advance). *Canal, 41 N.Y.S.3d at 829* ("In applying the [*Band* formula], the discount, divided by the number of years in the term of the [loan], should be added to the amount of interest due in one year, and this sum is compared to the difference between the principal and the discount in order to determine the true interest rate[.]" (internal quotation marks omitted)); *Shifer v. Kelmendi, 204 A.D.2d 300, 611 N.Y.S.2d 575, 575 (App. Div. 1994)* (applying the *Band Realty Co.* formula); *see Band Realty Co. v. North Brewster, Inc., 37 N.Y.2d 460, 335 N.E.2d 316, 317-18, 373 N.Y.S.2d 97 (N.Y. 1975)* (stating that "discount" in a loan in the amount of $300,000, where the lender advanced $261,000, to be $39,000); *Bakhash v. Winston, 134 A.D.3d 468, 19 N.Y.S.3d 887, 887 (App. Div. 2015)* ("Where, as here, the loan is for less than a year, the interest rate is annualized[.]")[9] ; *Boswick v. Bronte SPV LLC, 63 Misc. 3d 1204(A), 114 N.Y.S.3d 192 (Sup. Ct. 2019)* ("Fees, including loan origination fees, which are deemed interest for the purposes of determining whether an interest rate charged exceeds the usury limit, are annualized[.]").

Here, AKF advanced $93,614 to receive back $130,545, generating a discount of $36,931. The sum of $130,545 is the "principal." *See Canal, 41 N.Y.S.3d at 829* (finding that **[*22]** in a mortgage where $127,000 was disbursed to a borrower in return for a payment of $170,000, "the principal . . . [was] $170,000."). The RPA, on its face, states that it charges no interest. *See id.* (determining

---

[9] As previously discussed, although the RPA does not specify a term, the effective term is approximately 205 days based on the amount of time necessary to repay the $130,545.00 owed to AKF using the Alternative Daily Amount method.

2022 U.S. Dist. LEXIS 176467, *22

the amount of interest to be 0% when the contract "state[d] that the interest rate during the term of the note would be zero[.]" (cleaned up)). The term of the loan under the RPA was 205 days. *See In re GMI Grp., Inc., 606 B.R at 488-89* (calculating interest using the number of days until payment was due as the term of the loan).

Thus, the *Band* formula reveals that the RPA charged 70.2% in effective interest:

Discount (36,931)/Term of Loan in Years (205/365)+Interest on the Note (0%)=$65,755.19

65,755.19/Principal (130,545) - Discount (36,931) = 93,614 (Net Advance) = 70.2%

Because the term of the loan equals 205 days, or slightly below 7 months, it must be annualized. *See Bakhash, 19 N.Y.S.3d at 887* ("annualizing" a 4-month loan by multiplying it three times). Therefore, the final effective interest rate is nearly 125%:

Duration of a Year (365)/Term of Loan out of the Year (205) x Effective Interest (70.2) = 125%

Because the effective interest rate exceeds the statutory maximum of 25% by a magnitude of five times, it is patently usurious.

## C. Usurious [*23] Intent is Imputed

Usurious intent is the volitional decision "to charge [an interest other] than the legal rate as evidenced by the [contract]," not any actual subjective motivation "to violate the usury statute." *Matter of Dane's Est., 55 A.D.2d 224, 390 N.Y.S.2d 249, 250 (App. Div. 1976); Freitas v. Geddes Sav. & Loan Ass'n, 63 N.Y.2d 254, 471 N.E.2d 437, 443, 481 N.Y.S.2d 665 (N.Y. 1984)* (same). When a transaction's usurious nature is equivocal, usurious intent is a factual question for the jury; conversely, when a transaction's usurious nature is obvious, usurious intent is imputed as a matter of law. *See Fiedler v. Darrin, 50 N.Y. 437, 443 (N.Y. 1872)* ("[W]hen an act is equivocal in its character, the intent must be ascertained . . . [b]ut when an act is illegal the intent of the offender is immaterial."); *Hartley, 222 N.Y. at 187* ( "[intent can be established either when the] parties intend to evade the usury statutes of the state, or [when] the interest payable so large that. . . an intent . . . will necessarily be imputed to them[.]"); *Blue Wolf, 961 N.Y.S.2d at 89* ("If usury can be gleaned from the face of an instrument, intent will be implied and usury will be

found as a matter of law."); *accord Lloyd v. Scott, 29 U.S. 205, 216, 7 L. Ed. 833 (1830)* ("The [usurious] intention of the parties is a legal inference from established facts."); *De Korwin v. First Nat. Bank of Chicago, 275 F.2d 755, 762 (7th Cir. 1960)* (same).

The New York Court of Appeals has articulated two tests for identifying transactions so patently usurious such that usurious intent is imputed as a matter [*24] of law. The first is the 'usurious effect' test, focusing on the transaction's usurious consequences. *See Fiedler, 50 N.Y. at 443* ("The effect of the transaction was to secure the plaintiff more than [the statutory maximum] for the loan. The agreement was vicious because of the usurious effect, *by which the intent of the parties must be judged*" (emphasis added)); *Seymour v. Strong, 4 Hill 255 (N.Y. Sup. Ct. 1843)* ("The [transaction had a] usurious effect, by which the intent of the parties must be judged[.]") (New York's highest court before 1846); *Hall v. Earnest, 36 Barb. 585 (N.Y. Sup. Ct. 1861)* ("The argument that there can be no usury . . . when the party [executing] the paper is ignorant [of its character], and is in fact [told by others that the paper is legal], is not sound if the legal effect of the transaction involves a usurious agreement[.]"). The second, stemming from the *Freitas* decision, is the 'usurious on its face' test which asks whether the usury, usually the interest rate itself, "appear[s] on the face of the note[.]" *See 471 N.E.2d at 443* (finding that usurious intent could not be imputed to a mortgagee charging more than the lawful sum of interest, because the contract stated only a lawful amount of interest and the mortgagee inadvertently labelled and charged inspection services as fees and thereby elevated [*25] the interest amount); *Greenfield v. Skydell, 186 A.D.2d 391, 588 N.Y.S.2d 185, 185 (App. Div. 1992)* ("[I]n this case, no stated rate of interest appears upon the face of the note[;] . . . [thus t]o establish usury, facts extrinsic to the document must be referred to."); *AJW Partners, LLC v. Cyberlux Corp, 21 Misc. 3d 1109(A), 873 N.Y.S.2d 231 (Sup. Ct. 2008)* (same). "[B]ecause a usurer usually seeks to conceal the usury, and to accomplish the purpose by indirect methods, questions of usurious intent . . . are typically questions of fact[.]" *Adar Bays, 179 N.E.3d at 625* (cleaned up).

Here, the Court need look no further than the effective interest rate under the RPA. Because the RPA is patently usurious, intent can be imputed under either test. First, under the usurious effect test, the transaction readily allows imputation of intent. Against collateral that included the Receipts and Western-1's business lease, AKF loaned money at 125 % interest, which far exceeds

Case 23-78, Document 36, 05/01/2023, 3508267, Page290 of 304

A-583

Firefox

about:blank

Case 1:21-cv-11222-ER   Document 40-4   Filed 10/12/22   Page 11 of 12

Page 10 of 11

2022 U.S. Dist. LEXIS 176467, *25

the statutory limit. Thus, "the interest payable [is] so large" that "intent to provide for the payment of interest beyond the legal rate will necessarily be imputed[.]" *See Fiedler, 50 N.Y. at 443.* Second, under the facial test, the usurious nature of the transaction is readily visible from the contract, notwithstanding the RPA's boilerplate disclaimers that it is "not a loan" and charges no interest.[10] Although the New York Court of Appeals **[*26]** has not considered the effect of disclaimers of the kind the RPA contains, existing law sufficiently guides the Court. Under New York law, maneuvers of denial inserted into a contract do not automatically render it non-usurious. *See Simsbury Fund, Inc. v. New St. Louis Assocs., 204 A.D.2d 182, 611 N.Y.S.2d 557, 558 (App. Div. 1994)* ("[L]anguage [in the contract] purporting to reduce the interest rate to the legal rate in the event of a finding of usury, do[es] not make [it] nonusurious."); *Bakhash, 19 N.Y.S.3d at 887* ("[Although] the note says, 'in no event shall the rate of interest . . . exceed [25%] and any interest paid in excess of [25%] shall be. . . refunded[,]s . . . that does not make the [contract] nonusurious[.]"). Instead, the New York Appellate Division recently opined that intent may be imputed when a court can "glean[]" the usury "from the face of an instrument." *Blue Wolf, 961 N.Y.S.2d at 89.* Indeed, in *Freitas,* the New York Court of Appeals cited *Giventer v. Arnow, 37 N.Y.2d 305, 333 N.E.2d 366, 372 N.Y.S.2d 63 (N.Y. 1975)* as an example of a loan instrument which was facially usurious. In *Giventer,* "[a]t the time the [contract] was executed, the maximum rate of interest was fixed at 7.50 [%] per annum," and the contract provided for an "interest at 7[.50%] [p]er annum, [to be] comp[o]unded quarterly[.]" *Id. at 367.* Despite compounding the interest on a quarterly basis, the contract provided that no payment was due until **[*27]** after one year. *Id. at 368.* By the point payment was actually due, "the effective [compounded] annual rate would be 7.72[%]." *Id. at 367.* The operation of the contract rendered the provision "merely a way of expressing an interest rate of 7.72%" at the time of payment, and the court refused to allow "a convenient hedging device for avoiding the more severe penalties of the usury statute." *Id. at 368-69; see also Blue Wolf, 961 N.Y.S.2d at 90* (applying the facial test

and finding that plaintiff "successfully asserted" usury when the true interest rate of an agreement stating only "12% of interest" was 36.09%).

Here, unlike the *Freitas* contract that stated a lawful interest amount that only a banker's extra-contractual clerical error increased, it is the RPA's language itself that spells usury. From the four corners of the contract, the Court gleans a loan at an interest rate five times the statutory limit, ostensibly backed by collateral. As in *Giventer,* the language of the contract itself—*i.e.,* the transfer of $93,614 in return for $130,545 paid under demanding conditions, including an implicit term of slightly over six months—"was merely a way of expressing" a loan at a grossly usurious rate. The existence of a single boilerplate disclaimer, **[*28]** that may have also appeared in a footnote or printed in small letters on the back of the RPA, does not mean that the usury simply fades away from the RPA's "very face" or that the unlawful intent is no longer "apparent[.]" *See Condit v. Baldwin, 21 N.Y. 219, 221 (1860).* Thus, the Court imputes usurious intent as a matter of law.

* * *

In sum, the Court finds that Defendants have successfully established the defense of usury, as a matter of law, and that therefore Plaintiff's summary judgment motion as to both its breach of contract and guaranty claims must be denied.

**IV. Defendant's Successful Usury Defense Invalidates Plaintiff's Breach of Contract and Guaranty Claims**

Because the Court has found that Defendants have established their usury defense as a matter of law, the question is what impact that finding has on Plaintiff's breach of contract and guaranty claims beyond requiring the denial of Plaintiff's summary judgment motion on those claims. Sitting in diversity, the Court "must predict how [a] state's highest court would resolve a question of state law." *Pinto v. Allstate Ins. Co., 221 F.3d 394, 402-03 (2d Cir. 2000)* (citation omitted). Based on this analysis, the Court concludes that Plaintiff's breach of contract and guaranty claims must dismissed.

It was once an open question under **[*29]** New York law whether a successful defense of criminal usury eliminates the borrower's obligations to pay back the loan. *See Venture Mortgage Fund, L.P. v. Schmutz, 282 F.3d 185, 189 (2d Cir. 2002); Am. Equities Grp., Inc. v.*

---

[10] Although Dr. Rhee's assertions are irrelevant to the analysis, the Court notes that Dr. Rhee in his deposition stated that he could not remember whether he ever read the RPA before signing it. (*See* Dr. Rhee Dep., Dkt. 46-6, 122:17-20.) The RPA itself includes generic terms, such as "FUNDER" and "MERCHANT," and appears to be a boilerplate instrument. (*See generally* Dkt. 46-5.)

2022 U.S. Dist. LEXIS 176467, *29

*Ahava Dairy Prods. Corp., No. 1-CV-5207 (RWS), 2007 U.S. Dist. LEXIS 93511, 2007 WL 4563487, at *5 (S.D.N.Y. Dec. 18, 2007)*. However, last year, in response to a certified question, the New York Court of Appeals opined that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays, 179 N.E.3d at 621*; *see also Seidel, 598 N.E.2d at 9* ("[T]he borrower can simply keep the borrowed funds and walk away from the agreement."). Thus, affording dispositive weight to the New York Court of Appeals' opinions, *see Pinto, 221 F.3d at 402-03*, the Court finds that the RPA—and by extension, the guaranty—are invalid and unenforceable.

**CONCLUSION**

For the foregoing reasons, the Court denies Plaintiff's partial motion for summary judgment and dismisses Plaintiff's claims for breach of contract and guaranty. By October 28, 2022, the parties shall file a joint pre-trial briefing schedule as to the remaining claims in the Complaint.

SO ORDERED.

*/s/ Pamela K. Chen*

Pamela K. Chen

United States District Judge

Dated: September 28, 2022

Brooklyn, New York

**End of Document**

# Exhibit E

A-586

No *Shepard's* Signal™
As of: October 12, 2022 7:29 PM Z

## *GS Capital Partners, LLC v. FTE Networks, Inc.*

Supreme Court of New York, New York County

August 18, 2022, Decided

Index No. 650626/2021

**Reporter**
2022 N.Y. Misc. LEXIS 4698 *; 2022 NY Slip Op 22286 **

[**1] GS Capital Partners, LLC, Plaintiff, against FTE Networks, Inc., SCFTE SPV LLC, Defendants.

**Notice:** THIS OPINION IS UNCORRECTED AND SUBJECT TO REVISION BEFORE PUBLICATION IN THE PRINTED OFFICIAL REPORTS.

## Core Terms

summary judgment

## Case Summary

### Overview

HOLDINGS: [1]-Plaintiff was not entitled to summary judgment in lieu of complaint to recover under the terms of a convertible redeemable note because defendants raised factual disputes that could give rise to a potentially meritorious criminal usury defense, which was a fact-specific affirmative defense for which defendants should have the benefit of discovery, and thus, the proceeding was converted to a plenary action under *CPLR 3213*.

### Outcome

Plaintiff's motion for summary judgment in lieu of complaint denied.

## LexisNexis® Headnotes

Business & Corporate
Compliance > ... > Breach > Breach of Contract
Actions > Money Had & Received

Civil Procedure > Judgments > Summary
Judgment > Motions for Summary Judgment

*HN1*[ ] **Breach of Contract Actions, Money Had & Received**

*CPLR 3213* permits a party to move for summary judgment in lieu of a complaint when an action is based upon an instrument for the payment of money only and provides that if the motion is denied, the moving and answering papers shall be deemed the complaint and answer, respectively, unless the court orders otherwise.

Civil Procedure > Judgments > Summary
Judgment > Entitlement as Matter of Law

Contracts Law > Defenses > Usury

*HN2*[ ] **Summary Judgment, Entitlement as Matter of Law**

A potentially meritorious usury defense warrants denial of a motion for summary judgment in lieu of a complaint.

Banking Law > ... > National Banks > Interest &
Usury > Rate & Recovery of Interest

Contracts Law > Defenses > Usury

Real Property Law > Financing > Mortgages &
Other Security Instruments > Usury

Business & Corporate Compliance > ... > Discharge
& Payment > Payments > Interest

Banking Law > ... > Banking & Finance > National
Banks > Usury Litigation

*HN3*[ ] **Interest & Usury, Rate & Recovery of**

Case 23-78, Document 36, 05/01/2023, 3508267, Page294 of 304

A-587

Firefox

about:blank

Case 1:21-cv-11222-ER   Document 40-5   Filed 10/12/22   Page 3 of 5

Page 2 of 4

2022 N.Y. Misc. LEXIS 4698, *4698; 2022 NY Slip Op 22286, **1

**Interest**

A stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount should be treated as interest when applying the usury law, *Penal Law § 190.40*, and a contract is void ab initio if it violates the usury law. A criminally usurious loan is void and unenforceable.

Contracts Law > Defenses > Usury

*HN4*[ ] **Defenses, Usury**

Usury is a fact-specific affirmative defense for which defendants should have the benefit of discovery.

**Counsel:** [*1] For Plaintiff: Mendy M. Piekarski, PIEKARSKI LAW PLLC, New York, NY; Mohammad Karim Sabbidine, THOMPSON HINE LLP New York, NY.

For Defendants: Justin Y Chu, TARTER KRINSKY & DROGIN LLP, New York, NY; Mark R. Basile, THE BASILE LAW FIRM P.C., Jericho, NY.

**Judges:** Joel M. Cohen, J.

**Opinion by:** Joel M. Cohen

## Opinion

Joel M. Cohen, J.

The following e-filed documents, listed by NYSCEF document number (Motion 001) 2, 14, 15, 17, 18, 19, 20, 21, 22, 23, 24, 25, 26, 27, 28, 29, 30, 31, 32, 37, 38, 39, 40 were read on this motion for SUMMARY JUDGMENT IN LIEU OF A COMPLAINT.

Plaintiff GS Capital Partners, LLC ("GS Capital" or "Plaintiff") moves pursuant to *CPLR 3213* for summary judgment in lieu of complaint against Defendants FTE Networks, Inc. ("FTE") and SCFTE SPV LLC ("SCFTE" and together with FTE, "Defendants") to recover under the terms of a Convertible Redeemable Note ("Note"). Plaintiff's motion is DENIED, and this matter shall proceed as a plenary action.

**BACKGROUND**

The parties entered a series of agreements on March 10, 2020, pursuant to which GS Capital acquired FTE common stock at a discount. First, GS Capital and FTE entered a Securities Purchase Agreement ("SPA") (NYSCEF 6) which required FTE to enter the Note and for its affiliate, [*2] SCFTE, to enter a guaranty. Second, FTE executed the Note (NYSCEF 5) pursuant to which it promised, among other things, to pay GS Capital $1,800,000.00. The Note accrued interest at a 6% rate of interest. Third, SCFTE executed a Payment Guaranty ("Guaranty") on the Note (NYSCEF 7). The authenticity of the SPA, Note and Guaranty are not in dispute (NYSCEF 25 at 1 [Defendant's Memorandum of Law]).

Following the execution of the Note, in August of 2020, FTE informed the Securities and Exchange Commission ("SEC") that it could not timely file certain required documents and FTE subsequently became delinquent in its SEC filings (NYSCEF 4 ¶¶11-15 [Affidavit of Isaac Kastner], NYSCEF 8-10). As a result, GS Capital contends that FTE defaulted under Section 8(m) of the Note and on January 25, 2021 GS Capital issued a notice of acceleration to FTE (NYSCEF 11). This action was commenced on January 27, 2021, by the filing a summons with notice of motion for summary judgment in lieu of a complaint (NYSCEF 1).

On March 22, 2021, Defendants submitted opposition (NYSCEF 17-25). Defendants [**2] argue that (a) the Note is "inextricably linked to, a securities purchase agreement" and therefore not an instrument [*3] for the payment of money only; (2) the Note is criminally usurious; and (3) that Plaintiff may have acted as an unregistered securities dealer (NYSCEF 25 at 1). In support of their contentions, Defendants have filed a copy of the Complaint in *SEC v. John M. Fife et. al.* (N.D. IL. 20-cv-05227) (NYSCEF 24) in which the SEC claims "engaging in a regular business of buying convertible notes and then selling the resulting newly-issued shares of microcap companies' stock into the public market" constitutes a violation of *Section 15(a)(1) of the Securities Exchange Act*.

The parties stipulated to multiple adjournments (NYSCEF 26-30) and on July 20, 2021, informed the Court that their efforts at a compromise had failed (NYSCEF 31). GS Capital filed its reply on July 23, 2021 (NYSCEF 32). Thereafter, Defendants submitted letters to the Court (NYSCEF 37-38) to draw attention to supplemental authority. Specifically, Defendants contend that the Court of Appeals decision in *Adar Bays, LLC v GeneSYS ID, Inc., 37 NY3d 320, 157*

Page 3 of 4

2022 N.Y. Misc. LEXIS 4698, *3; 2022 NY Slip Op 22286, **2

*N.Y.S.3d 800, 179 N.E.3d 612 [2021]*, as subsequently relied on in *PHSC, Inc. v Powerhouse Group Enterprises, Inc., 74 Misc 3d 1222[A], 162 N.Y.S.3d 924, 2022 NY Slip Op 50204[U] [Sup Ct New York County 2022]*, warrants denial of Plaintiff's motion based on Defendants' potentially meritorious usury defense. Specifically, the Court of Appeals held that a conversion option to purchase securities at a discount could be treated as interest for **[*4]** purposes of applying a usury defense.

Plaintiff submitted a letter in response (NYSCEF 39) arguing that the Court should not consider Defendants' letters because they are impermissible sur-replies and because applying *Adar Bays* "would constitute an improper retroactive application of a new principle of law" under *Gurnee v Aetna Life and Cas. Co., 55 NY2d 184, 433 N.E.2d 128, 448 N.Y.S.2d 145 [1982]*. Defendants submitted a reply letter generally arguing that Plaintiff's analysis of *Gurnee* was incorrect (NYSCEF 40). The Court has considered the parties' arguments with respect to the applicability of *Adar Bays* on the merits.

**DISCUSSION**

**HN1[↑]** *CPLR 3213* permits a party to move for summary judgment in lieu of a complaint "[w]hen an action is based upon an instrument for the payment of money only" and provides that "[i]f the motion is denied, the moving and answering papers shall be deemed the complaint and answer, respectively, unless the court orders otherwise." The inquiry for the Court is whether the Note is "entitled to the expedited treatment of *CPLR 3213*" (*PDL Biopharma, Inc. v Wohlstadter, 147 AD3d 494, 494, 47 N.Y.S.3d 25 [1st Dept 2017]* [denying motion where the court had to consider additional documents, determine whether there was a default and directing discovery]). **HN2[↑]** Relevant here, a potentially meritorious usury defense warrants denial of a motion for summary judgment in lieu of a complaint (**[*5]** *Cleo Realty Assoc., L.P. v Papagiannakis, 151 AD3d 418, 419, 56 N.Y.S.3d 294 [1st Dept 2017]*).

**HN3[↑]** In *Adar Bays*, the Court of Appeals held that (1) "*a stock conversion option that permits a lender, in its sole discretion, to convert any outstanding balance to shares of stock at a fixed discount should be treated as interest*" when applying the usury law, *NY Penal Law § 190.40*, and (2) that a contract is "void ab initio" if it violates the usury law (*Adar Bays, 37 NY3d at 323-324*). The PHSC, Inc. decision cites Adar Bays for the

proposition that "a criminally usurious loan is void and unenforceable" (*PHSC, Inc., 74 Misc 3d 1222[A], 2022 NY Slip Op 50204[U] at *2*).

Plaintiff's reliance on *Gurnee* to limit the applicability of *Adar Bays* is misplaced. In Gurnee, the Court of Appeals held that its decision *Kurcsics v Merchants Mut. Ins. Co., 49 NY2d 451, 454, 403 N.E.2d 159, 426 N.Y.S.2d 454 [1980]* concerning the term "first party benefits" as used in the Insurance Law should be **[**3]** applied retroactively to all cases not barred by the statute of limitations. The Court of Appeals noted that "a change in decisional law usually will be applied retrospectively to all cases still in the normal litigating process. . . As an exception to this general rule, however, where there has been such a sharp break in the continuity of law that its impact will wreak more havoc in society than society's interest in stability will tolerate a court may direct that the new pronouncement operate prospectively alone" (*Gurnee, 55 NY2d at 191-92* [internal **[*6]** citations and quotations omitted]). The Court of Appeals stated "it is important to emphasize that Kurcsics did not establish a new principle of law. It merely construed a statute that had been in effect for a number of years" (*id. at 192* [quotation omitted]).The *Adar Bays* decision did not establish a new principle of law, but instead construed a statute that has been in effect for many years. Nor did the court suggest that its opinion should be given only prospective effect. Accordingly, there is no basis for the Court to find that *Adar Bays* is inapplicable to the present case.

The Court finds that Defendants have raised factual disputes that could give rise to a potentially meritorious criminal usury defense. **HN4[↑]** Usury is a fact-specific affirmative defense for which Defendants should have the benefit of discovery. Accordingly, this proceeding will be converted to a plenary action under *CPLR 3213* (*Punch Fashion, LLC v Merchant Factors Corp., 180 AD3d 520, 521, 120 N.Y.S.3d 284 [1st Dept 2020]*, lv to appeal dismissed sub nom. *Merchant Factors Corp. v Cleary, 35 NY3d 1124, 134 N.Y.S.3d 7, 158 N.E.3d 898 [2020]*). In view of this determination, the Court does not at this stage address the merits of Defendants' other arguments in opposition to the present motion.

Accordingly, it is

**ORDERED** that Plaintiff's motion for summary judgment in lieu of a complaint is **DENIED**; it is further

**ORDERED [*7]** that this matter proceed as a plenary action and that the moving and answering papers on

2022 N.Y. Misc. LEXIS 4698, *7; 2022 NY Slip Op 22286, **3

this motion be deemed the complaint and answer, respectively (*CPLR 3213*); it is further

**ORDERED** that the parties confer in advance pursuant to Commercial Division *Rule 8* and appear for a telephonic preliminary conference on September 20, 2022, at 10:30 a.m. (the parties should email dial-in information in advance of the call to SFC-Part3&commat;nycourts.gov).[1]

This constitutes the Decision and Order of the Court.

8/18/2022

**End of Document**

---

[1] In lieu of appearing for a preliminary conference, the parties may submit an agreed-on preliminary conference order in advance of the scheduled date (see https://www.nycourts.gov/LegacyPDFS/courts/comdiv/NY/PDFs/PC-Order-Part-3.pdf [Part 3 PC order template]).

A-590

# Exhibit F

 Neutral
As of: October 12, 2022 7:30 PM Z

## *New Y-Capp v. Arch Cap. Funding, LLC*

United States District Court for the Southern District of New York

September 30, 2022, Decided; September 30, 2022, Filed

18-cv-3223 (ALC)

**Reporter**
2022 U.S. Dist. LEXIS 180309 *; 2022 WL 4813962

THE NEW Y-CAPP, ET AL., Plaintiffs, -against- ARCH
CAPITAL FUNDING, LLC, et al., Defendants.

**Prior History:** *New Y-Capp, Inc. v. Arch Capital
Funding, LLC, 2019 U.S. Dist. LEXIS 168683, 2019 WL
4805897 (S.D.N.Y., Sept. 27, 2019)*

## Core Terms

collection, Enterprise, reconciliation, motion to dismiss,
lender, merchant, borrower, funds, bank account, res
judicata, state court, receivables, ownership, default,
loans

**Counsel: [*1]** For The New Y-Capp, Inc., Jonathan
Eugene Coleman, Donna Zemoria Pierce-Baylor,
Radiant Images, Inc., Gianna Wolfe, Plaintiffs: Shane R.
Heskin, White & Williams, LLP(Philadelphia),
Philadelphia, PA.

For Arch Capital Funding, LLC, MCA Recovery, LLC,
Defendants: Gabriel Mendelberg, LEAD ATTORNEY,
Mendelberg PC, New York, NY.

For High Speed Capital, LLC, Yellowstone Capital, LLC,
Yellowstone Capital West, LLC, Defendants: David A.
Picon, Matthew Jerome Morris, LEAD ATTORNEYS,
Proskauer Rose LLP (NYC), New York, NY.

For Yitzhak D. Stern, Defendant: Joseph Barbiere,
LEAD ATTORNEY, Cole Schotz Meisel Forman &
Leonard, P.A. (NJ), Hackensack, NJ; Jason Robert
Finkelstein, Cole Schotz P.C., New York, NY.

Avraham Y. Weinstein, Defendant, Pro se.

**Judges:** ANDREW L. CARTER, JR., United States
District Judge.

**Opinion by:** ANDREW L. CARTER, JR.

## Opinion

**OPINION AND ORDER**

**ANDREW L. CARTER, JR., United States District
Judge:**

Plaintiffs bring this suit against Defendants, a group of
merchant cash advance ("MCA") companies, and
various executives at these MCAs, alleging violating of
the Racketeer Influenced and Corrupt Organization Act
("RICO"), *18 U.S.C. § 1962*, conspiracy in violation of *18
U.S.C. § 1962(d)*, and wrongful execution.

The Court assumes familiarity with the facts **[*2]** of this
case, as set forth in its September 29, 2019 and
September 16, 2020 Opinions, denying Defendants'
motions to dismiss and granting Plaintiffs leave to
amend. The Court recites facts relevant to the motion.
Defendants now move to dismiss Plaintiffs' Third
Amended Complaint ("TAC").

**LEGAL STANDARD**

When resolving a motion to dismiss under *Federal Rule
of Civil Procedure 12(b)(6)*, a court should "draw all
reasonable inferences in [the plaintiff's] favor, assume
all well-pleaded factual allegations to be true, and
determine whether they plausibly give rise to an
entitlement to relief." *Faber v. Metro. Life Ins. Co., 648
F.3d 98, 104 (2d Cir. 2011)* (internal quotation marks
and citations omitted). Thus, "[t]o survive a motion to
dismiss [under *Rule 12(b)(6)*], a complaint must contain
sufficient factual matter, accepted as true, to 'state a
claim to relief that is plausible on its face.'" *Ashcroft v.
Iqbal, 556 U.S. 662, 678, 129 S. Ct. 1937, 173 L. Ed. 2d
868 (2009)* (quoting *Bell Atl. Corp. v. Twombly, 550 U.S.
544, 570, 127 S. Ct. 1955, 167 L. Ed. 2d 929 (2007)*).
However, the court need not credit "[t]hreadbare recitals
of the elements of a cause of action, supported by mere
conclusory statements." *Ashcroft, 556 U.S. at 678* (citing

2022 U.S. Dist. LEXIS 180309, *2

Twombly, 550 U.S. at 555).

The Court's function on a motion to dismiss is "not to weigh the evidence that might be presented at a trial but merely to determine whether the complaint itself is legally sufficient." Goldman v. Belden, 754 F.2d 1059, 1067 (2d Cir. 1985). Additionally, "[a]lthough the statute of limitations is ordinarily [*3] an affirmative defense that must be raised in the answer, a statute of limitations defense may be decided on a Rule 12(b)(6) motion if the defense appears on the face of the complaint." Thea v. Kleinhandler, 807 F.3d 492, 501 (2d Cir. 2015) (internal quotation marks and citations omitted).

"A court may consider a res judicata defense on a Rule 12(b)(6) motion to dismiss when the court's inquiry is limited to the plaintiff's complaint, documents attached or incorporated therein, and materials appropriate for judicial notice." TechnoMarine SA v. Giftports, Inc., 758 F.3d 493, 498 (2d Cir. 2014). Indeed, when a motion to dismiss is premised on this doctrine, the court may take judicial notice of the complaints and record in both actions without having to convert to summary judgment motion. McKoy v. Henderson, No. 05 Civ. 1535, 2007 U.S. Dist. LEXIS 15673, 2007 WL 678727, at *6 (S.D.N.Y. Mar 5, 2007).

## DISCUSSION

Defendants argue that Plaintiffs claims should be dismissed because (1) their claims are barred under the doctrine of res judicata and (2) they fail to plausibly plead the elements of their Rico claims.

### I. Res Judicata and the *Rooker-Feldman* Doctrine

The *Rooker-Feldman* doctrine requires this Court to abstain from exercising subject matter jurisdiction over state court final judgments. Because the existence of subject matter jurisdiction is a threshold question, the Court must resolve jurisdictional issues before delving into the merits [*4] of a dispute. See McCrory v. Administrator of Federal Emergency Management Agency of U.S. Dept. of Homeland Sec., 22 F. Supp. 3d 279, 286-87 (S.D.N.Y. 2014). "Underlying the *Rooker-Feldman* doctrine is the principle, expressed by Congress in 28 U.S.C. § 1257, that within the federal judicial system, only the Supreme Court may review state-court decisions." Green. v. Mattingly, 585 F.3d 97, 101 (2d Cir. 2009) (quoting Hoblock v. Albany County Bd. of Elections, 422 F.3d 77, 85 (2d Cir. 2005)). For the

*Rooker-Feldman* doctrine to apply, four requirements must be met: "(1) the federal-court plaintiff must have lost in state court; (2) the plaintiff must complain of injuries cause by a state-court judgment; (3) the plaintiff must invite district court review and rejection of that judgment; and (4) the state-court judgment must have been rendered before the district court proceedings commenced." Sung Cho v. City of New York, 910 F.3d 639, 644-45 (2d Cir. 2018).

Res Judicata operates in a fashion similar to that of the *Rooker-Feldman* doctrine "Under the doctrine of *res judicata*, '[a] final judgment on the merits of an action precludes the parties or their privies from relitigating issues that were or could have been raised in that action.'" Saud v. Bank of New York, 929 F.2d 916, 918-19 (2d Cir.1991) (quoting Federated Dep't Stores, Inc. v. Moitie, 452 U.S. 394, 398, 101 S. Ct. 2424, 69 L. Ed. 2d 103 (1981)). To determine the preclusive effect of a prior judgment, district courts consider: "whether the same transaction or connected series of transactions is at issue, whether the same evidence is needed to support both claims, and whether the facts essential to the second were present [*5] in the first." N.L.R.B. v. United Techs. Corp., 706 F.2d 1254, 1260 (2d Cir.1983).

The judgment at issue in this action is a confessed judgment filed by Defendants in New York state courts. Contrary to Defendants' contentions, the state action has no preclusive effect on the current case. The judgment stems from one transaction between one of the defendants and plaintiffs; in a plenary action filed in state court, plaintiffs claim that the transaction, forming the basis of the judgment, is a usurious loan and the judgment was obtained by filing a false affidavit. Plaintiffs did not initiate this suit to attack the confessed judgment. Plaintiffs' suit is premised on the theory that Defendants' scheme is violative of the federal RICO statute. Whereas the state action is concerned with the enforcement of the confessed judgment authored by the Defendants, this action challenges the legality of Defendants' operations, not the consent judgment itself. Since the plaintiffs claims "speak not to the propriety of the state court judgments, but to the fraudulent course of conduct that defendants pursued in obtaining such judgments," *Rooker-Feldman* does not apply. Sykes v. Mel S. Harris & Assocs. LLC, 780 F.3d 70, 94-95 (2d Cir. 2015).

Accordingly, the Court finds that the state action has no preclusive effect on this action. See, [*6] e.g., Cho, 910 F.3d at 647 (finding no abstention under *Rooker-*

2022 U.S. Dist. LEXIS 180309, *6

*Feldman* where "state-court judgments were a mere ratification of the harm allegedly caused by defendants.).

## II. RICO Claim

*Section 1964(c)* creates a private right of action for RICO violations. *18 U.S.C. § 1964(c)*. The RICO statute provides that it is "unlawful for any person employed by or associated with any enterprise engaged in, or the activities of which affect, interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through a pattern of racketeering activity or collection of unlawful debt." *18 U.S.C. § 1962(c)*.

To state a civil RICO claim, the plaintiff must allege: "(1) conduct (2) of an enterprise (3) through a pattern (4) of racketeering activity" or "through . . . collection of unlawful debt." *Lateral Recovery LLC v. Queen Funding, LLC, No. 21-cv-9607 (LGS), 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *2 (S.D.N.Y. July 20, 2022)* (quoting *18 U.S.C. § 1962(c)*). "[U]nlike a 'pattern of racketeering activity' which requires proof of two or more predicate acts, to satisfy RICO's 'collection of unlawful debt' definition the [plaintiff] need only demonstrate a single collection." *Fleetwood Servs., LLC v. Ram Cap. Funding LLC, No. 20-cv-5120 (LJL), 2021 U.S. Dist. LEXIS 94381, 2021 WL 1987320, at *3 (S.D.N.Y. May 18, 2021)* (citing *United States v. Giovanelli, 945 F.2d 479, 490 (2d Cir. 1991)*).

Defendants principally argue that Plaintiffs have not sufficiently pleaded the existence of an enterprise or the collection of unlawful debt.

### A. Existence of An Enterprise

Defendants argue [*7] that Plaintiffs' RICO claims fail because they do not plead that Yellowstone and its affiliates are separate entities. Consequently, they argue, Plaintiffs have not pleaded the existence of a person and an enterprise. This argument is without merit. Although the TAC alleges that members of the enterprise have some ownership overlap, the TAC notes several distinct entities with separate ownership and control:

 • **Defendant Stern** "is an owner and the Chief Executive Officer of HSC, Yellowstone and YCW. Stern is responsible for the day-to-day operations of

the Enterprise and has final say on all business decisions of the Enterprise including, without limitation, which usurious loans the Enterprise will fund, how such loans will be funded, which of Investors will fund each loan and the ultimate payment terms, amount and period of each usurious loan, including the loans extended to Y-CAPP, Radiant and the Class Members." TAC ¶483. Stern "has a controlling ownership interest in HSC, YCW, and Yellowstone, and is the Chief Executive Officer of HSC, YCW and Yellowstone." TAC ¶ 472.

 • **Defendant MCA Recovery** "provides legal services to the Enterprise and collects upon the debts of the Enterprise. [*8] Yellowstone has a partial ownership interest in MCA Recovery. On information and belief, Arch also has a partial ownership interest in MCA Recovery." TAC ¶ 473

 • **Defendant Arch** "is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of HSC, YCW, Yellowstone and MCA Recovery." TAC ¶ 499. "Arch solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws." TAC ¶ 474. "Arch: (i) pooled funds from Investors to fund the Agreements; (ii) underwrote the Agreements; (iii) entered into the Agreements; and (iv) collected upon the unlawful debt evidenced by the Agreements by effecting daily ACH withdrawals from the bank accounts of Y-CAPP' and the Class Members." *Id.* ¶ 501. "Arch ultimately benefits from the Enterprise's unlawful activity by receiving a management fee from the proceeds of the unlawful debt from the Enterprise's funneling of the usurious loan proceeds and to the Investors of the deals in which, upon information and belief, Arch has directly participated." *Id.* ¶ 502.

 • **Defendant HSC** "is organized under the laws of New York and maintains officers, books, [*9] records, and bank accounts independent of Arch, YCW Yellowstone and MCA Recovery." TAC ¶ 495. HSC solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws." TAC ¶ 475.

 • **Defendant Yellowstone** "is organized under the laws of New York and maintains officers, records, and bank accounts independent of Arch,

Case 23-78, Document 36, 05/01/2023, 3508267, Page301 of 304

A-594

Firefox

about:blank

Case 1:21-cv-11222-ER   Document 40-6   Filed 10/12/22   Page 5 of 7

Page 4 of 6

2022 U.S. Dist. LEXIS 180309, *9

HSC, YCW and MCA Recovery." TAC ¶ 487. "Yellowstone solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws." TAC ¶ 476.

• **Defendant YCW** "is organized under the laws of New York and maintains officers, books, records, and bank accounts independent of Arch, HSC, Yellowstone and MCA Recovery." TAC ¶ 491. "YCW solicits, underwrites, funds, services and collects upon lawful debt incurred by small businesses in states that do not have usury laws." TAC ¶ 477.

• The TAC also makes several claims against John and Jane Doe defendants.

*B. Unlawful Debt*

Defendants also argue that Plaintiffs do not sufficiently plead the collection of unlawful debt. They contend that the MCAs are not loans and thus cannot be said to be usurious. "RICO defines [*10] "unlawful debt" as a debt (A) 'which is unenforceable under State or Federal law in whole or in part as to principal or interest because of the laws relating to usury,' and (B) 'which was incurred in connection with . . . the business of lending money or a thing of value at a rate usurious under State or Federal law, where the usurious rate is at least twice the enforceable rate. . . .'" *Lateral Recovery LLC, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *4* (quoting *18 U.S.C. § 1961(6)*).

The essential element of usury is the existence of a loan or forbearance of money. *See Colonial Funding Network, Inc. for TVT Capital, LLC v. Epazz, Inc., 252 F. Supp. 3d 274, 280 (S.D.N.Y. 2017)* ("*TVT Capital*") (quoting *Feinberg v. Old Vestal Rd. Assocs., 157 A.D.2d 1002, 1003, 550 N.Y.S.2d 482, 483 (3d Dep't 1990)*). Without a loan, "there can be no usury, however unconscionable the contract may be." *TVT Capital, 252 F. Supp. 3d at 280* (quoting *Seidel v. 18 E. 17th St. Owners, Inc., 79 N.Y.2d 735, 744, 598 N.E.2d 7, 11-12, 586 N.Y.S.2d 240, 244-45 (1992)*). Determining usury is a question of fact. *Id.* (citing *Ujueta v. Euro-Quest Corp., 29 A.D.3d 895, 896, 814 N.Y.S.2d 551 (2006)*).

To constitute a loan, the transaction must involve a borrower and a lender. *See TVT Capital, 252 F. Supp. 3d at 281.* Furthermore, the lender must have purposefully loaned money at a usurious interest reserved in some form by the contract, and the borrower

must have agreed to these usurious terms. *Id.; see also Donatelli v. Siskind, 170 A.D.2d 433, 434, 565 N.Y.S.2d 224, 226 (2d Dep't 1991).* Thus, courts must determine a transaction's purpose by its true character, under all circumstances, rather than its title. *Kelly, Grossman & Flanagan, LLP v. Quick Cash, Inc., 35 Misc.3d 1205[A], 950 N.Y.S.2d 723, 2012 NY Slip Op 50560[U], 2012 WL 1087341, at *6 (Sup. Ct. 2012); see also Ujueta v. Euro-Quest Corp., 29 A.D.3d 895, 814 N.Y.S.2d 551 (2d Dep't 2006).*

"[W]hen determining whether a transaction was a true sale of receivables or a loan, "[t]he root of [the analysis] [*11] is the transfer of risk. Where the lender has purchased the accounts receivable, the borrower's debt is extinguished and the lender's risk with regard to the performance of the accounts is direct, that is, the lender and not the borrower bears the risk of non-performance by the account debtor." *Lateral Recovery LLC, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *4* (quoting *Endico Potatoes, Inc. v. CIT Grp./Factoring, Inc., 67 F.3d 1063, 1069 (2d Cir. 1995)*). "Courts have considered, among others, the following three factors to analyze who bears the ultimate risk that the borrower's customers will not pay: (1) whether there is a reconciliation provision; (2) whether the agreement has an indefinite term and (3) whether the lender has any recourse should the merchant declare bankruptcy." *Lateral Recovery LLC, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *4 (S.D.N.Y. July 20, 2022)* (citing *LG Funding, 122 N.Y.S.3d at 312*

*Reconciliation Provision.* Plaintiffs allege that the reconciliation provision exists in name only. They contend that the MCAs are structured so that businesses are led to believe they have a right to reconciliation. In practice, however, Defendants constructed a number of obstacles to call on the reconciliation provision:

> [S]ome of the reconciliation clauses provide that reconciliations will occur at the funders' "sole discretion."

> Others provide that, should the merchant fail to submit certain documentation related to reconciliation to the funder [*12] on just a single month, that the merchant forfeits the right to *ever* request a subsequent reconciliation.

> All, or almost all, of the reconciliation provisions provide no right to have the Daily Payment reduced *prospectively*, no matter how much a merchant's receivables fall.

Page 5 of 6

2022 U.S. Dist. LEXIS 180309, *12

TAC ¶¶ 135-37.

*Indefinite Nature of Agreement.* "A fixed term is typical of a loan, while an indefinite term of receiving a fixed percentage of actual receipts may suggest that the lender has assumed the risk associated with the receivables not being collectable. *Lateral Recovery LLC, No. 21-cv-9607 (LGS), 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022)* (citing *Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9* ("If the term is indefinite, then it is consistent with the contingent nature of each and every collection of future sales proceeds under the contract.")).

Here, Plaintiffs allege that "members of the Enterprise frequently refer to the MCA Agreements as having fixed terms and, in most cases, fixed daily or weekly repayment obligations." TAC ¶ 100. They further allege that Defendants promotion of the MCAs, read in context, point to a fixed term agreement. The TAC notes that one conversation with a member of the alleged RICO enterprise called the potential agreement "a long deal" in his efforts to induce consent.

*Lender Recourse in Event of Bankruptcy [*13]*. "If the merchant's bankruptcy triggers a default, this factor would weigh in favor of finding the agreement to be a loan because it would suggest that the lender has not assumed the risk of loss of not collecting on the receivables, but instead is relying on the creditworthiness of the borrower to be repaid." *Lateral Recovery LLC, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *6 (S.D.N.Y. July 20, 2022)* (citing *Fleetwood Servs., 2022 U.S. Dist. LEXIS 100837, 2022 WL 1997207, at *9* ("In determining whether the merchant retains the risk of nonpayment, it is significant that 'the agreement provides that [defendant's] written admission of its inability to pay its debt or its bankruptcy constitute events of default under the agreement, which entitle the plaintiff to the immediate full repayment of any of the unpaid purchased amount.'")).

Defendants' MCA agreements prior to 2016 specifically name bankruptcy as an event of default. TAC ¶ 318. From 2016 onwards, the MCAs were revised to exclude the express provisions regarding bankruptcy triggering a default. And other provisions "worked to ensure while bankruptcy may no longer have been an express default under the revised standard form of MCA Agreement, the guarantor continued to be absolutely liable for repayment in the event of a bankruptcy filing." TAC ¶ 320.

Having considered these factors, the Court [*14] is persuaded that the plaintiff has sufficiently pleaded that the agreements at issue constitute usury under New York law and satisfy the RICO statute unlawful debt provision. Other courts in this district faced with substantially similar facts have found the MCAs at issue are not simply business-to-business contracts but actual loans. *See Lateral Recovery LLC v. Queen Funding, LLC, No. 21-cv-9607 (LGS), 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913 (S.D.N.Y. July 20, 2022)*; *Fleetwood Servs., LLC v. Ram Cap. Funding LLC, No. 20-cv-5120 (LJL), 2021 U.S. Dist. LEXIS 94381, 2021 WL 1987320 (S.D.N.Y. May 18, 2021)*.

### III. RICO Conspiracy Claim

Defendants' sole argument against Plaintiffs' RICO Conspiracy Claim is that Plaintiffs did not sufficiently plead a RICO violation. As this argument is meritless, Plaintiffs' conspiracy claim survives Defendants' motion to dismiss. *See Lateral Recovery, 2022 U.S. Dist. LEXIS 129032, 2022 WL 2829913, at *8*.

### IV. Wrongful Execution

In light of the New York Court of Appeals' opinion in *Plymouth Venture Partners, II, L.P. v. GTR Source, LLC, 37 N.Y.3d 591, 163 N.Y.S.3d 467, 183 N.E.3d 1185 (2021)*, the Court believes the proper vehicle to litigate this claim is *N.Y.C.P.L.R. § 5240*. The Court will hold a telephonic conference on **October 12, 2022 at 10:30AM Eastern Time**. All Parties shall appear and should contact the Court at **1-888-363-4749 (access code: 3768660)**.

### CONCLUSION

For the foregoing reasons, Defendants motions to dismiss are **DENIED**. The Clerk of the Court is respectfully directed to terminate ECF Nos. 177, 180, 182, 184.

**SO ORDERED.**

**Dated: September 30, 2022**

/s/ Andrew L. Carter, Jr.

**ANDREW L. CARTER, JR.**

**United States [*15] District Judge**

A-596

Case 1:21-cv-11222-ER   Document 40-6   Filed 10/12/22   Page 7 of 7

2022 U.S. Dist. LEXIS 180309, *15

**New York, New York**

---

**End of Document**

**A-597**

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC., | CIVIL ACTION NO. 1:21-cv-11222-ER |
| *Plaintiff,* | |
| v. | **NOTICE OF APPEAL** |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, and ELI FIREMAN, | |
| *Defendants.* | |

**PLEASE TAKE NOTICE** that Plaintiff DarkPulse, Inc., by and through their undersigned counsel, in the above named case hereby appeals to the United States Court of Appeals for the Second Circuit, from the attached Order and Judgment, both entered January 17, 2023, that granted Defendants' Motion to Dismiss, dated May 26, 2022, a copy of each is enclosed herein.

DATED:      Jericho, New York
                   January 17, 2023

**THE BASILE LAW FIRM, P.C.**

By:*/s / Gustave P. Passanante*
Gustave P. Passanante, Esq.
Eric J. Benzenberg, Esq.
390 N. Broadway, Ste. 140
Jericho, NY 11753
Tel.:     (516) 455-1500
Fax:     (631) 498-0748
Email: gus@thebasilelawfirm.com
              eric@thebasilelawfirm.com

*Attorneys for Plaintiff DarkPulse, Inc.*