# 23-0078-cv

## United States Court of Appeals

*for the*

## Second Circuit

———————————

DARKPULSE, INC.,

*Plaintiff-Appellant,*

— v. —

FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, ELI FIREMAN,

*Defendants-Appellees.*

———————————————

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

**BRIEF and SPECIAL APPENDIX
FOR PLAINTIFF-APPELLANT**

MARK R. BASILE, ESQ
MARJORIE SANTELLI, ESQ
GUSTAVE P. PASSANANTE, ESQ
THE BASILE LAW FIRM P.C.
*Attorneys for Plaintiff-Appellant*
390 North Broadway, Suite 140
Jericho, New York 11753
(516) 455-1500

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................v

RULE 26.1 CORPORATE DISCLOSURE STATEMENT ...................................1

JURISDICTIONAL STATEMENT ........................................................2

ISSUES PRESENTED FOR REVIEW ......................................................3

STATEMENT OF THE CASE ...........................................................5

BACKGROUND ....................................................................9

    A.    The Parties .................................................................9

    B.    The 2021 Loan Agreement.....................................................9

        i.    Fixed $0.015 Conversion Price..................................................10

        ii.    $0.005 Default Fixed Conversion Price...................................11

        iii.    Commitment Shares.....................................................11

        iv.    Fees ...............................................................12

        v.    Choice of New York Law ................................................12

            1.    Registration Rights Agreement. ....................................13

    C.    Events Subsequent to the Execution of the Agreement .....................13

        i.    The New York Court of Appeals Decides Adar Bays.............13

        ii.    The Amendment.......................................................14

            A.    FirstFire Files Suit Against DarkPulse in the Delaware State Court .....................................................16

                1.    DarkPulse Moves to Dismiss the Delaware Case By Interposing the Defense of Criminal Usury Under NY Gen. Oblig. §5-521(3) ...........................17

                2.    FirstFire Voluntarily Dismisses the Delaware Suit Against DarkPulse ........................18

PROCEDURAL HISTORY.................................................................18

i

A.      DarkPulse Files Suit Against FirstFire and Elie Fireman in SDNY ................................................................................. 18

     I.      UNDER NEW YORK LAW, USURIOUS LOAN CONTRACTS ARE ABSOLUTELY VOID, INCLUDING LOANS TO CORPORATIONS ..................... 25

D.      Section 5-511(1) Commands that Usurious Contracts are Absolutely Void and Without Legal Effect ........................................ 26

E.      Under the Command of the Statute, "The Court *Shall* Declare" A Usurious Instrument to be Void "and Enjoin Any Prosecution Thereon" ......................................................................... 27

     I.      Section 5-511 is Based on the Familiar Rule That Illegal Contracts Are Unenforceable And the Courts Will Not Recognize Rights From Them .................................. 28

         II.      CORPORATIONS ARE NOT PERMITTED TO BRING AFFIRMATIVE CLAIMS FOR RELIEF BASED ON USURY (BUT A COURT MAY NOT ENFORCE A CONTRACT THAT IS USURIOUS AND VOID *AB INITIO*) ...................... 29

             A.      The Affirmative Defense in Section 5-521(3) Reflects the Well-Established Defense of Illegality ........................................... 29

             B.      History Of the Corporate Usury Defense ............. 30

             C.      To "Interpose the Defense of Usury" is Broadly Defined by the New York Court of Appeals .......................................................... 32

                 1.      The *Butterworth* Definition is Consistent With the Dictionary Definitions of "Defense" and "Claim." .................................... 33

             D.      An Affirmative Claim is a Distinct Cause of Action Seeking Affirmative Relief ................ 34

ii

E. Caselaw Applying §5-521(3) Shows that New York Courts Only Dismiss When the Corporate Plaintiff Alleges a Claim for Affirmative Relief ...............................35

F. Nothing in The Plain Language of § 5-521 Limits the Defense of Criminal Usury to "Actions Seeking Repayment of A Loan" ...........36

G. The District Court Cites *Haymount I* But Ignores *Haymount II*..............................38

1. Haymount II Recognizes that A Lender Seeking Dismissal Based Upon a Contractual Provision is *Seeking to Enforce the Contract* ...............38

III. APPLICATION TO THIS CASE.....................................40

A. DarkPulse Brought No Affirmative Claims Based on Usury; DarkPulse Raised Usury in Response to FirstFire's Attempt to Enforce the Forum Selection Clause ..............................40

1. DarkPulse Raised Usury as a Defense, Not an Affirmative Claim .....................................41

2. DarkPulse did not make a usury claim, it made a RICO claim.......................................42

SUMMARY OF THE ARGUMENT .....................................45

ARGUMENT .................................................48

IV. SECTION 29(B) PROVIDES A RIGHT OF RESCISSION FOR CONTRACTS MADE IN VIOLATION OF THE ACT ..........................48

A. Under Section 29(b), Contracts are Void if (1) "Made in Violation" of the Act or (2) Where Performance of the Contract Involves a Violation of the Act ...........................49

1. MADE IN VIOLATION OF THE ACT: *Eastside Church*: The Fifth Circuit Holds that an Unregistered Broker Dealer Violated the Act by Entering into a Transaction in Securities..........................49

iii

2.      Performance In Violation of the Act: Brokerage Contracts ....................................................................50

3.      *Berckeley v. Colkitt*: As Made, As performed .........................51

B.    Elements of a 29(b) Claim ..............................................52

C.    Elements of a Claim Under Section 15 (a) of the Exchange Act ...........................................................................52

1.      (1) Unregistered + (2) Securities Dealer....................................53

2.      Effect Any Transaction in Any Security................................54

3.      A Convertible Promissory Note Is A "Security"......................54

        a)      A Convertible Promissory Note Must be a Security to Be "Convertible" .........................................55

        b)      FirstFire Can Only Obtain Freely-Trading Stock at Conversion If the Note is a Security.........................56

V.    THE SECURITIES PURCHASE AGREEMENT EFFECTED A TRANSACTION IN SECURITIES .............................................57

A.    FirstFire Effected a Transaction in Securities When it Entered into the Agreement ................................................57

B.    The Securities Purchase Agreement Obligated FirstFire to Purchase the Note, Which Means FirstFire Was Required to Effect a Transaction in Securities.........................................58

VI.    THE DISTRICT COURT'S CONSTRUCTION OF SECTION 15(A) IS CONTRARY TO THE PLAIN LANGUAGE OF THE STATUTE..............................................................................58

A.    §15(a) Contains No "Act Like a Dealer" or "Act Like A Broker" Requirement ........................................................58

B.    The District Court's Blind Reliance On LG Capital and *Vystar* is Misplaced, because Both Decisions Fail to Recognize that a Convertible Promissory Note is a Security .............60

E.    *Vystar* is Incorrect Because its Analysis is Premised on the Failure to Recognize that A Convertible Promissory Note is a Security..........................................................................61

CONCLUSION .........................................................................63

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adar Bays, LLC v. GeneSYS ID, Inc.*,
179 N.E.3d 612 (New York 2021) ........................................................ *passim*

*Bankers Tr. Co. v. Litton Sys., Inc.*,
599 F.2d 488 (2d Cir. 1979) ........................................................... 30

*Berckeley v. Colkitt*,
455 F.3d 195 (3d Cir. 2006) .............................................. 48, 49, 51

*Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*,
105 A.D.3d 178 (2013 App. Div. 1st Dep't) ............................... 37

*Butterworth v. O'Brien*,
23 N.Y. 275 (1861) .......................................................... 30, 32, 33

*Curtis v. Leavitt*,
15 N.Y. 9 (1857) ............................................................... 30

*DarkPulse Inc. v. FirstFire Global Opportunities Fund, LLC, et al*,
2023 U.S. DIST LEXIS 7874 (S.D.N.Y. Jan. 17, 2023) ................ 2

*DiBella v. Hopkins*,
403 F.3d 102 (2d Cir. 2005) .......................................... 32

*Dry Dock Bank v. Am. Life Ins. & Tr. Co.*,
3 N.Y. 344 (1850) .......................................................... 30

*Eastside Church of Christ v. Nat'l Plan, Inc.*,
391 F.2d 357 (5th Cir. 1968), *cert. denied*, 393 U.S. 913 (1968).......... *passim*

*EMA Fin., LLC v. AppTech Corp.*,
2022 U.S. Dist. LEXIS 165560 (S.D.N.Y. Sep. 13, 2022) ............ 59

*EMA v. Vystar*,
336 F.R.D. 81 ....................................................... 20, 61, 62

*Foundation Ventures, LLC v. F2G, LTD.*,
No. 08 Civ. 10066 (PKL), 2010 WL 3187294
(S.D.N.Y. Aug. 11, 2010) ................................................... 46

*Hammelburger v. Foursome Inn Corp.*,
431 N.E.2d 278 (1981) ................................................. 28

v

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
 2022 U.S. Dist. LEXIS 186768 (S.D.N.Y. Oct. 12, 2022) ................... *passim*

*Haymount Urgent Care PC v. GoFund Advance, LLC*,
 609 F. Supp. 3d 237 (S.D.N.Y. June 27, 2022)................................ 35, 38, 41

*Intima-Eighteen, Inc. v. A.H. Schreiber Co.*,
 172 A.D.2d 456 (App. Div. 1st Dep't 1991).............................. 35, 36, 37, 38

*Kaiser Aluminum & Chem. Corp. v. Bonjorno*,
 494 U.S. 827 (1990).............................................................. 14-15

*Leemon v. Burns*,
 175 F. Supp. 2d 551 (S.D.N.Y. 2001) ...........................................54

*LG Capital Funding, LLC v. Accelera Innovations, LLC*,
 2018 U.S. Dist. LEXIS 137490 (E.D.N.Y. Aug. 10, 2018) .................... 55-56

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
 2018 U.S. Dist. LEXIS 202540 (S.D.N.Y. Sep. 28, 2018).................. *passim*

*McConnell v. Commonwealth Pictures Corp.*,
 166 N.E.2d 494 (New York 1960) .......................................... 29-30

*National Union Fire Ins. Co. v. City Sav., F.S.B.*,
 28 F.3d 376 (3d Cir. 1994)........................................................33

*P.J.P. Mech. Corp. v. Commerce & Indus. Ins. Co.*,
 65 A.D.3d 195 (App. Div. 1st Dep't 2009)....................................34

*Paycation Travel, Inc. v. Global Merchant Cash, Inc.*,
 192 A.D.3d 1040 (N.Y. App. Div. 2021) ................................... 35, 37

*Post v. President*,
 7 Hill 391 (New York 1844) .......................................................27

*Reeves v. Ernst & Young*,
 494 U.S. 56 (1990)...................................................................54

*Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*,
 678 F.2d 552 (5th Cir. 1982).................................................. 51, 52

*Roby v. Corp. Of Lloyd's*,
 996 F.2d 1353  (2d Cir. 1993)................................................ 40-41

*Rosa v. Butterfield*,
 33 N.Y. 665 (1865) ............................................................ 29, 30

*Sabine v. Paine*,
   119 N.E. 849 (1918) ....................................................................27

*Scantek Med., Inc. v. Sabella*,
   582 F. Supp. 2d 472 (S.D.N.Y. 2008) ..........................................35

*SEC v. Almagarby*,
   479 F. Supp. 3d 1266 (S.D. Fla. 2020) ...........................................7

*SEC v. Fierro*,
   2020 WL 7481773 (D.N.J. Dec. 18, 2020) ......................................7

*SEC v. Fife,*
   2021 WL 5998525 (N.D. Ill. Dec. 20, 2021) ...................................7

*SEC v. GPL Ventures, LLC*,
   No. 21-CV-6814 (S.D.N.Y. Aug. 13, 2021) ....................................7

*SEC v. Keener*,
   2020 WL 4736205 (S.D. Fla. Aug. 14, 2020) .................................7

*SEC v. LG Capital Funding, LLC*,
   Case No. 22-cv-03353 (WFK) (JRC) (E.D.N.Y.) .........................47

*SEC v. River N. Equity LLC*,
   415 F. Supp. 3d 853 (N.D. Ill. 2019) ..............................................7

*Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*,
   263 F.3d 26 (2d Cir. 2001) ..................................................... 26, 41

*Streamlined Consultants, Inc. v. EBF Holdings*,
   2022 U.S. Dist. LEXIS 171085 (S.D.N.Y. Sept. 20, 2022) ............. 22, 35, 41

*Szerdahelyi v. Harris*,
   490 N.E.2d 517 (1986) .................................................................28

*United States v. Sec. Indus. Bank*,
   459 U.S. 70 (1982) .......................................................................15

**Statutes & Other Authorities:**

15 U.S.C. § 77e .................................................................................56

15 U.S.C. § 78c(1)(13) ......................................................................54

15 U.S.C. § 78c(a)(5) .................................................................. 54, 59

15 U.S.C. § 78c(a)(10) ......................................................................54

15 U.S.C. § 78cc(b) ....................................................... *passim*

15 U.S.C. § 78o ............................................................63

15 U.S.C. § 78o(a)(1) ................................................. *passim*

18 U.S.C. § 1961(6) ......................................................19

18 U.S.C. § 1962(c) ........................................... 19, 39, 42

28 U.S.C. § 1291 ...........................................................2

28 U.S.C. § 1331 .........................................................19

28 U.S.C. § 1391(b)(1) ...............................................19

28 U.S.C. § 1391(b)(2) ...............................................19

17 C.F.R. § 230.144 .............................................. 12, 56

17 C.F.R. § 230.144(d)(3)(ii) ......................................56

17 C.F.R. § 230.506 .....................................................10

84 N.Y. Jur. 2d, Pleading § 166 ................................34

Black's Law Dictionary (6th ed. 1990) ....................33

Black's Law Dictionary (10th ed. 2014) ..................34

*Dictionary of Finance and Investment Terms* (10th ed. 2018) ..............55

Federal Rule of Appellate Procedure 26.1 ................1

N.Y. Penal Law § 190.40 .................................... *passim*

N.Y. Penal Law § 190.42 ...........................................31

NY Gen. Oblig. Law §§ 5-501-5-521 .......................26

NY Gen. Oblig. Law § 5-501 .....................................26

NY Gen. Oblig. Law § 5-511 .............................. *passim*

NY Gen. Oblig. Law § 5-511(1) ........................ 26, 31

NY Gen. Oblig. Law § 5-511(2) ........................ 27, 31

NY Gen. Oblig. Law § 5-521 ..................... 29, 31, 36, 38

NY Gen. Oblig. Law § 5-521(1) .................................30

NY Gen. Oblig. Law § 5-521(3) ........................ *passim*

David A. Lipton, *A Primer on Broker-Dealer Registration,*
    36 Cath. U.L. Rev. 899 (1987) ....................................................................52

*Frank W. Leonesio,* Exchange Act Release No. 23,524, 36 SEC Docket
    457 (Aug. 11, 1986)........................................................................................52

*Section 29(b): A Viable Remedy Awakened*,
    48 Geo. Wash. L. Rev. 1 (1979)............................................................. 48-49

## **RULE 26.1 CORPORATE DISCLOSURE STATEMENT**

Pursuant to Federal Rule of Appellate Procedure 26.1, Appellant DarkPulse, Inc., discloses and certifies that it is a publicly held corporation; that no publicly held corporation owns 10% or more of its stock, and that it has no affiliates and/or subsidiaries that are publicly held.

## JURISDICTIONAL STATEMENT

This Court has jurisdiction under 28 U.S.C. § 1291. The United States Court for the Southern District of New York issued an Opinion and Order dismissing in its entirety Appellant's suit against FirstFire Global Opportunity Fund and Eli Fireman on January 17, 2023, *see DarkPulse Inc. v. FirstFire Global Opportunities Fund, LLC, et al*, 2023 U.S. DIST LEXIS 7874 (S.D.N.Y. Jan. 17, 2023). The district court entered judgment on January 17, 2023. Appellant timely filed a Notice of Appeal on January 17, 2023.

## ISSUES PRESENTED FOR REVIEW

**<u>Issue One:</u>**

A corporation sues a lender for unlawful collection of debt under RICO. Defendant-lender raises an affirmative defense alleging that the claims are barred by provisions in the loan agreement. Does New York's rule that corporations may not bring affirmative usury claims mean that the corporate plaintiff *may not* defeat the lender's defense by showing that the loan agreement is patently usurious and void *ab initio* under NY GOL § 5-511?

Short Answer: NO. A lender raising affirmative defenses based on a contract is seeking to *enforce the contract*. The corporate borrower is raising usury as a defense against enforcement of the contract, not an affirmative usury claim.

Standard of Review: De Novo.

**<u>Issue Two:</u>**

May an unregistered securities dealer enter into the Securities Purchase Agreement or purchase the Convertible Promissory Note in this case without violating Section 15(a) of the Securities Exchange Act of 1934?

Short Answer: NO. Under §15(a) of the Exchange Act, it is unlawful for an unregistered securities dealer "to effect any transactions in . . . any security."

3

Because a convertible promissory note is a security, an unregistered securities dealer "effects a transaction in securities" when he purchases the note, or enters into a contract to purchase the note.

Stamdard of Review: De Novo.

## STATEMENT OF THE CASE

**Issue One**

Under New York law, a usurious loan illegal, unenforceable, and void *ab initio*. "Void ab initio" means that the loan contract is null from the beginning, as from the first moment when the purported contract was executed. Indeed, calling something a "void contract" is a misnomer, for if an agreement is void, it cannot be a contract. In this case, the parties executed a loan agreement via the purchase of a convertible promissory note. The note specified that it was governed by New York law, and also designated New York courts in a forum-selection clause.

Five months later, the New York Court of Appeals issued its opinion in *Adar Bays v. GenesysID, Inc*. *Adar Bays* clarified that a criminally usurious loan to a corporation (who are only to permitted to defend against criminal usury) is indeed, void *ab initio* like all other usurious loans in New York. The lender obviously took notice of the decision by securing an "Amendment" to the Note—which to change governance and forum selection from New York to Delaware (which has no laws against usury).

After the Amendment, the lender converted the Note, a dispute ensued. The borrower brought suit against the lender in the southern district of New York,

seeking rescission of the loan contract under securities law and alleging a RICO claim for unlawful collection of debt.

The lender then pointed to the "Amendment" specifying Delaware law and a Delaware forum, and demanded that the case be dismissed. The borrower however, pointed out that the loan was criminally usurious—in fact charging over 1000% in interest: this meant that the loan contract was void *ab initio, and was not capable of amendment.*

The court ignored the usury allegation, enforced the contract, and dismissed the borrower's case: because as a corporation—it was not permitted to bring an affirmative claim based on usury. Strikingly, the result of the court's ruling was that, contrary to New York law and the law of every other state, it enforced a patently unlawful and usurious contract despite unmistakable evidence of criminal usury.

The proper conclusion in this situation is to realize that the corporation *was* interposing a defense based on usury. The lender may have been a defendant, but its goal was to *enforce a patently usurious loan*, and the lender is given a statutory right to defend against it.

**Issue Two**

In the last few years, the SEC has commenced civil enforcement actions against several purveyors of toxic convertible securities (known as "toxic lenders")

6

for operating as unregistered securities dealers, in violation of Section 15(a) of the Securities Exchange Act of 1934.   Thus far, the courts have unanimously agreed[1] that the lenders in question were operating in violation of section 15(a) of the Act, which makes it unlawful for any unregistered securities dealer "to effect a transaction in securities."

Section 29(b): Rescission of Contracts that Violate the Act

Since toxic lenders are operating as unregistered securities dealers in violation of the Act, the small companies who have fallen victim to these loans have started to bring claims for rescission of the loan contracts based on that violation.  Section 29(b) of the Act provides that any contract "made in violation of the Act" or where performance involves a violation of the act, "shall be void."   15 U.S.C. § 78cc(b).  Hence, Appellant sued FirstFire for rescission of the agreement under section 29(b), arguing that FirstFire, as an unregistered securities dealer, could not purchase the convertible note (effecting a transaction in securities) or enter into a contract to purchase the convertible note (also effecting a transaction in securities) without violating section 15(a) of the Act.

Section 15(a) of the Securities Exchange Act provides that it is unlawful

---

[1]  *See, e.g*., *SEC v. Almagarby*, 479 F. Supp. 3d 1266 (S.D. Fla. 2020); *SEC v. Keener*, 2020 WL 4736205 (S.D. Fla. Aug. 14, 2020); *SEC v. Fierro*, 2020 WL 7481773 (D.N.J. Dec. 18, 2020); *SEC v. GPL Ventures, LLC*, No. 21-CV-6814 (S.D.N.Y. Aug. 13, 2021); *SEC v. River N. Equity LLC*, 415 F. Supp. 3d 853 (N.D. Ill. 2019); *SEC v. Fife,* 2021 WL 5998525 (N.D. Ill. Dec. 20, 2021).

for a securities dealer to "effect any transaction . . . in any security" unless the dealer is registered with the SEC.

Unfortunately, in the context of Securities Purchase Agreements and convertible promissory notes, the Southern District of New York has fashioned its own interpretation of section 15(a):    A contract will only violate § 15(a) if it requires that the unregistered dealer "act like a dealer."  The courts have not explained what "acting like a dealer" means, where that standard came from, or why they re-wrote the statute.

This formulation of § 15(a) adds to the southern districts other rescission claim rule, which is to require a showing that *performance of the agreement* would violate the Act.  The problem:  The SDNY formulation arbitrarily excises half of the statutory language providing that voids contracts – not just where performance would violate the act, but also those contracts **made in violation of the Act**.  An analysis that looks to performance only, to the exclusion of formation, is contrary to the plain language of the statute.

## BACKGROUND

### A.    The Parties

FirstFire Global Opportunities Fund, LLC ("FirstFire") is a New York-based investment fund that loans money to small publicly-traded companies in need of cash.   FirstFire is registered as a Delaware corporation with its principal place of business in New York, New York.   Eli Fireman is the Managing Member of FirstFire and a resident of the State of New York.   A-118, 119, 248

DarkPulse, Inc., is a microcap company that develops and sells fiber-sensor monitoring systems used to detect corrosion in various types of infrastructure; its principal place of business is located in New York, New York, and is incorporated in the State of Delaware.   DarkPulse is a publicly-traded company whose stock trades on the "over the counter market." A-118.

### B.    The 2021 Loan Agreement[2]

On April 26, 2021, FirstFire and DarkPulse executed a Loan Agreement ("Agreement" or "Loan Agreement").   The Agreement consists of three main documents: A convertible promissory note with a stated principal amount of $825,000.00 ("Note"); a Securities Purchase Agreement ("SPA"), which provides,

---

[2]  At the district court, DarkPulse's suit against FirstFire included claims pertaining to a 2018 convertible promissory note as well.  Only the 2021 Note is the subject of this appeal.

9

among other things, the terms for FirstFire's purchase of the Note; and a Registration Rights Agreement ("RRA"), which gives DarkPulse the additional obligation to register the stock under the Securities Act of 1933, *i.e*., file an effective registration statement for the stock that FirstFire was to receive under the Agreement. A-9-10.

FirstFire loaned DarkPulse $750,000.00 in cash by purchasing from DarkPulse a convertible promissory note in the amount of $825,000.00. A- 9. The Note states an interest charge of 10% a.p.r. with repayment due nine months after issuance. *Id.* A convertible promissory note is a type of debt security that gives the lender (FirstFire) the right to take repayment of the loan either in cash (at the stated interest rate) or in newly-issued company stock.[3] Similar to a stock option or warrant, a conversion right gives the holder the right to use the debt to purchase company stock at a particular price, called the "conversion price," which is similar to the "exercise price" in a stock option.

      i.     ***Fixed $0.015 Conversion Price.***

The conversion price under the Note (the "Fixed Conversion Price") is listed as $0.015 per share, and FirstFire's right to exercise the conversion option

---

[3] Because the Note itself is a security as defined in the Securities Exchange Act of 1934, and not registered under the Securities Act of 1933, DarkPulse's sale of the Note to FirstFire was done under the exemption from registration set forth in Rule 506(b). 17 CFR 230.506.

commenced 180 days after purchasing the Note. A- 10. Hence, on October 25, 2021, FirstFire had the right to exercise the conversion option, thereby using the debt under the Note (at that point, $825,000 + $61,875) to purchase DarkPulse stock at $0.015 per share. *Id.*[4]

### ii.     *$0.005 Default Fixed Conversion Price.*

The Note also provided that if DarkPulse defaulted on any provision under the Agreement, the FirstFire had the right to convert the debt at the much lower "Default Fixed Conversion Price" of $0.005 per share. A-106, 115-117. (Note at § 1.2(a) and Art. III (naming 21 separate events of default under the Note, including failure to meet obligations under the RRA)).

### iii.    *Commitment Shares.*

As payment for FirstFire's purchase of the Note, DarkPulse was required to convey to  FirstFire 60,000,000 shares of DarkPulse stock as "commitment shares" as up-front consideration for the loan.  A- 124.   With the average trading price on April 26, 2021, at $.019/per share, the 60 million commitment shares had an estimated (free trading) fair market value of $1,140,000 on the date they were conveyed.  However, as newly-issued stock not registered under the 1933 Act, the

---

[4] Historical stock prices show that the average trading price of DarkPulse stock on April 26, 2021 was $0.019. Accordingly, even the $0.015 non-default conversion strike price constituted a 21% discount to the share price on the date of execution (calculated as .015/.019 = .7895 or 79%).

60 million commitment shares were restricted from sale for six months. *See* 17 C.F.R. 230.144. Notably, DarkPulse was also obligated to register the commitment shares pursuant to the RRA.

       *iv.* ***Fees.***

The Agreement charged additional fees for the loan, including an original issue discount ("OID") of $75,000 which reduced the net amount of the loan to $750,000.00. DarkPulse was also obligated to pay all other expenses incurred by FirstFire both in executing the Agreement, *see* SPA at § 8(k) A- 144, expenses incurred at conversion), and for the costs of legal opinion letters. (necessary to ensure that FF received was freely trading shares at conversion), SPA at § 4(k). A-138.

       *v.* ***Choice of New York Law.***

Section 4.6 of the Note and Section 8(a) of the SPA provided that New York law would govern the agreement.

> 4.6 <u>Governing Law; Venue; Attorney's Fees</u>. This Note shall be governed by and construed in accordance with the laws of the State of New York without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note or any other agreement, certificate, instrument or document contemplated hereby shall be brought only in the state courts located in the state of New York or federal courts located in the state of New York.

Note, A-119.

3.      *Registration Rights Agreement.*

The RRA required DarkPulse to register all of the shares to be conveyed to FirstFire pursuant to the Loan Agreement—both the 60,000,000 commitment shares, as well as any shares FirstFire acquired upon conversion of the Note. *See* RRA at § 2, A-150. Registration refers to registration of the stock pursuant to the 1933 Securities Act. Registered stock is freely trading and not subject to the six-month restriction period under Rule 144. Pursuant to the Loan Agreement, failure to comply with the registration obligations and deadlines as set forth in the RRA was deemed an event of default that would trigger the default exercise price. *See* Note at § 3.21, A-117.

On April 26, 2021 the parties fully executed the Agreement, with FirstFire conveying to DarkPulse $750,000.00 in cash (minus fees) and DarkPulse conveying the Note in the amount of $825,000.00 and the 60,000,000 commitment shares.

C.      **Events Subsequent to the Execution of the Agreement**

1.      **The New York Court of Appeals Decides Adar Bays**.

On October 14, 2021, the New York Court of Appeals issued its opinion in *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612, 617-18 (New York 2021), resolving two certified questions pertaining to the interpretation of New York's usury statutes. The second certified question in *Adar Bays* is relevant to this case,

13

*viz.:* "[i]f the interest charged on a loan is determined to be criminally usurious under N.Y. Penal Law § 190.40, whether the contract is void *ab initio* pursuant to N.Y. Gen. Oblig. Law § 5-511." *Id*.

The Court of Appeals answered this question in the affirmative, holding that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: **complete invalidity of the loan instrument.**" *Id*.

### ii.    The Amendment.

After the *Adar Bays* decision, FirstFire drew up a one-page Amendment that changed the governing law of the Loan Agreement from New York to Delaware (Delaware has no laws against usury.)    On November 4, 2021, FirstFire CEO Fireman traveled to Las Vegas[5] to meet with DarkPulse CEO Dennis O'Leary, who was attending a conference there.  A-161   Fireman gave a pretextual excuse for the Amendment and obtained O'Leary's signature.   The signatures on the Amendment are dated October 26, 2021, but the Amendment states that it was "entered into on October 14, 2021," *i.e.*, the date of the *Adar Bays* decision.[6]  *Id*.

_____

[5]   The parties are not in agreement as to the location of the signing; Fireman's affidavit states that the meeting was in Arizona. A- 248.

[6]   Needless to say, dating the amendment on the date of the *Adar Bays* decision would obviously have no effect since judicial decisions are regarded as an expression of preexisting law. *See Kaiser Aluminum & Chem. Corp. v. Bonjorno*,

October 26, 2021, also marked the end of the six-month restriction period for both the 60,000,000 commitment shares, as well as any shares FirstFire would acquire from conversion of the debt from the Note (FirstFire's right of conversion under the Note also commenced on that date, s*ee* A- 104. Accordingly, the 60,000,000 commitment shares, as well as any shares obtained via conversion, could be freely sold into the market (regardless of registration status) on that date. On October 27, 2021, DarkPulse stock traded for an average price of $0.08 per share, which would give the commitment shares an estimated fair market value of **$4,800,000.00** (*i.e.*, 60,000,000 x .08 = $4,8000,000).

On November 17, 2021 FirstFire effected a conversion for $886,875.00,[7] which was the entire debt under the Note. A-13. In the conversion notice, FirstFire represented that DarkPulse's failure to comply with the RRA meant that it was in default under the Note, and that FirstFire was therefore entitled acquire the stock at the Default Fixed Conversion Price of $0.005 per share. Id. FirstFire effected the conversion by submitting the notice of conversion to DarkPulse's

---

494 U.S. 827 (1990). The principle "that statutes operate only prospectively, while judicial decisions operate retrospectively, is familiar to every law student." *United States v. Sec. Indus. Bank*, 459 U.S. 70, 79 (1982).

[7] Principal + stated interest.

15

transfer agent, who delivered (using the default price) FirstFire 177,375,000 shares of freely trading DarkPulse stock.[8] A- 13.

On November 29, 2021, DarkPulse contacted FirstFire to raise objections to the conversion, disputing FirstFire's entitlement to conversion under the default price, and claiming that FirstFire needed to return the excess shares. A- 253.

**A. FirstFire Files Suit Against DarkPulse in the Delaware State Court.**

On December 13, 2021 FirstFire brought suit against DarkPulse in the Delaware Court of Chancery. The complaint shows that FirstFire sought a declaration from the court on the Agreements to the effect that (1) FirstFire's November 17, 2021 conversion under the default conversion price was proper and legal under the Note, (2) that, under section 3.2 of the Note, DarkPulse's breach of the RRA entitled FirstFire to another 44 million shares of DarkPulse stock; and (3) that DarkPulse had breached another provision of the Note, which entitled FirstFire to at least 261 million shares in the aggregate. *see FirstFire Global Opportunities Fund LLC v. DarkPulse, Inc.*, C.A. No. 2021-1082-LWW (Del. Ch.), Dkt. No. 1; A- 248.

---

[8] On November 17, 2021, the average trading price for DarkPulse stock was $0.12465 per share, giving the conversion shares an estimated fair market value of **$22,109,793.75** (*i.e.*, $886,875/.005= 177,375,000 x $0.12465=$22,109,793.75).

**2. DarkPulse Moves to Dismiss the Delaware Case By Interposing the Defense of Criminal Usury Under NY Gen. Oblig. §5-521(3).**

On February 11, 2022 DarkPulse filed a motion to dismiss the Delaware claim by interposing the defense of criminal usury under New York law, see NY GOL 5-521(3). DarkPulse showed that when all of the required payments were properly included in the interest rate calculation—in particular the 60,000,000 shares of stock[9] required as up-front consideration for the loan—the actual interest rate imposed by the 2021 Loan Agreement was in excess of 1,200% a.p.r. Accordingly, the 2021 Loan Agreement (which specified governance under New York law when it was executed) was void *ab initio* under §5-511 and *Adar Bays*.

DarkPulse argued that FirstFire's attempt to amend the loan agreement had no effect; because under New York law, usury renders the entire Loan Agreement void *ab initio;* a note void in its inception for usury continues void forever. Accordingly, under *Adar Bays* and N.Y. G.O.L. § 5-511—the Loan Agreement

––––––––––––––––––––

[9] Calculation of the interest rate was based on assigning the commitment shares a discounted value of $0.0138 per share. At the time of the loan, DarkPulse stock was trading at $0.019 per share, so 60,000,000 shares would have a fair market value of $1,114,000. As argued in the brief in Delaware and before the SDNY, stock that is restricted from sale (even for only six months) should be discounted for proper valuation. As it happens, records indicate that the parties assigned a discounted value of $0.0138 per share, giving the 60,000,000 commitment shares a value of **$828,000**.

17

was legally impossible to amend; an agreement that New York law has deemed to be a nullity from the beginning cannot be amended.

### 3. FirstFire Voluntarily Dismisses the Delaware Suit Against DarkPulse

FirstFire's brief in Opposition to DarkPulse's motion to dismiss was due in the Delaware Chancery Court on March 14, 2022; instead of responding, FirstFire voluntarily dismissed the Delaware action on that date, *see FirstFire Global Opportunities Fund LLC v. DarkPulse, Inc.*, C.A. No. 2021-1082-LWW (Del. Ch.), Dkt. No. 33.

## PROCEDURAL HISTORY

### A.    DarkPulse Files Suit Against FirstFire and Elie Fireman  in SDNY

On December 31, 2021, DarkPulse commenced an action against FirstFire and Eli Fireman, in the U.S. District Court for the Southern District of New York.[10] DarkPulse alleged a total of six claims: three claims under the Securities and Exchange Act of 1934 ("Exchange Act"), one claim under the Racketeering Influenced and Corrupt Organizations Act ("RICO") and two state law claims.

_____

[10] On January 14, 2022, DarkPulse sought a temporary restraining order ("TRO") and preliminary injunction to prevent FirstFire from selling the 177,375,000 shares acquired via the November 17 conversion. The court declined the TRO and denied the preliminary injunction from the bench on January 21, 2022.  ECF 24 (Hr'g Transcript pp 43-47).

DarkPulse invoked subject matter jurisdiction pursuant to 28 U.S.C. § 1331 (federal question) and proper venue under 28 U.S.C. § 1391(b)(1) and (2) because FirstFire's principal place of business was located in that district, and because a substantial portion of the events giving rise to the action occurred in that district. A- 368.

As set forth in its First Amended Complaint, DarkPulse's claims against FirstFire are stated as:

 (I) for rescission of the Agreement under §29(b) of the Exchange Act, alleging that the Agreements violated §15(a) of the Exchange Act "as made";

 (II) for rescission of the Agreement under §29(b) of the Exchange Act, alleging that the Agreements required performance that would violate §15(a) of the Act);

(III) for violation of section 20(a) of the Exchange Act against Fireman as a control person;

(IV) a (RICO) claim against FirstFire and Eli Fireman under 18 U.S.C.§ 1962(c) for collection of unlawful debt;[11]

_____

[11] As discussed below, because the definition of unlawful debt under RICO turns in part on state laws regulating usury, proving liability under RICO requires demonstrating, among other things, that the Agreements are "unenforceable . . . in whole or in part" under New York's usury laws. *See* 18 U.S.C § 1961(6).

(V) Unjust Enrichment; and

(VI) Constructive trust.

Id.

**FirstFire Moves for Dismissal.** FirstFire filed a motion to dismiss DarkPulse's complaint in its entirety: FirstFire alleged that the Exchange Act claims (Counts I and II) must be dismissed because the Amendment to the Agreement contains an exclusive forum selection clause., Similarly, FirstFire claimed dismissal was warranted for Count IV (RICO) because the Agreement (as amended) was governed by Delaware law, which has no laws against usury.FirstFire also alleged that the Exchange Act claims (Counts I and II) failed as a matter of law under the analysis set forth in the *Vystar* and *ExeLED* cases.

**Opposition to Dismissal.** DarkPulse opposed FirstFire's attempt to enforce the Amendment, arguing that because the original Agreement (which was governed by New York law) was patently usurious and void *ab initio*, it was incapable of amendment; FirstFire's purported Amendment choosing Delaware law was a legal nullity.[12] DarkPulse opposed dismissal of the Exchange Act claims on the ground

---

[12] Contrary to statements in the courts opinion, (A- 19 ) DarkPulse never argued that the commitment shares should be valued at $4,800,000 for the purpose of calculating the interest rate. A- DarkPulse calculated a 1,242% interest rate by valuing the commitment shares at $741,500, which was based on the trading price

that *Vystar* and ExeLED were wrongly decided, and that the Agreement was

unlawful as made, and as performed.  A- 435.

## THE SOUTHERN DISTRICT OF NEW YORK GRANTS DISMISSAL ON ALL COUNTS

**Forum Selection/RICO: The Court Enforces The Loan Agreement As Amended**

The district court did not examine the interest rate charged under the 2021

Agreement, holding only that the Agreement, as amended, was "presumptively

enforceable," and dismissed the Exchange Act based on the Delaware forum

selection clause.  The court refused to consider whether the 2021 Note was

usurious on the ground that as a corporation, DarkPulse was not permitted to argue

usury, stating:

> Similar to the plaintiff in *Streamlined Consultants*, DarkPulse here
> attempts to use New York's usury statute as a sword to void the
> Second Transaction, circumvent the forum-selection clause in the

---

on the date of transfer ($1,140,000) plus a 35% discount due to the six-month
restriction period.  DarkPulse clarified that it had used a valuation lower than the
$828,000 that FirstFire had assigned to the shares.  A- 435,445.

Average price on date of transfer: $0.019 x 60,000,000 shares = $1,140,000
x .65 (35% discount) = $741,000   Net Amount borrowed: $825,000 -
$741,000 = $84,000.  See Band

Total Repayment (principal + interest) = $886,000

$886,000 - $84,000   x  100 = 956%  x 12  = 1,242.8%.
   $84,000                                 9

Amendment, and maintain the instant action against Defendants. The
sole case relied upon by DarkPulse for the proposition that it has the
right to do so is *Adar Bays, LLC v. GeneSYS ID,* . . . Nowhere in
its opinion, however, did the *Adar Bays* court suggest that a plaintiff
may use *§ 190.40* affirmatively; rather, the opinion exclusively
characterizes usury as a defense.. What's more, the courts in both
*Streamlined Consultants* and *Haymount* expressly relied upon *Adar*.
And like the plaintiffs in those cases, DarkPulse does not "present
[any] countervailing case law suggesting that [it] can seek affirmative
relief under the New York usury statute." Accordingly, Counts I and
II, as they relate to the 2021 Note, are dismissed.

A-21 (citations omitted). The district court rejected DarkPulse's RICO claim on

simiar grounds, holding that "the Delaware forum selection clause in the

Amendment is, as discussed, enforceable, and so too is the Delaware choice of law

provision," which meant that the debt under the Note was not unenforceable

because New York's usury law did not apply.[13]

The court then dismissed Claims I and II on the ground that DarkPulse had

failed to state a claim for rescission under section 29(b), stating:

DarkPulse contends that the Notes should be rescinded because
FirstFire was acting an unregistered securities dealer in violation of §
15(a).Courts in this District have, however, held that in § 29(b) actions,
a defendant's failure to register as a dealer does not make the
transaction "prohibited," where the underlying contract does not

---

[13] As discussed below, because the definition of unlawful debt under RICO turns in
part on state laws regulating usury, proving liability under RICO requires
demonstrating, among other things, that the Agreements are "unenforceable ... in
whole or in part" under New York's usury laws.

require the defendant to act as a dealer. Indeed, courts have routinely dismissed such actions.

. . . .

DarkPulse argues that because FirstFire was obligated to purchase the Notes, the SPAs cannot be performed without violating the Exchange Act. However, obligating FirstFire to purchase the Notes does not "explicitly require" FirstFire to act as a broker. Indeed, the language of the non-voidable sales purchase agreement in *ExeLED* is nearly identical to the language obligating DarkPulse to purchase the Notes here. . . . signature pages hereto."). The Court therefore finds this argument unpersuasive. For these reasons, the Court holds that DarkPulse has failed to state a claim under § 29(b).

A-21.

**Issue One:**

A corporation sues a lender for unlawful collection of debt under RICO. Defendant-lender raises an affirmative defense alleging that the claims are barred by provisions in the loan agreement. Does New York's rule that corporations may not bring affirmative usury claims mean that the corporate plaintiff *may not* defeat the lender's defense by showing that the loan agreement is patently usurious and void *ab initio* under NY GOL § 5-511?

NO. A lender raising affirmative defenses based on a contract is seeking to *enforce the contract*. The corporate borrower is raising usury as a defense against enforcement of the contract, not an affirmative usury claim. For a court to enforce a contract in the face of compelling evidence of criminal usury is contrary to the statutory command of NY GOL §5-511 and contrary to the maxim that a court may not enforce an illegal contract.

**I.    UNDER NEW YORK LAW, USURIOUS LOAN CONTRACTS ARE ABSOLUTELY VOID, INCLUDING LOANS TO CORPORATIONS.**

### § 5-511. Usurious contracts void

**1.** All bonds, bills, notes, assurances, conveyances, all other contracts or securities whatsoever, . . . whereupon or whereby there shall be reserved or taken, or secured or agreed to be reserved or taken, any greater sum, or greater value, for the loan or forbearance of any money, goods or other things in action, than is prescribed in section 5-501, *shall be void . . .*

**2.** Except as provided in subdivision one, whenever it shall satisfactorily appear . . . that any [loan] . . . has been taken or received in violation of the foregoing provisions**, *the court shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled*.**

N.Y. Gen. Oblig. Law § 5-511 (emphasis added).

25

**D.    Section 5-511(1) Commands that Usurious Contracts are Absolutely Void and Without Legal Effect[14]**

In both statute and caselaw, New York holds that usurious loans are "void ab initio" and "absolutely void." "'Void ab initio' means a bargain is null from the beginning, as from the first moment when the purported contract was executed.  A bargain that is void ab initio is a nullity because it is based on a promise for breach of which law neither gives a remedy nor otherwise recognizes any duty of performance by the promisor." *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins. Co.*, 263 F.3d 26, 31 (2d Cir. 2001).   Indeed, calling something a "void contract" is  . . . a misnomer, for "if an agreement is void, it cannot be a contract." *Id.*

---

[14] Prior to *Adar Bays*, most of the federal courts applying New York usury law concluded that the voiding mechanism in section 5-511 did **not** operate to void criminally usurious loans made to corporations, because the corporations were viewed as suing under Penal Law §190.40 instead of the civil usury law, NY Gen. Oblig. Law §§ 5-501-5-521 *et. seq*.

In *Adar Bays*, the New York Court of Appeals concluded that "loans proven to violate the criminal usury statute are subject to the same consequence as any other usurious loans: complete invalidity of the loan instrument." *Adar Bays*, 37 N.Y.3d at 333.  *Adar Bays* further clarified that corporations defending against usurious loans were not proceeding under the criminal code, but the civil code. "As regards civil usury, Penal Law § 190.40 merely specifies the rate of criminally usurious interest.  General Obligations Law § 5-511 (1) provides that all loans charging an interest rate greater than that permitted in section 5-501 "shall be void."

When it comes to the fate of usurious loans, New York law could not be clearer: "A note void in its inception for usury continues void forever, whatever its subsequent history may be . . . No vitality can be given to it by sale or exchange, because that which the statute has declared void cannot be made valid by passing through the channels of trade." *Claflin v. Boorum*.;CITE *Sabine v. Paine*, 119 N.E. 849, 850 (1918) ("An instrument which a statute, expressly or through necessary implication, declares void, strictly speaking, is a simulacrum only. It is without legal efficacy. It cannot obligate a party or support a right.").

**E.      Under the Command of the Statute, "The Court *Shall* Declare" A Usurious Instrument to be Void "and Enjoin Any Prosecution Thereon"**

New York usury statutes not only declare that usurious contracts are void, they command the courts to declare them void.  Under § 5-511(2) a court presented with an instrument that is patently usurious "*shall declare the same to be void*, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled."  N.Y. Gen. Oblig. Law 5-511(2) (emphasis added).  This "command" has been a part of New York's usury statutes for more than 150 years.  *See Sabine*, 119 N.E. at 850 (holding that "[t]he court is, under [the statute's] command, to declare it void, enjoin prosecution of it and order it to be surrendered and canceled, whenever satisfactory proof of its usurious character appears.") *Post v. President*, 7 Hill 391, 414-15 (New York 1844) ("The statute does not say that the court shall declare the security void at the instance of the borrower; but it declares all such

securities void, and that whenever, at the instance of any one to be affected by the security, it shall be made to appear to be usurious, the court shall declare it void and order it to be canceled."

**1.** **Section 5-511 is Based on the Familiar Rule That Illegal Contracts Are Unenforceable And the Courts Will Not Recognize Rights From Them.**

"A legal determination that a transaction governed by section 5-511 is void" is "a statutory expression of the familiar rule that illegal contracts, or those contrary to public policy, are unenforceable and that the courts will not recognize rights arising from them." *Szerdahelyi v. Harris*, 490 N.E.2d 517, 521 (1986). Given its status in the criminal code (NY Penal Law 190.40) it is even more galling for a lender to seek (and gain) the aid of the court to enforce "a loan for which it could be prosecuted." *Hammelburger v. Foursome Inn Corp.*, 431 N.E.2d 278, 283 (1981).

In this case, it must be noted that not only has FirstFire sought the aid of the court to enforce "a loan for which it could be prosecuted," but the district court *granted the aid and enforced the loan.*

28

## II. CORPORATIONS ARE NOT PERMITTED TO BRING AFFIRMATIVE CLAIMS FOR RELIEF BASED ON USURY (BUT A COURT MAY NOT ENFORCE A CONTRACT THAT IS USURIOUS AND VOID *AB INITIO*).

### § 5-521. Corporations prohibited from interposing defense of usury

**1.** No corporation shall hereafter interpose the defense of usury in any action. The term corporation, as used in this section, shall be construed to include all associations, and joint-stock companies having any of the powers and privileges of corporations not possessed by individuals or partnerships.

. . . .

**3.** The provisions of subdivision one of this section shall not apply to any action in which a corporation interposes a defense of criminal usury as described in section 190.40 of the penal law.

New York Gen. Oblig. Law § 5-521.

## A. The Affirmative Defense in Section 5-521(3) Reflects the Well-Established Defense of Illegality

The defense against usury "arises out of the settled principle that courts will not enforce contracts which are offenses against the law . . . [and] because the statute having declared the contract void, no legal liability or obligation can spring out of it. *Rosa v. Butterfield*, 33 N.Y. 665, 670 (1865). "It is the settled law of this State (and probably of every other State) that a party to an illegal contract cannot ask a court of law to help him carry out his illegal object, nor can such a person plead or prove in any court a case in which he, as a basis for his claim, must show forth his illegal purpose." *McConnell v. Commonwealth Pictures Corp.*, 166

29

N.E.2d 494, 496 (New York 1960); *Bankers Tr. Co. v. Litton Sys., Inc.*, 599 F.2d

488, 492 (2d Cir. 1979) ("Courts will not aid a person 'who founds his cause of

action upon his own immoral or illegal act.' This rationale is precisely the policy

articulated in the New York decisions.").

**B.     History Of the Corporate Usury Defense**

The  text  of  what  is  now  § 5-521(1)  originated  from  the  1850  act  "To

prohibit corporations from interposing the defence of usury in any action," which

the legislature passed in reaction to the *Dry Dock* case.[15]  *See Adar Bays, LLC v.*

*GeneSYS  ID,  Inc.*,  179  N.E.3d  612,  617-18  (New  York  2021).    Because  the

language of the 1850 Act pertained only to corporations raising usury as a defense,

it seemed to leave open the possibility for offensive or affirmative usury claims;

but that interpretation was quickly rejected as antithetical to the statute.  *See Rosa*

*v. Butterfield*, 33 N.Y. 665 (1865); *Butterworth v. O'Brien*, 23 N.Y. 275 (1861);

*Curtis  v.  Leavitt*,  15  N.Y.  9,  154  (1857).    New  York  courts  recognized  that  the

prohibition against bringing the defense of usury was in effect "to repeal the statute

of usury so far as it applies to corporations."  *Id*.

The New York legislature restored the usury defense to corporations in 1965

when it revamped New York's usury laws.  In response to widespread abuses, the

legislature added the usury provisions of the Penal Law, which made it a felony in

---

[15] *Dry Dock Bank v. Am. Life Ins. & Tr. Co.*, 3 N.Y. 344 (1850).

the second degree to charge more than 25% a.p.r. on a loan. *See* NY Penal Law §§ 190.40, 190.42. Noting the exploitation of the corporate usury exemption by loan sharks, the legislature restored the defense of usury to corporations by adding subsection (3) to §5-521, which expressly permits corporations to raise usury as a defense if the interest charged exceeds the 25% a.p.r. set forth in N.Y. Penal Law § 190.40. *See Adar Bays* 179 N.E.3d at 619.

Accordingly, the resulting statutory scheme held that (1) criminally usurious loans to corporations are unlawful; (2) criminally usurious loans to corporations are void *ab inito* under §5-511(1); (3) a court presented with a criminally usurious loan to a corporation shall declare it void (and is certainly not permitted to enforce it) under § 5-511(2); and finally, a corporation may "interpose the defense" of criminal usury under §5-521(3), but may not bring an affirmative claim. Although the legislature was again silent in regard to the ability of corporations to bring affirmative claims, New York courts have interpreted that silence as restricting corporations to defenses only. Hence, though a court must dismiss a corporation's *affirmative claim for relief* based on usury—in essence, leaving the parties where they lie—a court is still under the directive of § 5-511, and may not *enforce* the loan.

But what is "the *defense* of usury," and what is an affirmative claim? According to nearly every New York court to address the issue, an affirmative

claim has the characteristic of seeking some form of affirmative relief. When an

affirmative claim for relief is successful, the claimant is awarded the relief it seeks;

when a defense is successful, the opposing party's arguments are defeated, and no

relief is awarded. In this case, FirstFire is seeking to enforce the "amended"

clauses in a usurious contract, and DarkPulse simply attempted to *prevent*

*enforcement* (as discussed below).

**C.     To "Interpose the Defense of Usury" is Broadly Defined by the New York Court of Appeals.**

A federal court addressing claims under state law must predict " how the

forum state's highest court would decide the issues." *DiBella v. Hopkins*, 403 F.3d

102, 111 (2d Cir. 2005). As it happens, an 1861 decision from the New York

Court of Appeals provides very clear guidance on what is meant by "interposing

the defence of usury," stating:

> To interpose the defence means not only to plead it, and give
> evidence thereof, but also to use it at the trial as a defence. The
> inhibition extends to the entire series of acts which constitute the
> defence, and to each of them" Paige, J., at page 228, says: "The
> prohibition is, that no corporation shall, after the passage of the act,
> interpose the defence of usury in any action. This prohibition is not
> directed merely against pleading or proving the defence, but it is
> against interposing it, that is, either by plea or by proof, or by
> claiming the benefit of it at the trial or hearing.

*Butterworth v. O'Brien*, 23 N.Y. 275, 277-79 (1861). The interpretation of

"defence" set forth in the passage above is as broad as it gets, and would certainly

include the "interposition" of the criminal usury defense by DarkPulse in this case.

Further, this broad definition is completely consistent with how the term "defense" is regarded by the courts.

### 1. The *Butterworth* Definition is Consistent With the Dictionary Definitions of "Defense" and "Claim."

**Defenses.** The broad interpretation described in *Butterworth* is consistent with basic dictionary definition of "clam" and "defense." Black's Law Dictionary defines "defense," in pertinent part, as:

> That which is offered and alleged by the party proceeded against in an action or suit, as a reason in law or fact why the plaintiff should not recover or establish what he seeks. That which is put forward to diminish plaintiff's cause of action or defeat recovery . . .

> *A response to the claims of the other party*, setting forth reasons why the claims should not be granted. The defense may be as simple as a flat denial of the other party's factual allegations or may involve entirely new factual allegations. In the latter situation, the defense is an *affirmative defense*.

Black's Law Dictionary 419 (6th ed. 1990) (emphasis added). *See National Union Fire Ins. Co. v. City Sav., F.S.B*., 28 F.3d 376, 392 (3d Cir. 1994). Note that *any response to the claims of the other party* is a defense; it does not mean that plaintiffs cannot allege defenses. Assuming that because a party is the plaintiff in a case does not mean every allegation should be viewed through the lens of "affirmative relief.

33

**D.    An Affirmative Claim is a Distinct Cause of Action Seeking Affirmative Relief.**

An affirmative claim by its very nature seeks *affirmative relief*. A "claim" is defined as "[t]he assertion of an existing right; any *right to payment or to an equitable remedy*, even if contingent or provisional." BLACK'S LAW DICTIONARY 301 (10th ed. 2014) (emphasis added)).

The distinction between a "defense" and a "claim" is addressed by the courts in the context of distinguishing affirmative defenses from counterclaims, and the analysis surely applies here. An affirmative defense is not a "claim." An affirmative defense is defined as "[a] defendant's assertion of facts and arguments that, if true, will *defeat the plaintiff's ... claim*, even if all the allegations in the complaint are true" (emphasis added)) *Id.* at 509. The distinctions between affirmative defenses and counterclaims in New York procedure "are not merely semantic; these are substantive differences." *P.J.P. Mech. Corp. v. Commerce & Indus. Ins. Co.*, 65 A.D.3d 195, 199-200 (App. Div. 1st Dept., 2009). The distinction is described as:

> [F]acts pleaded which controvert the plaintiff's claim and serve merely to defeat it as a cause of action constitute a defense, and are inconsistent with the legal idea of a counterclaim, which is a separate and distinct cause of action. On the other hand, a claim that does not defeat the plaintiff's cause of action, but constitutes an independent cause of action for the defendant, should be pleaded as a counterclaim, and not as an affirmative defense.

84 NY Jur 2d, Pleading § 166.

**E.     Caselaw Applying §5-521(3) Shows that New York Courts Only Dismiss When the Corporate Plaintiff Alleges a Claim for Affirmative Relief.**

A review of the cases that dismissed a corporate borrower's invocation of usury show that every dismissal involved an affirmative claim for relief. Those claims range from monetary damages to declaratory judgment, each pleaded in a complaint or counterclaim. *See Streamlined Consultants, Inc. v. EBF Holdings*, 2022 U.S. Dist. LEXIS 171085, (S.D.N.Y. Sept. 20, 2022) (dismissing plaintiff corporation's causes of action for (1) rescission of the agreement as usurious and therefore unconscionable and (2) a declaratory judgment that the funding agreement was usurious and therefore void); *Paycation Travel, Inc. v. Global Merchant Cash, Inc.*, 192 A.D. 3d 1040, 1041, (N.Y. App. Div. 2021) (dismissing corporate borrower's cause of action to vacate a confession of judgment on grounds of usury); *Intima-Eighteen, Inc. v. A.H. Schreiber Co.*, 172 A.D.2d 456, 457 (App. Div. 1st Dept. 1991) (dismissing suit by corporate plaintiff seeking monetary damages based on usury); *Haymount Urgent Care PC v. GoFund Advance, LLC*, 609 F. Supp. 3d 237 (S.D.N.Y. June 27, 2022) ("*Haymount I*") (dismissing corporate borrower's claim seeking a declaratory judgment that the loan was usurious and void, but permitting other claims to proceed including a claim for unlawful collection of debt RICO to proceed). *Scantek Med., Inc. v. Sabella*, 582 F. Supp. 2d 472, 474 (S.D.N.Y. 2008) held that for the corporate

borrower, "[I]nsofar as the complaint seeks *affirmative monetary relief*, plaintiff improperly attempts to use a shield created by the Legislative as a sword."

**F.      Nothing in The Plain Language of § 5-521 Limits the Defense of Criminal Usury to "Actions Seeking Repayment of A Loan."**

Contrary to the holding of the district court, nothing in § 5-521 limits the usury defense solely to actions where the lender sues to collect on a loan.  Instead, the statute provides that corporations may "interpose a defense of criminal usury" in "*any* action. . . ." N.Y. Gen. Oblig. § 5-521(3).   The description of the corporate defense as limited to "actions seeking repayment of a loan" comes from *Intima-Eighteen, Inc. v. A.H. Schreiber Co.*, 172 A.D.2d 456, 457 (App. Div. 1st Dept. 1991).   In that case, a corporate plaintiff brought suit against a lender on the grounds of criminal usury, and sought money damages to recoup payments made on the usurious loan.  The *Intima* court upheld dismissal of the suit, explaining that dismissal was required because § 5-521(3) "is strictly an affirmative defense to an action seeking repayment of a loan, and may not, as attempted here, be employed as a means to effect recovery by the corporate borrower."  *Id.*(citations omitted).

Importantly, nothing in the opinion indicates that this passage is more than just a description § 5-521(3); the court was not setting out the parameters for bringing the defense  (which would impermissibly narrow the plain language of the statute in any event).   As Judge Rakoff observed in *Haymount II*:

> [W]hile it is true that New York courts have often spoken of corporations raising a defense of usury "as a defense to an action to recover repayment of a loan," the point of these discussions has been to explain that corporations may "not" raise usury "as the basis for a cause of action asserted by the corporation for affirmative relief." *Paycation*, 192 A.D. 3d at 1041. Defendants cite no case, nor is this Court aware of any, where New York courts have disallowed corporations from relying on usury as a defense to attempts to enforce features of an allegedly usurious contract against them, as plaintiffs seek to do here. And New York's usury statute contains no language along the lines defendants suggest, limiting the usury defense to actions where the lender sues to collect on a debt. Instead, the statute provides that corporations may "interpose a defense of criminal usury" in "*any* action. . . ." N.Y. Gen. Oblig. § 5-521(3) (emphasis added).

*Haymount II,* 2022 U.S. Dist. LEXIS 186768, at *9 (rejecting defendant lender's attempt to enforce waiver provision in usurious agreement, (discussed below)).

Further, this narrow "defense to recover payment of a loan" interpretation of 5-521(3) that *Haymount II* rejected was also expressly rejected by the same court that authored *Intima Eighteen*. In *Blue Wolf Capital Fund II, L.P. v. Am. Stevedoring Inc.*, 105 A.D.3d 178, (2013 App. Div. 1st Dept.), the court rejected the lender's invocation of *Intima Eighteen* to prevent a corporate borrower from bringing a usury defense in a foreclosure action. The court clarified that the prohibition was not intended to restrict the usury defense to any particular cause of action; the prohibition was against claims for *affirmative recovery*: "[u]nlike the borrower in *Intima*, [the borrower] does not invoke the usury statutes 'as a means to effect recovery.'" *Id*. at 184.

### G.     The District Court Cites *Haymount I*  But Ignores *Haymount II*.

In *Haymount I* the court, citing the prohibition on affirmative usury claims in § 5-521 and *Intima Eighteen*, dismissed a corporate plaintiff's claim for a declaratory judgment that the merchant cash advance ("MCA") agreements were criminally usurious under NY law.  Notably, the court permitted the plaintiff's other claims to continue, including a RICO claim based on unlawful collection of debt, and a claim for certification of a class-action.  *Haymount I*, 609 F. Supp. 3d 237.

### 1.     Haymount II Recognizes that A Lender Seeking Dismissal Based Upon a Contractual Provision is *Seeking to Enforce the Contract*.

After *Haymount I,* the defendant lender moved to strike the corporate plaintiff's class action claim, giving rise to the decision in *Haymount II*.  The defendant asserted that class action claims were barred by virtue of the class-action waiver provisions in the MCA Agreements, which the plaintiffs had agreed to.  The corporate plaintiff responded by asserting, of course, that if the MCA agreements were usurious under New York law, all aspects of the agreement, including the class action waiver provision, "are and were void from the outset."  *Haymount Urgent Care PC v. GoFund Advance, LLC*, 2022 U.S. Dist. LEXIS 186768, (S.D.N.Y. Oct. 12, 2022) ("*Haymount II*").

The defendant lender in *Haymount II* then argued (as FirstFire does in this case) that the corporate plaintiff was not permitted to attack the contractual waiver

38

because corporate entities are only permitted raise usury as "an affirmative defense

to an action to collect on a debt." *Id*.  Judge Rakoff rejected this claim, observing:

> Defendants therefore argue that because plaintiffs cannot sue
> affirmatively for a declaration that the MCA agreements were void
> from the outset, *defendants* should be allowed to enforce the MCA
> agreements' class action waiver provisions at the pleading stage.  To
> hold otherwise would, according to defendants, "frustrate[] New
> York's limits on the use of usury [by] . . . permit[ting] a corporate
> plaintiff to sue on allegedly usurious debt and use usury as a sword."
>
> It is hard to see how this argument, if true, would be limited to the
> issue of the MCA agreements' class action waivers.  Plaintiffs' entire
> RICO claim, at least to the extent it is predicated on showing the
> MCA agreements are usurious under New York law, involves in some
> sense "us[ing] usury as a sword" in a way that *New York's* usury laws
> by themselves might not authorize plaintiffs to do. Rather, Congress
> has chosen to provide a federal cause of action that amplifies certain
> state-law rights by allowing plaintiffs to bring RICO claims against
> enterprises engaged in the collection of debts rendered unlawful by
> state law. 18 U.S.C. § 1962(c).  Plaintiffs sue under that federal cause
> of action, not under New York's usury laws.
>
> With that understanding, the flaw in defendant's argument becomes
> clear. Plaintiffs are not (except through their previously dismissed
> declaratory action claim) bringing an affirmative claim to invalidate
> the MCA agreements, or the class action waivers contained therein.
> Rather, they are bringing federal RICO claims.  It is
> now *defendants* who are seeking to enforce the MCA agreements in
> part with respect to their class waiver provisions, and against that
> affirmative attempt to enforce these agreements, plaintiffs have
> "interpose[d] the defense of criminal usury," contending that the MCA
> agreements are and have always been void and that therefore the
> class-action waiver provisions in them cannot be enforced.

*Haymount II*, 2022 U.S. Dist. LEXIS 186768 at *10. In conjunction with the above

holding, Judge Rakoff observed that he was unaware of any case "where New York

courts have disallowed corporations from relying on usury as a defense to attempts to enforce features of an allegedly usurious contract." Id. Ironically, the district court in this case does precisely that.

## III.    APPLICATION TO THIS CASE

### A.    DarkPulse Brought No Affirmative Claims Based on Usury; DarkPulse Raised Usury in Response to FirstFire's Attempt to Enforce the Forum Selection Clause.

The situation in this case is nearly identical to *Haymount II*.  Like the plaintiff in that case (after dismissal of its claim for declaratory judgment, that is) DarkPulse brought no usury claims and sought no affirmative relief based on usury.  DarkPulse's claims before the district court were under the Exchange Act and under RICO.  Like the plaintiff in *Haymount II*, DarkPulse raised the usury defense in response to FirstFire's attempt to enforce the amended Agreement: When FirstFire moved for dismissal by invoking the Delaware forum selection clause contained in the Amendment, DarkPulse pointed out that the Delaware forum selection (and choice of law) clauses were utterly null—a product of FirstFire's brazen but ineffectual attempt to amend a criminally usurious contract that was void *ab initio*.

The presumptive enforceability of a forum-selection clause may be overcome "by a clear showing that the clause is unreasonable and unenforceable under the circumstances."  *Roby v. Corp. Of Lloyd's* 996 F.2d 1353 1363 (2d Cir.

40

1993).  Evidence that the forum selection clause is a legal nullity—the product of a

failed attempt to amend a contract that never came into existence—would seem to

rebut such a presumption.  *See, e.g.*, *Sphere Drake Ins. Ltd. v. Clarendon Nat'l Ins.*

*Co.*, 263 F.3d 26, 30 (2d Cir. 2001) (declining to enforce an arbitration clause

where plaintiff presents evidence that contract "never came into existence").

> The district court rejected the usury allegations, stating:

> Similar to the plaintiff in *Streamlined Consultants*, DarkPulse here
> attempts to use New York's usury statute as a sword to void the
> Second Transaction, circumvent the forum-selection clause in the
> Amendment, and maintain the instant action against Defendants.  The
> sole case relied upon by DarkPulse for the proposition that it has the
> right to do so is *Adar Bays, LLC v. GeneSYS ID,*  . . .  Nowhere in
> its opinion, however, did the *Adar Bays* court suggest that a plaintiff
> may use *§ 190.40* affirmatively; rather, the opinion exclusively
> characterizes usury as a defense.  *See generally id.* What's more,
> the courts in both *Streamlined Consultants* and *Haymount* expressly
> relied upon *Adar*. And like the plaintiffs in those cases, DarkPulse
> does not "present [any] countervailing case law suggesting that [it]
> can seek affirmative relief under the New York usury statute."
> *Haymount Urgent Care,* 2022 WL 2297768, at *12.  Accordingly,
> Counts I and II, as they relate to the 2021 Note, are dismissed.

A- 21.

## 1.  DarkPulse Raised Usury as a Defense, Not an Affirmative Claim.

The district court does not explain—or even acknowledge—its implicit

conclusion that raising criminal usury to *prevent enforcement* of a forum selection

clause is tantamount to bringing a claim for affirmative relief "[s]imilar to the

plaintiff in *Streamlined Consultants*" and *Haymount I* (who both brought claims

41

for declaratory judgment). This is the crux of the district court's holding and it is incorrect: DarkPulse did not "invoke the usury statutes 'as a means to effect recovery,'" but as a means to defeat enforcement of the "amended" Agreement and its new Delaware forum-selection and choice-of-law clauses. As Judge Rakoff explained in *Haymount II*, "[i]t is now *defendants* who are seeking to enforce the [] agreements . . . and against that affirmative attempt to enforce these agreements, plaintiffs have "interpose[d] the defense of criminal usury." *Haymount II* 2022 U.S. Dist. LEXIS 186768 at

### 2. DarkPulse did not make a usury claim, it made a RICO claim.

Because RICO's definition of "unlawful debt" turns in part on state laws regulating usury, proving liability under RICO meant that DarkPulse had to demonstrate (1) that New York law applied, and (2) that the Agreement is "unenforceable . . . in whole or in part" under New York's usury laws. Having concluded that DarkPulse was raising usury as a prohibited claim for affirmative relief, the district court dismissed the RICO claim[16] in a similar fashion, holding that "the Delaware forum selection clause is, as discussed, *enforceable*, and so too

---

[16] DarkPulse's RICO claim was based on § 1962(c), which makes it "unlawful for any person employed by or associated with any enterprise engaged in . . . interstate or foreign commerce, to conduct or participate, directly or indirectly, in the conduct of such enterprise's affairs through . . . collection of unlawful debt."[16] 18 U.S.C. § 1962(c).

is the Delaware choice-of-law provision." A- 31 (emphasis added).  Contrary to the command of §5-511, the court was presented what is essentially irrefutable evidence that the Agreement was usurious and void *ab initio*, but the court *enforced the Agreement*.

Further troubling is the court's refusal to address FirstFire's blatant attempts to "game the system" in this case.  FirstFire's so-called Amendment should be stated for what it is: a brazen, backdated attempt to escape the holding of *Adar Bays* and most importantly, a *legal nullity*.  Moreover, FirstFire's voluntary dismissal of its suit against DarkPulse in the Delaware Chancery court was obviously motivated by the realization that the case would surely end with the Delaware court declaring the Agreement usurious and void.   These sharp practices distort the justice system and cannot be countenanced, and the district court's ruling in this case rewards them.

.

**ISSUE TWO**

May an unregistered securities dealer enter into the Securities Purchase Agreement or purchase the Convertible Promissory Note in this case without violating Section 15(a) of the Securities Exchange Act of 1934?

NO.    Under §15(a) of the Exchange Act, it is unlawful for an unregistered securities dealer "to effect any transactions in . . . any security." Because a convertible promissory note is a security, an unregistered securities dealer "effects a transaction in securities" when he purchases the note, or enters into a contract to purchase the note.

## SUMMARY OF THE ARGUMENT

Cases with claims seeking (29(b) rescission premised on dealer-registration violations (§15(a)) began to appear in the New York southern district in 2018 with *LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 U.S. Dist. LEXIS 202540 (S.D.N.Y. Sep. 28, 2018) as a response to then-recent SEC prosecutions of unregistered securities dealers. Unfortunately, the first two cases (*ExeLED* and *Vystar*, discussed below) were not well argued and resulted in decisions that are clearly wrong. Unfortunately, the courts in the southern district of New York regard these cases as a type of precedent, which the district court in this case dutifully followed. The errors of the district court are noted below with a brief summary.

In this case, DarkPulse asserts that FirstFire is an unregistered dealer transacting in securities in violation of 15 U.S.C. § 78o(a)(1). DarkPulse argues that Loan Agreement is therefore unlawful and void under § 29(b) because as unregistered securities dealer, FirstFire could not enter into the SPA or purchase the promissory Note without violating § 15(a) of the Exchange Act, 15 U.S.C. § 78o(a)(1).

In response to these claims, the district court concluded:

DarkPulse contends that the Notes should be rescinded because FirstFire was acting an unregistered securities dealer in violation of § 15(a). **ERROR 1.** Courts in this District have, however, held that in

45

§ 29(b) actions, a defendant's failure to register as a dealer does not make the transaction "prohibited," where the underlying contract does not require the defendant to act as a dealer. **ERROR 2.**

A-26.

**ERROR 1**:  DarkPulse *is not* claiming that FirstFire "was acting [as] an unregistered securities dealer in violation of § 15(a)."  DarkPulse claims that FirstFire, by virtue of its business operations, *is* an unregistered securities dealer, (i.e., meets the definition of a securities dealer under the Exchange Act, *and* is not registered with the SEC as such) ***and***  that FirstFire violated section 15(a) of the Exchange Act when it entered into the Agreement in this case, which was itself a transaction in securities, and also required that FirstFire purchase another security.

**ERROR 2**:  The district court is correct that courts in the southern district of New York hold that a violation of 15(a) does not occur "where the underlying contract does not require the defendant to act as a dealer," but that interpretation is contrary to the plain language of section 15(a) of the Act.  The district court continued, holding:

> Here, neither of the Notes required FirstFire to act as a broker dealer**. ERROR 3.**

> DarkPulse argues that because FirstFire was obligated to purchase the Notes, the SPAs cannot be performed without violating the Exchange Act.  However, obligating FirstFire to purchase the Notes does not "explicitly require" FirstFire to act as a broker.  **ERROR 4.** *See Foundation Ventures, LLC v. F2G, LTD.*, No. 08 Civ. 10066 (PKL), 2010 WL 3187294, at *7 (S.D.N.Y. Aug. 11, 2010).

Indeed, the language of the non-voidable sales purchase agreement in *ExeLED* is nearly identical to the language obligating DarkPulse to purchase the Notes here. **ERROR 5**.

A-26.

**ERROR 3:** Use of the term "broker dealer" is not appropriate in this case. DarkPulse alleges that Firstfire is a dealer, not a broker, and these terms are defined differently in the Act.

**ERROR 4.** Again, DarkPuse is alleging that Firstfire is an unregistered dealer, not an unregistered broker. Further, § 15(a) prohibits transactions in securities, not "acting like a broker."

**ERROR 5:** The district court is correct that the contract in *ExeLED* is "nearly identical" to the FirstFire SPA in this case, but erred when it decided to follow to reject the language of the statute instead of considering that *ExeLED* may have been incorrectly decided. As more fully explained below, the parties in *ExeLED* never informed the court that a convertible promissory note is a security. [17]

_____

[17] Ironically, the SEC is now prosecuting LG Capital for multiple violations of § 15(a), *see SEC v. LG Capital Funding, LLC*, Case No. 22-cv-03353 (WFK) (JRC) (E.D.N.Y.).

## ARGUMENT

## IV.   SECTION   29(B)   PROVIDES   A   RIGHT   OF   RESCISSION   FOR CONTRACTS MADE IN VIOLATION OF THE ACT

### 29(b) Contract provisions in violation of title.

Every contract **made in violation of any provisions of this title** or of any rule or regulation thereunder, **and** every contract  . . . heretofore or hereafter made, **the performance of which involves the violation of,** or the continuance of any relationship or practice in violation of, **any provision of this title** or any rule or regulation thereunder, shall be void . . . .

18 U.S.C. § 78cc(b) (emphasis added).   The plain text of Section 29(b) allows for the rescission (1) of any contract "*made in violation of any provision of this title*" or (2) "*the performance of which* involves a violation of any provision of this title." § 78cc(b) (emphasis added).   Stated differently, "29(b) itself does not define a substantive violation of the securities laws; rather, it is the vehicle through which private parties may rescind contracts that were made or performed in violation of other substantive provisions."   *Berckeley v. Colkitt*, 455 F3d 195, 204 (3d Cir. 2006) (citing 892 F2d 199, 206, n.4 (2d Cir. 1989).

Section 29(b) provides that violations of the Act may occur in both the "making" of the contract and/or the "performance" of the contract, and accordingly each is under scrutiny for violations of the Act.   "Thus, the express terms of a contract could be perfectly lawful, yet the "making" of the contract might involve a violation of the Act or its rules or regulations."   *Section 29(b): A Viable Remedy*

48

*Awakened*, 48 Geo. Wash. L. Rev. 1, (1979).  Courts have distinguished situations where the violation is inseparable from the contract from situations where the violation is independent or collateral to the contract.  *Berckely,* 455 F3d at 204. Notably, most courts addressing the "unlawful performance" prong have held that, only contracts that  obligate a party to violate the Act are covered under section 29(b).

**DarkPulse claims against FirstFire.**  In this case, DarkPulse brought two §29(b) claims: (Claims I and II): Claim I alleges that the Agreement  violated section 15(a) of the Act "as made" and Claim II alleges the Agreement violated § 15(a)  by requiring unlawful performance. A-131, 132.

**A.    Under Section 29(b), Contracts are Void if (1) "Made in Violation" of the Act or (2) Where Performance of the Contract Involves a Violation of the Act**

**1.    MADE IN VIOLATION OF THE ACT:** *Eastside Church***: The Fifth Circuit Holds that an Unregistered Broker Dealer Violated the Act by Entering into a Transaction in Securities.**

The primary example of a § 29(b) claim for rescission based on a violation (of §15(a)) in the *formation* of a contract is found in *Eastside Church of Christ v. National Plan, Inc*., 391 F.3d 357 (5th Cir. 1968).  Although it is only a single case, it has the blessing of the Fifth Circuit Court of Appeals, and is on point in every respect to the case here on appeal.

In *Eastside Church*, the plaintiff church brought a § 29(b) action for rescission of certain bonds (securities) that it had issued to the bond purchaser-defendant National Plan. The church alleged that because National Plan was an unregistered broker dealer, National's purchase of the bonds was unlawful under § 15(a)(1). After review of the evidence, the Fifth Circuit agreed that National was indeed "a broker and a dealer within the meaning of the Act," and hence, because it was not registered, it could not lawfully effect the bond transactions in that case. The court held:

> Under § 15(a)(1), National was prohibited from effecting the transactions here involved and thus **violated the Act by entering into those transactions**. Under the voiding provision of § 29(b), it is sufficient to show merely that the prohibited transactions occurred and that appellants were in the protected class.

*Eastside Church*, 391 F.3d at 362 (citations omitted). Accordingly, the Fifth Circuit held the contract to be void and unenforceable. In this case, Darkpulse's second rescission claim (that formation of the contracts was unlawful) is nearly identical to the violation addressed in *Eastside Church.* Unfortunately, the district court completely ignored this claim.

### 2.     Performance In Violation of the Act: Brokerage Contracts

**Prior to 2018, the** classic example of a 29(b) /15(a) claim is brought by a customer seeking rescission of a brokerage contract where the customer finds out his broker (typically after the broker screws up) is not registered with the SEC.

See, e.g., *Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982).

### 3.    *Berckeley v. Colkitt*: As Made, As performed

*Berckeley v. Colkitt*, 455 F.3d at 205, is instructive for this case because it addresses both types of violation, and involves convertible securities.  In that case, Colkitt sought 29(b) recission of a securities purchase agreement with a lender, which provided for the lender's purchase of  several convertible bonds from Colkitt.  Colkitt alleged that the contract was (1) "made in violation of section 10(b) of the Act" because the lender falsely asserted that it would not unlawfully resell the Colkitt's shares into the US market, and (2) the lender's "performance" of the contract violated Section 5 of the Securities Act because it did unlawfully resell the shares into the U.S. market.  The district court rejected both claims.  The Third Circuit upheld the dismissal of Colkitt's "as performed" violation (because the downstream stock sales were not expressly required by the contract), but reversed the lower court's dismissal of the claim alleging an "as made" violation. The court held that if a material misrepresentation induced Colkitt to enter into the contract (and hence violated Section 10(b) of the Act) the very formation of the contract was unlawful.

**B.      Elements of a 29(b) Claim**

To void a contract under § 78cc(b), the proponent must show that "(1) the contract involved a prohibited transaction; (2)  he is in contractual privity with [the party seeking to enforce the contract]; and (3) he is in the class of persons that the securities acts were designed to protect."  *Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357, 363 (5th Cir. 1968), *cert. denied*, 393 U.S. 913 (1968); *Reg'l Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552, 559 (5th Cir. 1982).

**C.      Elements of a Claim Under Section 15 (a) of the Exchange Act.**

The broker-dealer registration requirement serves as the "keystone of the entire system of broker-dealer regulation." *Frank W. Leonesio,* Exchange Act Release No. 23,524, 36 SEC Docket 457, 464 (Aug. 11, 1986).  A broker-dealer that has registered with the SEC is bound to abide by numerous regulations designed to protect prospective purchasers of securities, including standards of professional conduct, financial responsibility requirements, recordkeeping requirements, and supervisory obligations over broker-dealer employees. *See generally* David A. Lipton, *A Primer on Broker-Dealer Registration,* 36 Cath. U.L. Rev. 899 (1987).

Section 15(a) provides:

> **It shall be unlawful** for any broker or dealer … to make use of the mails or any means or instrumentality of interstate commerce **to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security** (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

§ 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)) (emphasis added). Hence, it is unlawful for an (1) unregistered (2) broker or dealer to: (3) effect any transactions in any security, or (4) induce or attempt to induce the purchase or sale of any security. *Id*.

## 1.    (1) Unregistered +  (2) Securities Dealer

The district court never addressed elements (1) and (2) in its decision. However, there is no dispute that FirstFire is not registered as a dealer with the SEC or FINRA. As to the second element, DarkPulse contends that FirstFire operates a business buying and selling securities for its own account, and therefore fits the definition of a "dealer" as defined in the Exchange Act. More specifically, DarkPulse asserts that FirstFire's business model is nearly identical to that used by entities found to be dealers in recent SEC cases.

## 2.    Effect Any Transaction  in Any Security

A "transaction" is not defined in the Exchange Act, but the term is universally understood to include a purchase or sale, but encompasses a broad range of actions. Under the Act, the terms "buy" and "purchase" each include any contract to buy, purchase, or otherwise acquire. (15 U.S.C. § 78c(a)(5)) and defines "sale" to include "any contract to sell or otherwise dispose of" a security (15 U.S.C. 78c(1)(13)).

## 3.    A Convertible Promissory Note Is A "Security"

Pursuant to the definitions provided in Section 3(a)10 of the Act, a promissory note is a security.  That section provides:

> (10) The term "security" means any note, stock, treasury stock, security future, security-based swap, bond, debenture … but shall not include currency or any note, draft, bill of exchange, or banker's acceptance which has a maturity at the time of issuance of not exceeding nine months, exclusive of days of grace, or any renewal thereof the maturity of which is likewise limited.

15 U.S.C. § 78c(a)(10).  As defined in the Exchange Act, the convertible note in this case is  presumptively a security.  "The test begins with the language of the statute; because the Securities Acts define 'security' to include 'any note,' we begin with a presumption that every note  is a security." *Reeves v. Ernst & Young*, 494 U.S. 56, 64-65 (1990).  *Leemon v. Burns*, 175 F. Supp. 2d 551, 559 (SDNY 2001).

54

a)    <u>A Convertible Promissory Note Must be a Security to Be "Convertible"</u>

Presumptions aside, there can be no reasonable dispute that the FirstFire's Convertible Note is itself a security: if it was not a security, FirstFire would be unable to "convert" the Note into DarkPulse stock. In the context of securities law, "conversion" *can only occur between two securities*.[18] That is, by definition, any "convertible security" is a security—usually a bond, preferred stock, or note—that gives the holder has the right to exchange the security for a different security from the same issuer, such as exchanging preferred stock for common stock, or as in this case, exchanging a shares of the company's common stock. A convertible security is similar to a bond with an embedded option.

When the holder exercises the conversion right, no cash changes hands[19] because the lender uses the debt instead of cash to pay the exercise price. *See LG Capital Funding, LLC v. Accelera Innovations, LLC*, 2018 U.S. Dist. LEXIS

---

[18] "Conversion" refers to the actual process where the holder (who may be exercising its right to convert) exchanges the convertible for a different security, such as shares of common stock. *Dictionary of Finance and Investment Terms*, 149 (10th Ed. 2018).

[19] No cash can change hands if the holder wants to use the tacking provision in Rule 144.

137490, at *17 (E.D.N.Y. Aug. 10, 2018) (observing that with a convertible note, the lender "pre-paid" the exercise price "when it funded the note.").

> b) FirstFire Can Only Obtain Freely-Trading Stock at Conversion If the Note is a Security.

Under Section 5 of the Securities Act of 1933 ("Securities Act" or "'33 Act") (15 U.S.C. § 77e), all securities sold in the United States public market must be either registered with the SEC or otherwise qualify for an exemption from registration. Rule 144 is the most commonly-used exemption for the sale of restricted securities, (17 CFR § 230.144) and this is the exemption used by FirstFire. Rule 144 provides that qualifying unregistered securities may be freely sold after a six month holding period. Several conditions must be met to qualify for the Rule 144 exemption, but the SPA and Note each require DarkPulse to comply with all conditions necessary to ensure that FirstFire will be able to utilize Rule 144 (failure incurs various default penalties). *See* Note (A-109, 110); SPA (A-129, 130, 137-140). After the six-month holding period, the restriction is removed and the security may be freely sold in the public market. Lenders like FirstFire heavily rely on the use of "tacking," which allows the lender to immediately sell the shares acquired from conversion—as long as it held the Note for at least six months. *See* 17 C.F.R. § 230.144(d)(3)(ii).

## V.    THE    SECURITIES    PURCHASE    AGREEMENT EFFECTED A TRANSACTION IN SECURITIES

### A.    FirstFire Effected a Transaction in Securities When it Entered into the Agreement.

The Securities Purchase Agreement ("SPA") is a contract effecting the purchase and sale of securities.  It sets forth the terms for FirstFire's purchase (and DarkPulse's sale) of the Note (a security) and the 60,000,000 commitment shares (securities).   Page one of the SPA states the following:

> The Company and the Buyer are executing and delivering this Agreement in reliance upon the exemption from securities registration afforded by Section 4(a)(2) of the Securities Act of 1933, as amended (the "1933 Act") and Rule 506(b) promulgated by the United States Securities and Exchange Commission (the "SEC") under the 1933 Act

A-   124.   The above paragraph refers to "the exemption from securities registration afforded by Section 4(a)(2) and Rule 506(b)." This exemption permits DarkPulse to legally sell – and FirstFire to buy- the Note and Commitment shares (both securities) without registering them under the 1933 Act.  This statement is essentially boilerplate, but it demonstrates that both parties understood that the SPA effected a transaction in securities.   Sections 2.a,b and c also contain statements relating to eligibility for the exemption.  A-125.

57

**B.    The Securities Purchase Agreement Obligated FirstFire to Purchase the Note, Which Means FirstFire Was Required to Effect a Transaction in Securities**

FirstFire's only obligation is to purchase the Note and the commitment shares:

> Purchase of Note and Commitment Shares. On the Closing Date (as defined below), the Company shall issue and sell to the Buyer and the Buyer agrees to purchase from the Company the Note and the Commitment Shares, subject to the express terms of the Note, and this Agreement as the case may be. As it pertains to the Commitment Shares, and only the Commitment Shares, Buyer shall be limited to trading not more than five percent (5%) of the daily volume of the Company's Common Stock on any given Trading Day.

SPA at 1, A -124.

## VI.  THE DISTRICT COURT'S CONSTRUCTION OF SECTION 15(A) IS CONTRARY TO THE PLAIN LANGUAGE OF THE STATUTE

**A.    §15(a) Contains No "Act Like a Dealer" or "Act Like A Broker" Requirement**

The district court dismissed the rescission claim because, even if FirstFire were an unregistered securities dealer, the Agreement in this case would not violate §15(a), holding:

> [A] defendant's failure to register as a dealer does not make the transaction "prohibited," where the underlying contract does not require the defendant to act as a dealer. Indeed, courts have routinely dismissed such actions. . . . Here, neither of the Notes required FirstFire to act as a broker dealer.

> DarkPulse argues that because FirstFire was obligated to purchase the Notes, the SPAs cannot be performed without violating the Exchange

Act. However, obligating FirstFire to purchase the Notes does not "explicitly require" FirstFire to act as a broker.

A- 27 (citations omitted).

According to the district court's above-quoted holding, a contract only violates § 15(a) if it "explicitly require[s] Firstfire to act as a broker." This "interpretation" has no grounding in the language of the statute; §15(a) prohibits unregistered brokers or dealers from "effect[ing any transactions in . . . any security." Moreover, the court never explains what "acting like a broker" or "acting like a dealer" actually means; it concludes only that obligating Firstfire to *purchase a security* (which by definition is effecting a transaction in securities) does not qualify. Notably, statements made by other courts in this district seem to indicate "acting like a dealer" means buying *and* selling securities, per the definition of "dealer" in 15 U.S.C. § 78c(a)(5) and that a violation of § 15(a) is measured by that definition. *See EMA Fin., LLC v. AppTech Corp.*, 2022 U.S. Dist. LEXIS 165560 (S.D.N.Y. Sep. 13, 2022). However, that analysis only pertains the determination of whether an entity is a securities dealer to begin with, *i.e*., whether it "is in the business" of buying and selling securities for its own account. *Id*. Where an entity is deemed an unregistered dealer, § 15(a) commands that the dealer violates the act simply by *effecting a transaction in securities*; not when it enters a contract obligating it to "act like a dealer." Such an interpretation effectively re-writes federal securities law, and cannot be permitted.

**B.**     **The District Court's Blind Reliance On LG Capital and *Vystar* is Misplaced, because Both Decisions Fail to Recognize that a Convertible Promissory Note is a Security[20]**

In *LG Capital,* the parties executed a securities purchase agreement and a convertible promissory note similar to this case.  *LG Capital* appears to be one of the first convertible-promissory-note cases where the defendant alleged a right to § 29(b) rescission of the note based on the lender's violation of § 15(a) as an unregistered securities dealer.  The court rejected the claim, stating:

> Although it is an open question on this record whether LG should have registered as a "dealer" with the SEC… the Court concludes that even if LG should have registered, nothing in the Note or the SPA indicates that those contracts "could not have been legally performed" because LG failed to do so.  It is unlawful for an unregistered broker to "effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." But neither the Note nor the SPA require LG to take any action that would violate this statute.

*ExeLED* at *15-16 (citations omitted).  The above quoted analysis from *ExeLED* (as well as the record itself) reveals that the *ExeLED* court was never informed that the contracts in that case (a convertible note and a securities purchase agreement)

_____

[20] Prior to *Vystar* and *ExeLED*, the vast majority of § 29(b) rescission cases premised on § 15(a) violations involved rescission of brokerage contracts, not securities contracts.  However, unlike the SPA in this case, a brokerage contract does not effect a transaction in securities, and an unlicensed broker or dealer would not violate § 15(a) simply by entering into the contract, *see Eastside Church*, 391 F.3d 357.

*were themselves securities as defined in the Act.* Accordingly, the court's examination of the securities contracts that LG has entered into for language "requiring LG to take any action that would violate the statute," (*i.e.*, to effect a transaction in securities) is somewhat of an absurdity, because LG had *already effected a transaction in securities* when entered into the contract to purchase the Note (and when it purchased the Note).

**E. *Vystar* is Incorrect Because its Analysis is Premised on the Failure to Recognize that A Convertible Promissory Note is a Security.**

Just as in the *ExeLED* case, neither the parties nor the court in *EMA v. Vystar* seem to notice that the contract that the defendant sought to rescind (Securities Purchase Agreement for the purchase of a convertible note) was itself a transaction in securities, and that an unregistered securities dealer would have been prohibited under section 15(a) of the Act from purchasing the Note (a security) to begin with. The *Vystar* court held:

> Vystar claims that 'the underlying agreements [were] illegal when made as well as when performed" because Ema, as an unregistered broker-dealer, "could not have performed the contract with the share conversions and sales without violating the terms of the Exchange Act." In essence, Vystar contends that in entering and performing the contracts — in particular, the act of converting shares at a below-market rate and subsequently selling the shares — Ema acted as a broker-dealer and because Ema is not registered as a broker-*dealer, Ema has violated the Exchange Act.*

*Vystar,* 336 F.R.D at 81(citations omitted). As the above-quoted passage demonstrates, the flaw in the *Vystar* court's analysis stems from the defendant's

somewhat vague assertions regarding the nature of the violation, as well as a total failure to argue, (or to inform the court) that the "underlying agreement" effected a sale of a security.  As observed above, "conversion" into freely-trading shares of stock can only occur when the original instrument is itself a security.  *See* Rule 144.   Accordingly, any unregistered securities dealer that purchased the convertible note would be "effecting a transaction in securities," in violation of section 15(a)(1) of the Act.  *See Eastside Church*.  The *Vystar* court further observes:

> The flaw in Vystar's argument, however, is that it does not identify a provision in the contracts that obligates Ema to act as a broker-dealer. Certainly, Vystar contends that Ema has acted as a broker-dealer by converting the shares at a below-market rate and selling the shares. But Vystar does not explain why the act of converting shares violates the broker-dealer provision of the Exchange Act. And assuming *arguendo* that the selling of converted shares made Ema a broker-dealer, the selling of those shares was not required by the contract. Thus, "[a]t the time the parties entered into the Agreement, the Agreement could be performed without violating provisions of the securities laws."

*Vystar*, 336 F.R.D. at 81-82.  The court's observation that defendant in Vystar "does not identify a provision in the contracts that obligates EMA to act as a broker-dealer" is either poorly stated, or applies an incorrect standard—just as the district court in this case.  That is, in view of section 15(a), it is not necessarily unlawful for an unlicensed securities broker-dealer  "to act as a broker-dealer," but as noted above,  is it precisely (or even vaguely) clear what that phrase actually means.  The

prohibited conduct under section 15(a) is "to effect any transactions in, or to induce or attempt to induce the purchase or sale of, any security." 15 U.S.C. §78o (§15(a) of the Act).

## CONCLUSION

For the reasons described herein, Appellant DarkPulse, Inc., respectfully requests that the Court issue a ruling in its favor on both Issues presented.

Dated May 1, 2023

Respectfully Submitted,
/s/ Marjorie Santelli
Marjorie Santelli, Esq.
/s/ Mark R. Basile
Mark R. Basile, Esq.
/s/ Gus Passanante
Gus Passanante, Esq.
THE BASILE LAW FIRM P.C.
390 N. Broadway, Ste 140
Jericho, New York 11753
Tel. 516.455.1500
Fax. 631.498.04 78
marjorie@thebasilelawfirm.com
mark@thebasilelawfirm.com
gus@thebasilelawfirm.com

## CERTIFICATE OF COMPLIANCE

This Opening Brief by Appellant DarkPulse, Inc., has been prepared in accordance with Fed. R. App. 32(a)(7)(B) and Local R. 32.1 using: Microsoft Word, Times New Roman, 14 Point Type, with a total word count of 13,796, exclusive of the Corporate Disclosure Statement, Table of Contents, Table of Authorities, signature block, and Certificate of Compliance.

Dated May 1, 2023

# SPECIAL APPENDIX

SPA-1

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
----------------------------------------------------------X
DARKPULSE, INC.,

                Plaintiff,

    -against-                             21 **CIVIL** 11222 (ER)

                                                             **JUDGMENT**

FIRSTFIRE GLOBAL OPPORTUNITIES
FUND, LLC, and ELI FIREMAN,

                Defendants.
----------------------------------------------------------X

        It is hereby **ORDERED, ADJUDGED AND DECREED:**  That for the reasons

stated in the Court's Opinion and Order dated January 17, 2023, Defendants' motion to dismiss is

GRANTED in its entirety; accordingly, the case is closed.

**Dated:**  New York, New York

      January 17, 2023

                                       **RUBY J. KRAJICK**

                                _____
                                      **Clerk of Court**

                  **BY:**         *K. Mango*

                                      _____
                                      **Deputy Clerk**