# 23-78-cv

## United States Court of Appeals

*for the*

## Second Circuit

DARKPULSE, INC.,

*Plaintiff-Appellant,*

— v. —

FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, ELI FIREMAN,

*Defendants-Appellees.*

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## SUPPLEMENTAL APPENDIX

AARON H. MARKS, P.C.
BYRON PACHECO
JULIA D. HARPER
KIRKLAND & ELLIS LLP
*Attorneys for Defendants-Appellees*
601 Lexington Avenue
New York, New York 10022
(212) 446-4800

i

# TABLE OF CONTENTS

**Page**

Declaration of Aaron H. Marks in Support of
Defendants' Opposition to Plaintiff's Motion for
a Preliminary Injunction, dated January 19, 2022 .    SA-1

Exhibit G to Marks Declaration -
U.S. Securities and Exchange Commission
("SEC") Form 10-Q for Quarterly Period ended
September 30, 2021 ...............................................    SA-6

Declaration of Aaron H. Marks in Support of
Defendants' Motion to Dismiss the First
Amended Complaint, dated May 26, 2022 ............    SA-12

Exhibit A to Marks Declaration -
Excerpts from DPLS's SEC Form 424B4
Prospectus, filed May 3, 2022 ..............................    SA-15

Exhibit B to Marks Declaration -
Excerpts from DPLS's SEC Form 10-Q for
Quarterly Period ended March 31, 2022................    SA-29

Exhibit C to Marks Declaration -
Excerpts from DPLS's SEC Form 10-K for Fiscal
Year ended December 31, 2018 ............................    SA-39

Exhibit G to Marks Declaration -
DPLS's SEC Form 8-K, filed May 5, 2021 ...........    SA-110

Exhibit H to Marks Declaration -
DPLS's SEC Form 8-K, filed February 7, 2022 ....    SA-114

Exhibit L to Marks Declaration -
Department of State, Division of Corporations –
Business Entity Search Results..............................    SA-117

Exhibit P to Marks Declaration -
Visium Technologies, Inc.'s SEC Form 8-K, filed
January 16, 2019.....................................................    SA-119

SA-1

### UNITED STATES DISTRICT COURT
### SOUTHERN DISTRICT OF NEW YORK

| |
|---|
| DARKPULSE, INC., |
| Plaintiff, |
| v. |
| FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC and ELI FIREMAN |
| Defendants. |

Index No. 1:21-cv-11222 (ER)

### DECLARATION OF AARON H. MARKS IN SUPPORT OF DEFENDANTS' OPPOSITION TO PLAINTIFF'S MOTION FOR A PRELIMINARY INJUNCTION

I, Aaron H. Marks, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as follows:

1.      I am a partner of the law firm of Kirkland & Ellis LLP, counsel of record for Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman in the above-captioned action.  I submit this Declaration in support of Defendants' Opposition to Plaintiff's Motion for a Preliminary Injunction.  I make this Declaration based on my own personal knowledge.

**A.      DPLS Common Shares**

2.      According to DPLS's own website, https://ir.darkpulse.com/stock/, DPLS's stock is a penny stock not listed on a major exchange, but that rather trades through OTC Pink, one of OTC Market Group's platforms.

3.      DPLS's public filings indicate that as of September 30, 2021 there were nearly five billion (4,922,968,442) shares of DPLS common stock issued and outstanding, and DPLS has

SA-2

authorized a total of twenty billion (20,000,000,000) shares of common stock for issuance. Attached hereto as **Exhibit G** is a true and correct copy of DPLS's Form 10-Q for the quarterly period ended September 30, 2021, filed with the SEC on EDGAR on November 15, 2021.

4.   According to yahoo! finance and DPLS's own website, https://ir.darkpulse.com/stock/, as of January 14, 2022, DPLS shares closed trading at a price of approximately $0.05, and have a 52-week price range of $0.0014 to $0.202—the high of the range being about 144 times the low.

5.   According to the figures contained on DPLS's own website, in the 42 trading days between November 18, 2021 and January 14, 2022, the period between FirstFire's conversion and DPLS filing this motion, over 1.178 billion DPLS common shares were traded—for an average daily trading volume of 28.04 million shares per day during this period.

6.   Over the ten trading days preceding FirstFire's conversion pursuant to the Note, there was an average daily trading volume of 36.08 million DPLS common shares per day.

**B.     DPLS's History of Issuing Convertible Notes**

7.   According to DPLS's public filings, DPLS hired a registered broker-dealer and paid a finder's fee of $15,000 to the broker-dealer, who found FirstFire to enter into the Note. Attached hereto as **Exhibit H** is DPLS's Form 8-K filed with the SEC on EDGAR on May 5, 2021.

8.   DPLS's public filings reflect that between July 2018 and July 2021, DPLS entered into 20 different convertible notes with multiple investment funds—including the note issued to FirstFire on April 26, 2021 (the "Note") that is the subject of this dispute. Attached hereto as **Exhibit I** is a true and correct copy of DPLS's Form 10-K for the fiscal year ended December 31, 2018, filed with the SEC on EDGAR on April 14, 2019. Attached hereto as **Exhibit J** is a true and correct copy of DPLS's Form S-1/A Registration Statement, filed with the SEC on EDGAR on December 8, 2021.

2

SA-3

9.      On 36 separate occasions in 2020 and in 2021, DPLS issued significant volumes of shares of common stock upon the conversion or partial conversion of convertible promissory notes by their holders.  (**Exhibit J**, DPLS Form S-1/A at II-3–II-5.)

10.     In total, in 2020 and 2021, DPLS, through its transfer agent, issued over 3,545,380,000 common shares in connection with these 36 note conversions, including the 177,375,000 common shares issued to FirstFire on November 17, 2021.  (*Id.*)

11.     Each of the convertible notes entered by DPLS (and the convertible notes' attendant DPLS common shares) are disclosed in DPLS's public filings beginning the date the notes are entered.  (*See id.*)

12.     Additionally, on December 13, 2021, DPLS filed a prospectus registering 300 million shares of its common stock for sale by GHS Investments LLC, noting that common stock outstanding prior to the offering totaled 5,154,044,407.  Attached hereto as **Exhibit K** is DPLS's Form 424B4 filed with the SEC on EDGAR.

**C.      Lawsuits Filed By DPLS**

13.     According to DPLS's public filings, on May 13, 2021, two weeks after entering into the Note with FirstFire, DPLS filed a motion in its action against another investment fund with which DPLS entered into a convertible note, Carebourn Capital, L.P., "arguing that Carebourn is conducting itself as an unregistered dealer, in violation of Section 15(a) of the Securities and Exchange Act of 1934 (the "Act"), and, pursuant to Section 29(b) of the Act, the Company is entitled to have all contracts arising under the unlawful securities transaction declared void ab initio and seek rescissionary damages for any unlawful transactions effected by Carebourn"—the same arguments to rescind the Note that DPLS now makes here.  (**Exhibit G**, DPLS 10-Q at 25.)

3

14.    DPLS is litigating a similar case against More Capital, LLC (*id.* at 26), and on January 4, 2022, DPLS initiated an action against EMA Financial, LLC and a related entity and individual that is almost identical to this Action. *DarkPulse, Inc. v. EMA Fin., LLC, et al.*, Case No. 1:22-cv-00045 (S.D.N.Y. Jan. 3. 2022).

15.    It appears to be DPLS's pattern and practice to enter into convertible notes with investment funds, to receive the cash funding thereunder, and then seek to void or rescind the notes in frivolous litigation—in which DPLS even suggests that it had no prior knowledge of the allegations of unlawfulness that it is making.

**D.    The Delaware Action and this Action**

16.    On December 13, 2021, weeks after DPLS first demanded that FirstFire return the shares converted pursuant to the Note, FirstFire filed a complaint in the Delaware Chancery Court concerning this same dispute regarding the Note and seeking a declaration that the November 17 conversion was proper and that FirstFire was entitled to the 177,375,000 share of DPLS common stock it received in connection with the conversion ("the Delaware Action").

17.    On December 31, 2021, instead of responding to the Delaware Action, DPLS initiated this Action.

18.    Upon filing this Action, DPLS issued a press release, a true and correct copy of which is attached hereto as **Exhibit L**.

19.    DPLS has entered its appearance in the Delaware Action, and on January 14, 2022, the Delaware Chancery Court entered a scheduling order in the Delaware Action, providing for a February 4, 2022 deadline for DPLS to respond to the complaint and setting an April 13, 2022 hearing date for any motion that DPLS may file. *FirstFire Glob. Opp. Fund LLC v. DarkPulse, Inc.*, C.A. No. 2021-1082-LWW (Del. Ch. Dec. 13, 2021).

SA-5

Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

Executed on January 19, 2022 in Westchester County, New York.

_____
Aaron H. Marks

SA-6

# EXHIBIT G

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

# FORM 10-Q

(Mark One)

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended **September 30, 2021**

Or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: **000-18730**

# DarkPulse, Inc.

(Exact name of registrant as specified in its charter)

| | |
|---|---|
| **Delaware** | **87-0472109** |
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |
| **1345 Ave of the Americas, 2nd Floor, New York, NY** | **10105** |
| (Address of principal executive offices) | (Zip Code) |

**(800) 436-1436**
(Registrant's telephone number, including area code)

Securities registered pursuant to section 12(b) of the Act:

| **Title of Each Class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Not applicable | Not applicable | Not applicable |

Indicate by check mark whether the registrant has filed (1) all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports) and (2) has been subject to such filing requirements for the past 90 days.
Yes ☐ No X

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares outstanding of the registrant's common stock on November 12, 2021, was 4,976,669,407.

---

**DARKPULSE, INC.**
**FORM 10-Q**
**TABLE OF CONTENTS**

**FOR THE QUARTER ENDED SEPTEMBER 30, 2021**

**PART I—FINANCIAL INFORMATION**

| | |
|---|---|
| Item 1. Financial Statements | 3 |
| Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations | 27 |
| Item 3. Quantitative and Qualitative Disclosures About Market Risk | 35 |
| Item 4. Controls and Procedures | 35 |

**SA-8**

PART II—OTHER INFORMATION

    Item 1. Legal Proceedings      36

    Item 2. Unregistered Sales of Equity Securities and Use of Proceeds      36

    Item 6. Exhibits      37

SIGNATURES      38

2

## PART I—FINANCIAL INFORMATION

**Item 1. Financial Statements**

**DARKPULSE, INC.**
**CONDENSED CONSOLIDATED BALANCE SHEETS**

| | September 30, 2021 | Audited December 31, 2020 |
|---|---|---|
| **ASSETS** | | |
| **CURRENT ASSETS:** | | |
| Cash | $ 2,564,492 | $ 337 |
| Accounts receivable, net | 5,812,003 | – |
| Inventory | 1,630,051 | – |
| Unbilled revenue | 1,103,876 | – |
| Other current assets | 137,979 | – |
|    TOTAL CURRENT ASSETS | 11,248,401 | 337 |
| | | |
| **NON-CURRENT ASSETS:** | | |
| Property and equipment, net | 1,837,399 | – |
| Operating lease right-of-use assets | 1,476,771 | – |
| Patents, net | 355,719 | 393,990 |
| Goodwill | 15,536,899 | – |
| Other assets, net | 282,881 | 91,464 |
|    TOTAL NON-CURRENT ASSETS | 19,489,673 | 485,454 |
| | | |
|    TOTAL ASSETS | $ 30,738,072 | $ 485,791 |
| | | |
| **LIABILITIES AND STOCKHOLDERS' DEFICIT** | | |
| **CURRENT LIABILITIES:** | | |
| Accounts payable and accrued expenses | $ 9,549,305 | $ 1,089,869 |
| Convertible notes, net of discount $111,888 and $39,414 respectively | 1,091,375 | 931,158 |
| Notes payable | 2,000,000 | |
| Customer deposits | 4,802,891 | – |
| Derivative Liability | 479,088 | 1,220,877 |
| Contract liabilities | 2,699,688 | – |
| Operating lease liabilities - current | 575,446 | – |
| Other current liabilities | 2,190,110 | – |
|    TOTAL CURRENT LIABILITIES | 23,387,903 | 3,241,904 |
| | | |
| **NON-CURRENT LIABILITIES:** | | |
| Secured debenture | 1,184,516 | 1,176,092 |
| Operating lease liabilities - non-current | 1,592,880 | – |
|    TOTAL NON-CURRENT LIABILITIES | 2,777,396 | 1,176,092 |
| | | |
|    TOTAL LIABILITIES | 26,165,299 | 4,417,996 |
| | | |
| **STOCKHOLDERS' DEFICIT** | | |
| Common Stock, Par Value $0.0001, 20,000,000,000 shares authorized 4,922,968,442 and 4,088,762,156 shares issued and outstanding respectively | 492,297 | 408,876 |

SA-9

| | | |
|---|---|---|
| Treasury Stock, 100,000 shares Case 1:21-cv-11222-ER  Document 20-1  Filed 01/19/22  Page 4 of 6 | | (1,000) |
| Convertible Preferred Stock, Series D, par value $0.01, 100,000 shares authorized, 88,235 shares issued and outstanding | 883 | 883 |
| Paid in capital in excess of par value | 12,327,090 | 1,805,813 |
| Distributions | (6,400) | – |
| Non-controlling interest in a variable interest entity and subsidiary | (34,113) | (12,439) |
| Accumulated other comprehensive income | 168,496 | 315,832 |
| Accumulated deficit | (8,374,480) | (6,450,170) |
| TOTAL STOCKHOLDERS' EQUITY (DEFICIT) | 4,572,773 | (3,932,205) |
| | | |
| TOTAL LIABILITIES AND STOCKHOLDERS' EQUITY | $ 30,738,072 | $ 485,791 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

3

**DARKPULSE, INC.**
**CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**(UNAUDITED)**

| | FOR THE THREE MONTHS ENDED SEPTEMBER 30, | | FOR THE NINE MONTHS ENDED SEPTEMBER 30, | |
|---|---|---|---|---|
| | 2021 | 2020 | 2021 | 2020 |
| REVENUE | $ 3,500,970 | $ – | $ 3,500,970 | $ – |
| COST OF GOODS SOLD | 2,767,239 | – | 2,767,239 | – |
| GROSS PROFIT | 733,731 | – | 733,731 | – |
| | | | | |
| OPERATING EXPENSES: | | | | |
| Selling, general and administrative | 406,940 | 34,782 | 531,793 | 120,866 |
| Salaries, wages and payroll taxes | 1,007,453 | – | 1,007,453 | 187 |
| Professional fees | 1,680,600 | – | 1,901,572 | 48,297 |
| Depreciation and amortization | 91,222 | 12,757 | 116,736 | 38,271 |
| Debt transaction expenses | 33,000 | – | 184,950 | – |
| TOTAL OPERATING EXPENSES | 3,219,215 | 47,539 | 3,742,504 | 207,621 |
| | | | | |
| NET OPERATING LOSS | (2,485,484) | (47,539) | (3,008,773) | (207,621) |
| | | | | |
| OTHER INCOME (EXPENSE): | | | | |
| Interest expense | (320,706) | (37,318) | (671,290) | (97,842) |
| Gain on settlement of debt | 785,240 | – | 785,240 | 1,000 |
| Change in fair market of derivative liabilities | (251,133) | (87,852) | 76,363 | (44,684) |
| Gain/Loss on convertible notes | 432,893 | (1,313) | 741,789 | (39,414) |
| Foreign currency exchange rate variance | 152,361 | – | 152,360 | – |
| TOTAL OTHER INCOME (EXPENSE) | 798,655 | (126,483) | 1,084,462 | (180,940) |
| | | | | |
| NET LOSS | (1,686,829) | (174,022) | (1,924,311) | (388,561) |
| Net Loss attributable to noncontrolling interests in variable interest entity and subsidiary | 15,838 | – | 15,838 | – |
| Net loss attributable to Company stockholders | $ (1,670,991) | $ (174,022) | $ (1,908,473) | $ (388,561) |
| | | | | |
| LOSS PER SHARE: | | | | |
| Basic and Diluted | $ (0.00) | $ (0.00) | $ (0.00) | $ (0.00) |
| | | | | |
| WEIGHTED AVERAGE SHARES OUTSTANDING: | | | | |
| Basic and Diluted | 4,835,935,495 | 2,355,108,904 | 4,679,197,410 | 1,754,933,152 |

The accompanying notes are an integral part of these unaudited condensed consolidated financial statements.

4

**DARKPULSE, INC.**
**CONDENSED CONSOLIDATED STATEMENT OF OPERATIONS**
**(UNAUDITED)**

| | FOR THE THREE MONTHS ENDED SEPTEMBER 30, | FOR THE NINE MONTHS ENDED SEPTEMBER 30, |
|---|---|---|

On August 19, 2021, we entered into the Purchase Agreement with GHS, for the offering of up to $45,000,000 worth of Common Stock. Pursuant to the Purchase Agreement, on August 19, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from the Company, 31,799,260 shares of Common Stock for total proceeds to the Company, net of discounts, of $3,300,000, at an effective price of $0.1038 per share (the "**First Closing**"). We received approximately $2,790,000 in net proceeds from the First Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the First Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021. On September 30, 2021, the Company paid a $275,000 placement fee to J.H. Darbie & Co, $125,000 cash and $150,000 with 1,073,730 shares of common stock.

Pursuant to the Purchase Agreement, on August 31, 2021, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 27,297,995 shares of Common Stock for total proceeds to us, net of discounts, of $3,300,000, at an effective price of $0.120888 per share (the "**Second Closing**"). We received approximately $2,885,000 in net proceeds from the Second Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Second Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021. On September 30, 2021, the Company paid a $262,000 placement fee to J.H. Darbie & CO, $112,000 cash and $150,000 with 1,185,771 shares of common stock.

Pursuant to the Purchase Agreement, on September 22, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from us, 25,630,272 shares of Common Stock for total proceeds to us, net of discounts, of $2,000,000, at an effective price of $0.085836 per share (the "**Third Closing**"). We received approximately $1,915,000 in net proceeds from the Third Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Third Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021. On September 30, 2021, the Company paid a $185,000 placement fee to J.H. Darbie & CO, $85,000 cash and $100,000 with 934,580 shares of common stock.

**NOTE 12 – RELATED PARTY TRANSACTIONS**

The Company follows subtopic 850-10 of the FASB Accounting Standards Codification for the identification of related parties and disclosure of related party transactions. Pursuant to Section 850-10-20 the related parties include a) affiliates of the Company; b) Entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825-10-15, to be accounted for by the equity method by the investing entity; c) trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; d) principal owners of the Company; e) management of the Company; f) other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and g) Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. The financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include: a) the nature of the relationship(s) involved; b) a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; c) the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

During the three months ended September 30, 2021 and 2020, the Company's Chief Executive Officer advanced personal funds in the amount of $0 and $10,582 for Company expenses. As of September 30, 2021, the Company's Chief Executive Officer is owed a total of $23,980 for advanced personal funds.

**NOTE 13 - COMMITMENTS & CONTINGENCIES**

*Potential Royalty Payments*

The Company, in consideration of the terms of the debenture to the University of New Brunswick, shall pay to the University a two percent royalty on sales of any and all products or services which incorporate the Company's patents for a period of five years from April 24, 2018.

*Legal Matters*

*Carebourn Capital, L.P.*

On January 29, 2021, Carebourn Capital, L.P. ("**Carebourn**") commenced suit against the Company in the 4th Judicial District (Hennepin County District Court) (Minnesota), alleging the Company breached the terms and conditions of two convertible promissory notes and accompanying securities purchase agreements Carebourn and the Company entered into on July 17, 2018 and July 24, 2018, respectively.

Also on January 29, 2021, Carebourn moved for a temporary injunction to enjoin the Company from transferring any shares of its common stock to any third parties. Following submission of briefing by both parties and oral arguments on Carebourn's motion, on March 17, 2021, the Court denied Carebourn's motion for a temporary injunction.

On April 14, 2021, Carebourn filed an amended complaint and asserted new claims. On May 13, 2021, the Company filed a motion to dismiss Carebourn's amended complaint, arguing that Carebourn is conducting itself as an unregistered dealer, in violation of Section 15(a) of the Securities and Exchange Act of 1934 (the "**Act**"), and, pursuant to Section 29(b) of the Act, the Company is entitled to have all contracts arising under the unlawful securities transaction declared void ab initio and seek rescissionary damages for any unlawful securities transactions effected by Carebourn.

As of the date hereof, a ruling has not been issued on the foregoing motions to dismiss filed by the Company and other defendants. Furthermore, as of the date hereof, the Company and Carebourn are conducting discovery. The Company intends to defend itself against the allegations asserted in Carebourn's amended complaint and interpose the defenses provided under the Act, including but not limited to asserting that Carebourn is an unregistered dealer acting in violation of Section 15(a) and, pursuant to Section 29(b), the Company interposing its right to rescind the unlawful securities contracts in their entirety and, furthermore, seek rescissionary damages for any unlawful securities transactions effected by Carebourn. The Company contends that its arguments are brought in good faith, particularly in light of recent SEC enforcement actions and the SEC's ongoing

investigation against Carebourn. See U.S. Securities and Exchange Commission v. Carebourn Capital, LP et al, Case No. 1:20-cv-07162 (N.D. Ill.).

**Former DarkPulse Officers**

On September 10, 2021, Stephen Goodman, Mark Banash, and David Singer (the "**Former Officers**"), all former officers and employees of the Company, commenced suit against the Company in Arizona Superior Court, Maricopa County. The complaint alleges the Company breached the rights of the Former Officers in connection with Series D preferred stock issued to the Former Officers. The Company intends to defend itself against the allegations asserted in the Former Officers' complaint. if the case progresses the Company will file countersuits against all plaintiffs.

25

**More Capital, LLC**

On June 29, 2021, More Capital, LLC ("**More**") commenced suit against the Company, et al., in the 4th Judicial District (Hennepin County District Court) (Minnesota), alleging the Company breached the terms and conditions of a convertible promissory note and accompanying securities purchase agreement More and the Company entered into on August 20, 2018.

On July 20, the Company filed a motion to dismiss More's complaint, arguing that the claims asserted against the Company fail to state a claim upon which relief can be granted.

The Company intends to defend itself against the allegations asserted in More's complaint and interpose the defenses provided under the Act, including but not limited to asserting that More is an unregistered dealer acting in violation of Section 15(a) of the Act and, pursuant to Section 29(b) of the Act, the Company interposing its right to rescind the unlawful securities contracts in their entirety and, furthermore, seek rescissionary damages for any unlawful securities transactions effected by More. The Company contends that its arguments are brought in good faith, particularly in light of recent SEC enforcement actions and the SEC's ongoing investigation against More, among other parties, for violations of federal securities laws, including violations of Section 15(a) of the Act. See U.S. Securities and Exchange Commission v. Carebourn Capital, LP et al, Case No. 1:20-cv-07162 (N.D. Ill.).

From time to time, we may become involved in litigation relating to claims arising out of our operations in the normal course of business. We are not currently involved in any pending legal proceeding or litigation and, to the best of our knowledge, no governmental authority is contemplating any proceeding to which we are a party or to which any of our properties is subject, which would reasonably be likely to have a material adverse effect on our business, financial condition and operating results.

**NOTE 14 – SUBSEQUENT EVENTS**

The Company evaluated events occurring after the date of the accompanying unaudited condensed consolidated balance sheets through the date the financial statements were issued and has identified the following subsequent events that it believes require disclosure:

Effective October 1, 2021, we entered into and closed the Membership Purchase Agreement (the "**TerraData MPA**") with TerraData Unmanned, PLLC, a Florida limited liability company ("**TerraData**"), and Justin Dee, the sole shareholder of TerraData, pursuant to which we agreed to purchase 60% of the equity interests in TerraData in exchange for 3,725,386 shares of our Common Stock and $400,000, subject to adjustments as defined in the TerraData MPA, to be paid within 12 weeks of closing. TerraData is now a subsidiary of the Company.

Pursuant to the Purchase Agreement, on October 1, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from us, 37,187,289 shares of Common Stock for total proceeds to us, net of discounts, of $3,000,000, at an effective price of $0.08874 per share (the "**Fourth Closing**"). We received approximately $2,850,000 in net proceeds from the Fourth Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fourth Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

Pursuant to the Purchase Agreement, on October 14, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from us, 14,282,304 shares of Common Stock for total proceeds to us, net of discounts, of $1,055,000, at an effective price of $0.08125 per share (the "**Fifth Closing**"). We received approximately $1,002,250 in net proceeds from the Fifth Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fifth Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

26

**Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations**

*This Management's Discussion and Analysis of Financial Condition and Results of Operations contain certain forward-looking statements. Historical results may not indicate future performance. Our forward-looking statements reflect our current views about future events; are based on assumptions and are subject to known and unknown risks and uncertainties that could cause actual results to differ materially from those contemplated by these statements. Factors that may cause differences between actual results and those contemplated by forward-looking statements include, but are not limited to, those discussed in the "Risk Factors" section of our Annual Report on Form 10-K for the year ended December 31, 2020. We undertake no obligation to publicly update or revise any forward-looking statements, including any changes that might result from any facts, events, or circumstances after the date hereof that may bear upon forward-looking statements. Furthermore, we cannot guarantee future results, events, levels of activity, performance, or achievements*

**Critical Accounting Policies**

SA-12

## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| DARKPULSE, INC.,<br><br>                    Plaintiff,<br><br>v.<br><br>FIRSTFIRE GLOBAL OPPORTUNITIES<br>FUND, LLC and ELI FIREMAN<br><br>                    Defendants. | Index No. 1:21-cv-11222 (ER) |

### DECLARATION OF AARON H. MARKS IN SUPPORT OF DEFENDANTS'
### MOTION TO DISMISS THE FIRST AMENDED COMPLAINT

I, Aaron H. Marks, hereby declare, under penalty of perjury pursuant to 28 U.S.C. § 1746, as

follows:

1.       I am a partner of the law firm of Kirkland & Ellis LLP, counsel of record for

Defendants FirstFire Global Opportunities Fund, LLC ("FirstFire") and Eli Fireman in the above-

captioned action.  I have personal knowledge of the facts set forth in this Declaration, unless

otherwise indicated.  I submit this Declaration in support of Defendants' Motion to Dismiss the

First Amended Complaint.

2.       Attached hereto as **Exhibit A** is a true and correct copy of excerpts from DPLS's

Form 424B4 Prospectus filed with the SEC on EDGAR on May 3, 2022.

3.       Attached hereto as **Exhibit B** is a true and correct copy of excerpts from DPLS's

Form 10-Q for the quarterly period ended March 31, 2022, filed with the SEC on EDGAR on May

16, 2022.

SA-13

4.      Attached hereto as **Exhibit C** is a true and correct copy of excerpts from DPLS's Form 10-K for the annual period ended December 31, 2018, filed with the SEC on EDGAR on April 16, 2019, and Exhibits 99.5, 10.2, and 4.1 thereto.

5.      Attached hereto as **Exhibit D** is a true and correct copy of excerpts from DPLS's Form S-1/A Registration Statement, filed with the SEC on EDGAR on December 9, 2021.

6.      On 36 separate occasions in 2020 and in 2021, when adding together the numbers from DPLS's public filings, DPLS issued over 3,545,370,000 common shares in connection with conversions of promissory notes, including the 177,375,000 common shares issued to FirstFire. (**Exhibit D**, DPLS Form S-1/A at II–3–II-5.)

7.      Attached hereto as **Exhibit E** is a true and correct copy of the Registration Rights Agreement between DPLS and FirstFire entered into on April 26, 2021.

8.      A review of DPLS's public filings since April 26, 2021 shows no registration statements registering the shares that were the subject of the 2021 Note.

9.      Attached hereto as **Exhibit F** is a true and correct copy of Amendment No. 1 to the Convertible Promissory Note issued on April 26, 2021 between FirstFire and DPLS, entered into on October 25, 2021 and effective as of April 26, 2021.

10.      Attached hereto as **Exhibit G** is a true and correct copy of DPLS's Form 8-K filed with the SEC on EDGAR on May 5, 2021.

11.      Attached hereto as **Exhibit H** is a true and correct copy of DPLS's Form 8-K filed with the SEC on EDGAR on February 7, 2022.

12.      Attached hereto as **Exhibit I** is a true and correct copy of DPLS's Form 8-K filed with the SEC on EDGAR on February 8, 2021.

2

13.     Attached hereto as **Exhibit J** is a true and correct copy of DPLS's registration to do business in the state of Texas, obtained through a public records search.

14.     Attached hereto as **Exhibit K** is a true and correct copy of DPLS's name reservation in the state of Arizona, obtained through a public records search.

15.     Attached hereto as **Exhibit L** is a true and correct copy of a business entity search conducted on the New York Department of State Division of Corporations website.

16.     Attached hereto as **Exhibit M** is a true and correct copy of DPLS's Form 8-K/A filed with the SEC on EDGAR on November 19, 2018.

17.     Attached hereto as **Exhibit N** is a true and correct copy of excerpts from DPLS's Form 10-K for the annual period ended December 31, 2019, filed with the SEC on EDGAR on June 8, 2020.

18.     Attached hereto as **Exhibit O** is a true and correct copy of excerpts from DPLS's Form 10-Q for the quarterly period ended September 30, 2020, filed with the SEC on EDGAR on November 13, 2020.

19.     Attached hereto as **Exhibit P** is a true and correct copy of Visium Technologies, Inc.'s Form 8-K filed with the SEC on EDGAR on January 16, 2019, and Exhibit 10.2 thereto.


        Pursuant to 28 U.S.C. § 1746(2), I declare under penalty of perjury that the foregoing is true and correct.

                        Executed on May 26, 2022 in Westchester County, New York.


                        */s/ Aaron H. Marks*_____
                        Aaron H. Marks

3

SA-15

# EXHIBIT A

5/26/22, 12:24 PM    Case 1:21-cv-11222-ER   Document 32-1   Filed 05/26/22   Page 2 of 14    https://sec.report/Document/0001683168-22-003140/darkpulse_424b4.htm

**PROSPECTUS**

**Filed Pursuant to Rule 424(b)(4)**
**Registration No. 333-261453**

**300,000,000 Shares of Common Stock**

This prospectus relates to the offer and resale of up to: 300,000,000 shares of our common stock, par value $0.0001 per share (the "**Shares**"), that may be purchased by GHS Investments LLC, a Nevada limited liability company ("**GHS**"), pursuant to the Equity Financing Agreement dated November 9, 2021 between the Company and GHS (the "**EFA**"). GHS is also referred to herein as the "**Selling Security Holder**."

We will not receive any of the proceeds from the sales of the Shares by the Selling Security Holder.

The Selling Security Holder identified in this prospectus may offer the shares of Common Stock from time to time through public or private transactions at prevailing market prices or at privately negotiated prices. The Selling Security Holder can offer all, some or none of its shares of Common Stock, thus we have no way of determining the number of shares of Common Stock it will hold after this offering. See "Plan of Distribution."

The Selling Security Holder is an "underwriter" within the meaning of Section 2(a)(11) of the Securities Act.

Our Common Stock is currently quoted on the OTC Markets under the symbol "DPLS." On April 14, 2022, the last reported sale price of our Common Stock on the OTC Markets was $0.048.

**Investing in our Common Stock involves a high degree of risk. You should review carefully the risks and uncertainties described under the heading "Risk Factors" beginning on page 5 of this prospectus, and under similar headings in any amendments or supplements to this prospectus.**

**Neither the Securities and Exchange Commission nor any state securities commission has approved or disapproved of these securities or passed upon the adequacy or accuracy of this prospectus. Any representation to the contrary is a criminal offense.**

The date of this prospectus is May 3, 2022

SA-17

**TABLE OF CONTENTS**

| | |
|---|---|
| ABOUT THIS PROSPECTUS | 1 |
| PROSPECTUS SUMMARY | 1 |
| THE OFFERING | 4 |
| RISK FACTORS | 5 |
| CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS | 16 |
| PRIVATE PLACEMENT | 17 |
| USE OF PROCEEDS | 18 |
| SELLING SECURITY HOLDER | 19 |
| MARKET PRICE OF COMMON STOCK AND OTHER STOCKHOLDER MATTERS | 20 |
| MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATION | 22 |
| BUSINESS | 30 |
| DIRECTORS, EXECUTIVE OFFICERS, PROMOTERS AND CONTROL PERSONS | 40 |
| EXECUTIVE COMPENSATION | 43 |
| SECURITY OWNERSHIP OF CERTAIN BENEFICIAL OWNERS AND MANAGEMENT | 44 |
| CERTAIN RELATIONSHIPS AND RELATED TRANSACTIONS, AND DIRECTOR INDEPENDENCE | 45 |
| DESCRIPTION OF SECURITIES | 46 |
| PLAN OF DISTRIBUTION | 49 |
| SHARES ELIGIBLE FOR FUTURE SALE | 51 |
| SECURITIES AUTHORIZED FOR ISSUANCE UNDER EQUITY COMPENSATION PLANS | 51 |
| CHANGES IN AND DISAGREEMENTS WITH ACCOUNTANTS | 51 |
| DISCLOSURE OF COMMISSION POSITION ON INDEMNIFICATION OF SECURITIES ACT LIABILITIES | 52 |
| LEGAL MATTERS | 52 |
| EXPERTS | 52 |
| WHERE YOU CAN FIND MORE INFORMATION | 52 |
| INDEX TO FINANCIAL STATEMENTS | F-1 |

You should rely only on the information contained in this prospectus. We have not authorized anyone to provide you with information different from that which is contained in this prospectus. This prospectus may be used only where it is legal to sell these securities. The information in this prospectus may only be accurate on the date of this prospectus, regardless of the time of delivery of this prospectus or of any sale of securities.

i

### Risks Related to the Offering

***Our existing stockholders may experience significant dilution from the sale of our common stock pursuant to the GHS Equity Financing Agreement.***

The sale of our common stock to GHS in accordance with the EFA may have a dilutive impact on our shareholders. As a result, the market price of our common stock could decline. In addition, the lower our stock price is at the time we exercise Puts, the more shares of our common stock we will have to issue to GHS in order to exercise a Put under the EFA. If our stock price decreases, then our existing shareholders would experience greater dilution for any given dollar amount raised through the offering.

The perceived risk of dilution may cause our stockholders to sell their shares, which may cause a decline in the price of our common stock. Moreover, the perceived risk of dilution and the resulting downward pressure on our stock price could encourage investors to engage in short sales of our common stock. By increasing the number of shares offered for sale, material amounts of short selling could further contribute to progressive price declines in our common stock.

***The issuance of shares pursuant to the EFA may have a significant dilutive effect.***

Depending on the number of shares we issue pursuant to the EFA, it could have a significant dilutive effect upon our existing shareholders. Although the number of shares that we may issue pursuant to the EFA will vary based on our stock price (the higher our stock price, the less shares we have to issue), there may be a potential dilutive effect to our shareholders, based on different potential future stock prices, if the full amount of the EFA is realized. Dilution is based upon common stock put to GHS and the stock price discounted to GHS's purchase price.

***GHS will pay less than the then-prevailing market price of our common stock which could cause the price of our common stock to decline.***

Our common stock to be issued under the EFA will be purchased at an 8% discount, or 92% of the volume-weighted average price for the Company's common stock during the ten consecutive trading days immediately preceding each Put.

GHS has a financial incentive to sell our shares immediately upon receiving them to realize the profit between the discounted price and the market price. If GHS sells our shares, the price of our common stock may decrease. If our stock price decreases, GHS may have further incentive to sell such shares. Accordingly, the discounted sales price in the EFA may cause the price of our common stock to decline.

***We may not have access to the full amount under the financing agreement.***

The lowest volume-weighted average price for the ten days ended April 11, 2022 was $0.0479. At that price we would be able to sell shares to GHS under the EFA at the discounted price of $0.044068. At that discounted price, the remaining 130,350,482 shares would only represent $5,744,285, which is below the full amount of the EFA. In addition, any single drawdown must be at least $10,000 and cannot exceed $3,000,000 and any single drawdown may not exceed 200% of the average daily trading dollar volume of our Common Stock during the ten trading days preceding the put.

***There could be unidentified risks involved with an investment in our securities.***

The foregoing risk factors are not a complete list or explanation of the risks involved with an investment in the securities. Additional risks will likely be experienced that are not presently foreseen by us. Prospective investors must not construe this the information provided herein as constituting investment, legal, tax or other professional advice. Before making any decision to invest in our securities, you should read this entire Prospectus and consult with your own investment, legal, tax and other professional advisors. An investment in our securities is suitable only for investors who can assume the financial risks of an investment in us for an indefinite period of time and who can afford to lose their entire investment. We make no representations or warranties of any kind with respect to the likelihood of the success or the business of our Company, the value of our securities, any financial returns that may be generated or any tax benefits or consequences that may result from an investment in us.

14

## CAUTIONARY NOTE REGARDING FORWARD-LOOKING STATEMENTS

This prospectus contains various "forward-looking statements." You can identify forward-looking statements by the use of forward-looking terminology such as "believes," "expects," "may," "would," "could," "should," "seeks," "approximately," "intends," "plans," "projects," "estimates" or "anticipates" or the negative of these words and phrases or similar words or phrases. You can also identify forward-looking statements by discussions of strategy, plans or intentions. These statements may be impacted by a number of risks and uncertainties.

The forward-looking statements are based on our beliefs, assumptions and expectations of our future performance taking into account all information currently available to us. These beliefs, assumptions and expectations are subject to risks and uncertainties and can change as a result of many possible events or factors, not all of which are known to us. If a change occurs, our business, financial condition, liquidity and results of operations may vary materially from those expressed in our forward-looking statements. You should carefully consider these risks before you make an investment decision with respect to our securities. For a further discussion of these and other factors that could impact our future results, performance or transactions, see the section entitled "Risk Factors."

## PRIVATE PLACEMENT

### *Equity Financing Agreement*

On November 9, 2021, we entered an EFA and Registration Rights Agreement (the "**Registration Rights Agreement**") with GHS, pursuant to which GHS agreed to purchase up to $30,000,000 in shares of our Common Stock, from time to time over the course of 24 months (the "**Contract Period**") after effectiveness of a registration statement on Form S-1 (the "**Registration Statement**") of the underlying shares of Common Stock.

The EFA grants us the right, from time to time at our sole discretion (subject to certain conditions) during the Contract Period, to direct GHS to purchase shares of Common Stock on any business day (a "**Put**"), provided that at least ten Trading Days (as defined in the EFA) have passed since the most recent Put. The purchase price of the shares of Common Stock contained in a Put shall be 92% of the Market Price with "Market Price" defined as the lowest volume weighted average price (VWAP) price of the Common Stock during the Pricing Period (as defined in the EFA). No Put will be made in an amount less than $10,000 or greater than $3,000,000. In no event are we entitled to make a Put or is GHS entitled to purchase that number of shares of Common Stock of the Company, which when added to the sum of the number of shares of Common Stock beneficially owned (as such term is defined under Section 13(d) and Rule 13d-3 of the Exchange Act), by GHS, would exceed 4.99% of the number of shares of Common Stock outstanding on such date, as determined in accordance with Rule 13d-1(j) of the Exchange Act.

The EFA will terminate upon any of the following events: when GHS has purchased an aggregate of $30,000,000 in the Common Stock of the Company pursuant to the EFA; on the date that is 24 months from the date of the EFA; or by mutual written consent of the parties. Actual sales of shares of Common Stock to GHS under the EFA will depend on a variety of factors to be determined by us from time to time, including, among others, market conditions, the trading price of the Common Stock and determinations by us as to the appropriate sources of funding for the Company and its operations. The net proceeds under the EFA to us will depend on the frequency and prices at which we sell shares of our stock to GHS.

The Registration Rights Agreement provides that we shall (i) use our best efforts to file with the SEC the Registration Statement within 45 days of the date of the Registration Rights Agreement; and (ii) have the Registration Statement declared effective by the SEC within 30 days after the date the Registration Statement is filed with the SSEC, but in no event more than 90 days after the Registration Statement is filed.

We to use the proceeds from the Puts for operational expenses and also potential acquisitions deemed beneficial to the operational capabilities of the Company.

See "Plan of Distribution" elsewhere in this prospectus for more information.

## USE OF PROCEEDS

The Selling Security Holder will receive all the proceeds from the sales of the Shares under this prospectus. We will not receive any proceeds from these sales. To the extent we receive proceeds from the Puts to the Selling Security Holder, we will use those proceeds for operations and acquisitions. We have agreed to bear the certain expenses relating to the registration of the shares of Common Stock being registered herein for Selling Security Holder.

See "Plan of Distribution" elsewhere in this prospectus for more information.

15

*Our Operating Units*

Our operating units consist of, Optilan, a company headquartered in Coventry, United Kingdom whose focus is in telecommunications, energy, rail, critical network infrastructure, pipeline integrity systems, renewables and security; Remote Intelligence, a company headquartered in Pennsylvania who provides unmanned aerial drone and UGC (unmanned ground crawler) services to a variety of clients from industrial mapping and ecosystem services, to search and rescue, to pipeline security; Wildlife Specialists, a company headquartered in Pennsylvania who provides clients with comprehensive wildlife and environmental assessment, planning, and monitoring services; TerraData Unmanned, a company headquartered in Florida who custom manufactures NDAA compliant drones and unmanned ground crawlers to meet the needs of its customers; and TJM West Electronics, a company headquartered in Arizona who is a U.S. manufacturer and test of advanced electronics, cables and sub-assemblies specializing in advanced package and complex CCA and hardware.

*Recent Events*

<u>Acquisitions</u>

On August 9, 2021, we entered into a Share Purchase Agreement with Optilan Guernsey Limited and Optilan Holdco 2 Limited (the "**Sellers**"), pursuant to which we purchased from the Sellers all of the issued and outstanding equity interests of Optilan HoldCo 3 Limited, a private company incorporated in England and Wales ("**Optilan**") for £1.00 and also a commitment to enter into the Subscription (as defined below). Optilan is now a wholly-owned subsidiary of the Company.

On August 9, 2021, we entered into a Subscription Agreement with Optilan (the "**Subscription**"), pursuant to which we agreed to purchase an aggregate of 4,000,000 Ordinary Shares of Optilan for an aggregate purchase price of £4,000,000.

On August 30, 2021, we closed two separate Membership Interest Purchase Agreements (the "**MPAs**") with Remote Intelligence, Limited Liability Company, a Pennsylvania limited liability company ("**RI**") and Wildlife Specialists, LLC, a Pennsylvania limited liability company ("**WS**") pursuant to which we agreed to pay to the majority shareholder of each of RI and WS an aggregate of 15,000,000 shares of our Common Stock, $500,000 to be paid on the closing date, and an additional $500,000 to be paid 12 weeks from closing date in exchange for 60% ownership of each of RI and WS. RI and WS are now subsidiaries of the Company.

On September 8, 2021, we entered into and closed the Stock Purchase Agreement (the "TJM SPA") with TJM Electronics West, Inc., an Arizona corporation ("**TJM**"), and TJM's shareholders, pursuant to which we agreed to purchase all of the equity interests in TJM in exchange for $450,000, subject to adjustments as defined in the TJM SPA. TJM is now a wholly-owned subsidiary of the Company.

Effective October 1, 2021, we entered into and closed the Membership Purchase Agreement (the "**TerraData MPA**") with TerraData Unmanned, PLLC, a Florida limited liability company ("**TerraData**"), and Justin Dee, the sole shareholder of TerraData, pursuant to which we agreed to purchase 60% of the equity interests in TerraData in exchange for 3,725,386 shares of our Common Stock and $400,000, subject to adjustments as defined in the TerraData MPA, to be paid within 12 weeks of closing. TerraData is now a subsidiary of the Company.

<u>Financings</u>

On January 4, 2021, we entered into a securities purchase agreement with Geneva Roth Remark Holdings, Inc. ("**Geneva**") issuing to Geneva a convertible promissory note in the aggregate principal amount of $42,350 with a $3,850 original issue discount and $3,500 in transactional expenses due to Geneva and its counsel. The note bears interest at 8% per annum and may be converted into common shares of our Common Stock at a conversion price equal to 70% of the lowest trading price of our common stock during the 20 prior trading days. We received $35,000 net cash. On July 12, 2021, Geneva converted $42,350 of principal and $1,540 into 1,784,146 shares of common stock.

On February 3, 2021, we entered into a securities purchase agreement with Geneva issuing to Geneva a convertible promissory note in the aggregate principal amount of $94,200 with a $15,700 original issue discount and $3,500 in transactional expenses due to Geneva and its counsel. The note bears interest at 4.5% per annum and may be converted into common shares of our Common Stock at a conversion price equal to 81% of the lowest two trading prices of our Common Stock during the 10 prior trading days. We received $75,000 net cash.

On July 14, 2021, the note was paid in full, including all accrued and unpaid interest.

20

On February 18, 2021, we entered into a securities purchase agreement with Geneva issuing to Geneva a convertible promissory note in the aggregate principal amount of $76,200 with a $12,700 original issue discount and $3,500 in transactional expenses due to Geneva and its counsel. The note bears interest at 4.5% per annum and may be converted into common shares of our Common Stock at a conversion price equal to 81% of the lowest two trading prices of our Common Stock during the 10 prior trading days. We received $60,000 net cash.

On July 14, 2021, the note was paid in full, including all accrued and unpaid interest.

On April 5, 2021, we entered into a securities purchase agreement with Geneva Roth issuing to Geneva a convertible promissory note in the aggregate principal amount of $64,200 with a $10,700 original issue discount and $3,500 in transactional expenses due to Geneva and its counsel. The note bears interest at 4.5% per annum and may be converted into common shares of our Common Stock at a conversion price equal to 81% of the lowest two trading prices of our Common Stock during the 10 prior trading days. We received $50,000 net cash. On July 14, 2021, the note was paid in full, including all accrued and unpaid interest.

On April 26, 2021, we entered into a Securities Purchase Agreement and Registration Rights Agreement with FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, a Delaware limited liability company (the "**FirstFire**"), pursuant to which we issued to FirstFire a Convertible Promissory Note in the principal amount of $825,000 (the "**FirstFire Note**"). The purchase price of the FirstFire Note is $750,000. The FirstFire Note matures on January 26, 2022 upon which time all accrued and unpaid interest will be due and payable. Interest accrues on the FirstFire Note at 10% per annum guaranteed until the FirstFire Note becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. The FirstFire Note is convertible at any time after 180 days from issuance, upon the election of the FirstFire, into shares of our Common Stock at $0.015 per share. The FirstFire Note is subject to various "Events of Default," which are disclosed in the FirstFire Note. Upon the occurrence of an "Event of Default," the conversion price would become $0.005. On November 17, 2021, FirstFire converted $825,000 of principal and $61,875 of interest into 177,375,000 shares of common stock.

See "Legal Proceedings" for additional information regarding the FirstFire Note.

On July 14, 2021, we entered a Securities Purchase Agreement with GS Capital Partners, LLC (the "**GS**"), pursuant to which we issued to GS a 6% Redeemable Note in the principal amount of $2,000,000 (the "**GS Note**"). The purchase price of the GS Note is $1,980,000. The GS Note matures on July 14, 2022 upon which time all accrued and unpaid interest will be due and payable. Interest accrues on the GS Note at 6% per annum until the GS Note becomes due and payable. The GS Note is subject to various "Events of Default," which are disclosed in the GS Note. Upon the occurrence of an "Event of Default," the interest rate on the GS Note will be 18%. The GS Note is not convertible into shares of our Common Stock and is not dilutive to existing or future shareholders and we plan on using a portion of the proceeds of the GS Note to retire existing convertible debt.

On August 19, 2021, we entered into the Purchase Agreement with GHS, for the offering of up to $45,000,000 worth of Common Stock. Pursuant to the Purchase Agreement, on August 19, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from the Company, 31,799,260 shares of Common Stock for total proceeds to the Company, net of discounts, of $3,300,000, at an effective price of $0.1038 per share (the "**First Closing**"). We received approximately $2,790,000 in net proceeds from the First Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the First Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

Pursuant to the Purchase Agreement, on August 31, 2021, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 27,297,995 shares of Common Stock for total proceeds to us, net of discounts, of $3,300,000, at an effective price of $0.120888 per share (the "**Second Closing**"). We received approximately $2,885,000 in net proceeds from the Second Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Second Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

Pursuant to the Purchase Agreement, on September 22, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from us, 25,630,272 shares of Common Stock for total proceeds to us, net of discounts, of $2,000,000, at an effective price of $0.085836 per share (the "**Third Closing**"). We received approximately $1,915,000 in net proceeds from the Third Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Third Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

SA-23

21

Pursuant to the Purchase Agreement, on October 1, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from us, 37,187,289 shares of Common Stock for total proceeds to us, net of discounts, of $3,000,000, at an effective price of $0.08874 per share (the "**Fourth Closing**"). We received approximately $2,850,000 in net proceeds from the Fourth Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fourth Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

Pursuant to the Purchase Agreement, on October 14, 2021, we and GHS agreed that we would issue and sell to GHS, and GHS would purchase from us, 14,282,304 shares of Common Stock for total proceeds to us, net of discounts, of $1,055,000, at an effective price of $0.08125 per share (the "**Fifth Closing**"). We received approximately $1,002,250 in net proceeds from the Fifth Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fifth Closing for working capital and for general corporate purposes. The shares were issued to GHS in a registered direct offering, pursuant to a prospectus supplement to our currently effective registration statement on Form S-3 (File No. 333-257826), which was initially filed with the SEC on July 12, 2021, and was declared effective on August 18, 2021.

On November 9, 2021, we entered an Equity Financing Agreement (the "**Equity Financing Agreement**") and Registration Rights Agreement (the "**GHS Registration Rights Agreement**") with GHS, pursuant to which GHS agreed to purchase up to $30,000,000 in shares of our Common Stock, from time to time over the course of 24 months (the "**Contract Period**") after effectiveness of a registration statement on Form S-1 (the "**Registration Statement**") of the underlying shares of Common Stock.

The GHS Registration Rights Agreement provides that we shall (i) use our best efforts to file with the SEC a Registration Statement within 45 days of the date of the GHS Registration Rights Agreement; and (ii) have the Registration Statement declared effective by the SEC within 30 days after the date the GHS Registration Statement is filed with the SEC, but in no event more than 90 days after the GHS Registration Statement is filed.

Pursuant to the Equity Financing Agreement, on December 21, 2021, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 43,777,478 shares of Common Stock for total proceeds to us, net of discounts, of $2,548,326, at an effective price of $0.0696 per share (the "**First EFA Closing**"). We received approximately $2,296,469 in net proceeds from the First EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the First EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on January 12, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 23,372,430 shares of Common Stock for total proceeds to us, net of discounts, of $1,150,000, at an effective price of $0.054124 per share (the "**Second EFA Closing**"). We received approximately $1,033,975 in net proceeds from the Second EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Second EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on January 21, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 33,454,988 shares of Common Stock for total proceeds to us, net of discounts, of $1,150,000, at an effective price of $0.037812 per share (the "**Third EFA Closing**"). We received approximately $1,033,975 in net proceeds from the Third EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Third EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on February 7, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 16,040,411 shares of Common Stock for total proceeds to us, net of discounts, of $500,000, at an effective price of $0.0342884 per share (the "**Fourth EFA Closing**"). We received approximately $448,975 in net proceeds from the Fourth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fourth EFA Closing for working capital and for general corporate purposes.

On February 21, 2022, we sold 75,798,921 shares of our Common Stock at $0.032982 per share for total consideration of $2,500,000.

On March 3, 2022, we sold 16,579,569 shares of our Common Stock at $0.0301576 per share for total consideration of $500,000.

On March 14, 2022, we sold 5,617,347 shares of our Common Stock at $0.071208 per share for total consideration of $400,000.

SA-25

Pursuant to the Equity Financing Agreement, on March 23, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 29,257,395 shares of Common Stock for total proceeds to us, net of discounts, of $1,500,000, at an effective price of $0.056396 per share (the "**Fifth EFA Closing**"). We received approximately $1,348,975 in net proceeds from the Fifth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fifth EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on April 11, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 23,746,816 shares of Common Stock for total proceeds to us, net of discounts, of $1,000,000, at an effective price of $0.04211091 per share (the "**Sixth EFA Closing**"). We received approximately $898,975 in net proceeds from the Sixth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Sixth EFA Closing for working capital and for general corporate purposes.

<u>Partnerships</u>

We have entered into a consulting agreement with the Bachner Group to assist in the successful transformation from an R&D focused company to a sales-focused company, and assist us with federal contract opportunities.

<u>Other Events</u>

On August 3, 2021, we entered into an Engagement Agreement and Terms and Conditions (the "**EIAP Agreement**") with Energy & Industrial Advisory Partners, LLC ("**EIAP**"). Pursuant to the EIAP Agreement, we have engaged EIAP to serve as an advisor to us in the proposed transaction for agreed target company or any of its subsidiaries and/or the whole or any part of its or their business or assets (the "**Transaction**"). EIAP will receive a monthly retainer of $10,000 per month payable upon receipt of an invoice. EIAP will also receive a consulting bonus fee of $350,000 payable upon completion of the Transaction. In the event of successful completion of the Transaction as a result of EIAP's involvement, EIAP agrees to deduct the total retainer fee from the consulting bonus fee. The EIAP Agreement may be terminated, with or without cause, by either party upon ten days' written prior notice thereof to the other party. If (a) during the term of the EIAP Agreement, or (b) within two years following the date of the EIAP Agreement's termination by us (provided that such two-year period shall be extended by the same period of time that we take to settle in full all fees, expenses and/or outlays due or to become due to EIAP as at the date of the EIAP Agreement's termination), we complete a transaction with the target company or a similar transaction to the Transaction, then we will pay the consulting bonus fee at the completion of the transaction.

***Going Concern Uncertainty***

As shown in the accompanying financial statements, the Company generated net losses of $4,826,320 and $275,842 during the years ended December 31, 2021 and 2020, respectively. As of December 31, 2021, the Company's current liabilities exceeded its current assets by $10,120,885. As of December 31, 2021, the Company had $3,658,846 of cash.

We will require additional funding to finance the growth of our operations and achieve our strategic objectives. These factors, as relative to capital raising activities, create doubt as to our ability to continue as a going concern. We are seeking to raise additional capital and are targeting strategic partners in an effort to accelerate the sales and marketing of our products and begin generating revenues. Our ability to continue as a going concern is dependent upon the success of future capital offerings or alternative financing arrangements, expansion of our operations and generating sales. The accompanying financial statements do not include any adjustments that might be necessary should we be unable to continue as a going concern. Management is actively pursuing additional sources of financing sufficient to generate enough cash flow to fund its operations; however, management cannot make any assurances that such financing will be secured.

<hr>

23

*Results of Operations*

For the Years Ended December 31, 2021 and 2020

*Revenues*

For the year ended December 31, 2021, total revenues were $7,783,340 compared to $0 for the same period in 2020, an increase of $7,783,340. This increase primarily consisted of revenues of $7,247,932 from the acquisition of Optilan in August 2021, $277,747 from the acquisition of Wildlife Specialists in August 2021

and $174,266 from the acquisition of TJM Electronics in September 2021 as well as $13,078 from DarkPulse.

*Cost of Goods Sold and Gross Profit*

For the year ended December 31, 2021, cost of goods sold were $6,685,210 compared to $0 for the same period in 2020, an increase of $6,685,210.

Gross profit for the year ended December 31, 2021 was $1,098,130 with a gross profit margin of 14.11% compared to $0 for the same period in 2020 with no gross profit margin.

*Operating Expenses*

Selling, general and administrative expenses for year ended December 31, 2021 increased by $3,769,708, or 2,526%, to $3,918,967 from $149,259 for the year ended December 31, 2020.

The increase primarily consisted of an increase to the operations from our various acquisitions.

Payroll related expenses for year ended December 31, 2021, increased by $2,653,496 to $2,653,683 from $187 for the year ended December 31, 2020. The increase primarily consisted of an increase to the numbers of employees inherited from our various acquisitions.

Professional fees for the year ended December 31, 2021, increased by $2,879,830 to $2,930,245 from $50,415 for the year ended

December 31, 2020. This increase primarily consisted of increased legal expenditures associated with the increase in litigation as well as fees associated with the various capital raises in 2021.

Depreciation and amortization for year ended December 31, 2021, increased by $207,278 to $258,306 from $51,028 for the year ended

December 31, 2020. This increase is primarily due to the increase in depreciable assets we acquired from new acquisitions.

*Other Income (Expense)*

For the year ended December 31, 2021, we had other income $4,021,700 compared to other expense of $17,103 for the same period in 2020, an increase in income of $4,038,803. This increase in other income increase primarily consisted of changes of $3,421,633 of gain related to the extinguishment of debt, $653,501 increase in the fair value of the Company's derivative instruments, $11,600 of gain on foreign currency exchange rate variance, a decrease in interest expense of $4,706 due to increased borrowings offset by $31,636 loss on convertible notes.

*Net Income (Loss)*

As a result of the above, we reported a net loss of $4,826,320 for the year ended December 31, 2021 compared to a net loss of $275,842 for the year ended December 31, 2020.

SA-28

# BUSINESS

### Organization

DarkPulse is a technology-security company incorporated in 1989 as Klever. One of our principal wholly-owned subsidiaries, DPTI, originally started as a technology spinout from the University of New Brunswick, Fredericton, Canada. DPI is comprised of multiple security platforms: Patented BOTDA Fiber Optic sensor systems and Satellite Communications services.

In December 2010, DPTI entered into an Assignment Agreement with the University, pursuant to which the University sold, transferred, and assigned to us Patents in exchange for the issuance of a debenture to the University in the amount of C$1,500,000 (Canadian dollars). In April 2017, DPTI issued the Debenture. The Patents and the Debenture were initially recorded in our accounts at $1,491,923, based upon the exchange rate between the U.S. dollar and the Canadian dollar on December 16, 2010, the date of the original debenture. In addition to the repayment of principal and interest, the Debenture requires DPTI to pay the University a 2% royalty on sales of any and all products or services which incorporate the Patents for a period of five years commencing on April 24, 2018, as well as to reimburse the University for its patent-related costs.

On April 27, 2018, Klever entered into an Merger involving Klever as the surviving parent corporation and acquiring DPTI as its wholly-owned subsidiary. On July 18, 2018, the parties closed the Merger Agreement, as amended on July 7, 2018, and the name of the Company was subsequently changed to "DarkPulse, Inc." With the change of control of the Company, the Merger was accounted for as a recapitalization in a manner similar to a reverse acquisition.

On July 20, 2018, we filed a Certificate of Amendment to our Certificate of Incorporation with the State of Delaware, changing the name of the Company to "DarkPulse, Inc." We filed a corporate action notification with FINRA, and our ticker symbol was changed to "DPLS."

Our security and monitoring systems will be delivered in applications for critical infrastructure/ key resources such as but not limited to border security, pipelines, the oil and gas industry and mine safety. Current uses of fiber optic distributed sensor technology have been limited to quasi-static, long-term structural health monitoring due to the time required to obtain the data and its poor precision. Our patented BOTDA dark-pulse sensor technology allows for the monitoring of highly dynamic environments due to its greater resolution and accuracy.

<u>Our Operating Units</u>

### Optilan

Founded in 1990, Optilan is a leading independent security and communications systems integrator worldwide. Providing specialist technologies and techniques Optilan helps to protect businesses and organizations from external threats. Telecommunications, Energy, Rail, Critical Network Infrastructure, Pipeline Integrity Systems, Renewables and Security. Headquartered in Warwick, United Kingdom with a 30-year pedigree, at Optilan our customers trust us to keep the integrity of their assets safe and secure, by managing the life cycle delivery risk of our solutions. By fostering a collaborative design approach to complex problems, we provide innovative solutions, custom fit to even the most demanding of sites and scale of projects. Importantly, our commitment to our safety culture remains unaverred, to ensure that everyone goes home safely every day. We orchestrate business resilience with a suite of end-to-end solutions, combined with connectivity and professional service at a global level. Today's business environment is more dynamic than ever, with continuous change and disruption accepted as the new normal. We complement our tailored, integrated expertise with a curated ecosystem of leading manufacturers, to achieve both high quality and enduring results. We are proud to foster a unique culture full of talented individuals. Our sector focus ensures that our account teams are fully accredited in their operational areas. We are committed to creating individually tailored solutions, using collaborative techniques and programming tools to deliver the networks of the future. Optilan has provided integrated solutions for leading Oil and Gas, Industrial and Energy companies around the world. As an industry leader in deploying communication networks with exceptional reliability, our reputation for delivering the highest quality products remains unsurpassed. This spans mobile, broadband, security systems and customer premise works. Our professionals have the skill to adopt and embed our expertise into existing platforms, processes, and cultures, delivering exceptional value for our clients. Beyond our operational scope, we strive to consider the impact of our global footprint and mitigate associated environmental and sustainability risks. These factors combined set Optilan apart and establish why customers continue to trust and invest in our services.

27

SA-29

# EXHIBIT B

SA-30

Table of Contents

UNITED STATES
SECURITIES AND EXCHANGE COMMISSION
Washington, D.C. 20549

**FORM 10-Q**

(Mark One)

☒    **QUARTERLY REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the quarterly period ended **March 31, 2022**

Or

☐    **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15 (d) OF THE SECURITIES EXCHANGE ACT OF 1934**

For the transition period from _____ to _____

Commission File Number: **000-18730**

**DARKPULSE, INC.**
(Exact name of registrant as specified in its charter)

| **Delaware** | **87-0472109** |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| **1345 Ave of the Americas, 2ⁿᵈ Floor, New York, NY** | **10105** |
|---|---|
| (Address of principal executive offices) | (Zip Code) |

**(800) 436-1436**
(Registrant's telephone number, including area code)

Securities registered pursuant to section 12(b) of the Act:

| **Title of Each Class** | **Trading Symbol(s)** | **Name of each exchange on which registered** |
|---|---|---|
| Not applicable | Not applicable | Not applicable |

Indicate by check mark whether the registrant has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the preceding 12 months (or for such shorter period that the registrant was required to file such reports).
Yes ☐ No ☒

Indicate by check mark whether the registrant has been subject to such filing requirements for the past 90 days.
Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically every Interactive Data File required to be submitted pursuant to Rule 405 of Regulation S-T (§232.405 of this chapter) during the preceding 12 months (or for such shorter period that the registrant was required to submit such files).
Yes ☒ No ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, a smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer," "smaller reporting company," and "emerging growth company" in Rule 12b-2 of the Exchange Act.

| Large accelerated filer | ☐ | Accelerated filer | ☐ |
|---|---|---|---|
| Non-accelerated filer | ☐ | Smaller reporting company | ☒ |
| | | Emerging growth company | ☐ |

SA-31

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

Indicate by check mark whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act). Yes ☐ No ☒

The number of shares outstanding of the registrant's common stock on May 10, 2022, was 5,451,212,038.

SA-32

**TABLE OF CONTENTS**

| | |
|---|---|
| ***PART I—FINANCIAL INFORMATION*** | *3* |
| **Item 1. Financial Statements** | **3** |
| **Item 2. Management's Discussion and Analysis of Financial Condition and Results of Operations** | **25** |
| **Item 3. Quantitative and Qualitative Disclosures About Market Risk** | **30** |
| **Item 4. Controls and Procedures** | **30** |
| ***PART II—OTHER INFORMATION*** | *31* |
| **Item 1. Legal Proceedings** | **31** |
| **Item 6. Exhibits** | **32** |
| ***SIGNATURES*** | *33* |

2

**DARKPULSE, INC.**
**Consolidated Statement of Stockholders' Deficit**
**For the Three Months Ended March 31, 2022 and 2021**

| | Preferred Stock | | Common Stock | | Treasury Stock | Paid in Capital in Excess of Par Value | Non-Controlling Interest in Subsidiary | Accumulated Other Comprehensive Income | Accumulated Deficit | Total Stockholders' Deficit |
|---|---|---|---|---|---|---|---|---|---|---|
| | Shares | Amount | Shares | Amount | | | | | | |
| Balance, December 31, 2021 | 88,235 | $ 883 | 5,197,821,885 | $ 519,782 | $ (1,000) | $20,248,703 | $ 2,358,227 | $ (284,463) | $ (11,276,490) | $ 11,565,642 |
| Common stock issued for cash | – | | 200,121,061 | 20,012 | | 7,679,988 | | | | 7,700,000 |
| Foreign currency adjustment | – | | – | – | – | | | (219,569) | – | (219,569) |
| Net loss | – | – | – | – | – | – | – | – | (5,384,270) | (5,384,270) |
| Balance, March 31, 2022 | 88,235 | $ 883 | 5,397,942,946 | $ 539,794 | $ (1,000) | $27,928,691 | $ 2,358,227 | $ (504,032) | $ (16,660,760) | $ 13,661,803 |
| | | | | | | | | | | |
| Balance, December 31, 2020 | 88,235 | $ 883 | 4,088,762,156 | $ 408,876 | $ (1,000) | $ 1,805,813 | $ (12,439) | $ 315,832 | $ (6,450,170) | $ (3,932,205) |
| Conversion of convertible notes | – | – | 600,999,995 | 60,100 | – | 189,839 | – | – | – | 249,939 |
| Foreign currency adjustment | – | – | – | – | – | – | – | (17,909) | – | (17,909) |
| Net loss | – | – | – | – | – | – | – | – | (51,874) | (51,874) |
| Balance, March 31, 2021 | 88,235 | $ 883 | 4,689,762,151 | $ 468,976 | $ (1,000) | $ 1,995,652 | $ (12,439) | $ 297,923 | $ (6,502,044) | $ (3,752,049) |

See accompanying notes to consolidated financial statements.

6

**Preferred Stock**

In accordance with the Company's Certificate of Incorporation, the Company has authorized a total of 2,000,000 shares of preferred stock, par value $0.01 per share, for all classes. As of March 31, 2022, and December 31, 2021, there were 88,235 total preferred shares issued and outstanding for all classes.

During the three months ended March 31, 2022, the Company issued no shares of preferred stock.

**Common Stock**

In accordance with the Company's bylaws, the Company has authorized a total of 20,000,000,000 shares of common stock, par value $0.0001 per share. As of March 31, 2022 and December 31, 2021, there were 5,397,942,946 and 5,197,821,885 common shares issued and outstanding.

During the three months ended March 31, 2022, the Company issued the following shares of common stock:

On January 12, 2022, the Company issued 23,372,430 shares of common stock for $1,150,000.

On January 21, 2022, the Company issued 33,454,988 shares of common stock for $1,150,000.

On February 7, 2022, the Company issued 16,040,411 shares of common stock for $500,000.

On March 3, 2022, the Company issued 16,579,569 shares of common stock for $500,000.

On March 7, 2022, the Company issued 75,798,921 shares of common stock for $2,500,000.

On March 14, 2022, the Company issued 5,617,347 shares of common stock for $400,000.

On March 23, 2022, the Company issued 29,257,395 shares of common stock for $1,500,000.

**Stock Options**

During the three months ended March 31, 2022, the Company did not issue any stock options and had no stock options outstanding at March 31, 2022.

**Public Offerings**

On November 9, 2021, we entered an Equity Financing Agreement (the "**Equity Financing Agreement**") and Registration Rights Agreement (the "**GHS Registration Rights Agreement**") with GHS, pursuant to which GHS agreed to purchase up to $30,000,000 in shares of our Common Stock, from time to time over the course of 24 months (the "**Contract Period**") after effectiveness of a registration statement on Form S-1 (the "**Registration Statement**") of the underlying shares of Common Stock.

The GHS Registration Rights Agreement provides that we shall (i) use our best efforts to file with the SEC a Registration Statement within 45 days of the date of the GHS Registration Rights Agreement; and (ii) have the Registration Statement declared effective by the SEC within 30 days after the date the GHS Registration Statement is filed with the SEC, but in no event more than 90 days after the GHS Registration Statement is filed.

Pursuant to the Equity Financing Agreement, on January 12, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 23,372,430 shares of Common Stock for total proceeds to us, net of discounts, of $1,150,000, at an effective price of $0.054124 per share (the "**Second EFA Closing**"). We received approximately $1,033,975 in net proceeds from the Second EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Second EFA Closing for working capital and for general corporate purposes.

21

Pursuant to the Equity Financing Agreement, on January 21, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 33,454,988 shares of Common Stock for total proceeds to us, net of discounts, of $1,150,000, at an effective price of $0.037812 per share (the "**Third EFA Closing**"). We received approximately $1,033,975 in net proceeds from the Third EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Third EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on February 7, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 16,040,411 shares of Common Stock for total proceeds to us, net of discounts, of $500,000, at an effective price of $0.0342884 per share (the "**Fourth EFA Closing**"). We received approximately $448,975 in net proceeds from the Fourth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fourth EFA Closing for working capital and for general corporate purposes.

On February 21, 2022, we sold 75,798,921 shares of our Common Stock at $0.032982 per share for total consideration of $2,500,000.

On March 3, 2022, we sold 16,579,569 shares of our Common Stock at $0.0301576 per share for total consideration of $500,000.

On March 14, 2022, we sold 5,617,347 shares of our Common Stock at $0.071208 per share for total consideration of $400,000.

Pursuant to the Equity Financing Agreement, on March 23, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 29,257,395 shares of Common Stock for total proceeds to us, net of discounts, of $1,500,000, at an effective price of $0.056396 per share (the "**Fifth EFA Closing**"). We received approximately $1,348,975 in net proceeds from the Fifth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fifth EFA Closing for working capital and for general corporate purposes.

**NOTE 11 – RELATED PARTY TRANSACTIONS**

The Company follows subtopic 850-10 of the FASB Accounting Standards Codification for the identification of related parties and disclosure of related party transactions. Pursuant to Section 850-10-20 the related parties include a) affiliates of the Company; b) Entities for which investments in their equity securities would be required, absent the election of the fair value option under the Fair Value Option Subsection of Section 825-10-15, to be accounted for by the equity method by the investing entity; c) trusts for the benefit of employees, such as pension and profit-sharing trusts that are managed by or under the trusteeship of management; d) principal owners of the Company; e) management of the Company; f) other parties with which the Company may deal if one party controls or can significantly influence the management or operating policies of the other to an extent that one of the transacting parties might be prevented from fully pursuing its own separate interests; and g) Other parties that can significantly influence the management or operating policies of the transacting parties or that have an ownership interest in one of the transacting parties and can significantly influence the other to an extent that one or more of the transacting parties might be prevented from fully pursuing its own separate interests. The financial statements shall include disclosures of material related party transactions, other than compensation arrangements, expense allowances, and other similar items in the ordinary course of business. However, disclosure of transactions that are eliminated in the preparation of consolidated or combined financial statements is not required in those statements. The disclosures shall include: a) the nature of the relationship(s) involved; b) a description of the transactions, including transactions to which no amounts or nominal amounts were ascribed, for each of the periods for which income statements are presented, and such other information deemed necessary to an understanding of the effects of the transactions on the financial statements; c) the dollar amounts of transactions for each of the periods for which income statements are presented and the effects of any change in the method of establishing the terms from that used in the preceding period; and d) amounts due from or to related parties as of the date of each balance sheet presented and, if not otherwise apparent, the terms and manner of settlement.

During the three months ended March 31, 2022 and 2021, the Company's Chief Executive Officer advanced personal funds in the amount of $0 and $329 for Company expenses. As of March 31, 2022, the Company's Chief Executive Officer is owed a total of $0 for advanced personal funds.

22

On March 3, 2022, we sold 16,579,569 shares of our Common Stock at $0.0301576 per share for total consideration of $500,000.

On March 14, 2022, we sold 5,617,347 shares of our Common Stock at $0.071208 per share for total consideration of $400,000.

Pursuant to the Equity Financing Agreement, on March 23, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 29,257,395 shares of Common Stock for total proceeds to us, net of discounts, of $1,500,000, at an effective price of $0.056396 per share (the "**Fifth EFA Closing**"). We received approximately $1,348,975 in net proceeds from the Fifth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Fifth EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on April 11, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 23,746,816 shares of Common Stock for total proceeds to us, net of discounts, of $1,000,000, at an effective price of $0.04211091 per share (the "**Sixth EFA Closing**"). We received approximately $898,975 in net proceeds from the Sixth EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Sixth EFA Closing for working capital and for general corporate purposes.

Pursuant to the Equity Financing Agreement, on May 3, 2022, we and GHS agreed that the Company would issue and sell to GHS, and GHS would purchase from us, 29,522,276 shares of Common Stock for total proceeds to us, net of discounts, of $1,000,000, at an effective price of $0.03387273 per share (the "**Seventh EFA Closing**"). We received approximately $898,975 in net proceeds from the Seventh EFA Closing after deducting the fees and other estimated offering expenses payable by us. We used the net proceeds from the Seventh EFA Closing for working capital and for general corporate purposes.

***Going Concern Uncertainty***

As shown in the accompanying financial statements, during the three months ended March 31, 2022, the Company reported a net loss of $5,384,270. As of March 31, 2022, the Company's current liabilities exceeded its current assets by $7,610,707. As of March 31, 2022, the Company had $4,785,797 of cash.

We will require additional funding to finance the growth of our operations and achieve our strategic objectives. These factors, as relative to capital raising activities, create doubt as to our ability to continue as a going concern. We are seeking to raise additional capital and are targeting strategic partners in an effort to accelerate the sales and marketing of our products and begin generating revenues. Our ability to continue as a going concern is dependent upon the success of future capital offerings or alternative financing arrangements, expansion of our operations and generating sales. The accompanying financial statements do not include any adjustments that might be necessary should we be unable to continue as a going concern. Management is actively pursuing additional sources of financing sufficient to generate enough cash flow to fund its operations; however, management cannot make any assurances that such financing will be secured.

***Results of Operations***

Revenues

For the three months ended March 31, 2022, total revenues were $2,018,333 compared to $0 for the same period in 2021, an increase of $2,018,333. This increase primarily consisted of revenues of $1,856,961 from Optilan, $34,094 from Wildlife Specialists and $118,926 from TJM Electronics as well as $8,352 from the remaining subsidiaries.

27

Cost of Goods Sold and Gross Loss

For the three months ended March 31, 2022, cost of goods sold were $2,348,567 compared to $0 for the same period in 2021, an increase of $2,348,567.

Gross loss for the three months ended March 31, 2022 was $330,234 with a gross loss margin of (16.36)% compared to $0 for the same period in 2021 with no gross profit margin.

Operating Expenses

Selling, general and administrative expenses for three months ended March 31, 2022 increased by $948,520, or 3,195%, to $978,208 from $29,688 for the three months ended March 31, 2021. The increase primarily consisted of an increase to the operations from our various acquisitions.

Payroll related expenses for three months ended March 31, 2022, increased to $1,972,067 from $0 for the three months ended March 31, 2021. The increase primarily consisted of an increase to the numbers of employees inherited from our various acquisitions.

Professional fees for the three months ended March 31, 2022, increased by $1,463,749 to $1,538,103 from $74,354 for the three months ended March 31, 2021. This increase primarily consisted of increased legal expenditures associated with the increase in litigation.

Depreciation and amortization for three months ended March 31, 2022, increased by $215,857 to $228,614 from $12,757 for the three months ended March 31, 2021. This increase is primarily due to the increase in depreciable assets we acquired from new acquisitions.

Other Income (Expense)

For the three months ended March 31, 2022, we had other expense of $337,043 compared to other income of $107,675 for the same period in 2021, an increase in expense of $444,718. This increase in other income primarily consisted of changes of $35,750 of gain related to the extinguishment of debt, $156,051 increase in the fair value of the Company's derivative instruments, $19,853 of gain on foreign currency exchange rate variance, an increase in interest expense of $486,092 due to increased borrowings associated with acquisitions.

Net Loss

As a result of the above, we reported a net loss of $5,384,270 and $51,874 for the three months ended March 31, 2022 and 2021, respectively.

*Liquidity and Capital Resources*

We require working capital to fund the continued development and commercialization of our proprietary fiber optic sensing devices, and for operating expenses. During the three months ended March 31, 2022, we had $7,700,000 in new cash proceeds compared to the three months ended March 31, 2021, when we had $212,750 in new cash proceeds.

As of March 31, 2022, we had cash of $4,785,797, compared to $50,714 as of March 31, 2021. We currently do not have sufficient cash to fund our operations for the next 12 months and we will require working capital to complete development, testing and marketing of our products and to pay for ongoing operating expenses. We anticipate adding consultants for technology development and the corresponding operations of the Company, but this will not occur prior to obtaining additional capital. Management is currently in the process of looking for additional investors. Currently, loans from banks or other lending sources for lines of credit or similar short-term borrowings are not available to us. We have been able to raise working capital to fund operations through the issuances of convertible notes or obtained through the issuance of our restricted common stock. As of March 31, 2022, our current liabilities exceeded our current assets by $7,610,707.

28

Cash Flows From Operating Activities

During the three months ended March 31, 2022, net cash used by operating activities was $6,288,504, resulting from our net loss of $5,384,270 and an increase in expenses related to our convertible notes payables, including increase in inventory of $1,017,178 and operating lease liabilities of $440,171. These increases were offset by a decrease in derivative liability of $125,107, decrease in accounts payable and accrued expenses of $355,398 and an increase from the gain on the extinguishment of debt of $35,750, increase in accounts receivable of $2,523,210, decrease in unbilled revenue of $255,622 and increase in contract liability of $1,451,343.

By comparison, during the three months ended March 31, 2021, net cash used by operating activities was $161,173, resulting from our net loss of $51,874 partially offset by non-cash expenses totaling $126,580 and increases in accounts payable and accrued liabilities of $17,281.

Cash Flows From Investing Activities

During the three months ended March 31, 2022, we had net cash used in investing activities of $64,980. During the three months ended March 31, 2021, net cash used by investing activities was $1,200, of capitalized patents costs of $1,200.

Cash Flows From Financing Activities

During the three months ended March 31, 2022, net cash provided by financing activities was $7,700,000 which was comprised of proceeds from the sale of common stock from offering of $7,700,000. During the three months ended March 31, 2021, net cash used by financing activities was $212,750, which was comprised of proceeds from issuance of convertible notes payable of $212,750.

*Factors That May Affect Future Results*

Management's Discussion and Analysis contains information based on management's beliefs and forward-looking statements that involve a number of risks, uncertainties, and assumptions. There can be no assurance that actual results will not differ materially from the forward-looking statements as a result of various factors, including but not limited to, our ability to obtain the equity funding or borrowings necessary to market and launch our products, our ability to successfully serially produce and market our products; our success establishing and maintaining collaborative licensing and supplier arrangements; the acceptance of our products by customers; our continued ability to pay operating costs; our ability to meet demand for our products; the amount and nature of competition from our competitors; the effects of technological changes on products and product demand; and our ability to successfully adapt to market forces and technological demands of our customers.

*Off-Balance Sheet Arrangements*

We do not have any off-balance sheet arrangements that have or are reasonably likely to have a current or future material effect on our consolidated financial condition, changes in financial condition, revenues or expenses, results of operations, liquidity capital expenditures or capital resources.

*Recent Accounting Pronouncements*

We have provided a discussion of recent accounting pronouncements in Note 1 to the Condensed Financial Statements.

# EXHIBIT C

SA-40

10-K 1 darkpulse_10k-123118.htm FORM 10-K

Table of Contents

# UNITED STATES
## SECURITIES AND EXCHANGE COMMISSION
### Washington, D.C. 20549

## FORM 10-K

☒ **ANNUAL REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**For the fiscal year ended December 31, 2018**

☐ **TRANSITION REPORT PURSUANT TO SECTION 13 OR 15(d) OF THE SECURITIES EXCHANGE ACT OF 1934**

**Commission file number: 000-18730**

**DarkPulse, Inc.**
(Exact Name of Registrant as Specified in its Charter)

| Delaware | 87-0472109 |
|---|---|
| (State of other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

| 350 5th Ave | |
|---|---|

**350 5th Ave**
**59th Floor**
**New York, NY**        **10018**

| (Address of Principal Executive Offices) | (Zip Code) |
|---|---|

**(800) 436-1436**
(Registrant's Telephone Number, including Area Code)

SECURITIES REGISTERED PURSUANT TO SECTION 12(b) OF THE ACT: **None**

SECURITIES REGISTERED PURSUANT TO SECTION 12(g) OF THE ACT: **Common Stock, par value $.01 per share**

Indicate by check mark if the registrant is a well-known seasoned issuer, as defined in Rule 405 of the Securities Act. Yes ☐ No ☒

Indicate by check mark if the registrant is not required to file reports pursuant to Section 13 or Section 15(d) of the Act. Yes ☐ No ☒

Indicate by check mark whether the registrant (1) has filed all reports required to be filed by Section 13 or 15(d) of the Securities Exchange Act of 1934 during the past 12 months (or for such shorter period that the registrant was required to file such reports), and (2) has been subject to such filing requirements for the past 90 days. Yes ☒ No ☐

Indicate by check mark whether the registrant has submitted electronically, every Interactive Data File pursuant to Rule 405 of Regulation S-T during the preceding 12 months (or for such shorter period that the registrant was required to submit such files). Yes ☒ No ☐

Indicate by check mark if disclosure of delinquent filers pursuant to Item 405 of Regulation S-K is not contained herein and will not be contained, to the best of the registrant's knowledge, in definitive proxy or information statements incorporated by reference in Part III of this Form 10-K or any amendment to this Form 10-K. ☐

Indicate by check mark whether the registrant is a large accelerated filer, an accelerated filer, a non-accelerated filer, smaller reporting company, or an emerging growth company. See the definitions of "large accelerated filer," "accelerated filer", "smaller reporting company", and "emerging growth company" in Rule 12b-2 of the Exchange Act. (Check one)

SA-41

| | | | |
|---|---|---|---|
| Large accelerated filer | ☐ | Accelerated filer | ☐ |
| Non-accelerated filer | ☐ (Do not check if a smaller reporting company) | Smaller reporting company | ☑ |
| Emerging growth company | ☐ | | |

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. o

Indicate by check mark whether the registrant is a shell company, as defined in Rule 12b-2 of the Exchange Act.  Yes ☐ No ☒

The aggregate market value of the registrant's common stock owned by non-affiliates, based on the closing price of $0.0035 as quoted on OTC Markets, on April 12, 2019, is $357,592. For purposes of this computation all officers, directors and 5% beneficial owners of the registrant are deemed to be affiliates. Such determination should not be deemed an admission that such officers, directors and beneficial owners are, in fact, affiliates of the registrant. The number of common shares held by non-affiliates of the Registrant totaled 102,168,914.

The number of shares of the registrant's common stock, $0.01 par value per share, outstanding as of April 12, 2019, was 102,168,914.

Transitional Small Business Disclosure Format (Check one):   Yes ☐   No ☒

Check whether the registrant is a shell company (as defined in Rule 12b-2 of the Exchange Act).  Yes ☐ No ☒

SA-42

TABLE OF CONTENTS

Item Number and Caption                                                                                                     Page

PART I

Item 1.        Business                                                                                                      1

Item 1A.       Risk Factors                                                                                                  6

Item 1B.       Unresolved Staff Comments                                                                                     14

Item 2.        Properties                                                                                                    14

Item 3.        Legal Proceedings                                                                                            14

Item 4.        Mine Safety Disclosures                                                                                       14

PART II

Item 5.        Market for Registrant's Common Equity, Related Stockholder Matters and Issuer Purchases of Equity Securities    15

Item 6         Selected Financial Data                                                                                       17

Item 7.        Management's Discussion and Analysis of Financial Condition and Results of Operations                          17

Item 7A.       Quantitative and Qualitative Disclosures About Market Risk                                                     19

Item 8.        Financial Statements and Supplementary Data                                                                    19

Item 9.        Changes in and Disagreements with Accountants on Accounting and Financial Disclosure                           19

Item 9A.       Controls and Procedures                                                                                       19

Item 9B.       Other Information                                                                                             21

PART III

Item 10.       Directors, Executive Officers and Corporate Governance                                                        22

Item 11.       Executive Compensation                                                                                        23

Item 12.       Security Ownership of Certain Beneficial Owners and Management and Related Stockholder Matters                 24

Item 13.       Certain Relationships and Related Transactions, and Director Independence                                      24

Item 14.       Principal Accountant Fees and Services                                                                        25

Item 15.       Exhibits and Financial Statement Schedules                                                                    26

Signatures                                                                                                                   29

PART II

**ITEM 5. MARKET FOR REGISTRANT'S COMMON EQUITY, RELATED STOCKHOLDER MATTERS AND ISSUER PURCHASES OF EQUITY SECURITIES**

Our common stock is traded on the OTC Markets under the trading symbol DPLS. The Company has 3 billion authorized common shares.

The following table sets forth the high and low bid of the Company's Common Stock for each quarter within the past two years. The information below was provided from http://www.nasdaq.com/ and reflects the highest and lowest closing prices during each quarter.

| 2018: | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 0.0520 | $ | 0.0040 |
| Second Quarter | $ | 0.1720 | $ | 0.0300 |
| Third Quarter | $ | 0.2400 | $ | 0.0700 |
| Fourth Quarter | $ | 0.0900 | $ | 0.0190 |

| 2017: | High | | Low | |
|---|---|---|---|---|
| First Quarter | $ | 0.0280 | $ | 0.0135 |
| Second Quarter | $ | 0.0880 | $ | 0.0185 |
| Third Quarter | $ | 0.0300 | $ | 0.0058 |
| Fourth Quarter | $ | 0.0085 | $ | 0.0040 |

The number of shareholders of record of the Company's common stock as of April 15, 2019 was approximately 931.

The Company has not paid any cash dividends to date and does not anticipate paying cash dividends in the foreseeable future. It is the present intention of management to utilize any available funds for the development of the Company's business.

**Recent Sales of Unregistered Securities.**

On November 17, 2017, the Company issued 500,000 shares of restricted common stock at $0.02 per share to an investor for cash proceeds to the Company of $10,000.

On July 17, 2018, the Company entered into a securities purchase agreement with Carebourn Capital L.P., issuing a convertible promissory note in the aggregate principal amount of $189,750. The note may be converted into the Company's common stock at a conversion price equal to 60% of the average of the three lowest trading prices of the Company's common stock during the 20 prior trading days.

On July 27, 2018, The Company entered into a securities purchase agreement with Carebourn, issuing a convertible promissory note in the aggregate principal amount of $201,000. The note may be converted into the Company's common stock at a conversion price equal to 60% of the average of the three lowest trading prices of the Company's common stock during the 20 prior trading days.

On August 20, 2018, the Company entered into a securities purchase agreement with More Capital LLC, issuing a convertible promissory note in the aggregate principal amount of $97,000. The note may be converted into common shares of the Company's common stock at a conversion price equal to 60% of the average of the three lowest trading prices of the Company's common stock during the 20 prior trading days.

15

On September 24, 2018, the Company entered into a securities purchase agreement with Auctus Fund, LLC, issuing a convertible promissory note in the aggregate principal amount of $100,000. The note may be converted into common shares of the Company's common stock at a conversion price equal to 70% of the lowest trading price of the Company's common stock during the 20 prior trading days.

On September 25, 2018, the Company entered into a securities purchase agreement with EMA Financial, LLC, issuing a convertible promissory note in the aggregate principal amount of $100,000. The note may be converted into common shares of the Company's common stock at a conversion price equal to the lower of current market price, $0.25, or 70% of the lowest trading price of the Company's common stock during the 20 prior trading days.

On September 24, 2018, the Company entered into a securities purchase agreement with FirstFire Global Opportunities Fund LLC, issuing a convertible promissory note in the aggregate principal amount of $247,500. The may be converted into common shares of the Company's common stock at a conversion price equal to the lower of $0.25, or 70% of the lowest trading price of the Company's common stock during the 20 prior trading days.

On January 10, 2019, the Company entered into a Securities Purchase Agreement with GS Capital Partners, LLC, issuing a convertible redeemable note in the principal amount of $65,000. The may be converted into common shares of the Company's common stock at a conversion price equal to the lower of $0.25, or 70% of the lowest trading price of the Company's common stock during the 20 prior trading days.

On February 12, 2019, the Company entered into a securities purchase agreement with Crown Bridge Partners, LLC, issuing a convertible promissory note in the aggregate principal amount of up to $35,000. The note may be converted into common shares of the Company's common stock at a conversion price equal 70% of the lowest trading price of the Company's common stock during the 20 prior trading days.

**Compliance with Section 16(a) of the Securities Exchange Act of 1934**

Section 16(a) of the Exchange Act requires the Company's directors, executive officers, and persons who own more than 10% of a registered class of the Company's equity securities, to file with the Commission reports regarding initial ownership and changes in ownership. Directors, executive officers, and greater than 10% stockholders are required by the Commission to furnish the Company with copies of all Section 16(a) forms they file.

The Company is not aware of any common stock transactions during the year ended December 31, 2018 for which either Forms 4 or Forms 5 were required to be filed.

**Equity Compensation Plan Information**

The following table shows information with respect to each equity compensation plan under which our common stock is authorized for issuance through December 31, 2018.

**EQUITY COMPENSATION PLAN INFORMATION**

| Plan category | Number of securities to be issued upon exercise of outstanding options, warrants and rights | Weighted average exercise price of outstanding options, warrants and rights | Number of securities remaining available for future issuance under equity compensation plans (excluding securities reflected in column (a) |
|---|---|---|---|
| | (a) | (b) | (c) |
| Equity compensation plans approved by security holders | – | – | 20,000,000 |

| | | |
|---|---|---|
| **Total** | – | – | 20,000,000 |

16

**Issuer Purchases of Equity Securities**

None.

**ITEM 6.  SELECTED FINANCIAL DATA**

Not required for smaller reporting companies.

**ITEM 7.   MANAGEMENT'S DISCUSSION AND ANALYSIS OF FINANCIAL CONDITION AND RESULTS OF OPERATIONS**

**Background**

DarkPulse, Inc. (the "Company") is a technology-security company created to develop, market and distribute a full suite of engineering, installation and security management solutions to industries and governments and has not commenced its planned principal operations. Coupled with our patented BOTDA dark-pulse technology (the "DarkPulse Technology"), DarkPulse provides its customers a comprehensive data stream of critical metrics for assessing the health and security of their infrastructure. Our comprehensive system provides for rapid, precise analysis and responsive activities predetermined by the end- user customer. The Company's activities since inception have consisted principally of developing various solutions which the Company is currently testing, obtaining patents and trademarks related to its technology, and raising capital. The Company's activities are subject to significant risks and uncertainties including failing to secure additional funding needed to finalize development of the Company's technology and to commercialize its product in a profitable manner.

**Going Concern Uncertainty**

As shown in the accompanying financial statements, the Company generated net losses of $3,318,059 and $140,303 during the years ended December 31, 2018 and 2017, respectively. The Company did not generate any revenue from product sales during the years ended December 31, 2018 and 2017. As of December 31, 2018, the Company's current liabilities exceeded its current assets by $1,670,816. As of December 31, 2018, the Company had $72,294 of cash.

The Company will require additional funding during the next twelve months to finance the growth of its current operations and achieve its strategic objectives. These factors, as well as the uncertain conditions that the Company faces relative to capital raising activities, create substantial doubt as to the Company's ability to continue as a going concern. The Company is seeking to raise additional capital principally through private placement offerings and is targeting strategic partners in an effort to finalize the development of its products and begin generating revenues. The ability of the Company to continue as a going concern is dependent upon the success of future capital offerings or alternative financing arrangements and expansion of its operations. The accompanying financial statements do not include any adjustments that might be necessary should the Company be unable to continue as a going concern. Management is actively pursuing additional sources of financing sufficient to generate enough cash flow to fund its operations through calendar year 2019. However, management cannot make any assurances that such financing will be secured.

**Results of Operations**

**Revenues**

To date, the Company has not generated any operating revenues.

**Operating Expenses**

General and administrative expenses for the year ended December 31, 2018 increased by $196,061 to $219,656 from $23,595 for the year ended December 31, 2017. The primary reason for the overall increase in general and administrative expense in the current year is an increase in professional fees.

Payroll and compensation expenses for the year ended December 31, 2018 increased to $2,056,144 from $0 for the year ended December 31, 2017. The primary reason for the overall increase in payroll and compensation expense in the current year is an increase in stock related compensation to related parties.

5/26/22, 12:28 PM https://sec.report/Document/0001683168-...darkpulse_10k.htm

17

The Board of Directors pre-approved 100% of the Company's 2018 and 2017 audit fees, audit-related fees and all other fees.

## ITEM 15.  EXHIBITS AND FINANCIAL STATEMENT SCHEDULES

### 3.  Exhibits

The following exhibits are included as part of this report:

| Exhibit Number | Title of Document |
|---|---|
| 2.1 | Form of Agreement and Plan of Merger by and between Klever Marketing, Inc., DarkPulse Technologies Inc. and DPTH Acquisition Corporation dated April 27, 2018 (incorporated by reference to Exhibit 2.1 to Form 8K filed May 1, 2018) |
| 2.2 | Form of Amendment No. 1 to Agreement and Plan of Merger by and between Klever Marketing, Inc., DarkPulse Technologies Inc. and DPTH Acquisition Corporation dated June 29, 2018 (incorporated by reference to Exhibit 2.1 to Form 8K/A filed July 13, 2018) |
| 2.3 | Form of Amendment No. 2 to Agreement and Plan of Merger by and between Klever Marketing, Inc., DarkPulse Technologies Inc. and DPTH Acquisition Corporation dated August 17, 2018, effective as of July 18, 2018 (incorporated by reference to Exhibit 2.1 to Form 8K filed August 21, 2018) |
| 3.01 | Restated Certificate of Incorporation of Klever Marketing, Inc. a Delaware corporation (incorporated by reference to Annual Report on Form 10-KSB filed June 20, 1997) |
| 3.02 | Certificate of Designation of Rights, Privileges and Preferences: Rights of A Class Voting Preferred Stock, Series 1, of Klever Marketing, Inc., dated February 7, 2000  (incorporated by reference to Annual Report on Form 10-KSB filed June 20, 1997) |
| 3.03 | Amended Bylaws (incorporated by reference to Annual Report on Form 10-KSB filed March 29, 2001) |
| 3.04 | Certificate of Amendment to Certificate of Incorporation (incorporated by reference to Exhibit 3.1 to Form 8K filed July 24, 2018) |
| 3.05 | Certificate of Designation of Series D Preferred Stock (incorporated by reference to Exhibit 3.2 to Form 8K filed July 24, 2018) |
| 4.01 | Amended Certificate of Designation of Rights, Privileges and Preferences: Rights of A Class of Voting Preferred Stock, Series 1, of Klever Marketing, Inc., Dated February 7, 2000 (incorporated by reference to Quarterly Report on Form 10-QSB filed May 15, 2001) |
| 4.02 | Certificate of Designation of Rights, Privileges and Preferences of Class B Voting Preferred Stock, of Klever Marketing, Inc., dated September 24, 2000 (incorporated by reference to Quarterly Report on Form 10-QSB filed May 15, 2001) |
| 4.03 | Certificate of Designation of Rights, Privileges and Preferences of Class C Voting Preferred Stock, of Klever Marketing, Inc., dated January 2, 2001 (incorporated by reference to Quarterly Report on Form 10-QSB filed May 15, 2001) |
| 4.04 | Certificate of Designation of Rights, Privileges and Preferences of Class D Voting Preferred Stock, of Klever Marketing, Inc., dated June 14, 2002 (incorporated by reference to Quarterly Report on Form 10-QSB filed August 19, 2002) |

SA-49

| | |
|---|---|
| 4.05 | Amendment to the Certificates of Designation of Rights, Privileges and Preferences of Class A, B, and C Voting Preferred Stock, of Klever Marketing, Inc., dated June 12, 2002 (incorporated by reference to Quarterly Report on Form 10-QSB filed August 19, 2002) |
| 4.06 | |
| 4.07 | Convertible Promissory Note dated July 14, 2018 (incorporated by reference to Exhibit 99.1 to Form 10Q filed August 15, 2018) |
| 4.08 | Convertible Promissory Note dated July 14, 2018 (incorporated by reference to Exhibit 99.2 to Form 10Q filed August 15, 2018) |
| 4.09 | |
| 4.10 | Convertible Promissory Note dated July 14, 2018 (incorporated by reference to Exhibit 99.3 to Form 10Q filed August 15, 2018) |
| 4.11 | Convertible Promissory Note dated July 14, 2018 (incorporated by reference to Exhibit 99.4 to Form 10Q filed August 15, 2018) |
| 4.12 | Convertible Promissory Note dated July 17, 2018, effective July 18, 2018 (incorporated by reference to Exhibit 99.5 to Form 10Q filed August 15, 2018) |
| 4.13 | Convertible Promissory Note dated July 24, 2018, and effective July 27, 2018 (incorporated by reference to Exhibit 99.6 to Form 10Q filed August 15, 2018) |
| 4.14 | Convertible Promissory Note dated August 20, 2018, effective August 24, 2018 (incorporated by reference to Exhibit 10.1 to Form 8K filed August 27, 2018) |
| 4.15 | Convertible Promissory Note issued to EMA dated September 25, 2018, effective September 28, 2018 (incorporated by reference to Exhibit 10.1 to Form 8K filed October 5, 2018) |
| 4.16 | Convertible Promissory Note issued to Auctus dated September 25, 2018, effective September 27, 2018 (incorporated by reference to Exhibit 10.2 to Form 8K filed October 5, 2018) |
| 4.17 | Convertible Promissory Note issued to FirstFire dated September 24, 2018, and effective October 9, 2018 (incorporated by reference to Exhibit 10.1 to Form 8K filed October 15, 2018) |
| | 8% Convertible Redeemable Note issued to GS Capital Partners, LLC dated January 10, 2019 (incorporated by reference to Exhibit 4.1 to Form 8K filed January 15, 2019) |
| | Form of Convertible Promissory Note issued to Crown Bridge Partners, LLC dated February 5, 2019 (incorporated by reference to Exhibit 4.1 to Form 8K filed February 14, 2019) |
| 10.01 | Stock Incentive Plan, effective June 1, 1998  (incorporated by reference to Annual Report on Form 10-KSB filed June 20, 1997) |
| 10.02 | Asset purchase agreement dated August 27, 2004 (incorporated by reference to Quarterly Report on Form 10-QSB filed November 19, 2004) |
| 10.03 | Software Development Works Agreement between Klever Marketing, Inc. and Qualzoom Inc. dated August 15, 2010 (incorporated by reference to Quarterly Report on Form 8K filed November 19, 2010) |

27

10.04   [Software Development Agreement between Klever Marketing, Inc. and Briabe Media Inc. September 22, 2010](#) (incorporated by reference to Quarterly Report on Form 8K filed November 19, 2010)

10.05   [License Agreement by and between Battelle Memorial Institute and Darkpulse Technology Holdings Inc. dated December 28, 2018](#) (incorporated by reference to Exhibit 10.1 to Form 8K filed January 3, 2019)

10.06   [Securities Purchase Agreement by and between DarkPulse, Inc. and GS Capital Partners, LLC dated January 10, 2019](#) (incorporated by reference to Exhibit 10.1 to Form 8K filed January 15, 2019)

10.07   [Form of Securities Purchase Agreement between DarkPulse, Inc. and Crown Bridge Partners, LLC dated February 5, 2019](#) (incorporated by reference to Exhibit 10.1 to Form 8K filed February 14, 2019)

16.1    [Letter from Haynie & Company](#) (incorporated by reference to Exhibit 16.1 to Form 8K filed March 11, 2019)

23.1    [Consent of D. Brooks and Associates](#) (incorporated by reference to Exhibit 10.2 to Form 8K/A filed November 19, 2018)

99.1    [Audited consolidated financial statements of DarkPulse Technologies Inc. as of and for the years ended December 31, 2017 and 2016, including the Independent Auditor's Report thereon, and the notes related thereto](#) (incorporated by reference to Exhibit 10.2 to Form 8K/A filed November 19, 2018)

99.2    [Unaudited interim condensed consolidated financial statements of DarkPulse Technologies Inc. as of June 30, 2018, and for the six months ended June 30, 2018 and 2017 and the notes related thereto](#) (incorporated by reference to Exhibit 10.2 to Form 8K/A filed November 19, 2018)

31.1    [Certification of President, Chief Executive Officer, Chief Financial Officer, Chairman of the Board of Directors Pursuant to Rule 13a-14(a) and Rule 15d-14(a) under the Exchange Act.](#)

31.1    [Certification of President, Chief Executive Officer, Chief Financial Officer, Chairman of the Board of Directors Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002.](#)

101.INS   XBRL Instance Document

101.SCH   XBRL Schema Document

101.CAL   XBRL Calculation Linkbase Document

101.DEF   XBRL Definition Linkbase Document

101.LAB   XBRL Label Linkbase Document

101.PRE   XBRL Presentation Linkbase Document

---

28

## SIGNATURES

Pursuant to the requirements of section 13 or 15(d) of the Securities Exchange Act of 1934, as amended, the Registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**DARKPULSE, INC.**

Dated:  April 16, 2019

By:  /s/ Dennis M. O'Leary
Dennis M. O'Leary
Chairman, Chief Executive Officer and President
Chief Financial Officer
Principal Executive Officer
Principal Financial Officer
Principal Accounting Officer

Pursuant to the requirements of the Securities Exchange Act of 1934, as amended, this report has been signed below by the following persons on behalf of the Registrant and in the capacities indicated on this 16th day of April 2019.

| Signature | Title |
| --- | --- |
| /s/ Dennis M. O'Leary | Chairman, Chief Executive Officer and President |
| Dennis M. O'Leary | Chief Financial Officer, Principal Executive Officer, Principal Financial Officer and Principal Accounting Officer |

29

5/26/22, 5:48 PM    Case 1:21-cv-1222-ER   https://www.sec.gov/Archives/edgar/data/866439/000168316818002352/darkpulse_10q-ex9905.htm    Document 32   Filed 05/26/22   Page 41 of 71

EX-99.5 10 darkpulse_10q-ex9905.htm CONVERTIBLE PROMISSORY NOTE CAREBOURN
Exhibit 99.5

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS NOTE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

Principal Amount: $US189,750.00                            Issue Date: JULY 17, 2018
Purchase Price: $US165,000.00
Original Issue Discount: $24,750.00

<u>**CONVERTIBLE PROMISSORY NOTE**</u>

FOR VALUE RECEIVED, KLEVER MARKETING, INC. a DELAWARE corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **CAREBOURN CAPITAL, L.P.**, a Delaware limited partnership, or registered assigns (the "Holder") the sum of **$US189,750.00** together with any interest as set forth herein, on **JULY 17, 2019** (the "Maturity Date"), and to pay interest on the unpaid principal balance hereof at the rate of 12% (The "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. Interest shall commence accruing on the date that the Note is fully paid and shall be computed on the basis of a 365-day year and the actual number of days elapsed. All payments due hereunder (to the extent not converted into common stock, **no** par value per share (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date. As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement dated the date hereof, pursuant to which this Note was originally issued (the "Purchase Agreement").

This Note carries an original issue discount of **$24,750.00** (the "OID"). In addition, the

Borrower shall authorize the Holder, pursuant to a disbursement memorandum dated on or around the Issue Date, to pay **$US15,000.00** (the "Transactional Expense Amount") to the Holder or the Holder's designee, to cover the Holder's accounting fees, due diligence fees, monitoring (including but not limited to ACH monitoring costs), and/or other transactional costs incurred in connection with the purchase of the Note, as well as **$-0-** (the "Legal Fee") to Holder's attorney, to cover Holder's legal review fees in connection with the purchase and sale of the Note, all of which are included in the initial principal balance of this Note. The Purchase Price of this Note shall be **$US165,000.00**, computed as follows: **$US189,750.00** initial principal balance less the OID. Accordingly, the net amount to be received by the Company shall be **$US150,000.00**. computed as follows: the purchase price of **US$165,000.00**, less the Transactional Expense Amount.

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

1

SA-53

The following terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1  <u>Conversion Right.</u> The Holder shall have the right from time to time, and at any time after the date of this Note and ending on the later of: (i) the Maturity Date and (ii) the date of payment of the Default Amount (as defined in Article III) pursuant to Section 1.6(a) or Article III, each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock. For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso, provided, further, however, that the limitations on conversion may be waived by the Holder upon, at the election of the Holder, not less than 61 days' prior notice to the Borrower, and the provisions of the conversion limitation shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver). The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 6:00 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, plus (34) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

1.2  <u>Conversion Price.</u>

<u>Calculation of Conversion Price.</u> The conversion price (the "Conversion Price") shall equal the Variable Conversion Price (as defined herein) (subject to equitable adjustments for stock splits, stock dividends or rights offerings by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events). The "Variable Conversion Price" shall mean **60%** multiplied by the Market Price (as defined herein) (representing a discount rate of **40%**). In the case that shares of the Borrower's common stock are not deliverable via DWAC following the conversion of any amount hereunder, an additional Five Percent (5%) discount shall be added to the amount being converted at such time. In the event that the Borrower's shares of common stock are chilled for deposit into the DTC system and only eligible for Xclearing deposit, an additional Ten percent (10%) discount shall be added to the amount being converted at such time ."Market Price" means the average of the lowest three (3) Trading Prices (as defined below) for the Common Stock during the twenty (20) Trading Day period ending on the latest complete Trading Day prior to the Conversion Date. "Trading Price" means, for any security as of any date, the lowest price quoted on the OTC Markets operated by the OTC Markets Group, Inc. or applicable trading market (the "OTC") as reported by a reliable reporting service ("Reporting Service") designated by the Holder (i.e. Bloomberg) or, if the OTC Markets is not the principal trading market for such security, the closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded. If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTC Markets, or on the principal securities exchange or other securities market on which the Common Stock is then being traded.

2

1.3     <u>Authorized Shares</u>. The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note issued pursuant to the Purchase Agreement. The Borrower is required at all times to have authorized and reserved five times the number of shares that is actually issuable upon full conversion of the Note (based on the Conversion Price of the Notes in effect from time to time) (the "Reserved Amount"). The Reserved Amount shall be increased from time to time in accordance with the Borrower's obligations pursuant to Section 4(g) of the Purchase Agreement. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Notes. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Article III of the Note. However, upon receipt of written notice from the Holder of Borrower's failure to maintain the Reserved Amount, the Borrower shall have three (3) days to cure any deficiencies in the Reserved Amount.

1.4     <u>Method of Conversion</u>.

(a)     <u>Mechanics of Conversion</u>. Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time from time to time after One Hundred Eighty Days following the Issue Date, by (A) submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 6:00 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower.

(b)     <u>Surrender of Note Upon Conversion</u>. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted. The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid principal amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c)     <u>Payment of Taxes</u>. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d)     <u>Delivery of Common Stock Upon Conversion</u>. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Purchase Agreement.

3

Case 23-78, Document 50, 07/31/2023, 3549426, Page57 of 151

SA-55

(e) <u>Obligation of Borrower to Deliver Common Stock</u>. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is received by the Borrower before 6:00 p.m., New York, New York time, on such date.

(f) <u>Delivery of Common Stock by Electronic Transfer</u>. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission ("DWAC") system.

(g) <u>Failure to Deliver Common Stock Prior to Deadline</u>. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued),shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly, the parties acknowledge that the liquidated damages provision contained in this Section 1.4(g) are justified.

1.5     <u>Concerning the Shares</u>. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144 under the Act (or a successor rule) ("Rule 144") or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement). Except as otherwise provided in the Purchase Agreement (and subject to the removal provisions set forth below), until such time as the shares of Common Stock issuable upon conversion of this Note have been registered under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for shares of Common Stock issuable upon conversion of this Note that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

**"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN**

SA-56

CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."

4

The legend set forth above shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if (i) the Borrower or its transfer agent shall have received an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be accepted by the Company so that the sale or transfer is effected or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold. In the event that the Company does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

1.6     Effect of Certain Events.

(a)     Effect of Merger, Consolidation, Etc. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall either: (i) be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III) or (ii) be treated pursuant to Section 1.6(b) hereof. "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

(b)     Adjustment Due to Merger, Consolidation, Etc. If, at any time when this Note is issued and outstanding and prior to conversion of all of the Notes, there shall be any merger, consolidation, or an exchange of shares, recapitalization or reorganization pursuant to a merger or consolidation, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets or more than 50% of the total outstanding shares of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not affect any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, thirty (30) days prior written notice (but in any event at least fifteen (15) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time theHolder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Section 1.6(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c)     Adjustment Due to Distribution. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

(f)     Notice of Adjustments. Upon the occurrence of each adjustment or readjustment of the Conversion Price as a result of the events described in this Section 1.6, the Borrower, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder of a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Borrower shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon conversion of the Note.

SA-58

1.8    <u>Status as Shareholder</u>. Upon submission of a Notice of Conversion by a Holder, (i) the shares covered thereby (other than the shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies (including, without limitation, (i) the right to receive Conversion Default Payments pursuant to Section 1.3 to the extent required thereby for such Conversion Default and any subsequent Conversion Default and (ii) the right to have the Conversion Price with respect to subsequent conversions determined in accordance with Section 1.3) for the Borrower's failure to convert this Note.

1.9    <u>Prepayment</u>. Notwithstanding anything to the contrary contained in this Note, the Borrower may prepay the amounts outstanding hereunder pursuant to the following terms and conditions, and subject to the Holder's acceptance in Holder's sole discretion:

(a)    At any time during the period beginning on the Issue Date and ending on the date which is one hundred and eighty (180) days following the Issue Date, the Borrower shall have the right, exercisable on not less than twenty (20) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full by making a payment to the Holder of an amount in cash equal to 130%, multiplied by the sum of: (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note.

(b)    At any time during the period beginning the day which is one hundred and eighty one (181) days following the Issue Date and ending on the date which is **THREE HUNDRED SIXTY FOUR (364)** days following the Issue Date, the Borrower shall have the right, exercisable on not less than twenty (20) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full by making a payment to the Holder of an amount in cash equal to 150%, multiplied by the sum of: (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note.

(c)    After the expiration of **THREE HUNDRED SIXTY-FOUR (364)**, the Borrower shall have no right of prepayment.

Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than twenty (20) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the applicable prepayment amount to or upon the order of the Holder as specified by the Holder in writing to the Borrower at least one (1) business day prior to the Optional Prepayment Date. If the Borrower delivers an Optional Prepayment Notice and fails to pay the applicable prepayment amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to this Section 1.9. Notwithstanding anything to the contrary in this Note, the Borrower's right to prepay the amounts outstanding under this Note, in accordance with the terms and conditions of this Note, is expressly conditional upon the Holder's written acceptance, in Holder's sole discretion, of such applicable prepayment during the time that the Borrower is exercising their right to prepay this Note.

ARTICLE II. CERTAIN COVENANTS

2.1    <u>Distributions on Capital Stock</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors.

SA-60

    2.3   <u>Sale of Assets</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease, exchange (including but not limited to an exchange for assets of equal or greater value) or otherwise dispose of any significant portion of its assets outside the ordinary course of business, except that Borrower shall have sole discretion to dispose of Borrower's pre-merger "Klever Marketing" assets. Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition.

6

2.4      <u>Advances and Loans</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, lend money, give credit or make advances to any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Borrower, except loans, credits or advances (a) in existence or committed on the date hereof and which the Borrower has informed Holder in writing prior to the date hereof, (b) made in the ordinary course of business, (c) made to a pending merging partner pursuant to an agreement of merger or (c) not in excess of $100,000.

ARTICLE III. EVENTS OF DEFAULT

If any of the following events of default (each, an "Event of Default") shall occur:

3.1      <u>Failure to Pay Principal or Interest</u>. The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity, upon acceleration or otherwise, following a five (5) day cure period.

3.2      <u>Conversion and the Shares</u>. The Borrower fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within forty-eight (48) hours of a demand from the Holder.

3.3      <u>Breach of Covenants</u>. The Borrower breaches any covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of ten (10) days after written notice thereof to the Borrower from the Holder.

3.4      <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.5      <u>Receiver or Trustee</u>. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.6      <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $50,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

7

3.7    Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.8    Delisting of Common Stock. The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC Markets or an equivalent replacement exchange, the Nasdaq National Market, the Nasdaq SmallCap Market, the New York Stock Exchange, or the American Stock Exchange.

3.9    Failure to Comply with the Exchange Act. The Borrower shall fail to comply with the reporting requirements of the Exchange Act; and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

3.10    Liquidation. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business except for disposal of Borrower's pre-merger "Klever Marketing" assets, which shall not be considered an Event of Default.

3.11    Cessation of Operations. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.12    Maintenance of Assets. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future).

3.13    Financial Statement Restatement. The restatement of any financial statements filed by the Borrower with the SEC for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.14    Reverse Splits. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

3.15    Replacement of Transfer Agent. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.16    Cross-Default. Notwithstanding anything to the contrary contained in this Note or other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained any other financial instrument, including but not limited to all convertible promissory notes, already issued, or issued in the future, by the Borrower, to the Holder or any other 3rd party, after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note.

3.17    ACH Account Change. The Borrower changes it bank account to an account that differs from the bank account specified on Exhibit B attached hereto, without (i) prior signed written consent of the Holder and (ii) Borrower's execution of a signed authorization agreement for preauthorized payments that is exactly the same as the form attached hereto as Exhibit B (except for the new bank account information) with respect to the new bank account.

3.18    ACH Payment Default. The Borrower blocks, rejects, or otherwise restricts any action taken by Holder pursuant to Holder's rights under this Note with respect to the Borrower's bank account, including but not limited to Holder's withdrawal of the Specific Daily Repayment Amount (as defined in Exhibit B attached hereto) pursuant to an ACH debit transaction or otherwise from the Borrower's bank account, or the Holder's withdrawal of the Specific Daily Repayment Amount from the Borrower's bank account pursuant to an ACH debit transaction or otherwise is rejected for any reason.

3.19    Event of Default. Upon the occurrence of any Event of Default specified in Sections 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, and/or 3.16, exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice") , , the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to the greater of (i) 150% times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x) and, (y) shall collectively be known as

SA-63

the "Default Sum"), and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

---

8

**SA-64**

If the Borrower fails to pay the Default Amount within five (5) business days of written notice that such amount is due and payable, then the Holder shall have the right at any time, so long as the Borrower remains in default (and so long as to the extent that there are sufficient authorized shares), to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect.

ARTICLE IV. MISCELLANEOUS

4.1    <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2    <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Borrower, to:

> **KLEVER MARKETING, INC.**
> <u>**8760 Virginia Meadows Drive**</u>
> <u>**Manassas, VA** 20109</u>Attention: Dennis O' Leary / CEO
> <u>**Email: doleary@darkpulse.com**</u>

If to the Holder:

> **CAREBOURN CAPITAL, L.P.**
> **8700 Black Oaks Lane N**
> **Maple Grove, Minnesota 55311**
> **Attn: Chip Rice, Managing Member**
> <u>**Email: info@carebourncapital.com**</u>

4.3    <u>Amendments</u>. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument (and the other Notes issued pursuant to the Purchase Agreement) as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4    <u>Assignability</u>. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the 1933 Act). Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement.

4.5    <u>Cost of Collection</u>. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

9

4.6     Governing Law.

(a).     Except in the case of the Mandatory Forum Selection provisions in Section 4.6(b) below, which clause shall be governed and interpreted in accordance with Minnesota law, this Agreement and all other Transaction Documents shall be delivered and accepted in and shall be deemed to be contracts made under and governed by the internal laws of the State of Minnesota, and for all purposes shall be construed in accordance with the laws of such State, without giving effect to the choice of law provisions of such state. This Agreement shall be governed by and construed in accordance with the laws of the State of Minnesota without regard to principles of conflicts of laws.

(b).     Mandatory Forum Selection. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state courts or federal courts located in the state of Minnesota, County of Hennepin. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. The Borrower and Holder waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

4.7     Certain Amounts. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

4.8     Usury Savings Clause. Notwithstanding any provision in this Note or the other Transaction Documents to the contrary, the total liability for payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions, or other sums which may at any time be deemed to be interest, shall not exceed the limit imposed by the usury laws of the jurisdiction governing this Note or any other applicable law. In the event the total liability of payments of interest and payments in the nature of interest, including, without limitation, all charges, fees, exactions or other sums which may at any time be deemed to be interest, shall, for any reason whatsoever, result in an effective rate of interest, which for any month or other interest payment period exceeds the limit imposed by the usury laws of the jurisdiction governing this Note, all sums in excess of those lawfully collectible as interest for the period in question shall, without further agreement or notice by, between, or to any party hereto, be applied to the reduction of the outstanding principal balance due hereunder immediately upon receipt of such sums by the Holder hereof, with the same force and effect as though the Company had specifically designated such excess sums to be so applied to the reduction of the principal balance then outstanding, and the Holder hereof had agreed to accept such sums as a penalty-free payment of principal; provided, however, that the Holder may, at any time and from time to time, elect, by notice in writing to the Company, to waive, reduce, or limit the collection of any sums in excess of those lawfully collectible as interest, rather than accept such sums as a prepayment of the principal balance then outstanding. It is the intention of the parties that the Company does not intend or expect to pay, nor does the Holder intend or expect to charge or collect any interest under this Note greater than the highest non-usurious rate of interest which may be charged under applicable law.

4.9     Purchase Agreement. By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Purchase Agreement.

10

5/26/22, 5:48 PM    Case 1:21-Cv-11222-ER Document 32-8 Filed 05/26/22 Page 28 of 41
https://www.sec.gov/Archives/edgar/data/866439/000168316818002352/darkpulse_10q-ex9905.htm

4.10    Notice of Corporate Events. Except as otherwise provided below, the Holder of this Note shall have no rights as a Holder of Common Stock unless and only to the extent that it converts this Note into Common Stock. The Borrower shall provide the Holder with prior notification of any meeting of the Borrower's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Borrower of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any proposed sale, lease or conveyance of all or substantially all of the assets of the Borrower or any proposed liquidation, dissolution or winding up of the Borrower, the Borrower shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Borrower shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.9.

4.11    Remedies. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

4.12    [Reserved].

4.13    ACH Payment Authorization. Borrower irrevocably authorizes Holder's right to withdraw (through an ACH debit or otherwise) **$500.00** (the "Specific Daily Repayment Amount") (subject to adjustment as provided herein) from the Borrower's bank account (initially, the bank account identified on Exhibit B attached hereto, but also including any subsequent bank account of the Borrower if such account is changed) (the "Bank Account"), on each business day, until this Note is satisfied in full **(ACH DEBIT WILL COMMENCE ON THE 121ST DAY OF THIS CONTRACT)**. Borrower shall provide Holder with all required access codes to effectuate any and all ACH debit transactions as provided for in this Note. Borrower understands that it is responsible for ensuring that at least the Specific Daily Repayment Amount remains in its Bank Account on each business day until this Note is satisfied in full, and that the Borrower shall be responsible for any charges incurred by the Holder resulting from a rejected ACH attempt, insufficient funds in the Bank Account, and/or all related bank charges. Such charges shall be immediately added to the outstanding balance of the Note. The Specific Daily Repayment Amount shall automatically adjust to such prorated higher amount based upon the addition of charges to the outstanding balance of Note, as well as to reflect any penalties incurred or events of defaults triggered under the terms of the Note (to be calculated as follows: the total outstanding amount under the Note (including but not limited to all principal, interest, charges, penalties, and additions due to any event of default) divided by the number of business days remaining prior to the Maturity Date). Holder shall not be responsible for any overdrafts or rejected transactions that result from Holder's ACH debiting of the Specific Daily Repayment Amount as provided in this Note and the exhibits hereto. Holder may debit the Specific Daily Repayment Amount each business day.

The Holder shall be permitted to aggregate the Specific Daily Repayment Amount of all convertible promissory notes then issued by the Borrower to the Holder, and withdraw such aggregated amount from the Borrower's bank account, in the interest of reducing overall fees associated with the ACH debit transactions.

The Holder may, from time to time, provide a schedule to the Borrower via electronic mail (each a "Schedule") to doleary@darkpulse.com & sgoodman@darkpulse.com, showing the outstanding balance of the Note as well as all ACH debits, conversion amounts, and/or all other adjustments as provided in the Note (the "Schedule"). If the Borrower does not respond to the Holder, via electronic mail to **info@carebourncapital.com**, stating that the respective Schedule is accurate or disputing the amounts contained therein (with objective documentation unequivocally supporting such dispute), within two (2) business days of receipt of the respective Schedule, then the Borrower shall be deemed to have irrevocably approved the amounts contained in such respective Schedule.

---

11

4.14 <u>Terms of Future Financings</u>. So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any security with any term more favorable to the holder of such security or with a term in favor of the holder of such security that was not similarly provided to the Holder in this Note, then the Borrower shall notify the Holder of such additional or more favorable term and such term, at Holder's option, shall become a part of the transaction documents with the Holder. The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, original issue discounts, stock sale price, private placement price per share, and warrant coverage.

**[SIGNATURE PAGE FOLLOWS]**

12

SA-68

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this **JULY 17, 2018**.

**KLEVER MARKETING, INC.**

By:  /s/ Dennis O'Leary
Name: Dennis O' Leary
Title: CEO

13

5/26/22, 5:48 PM    Case 1:21-cv-11222-ER   Document 32-8   Filed 05/26/22   Page 31 of 71   https://www.sec.gov/Archives/edgar/data/866439/000168316818002352/darkpulse_10q-ex9905.htm

**EXHIBIT A: NOTICE OF CONVERSION**

The undersigned hereby elects to convert $_____ principal amount of

the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of **KLEVER MARKETING, INC.,** a **DELAWARE** corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of **JULY 17, 2018** (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

☐    The Borrower shall electronically transmit the Common Stock issuable pursuant to

this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

☐    The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

**CAREBOURN CAPITAL, L.P.**
8700 Black Oaks Lane N
Maple Grove, Minnesota 55311
Attention: Certificate Delivery
612.889.4671

Date of Conversion: _____
Applicable Conversion Price: $_____
Number of Shares of Common Stock to be Issued Pursuant to Conversion of the Notes: _____
Amount of Principal Balance Due remaining Under the Note after this conversion: _____

**CAREBOURN CAPITAL, L.P.**

**By:**    **Carebourn Partners, LLC,**
     **a Minnesota limited liability company,**
     **its General Partner**

By:_____
Name: Chip Rice
Title: Managing Member

---

14

**EXHIBIT B**

(see attached)

---

15

**EXHIBIT C**
(see attached)

16

SA-72

## EXHIBIT D
(see attached)

<u>Representations and Warranties Regarding Anti-Money Laundering; OFAC</u>.

1.1.     The Borrower should check the Office of Foreign Assets Control ("OFAC") website at <u>http://www.treas.gov/ofac</u> before making the following representations

1.2.     The Borrower represents that the cash amounts to be paid to Carebourn Capital, L.P. (the "Holder") under the convertible promissory note dated **JULY 17, 2018** (the "Note"), by the Borrower, were not and are not directly or indirectly derived from activities that contravene U.S. federal or state or international laws and regulations, including anti-money laundering laws and regulations. U.S. federal regulations and executive orders administered by OFAC prohibit, among other things, the engagement in transactions with, and the provision of services to, certain foreign countries, territories, entities and individuals. The lists of OFAC prohibited countries, territories, persons and entities can be found on the OFAC website at <u>http://www.treas.gov/ofac</u>. In addition, the programs administered by OFAC (the "OFAC Programs") prohibit dealing with individuals[1] or entities in certain countries regardless of whether such individuals or entities appear on the OFAC lists.

1.3.     To the best of the Borrower's knowledge, none of: (1) the Borrower; (2) any person controlling or controlled by the Borrower; (3) if the Borrower is a privately-held entity, any person having a beneficial interest in the Borrower; or (4) any person for whom the Borrower is acting as agent or nominee is a country, territory, individual or entity named on an OFAC list, or a person or entity prohibited under the OFAC Programs.

1.4.     To the best of the Borrower's knowledge, none of: (1) the Borrower; (2) any person controlling or controlled by the Borrower; (3) if the Borrower is a privately-held entity, any person having a beneficial interest in the Borrower; or (4) any person for whom the Borrower is acting as agent or nominee is a senior foreign political figure[2], or any immediate family[3] member or close associate[4] of a senior foreign political figure, as such terms are defined in the footnotes below.

---

[1] These individuals include specially designated nationals, specially designated narcotics traffickers and other parties subject to OFAC sanctions and embargo programs.

[2] A "senior foreign political figure" is defined as a senior official in the executive, legislative, administrative, military or judicial branches of a foreign government (whether elected or not), a senior official of a major foreign political party, or a senior executive of a foreign government-owned corporation. In addition, a "senior foreign political figure" includes any corporation, business or other entity that has been formed by, or for the benefit of, a senior foreign political figure.

[3] "Immediate family" of a senior foreign political figure typically includes the figure's parents, siblings, spouse, children and in-laws.

[4] A "close associate" of a senior foreign political figure is a person who is widely and publicly known to maintain an unusually close relationship with the senior foreign political figure, and includes a person who is in a position to conduct substantial domestic and international financial transactions on behalf of the senior foreign political figure.

17

1.5.    Borrower hereby represents and warrants that the cash payments under the Note are to be made on its own behalf or, if applicable, and such cash payments do not directly or indirectly contravene United States federal, state, local or international laws or regulations applicable to Borrower, including anti-money laundering laws.

1.6.    If the Borrower is affiliated with a non-U.S. banking institution (a "Foreign Bank"), or if the Borrower receives deposits from, makes payments on behalf of, or handles other financial transactions related to a Foreign Bank, the Borrower represents and warrants to the Holder that: (1) the Foreign Bank has a fixed address, other than solely an electronic address, in a country in which the Foreign Bank is authorized to conduct banking activities; (2) the Foreign Bank maintains operating records related to its banking activities; (3) the Foreign Bank is subject to inspection by the banking authority that licensed the Foreign Bank to conduct banking activities; and (4) the Foreign Bank does not provide banking services to any other Foreign Bank that does not have a physical presence in any country and that is not a regulated affiliate.

1.7.    Upon the written request from the Holder, Borrower agrees to provide all information to the Holder to enable the Holder to comply with all applicable anti-money laundering statutes, rules, regulations and policies. Borrower understands and agrees that the Holder may release confidential information about Borrower and, if applicable, any of its affiliates, directors, officers, trustees, beneficiaries and grantors related thereto, to any person if the Holder, in its sole discretion, determines that such disclosure is necessary to comply with applicable statutes, rules, regulations and policies.

IN WITNESS WHEREOF, Borrower has caused this representation letter to be signed in its name by its duly authorized officer this **JULY 17, 2018**.

**KLEVER MARKETING, INC.**

By: /s/Dennis O'Leary
Name: Dennis O'Leary
Title: CEO

18

EX-10.2 3 dark_8k-ex1002.htm CONVERTIBLE PROMISSORY NOTE
Exhibit 10.2

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

**Principal Amount: US$100,000.00**                                    **Issue Date: September 25, 2018**
**Purchase Price: US$100,000.00**

<u>**CONVERTIBLE PROMISSORY NOTE**</u>

        **FOR VALUE RECEIVED, DARKPULSE, INC.**, a Delaware corporation (hereinafter called the "Borrower"), hereby promises to pay to the order of **AUCTUS FUND, LLC**, a Delaware limited liability company, or registered assigns (the "Holder") the sum of US$100,000.00 together with any interest as set forth herein, on June 25, 2019 (the "Maturity Date"), and to pay interest on the unpaid principal balance hereof at the rate of eight percent (8%) (the "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein with the written consent of the Holder which may be withheld for any reason or for no reason. Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of the lesser of (i) twenty four percent (24%) per annum or (ii) the maximum amount allowed by law from the due date thereof until the same is paid (the "Default Interest"). Interest shall commence accruing on the date that the Note is fully paid and shall be computed on the basis of a 365-day year and the actual number of days elapsed. All payments due hereunder (to the extent not converted into common stock, $0.01 par value per share (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date. As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement dated the date hereof, pursuant to which this Note was originally issued (the "Purchase Agreement").

1

SA-75

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following terms shall apply to this Note:

ARTICLE I. CONVERSION RIGHTS

1.1  <u>Conversion Right</u>. The Holder shall have the right from time to time, and at any time following the Issue Date and ending on the later of (i) the Maturity Date and (ii) the date of payment of the Default Amount (as defined in Article III) pursuant to Section 1.6(a) or Article III, each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the Conversion Price (as defined below) determined as provided herein (a "Conversion"); <u>provided</u>, <u>however</u>, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock. For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso, <u>provided</u>, <u>further</u>, <u>however</u>, that the limitations on conversion may be waived by the Holder (up to a maximum of 9.99%) upon, at the election of the Holder, not less than 61 days' prior notice to the Borrower, and the provisions of the conversion limitation shall continue to apply until such 61st day (or such later date, as determined by the Holder, as may be specified in such notice of waiver). The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 6:00 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion <u>plus</u> (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, provided however, that the Borrower shall have the right to pay any or all interest in cash <u>plus</u> (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) <u>plus</u> (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

2

1.2  <u>Conversion Price</u>.

Calculation of Conversion Price. Subject to the adjustments described herein, the conversion price (the "Conversion Price") shall equal the lesser of (i) the lowest Trading Price (as defined below) during the previous twenty (20) Trading Day period ending on the latest complete Trading Day prior to the date of this Note and (ii) the Variable Conversion Price (as defined herein) (subject to equitable adjustments for stock splits, stock dividends or rights offerings by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events). The "Variable Conversion Price" shall mean 70% multiplied by the Market Price (as defined herein) (representing a discount rate of 30%). "Market Price" means the lowest Trading Price for the Common Stock during the twenty (20) Trading Day period ending on the latest complete Trading Day prior to the Conversion Date. "Trading Price" means, for any security as of any date, the lesser of: (i) the lowest trade price on the OTC Pink, OTCQB or applicable trading market as reported by a reliable reporting service ("Reporting Service") designated by the Holder or, if the OTC Pink is not the principal trading market for such security, the trading price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no trading price of such security is available in any of the foregoing manners, the average of the trading prices of any market makers for such security that are listed in the "pink sheets" by the National Quotation Bureau, Inc., or (ii) the closing bid price on the OTC Pink, OTCQB or applicable trading market as reported by a Reporting Service designated by the Holder or, if the OTC Pink is not the principal trading market for such security, the closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no closing bid price of such security is available in any of the foregoing manners, the average of the closing bid prices of any market makers for such security that are listed in the "pink sheets" by the National Quotation Bureau, Inc. To the extent the Conversion Price of the Borrower's Common Stock closes below the par value per share, the Borrower will take all steps necessary to solicit the consent of the stockholders to reduce the par value to the lowest value possible under law. The Borrower agrees to honor all conversions submitted pending this adjustment. Furthermore, the Conversion Price may be adjusted downward if, within three (3) business days of the transmittal of the Notice of Conversion to the Borrower, the Common Stock has a closing bid which is 5% or lower than that set forth in the Notice of Conversion. If the shares of the Borrower's Common Stock have not been delivered within three (3) business days to the Borrower, the Notice of Conversion may be rescinded. At any time after the Closing Date, if in the case that the Borrower's Common Stock is not deliverable by DWAC (including if the Borrower's transfer agent has a policy prohibiting or limiting delivery of shares of the Borrower's Common Stock specified in a Notice of Conversion), an additional 10% discount will apply for all future conversions under all Notes. If in the case that the Borrower's Common Stock is "chilled" for deposit into the DTC system and only eligible for clearing deposit, an additional 15% discount shall apply for all future conversions under all Notes while the "chill" is in effect. If in the case of both of the above, an additional cumulative 25% discount shall apply. Additionally, if the Borrower ceases to be a reporting company pursuant to the 1934 Act or if the Note cannot be converted into free trading shares after one hundred eighty-one (181) days from the Issue Date, an additional 30% discount will be attributed to the Conversion Price. If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTC Pink, OTCQB or on the principal securities exchange or other securities market on which the Common Stock is then being traded. The Borrower shall be responsible for the fees of its transfer agent and all DTC fees associated with any such issuance. Holder shall be entitled to deduct $500.00 from the conversion amount in each Notice of Conversion to cover Holder's deposit fees associated with each Notice of Conversion. If at any time the Conversion Price as determined hereunder for any conversion would be less than the par value of the Common Stock, then at the sole discretion of the Holder, the Conversion Price hereunder may equal such par value for such conversion and the Conversion Amount for such conversion may be increased to include Additional Principal, where "Additional Principal" means such additional amount to be added to the Conversion Amount to the extent necessary to cause the number of conversion shares issuable upon such conversion to equal the same number of conversion shares as would have been issued had the Conversion Price not been adjusted by the Holder to the par value price.

3

SA-77

While this Note is outstanding, each time any 3rd party has the right to convert monies owed to that 3rd party (or receive shares pursuant to a settlement or otherwise), including but not limited to under Section 3(a)(9) and Section 3(a)(10), at a discount to market greater than the Conversion Price in effect at that time (prior to all other applicable adjustments in the Note), then the H1older, in Holder's sole discretion, may utilize such greater discount percentage (prior to all applicable adjustments in this Note) until this Note is no longer outstanding. While this Note is outstanding, each time any 3rd party has a look back period greater than the look back period in effect under the Note at that time, including but not limited to under Section 3(a)(9) and Section 3(a)(10), then the Holder, in Holder's sole discretion, may utilize such greater number of look back days until this Note is no longer outstanding. The Borrower shall give written notice to the Holder within one (1) business day of becoming aware of any event that could permit the Holder to make any adjustment described in the two immediately preceding sentences.

(a) Conversion Price During Major Announcements. Notwithstanding anything contained in Section 1.2(a) to the contrary, in the event the Borrower (i) makes a public announcement that it intends to consolidate or merge with any other corporation (other than a merger in which the Borrower is the surviving or continuing corporation and its capital stock is unchanged) or sell or transfer all or substantially all of the assets of the Borrower or (ii) any person, group or entity (including the Borrower) publicly announces a tender offer to purchase 50% or more of the Borrower's Common Stock (or any other takeover scheme) (the date of the announcement referred to in clause (i) or (ii) is hereinafter referred to as the "Announcement Date"), then the Conversion Price shall, effective upon the Announcement Date and continuing through the Adjusted Conversion Price Termination Date (as defined below), be equal to the lower of (x) the Conversion Price which would have been applicable for a Conversion occurring on the Announcement Date and (y) the Conversion Price that would otherwise be in effect. From and after the Adjusted Conversion Price Termination Date, the Conversion Price shall be determined as set forth in this Section 1.2(a). For purposes hereof, "Adjusted Conversion Price Termination Date" shall mean, with respect to any proposed transaction or tender offer (or takeover scheme) for which a public announcement as contemplated by this Section 1.2(b) has been made, the date upon which the Borrower (in the case of clause (i) above) or the person, group or entity (in the case of clause (ii) above) consummates or publicly announces the termination or abandonment of the proposed transaction or tender offer (or takeover scheme) which caused this Section 1.2(b) to become operative.

(b) Pro Rata Conversion; Disputes. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Borrower shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 4.13.

1.3 Authorized Shares. The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note issued pursuant to the Purchase Agreement. The Borrower is required at all times to have authorized and reserved six times the number of shares that is actually issuable upon full conversion of the Note (based on the Conversion Price of the Notes in effect from time to time) (the "Reserved Amount"). The Reserved Amount shall be increased from time to time in accordance with the Borrower's obligations pursuant to Section 3(d) of the Purchase Agreement. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Notes. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note. Notwithstanding the foregoing, in no event shall the Reserved Amount be lower than the initial Reserved Amount, regardless of any prior conversions.

4

5/26/22, 5:47 PM    Case 1:21-cv-1222-ER    Document 32-3    Filed 05/26/22    Page 40 of 151    https://www.sec.gov/Archives/edgar/data/866439/000168316818002976/dark_8k-ex1002.htm

If, at any time the Borrower does not maintain or replenish the Reserved Amount within three (3) business days of the request of the Holder, the principal amount of the Note shall increase by Five Thousand and No/100 United States Dollars ($5,000) (under Holder's and Borrower's expectation that any principal amount increase will tack back to the Issue Date) per occurrence.

1.4  Method of Conversion.

(a)  Mechanics of Conversion. Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by (A) submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 5:00 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower.

(b)  Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted. The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid principal amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c)  Payment of Taxes. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d)  Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Purchase Agreement.

5

5/26/22, 5:47 PM                    Case 1:21-cv-11222-ER   Document 32-3   Filed 05/26/22   Page 41 of 62                    https://www.sec.gov/Archives/edgar/data/866439/...dark_8k-ex1002.htm

(e) _Obligation of Borrower to Deliver Common Stock_. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is received by the Borrower before 5:00 p.m., New York, New York time, on such date.

(f) _Delivery of Common Stock by Electronic Transfer_. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its commercially reasonable best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal At Custodian ("DWAC") system.

(g) _DTC Eligibility & Market Loss_. If the Borrower fails to maintain its status as "DTC Eligible" for any reason, or, if the Conversion Price is less than $0.01 at any time while this Note is outstanding, the principal amount of the Note shall increase by Fifteen Thousand and No/100 United States Dollars ($15,000) (under Holder's and Borrower's expectation that any principal amount increase will tack back to the Issue Date). In addition, the Variable Conversion Price shall be redefined to mean forty percent (40%) multiplied by the Market Price, subject to adjustment as provided in this Note.

(h) _Failure to Deliver Common Stock Prior to Delivery Deadline_. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock until the Borrower issues and delivers a certificate to the Holder or credit the Holder's balance account with OTC for the number of shares of Common Stock to which the Holder is entitled upon such Holder's conversion of any Conversion Amount (under Holder's and Borrower's expectation that any damages will tack back to the Issue Date).. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly the parties acknowledge that the liquidated damages provision contained in this Section 1.4(h) are justified.

6

SA-80

     (i)   <u>Rescindment of a Notice of Conversion</u>. If (i) the Borrower fails to respond to Holder within one (1) business day from the Conversion Date confirming the details of Notice of Conversion, (ii) the Borrower fails to provide any of the shares of the Borrower's Common Stock requested in the Notice of Conversion within three (3) business days from the date of receipt of the Note of Conversion, (iii) the Holder is unable to procure a legal opinion required to have the shares of the Borrower's Common Stock issued unrestricted and/or deposited to sell for any reason related to the Borrower's standing, (iv) the Holder is unable to deposit the shares of the Borrower's Common Stock requested in the Notice of Conversion for any reason related to the Borrower's standing, (v) at any time after a missed Deadline, at the Holder's sole discretion, or (vi) of OTC Markets changes the Borrower's designation to 'Limited Information' (Yield), 'No Information' (Stop Sign), 'Caveat Emptor' (Skull & Crossbones), 'OTC', 'Other OTC' or 'Grey Market' (Exclamation Mark Sign) or other trading restriction on the day of or any day after the Conversion Date, the Holder maintains the option and sole discretion to rescind the Notice of Conversion ("Rescindment") with a "Notice of Rescindment."

     1.5  <u>Concerning the Shares</u>. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144 under the Act (or a successor rule) ("Rule 144") or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement). Except as otherwise provided in the Purchase Agreement (and subject to the removal provisions set forth below), until such time as the shares of Common Stock issuable upon conversion of this Note have been registered under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for shares of Common Stock issuable upon conversion of this Note that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

     **"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

7

The legend set forth above shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if (i) the Borrower or its transfer agent shall have received an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be reasonably accepted by the Borrower so that the sale or transfer is effected or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold. In the event that the Borrower does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

1.6  Effect of Certain Events.

(a)  Effect of Merger, Consolidation, Etc. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall either: (i) be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III) or (ii) be treated pursuant to Section 1.6(b) hereof. "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

(b)  Adjustment Due to Merger, Consolidation, Etc. If, at any time when this Note is issued and outstanding and prior to conversion of all of the Notes, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not affect any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, thirty (30) days prior written notice (but in any event at least fifteen (15) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Section 1.6(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

(c)  Adjustment Due to Distribution. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

8

SA-82

(d) <u>Adjustment Due to Dilutive Issuance</u>. If, at any time when any Notes are issued and outstanding, the Borrower issues or sells, or in accordance with this Section 1.6(d) hereof is deemed to have issued or sold, except for shares of Common Stock issued directly to vendors or suppliers of the Borrower in satisfaction of amounts owed to such vendors or suppliers (provided, however, that such vendors or suppliers shall not have an arrangement to transfer, sell or assign such shares of Common Stock prior to the issuance of such shares), any shares of Common Stock for no consideration or for a consideration per share (before deduction of reasonable expenses or commissions or underwriting discounts or allowances in connection therewith) less than the Conversion Price in effect on the date of such issuance (or deemed issuance) of such shares of Common Stock (a "Dilutive Issuance"), then immediately upon the Dilutive Issuance, the Conversion Price will be reduced to the amount of the consideration per share received by the Borrower in such Dilutive Issuance.

The Borrower shall be deemed to have issued or sold shares of Common Stock if the Borrower in any manner issues or grants any warrants, rights or options (not including employee stock option plans), whether or not immediately exercisable, to subscribe for or to purchase Common Stock or other securities convertible into or exchangeable for Common Stock ("Convertible Securities") (such warrants, rights and options to purchase Common Stock or Convertible Securities are hereinafter referred to as "Options") and the price per share for which Common Stock is issuable upon the exercise of such Options is less than the Conversion Price then in effect, then the Conversion Price shall be equal to such price per share. For purposes of the preceding sentence, the "price per share for which Common Stock is issuable upon the exercise of such Options" is determined by dividing (i) the total amount, if any, received or receivable by the Borrower as consideration for the issuance or granting of all such Options, plus the minimum aggregate amount of additional consideration, if any, payable to the Borrower upon the exercise of all such Options, plus, in the case of Convertible Securities issuable upon the exercise of such Options, the minimum aggregate amount of additional consideration payable upon the conversion or exchange thereof at the time such Convertible Securities first become convertible or exchangeable, by (ii) the maximum total number of shares of Common Stock issuable upon the exercise of all such Options (assuming full conversion of Convertible Securities, if applicable). No further adjustment to the Conversion Price will be made upon the actual issuance of such Common Stock upon the exercise of such Options or upon the conversion or exchange of Convertible Securities issuable upon exercise of such Options.

Additionally, the Borrower shall be deemed to have issued or sold shares of Common Stock if the Borrower in any manner issues or sells any Convertible Securities, whether or not immediately convertible (other than where the same are issuable upon the exercise of Options), and the price per share for which Common Stock is issuable upon such conversion or exchange is less than the Conversion Price then in effect, then the Conversion Price shall be equal to such price per share. For the purposes of the preceding sentence, the "price per share for which Common Stock is issuable upon such conversion or exchange" is determined by dividing (i) the total amount, if any, received or receivable by the Borrower as consideration for the issuance or sale of all such Convertible Securities, plus the minimum aggregate amount of additional consideration, if any, payable to the Borrower upon the conversion or exchange thereof at the time such Convertible Securities first become convertible or exchangeable, by (ii) the maximum total number of shares of Common Stock issuable upon the conversion or exchange of all such Convertible Securities. No further adjustment to the Conversion Price will be made upon the actual issuance of such Common Stock upon conversion or exchange of such Convertible Securities.

(e) <u>Purchase Rights</u>. If, at any time when any Notes are issued and outstanding, the Borrower issues any convertible securities or rights to purchase stock, warrants, securities or other property (the "Purchase Rights") pro rata to the record holders of any class of Common Stock, then the Holder of this Note will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such Holder could have acquired if such Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without regard to any limitations on conversion contained herein) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

9

5/26/22, 5:47 PM    Case 1:21-cv-11222-ER    Document 32-3    Filed 05/26/22    Page 45 of 101
https://www.sec.gov/Archives/edgar/data/866439/000168316818002976/dark_8k-ex1002.htm

(f)  <u>Notice of Adjustments</u>. Upon the occurrence of each adjustment or readjustment of the Conversion Price as a result of the events described in this Section 1.6, the Borrower, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Borrower shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon conversion of the Note.

1.7  [Intentionally Omitted].

1.8  Status as Shareholder. Upon submission of a Notice of Conversion by a Holder, (i) the shares covered thereby (other than the shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies (including, without limitation, (i) the right to receive Conversion Default Payments pursuant to Section 1.3 to the extent required thereby for such Conversion Default and any subsequent Conversion Default and (ii) the right to have the Conversion Price with respect to subsequent conversions determined in accordance with Section 1.3) for the Borrower's failure to convert this Note.

1.9  Prepayment. Subject to the terms of this Note, and provided that an Event of Default has not occurred under this Note, the Borrower may prepay the amounts outstanding hereunder pursuant to the following terms and conditions:

(a)  At any time during the period beginning on the Issue Date and ending on the date which is one hundred eighty (180) days following the Issue Date, the Borrower shall have the right, exercisable on not less than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full by making a payment to the Holder of an amount in cash equal to 130%, multiplied by the sum of: (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note plus (y) Default Interest, if any.

(b)  After the expiration of one hundred eighty (180) days following the date of the Note, the Borrower shall have no right of prepayment.

10

## ARTICLE II. CERTAIN COVENANTS

2.1 <u>Distributions on Capital Stock</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors.

2.2 <u>Restriction on Stock Repurchases</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any such shares.

2.3 <u>Borrowings</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, create, incur, assume guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any person, firm, partnership, joint venture or corporation, except by the endorsement of negotiable instruments for deposit or collection, or suffer to exist any liability for borrowed money, except (a) borrowings in existence or committed on the date hereof and of which the Borrower has informed Holder in writing prior to the date hereof, (b) indebtedness to trade creditors financial institutions or other lenders incurred in the ordinary course of business or (c) borrowings, the proceeds of which shall be used to repay this Note.

2.4 <u>Sale of Assets</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business. Any consent to the disposition of any assets may be conditioned on a specified use of the proceeds of disposition. This Section 2.4 shall not apply to the Borrower's disposition of the assets owned by the Borrower prior to April 27, 2018, the date of execution of the agreement and plan of merger between the Borrower and Darkpulse Technologies Inc.

2.5 <u>Advances and Loans</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, lend money, give credit or make advances to any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Borrower, except loans, credits or advances (a) in existence or committed on the date hereof and which the Borrower has informed Holder in writing prior to the date hereof, (b) made in the ordinary course of business or (c) not in excess of $100,000.

2.6 <u>3(a)(10) Transaction</u>. So long as this Note is outstanding, the Borrower shall not enter into any transaction or arrangement structured in accordance with, based upon, or related or pursuant to, in whole or in part, Section 3(a)(l0) of the Securities Act (a "3(a)(l0) Transaction"). In the event that the Borrower does enter into, or makes any issuance of Common Stock related to a 3(a) (l0) Transaction while this note is outstanding, a liquidated damages charge of 25% of the outstanding principal balance of this Note, but not less than Fifteen Thousand Dollars $15,000, will be assessed and will become immediately due and payable to the Holder at its election in the form of cash payment or addition to the balance of this Note.

2.7 <u>Preservation of Existence, etc.</u> The Borrower shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries (other than dormant Subsidiaries that have no or minimum assets) to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

2.8 <u>Non-circumvention</u>. The Borrower hereby covenants and agrees that the Borrower will not, by amendment of its Certificate or Articles of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all the provisions of this Note and take all action as may be required to protect the rights of the Holder.

11

## ARTICLE III. EVENTS OF DEFAULT

If any of the following events of default (each, an "Event of Default") shall occur:

3.1 <u>Failure to Pay Principal or Interest</u>. The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity, upon acceleration or otherwise.

3.2 <u>Conversion and the Shares</u>. The Borrower (i) fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, (iii) directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, (iv) fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion, (v) fails to remain current in its obligations to its transfer agent, (vi) causes a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent, (vii) fails to repay Holder, within forty eight (48) hours of a demand from the Holder, any amount of funds advanced by Holder to Borrower's transfer agent in order to process a conversion, and/or (viii) fails to maintain the Reserved Amount.

3.3 <u>Failure to Deliver Transaction Expense Amount</u>. The Borrower fails to deliver the Transaction Expense Amount (as defined in the Purchase Agreement) to the Holder within three (3) business days of the date such amount is due.

3.4 <u>Breach of Covenants</u>. The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of ten (10) days after written notice thereof to the Borrower from the Holder.

3.5 <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.6 <u>Receiver or Trustee</u>. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors or commence proceedings for its dissolution, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed for the Borrower or for a substantial part of its property or business without its consent and shall not be discharged within sixty (60) days after such appointment.

3.7 <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $50,000, and shall remain unvacated, unbonded or unstayed for a period of twenty

  (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

3.8 <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower, or the Borrower admits in writing its inability to pay its debts generally as they mature, or have filed against it an involuntary petition for bankruptcy relief, all under federal or state laws as applicable or the Borrower admits in writing its inability to pay its debts generally as they mature, or have filed against it an involuntary petition for bankruptcy relief, all under international, federal or state laws as applicable.

12

SA-86

3.9 <u>Delisting of Common Stock</u>. The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC Pink, OTCQB, Nasdaq National Market, Nasdaq Small Cap Market, New York Stock Exchange, NYSE MKT, or an equivalent replacement exchange

3.10 <u>Failure to Comply with the Exchange Act</u>. The Borrower shall fail to comply with the reporting requirements of the Exchange Act (including but not limited to becoming delinquent in its filings); and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

3.11 <u>Liquidation</u>. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.12 <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.13  <u>Maintenance of Assets</u>. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future), or any disposition or conveyance of any material asset of the Borrower.

3.14 <u>Financial Statement Restatement</u>. The restatement of any financial statements filed by the Borrower with the SEC for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.15 <u>Reverse Splits</u>. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

3.16  <u>Replacement of Transfer Agent</u>. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.17 <u>Cessation of Trading</u>. Any cessation of trading of the Common Stock on at least one of the OTC Pink, OTCQB, Nasdaq National Market, Nasdaq Small Cap Market, New York Stock Exchange, NYSE MKT, or an equivalent replacement exchange, and such cessation of trading shall continue for a period of five consecutive (5) Trading Days.

3.18 <u>Cross-Default</u>. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the Other Agreements (as defined herein), after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "Other Agreements" means, collectively, all agreements and instruments between, among or by: (1) the Borrower, and, or for the benefit of, (2) the Holder (and any affiliate of the Holder) or any other third party, including, without limitation, promissory notes; provided, however, the term "Other Agreements" shall not include the agreements and instruments defined as the Documents. Each of the loan transactions will be cross-defaulted with each other loan transaction and with all other existing and future debt of Borrower to the Holder.

3.19 <u>Bid Price</u>. The Borrower shall lose the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2) and/or a market (including the OTC Pink, OTCQB or an equivalent replacement exchange).

13

3.20 OTC Markets Designation. OTC Markets changes the Borrower's designation to 'No Information' (Stop Sign), 'Caveat Emptor' (Skull and Crossbones), or 'OTC', 'Other OTC' or 'Grey Market' (Exclamation Mark Sign).

3.21 Inside Information. Any attempt by the Borrower or its officers, directors, and/or affiliates to transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date.

3.22 Unavailability of Rule 144. If, at any time on or after the date which is six (6) months after the Issue Date, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent in order to facilitate the Holder's conversion of any portion of the Note into free trading shares of the Borrower's Common Stock pursuant to Rule 144, and (ii) thereupon deposit such shares into the Holder's brokerage account.

Upon the occurrence of any Event of Default specified in Sections 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16. 3.17, 3.18, 3.19, 3.20, 3.21, and/or 3.22 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to (i) 150% (EXCEPT WITH RESPECT TO SECTION 3.2 AND/OR 3.22, IN WHICH CASE 150% SHALL BE REPLACED WITH 200%) times the sum of (w) the then outstanding principal amount of this Note plus (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") plus (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) plus (z) any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment plus the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum") or (ii) at the option of the Holder, the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum in accordance with Article I, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of a breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date, multiplied by (b) the highest Trading Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity. Further, if a breach of Sections 3.9, 3.10 and/or 3.19 occurs or is continuing after the six (6) month anniversary of this Note, then the principal amount of the Note shall increase by Fifteen Thousand and No/100 United States Dollars ($15,000) (under Holder's and Borrower's expectation that any principal amount increase will tack back to the Issue Date) and the Holder shall be entitled to use the lowest Trading Price during the delinquency period as a base price for the conversion with the Variable Conversion Price shall be redefined to mean forty percent (40%) multiplied by the Market Price (at the option of the Holder), subject to adjustment as provided in this Note. For example, if the lowest Trading Price during the delinquency period is $0.01 per share and the conversion discount is 50%, then the Holder may elect to convert future conversions at $0.005 per share. If this Note is not paid at Maturity Date, then the outstanding principal due under this Note shall increase by Fifteen Thousand and No/100 United States Dollars ($15,000).

The Holder shall have the right at any time after the occurrence of an Event of Default, to require the Borrower to immediately issue, in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock of the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect, subject to the terms of this Note. This requirement by the Borrower shall automatically apply upon the occurrence of an Event of Default without the need for any party to give any notice or take any other action.

If the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then if the Holder prevails in such action, the Holder shall be reimbursed by the Borrower for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

14

5/26/22, 5:47 PM     Case 1:21-cv-11222-ER     Document 32-3     Filed 05/26/22     Page 59 of 101     https://www.sec.gov/Archives/edgar/data/866439/000168316818002976/dark_8k-ex1002.htm

ARTICLE IV. MISCELLANEOUS

4.1  Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2  Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Borrower, to: DarkPulse, Inc.

8760 Virginia Meadows Dr.
Manassas, VA 20109
Attn: Dennis O'Leary
E-mail: doleary@darkpulse.com

If to the Holder:

Auctus Fund, LLC
545 Boylston Street, 2nd Floor
Boston, MA 02116
Attn: Lou Posner
Facsimile: (617) 532-6420

With a copy to (which copy shall not constitute notice): Chad Friend, Esq., LL.M.

Legal & Compliance, LLC
330 Clematis Street, Suite 217
West Palm Beach, FL 33401
e-mail: CFriend@LegalandCompliance.com

15

5/26/22, 5:47 PM    Case 1:21-cv-11222-ER   Document 32-3   Filed 05/26/22   Page 51 of 71

4.3 <u>Amendments</u>. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument (and the other Notes issued pursuant to the Purchase Agreement) as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4 <u>Assignability</u>. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Neither the Borrower nor the Holder shall assign this Note or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Holder may assign its rights hereunder to any "accredited investor" (as defined in Rule 501(a) of the 1933 Act) in a private transaction from the Holder or to any of its "affiliates", as that term is defined under the 1934 Act, without the consent of the Borrower. Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a <u>bona fide</u> margin account or other lending arrangement. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

4.5 <u>Cost of Collection</u>. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

4.6 <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state courts of Massachusetts or in the federal courts located in the Commonwealth of Massachusetts. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **THE BORROWER HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY**. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

16

Case 23-78, Document 50, 07/31/2023, 3549426, Page92 of 151

4.7  <u>Certain Amounts</u>. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

4.8  <u>Purchase Agreement</u>. By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Purchase Agreement.

4.9  <u>Notice of Corporate Events</u>. Except as otherwise provided below, the Holder of this Note shall have no rights as a Holder of Common Stock unless and only to the extent that it converts this Note into Common Stock. The Borrower shall provide the Holder with prior notification of any meeting of the Borrower's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Borrower of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any proposed sale, lease or conveyance of all or substantially all of the assets of the Borrower or any proposed liquidation, dissolution or winding up of the Borrower, the Borrower shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Borrower shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.9 including, but not limited to, name changes, recapitalizations, etc. as soon as possible under law.

4.10  <u>Usury</u>. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable provision shall automatically be revised to equal the maximum rate of interest or other amount deemed interest permitted under applicable law. The Borrower covenants (to the extent that it may lawfully do so) that it will not seek to claim or take advantage of any law that would prohibit or forgive the Borrower from paying all or a portion of the principal or interest on this Note.

17

4.11 <u>Remedies</u>. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required. No provision of this Note shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of, and interest on, this Note at the time, place, and rate, and in the form, herein prescribed.

4.12 <u>Severability</u>. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

4.13 <u>Dispute Resolution</u>. In the case of a dispute as to the determination of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, Default Sum, Closing or Maturity Date, the closing bid price, or fair market value (as the case may be) or the arithmetic calculation of the Conversion Price or the applicable prepayment amount(s) (as the case may be), the Borrower or the Holder shall submit the disputed determinations or arithmetic calculations via facsimile (i) within two (2) Business Days after receipt of the applicable notice giving rise to such dispute to the Borrower or the Holder or (ii) if no notice gave rise to such dispute, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Borrower are unable to agree upon such determination or calculation within two (2) Business Days of such disputed determination or arithmetic calculation (as the case may be) being submitted to the Borrower or the Holder, then the Borrower shall, within two (2) Business Days, submit via facsimile (a) the disputed determination of the Conversion Price, the closing bid price, the or fair market value (as the case may be) to an independent, reputable investment bank selected by the Borrower and approved by the Holder or (b) the disputed arithmetic calculation of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, Default Sum to an independent, outside accountant selected by the Holder that is reasonably acceptable to the Borrower. The Borrower shall cause at its expense the investment bank or the accountant to perform the determinations or calculations and notify the Borrower and the Holder of the results no later than ten (10) Business Days from the time it receives such disputed determinations or calculations. Such investment bank's or accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

4.14 <u>Terms of Future Financings.</u> So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any security with any term more favorable to the holder of such security or with a term in favor of the holder of such security that was not similarly provided to the Holder in this Note, then the Borrower shall notify the Holder of such additional or more favorable term and such term, at Holder's option, shall become a part of the transaction documents with the Holder. The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, original issue discounts, stock sale price, private placement price per share, and warrant coverage.

4.15 <u>Piggyback Registration</u> Rights. The Borrower shall include on the next registration statement the Borrower files with SEC (or on the subsequent registration statement if such registration statement is withdrawn) all shares issuable upon conversion of this Note. Failure to do so will result in liquidated damages of 25% of the outstanding principal balance of this Note, but not less than Fifteen Thousand and No/100 United States Dollars ($15,000), being immediately due and payable to the Holder at its election in the form of cash payment or addition to the balance of this Note.

[signature page follows]

18

SA-92

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer as of the date first above written.

**DARKPULSE, INC.**

By: /s/ Dennis O'Leary

Name: Dennis O'Leary

Title: Chief Executive Officer

19

EXHIBIT A
NOTICE OF CONVERSION

The undersigned hereby elects to convert $ principal amount of the Note (defined below) together with $_of accrued and unpaid interest thereto, totaling $_into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of DarkPulse, Inc., a Delaware corporation (the "Borrower"), according to the conditions of the convertible note of the Borrower dated as of September 25, 2018 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]   The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal At Custodian system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

[ ]   The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

Name: [NAME]
Address: [ADDRESS]

Date of Conversion:
Applicable Conversion Price:                          $ _____
Number of Shares of Common Stock to be Issued Pursuant to
    Conversion of the Notes:                             _____
Amount of Principal Balance Due remaining Under the Note after
    this conversion:                                     _____
Accrued and unpaid interest remaining:                  _____

[HOLDER]

By: _____
Name: [NAME]
Title: [TITLE]
Date: [DATE]

20

**SA-94**

EX-4.1 2 darkpulse_8k-ex0401.htm FORM OF CONVERTIBLE PROMISSORY NOTE

**Exhibit 4.1**

**NEITHER THE ISSUANCE NOR SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

**Principal Amount: $105,000.00**                                    **Issue Date: February 5, 2019**
**Purchase Price: $94,500.00**
**Original Issue Discount: $10,500.00**

<u>**CONVERTIBLE PROMISSORY NOTE**</u>

      **FOR VALUE RECEIVED, DARKPULSE, INC.,** a Delaware corporation (hereinafter called the "Borrower") (Trading Symbol: DPLS), hereby promises to pay to the order of **CROWN BRIDGE PARTNERS, LLC,** a New York limited liability company, or registered assigns (the "Holder") the principal sum of up to $105,000.00 (the "Principal Amount"), together with interest at the rate of eight percent (8%) per annum (with the understanding that the first twelve months of interest of each tranche shall be guaranteed), at maturity or upon acceleration or otherwise, as set forth herein (the "Note"). The consideration to the Borrower for this Note is up to $94,500.00 (the "Consideration"). The Holder shall pay $31,500.00 of the Consideration (the "First Tranche") within a reasonable amount of time of the full execution of the transactional documents related to this Note. At the closing of the First Tranche, the outstanding principal amount under this Note shall be $35,000.00, consisting of the First Tranche plus the prorated portion of the OID (as defined herein). The Holder may pay, in its sole discretion, such additional amounts of the Consideration and at such dates as the Holder may choose in its sole discretion. **THE PRINCIPAL SUM DUE TO THE HOLDER SHALL BE PRORATED BASED ON THE CONSIDERATION ACTUALLY PAID BY THE HOLDER, THE APPLICABLE PORTION OF THE OID, AS WELL AS THE APPLICABLE FEES AND INTEREST.** The maturity date for each tranche funded shall be twelve (12) months from the effective date of each payment (each a "Maturity Date"), and is the date upon which the principal sum of each respective tranche, as well as any accrued and unpaid interest and other fees relating to that respective tranche, shall be due and payable. This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein. Any amount of principal or interest on this Note, which is not paid by the Maturity Date, shall bear interest at the rate of the lesser of (i) fifteen percent (15%) per annum or (ii) the maximum amount permitted by law from the due date thereof until the same is paid ("Default Interest"). Interest shall commence accruing on the date that the Note is fully paid and shall be computed on the basis of a 365-day year and the actual number of days elapsed. All payments due hereunder (to the extent not converted into the Borrower's common stock (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date. As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed.

      This Note carries a prorated original issue discount of up to $10,500.00 (the "OID"), to cover the Holder's accounting fees, due diligence fees, monitoring, and/or other transactional costs incurred in connection with the purchase and sale of the Note, which is included in the principal balance of this Note. Thus, the purchase price of this Note shall be up to $94,500.00, computed as follows: the Principal Amount minus the OID.

1

5/26/22, 5:46 PM                    Case 1:21-cv-11222-ER    Document 32-3    Filed 05/26/22    Page 57 of 71
https://www.sec.gov/Archives/edgar/data/866439/000168316819000375/darkpulse_8k-ex0401.htm

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

The following additional terms shall apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1        Conversion Right. The Holder shall have the right at any time to convert all or any part of the outstanding and unpaid principal amount and accrued and unpaid interest of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the conversion price (the "Conversion Price") determined as provided herein (a "Conversion"); provided, however, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock. For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower or Borrower's transfer agent by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, plus (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) plus (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

1.2        Conversion Price.

(a)        Calculation of Conversion Price. The Conversion Price shall be the Variable Conversion Price (as defined herein) (subject to equitable adjustments for stock splits, stock dividends or rights offerings by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events) (also subject to adjustment as further described herein). The "Variable Conversion Price" shall mean 70% multiplied by the Market Price (as defined herein) (representing a discount rate of 30%). "Market Price" means the lowest one (1) Trading Price (as defined below) for the Common Stock during the twenty (20) Trading Day period ending on the last complete Trading Day prior to the Conversion Date. "Trading Price" means, for any security as of any date, the lesser of the (i) lowest traded price or (ii) lowest closing bid price on the Over-the-Counter Pink Marketplace, OTCQB, or applicable trading market (the "OTCQB") as reported by a reliable reporting service ("Reporting Service") designated by the Holder (i.e. Bloomberg) or, if the OTCQB is not the principal trading market for such security, on the principal securities exchange or trading market where such security is listed or traded or, if the lowest intraday trading price of such security is not available in any of the foregoing manners, the lowest intraday price of any market makers for such security that are quoted on the OTC Markets. If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTCQB, or on the principal securities exchange or other securities market on which the Common Stock is then being traded. In the event that shares of the Borrower's Common Stock are not deliverable via DWAC following the conversion of any amount hereunder, an additional ten percent (10%) discount shall be factored into the Variable Conversion Price until this Note is no longer outstanding (resulting in a discount rate of 40% assuming no other adjustments are triggered hereunder.) Additionally, if the Borrower fails to comply with the reporting requirements of the Exchange Act (including but not limited to becoming late or delinquent in its filings, even if the Borrower subsequently cures such delinquency) at any time while after the Issue Date, and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act, an additional fifteen percent (15%) discount shall be factored into the Variable Conversion Price until this Note is no longer outstanding (resulting in a discount rate of 45% assuming no other adjustments are triggered hereunder.)

SA-96

2

5/26/22, 5:46 PM
https://www.sec.gov/Archives/edgar/data/866439/000168316819000375/darkpulse_8k-ex0401.htm

Case 1:21-cv-11222-ER Document 32-3 Filed 05/26/22 Page 59 of 71

Each time, while this Note is outstanding, the Borrower enters into a Section 3(a)(9) transaction (including but not limited to the issuance of new promissory notes or of a replacement promissory note), or Section 3(a)(10) transaction, in which any 3rd party has the right to convert monies owed to that 3rd party (or receive shares pursuant to a settlement or otherwise) at a discount to market greater than the Variable Conversion Price in effect at that time (prior to all other applicable adjustments in the Note), then the Variable Conversion Price shall be automatically adjusted to such greater discount percentage (prior to all applicable adjustments in this Note) until this Note is no longer outstanding. Each time, while this Note is outstanding, the Borrower enters into a Section 3(a)(9) transaction (including but not limited to the issuance of new promissory notes or of a replacement promissory note), or Section 3(a)(10) transaction, in which any 3rd party has a look back period greater than the look back period in effect under the Note at that time, then the Holder's look back period shall automatically be adjusted to such greater number of days until this Note is no longer outstanding. The Borrower shall give written notice to the Holder, with the adjusted Variable Conversion Price and/or adjusted look back period (each adjustment that is applicable due to the triggering event), within one (1) business day of an event that requires any adjustment described in the two immediately preceding sentences.

Holder shall be entitled to deduct $750.00 from the conversion amount in each Notice of Conversion to cover Holder's deposit fees associated with each Notice of Conversion.

If at any time the Conversion Price as determined hereunder for any conversion would be less than the par value of the Common Stock, then at the sole discretion of the Holder, the Conversion Price hereunder may equal such par value for such conversion and the Conversion Amount for such conversion may be increased to include Additional Principal, where "Additional Principal" means such additional amount to be added to the Conversion Amount to the extent necessary to cause the number of conversion shares issuable upon such conversion to equal the same number of conversion shares as would have been issued had the Conversion Price not been adjusted by the Holder to the par value price.

(b) <u>Authorized Shares</u>. The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note. The Borrower is required at all times to have authorized and reserved ten times the number of shares that is actually issuable upon full conversion of the Note (based on the Conversion Price of the Notes in effect from time to time)(the "Reserved Amount"). The Reserved Amount shall be increased from time to time in accordance with the Borrower's obligations hereunder. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Notes. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note.

If, at any time the Borrower does not maintain the Reserved Amount it will be considered an Event of Default under Section 3.2 of the Note.

1.3 <u>Method of Conversion</u>.

(a) <u>Mechanics of Conversion</u>. Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by (A) submitting to the Borrower or Borrower's transfer agent a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 11:59 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower.

3

(b)  Surrender of Note Upon Conversion. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted. The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie*, be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid principal amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c)  Payment of Taxes. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d)  Delivery of Common Stock Upon Conversion. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within two (2) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof.

(e)  Obligation of Borrower to Deliver Common Stock. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is sent to the Borrower or Borrower's transfer agent before 11:59 p.m., New York, New York time, on such date.

(f)  Delivery of Common Stock by Electronic Transfer. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal Agent Commission ("DWAC") system.

4

(g)   Failure to Deliver Common Stock Prior to Deadline. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly the parties acknowledge that the liquidated damages provision contained in this Section 1.4(g) are justified.

(h)   DTC; Market Loss. If the Borrower fails to maintain its status as "DTC Eligible" for any reason, or, if at any time while this Note is outstanding the Conversion Price is equal to or lower than $0.01, then an additional twenty-five percent (25%) discount shall be factored into the Variable Conversion Price until this Note is no longer outstanding (resulting in a discount rate of 55%, assuming no other adjustments are triggered hereunder).

1.4        Concerning the Shares. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144 under the Act (or a successor rule) ("Rule 144") or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor. Except as otherwise provided (and subject to the removal provisions set forth below), until such time as the shares of Common Stock issuable upon conversion of this Note have been registered under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for shares of Common Stock issuable upon conversion of this Note that has not been so included in an effective registration statement or that has not sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

**"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if (i) the Borrower or its transfer agent shall have received an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be accepted by the Borrower so that the sale or transfer is effected or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold. In the event that the Borrower does not accept the opinion of counsel provided by the Holder with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

5

1.5      [Intentionally Omitted].

1.6      <u>Status as Shareholder</u>. Upon submission of a Notice of Conversion by a Holder, (i) the shares covered thereby (other than the shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies (including, without limitation, (i) the right to receive Conversion Default Payments pursuant to Section 1.3 to the extent required thereby for such Conversion Default and any subsequent Conversion Default and (ii) the right to have the Conversion Price with respect to subsequent conversions determined in accordance with Section 1.3) for the Borrower's failure to convert this Note.

ARTICLE II. CERTAIN COVENANTS

2.1      <u>Distributions on Capital Stock</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors.

2.2      <u>Restriction on Stock Repurchases</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any such shares.

ARTICLE III. EVENTS OF DEFAULT

If any of the following events of default (each, an "Event of Default") shall occur:

3.1      <u>Failure to Pay Principal or Interest</u>. The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity, upon acceleration or otherwise, and such breach continues for a period of five (5) days.

3.2      <u>Conversion and the Shares</u>. The Borrower fails to reserve a sufficient amount of shares of common stock as required under the terms of this Note (including Section 1.3 of this Note) and such breach continues for a period of five (5) days, fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, the Borrower directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, or fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for two (2) business days after the Holder shall have delivered a Notice of Conversion. It is an obligation of the Borrower to remain current in its obligations to its transfer agent. It shall be an event of default of this Note, if a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent. If at the option of the Holder, the Holder advances any funds to the Borrower's transfer agent in order to process a conversion, such advanced funds shall be paid by the Borrower to the Holder within five (5) business days of a demand from the Holder, either in cash or as an addition to the balance of the Note, and such choice of payment method is at the discretion of the Borrower.

SA-101

6

3.3    Breach of Covenants. The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents and such breach continues for a period of ten (10) days after written notice thereof to the Borrower from the Holder.

3.4    Breach of Representations and Warranties. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith, shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note.

3.5    Receiver or Trustee. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed.

3.6    Judgments. Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $50,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

3.7    Bankruptcy. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower.

3.8    Delisting of Common Stock. The Borrower shall fail to maintain the listing or quotation of the Common Stock on the OTCQB or an equivalent replacement exchange, the Nasdaq Global Market, the Nasdaq Capital Market, the New York Stock Exchange, or the NYSE MKT.

3.9    Failure to Comply with the Exchange Act. The Borrower shall fail to comply with the reporting requirements of the Exchange Act (including but not limited to becoming late or delinquent in its filings at any time while this Note is outstanding, even if the Borrower subsequently cures such delinquency), and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

3.10    Liquidation. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.11    Cessation of Operations. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due, or any disposition or conveyance of any material asset of the Borrower.

3.12    Financial Statement Restatement. The Borrower replaces its auditor, or any restatement of any financial statements filed by the Borrower with the SEC for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note.

3.13    Replacement of Transfer Agent. In the event that the Borrower replaces its transfer agent, and the Borrower fails to provide prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.14    Cross-Default. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the other financial instrument, including but not limited to all convertible promissory notes, currently issued, or hereafter issued, by the Borrower, to the Holder or any other 3rd party (the "Other Agreements"), after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note, in which event the Holder shall be entitled to apply all rights and remedies of the Holder under the terms of this Note by reason of a default under said Other Agreement or hereunder.

7

3.15    Inside Information. Any attempt by the Borrower or its officers, directors, and/or affiliates to transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date.

3.16    No bid. At any time while this Note is outstanding, the lowest Trading Price on the OTCQB or other applicable principal trading market for the Common Stock is equal to or less than $0.0001.

Upon the occurrence of any Event of Default specified in Sections 3.1, 3.2, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, and/or 3.16 exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to 150% multiplied by the then outstanding entire balance of the Note (including principal and accrued and unpaid interest) plus Default Interest, if any, plus any amounts owed to the Holder pursuant to Sections 1.4(g) hereof (collectively, in the aggregate of all of the above, the "Default Amount"), and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity.

If the Borrower fails to pay the Default Amount within one (1) business day of written notice that such amount is due and payable, then the Holder shall have the right at any time, to require the Borrower, upon written notice, to immediately issue, in lieu of the Default Amount, the number of shares of Common Stock of the Borrower equal to the Default Amount divided by the Conversion Price then in effect, subject to issuance in tranches due to the beneficial ownership limitations contained in this Note.

ARTICLE IV. MISCELLANEOUS

4.1    Failure or Indulgence Not Waiver. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2    Notices. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, facsimile, or electronic mail addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery, upon electronic mail delivery, or delivery by facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

If to the Borrower, to:

DARKPULSE, INC.
350 5th Ave., 59th Fl.
New York, NY 10018
e-mail: doleary@darkpulse.com

If to the Holder:

CROWN BRIDGE PARTNERS, LLC
1173a 2nd Avenue, Suite 126
New York, NY 10065
e-mail: Info@CrownBridgeCapital.com

8

4.3     Amendments. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument as originally executed, or if later amended or supplemented, then as so amended or supplemented.

4.4     Assignability. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Notwithstanding anything to the contrary herein, the rights, interests or obligations of the Borrower hereunder may not be assigned, by operation of law or otherwise, in whole or in part, by the Borrower without the prior signed written consent of the Holder, which consent may be withheld at the sole discretion of the Holder (any such assignment or transfer shall be null and void if the Borrower does not obtain the prior signed written consent of the other Holder). This Note or any of the severable rights and obligations inuring to the benefit of or to be performed by Holder hereunder may be assigned by Holder to a third party, in whole or in part, without the need to obtain the Company's consent thereto. Each transferee of this Note must be an "accredited investor" (as defined in Rule 501(a) of the 1933 Act). Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a bona fide margin account or other lending arrangement.

4.5     Cost of Collection. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof costs of collection, including reasonable attorneys' fees.

4.6     Governing Law. This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state and/or federal courts of New York City, NY. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon forum non conveniens. The Borrower and Holder waive trial by jury. The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

4.7     Certain Amounts. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

4.8     Remedies. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required.

9

SA-107

4.9      <u>Prepayment</u>. Notwithstanding anything to the contrary contained in this Note, the Borrower may prepay any amount outstanding under each tranche of this Note, during the initial 60 calendar day period after the issuance of the respective tranche of this Note, by making a payment to the Holder of an amount in cash equal to 125% multiplied the amount that the Borrower is prepaying, subject to the Holder's prior written acceptance in Holder's sole discretion. Notwithstanding anything to the contrary contained in this Note, the Borrower may prepay any amount outstanding under each tranche of this Note, during the 61st through 120 calendar day period after the issuance of the respective tranche of this Note, by making a payment to the Holder of an amount in cash equal to 140% multiplied the amount that the Borrower is prepaying, subject to the Holder's prior written acceptance in Holder's sole discretion. Notwithstanding anything to the contrary contained in this Note, the Borrower may prepay any amount outstanding under each tranche of this Note, during the 121st through 180 calendar day period after the issuance of the respective tranche of this Note, by making a payment to the Holder of an amount in cash equal to 150% multiplied the amount that the Borrower is prepaying, subject to the Holder's prior written acceptance in Holder's sole discretion. The Borrower may not prepay any amount outstanding under each tranche of this Note after the 180th calendar day after the issuance of the respective tranche of this Note.

4.10      <u>Usury</u>. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable provision shall automatically be revised to equal the maximum rate of interest or other amount deemed interest permitted under applicable law. The Borrower covenants (to the extent that it may lawfully do so) that it shall not seek to claim or take advantage of any law that would prohibit or forgive the Borrower from paying all or a portion of the principal or interest on this Note.

4.11      <u>Section 3(a)(10) Transactions</u>. If at any time while this Note is outstanding, the Borrower enters into a transaction structured in accordance with, based upon, or related or pursuant to, in whole or in part, Section 3(a)(10) of the Securities Act (a "3(a)(10) Transaction"), then a liquidated damages charge of 25% of the outstanding principal balance of this Note at that time, will be assessed and will become immediately due and payable to the Holder, either in the form of cash payment or as an addition to the balance of the Note, as determined by mutual agreement of the Borrower and Holder.

4.12      <u>Reverse Split Penalty</u>. If at any time while this Note is outstanding, the Borrower effectuates a reverse split with respect to the Common Stock, then a liquidated damages charge of 15% of the outstanding principal balance of this Note at that time, will be assessed and will become immediately due and payable to the Holder, either in the form of cash payment or as an addition to the balance of the Note, as determined by mutual agreement of the Borrower and Holder.

4.13      <u>[Intentionally Omitted]</u>.

4.14      <u>Terms of Future Financings</u>. While the Note or any principal amount, interest or fees or expenses due thereunder remain outstanding and unpaid, the Borrower shall not enter into any public or private offering of its securities (including securities convertible into shares of Common Stock) with any individual or entity (an "Other Investor") that has the effect of establishing rights or otherwise benefiting such Other Investor in a manner more favorable in any material respect to such Other Investor than the rights and benefits established in favor of the Holder or the Note unless, in any such case, the Holder has been provided with such rights and benefits pursuant to a definitive written agreement or agreements between the Borrower and the Holder.

*[signature page to follow]*

10

SA-108

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer this February 5, 2019.

**DARKPULSE, INC.**

By: _____
Name: <u>Dennis O'Leary</u>
Title: <u>Chief Executive Officer</u>

---

11

SA-109

**EXHIBIT A -- NOTICE OF CONVERSION**

        The undersigned hereby elects to convert $ _____ principal amount of the Note (defined below) into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of DARKPULSE, INC., a Delaware corporation (the "Borrower") according to the conditions of the convertible note of the Borrower dated as of February 5, 2019 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[ ]    The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal Agent Commission system ("DWAC Transfer").

        Name of DTC Prime Broker:
        Account Number:

[ ]    The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

        CROWN BRIDGE PARTNERS, LLC
        1173a 2nd Avenue, Suite 126
        New York, NY 10065
        e-mail: Info@CrownBridgeCapital.com

        Date of Conversion:          _____
        Applicable Conversion Price:   $ _____
        Number of Shares of Common Stock to be Issued
        Pursuant to Conversion of the Notes:  _____
        Amount of Principal Balance Due remaining Under
        the Note after this conversion:     _____

        CROWN BRIDGE PARTNERS, LLC

        By: _____
        Name: _____
        Title: _____
        Date: _____

12

SA-110

# EXHIBIT G

8-K 1 darkpulse_8k.htm CURRENT REPORT

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
**Washington, DC 20549**

## FORM 8-K

CURRENT REPORT
Pursuant to Section 13 OR 15(d) of the Securities and Exchange Act of 1934

Date of Report (Date of earliest event reported): April 26, 2021

Commission File Number 000-18730

## DARKPULSE, INC.
(Exact name of small business issuer as specified in its charter)

| Delaware | 87-0472109 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1345 Ave of the Americas, 2nd Floor, New York, NY 10105**
(Address of principal executive offices)

**800-436-1436**
(Issuer's telephone number)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instructions A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Not applicable. | | |

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

SA-112

**Item 1.01    Entry into a Material Definitive Agreement.**

*FirstFire Convertible Promissory Note*

On July 26, 2021, DarkPulse, Inc., a Delaware corporation (the "**Company**"), entered a Securities Purchase Agreement (the "**SPA**") and Registration Rights Agreement (the "**Registration Rights Agreement**") with FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, a Delaware limited liability company (the "**Lender**"), pursuant to which the Company issued to the Lender Convertible Promissory Note in the principal amount of $825,000 (the "**Note**"). The purchase price of the Note is $750,000. The Note matures on January 26, 2022 upon which time all accrued and unpaid interest will be due and payable. Interest accrues on the Note at 10% per annum guaranteed until the Note becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. The Note is convertible at any time after 180 days from issuance, upon the election of the Lender, into shares of the Company's Common Stock at $0.015 per share. The Note is subject to various "Events of Default," which are disclosed in the Note. Upon the occurrence of an "Event of Default," the conversion price will become $0.005. In the event of a DTC "chill" on the Company's shares, an additional discount of 10% will apply to the conversion price while the "chill" is in effect. Upon the issuance of the Note, the Company has initially agreed to reserve 550,000,000 shares of Common Stock.

The Registration Rights Agreement provides that the Company shall (i) use its best efforts to file with the Securities and Exchange Commission (the "**Commission**") an S-1 Registration Statement within 90 days of the date of the Registration Rights Agreement to register the shares into which the Note is convertible; and (ii) have the Registration Statement declared effective by the Commission within 180 days after the date the Registration Statement is filed with the Commission.

The Lender delivered to the Company appropriate investment representations with respect to the Note and consented to the imposition of a restrictive legend upon the Note and conversion shares, unless registered pursuant to the Registration Rights Agreement. The Lender did not enter into the transaction with the Company as a result of or subsequent to any advertisement, article, notice, or other communication published in any newspaper, magazine, or similar media or broadcast on television or radio, or presented at any seminar or meeting. The Lender was also afforded the opportunity to ask questions of management and to receive answers concerning the terms and conditions of the transaction. The securities were issued without registration under the Securities Act of 1933, as amended, by reason of the exemption from registration afforded by the provisions of Section 4(a)(2) thereof, and Rule 506(b) promulgated thereunder, as a transaction by an issuer not involving any public offering. Selling commissions in the amount of $15,000 were paid to J.H. Darbie & Co.

**Item 2.03    Creation of a Direct Financial Obligation or an Obligation under an Off-Balance Sheet Arrangement of a Registrant.**

The disclosure contained in Item 1.01 herein is incorporated by reference into this Item 2.03.

**Item 3.02    Unregistered Sales of Equity Securities.**

The disclosure contained in Item 1.01 herein is incorporated by reference into this Item 3.02.

**Item 7.01    Regulation FD Disclosure.**

On May 5, 2021, DarkPulse, Inc., a Delaware corporation (the "**Company**"), issued press release which announced the transaction with FirstFire. Pursuant to the rules and regulations of the Securities and Exchange Commission (the "**SEC**"), the information in this Item 7.01 disclosure, including Exhibit 99.1, and the information set forth therein, is deemed to have been furnished to, and shall not be deemed to be "filed" with, the SEC.

2

SA-113

The press release may contain forward-looking statements. Such forward-looking statements are based on information presently available to the Company's management and are current only as of the date made. Actual results could also differ materially from those anticipated as a result of a number of factors, including, but not limited to, those discussed in the Company's Annual Report on Form 10-K for the year ended December 31, 2020, and subsequent reports filed by the Company with the SEC. For those reasons, undue reliance should not be placed on any forward-looking statement. The Company assumes no duty or obligation to update or revise any forward-looking statement, although it may do so from time to time as management believes is warranted or as may be required by applicable securities law. Any such updates or revisions may be made by the registrant by filing reports with the SEC, through the issuance of press releases or by other methods of public disclosure.

**Item 9.01          Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated May 5, 2021 |

### SIGNATURES

Pursuant to the requirements of the Securities Exchange Act 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**DarkPulse, Inc.**

Date: May 5, 2021                    By:      */s/ Dennis O'Leary*
                                             Dennis O'Leary, Chief Executive Officer

3

SA-114

# EXHIBIT H

SA-115

**UNITED STATES**
**SECURITIES AND EXCHANGE COMMISSION**
Washington, DC 20549

# FORM 8-K

CURRENT REPORT
Pursuant to Section 13 OR 15(d) of the Securities and Exchange Act of 1934

Date of Report (Date of earliest event reported): February 7, 2022

Commission File Number 000-18730

## DARKPULSE, INC.
(Exact name of small business issuer as specified in its charter)

| Delaware | 87-0472109 |
|---|---|
| (State or other jurisdiction of incorporation or organization) | (I.R.S. Employer Identification No.) |

**1345 Ave of the Americas, 2nd Floor, New York, NY 10105**
(Address of principal executive offices)

**800-436-1436**
(Issuer's telephone number)

Check the appropriate box below if the Form 8-K filing is intended to simultaneously satisfy the filing obligation of the registrant under any of the following provisions (see General Instructions A.2. below):

☐ Written communications pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

☐ Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

☐ Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

☐ Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c))

Securities registered pursuant to Section 12(b) of the Act:

| Title of each class | Trading Symbol(s) | Name of each exchange on which registered |
|---|---|---|
| Not applicable. | | |

Indicate by check mark whether the registrant is an emerging growth company as defined in as defined in Rule 405 of the Securities Act of 1933 (§230.405 of this chapter) or Rule 12b-2 of the Securities Exchange Act of 1934 (§240.12b-2 of this chapter).

Emerging growth company ☐

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. ☐

SA-116

**Item 7.01**        **Regulation FD Disclosure.**

On February 7, 2022, DarkPulse, Inc., a Delaware corporation (the "**Company**"), issued press release which announced entering into a lease agreement for its new corporate headquarters in Houston, Texas. A copy of the press release is attached hereto as Exhibit 99.1, and is incorporated herein by reference. Pursuant to the rules and regulations of the Securities and Exchange Commission (the "**SEC**"), the information in this Item 7.01 disclosure, including Exhibit 99.1, and the information set forth therein, is deemed to have been furnished to, and shall not be deemed to be "filed" with, the SEC.

The press release may contain forward-looking statements. Such forward-looking statements are based on information presently available to the Company's management and are current only as of the date made. Actual results could also differ materially from those anticipated as a result of a number of factors, including, but not limited to, those discussed in the Company's Annual Report on Form 10-K for the year ended December 31, 2020, and subsequent reports filed by the Company with the SEC. For those reasons, undue reliance should not be placed on any forward-looking statement. The Company assumes no duty or obligation to update or revise any forward-looking statement, although it may do so from time to time as management believes is warranted or as may be required by applicable securities law. Any such updates or revisions may be made by the registrant by filing reports with the SEC, through the issuance of press releases or by other methods of public disclosure.

**Item 9.01**        **Financial Statements and Exhibits.**

(d) Exhibits.

| Exhibit No. | Description |
|---|---|
| 99.1 | Press Release dated February 7, 2022 |
| 104 | Cover Page Interactive Data File (formatted in Inline XBRL) |

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned, thereunto duly authorized.

**DarkPulse, Inc.**

Date: February 7, 2022                    By:    */s/ Dennis O'Leary*

Dennis O'Leary, Chief Executive Officer

2

SA-117

# EXHIBIT L

SA-118

# Department of State
## Division of Corporations

### Entity Search Results

**A total of 2 entities were found. If the entity name you are searching is not displayed please refine the search.**

Search

| Name | DOS ID # | Assumed Name ID # | Status | Entity Type | Date of First Filing | County |
|------|----------|-------------------|--------|-------------|---------------------|--------|
| DARKPULSE TECHNOLOGIES INTERNATIONAL INC | 5198336 | | Active | DOMESTIC BUSINESS CORPORATION | 09/07/2017 | New York |
| DARKPULSE TECHNOLOGY HOLDINGS INC | 5165601 | | Active | DOMESTIC BUSINESS CORPORATION | 07/06/2017 | New York |

Rows per page: 5 ▾   1-2 of 2   ‹ ›

Return to Search

SA-119

# EXHIBIT P

| SA-120 |

8-K 1 form8-k.htm

---

# UNITED STATES
# SECURITIES AND EXCHANGE COMMISSION
**Washington, D.C. 20549**

# FORM 8-K

CURRENT REPORT

**Pursuant to Section 13 or 15(d) of the Securities and Exchange Act of 1934**

**Date of Report (Date of earliest event reported): January 10, 2019**

# VISIUM TECHNOLOGIES, INC.
(Exact name of Registrant as specified in its charter)

| Florida | 000-25753 | 87-04496677 |
|---|---|---|
| **(State or other jurisdiction of incorporation)** | **(Commission File Number)** | **(IRS Employer Identification No.)** |

**11325 Random Hills Road, Suite 360**
**Fairfax, Virginia 22030**
**(Address of principal executive offices, including zip code)**

**(703) 225-3443**
**(Registrant's telephone number, including area code)**

Check the appropriate box below if the 8-K filing is intended to simultaneously satisfy the filing obligations of the registrant under any of the following provisions:

[  ]  Written communication pursuant to Rule 425 under the Securities Act (17 CFR 230.425)

[  ]  Soliciting material pursuant to Rule 14a-12 under the Exchange Act (17 CFR 240.14a-12)

[  ]  Pre-commencement communications pursuant to Rule 14d-2(b) under the Exchange Act (17 CFR 240.14d-2(b))

[  ]  Pre-commencement communications pursuant to Rule 13e-4(c) under the Exchange Act (17 CFR 240.13e-4(c)).

Indicate by check mark whether the registrant is an emerging growth company as defined in Rule 405 of the Securities Act of 1933 (17 CFR §230.405) or Rule 12b-2 of the Securities Exchange Act of 1934 (17 CFR §240.12b-2).

Emerging growth company [  ]

If an emerging growth company, indicate by check mark if the registrant has elected not to use the extended transition period for complying with any new or revised financial accounting standards provided pursuant to Section 13(a) of the Exchange Act. [  ]

**Item 1.01 Entry into a Material Definitive Agreement**

On January 10, 2019, Visium Technologies, Inc., a Florida corporation (the "Company"), entered into that certain securities purchase agreement (the "Agreement") with Auctus Fund, LLC, a Delaware limited liability company (the "Holder"), whereby the Holder purchased from the Company, for a purchase price of $150,000 (the "Purchase Price") (i) an 8% senior convertible promissory note in the principal amount of $150,000.00 (the "Note") convertible into shares of the Company's common stock (the "Common Stock"); and (ii) a warrant to purchase 250,000 shares of the Company's Common Stock, exercisable at a price of $0.15, subject to adjustment, per share over the course of a three year term (the "Warrant", and together with the Note, the "Securities"). The Warrant provides for a cashless exercise provision. The closing occurred following the satisfaction of customary closing conditions.

The Note matures twelve (12) months from the date of issuance and may be prepaid at any time pursuant to the terms of the Note. The Note is convertible into shares of the Company's Common Stock at a price (the "Conversion Price") equal to the lower of (i) $0.15 per share or (ii) 65% multiplied by the lowest traded price of the Common Stock during the ten (10) consecutive Trading Day period (as defined in the Note) immediately preceding the Trading Day that the Company receives a notice of conversion (the "Variable Conversion Price"). The Conversion Price may further be adjusted in connection with the terms of the Note.

The above descriptions of the Agreement, the Note and the Warrant do not purport to be complete and are qualified in their entirety by the full text of the forms of such documents, which are provided as exhibits 10.1, 10.2 and 4.1, respectively, to this Current Report on Form 8-K, and are incorporated herein by reference.

**Item 3.02 Unregistered Sales of Equity Securities.**

The applicable information set forth in Item 1.01 of this Current Report on Form 8-K is incorporated by reference in this Item 3.02. The issuance of the Securities set forth herein was made in reliance on the exemption provided by Section 4(a)(2) of the Securities Act for the offer and sale of securities not involving a public offering. The Company's reliance upon Section 4(a)(2) of the Securities Act in issuing the Securities was based upon the following factors: (a) the issuance of the Securities was an isolated private transaction by us which did not involve a public offering; (b) there was only one recipient; (c) there were no subsequent or contemporaneous public offerings of the Securities by the Company; (d) the Securities were not broken down into smaller denominations; (e) the negotiations for the issuance of the Securities took place directly between the individual and the Company; and (f) the recipient of the Securities is an accredited investor.

**Item 9.01. Financial Statements and Exhibits.**

| Exhibit Number | Description |
| --- | --- |
| 4.1* | Form of Warrant issued to Auctus Fund, LLC |
| 10.1* | Securities Purchase Agreement by and between the Company and Auctus Fund, LLC, |
| 10.2* | Form of Promissory Note issued to Auctus Fund, LLC, |

*\* filed herewith*

SA-122

**SIGNATURES**

Pursuant to the requirements of the Securities Exchange Act of 1934, the registrant has duly caused this report to be signed on its behalf by the undersigned hereunto duly authorized.

Date: January 16, 2019

VISIUM TECHNOLOGIES, INC.

By: */s/ Mark Lucky*

Mark Lucky
Chief Financial Officer

SA-123

SA-124

EX-10.2 4 ex10-2.htm

**NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE CONVERTIBLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES.**

**Principal Amount: US$150,000.00**                                               **Issue Date: January 7, 2019**
**Purchase Price: US$150,000.00**

## SENIOR CONVERTIBLE PROMISSORY NOTE

FOR VALUE RECEIVED, **VISIUM TECHNOLOGIES, INC.**, a Florida corporation (hereinafter called the "Borrower") (Trading Symbol: VISM), hereby promises to pay to the order of **AUCTUS FUND, LLC**, a Delaware limited liability company, or registered assigns (the "Holder") the sum of US$150,000.00 together with any interest as set forth herein, on January 7, 2020 (the "Maturity Date"), and to pay interest on the unpaid principal balance hereof at the rate of eight percent (8%) (the "Interest Rate") per annum from the date hereof (the "Issue Date") until the same becomes due and payable, whether at maturity or upon acceleration or by prepayment or otherwise. This Note may not be prepaid in whole or in part except as otherwise explicitly set forth herein with the written consent of the Holder which may be withheld for any reason or for no reason. Any amount of principal or interest on this Note which is not paid when due shall bear interest at the rate of the lesser of (i) twenty-four percent (24%) per annum and (ii) the maximum amount permitted under law from the due date thereof until the same is paid (the "Default Interest"). Interest shall commence accruing on the date that the Note is fully paid and shall be computed on the basis of a 360-day year and the actual number of days elapsed. All payments due hereunder (to the extent not converted into common stock, $0.0001 par value per share (the "Common Stock") in accordance with the terms hereof) shall be made in lawful money of the United States of America. All payments shall be made at such address as the Holder shall hereafter give to the Borrower by written notice made in accordance with the provisions of this Note. Whenever any amount expressed to be due by the terms of this Note is due on any day which is not a business day, the same shall instead be due on the next succeeding day which is a business day and, in the case of any interest payment date which is not the date on which this Note is paid in full, the extension of the due date thereof shall not be taken into account for purposes of determining the amount of interest due on such date. As used in this Note, the term "business day" shall mean any day other than a Saturday, Sunday or a day on which commercial banks in the city of New York, New York are authorized or required by law or executive order to remain closed. Each capitalized term used herein, and not otherwise defined, shall have the meaning ascribed thereto in that certain Securities Purchase Agreement dated the date hereof, pursuant to which this Note was originally issued (the "Purchase Agreement").

SA-125

This Note is free from all taxes, liens, claims and encumbrances with respect to the issue thereof and shall not be subject to preemptive rights or other similar rights of shareholders of the Borrower and will not impose personal liability upon the holder thereof.

This Note shall be a senior obligation of the Company, with priority over all future Indebtedness (as defined below) of the Company as provided for herein. "Indebtedness" means (a) all indebtedness of the Borrower for borrowed money or for the deferred purchase price of property or services, including any type of letters of credit, but not including deferred purchase price obligations in place as of the Issue Date and as disclosed in the SEC Documents or obligations to trade creditors incurred in the ordinary course of business, (b) all obligations of the Borrower evidenced by notes, bonds, debentures or other similar instruments, (c) purchase money indebtedness hereafter incurred by the Borrower to finance the purchase of fixed or capital assets, including all capital lease obligations of the Borrower which do not exceed the purchase price of the assets funded, (d) all guarantee obligations of the Borrower in respect of obligations of the kind referred to in clauses (a) through (c) above that the Borrower would not be permitted to incur or enter into, and (e) all obligations of the kind referred to in clauses (a) through (d) above that the Borrower is not permitted to incur or enter into that are secured and/or unsecured by (or for which the holder of such obligation has an existing right, contingent or otherwise, to be secured and/or unsecured by) any lien or encumbrance on property (including accounts and contract rights) owned by the Borrower, whether or not the Borrower has assumed or become liable for the payment of such obligation.

The following terms shall also apply to this Note:

## ARTICLE I. CONVERSION RIGHTS

1.1 <u>Conversion Right</u>. The Holder shall have the right from time to time, and at any time following the Issue Date, and ending on the later of (i) the Maturity Date and (ii) the date of payment of the Default Amount (as defined in Article III) pursuant to Section 1.6(a) or Article III, each in respect of the remaining outstanding principal amount of this Note to convert all or any part of the outstanding and unpaid principal amount of this Note into fully paid and non-assessable shares of Common Stock, as such Common Stock exists on the Issue Date, or any shares of capital stock or other securities of the Borrower into which such Common Stock shall hereafter be changed or reclassified at the Conversion Price (as defined below) determined as provided herein (a "Conversion"); <u>provided</u>, <u>however</u>, that in no event shall the Holder be entitled to convert any portion of this Note in excess of that portion of this Note upon conversion of which the sum of (1) the number of shares of Common Stock beneficially owned by the Holder and its affiliates (other than shares of Common Stock which may be deemed beneficially owned through the ownership of the unconverted portion of the Notes or the unexercised or unconverted portion of any other security of the Borrower subject to a limitation on conversion or exercise analogous to the limitations contained herein) and (2) the number of shares of Common Stock issuable upon the conversion of the portion of this Note with respect to which the determination of this proviso is being made, would result in beneficial ownership by the Holder and its affiliates of more than 4.99% of the outstanding shares of Common Stock. For purposes of the proviso to the immediately preceding sentence, beneficial ownership shall be determined in accordance with Section 13(d) of the Securities Exchange Act of 1934, as amended (the "Exchange Act"), and Regulations 13D-G thereunder, except as otherwise provided in clause (1) of such proviso. The number of shares of Common Stock to be issued upon each conversion of this Note shall be determined by dividing the Conversion Amount (as defined below) by the applicable Conversion Price then in effect on the date specified in the notice of conversion, in the form attached hereto as Exhibit A (the "Notice of Conversion"), delivered to the Borrower by the Holder in accordance with Section 1.4 below; provided that the Notice of Conversion is submitted by facsimile or e-mail (or by other means resulting in, or reasonably expected to result in, notice) to the Borrower before 11:59 p.m., New York, New York time on such conversion date (the "Conversion Date"). The term "Conversion Amount" means, with respect to any conversion of this Note, the sum of (1) the principal amount of this Note to be converted in such conversion plus (2) at the Holder's option, accrued and unpaid interest, if any, on such principal amount at the interest rates provided in this Note to the Conversion Date, provided however, that the Borrower shall have the right to pay any or all interest in cash <u>plus</u> (3) at the Holder's option, Default Interest, if any, on the amounts referred to in the immediately preceding clauses (1) and/or (2) <u>plus</u> (4) at the Holder's option, any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof.

12  Conversion Price.

Calculation of Conversion Price. Subject to the adjustments described herein, the conversion price (the "Conversion Price") shall equal the lesser of: (i) $0.15, and (ii) the Variable Conversion Price (as defined herein) (subject to equitable adjustments for stock splits, stock dividends or rights offerings by the Borrower relating to the Borrower's securities or the securities of any subsidiary of the Borrower, combinations, recapitalization, reclassifications, extraordinary distributions and similar events). The "Variable Conversion Price" shall mean 65% multiplied by the Market Price (as defined herein) (representing a discount rate of 35%). "Market Price" means the lowest Trading Price (as defined below) for the Common Stock during the ten (10) Trading Day period ending on the latest complete Trading Day prior to the Conversion Date. "Trading Price" means, for any security as of any date, the lesser of: (i) the lowest trade price on the OTC Pink, OTCQB or applicable trading market as reported by a reliable reporting service ("Reporting Service") designated by the Holder or, if the OTC Pink is not the principal trading market for such security, the trading price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no trading price of such security is available in any of the foregoing manners, the average of the trading prices of any market makers for such security that are listed in the "pink sheets" by the National Quotation Bureau, Inc., or (ii) the closing bid price on the OTC Pink, OTCQB or applicable trading market as reported by a Reporting Service designated by the Holder or, if the OTC Pink is not the principal trading market for such security, the closing bid price of such security on the principal securities exchange or trading market where such security is listed or traded or, if no closing bid price of such security is available in any of the foregoing manners, the average of the closing bid prices of any market makers for such security that are listed in the "pink sheets" by the National Quotation Bureau, Inc. To the extent the Conversion Price of the Borrower's Common Stock closes below the par value per share, the Borrower will take all steps necessary to solicit the consent of the stockholders to reduce the par value to the lowest value possible under law. The Borrower agrees to honor all conversions submitted pending this adjustment. Furthermore, the Conversion Price may be adjusted downward if, within three (3) business days of the transmittal of the Notice of Conversion to the Borrower, the Common Stock has a closing bid which is 5% or lower than that set forth in the Notice of Conversion. If the shares of the Borrower's Common Stock have not been delivered within three (3) business days to the Borrower, the Notice of Conversion may be rescinded. At any time after the Closing Date, if in the case that the Borrower's Common Stock is not deliverable by DWAC (including if the Borrower's transfer agent has a policy prohibiting or limiting delivery of shares of the Borrower's Common Stock specified in a Notice of Conversion), an additional 10% discount will apply for all future conversions under all Notes. If in the case that the Borrower's Common Stock is "chilled" for deposit into the DTC system and only eligible for clearing deposit, an additional 15% discount shall apply for all future conversions under all Notes while the "chill" is in effect. If in the case of both of the above, an additional cumulative 25% discount shall apply. Additionally, if the Borrower ceases to be a reporting company pursuant to the 1934 Act or if the Note cannot be converted into free trading shares after one hundred eighty-one (181) days from the Issue Date, an additional 15% discount will be attributed to the Conversion Price. If the Trading Price cannot be calculated for such security on such date in the manner provided above, the Trading Price shall be the fair market value as mutually determined by the Borrower and the holders of a majority in interest of the Notes being converted for which the calculation of the Trading Price is required in order to determine the Conversion Price of such Notes. "Trading Day" shall mean any day on which the Common Stock is tradable for any period on the OTC Pink, OTCQB or on the principal securities exchange or other securities market on which the Common Stock is then being traded. The Borrower shall be responsible for the fees of its transfer agent and all DTC fees associated with any such issuance. Holder shall be entitled to deduct $750.00 from the conversion amount in each Notice of Conversion to cover Holder's deposit fees associated with each Notice of Conversion.

While this Note is outstanding, each time any 3rd party has the right to convert monies owed to that 3rd party (or receive shares pursuant to a settlement or otherwise), including but not limited to under Section 3(a)(9) and Section 3(a)(10), at a discount to market greater than the Conversion Price in effect at that time (prior to all other applicable adjustments in the Note), then the H1older, in Holder's sole discretion, may utilize such greater discount percentage (prior to all applicable adjustments in this Note) until this Note is no longer outstanding. While this Note is outstanding, each time any 3rd party has a look back period greater than the look back period in effect under the Note at that time, including but not limited to under Section 3(a)(9) and Section 3(a)(10), then the Holder, in Holder's sole discretion, may utilize such greater number of look back days until this Note is no longer outstanding. The Borrower shall give written notice to the Holder within one (1) business day of becoming aware of any event that could permit the Holder to make any adjustment described in the two immediately preceding sentences.

3

SA-127

(a)<u>Conversion Price During Major Announcements</u>. Notwithstanding anything contained in Section 1.2(a) to the contrary, in the event the Borrower (i) makes a public announcement that it intends to consolidate or merge with any other corporation (other than a merger in which the Borrower is the surviving or continuing corporation and its capital stock is unchanged) or sell or transfer all or substantially all of the assets of the Borrower or (ii) any person, group or entity (including the Borrower) publicly announces a tender offer to purchase 50% or more of the Borrower's Common Stock (or any other takeover scheme) (the date of the announcement referred to in clause (i) or (ii) is hereinafter referred to as the "Announcement Date"), then the Conversion Price shall, effective upon the Announcement Date and continuing through the Adjusted Conversion Price Termination Date (as defined below), be equal to the lower of (x) the Conversion Price which would have been applicable for a Conversion occurring on the Announcement Date and (y) the Conversion Price that would otherwise be in effect. From and after the Adjusted Conversion Price Termination Date, the Conversion Price shall be determined as set forth in this Section 1.2(a). For purposes hereof, "Adjusted Conversion Price Termination Date" shall mean, with respect to any proposed transaction or tender offer (or takeover scheme) for which a public announcement as contemplated by this Section 1.2(b) has been made, the date upon which the Borrower (in the case of clause (i) above) or the person, group or entity (in the case of clause (ii) above) consummates or publicly announces the termination or abandonment of the proposed transaction or tender offer (or takeover scheme) which caused this Section 1.2(b) to become operative.

(b)   <u>Pro Rata Conversion; Disputes</u>. In the event of a dispute as to the number of shares of Common Stock issuable to the Holder in connection with a conversion of this Note, the Borrower shall issue to the Holder the number of shares of Common Stock not in dispute and resolve such dispute in accordance with Section 4.13.

(c)If at any time the Conversion Price as determined hereunder for any conversion would be less than the par value of the Common Stock, then the Conversion Price hereunder shall equal such par value for such conversion and the Conversion Amount for such conversion shall be increased to include Additional Principal, where "Additional Principal" means such additional amount to be added to the Conversion Amount to the extent necessary to cause the number of conversion shares issuable upon such conversion to equal the same number of conversion shares as would have been issued had the Conversion Price not been subject to the minimum price set forth in this Section 1.2(c).

1.3<u>Authorized Shares</u>. The Borrower covenants that during the period the conversion right exists, the Borrower will reserve from its authorized and unissued Common Stock a sufficient number of shares, free from preemptive rights, to provide for the issuance of Common Stock upon the full conversion of this Note issued pursuant to the Purchase Agreement. The Borrower is required at all times to have authorized and reserved seven times the number of shares that is actually issuable upon full conversion of the Note (based on the Conversion Price of the Notes in effect from time to time) (the "Reserved Amount"). The Reserved Amount shall be increased from time to time in accordance with the Borrower's obligations pursuant to Section 3(d) of the Purchase Agreement. The Borrower represents that upon issuance, such shares will be duly and validly issued, fully paid and non-assessable. In addition, if the Borrower shall issue any securities or make any change to its capital structure which would change the number of shares of Common Stock into which the Notes shall be convertible at the then current Conversion Price, the Borrower shall at the same time make proper provision so that thereafter there shall be a sufficient number of shares of Common Stock authorized and reserved, free from preemptive rights, for conversion of the outstanding Notes. The Borrower (i) acknowledges that it has irrevocably instructed its transfer agent to issue certificates for the Common Stock issuable upon conversion of this Note, and (ii) agrees that its issuance of this Note shall constitute full authority to its officers and agents who are charged with the duty of executing stock certificates to execute and issue the necessary certificates for shares of Common Stock in accordance with the terms and conditions of this Note. Notwithstanding the foregoing, in no event shall the Reserved Amount be lower than the initial Reserved Amount, regardless of any prior conversions.

4

SA-128

If, at any time the Borrower does not maintain or replenish the Reserved Amount within three (3) business days of the request of the Holder, the principal amount of the Note shall increase by Five Thousand and No/100 United States Dollars ($5,000) (under Holder's and Borrower's expectation that any principal amount increase will tack back to the Issue Date) per occurrence.

1.4 <u>Method of Conversion</u>.

(a) <u>Mechanics of Conversion</u>. Subject to Section 1.1, this Note may be converted by the Holder in whole or in part at any time from time to time after the Issue Date, by
(A) submitting to the Borrower a Notice of Conversion (by facsimile, e-mail or other reasonable means of communication dispatched on the Conversion Date prior to 5:00 p.m., New York, New York time) and (B) subject to Section 1.4(b), surrendering this Note at the principal office of the Borrower.

(b) <u>Surrender of Note Upon Conversion</u>. Notwithstanding anything to the contrary set forth herein, upon conversion of this Note in accordance with the terms hereof, the Holder shall not be required to physically surrender this Note to the Borrower unless the entire unpaid principal amount of this Note is so converted. The Holder and the Borrower shall maintain records showing the principal amount so converted and the dates of such conversions or shall use such other method, reasonably satisfactory to the Holder and the Borrower, so as not to require physical surrender of this Note upon each such conversion. In the event of any dispute or discrepancy, such records of the Borrower shall, *prima facie,* be controlling and determinative in the absence of manifest error. Notwithstanding the foregoing, if any portion of this Note is converted as aforesaid, the Holder may not transfer this Note unless the Holder first physically surrenders this Note to the Borrower, whereupon the Borrower will forthwith issue and deliver upon the order of the Holder a new Note of like tenor, registered as the Holder (upon payment by the Holder of any applicable transfer taxes) may request, representing in the aggregate the remaining unpaid principal amount of this Note. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that, by reason of the provisions of this paragraph, following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

(c) <u>Payment of Taxes</u>. The Borrower shall not be required to pay any tax which may be payable in respect of any transfer involved in the issue and delivery of shares of Common Stock or other securities or property on conversion of this Note in a name other than that of the Holder (or in street name), and the Borrower shall not be required to issue or deliver any such shares or other securities or property unless and until the person or persons (other than the Holder or the custodian in whose street name such shares are to be held for the Holder's account) requesting the issuance thereof shall have paid to the Borrower the amount of any such tax or shall have established to the satisfaction of the Borrower that such tax has been paid.

(d) <u>Delivery of Common Stock Upon Conversion</u>. Upon receipt by the Borrower from the Holder of a facsimile transmission or e-mail (or other reasonable means of communication) of a Notice of Conversion meeting the requirements for conversion as provided in this Section 1.4, the Borrower shall issue and deliver or cause to be issued and delivered to or upon the order of the Holder certificates for the Common Stock issuable upon such conversion within three (3) business days after such receipt (the "Deadline") (and, solely in the case of conversion of the entire unpaid principal amount hereof, surrender of this Note) in accordance with the terms hereof and the Purchase Agreement.

(e) <u>Obligation of Borrower to Deliver Common Stock</u>. Upon receipt by the Borrower of a Notice of Conversion, the Holder shall be deemed to be the holder of record of the Common Stock issuable upon such conversion, the outstanding principal amount and the amount of accrued and unpaid interest on this Note shall be reduced to reflect such conversion, and, unless the Borrower defaults on its obligations under this Article I, all rights with respect to the portion of this Note being so converted shall forthwith terminate except the right to receive the Common Stock or other securities, cash or other assets, as herein provided, on such conversion. If the Holder shall have given a Notice of Conversion as provided herein, the Borrower's obligation to issue and deliver the certificates for Common Stock shall be absolute and unconditional, irrespective of the absence of any action by the Holder to enforce the same, any waiver or consent with respect to any provision thereof, the recovery of any judgment against any person or any action to enforce the same, any failure or delay in the enforcement of any other obligation of the Borrower to the holder of record, or any setoff, counterclaim, recoupment, limitation or termination, or any breach or alleged breach by the Holder of any obligation to the Borrower, and irrespective of any other circumstance which might otherwise limit such obligation of the Borrower to the Holder in connection with such conversion. The Conversion Date specified in the Notice of Conversion shall be the Conversion Date so long as the Notice of Conversion is received by the Borrower before 5:00 p.m., New York, New York time, on such date.

(f) <u>Delivery of Common Stock by Electronic Transfer</u>. In lieu of delivering physical certificates representing the Common Stock issuable upon conversion, provided the Borrower is participating in the Depository Trust Company ("DTC") Fast Automated Securities Transfer ("FAST") program, upon request of the Holder and its compliance with the provisions contained in Section 1.1 and in this Section 1.4, the Borrower shall use its commercially reasonable best efforts to cause its transfer agent to electronically transmit the Common Stock issuable upon conversion to the Holder by crediting the account of Holder's Prime Broker with DTC through its Deposit Withdrawal At Custodian ("DWAC") system.

6

(g)  DTC Eligibility & Market Loss. If the Borrower fails to maintain its status as "DTC Eligible" for any reason, or, if the Conversion Price is less than $0.01 at any time after the Issue Date, the principal amount of the Note shall increase by Fifteen Thousand and No/100 United States Dollars ($15,000) (under Holder's and Borrower's expectation that any principal amount increase will tack back to the Issue Date). In addition, the Variable Conversion Price shall be redefined to mean forty percent (40%) multiplied by the Market Price, subject to adjustment as provided in this Note.

(h)  Failure to Deliver Common Stock Prior to Delivery Deadline. Without in any way limiting the Holder's right to pursue other remedies, including actual damages and/or equitable relief, the parties agree that if delivery of the Common Stock issuable upon conversion of this Note is not delivered by the Deadline (other than a failure due to the circumstances described in Section 1.3 above, which failure shall be governed by such Section) the Borrower shall pay to the Holder $2,000 per day in cash, for each day beyond the Deadline that the Borrower fails to deliver such Common Stock until the Borrower issues and delivers a certificate to the Holder or credit the Holder's balance account with OTC for the number of shares of Common Stock to which the Holder is entitled upon such Holder's conversion of any Conversion Amount (under Holder's and Borrower's expectation that any damages will tack back to the Issue Date).. Such cash amount shall be paid to Holder by the fifth day of the month following the month in which it has accrued or, at the option of the Holder (by written notice to the Borrower by the first day of the month following the month in which it has accrued), shall be added to the principal amount of this Note, in which event interest shall accrue thereon in accordance with the terms of this Note and such additional principal amount shall be convertible into Common Stock in accordance with the terms of this Note. The Borrower agrees that the right to convert is a valuable right to the Holder. The damages resulting from a failure, attempt to frustrate, interference with such conversion right are difficult if not impossible to qualify. Accordingly the parties acknowledge that the liquidated damages provision contained in this Section 1.4(h) are justified.

(i)  Rescindment of a Notice of Conversion. If (i) the Borrower fails to respond to Holder within one (1) business day from the Conversion Date confirming the details of Notice of Conversion, (ii) the Borrower fails to provide any of the shares of the Borrower's Common Stock requested in the Notice of Conversion within three (3) business days from the date of receipt of the Note of Conversion, (iii) the Holder is unable to procure a legal opinion required to have the shares of the Borrower's Common Stock issued unrestricted and/or deposited to sell for any reason related to the Borrower's standing, (iv) the Holder is unable to deposit the shares of the Borrower's Common Stock requested in the Notice of Conversion for any reason related to the Borrower's standing, (v) at any time after a missed Deadline, at the Holder's sole discretion, or (vi) if OTC Markets changes the Borrower's designation to 'Limited Information' (Yield), 'No Information' (Stop Sign), 'Caveat Emptor' (Skull & Crossbones), 'OTC', 'Other OTC' or 'Grey Market' (Exclamation Mark Sign) or other trading restriction on the day of or any day after the Conversion Date, the Holder maintains the option and sole discretion to rescind the Notice of Conversion ("Rescindment") with a "Notice of Rescindment."

7

15 <u>Concerning the Shares</u>. The shares of Common Stock issuable upon conversion of this Note may not be sold or transferred unless (i) such shares are sold pursuant to an effective registration statement under the Act or (ii) the Borrower or its transfer agent shall have been furnished with an opinion of counsel (which opinion shall be in form, substance and scope customary for opinions of counsel in comparable transactions) to the effect that the shares to be sold or transferred may be sold or transferred pursuant to an exemption from such registration or (iii) such shares are sold or transferred pursuant to Rule 144 under the Act (or a successor rule) ("Rule 144") or (iv) such shares are transferred to an "affiliate" (as defined in Rule 144) of the Borrower who agrees to sell or otherwise transfer the shares only in accordance with this Section 1.5 and who is an Accredited Investor (as defined in the Purchase Agreement). Except as otherwise provided in the Purchase Agreement (and subject to the removal provisions set forth below), until such time as the shares of Common Stock issuable upon conversion of this Note have been registered under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold, each certificate for shares of Common Stock issuable upon conversion of this Note that has not been so included in an effective registration statement or that has not been sold pursuant to an effective registration statement or an exemption that permits removal of the legend, shall bear a legend substantially in the following form, as appropriate:

**"NEITHER THE ISSUANCE AND SALE OF THE SECURITIES REPRESENTED BY THIS CERTIFICATE NOR THE SECURITIES INTO WHICH THESE SECURITIES ARE EXERCISABLE HAVE BEEN REGISTERED UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR APPLICABLE STATE SECURITIES LAWS. THE SECURITIES MAY NOT BE OFFERED FOR SALE, SOLD, TRANSFERRED OR ASSIGNED (I) IN THE ABSENCE OF (A) AN EFFECTIVE REGISTRATION STATEMENT FOR THE SECURITIES UNDER THE SECURITIES ACT OF 1933, AS AMENDED, OR (B) AN OPINION OF COUNSEL (WHICH COUNSEL SHALL BE SELECTED BY THE HOLDER), IN A GENERALLY ACCEPTABLE FORM, THAT REGISTRATION IS NOT REQUIRED UNDER SAID ACT OR (II) UNLESS SOLD PURSUANT TO RULE 144 OR RULE 144A UNDER SAID ACT. NOTWITHSTANDING THE FOREGOING, THE SECURITIES MAY BE PLEDGED IN CONNECTION WITH A BONA FIDE MARGIN ACCOUNT OR OTHER LOAN OR FINANCING ARRANGEMENT SECURED BY THE SECURITIES."**

The legend set forth above shall be removed and the Borrower shall issue to the Holder a new certificate therefore free of any transfer legend if (i) the Borrower or its transfer agent have received an opinion of counsel, in form, substance and scope customary for opinions of counsel in comparable transactions, to the effect that a public sale or transfer of such Common Stock may be made without registration under the Act, which opinion shall be reasonably accepted by the Borrower so that the sale or transfer is effected or (ii) in the case of the Common Stock issuable upon conversion of this Note, such security is registered for sale by the Holder under an effective registration statement filed under the Act or otherwise may be sold pursuant to Rule 144 without any restriction as to the number of securities as of a particular date that can then be immediately sold. In the event that the Borrower does not accept the opinion of counsel provided by the Buyer with respect to the transfer of Securities pursuant to an exemption from registration, such as Rule 144 or Regulation S, at the Deadline, it will be considered an Event of Default pursuant to Section 3.2 of the Note.

8

1.6  <u>Effect of Certain Events</u>.

(a)  <u>Effect of Merger, Consolidation, Etc</u>. At the option of the Holder, the sale, conveyance or disposition of all or substantially all of the assets of the Borrower, the effectuation by the Borrower of a transaction or series of related transactions in which more than 50% of the voting power of the Borrower is disposed of, or the consolidation, merger or other business combination of the Borrower with or into any other Person (as defined below) or Persons when the Borrower is not the survivor shall either: (i) be deemed to be an Event of Default (as defined in Article III) pursuant to which the Borrower shall be required to pay to the Holder upon the consummation of and as a condition to such transaction an amount equal to the Default Amount (as defined in Article III) or (ii) be treated pursuant to Section 1.6(b) hereof. "Person" shall mean any individual, corporation, limited liability company, partnership, association, trust or other entity or organization.

(b)  <u>Adjustment Due to Merger, Consolidation, Etc</u>. If, at any time when this Note is issued and outstanding and prior to conversion of all of the Notes, there shall be any merger, consolidation, exchange of shares, recapitalization, reorganization, or other similar event, as a result of which shares of Common Stock of the Borrower shall be changed into the same or a different number of shares of another class or classes of stock or securities of the Borrower or another entity, or in case of any sale or conveyance of all or substantially all of the assets of the Borrower other than in connection with a plan of complete liquidation of the Borrower, then the Holder of this Note shall thereafter have the right to receive upon conversion of this Note, upon the basis and upon the terms and conditions specified herein and in lieu of the shares of Common Stock immediately theretofore issuable upon conversion, such stock, securities or assets which the Holder would have been entitled to receive in such transaction had this Note been converted in full immediately prior to such transaction (without regard to any limitations on conversion set forth herein), and in any such case appropriate provisions shall be made with respect to the rights and interests of the Holder of this Note to the end that the provisions hereof (including, without limitation, provisions for adjustment of the Conversion Price and of the number of shares issuable upon conversion of the Note) shall thereafter be applicable, as nearly as may be practicable in relation to any securities or assets thereafter deliverable upon the conversion hereof. The Borrower shall not affect any transaction described in this Section 1.6(b) unless (a) it first gives, to the extent practicable, thirty (30) days prior written notice (but in any event at least fifteen (15) days prior written notice) of the record date of the special meeting of shareholders to approve, or if there is no such record date, the consummation of, such merger, consolidation, exchange of shares, recapitalization, reorganization or other similar event or sale of assets (during which time the Holder shall be entitled to convert this Note) and (b) the resulting successor or acquiring entity (if not the Borrower) assumes by written instrument the obligations of this Section 1.6(b). The above provisions shall similarly apply to successive consolidations, mergers, sales, transfers or share exchanges.

SA-133

(c) <u>Adjustment Due to Distribution</u>. If the Borrower shall declare or make any distribution of its assets (or rights to acquire its assets) to holders of Common Stock as a dividend, stock repurchase, by way of return of capital or otherwise (including any dividend or distribution to the Borrower's shareholders in cash or shares (or rights to acquire shares) of capital stock of a subsidiary (i.e., a spin-off)) (a "Distribution"), then the Holder of this Note shall be entitled, upon any conversion of this Note after the date of record for determining shareholders entitled to such Distribution, to receive the amount of such assets which would have been payable to the Holder with respect to the shares of Common Stock issuable upon such conversion had such Holder been the holder of such shares of Common Stock on the record date for the determination of shareholders entitled to such Distribution.

(d) <u>Adjustment Due to Dilutive Issuance</u>. If, at any time when any Notes are issued and outstanding, the Borrower issues or sells, or in accordance with this Section 1.6(d) hereof is deemed to have issued or sold, except for shares of Common Stock issued directly to vendors or suppliers of the Borrower in satisfaction of amounts owed to such vendors or suppliers (provided, however, that such vendors or suppliers shall not have an arrangement to transfer, sell or assign such shares of Common Stock prior to the issuance of such shares), any shares of Common Stock for no consideration or for a consideration per share (before deduction of reasonable expenses or commissions or underwriting discounts or allowances in connection therewith) less than the Conversion Price in effect on the date of such issuance (or deemed issuance) of such shares of Common Stock (a "Dilutive Issuance"), then immediately upon the Dilutive Issuance, the Conversion Price will be reduced to the amount of the consideration per share received by the Borrower in such Dilutive Issuance.

The Borrower shall be deemed to have issued or sold shares of Common Stock if the Borrower in any manner issues or grants any warrants, rights or options (not including employee stock option plans), whether or not immediately exercisable, to subscribe for or to purchase Common Stock or other securities convertible into or exchangeable for Common Stock ("Convertible Securities") (such warrants, rights and options to purchase Common Stock or Convertible Securities are hereinafter referred to as "Options") and the price per share for which Common Stock is issuable upon the exercise of such Options is less than the Conversion Price then in effect, then the Conversion Price shall be equal to such price per share. For purposes of the preceding sentence, the "price per share for which Common Stock is issuable upon the exercise of such Options" is determined by dividing (i) the total amount, if any, received or receivable by the Borrower as consideration for the issuance or granting of all such Options, plus the minimum aggregate amount of additional consideration, if any, payable to the Borrower upon the exercise of all such Options, plus, in the case of Convertible Securities issuable upon the exercise of such Options, the minimum aggregate amount of additional consideration payable upon the conversion or exchange thereof at the time such Convertible Securities first become convertible or exchangeable, by (ii) the maximum total number of shares of Common Stock issuable upon the exercise of all such Options (assuming full conversion of Convertible Securities, if applicable). No further adjustment to the Conversion Price will be made upon the actual issuance of such Common Stock upon the exercise of such Options or upon the conversion or exchange of Convertible Securities issuable upon exercise of such Options.

SA-134

Additionally, the Borrower shall be deemed to have issued or sold shares of Common Stock if the Borrower in any manner issues or sells any Convertible Securities, whether or not immediately convertible (other than where the same are issuable upon the exercise of Options), and the price per share for which Common Stock is issuable upon such conversion or exchange is less than the Conversion Price then in effect, then the Conversion Price shall be equal to such price per share. For the purposes of the preceding sentence, the "price per share for which Common Stock is issuable upon such conversion or exchange" is determined by dividing (i) the total amount, if any, received or receivable by the Borrower as consideration for the issuance or sale of all such Convertible Securities, plus the minimum aggregate amount of additional consideration, if any, payable to the Borrower upon the conversion or exchange thereof at the time such Convertible Securities first become convertible or exchangeable, by (ii) the maximum total number of shares of Common Stock issuable upon the conversion or exchange of all such Convertible Securities. No further adjustment to the Conversion Price will be made upon the actual issuance of such Common Stock upon conversion or exchange of such Convertible Securities.

(e) <u>Purchase Rights</u>. If, at any time when any Notes are issued and outstanding, the Borrower issues any convertible securities or rights to purchase stock, warrants, securities or other property (the "Purchase Rights") pro rata to the record holders of any class of Common Stock, then the Holder of this Note will be entitled to acquire, upon the terms applicable to such Purchase Rights, the aggregate Purchase Rights which such Holder could have acquired if such Holder had held the number of shares of Common Stock acquirable upon complete conversion of this Note (without regard to any limitations on conversion contained herein) immediately before the date on which a record is taken for the grant, issuance or sale of such Purchase Rights or, if no such record is taken, the date as of which the record holders of Common Stock are to be determined for the grant, issue or sale of such Purchase Rights.

(f)<u>Notice of Adjustments</u>. Upon the occurrence of each adjustment or readjustment of the Conversion Price as a result of the events described in this Section 1.6, the Borrower, at its expense, shall promptly compute such adjustment or readjustment and prepare and furnish to the Holder a certificate setting forth such adjustment or readjustment and showing in detail the facts upon which such adjustment or readjustment is based. The Borrower shall, upon the written request at any time of the Holder, furnish to such Holder a like certificate setting forth (i) such adjustment or readjustment, (ii) the Conversion Price at the time in effect and (iii) the number of shares of Common Stock and the amount, if any, of other securities or property which at the time would be received upon conversion of the Note.

1.7   [<u>Intentionally Omitted</u>].

1.8   <u>Status as Shareholder</u>. Upon submission of a Notice of Conversion by a Holder, (i) the shares covered thereby (other than the shares, if any, which cannot be issued because their issuance would exceed such Holder's allocated portion of the Reserved Amount or Maximum Share Amount) shall be deemed converted into shares of Common Stock and (ii) the Holder's rights as a Holder of such converted portion of this Note shall cease and terminate, excepting only the right to receive certificates for such shares of Common Stock and to any remedies provided herein or otherwise available at law or in equity to such Holder because of a failure by the Borrower to comply with the terms of this Note. Notwithstanding the foregoing, if a Holder has not received certificates for all shares of Common Stock prior to the tenth (10th) business day after the expiration of the Deadline with respect to a conversion of any portion of this Note for any reason, then (unless the Holder otherwise elects to retain its status as a holder of Common Stock by so notifying the Borrower) the Holder shall regain the rights of a Holder of this Note with respect to such unconverted portions of this Note and the Borrower shall, as soon as practicable, return such unconverted Note to the Holder or, if the Note has not been surrendered, adjust its records to reflect that such portion of this Note has not been converted. In all cases, the Holder shall retain all of its rights and remedies (including, without limitation, (i) the right to receive Conversion Default Payments pursuant to Section 1.3 to the extent required thereby for such Conversion Default and any subsequent Conversion Default and (ii) the right to have the Conversion Price with respect to subsequent conversions determined in accordance with Section 1.3) for the Borrower's failure to convert this Note.

11

SA-135

     1.9  <u>Prepayment</u>. Subject to the terms of this Note, and provided that an Event of Default has not occurred under this Note, the Borrower may prepay the amounts outstanding hereunder pursuant to the following terms and conditions:

       (a) At any time during the period beginning on the Issue Date and ending on the date which is ninety (90) calendar days following the Issue Date, the Borrower shall have the right, exercisable on not less than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full by making a payment to the Holder of an amount in cash equal to 120%, multiplied by the sum of: (w) the then outstanding principal amount of this Note <u>plus</u> (x) accrued and unpaid interest on the unpaid principal amount of this Note <u>plus</u> (y) Default Interest, if any.

       (b) At any time during the period beginning the day which is ninety one (91) calendar days following the Issue Date and ending on the date which is one hundred eighty (180) calendar days following the Issue Date, the Borrower shall have the right, exercisable on not less than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full by making a payment to the Holder of an amount in cash equal to 125%, multiplied by the sum of: (w) the then outstanding principal amount of this Note <u>plus</u> (x) accrued and unpaid interest on the unpaid principal amount of this Note <u>plus</u> (y) Default Interest, if any.

       (c) At any time during the period beginning the day which is one hundred eighty one (181) calendar days following the Issue Date and ending on the date which is three hundred sixty four (364) calendar days following the Issue Date, the Borrower shall have the right, exercisable on not less than three (3) Trading Days prior written notice to the Holder of the Note to prepay the outstanding Note (principal and accrued interest), in full by making a payment to the Holder of an amount in cash equal to 135%, multiplied by the sum of: (w) the then outstanding principal amount of this Note <u>plus</u> (x) accrued and unpaid interest on the unpaid principal amount of this Note <u>plus</u> (y) Default Interest, if any.

       (d) After the expiration of three hundred sixty four (364) calendar days following the date of the Note, the Borrower shall have no right of prepayment.

     1.10 Any notice of prepayment hereunder (an "Optional Prepayment Notice") shall be delivered to the Holder of the Note at its registered addresses by physical mail and shall state: (1) that the Borrower is exercising its right to prepay the Note, and (2) the date of prepayment which shall be not more than three (3) Trading Days from the date of the Optional Prepayment Notice. On the date fixed for prepayment (the "Optional Prepayment Date"), the Borrower shall make payment of the applicable prepayment amount to or upon the order of the Holder as specified by the Holder in writing to the Borrower. If the Borrower delivers an Optional Prepayment Notice and fails to pay the applicable prepayment amount due to the Holder of the Note within two (2) business days following the Optional Prepayment Date, the Borrower shall forever forfeit its right to prepay the Note pursuant to Section 1.9.

SA-136

ARTICLE II. CERTAIN COVENANTS

2.1 <u>Distributions on Capital Stock</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent (a) pay, declare or set apart for such payment, any dividend or other distribution (whether in cash, property or other securities) on shares of capital stock other than dividends on shares of Common Stock solely in the form of additional shares of Common Stock or (b) directly or indirectly or through any subsidiary make any other payment or distribution in respect of its capital stock except for distributions pursuant to any shareholders' rights plan which is approved by a majority of the Borrower's disinterested directors.

2.2 <u>Restriction on Stock Repurchases</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not without the Holder's written consent redeem, repurchase or otherwise acquire (whether for cash or in exchange for property or other securities or otherwise) in any one transaction or series of related transactions any shares of capital stock of the Borrower or any warrants, rights or options to purchase or acquire any such shares.

2.3 <u>Borrowings</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, create, incur, assume guarantee, endorse, contingently agree to purchase or otherwise become liable upon the obligation of any person, firm, partnership, joint venture or corporation, except by the endorsement of negotiable instruments for deposit or collection, or suffer to exist any liability for borrowed money, except (a) borrowings in existence or committed on the date hereof and of which the Borrower has informed Holder in writing prior to the date hereof, (b) indebtedness to trade creditors financial institutions or other lenders incurred in the ordinary course of business or (c) borrowings, the proceeds of which shall be used to repay this Note.

2.4 <u>Sale of Assets</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, sell, lease or otherwise dispose of any significant portion of its assets outside the ordinary course of business. Any consent to the disposition of any assets shall be conditioned on a specified use of the proceeds towards the repayment of this Note.

2.5 <u>Advances and Loans</u>. So long as the Borrower shall have any obligation under this Note, the Borrower shall not, without the Holder's written consent, lend money, give credit or make advances to any person, firm, joint venture or corporation, including, without limitation, officers, directors, employees, subsidiaries and affiliates of the Borrower, except loans, credits or advances (a) in existence or committed on the date hereof and which the Borrower has informed Holder in writing prior to the date hereof, (b) made in the ordinary course of business or (c) not in excess of $100,000.

13

26 Section 3(a)(9) or 3(a)(10) Transaction. So long as this Note is outstanding, the Borrower shall not enter into any transaction or arrangement structured in accordance with, based upon, or related or pursuant to, in whole or in part, either Section 3(a)(9) of the Securities Act (a "3(a)(9) Transaction") or Section 3(a)(l0) of the Securities Act (a "3(a)(l0) Transaction"). In the event that the Borrower does enter into, or makes any issuance of Common Stock related to a 3(a)(9) Transaction or a 3(a)(l0) Transaction while this Note is outstanding, a liquidated damages charge of 25% of the outstanding principal balance of this Note, but not less than Fifteen Thousand Dollars $15,000, will be assessed and will become immediately due and payable to the Holder at its election in the form of cash payment or addition to the balance of this Note.

27 Preservation of Existence, etc. The Borrower shall maintain and preserve, and cause each of its Subsidiaries to maintain and preserve, its existence, rights and privileges, and become or remain, and cause each of its Subsidiaries (other than dormant Subsidiaries that have no or minimum assets) to become or remain, duly qualified and in good standing in each jurisdiction in which the character of the properties owned or leased by it or in which the transaction of its business makes such qualification necessary.

28 Non-circumvention. The Borrower hereby covenants and agrees that the Borrower will not, by amendment of its Certificate or Articles of Incorporation or Bylaws, or through any reorganization, transfer of assets, consolidation, merger, scheme of arrangement, dissolution, issue or sale of securities, or any other voluntary action, avoid or seek to avoid the observance or performance of any of the terms of this Note, and will at all times in good faith carry out all the provisions of this Note and take all action as may be required to protect the rights of the Holder.

29 Repayment from Proceeds. While any portion of this Note is outstanding, if the Company receives cash proceeds from any source or series of related or unrelated sources, including but not limited to, from payments from customers, the issuance of equity or debt, the conversion of outstanding warrants of the Borrower, the issuance of securities pursuant to an equity line of credit of the Borrower or the sale of assets, the Borrower shall, within one (1) business day of Borrower's receipt of such proceeds, inform the Holder of such receipt, following which the Holder shall have the right in its sole discretion to require the Borrower to immediately apply all or any portion of such proceeds to repay all or any portion of the outstanding amounts owed under this Note. Failure of the Borrower to comply with this provision shall constitute an Event of Default. In the event that such proceeds are received by the Holder prior to the Maturity Date, the required prepayment shall be subject to the terms of Section 1.9 herein.

ARTICLE III. EVENTS OF DEFAULT

If any of the following events of default (each, an "Event of Default") shall occur:

3.1 Failure to Pay Principal or Interest. The Borrower fails to pay the principal hereof or interest thereon when due on this Note, whether at maturity, upon acceleration or otherwise.

SA-138

3.2 <u>Conversion and the Shares</u>. The Borrower (i) fails to issue shares of Common Stock to the Holder (or announces or threatens in writing that it will not honor its obligation to do so) upon exercise by the Holder of the conversion rights of the Holder in accordance with the terms of this Note, (ii) fails to transfer or cause its transfer agent to transfer (issue) (electronically or in certificated form) any certificate for shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, (iii) directs its transfer agent not to transfer or delays, impairs, and/or hinders its transfer agent in transferring (or issuing) (electronically or in certificated form) any certificate for shares of Common Stock to be issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note, (iv) fails to remove (or directs its transfer agent not to remove or impairs, delays, and/or hinders its transfer agent from removing) any restrictive legend (or to withdraw any stop transfer instructions in respect thereof) on any certificate for any shares of Common Stock issued to the Holder upon conversion of or otherwise pursuant to this Note as and when required by this Note (or makes any written announcement, statement or threat that it does not intend to honor the obligations described in this paragraph) and any such failure shall continue uncured (or any written announcement, statement or threat not to honor its obligations shall not be rescinded in writing) for three (3) business days after the Holder shall have delivered a Notice of Conversion, (v) fails to remain current in its obligations to its transfer agent, (vi) causes a conversion of this Note is delayed, hindered or frustrated due to a balance owed by the Borrower to its transfer agent, (vii) fails to repay Holder, within forty eight (48) hours of a demand from the Holder, any amount of funds advanced by Holder to Borrower's transfer agent in order to process a conversion, (viii) fails to reserve sufficient amount of shares of common stock to satisfy the Reserved Amount at all times, (ix) fails to provide a Rule 144 opinion letter from the Borrower's legal counsel to the Holder, covering the Holder's resale into the public market of the respective conversion shares under this Note, within two (2) business days of the Holder's submission of a Notice of Conversion to the Borrower (provided that the Holder must request the opinion from the Borrower at the time that Holder submits the respective Notice of Conversion and the date of the respective Notice of Conversion must be on or after the date which is six (6) months after the date that the Holder funded the Purchase Price under this Note), and/or (x) an exemption under Rule 144 is unavailable for the Holder's deposit into Holder's brokerage account and resale into the public market of any of the conversion shares under this Note at any time after the date which is six (6) months after the date that the Holder funded the Purchase Price under this Note.

3.3 <u>Failure to Deliver Transaction Expense Amount</u>. The Borrower fails to deliver the Transaction Expense Amount (as defined in the Purchase Agreement) to the Holder within three (3) business days of the date such amount is due.

3.4 <u>Breach of Covenants</u>. The Borrower breaches any material covenant or other material term or condition contained in this Note and any collateral documents including but not limited to the Purchase Agreement and such breach continues for a period of ten (10) days after written notice thereof to the Borrower from the Holder.

15

3.5 <u>Breach of Representations and Warranties</u>. Any representation or warranty of the Borrower made herein or in any agreement, statement or certificate given in writing pursuant hereto or in connection herewith (including, without limitation, the Purchase Agreement), shall be false or misleading in any material respect when made and the breach of which has (or with the passage of time will have) a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.6 <u>Receiver or Trustee</u>. The Borrower or any subsidiary of the Borrower shall make an assignment for the benefit of creditors or commence proceedings for its dissolution, or apply for or consent to the appointment of a receiver or trustee for it or for a substantial part of its property or business, or such a receiver or trustee shall otherwise be appointed for the Borrower or for a substantial part of its property or business without its consent and shall not be discharged within sixty (60) days after such appointment.

3.7 <u>Judgments</u>. Any money judgment, writ or similar process shall be entered or filed against the Borrower or any subsidiary of the Borrower or any of its property or other assets for more than $50,000, and shall remain unvacated, unbonded or unstayed for a period of twenty (20) days unless otherwise consented to by the Holder, which consent will not be unreasonably withheld.

3.8 <u>Bankruptcy</u>. Bankruptcy, insolvency, reorganization or liquidation proceedings or other proceedings, voluntary or involuntary, for relief under any bankruptcy law or any law for the relief of debtors shall be instituted by or against the Borrower or any subsidiary of the Borrower, or the Borrower admits in writing its inability to pay its debts generally as they mature, or have filed against it an involuntary petition for bankruptcy relief, all under federal or state laws as applicable or the Borrower admits in writing its inability to pay its debts generally as they mature, or have filed against it an involuntary petition for bankruptcy relief, all under international, federal or state laws as applicable.

3.9 <u>Delisting of Common Stock</u>. The Borrower shall fail to maintain the listing of the Common Stock on at least one of the OTC Pink, OTCQB, Nasdaq National Market, Nasdaq Small Cap Market, New York Stock Exchange, NYSE MKT, or an equivalent replacement exchange

3.10 <u>Failure to Comply with the Exchange Act</u>. The Borrower shall fail to comply with the reporting requirements of the Exchange Act (including but not limited to becoming delinquent in its filings); and/or the Borrower shall cease to be subject to the reporting requirements of the Exchange Act.

3.11 <u>Liquidation</u>. Any dissolution, liquidation, or winding up of Borrower or any substantial portion of its business.

3.12 <u>Cessation of Operations</u>. Any cessation of operations by Borrower or Borrower admits it is otherwise generally unable to pay its debts as such debts become due, provided, however, that any disclosure of the Borrower's ability to continue as a "going concern" shall not be an admission that the Borrower cannot pay its debts as they become due.

3.13 <u>Maintenance of Assets</u>. The failure by Borrower to maintain any material intellectual property rights, personal, real property or other assets which are necessary to conduct its business (whether now or in the future), or any disposition or conveyance of any material asset of the Borrower.

3.14 <u>Financial Statement Restatement</u>. The restatement of any financial statements filed by the Borrower with the SEC for any date or period from two years prior to the Issue Date of this Note and until this Note is no longer outstanding, if the result of such restatement would, by comparison to the unrestated financial statement, have constituted a material adverse effect on the rights of the Holder with respect to this Note or the Purchase Agreement.

3.15 <u>Reverse Splits</u>. The Borrower effectuates a reverse split of its Common Stock without twenty (20) days prior written notice to the Holder.

3.16 <u>Replacement of Transfer Agent</u>. In the event that the Borrower proposes to replace its transfer agent, the Borrower fails to provide, prior to the effective date of such replacement, a fully executed Irrevocable Transfer Agent Instructions in a form as initially delivered pursuant to the Purchase Agreement (including but not limited to the provision to irrevocably reserve shares of Common Stock in the Reserved Amount) signed by the successor transfer agent to Borrower and the Borrower.

3.17 <u>Cessation of Trading</u>. Any cessation of trading of the Common Stock on at least one of the OTC Pink, OTCQB, Nasdaq National Market, Nasdaq Small Cap Market, New York Stock Exchange, NYSE MKT, or an equivalent replacement exchange, and such cessation of trading shall continue for a period of five consecutive (5) Trading Days.

3.18 <u>Cross-Default</u>. Notwithstanding anything to the contrary contained in this Note or the other related or companion documents, a breach or default by the Borrower of any covenant or other term or condition contained in any of the Other Agreements (as defined herein), after the passage of all applicable notice and cure or grace periods, shall, at the option of the Holder, be considered a default under this Note and the Other Agreements, in which event the Holder shall be entitled (but in no event required) to apply all rights and remedies of the Holder under the terms of this Note and the Other Agreements by reason of a default under said Other Agreement or hereunder. "Other Agreements" means, collectively, all agreements and instruments between, among or by: (1) the Borrower, and, or for the benefit of, (2) the Holder (and any affiliate of the Holder) or any other third party, including, without limitation, promissory notes; provided, however, the term "Other Agreements" shall not include the agreements and instruments defined as the Documents. Each of the loan transactions will be cross-defaulted with each other loan transaction and with all other existing and future debt of Borrower to the Holder.

3.19 <u>Bid Price</u>. The Borrower shall lose the "bid" price for its Common Stock ($0.0001 on the "Ask" with zero market makers on the "Bid" per Level 2) and/or a market (including the OTC Pink, OTCQB or an equivalent replacement exchange).

17

3.20 <u>OTC Markets Designation</u>. OTC Markets changes the Borrower's designation to 'No Information' (Stop Sign), 'Caveat Emptor' (Skull and Crossbones), or 'OTC', 'Other OTC' or 'Grey Market' (Exclamation Mark Sign).

3.21 <u>Inside Information</u>. Any attempt by the Borrower or its officers, directors, and/or affiliates to transmit, convey, disclose, or any actual transmittal, conveyance, or disclosure by the Borrower or its officers, directors, and/or affiliates of, material non-public information concerning the Borrower, to the Holder or its successors and assigns, which is not immediately cured by Borrower's filing of a Form 8-K pursuant to Regulation FD on that same date.

3.22 <u>Unavailability of Rule 144</u>. If, at any time on or after the date which is six (6) months after the Issue Date, the Holder is unable to (i) obtain a standard "144 legal opinion letter" from an attorney reasonably acceptable to the Holder, the Holder's brokerage firm (and respective clearing firm), and the Borrower's transfer agent in order to facilitate the Holder's conversion of any portion of the Note into free trading shares of the Borrower's Common Stock pursuant to Rule 144, and (ii) thereupon deposit such shares into the Holder's brokerage account.

UPON THE OCCURRENCE OF ANY EVENT OF DEFAULT SPECIFIED IN SECTION 3.2 AND/OR 3.22 OF THIS NOTE, THE NOTE SHALL BECOME IMMEDIATELY DUE AND PAYABLE AND THE BORROWER SHALL PAY TO THE HOLDER, IN FULL SATISFACTION OF ITS OBLIGATIONS HEREUNDER, AN AMOUNT EQUAL TO: (Y) THE DEFAULT SUM (AS DEFINED HEREIN); MULTIPLIED BY (Z) TWO (2). Upon the occurrence of any Event of Default specified in Sections 3.1, 3.3, 3.4, 3.5, 3.6, 3.7, 3.8, 3.9, 3.10, 3.11, 3.12, 3.13, 3.14, 3.15, 3.16. 3.17, 3.18, 3.19, 3.20, and/or 3.21, exercisable through the delivery of written notice to the Borrower by such Holders (the "Default Notice"), the Note shall become immediately due and payable and the Borrower shall pay to the Holder, in full satisfaction of its obligations hereunder, an amount equal to (i) 150% <u>times</u> the <u>sum</u> of (w) the then outstanding principal amount of this Note <u>plus</u> (x) accrued and unpaid interest on the unpaid principal amount of this Note to the date of payment (the "Mandatory Prepayment Date") <u>plus</u> (y) Default Interest, if any, on the amounts referred to in clauses (w) and/or (x) <u>plus</u> (z) any amounts owed to the Holder pursuant to Sections 1.3 and 1.4(g) hereof (the then outstanding principal amount of this Note to the date of payment <u>plus</u> the amounts referred to in clauses (x), (y) and (z) shall collectively be known as the "Default Sum") or (ii) at the option of the Holder, the "parity value" of the Default Sum to be prepaid, where parity value means (a) the highest number of shares of Common Stock issuable upon conversion of or otherwise pursuant to such Default Sum in accordance with Article I, treating the Trading Day immediately preceding the Mandatory Prepayment Date as the "Conversion Date" for purposes of determining the lowest applicable Conversion Price, unless the Default Event arises as a result of a breach in respect of a specific Conversion Date in which case such Conversion Date shall be the Conversion Date), <u>multiplied by</u> (b) the highest Trading Price for the Common Stock during the period beginning on the date of first occurrence of the Event of Default and ending one day prior to the Mandatory Prepayment Date (the "Default Amount") and all other amounts payable hereunder shall immediately become due and payable, all without demand, presentment or notice, all of which hereby are expressly waived, together with all costs, including, without limitation, legal fees and expenses, of collection, and the Holder shall be entitled to exercise all other rights and remedies available at law or in equity. Further, if a breach of Sections 3.9, 3.10 and/or 3.19 occurs or is continuing after the six (6) month anniversary of this Note, then the principal amount of the Note shall increase by Fifteen Thousand and No/100 United States Dollars ($15,000) (under Holder's and Borrower's expectation that any principal amount increase will tack back to the Issue Date) and the Holder shall be entitled to use the lowest Trading Price during the delinquency period as a base price for the conversion with the Variable Conversion Price shall be redefined to mean forty percent (40%) multiplied by the Market Price, subject to adjustment as provided in this Note. For example, if the lowest Trading Price during the delinquency period is $0.50 per share and the conversion discount is 50%, then the Holder may elect to convert future conversions at $0.25 per share. If this Note is not paid at Maturity Date, then the outstanding principal due under this Note shall increase by Fifteen Thousand and No/100 United States Dollars ($15,000).

18

The Holder shall have the right at any time, to require the Borrower, to immediately issue, in lieu of the Default Amount and/or Default Sum, the number of shares of Common Stock of the Borrower equal to the Default Amount and/or Default Sum divided by the Conversion Price then in effect, pursuant to the terms of this Note (including but not limited to any beneficial ownership limitations contained herein). This requirement by the Borrower shall automatically apply upon the occurrence of an Event of Default without the need for any party to give any notice or take any other action.

If the Holder shall commence an action or proceeding to enforce any provisions of this Note, including, without limitation, engaging an attorney, then if the Holder prevails in such action, the Holder shall be reimbursed by the Borrower for its attorneys' fees and other costs and expenses incurred in the investigation, preparation and prosecution of such action or proceeding.

ARTICLE IV. MISCELLANEOUS

4.1 <u>Failure or Indulgence Not Waiver</u>. No failure or delay on the part of the Holder in the exercise of any power, right or privilege hereunder shall operate as a waiver thereof, nor shall any single or partial exercise of any such power, right or privilege preclude other or further exercise thereof or of any other right, power or privileges. All rights and remedies existing hereunder are cumulative to, and not exclusive of, any rights or remedies otherwise available.

4.2 <u>Notices</u>. All notices, demands, requests, consents, approvals, and other communications required or permitted hereunder shall be in writing and, unless otherwise specified herein, shall be (i) personally served, (ii) deposited in the mail, registered or certified, return receipt requested, postage prepaid, (iii) delivered by reputable air courier service with charges prepaid, or (iv) transmitted by hand delivery, telegram, electronic mail, or facsimile, addressed as set forth below or to such other address as such party shall have specified most recently by written notice. Any notice or other communication required or permitted to be given hereunder shall be deemed effective (a) upon hand delivery or delivery by electronic mail or facsimile, with accurate confirmation generated by the transmitting facsimile machine, at the address or number designated below (if delivered on a business day during normal business hours where such notice is to be received), or the first business day following such delivery (if delivered other than on a business day during normal business hours where such notice is to be received) or (b) on the second business day following the date of mailing by express courier service, fully prepaid, addressed to such address, or upon actual receipt of such mailing, whichever shall first occur. The addresses for such communications shall be:

19

SA-143

If to the Borrower, to:

    Visium Technologies, Inc.
    11325 Random Hills Road, Suite 360
    Fairfax, VA 22030 Attn:
    Henry Holcombe
    E-mail: info@visiumtechnologies.com If to

the Holder:

    Auctus Fund, LLC
    545 Boylston Street, 2nd Floor
    Boston, MA 02116
    Attn: Lou Posner Facsimile:
    (617) 532-6420

With a copy to (which copy shall not constitute notice): Chad

    Friend, Esq., LL.M.
    Anthony L.G., PLLC
    625 N. Flagler Drive, Suite 600
    West Palm Beach, FL 33401
    E-mail: CFriend@AnthonyPLLC.com

    43<u>Amendments</u>. This Note and any provision hereof may only be amended by an instrument in writing signed by the Borrower and the Holder. The term "Note" and all reference thereto, as used throughout this instrument, shall mean this instrument (and the other Notes issued pursuant to the Purchase Agreement) as originally executed, or if later amended or supplemented, then as so amended or supplemented.

    44<u>Assignability</u>. This Note shall be binding upon the Borrower and its successors and assigns, and shall inure to be the benefit of the Holder and its successors and assigns. Neither the Borrower nor the Holder shall assign this Note or any rights or obligations hereunder without the prior written consent of the other. Notwithstanding the foregoing, the Holder may assign its rights hereunder to any "accredited investor" (as defined in Rule 501(a) of the 1933 Act) in a private transaction from the Holder or to any of its "affiliates", as that term is defined under the 1934 Act, without the consent of the Borrower. Notwithstanding anything in this Note to the contrary, this Note may be pledged as collateral in connection with a <u>bona fide</u> margin account or other lending arrangement. The Holder and any assignee, by acceptance of this Note, acknowledge and agree that following conversion of a portion of this Note, the unpaid and unconverted principal amount of this Note represented by this Note may be less than the amount stated on the face hereof.

SA-144

45 <u>Cost of Collection</u>. If default is made in the payment of this Note, the Borrower shall pay the Holder hereof reasonable costs of collection, including reasonable attorneys' fees.

46 <u>Governing Law</u>. This Note shall be governed by and construed in accordance with the laws of the State of Nevada without regard to principles of conflicts of laws. Any action brought by either party against the other concerning the transactions contemplated by this Note shall be brought only in the state courts of Massachusetts or in the federal courts located in the Commonwealth of Massachusetts. The parties to this Note hereby irrevocably waive any objection to jurisdiction and venue of any action instituted hereunder and shall not assert any defense based on lack of jurisdiction or venue or based upon *forum non conveniens*. **THE BORROWER HEREBY IRREVOCABLY WAIVES ANY RIGHT IT MAY HAVE TO, AND AGREES NOT TO REQUEST, A JURY TRIAL FOR THE ADJUDICATION OF ANY DISPUTE HEREUNDER OR IN CONNECTION WITH OR ARISING OUT OF THIS NOTE OR ANY TRANSACTION CONTEMPLATED HEREBY.** The prevailing party shall be entitled to recover from the other party its reasonable attorney's fees and costs. In the event that any provision of this Note or any other agreement delivered in connection herewith is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any such provision which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision of any agreement. Each party hereby irrevocably waives personal service of process and consents to process being served in any suit, action or proceeding in connection with this Agreement or any other Transaction Document by mailing a copy thereof via registered or certified mail or overnight delivery (with evidence of delivery) to such party at the address in effect for notices to it under this Agreement and agrees that such service shall constitute good and sufficient service of process and notice thereof. Nothing contained herein shall be deemed to limit in any way any right to serve process in any other manner permitted by law.

47 <u>Certain Amounts</u>. Whenever pursuant to this Note the Borrower is required to pay an amount in excess of the outstanding principal amount (or the portion thereof required to be paid at that time) plus accrued and unpaid interest plus Default Interest on such interest, the Borrower and the Holder agree that the actual damages to the Holder from the receipt of cash payment on this Note may be difficult to determine and the amount to be so paid by the Borrower represents stipulated damages and not a penalty and is intended to compensate the Holder in part for loss of the opportunity to convert this Note and to earn a return from the sale of shares of Common Stock acquired upon conversion of this Note at a price in excess of the price paid for such shares pursuant to this Note. The Borrower and the Holder hereby agree that such amount of stipulated damages is not plainly disproportionate to the possible loss to the Holder from the receipt of a cash payment without the opportunity to convert this Note into shares of Common Stock.

48 <u>Purchase Agreement</u>. By its acceptance of this Note, each party agrees to be bound by the applicable terms of the Purchase Agreement.

21

SA-145

4.9 <u>Notice of Corporate Events</u>. Except as otherwise provided below, the Holder of this Note shall have no rights as a Holder of Common Stock unless and only to the extent that it converts this Note into Common Stock. The Borrower shall provide the Holder with prior notification of any meeting of the Borrower's shareholders (and copies of proxy materials and other information sent to shareholders). In the event of any taking by the Borrower of a record of its shareholders for the purpose of determining shareholders who are entitled to receive payment of any dividend or other distribution, any right to subscribe for, purchase or otherwise acquire (including by way of merger, consolidation, reclassification or recapitalization) any share of any class or any other securities or property, or to receive any other right, or for the purpose of determining shareholders who are entitled to vote in connection with any proposed sale, lease or conveyance of all or substantially all of the assets of the Borrower or any proposed liquidation, dissolution or winding up of the Borrower, the Borrower shall mail a notice to the Holder, at least twenty (20) days prior to the record date specified therein (or thirty (30) days prior to the consummation of the transaction or event, whichever is earlier), of the date on which any such record is to be taken for the purpose of such dividend, distribution, right or other event, and a brief statement regarding the amount and character of such dividend, distribution, right or other event to the extent known at such time. The Borrower shall make a public announcement of any event requiring notification to the Holder hereunder substantially simultaneously with the notification to the Holder in accordance with the terms of this Section 4.9 including, but not limited to, name changes, recapitalizations, etc. as soon as possible under law.

4.10 <u>Usury</u>. If it shall be found that any interest or other amount deemed interest due hereunder violates the applicable law governing usury, the applicable provision shall automatically be revised to equal the maximum rate of interest or other amount deemed interest permitted under applicable law. The Borrower covenants (to the extent that it may lawfully do so) that it will not seek to claim or take advantage of any law that would prohibit or forgive the Borrower from paying all or a portion of the principal or interest on this Note.

4.11 <u>Remedies</u>. The Borrower acknowledges that a breach by it of its obligations hereunder will cause irreparable harm to the Holder, by vitiating the intent and purpose of the transaction contemplated hereby. Accordingly, the Borrower acknowledges that the remedy at law for a breach of its obligations under this Note will be inadequate and agrees, in the event of a breach or threatened breach by the Borrower of the provisions of this Note, that the Holder shall be entitled, in addition to all other available remedies at law or in equity, and in addition to the penalties assessable herein, to an injunction or injunctions restraining, preventing or curing any breach of this Note and to enforce specifically the terms and provisions thereof, without the necessity of showing economic loss and without any bond or other security being required. No provision of this Note shall alter or impair the obligation of the Borrower, which is absolute and unconditional, to pay the principal of, and interest on, this Note at the time, place, and rate, and in the form, herein prescribed.

4.12 <u>Severability</u>. In the event that any provision of this Note is invalid or unenforceable under any applicable statute or rule of law, then such provision shall be deemed inoperative to the extent that it may conflict therewith and shall be deemed modified to conform with such statute or rule of law. Any provision hereof which may prove invalid or unenforceable under any law shall not affect the validity or enforceability of any other provision hereof.

22

4.13  <u>Dispute Resolution</u>. In the case of a dispute as to the determination of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, Default Sum, Closing or Maturity Date, the closing bid price, or fair market value (as the case may be) or the arithmetic calculation of the Conversion Price or the applicable prepayment amount(s) (as the case may be), the Borrower or the Holder shall submit the disputed determinations or arithmetic calculations via facsimile (i) within two (2) Business Days after receipt of the applicable notice giving rise to such dispute to the Borrower or the Holder or (ii) if no notice gave rise to such dispute, at any time after the Holder learned of the circumstances giving rise to such dispute. If the Holder and the Borrower are unable to agree upon such determination or calculation within two (2) Business Days of such disputed determination or arithmetic calculation (as the case may be) being submitted to the Borrower or the Holder, then the Borrower shall, within two (2) Business Days, submit via facsimile (a) the disputed determination of the Conversion Price, the closing bid price, the or fair market value (as the case may be) to an independent, reputable investment bank selected by the Borrower and approved by the Holder or (b) the disputed arithmetic calculation of the Conversion Price, Conversion Amount, any prepayment amount or Default Amount, Default Sum to an independent, outside accountant selected by the Holder that is reasonably acceptable to the Borrower. The Borrower shall cause at its expense the investment bank or the accountant to perform the determinations or calculations and notify the Borrower and the Holder of the results no later than ten (10) Business Days from the time it receives such disputed determinations or calculations. Such investment bank's or accountant's determination or calculation shall be binding upon all parties absent demonstrable error.

4.14  <u>Terms of Future Financings.</u> So long as this Note is outstanding, upon any issuance by the Borrower or any of its subsidiaries of any security with any term more favorable to the holder of such security or with a term in favor of the holder of such security that was not similarly provided to the Holder in this Note, then the Borrower shall notify the Holder of such additional or more favorable term and such term, at Holder's option, shall become a part of the transaction documents with the Holder. The types of terms contained in another security that may be more favorable to the holder of such security include, but are not limited to, terms addressing conversion discounts, prepayment rate, conversion lookback periods, interest rates, original issue discounts, stock sale price, private placement price per share, and warrant coverage.

4.15 <u>Piggyback Registration</u> Rights. The Borrower shall include on the next registration statement the Borrower files with SEC (or on the subsequent registration statement if such registration statement is withdrawn) all shares issuable upon conversion of this Note. Failure to do so will result in liquidated damages of 25% of the outstanding principal balance of this Note, but not less than Fifteen Thousand and No/100 United States Dollars ($15,000), being immediately due and payable to the Holder at its election in the form of cash payment or addition to the balance of this Note.

4.16 <u>Future Raises; Repayment from Proceeds</u>. The Borrower shall not consummate any capital raising transactions (including but not limited to from the issuance of debt and/or equity securities) during the initial sixty (60) days after the Issue Date. Until the Note is satisfied in full, if the Borrower receives cash proceeds from any source or series of related or unrelated sources, including but not limited to, from the issuance of equity and/or debt securities, the conversion of outstanding warrants of the Borrower, the issuance of securities pursuant to an equity line of credit of the Borrower or the sale of assets, the Borrower shall, within one (1) business day of Borrower's receipt of such proceeds, inform the Holder of such receipt, following which the Holder shall have the right in its sole discretion to require the Borrower to immediately apply all or any portion of such proceeds to repay all or any portion of this Note. Failure of the Borrower to comply with this provision shall constitute an Event of Default under Section 3.4 of the Note. In the event that such proceeds are received by the Holder prior to the Maturity Date, the required prepayment shall be subject to the terms of Section 1.9 herein.

[signature page follows]

SA-147

IN WITNESS WHEREOF, Borrower has caused this Note to be signed in its name by its duly authorized officer as of the date first above written.

VISIUM TECHNOLOGIES, INC.

By:   */s/ Mark Lucky*
Name: Mark Lucky
Title:   Chief Financial Officer

24

SA-148

EXHIBIT A NOTICE OF CONVERSION

The undersigned hereby elects to convert $_____$principal amount of the Note (defined below) together with $_____$of accrued and unpaid interest thereto, totaling $_____$into that number of shares of Common Stock to be issued pursuant to the conversion of the Note ("Common Stock") as set forth below, of Visium Technologies, Inc., a Florida corporation (the "Borrower"), according to the conditions of the senior convertible promissory note of the Borrower dated as of January 7, 2019 (the "Note"), as of the date written below. No fee will be charged to the Holder for any conversion, except for transfer taxes, if any.

Box Checked as to applicable instructions:

[  ] The Borrower shall electronically transmit the Common Stock issuable pursuant to this Notice of Conversion to the account of the undersigned or its nominee with DTC through its Deposit Withdrawal At Custodian system ("DWAC Transfer").

Name of DTC Prime Broker:
Account Number:

[  ] The undersigned hereby requests that the Borrower issue a certificate or certificates for the number of shares of Common Stock set forth below (which numbers are based on the Holder's calculation attached hereto) in the name(s) specified immediately below or, if additional space is necessary, on an attachment hereto:

Name: [NAME]
Address: [ADDRESS]

| | | |
|---|---|---|
| Date of Conversion: | | |
| Applicable Conversion Price: | $_____ | Number of |
| Shares of Common Stock to be Issued | | |
|    Pursuant to Conversion of the Notes: | _____ | Amount of |
| Principal Balance Due remaining | | |
|    Under the Note after this conversion: | _____ | |
| Accrued and unpaid interest remaining: | _____ | |

[HOLDER]

By: _____     Name: [NAME]
Title:   [TITLE]
Date:   [DATE]

25

SA-149