# 23-0078-cv

## United States Court of Appeals

*for the*

## Second Circuit

---

DARKPULSE, INC.,

*Plaintiff-Appellant,*

— v. —

FIRSTFIRE GLOBAL OPPORTUNITIES FUND, LLC, ELI FIREMAN,

*Defendants-Appellees.*

---

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## REPLY BRIEF FOR PLAINTIFF-APPELLANT

MARK R. BASILE, ESQ
MARJORIE SANTELLI, ESQ
THE BASILE LAW FIRM P.C.
*Attorneys for Plaintiff-Appellant*
390 North Broadway, Suite 140
Jericho, New York 11753
(516) 455-1500

# TABLE OF CONTENTS

**Page**

TABLE OF AUTHORITIES ..................................................................................iv

ISSUE ONE (Usury Issue)......................................................................................1

DARKPULSE MADE CLEAR THAT IT IS APPEALING THE
LOWER COURT'S DISMISSAL OF COUNTS I, II (SECURITIES
LAW CLAIMS) AND IV (THE RICO CLAIM)...........................................1

    A.    DarkPulse Challenges the Legal Error that Underlies the
District Court's Dismissal of Counts I, II and IV ................................1

FIRSTFIRE REFUSES TO ADDRESS THE DIFFERENCE
BETWEEN AN AFFIRMATIVE CLAIM (WHICH SEEKS
DAMAGES) AND A DEFENSE TO ENFORCEMENT (WHICH
DOES NOT) ..................................................................................................2

    A.    If Successful, DarkPulse's Usury Allegation Would Not
Provide Affirmative Relief or Recovery; It Simply Defeats
FirstFire's Affirmative Defense and Allows DarkPulse's
Claims to Proceed....................................................................................3

    B.    Throughout its Brief, FirstFire Repeatedly Mischaracterizes
DarkPulse's Claims As "Seek[ing] to Rescind Transactions
Because they Are Criminally Usurious," Which is Patently
False.........................................................................................................4

    C.    A Party *May* Plead Unconscionability in Order to Resist
Enforcement of a Forum Selection Clause (Because it is
Defensive) ...............................................................................................5

NEW YORK USURY LAW DEMONSTRATES THAT
USURIOUS AGREEMENTS ARE ILLEGAL, VOID, AND MAY
NEVER BE ENFORCED...............................................................................6

    A.    FirstFire Never Addresses that it is Seeking to Enforce an
Illegal Contract that was Deemed Void the Minute it Came
into Existence ..........................................................................................7

        1.    An Agreement that is *Void Ab Initio* Cannot be Ratified
for the Same Reason it Cannot be Amended .............................7

i

2.    Adar Bays Confirmed that Criminally Usurious Contracts to Corporate Borrowers are *Void Ab Initio* ...............8

B.    *Haymount II* Distinguished Arbitration Provisions, Not Forum Selection Provisions ..................................................8

FIRSTFIRE'S OBVIOUSLY FALSE CONTENTION THAT THE APRIL 2021 LOAN AGREEMENT IS "NOT USURIOUS AS A MATTER OF LAW" CANNOT BE TAKEN SERIOUSLY ........................9

A.    As Demonstrated at the District Court, the 2021 Agreement Charged In Excess Of 1,242% A.P.R. *Without The Value of The Conversion Option or Default Conversion Price* .......................10

1.    The 60,000,000 Commitment Shares are Required as Up-Front Consideration for the Loan and Have Nothing to do With Default; the Value of the Shares Must Be Included in the Interest Calculation ..........................11

2.    Interest Includes the Value of Securities Given as Consideration for a Loan ..........................................11

3.    Despite the Stated 10% Interest Rate, the Loan Agreement is Patently Usurious When the Value of the Commitment Shares is Included ...............................12

THAT DARKPULSE IS A REPEAT-CUSTOMER OF TOXIC LENDERS DOES NOT DEMONSTRATE SOPHISTICATION ...............14

A.    All Three Convertible Notes Exhibited in FirstFire's Special Appendix Were Purchased by Lenders Currently Under Prosecution by the Securities and Exchange Commission for Operating as Unregistered Dealers, in Violation of §15(a) ...............15

ISSUE TWO .........................................................................17

Preliminary Statement .......................................................17

I.    THE "AS MADE" VS "AS PERFORMED" DISTINCTION ..........19

A.    For Contracts "Made in Violation" of the Act, the Express Terms Can Be Perfectly Lawful ..................................20

B.    Where A Contract Requires Performance That Violates the Act, Evidence of The Violation is Frequently in The Agreement .........................................................21

II.     FIRSTFIRE'S "DECADES OF CASELAW" ADDRESS
        SECTION 29(B) CLAIMS FOR BROKERAGE
        CONTRACT RESCISSION, BUT HAVE LITTLE
        BEARING ON THIS CASE ...............................................................22

        A.    Prior to *Vystar* and *ExeLED*, most 29(b) Claims Based
              on § 15(a) Were for Rescission of Brokerage Contracts ..........23

        B.    A *Brokerage* Contract is Uniquely Suited to Show
              Nearly Every Element of a § 15(a) Violation ...........................24

        C.    "Broker Services" and "Act Like a Broker" is
              Shorthand for All the Activities Held to Violate
              Section 15(a), and Cannot Supplant the Language of
              the Statute ..................................................................................25

        D.    *Vystar* and *ExeLED* Applied the Brokerage
              Contract/Unregistered Broker Analysis to an
              Unregistered Dealer Effecting a Securities Contract ...............26

        E.    There Is No Such Thing as A "Dealer Services"
              Contract, and §15(a) Contains No "act Like  a Dealer"
              Prohibition.  Unregistered Dealer Violates §15(a) By
              Effecting a Transaction in Securities,  Which FirstFire
              Did in this Case ........................................................................26

        F.    Unlike A Brokerage Contract, A Securities Purchase
              Contract Effects A Transaction in Securities, and
              Provides No Evidence of Dealer Status ...................................27

              1.    Dealer Status Must be Determined by
                    Extraneous Evidence About the Dealer's
                    Business ..........................................................................27

III.    FIRSTFIRE'S UNWILLING INNOCENT PARTY
        ARGUMENTS ARE MERITLESS ...................................................29

CONCLUSION .......................................................................................30

iii

# TABLE OF AUTHORITIES

**Page(s)**

**Cases:**

*Adar Bays, LLC v. GeneSYS ID, Inc.,*
179 N.E.3d 612 (New York 2021) ........................................................8, 11, 14

*Am. E. Grp., LLC v. Livewire Ergogenics, Inc.,*
2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) .............................................11

*Antares Mgmt. LLC v. Galt Glob. Capital, Inc.,*
No. 12-CV-6075(TPG), 2013 U.S. Dist. LEXIS 43545
(S.D.N.Y. Mar. 22, 2013).................................................................................23

*Atl. Marine Constr. Co. v. United States Dist. Court,*
571 U.S. 49, 134 S. Ct. 568 (2013) ...............................................................2

*Band Realty Co. v. N. Brewster, Inc.,*
335 N.E.2d 316 (N.Y. 1975) .........................................................................13

*Bankers Tr. Co. v. Litton Sys., Inc.,*
599 F.2d 488 (2d Cir. 1979) ...........................................................................7

*Berckeley Inv. Grp., Ltd. v. Colkitt,*
455 F.3d 195 (3d Cir. 2006)..........................................................................21

*Chassman v. Shipley,*
695 F. App'x 630 (2d Cir. 2017)...................................................................11

*Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.,*
93 F. Supp. 2d 220 (D. Conn. 2000)..............................................................29

*Cyber Apps World, Inc. v. EMA Fin., LLC,*
2022 U.S. Dist. LEXIS 222869 (S.D.N.Y. Dec. 9, 2022) .............................5

*Durst v. Abrash,*
22 A.D.2d 39 (1st Dep't 1964) .......................................................................7

*Eastside Church of Christ v. Nat'l Plan, Inc.,*
391 F.2d 357 (5th Cir. 1968)..........................................................19, 28, 29

*Ema Fin., LLC v. Vystar Corp.,*
336 F.R.D. 75 (S.D.N.Y. 2020).......................................................17, 23, 26

*Found. Ventures, LLC v. F2G, Ltd.,*
2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11, 2010) ................23, 24, 25

iv

*Frati v. Saltzstein*,
　　2011 U.S. Dist. LEXIS 25567 (S.D.N.Y. Mar. 14, 2011)..............................23

*Freitas v. Geddes Sav. & Loan Ass'n*,
　　471 N.E.2d 437 (N.Y. 1984) ..........................................................................10

*Hillair Capital Invs., L.P. v. Integrated Freight Corp.*,
　　963 F. Supp. 2d 336 (S.D.N.Y. 2013) ...................................................... 11-12

*In re Grand Union Co.*,
　　219 F. 353 (2d Cir. 1914)................................................................................11

*Lawrence v. Richman Gr. of Conn., LLC*,
　　407 F. Supp. 2d 385 (D. Conn. 2005) *aff'd*, 199 F. App'x 55
　　(2d Cir. 2006)..........................................................................................23, 24

*LG Capital Funding, LLC v. ExeLED Holdings, Inc.*,
　　2018 U.S. Dist. LEXIS 202540 (S.D.N.Y. Sep. 28, 2018).........17, 18, 23, 26

*Marine Midland Bank, N.A. v. United Mo. Bank, N.A.*,
　　223 A.D.2d 119 (App. Div. 1st Dept. 1996) .....................................................6

*Mills v. Elec. Auto-Lite Co.*,
　　396 U.S. 375 (1970).................................................................................20, 21

*P.J.P. Mech. Corp. v. Commerce & Indus. Ins. Co.*,
　　65 A.D.3d 195 (App. Div. 1st Dep't 2009).......................................................3

*Palmer v. Thomson & McKinnon Auchincloss, Inc.*,
　　474 F. Supp. 286 (D. Conn. 1979)........................................................... 29-30

*Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*,
　　794 F. Supp. 1265 (S.D.N.Y. 1992) ...............................................................22

*Ragone v. Atl. Video*,
　　595 F.3d 115 (2d Cir. 2010) .............................................................................5

*Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*,
　　678 F.2d 552 (5th Cir. 1982)............................................................21, 22, 23

*Schermerhorn v. Talman*,
　　14 N.Y. 93 (N.Y. 1856) ..................................................................................11

*SEC v. Almagarby*,
　　479 F. Supp. 3d 1266 (S.D. Fla. 2020) ..........................................................27

*SEC v. Auctus Fund Management*,
Civil Action No. 23-cv-11233 (D. Mass. June 1, 2023).........................15, 16

*SEC v. Crown Bridge Partners, LLC*,
Civil Action No. 22-cv-06537, 2022 U.S. Dist. LEXIS 142555
(S.D.N.Y. Aug. 8, 2022).................................................................................15

*Seidel v. 18 East 17th Street Owners, Inc.*,
79 N.Y.2d 735 (N.Y. 1992) ............................................................................11

*Szerdahelyi v. Harris*,
490 N.E.2d 517 (1986) .....................................................................................7

*TradeComet.com LLC v. Google, Inc.*,
435 F. App'x 31 (2d Cir. 2011) ........................................................................6

*United States SEC v. Big Apple Consulting USA, Inc.*,
783 F.3d 786 (11th Cir. 2015)........................................................................28

*United States SEC v. Carebourn Capital, L.P.*,
No. 21-cv-2114(KMM/JFD), 2022 U.S. Dist. LEXIS 67596
(D. Minn. Apr. 12, 2022) ...............................................................................15

*United States SEC v. Carebourn Capital, LP*,
339 F.R.D. 510 (N.D. Ill. 2021) .....................................................................14

*Walker v. Am. Cent. Ins. Co.*,
38 N.E. 106 (1894) .......................................................................................3, 4

*Zerman v. Jacobs*,
510 F. Supp. 132 (S.D.N.Y. 1981) .................................................................22

**Statutes & Other Authorities:**

15 U.S.C. § 78c(a)(4) ........................................................................................24

15 U.S.C. § 78c(a)(4)(A) ...................................................................................24

15 U.S.C. § 78c(a)(5) ........................................................................................27

15 U.S.C. § 78o(a)(1)........................................................................................25

28 U.S.C. § 1391 .................................................................................................2

28 U.S.C. § 1406.................................................................................................2

Am. Jur. 2d Brokers § 1 1997 ...........................................................................24

Black's Law Dictionary (10th ed. 2009) ...................................................28

Fed. R. Civ. P. 12(b)(3)............................................................................2

N.Y. C.P.L.R. § 3018 ...............................................................................3

N.Y. Gen. Oblig. § 5-501(2)....................................................................11

N.Y. Gen. Oblig. § 5-511 .........................................................................7

N.Y. Gen. Oblig. § 5-511(2)......................................................................7

N.Y. Gen. Oblig. § 5-521(3)......................................................................9

N.Y. Penal Law § 190.40 .........................................................................10

Restat. 2d of Conflict of Laws, § 187 (2nd 1988) ....................................6

Steimberg, Marc, *Section 29(b): A Viable Remedy Awakened*, 48 Geo.
    Wash. L. Rev. 1 (1979) .......................................................................20

Securities Exchange Act § 3(a)(5)(A)......................................................27

Securities Exchange Act § 10(b).............................................................21

Securities Exchange Act § 14(a).............................................................20

Securities Exchange Act § 15(a).....................................................*passim*

Securities Exchange Act § 29(b)....................................................*passim*

In Reply to Appellee FirstFire Global Opportunity Fund, Inc.'s ("FirstFire")

Brief in opposition, Appellant DarkPulse, Inc., ("DarkPulse") submits the following:


**ISSUE ONE**

(Usury Issue)

**DARKPULSE MADE CLEAR THAT IT IS APPEALING THE LOWER COURT'S DISMISSAL OF COUNTS I, II (SECURITIES LAW CLAIMS) AND IV (THE RICO CLAIM).**

FirstFire claims that

DarkPulse's briefing is less than clear about what it is appealing, despite nearly twenty pages dedicated to New York's usury laws; . . . . DarkPulse frames "Issue One" in its brief as an appeal of Count IV (RICO) (Br. at 24), objecting to the District Court's enforcement of the Amendment's choice-of-law clause (A-30). However, DarkPulse's arguments regarding "Issue One" discuss only the District Court's dismissal of Counts I and II (Section 29(b) claims) based on the Amendment's forum-selection clause. (Br. at 40; A-17–21.)

FirstFire ("FF") Br. at n. 8.

**A.    DarkPulse Challenges the Legal Error that Underlies the District Court's Dismissal of Counts I, II and IV.**

DarkPulse directly addresses the district court's dismissal of its Count IV (RICO) claim on pages 42-43 of its opening Brief.   Although more Brief space is devoted to addressing the Delaware forum-selection clause, this is largely because the district court's analysis was almost entirely in that section of the opinion, *see* A-

21.  The court then enforced the Delaware choice-of-law provision[1] by applying the same flawed analysis it used to deny DarkPulse's challenge to the  forum-selection clause, stating only that the "Delaware forum selection clause is, as discussed, enforceable, and so too is the Delaware choice of law provision." A-31.  Given the importance of governing law to a RICO unlawful-debt claim, the lower court's application of Delaware law is far more consequential than its dismissal of the securities-law claims because it essentially defeats the claim.  Claims I and II (the Section 29(b) claims for rescission) may still be brought in the Delaware forum.[2]


### FIRSTFIRE REFUSES TO ADDRESS THE DIFFERENCE BETWEEN AN AFFIRMATIVE CLAIM (WHICH SEEKS DAMAGES) AND A DEFENSE TO ENFORCEMENT (WHICH DOES NOT).

Firstfire contends that there is a "strict line between claim and defense," but conspicuously avoids any discussion on how that line is defined.

As explained in DarkPulse's opening Brief, the fundamental difference

---

[1]  The district court also performed a choice-of-law analysis, (*see* A-32) but that analysis presumed a valid agreement and valid amendment.

[2]  Pursuant to *Atl. Marine Constr. Co. v. United States Dist. Court*, 571 U.S. 49, 134 S. Ct. 568 (2013), a case filed in a district where venue is proper under §1391 (as is true in this case) may not be dismissed under §1406(a) or Rule 12(b)(3), but instead transferred to the correct forum.

2

between an affirmative claim and a defense is that former seeks recovery or other affirmative relief, and the latter does not. *See Walker v. Am. Cent. Ins. Co.*, 38 N.E. 106 (1894) (holding that "[f]acts pleaded which controvert [ a party's] claim and serve merely to defeat it as a cause of action are inconsistent with the legal idea of a counterclaim, which is a separate and distinct cause of action"). The effect of a successful defense does not result in any affirmative relief, such as monetary damages, it simply defeats a claim by the opposing party. *See P.J.P. Mech. Corp. v. Commerce & Indus. Ins. Co.*, 65 A.D.3d 195 (App. Div. 1st Dept. 2009)) ("as an affirmative defense, [defendant's] claim . . . merely sought dismissal of the suit . . . When raised as a counterclaim, however, it effectively sought damages from plaintiff, thus triggering the insurer's duty to defend"); *see also* N.Y. C.P.L.R. § 3018 (defining affirmative defense to include "facts showing illegality either by statute or common law." ).

**A.    If Successful, DarkPulse's Usury Allegation Would Not Provide Affirmative Relief or Recovery; It Simply Defeats FirstFire's Affirmative Defense and Allows DarkPulse's Claims to Proceed.**

The inaccuracy of FirstFire's description becomes even more apparent when considering what would occur if DarkPulse were successful. Contrary to what FirstFire implies, a 'successful' assertion of usury would not entitle DarkPulse to rescind the contract; DarkPulse would obtain no relief whatsoever. A 'victory'

3

would simply allow DarkPulse's securities law and RICO claims to move forward, which demonstrates that it is a defense, not a claim. *Walker*, 38 N.E. 106 ("[f]acts pleaded which controvert [ a party's] claim and serve merely to defeat it as a cause of action are inconsistent with the legal idea of a counterclaim").

## B. Throughout its Brief, FirstFire Repeatedly Mischaracterizes DarkPulse's Claims As "Seek[ing] to Rescind Transactions Because they Are Criminally Usurious," Which is Patently False.

Firstfire's description of DarkPulse's claims are, to be charitable, not an exemplar of accuracy. Firstfire repeatedly mischaracterizes the claims DarkPulse's brought in its complaint, stating (1) that DarkPulse "invokes New York's usury law (§5-511) in connection with seeking affirmative relief (*i.e.*, rescission and the return of its shares);" (2) that DarkPulse "expressly pleads that it seeks to rescind transactions because they are criminally usurious," and (3) that "DarkPulse is invoking usury affirmatively to void the Second Transaction and rescind the 2021 Note entirely, which New York law does not allow." FF Br. at 20, 28 (citing A-392-93) and 18. The first statement is very misleading but statements (2) and (3) are completely false.

What FirstFire is attempting to obscure is that DarkPulse's *only claim for rescission* is under §29(b) of the Securities Exchange Act of 1934, and has *nothing to do with usury*. DarkPulse raised usury in response to FirstFire's attempt to enforce

the forum-selection clause (and choice-of-law provision) in the Delaware Amendment.

## C. A Party *May* Plead Unconscionability in Order to Resist Enforcement of a Forum Selection Clause (Because it is Defensive).

FirstFire draws a comparison between usury and unconscionability, because both are permitted as defenses to contract enforcement but not as affirmative claims. FirstFire states: 'like usury, [a] cause of action for unconscionability may not be used to seek affirmative relief' under New York law,' and courts routinely and consistently dismiss unconscionability when raised as an affirmative claim." FF Br. at n. 9 (internal citations omitted).

FirstFire's illustration undermines its own point, because although unconscionability cannot be used as a claim for affirmative relief—it *may* be raised by a plaintiff seeking to resist a forum selection clause, as well as other contractual provisions.[3] *See  Ragone v. Atl. Video*, 595 F.3d 115, 121 (2d Cir. 2010) (plaintiff

---

[3] The district court does not explain why usury *may* be raised in terms of the "public policy" exception to enforcement of the Delaware choice of law provision, but may *not be raised* as evidence that the Delaware Amendment was utterly void because of usury.  See A- 28.Slip Op at 23.  *See also Cyber Apps World, Inc. v. EMA Fin., LLC*, 2022 U.S. Dist. LEXIS 222869 (S.D.N.Y. Dec. 9, 2022) (permitting plaintiff to raise usury as "public policy" exemption for choice-of-law clause, but rejecting claim).

resisting enforcement of arbitration clause on unconscionability grounds); *TradeComet.com LLC v. Google, Inc.*, 435 F. App'x 31, 35 (2d Cir. 2011) (addressing plaintiff's challenge to forum-selection clause based on unconscionability, assessing whether "enforcement would be unreasonable or unjust, or that the clause was invalid for such reasons as fraud or overreaching."). Further, "[a] choice-of-law provision, like any other contractual provision, will not be given effect if the consent of one of the parties to its inclusion in the contract was obtained by improper means, such as by misrepresentation, duress, or undue influence, or by mistake." Restat. 2d of Conflict of Laws, § 187 (2nd 1988) cited in *Marine Midland Bank, N.A. v. United Mo. Bank, N.A.*, 223 A.D.2d 119, 123-24 (App. Div. 1st Dept. 1996).

## NEW YORK USURY LAW DEMONSTRATES THAT USURIOUS AGREEMENTS ARE ILLEGAL, VOID, AND MAY NEVER BE ENFORCED.

FirstFire complains that DarkPulse spent "nearly twenty pages" dedicated to New York usury law (Br. at n. 8) but given the central role that New York usury law plays in this case, it might be more appropriate to ask why FirstFire spent so little time addressing it.

---

**A.    FirstFire Never Addresses that it is Seeking to Enforce an Illegal Contract  that was Deemed Void the Minute it Came into Existence.**

New York usury law directs that a court presented with a usurious loan agreement "shall declare the same to be void, and enjoin any prosecution thereon, and order the same to be surrendered and cancelled," N.Y. GOL § 5-511 (2).  As noted by the New York Court of Appeals, §5-511 "is no more than the implementation of a statutory expression of the familiar rule that illegal contracts, or those contrary to public policy, are unenforceable and that the courts will not *recognize rights arising from them*.  The law leaves the parties to such agreements where it finds them."    *Szerdahelyi v. Harris*, 490 N.E.2d 517, 520-21 (1986) (citations omitted) (emphasis added).

### *1.    An Agreement that is Void Ab Initio Cannot be Ratified for the Same Reason it Cannot be Amended.*

As this Court has observed, "a contract which is voidable may be ratified while a void transaction cannot be." *Bankers Tr. Co. v. Litton Sys*., Inc., 599 F.2d 488, 492-93 (2d Cir. 1979).  New York law is emphatic that usurious contracts are *void ab initio*.  Moreover, where a contract is deemed void ab initio, *no part of the agreement survives*.  *See Durst v. Abrash*, 22 A.D.2d 39 (1st Dept. 1964) ("If the main purpose of the transaction was illegal then the subsidiary agreements . . .  are rendered invalid by the invalidity of the principal agreement.").

7

**2.    *Adar Bays Confirmed that Criminally Usurious Contracts to Corporate Borrowers are Void Ab Initio***

FirstFire's attempts to factually distinguish *Adar Bays* are irrelevant. *Adar Bays, LLC v. GeneSYS ID, Inc.*, 179 N.E.3d 612 (New York 2021). *Adar Bays* applies to this case because it confirmed that the contract between FirstFire and DarkPulse was void at its inception and incapable of amendment.

**B.    *Haymount II* Distinguished Arbitration Provisions, Not Forum Selection Provisions.**

FirstFire next argues that the decision in *Haymount II* "should be cabined to a class action waiver" and that "Judge Rakoff was careful to distinguish this class action waiver decision from other types of contractual provisions that designate the appropriate forum . . ." FF Br. at 25. These claims are meritless. The distinction Judge Rakoff addressed in *Haymount* II was not related to a broad category of forum selection clauses, but was based on a unique carve-out provided by "express language in the Federal Arbitration Act." *Haymount II.* LEXIS *15 (addressing a consequence of a class action waiver when it was contained within an arbitration provision).

The actual language used by Judge Rakoff broadly included any provision in the contract that a Lender sought to enforce, stating:

> Defendants cite no case, nor is this Court aware of any, where New York courts have disallowed corporations from relying on usury as a defense to attempts to enforce features of an allegedly usurious contract against them, as plaintiffs seek to do here. And New York's usury statute

8

contains no language along the lines defendants suggest, limiting the usury defense to actions where the lender sues to collect on a debt. Instead, the statute provides that corporations may "interpose a defense of criminal usury" in "*any* action. . . ." N.Y. Gen. Oblig. § 5-521(3) (emphasis added).

*Haymount II,* 2022 U.S. Dist. LEXIS 186768, at *9.

## FIRSTFIRE'S OBVIOUSLY FALSE CONTENTION THAT THE APRIL 2021 LOAN AGREEMENT IS "NOT USURIOUS AS A MATTER OF LAW" CANNOT BE TAKEN SERIOUSLY.

Firstfire ends its argument on Issue One by claiming that the "2021 Note is not usurious as a matter of law." FF Br. at 36.   This contention is patently false. There can be no serious dispute that the Loan Agreement[4] is not just criminally usurious—*but extremely so*.   The obviously usurious nature of the Agreement is, after all, why Firstfire so adamantly seeks to prevent DarkPulse from raising the question to begin with.

FirstFire claims that (1) the "First Amended Complaint still fails to plead that the 2021 Note is usurious," (2) that "the 2021 Note is not usurious as a matter of law," and that DarkPulse "fabricated" the interest rate by including value of the

---

[4] Because the 2021 Loan Agreement is comprised of three documents (the Note, SPA and RRA) DarkPulse refers to the "Agreement," or "Loan Agreement."

9

default penalties. FF Brief at 36-37. Even a cursory examination of the Loan Agreement shows that each of these statements are meritless.

## A. As Demonstrated at the District Court, the 2021 Agreement Charged In Excess Of 1,242% A.P.R. *Without The Value of The Conversion Option or Default Conversion Price.*

First, although DarkPulse never 'pleaded' *usury* at all (because DarkPulse's claims are for RICO and Securities law violations) the FAC plainly alleges that the Loan Agreement charges interest in excess of the legal rate under NY Penal Law § 190.40. [5] Second, DarkPulse has amply demonstrated—both in its Brief to this Court and before the district court—that the Loan Agreement is usurious on its face *without the value of the default discount conversion price*. A borrower satisfies his *prima facie* burden of proving usury by showing that an agreement evidences a loan and charges an illegal rate of interest. *See Freitas v. Geddes Sav. & Loan Ass'n*, 471 N.E.2d 437, 443 (N.Y. 1984).

---

[5] The FAC alleges that the 2021 Note charges "more than twice the enforceable rate under New York law," (¶ 72) and although the 291% a.p.r. interest calculation (¶ 79) includes the default charges, the footnote also provides calculations showing the interest rate *without* the default charges as 158% a.p.r. (stated 10% interest, added 10% original issue discount and another 138% charge when including the value of the commitment shares). S*ee* A- 383-384. Although the calculations in the FAC are not correct (they vastly undercount the interest rate) the 158% a.p.r. alleged cannot in any way be construed as a "failure to plead that the 2021 Note is usurious."

1. **The 60,000,000 Commitment Shares are Required as Up-Front Consideration for the Loan and Have Nothing to do With Default; the Value of the Shares Must Be Included in the Interest Calculation.**

Under NY Gen. Oblig. § 5-501(2), "interest" is defined broadly, and includes "money, goods or things in action" and "shall include any and all amounts paid or payable, directly or indirectly, by any person, to or for the account of the lender in consideration for making the loan or forbearance."[6]

2. **Interest Includes the Value of Securities Given as Consideration for a Loan.**

It is settled law in New York that the value of securities given as consideration for a loan must be included in the interest calculation. *Adar Bays*, 37 N.Y.3d at 334; *Am. E. Grp., LLC v. Livewire Ergogenics, Inc*., 2020 LEXIS 14235 (S.D.N.Y. Jan. 28, 2020) (finding contract criminally usurious based on added value of up-front stock payment); *Hillair Capital Invs., L.P. v. Integrated Freight Corp*., 963 F. Supp.

---

[6] An unpublished case from this Court, *Chassman v. Shipley*, 695 F. App'x 630 (2d Cir. 2017), incorrectly held that the value of warrants given as consideration for a loan could not be included as interest because the lender referred to the warrants as "inducement" instead of "interest." This holding from *Shipley* is contrary to to well-established New York usury law, because it fails the fundamental duty of a court to look beyond the form of the document and take into account "all other property exchanged in consideration for the loan," that must be "included in determining the loan's interest rate for purposes of [New York's] usury statutes," *Adar Bays*, 37 N.Y.3d at 334. *See also In re Grand Union Co.*, 219 F. 353 (2d Cir. 1914); *Seidel v. 18 East 17th Street Owners, Inc.*, 79 N.Y.2d 735 (N.Y. 1992); *Schermerhorn v. Talman,* 14 N.Y. 93 (N.Y. 1856).

2d 336 (S.D.N.Y. 2013) (value of shares must be included even where restricted, use of IRS and other valuation methods are widely used).

### 3. *Despite the Stated 10% Interest Rate, the Loan Agreement is Patently Usurious When the Value of the Commitment Shares is Included.*

On the date the shares were conveyed, the stock (if freely trading) had a fair market value of **$1,140,000**.  Although the shares would typically be valued at a discount (because they were unregistered and therefore restricted from sale) that discount would be minimal in this case because (1)  DarkPulse was obligated to register the shares (which would make them freely trading); (2) DarkPulse was obligated to ensure that the shares could be sold under the Rule 144 exemption from registration (which allows the shares to be sold after six months); and (3) the actual value of the shares quadrupled by the time the six-month restriction was removed (leaving the 60,000,000 commitment shares with an estimated fair market value of **$4,800,000**).[7]

More importantly, though a precise value of the (restricted) commitment shares at the time of issuance would require factfinding, no reasonable estimate of the share value would be low enough to put the Loan Agreement into non-usurious

---

[7]And the prices continued upward until the end of November 2021.  Accordingly, the "leak out" provision in the April 2021 SPA, which prevented FirstFire from dumping all the stock in 1-2 would (if followed) increased profits.

(*or non-RICO*) territory. As observed by the New York Court of Appeals, the "issue is not a question of determining most precisely the rate of return realized by a lender as an abstract matter … [r]ather the issue is *whether a lender has received a return proscribed as usurious* by the Legislature." *Band Realty Co. v. N. Brewster, Inc*., 335 N.E.2d 316, 319 (N.Y. 1975) (emphasis added).

Under New York law, up-front payments to the lender are *retained interest*; the value of up-front payments are subtracted from the amount the borrower received from the lender at closing. *See Band Realty*, 335 N.E.2d at 318. Here, the Loan Agreement reflects DarkPulse receiving a principal amount of $825,000 at closing. Even assigning a 35% discount to the market price on the date of transfer, the commitment shares would be valued at $741,500.00, leaving the net loan to DarkPulse is calculated as $84,000.00. Hence, *at the time it was executed*, the Loan Agreement was governed by New York law, and obligated DarkPulse to repay FirstFire $886,875 (defined interest + principal) on a nine-month (net) loan of $84,000.00, evidencing an interest rate of **1,242% APR.**[8]

---

[8] 886,875-84,000)/84,000  x 100 = 956%  x  12/9 = 1,242.8%.

**THAT DARKPULSE IS A REPEAT-CUSTOMER OF TOXIC LENDERS DOES NOT DEMONSTRATE SOPHISTICATION.**

FirstFire alleges that DarkPulse's repeated use of convertible notes is evidence of its sophistication, and that DarkPulse is therefore not entitled to the protection of New York usury laws. FF Br. at 29. This claim is divorced from reality. New York usury laws expressly outline the circumstances that afford a corporation protection, and those circumstances are present here. *See Adar Bays*, *supra*. Moreover, a repeat-customer using convertible promissory notes –either the Note in this case or those described in DarkPulse's SEC filings -- "are a form of last-resort financing for companies that have nowhere else to turn in the marketplace" and are described as 'desperation financing.'"

FirstFire asserts that "DarkPulse was litigating certain of these actions" prior to the Delaware Amendment, FF Br. fn. 4, apparently to give the impression that DarkPulse is a sophisticated actor scheming to defraud various toxic lenders. However, at the time of the Delaware Amendment, DarkPulse was the *defendant* in a consolidated suit by two convertible note lenders, Carebourn Capital and More Capital, both of which were under investigation by the SEC at the time they filed suit against DarkPulse. *See United States SEC v. Carebourn Capital, LP*, 339 F.R.D. 510 (N.D. Ill. 2021). The SEC subsequently commenced a civil prosecution against Carebourn for operating as an unregistered securities dealer in violation of §15(a) of

14

the Act. *United States SEC v. Carebourn Capital, L.P.*, No. 21-cv-2114 (KMM/JFD), 2022 U.S. Dist. LEXIS 67596 (D. Minn. Apr. 12, 2022). DarkPulse successfully defended Carebourn's suit by demonstrating that Carebourn was operating as an unregistered securities dealer and could not legally effect the transactions. *See Carebourn Capital, L.P. v. DarkPulse, Inc*., 2023 Minn. Dist. LEXIS 1732 (summary judgment granted to DarkPulse).

**A.   All Three Convertible Notes Exhibited in FirstFire's Special Appendix Were Purchased by Lenders Currently Under Prosecution by the Securities and Exchange Commission for Operating as Unregistered Dealers, in Violation of §15(a).**

Included in the exhibits from FirstFire's supplemental appendix are copies of three convertible promissory notes that other lenders purchased from DarkPulse. *See* SA- 52 (Carebourn Capital Note); SA-74 (Auctus Fund Note); and SA-94 (Crown Bridge Partners Note).

*All three lenders are currently under civil prosecution by the SEC for violations of the § 15(a)*. *See United States SEC v. Carebourn Capital, L.P.*, No. 21-cv-2114 (KMM/JFD), 2022 U.S. Dist. LEXIS 67596 (D. Minn. Apr. 12, 2022); *SEC v. Crown Bridge Partners, LLC*, Civil Action No. 22-cv-06537, 2022 U.S. Dist. LEXIS 142555 (S.D.N.Y. Aug. 8, 2022); and *SEC v. Auctus Fund Management*, Civil Action No. 23-cv- 11233, (D. Mass) Complaint filed June 1, 2023.

15

The SEC Complaint in Auctus, which is naturally very similar to the complaint filed in all of the dealer registration cases, describes that

> Defendants operated a regular business through which they bought convertible promissory notes (the "Notes") through the Fund by entering into "Securities Purchase Agreements" with companies that traded on the public markets. The Notes were a type of debt security that could be converted into equity (meaning, shares of stock). The Defendants would convert the Notes to stock at a price per share that was guaranteed under the terms of the Notes to be substantially discounted from the current market price of the security, and then sell the newly issued shares into the public markets."

SEC Complaint, *SEC v. Auctus Fund*.

Although the *Auctus* case is only at the complaint stage, the SEC has won every dealer-registration case brought against convertible-note lenders thus far, which has become substantial. It is therefore difficult to fathom how the courts can continue to find in favor of the SEC's claims of §15(a) violations, but deny an issuer's claim for rescission based on §15(a) violations. That is, where the SEC alleges that these lenders violated § 15(a) by having "bought convertible promissory notes" . . . [which] were a type of debt security", one would think it obvious that the unlicensed dealer purchasing that security violated §15(a) when it effected that purchase. Hopefully this Court will remedy that incongruity with its decision in this case.

16

**ISSUE TWO**

May an unregistered securities dealer enter into the Securities Purchase Agreement or purchase the Convertible Promissory Note in this case without violating Section 15(a) of the Securities Exchange Act of 1934?

NO.  Under §15(a) of the Exchange Act, it is unlawful for an unregistered securities dealer "to effect any transactions in  . . . any security." Because a convertible promissory note is a security, an unregistered securities dealer "effects a transaction in securities" when he purchases the note, or enters into a contract to purchase the note.

**Preliminary Statement**

Issue Two presumes the existence of an unregistered securities dealer because the district court found it unnecessary to address whether FirstFire was a dealer. According to the district court, even if FirstFire were an unregistered dealer, DarkPulse's claim for rescission would still fail because "[n]either of the Notes require FirstFire to act as a dealer." A-26.[9]

---

[9] The court held that its conclusion adhered to the analysis in the *ExeLED* and *Vystar* decisions, which likewise deemed it unnecessary to reach the "dealer" question for the same reason.  A-26.  *See LG Capital Funding, LLC v. ExeLED Holdings, Inc.*, 2018 U.S. Dist. LEXIS 202540, at *15 (S.D.N.Y. Sep. 28, 2018) ("even if LG should have registered, nothing in the Note or the SPA indicates that those contracts "could not have been legally performed" because LG failed to do so.");  *Ema Fin., LLC v. Vystar Corp.*, 336 F.R.D. 75, 81-82 (S.D.N.Y. 2020) (following *LG Capital*,

17

Appellee FirstFire acknowledges that the lower court never reached that question (FF Br. at 45) but nonetheless argues that it is not a dealer, and attacks DarkPulse for making the (imaginary) claim that FirstFire's entry into the Agreement somehow turned it into a dealer. See FF Br. at 39.

As should be evident from the text of Issue two, DarkPulse does not argue (and has never argued) that FirstFire's entry into the Agreement would make it a "dealer" as defined in the Exchange Act. DarkPulse makes no argument (either here or in its opening brief) about whether FirstFire is a dealer, because the district court never reached that question. DarkPulse will make those arguments to the district court on remand.

---

dismissing claim because "Vystar does not identify a provision in the contracts that obligates Ema to act as a broker-dealer.").

## I. THE AS MADE" VS "AS PERFORMED" DISTINCTION.

Firstfire argues that "Darkpulse's distinction between contracts "made in violation" and "performed in violation" of the Exchange Act is meritless." [10] However, as with most of the arguments presented in its brief, this contention is neither explained nor supported by caselaw, making response difficult. Nonetheless, this distinction is relevant for the analysis in this case, and will be further addressed here.

In drafting section 29(b), Congress could not have been clearer: where the non-violating party demonstrated unlawful conduct occurred in the "making" of the contract, and/or where "performance" of the contract "involved a violation" of the Exchange Act, it was entitled to rescission. The statute's coverage of both types of illegality is noteworthy, because "the express terms of a contract could be

---

[10] FirstFire also contends that Darkpulse "fails to explain how the agreements here were made in violation of the Exchange Act." FF Br. at 42. DarkPulse argues that because the Agreement is a contract effecting a transaction in securities, an unregistered dealer like FirstFire would violate § 15(a) by entering into the Agreement to begin with. *See* DarkPulse Br. at 45, 46, 57; *Eastside Church*, 391 F.2d at 362 ("National was prohibited from effecting the transactions here involved and thus violated the Act by entering into those transactions."). DarkPulse also alleged that FirstFire could not *perform* the Agreement without violating §15(a), because FirstFire's only obligation under the Agreement was to purchase a convertible promissory Note, which is a security.

perfectly lawful, yet the "making" of the contract might involve a violation of the Act or its rules or regulations."[11]

## A. For Contracts "Made in Violation" of the Act, the Express Terms Can Be Perfectly Lawful.

The most well-known discussion of §29(b) is in *Mills v. Elec. Auto-Lite Co.*, 396 U.S. 375 (1970), where the underlying violation occurred in the "making" of a contract. In *Mills*, plaintiff shareholders alleged that approval for the merger had been obtained fraudulently, because the Auto-Lite managers had made false statements in the proxy voting materials for the merger, in violation of §14(a) of the Exchange Act. That is, the merger contract contained no unlawful provisions, but was "made" in violation of §14(a).

**Examination of extraneous evidence**. The lower courts examined the proxy statements and agreed that they were materially misleading and violated §14(a). The only question on appeal was, roughly, how bad did the violation have to be for the plaintiffs to be entitled to a remedy, including rescission?

The Court held that the plaintiffs were entitled to a remedy because the proxy materials were "an essential link in the accomplishment of the transaction." The

---

[11] Steimberg, Marc, *Section 29(b): A Viable Remedy Awakened*, 48 Geo. Wash. L. Rev. 1, (1979)

Court left the precise remedy to the lower courts, but noted that the remedy of voiding under §29(b) did not automatically void the entire agreement  but was an option for the non-violating party.  396 U.S. 375, 387-88.

The U.S. Court of Appeals for the Third Circuit used a similar analysis in *Berckeley v. Colkitt*, where the defendant Colkitt asserted that plaintiffs had made fraudulent statements (in violation of §10(b) of the Exchange Act) to induce entry into the agreement, and sought rescission under §29(b).  *Berckeley Inv. Grp., Ltd. v. Colkitt*, 455 F.3d 195 (3d. Cir. 2006).  The court remanded the case to the lower court to consider the 10(b) claim (consideration of evidence extraneous to the contract).  The court stated:

> The Section 10(b) claim alleges that Berckeley made material misrepresentations that induced Colkitt to enter into the Agreement. If Colkitt is able to prove that claim, then the Agreement was 'made in violation of' Section 10(b). The misrepresentations that induced Colkitt to enter into the Agreement would be inseparable from the underlying agreement between the parties.

*Berckeley*, 455 F.3d 195, 207 (3d Cir. 2006) (citation and quotation marks omitted).

**B.    Where A Contract Requires Performance That Violates the Act, Evidence of The Violation is Frequently in The Agreement**.

*In Regional Props., Inc. v. Fin. & Real Estate Consulting Co.*, 678 F.2d 552 (5th Cir. 1982) two land developers sued for rescission under § 29(b) upon learning that the person they contracted as a broker for sales of partnership shares was not registered with the SEC.  *Id*. at 555-6.  After a two-day trial, the court found that the

person was indeed an unregistered broker and therefore could not perform the contract without violating §15(a).  Unlike the contract in this case, the broker-services contract in *Regional* was not itself a security, hence there could be no violation of §15(a) simply by entering into the contract.

## II.    FIRSTFIRE'S "DECADES OF CASELAW" ADDRESS SECTION 29(B) CLAIMS FOR BROKERAGE CONTRACT RESCISSION, BUT HAVE LITTLE BEARING ON THIS CASE.

Although FirstFire contends that "decades of caselaw" support the district court's holding in this case, most of the cases in FirstFire's string cites have almost no application to this case. For example, FirstFire cites several cases for the proposition that "only unlawful *contracts* may be rescinded, not unlawful *transactions* . . . ."  FF Br. 39, 41 (citing *Pompano-Windy City Partners, Ltd. v. Bear Stearns & Co.*, 794 F. Supp. 1265, 1288 (S.D.N.Y. 1992) and *Zerman v. Jacobs*, 510 F. Supp. 132 (S.D.N.Y. 1981).   The relevance of *Zerman* and *Pompano* to this case is unclear; both cases involved customers suing to their broker to rescind certain transactions that the broker effected, not the contract between the customer and the broker.  The courts rejected these claims, explaining that, under 29(b), "only unlawful contracts may be rescinded, not unlawful transactions made pursuant to lawful contracts." *Id*.  The distinction between a contract and a transaction at issue

22

in those cases are not relevant to this case at all; no one claiming that the Agreement DarkPulse seeks to rescind is not a *contract*.

## A. Prior to *Vystar* and *ExeLED*, most 29(b) Claims Based on § 15(a) Were for Rescission of Brokerage Contracts.

In the unregistered broker cases *Regional Properties*, unregistered the courts began to assess the violation simply by looking at the terms of the contract. If the contract required an unregistered broker to undertake actions that violated §15(a), the contract could not be performed without violating the Act and the court permitted rescission. *See Lawrence v. Richman Gr. of Conn., LLC*, 407 F. Supp. 2d 385 (D. Conn. 2005) *aff'd*, 199 F. App'x 55 (2d Cir. 2006) (contract paying unregistered broker to solicit investors violated §15(a) as a matter of law); On the other hand, if an unregistered broker *could* perform the contract without violating the Act, the rescission claim was rejected. *See Found. Ventures, LLC v. F2G, Ltd.*, 2010 U.S. Dist. LEXIS 81293 (S.D.N.Y. Aug. 11, 2010) (rejecting claim for rescission where finders contract did not require unregistered broker to engage in activity that would violate 15(a)).[12]

---

[12] *See also Frati v. Saltzstein*, 2011 U.S. Dist. LEXIS 25567, at *18 (S.D.N.Y. Mar. 14, 2011) (claim that unregistered broker induced plaintiff to enter subscription agreement, rejected because the agreement could be performed without violating the act and plaintiff lacked privity). *Antares Mgmt. LLC v. Galt Glob. Capital, Inc.*, No. 12-CV-6075(TPG), 2013 U.S. Dist. LEXIS 43545, at *24 (S.D.N.Y. Mar. 22, 2013)

**B.    A *Brokerage* Contract is Uniquely Suited to Show Nearly Every Element of a § 15(a) Violation.**

Although simply examining the terms of a contract would be inadequate in most circumstances, a brokerage contract itself frequently provides evidence of the § 15(a) violation.[13]   Where a brokerage contract by its terms compensates an unregistered broker to effect transactions in securities on behalf of another—the contract by *itself* establishes all the crucial elements of a 15(a) violation.  That is, the compensation required under the contract shows that the unregistered person is "engaged in the business" and if the contract requires that the broker (2) "effect transactions in securities" on (3) behalf of another, it evidences both the person's status as *a broker* as defined in §78c(a)(4) *and* that it must effect a transaction in securities.  Accordingly, the unregistered broker would violate §15(a) if it performed the contract.  *See, e.g., Lawrence*, 407 F. Supp. 2d 385; *Found. Ventures*, 2010 U.S. Dist. LEXIS 81293.

_____

(alleging oral contract to act as a "finder" actually required broker activity by unregistered broker).

[13] Broker: As defined in the Exchange Act, a 'broker' means "any person (1) engaged in the business (2) of effecting transactions in securities (3) for the account of others."  15 U.S.C. § 78c(a)(4)(A).  Accordingly, strong signals of broker status are "(1) that a person is acting for compensation; and (2) the person is acting on behalf of another." Am. Jur 2d. Brokers §1 1997.

**C.   "Broker Services" and "Act Like a Broker" is Shorthand for All the Activities Held to Violate Section 15(a), and Cannot Supplant the Language of the Statute.**

Many courts considering whether an unregistered broker's performance of the contract would violate §15(a) speak in terms of "whether the contract "on its face" requires the unregistered **broker** to perform "broker services." *See, e.g., Foundation Ventures,* LEXIS 81293 ("To find a contract unenforceable for illegality at the pleading stage, the question is whether the contract "on its face" requires the unregistered finder to perform "broker services."). The terms "broker services" and "act like a broker" are obviously not found in §15(a), but have been used in unregistered broker cases as shorthand for broad range of activities encompassed by the phrase "induce or attempt to induce the purchase or sale" of any security.[14]" § 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)). This has been held to include advertising for securities, assisting an issuer in structuring prospective securities transactions, or negotiating specific terms of a securities contract on behalf

---

[14] It shall be unlawful for any broker or dealer . . . to make use of the mails or any means or instrumentality of interstate commerce to effect  any transactions in, or to induce or attempt to induce the purchase or sale of, any security (other than an exempted security or commercial paper, bankers' acceptances, or commercial bills) unless such broker or dealer is registered in accordance with subsection (b) of this section.

§ 15(a)(1) (codified as 15 U.S.C. § 78o(a)(1)).

of another. *See Edgepoint Capital*, 6 F.4th 50, 59, n. 5 (listing cases). Obviously, this language cannot supplant the language provided in § 15(a), nor is it meant to. *There is no such thing as a "dealer services" contract equivalent to a broker services contract.*

**D.** ***Vystar*** **and** ***ExeLED*** **Applied the Brokerage Contract/Unregistered Broker Analysis to an Unregistered Dealer Effecting a Securities Contract.**

As described more fully in its opening brief, the Vystar and ExeLED cases were wrongly decided because the court was never informed that the Notes in those cases were securities, and that the purchase of the Note would effect a transaction in securities. It is also significant that these courts applied the analysis from unregistered brokers/brokerage contracts to claims alleging violations by an unregistered dealer entering into a contract that itself effected a transaction in securities.

**E.** **There Is No Such Thing as A "Dealer Services" Contract, and §15(a) Contains No "act Like a Dealer" Prohibition. Unregistered Dealer Violates §15(a) By Effecting a Transaction in Securities, Which FirstFire Did in this Case.**

As defined in the Exchange Act, a "dealer"

(A) . . . means any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise.

(B) Exception for person not engaged in the business of dealing. The term "dealer" does not include a person that buys or sells securities . . . for

26

such person's own account, either individually or in a fiduciary capacity, but not as a part of a regular business.

15 U.S.C.S. § 78c (a)(5).

Broadly speaking, there is no "dealer" equivalent to a brokerage contract: A dealer "is engaged in the business of buying and selling securities for its *own account*," and does not need the equivalent of a brokerage contract to do so. The contracts used by a dealer are contracts for the purchase or sale of a security. *See SEC v. Almagarby*, 479 F. Supp. 3d 1266, 1271-72 (S.D. Fla. 2020) (Section 15(a) makes it unlawful for, *inter alia*, for an unregistered dealer to purchase or sell securities. Section 3(a)(5)(A) of the Exchange Act defines dealer as "any person engaged in the business of buying and selling securities . . . for such person's own account through a broker or otherwise." Moreover, because of the trader exception, there is nothing about entry into a single contract, and nothing in the contract itself that would demonstrate that one party is a dealer, as opposed to a trader.

**F.  Unlike A Brokerage Contract, A Securities Purchase Contract Effects A Transaction in Securities, and Provides No Evidence of Dealer Status.**

*1.    Dealer Status Must be Determined by Extraneous Evidence About the Dealer's Business.*

As described by the Court of Appeals for the 11th Circuit:

To qualify as a "dealer," a person must be in the "business of" buying and selling securities. We think the centerpiece to this definition is the word "business," which is defined as "[a] commercial enterprise carried

27

> on *for profit*, a particular occupation or employment habitually engaged
> in for *livelihood* or *gain*" Black's Law Dictionary 239 (10th ed. 2009)
> (emphasis added). Central to this definition is *profit* or *gain*. While
> evidence of merely *some* profits from buying and selling securities may
> alone be inconclusive proof, the defendants' *entire* business model was
> predicated on the purchase and sale of securities.

*United States SEC v. Big Apple Consulting USA, Inc.*, 783 F.3d 786, 809-10 (11th Cir. 2015).

*Eastside Church of Christ v. Nat'l Plan, Inc.*, 391 F.2d 357 (5th Cir. 1968) is the most relevant example of rescission based on a dealer-registration violation. In that case, the Church sought to void the transaction under §29(b) on the ground that the contract was made in violation of the Exchange Act, arguing that, as an unregistered dealer, National was not permitted to purchase the security to begin with, and violated § 15(a) by doing so.

The Fifth Circuit agreed with the Church, concluding that National was a broker *and* a dealer. Notably, the court did not reach this conclusion by examining the bond-purchase contract, but conducted a two-day trial and relied on *testimonial evidence* from the owner of National about its "principal" business. Id. 391 F.2d at 361-62. In light of that finding, the Court then held:

> Under § 15(a) (1), National was prohibited from effecting the
> transactions here involved and *thus violated the Act by entering into
> those transactions*. Under the voiding provision of § 29(b), it is
> sufficient to show merely that the prohibited transactions occurred
> and that appellants were in the protected class.

Id. at 362 (emphasis added).

The same extra-contractual survey of evidence was necessary in *Couldock & Bohan, Inc. v. Societe Generale Sec. Corp.*, 93 F. Supp. 2d 220 (D. Conn. 2000).  In that case, a clearing agent, itself seeking to avoid violating Exchange Act, cancelled its contract with a customer whose buying and selling activity was of a nature and quantity that would render it a securities dealer.   When the customer sued on the contract, the clearing agent sought rescission under 29(b) for violations of 15(a).  After a thorough assessment of the customer's business operations, the court agreed that the customer met the definition of "dealer" and dismissed the case.

## III.   FIRSTFIRE'S UNWILLING INNOCENT PARTY ARGUMENTS ARE MERITLESS.

Finally, FirstFire contends that DarkPulse is not entitled to rescission because it is not "unwilling and innocent" for various reasons.   FF Br. at 47.   Even if the district court had addressed this argument it would fail.   The "unwilling and innocent" language comes from *Mills,* where the Supreme Court's reference to the "the "unwilling innocent" party obviously meant the *non-violating* party.   However, to the extent that Circuit allows the defense of *in pari delicto*, FirstFire's claim fails.

In order to assert the defense, it must be shown that the fault of the parties is "clearly mutual, simultaneous, and relatively equal" and that the plaintiff was an active, essential, and knowing participant in the unlawful activity.   *Palmer v.*

*Thomson & McKinnon Auchincloss, Inc.*, 474 F. Supp. 286, 289 (D. Conn. 1979).

FirstFire has provided no evidence that DarkPulse had any knowledge that FirstFire was operating as an unregistered dealer, let alone evidence that it actively participated or encouraged it to operate in an unlawful manner.

## CONCLUSION

For the reasons stated herein and in DarkPulse Opening Brief, Appellant DarkPulse respectfully requests that the Court decide in its favor on both issues.

Respectfully Submitted,
*/s/* Marjorie Santelli
Marjorie Santelli, Esq.
*/s/* Mark R. Basile
Mark R. Basile, Esq.
THE BASILE LAW FIRM P.C.
390 N. Broadway, Ste 140
Jericho, New York 11753
Tel. 516.455.1500
Fax. 631.498.04 78
*marjorie@thebasilelawfirm.com*
*mark@thebasilelawfirm.com*

30

## CERTIFICATE OF COMPLIANCE

This Reply Brief by Appellant DarkPulse, Inc., has been prepared in accordance with Fed. R. App. 32(a)(7)(B) and Local R. 32.1 using: Microsoft Word, Times New Roman, 14 Point Type, with a total word count of 6,885, exclusive of the Table of Contents, Table of Authorities, signature block, and Certificate of Compliance.